

Neutral Citation Number: [2023] EWHC 3114 (Comm)

Case Nos: **FL-2022-000018**
**FL-2022-000020**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**
**FINANCIAL LIST**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 5 December 2023

Before:

**THE HON MR JUSTICE MICHAEL GREEN**
- - - - - - - - - - - - - - - - - - - - -
**Between:**

**Wirral Council as administering authority of Merseyside Pension Fund (the Representative Claimant)**　　　**Representative Claimant**

**- and –**

**Indivior PLC**　　　**Defendant**

**And Between:**

**Wirral Council as administering authority of Merseyside Pension Fund (the Representative Claimant)**　　　**Representative Claimant**

**- and –**

**Reckitt Benckiser Group PLC**　　　**Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Graham Chapman KC, Alex Barden** and **Joseph Leech** (instructed by **Mishcon de Reya LLP**) for the **Representative Claimant**
**Conall Patton KC** (instructed by **Freshfields Bruckhaus Deringer LLP**) for **Indivior PLC**
**Helen Davies KC, Tony Singla KC** and **Jonathan Scott** (instructed by **Linklaters LLP**) for **Reckitt Benckiser Group PLC**

Hearing dates: 20 & 21 November 2023
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 10.30am on Tuesday 5 December 2023 by
circulation to the parties or their representatives by e-mail and by release to the National
Archives.

.............................

Approved Judgment

**Mr Justice Michael Green:**

### Introduction

1.     The Supreme Court in *Lloyd v Google LLC* [2022] AC 1217 ("***Lloyd v Google***") shone a light on the availability of representative proceedings under (what is now) CPR 19.8. This led the Representative Claimant in both these proceedings, Wirral Council as administering authority of Merseyside Pension Fund ("**Wirral**"), to begin "**Representative Proceedings**" against each Defendant, Reckitt Benckiser Group plc ("**Reckitt**") and Indivior plc ("**Indivior**" and collectively the "**Defendants**"), to pursue claims under ss.90 and 90A and Schedule 10A of the Financial Services and Markets Act 2000 ("**FSMA**"). The Defendants have issued applications to strike out the Representative Proceedings (or that Wirral may not act as a Representative Claimant, but this amounts to the same thing) on the basis that the Representative Proceedings are not the appropriate procedure for these claims under FSMA. The Defendants say that the claims should be brought in the usual way by ordinary multi-party proceedings with each purportedly represented person being a claimant.

2.     This is the first time that this has been attempted for securities claims under ss.90, 90A and Schedule 10A FSMA. There have been a number of such claims brought by way of ordinary CPR Part 7 proceedings in recent years and these have been actively case-managed by Judges sitting in the Financial List, in a largely consistent way. In fact multi-party claim forms have been issued against both Defendants by many of the investors who have opted-in to the Representative Proceedings alleging the same causes of action under FSMA ("**the Multi-party Proceedings**"). Those proceedings have been stayed pending resolution of these applications.

3.     There is no dispute that the applications are to be resolved by the exercise of a discretion so as to give effect to the overriding objective. The Defendants' main point is that if the Representative Proceedings are allowed to continue they would prevent the Court from case-managing the proceedings in the manner it has done in other similar cases and will allow Wirral, the Representative Claimant, to dictate the structure of the proceedings, in particular as to what issues are to be tried at the bifurcated first stage trial and whether there should be some preparation for the next stage in the process before that first trial. Wirral says that it is entitled to issue such claims and that *Lloyd v Google* effectively endorses such an approach. Unless the Defendants can show some fundamental flaw in the route it has decided to follow, Wirral maintains that the Court should not strike out the claims.

4.     Ms Helen Davies KC, leading Mr Tony Singla KC and Mr Jonathan Scott, appeared for Reckitt and made the bulk of the submissions on behalf of the Defendants. Mr Conall Patton KC appeared for Indivior and largely adopted Ms Davies KC's submissions. Mr Graham Chapman KC, leading Mr Alex Barden and Mr Joseph Leech appeared for Wirral. I am grateful to them and their teams for their clear and helpful submissions.

### Background

5.     It is unnecessary to explain in great detail the factual basis for the claims. They are founded on the allegation that there was a "**Scheme**" in which the Defendants participated, through a US subsidiary called Reckitt Benckiser Pharmaceuticals, Inc, ("**RBP**") in relation to the marketing of a drug under the brand name "**Suboxone**" for

the treatment of opioid addiction. In 2002, the US Food and Drug Administration approved an application by RBP for the sale of Suboxone in tablet form and it was granted a 7-year period of orphan drug exclusivity.

6.    The Scheme is said to have taken place between 2006 and 2013 when the Defendants carried out a plan to switch the market for Suboxone from the tablet form to a sublingual film version. This is alleged to have been done because the tablet form was losing its protection, allowing in generic competition, whereas it was hoped that the sublingual film version would have an added period of protection. The Scheme was effected by making allegedly fraudulent claims that the film version was safer for children when the Defendants knew that it was potentially more dangerous. The Scheme did have the effect that competition from generic manufacturers of Suboxone tablets was thwarted, despite their tablets being cheaper and probably safer for children (although neither Particulars of Claim contain any allegation to this effect).

7.    On 9 April 2019, the US Department of Justice publicised details of a federal indictment brought against RBP (then known as Indivior Inc) and Indivior. (Indivior had demerged from Reckitt in December 2014.) Wirral says that this revealed details of the Scheme. There were also related Federal Trade Commission lawsuits. In or around July 2019 (in the case of Reckitt) and July 2020 (in the case of Indivior), settlements were reached by the Defendants with the US authorities whereby Indivior agreed to pay US$600m and Reckitt US$1.4bn in settlement of their liabilities. A US subsidiary of Indivior, Indivior Solutions, Inc, and Indivior's former CEO and medical director all pleaded guilty to certain criminal charges brought against them in relation to the Scheme.

8.    The Defendants will apparently deny that they engaged in the Scheme. They will say that the settlements were entered into without any admission of liability. They have not yet put in a Defence to the claims because of these applications.

**The claims brought against the Defendants**

9.    The Representative Proceedings were issued on 21 September 2022. On the same day and the day after, there were three Claim Forms issued against the Defendants (two against Reckitt and one against Indivior) on behalf of a large number of Claimants in the Multi-party Proceedings. Those Claims Forms have not been formally served and, as stated above, they have been stayed by consent pending resolution of these applications. The Claimants have however provided (not by way of service) draft Particulars of Claim in the Multi-party Proceedings.

10.   Under s.90A and Schedule 10A FSMA issuers of securities are potentially liable to investors who have suffered loss as a result of misleading statements or dishonest omissions in certain "*published information*" relating to the securities or a dishonest delay in publishing such information. Wirral's case is that the facts and potential consequences of the Scheme were information that the Defendants were required to disclose in published information (and in a prospectus issued by Indivior which is also subject to a claim under s.90 FSMA) and the Defendants knew that disclosure of the information would cause huge damage to their market capitalisation, as happened on the day the US indictment became public.

11.   It is a condition of liability under s.90A and Schedule 10A FSMA that a person discharging managerial responsibility (a "**PDMR**") within the issuer knew the

published information contained an untrue or misleading statement or was reckless as to the same. In relation to omissions from the published information, a PDMR within the issuer has to have known that this was a dishonest concealment of a material fact. A PDMR means essentially a director of the issuer, including an alleged *de facto* director – see *Allianz Global Investors GmbH & Ors v G4S Ltd* [2022] EWHC 1081 (Ch). It is clear that a case under s.90A and Schedule 10A FSMA requires the dishonesty of a PDMR to be proved.

12.    Further, the effect of paras 3(1) and 3(4) of Schedule 10A FSMA is that an issuer is only liable to pay compensation to a person who acquires, continues to hold or disposes of the securities in reasonable reliance on published information to which Schedule 10A applies and suffers loss in respect of the securities as a result of any untrue or misleading statements in that published information or the omission from that published information of any matter required to be included in it.

13.    By the Representative Proceedings, Wirral seeks to try what it calls the "*common issues*", which are those related to the Defendants and which are not dependent on any issue that is particular to any individual investor. Therefore issues such as an investor's standing to sue, reliance, causation and quantum are not common or defendant-side issues and are not therefore part of the Representative Proceedings. This can be seen from the declarations that Wirral seeks as set out in the Reckitt Claim Form that:

"(a)    The Defendant's published information between 2006 and the present (i) omitted information which it was required to include, including a full and fair description of the Scheme, and/or (ii) contained statements that were untrue or misleading in light of the Scheme and/or (iii) delayed in the publication of a full and fair description of the Scheme.

(b)    One or more persons discharging managerial responsibilities within the Defendant (i) knew such omissions to be a dishonest concealment of a material fact, and/or (ii) knew or was reckless as to whether such statements were untrue or misleading, and/or (iii) acted dishonestly in delaying publication of the information."

14.    The Claim Form goes on to make clear that the claims for declarations are made by Wirral in a representative capacity under CPR 19.6 (which this year became CPR 19.8) on behalf of a "*group or groups of persons with the same interest*" that is those who held, acquired or disposed of interests in securities of the Defendant between 2006 and the present date. These have been described as "*opt-in*" Representative Proceedings because not only do the represented persons have to have standing to bring their own claims but they also will have had to sign up to a Costs Sharing and Governance Agreement and have had their identities made known by Wirral's solicitors to the Defendants' solicitors. Wirral proposes that a cut-off date for signing up be set by the Court for some time in 2025. So these are not "*opt-out*" proceedings in which all investors in the Defendants' securities are to be represented. Rather it is limited to those who have been identified and agreed to the costs sharing and governance arrangements that have been put in place.

15.     The draft Particulars of Claim in the Multi-party Proceedings are materially identical to the Representative Proceedings in the way that they deal with the defendant-side issues. However, they are brought on behalf of numerous institutional investors who are listed in schedules to the respective Claim Forms – a total of 286 in the Reckitt Claim Forms and 153 in the Indivior Claim Form. The draft Particulars of Claim also plead the Claimants' reliance on the published information and the alleged untrue or misleading statements or omissions contained therein. And they seek damages rather than the declarations sought in the Representative Proceedings. The pleas of reliance were much criticised by the Defendants who say that they do not work in law.

16.     It is a striking feature of these applications that all the institutional investors who are Claimants in the Multi-party Proceedings are also signed up to the Representative Proceedings (save for a small number who subsequently withdrew) and would prefer, for the perhaps obvious reasons I will come on to, that those proceedings be allowed to continue. They are joined in the Representative Proceedings by a present total of 302 retail investors (although, because of duplication, there are some 233 different retail investors across both claims) who have signed up and been accepted and agreed to the funding arrangements in place for the Representative Proceedings. Mr Chapman KC told me that the retail investors are not parties to the Multi-party Proceedings because the litigation funders are not prepared to allow them to join the Multi-party Proceedings. The reasons for this are unclear but it is prayed in aid of Mr Chapman KC's argument that such retail investors would otherwise be denied access to justice if the Representative Proceedings are not allowed to go ahead. Mr Chapman KC also suggested that the number of retail investors joining the Representative Proceedings is likely to increase if Wirral succeeds in its opposition to these applications.

17.     The distinct advantage of the Representative Proceedings from Wirral's and the Multi-party Proceedings Claimants' point of view is that there will be no front-loading of costs on claimant-side matters, such as standing and reliance. All the burden will be on the Defendants to deal with the common issues and defend the relief sought in the Representative Proceedings, namely the two declarations set out above. The Defendants say simply that it should be for the Court to decide how to case manage the proceedings and what should be done and when, taking into account both sides' positions and more generally the administration of justice and the overriding objective.

18.     Therefore I think it is helpful first to look at how these sorts of securities claims have to date been managed by the Court; and then consider whether it is appropriate to proceed in the way Wirral has done, by reference to *Lloyd v Google*.

**The management of securities claims**

19.     There have not been many securities claims under s.90A and Schedule 10A FSMA since its introduction in 2010. Mr Chapman KC would put that down to the disinclination of investors to litigate in the UK requiring a heavy front-loading of costs. Furthermore, none of the s.90A and Schedule 10A FSMA claims have actually reached a trial, even of a first stage issue. Some have settled and others are progressing towards a trial.

20.     Like any other forms of civil litigation, securities claims must be case managed and tried in accordance with the overriding objective, in particular so that the Court can deal with cases justly and at proportionate cost. The Court's duty of active case management

Approved Judgment

specifically includes, by CPR 1.4(2), "*deciding the order in which issues are to be resolved*", "*helping the parties to settle the whole or part of the case*", "*fixing timetables or otherwise controlling the progress of the case*" and "*dealing with as many aspects of the case as it can on the same occasion*".

21.    Case management issues that commonly arise for determination in securities claims include whether there should be a split trial and, if so, what split; and, if there is a split trial, whether and to what extent progress should nevertheless be made on the deferred issues in the meantime, e.g. by requiring the provision of further information, disclosure or witness evidence. The Court weighs the different options by reference to the particular circumstances of the case and after there has been a debate between the parties and the Court at a CMC, normally after the close of pleadings. Critically it is down to the Court to decide for itself what the appropriate case management should be for the case before it.

22.    In *Manning & Napier v Tesco plc* [2017] EWHC 3296 (Ch) ("*Tesco*"), Hildyard J was concerned about the lack of particularisation in the Claimants' plea of reliance. At [29], Hildyard J said as follows (underlining added):

> "I am satisfied in this case that, on a matter which is absolutely central to the statutory form of action, that is to say, the issue of reliance, the court should be properly astute to ensure that sufficient particularity is supplied. That is both in order to ensure that the defendant knows precisely what is alleged, or sufficiently precisely what is alleged, and also to focus the mind of each of the individual claimants, who have brought very serious allegations, as to precisely the basis on which individually they have proceeded. Joinder of claimants to Group actions, whether or not subject to a GLO, should not be a matter of subscription but of orderly and careful assessment in respect of each claimant that the statutory requirements to establish liability are appreciated and satisfied. I would note parenthetically, without in any way suggesting that this applies in the particular case, that there is a danger in the case of group actions that people do subscribe to the action in the expectation, or at least hope, of settlement, without at that stage giving sufficient focus to the need for its case to be tested with the same degree of particularity as would be the case if they were fewer in number."

Hildyard J's concerns about inadequate assessment of individual claims at the outset and joinder as "*a matter of subscription*" could be a description of what the Representative Proceedings in this case seek to achieve.

23.    In *Allianz Global Investors GmbH & Ors v RSA Insurance Group plc* [2021] EWHC 570 (Ch), Miles J initially ordered a split trial with the issue of reliance to be determined in the first trial. He noted at [52] that "*more rather than fewer issues should be tried at the first trial*" which, he thought, would make a settlement of the remaining issues more likely. At [55] he said that "*the claimants have chosen to bring this case late in the limitation period and the more time that passes the more difficult it will be for the parties and the court to determine what happened on a true factual basis*". At [56], Miles J emphasised that "*[t]he claimants have brought this claim and must be ready to take part in it fully*", and at [64] he said this (underlining added):

"The next point concerns the allocation of the litigation burden as between the parties. The defendants are entitled to examine and scrutinise the claimants' case, just as the claimant is entitled to examine the defendant's conduct. The claimants' proposal would effectively mean postponing their burden until a later stage, while placing almost all the work on the defendant. Sometimes, by its nature, litigation is lopsided in that way: the claimant has no evidence to give and the case entirely concerns the conduct of a defendant. But, here, the imbalance would be created by the proposed order splitting the trial. It seems to me that the claimants, having brought the action, should be prepared to undertake substantial work in ensuring the expeditious progress of the proceedings to resolution."

24.    Subsequently (in a Ruling dated 28 February 2022), Miles J revisited the split of issues, ordering that reliance should be determined at the second trial rather than the first. However, he also ordered (in the face of opposition from the claimants) that a sample of claimants should give disclosure in relation to reliance in advance of the first trial. He made that order for several reasons, including that the disclosure could be *"helpful for the purposes of settlement"*, that it would mitigate the risk posed by witnesses' memories fading, that it would lead to a more appropriate allocation of the litigation burden, and that such disclosure would mean that *"the parties and the court would not be starting from a standing start in the event that the claimants succeed"* at the first trial.

25.    In *Various Claimants v G4S Limited* [2022] EWHC 1742 (Ch), Falk J, as she then was, ordered a split trial, but ordered the claimants to take several material steps in relation to issues to be the subject of the second trial in advance of the first trial, including:

(a)    a process of claimant sampling on the issue of reliance, which she anticipated would be followed by disclosure from sample claimants (with the scope of that disclosure to be determined at a further CMC before the first trial).

(b)    all claimants were ordered to "*clarify their individual cases about what individuals relied on, when, and on what statements, and to disclose or provide details of any specific meetings or communications on which they rely*". Falk J anticipated that this information would be used in the sampling exercise and would assist the defendant in understanding the reliance case, which would "*promote the potential for settlement*".

(c)    Falk J also anticipated, subject to discussion at a further CMC, that the sample claimants (and possibly others) would provide witness statements in advance of trial 1, at least as regards any case on reliance by particular individuals on particular statements or documents.

26.    In the course of her judgment Falk J emphasised that "*some progression of the claimants' case is needed, in my view, to ensure that settlement discussions can best be facilitated*", that there was "*a point about ensuring proper engagement by the claimant*", and that by ordering the claimants to progress matters that are the subject of the second trial in advance of the first trial she hoped "*to reduce, so far as possible, the gap between trials, ensure, as already indicated, that matters relevant to defendant disclosure are brought out, and try to ensure an appropriate balance and fairness in the burden between the parties*": [43] – [44]. Falk J made similar orders in the related case of *Various Claimants v Serco Group plc* [2022] EWHC 2052 (Ch).

**Approved Judgment**

27.     I have also had occasion to hear argument on these matters of case management in *Various Claimants v Standard Chartered* [2023] EWHC 2756, but I deferred the issue of split trial to a later CMC. The point is that these are very much live issues before the Court upon which a decision has to be made to suit the particular circumstances of that case.

28.     The Representative Proceedings however predetermine those issues of split trial and other matters of case management in the Claimants' favour without being put before the Court. Whether that is appropriate or not needs to be determined by reference to the scope of CPR 19.8 and *Lloyd v Google*.

### CPR 19.8 and *Lloyd v Google*

29.     CPR 19.8 has been in the same or similar terms for many years. It relevantly provides as follows:

> "(1)   Where more than one person has the same interest in a claim –
>
> (a) the claim may be begun; or
>
> (b) the court may order that the claim be continued,
>
> by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.
>
> (2)       The court may direct that a person may not act as a representative.
>
> (3)   Any party may apply to the court for an order under paragraph (2).
>
> (4)   Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule –
> (a)    is binding on all persons represented in the claim; but
>     (b)    may only be enforced by or against a person who is not a party to the claim with the permission of the court.
> (5)   This rule does not apply to a claim to which rule 19.9 applies."

30.     CPR 19.9 provides for representation orders to be made by the Court in certain specified claims, namely those concerned with the estates of deceased persons, property subject to a trust or the meaning of a document including a statute. This is particularly aimed at representation of persons who cannot be ascertained or who are unborn, which situation normally arises in those contexts. In those cases, an order is required from the Court and there is no automatic right to begin such proceedings as under CPR 19.8. Nevertheless, as Ms Davies KC submitted, the Court will, in the exercise of its discretion, still apply the overriding objective.

31.     Mr Chapman KC placed great emphasis on the fact that, so long as the "*same interest*" threshold requirement is met, Wirral is entitled "*as of right*" to bring the Representative Proceedings. It is correct to say that, because it is accepted that the "*same interest*" threshold requirement is satisfied, Wirral was entitled under CPR 19.8(1)(a) to commence the Representative Proceedings. But that has no bearing on the question as to whether the Court's discretion, which arises on an application under CPR 19.8(2)

Approved Judgment

and (3), should be exercised in favour of allowing the proceedings to continue. As Ms Davies KC submitted, the Defendants did have to issue such an application in order to bring the matter before the Court, but once it is there, the Court has to exercise its discretion as described by Lord Leggatt in [75] of *Lloyd v Google*, which I will come on to. In other words, as this is the same discretion as would arise under CPR 19.8(1)(b), or indeed CPR 19.9, no presumption arises in favour of the Representative Proceedings by reason of their having been started "*as of right*" under CPR 19.8(1)(a).

32.    There is no doubt that Lord Leggatt's extensive consideration of the history and availability of the representative action in *Lloyd v Google*, albeit all *obiter*, suggests that a bifurcated process can be appropriate for such an action. Mr Chapman KC submitted that the use of the Representative Proceedings in this case, with effective bifurcation of the issues so that claimant-side issues are deferred to what he called "*follow-on*" claims, has been effectively endorsed by the Supreme Court in *Lloyd v Google*. As he rightly said, the Supreme Court were unanimous, Lord Reed PSC, Lady Arden, Lord Sales and Lord Burrows JJSC agreeing with Lord Leggatt's judgment.

33.    But it is important to note at the outset, that in *Lloyd v Google*, the claimant, Mr Lloyd, was <u>not</u> seeking bifurcation, because his proceedings were unworkable and unviable unless all issues, including damages, could be resolved at the trial of the representative action. The Supreme Court however held that, because there would need to be an individual assessment of damages for every represented person, the representative action could not resolve those issues without some form of bifurcation. It is Lord Leggatt's explanation as to how bifurcated representative proceedings are possible that Mr Chapman KC most relies on from the case. It is necessary however to understand how Lord Leggatt got to that position.

34.    Mr Lloyd was claiming, with financial backing, as a representative of the class of Apple iPhone users in England and Wales at the material time. That class was estimated to be in excess of four million people and it was proposed on an "*opt-out*" basis. The claim on behalf of that class was against Google which was said to have breached the Data Protection Act 1998 in secretly tracking the internet activity of Apple iPhone users and using the data for commercial purposes without the users' knowledge or consent. As Lord Leggatt said in [3] class actions are readily available in the United States, Canada and Australia, but in the UK the only sector in which a statutory regime has been established is for competition claims. So Mr Lloyd sought to use the representative procedure under CPR 19.8. The issue arose not on an application under CPR 19.8(2) but in the context of considering an application for permission to serve the proceedings out of the jurisdiction.

35.    In [24] to [32], Lord Leggatt explained the other forms of collective actions: group actions which have the disadvantage that they have to be "*opt-in*" (although this is an "*opt-in*" case); and collective proceedings, which can be either "*opt-in*" or "*opt-out*", but are presently limited to competition claims and which have a carefully calibrated regime that allows for an "*aggregate award of damages*".

36.    Lord Leggatt then embarked on a detailed historical survey of representative actions under what is now CPR 19.8, but which has been available for "*several hundred years*" – [33] to [66]. He explained that the origins of the rule were as a solution to the "*complete joinder rule*" whereby all persons materially interested in the subject-matter of the suit had to be parties to it. He also showed how whenever the Courts attempted

**Approved Judgment**

to narrow the rule, this tended to be corrected by later appellate decisions that emphasised its broad nature – see, for example, *Duke of Bedford v Ellis* [1901] AC 1.

37.    Lord Leggatt, importantly for this case, referred to *Prudential Assurance Co Ltd v Newman Industries Ltd* [1981] Ch 229 ("*Prudential*") which he described as an example of a bifurcated process being used in a representative action. At [48], Lord Leggatt said of *Prudential* as follows:

> "This decision was important in demonstrating the potential for a bifurcated process whereby issues common to the claims of a class of persons may be decided in a representative action which, if successful, can then form a basis for individual claims for redress. More generally, the *Prudential* case marked a welcome revival of the spirit of flexibility which characterised the old case law."

*Prudential* was also relied on in [58] and [81] of Lord Leggatt's judgment and he clearly regarded it as an important decision, albeit that it was overturned by the Court of Appeal on the substantive point as to whether the shareholders had a personal cause of action against the directors. I will deal with *Prudential* in more detail below.

38.    In [49] to [55], Lord Leggatt went on to consider whether the fact that damages were being claimed which were necessarily personal to the members of the represented class was a bar to the use of the representative action. He concluded that it was not. And he explained that *Emerald Supplies Ltd v British Airways plc* [2011] Ch 345 did not decide that a representative action could not be brought if damage is an ingredient of the cause of action. Rather he suggested that the difficulties that the Court of Appeal identified in the representative action could have been solved by either adjusting the class or by adopting the *Prudential* form of bifurcation.

39.    Lord Leggatt placed some reliance on Commonwealth authorities and some academic articles. Mr Chapman KC highlighted a quote from an Australian case in [60] in which it was said that: "*the simplicity of the rule is also one of its strengths, allowing it to be treated as a flexible rule of convenience in the administration of justice and applied 'to the exigencies of modern life as occasion requires'...The court retains the power to reshape proceedings at a later stage if they become impossibly complex or the defendant is prejudiced*". Furthermore, Mr Chapman KC submitted that I should have regard to the evidence Wirral has adduced in relation to the experience of Commonwealth jurisdictions in dealing with securities claims, in the same way that Lord Leggatt did.

40.    The heart of Lord Leggatt's judgment on the availability of the representative procedure is contained within [67] to [84]. It should not be forgotten that the only way that Mr Lloyd could bring his claim on behalf of over four million Apple iPhone users was by way of representative action. If that were not available, then there would be no claim. It was the representative action or nothing. As Lord Leggatt said in [67]: "*it is better to go as far as possible towards justice than to deny it altogether and that, if you cannot realistically make everyone interested a party, you should ensure that those who are parties will "fairly and honestly try the right"*". So as he makes clear in [68], the Court should strive to allow such a claim to be brought with a broad interpretation of the rule. In particular, as he explains in [69] to [74] the "*same interest*" threshold requirement should be interpreted purposively in the light of the overriding objective and the rationale for the rule.

Approved Judgment

41. All parties rely on [75] which summarises the Court's discretion. It says as follows:

> "(ii) The court's discretion
>
> 75    Where the same interest requirement is satisfied, the court has a discretion whether to allow a claim to proceed as a representative action. As with any power given to it by the Civil Procedure Rules, the court must in exercising its discretion seek to give effect to the overriding objective of dealing with cases justly and at proportionate cost: see CPR rule 1.2(a). Many of the considerations specifically included in that objective (see CPR rule 1.1(2)) - such as ensuring that the parties are on an equal footing, saving expense, dealing with the case in ways which are proportionate to the amount of money involved, ensuring that the case is dealt with expeditiously and fairly, and allotting to it an appropriate share of the court's resources while taking into account the need to allot resources to other cases - are likely to militate in favour of allowing a claim, where practicable, to be continued as a representative action rather than leaving members of the class to pursue claims individually."

42. Ms Davies KC submitted that Lord Leggatt was there confirming that once the matter is before the Court the discretion has to be exercised so as to give effect to the overriding objective. She said that Lord Leggatt does not say that where the representative proceedings have been started as of right because the "*same interest*" threshold has been passed there is any presumption in favour of allowing them to continue. Rather Lord Leggatt dealt with it in a quite general way without regard to how the matter had come before the Court. While Mr Chapman KC did not expressly disagree with that, he did refer to Lord Leggatt saying that the overriding objective factors "*are likely to militate in favour of allowing a claim, where practicable, to continue*". It seems to me that Lord Leggatt was simply making clear that the Court needs to exercise its discretion so as to further the overriding objective and that has to be done by reference to the particular circumstances pertaining to the case before it.

43. Lord Leggatt considered four further aspects of representative actions: (i) no requirement for the consent of each member of the represented class (ie it can be "*opt-out*"); (ii) the definition of the class; (iii) the liability for costs; and (iv) "*the scope for claiming damages*". The latter section is contained in [80] to [83] and includes the paragraph most relied on by Mr Chapman KC. It is important to recognise that, as explained in [80] and in the section's title, Lord Leggatt was dealing with the fact that representative actions can be used even where the represented persons have their own separate cause of action and claim for damages. Lord Leggatt concluded that the assessment of individual claims to damages can be left to another stage by use of a bifurcated process.

44. He explained this in [81] as follows (underlining added):

> "In cases where damages would require individual assessment, there <u>may</u> nevertheless be advantages in terms of justice and efficiency in adopting a bifurcated process - as was done, for example, in the *Prudential* case [1981] Ch 229 - whereby common issues of law or fact are decided through a representative claim, leaving any issues which require individual determination - <u>whether they relate to liability or the amount of damages</u> - to be dealt with at a subsequent stage of the proceedings."

**Approved Judgment**

The paragraph then continued to deal with limitation and [82] and [83] explained the difficulties of dealing with individual damages claims in a representative action.

45.   As one can see, in proposing the bifurcated process, Lord Leggatt referred again to *Prudential*, but he expressly limited his comment to cases "*where damages would require individual assessment*". He also said that there "*may*" be advantages, not that there always will be. Having said that, he did go on to suggest that not only damages issues but also issues related to liability could be dealt with at another stage. That seems a little inconsistent to the opening words and with the fact that the section was only seemingly dealing with damages. The point is relevant to this case because it is not only damages issues that Wirral wants to avoid at the trial of the Representative Proceedings, but also issues related to standing, reliance, causation and limitation.

46.   Furthermore, as Mr Chapman KC fairly accepted, there is no development in Lord Leggatt's judgment as to the nature of the bifurcation process and how the second stage of the proceedings would work. Nor is there any reference to the case management issues that might arise as a result of bifurcation, in particular whether such a representative action might deprive the Court of its ability to case manage the claims from start to end. In this case, Wirral has been very reticent about how the follow-on claims would work – whether they would be fresh claims, or part of the Representative Proceedings or the Multi-party Proceedings – and it was only in his oral submissions that Mr Chapman KC offered some possible options for that second stage. It seems to me important that both the parties and the Court are clear as to exactly how the process will work through to a conclusion so as to be able to judge whether that is an appropriate course to take.

47.   Lord Leggatt did not need to deal with these matters because they were not before the Supreme Court. While he thought that the representative claim could have been brought with bifurcation of the individual damages claims (see [84]), Mr Lloyd did not want that because a bifurcated process would not be practical and it would not have funding because there would be no financial return at the end of the representative stage of the process (see [85]). In the circumstances, bifurcation was not in issue in the case, and Lord Leggatt's suggestions as to possible bifurcation in other cases really were *obiter*. Nevertheless they come from the highest authority and are due the utmost respect. There is no doubt that Lord Leggatt wanted to see more use made of the representative action, in the absence of class action rules, and for it to be a flexible method of getting such cases before the Courts.

48.   But one does have to be careful about the consequences. One can perfectly understand that the Court should try to ensure that there is appropriate access to justice for those who would not be able to bring claims save by way of representative action. But where there are perfectly feasible non-representative proceedings, the Court should be able to weigh whether those are preferable to representative proceedings both from the parties' and the Court's point of view. I do not think that Lord Leggatt would have been contemplating the use of representative proceedings that would effectively deprive the Court of being able to decide which is the best way to case manage such cases based on their own particular circumstances.

49.   I also think that some caution needs to be exercised over undue reliance on *Prudential* as a justification for bifurcation in this case. *Prudential* was a very unusual case where the issue as to representation by the plaintiff of all other shareholders in their personal

actions against the directors for damages in respect of a misleading circular and conspiracy only arose at the beginning of the trial. Vinelott J was, in any event, going to try the underlying factual issues both in the context of the plaintiff's own personal action and in the derivative proceedings. So by allowing the plaintiff to bring the claim also in a representative capacity this did not cause any disruption to the trial or require any particular element of case management.

50.    It is true to say that Vinelott J adopted a bifurcated process in allowing declarations to be made as to liability but with individual shareholders having to establish their damages claims "*in a separate action*". At p.256F, Vinelott J said as follows:

> "The practical effect of such a declaration would, it seems to me, be no greater and no less than the effect of declarations, first, that the circular was tricky and misleading; secondly, that the individual defendants conspired to procure its circulation in order to procure the passing of the relevant resolution; and thirdly, that in so doing they conspired either to injure the plaintiff and the other shareholders at that date or to commit an unlawful act, or to induce a breach by the first defendant company of its contractual duty to the shareholders…The members of the class who share a common interest in obtaining the declarations I have outlined are shareholders other than the second and fourth defendants as at July 29. A person coming within that class will be entitled to rely on the declarations as res judicata, but will still have to establish damage in a separate action".

The nature of such a separate action was not described and it never reached that stage because the Court of Appeal overturned the declarations on the personal action as being misconceived. But it was clearly limited to damages issues.

51.    While *Prudential* was influential in Lord Leggatt's survey of representative actions and the possible use of a bifurcated process and even though there are parallels with the present causes of action under s.90A and Schedule 10A, albeit that these are against the issuing company not its directors, it does not really help on the question of case management and in particular when a decision has to be made at the outset of proceedings, rather than at the trial itself.

52.    There have been two reported first instance decisions subsequent to *Lloyd v Google*: (i) *Commission Recovery Ltd v Marks & Clerk LLP* [2023] EWHC 398 (Comm) a decision of Robin Knowles J ("*Commission Recovery*"); and (ii) *Prismall v Google UK Ltd and ors* [2023] EWHC 1169, a decision of Heather Williams J ("*Prismall*"). Both are under appeal and I understand that the appeal in *Commission Recovery* was heard by the Court of Appeal at the same time as this hearing.

53.    In *Commission Recovery*, Robin Knowles J refused to strike out a representative claim brought on behalf of clients of patent attorneys in respect of undisclosed commissions for referrals to a service provider. The issue was largely concerned with the "*same interest*" requirement and class composition which is not of relevance to the present cases. Robin Knowles J did deal with discretion and referred to the importance of the overriding objective, in the context of each case's own facts and circumstances (see [79] and [80]). It also seemed to be the case that a representative action was the only way the claims in respect of the secret commissions could be brought, as Robin Knowles J said at [81]: "*If the choice is this or nothing, then better this*". In that sense

<u>Approved Judgment</u>

it was the same as *Lloyd v Google*, in that the only way the case could proceed was by way of representative action.

54.    Mr Chapman KC repeatedly referred to Robin Knowles J's statement that "*we are still perhaps in the foothills of the modern, flexible use of CPR 19.6*" at [91]. That is clearly right but it still should only be considered on a principled basis by reference to the particular circumstances of the case. *Commission Recovery* does not deal with bifurcation or the case management consequences if there were any such bifurcation, including how the follow-on claims would be managed and tried.

55.    In *Prismall*, Heather Williams J struck out the representative action being brought purportedly on behalf of some 1.6m persons for the tort of misuse of private information, namely their medical records. This was similar to *Lloyd v Google* in that the representative claimant was seeking to argue that the Court could award "*lowest common denominator*" damages, which avoided any issue about the individual assessment of damages by members of the represented class. Heather Williams J rejected that notion and hence the claim could not proceed. Again there is no discussion of bifurcation as that was not being sought.

56.    Returning to *Lloyd v Google*, it seems to me that the Supreme Court was advocating for greater use of the representative action, principally where it would provide access to justice that would not otherwise be available to that class of claimants. Lord Leggatt dealt in passing with bifurcation as a potential way round the problem that individual claims to damages could not be tried in the representative action. He did not however explain how bifurcation would work in any particular case and made it clear that the Court should decide each case by reference to the overriding objective. Importantly I do not think that he was suggesting that claimants should be able to bring representative actions in order to bifurcate and thereby avoid what they would otherwise be required to do if they had brought ordinary multi-party claims. Bifurcation is a solution to a particular problem with representative actions; but it is not the purpose of representative actions. Yet bifurcation is the sole purpose and stated advantage, put forward by Wirral, of these Representative Proceedings.

**The Applications**

57.    The applications have been brought principally under CPR 19.8(2) and (3), as Ms Davies KC made clear in her oral submissions. As explained above, such an application brings into play the Court's discretion to decide whether it is appropriate for the Representative Proceedings to continue by reference to the overriding objective. It is accepted that if the Court decided under CPR 19.8(2) that Wirral should not act as a Representative Claimant, then the Representative Proceedings would be struck out.

58.    Both application notices also sought to strike out the Claim Forms under CPR 3.4(2). This must have been CPR 3.4(2)(b) which is on the grounds of abuse of the Court's process or that "*it is likely to obstruct the just disposal of the proceedings.*" Ms Davies KC said that this was only included as "*belt and braces*" and that the real question for the Court is the exercise of its discretion under CPR 19.8(2). Mr Chapman KC sought to make something of the Defendants' reliance on CPR 3.4(2) by suggesting that they had a very high hurdle to get over in establishing that, in issuing the Claim Forms "*as of right*", Wirral was in some way acting to abuse the Court's process.

Approved Judgment                                           Wirral Council v Reckitt Benckiser Group plc and Indivior plc

59.    Nothing turns on this point and I will proceed to consider the applications on the basis that I am exercising a discretion so as to give effect to the overriding objective.

**The exercise of discretion in these cases**

Wirral's arguments in favour of the Representative Proceedings

60.    Wirral's main overarching point is that it does not need to justify the bringing of the Representative Proceedings because it is doing what it is entitled to do under CPR 19.8(1) and that these are entirely the sorts of cases envisaged by Lord Leggatt in *Lloyd v Google* as being appropriate to be brought in this way. Mr Chapman KC did condescend to the particular advantages of the Representative Proceedings, being principally that they would be less risky, costly and burdensome for the represented persons, and would provide access to justice for retail investors who would not otherwise be able to bring such claims in their own names.

61.    These benefits arise as a result of the bifurcation inherent in the Representative Proceedings, in which there will only be declarations on the common defendant-side issues. That means that there will be no front-loading of costs on the part of the represented persons. Mr Chapman KC was quite open about this, that it would mean that the represented persons will get the benefit of the findings on the common issues without having been required to plead their case, provide disclosure or other evidence and without being at risk of being a selected test claimant who might have to provide evidence of reliance before the trial of the Representative Proceedings. Furthermore, it means that an investor would be able to defer any decision on whether to bring their claim until after the declarations have been made or if the declarations are not made, they would save the time and expense of bringing their own claim. Mr Chapman KC also suggested that this process would be more likely to lead to a settlement of these cases, although it is not clear what the evidence for that was.

62.    In relation to the institutional investors, Wirral's case is that there are legitimate advantages of the Representative Proceedings in terms of efficiency and access to justice. It perhaps goes without saying that institutional investors would prefer to minimise their risks, costs and expenditure of resources and wait and see if the Representative Proceedings succeed. To that end Wirral adduced evidence from two US attorneys to say that their institutional investor clients are deterred from pursuing securities claims in England and Wales because of the procedures here requiring them to bring proceedings in their own names and provide information, evidence and disclosure about their cases. Both of these attorneys have a few clients who have signed up to the Representative Proceedings and therefore also the Multi-party Proceedings. But their evidence was not about those clients. I am therefore unclear as to its status and relevance. In any event, what they said was as follows:

(1)    Mr Michael G. Lange is a Massachusetts attorney working for what is called a third-party claims filer called Financial Recovery Technologies, LLC ("**FRT**"). FRT represents some 2500 institutional investors worldwide and Mr Lange says that they give very careful consideration to the cost and benefit of taking part in securities class actions and they make rational decisions, being "*more likely to join efforts when recovery prospects are higher, and the related risks and burdens are lower.*" Apparently, according to Mr Lange, the UK is the only worldwide jurisdiction for litigation that is seen as high-risk for FRT's clients

and that is because of the requirement to sign up publicly to a claim, to provide documents and information, such as reliance questionnaires, at an early stage and also the risk of an adverse costs order. Mr Lange said that an average of over 12 FRT clients register for any proposed Australian securities claim whereas only just over 2% sign up for any UK action.

(2) Ms Elisa Mendoza is an Oklahoma attorney who also works for a third-party claims filer called Securities Class Action Services, LLC ("**SCAS**"). SCAS represents some 600 institutional investors on the possibility of bringing claims in numerous jurisdictions. She says that a number of SCAS' clients have decided not to pursue claims in the UK despite being advised that they have potentially good claims. Ms Mendoza said that only 29% of clients with a potential claim sign up for UK claims as compared to 79% for New Zealand claims and 62% for Australian claims. Ms Mendoza opined that the "*bifurcated approach…may remove or mitigate some of the barriers which I believe limit participation rates today.*"

63.    Mr Chapman KC fairly accepted that this evidence did not show that any institutional investors had been deterred from joining the Multi-party Proceedings in this case. But he did also maintain that the evidence is compelling that institutional investors are generally put off from litigating in the UK unless their claims are very large because of the prohibitive costs and risks of doing so.

64.    Wirral also sought to rely on a report from Professor Andrew Higgins, who is Professor of Civil Justice Systems at Oxford University, and a member of the Civil Justice Council. Professor Higgins' report explains the comparative position of bifurcated securities claims in Australia, New Zealand and Canada (he is qualified to practise in Australia, but not New Zealand and Canada, which is why he concentrates on Australia in his report). The admissibility of his 67-page "*expert report*" was challenged by the Defendants. On 3 August 2023, Foxton J ruled that it could not be admitted as expert evidence because it did not meet the requirements for such evidence. However, he did say that it could be relied upon "*as if Professor Higgins had published an article in these terms or produced a report as part of some independent project*".

65.    Mr Chapman KC said that just as Lord Leggatt relied on the comparative position in other Commonwealth jurisdictions to inform the debate in *Lloyd v Google*, so I can do the same by reference to Professor Higgins' report. In my view, it carries limited weight as to the exercise of my discretion in this case.

66.    Professor Higgins focused on the Australian class action regime which has been established by Federal statute, perhaps similar to that in respect of competition claims in the UK, although there is no certification procedure. He did not really give evidence in relation to the representative action in Australia, as that has become what he described as "*in effect a historic relic*".

67.    Professor Higgins stated that the class action regime in Australian securities claims have been working well and have been "*cautiously welcomed*" by the Australian Securities and Investments Commission as "*maintaining the integrity of the equity capital market*" and Australian judges believe that they have had a "*disciplining effect on corporate behaviour*".

Approved Judgment

68.  Mr Chapman KC particularly relied on the statistics produced by Professor Higgins as showing, I think, that the securities class action claims in Australia, which have a bifurcated process, have proved popular with institutional and retail investors. Professor Higgins referred to 122 shareholder class actions filed between 1992 and 2019, although this was only in respect of 63 different companies. Most of the claims were settled and the data in respect of 84% of those settlement agreements showed that some 95,000 shareholders received individual compensation amounting to an average of AUS$9,362 per class member.

69.  Mr Chapman KC concentrated on the retail investors which were the vast majority in number of the shareholders in both Defendants: according to their 2019 Annual Reports, some 68% or 11,552 shareholders in Reckitt; and 89% or 10,566 shareholders in Indivior. Mr Richard Leedham, a partner in Mishcon de Reya LLP, Wirral's solicitors, stated in his witness statement that there are disincentives to retail investors participating in such claims which would mean having to instruct lawyers, particularise their cases including on limitation, reliance and loss and provide disclosure and factual evidence. Mr Leedham said that these requirements of ordinary proceedings are a "*substantial chilling factor on the participation of investors in securities actions (and on the willingness of litigation funders to fund such actions).*" He relied on the fact that there has been no claim brought under s.90A FSMA by retail investors.

70.  As to the funding of claims by retail investors, Mr Leedham said that litigation funders are not prepared to do so as it is not "*economically viable*" for them to do so, "*prior to a finding of liability being made*". In these proceedings, there is funding for the Representative Proceedings provided by two subsidiaries of Woodsford Group Limited ("**Woodsford**"). ATE insurance is also in place to cover adverse costs orders of up to £10m in relation to each Defendant. However, Woodsford is not apparently prepared to fund retail investors who may want to join the Multi-party Proceedings. This is said to be a barrier to access to justice for the retail investors. (The institutional investors have secured funding for the Multi-party Proceedings.)

71.  More generally, Mr Chapman KC submitted that the Defendants' position that investors with potential claims under ss.90 and 90A FSMA must pursue multi-party proceedings with all their procedural disadvantages will necessarily limit those claims to large sophisticated institutional investors and the smaller, retail investors who have equally good claims will be unable to participate. He said that this situation was exactly what the Supreme Court in *Lloyd v Google* wanted to avoid. Mr Chapman KC said there is no unfairness on the Defendants because they can still fight every substantive point in both the Representative Proceedings and in the follow-on claims if they occur.

72.  After being pressed to do so, Mr Chapman KC spelt out in his oral submissions four "*options*" as he called them for the second stage of the Representative Proceedings, assuming that Wirral is successful in getting the declarations that it seeks. Those four options are as follows:

(1) The Representative Proceedings are amended to bring in the represented persons as claimants and to pursue their individual claims;

(2) New Claim Forms would be issued by the represented persons, relying on the declarations and pursuing their own individual follow-on claims;

(3) The parties to the Multi-party Proceedings apply to lift the stay and pursue their claims in those revived proceedings; or

(4) The represented persons in the Representative Proceedings apply to join the Multi-party Proceedings and they all proceed with their individual follow-on claims.

73. Mr Chapman KC emphasised that no decisions had been taken and that the Court may very well have something to say in due course about which option should be adopted. He said that options (3) and (4) are particular to this case, because of the existence of the Multi-party Proceedings, but he accepted that there is no authority where the nature of the follow-on claims has been considered. In *Lloyd v Google*, Lord Leggatt seemed to be contemplating amendments to the representative action if it had gone ahead on a bifurcated basis because of the limitation issue – see [81] and the discussion of *Moon v Atherton* [1972] 2 QB 435.

74. I do find it surprising that there is no clear strategy for taking these claims through to a conclusion, by which I mean the investors actually receiving some compensation. The funders must have contemplated funding the investors all the way through to such recovery (there would be no sense in doing otherwise) and yet they apparently have no idea how the proceedings will work save up to the obtaining of the declarations in the Representative Proceedings.

75. Nevertheless Mr Chapman KC submitted that the Defendants can have no principled objection to Wirral pursuing the Representative Proceedings through to a conclusion and the suggested disadvantages of those proceedings, such as the difficulties of settlement without knowing much more about the individual claims, really amount to nothing very much and certainly not enough to justify the striking out of the Representative Proceedings.

Defendants' arguments against the Representative Proceedings

76. The Defendants' main argument is that the Representative Proceedings would prevent the Court from being able to exercise its case management powers in relation to the procedural structure, such as a bifurcated process, and its general control over the shape of the proceedings prior to trial. They say that it should be open to the Court to decide whether the proceedings should be bifurcated and, if so, what should be tried at the first stage and whether progress should be made on second stage issues ahead of the first stage trial. The Court should be able to decide whether in this particular case the same approach as was adopted in the other securities cases of *G4S, RSA* and *Serco* (as described above) by Miles and Falk JJ should be adopted in this case or whether an alternative approach is more suitable. It will still be open to the Claimants to argue that there should be bifurcation and no progress on what would be second stage issues. But it would be up to the Court to decide this, rather than Wirral and its represented persons, who have presented this as a *fait accompli* with which the Court cannot interfere.

77. Ms Davies KC submitted that the inability of the Court to control its own procedure has a number of disadvantages. First, she said that not having details of the individual claimant issues at an early stage will make settlement more difficult. Particulars of standing, reliance and quantum will enable the Defendants properly to assess the claims and value them for settlement purposes. Wirral has offered to share some trading data in relation to all represented persons (who will have had to provide such information to

Case 2:23-cv-09217-MEMF-KS    Document 114-5    Filed 09/05/25    Page 20 of 1378
Page ID #:4310
Wirral Council v Reckitt Benckiser Group plc and Indivior plc
Approved Judgment

Wirral) but the Defendants say that such voluntary disclosure would be inadequate and unenforceable. Further no such orders for disclosure or the like can be made against represented persons who are not parties for such purpose – see *Ventouris v Mountain* [1990] 1 WLR 1370.

78.    Second, Ms Davies KC submitted that there was a serious risk of fading memories in this case because some of the published information relied upon goes back to 2006 and investors may wish to say that they relied on such statements. The Court could do something to mitigate this, as Miles and Falk JJ did in *G4S* and *RSA*, by having earlier disclosure and witness statements. This would also prevent subsequent evidence being overinfluenced by the findings of the Judge in the first trial – see [72] in *G4S*. However, this would not be possible if the Representative Proceedings went ahead.

79.    Ms Davies KC's third point follows on from the second. Case management orders dealing with such matters as disclosure and witness statements before the first trial means that the parties and the Court would not be "*starting from a standing start*" in terms of preparation for the second stage trial. Not only would this not be possible in the Representative Proceedings but also it is one of the reasons why the investors wish to run the proceedings in this way.

80.    Fourth, Ms Davies KC relied on the allocation of litigation burden, something that was referred to in the other securities cases. She said that as the other Judges recognised, claimants who bring such claims should be prepared to undertake substantial work to progress the case and to engage properly with it in order to ensure that it is resolved fairly and expeditiously. This lack of engagement is actually put forward by Wirral as an advantage of the Representative Proceedings saving the investors' time and money. But Ms Davies KC submitted that it is self-evidently not in the interests of justice or consistent with the overriding objective or fair to the Defendants that the burden should be so lop-sided against them. These would all be issues that could be addressed by the Court in ordinary proceedings but not in the Representative Proceedings.

81.    As to the institutional investors being deterred from litigating in the UK, Ms Davies KC submitted that Mr Lange's and Ms Mendoza's evidence is not particularly helpful or relevant. It is clear from the existence of the Multi-party Proceedings in this case, that institutional investors have not in fact been deterred from such proceedings against the Defendants. Furthermore, it is obvious that they would want to avoid any sort of front-loading of costs if at all possible and would prefer to wait and see the outcome of the trial on common defendant-side issues before putting together and engaging with the claimant-side issues. But merely because they would prefer to be involved in litigation in that minimal way does not mean that it is consistent with the fair administration of justice or the overriding objective.

82.    As for the retail investors, Ms Davies KC submitted that their position has been exaggerated for the purpose of supporting the Representative Proceedings. The Defendants have been notified that, as at the date of the hearing, some 302 retail investors, 203 in Reckitt and 99 in Indivior (there is some duplication, as explained in [16] above), had signed up to the Representative Proceedings. By letter dated 16 November 2023 from Mishcon de Reya LLP to Linklaters LLP, Reckitt's solicitors, they confirmed that none of those retail investors had joined the Multi-party Proceedings and that Woodsford was not willing to fund them should they have wished to do so. This was said to be because of the "*economic and administrative burden*" of

**Approved Judgment**

pursuing such claims, which burden is said to apply to the funders and the retail investors themselves. However, that seemingly does not apply to the institutional investors who have funding for both forms of proceedings.

83.   The actual funding agreement has not been disclosed. But Ms Davies KC did show me the Costs Sharing and Governance Agreement which contains the terms upon which investors are able to become represented persons in the Representative Proceedings. The represented persons have to agree to costs sharing in order to opt-in to the Representative Proceedings. They have to provide "*valid, accurate and complete trading data*" presumably to prove that they have *prima facie* standing to pursue a claim. By clause 14, unless Wirral agrees otherwise "*for example because the Third Party has put in place other funding arrangements acceptable to [Wirral]*", the Third Party (meaning the party signing up to the Representative Proceedings) has to pay its estimated share of the incurred Action Costs and Adverse Costs (as those terms are defined) and make arrangements to secure its estimated share of the future Action Costs and Adverse Costs through to the conclusion of the proceedings. That must be either (i) by way of a written and binding obligation that an English company with at least 3 years of audited financial statements and net assets of at least £10m, or an equally creditworthy entity, will indemnify the payment of those costs as they are incurred on a month-by-month basis; or (ii) pay up front and in full a sum corresponding to the investor's estimated share of future costs.

84.   These are quite stringent requirements and any retail investors that can satisfy them must be fairly substantial in themselves. Mr Chapman KC pointed to the beginning of the clause and suggested that retail investors may come to a different agreement with Wirral, but there is no evidence before me that that has happened. On the contrary, as Ms Davies KC submitted, the clause indicates that retail investors with small claims would be unlikely to be able to participate in the Representative Proceedings, which would deprive them of access to justice. Even though there are a large number of retail investors, the value of their shareholdings was only some 0.02% to 0.03% of each Defendant's total share capital. Accordingly, Ms Davies KC submitted that there is no proof that these Representative Proceedings are actually beneficial to retail investors. And the fact that they have been excluded by the funders from participating in the Multi-party Proceedings is something that is inexplicable and because of the attitude of Woodsford.

85.   As to Professor Higgins' report, Ms Davies KC submitted that little reliance can be placed on it. In any event, she said that it did not support Wirral's arguments. That is principally because Professor Higgins only deals with Australia's statutory class action procedure. There is no automatic bifurcation of those actions and indeed Professor Higgins explains that the initial trial of such proceedings will normally involve the full trial of all issues in at least one lead claim. That would be very different to the situation if the Representative Proceedings in this case went ahead, because there would not be any resolution of any standing, reliance, limitation or quantum issues in relation to any claim, including Wirral's. Professor Higgins also refers to the considerable case management powers that the Australian Court would have prior to the first trial, including the power to order sampling and disclosure. There are also powers to approve collective settlements. Ms Davies KC therefore submitted that this evidence supported the Defendants' position of allowing the Court to case manage these proceedings all the way through. She also questioned Professor Higgins' statistics, saying that the number

Approved Judgment

of actions in a 27-year period was small – approximately 4 a year, or 2.5 a year based on the number of companies – which meant it did not prove anything about their availability to retail investors. (Mr Chapman KC maintained that the figures were high in proportion to the much smaller population and economy of Australia.)

86.    Mr Patton KC adopted all of Ms Davies KC's submissions with some additional observations on the policy underlying s.90A and Schedule 10A FSMA. That new statutory regime derived from a review carried out by Professor Paul Davies KC, who produced a Discussion Paper dated March 2007, followed by a Final Report dated June 2007. Professor Davies KC's terms of reference from the Government were to consider the impact of the new regime on "*issuers, markets, investors and others; the quantity and quality of information disclosed; the competitiveness of the UK as a good place to do business*". Professor Davies KC focused on the requirements of reasonable reliance and fraud as setting a high bar for liability, that would hopefully prevent the private securities litigation culture that had developed in the US.

87.    In his Final Report, Professor Davies KC was keen to stress that it would not be beneficial for the UK financial markets for private securities litigation to follow the course taken in the US, where the availability of funding and lower thresholds for liability had led to extensive private securities actions. He recognised that recent changes in litigation funding rules in the UK may exacerbate the risk of unmeritorious claims being pursued but he considered that this risk could be tempered by making liability fraud-based, rather than negligence-based, and dependent on reasonable reliance by the investors. In other words, he wanted to avoid speculative collective litigation in the UK. The Government agreed, stating in its impact assessment of the new regime that it had "*deliberately been shaped, principally by selecting a demanding fraud test for liability, to minimise the potential for speculative litigation and the corresponding pressure on issuers to settle in order to terminate litigation, rather than compensate for harm done to shareholders*". (Ms Davies KC also referred to *Mastercard Inc v Merricks* [2021] 3 All ER 285, at [154] in the judgment of Lord Sales and Lord Leggatt, who referred to the significant risk of flawed collective proceedings being held over the defendant's head "*in terrorem to extract a substantial settlement payment without a proper basis for it*".)

The exercise of discretion in this case

88.    I have received a lot of evidence that seems to me to be more related to policy reasons for exercising my discretion one way or another. Thus the evidence of Mr Lange and Ms Mendoza and Professor Higgins' report are directed at whether representative actions in securities litigation under FSMA should be allowed to proceed and, I assume, become the normal way for such claims to be brought. The reference to the policy behind the introduction of s.90A and Schedule 10A FSMA in Professor Paul Davies KC's papers is to similar effect, although there is no discussion therein as to procedure or the use of representative actions to enable such cases to be brought.

89.    However, I am not deciding these applications on policy grounds or to say that this is how securities claims in general should be brought. (I do not know if the Government has considered legislating for class actions in this area, but that does not affect whether the flexibility of the representative action should apply to these sorts of claims – see [68] of *Lloyd v Google*.) I am deciding how my discretion should be exercised in the particular cases before me. In fairness to Ms Davies KC, she did say that she was not

Approved Judgment

advocating for all securities cases under FSMA and was not saying that they can never be brought using the representative action under CPR 19.8. But in this particular case, and perhaps most significantly because of the existence of the Multi-party Proceedings, she was saying that the Representative Proceedings are not appropriate and will not further the overriding objective.

90. While *Lloyd v Google* might be understood to have presaged a new look at the utility of representative actions, I do not think that Lord Leggatt would have contemplated that his judgment would be used to oust the ability of the Court to case manage these sorts of claims from the start. Mr Chapman KC said that if Lord Leggatt had had concerns about the effect of bifurcation on case management, he would have said so. But the trouble with that is that the issue was not before the Supreme Court and it is unclear whether any submissions were made about it. The case was more about whether the representative action could be used where otherwise a very large number of persons would not have any access to justice and where bifurcation simply would not work.

91. As I said in [56] above, I do not believe that the availability of a bifurcated process in representative actions is the reason for using representative actions. Rather, a bifurcated process can be used in order to enable a representative action to proceed and particularly where there would be no other way that the proceedings could be brought by or on behalf of such a large number of claimants whose claims are likely to be too small to bring individually. It provides a means of access to justice for those individuals. That is not to say that the claimants have to show that they could not bring their claims in any other way. But I do question whether it is appropriate to be using the representative action for the express purpose of bifurcation so as to remove any possibility of the Court being able to require the represented persons to do anything in relation to their claims at their initial stages.

92. Mr Chapman KC and Wirral's evidence on the applications were perfectly and creditably candid about this being the purpose of the Representative Proceedings. The investors and their funders do not want the risk and costs of pursuing the Multi-party Proceedings where the Judge managing the case may require them to provide information or disclosure or witness evidence before a first trial takes place on the common defendants-side issues. While I understand that desire, I do not believe that it is a legitimate basis for depriving the Court of its power to case manage such claims.

93. The Representative Proceedings cannot be looked at in isolation from what is to follow their resolution. The only point of the Representative Proceedings is to succeed at the end of the day in recovering compensation for the losses alleged to have been suffered by the represented persons. They obviously hope to succeed in the Representative Proceedings in order then to pursue their follow-on claims, in whatever form they later decide they should take. So from both the parties' and the Court's perspective, the proceedings all the way through to the recovery of compensation have to be considered as effectively one set of proceedings. There is an element of manipulation in framing the Representative Proceedings in the way they have been in order to say that the Court only need look at Wirral's entitlement to start such Proceedings under CPR 19.8(1)(a) and consider how the issues raised in those Proceedings should be tried. But that would be shutting one's eyes to reality, which is that the Representative Proceedings are merely the first stage of the investors' route to recovery.

Approved Judgment

94.   There should be nothing to fear on behalf of the investors in putting case management into the hands of the Court. If they have a good case for asking that there be a bifurcation of the common defendant-side issues from the individual claimant-side issues and that nothing should be done about the latter before the former is decided, then that case can be made to the Judge managing the case. That Judge will weigh the arguments, including perhaps the difficulties of obtaining funding for the front-loading of costs to do that sort of work at the initial stages, and decide what is in the best interests of the parties, the Court and the administration of justice to require the claimants to do.

95.   When looked at like that, Wirral's proposition does seem quite extraordinary. It is asking the Court to accept that it should have no control over whether the proceedings should be bifurcated in the way that the Representative Proceedings will dictate that they are. One can see from the judgments in *G4S* and *RSA* how the Judges have carefully balanced all the competing interests in deciding how those cases should be managed. But Wirral is saying that the investors should be able, unilaterally, without any input from the Defendants or the Court, to bifurcate the proceedings in the way they want them to be. I do not think that *Lloyd v Google* gives them that entitlement; nor that the Court is bound to accept that this is in accordance with the overriding objective.

96.   The Court is required actively to case manage claims so as to further the overriding objective (CPR 1.4(1)). But the Representative Proceedings effectively prevent the Court from doing that, certainly in relation to the Multi-party Proceedings. I do not see how the Court can be furthering the overriding objective by depriving itself of the ability to apply the overriding objective in case managing a claim.

97.   The existence of the Multi-party Proceedings shows that institutional investors have not been deterred from pursuing their claims in England and Wales by the way that securities cases are managed here. The fact that they would prefer not to expend cost and effort in preparing and putting forward their cases until after the first trial has been completed is unsurprising but contrary to the way litigation is normally conducted in this jurisdiction and will necessarily mean that the proceedings will not be brought to a final conclusion expeditiously. As the judgments in *Tesco* and *G4S* make clear, claimants must properly plead and particularise their cases from the beginning and it should not be as simple as subscribing to litigation without any risk or cost being incurred. I do not think that the position of the institutional investors affects the appropriateness of the Representative Proceedings.

98.   The position of the retail investors is a little different and I was concerned, if it is true, that they might be deprived of access to justice if the Representative Proceedings cannot go ahead. But as it emerged from the evidence and the hearing, the retail investors are inexplicably not being allowed to participate in the Multi-party Proceedings because of the attitude of the funders. Even though the retail investors who have signed up to the Representative Proceedings, including satisfying the stringent financial conditions, have been allowed to participate in them, including presumably to take their claims to a conclusion in the follow-on claims (although the commitment in the Costs Sharing and Governance Agreement is limited to the Representative Proceedings), they have been denied funding and the opportunity to participate in the Multi-party Proceedings.

99.   But this situation has been engineered by the funders. And it has enabled Wirral to say that the retail investors cannot pursue their claims otherwise than through the

Approved Judgment

Representative Proceedings and will be denied access to justice. But without any adequate and coherent explanation from the funders as to why they have apparently discriminated against the retail investors in relation to the Multi-party Proceedings, I am not prepared to accept that they can only seek redress through the Representative Proceedings. There is no evidence that retail investors who have opted-in to the Representative Proceedings would not be able to obtain their own funding and issue their own proceedings, which could then be consolidated or at least managed together with the Multi-party Proceedings.

100.    Furthermore Ms Davies KC referred to the *RBS Rights Issue litigation* pursuant to s.90 FSMA which included thousands of retail investors, and the *Lloyds/HBOS Group Litigation* that involved claims from around 6,000 investors, both institutional and retail. These show that retail investors have been able to bring their claims under the current procedural structure and have had access to justice in similar securities claims, albeit not under s.90A FSMA. I therefore think that the evidence does not show that retail investors are unable to bring their claims otherwise than through the Representative Proceedings. In fact the evidence may indicate that the financial conditions to participation in the Representative Proceedings may be a disincentive to join them.

101.    In terms of the overriding objective, it seems to me that the case management of the other securities claims have shown how the Court can deal with these cases fairly, proportionately and by allotting an appropriate share of the Court's resources to them. If the Claimants are required to provide material in support of their individual claims and to engage with the proceedings from an early stage, it is more likely that the proceedings will be dealt with expeditiously overall. It will mean that there will not be a standing start after the first trial and with fading memories it may be important that the final trial is not delayed too long and that their evidence is recorded at an earlier stage. There was not much discussion at the hearing about the possible disruption as a result of appeals. But this can be factored in by the Court in making sensible, practical case management directions, including by putting the parties on an equal footing.

102.    Wirral suggested that an advantage of the Representative Proceedings would be that if it did not succeed in obtaining the declarations, then the time, effort and costs of the potential follow-on claims would be saved. It also said that settlement would be much more likely if it succeeded in the Representative Proceedings, although as I noted above, there was no real evidence to support this. But more fundamentally is that these considerations can be taken into account by the Judge case managing the proceedings from the start and the suggested advantages would be equally applicable if that Judge directed bifurcation in the same or similar way that Wirral is hoping to achieve in the Representative Proceedings.

103.    There was discussion in all the parties' skeleton arguments about limitation. Wirral relied on [81] of *Lloyd v Google* and said that there may be an advantage in respect of limitation for late joiners to the Representative Proceedings. The Defendants disagreed that late joiners could defeat a limitation defence by relation back to the issue of the Representative Proceedings. In any event, those who are parties to the Multi-party Proceedings are protected. However, at the hearing, all parties seemed to accept that the arguments in relation to limitation were actually neutral on the applications before the Court and as to the exercise of the Court's discretion.

**Approved Judgment**

104. So I return to the main point that these issues should be for the Judge managing the claims to consider. That will be done by reference to the overriding objective. To allow the Representative Proceedings to continue would mean that a Judge has no power to decide the best way to manage the claims from start to end by reference to all relevant factors, including the respective positions of the parties, the appropriate use of the Court's resources and the administration of justice. They take away from the Court one of its prime functions to manage and deal with cases justly and at proportionate cost.

105. I therefore conclude that, in the circumstances of this case, my discretion should be exercised against the Representative Proceedings and in favour of the Multi-party Proceedings, should the Claimants wish to proceed with them. They can be managed in the normal way so as to further the overriding objective and in particular the Claimants can argue for the same bifurcated process, with no progress on claimant-side issues in the meantime and it will be up to the Judge managing that case to decide whether that is appropriate or not. But I think it would be unfair and unjust, and contrary to the overriding objective, to allow the Representative Proceedings to oust the jurisdiction of the Court to case manage the claims from the start.

**Conclusion**

106. For the reasons I have set out above, I allow the Defendants' applications which means that I order as follows:

(1) That Wirral may not act as a representative pursuant to CPR 19.8(2); and

(2) That therefore the Claim Forms and Particulars of Claim in the Representative Proceedings be struck out.

107. I would hope that the parties will be able to agree a draft Order in respect of that outcome. If there are any consequential matters that cannot be agreed, I am happy to deal with them in writing or, if necessary, at a further oral hearing to be arranged through the usual channels.



**Neutral Citation No. [2024] CAT 76**

**Case Number: 1381/7/7/21**

**IN THE COMPETITION APPEAL TRIBUNAL**

<u>**19 December 2024**</u>

**Salisbury Square House**
**8 Salisbury Square**
**London EC4Y 8AP**

Before:
**THE HONOURABLE MR JUSTICE WAKSMAN**
**(Chair)**
**EAMONN DORAN**
**DEREK RIDYARD**
Sitting as a Tribunal in England and Wales

BETWEEN:

**JUSTIN LE PATOUREL**

<u>Class Representative</u>

and

**(1) BT GROUP PLC**

**(2) BRITISH TELECOMMUNICATIONS PLC**

<u>Defendants</u>

and

**COMPETITION AND MARKETS AUTHORITY**

<u>Interested Party</u>

# NON-CONFIDENTIAL REDACTED JUDGMENT

**Hearing dates**: 29-31 January, 1, 5-8, 12-15, 19, 20-22, and 26-29 February, 1, 4-5, and 18-22 March 2024

**Representation**:

**Ronit Kreisberger KC, Derek Spitz, Michael Armitage, Jack Williams and Matthew Barry** (instructed by Mishcon de Reya LLP, Solicitors) for the Class Representative

**Daniel Beard KC, Daisy Mackersie, Natalie Nguyen, Sarah Love and Ali Al-Karim** (instructed by Simmons & Simmons LLP, Solicitors) for the Defendants

**Jennifer MacLeod** (instructed by the CMA Legal Department) for the CMA

Table of Contents

**INTRODUCTION** .................................................................................................................................7

**BACKGROUND** ...................................................................................................................................8

**THE DAMAGES SOUGHT** ...............................................................................................................10

**THE CORE ISSUES** ...........................................................................................................................10
Liability Issues ...................................................................................................................................10
Quantum Issues ..................................................................................................................................11

**THE PARTIES' SUBMISSIONS** ......................................................................................................11

**THE EVIDENCE** ................................................................................................................................12
Lay Witnesses ....................................................................................................................................12
Experts ................................................................................................................................................12
Documentary Evidence and Glossary ...............................................................................................14

**THE LAW – THE GENERAL POSITION** .......................................................................................15
Introduction: United Brands ..............................................................................................................15
Phenytoin ...........................................................................................................................................16
Albion Water II ..................................................................................................................................20
Liothyronine .......................................................................................................................................23
Hydrocortisone ...................................................................................................................................23
Other Cases and Matters ....................................................................................................................25
Unfairness by Comparison .................................................................................................................26
The relevance or otherwise of regulation ..........................................................................................28
The Effect and Significance of Ofcom's 2017 Provisional Conclusions and Statement ...................29
Prices and margins on the undertaking's other products ....................................................................31
Burden and Standard of proof ...........................................................................................................31

**FACTUAL MATTERS (1): BT'S MARKET SHARE** .....................................................................32
Background and the Basics of BT's Pricing ......................................................................................34
Line Rental Pricing ............................................................................................................................35
Call Charges .......................................................................................................................................39
ARPU .................................................................................................................................................39
Gross Margin ......................................................................................................................................41

**FACTUAL MATTERS (2): OFCOM AND BT** ................................................................................43
Background .........................................................................................................................................43
2006 ....................................................................................................................................................43
2009 ....................................................................................................................................................44
2013 ....................................................................................................................................................44
2014 ....................................................................................................................................................44
2015 ....................................................................................................................................................44
2016 ....................................................................................................................................................45
2017 ....................................................................................................................................................45
2020 and 2021 ....................................................................................................................................48

**FACTUAL MATTERS (3): SWITCHING** ........................................................................................49

**FACTUAL MATTERS (4): BT'S PERCEPTIONS AS TO LINE RENTAL INCREASES AND SWITCHING** ...............55
Introduction .......................................................................................................................................55
The Immediate Purpose of BT's line rental increases .......................................................................55

**MARKET DEFINITION** ...................................................................................................................59
Introduction .......................................................................................................................................59
The Basic Approach ...........................................................................................................................59
The SSNIP Test ..................................................................................................................................60
The Cellophane Fallacy .....................................................................................................................61

PRICE DISCRIMINATION ...................................................................................................62
THE RELEVANCE OF SWITCHING .......................................................................................62
REASONS FOR SWITCHING ..............................................................................................63
   *The Possibility of Secular Trend* .............................................................................63
   *Gradual and consistent decline in SFV Customers* ................................................64
   *Price Increase in face of declining SFV customer base* ........................................67
   *Dr Jenkins' Evidence on Secular Trend* ................................................................67
   *Dr Jenkins' Event Study on the Commitments Price Reduction* ............................68
   *BT's own perception as to reasons for switching* ..................................................69
   *Competition from the Post Office* ..........................................................................80
   *Conclusion* .............................................................................................................80
SUMMARY OF MR PARKER'S APPROACH .........................................................................80
   *SPC-Dual play bundle price differential* ..............................................................80
   *Line Rental Price Increases* ..................................................................................80
   *Call Price Increases* ..............................................................................................81
SUMMARY OF DR JENKINS' APPROACH ...........................................................................81
   *Switching per se* .....................................................................................................81
   *Dr Jenkins' Critical Loss Analysis ("CLA")* ......................................................81
   *Bundles as constraints on SFV Pricing* ................................................................81
ANALYSIS: MR PARKER'S APPROACH ...............................................................................81
   *Mr Parker's use of BT price data* ..........................................................................81
   *Mr Parker's SPC-Bundle Price Differential* ........................................................87
   *Line Rental Price Increases* ..................................................................................96
   *Call Price Increases* ..............................................................................................99
ANALYSIS: DR JENKINS' APPROACH .................................................................................102
   *Switching per se* .....................................................................................................102
   *CLA* .......................................................................................................................103
   *Bundles as Constraints on SFV Pricing* ...............................................................111
CONCLUSION ON MARKET DEFINITION .............................................................................115

**DOMINANCE** ............................................................................................................**115**
THE LAW ......................................................................................................................115
MARKET SHARE ............................................................................................................116
OTHER FACTORS GOING TO DOMINANCE .........................................................................117
   *Barriers to Expansion* ...........................................................................................117
   *The Position of the Post-Office* .............................................................................118
   *Constraints from Bundles* ......................................................................................119
   *Price Leadership* ...................................................................................................120
CONCLUSION ON DOMINANCE ........................................................................................122

**LIMB 1 METHODOLOGIES: DESCRIPTION** ..................................................**122**
INTRODUCTION ..............................................................................................................122
MR DUCKWORTH'S METHODOLOGY .................................................................................126
DR JENKINS' METHODOLOGY ..........................................................................................131
   *Derivation of BT Consumer Common and Incremental Costs* ..............................131
   *SAC Combi* ............................................................................................................133
   *DSAC Cross-Check* ...............................................................................................137
   *Dr Jenkins' Sensitivities* .......................................................................................138
   *Comparative Tables* ..............................................................................................138

**REASONABLE MARGIN** ........................................................................................**140**
INTRODUCTION ..............................................................................................................140
THE LAW ON REASONABLE MARGIN .................................................................................141
MR DUCKWORTH'S APPROACH ........................................................................................141
   *BT's Reported Margins 2004-2006* .......................................................................141
   *Mr Duckworth's Comparators* ..............................................................................143
   *Ofcom's 2017 Provisional Conclusions and a 10% margin* ..................................145
DR JENKINS' ANALYSIS ..................................................................................................149
   *The Upper Bounds Point* .......................................................................................149
   *Dr Jenkins' comparators* .......................................................................................151
CONCLUSION ON REASONABLE MARGIN ...........................................................................156

**LAW ON COMBINATORIAL AND OTHER TESTING - PPC**.....................................**156**

**ANALYSIS OF THE RFS METHODOLOGY** ................................................................161

INTRODUCTION ................................................................................................161
OBJECTION AS A MATTER OF PRINCIPLE TO THE RFS MODEL AS AN APPROPRIATE WAY OF CALCULATING A COMPETITIVE
BENCHMARK AS AT 2009 ....................................................................................161
    *Use of an FAC model.* ....................................................................................162
    *The Regulatory Purpose of the RFS.* ..................................................................166
OBJECTIONS TO THE USE OF THE RFS METHODOLOGY IN RESPECT OF THE CLAIM YEARS ..............167
    *Introduction* ................................................................................................167
    *The use of "actual data"* ................................................................................167
    *Legal Certainty* ............................................................................................169
    *Use of the CPI Index and reported indirect costs before and as at 2009.* ..........................169
    *Indirect Costs Data from 2015/16 going forward* ................................................172
    *Particular cost events that might affect common costs* ............................................176
    *Changes in call pricing and competition* ............................................................176
    *Economies of scope and size of common costs* ....................................................176
    *Economies of Scale* ......................................................................................177
    *Different Cost allocations in the claim years* ......................................................178
    *Likely Size of Common Costs BT Consumer* ........................................................180
CONCLUSIONS ON THE RFS METHODOLOGY ..............................................................184

**ANALYSIS OF DR JENKINS' METHODOLOGY** ....................................................**184**

INTRODUCTION ................................................................................................184
DR JENKINS' DERIVATION OF THE COMMON COSTS OF BT CONSUMER ..............................185
    *The Relevant Figures* ....................................................................................185
    *Dr Jenkins' Primary Approach* ........................................................................186
    *VULA Margin* ............................................................................................188
    *The TSO Cross-check.* ....................................................................................190
    *Conclusion on BT Consumer Common Costs* ......................................................192
THE SAC COMBI EXERCISE ................................................................................192
    *Insufficient number of combinations* ................................................................192
    *The "Number of Lines Error"* ........................................................................197
    *Conclusions on Dr Jenkins' SAC Combi methodology* ............................................199

**DR JENKINS' DSAC CROSS-CHECK** ..............................................................**200**

**DR JENKINS' FAC ANALYSIS** ......................................................................**203**

**OVERALL CONCLUSION ON THE COMPETITIVE BENCHMARK** ..........................**207**

INTRODUCTION ................................................................................................207
2015/2016 ......................................................................................................208
    *The Common Costs Starting Point* ....................................................................208
    *The SFV Services Common Costs Contribution* ....................................................209
    *Application of Margin* ..................................................................................211
    *Resulting Figure for 2015/16.* ........................................................................211
THE FOLLOWING YEARS TO 2021/22 ....................................................................211
OVERALL CONCLUSION ON LIMB 1 FIGURES ............................................................214

**LIMB 2 (1): UNFAIRNESS "IN AND OF ITSELF"** ..............................................**214**

INTRODUCTION ................................................................................................214
    *The CR's case* ............................................................................................214
    *BT's case.* ..................................................................................................215
    *The Tribunal's analysis* ................................................................................217
EXTENT OF THE EXCESS ....................................................................................217
PROVISION OF ECONOMIC VALUE: (A) GENERALLY ....................................................218
    *Introduction* ................................................................................................218
    *The Extent or Level of Economic Value Required* ................................................218
    *The Relevance of the ability to switch (or not)* ....................................................218
PROVISION OF ECONOMIC VALUE: (B) GIVES ..........................................................219
    *Onshoring of Customer Call Centres* ................................................................220
    *Call Protect.* ..............................................................................................221
    *Care Level 2/Fault Fix Guarantee.* ..................................................................224
    *Right Plan* ................................................................................................226

Caller Display ............................................................................................................................227
Other Points about the Gives ......................................................................................................228
Conclusions on the Gives ............................................................................................................231
PROVISION OF ECONOMIC VALUE: (C) BRAND VALUE ...........................................................231
Introduction ................................................................................................................................231
What are NPS? ............................................................................................................................231
Use of BT's NPS documents at trial ...........................................................................................232
Survey Base for NPS documents .................................................................................................234
Particular NPS documents ..........................................................................................................235
Conclusions on the NPS documents ............................................................................................238
Ofcom Materials .........................................................................................................................239
Introduction ................................................................................................................................239
2016 Switching Tracker Data ......................................................................................................239
Comparison Documents ..............................................................................................................239
2016 – 2022 Switching Tracker Data ..........................................................................................241
Analysis ......................................................................................................................................241
PROVISION OF ECONOMIC VALUE: (D) ABILITY OF CUSTOMERS TO SWITCH ..........................243
Conclusions on Brand Value .......................................................................................................249
PROVISION OF ECONOMIC VALUE: (E) CONCLUSIONS ...........................................................250
WORKABLE COMPETITION FACTORS .......................................................................................250
Introduction ................................................................................................................................250
Price Dispersion .........................................................................................................................251
Cost Efficiencies Dispersion .......................................................................................................253
EXISTENCE OR OTHERWISE OF EXPLOITATION BY BT OVER ITS PRICE INSENSITIVE CUSTOMERS ("THE EXPLOITATION POINT")
....................................................................................................................................................255
Introduction ................................................................................................................................255
Price insensitivity of SFV customers ...........................................................................................255
BT sought to maximise value from a declining market and regular price increases ......................255
No price competition from competitors ........................................................................................256
Conclusions ................................................................................................................................257
DISPROPORTIONATE IMPACT OF PRICE INCREASES ON SFV CUSTOMERS ("THE DISPROPORTIONATE IMPACT POINT") ............257
PRICE RISE REVENUE USED TO FUND NON-SFV INVESTMENTS ("THE NON-SFV INVESTMENTS POINT") .............................259
LACK OF TRANSPARENCY ("THE LACK OF TRANSPARENCY POINT") ......................................260
Customers ...................................................................................................................................260
The Press ....................................................................................................................................260
Ofcom .........................................................................................................................................261
Conclusions ................................................................................................................................265
EFFECT OF THE EXPLOITATION, DISPROPORTIONATE IMPACT, NON-SFV INVESTMENTS AND LACK OF TRANSPARENCY POINTS
....................................................................................................................................................265
PRICE RISES DURING PERIOD WHEN OFCOM EXPRESSING CONCERN ....................................266
MARKET DYNAMICS .................................................................................................................268
Migration Intent ..........................................................................................................................268
Rebalancing ................................................................................................................................268
Conclusion on Market Dynamics .................................................................................................271
THE SIGNIFICANCE OR OTHERWISE OF OFCOM'S 2017 PROVISIONAL CONCLUSIONS AND STATEMENT ......................271
CONCLUSION ON UNFAIRNESS IN AND OF ITSELF ....................................................................273

LIMB 2 – (2) UNFAIRNESS BY COMPARISON ...................................................................273

INTRODUCTION ..........................................................................................................................273
COMMITMENTS PRICING ...........................................................................................................274
THE POST OFFICE ......................................................................................................................275
THE PRICING OF BT'S RIVALS ...................................................................................................275
HPS ...........................................................................................................................................276
BT'S BUSINESS TARIFF .............................................................................................................277
CONCLUSION ON UNFAIRNESS BY COMPARISON ......................................................................277

ALTERNATIVE CASE BASED ON LINE RENTAL PRICE ONLY .......................................277

OVERALL CONCLUSION ON LIABILITY ............................................................................277

QUANTUM (1): BASIS OF OVERCHARGE ..........................................................................278

QUANTUM (2): BUSINESS CUSTOMERS ...........................................................................280

INTRODUCTION ..................................................................................................................280
THE EXCLUSION ISSUE .......................................................................................................280
THE PROPORTION ISSUE .....................................................................................................283
THE PASS-ON ISSUE ...........................................................................................................286

**QUANTUM (3): BT EMPLOYEES WITH GIFTED SERVICES**................................................**286**

**QUANTUM (4): DECEASED CLASS MEMBERS** ...................................................................**287**

INTRODUCTION ..................................................................................................................287
THE MORTALITY QUESTION ...............................................................................................288
THE PERSONAL REPRESENTATIVE QUESTION ......................................................................290
    *Introduction*.....................................................................................................290
    *Rate of will-writing* ...........................................................................................291
    *The 20% adjustment* .........................................................................................294

**QUANTUM (5): INTEREST AND RELATED MATTERS** ........................................................**296**

INTRODUCTION ..................................................................................................................296
INFLATION ........................................................................................................................296
COMPOUND INTEREST ........................................................................................................298
CALCULATION OF SIMPLE INTEREST ...................................................................................300

**OVERALL CONCLUSION** .................................................................................................**300**

## INTRODUCTION

1.  This case concerns a claim against two Defendants, BT Group Plc and British Telecommunications Plc (collectively "BT"). The claim is that BT has abused its dominant position in a telecommunications ("telecoms") market by imposing unfair prices, contrary to section 18 of the Competition Act 1998 ("the Act"). The claim is brought by Mr Justin Le Patourel as the Class Representative ("the CR") in respect of approximately 2.3m affected BT customers.

2.  The market is concerned with the provision of landline telephone services to residential addresses known as Standalone Fixed Voice Services ("SFV Services"). These are provided in circumstances where the customer contracts with BT for access to the telephone network for voice calls only. The charges consist of a fixed line rental charge and a variable charge for calls made.

3.  Within the provision of SFV Services there are, according to the CR, two customer groups. The first consists of Voice Only Customers ("VOCs"). A VOC buys an SFV service and does not buy a broadband service from either the same or any other provider. As at 2019, there were 1.2m such customers, representing about 5% of total residential customers. The second customer group encompasses Split Purchase Customers ("SPCs"). As at 2019, there were 1.1m SPCs. Such customers also take a broadband service pursuant to a separate contract, either with BT or with some other provider. What they do not have is a "bundle", i.e. a package of telephone and broadband services provided together by the same supplier under one contract. The market for bundles, comprising voice and broadband, and which the CR says is separate from the SPC market, is known in the industry as "Dual Play" ("DP"). There are also several other bundles sold alongside voice by BT and others, including services such as TV, mobile etc.

4.  On 15 January 2021, Mr Le Patourel issued a claim form in which he applied for a collective proceedings order ("CPO") in respect of the claim referred to above. Following a hearing which took place on 24 and 25 June 2021, and a judgment handed down on 27 September 2021 ([2021] CAT 30), the Tribunal made a CPO on 19 October 2021. By that order, and pursuant to section 47B of the Act and Rules 77 and 80 of the Competition Appeal Tribunal Rules, Mr Le Patourel was authorised to act as the CR to continue collective proceedings on an opt-out basis claiming damages for loss suffered by the Class (as defined below). The remedy sought is an award of aggregate damages for the Class pursuant to section 47C(2) of the Act, together with interest, costs and any further or other relief as the Tribunal may think fit.

5.  The details of the class and claim period were set out in the CPO as follows:

> "The Class shall be defined as: "all persons domiciled in any part of the United Kingdom (except in the **Hull Area**) – or their UK-domiciled personal representatives – who, during the **Claim Period**, bought a **BT Standalone Fixed Voice Service** except for the **Excluded Services** (referred to below as "**the Class Members**")", whereby:

(a) **BT Standalone Fixed Voice Service** means any residential landline calling plan service provided by BT, except for the Excluded Services, which (i) includes landline line rental and (ii) has not been sold as part of a bundle with broadband. For these purposes, a bundle refers to a contract, or two or more closely related, linked or interdependent contracts which, individually or together, include and require the purchase of broadband as well as the landline calling plan service.

(b) **Excluded Services** means BT Basic and BT Home Phone Saver.

(c) **Hull Area** means the area defined as the Licence Area in the licence granted on 30 November 1987 by the Secretary of State under Section 7 of the Telecommunications Act 1984 to Kingston upon Hull City Council and Kingston Communications (Hull) plc.

(d) The **Claim Period** means:

(i) for residential BT Voice Only Customers, between 1 October 2015 and 1 April 2018 inclusive;

(ii) for business BT Voice Only Customers, between 1 October 2015 and the date of the Tribunal's final determination of the Claims made by the Sub-class of BT Voice Only Customers or their earlier settlement (or settlement of any part thereof); and

(iii) for BT Split Purchase Customers, between 1 October 2015 and the date of the Tribunal's final determination of the Claims made by the Subclass of BT Split Purchase Customer or their earlier settlement (or settlement of any part thereof)."

6.   By the same order, the Tribunal dismissed an application by BT, made on 30 April 2021, to strike out or summarily dismiss the claim. By a judgment handed down on 6 May 2022, the Court of Appeal dismissed BT's appeal against the making of the CPO ([2022] EWCA Civ 593).

7.   All the relevant notifications and other procedural steps required of the CR in pursuance of the CPO have been taken.

8.   The latest iteration of the claim is to be found in the Re-Re-Re-Re-Amended Claim Form dated 11 December 2023, followed by the Re-Re-Amended Defence dated 15 December 2023 and the Re-Re-Amended Reply dated 21 December 2023.

9.   What follows is the Tribunal's unanimous judgment on the substantive claim.

**BACKGROUND**

10.  The immediate background to the making of the claim, and a matter relied upon (among other things) by Mr Parker, the expert economist retained by the CR, who produced two reports in support of the claim, dated 13 January and 26 May 2021 ("DP1" and "DP2" respectively) was a review of BT's pricing for the two relevant groups of customers, namely VOCs and SPCs, by the Office of Communications ("Ofcom"). It is necessary at this stage to give a summary of Ofcom's intervention and the consequences of it. However, there is an issue between the parties as to the relevance, admissibility and (if admissible) the weight to be attached to the Ofcom findings in this regard. The making of the summary below is without prejudice to that issue which we determine later in the judgment.

8

11.  The background to that intervention, so far as Ofcom was concerned, was that when BT was privatised in 1984, it was subject to retail price control, continuing until 31 July 2006, and released from it as from 1 August 2006. However, although BT was released from such price control, it was not fully deregulated because Ofcom still considered that BT had "significant market power" ("SMP") in the relevant markets. Ofcom therefore still did not permit BT to compete freely within the bundles market. That restriction was removed by Ofcom's decision dated 15 September 2009.

12.  There are various other Ofcom reviews and decisions which followed, and which will be referred to below. However, in its "Review of the Market for Standalone Landline Telephone Services: Provisional Conclusions" dated 28 February 2017 ("the 2017 Provisional Conclusions"), Ofcom set out proposals to address the concerns which it had by that stage about the standalone telephone services market and BT's pricing therein. These were then open for a consultation period ending on 9 May 2017.

13.  At this stage, the proposal to cut the line rental price applied to both VOCs and SPCs, which Ofcom then considered were in the same market.

14.  On 24 October 2017 BT put forward a voluntary proposal to Ofcom. This included, for VOCs but not SPCs, a line rental reduction of £7 per month as from 1 April 2018 and thereafter raising the price of calls and line rental by no more than inflation each year. It also proposed an improvement in the information made available to such customers to make them more aware of potential savings. For SPCs, BT proposed to stimulate engagement by issuing an annual statement showing their total spend which should help them consider what alternatives were available for voice-only services in conjunction with broadband services. We refer to the above proposals as "the Commitments".

15.  Following consideration of the consultation responses and further market research, along with BT's proposals, Ofcom produced its "Review of the Market for Standalone Landline Telephone Services: Statement" on 26 October 2017 ("the 2017 Statement"). This consisted of its final conclusions, together with its 2017 Provisional Conclusions. In it, Ofcom accepted the Commitments in place of making any binding decision of its own.

16.  Following a consultation launched in 2020, aimed at reviewing the performance of the BT Commitments to date, Ofcom published its "Statement in its Consultation on Protecting voice-only landline telephone customers" on 25 March 2021 ("the 2021 Statement"). In it, Ofcom accepted a renewed BT Commitment with price increases for VOCs limited to inflation and in any event within a safeguard cap of 2.5% of the price of line rental. This commitment would last 5 years. The existing commitment in respect of SPCs continues as before.

17.     It will be seen from the terms of the CPO that the claim in respect of VOCs is for a three-year period, which ends with the commencement of the Commitments on 1 April 2018. For reasons of limitation, that period does not start any earlier than 1 October 2015. The claim in respect of the SPCs runs up until the determination of it by this Tribunal, since they were not the subject of the Commitments.

## THE DAMAGES SOUGHT

18.     The  damages claimed are presently quantified up to 31 March 2022. The total, inclusive of VAT and compensating for inflation, but before interest, is about £1,101m. This is made up of £430m for VOCs and £671m for SPCs. Interest is then claimed on a compound basis up to December 2022, which would increase the total damages claimed to £1,307m. If simple interest were added instead, the total claim would be around £1,278m. There are various significant issues between the parties on quantum.

19.     The total number of claimants is a maximum of 3.8m. This will include customers who were in one of the two sub-classes at some point within the relevant claim period, even if they were not customers at the beginning and/or not customers at the end. Of that total of 3.8m, and before any adjustments for death and intestacy and before taking account of any of the other quantum points, 1.8m members of the Class were VOCs and 2m members of the Class were SPCs. The precise number of Class Members for each year, and which members were VOCs or SPCs, is now agreed.

20.     There is an alternative claim in damages, which is less than the principal claim. It is based on excessive and unfair prices for access only, i.e.  line rental.

21.     Although there are two sub-classes, namely VOCs and the SPCs, the CR's claim is in respect of both of them, with no alternative claim for just one of them. In other words, the claim is made on an "all or nothing" basis.

## THE CORE ISSUES

22.     These are set out below.

### Liability Issues

23.     Both sides accept that there are four key stages in the analysis of the CR's claim that BT has abused its dominant position, which can be framed as follows:

(1)     Market Definition: is there a distinct market consisting of the supply of SFV Services only as opposed to some wider market, in particular one including bundles?

(2)     Dominance: if so, is BT dominant in that market?

(3)     Excessive pricing (Limb 1): if so, did BT charge prices for its SFV Services to the VOCs and SPCs over the claim period which were excessive?

(4)    <u>Unfairness (Limb 2)</u>: if so, were such excessive prices unfair and thereby abusive?

24.    It follows that if the answer to any one of those questions is "No", the CR's claim must fail.

25.    The references to Limbs 1 and 2 are, of course, to the analysis contained in the judgment of the CJEU in *United Brands v European Commission* [1978] 1 C.M.L.R. 429, which the parties described as "seminal". The case itself is dealt with below. All of the economic experts, as well as the parties' submissions, addressed these four questions separately, and in that order.

**Quantum Issues**

26.    These are as follows:

(1)    <u>Failure to Mitigate</u>: did the Class fail to mitigate its loss by failing to switch to alternative providers or other suitable BT tariffs, including bundles?

(2)    <u>Basis of Overcharge</u>: the approach to the amount of overcharge, as a matter of principle;

(3)    <u>The size of the Class</u>:

(a)    Business customers who purchased SFV Services: should they be excluded from the Class?

(b)    Class Members who were gifted broadband: should they be included?

(c)    Class Members who are deceased without personal representation: it is agreed that they should be excluded from the Class, and the question is how many there are;

(4)    <u>Interest and inflation</u>:

(a)    Inflation: should damages be uprated to take inflation into account?

(b)    Compound Interest: should compound interest be awarded as damages for loss of use of monies?

(c)    Simple Interest: how much should be awarded by way of simple interest?

## <u>THE PARTIES' SUBMISSIONS</u>

27.    The CR and BT each produced detailed opening submissions on 10 and 17 January 2024 respectively ("Openings") and lengthier, detailed closing submissions on 12 March 2024 with various Appendices ("Closings"). The latter were followed by oral closing submissions. We also have the benefit of two sets of submissions from the Competition and Markets Authority ("CMA"), whom we permitted to intervene, filed on 29 July 2022 ("CM1") and 14 November 2023 ("CM2"). Counsel for the CMA did not take part in the trial, save to make some brief opening submissions.

28.    We should add that, at various stages during the trial, the parties helpfully produced further materials, sometimes in agreed letters and sometimes in the form of further diagrams, tables or spreadsheets.

29.    In this judgment, we have not dealt specifically with every single point or argument made by the parties or every single piece of evidence. Had we attempted to do so, this would, in the words of Teare J in *The Suez Fortune* [2019] EWHC 2599 (Comm) at paragraph 26, have resulted in a judgment of "intolerable length". This is in the context of a case where, apart from the weeks of expert evidence, together with lay evidence, there were in total over 660 pages of detailed written submissions, with over 3,600 footnotes, dealing with references and other matters, and 5 days of closing arguments. While all of that has been considered by us, what we have done in the judgment is to deal with the parties' key points, and the key materials, on all matters. It is neither necessary nor appropriate to do more.

## THE EVIDENCE

### Lay Witnesses

30.    For the CR, there were no lay witnesses.

31.    For BT, there were the following lay witnesses, all of whom gave oral evidence:

(1)    Jonathan Bunt, the present Director of Regulatory affairs for the BT Consumer Business Unit, who has produced 3 witness statements ("WSs") dated 29 April 2021, 23 February and 3 August 2023 ("JB1, JB2, and JB3");

(2)    Margaret Blight, the present Start-up Partnerships Director employed by BT, who produced one WS dated 23 February 2023 ("MB1");

(3)    Deirdre Cheek, the current principal of Regulatory Affairs within the Regulatory Team of BT Group. She produced one WS dated 18 February 2023 ("DC1"), and

(4)    Richard Cackett, the current Director of Commercial Finance at BT Consumer. He produced one WS dated 23 February 2023 ("RC1").

32.    We accept that all the BT witnesses were doing their best to assist the Tribunal. Occasionally, a witness took some time to answer a question or appeared not to be entirely objective, but this is not a case where we would conclude that any witness's evidence was simply implausible or not credible as a whole. Nor is this a case where some key primary fact turned exclusively or mainly on witness evidence. Where we perceived a difficulty with a witness's evidence which was relevant, we will refer to it in context, below.

### Experts

33.    There were the following expert witnesses for the CR, all of whom gave oral evidence:

(1)    David Parker, an economist with the consultancy Frontier Economics Limited and latterly Berkeley Research Group (BRG) which specialise in micro economic analysis. In addition

to DP1 and DP2 (see above), he has produced 3 further reports, DP3, DP4 and DP5, dated 29 September 2023, 10 November 2023 and 8 February 2024 respectively;

(2)    Martin Duckworth, an economist also with Frontier Economics Limited, who has produced reports dated 29 September and 10 November 2023 ("MD1 and MD2");

(3)    Prof. Graham Loomes, a behavioural economist and Professor of Behavioural Science at Warwick Business School; he has produced 2 reports dated 7 September and 10 November 2023 respectively ("GL1 and GL2"); and

(4)    Jonathan Punter, a consulting actuary with the firm Punter Southall, who has produced 3 reports dated 29 September, 10 November and 28 November 2023 ("JP1, JP2 and JP3") together with a supplemental note dated 6 October 2023.

34.    The expert witnesses for BT, all of whom gave oral evidence, were as follows:

(1)    Dr Helen Jenkins, an economist who specialises in empirical microeconomics, and a partner of Oxera Consulting LLP. She has produced 3 reports, dated 29 September and 10 November 2023 and 11 February 2024 ("HJ1, HJ2 and HJ3");

(2)    David Matthew, an economist who is Managing Director of NERA Economic Consulting. He has produced 2 reports, dated 29 September and 10 November 2023 ("DM1 and DM 2");

(3)    Dr Stefan Hunt, an economist and partner at Keystone Europe Limited, a consultancy specialising in microeconomics strategy and technology analysis. He has produced one report dated 29 September 2023 ("SH1"); and

(4)    Bob Scott, an actuary and Senior Partner in Lane Clark and Peacock LLP, a firm of consultants and actuaries ("BS1").

35.    The economic experts produced a joint statement on 15 December 2023 ("the JES"). The behavioural economists produced a joint statement on 14 December 2023 ("the Behavioural JES"), and the actuarial experts produced a joint statement on 15 December 2023 ("the Actuarial JES").

36.    The issues which the various experts evidence addressed are set out in the table below, using the expert's initials.

| Issue | CR expert | BT expert |
|---|---|---|
| Market definition | DP | HJ |
| Dominance | DP | HJ |
| Excessive Pricing – Limb 1 | DP, MD | HJ, DM |
| Abuse – Limb 2 | DP, GL | HJ, DM, SH |
| Deceased members without PRs | JP | BS |
| Members with gifted broadband and Business Customers | DP | HJ |

37.    We did face some difficulties with the economic expert evidence. This is because, in the case of many areas of dispute, the methodologies employed by each of the opposing experts were quite different. Perhaps because of this, at various points each party submitted that the other party's line of analysis should be rejected entirely. As will be seen, for the most part, we did not rule out a line of reasoning as simply illegitimate *per se* but rather took account of possible defects so that our approach then blended the outcomes of the various models so to reach the appropriate outcome. Sometimes, for example with Dr Jenkins, she would produce a set of alternative outcomes or "sensitivities" which represented what, for her, was a more "conservative" outcome than her primary outcome. This, at least, gave us some alternative views to consider. In addition, on occasion, each side's experts would "run" the other side's expert's analysis to see if it altered their outcome or not. Finally, and at our request, both sides produced alternative analyses using different figures for the purpose of the Limb 1 exercise. Here, that produced by the CR contained somewhat more variables than that produced by BT. All of this was useful, but it did not remove entirely the need, as we saw it, to consider outcomes that were not directly the product of either side's approach. This is perhaps inevitable in cases of this kind where sets of figures, percentages and comparisons are so important and which are therefore highly fact and expert opinion sensitive.

38.    As for the experts themselves, as with BT's lay witnesses, this is not a case where one side's expert can be criticised as generally lacking credibility or relevant experience. All of the experts, but particularly Mr Parker and Mr Duckworth for the CR, and Dr Jenkins for BT, are highly experienced, both in their fields and in giving evidence to tribunals such as this. On occasion, all of them could be said to have strayed into arguing their case and losing objectivity, or speculating. In general however, the experts did their best to assist us. The economic experts had to deal with our numerous questions for each of the hot tub sessions (which we notified in advance) as well as cross-examination, and the ground they covered was very extensive, as will be made clear below. Their professional and constructive approach to these exchanges during the hearing, even on matters where they disagreed with one other, greatly assisted us in reaching our conclusions on the core economic issues. We should add that we found the JES a particularly useful document.

**Documentary Evidence and Glossary**

39.    As might be expected in a case of this kind there is a substantial volume of documents. Most are BT internal documents. A large number were put to witnesses, but there was a further number which were only referred to in the parties' submissions, principally their Closings. We refer to many

internal documents below, but are conscious of the fact that, on various occasions, both sides referred to them selectively, and we have borne this in mind.

40.    The other main repository of documentary references is the material produced by Ofcom. We refer to that, and its significance or otherwise, below.

41.    Further, and in the light of the very many technical terms and acronyms used in the evidence and documents, we append to this judgment a Glossary. This is not agreed as such, but it is one which we have derived from the Agreed Glossary dated 13 February 2024; for the most part the changes are to add items or to delete items which are unnecessary.

## THE LAW – THE GENERAL POSITION

### Introduction: *United Brands*

42.    Section 18 of the Act provides:

> "Abuse of dominant position…
> (1) Subject to section 19, any conduct on the part of one or more undertakings which amounts to the abuse of a dominant position in a market is prohibited if it may affect trade within the United Kingdom.
>
> (2) Conduct may, in particular, constitute such an abuse if it consists in— (a) directly or indirectly imposing unfair purchase or selling prices or other unfair trading conditions;…."

43.    At paragraph 56 of his judgment in in the Court of Appeal in *CMA v Flynn Pharma Ltd* [2020] EWCA Civ 339 ("*Phenytoin*"), Green LJ (with whom Sir Geoffrey Vos C (as he then was) and Sir Stephen Richards agreed) said that the starting point for a claim based on unfair pricing is the judgment of the CJEU in *United Brands.*, which all parties there described as "seminal". Paragraphs 248–254 thereof read as follows:

> "[248] The imposition by an undertaking in a dominant position directly or indirectly of unfair purchase or selling prices is an abuse to which exception can be taken under Article 86 of the Treaty.
>
> [249] It is advisable therefore to ascertain whether the dominant undertaking has made use of the opportunities arising out of its dominant position in such a way as to reap trading benefits which it would not have reaped if there had been normal and sufficiently effective competition.
>
> [250] In this case charging a price which is excessive because it has no reasonable relation to the economic value of the product supplied is such an abuse.
>
> [251] This excess could, inter alia, be determined objectively if it were possible for it to be calculated by making a comparison between the selling price of the product in question and its cost of production, which would disclose the amount of the profit margin; however the Commission has not done this since it has not analysed UBC's costs structure.
>
> [252] The question therefore to be determined is whether the difference between the costs actually incurred and the price actually charged is excessive and, if the answer to this question is in the affirmative, to consider whether a price has been imposed which is either unfair in itself or when compared to competing products.
>
> [253] Other ways may be devised-and economic theorists have not failed to think up several-of selecting the rules for determining whether the price of a product is unfair.
>
> [254] While appreciating the considerable and at times very great difficulties in working out production costs which may sometimes include a discretionary apportionment of indirect costs and general expenditure and

which may vary significantly according to the size of the undertaking, its object, the complex nature of its set up, its territorial area of operations, whether it manufactures one or several products, the number of its subsidiaries and their relationship with each other, the production costs of the banana do not seem to present any insuperable problems."

44.    Both parties, and indeed the Tribunal in this case, have referred to the two questions raised in paragraph 252 of *United Brands* as "Limb 1" and Limb 2". Limb 1 considers whether the price is excessive and if so, Limb 2 considers whether it is unfair either in itself or when compared to competing products. We noted this at paragraph 25 above.

45.    The *United Brands* test has of course been considered in many cases. For our purposes, there are the following key English authorities which all deal with excessive pricing:

(1)    The decision of the Court of Appeal in *Phenytoin*;

(2)    The decision of the Tribunal in *Albion Water Ltd v Water Services Regulation Authority and United Utilities Water plc* [2008] CAT 31 ("*Albion Water II*");

(3)    The decision of the Tribunal in *Hg Capital LLP v CMA [2023] CAT 52* ("*Liothyronine*") and

(4)    The decision of the Tribunal in *Allergan plc v CMA* [2023] CAT 56 ("*Hydrocortisone*")

46.    We set out below the principal points to be derived from those four cases, making reference to other case-law where appropriate, and then deal with some further, specific matters.

47.    Above and beyond stating the general principles which are applicable, we have avoided detailed consideration of particular areas of law where the parties do not appear to be in disagreement. Rather we have concentrated on where they are, or may be.

**Phenytoin**

48.    We deal with *Phenytoin* first, since it is Court of Appeal authority. This was an appeal from a decision of the Tribunal dated 7 June 2018 ([2018] CAT 11) which, in turn, had upheld an appeal from a decision of the CMA which had held that the relevant prices for the drug were unfair and thus abusive. The Tribunal set aside the CMA's decision. The Court of Appeal dismissed the appeal against the decision of the Tribunal, although on different grounds to those given by the Tribunal, and remitted the matter back to it. The particular issue in *Phenytoin* concerned the correct approach to be taken by the CMA when considering the methodology used to ascertain the competitive benchmark which forms part of the Limb 1 analysis. The Court of Appeal held that when a competition authority is determining a competitive benchmark, there is no rule of law requiring it to use one particular method, which is effectively what the Tribunal had decided. However, even though it had a margin of appreciation to decide what methodology to use, and what evidence to rely upon, where the undertaking said to have abused its dominant position had put forward sound evidence and arguments tending to show that its prices were fair, the CMA was under a duty to

16

evaluate fairly and impartially all the arguments and evidence advanced. It had not been open to the CMA here to ignore the comparator evidence raised by the undertakings in their defence. So the outcome, so far as the CMA's decision was concerned, was the same, which was that it was wrong.

49.    The particular point at issue in *Phenytoin* is not an issue here, but having considered the relevant authorities including *United Brands*, Green LJ made some general observations about abuse of dominant position by reason of excessive pricing as follows:

> "97 I would draw the following general conclusions from the case law about the test to be applied: (i) The basic test for abuse, which is set out in the Chapter II prohibition and in article 102FEU, is whether the price is "unfair". In broad terms a price will be unfair when the dominant undertaking has reaped trading benefits which it could not have obtained in conditions of "normal and su□ciently e□ective competition", ie "workable" competition. (ii) A price which is "excessive" because it bears no "reasonable" relation to the economic value of the good or service is an example of such an unfair price. (iii) There is no single method or "way" in which abuse might be established and competition authorities have a margin of manoeuvre or appreciation in deciding which methodology to use and which evidence to rely upon. (iv) Depending upon the facts and circumstances of the case a competition authority might therefore use one or more of the alternative economic tests which are available. There is however no rule of law requiring competition authorities to use more than one test or method in all cases. (v) If a cost-plus test is applied the competition authority may compare the cost of production with the selling price in order to disclose the profit margin. Then the authority should determine whether the margin is "excessive". This can be done by comparing the price charged against a benchmark higher than cost such as a reasonable rate of return on sales (ROS) or to some other appropriate benchmark such as return on capital employed (ROCE). When that is performed, and if the price exceeds the selected benchmark, the authority should then compare the price charged against any other factors which might otherwise serve to justify the price charged as fair and not abusive. (vi) In analysing whether the end price is unfair a competition authority may look at a range of relevant factors including, but not limited to, evidence and data relating to the defendant undertaking itself and/or evidence of comparables drawn from competing products and/or any other relevant comparable, or all of these. There is no fixed list of categories of evidence relevant to unfairness. (vii) If a competition authority chooses one method (e g cost-plus) and one body of evidence and the defendant undertaking does not adduce other methods or evidence, the competition authority may proceed to a conclusion upon the basis of that method and evidence alone. (viii) If an undertaking relies, in its defence, upon other methods or types of evidence to that relied upon by the competition authority then the authority must fairly evaluate it…
>
> 107 Pulling the strands together I conclude that the economic literature supports the conclusions of law that I derive from the case law summarised above (cf para 97). There are many di□erent tests which might be used to determine whether a price is excessive and unfair; there are or may be di□culties with all tests and much will depend upon the availability of evidence and data; all cases are highly fact and context specific; there is a need for competition authorities to be able to intervene ex post in pharmaceutical cases; and, it is economically rational that competition authorities should have a margin of appreciation as to the choice of method and evidence that they seek to rely upon…
>
> 125 In my view by the nature of the abuse in issue there needs to be "a" benchmark. But, in the first instance at least, the choice of benchmark is for the competition authority to choose and can be based upon the costs of the undertaking being investigated or it can be based upon comparables such as the prices charged by the same or di□erent undertakings in the same or di□erent geographical markets or indeed any other benchmark or combinations thereof capable of providing a "su□cient" indication that the prices charged are excessive and unfair. It follows from the above that assuming the Tribunal was mandating the use in all cases of a hypothetical benchmark price which did not include the costs of the undertaking or some other benchmark related to the undertaking, then I respectfully disagree with the Tribunal…
>
> 154 The concept of economic value is not defined. In broad terms the economic value of a good or service is what a consumer is willing to pay for it. But this cannot serve as an adequate definition in an abuse case since otherwise true value would be defined as anything that an exploitative and abusive dominant undertaking could get away with. It would equate proper value with an unfair price. This is a well-known conundrum in international competition law. The same point was made by the Court of Appeal in Attheraces [2007] Bus LR D77; [2007] UKCLR 309, para 205. The issue was first identified in US antitrust and arose from criticisms of the judgment of the Supreme Court in United States v Du Pont & Co (1956) 351 US 377 when it attracted the

soubriquet "the cellophane fallacy". To overcome this in United Brands in para 250 the court held that there must be a "reasonable" relationship between price and economic value.

155 The simple fact that a consumer will or must pay the price that a dominant undertaking demands is not therefore an indication it reflects a reasonable relationship with economic value. But a proxy might be what consumers are prepared to pay for the good or service in an effectively competitive market, hence the relationship between the two descriptions of abuse in paras 249 and 250 and the fact that the economic value description is said to be an example of the broader description of an abuse in para 249…

171 First, the Tribunal observed that this [ie economic value] was clearly a legal test. The categorisation of this as a "legal" concept seemingly led the Tribunal to treat economic value as a discrete component of the test in law to be applied. It is "legal" in the strictly limited sense that it has been ascribed a meaning in a court judgment but, at base, it is an economic concept which describes what it is that users and customers value and will reasonably pay for and it arose in the United Brands judgment [1978] ECR 207 as an economic description of the abuse of unfair pricing: see the analysis at para 61 above.

172 Second, the Tribunal did not agree with the submissions of all parties that economic value was simply a matter to be taken into account as part of other components of the test. The Tribunal held that it was not part of the "in itself" test but was part of "a more general assessment" (Judgment, paras 427 and 443(6)). I agree with the parties on this. It is evident from the judgment in United Brands that the reference to "economic value" is a part of the overall descriptor of the abuse; it is not the test. The test should therefore, when properly applied, be capable of evaluating economic value. So, for instance, as the CMA argues, when evaluating patient benefit it would be possible to measure its economic value in the plus element of cost-plus, or even in the fairness element. Equally, if there is evidence of the prices being charged in relevant, comparator, markets which were e☐ectively competitive then those prices could be capable of acting as proxy evidence of the economic value of patient benefit. In so far as an issue of fact arises which can be categorised as an aspect of "economic value" it needs to be measured and it can be evaluated in various parts of that test. If it is properly factored into "plus" or "fairness" or into some other part of the test, or is reflected in other evidence which can stand as a proxy for economic value, then there is no incremental obligation to take it into account again, as a discrete advantage or justification for a high price. In para 421 the Tribunal states that the analysis of economic value conducted at other stages of the test are "broadly similar" but that there is a "di☐erent perspective". With respect I do not follow this. The analysis of the Tribunal, for instance as articulated in para 443(6) of the Judgment (set out at para 40 above), suggests that it is a requirement discrete from other components of the test to be applied only after all those components have been worked through. But if this were so it would (wrongly) risk compelling a competition authority to double count economic value. In short, economic value needs to be factored in and fairly evaluated, somewhere, but it is properly a matter which falls to the judgment of the competition authority as to where in the analysis this occurs."

50.    Before considering these paragraphs as a whole, something more needs to be said about the reference to "economic value" in paragraph 172. This arose because the Tribunal had found, or appeared to have found, that in addition to undertaking the Limb 1 and Limb 2 exercise to reach a judgment on unfairness, the authority had also to consider, in the round as it were, what the economic value of the product was and whether the price charged bore no reasonable relation to it. See paragraphs 427 and 443 (6)-(8) of the decision of the Tribunal. The Court of Appeal disagreed with that approach. There is no further overarching test concerned with economic value, although it needs to be taken into account somewhere.

51.    Without wishing to parse the paragraphs quoted in paragraph 49 above as if they were a statute, it seems to us that they yield the following propositions which are relevant for present purposes and which apply as much to the Tribunal as they do to the CMA:

(1)    To be abusive, the price must not only be excessive but also unfair;

(2)    It will be unfair if the dominant undertaking has reaped trading benefits which it could not have obtained in conditions of workable competition;

(3)    If a price is excessive and bears no reasonable relation to the economic value of the service in question, this is an example of an unfair price. However the lack of a reasonable relation to the economic value of the service is not itself the test; rather, it is an economic description of the abuse. It needs to be considered at some point in the analysis: this could be under the Limb 1 or Limb 2 exercise;

(4)    Where the price is found to be excessive, whether it is unfair will depend on a number of factors including, but not limited to, evidence and data relating to the defendant undertaking itself and/or evidence of comparables drawn from competing products and/or any other relevant comparable, or all of these. There is no fixed list of categories of evidence relevant to unfairness. In particular, if the question of economic value (see below) has not been taken into account under Limb 1, it must be considered as part of the unfairness exercise under Limb 2.

52.    Interposing there, in our view, both parties here did ultimately seek to take the question of economic value as part of the Limb 2 assessment of unfairness, rather than in the context of Limb 1 excessiveness. (Mr Parker was disposed sometimes to bring it into the question of excessiveness, but we did not agree with this and in any event, it was not ultimately the CR's case.)

53.    For our part, and notwithstanding the flexibility open to a court or competition authority as to where to take into account the question of economic value, we consider the approach taken by the parties to be a helpful one. This is for two reasons. First, it enables the Limb 1 exercise, complex and challenging as it may be, to focus on the linear process of deciding (a) the relevant competitive benchmark, (b) the excess of the price (if any) over that benchmark, and (c) whether such excess is significant and persistent (for the latter, see paragraphs 54-55 below). One would perhaps hesitate to describe such a process as "mechanical" where the underlying questions can be the subject of hotly contested expert evidence and where they involve various value judgments, and moreover where there is a margin of appreciation afforded, at least to a competition authority. Nonetheless, we consider that it is, from an analytical point of view, "cleaner" and more efficient if the question of economic value can be considered as part of the Limb 2 unfairness exercise which, on any view, is clearly less "mechanical" than the Limb 1 exercise, and where a multiplicity of different factors can be taken into account.

54.    As for the nature or extent of the excess of price over the competitive benchmark which needs to be shown, in the end, both parties here were content to adopt the expression "significant and persistent".

This expression has its origins in paragraph 56 of the decision of the Court of Justice in *Latvian Copyright* [2017] 5 C.M.L.R. 19:

> "It should be emphasised in this regard that, as observed by the Advocate General in point 107 of his Opinion, the difference must be significant for the rates concerned to be regarded as "abusive". Furthermore, that difference must persist for a certain length of time and must not be temporary or episodic."

55.    It was adopted by the Tribunal in its decision in *Phenytoin*. It was not expressly referred to by the Court of Appeal, no doubt because there was no appeal issue relating to it. We also proceed on the basis that a significant and persistent excess needs to be shown.

56.    It also appears to us to be implicit in the judgment of the Court of Appeal in *Phenytoin* at paragraph 97 (vi) that if and when Limb 2 is reached, the Court should balance all the factors involved which go one way or the other, giving them such weight as it considers appropriate, so as then to conclude whether the price was itself unfair. Of course, the very size of the excess can be a factor pointing strongly towards unfairness. On the other hand, it would, in our view, be wrong to approach the Limb 2 exercise as if there were a presumption of unfairness established already by the mere fact that the price was excessive under Limb 1, subject only to any justification which the defendant can establish. We do not see the decision in *United Brands* as directing such an approach, nor do we see why it is necessary. Nor do we see the reference by Green LJ in *Phenytoin* at paragraph 97 (v) to "other factors which might otherwise serve to justify the price charged as fair" (quoted at paragraph 49 above) to mean that there was some presumption of unfairness. All it meant was evidence or arguments pointing towards fairness rather than unfairness. Indeed that is demonstrated by paragraph 97 (vi).

57.    The importance of distinguishing between the Limb 1 and Limb 2 exercises was emphasised by Laddie J in *BHB v Chandler* [2005] EWHC 1074 (Ch):

> "51. I do not accept that this supports the proposition advanced on behalf of VCI. On the contrary it appears, particularly from the paragraph 252 of the judgment [in *United Brands*], that all the ECJ was saying was that comparing prices with costs determines the profit margin. Once that has been achieved it is necessary to go on to the next stage to determine whether the price is unfair. What it did not do was suggest that high prices or high margins are the same as unfair prices. Indeed, were Mr Turner right, it seems to me that the law reports would be full of cases where undertakings in dominant positions would have been found guilty of abuse by simply charging high prices. As Mr Vaughan says, the reality is that there are no such cases."

58.    In paragraphs 195 and 208 of *Attheraces Limited v British Horseracing Board* [2007] EWCA Civ 38, the approach of Laddie J in *BHB* on some related issues (although not this paragraph – which was not discussed) was endorsed by the Court of Appeal.

**Albion Water II**

59.    *Albion Water II* was an appeal to the Tribunal from a decision of the Welsh Water Authority that certain charges made by Albion Water for the carriage of non-potable water through a pipeline to a particular water company were not excessive (and therefore could not be unfair) for the purposes of a Chapter II claim. It, of course, preceded *Phenytoin*.

60.   As to the most appropriate methodology the Tribunal stated as follows:

> "88. Despite the various cases in this area, no consensus has emerged as to what, if any, is the most appropriate method of measuring cost in excessive pricing cases. The ECJ has stated that the "costs actually incurred" must be ascertained (United Brands, paragraph [252]), but there is no rule of law as to how that is to be done: it is a matter of fact, accounting technique and economic assessment. However, community jurisprudence only permits the inclusion of efficiently incurred costs (see Case 395/87 Ministère Public v Tournier [1989] ECR 2521, [1991] 4 CMLR 248, at paragraph [42]."

61.   It also stated that the relevant costs to be calculated were those which were "reasonably attributable" to the production of the relevant service. See, for example, paragraph 198. Such relevant costs would then be added to a reasonable margin to make up the "competitive benchmark".

62.   As for the extent of any excess required under Limb 1, the Tribunal was prepared to accept, as contended for by the Authority, that the excess needed to be "material" while declining to specify when a particular percentage excess would reach that materiality threshold. It sufficed to say that a price of at least 46.8% above the costs reasonably attributable to the relevant water supply was materially excessive. Ascertaining the extent of the excess involved a "proper degree of discretionary judgment by the decision-maker". We do not consider that there is any real difference between the threshold of "material" and "significant".

63.   The Tribunal also made the following observations about economic value, summarising what was said in paragraphs 203-217 of the decision of the Court of Appeal in *Attheraces*:

> "222. The European Commission (in *Scandlines*) and the Court of Appeal (in *Attheraces*) have both stated that the concept of economic value does not necessarily, or always, imply a cost-based approach, still less according to any particular measure of cost. It is clear that the economic value of a product or service should take account also of relevant "non-cost-related factors", i.e. factors other than the cost of supplying a product or service but which mean that a product or service has a particular enhanced value from the customer's perspective…
>
> 224…the parties drew the Tribunal's attention to the passages in the judgment of Mummery LJ [in *Attheraces*] at paragraphs [203] et seq. From these a number of principles emerge:
>
> (a)    Subject to what is envisaged by Article 82 EC, the economic value of a product or service is what it would fetch (paragraph [205]).
>
> (b)    Article 82 and the Chapter II prohibition proceed from the premise that the undertaking has a dominant position enabling it to distort the market in which it operates. Dominance may have the effect of distorting the economic value of the product or service (paragraph [205]).
>
> (c)    It does not follow that whatever price a seller in a dominant position exacts, or seeks to exact, is necessarily an abuse of his dominant position (paragraph [206]).
>
> (d)    The economic value of a product is a different concept from its cost. Although a comparison between price and cost of supply (plus a reasonable return) may be a first step in the analysis of economic value, it is not conclusive on the question of unfair pricing and the existence of an abuse (paragraphs [207], [209] and [213]).
>
> (e)    It is relevant to consider whether the customer's competitiveness had been, or was at risk of being, materially compromised by the terms of supply (paragraphs [215] and [217])…
>
> 225…In our view, the Authority was correct to observe at paragraph 12.61 of the Report that neither Scandlines nor Attheraces "excludes the possibility that, in the absence of relevant non-cost-related factors, the very excessiveness of a price could be sufficient to establish that the price bears no reasonable relation to the economic value of the product/service being provided." This approach is also consistent with that taken by the European Commission in Deutsche Post (see paragraph [203] above)."

64.     We accept that, to the extent that a product or service has a particular enhanced value from the customer's perspective, that is looking at the matter from a subjective (i.e. the customer's) point of view. Indeed, there was some evidence adduced before us on that very question of customers' actual preferences or views in relation to SFV Services.

65.     In *Albion Water II* itself, the Tribunal observed as follows:

> "216. The test laid down by the ECJ, like the prohibition in Article 82 itself, contains words – "bears", "reasonable", "relation" – which lack precision. Their practical application depends on the legal and economic context. It follows that there is no single correct measure of the 'economic value' of an asset such as the Ashgrove system. As the Tribunal has already held in paragraph [310] of the main judgment, and as the parties have accepted in their pleadings, whether a given price bears "no reasonable relation" to its "economic value" is a matter of degree, which involves a considerable margin of appreciation, not least because the concept of "economic value", and whether the price has a "reasonable" relation to that value, are matters of judgment."

66.     We would agree with that observation.

67.     The Tribunal went on to conclude that the extent of economic value contended for by the Authority had not been shown. Rather, it was limited, as follows:

> "249.     It follows from the foregoing that the economic value of the services to be supplied in this case was not more, or not significantly more, than the costs reasonably attributable to the service of the transportation and partial treatment of water by Dŵr Cymru, generally and through the Ashgrove system in particular."

68.     In other words, there was no real economic value above the underlying costs of supplying the service.

69.     The Tribunal further noted that factors going to the establishment of a dominant position, notably barriers to entry, may well be relevant to determining whether the price was so high as to amount to an abuse. This was particularly true in excessive pricing cases where it was important to distinguish excessive prices which were shielded from effective competitive pressure, as opposed to temporarily high prices which were the subject of normal market forces in a competitive market. While the former would not in itself establish an abuse, it suggests that the Tribunal should review with care the lawfulness of the price which was unconstrained by any competitive considerations whatsoever. It goes to the question as to whether the relevant market was capable of functioning in a manner likely to produce a reasonable relationship of price to economic value. This was not the case in *Albion Water II,* because the water authority had a 100% share of the relevant market and there were significant barriers to entry. See paragraphs 213 and 266-270 of the judgment.

70.     In addition, the Tribunal's decision in *Phenytoin* ([2018] CAT 11) also considered (at paragraph 369) that the CMA was entitled to have regard to the substantial disparity between the companies' prices and their economic value, the fact that competitive conditions on the markets showed that they did not function in a manner which was likely to produce a reasonable relation between the two, that the prices had an adverse effect on the end customer, and the fact that the companies were aware of this.

71.    We return to the question of economic value when considering the case of *Hydrocortisone* below.

**Liothyronine**

72.    The main relevance of this case, for our purposes, concerns what it says about so-called "entry-incentivising prices" in the context of setting a reasonable margin. This is best dealt with in context, and we do that at paragraphs 597 - 599 below. We would only add here that the Tribunal in *Liothyronine* also endorsed the observations made by the Tribunal in *Albion Water II* at paragraph 222, set out in paragraph 63 above.

**Hydrocortisone**

73.    There are various aspects of this decision of the Tribunal which we found helpful.

74.    First, there is a point as to the correct analytical approach. Here, the Tribunal observed as follows:

> "(2) The dangers of backward reasoning
> 153. Particularly where the abuse alleged is one of excessive pricing, there is great danger in reasoning backwards from a perceived excessive – and so potentially abusive – price.
> The backwards reasoning goes like this:
>     (1) Only a dominant undertaking can raise price so as to constitute an abuse of a dominant position. If the undertaking were not dominant, competition would ensure a "proper price".
>     (2) Therefore, if the price is abusive, the undertaking is dominant.
>     (3) If the undertaking is dominant, then the market must be defined consistently with that finding of dominance.
>
> 154. Particularly in difficult cases, it is important to keep the processes of (i) market definition, (ii) dominance and (iii) abuse as distinct analytical stages. Take an allegedly wantonly or obviously abusive monopoly, where it appears that the monopolist is charging abusive monopoly rents because (i) the monopolist has the market power and (ii) it pays the monopolist to exercise that power because high margins on low sales are what brings in more revenue than smaller margins on higher sales. In such a simple case, it is tempting to reason from outcome, as follows: (i) the price is abusively high (the outcome), (ii) therefore there is dominance (because the monopolist could not abuse market power without dominance) and (iii) therefore the market has got to be defined as excluding what might otherwise be regarded as substitutes to the monopolist's product, so as to achieve the dominance in the market to render an abuse of dominance possible.
>
> 155. The problem with this sort of reasoning is that whilst the conclusion (an abuse of a dominant position) may be right, the reasoning assumes that which needs to be tested for. For that reason, this approach is to be deprecated as creating an avoidable risk of wrong outcomes. The fact is that there are many explanations for high prices that are consistent with competitive behaviour and inconsistent with a finding of infringement of the Chapter II prohibition…"

75.    In general, we agree with the above paragraphs. They are consistent with the approach which we advocate in paragraph 53 above. Of course, in a case involving allegations of exploitatively high prices, there are a number of common threads that run through the assessment of the three questions of market definition, dominance and excessively high prices. Consequently, <u>evidence</u> that is relevant to one of these questions might well also be relevant to the others, even though each of the three questions must be assessed independently of one another.

76.    At paragraphs 312 and 313, the Tribunal referred to the concept of consumer surplus which was a measure of the additional benefit that individual consumers receive because they are paying less for something than they would have been prepared to pay. At paragraph 313, the Tribunal said this:

> "Consumer surplus is an individual value, subjective to the individual consumer. In some cases, these subjective values will converge in that consumers will generally value something in a similar way (e.g. food, medical products, other "essential" goods), but even here subjectivity reigns (e.g. how a consumer might choose between food or a medical product). Consumer surplus is based on value to the consumer, measured in monetary terms. Assuming a consumer has the ability to pay, they will pay a price for a product up to and including the monetary value they place on it – but no more."

77.   Then, at paragraph 322, there is a detailed exposition of three potentially different situations where high prices (in the sense of being above the competitive benchmark) pertain. First, there may be relative inefficiency between sellers. Thus, while prices may be relatively similar, one producer may enjoy a higher surplus because it is more efficient ("Case 1") - see paragraph 322 (1). Second, one particular supplier may be able to generate - and provide - additional value through what the Tribunal refers to as the provision of "distinctive value" ("Case 2") - see paragraph 322 (2). Third, where producer surplus is generated for the undertaking without any added value to buyers ("Case 3") - see paragraph 322 (3).

78.   As to Case 2, this arises where buyers are in effect willing to pay a premium, i.e. more than they would pay for an alternative or substitute product. The term "distinctive value" (as opposed to "product differentiation") is designed to capture

> "…any definable aspect of a Seller's offering that adds value to the Buyer, in the sense that this aspect represents something that Buyers wish to purchase from that Seller in contradistinction to the offerings of other Sellers; and for which the Buyer will pay a premium."

79.   As for product differentiation itself, this is not confined merely to innovation but also to providing a better quality product in other ways and in catering to the subjective tastes or preferences of buyers.

80.   The Tribunal further observed at footnote 399 that investment in brand is also an example of what buyers may value and pay a premium for, even though other products are identical:

> "Investment in brand is also an example of this: for reasons that may well be objectively indefensible, Buyers will pay a premium for a "brand", even though the identical product is available unbranded. The owner of a (valued) brand may command a higher price, but will always be at risk from unbranded competition (or other brands)."

81.   Case 3 arises where the seller possesses market power which does not generate additional value for buyers. Here buyers are obliged to pay more for what is the same product. In such cases, the higher prices do not for some reason attract competition in the form of new entrants. This may happen where a single seller is able to create sufficient barriers to contestability so as to exclude other competitors.

82.   We see the usefulness of sketching out different scenarios where distinctive value is either offered or not offered, but would caution against too prescriptive an approach. As the Tribunal in *Hydrocortisone* itself observed at paragraph 323, the distinction between Cases 2 and 3 is by no means easy to draw and some cases will straddle both Case 2 and Case 3.

83.   Subject to the caveat just mentioned, we would adopt the concept of distinctive value as a useful yardstick by which to measure that value in the product which is different to its cost (as established

for these purposes by the relevant competitive benchmark under Limb 1) and which is something in some way different from the offerings of other sellers, but which can include the brand or other value ascribed subjectively by the customer for the product, as distinct from the product's particular features. In that regard, innovation in its features is not necessary if they are perceived by the customer (subjectively or objectively) to amount to a better quality product in some way. We did not understand BT to disagree with this proposition; see, for example, paragraphs 175-177 of its Opening and paragraphs 683-688 of its Closing. We would add that, in our view, the assessment of distinctive value (or not) is highly fact-sensitive and involves a considerable amount of judgment (as noted in paragraphs 65 and 66 above).

84.    There is a further aspect to the decision in *Hydrocortisone* which we consider in paragraphs 96 and 97 below.

**Other Cases and Matters**

85.    In the context of economic value, BT refers to what the Court of Appeal stated in *Attheraces* at paragraph 117:

> "Secondly, the central concept in abuse of dominant position by excessive and unfair pricing is not identified as the cost of producing the product or the profit made in selling it, but as the "economic value of the product supplied." The selling price of a product is excessive and an abuse "if it has no reasonable relation to its economic value."

86.    BT also referred to paragraph 155 in the same judgment which reads as follows:

> "A particularly high price and high profit margin may, however, be a determining factor if unjustified by any objective criteria, or in comparison with competing products, or where the dominant undertaking is exploiting its ownership of an essential facility….The approach was that, in principle, prices are excessive if they "are higher than would be expected in a competitive market" and "there is no effective competitive pressure to bring them down to competitive levels, nor is there likely to be." It was recognised that "measuring whether a price is above the level that would exist in a competitive market is rarely an easy task" but the difficulty of the exercise was not a reason for not attempting it."

87.    We would agree with both of those passages taken from *Attheraces*.

88.    We would add that *Attheraces* was a case where the first instance judge had found there to have been abuse because of the price charged by the BHB to betting companies for providing details of all the horse races on any given day. He did not consider, for the purposes of economic value, anything other than the costs of providing it. The Court of Appeal allowed BHB's appeal on the basis that the value to the "demand side" i.e. the betting companies, had to be considered as well as the "supply side" costs. The value of the information to the betting companies was very high, for without it they could not have run their businesses effectively. That was the case notwithstanding that the costs to the BHB of producing the information were low. Accordingly, the prices charged were not abusive.

89.    In the case of *Deutsche Post AG – Interception of cross-border mail* (OJ 2001 L 331, p. 400) 20 July 2001, Deutsche Post deemed mail containing any reference to Germany (for example, the

inclusion of a German reply address in the contents of the mail) to have a German sender and, accordingly, charged the full domestic tariff for such mail. The Commission decided that, by intercepting, surcharging and delaying normal cross-border mail in this way, Deutsche Post had abused its dominant position on the German market for the delivery of cross-border mail. Further, the Commission found that the price charged by Deutsche Post exceeded the average cost for delivering incoming cross-border mail by at least 25%, and that the price bore no reasonable relationship to actual costs or to the real value of the service provided. In that case, there was no invocation of economic value above the costs of supplying the service, and the Commission disagreed with Deutsche Post as to what those costs truly were.

90.    Two other factors should be mentioned: First, in considering whether the undertaking's conduct is abusive, it is legitimate to consider whether it had any anti-competitive or exploitative intent. That said, the presence of any such intent is not a prerequisite to a finding of abuse and equally, the absence of any such intent does not preclude such a finding. See the decision of the Court of Justice in *Tomra Systems v Commission* (2012) T-549/10 at paragraph 19-24.

91.    Second, a lack of transparency on the part of the relevant undertaking with regard to its conduct can be a factor going to unfairness. The Court of Appeal so held in *London & South-East Railway v Gutmann* [2022] EWCA Civ 1077 in connection with the rail company's operation of a system which fails to be transparent as to the availability of cheaper alternative prices for the same service.

**Unfairness by Comparison**

92.    All of the above factors are said to be relevant to the first form of abuse under *United Brands*, namely "unfair in itself". This was the main way in which the CR put its case here, but in the alternative, or as support for a finding of unfairness in itself, the CR made and maintained a case of unfairness by comparison. However, insofar as there was a case of "unfairness in comparison", the following points are relevant: First, comparators could be drawn from different markets or the same market at the same time, or comparators separated by time. The key point is whether such comparators are probative. Any such comparators should be selected in accordance with objective, appropriate and verifiable criteria and comparison should be made on a consistent basis. Further, comparators could be relevant under the first form of unfairness as well. See paragraph 331 (1) of *Hydrocortisone* and paragraph 308 (4) of the decision of the Tribunal in *Phenytoin*.

93.    Second, if the comparator prices are themselves distorted because they were not set in conditions of effective competition and were affected by the exercise of market power, they are not reliable. See, for example, *Phenytoin* at paragraph 155 and the decision of the Tribunal in *Hydrocortisone* at paragraph 348.

94.     Third, there is a more general point. This concerns the interrelationship between the "of itself" and "by comparison" elements of Limb 2. A claimant, absent anything else, does not have to establish unfairness by reference to both of these elements. In that sense, they can be said to be alternatives.

95.     However, that is not a complete picture. If, for example, a defendant wishes to put forward comparators by reference to which it is said that the price could not be regarded as unfair, the competition authority or claimant, as the case may be, must address those comparators. Once the comparators are engaged with, as it were, the exercise of assessing them then forms part of the overall assessment of unfairness or otherwise. If the conclusion, or provisional conclusion, is that the prices were unfair in themselves, then a finding of unfairness by comparison would support that position. Conversely, however, if the analysis of the comparators suggests that the prices in question were not unfair, then that conclusion must be fed into the overall assessment of unfairness as well. Otherwise, there would be no point in a defendant raising the issue of fairness by comparison. For those reasons, the Tribunal (or competition authority) must consider comparators if they are properly raised. All of this was made very clear by Sir Geoffrey Vos in his concurring judgment in *Phenytoin*:

> "*Issue 2: The both limbs issue: Was the CAT wrong to hold that the two-limb test for unfairness in para 252 of United Brands required the CMA to consider both limbs, even if the CMA had held the first "unfair in itself" limb satisfied?*
>
> 256 I was struck in the course of argument by the way in which this issue seemed to turn on semantic and black-letter reasoning. As I have said, Court of Justice decisions and Advocate General opinions are not to be construed as deeds. As is well known, they are generally and deliberately more nuanced and open to interpretation than decisions of domestic courts.
>
> 257 The CAT acknowledged at para 366 that it was clear from para 47 of the General Court in Scippacercoloa [2009] ECR I-46, and paras 101 and 103 of the Commission Decision in Scandlines Sverige AB v Port of Helsingborg [2006] 4 CMLR 23 that the two tests of unfairness in para 252 of United Brands [1978] ECR 207 are "alternatives, in the sense that an authority can, as a matter of law, establish a breach of article 102FEU under either alternative 1 or 2 and does not need to succeed under both".
>
> 258 The question under this issue is whether the CAT was right when it went on at paras 366 and 443(5) to say that: (i) the CMA did not have an unfettered choice between the two; (ii) a breach of article 102FEU could not be established by selecting only the first alternative, when a prima facie argument had been raised that under the other alternative, the pricing was fair; and (iii) the CMA could not find that there is an infringement where one alternative demonstrates unfairness and the other does not, as a matter of logic, to accord with the burden of proof, to respect the presumption of innocence, and to accord with the sanity check mentioned by Advocate General Wahl at point 124.
>
> 259 In my judgment, the CAT was wrong to say that the CMA was obliged to consider the second alternative of the unfairness test having decided that it was appropriate in all the circumstances to adopt the first alternative. As has been repeatedly said, the tests are alternatives. But I do agree with the CAT when it said at para 367 that the CMA could not "simply ignore a prima facie valid argument that a price is fair" whichever alternative it chose to adopt.
>
> 260 It, therefore, seems to me that the question of whether the choice between the two limbs of the unfairness test adumbrated in United Brands [1978] ECR 207 is a binary one, is an academic and irrelevant one. As will appear under issue 3 below, I take the view that the competition authority will always need, at least as part of its duty of good administration, to give some consideration to prima facie valid comparators advanced evidentially by the undertakings. That is so whether or not the CMA chooses to proceed eventually under the "unfair in itself" alternative of the unfairness test. Even in that situation, the fact that comparators are expressly mentioned under the second alternative does not absolve the CMA from giving whatever proper attention is

required to comparators raised by the undertakings. In these circumstances, I am in substantive agreement with Green LJ's conclusions on this point…

273 Green LJ also concludes at para 113 that (i) the CMA has no duty in every case proactively to investigate all comparators put forward by an undertaking that prima facie demonstrate that the prices charged were fair, and that (ii) the CMA does, however, have a duty fairly to evaluate any such comparators. As I have said, it may well be prudent for the CMA to make its own investigations, but it is not under a legal duty to do so. If the CMA wrongly ignores evidence of comparators, and those comparators turn out to be relevant or important, their analysis will fail at the CAT. In my judgment, the suggestion of an obligation in every case to conduct any investigation is not warranted in law."

### The relevance or otherwise of regulation

96.    In *Hydrocortisone*, the Tribunal observed as follows:

"351. We have been somewhat critical of the regulatory environment that has at least facilitated these overcharges. We have been even more critical of – and have rejected in terms – arguments that seek to justify these overcharges by reference to the regulatory environment. We want to be clear that the fact that a mere regulatory environment has engendered a dominant position which is then abused in no way justifies the abuse."

97.    The fact that there is a regulatory regime which in theory could apply controls does not preclude the possibility of an abuse. What is relevant is the actual position in the relevant market in the context of any controls which may have been exercised. See *Hydrocortisone* again at paragraph 329 (2). A similar point was made in *Albion Water II* at paragraph 242:

"As regards the need for regulatory approval of the First Access Price, even though Dŵr Cymru apparently believed it needed its access charges to be approved by the Authority, this does not absolve it from its special responsibility under the Chapter II prohibition. Even if the position of the regulator (in favour, at the material time, of access prices set according to regional average costs) and/or the relevant regulatory framework encouraged or made it easier for water companies to engage in anti-competitive conduct, those undertakings remained subject to the Act."

98.    In relation to this, BT has quoted from part of paragraph 31 of the decision of the Tribunal in *Phenytoin*. The whole of that (introductory) paragraph reads as follows:

"Cases of pure unfair pricing are rare in competition law. Authorities find them difficult to bring and are, rightly, wary of casting themselves in the role of price regulators. Generally, price control is better left to sectoral regulators, where they exist, and operated prospectively; ex post price regulation through the medium of competition law presents many problems. However, the law prohibits unfair pricing in certain circumstances and in such cases there is no reason in principle why competition law cannot be applied, provided this is done on the correct legal basis and the analysis of evidence is sound."

99.    We do not consider that this is inconsistent with what was said in *Hydrocortisone*, as referred to above.

100.    BT also refers to part of paragraph 49 of the AG's opinion in *Latvian Copyright* which reads as follows:

"Secondly, a price significantly in excess of a competitive price is more unlikely to occur in markets where there is a sectoral regulator whose task is, inter alia, to fix or control prices charged by the undertakings active in that sector. Sectoral authorities are clearly better-equipped than competition authorities to oversee prices and, where necessary, act to remedy possible abuses. It would seem, therefore, that antitrust infringements in those situations should be mainly confined to cases of error or, more generally, to regulatory failures: cases where the sectoral authority should have intervened and erroneously failed to do so."

101.    It seems to us that what is being suggested here is that in practice, in a situation where a regulator has acted in relation to pricing, the prospect of abusive excessive pricing from a competition law point of view is less likely than a case where a regulator has not intervened. The last sentence of the

paragraph contemplates a situation where the regulator did not intervene. We think that this paragraph is perhaps too dogmatic, but in any event, in our case, Ofcom did not intervene to set prices until 2017, and once it effectively did so (through obtaining the Commitments in respect of VOCs), that marked the end of the claim period for the VOCs.

102.   In this context, BT itself refers to what the Tribunal said in *Hydrocortisone* but in a different passage:

> "330. There is no single method for ascertaining whether a price is unlawful in terms of its excess or not, and any given method will have some inherent weaknesses. When considering whether a price is or is not excessive, a tribunal must have careful regard to "regulatory overreach", in that interference in an outcome that may actually be competitive is as bad as failing to call out as infringements excessive prices."

103.   Read fairly, all that passage seems to be saying is that a tribunal should take care that it is not pronouncing as unlawful, conduct by an undertaking which is actually competitive, since that itself is detrimental to consumers. We would, of course, agree. We do not see this passage as contradicting the various passages to which we referred at paragraphs 96 to 97 above.

104.   On that basis we would reject any suggestion on the part of BT that the mere fact of "regulatory scrutiny" by Ofcom over the claim period somehow mitigates its position in relation to abuse. This does not mean, of course, that the views of Mr Matthew were irrelevant to the topics discussed. We evaluate his evidence, in context, along with the others, below.

**The Effect and Significance of Ofcom's 2017 Provisional Conclusions and Statement**

105.   It is not suggested (nor could it be) that any aspect of the 2017 Provisional Conclusions and Statement (summarised at paragraphs 155-161 below) bind this Tribunal. At the end of the day, it is for this Tribunal, and no-one else, to decide this case on the basis of the materials put before it.

106.   However, the CR contends that the findings contained in those documents are admissible, relevant and should be given substantial weight, so as to corroborate his claims. The position, in law, in relation to prior regulatory findings which may be said to overlap in some way with the issues before a later Tribunal, has been clearly set out by the Court of Appeal in *Evans v Barclays Bank and others* [2023] EWCA Civ 876 ("*FX*"). *FX* involved an appeal from the decision of the CAT to certify collective proceedings on an opt-in and not opt-out basis, subject to a viable claim being shown. One of the grounds of appeal concerned the approach of the majority of the Tribunal to the present viability or otherwise of the claims, and that the majority had failed to draw proper inferences from prior decisions of the Commission that gave weight to the claim. Green LJ (with whom Sir Julian Flaux C and Snowden LJ agreed) dealt with position in principle as follows:

> "100. Most importantly, it is well established that the rule [in Hollington v Hewthorn] does not apply to the CAT which has its own rules of procedure and evidence. CAT Rule 55(1)(b) makes clear that the CAT has a wide discretion as to the evidence to be admitted. This has been recognised on many occasions and is, in my view, correct: see e.g. Agents' Mutual Limited v Gascoigne Halman Limited [2017] CAT 5 at paragraph [8]; Argos and Littlewoods v OFT [2003] CAT 16 at paragraph [105]; Aberdeen Journals v. OFT [2003] CAT 11 at paragraphs [126] and [134]), Consumer Association v Qualcomm [2023] CAT [9] ("Consumers

Association") at paragraph [18]. In Le Patourel the CAT had relied upon the findings in a prior settlement decision between the respondent, BT, and OFCOM. The Court of Appeal agreed with the CAT that the findings were relevant as showing a serious case to be advanced but made clear that they were not binding upon the CAT at trial (ibid paragraph [106]). And of course, there is already a statutory exception to the rule in section 60A CA 1998.

101. There is no need for the CAT to be hidebound by a common law rule on fairness. Whilst the CAT does not apply the strict rule in Hollington it does, of course, endeavour to secure fairness but it is a sophisticated tribunal well able to form its own view on the value, if any, of prior findings.

102. The CAT, if confronted with prior findings said to be relevant, will carefully decide what weight can be attached to those findings. Without intending to be exhaustive, it will examine such matters as: whether the decision is a follow-on decision and the limits of the binding effect under section 60A CA 1998; where not a follow-on decision, the extent of the overlap between the prior findings of facts and the present case; who the earlier decision maker was and whether it was a specialist fact finder or otherwise; what the standard of proof was which was applied to the findings; and the nature of the legal analysis in the prior decision and the extent to which this affects the findings of fact made. The CAT will also consider to what forensic use the earlier findings are sought to be deployed. There might be many relevant uses some of which fall short of reliance upon earlier conclusions about the ultimate merits. The earlier decision might for instance identify relevant evidence and thereby demonstrate lines of inquiry relevant only to disclosure. The CAT will be conscious of the risk that being invited to perform a detailed inquiry into how prior findings came about draws it into disproportionate, satellite, litigation: see Consumers Association (ibid) paragraph [30]."

107.    The decision in *FX* post-dates, and indeed in the passages quoted, makes reference to, a decision of the Tribunal in *Consumers' Association v Qualcomm* [2023] CAT 9. Considerable reliance was placed upon *Qualcomm* by BT in respect of the effect upon this Tribunal of the Ofcom decisions. In that case, the Tribunal was asked to strike out certain passages in the Claimant's Reply which referred to the decision of various foreign tribunals in relation to the Defendant's licence practices, including royalties charged, which were the subject of the collective proceedings. The Tribunal struck out the relevant passages in the Reply on the basis that it would not be appropriate to attach any weight to the findings reached by other courts, tribunals or regulators. To do otherwise would risk the decision being made, at least in part on evidence which was not before the Tribunal. It would be impractical to even allow weight to be given to those other decisions because it would involve a detailed assessment of the evidence and arguments before those tribunals, leading to satellite litigation. The facts of that case are very different from ours and we do not read it to lay down a general rule that the decision of any other body, especially a regulatory body in the same jurisdiction, is inadmissible. More importantly, if it did, it has been overtaken by *FX*.

108.    The question for this Tribunal is thus to consider the weight, if any, to be given to the findings of Ofcom in 2017. The same applies to any other views or actions of Ofcom which are said to be relevant. They may be of particular relevance where Ofcom has deployed or undertaken an evidenced-based analysis on a particular question. Perhaps unsurprisingly, each side has relied upon Ofcom's views or findings where they were helpful to its case. Where a particular point is dealt with by Ofcom, especially in relation to factual matters, we deal with it below, insofar as necessary, in context.

**Prices and margins on the undertaking's other products**

109.  *Napp Pharmaceuticals v DGFT* [2002] ECC 13 involved an appeal to the Tribunal against a finding made by the DGFT that Napp had abused its dominant position in the supply of sustained-release morphine tablets and consequential orders. One of the arguments made by Napp was that:

> "409…in an industry, such as the pharmaceutical industry, in which relatively few successful drugs must fund the research and development costs of many unsuccessful drugs, and the ongoing research costs of new products yet to be discovered, it is wrong to look at the margins of a single successful product and deem those margins, standing alone, to be excessive. The only sensible approach…is to look at the company's prices and profits over a portfolio of products and then judge whether its return on investment is reasonable on that portfolio basis. That is precisely what the PPRS does. Accordingly, says Napp, a company whose ROC is well within the limits of the PPRS cannot be judged to have charged excessive prices on a single product."

110.  The Tribunal rejected this argument. This was partly because Napp could not escape simply because there was a regulator in the industry and one which had approved its portfolio pricing. But it was also because such an argument

> "…impermissibly directs attention away from the specific product market which we are required to consider when deciding whether there is an abuse of a dominant position under section 18 of the Act. In our view, it is not appropriate, when deciding whether an undertaking has abused a dominant position by charging excessive prices in a particular market, to take into account the reasonableness or otherwise of its profits on other, unspecified, markets comprised in some wider but undefined "portfolio" unrelated to the market in which dominance exists."

111.  A similar point was made by the Commission in its Commitments Decision in *Aspen* 10 February 2021 Case AT. 40394. At paragraph 204 it stated that:

> "…cross-subsidisation between markets cannot give a dominant undertaking carte blanche to disproportionately hike up prices, especially in a context, such as that at stake, where the Products were profitable at portfolio level already before the price increases…"

112.  However, it is important to distinguish what may be regarded as cross-subsidisation between separate activities from the situation in which the different activities of a multi-product firm share common costs, as arises here in the case of BT. Where common costs are shared across multiple outputs, this gives rise to an intrinsic interdependence between the profitability of those activities, and at least a degree of flexibility in the way in which those common costs might be recovered across the different products. This is a matter which we address below.

**Burden and Standard of proof**

113.  It is, of course, the case that the CR must prove its case on the balance of probabilities. We do not think it helpful to put any gloss on this.

114.  BT makes a particular point based on the well-known observation of Lord Hoffmann in *Secretary of State for the Home Department v Rehman* [2001] 3 WLR 877 that while the standard of proof does not vary according to the seriousness of the case, it takes more compelling evidence to prove you saw a lioness in Regents Park than to prove you saw an Alsatian. It referred to this in the context of a reference to the decision of the Tribunal in a Chapter I prohibition case dealing with bid-rigging, *Durkan v Office of Fair Trading* [2011] CAT 6. What the Tribunal said there was this:

31

"93. It is common ground that the legal burden of proving the existence of an infringement of the Chapter I prohibition lies on the OFT (see *Napp Pharmaceutical Holdings Ltd v Director General of Fair Trading* [2002] CAT 1 ("Napp"), paragraph 95).

94. The question of the standard of proof has been considered in a number of cases. In *Napp*, at paragraph 109, and *JJB Sports plc and All Sports Limited v Office of Fair Trading* [2004] CAT 17 ("JJB"), at paragraph 204, the Tribunal held that the standard of proof is the civil standard of proof on the balance of probabilities. The seriousness of an infringement of the Chapter I prohibition, involving (as here) the imposition of penalties, is a factor to be taken into account in considering the probability of an infringement having occurred. We were referred by Mr Beard to the well known passage from the speech of Lord Hoffmann in *Secretary of State for the Home Department v Rehman* [2001] 3 WLR 877 concerning the relative likelihood of coming across Alsatians and lions in Regent's Park and to a passage in the opinion of Lady Hale in *In Re B* [2008] 3 WLR 1 where she stressed that the seriousness of an allegation of misconduct is not necessarily a factor which makes it less likely that the allegation is true: context is everything. We agree with the OFT's submission that both those points are relevant here because, although the alleged infringement is a serious one, many of the addressees of the Decision asserted that this kind of conduct had been widespread in the industry and infringements have been admitted by a very large number of companies.

95. It is incumbent on the OFT to adduce precise and consistent evidence in order to establish the existence of an infringement. But it is sufficient, according to the caselaw, if the body of evidence relied on by the OFT, viewed as a whole, meets that requirement: see *JJB*, at paragraph 206."

115.    We agree with what is said there, although we do not think it is particularly relevant in this case.

## FACTUAL MATTERS (1): BT'S MARKET SHARE

116.    On the assumption that the relevant market is SFV Services, Mr Parker has calculated BT's market shares, principally using information supplied by Ofcom, which itself received information from BT and the other operators up to the end of 2017, after which he extrapolated the position (see Section 5.2 of DP3). The experts agreed the market share results put forward by the experts in respect of their respective market definition (see JES p81). In summary:

(1)    For the subclass of VOCs and for the period prior to the introduction of the Commitments on 1 April 2018, BT's market share in terms of number of lines was between 64% and 76%, and when measured in terms of revenue was between 70% and 78%;

(2)    For the subclass of SPCs and for the period prior to the introduction of the Commitments on 1 April 2018, BT's market share in terms of number of lines was between 97% and 98%, and when measured in terms of revenue was also between 97% and 98%;

(3)    For the subclass of SPCs and for the period after the introduction of the Commitments on 1 April 2018, BT's market share in terms of number of lines was between 95% and 96%, and when measured in terms of revenue was between 96% and 97%;

(4)    For the subclass of VOCs and for the period after the introduction of the Commitments on 1 April 2018 (when in fact VOCs were no longer in the Class) BT's estimated market share in terms of number of lines was between 54% and 64%, and in terms of revenue was between 61% and 68%, if the previous market share had continued;

32

(5)     For SFV services as a whole, i.e. both sub-classes combined, up to the introduction of the Commitments, BT's market share in terms of the number of lines was between 74% and 85% and when measured in terms of revenue was between 78% and 86%;

(6)     All of the above figures relate to market share of lines i.e. "access"; if one were to look at market share in terms of "non-access" i.e. calls, across SFV Services:

(a)     For the pre-Commitments period, when measured by the number of minutes, BT's share was between 71% and 80%, and, when measured by revenue, BT's share was between 84% and 85%; and

(b)     For the post-Commitments period, when measured by the number of minutes, BT's share was between 63% and 71%, and when measured by revenue, BT's share was around 84%;

(7)     Finally, in terms of SFV revenues as a whole for the period 2013-2018, and using Ofcom data for the period up to 2014 and extrapolating thereafter, BT's market share was between 82% and 85%.

117.    We should add that, while the content of paragraphs 116(5) and 116(6) is said to have been agreed by the CR, we do note that these sub-paragraphs involve questions of ARPMs which were disputed and imply pricing by BT higher than its competitors. That said, this point does not affect our assessment of dominance here.

118.    The other telecoms companies which provided SFV Services were the Post-Office, TalkTalk, SSE, Virgin Media, Sky, Phone-Co-op, Direct Save Telecom, Plus Net and Utility Warehouse. These companies all provided data to Ofcom as at 2017 for the purposes of Ofcom's 2017 review. Mr Parker did not include Phone-Co-op's figures for the individual sub-classes because he said that it had █% share of each of those markets. The figures for Direct Save Telecom, Plus Net and Utility Warehouse were also excluded on the basis that the Ofcom data indicated that their market shares were immaterial. It is important to note, as the next paragraph shows, that suppliers may continue to supply a voice-only product, for example to its existing customer base, while not promoting, or actively promoting, or even supplying it, for the purpose of new customers.

119.    The position in respect of the other suppliers is as follows:

(1)     The Post Office sold its telecoms business to Shell Energy in March 2021. Shell Energy continued to sell SFV Services to new customers until September 2022;

(2)     TalkTalk stopped actively marketing SFV Services to new customers in 2014, and stopped providing them altogether to new customers by December 2016;

(3)   Virgin Media ███████████████████████████████████████████████
███████████████████████████████████ did not strongly promote these services from
August 2021;

(4)   Sky ██████████████████████████████████████████████████████████
███████████████████████████████ withdrew SFV services to new customers in
2019;

(5)   SSE ███████████████████████████████████████████████████████ sold its
telecoms business to OVO in 2020, which then ceased marketing SFV services to new
customers;

(6)   The above is drawn from information provided by the suppliers to Ofcom for the purposes
of the 2017 Provisional Conclusions (see paragraph A8.56 of Annex 8 thereto) and the 2020
Report (see paragraphs 3.6 and 3.7 thereof), together with Dr Jenkins' Figure 7.5 under
paragraph 7.67 of HJ1, which is based on an analysis of the Pure Pricing database for pricing
of Voice services for key fixed line operators in the UK at F/781. The database covers the
four product areas of Line rental, Line rental saver products, Voice bundles and Call
packages.

**Background and the Basics of BT's Pricing**

120.   BT's voice pricing comprised line rental (a fixed monthly charge) and call charges (which can be
either a series of prices per minute for different categories of call, and/or a fixed monthly price for
a certain package of calls).

121.   While the line rental charge is transparent and easily identified, call charges are more complex and
difficult to compare between packages or between operators. The amount of revenue they generate
for the provider (and the price paid by the consumer) depends on both the prices and the extent to
which voice calls are made.

122.   The tariff of BT's voice call charges offered to consumers is largely the same for all voice customers,
whether or not they purchased voice services as part of a bundle. But the actual uptake of the
different packages depended on user choices – many bundle customers did not make voice calls at
all from their landlines.

123.   BT's standard line rental ("SLR") has also been the same for all voice customers, whether SFV or
bundle customers, though the line rental element in any given bundle forms only a part of the bundle
price. Different (non-standard) line rental prices were offered by BT to some customer groups such
as those qualifying for the Home Phone Saver package ("HPS"), and (from 2018) those identified
as VOCs following the Commitments.

124. There has been substantial change over time in the composition of voice prices, from a classic utility pricing model (comprising a fixed fee plus usage-based charge) towards a greater reliance on fixed subscription-based charges (with either no or less emphasis on the per-call element). This change in part reflects the competition faced from mobile phone contracts which have moved towards a fixed price for a package of calls.

125. There has also been a significant reduction in the volume of calls made from landlines. Figure 2.3 of HJ2 summarises the Ofcom data on UK market voice calls: the total for fixed line voice calls fell by over 75% from over 160m minutes in 2007 to around 35m in 2022. Meanwhile, the number of mobile voice minutes increased from just over 100m to 170m across the same period.

126. This creates a complex factual background to the analysis of market prices and price changes, under which it is not simple to identify a definitive 'price per unit' charged by BT or its rivals for the SFV products in question. We return to this below in the context of the market definition and dominance assessments.

**Line Rental Pricing**

127. BT's prices for SLR are shown in the two following tables from DP3. As between April 2017 and September 2018, the price of £18.99, imposed in July 2016, was frozen, and it dropped in the case of VOCs as from 1 April 2018 to £11.99.

## Table 13    BT's Standard Line Rental price increases, pre-Commitments

| Date | Price Increase Name | | | BT SLR |
| --- | --- | --- | --- | --- |
| | | Price | Change (£) | Change (%) |
| 01/10/2010 | Pacific | £13.29 | £0.50 | 4% |
| 28/04/2011 | Atlantic | £13.90 | £0.30 | 2% |
| 03/12/2011 | White | £14.60 | £0.70 | 5% |
| 05/01/2013 | Beech | £15.45 | £0.85 | 6% |
| 04/01/2014 | Pegasus | £15.99 | £0.54 | 3% |
| 01/12/2014 | Window | £16.99 | £1.00 | 6% |
| 20/09/2015 | Laika | £17.99 | £1.00 | 6% |
| 03/07/2016 | 16/17 Price Change | £18.99 | £1.00 | 6% |

**Table 14    BT's Standard Line Rental price increases, post-Commitments**

| Date | Name | BT SLR (for Split Purchase Customers) | | | BT SLR (for Voice Only Customers) | | |
|---|---|---|---|---|---|---|---|
| | | Price | Change (£) | Change (%) | Price | Change (£) | Change (%) |
| 01/04/2018 | Commitments Introduced | £18.99 | £0.00 | 0% | £11.99 | -£7.00 | -37% |
| 16/09/2018 | 18/19 Price Change | £19.99 | £1.00 | 5% | £11.99 | £0.00 | 0% |
| 31/03/2020 | Price Change 2020 | £20.20 | £0.21 | 1% | £12.14 | £0.15 | 1% |
| 31/03/2021 | Price Change 2021 | £21.10 | £0.90 | 4% | £11.73 | -£0.41 | -3% |
| 31/03/2022 | Price Change 2022 | £23.05 | £1.95 | 9% | £11.73 | £0.00 | 0% |
| 31/03/2023 | Price Change 2023 | £26.35 | £3.30 | 14% | £11.73 | £0.00 | 0% |

128.    We should add that the dates given above are when the various price changes came into effect. Typically, they were announced around 3 months before they came into effect – see Annex 2 to JB2.

129.    In order to provide a voice service to a household, the retail operation of BT needs to buy in a wholesale line rental ("WLR") service from Openreach. Other retailers like TalkTalk also have to buy a relevant wholesale product from Openreach unless they have their own network, like Virgin. WLR costs were generally decreasing prior to the Commitments, and then increasing somewhat afterwards, as shown in the Chart below:

Chart 1: BT Standard Line Rental price increases compared to cost inputs, 2009-2023



130.    One can see from this chart that the gap between SLR and the WLR paid by BT to Openreach has widened considerably – from around £4 to around £11.50 at the time of the Commitments and (for SPCs) to more than £15 by 2022. This visible 'alligator jaws' image was cited by the CR and his

experts as evidence of BT's exercise of market power, but it is only part of the picture. There were other factors at play that need to be taken into account (see paragraph 140 below) before any robust conclusions could be drawn as to the effect of the SLR price increase on the SFV customers.

131.    The line rental charge pricing of the other telecoms operators in relation to BT's pricing is set out in the following Table which comes from paragraph 5.80 in DP3:

**Table 12    Price changes of the line rental component of BT Standard Line Rental compared to competitor products, April 2009 – April 2018**

| Date | BT | Plusnet | Virgin Media | TalkTalk | Sky | EE/ Orange | Post Office |
|------|-----|---------|--------------|----------|-----|------------|-------------|
| 01/04/2009 | £12.50 | | | £11.25 | | - | - |
| 01/06/2009 | | | | | | | - |
| 01/09/2009 | | | | | £11.00 | | - |
| 01/12/2009 | | | | £11.49 | | | - |
| 01/01/2010 | £12.79 | | | | | | - |
| 01/02/2010 | | £11.25 | | | | | - |
| 01/03/2010 | | | £11.99 | | | | - |
| 01/10/2010 | £13.29 | | | £12.04 | | £11.50 | - |
| 01/11/2010 | | | £12.24 | | | | - |
| 01/12/2010 | | | | £12.30 | | | - |

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 01/01/2011 | £13.60 | | | | | | - |
| 01/02/2011 | | £11.99 | | | £11.25 | | - |
| 01/03/2011 | | | £12.99 | | | | - |
| 01/05/2011 | £13.90 | | | £12.60 | | | - |
| 01/07/2011 | | | £13.90 | | £12.25 | | - |
| 01/09/2011 | | | | | | £12.75 | - |
| 01/10/2011 | | | | £13.80 | | | - |
| 01/12/2011 | £14.60 | £12.99 | | | | | - |
| 01/03/2012 | | | | | | £13.50 | - |
| 01/05/2012 | | | | £14.50 | | | - |
| 01/09/2012 | | | | | £14.50 | | - |
| 01/12/2012 | | £13.99 | £14.99 | £14.95 | | £14.00 | - |
| 01/01/2013 | £15.45 | | | | | | |
| 01/05/2013 | | £14.50 | | | | | |
| 01/06/2013 | | | | | | £14.75 | |
| 01/09/2013 | | | | £15.40 | | | |
| 01/12/2013 | | | £15.99 | | £15.40 | | |
| 01/01/2014 | £15.99 | | | | | £15.40 | |
| 01/03/2014 | | | | £15.95 | | | |
| 01/04/2014 | | | | | | | £12.00 |
| 01/05/2014 | | | | | | | £13.00 |
| 01/06/2014 | | £15.95 | | | | £15.75 | |
| 01/12/2014 | £16.99 | | | | | | |
| 01/01/2015 | | | £16.99 | £16.70 | £16.40 | | £15.00 |
| 01/05/2015 | | | | | | £16.40 | |
| 01/09/2015 | | £16.99 | | £17.70 | | | |
| 01/10/2015 | £17.99 | | | | | | |
| 01/11/2015 | | | | | | | £16.00 |
| 01/12/2015 | | | £17.99 | | £17.40 | £17.50 | |
| 01/07/2016 | £18.99 | | | | | | |
| 01/09/2016 | | | | | | | £16.99 |
| 01/10/2016 | | £17.99 | £19.00 | | | | |
| 01/12/2016 | | | | - | | £18.50 | |
| 01/03/2017 | | | | - | £18.99 | | |
| 01/07/2017 | | £18.99 | | - | | | |
| 01/12/2017 | | | | - | | £19.00 | |

132.   Put graphically, the various line rental prices of BT's competitors, as compared with its own such prices, can be seen from the following Figure which is under paragraph 5.79 of DP3:

**Figure 22**    **Prices of the line rental component of BT Standard Line Rental compared to competitor products, April 2009 – April 2023**



**Call Charges**

133.  The charges made by BT and its rivals for both individual calls and call plans were subject to a variety of changes both before and during the claim period including changes in the balance between per-minute, package and fixed charges. These changes took place against a background of declining call volumes. On the actual prices charged by BT and its rivals for call packages and out-of-plan calls, Dr Jenkins' analysis at paragraphs 7.73-7.77 of HJ1 shows that overall, BT's prices for call plans and out-of-plan calls were largely comparable with and were sometimes exceeded by the prices of its competitors. This was the view of Ofcom also.

134.  The CR claimed that if one measured the price of calls by ARPM (i.e. average revenue per minute), a very different picture emerges with BT's ARPMs consistently above those of its rivals. However, there are difficulties with this analysis, as we explain at paragraphs 380-390 below.

**ARPU**

135.  Line rental and call charges, and changes in call volumes, are brought together in measuring the total voice revenue received from each customer - the so-called Average Revenue per User ("ARPU"). It is common ground that, broadly speaking, first, ARPU has been relatively flat in real terms since at least 2007 until the end of the claim period, Mr Parker observing in DP2, at paragraph 2.30, that "Average revenue per line was relatively stable over time". See Figure A5.4 below from the Annexes to the 2017 Provisional Conclusions:

39



**Figure A5.4: BT's SFV revenues (£ per line per month, ex. VAT, CPI adjusted for December 2016 prices) [✂]**

*Source: Response dated 24 June 2016 to questions 2 and 3 of the 10th BT s.135 under the NMR and 9 December 2016 to questions 5 and 6 of the 2nd BT s.135.*

136. As from the start of the claim period, ARPU rose in nominal terms between 2015/16 and 2017/18 before declining and with a nominal decrease of 3% at the end of the claim period, compared with the start of it, as is shown by Figure 7.4 from HJ1:

**Figure 7.4     Change in ARPU for SFV Services over time**



Notes: Series does not start until 2015/16 due to the availability of relevant disclosure information.
Source: Oxera analysis based on data from ONS and the F19 Summary (BT00092355), the F18 and F20 Summary
(BT00092336) and F21 Summary (BT00092356).

**Gross Margin**

137.    Chart 1 under paragraph 129 above shows a steadily increasing gap between BT's line rental price
and the WLR price it paid to Openreach.

138.    Gross margin overall, i.e. for access and calls can also be shown from Figure A5.10 in the Annexes
to the 2017 Provisional Conclusions.



**Figure A5.10: Estimated gross margins for line rental and calls (£ per line per month, CPI adjusted for December 2016 prices) [✕]**

Source: Response dated 24 June 2016 to questions 2 and 3 of the 10th BT s.135 under the NMR and 9 December 2016 to questions 5 and 6 of the 2nd BT s.135.

139.  As for the claim period onwards, Dr Jenkins' Table 4 from Annex B3a to the JES shows effective percentage gross margins for SFV Services of around 65% across the entire claim period and for bundles, from around 36% to 40%. In absolute (cash) terms the gross margins per customer from bundles are higher than from SFV Services in every year of the claim period.

**Table 4    Gross margin per customer buying fixed voice services in a bundle and SFV Services customer**

|  | Formula | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|---|
| **Bundles[1]** | | | | | | | | |
| Revenue (£m) | [A1] | 3,397 | 3,805 | 3,945 | 4,066 | 3,986 | 3,598 | 3,688 |
| Cost of Sales (£m) | [B1] | 2,006 | 2,388 | 2,517 | 2,537 | 2,556 | 2,402 | 2,423 |
| Gross margin (£m) | [C1] = [A1 – B1] | 1,391 | 1,417 | 1,428 | 1,529 | 1,431 | 1,196 | 1,265 |
| Number of customers (#m) | [D1] | 6.4 | 6.7 | 6.7 | 6.5 | 6.3 | 6.1 | 5.6 |
| **Gross margin per customer (£/line/year)** | [E1] = [C1] / [D1] | 217.99 | 212.84 | 213.74 | 236.90 | 228.78 | 194.68 | 224.33 |
| | | | | | | | | |
| **SFV Services** | | | | | | | | |
| Revenue (£m) | [A2] | 724 | 607 | 503 | 174 | 138 | 110 | 83 |
| Cost of Sales (£m) | [B2] | 251 | 212 | 172 | 64 | 50 | 40 | 33 |
| Gross margin (£m) | [C2] = [A2 – B2] | 473 | 395 | 331 | 110 | 88 | 70 | 51 |
| Number of customers (#m) | [D2] | 2.7 | 2.1 | 1.7 | 0.6 | 0.5 | 0.4 | 0.3 |
| **Gross margin per customer (£/line/year)** | [E2] = [C2] / [D2] | 173.61 | 184.40 | 192.22 | 172.42 | 173.80 | 167.71 | 156.07 |
| | | | | | | | | |
| **Difference in margin (£/line/year)** | [F] = [E1] – [E2] | 44.38 | 28.44 | 21.52 | 64.48 | 54.97 | 26.97 | 68.26 |

140.  The evidence on ARPU, summarised at paragraphs 135 and 136 above suggests that the combined effect of increases in line rental charges, changes in the levels and composition of call charges, and declining call volumes have combined to deliver the broadly flat ARPU from SFV customers since 2007. How this plays into the evidence on SFV profitability depends on how this flat ARPU compares with the cost of providing these Services, given the movements that have been observed in WLR per customer and the impact that declining call volumes has had on BT's costs.

141.  The most effective way to take these other factors into account is to look at BT's margins on SFV customers over time, focusing on the margin between ARPU and costs. When this exercise is done, it shows that, gross margins (i.e. ARPU minus direct costs) increased from around £8 to £15 per line in real terms, an increase in percentage gross margin on sales from around 32% to 63% (see Ofcom's Figure A5.10 at paragraph 138 above). This 63% gross margin in 2015 is very close to the experts' agreed gross margin SFV calculations throughout the claim period, which stand at around 65%.

## FACTUAL MATTERS (2): OFCOM AND BT

### Background

142.  We have summarised some aspects of Ofcom's involvement at paragraphs 11 - 16 above. We add some more detail here.

143.  Until 1981, BT was the monopoly provider of telecommunications services, with statutory restrictions preventing market entry. It was then privatised in 1984, following which it was subject to retail price controls which included capping its SFV Services prices. Prior to 2006, BT had been determined by Oftel, then Ofcom, its successor, to have SMP. By section 78 of the Communications Act 2003, a person had SMP in relation to a market if it enjoys a position which amounts to or is equivalent to dominance of the market. A firm which has SMP is then subject to various forms of regulation including price control.

### 2006

144.  In 2006, Ofcom consulted on whether retail price control should continue beyond 31 July 2006 (when the then current set of controls came to an end) in its "Retail Price Controls: Explanatory Statement and Proposals" dated 21 March 2006 ("the 2006 Consultation"). By its "Retail Price Controls: Explanatory Statement" dated 19 July 2006 ("the 2006 Statement"), Ofcom decided that there would no longer be retail price controls as from 1 August 2006. In its conclusions, it said this:

> "5.15 In reaching a conclusion concerning the expiry of the RPC, Ofcom has balanced the consequences of BT's continued market power in these markets with its view of the extent to which other factors – chiefly competitive pressure and other regulation – limits BT's ability to set excessive prices.
>
> 5.16 Ofcom considers that allowing expiry of BT's retail price controls but underpinned by BT's assurances and supported by an extensive communications campaign meets the requirements set out in Sections 3 and 4 (above). The interests of consumers will be served by their increased awareness of the choices available and with increasing competition engendered by appropriate wholesale regulation. This in turn should lead to new services greater choice for consumers and further reductions in retail prices."

145.  Because BT was still deemed to have SMP, it was subject to other regulatory controls, for example, the duty not to discriminate, price publication and notification requirements, along with providing regulatory financial statements (RFSs). It also remained unable to sell bundles with fixed voice services, even though rival telecoms retailers did offer such bundles.

**2009**

146.    In 2009, Ofcom consulted further, on whether BT still had SMP – see its "Fixed Narrowband Retail Services Market Review, Consultation," dated 19 March 2009 ("the 2009 Consultation"). By its "Fixed Narrowband Retail Services Markets: Identification of markets and determination of market power" dated 15 September 2009 ("the 2009 Statement"), Ofcom determined that BT no longer had SMP. Ofcom therefore removed remaining regulatory controls. This enabled BT to sell bundles with fixed voice services and it was no longer required to provide separate cost accounting for SFV Services, including providing RFSs.

**2013**

147.    On 26 September 2013, Ofcom published its "Statement: Review of the Fixed Narrowband Services Markets" ("the 2013 Statement"), in which it concluded (inter alia) that "the fixed voice retail calls markets in the UK (excluding the Hull Area) remain effectively competitive and no company holds a position of SMP".

**2014**

148.    On 28 January 2014, Ofcom published its report on the "Cost and Value of Communications Services in the UK" ("the 2014 Report"). It noted as follows at paragraph 2.1.6:

> "There is an active market in the UK for standalone (i.e. not bundled) fixed line rental services. Retail competition is enabled by regulated access to wholesale line rental, the price of which has fallen and will continue to fall. This has enabled the provision of competitive services by other providers. For example, the Post Office currently offers a standalone landline service for £12 per month.
>
> Social tariffs are also available as a low cost option for low income users. The price of BT Basic, the principal social tariff, is lower now in real terms than it was six years ago. This is a good choice for eligible consumers with low outbound call usage (for example, for consumers who rely more on receiving than making calls to keep in touch). Eligibility is defined as being in receipt of certain benefits available to low income households.
>
> Despite this range of choice and the overall positive trend in fixed voice costs, some retail prices for line rental have increased in recent years. This is related to the fact that landlines generally tend to be sold as a bundle with other products – historically with voice calls, more recently with broadband. Market competition has tended to focus on the headline price of the bundle, which has generally fallen. Consequently consumers buying a landline service without broadband may not benefit fully from the effects of competition. Furthermore, some providers (TalkTalk and Virgin Media) have recently ceased their standalone landline service. Ofcom will continue to monitor this situation carefully."

**2015**

149.    In March 2015, Ofcom announced a Strategic Review of Digital Communications and in July 2015, it published a Discussion Document. As the title suggests this was principally about broadband but also mobile services as opposed to landline telephone services.

150.    On 7 October 2015, Sharon White, the (then) CEO of Ofcom, gave a speech at the LSE, in which she stated that landline and broadband prices had risen in recent months "without the apparent justification of higher costs or improved service", and that BT and three other providers had raised

line rental prices that year. She said Ofcom was "concerned about this" and was watching the market "closely".

**2016**

151.   On 25 February 2016, Ofcom published its "Initial conclusions from the Strategic Review of Digital Communications" ("the 2016 Statement"). Notwithstanding the general focus of this review, it noted as follows:

> "7.9 We have particular concerns about the situation for consumers who use standalone landline services. These consumers generally do not engage with the market: 71% of standalone landline customers have never switched provider or considered doing so. These customers tend to be older and more vulnerable. Almost 60% of consumers who buy standalone landline products and have no broadband service are over-75 and nearly half (47%) live in DE households on the socio-economic scale.  Actions to empower these consumers may not be enough on their own to produce a very different market outcome.
>
> 7.10 A number of changes can be observed in stand-alone landline services:
> • different providers' prices are converging towards higher levels. For example, the Post Office has increased its prices after significantly undercutting BT a few years ago;
> • line rental prices are rising, despite the price of wholesale services on which they are based falling (see Figure 17);
> • rising prices for both call bundles and out-of-bundle calls; and
> • less choice among the larger providers. For example, TalkTalk no longer offers a standalone landline service while Sky and Virgin Media do not actively promote this product."

152.   The 2016 Statement did not itself propose any direct changes so far as landline services were concerned save in respect of the relationship between BT and Openreach which affected both landline and broadband. However, in the course of 2016, Ofcom was having discussions with BT about its landline pricing, among other things.

153.   However, on 4 May 2016, the Advertising Standards Authority ("the ASA") announced new rules in relation to broadband advertising. These prohibited providers of bundles from advertising only the 'incremental broadband price' (i.e. the part of the bundle price attributed to the charge for broadband only) but not the total price of the bundle, which included the line rental, which was often significantly more than the broadband charge. The new rules, which came into effect on 31 October 2016, required bundle providers to "[s]how all-inclusive up-front and monthly costs; no more separating out line rental."

154.   In December 2016, Ofcom launched its Review of the Market for Standalone Landline Telephone Services ("the Landline Review").

**2017**

155.   As already noted, the 2017 Provisional Conclusions in respect of the Landline Review were published on 28 February 2017. It provisionally found that the market for SFV Services was different from the bundles market, and that BT had SMP in respect of the former market. In the context of its market definition analysis, it said that current SFV line access prices were substantially above competitive levels.

156.    There are 10 Annexes to the 2017 Provisional Conclusions. Annex 8 consisted of the supporting
evidence relied upon by Ofcom ("Annex 8"). The executive summary of the 2017 Provisional
Conclusions included the following:

> "1.5 However, customers that do not take bundled services have not benefited from competition in the same
> way. We are particularly concerned about people who only buy a landline from a provider – either because
> they do not want broadband or pay-tv, or because they take these services separately, usually from different
> companies.
>
> 1.6  Our concerns are that relative to those who purchase services in a bundle, these consumers have less choice
> of suppliers, are not benefiting from strong price competition or promotional offers and their loyalty to their
> suppliers is leading to ever higher prices. Further, while price increases up to 2013 might have been explained
> by the rebalancing of revenue from calls and the line rental, since then we have observed a more rapid inflation
> and it is now clear we need to act. Data relates to the proportion of customers self-reporting a bundle of
> services, and understates the proportion purchasing multiple services from a single provider. We use this to
> allow for comparability with 2009 data. Revised analysis for 2016 based on the main provider used for each
> service is reported in Figure A8.1. This analysis also defines those who pay line rental in addition to their
> broadband service, as a bundle.
>
> 1.7 We have found that these customers – often elderly people who have remained with the same landline
> provider for many decades – are getting increasingly poor value for money. They are particularly affected by
> price increases, and, we consider, are in need of additional protection in a market that is not serving them well
> enough.
>
> 1.8 To address this situation, we are now proposing to cut the price of BT's standard line rental by at least £5
> per month for customers with standalone landline contracts. Thereafter BT would only be allowed to increase
> its average prices for line rental and calls in line with inflation."
>
> 1.9 …From December 2009 to December 2016, line rental prices have risen by between 25% and 49% in real
> terms. At the same time, the wholesale costs for providing landline services have fallen by up to 26% in real
> terms. Wholesale costs are represented by the WLR and MPF lines in Figure 1.2. These two wholesale products
> are used by providers to offer retail line rental services to consumers.
>
> 1.10 This fall in the wholesale costs has allowed more competitive pricing in the bundled market but for
> landline only has simply meant that the profit in the provision of this service has grown significantly…
>
> 1.11 This trend is observable across all major providers of landline services – not just BT. We are therefore
> concerned that standalone landline telephone consumers are increasingly worse off compared to consumers of
> bundled services.
>
> 1.12 There are currently about 2.9 million standalone landline consumers which account for 11% of total
> residential landline customers. They fall into two categories:
>
>> • About 1.7 million consumers buy landline services but do not purchase fixed broadband. We refer
>> to this group as "voice-only" consumers.
>>
>> • Approximately 1.2 million consumers buy both landline and broadband services but on a standalone
>> basis outside of a bundle. They have faced the same line rental price increases as voice-only
>> consumers and have not benefited from competition in bundles. We refer to this second group as
>> "split purchasers".
>
> 1.13 Standalone landline customers generally do not engage with the market: 70% of standalone landline
> customers have never switched provider or considered doing so. They tend to be older and less likely to shop
> around for a better deal. Approximately 43% of standalone landline customers are at least 75 years old, and
> 35% live in DE socio-economic group households (for comparison, 4% of dual-play customers are 75 or over,
> and 20% are in DE group households)…
>
> 1.17 BT benefits from a very high market share; over 70%, in a market where many customers are not actively
> engaged. This in turn has allowed BT to act as a price leader, steadily increasing the price of standalone landline
> services. Further, given the difficulty in winning new customers from BT, the range of choice from competing
> providers has declined as prices have increased.

1.18 As illustrated in Figure 1.2 above, BT has been able to raise prices to its standalone landline telephone customers despite falling costs.

1.19 A key reason for the decline in costs has been reductions in regulated charges for wholesale inputs. However, while wholesale regulation has supported competition in bundles, as we have discussed, it has clearly not been able to sufficiently protect these standalone customers.

1.20 Consequently, we consider we need to act directly in the retail market through regulation of BT's retail landline services…

4.7.2 Experience of switching: Around 70% of SFV 93 customers report that they have never switched provider. Many of these respondents are likely to have been with BT since it was the monopoly provider of fixed line services (see paragraph 4.39.1 below). In contrast, dual-play services are relatively new, and 26% have switched provider in the past 3 years."

157. Following negotiations of Ofcom in 2017, BT volunteered the Commitments, which included: (i) a reduction of £7 on the monthly line rental price for VOCs; (ii) a Consumer Price Index ("CPI") cap on future price increases, based on a basket of SFV calls and access services for VOCs; and (iii) a commitment to provide SPCs with an annual statement setting out the customer's annual spend and savings available if landline and broadband services were bought as a bundle. The price cut did not apply to: SPCs; VOCs who bought BT Basic (later named BT Home Essentials) or BT Home Phone Saver ("HPS"); and any VOCs who were businesses.

158. These Commitments were noted in the 2017 Statement. This essentially maintained the views expressed in the 2017 Provisional Conclusions and explained its approval of the offered Commitments. See paragraph 15 above. The 2017 Statement was accompanied by three Annexes. The third Annex described the supporting information for the Statement which included a document itself called "Evidence Supporting the Statement" ("the Evidence"). This served the same function as Appendix 8 to the 2017 Provisional Conclusions. In the Statement, Ofcom maintained its earlier view and pointed out that line rental prices had risen by between 23% and 47% in the period from December 2009 to June 2017, while the wholesale cost of providing these services had fallen by 27% in real terms.

159. In the summary, the 2017 Statement concluded as follows:

"1.10 Since the February Consultation, we have been made aware that providers of standalone telephony services on Openreach's network are in fact able to identify which of their customers are voice-only and which are split purchasers. Therefore, while providers have not so far set different prices (or other terms and conditions) between these two customer groups, they could do so if they wished. Accordingly, we are no longer of the view that voice-only and split-purchase customers should be considered part of the same market.

1.11 While we have concerns about the current outcomes for both customer groups, our concerns are more acute for voice-only customers. Voice-only customers generally do not engage with the market: 77% of voice-only customers have never switched provider or considered doing so. They tend to be older and less likely to shop around for a better deal. Over 40% of voice-only customers are at least 75 years old, and 40% live in DE socioeconomic group households (for comparison, 5% of dual-play customers are 75 or over, and 20% are in DE group households).5 Moreover there are now relatively few providers of landline only services for these consumers to choose from.

1.12 Even if measures to promote engagement and competition for voice-only customers are successful, they are likely to take time to have an impact (and there are challenges to them being successful, which requires both that voice-only customers engage more actively and also that this stimulates a growth in the existing, limited competition). BT currently holds a dominant position in the market for voice-only customers and the lack of competition enables it to maintain prices above the competitive level.

1.13 We therefore consider that a significant price cut is important to alleviate the detriment suffered by voice-only customers. We are also in favour of providing information to consumers, because of the potential benefits in encouraging their engagement in the market and greater competition.

1.14 Like voice-only customers, split purchasers have suffered increases in line rental charges in recent years without significant offsetting benefits. However, split purchasers are typically younger and more technologically literate, and, by definition, have internet access which allows them to access alternative offers more easily. Unlike voice-only customers, split purchasers have a wide range of choices available to them, such as dual-play (telephone and broadband) bundles, which should allow them to seek better value for money from providers if they increase their levels of engagement.

1.15 To address the detriment faced by split purchasers we have decided that it is more appropriate to allow time for split purchasers to become more actively engaged and potentially switch to dual-play bundles where that is a better option for them, than to include them in a price control at this stage. Split purchasers may benefit from being informed that, in many cases, they are not obtaining good value for money and can find themselves a better deal."

160.    We should point out that the actual text of paragraph 1.11 said that 55% of dual play customers were over 75 rather than 5%. The reference to 55% is clearly an error - see the underlying evidence referred to and relied upon at page 35 of the Evidence.

161.    In accepting BT's proposals, Ofcom said:

"1.20 We consider that BT's voluntary proposal addresses our concerns over the prices offered to voice-only customers. It brings line rental prices back down to levels last seen in 2009 in real terms, as shown in Figure 2 below. It reverses the trend of recent years for ever higher prices and goes further to ensure that prices are constrained by CPI for the next three years.

1.21 BT has also agreed to improve its communications with its voice-only customers to provide information on potential savings and the switching process.

1.22 For split-purchase customers, the focus of BT's proposal is now solely on encouraging engagement through an annual statement. We consider that this, plus the absence of a price cut, might encourage them to engage more actively with the deals available in the market for dual-play and other bundles. Additionally, we will be exploring other types of prompts or tools for consumers more generally in our consumer engagement project. We launched this project in July 2017 through a call for inputs.

1.23 We therefore consider that BT's voluntary proposal is sufficient to address our concerns in relation to this review. Accordingly, we have decided against the imposition of formal regulation at this time."

**2020 and 2021**

162.    In its 2020 Consultation, Ofcom considered that price protection for VOCs "remains necessary to address our previous concerns from our last review in 2017" because there "is little competition in the market for this group of customers". In the 2021 Statement (see paragraph 16 above), Ofcom accepted a new set of voluntary commitments from BT for a further five-year period from March 2021 which applied an inflation-linked control on a basket of SFV calls and access services to VOCs. Ofcom did not assess SFV prices charged to SPCs in the 2020 Review, nor did it propose that BT now make price cuts to this part of the service, as it had for VOCs.

**FACTUAL MATTERS (3): SWITCHING**

163.    The overall position is best shown by the figure below, from HJ1:

**Figure 3.4    Number of BT lines sold to SFV customers and number of BT fixed voice services sold in a bundle**



164.    One can see from this graph that SFV Customer numbers reached a peak (over the period shown) in 2010 of around 7.6m, followed by a steady decline down to about 1m in 2022. This decline was accompanied by a significant increase in the number of fixed voice lines within bundles from 2009 to around 2014, after which point the number of BT bundle customers stabilised and then declined in the last 2 years of the claim period.

165.    If one looks simply at the decreasing SPC numbers, this is shown in the following tables from DP3:

**Figure 9**      **Estimated number of BT Split Purchase Customers, 2014 Q2 – 2018 Q2**



**Figure 12**    **Estimated number of BT Split Purchase Customers, 2018 Q2 – 2022 Q2**



166.  For VOC figures, there was a reduction from 2.1m in 2014 Q2 to 0.5m in 2022 Q2 - a fall of almost 75%. See paragraph 3.39 of HJ2, based on the same data pack as Mr Parker used for his SPC decline figures.

167.  The figure below shows, for each year, the percentage of that years' SFV customers which switched and, within that percentage, how many switched supplier, i.e. away from BT, and how many switched service within BT. So on any view, there was a significant amount of switching each year. This figure derives from paragraph 201 of SH1.

50



Figure 10: Total rates of BT SFV customer switching (supplier & service)

168.    As for the breakdown of switching SFV customers between VOCs and SPCs, Dr Hunt said that the switching rate was higher for SPCs than for VOCs, on the basis of his own analysis of the raw data (see paragraph 200 of SH1), and significantly higher on the basis of his restated Ofcom Switching Tracker figures (see paragraph 207 of SH1).

169.    In this regard, it needs to be recalled that in each year, there were also SFV customers who joined from elsewhere ("the joiners"). See the green elements of the diagram below, shown under paragraph 5.83 of HJ1 (the black sections of each column may be ignored for present purposes):

**Figure 5.19    BT's SFV customer additions and losses to BT's competitors, 2014–2019**



170.    These percentages were extrapolated by Dr Jenkins from the underlying figures which are shown in Tables 11 and 12 of the Agreed Matters Document:

**Table 11        Additions to BT's SFV customer base (2014-2022)**

|  | 2014 | 2015 | 2016 | 207 | Jan-Mar 2018 | Apr-Dec 2018 | 2019 | 2020 | 2021 | Jan-Oct 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total additions into SFV** | 435,980 | 381,189 | 331,927 | 263,633 | 52,286 | 179,514 | 195,581 | 198,437 | 170,879 | 78,511 |

**Table 12        Additions to BT's SFV customer base split by VOCs and SPCs (2018-2022)**

|  | Apr-Dec 2018 | 2019 | 2020 | 2021 | Jan-Oct 2022 |
|---|---|---|---|---|---|
| **Additions to VOCs** | 24,742 | 29,934 | 40,852 | 59,541 | 28,951 |
| **Additions to SPCs** | 154,772 | 165,647 | 157,585 | 131,338 | 49,560 |
| **Total additions into SFV** | 179,514 | 195,581 | 198,437 | 170,879 | 78,511 |

171.    Mr Parker has questioned whether those figures are correct, based on the number of customers who said, in 2022, that they had been customers as at 2014 (see paragraph 175 below). There may in fact be no discrepancy if at least some of the new joiners departed relatively quickly after they had joined. But in any event, the real point is that, while there were some new joiners, this had minimal impact on the overall rate of decline as shown in Figure 3.4 under paragraph 163 above.

172.    As to where the SFV customers went overall (whether BT or not, but most were BT), Figure 4.4 under paragraph 4.53 of HJ1 shows that an increasing majority went to bundles as opposed to competing providers' voice-only services:

**Figure 4.4     Products chosen by recent SFV switchers, 2016-2019, all operators**



Source: Ofcom Switching tracker data tables, 2016 Tracker Table 34, 2017 Tracker Table 41 **{C/351/95-96};**

173.    If one takes the total increase in BT's bundled fixed lines from 2014 to 2018, the figure below shows the source of the increased number of lines, as set out at paragraph 3.48 of HJ2:

**Figure 3.2    Assumed sources of the increase in bundled fixed lines, Q2 2014 to Q2 2018**



174. This shows that 59.4% of the increase came from BT SFV customers (excluding BT Basic customers who are not part of the Class).

175. Further, it follows from the figures used by Dr Jenkins (as to which there was no real dispute, since they came from BT itself), of the 1,113,285 SFV customers in October 2022 (a total derived from the F19 Summary, BT00092355), 881,370 had been SFV customers in January 2014. But this latter figure itself corresponded to only 18.8% of the total of 4,681,019 SFV customers in January 2014.

176. The figures referred to above are either agreed, or any dispute over them does not matter for present purposes.

177. We should add that these switching rates are much higher than those quoted by Ofcom and used in its 2017 Provisional Conclusions. The explanation for this discrepancy is common ground. It is that Ofcom's analysis only captured consumers who switched landline provider away from BT and remained a stand-alone fixed voice customer. It therefore did not include BT customers who switched to a bundle, nor did it include those who stayed with BT for the landline, but then changed or added broadband from another provider. See paragraphs 512 - 522 of SH1.

54

## FACTUAL MATTERS (4): BT'S PERCEPTIONS AS TO LINE RENTAL INCREASES AND SWITCHING

### Introduction

178. This is an important topic because it is relevant to certain aspects of market definition as well as Limb 2. The relevant material is constituted by the evidence of BT's witnesses and its own contemporaneous documents.

179. To recapitulate on BT's line rental increases,

    (1)    Between 1 October 2010 and 3 July 2016, there were price increases at least once in every year;

    (2)    Between 1 December 2014 and 3 July 2016 there were 3 consecutive price rises of £1 each, culminating in an SLR of £18.99;

    (3)    Due to a general price freeze introduced in 2017, that £18.99 price remained in place until 1 April 2018. At that point, it dropped by £7 for VOCs but remained for SPCs, until 16 September 2018 when it rose by £1 to £19.99;

    (4)    Thereafter, for SPCs, price increases followed, not by a set amount (for example £1) but rather by a percentage related to CPI;

    (5)    Thus, the £19.99 price was changed on 31 March 2020 by a modest 21p which equated with CPI;

    (6)    For the following years, the increase was CPI +3.9% which made for much larger increases.

180. We have set out the position in relation to BT's competitors, so far as line rental prices were concerned, in paragraphs 131 - 132 above. The issue of their pricing, as opposed to that of BT, arises in the context of price leadership within the topic of Dominance, considered below.

### The Immediate Purpose of BT's line rental increases

181. It is clear from the evidence of all of BT's witnesses that the immediate causes of the numerous line rental increases were the revenue targets which the Voice division had to meet.

182. As Mr Cackett explained, each year, BT Consumer produced a 5-year Medium Term Plan ("MTP"). Internal references to the "budget" were normally to the detailed first year budget within the MTP. The MTP was, in effect, BT Consumer's proposed contribution to the final targets set by BT Group for its various constituents, including BT Consumer. Those targets were set each year and BT Consumer would have to consider whether its own MTP was likely to meet the targets or not. If it appeared that the MTP would not meet the targets set by BT Group, the latter target might be adjusted, so as to reflect the likely performance of the MTP; alternatively, the MTP might be adjusted to conform more closely to the target, for example, by cutting some costs.

183.    The budget figures would deal with costs and revenue. As for revenue targets for BT Consumer, these were in turn split up into revenue targets for each division, including Voice. They were then dealt with by that division's General Managers. In relation to Voice, this involved meetings with Ms Blight, who was Voice's General Manager from November 2015 until late 2016 and also Mr Bunt, who became Acting General Manager upon Ms Blight's departure on leave, and then General Manager from 1 April 2017, once Ms Blight had moved to a different role. He remained in that post until April 2019, when he was promoted to Director of Portfolio and Pricing within BT Consumer. He became BT Consumer's Regulatory Affairs Director in December 2019, and then the Retail Regulatory Affairs director for both BT Consumer and the business and public sector provision of BT Group, called BT Enterprise.

184.    Mr Bunt had originally been appointed Senior Propositions Manager of the Voice Propositions Team in November 2013, becoming Head of Pricing within Voices Propositions Team in April 2015. At that point, BT Consumer was made up of four divisions, namely Voice, Broadband, TV and Sport, with a fifth division, namely Mobile, being added from around October 2015.

185.    In general, and it follows from what is said above, price changes in line rental made or to be made by Voice were considered in the context of the annual revenue (and costs) targets which Voice had to meet. The increases were not driven, for example, by increases in costs, not least because the primary direct cost was WLR which was either flat or decreasing somewhat.

186.    Both Mr Bunt and Ms Blight accepted that in practice, and especially when line rental was increasing by £1 a year, that this was driven by the need to meet Voice's revenue targets. It was also understood that the profits from Voice could contribute within BT Group to investments in fibre-optic cable, 5G, and other expenditure not related directly to Voice. There was clearly a belief that increasing line rental prices would increase BT's total voice revenues, compared to the levels that would arise absent the price rise; in other words, that any reduction in consumer demand arising from these line rental price increases would not outweigh the increase in line rental per customer.

187.    To take an example of how price changes were designed to achieve particular revenue targets, one can take the projected price increases for 2015-2016, known as Project Laika. The key support slide for 2015-2016 is dated 4 September 2014. The extract below shows how the revenue target is to be delivered:

| | |
|---|---|
| **1516 Pricing Plan – 1 of 2** | |
| **A base plan to deliver £41.4m against the £39m target** | |

**Context**

- 14/15: £38.5m from general voice pricing (£40m upside less £1.5m in gives)

- The £10m incremental challenge for 14/15 was delivered through a range of profit protection activities through these opportunities can not be replicated, unlike the basic annual price change

**Base Price Change**

- MTP pricing target for 15/16 is £39m

- Pricing below covers Voice only at this point – BB & Bundles are providing input by 5th Sept

| Item | Pricing | Benefit 15/16 (£'m) |
|---|---|---|
| Line Rental | £1 increase (5.9%) | 24.3 |
| Packages | 6.4% increase (i.e. 6.5% once prices rounded) | 6.0 |
| Calls and Calling Features | 6.4% increase (i.e. 6.5% once prices rounded) | 7.4 |
| Gives | | -2.0 |
| **Total** | | **35.7** |

**Further Pricing Activity – Recommended Plan delivers £5.7m**

| Item | Timing | Price Change | GM 15/16 (£'m) |
|---|---|---|---|
| LRS Price Increase (to align with increased standard rental) | Price Change | 6.50% | 3.3 |
| Re-FEWE-ing | Various | £3.50 | 0.5 |
| Type - J (and Paper Bills charging) | CCP42 | £2 | 0.4 |
| LR+ paying for paper bills | CCP41 | £1.59 | 0.7 |
| Move Price Change to Sunday 29th November | 29th Nov 15 | Various | 0.8 |
| **Total** | | | **5.7** |

188.    The extent to which a £1 price increase was seen by those in the Voice division as a default is expressed in Mr Bunt's 15/16 Price Plan document dated 12 December 2014 ("15/16 Pricing"). This contains a number of recommendations by Mr Bunt. At page 6, he observed thus:

**15/16 Pricing – LT Strategy**

**Sustainability of Current Pricing Approach:**

- Pegasus to 15/16 pricing has seen 2 key changes in approach:
  1. 1 month creep in price change date
  2. £1 increase in LR on each occasion
- The sustainability of this creep is in question especially as in future years this moves the price change close to the start of the Football season – which is a strategically important period.

**Long Term reduction in our dependence on price changes**

- Price changes create significant headroom for our competitors to do likewise
- A culture of annual price change can become a drug on which we get hooked, losing perspective of the elasticity of our pricing an volume impact
- Our 3-5 year view is to reduce the budgeted price change down year-on-year to improve the competitiveness of our offering and enable us to put the squeeze on our competitors *15/16 £41.4m ,16/17 £35m,  17/18 £30m*

189. In her evidence, Ms Blight said that she agreed 100% with the "drug" analogy and added this (Day8/135):

> "…and that is what I sort of was alluding to when I talked about short term. Because of course when you put the price up, you immediately get the sugar high of extra revenue, but then it is very hard to analyse the churn impact and disaggregate what is the churn from the price change versus the churn from Sky's marketing or something the Post Office does."

190. In fact, the thrust of her evidence was that the Voice team would have to be creative in terms of providing extra value, given that the line rental price increases were almost inevitable, which is where the question of Gives is relevant (see below).

191. In evidence, Mr Bunt accepted that line rental increases were pretty much a "given" and that Voice was really fixed with the revenue targets. He said that, when he suggested not to increase prices at a particular point, he would be overruled by "the grown-ups" i.e. senior BT management. He added that there was, not only within Voice, but also within the senior members of the Consumer Leadership Team, to whom the Voice team would present its proposals, "collective handwringing" at the absence of a better plan than line rental increases to meet the MTP targets.

192. For his part, Mr Cackett did not think that an annual price increase of £1 was a "given", but on the other hand, the starting point would be what was done in the previous year. He also accepted that there was a tension between those in Voice, who questioned whether prices needed to be increased and those on Mr Cackett's side, who said that the price increase should not be interfered with. He said that nonetheless, there was considerable discussion before deciding the outcome for any particular year; it might look like a *fait accompli* because of what was done each year, but it was probably significantly more nuanced than that. We do not think that there is really much between the evidence of Mr Bunt and Ms Blight on the one hand and that of Mr Cackett on the other in relation to this matter.

193. The £1 price increase contemplated by Project Laika was indeed implemented, in September 2015.

194. It is, of course, also important to bear in mind that, as we have noted above, the successive increases in line rental prices did not secure any real year-on-year increases in BT's ARPU from SFV customers. It was clearly BT's belief that the line rental price increases helped to increase voice revenues compared to the counterfactual in which line rental prices were maintained, but other factors, notably the decreasing call volumes, prevented any material increases in ARPU despite the line rental price rises.

195. All of this is important background for, among other things the question of BT's perception of the risk of churn in the context of price increases.

**MARKET DEFINITION**

**Introduction**

196.  As already noted, the CR contends that the relevant market is SFV Services prior to the Commitments, and SPCs afterwards, and that BT is dominant in both markets. BT contends that the relevant market is wider, being a product market which encompasses SFV Services and bundles. If BT is right, that is the end of the claim because the CR does not contend that BT is dominant within that wider market. If the CR is right, BT does not concede that it is dominant in SFV Services, and so we would then proceed to determine that issue.

197.  Each side relies on a number of different factors to support its position which are discussed below.

198.  At this point, we should just record what is agreed between the parties about other aspects of the markets, as set out in the JES:

(1)  Prior to the Commitments, VOCs and SPCs formed part of the same market, given BT's inability to price discriminate between the two customer groups at that stage;

(2)  Both pre-and post-Commitments:

(a)  SFV access (i.e. line rental) and SFV calls form part of the same market;

(b)  the relevant markets exclude BT Basic / Home Essentials;

(c)  the relevant markets exclude SFV services aimed at business customers;

(d)  the relevant markets exclude mobile voice services; and

(e)  the relevant geographic market is UK-wide (excluding the Hull area);

(3)  Further, Mr Parker maintained that after the Commitments, when BT was able to price discriminate between SPCs and VOCs, SFV Services sold to VOCs who received the Commitments discount were in a different market from SFV Services sold to SPCs (and VOCs not eligible for the discount); for her part, Dr Jenkins agreed that this was likely. See her comments at paragraph 5.1.9 of the JES.

**The Basic Approach**

199.  We did not understand the parties to disagree about the purpose of market definition in the present context. As it is put in paragraph 2.1 of the CMA Market Definition Guidelines:

> "Market definition is not an end in itself but a key step in identifying the competitive constraints acting on a supplier of a given product or service. Market definition provides a framework for competition analysis. For example, market shares can be calculated only after the market has been defined and, when considering the potential for new entry, it is necessary to identify the market that might be entered. Market definition is usually the first step in the assessment of market power."

200.  See also, to similar effect, paragraphs 6, 9(a) and 10 of the Commission Notice C/2024/1645 on "the definition of the relevant market for the purposes of Union competition law" ("the Commission MD Notice").

201.    When assessing the focal product, i.e. the product that is being considered as a candidate for a relevant product market, the fact that other products might to some extent be considered as alternatives due to being substitutable and/or functionally similar is relevant but not in itself conclusive. That is because:

> "The key idea is that of a competitive constraint: do the other products alleged to form part of the same market act as a competitive constraint on the conduct of the allegedly dominant firm?"

See *Aberdeen Journals v Director General of Fair Trading (No. 1)* [2002] CAT 4 ("*Aberdeen Journals 1*") at para. 97 and *Generics (UK) Ltd v CMA* [2018] CAT 4 at para. 401.

202.    Here, therefore, the focal product is SFV Services (or such services to SPCs after the Commitments) and the main other products that are considered to provide a possible competitive constraint on the focal product are bundles.

**The SSNIP Test**

203.    Both sides also agree that one common approach to ascertaining the correct market by reference to the competitive constraint exerted (or not) by the other product is to use the SSNIP Test framework. This involves identifying the smallest group of products in which a hypothetical monopolist ("HM"), which controls the focal product, could profitably sustain at least a "small but significant non-transitory increase in price" (i.e. "SSNIP") above the competitive level. The size of such an increase is typically taken to be 5-10%. If the HM can "pass" that test, i.e. it is commercially better off after the increase, this indicates that the focal product is its own market i.e. the market is narrow. If, on the other hand, the test is "failed" so that the price increase cannot be profitably maintained (because of the extent to which the HM loses customers to other products as a result of the SSNIP), this indicates that the market is wider. Therefore, the key question is whether the ability of consumers to switch from a voice-only contract (SFV or later, SPC) to a voice plus broadband bundle would provide an effective competitive constraint on a hypothetical monopoly supplier of SFV Services (or later, such services to SPCs).

204.    As to how the SSNIP test might be carried out, paragraph 3.7 of the CMA Market Definition Guidelines includes the following factors as likely to be important:

> "• Evidence from the undertakings active in the market and their commercial strategies may be useful. For example, company documents may indicate which products the undertakings under investigation believe to be the closest substitute to their own products…
> • Customers and competitors will often be interviewed. In particular, customers can sometimes be asked directly how they would react to a hypothetical price rise, although because of the hypothetical nature of the question, answers may need to be treated with a degree of caution…
> • Evidence on product characteristics may provide useful information where customer substitution patterns are likely to be influenced significantly by those characteristics. Where the objective characteristics of products are very similar and their intended use the same this would be good evidence that the products are close substitutes. However, the following caveats should be noted. First, even where products apparently have very similar characteristics and intended use, switching costs and brand loyalty may affect how substitutable they are in practice. Second, just because products display similar physical characteristics, this does not necessarily mean that customers would view them to be close substitutes. For example, peak customers may not view rail

60

travel during off peak times to be a close substitute for rail travel at peak times. Third, products with very different physical characteristics may be close substitutes if, from a customer's point of view, they have a very similar use.

• Patterns in price changes can be informative. For example, two products showing the same pattern of price changes, for reasons not connected to costs or general price inflation, would be consistent with (although not proof of) these two products being close substitutes. Customer reactions to price changes in the past may also be relevant…

• Evidence on own or cross price elasticities of demand may also be examined if it is available…

• In some cases **critical loss** analysis may be relevant. One definition of critical loss is the minimum percentage loss in volume of sales required to make a 5 (or 10) per cent price increase on a product unprofitable. The critical percentage tends to be lower when an undertaking has a high mark up over unit costs (since each sale lost entails a relatively large loss in profit). However, the fact that an undertaking can set a high mark up might also demonstrate that its current customer base is not particularly price sensitive..."

205.    The following also emerges from the Commission MD Notice:

"56…Undertakings typically monitor competition in the ordinary course of business. There may also be industry associations or experts monitoring competition. While such industry views on market boundaries do not necessarily correspond to the concept of the relevant market within the meaning of Union competition law, information on which undertakings regard each other as (close) competitors, as well as the views of other market participants and industry experts on competitive constraints, can provide useful information for assessing demand substitution…

77. Evidence used by the Commission to define markets should be reliable. This is likely to be the case, for instance, when the evidence comes from public authorities or is supported by multiple sources, including by market participants with conflicting interests, such as suppliers and their direct customers…

81…In cases involving regulated markets, including, for instance, the telecommunications, energy or healthcare sectors, the Commission may also seek data from and the views of sector-specific regulators…"

206.    The Tribunal in *Aberdeen Journals 1* stated as follows in this context:

"103.    In general, evidence as to how the undertakings in question themselves see the market is likely to be particularly significant. As the Director points out at paragraph 2.6 of OFT 403:

"The idea of a market is familiar. Annual reports, business plans and other documents often refer to the market in which the undertaking operates. This will normally include other undertakings which the undertaking views as its competitors."

104. In the Tribunal's view, contemporary evidence as to how the allegedly dominant undertaking itself views its competitors, and vice versa, may, depending on the particular circumstances, be of decisive importance when it comes to defining the market in any given case."

**The Cellophane Fallacy**

207.    In an abuse of dominance case concerned with excessive pricing, the allegation is that the firm in question is already charging a price significantly above competitive levels, as a result of the exercise of its market power. This poses a problem for the SSNIP test. That is because, while a modest price increase from the prevailing price of the HM may fail the SSNIP test, it does not follow that the SSNIP test would fail where the price increase was implemented from a lower (competitive) starting point. This is the well-known Cellophane Fallacy, recognised, for example in paragraph 5.5 of the CMA Market Definition Guidelines and paragraph 30 of the Commission MD Notice. Indeed, in its Decision of 15 October 2014 in Case AT.39523 *Slovak Telecom* at para. 158 (cited more fully at paragraph 427 below), the Commission said that because of the Cellophane Fallacy, it "does not normally rely on the SSNIP-test exercise in the context of cases which are based on Article 102 of the Treaty."

208.    Both experts accept the existence of the Cellophane Fallacy. However, it is problematic only in one direction i.e. where the SSNIP test is failed, indicating a broader market. If the SSNIP is passed, even at an increase from the prevailing price, such that the narrow market is (still) entailed, it has no adverse effect on what can be concluded from the test.

209.    Dr Jenkins in the book *Economics for the Competition Lawyer* (3rd Edition), written by her and others ("JNK") put it thus at paragraph 3.79:

> "At the very least a one-way test can be applied. If, at the prevailing price level, a monopolist can profitably impose a SSNIP, you can be confident that the market is no wider. If, in contrast, you find that the monopolist cannot profitably increase price, there may be a cellophane fallacy and the market may be defined too broadly. Ultimately, if there is a high probability that the analysis will suffer from a cellophane fallacy, you may have to conclude that market definition is not a useful intermediate step and instead focus directly on indicators of market power, such as profitability".

**Price Discrimination**

210.    If the HM has two separate customer groups and it can price discriminate between them by charging one group a price which is higher than that charged to the other by a SSNIP or more, and doing so profitably, and where the difference is unrelated to cost, this suggests that each group forms a separate market. Paragraph 88 of the Commission MD Notice puts it thus when explaining that separate markets can be inferred from price discrimination typically:

> "when three cumulative conditions are met: (a) it is possible to identify clearly to which group an individual customer belongs at the moment of selling the relevant product to the customer; (b) trade between customers or arbitrage by third parties is unlikely; (c) the discrimination between customers or customer groups is of a non-transitory nature".

**The Relevance of Switching**

211.    On any view, the phenomenon of extensive amounts of switching, as shown in paragraphs 163 - 176 above, is significant. The question is whether or not it reveals evidence on the kind of substitution from SFV to bundles, that would show a competitive constraint on a hypothetical SFV monopolist.

212.    As Mr Parker put it in the JES at paragraph 5.1.1:

> "Evidence on switching is one type of evidence that is relevant to market definition. The key issue is whether there is sufficient switching to have acted as a competitive constraint on the hypothetical monopolist. (Parker 3, paras. 4.16(a) and 4.17) For switching to act as a constraint, switching needs to take place as a result of changes in relative prices, rather than other non-price factors, such as changes in tastes."

213.    The CR says that switching occurred mainly as a result of what Mr Parker refers to as the "secular trend". In other words, it reflects an increase in customer preference for bundles rather than SFV Services (only a small minority of VOCs migrated to other voice-only providers which, in any event, were decreasing in numbers). It was not, in the main, a reaction to any price increases on the part of BT, although Mr Parker does not suggest there could be no such reaction. That being so, he reasons that the phenomenon of switching cannot assist BT in relation to market definition, and in particular on the issue as to whether bundles act as a competitive restraint on SFV pricing and the operation of the SSNIP test.

214.   On the other hand, BT contends that switching is indeed, to a significant, albeit not exclusive degree, a reaction to price increases by BT. On that basis, not only is it relevant to the market definition issue, but it positively suggests that bundles <u>do</u> act as a competitive restraint on SFV pricing in a way which means the SSNIP test fails.

215.   Since the reason, or main reason, for switching is such an important foundational question, we deal with it at this point, before turning to the analyses on market definition offered by Mr Parker, on the one hand, and Dr Jenkins on the other. Both Mr Parker and Dr Jenkins have also given evidence on the issue of switching, which we refer to in context below.

**Reasons for switching**

*The Possibility of Secular Trend*

216.   The possibility of secular trend, based on changes in customer preference, as opposed to any increased price of the focal product was recognised by Dr Jenkins and her co-authors in JNK, at paragraphs 3-187 – 3.189:

> "3.187   The other question is whether-and at what point-the new product imposes a pricing constraint on the old product. An example is the analysis of the leased-lines market by OPTA, the Dutch telecoms regulator, in 2005. A leased line is a permanently connected communications link between two premises, dedicated to a customer's exclusive use. At the time, business users had begun to switch from leased lines to other data services, such as those based on internet protocol technology. While these newer data services had more variable capacity and required more outsourcing of network management functions, customers considered them a lower-cost alternative to leased lines. Having noted a high degree of migration from leased lines to the newer data services between 2002 and 2004, OPTA nonetheless concluded that the movement between the products was not relevant for market definition:
>
> > Switching and migration from service A to B does not automatically constitute demand substitution. Demand substitution requires that switching from A to B is caused by changes in the price difference between A and B. In this case, there is price pressure. Migration, however, can result from other factors, such as the emergence of a completely new service (B) or changes in user preferences. Consumers migrate as a result, where this migration no longer depends on further small (5 per cent to 10 per cent) changes in the price difference between A and B.
>
> 3.188.   Is this an overly restrictive interpretation of the hypothetical monopolist test? What ultimately matters is whether the old product is a product worth monopolizing. Here, product migration does have relevance…There comes a point when demand for the old product has fallen so far that it is no longer a product worth monopolizing and therefore does not constitute a separate market. From this perspective, product migration over time is just as relevant to market definition as switching between products in response to price changes.
>
> 3.189 Yet some caution is still required in these cases. The migration process may not be uniform across all groups of consumers in the market. After the early adopters of the new product and then mass migration by others, there may be situations where the consumers who remain with the old product are those with the highest willingness to pay or the lowest ability to switch. Because of these remaining consumers the old products may still be a market worth monopolizing…"

217.   The same point is made at paragraph 52 of the Commission MD Notice:

> "In some cases, undertakings may also collect relevant information on demand substitutes during the ordinary course of business. For example, an undertaking may have data on the customers that it has won and lost and the identity of the competitors which lost/won those customers. By contrast, evidence of customers shifting away from a product as a result of factors unrelated to changes in relative supply conditions, such as a change in preferences or consumption patterns over time, are less informative for demand substitution."

218. More specifically, Mr Matthew observes in DM1:

> "157. One potentially significant feature of telecoms markets is that new or upgraded products are introduced in waves. As these new and upgraded products become available, a process of customer upgrading usually follows over a period that often takes several years. Initially the new products may be used by early adopters followed by the main part of the customer base, with a residual group of customers that do not value the better products available and continue to use the legacy products, in some cases continuing to do so until the old products are actually withdrawn. This process of customer migration can be observed in the take up of broadband by voice customers(facilitated by local loop unbundling regulation) which resulted in the rapid growth of bundles as the predominant way of purchasing fixed telecoms products, the upgrades of "standard" broadband to "superfast" broadband (facilitated by virtual unbundled local access regulation), and the current migration to full fibre broadband."

219. Dr Jenkins does not deny this as a possibility; indeed, her approach is to give some weight to it, but she nevertheless concludes that there is sufficient price-based switching from SFV to bundles to meet the requirements of the SSNIP test.

*Gradual and consistent decline in SFV Customers*

220. Mr Parker addresses the issue of secular trend directly at paragraphs 3.61 to 3.63 of DP4. He says that, broadly, there can be seen a gradual and consistent decline in SFV Services customers across the claim period, even where there was either a freeze on line rental price or where the Commitments price had been introduced for VOCs. Further, and in any event, the decline in SFV customers did not seem to turn on a particular line rental price increase at a particular time; in other words, there were no "spikes" in customer loss which one might have expected following a price rise. He says that a fairly swift reaction to price increase in terms of switching might be expected here, since customers who wished to terminate their contracts because of a price increase could do so without penalty, provided they acted within 30 days from the date of being notified of the increase (of which BT had to give at least 30 days' notice), as mandated by Ofcom's General Condition 9.6.

221. Figure 3 in DP4 shows the rate of decline of BT's SFV customers, and the various changes to BT's standard line rental over the claim period.

64



**Figure 3    Change in the number of BT SFV Customers over the period covered by Dr Jenkins's CLA, January 2014 – October 2020**

222.    The particular point that the decline continued in SFV customer numbers even during the price freeze is brought out in the further table prepared by Mr Parker as Table 1 in MdR's letter of 15 February 2024:

| | | | | | Price Freeze | | | |
|---|---|---|---|---|---|---|---|---|
| **Start** | Jul-14 | Jul-15 | Jul-16 | Jul-17 | Jul-18 | Jul-19 | Jul-20 | Jul-21 |
| **End** | Apr-15 | Apr-16 | Apr-17 | Apr-18 | Apr-19 | Apr-20 | Apr-21 | Apr-22 |
| Start BT SFV Customers | 3,727,915 | 2,928,056 | 2,396,517 | 2,026,677 | 1,772,172 | 1,546,625 | 1,365,492 | 1,170,340 |
| End BT SFV Customers | 3,265,641 | 2,509,833 | 2,104,063 | 1,812,957 | 1,592,047 | 1,402,177 | 1,216,152 | 1,040,610 |
| Diff. | 462,274 | 418,223 | 292,454 | 213,720 | 180,125 | 144,448 | 149,340 | 129,730 |
| **% change** | -12% | -14% | -12% | -11% | -10% | -9% | -11% | -11% |

**Source**    Oxera datapack - BT customers switching analysis, Sheet('Customer journey)
**Notes**    The Price Freeze refers to the period Jul-17 to Apr-18 during which BT froze line rental price increases.

223.    Professor Loomes agreed. In the hot tub discussion on Day 19/70-71 he said that:

> "I am perfectly happy to agree that there has been, over the years, a substantial migration away from SFV products and towards bundled products, that is certainly true. I think it is highly likely to be for historical, technological, social reasons, qualitative features. The improvement in what having broadband offers to people, they see it is more important, they see its benefits. They are also pushed to some extent by the difficulties of operating in a world which is increasingly referring people to go online, rather than dealing with them face−to−face or on the telephone…. But it is a continuum, and therefore we should not be surprised to see that as circumstances, the so−called secular trend, as circumstances make it more and more advantageous to be in a bundle, to have broadband at least, and more and more difficult not to have it, you are going to see this gradual migration."

224.    He was then cross-examined about this statement on Day 20 and whether it applied only to VOCs or to SPCs as well. He said he thought that SPCs might also move in the direction towards bundles (impliedly for the same reason as VOCs), but he accepted that this would not be so if the move was

simply to get broadband, as opposed to, for example, obtaining TV as well, or to get a better version of broadband.

225.   Mr Parker put this switching down largely (though not exclusively) to the fact that an increasing number of UK consumers had been persuaded of the benefits of having home broadband access over time, and that most of the switching was due to decisions associated with the natural process of migration towards home broadband. He thought that price factors played only a minor role and that therefore, in the context of applying the SSNIP test framework, it would not be safe to equate the amount of switching overall with the additional losses that a SFV HM would suffer were it to impose a price rise that was 5-10% above the competitive level. If he is right in that proposition, then there would be less reason to conclude that an HM would refrain from imposing a unilateral price increase because of the specific switching consequences of doing so.

226.   Importantly, this is not to say that the HM would be immune from or unharmed by the general market-wide trend towards bundles and away from SFV contracts. Any such supplier would fear (and suffer commercially from) the adverse commercial consequences of this change. Instead, the CR's case as advanced by Mr Parker was that the *extra* commercial damage caused by any *additional* switching that was specifically related to a decision to impose a SSNIP above the competitive level would not, in itself, be a factor that would make the ongoing switching away from SFV very much worse than it would be absent that price rise.

227.   It is obviously true that the basis of any secular trend towards bundles must be somewhat different for SPCs, since they already have broadband. In the period prior to 2018, we are unable to identify VOCs and SPCs separately, so it is not possible to identify the extent to which the trend towards bundles applied differently for the two groups. However, SPCs still form part of a gradual but consistent decline in the SFV Services customer base and this occurs whether there was a particular price rise or not. Moreover, for the period from 2018 onwards, there is clear evidence that a substantial number of SPCs cancelled their voice-only contracts in favour of a bundle contract, and Mr Parker's contention was that their propensity to do so was not much affected by marginal changes in SFV prices. Indeed, his interpretation of the existence of SPCs paying a large price premium for buying two standalone products instead of a single DP bundle was that any supplier currently choosing to charge the inflated standalone voice price (which in practice was BT in over 90% of cases) clearly had not been dissuaded from charging such a premium across the entire claim period.

228.   We think it is perfectly plausible to suggest a secular trend towards bundles from SPCs as these customers realise that bundles provide a more convenient way to receive voice and broadband

services, and that this shift arises as a matter of customer preference, which is not essentially related to price changes made by BT at any given point.

*Price Increase in face of declining SFV customer base*

229.   BT has submitted that the CR has not adduced any specific evidence to show the existence of the secular trend, for example, survey evidence. That is a fair point and we take it into account. On the other hand the CR can say that switching cannot have been primarily price-related because if it was, and BT perceived that it was, BT would not have continued to increase line rental prices as it did. Here, we focus on line rental because price changes in relation to call charges are more complex and less obvious; see also the issue of ARPMs discussed below.

230.   As to that point, made by Mr Parker in the hot tub discussion (Day 9/128-130), there are really only two answers. The first is that BT did not care about any effect on its price increase, precisely because it believed that switching was going to occur anyway; that answer would support the CR's case on secular trend. The other answer is to say that it was rational to keep increasing prices, despite the fact that they would inevitably lead to significant switching, because of BT's migration intent or the recapture effect, which meant that BT (in contrast to the hypothetical stand-alone SFV monopolist) positively benefited from consumers who switched to bundles. We deal with both of these points below. We should say here, however, that we reject the suggestion that BT's pricing was motivated by a migration intent because of the absence of any real evidence to support its existence. As for the recapture effect, we accept that this can be a factor which would make it less "painful" for BT to increase prices, than might be the case for a single product operator. However, we do not find the evidence on this phenomenon sufficiently strong to discredit Mr Parker's evidence on market definition and as we note below it does create some problems for BT's arguments on the relevant product market, because recapture incentives accentuate the Cellophane Fallacy problem and will tend to elevate BT pricing further above the competitive level.

231.   If, on the other hand, ARPU is to be taken as the only valid proxy for price in this context, this is a powerful argument against switching being price-related, since ARPU was essentially flat and on that basis there were no price increases to begin with, and thus any switching was for another reason.

*Dr Jenkins' Evidence on Secular Trend*

232.   Part of Dr Jenkins' evidence here was to point out that in her Critical Loss Analysis ("CLA"), she has made a 20% adjustment to take account of any secular trend effect. The problem with this is that the basis for that particular adjustment is not clear. In the hot tub discussion she said that "okay, it is hard to know exactly what is going on there". She then said at Day 9/123 that:

> "yes, there may be things going on that make bundles attractive and you have price changing at the same time" and stated that she did not see "how you can disentangle those two things…the price is an integral part of what it is driving at".

233. We did not think that these observations took the matter much further. Indeed, it seemed odd, because in conducting a market definition exercise, the task of distinguishing price from other influences - though seldom straightforward or uncontroversial - is one of the core tasks we would expect an expert economist to tackle.

234. It is correct that at p124, Dr Jenkins said this:

> "I am saying that when making that choice for any substitute product, it is always the case that what you are thinking about is the combination of the price and the product features that are going on. So even if it were the case that you said, well, the price stayed the same and the quality improved of bundles, and we saw switching towards it, that is still relevant, economically driven switching for the Voice customers. The other product is becoming more attractive."

235. The problem about this statement is that it seems to us to place insufficient focus on the need to distinguish switching that is due to relative price changes, and switching that is due to changes in tastes and the perceived quality of broadband access (or the secular trend) that would have influenced customer changes irrespective of any pricing incentives. The economic logic of the SSNIP test clearly requires an assessment of price effects <u>holding other things constant</u>, and in this passage Dr Jenkins has failed to address this critical distinction.

236. In making this criticism of Dr Jenkins' approach, we do not suggest that price is the only thing that matters, or that considerations of quality etc. do not affect the way competition and choices between different products work. Rather, the point is that this is precisely why it is necessary to isolate and hold constant those other factors when conducting the SSNIP test in order to understand the factors that would constrain the pricing conduct of an HM. Dr Jenkins' approach did not really tackle this critical task.

237. This was exemplified when in the end, at Day 9/126, she said this:

> "Indeed, the way I structured my market definition analysis was to start by saying there is just a lot of switching from Voice sold at standalone to Voice sold in a bundle; in and of itself that is a clear sign that the two products are seen to be substitutes in some kind of way."

238. Accordingly, we did not find Dr Jenkins' evidence here very satisfactory.

239. We return to her evidence in the context of the specific points about switching which she made to support the general argument that SFV Services and bundles were in the same market, dealt with in paragraphs 391 - 397 below.

*Dr Jenkins' Event Study on the Commitments Price Reduction*

240. At this juncture, we deal with Dr Jenkins' "Event Study", which she undertook, in fact in the context of unfairness, together with observations about it made by Mr Parker in the context of her CLA which is considered below. We think that it is highly relevant here because the evidence uncovered in this debate provides one of the strongest indications that VOCs switching was <u>not</u> primarily related to price.

241. The "event" considered by Dr Jenkins was the introduction of the Commitments on 1 April 2018. She deals with this at Section 7A.2 of HJ1 and Annex 10 thereto. Her analysis shows that the decline in VOC numbers slowed down after the Commitments, that the slowdown was statistically significant, and that it was consistent with those VOCs being responsive to price changes, in this context, price reductions. However, she went on to say that she was not saying that this formally demonstrated causality between the introduction of the Commitments, and switching away, but at least it ruled out as causes, the ASA Ruling or the result of an overall <u>upwards</u> trend in the rate of decline.

242. Mr Parker then drew upon the event study in this way in Annex A to the JES: the price reduction effected by the Commitments with a drop in SLR, from £18.99 per month to £11.99 per month, represented a 30% price change, if taken as a share of SLR ARPUs, assuming no change in call prices. Dr Jenkins' minimum price elasticity figure for the purposes of her CLA (see paragraph 429 below) is -2.63. If that price elasticity was correct, then it would suggest that a 30% price fall would lead to an <u>increase</u> in VOCs of 78%. In fact, the VOCs <u>fell</u> by 9%. And even if the price elasticity for VOCs was somewhat different for SPCs, there would still remain a large unexplained difference.

243. Dr Jenkins' response to this is to suggest that there is an "asymmetry", whereby the elasticity in reactions against price increases is not the same as elasticity in response to price decreases. She suggests (without any clear evidential basis) that once an SFV customer has left BT for a bundle, for example, there is a disinclination to move again, even if it would be in response to a price decrease. We did not find this a persuasive point and even if there was some impediment preventing consumers switching back to SFV contracts, it would still not explain why switching from SFV to bundles continued after the Commitments, even if the rate of decline so far as the VOCs were concerned had reduced somewhat.

244. Mr Parker goes on to say that the better explanation for the 9% drop is that it is simply part of a gradual and consistent reduction in the number of SFV customers over the claim period, which is essentially a function of secular trend rather than pricing. We agree with him about that, and we think that the consequences of the event study amount to important evidence to show that switching is not primarily related to price.

*BT's own perception as to reasons for switching*

<u>Introduction</u>

245. BT's own view as to the reasons for switching, or "churn" as it described it, is relevant evidence as to what those reasons in fact were. One important way of assessing what its view was, is by examining the extent to which BT was concerned about churn occurring, or having occurred as a result specifically of its own SFV pricing decisions.

246.   That BT monitored actual churn is clear. In paragraph 23 of JB2, Mr Bunt says that when he had been Head of Pricing in April 2015, he wanted churn rate to be monitored more closely and methodically than previously. In addition, and as from early 2015, BT used spreadsheets, which showed weekly churn rates.

247.   One such spreadsheet, dated 8 February 2016, set out the numbers of customers for different services, who had churned in a particular week, and then a code for why they left. The code "Detrimental change Mgrsign off [manager sign-off]" applies where a customer, having been notified of a price increase, then elects to terminate without charge. "LLU (L)", referring to local loop unbundling, is where the customer has gone to a broadband supplier. "Going to WLR competitor" is where a voice-only customer has moved to a different voice-only supplier.

248.   As Mr Bunt explained at paragraph 26 of JB2, there were limits to the utility of the spreadsheet because the data was based only on those customers who had positively informed BT when they were leaving, or where it was obvious to BT what had happened because there was a transfer to a different voice-only supplier. In addition, sometimes, the call centre representative had been given a reason, but failed to record it. So the actual number of customers who left for a particular reason could be significantly higher. In the event, Mr Bunt still used the spreadsheet but he was aware of its limitations.

249.   However, the documents that have particular relevance for these purposes are churn figures or estimates in the context of proposed pricing decisions, or in reviews of such decisions.

      General views about churn and pricing: the documents and the evidence of Mr Bunt and Ms Blight

250.   In this context, and in cross-examination, Mr Bunt was taken to a number of documents said to reflect BT's views about churn. The first was the "BT Consumer: Q2 FY14/15 Consumer Operational Review" dated 30 September 2014. This was therefore looking at the immediate results of notification in August 2014 of the Robin/Window price increases which were to be implemented in December 2014. Among other things, it stated:

   • 0.1% - incremental to BAU bill response PTC - forecast was 0.4%
   • 2k calls from 1.5m notifications, well below PTC forecast
   • 0.5k pushes of "No HTT button" to date
   • No material increase in customers ceasing directly due to price

251.   The 2,000 customers who called in response to the price increase notification were all customers, not just SFV customers. This was obviously a very small proportion of total SFV customers, even if there were more who would be terminating because of the price increases than the 2,000 shown. This is reflected in the final sentence recording no material increase in customers ceasing directly due to price.

252. One then goes to Mr Bunt's 15/16 Pricing Plan dated 12 December 2014. At page 11 is an assessment of a proposal for a price increase of £2 (rather than £1) above the existing £16.99 but with an option for a new 18-month contract at a price of £17.49. On the figures, there would be a £12m benefit from those back-book customers who simply continued with their existing contract and paid the increased rate. On the other hand, there would be a loss from customers who chose to recontract at £17.49 (compared with them having to pay £17.99 on the basis of a £1 increase only) of £3.9m. Further, it was assumed that there would be £1.5m lost due to customer churn. Overall, there would still be a significant revenue benefit with a £2 price increase, but one notes the reference to "PR risk" and in the event the price rise was £1. What this document shows is that the levels of churn estimated by BT were insufficient to outweigh the revenue-increasing impact of a price increase.

253. On 15 January 2015, a further iteration of the 15/16 Pricing Plan was produced. At page 6, it stated that recent price changes had demonstrated that churn driven by price change was low, namely 2,500 voice customers exercised their right to terminate the contract having been advised of the price increases, out of a total of around 9m voice customers in total. It went on to say:

> "Based on this we can conclude that Price changes are sustainable with increasing subtlety."

254. Mr Bunt agreed that this meant that BT was satisfied that churn was not here an obstacle to price rises. He added that BT was contemplating other structures and approaches which might be looked at, but in fact the contemplated price rise did take place.

255. A churn analysis PowerPoint dated 19 January 2015 in relation to the implementation in December 2014 of the Window price increase stated that the evidence showed that, while a price increase was likely to cause a spike in churn for a short period, it was not detrimental to churn numbers. Overall, the churn impact to date had been minimal, but many customers may not have had their first quarterly bill showing the price increase and therefore the exercise should be run again at the end of Q4.

256. Then, on 4 June 2015, Mr Bunt was asked whether he could produce a revised 15/16 Pricing Plan paper. He did so, adding in an email that he anticipated that the churn for 2015/16 would be broadly similar to that in 2014/15 i.e. 2,000 customers. He added that:

> "our pricing scale decision are not based on complex elasticity modelling but rather on finding a sweet spot between budgetary needs and PR risk."

257. Mr Bunt said in evidence that the pricing decision may have been based on some other factors as well, but accepted that this comment showed that the decision was not being based on complex modelling of customer switching following a price increase. There was simply the predicted 2,000 customers which were the subject of direct churn.

258. Mr Bunt was then taken to a document dated 29 July 2016 called "Price Change 2017" which was produced shortly after implementation of the 2016/2017 price change. This stated that:

> • We have seen greater churn than in previous years (7k) – however this is dwarfed in comparison to the additional revenue driven by the higher % increases. It is not clear how much this churn was driven by us or competitors (free fibre.) But for 17/18 we should be careful to not to over-tip the balance by repeating all of the higher % increases from 16/17

259. Mr Bunt accepted that the middle line was suggesting that it was not clear whether it was the price increase which drove away the 7,000 customers or some other competitive activity, and the example given was an offer of free fibre.

260. There was a later iteration of the same document dated 15 August 2016, which said this at p5:

> Price Change 1617 drove 8k incremental churn vs 1516 but is more than offset by the increase in revenue YoY, while PTC remains below target and only slightly up vs 1516

> • Increased churn is likely to have been driven by both a higher % increase in Price Change and highly competitive offers in market at the same time (e.g. free fibre)

> • In 1718 we need to be wary of repeating a high % price increase and driving greater incremental churn

| | 1516 | 1617 | YoY var | YoY % |
|---|---|---|---|---|
| Churn | 23k | 31k | 8k | 13% |
| Price change revenue | £133m | £196m | £63m | 47% |

261. What is clear from this is that BT were certainly alive to the prospect of some price-related churn (across the board) and it needed to be careful, going forwards; but on the other hand, it did not discourage BT from implementing the 2016/2017 price change. Mr Bunt added that in fact, because of the increase in broadband prices for 2016/2017, this would have made the overall price increase to bundle customers greater in percentage terms.

262. We should add that, notwithstanding the passage cited in paragraph 260 above, this document still assumed a price increase of £1 (see for example page 7). This had been foreshadowed in an earlier version of the same document dated 22 July 2016 where, at page 2, a key assumption was a price increase to £19.99.

263. In the event, by 19 October 2016, the decision had been taken to freeze the line rental price at £18.99. In answer to questions from the Tribunal about the reason for this (Day 7/56-57), Mr Bunt said that by this time, there had already been conversations with Ofcom in relation to its review (which had started much earlier, in 2016) and about offering a rental price freeze, and so BT would not have felt it could impose a price increase at that time. Mr Bunt had the timing right because, for example, in a letter to Mr Oxley of Ofcom dated 22 December 2016, BT was already offering a £2 line rental reduction for "true solus" customers (i.e VOCs) along with a price freeze, and an earlier document prepared for Ofcom stated that in previous discussions with Ofcom, BT had proposed a price freeze.

264.    As against those documents, Mr Bunt was referred to some other documents in re-examination. One such document was "Consumer Voice Strategy 15/16 onwards" dated 19 March 2015. It is necessary to consider a number of elements of this. First, at p2 it states:

> **Lines: Reduce solus churn to 16% within 2 years to maximise revenue and upsell opportunity**
> • Execute continuous multi-channel recontracting plan to increase in-contract customer volumes
> • Move customers to lowest churning products and deepen relationships to mitigate competitor churn
> • Build capability to maximise recontracts with lowest possible operational impact (e.g. coupons and decisioning)

265.    Mr Bunt explained that this was a strategy to reduce the churn from BT's SFV customers and the rate of 16% is of course familiar from the switching rates described above. In fact, Mr Bunt said that it was nearer 20%.

266.    At p5 it then says:

> **Context**
>
> Solus voice lines have seen a steady decline over recent years due to three main factors:
>
> • General consolidation of services in the market place in bundles
>
> • Competitor losses (30% of solus churn) driven by solus competitor attacks
>
> • High levels of bereavement (21% of solus churn) on solus base
>
> and
>
> **Strategy**
>
> • Reduce the solus churn by regular re-contracting activity across relevant channels
>
> • Deepen relationship and move customers to lower churn products making it easier to upsell and harder for competitors to acquire (e.g. Free PCD attach, reduces churn rate by 8.4pp)
>
> • Use a targeted approach to optimise ARPU delta, LRS mix, and CCSOs, underpinned by decisioning, targeted campaigns and advisor incentivisation
>
> • Improved campaign agility and minimal operational impact through coupon expansion and optimising / expansion of decisioning

267.    Mr Bunt explained that "competitor losses" meant predominantly the marketing and customer acquisition activities of the Post Office. Finally, he explained the references to product development and related matters which appeared at p5. He said that this was about how the development budget, which was available to make the products more attractive and work better, could reduce the need for customers to call, and to improve customer satisfaction.

268.    We follow all of that, and see that BT was concerned about SFV churn. But nothing in this document expressed any concern about its own pricing behaviour in relation to churn. That is the key point. Indeed, what this document does not suggest is any need to reduce prices (or not have price increases) because of the risk of churn. Yet further, as we shall see, in our view, much of the switching we described was not price-related anyway.

269.    Ms Blight was also cross-examined about this. She had said in paragraph 59 of MB1 in the context of a possible price increase of £2 for 2016/17, that this was not taken forward. While it would have created additional revenue, it was felt that this level of price increase would have undermined any positive press and customer reactions, and would have led to greater churn in the long run. She accepted in evidence that had there been any concerns about churn and competitor pricing, it would have been recorded in at least some of the relevant pricing slides. In fact, the slides contained in the 2016/17 pricing pack do not make reference to greater churn in the context of rejecting the £2 increase proposal. Instead, one of the points against such an increase was "PR red flag on £2 line rental increase", in other words, much the same as the point made in relation to 2015/16 - see paragraph 252 above. It is true that Ms Blight suggested that PR and regulatory issues would have a knock-on impact on churn, and that it was obvious that a reason for not recommending a £2 increase must have been because of a concern over churn, but we did not find this a convincing explanation. When asked why it appeared that no one was saying that after 5 years of increases with customer losses every year, something was not right, Ms Blight suggested that perhaps their calculations were wrong and they should not have put up prices as much, and this would have saved churn. However, the point is that this did not happen. In reality, of course, the fact is that there were no concerns expressed in relation to the actual price increases for line rental of £1 or other amounts, or in relation to price increases for other elements of the charges to customers.

Home Phone Saver ("HPS")

270.    BT also cites the specific example of the introduction of HPS in July 2014 as showing that BT took the risk of customer churn into account in its pricing decisions. The churn risk at play here is said to be in particular the loss of VOCs to the Post Office and it should be noted that evidence on substitution from one SFV provider to another, even if it is related to price, does not address the SSNIP test question on SFV Services or assist BT in its argument for a wider product market definition.

271.    To set some context, the Post Office had been providing (among other things) voice-only services since at least the beginning of 2013. It ceased to provide them when it sold its telecoms business to Shell Energy in March 2021.

272.    The central features of HPS, once introduced, were as follows:

    (1)    A single flat charge of (initially) £19.99, which was payable for a fixed period of 3 years;

    (2)    Unlimited anytime calls ("UAC") to other landlines along with calls to mobiles at a competitive rate of 1p per minute; and

    (3)    Other features such as Caller Display and Anomalous Call Reject were included within the package.

273.   When HPS was first being considered, BT's line rental was £15.99, whereas the Post Office line rental was £12, but with a separate charge for UAC.

274.   Two questions arise: first, what were the reasons for the introduction of HPS and second, how exactly was it marketed?

275.   As to the reason for its introduction, Ms Cheek (who was not involved at the beginning) said that she understood from colleagues that one of the reasons was to try and avoid customer churn. For his part, Mr Bunt said that HPS was an attempt to counter the trend of customer churn to the Post Office. In oral evidence, when asked why BT was not more price-competitive, given that its main competitor, the Post Office was significantly cheaper, he said that this was why BT introduced HPS, and that the documents all showed this.

276.   In reality, the documents themselves do tell the story of the thinking behind HPS and the concern over churn to the Post Office. We set out what we consider to be the key documents below.

277.   The first is the Project Robin 2014/2015 document dated 10 December 2013. As already noted, the key objective was to meet the revenue target, which was then expressed to be £67m. At page 6, a proposition (referred to as a "prop") was introduced, which ultimately became HPS. It said that there were 1.1m voice-only customers, of whom 200,000 were on BT Basic and of the remainder, 19% had left and 60% of leavers went to the Post Office. This amounted to around 100,000 customers per year. The core feature of the prop was then spelt out, involving, at that stage, a £20 per month charge as against the Post Office's £12 line rental and £5.75 charge for UAC. The benefit was described as follows:

> "Retain 19k customers in 14/15
> • PR defence for 14/15 price changes
> • Defence against the Post Office
> • Additional benefits:
>           - Acquisition"

278.   Under "implementation" it said that the prop would be targeted at existing BT customers who were pensioners, and it would be a key retention prop. It is plain from this document that the reasons for the proposal included both a defence against the Post Office and a PR defence for the impending price rises.

279.   The next document is the 2014/15 Pricing Update dated 7 February 2014. At page 8, it referred to the 1.1m true solus customers, and that in 2012/13, 38,000 went to the Post Office and 80,000 went to other competitors. In 2013/2014, the projected loss to the Post Office was 27,000. The version of HPS then being proposed was set out at page 9 and its cost was said to be £1m. Assuming that 50,000 customers took it up and there was 80% cannibalisation. The latter refers to customers who in fact would have stayed with BT anyway, and might now take advantage of the HPS as opposed

to paying the standard line rental. Different iterations of the HPS are then shown at page 19 and the third, Option 3, was said to represent "a credible alternative to the Post Office and strong defence against future campaigns." There is then a comparison between BT's standard line rental and call package with that of the Post Office. It was noted that gross margin was very sensitive to the ratio of "saves", i.e. those customers who took up HPS and would otherwise have churned, to cannibalised sales as described above. The minimum ratio was said to be 50:50. If there was huge cannibalisation, this would not have worked, because the HPS scheme would do more to reduce BT revenues than it did to retain them.

280.    Page 35 addressed what were described as the key affected segment - namely older voice-only customers. Of those customers, it was said that there was 20% churn in a year and 20% of those went to the Post Office, again referring to a figure of 100,000 each year (although this does not square with the more modest figures given at page 8). These customers were "being pushed away by rising prices" and budgeting and peace of mind were very important for this segment. HPS was then said to be primarily a "save tool" to use as a PR defence and a "give" during the Robin price increase and not to be offered proactively on the BT.com website. It was available only to voice-only customers.

281.    There was then a further version of the Pricing Update, dated 12 February 2014. Again, this refers to voice-only churn including to the Post Office. It said that the prop defended against the government's concerns over mid-contract price rises and other things, Ofcom's concern over bill shock and headlines around exploiting loyal customers and confusing plans and tariffs. The cost to BT was said to be £0.6m with a 50,000 take-up, and 80% cannibalisation.

282.    In the Pricing Update of 5 March 2014 the rationale was said to be:

> "• PR Defence: Strong defence against criticism that our loyal voice customers get punished by rising costs of the service
> • Regulatory: Strong defence against Ofcom argument that solus voice non-switchers are being penalised
> • Churn reduction: 1.1m true solus customers, 15% annual churn, 90k competitive losses per year; FPS will help reduce churn"

283.    The Project Window Execution Update dated 24 June 2014 contained detailed calculations of the "Save-Cannibalised ratio" and its Notes at page 11 included the following:

> "• Very sensitive to save : cannibalisation ratio.
> • Important to get due credit and we want the press coverage but not the swell in take-up.
> • We are notifying everywhere we have to, so we can say we are telling our customers about this – but nowhere else.
> • Limit availability, only include in prose comms"

284.    The Post-Investment Review-Home Phone Saver dated 23 January 2015 initially described the HPS (here referred to as FPS – Fixed Price Solus) as:

> "• PR Defence: Strong defence against criticism that our loyal voice customers get punished by rising costs of the service
> • Regulatory: Strong defence against Ofcom argument that solus voice non-switchers are being penalised

> • Churn reduction: 1.1m true solus customers, 15% annual churn, 90k competitive losses per year; FPS will help reduce churn"

285. It then said that 13,000 customers had been saved as opposed to the 9,500 estimated. There was said to be a 9.2% churn benefit, a £10.5m saving, but with a cannibalisation loss of £3.37m. Under the heading "PR Defence" there was said to have been positive reports on the BBC and in the Guardian and national papers.

286. Under Actual Project Performance after stating better than expected results, it went on to say:

> "The risk remains of revenue cannibalisation for customers that would have taken higher margin products. This is managed by restricting the availability of the product and ensuring it is only focussed on high propensity to churn customers."

287. It is plain from these documents that HPS was intended to serve a number of purposes and there were two main ones. First it was a response to customer churn, and in particular to that to the Post Office. Second, it was a PR defence to the various concerns which had been picked up about this group of customers in the media and by Ofcom, and in relation to the reaction to the general line rental increase that was going to take place. In other words, HPS was neither a simple reaction to the Post Office, nor could it be seen as "merely" a PR defence.

288. It is important to note that the financial consequences were carefully thought through. That was because of the need to balance the revenues that BT retained from those who took the HPS as opposed to leaving altogether with the revenues it lost to those who would not have left, but took advantage of the HPS pricing when they might otherwise have stayed with BT on the standard tariff. This leads into the second aspect of HPS, namely the nature of its marketing.

289. Because of the careful ratio between saves and cannibalisation which had to be maintained, BT did not want HPS to be taken up by "all and sundry", as it were. As some of the documents above show, it was very much a targeted retention tool. Its availability would be shown in all customers' bills with the price changes. Beyond that, BT wished to concentrate the promotion of HPS on those customers whom it thought would otherwise leave.

290. This explains the references in the Project Window Execution Update dated 24 June 2014 cited in paragraph 283 above. In addition, that document also stated at p10:

> "Objective
> • Limit marketing to customers during Window whilst demonstrating externally that the prop is widely available…
> • Reactive saves only…
> Targeted Marketing
> From September we will target high churn risk 'true' solus customers. This helps with the save ratio."

291. Then, by an email dated 8 June 2016, Mr Bunt provided what he said should be the advice to BT's call centre staff, as follows:

> "Thought it through and there are 2 things I want to say: 1. Stop pushing the button 2. Stop proactively selling HPS

Here's my proposed wording – let me have your thoughts: "There are a couple of tweaks we need to make to how we are working to make sure this price change continues to be extremely successful. Firstly, a reminder that we should only be pushing the AOT button If someone is upset with our price change and is off to talk to someone else about switching their service – and they tell us so explicitly – then we need to "push the button". We must make sure we only push that button if a customer is upset because of the price change, the button isn't for general dissatisfaction and a customer needs to be specific before we press. Secondly, Home Phone Saver 2019 is an important tool that we should use to save customers. We should also use it if customers call and deliberately request it. It should only be used in those 2 circumstances and we need to ensure that we aren't providing it to customers without a strong reason."

292.    AOT here stands for "Advice of Transfer". In this context, COT stands for "Customer Options Team" which would deal with a customer who wished to cancel their contract.

293.    As to this, Mr Bunt said that in fact, BT wrote to over 1m customers referring to HPS in the context of the price increase letters, and beyond this, it was targeted marketing. The former is simply a reference to all of the eligible VOCs and it is common ground they would have seen HPS on the relevant letters. However, the point of Mr Bunt's instructions was to limit customers' exposure to HPS otherwise, which he accepted. This was because BT did not want SFV customers to "sort of stumble across the product" as it was directed only to those who were likely to switch and because of the risk of too much cannibalisation.

294.    Subsequently, there was a change of approach which coincided with Ofcom's renewed interest in BT's pricing. Thus Jeremy Benson at BT emailed as follows to Stuart Murray as follows on 31 October 2016:

The customer ███████████ spoke to BT several times over the weekend as her Mother-in-Law has moved house. She asked about Home Phone Saver and was told a number of times that it wasn't available to new customers. She had been on Virgin in her previous property.

We looked into this to see if it was a wider issue. From what I've found out, in a nutshell, we were selling 'too many' (not a good product for us commercially as you know), so we made it unavailable on certain systems (Agent.com), and some advisors could not see (and thus sell) it. It could only be ordered on Oneview which had restricted access for advisors.

This has now been rectified with Emergency briefs sent to advisors last week, so all advisors should have visibility of it on their systems and be able to sell to customers.

I have asked the commercial team to confirm that HPS won't be restricted in future and that customers will always be able to buy it.

295.    Then, on 1 November, Mr Benson suggested as follows:

Yes we have – that given the current state of play with Ofcom on solus voice, we've emphasised that Home Phone Saver is a key part of our (solus) defence strategy with them, and that we need to make sure all our advisers have the correct information, and that HPS is fully available without any (commercial) restrictions in place. We wouldn't want any complaints getting to Ofcom from customers saying they couldn't get it.

The business fully understand this, and are following up with the key Channel teams for their assurances, and seeing whether there  is anything else we can do to add greater certainty (e.g. an updated blanket briefing).

Would it help if I drafted a note for you to send to Kelly Barlow, underlining the importance of ensuring sales are not restricted, although I think the team has it under control now?

296.    Mr Murray responded that the position might not have been exactly as Mr Benson described it, and BT might need to change its position with Ofcom on HPS, but nonetheless there was clearly a recognition that HPS may need to be promoted more widely. Mr Bunt accepted that the context here was Ofcom's price concerns.

297.    While BT at paragraph 168 (d) of its Response dated 19 May 2017 stated that

"Given the active marketing by BT of the Home Phone Saver product, there can be no suggestion of a price discrimination strategy. Rather BT created this product in the face of competition from the Post Office."

we do not think that this tells the whole story, notwithstanding Mr Bunt's suggestion in evidence that it did.

298.    First, it is clear that HPS had not always been actively marketed, even if, by the time of the Response, a decision had been made to open it up fully, in the light of Ofcom's pricing concerns (See paragraphs 294 and 295 above). Second, while the competition from the Post Office was part of its rationale, it was not the whole of it. See paragraph 287 above.

299.    In re-examination, Mr Bunt was referred to the Consumer Update from Mr Petter, the CEO of BT Consumer. At p10, Mr Petter said that HPS was available to existing customers through BT's call centres. That was true, although there were the limitations on how it was offered there, referred to in paragraph 291 above. He added that all relevant customers were written to about the product in the annual price change notification, which is common ground. He then said that there were targeted campaigns and that by June 2016, 165,000 customers had taken up the 3 iterations of HPS to date. He went on to say (and this was pointed out to Mr Bunt in re-examination) that BT had sent more than 4 million communications promoting HPS over the last 2 years. On the face of it, that must be a reference to, or included, writing to all customers as part of the price change notification, which would have happened 3 times in the previous 2 years. So, in our view, what was said here is not inconsistent with what emerged from the documents referred to above.

300.    Equally, reference was made to the BT Update magazine of September 2014. HPS was referred to in it as one of a number of "great deals". This was, according to Mr Bunt, a "bill insert magazine" so it was put in every single bill to the relevant customers. The Update concerned in fact looks like one that may have come with price notification letters, as this is what the first substantive page

speaks to. However, in any event, it was clearly not the targeted marketing which Mr Bunt himself (and the documents referred to above) confirmed was limited to those customers who BT considered constituted a high risk of churn.

301.　Overall, there is, of course, nothing wrong with BT choosing to limit the way in which HPS was marketed, and we would agree that it was a targeted retention tool. However, what it does mean is that it was a limited exercise in the context of pricing decisions and it was obviously not a direct response to the Post Office's pricing in the sense of BT deciding not to increase line rental, or decreasing it. Further, since HPS was targeted at customers who it feared would switch to another SFV supplier, the substitution threat at issue here has nothing to do with the substitution between SFV and bundles that lies at the heart of BT's arguments on the relevant market. We do not consider that the case of HPS therefore adds much on the issue of market definition in the context of churn.

*Competition from the Post Office*

302.　Clearly there were some VOCs who switched to the Post Office which had significantly cheaper prices. But as a proportion of the Class, this was relatively small (see paragraphs 277, 279 and 280 above) and so it cannot by any means constitute the primary driver for switching overall.

*Conclusion*

303.　Overall, we think that the evidence shows that the primary driver for switching was indeed the secular trend which would have exerted a downward pressure on SFV demand irrespective of price movements. That being the case, BT's arguments against a narrow SFV market cannot rely on switching away from SFV alone, and must identify the extent to which the threat of further switching (over and above that which would occur in any event) provides a competitive constraint on the hypothetical monopoly supplier of SFV. In fact it did not show that there was a significant threat in that sense.

**Summary of Mr Parker's approach**

304.　Mr Parker employs three different "real world" data sets which he says all show that the SSNIP test has been passed i.e. the market is the narrower one of SFV Services.

*SPC-Dual play bundle price differential*

305.　First, he takes what he says are the significant absolute price differentials at any point in time between SPC pricing when added to a standalone broadband on the one hand, and DP bundle pricing on the other.

*Line Rental Price Increases*

306.　Second, he relies on the fact of significant increases in line rental pricing both before and during the claim period, even though wholesale costs were decreasing.

*Call Price Increases*

307. Finally, Mr Parker relies upon what he says were call price increases (and differentials between BT and other providers' call pricing) over the claim period, based upon ARPM.

**Summary of Dr Jenkins' Approach**

*Switching per se*

308. Dr Jenkins' first, and more general approach was to say that the very fact of the extensive switching referred to above show that standalone voice services, and bundles are both part of the same market.

*Dr Jenkins' Critical Loss Analysis ("CLA")*

309. Second, and more specifically, Dr Jenkins relies on her CLA, which can be a useful way to apply the SSNIP Test. It involves, ultimately, a comparison between a notional "critical loss" of customers to the HM, following a price increase of 5-10%, and the "actual loss" of customers in response to actual price changes. In both cases, the loss of customers is expressed as a percentage of the original customer base. Dr Jenkins' CLA showed that the actual loss would exceed the critical loss, which means that the SSNIP test failed, which in turn points to a wider market.

*Bundles as constraints on SFV Pricing*

310. Finally, Dr Jenkins posits that, because of how BT's line rental and call price increases were applied across both SFV and bundle customers, it follows that bundles did indeed exercise a constraint on SFV pricing, in which case they must both be in the same market.

**Analysis: Mr Parker's Approach**

*Mr Parker's use of BT price data*

311. Before turning to the detail of Mr Parker's 3 datasets and the particular points taken against each of them by BT, there are some general objections to his approach, which should be considered first.

    <u>Introduction</u>

312. The SSNIP test framework is based around a 'thought experiment' in which the competitive constraints on an HM of a candidate product are assessed, based on available market evidence and other insights. Since the candidate market in the current case is SFV services (including VOCs up until 2017 but excluding them after 2018), and since BT itself supplied a substantial share of this candidate market in the earlier period (and over 90% in respect of SPCs only after 2018), it is inevitable that much of the empirical analysis for the SSNIP test was based around the observed pricing and consumer responses faced by BT itself.

313. Thus Mr Parker has focused on BT's own pricing in different ways for each of his data-based SSNIP analyses, and Dr Jenkins has deployed BT data on the switching figures and has also used its gross margin for the purpose of her CLA. Further, in the price elasticity calculations which form part of her CLA, she has used BT's line rental pricing.

314.    However, Dr Jenkins says that Mr Parker should have taken steps to distinguish BT's actual pricing decisions from the pricing that might be observed from an SFV HM. This is because BT is a multi-product firm, facing competitive dynamics in that context, whereas the HM must be taken to be a single-product supplier. Why this matters is because it is then said that the pricing decisions made by BT are not necessarily reflective of what a HM might charge, because it may be internally rational for BT to increase price by more than 5% or 10% above a benchmark in a notional SSNIP test, even though a HM would not do so because it would lose too many customers and thereby become unprofitable. In fact, Dr Jenkins' objection is not so much to the use of BT data as such. At paragraph 5.2.14 of the JES, she agreed that:

> "…it is standard practice to use the data from an incumbent with a large product share as a proxy for the data that would be available from a hypothetical monopolist if it existed, Mr. Parker's argument goes further than this as he is using the behaviour of the incumbent in his argument. He relies on the decision of BT to implement and not reverse the pricing policy that they did and it stands or falls on whether the hypothetical monopolist would have found it profitable to make the same decisions."

315.    So the objection is not to the use of BT data as such in conducting the market analysis (indeed given BT's high share of SFV Services it would be hard to conduct any market analysis without including some BT sales), but rather to the inferences that Mr Parker sought to draw from BT's pricing and commercial conduct, given that BT's position and commercial incentives differ from that of the HM. Further, Dr Jenkins says that the outcome of her objection is not to say that there should be some modification of the BT price data to be used in the SSNIP test; rather, it is to disregard the BT's pricing decisions entirely, on the basis that the subject of the test is not BT but the (different) HM.

316.    As we discerned during opening arguments, there are really two versions of this objection, a strong and a weak one. The strong version is BT's supposed "migration intent" and the weaker one (because it does not depend on such a specific intent) may be referred to as the "recapture effect". We deal with each in turn.

BT Migration Intent

317.    This describes a supposed motivation on the part of BT to set line rental prices at a relatively high level, in order to incentivise SFV customers to move over to BT bundles, which, because they cost BT only marginally more to provide, would actually yield higher profits for BT despite the small increment in the price between SFV and bundles. This suggestion first appeared in BT's Response to the CR's CPO application at paragraph 68 (although in fact referring to other telecoms providers). Ms Blight also referred, at paragraph 29 of MB1, to BT encouraging customers to take BT bundles, although she does not actually say that BT increased its line rental prices in order to do so. As for Mr Bunt, at paragraph 33 of JB1, he said that:

> "1 agree with what is said in paragraphs 66 to 68 of the Response about the competitive factors that encouraged providers to incentivise the take-up of bundles including broadband. In my role within Voice Pricing, one of

the key drivers to BT's pricing strategy was to move customers away from voice only services to broadband and bundles. In fact, during my whole period at BT, the overall strategy has been to get customers online using BT's broadband packages, which we achieved in a number of ways: (1) through marketing generous broadband bundle offers to new customers; (2) through cross-selling of broadband packages to existing landline only customers; and (3) by launching targeted products such as BT Basic plus broadband,.."

318.   However, he accepted that none of the documents put to him showed any such intent on the part of BT, except for an email exchange dated 29 December 2015, in which there was a reference to the fact that while the aim was to make the VOCs take broadband and become "stickier" which would support broadband growth,

"aggressive deals to date have not persuaded them to take-up BB therefore a step change here is unlikely."

319.   Mr Bunt said in evidence that this was an example of migration intent, but we disagree.

320.   As for Mr Parker, he doubted the relevance of the suggestion in terms of any argument that bundles acted as a constraint on SFV pricing. Indeed, he pointed out that the opposite would be true, because it would create upwards, not downwards pressure, which would be inconsistent with BT's argument that bundles acted as a price constraint for SFV Services.

321.   Then Dr Jenkins took up the point in HJ2 and in particular at paragraph 3.59-3.66. This was in the context of the suggestion that Mr Parker was conflating the position of the HM for the purpose of the SSNIP test with BT's actual position.

322.   We do not accept that there was any such migration intent on the part of BT. This is because, first, there is in truth no witness evidence from BT to support the notion that it was acting in this way when setting or increasing SFV prices. Moreover, there was nothing in its extensive documentation disclosed to support this idea. Ofcom reached a similar conclusion at paragraph 3.42.3 of the 2017 Provisional Conclusions which was responding to a submission made by BT (through Oxera) that there was such an incentive. There is simply no factual foundation for it and in the end, BT did not strongly press the point in its closing submissions.

323.   A further point made by Mr Parker against the migration intent theory is that it was implausible anyway, because it assumed that bundles were more profitable for BT than SFV Services, which was not correct. That criticism turned on whether the appropriate comparator in this context for profitability was gross or net margin.

324.   Dr Jenkins says that the correct metric is absolute gross margins (i.e. in cash terms), and that selling bundles created a higher gross margin per customer than selling SFV Services. The latter point is plainly right, since BT was providing an additional service (i.e. broadband) for an additional price and there were economies of scope. See paragraph 11.9 of Annex B to the JES. Nor is it suggested that bundles were being sold at a loss.

325.    For his part, Mr Parker says that the comparison should be with net margin, and when one takes into account incremental costs and contribution to common costs, on his analysis, SFV Services were more profitable than bundles. He also cited Dr Jenkins' own evidence, which endorsed the need for firms to cover their indirect cost as well as direct costs in order to trade profitably in the long run. Of course, all of that, then turns on the detailed (and diverging) analyses of costs for the purposes of arriving at a competitive benchmark by each side's experts for the purpose of Limb 1.

326.    We do not consider it necessary to explore this further issue in any detail here. It seems to us that in this context, BT Consumer may well have looked at differences between SFV Services and bundles on an absolute gross margin basis. And certainly, Mr Bunt said that they looked at pricing very much through the prism of gross margins. However, Mr Cackett's evidence was clear that from BT Group's perspective the ultimate focus was on a net profit figure that did take account of indirect as well as direct costs, which would tend to support Mr Parker's approach. But at the end of the day, none of that means that BT in fact raised SFV prices in order to migrate customers to bundles.

### BT's Recapture Effect: Introduction

327.    In the particular case of BT, it is obviously correct that if an SFV customer, whether VOC or SPC, switched, that customer might then take up a BT bundle. If so, BT has thereby "recaptured" the customer.

328.    Dr Jenkins refers to recapture rates in the context, again, of the suggestion that Mr Parker has conflated the position of the HM with BT's own position. Her point is that, while pricing at a particular level may still be profitable for BT (because although it loses SFV customers, it recaptures some of them and their revenues in additional bundle sales), the question is what the HM, as a notional single-product supplier, would have done. To put it another way, since DP and other bundles were seen as the closest competing product to the candidate SFV product market, there is a clear risk that BT's commercial stake in this substitute product could distort a SSNIP analysis that was based on BT's pricing incentives and market conduct. Therefore, the pricing conduct of BT cannot be equated with the conduct of the HM.

329.    Dr Jenkins deals with the facts behind this at paragraphs 3.62-3.64 of HJ2. Her Figure 3.5 shows that a substantial proportion of SFV customers leaving (between 42% and 50% over a 6-year period) who cited price increases as their reason for doing so, in fact switched either into a BT bundle or BT mobile. Mr Parker produced his own figures, but they do not differ very much.  For Dr Jenkins, BT's recapture incentive (i.e. the fact that BT's revenues would be recaptured and even enhanced if an SFV customer who switched away from BT traded up to a BT bundle), was a core part of Dr Jenkins' description of pricing and BT's motivation.

330. There was broad agreement between the experts on the fact that the price gap between BT's SFV and DP bundles was small, but they adopted very different interpretations of this evidence. In contrast to Dr Jenkins' view, Mr Parker considered that the small increment in price arising between SFV and the DP bundle arose from the fact that bundle prices were competitive whereas SFV prices were excessively high due to the absence of effective competition in this product.

BT's Recapture Effect: Analysis

331. As has already been noted at paragraphs 323 - 325 above, Mr Parker's conclusion was that bundles were significantly less profitable than SFV contracts on a net profit basis (i.e. when an appropriate account was taken of indirect costs).

332. The relative net profitability of SFV versus bundles is a complex matter to assess, but the fact that BT earns positive margins on bundles, and that its business is clearly set up to compete actively for such sales, is sufficient to create a recapture effect that does need to be taken into consideration when assessing BT's pricing of SFV services, and which also calls for caution in treating BT as synonymous with the HM in the SSNIP test.

333. The standard economic analysis of pricing, where such recapture incentives are present, is that it will tend to increase the price level that the affected firm will charge in the primary product market - in this case SFV services. The rationale is simple: if there is any finite probability of some recapture, and provided positive profits are earned on the related product (in this case bundles), then the commercial harm from losing sales in the primary product is mitigated and this will in turn relax the constraints that would otherwise deter the firm in question from raising the primary product price.

334. While Dr Jenkins was keen to emphasise the demand-side linkages between SFV and bundles, we should note that this raises the possibility that the recapture incentive could cause BT to elevate SFV prices in a manner that might support the CR's market power allegations. In theory, a monopoly supplier of a product X that also supplies and benefits from recapture to a related product Y might be expected to charge a price in excess of even the standalone monopoly price level for X in order to take account of the recapture incentive. Therefore, this phenomenon only increases the extent of the Cellophane Fallacy which we discuss in the context of Dr Jenkins' CLA at paragraphs 424 - 430 below.

335. For his part, Mr Parker had originally been critical of Dr Jenkins' reliance on BT's recapture incentives prior to the Hearing. For example, at paragraph 10.20 Annex A3b of the JES he commented:

"I note that the recapture rate is only relevant if bundles are more profitable than SFV Services, as in that case BT would have some incentive to try and move its SFV Customers onto bundled products. The analysis in Annex A3a above shows that, under Dr Jenkins's own categorisation of the revenues and costs of providing

BT Services, BT Bundles are less profitable in the long run than BT SFV Services. It therefore would not be economically rational for BT to try to migrate customers from more profitable SFV Services to relatively less profitable bundled products. There is, therefore, no rate of recapture which would be consistent with it being rational for BT to increase its prices of SFV Services, given Dr Jenkins's elasticity estimates…"

336. In the body of the JES at paragraph 5.1.4 he said that:

"the recapture incentive is not relevant when considering the differences in incentives between BT and the hypothetical monopolist, as there is no evidence to suggest BT faced such an incentive."

337. Even accepting that bundles were less profitable to BT than SFV contracts, this conclusion does not seem credible (unless it were established that BT actually made no profit from selling bundles).

338. However, following some exchanges between the Tribunal and the parties during their Oral Openings, Mr Parker appeared more willing to accept that the recapture point might have some relevance. In DP5, submitted during the Hearing on 6 February 2024, Mr Parker advocated the adoption of a variant on the standard HM test in which the analysis instead considered a hypothetical multi-product monopolist test ('HMMT') as a way to deal with this factor. The HMMT is a concept found in the industrial organisation literature and is also discussed in the US DOJ Horizontal Merger Guidelines under a different term, as a way to deal with the economic assessment when horizontal mergers between multi-product firms take place. Mr Parker argued that in the current case, the HMMT would be a monopoly supplier of both voice and bundles, and that the test should be whether that firm had the power to impose a SSNIP.

339. This change of tack and new expert evidence prompted a procedural objection from BT's counsel, but this effectively disappeared when Dr Jenkins produced HJ3, which heavily criticised Mr Parker's adoption of the HMMT test in this case, arguing that it took the analysis of market definition well beyond its intended first stage status and attempted instead to complete a full competitive assessment. With some justification, she criticised Mr Parker's HMMT as defining a broad candidate market that encompassed all sellers of SFV and bundles in a single frame. The fact that such a broadly defined hypothetical firm might have market power was incapable of shedding much light on whether BT alone possessed such power as a supplier of SFV services. Moreover, in the end, the late raising of the HMMT point by Mr Parker did not in fact leave enough time for a thoroughgoing analysis of it, by either expert or indeed the Tribunal.

340. As matters stand, our considered view is that the market definition exercise here should focus on the conventional HMT (HM test) rather than Mr Parker's suggested HMMT. Further, in making the assessment of BT's position in that market, it seems clearly right that we should take due account of the fact that BT is an important supplier of bundles as well as SFV services. In other words, there was potential for the operation of a recapture effect. However, it is more difficult to assess the significance of that factor here. After all, the recapture position was not complete, because BT did not recapture 50% of those who provided the data referred to in paragraph 329 above, and on Mr

Parker's own analysis the margins earned on bundles were far thinner than those earned by BT on SFV sales.

341.    We do not think that the recapture effect point materially affects Mr Parker's SPC-Bundle Price Differential argument. This is not simply because it is hard to quantify, but because the differentials he arrives at are far in excess of the typical SSNIP of 5-10% anyway. See paragraph 348 below. As for line rental increases, we do not agree that they can be examined in isolation anyway, and once the relative margins are built in (see paragraph 378 below), the difference between them is such that even some adjustment to take account of the recapture effect would not destroy the point. Finally, on call charges, we reach the view that the argument here does not assist the CR anyway – see paragraph 390 below.

342.    Accordingly, and overall, we do not think that the point about recapture effect, although valid in itself, affects the outcome of our views of Mr Parker's evidence, or indeed on market definition as a whole.

*Mr Parker's SPC-Bundle Price Differential*

  *Description of the approach*

343.    The differential relied upon by Mr Parker between the price charged to SPCs who have separate voice and broadband contracts, and dual bundle prices, is set out at Figures 7 and 8 of DP3:



**Figure 7    Total prices paid by Split Purchase Customers and Dual Play Customers for the access component of fixed voice services and standard fixed broadband services, 2015 Q4 – 2018 Q2**

Figure 8    Total prices paid by Split Purchase Customers and Dual Play Customers for the access component of fixed voice services and superfast fixed broadband services, 2015 Q4 – 2018 Q2



344.    The dark red squares in Figures 7 and 8 show list prices to split service customers, i.e., the minority of SPCs (20% or less) who purchased both standalone voice services and standalone broadband services from BT. In the case of Figure 8, the light red squares show list prices to split service supplier customers who purchased both standalone voice services from BT and standalone broadband from Virgin Media.

345.    The green dots, for Figure 7, represent the BT fixed voice price plus the list price of the TalkTalk standalone 17MB/Unlimited broadband package.

346.    For both Figures 7 and 8, between Q4 2015 and Q1 2017, the yellow triangles and blue diamonds show, respectively, the average of the cheapest available promotional price for a dual-play bundle from BT, PlusNet, Virgin Media, TalkTalk, Sky and EE (yellow) and the average of the cheapest available list price for a dual-play bundle from the same providers (blue).

347.    Mr Parker says (as is correct if the Figures are correct) that this means that:

(1)    SPCs who bought voice and standard broadband under separate contracts between 2015 Q4 and 2018 Q2 paid, on average, depending on the choice of broadband provider, in the range of:

(a) £11 to £20 (or 37% to 69%) more for fixed voice and broadband services than customers purchasing standard Dual Play at the list price, with SPCs paying a minimum of £9 (or 33%) more in any given month; and

(b) £19 to £27 (or 88% to 123%) more for fixed voice and broadband services than customers purchasing standard Dual Play at the promotional price, with SPCs paying a minimum of £16 (or 70%) more in any given month; and

(2) SPCs who bought voice and superfast broadband under separate contracts (see Figure 8) between 2015 Q4 and 2018 Q2 paid, on average, depending on the choice of broadband provider, in the range of:

(a) £19 to £22 (or 51% to 60%) more for fixed voice and broadband services than customers purchasing superfast Dual Play at the list price, with SPCs paying a minimum of £16 (or 44%) more in any given month; and

(b) £26 to £30 (or 89% to 100%) more for fixed voice and broadband services than customers purchasing superfast Dual Play at the promotional price, with SPCs paying a minimum of £23 (or 65%) more in any given month.

348. He noted that these differentials were far in excess of the typical SSNIP of 5-10% and that they appear to be sustained. This is therefore an example of price discrimination, proving that SFV (or here the SPC element of it) and bundle customers are in different markets.

349. Of course, this is only dealing with SPC pricing. However, Mr Parker says that this is an appropriate proxy for VOC pricing as well. That is because in the period relevant for VOCs, namely pre-Commitments, it is accepted that VOCs and SPCs were in the same market and indeed BT was not able to distinguish between the two. We are not convinced that this logic works and consider that the Price Differential argument can be used in respect of SPCs only. On the other hand, there is, for VOCs only, the effect of Dr Jenkins' "event study", which supports the CR's case on market definition. See paragraphs 240 - 244 and 434 above.

The Price Differential

350. We here deal with the particular figures used by Mr Parker in his Tables 7 and 8. Mr Parker's dataset essentially comes from Ofcom's Supporting Evidence, along with its "Pricing Trends for Communications Services in the UK" reports for 2020-2022. Indeed, for Ofcom, the relevant differential between SPC pricing and bundle pricing was such that it concluded that SFV Services were not in the same market as bundles. See in particular paragraph 3.41.1 of the 2017 Provisional Conclusions.

351.    Prior to the trial, while Dr Jenkins had made a number of general objections to Mr Parker's use of this differential (dealt with above), she did not challenge the particular figures used in his Figures 7 and 8 and did not produce any alternative sets of figures herself. At paragraph 5.2.5 of the JES, and in the hot tub discussion, she said that she had no reason to doubt his figures. Although she questioned whether SPCs would have paid list prices to the broadband supplier, she accepted that no alternative figures had been produced by BT.

352.    However, in his cross-examination of Mr Parker, Mr Beard KC made a number of points about the validity or appropriateness of the figures which Mr Parker used, and it is necessary to deal with these matters, even though they had not been foreshadowed in BT's Opening or in HJ1 or HJ2.

353.    First, it was suggested that, of the 20% of SPCs who were split service i.e. they took both voice and broadband from BT, it was possible that if any of them had BT employee discounts, they may be paying substantially less. Mr Parker agreed but said that he had not seen any evidence about such discounts. This was because BT has not adduced any evidence on the point, which it could have done. It is correct that, in answer to a question from Mr Doran, Mr Bunt said that the split service group were a "strange group" with "strange behaviours"; and there were a lot of ex-employees there who previously had a landline paid for and received free broadband, but that is as far as the evidence went and we do not think it materially assists. It is worth pointing out that Mr Bunt went on to say that:

> "those [split service] customers were paying above average dual play prices when you added up the two components."

354.    As for split supplier customers, and leaving aside particular points made, for example, about Sky, BT suggested that there was evidence to show that such SPCs in fact found it cheaper to be with split suppliers rather than go to bundles. Reference was made, first, to some evidence given by Mr Bunt in cross-examination. He said that there were many customers in this group whom Mr Bunt thought were getting incredibly good broadband deals, like free broadband or similar when they took Sky TV. So the reason they were not moving was because they already had the best possible deal i.e. free broadband. In reality, all he was talking about was Sky and this is dealt with separately below.

355.    BT also referred to the results of the Ofcom NMR Residential Consumer Survey 2017, where the question asked was:

> "Q14. Why do you use (BROADBAND SUPPLIER) for your broadband service rather than using (LANDLINE SUPPER) for your broadband and your landline? Base: UK adults aged 16+ with a landline phone service using different providers for landline and fixed broadband (282)"

356.    45% of those surveyed said that the reason was "Deal/Price" while 43% said "Service quality/trusted". We see that, although this was a relatively small sample, it was (understandably)

not clear how far this cohort had looked into other deals and whether it extended beyond Sky, for example, offering free broadband where Sky TV was taken.

357.    The next point concerns data from Sky itself. This issue arose because, in relation to the majority of SPCs who were split supplier rather than split service, Figure 7 only gave the example of one non-BT broadband supplier, namely TalkTalk. And in the case of Figure 8, the only example was Virgin Media. When asked why Sky prices for the supply of standalone broadband were not included, Mr Parker said that this was because Sky had not consented to the CR's request for disclosure of the data it had given to Ofcom for the purposes of the 2017 review. However, this was not a complete answer because in fact, the (publicly available) Ofcom materials revealed some of Sky's pricing. Mr Parker accepted that he could have used that dataset.

358.    The information set out in Table 1.32 of Ofcom's Supporting Evidence shows that Sky's standalone broadband price was significantly less than TalkTalk's. For Q1 2017, the total SPC price using Sky broadband would be £34.15p, which was only £4 more than the blue diamond (lowest bundle list price), although this is still more than a 10% difference. But it would also be just less than the standard BT bundle list price of £34.99, shown in Ofcom's figures. In addition, Figure 8.43 in the Annex to the 2017 Provisional Conclusions shows that a total SPC price using Sky's standard broadband would be £31.99, whereas BT's standard bundle was actually more.

359.    As for Figure 8, an SPC taking Sky superfast broadband would be paying £38.99. This is very much lower than the combined price which would be paid by an SPC using Virgin Media broadband which would be around £55. It would also be the same as the Sky bundle and less than BT's bundle for the slower speed of 17 Mb being £40.99.

360.    BT's submission is that when Sky's pricing is factored in, the differential between SPC and bundle pricing becomes much less stark. To that end, BT's Closing Submissions contained reworked Figures 7 and 8 as follows:





361. The upshot of this is that the SPC price which uses the Sky broadband element is much closer to the DP list price than the other SPC prices. Precisely how or by whom these new figures have been calculated is not clear and the CR says that this is effectively new evidence which its experts have not had the opportunity to consider. Moreover, to the extent it is evidence, it could and should have been produced much earlier. We think that this is a reasonable objection.

362. In our view, the correct way to proceed here is to utilise the further tables which have been produced by Mr Parker to deal with the question of Sky and which form Tables 1 and 2 within the Annex to the CR's Closing. No objection was taken to these tables by BT. They show the following:

**Table 1     Relative prices (in % terms) paid by Split Purchase Customers for fixed voice and fixed standard broadband services compared to standard broadband Dual Play Customers, 2015 Q4 – 2018 Q2**

| % saving from switching to… | Split Purchase (incl. BT broadband) | | Split Purchase (incl. TalkTalk broadband) | | Split Purchase (incl. Sky broadband) | |
|---|---|---|---|---|---|---|
| | Dual Play (list) | Dual Play (promo) | Dual Play (list) | Dual Play (promo) | Dual Play (list) | Dual Play (promo) |
| 2015 Q4 | 63% | 98% | 40% | 70% | - | - |
| 2016 Q1 | 73% | 133% | 48% | 99% | - | - |
| 2016 Q2 | 55% | 163% | 33% | 125% | - | - |
| 2016 Q3 | 67% | 120% | 35% | 78% | - | - |
| 2016 Q4 | 68% | 109% | 36% | 69% | ■ | ■ |
| 2017 Q1 | 61% | 176% | 37% | 134% | ■ | ■ |
| 2017 Q2 | 68% | 153% | 37% | 106% | - | - |
| 2017 Q3 | 77% | 101% | - | - | - | - |
| 2017 Q4 | 74% | 101% | - | - | - | - |
| 2018 Q1 | 79% | 109% | - | - | - | - |
| 2018 Q2 | 74% | 124% | - | - | - | - |

Source:  *Frontier Economics based on data from: BT Consumer Price Guides for the period 2015 Q4 to 2018 Q2; TalkTalk's s135 data submission to Ofcom for the period 2015 Q4 to 2017 Q2; Ofcom's Annexes to the Provisional Conclusions and Evidence supporting the Statement (for data on the price of standalone standard broadband from Sky in 2016 Q4 and 2017 Q1 respectively); and Ofcom's Pricing Trends Communications Reports for 2019 and 2022.*

**Table 2**     **Relative prices (in % terms) paid by Split Purchase Customers for fixed voice and fixed superfast broadband services compared to superfast broadband Dual Play Customers, 2015 Q4 – 2018 Q2**

| % saving from switching to... | Split Purchase (incl. BT broadband) | | Split Purchase (incl. VM broadband) | | Split Purchase (incl. Sky broadband) | |
|---|---|---|---|---|---|---|
| | Dual Play (list) | Dual Play (promo) | Dual Play (list) | Dual Play (promo) | Dual Play (list) | Dual Play (promo) |
| 2015 Q4 | 57% | 105% | 50% | 97% | - | - |
| 2016 Q1 | 64% | 104% | 58% | 97% | - | - |
| 2016 Q2 | 52% | 109% | 47% | 101% | - | - |
| 2016 Q3 | 57% | 117% | 49% | 105% | - | - |
| 2016 Q4 | 63% | 88% | 59% | 84% | ■ | ■ |
| 2017 Q1 | 56% | 123% | 53% | 118% | - | - |
| 2017 Q2 | 63% | 123% | 44% | 97% | - | - |
| 2017 Q3 | 62% | 77% | 52% | 65% | - | - |
| 2017 Q4 | 63% | 80% | 52% | 68% | - | - |
| 2018 Q1 | 67% | 93% | 50% | 73% | - | - |
| 2018 Q2 | 67% | 98% | 50% | 78% | - | - |

*Source:   Frontier Economics based on data from: BT Consumer Price Guides for the period 2015 Q4 to 2018 Q2; Virgin Media's broadband only web page for the period 2015 Q4 to 2018 Q2; Ofcom's Annexes to the Provisional Conclusions (for data on the price of standalone superfast broadband from Sky in 2016 Q4); and Ofcom's Pricing Trends Communications Reports for 2019 and 2022.*

363.   What these tables show is that there was a differential between SPC pricing and dual play bundle pricing for standard broadband of ■% and ■% where the comparator was list pricing and ■% and ■% where the comparator was promotional pricing. The differentials in relation to superfast broadband were ■% and ■%, respectively. Obviously, these were far more modest differentials than was shown in relation to the position of SPCs who used BT or TalkTalk as the broadband provider, but from a SSNIP point of view, they are still significant. Indeed, when Ofcom included Sky broadband pricing in its comparisons on a weighted average basis, it still found a monthly differential of £14.57 when compared with promotional pricing and £8.01 when compared with list bundle pricing.

364.   Accordingly, we do not consider that the Sky data and its implications are fatal to Mr Parker's differential analysis here.

365.   BT made a further, more general, point, questioning whether Mr Parker should have relied upon promotional bundle pricing. This was on the basis that list prices still applied to "back book" customers. Mr Parker disagreed on the basis that the bundle providers must have thought that the promotional prices were still remunerative. The CR also here relies upon the increasing prevalence of discounting in bundles, as observed by Ofcom in its 2016 Communications Market Report, where it stated that 94% of all dual play plans had some discount element in 2015. Dr Jenkins herself had also emphasised, in HJ1, that large promotional discounts on bundles were a key driver of strong price competition. This was in the context of suppliers like BT encouraging customers to take both services from a single supplier, and the role played by bundles in relation to SFV Services pricing-see paragraphs 5.40 - 5.42. The CR therefore submits that it is realistic to use promotional pricing as a relevant comparator.

366.   We follow all of that, although, of course, back book pricing still remains, and the fact that 94% of dual play plans had some discount element does not mean that that 94% of customers benefited from such discounts. Ofcom's 2020 report titled "Pricing Trends for Communications Services in the UK" noted, for example, that around half of all standard broadband customers were out of contract in 2019, which indicates that the discounted offers available on new deals are not representative of prices across the market. The same Report also showed that the price gap between list and promoted prices for standard dual play contracts fluctuated between £5 and £10 per month, on a typical promoted dual play price of around £20 per month. In that context, one might expect the lower margins earned through promotional pricing to be offset against the higher margins obtained on list prices, and it is not obvious that any one bundle supplier could sustain a viable operation by selling exclusively at promoted prices. Hence, whilst it is clearly reasonable to refer to promotional pricing, a proper assessment of market prices should include some consideration of both promotional and back book/out of contract price levels.

367.   Allied to that general point was the suggestion that there was a mismatch in the comparison between SPC pricing and bundle pricing. On SPC pricing, Mr Parker simply took the average. But when it came to bundle pricing, he took the average of the lowest of the list, and promotional prices of each of the relevant suppliers. Mr Parker defended what he had done on the basis that the SPC prices he used reflected what the supplier could achieve in the market. That is true, but again the focus of his analysis on promoted prices when around half of all bundle customers pay list prices does present only a partial picture.

368.   It was also suggested that Mr Parker's analysis was defective because it did not take into account call charges. However, he expanded his analysis in DP5 to include calls. The overall differential result was, not affected. See paragraphs 3.6-3.3.13.

369.    We should note here that even on the basis of a significant price gap between standalone and bundle prices, Dr Jenkins said that an absolute price difference between the focal product and the closest substitute cannot prove conclusive for the SSNIP test. Indeed, she argued that it is common for products within the same relevant market to have different price levels. This claim is clearly correct, but it is most relevant in cases where products are differentiated from one another. For split service (i.e. those who bought both voice and broadband from BT) SPCs, it is hard to see how any differentiation between the bundle and the standalone combination could justify a significant and sustained price gap. Where SPCs chose different providers for the two products, there is more scope for actual or perceived service quality differentiation to play some part, so there is some potential for this criticism to apply. However, this possibility does not render the CR's focus on significant and sustained price differentials invalid, and beyond the point of principle made here by Dr Jenkins, BT offered little evidence in this context to explain the differentials in quality terms.

370.    A further point made by Dr Jenkins in the hot tub discussion was that the price differential might be explained by SPCs purchasing an SFV Service on the one hand and then broadband without voice, but coupled with another service like TV, on the other. She suggested that Virgin Media for example would do this. However, she produced no detailed evidence on this and Ofcom data showed that the vast majority of bundles included landline. For example, in 2017 only 7% of households overall were taking broadband and another non-voice service. Dr Jenkins suggested in cross-examination that this 7% could be SPCs but in truth, this was just speculation with no proper evidence behind it. So we do not think that this further point goes anywhere.

371.    Having considered all of the matters above, we take the view that, notwithstanding the points made against his analysis, Mr Parker has established that there was a price differential between SPCs and dual play bundle pricing that exceeded the 5-10 per cent significance threshold that is normally used in the SSNIP test.

*Line Rental Price Increases*

        Introduction

372.    See Tables 1 and 2 from the CR's Opening which are based on Tables 13 and 14 in DP3:

Table 1: BT Standard Line Rental price increases pre-Commitments[46]

| Date | Price Increase Name | BT SLR | | |
|------|---------------------|--------|--------|--------|
| | | Price | Change (£) | Change (%) |
| 01/04/2009 | Bordeaux | £12.50 | £1.00 | 9% |
| 01/10/2010 | Pacific | £13.29 | £0.50 | 4% |
| 28/04/2011 | Atlantic | £13.90 | £0.30 | 2% |
| 03/12/2011 | White | £14.60 | £0.70 | 5% |
| 05/01/2013 | Beech | £15.45 | £0.85 | 6% |
| 04/01/2014 | Pegasus | £15.99 | £0.54 | 3% |
| 01/12/2014 | Window | £16.99 | £1.00 | 6% |
| 20/09/2015 | Laika | £17.99 | £1.00 | 6% |
| 03/07/2016 | 16/17 Price Change | £18.99 | £1.00 | 6% |

Table 2: BT Standard Line Rental price increases post-Commitments[47]

| Date | Name | BT SLR (for SPCs) | | | BT SLR (for VOCs) | | |
|------|------|-------|------------|------------|-------|------------|------------|
| | | Price | Change (£) | Change (%) | Price | Change (£) | Change (%) |
| 01/04/2018 | Commitments Introduced | £18.99 | £0.00 | 0% | £11.99 | -£7.00 | -37% |
| 16/09/2018 | 18/19 Price Change | £19.99 | £1.00 | 5% | £11.99 | £0.00 | 0% |
| 31/03/2020 | Price Change 2020 | £20.20 | £0.21 | 1% | £12.14 | £0.15 | 1% |
| 31/03/2021 | Price Change 2021 | £21.10 | £0.90 | 4% | £11.73 | -£0.41 | -3% |
| 31/03/2022 | Price Change 2022 | £23.05 | £1.95 | 9% | £11.73 | £0.00 | 0% |
| 31/03/2023 | Price Change 2023 | £26.35 | £3.30 | 14% | £11.73 | £0.00 | 0% |

373. On the basis that most of these increases are 5% or more, Mr Parker says that the SSNIP has been passed by BT. In particular, the figures from the Tables shown under paragraph 372 above, yield the following:

(1) VOCs: Between January 2009 and March 2018, while BT's main direct input cost (wholesale line rental) was declining, BT increased the price of standard line rental charged to VOCs by 65%, from £11.50 to £18.99;

(2) SPCs: Between January 2009 and April 2023, BT increased the price of standard line rental charged to SPCs by 129%, from £11.50 to £26.35;

(3) Many of the "routine" annual price increases that BT imposed for standard line rental were also individually above a SSNIP.

374. These figures, as figures, were not disputed by BT, nor could they be. However, Dr Jenkins made the following objections to this analysis:

(1) The relevant period to consider is the claim period and not a period starting any earlier;

(2) Line Rental is the incorrect metric; it should be ARPU.

The Relevant Period

375. Dr Jenkins said that the period for considering the various price increases must be confined to the claim period. On that basis, there was only a 5.6% increase in total between 2015 and 2018 for VOCs. Of course, that is still more than 5%, but the key point is that there is no reason to restrict the period under consideration to the claim period. Here, in the period immediately before, BT was raising line rental prices frequently (see Table 1 under paragraph 372 above), and we have observed that in the pre-claim period BT substantially increased the gross profitability of its SFV Services from 35% to 65%. As a matter of general principle, a hypothetical monopoly supplier that imposed a unilateral 5-10% price increase above the competitive level in period 1 and then held that elevated price level constant in period 2 could not validly argue that its constant prices in period 2 meant that it could not sustain prices above the competitive level in that period. So we reject this objection.

The Correct Metric

376. Dr Jenkins also says that Mr Parker has used an incorrect metric for this exercise, namely Line Rental. She says that the correct metric should be ARPU. But if so, then there is no overall increase at all – see the Tables at paragraphs 135 - 136 above. It is true that the experts did use ARPU as the proxy for price in the Limb 1 exercise. However, as we say below, that is a different exercise. Indeed, for the purpose of her actual loss calculations which form part of her CLA, Dr Jenkins herself uses line rental "because the line rental does not depend on usage patterns, so it would affect all customers the same and it is this change in price, which is most obvious to the customer." We address this further in the discussion of Dr Jenkins' CLA in paragraph 404 below.

377. To deal with Dr Jenkins' objection to the use of line rental here, in the context of market definition, it is necessary to take stock of the purpose of the SSNIP test. The point is to try and ascertain customer reaction to a significant unilateral increase in price that entails an attempt by the hypothetical monopolist to exercise market power. This change is normally embodied in a 5-10% price increase, holding all other factors constant. However, in the case of SFV Services and Line Rental changes, we know from the flat ARPU patterns that other things were not constant, and indeed BT's line rental increases served only to compensate for other factors, such as the fall in call volumes and the numerous changes that occurred in the way that calls were priced, that reduced revenues per user. The fact that other parameters of cost, revenue and volume changed simultaneously with BT's changes in Standard Line Rental make this a more complex pattern, and undermines the simplicity of Mr Parker's claim that each change in BT's Line Rental prices simulated a series of discrete SSNIPs.

378. However, this criticism of Mr Parker's Line Rental SSNIP argument does not deprive his analysis of all its value. As we have already noted, while SFV ARPU remained broadly flat over the period

from 2007 to the end of the claim period, the gap between ARPU and direct costs (i.e. gross margins) increased from around £8 to £15 per line in real terms between 2007 and 2015, representing an increase in percentage terms from around 32% to 63% - see paragraph 141 above. This elevation of gross margins to 63% during this pre-claim period seems best to show the increase in SFV profitability that occurred. This factor, rather than potentially incomplete comparisons of wholesale and line rental prices is a more persuasive basis for the CR's claim that BT successfully imposed a significant worsening of competitive terms on SFV customers over this period. Indeed, and as explored in the hot tub discussion on Day 28/92, effectively this ability of BT to increase gross margins can be seen as a form of SSNIP in fundamental terms. It can also be seen as BT being able to exercise a significant amount of price discrimination against SFV customers.

<u>Conclusion</u>

379. Overall, we think that, while it is clearly inappropriate to focus on line rental price changes in isolation and therefore we do not accept Mr Parker's analysis of line rental price increases in its simplest form, there is significant force in Mr Parker's line rental increase analysis provided that we build into it the further points just made at paragraphs 377 - 378 above.

*Call Price Increases*

380. The ARPMs relied upon by Mr Parker are set out in Chart 2 of the CR's Opening, as drawn from his Figure 1 in Annex A2 to the JES:

### Chart 2: BT's ARPM for calls made by BT and non-BT SFV Customers, 2013-2023



BT data: Financial year ending 31 March; Non-BT data: Calendar year ending 31 December

■ BT  ■ Non-BT

381.  According to this chart, BT's ARPM - a proxy for the average unit call prices paid by BT customers - has increased significantly over time. BT's ARPMs increased by 46% from 3.32p/minute to 4.84p/minute between 2013 and 2022. In contrast, ARPMs for other providers declined by 32% over the same period, from 2.56p/minute in 2013 to 1.75p/minute in 2022. As of 2022, BT's ARPMs were more than two and a half times higher than those of other providers. The CR therefore submits that, again, the size of the price increases suggests that the SSNIP test has been passed; this outcome therefore corroborates Mr Parker's earlier conclusions based on the differential between SPC pricing and bundle prices, and online rental price increases.

382.  However, as we see it, there are two significant problems with this analysis.

383.  First, there is a question as to whether ARPM is an appropriate proxy for pricing in this context at all. This is because of the existence of the various call packages offered by BT and its competitors. As Dr Jenkins pointed out at paragraph 4.46 of HJ2:

> "The presence of call packages, which provides a set allowance of calls for a fixed price irrespective of the actual level of consumption within the inclusive allowance, means that an ARPM measure will provide a distorted view of the underlying average per minute call prices. By way of example, if all fixed voice customers of BT and its rivals purchased an unlimited call package at the same price, but BT's customers consumed fewer minutes than its rivals' customers, the ARPM measure would imply that BT was more expensive than its rivals, despite them charging the same price for the same package of calls."

384.  Instead, it is more appropriate here to focus on the actual prices charged by BT and its rivals for call packages and out-of-plan calls. This is what Dr Jenkins did in her analysis at paragraph 7.73-7.77 of HJ2. These comparisons show that overall, BT's prices for call plans and out-of-plan calls were largely comparable with and sometimes exceeded by the prices of its comparators.

385.  We think that Dr Jenkins' approach of using the actual charges rather than ARPM is more appropriate here. This conclusion is fortified substantially by the next point.

386.  Second, it is now doubtful whether the ARPMs of BT and its rivals were compared on a like-for-like basis anyway. This emerged as a result of an analysis carried out by Dr Jenkins which included, as an extra column, Ofcom's data as to BT's ARPMs, as opposed to those generated by BT's own internal data. Figure 1, in Section B3b of the Annex to the JES shows as follows:

Figure 1    ARPM for calls made by BT and non-BT customers (2013–2022)



Note: The BT (Ofcom data) and Non-BT (Ofcom data) ARPMs are presented on a calendar year basis. The BT (internal BT data) ARPMs are presented on a financial year basis.

Source: Oxera analysis based on Parker 3 datapack, 'SDP – Calls Analysis – submission', Ofcom ARPMs and BT Internal ARPMs worksheets.

387.    At paragraph 4.49 of HJ2, and in response to issues 6.3.1 and 6.3.4 in the JES, Dr Jenkins noted that the Ofcom-derived BT ARPMs were similar to its competitors' ARPMs for the period 2020-2022. The explanation for that result, as amplified in the letter from Simmons & Simmons ("S&S") dated 9 March 2024 and the note from Dr Jenkins attached ("the 9 March Letter") appears to be this: when BT reported its core revenue, it included the revenue derived from the sale of its call plans as well as from the per call charges obtained from calls made out-of-plan. The reallocation performed by Ofcom from 2020 onwards appears to have stripped out the call-plan revenue, not least because the figures used by Ofcom for BT's competitors' ARPMs were also "net" of call plan revenue, as it were. So, from 2020 onwards, the ARPMs of BT and its competitors were being compared on a direct basis. On that basis, BT's ARPMs were not significantly higher, and indeed was slightly lower for 2 years.

388.    It would follow that if BT's call plan revenue was removed from its ARPMs for the previous years, the revenue would very significantly decrease as would, obviously, its ARPM.

389.    The CR has objected to BT's reliance on the 9 March Letter on the basis that this amounted to new evidence and was inadmissible. We disagree. It made obvious sense to try and explain the discrepancy in the ARPM figures after 2020 and to understand how Ofcom's reallocation exercise was likely to have worked. The CR could have put in its own riposte to all of this, if he thought that the analysis was wrong, but he did not do so.

390.    In the event, and for the reasons given above, we do not consider that Mr Parker's ARPM analysis in relation to call pricing can be safely relied upon in the context of market definition and the SSNIP test.

**Analysis: Dr Jenkins' Approach**

*Switching per se*

391.    Dr Jenkins' first argument is that the phenomenon of switching itself suggests that bundles acted as a price constraint - see paragraphs 4.51 and 4.54 of HJ1. This is on the basis that voice-only customers who switch to bundles must regard the latter as close substitutes for the former and that in turn leads to the inference that (a) bundles represent a significant pricing constraint and (b) the relevant market is SFV Services and bundles together.

392.    However, we fail to see how the existence of switching without more can entail these conclusions. Indeed, we have already concluded that the main reason for switching was <u>not</u> price-related. See paragraphs 216 - 303 above.

393.    However, Dr Jenkins made a related argument which was that even if switching was not price-related, but could be driven by quality improvements this would still be relevant for market definition. In the hot tub discussion, she put it in this way on Day 9/125-126:

> "It is a meaningful competitive attribute, perhaps is a better way of putting it. That a SSNIP analysis or a hypothetical monopolist test, as we both agree, it is a framework of thought that is trying to capture changing -- worsening the competitive conditions, actually, is what the HMT does, and does it via increasing price. But that can be worsened in other ways, and the guidance does -- increasingly you see in the guidance given by competition authorities a recognition that, in thinking about substitution behaviour, it may not only be price that you want to take into account, it can be other features, and that is coming to the fore because we have, increasingly, products that have zero price. So when people are contemplating that, they go, well, does that mean, you know, there is never anything to monopolise? Well, we monopolise in a different way. I think that is just recognising that what is being offered and what you have to think about is not – we economists are terrible at just saying, well, you can turn everything into a price, and that is why we do this as a shortcut, but it does not mean you ignore switching that is driven by these other competitive factors. It is relevant."

394.    We did not find this a particularly persuasive argument. The key point of the SSNIP test is to consider customer reaction to a small but significant increase in price, not some other criterion, and of course, Dr Jenkins accepts the value of such a test because her own CLA is, according to her, one manifestation of it. Yet further, in the context of discussing secular trend, Dr Jenkins accepted that if there was a secular trend it was, by definition, not related to price and had to be taken into account. As we have already noted, the fact that the SSNIP test focuses on price (and holding other things constant) does not mean that it assumes price is the only factor that drives consumer behaviour. But in the current context where the attraction of broadband access increases over time, it is particularly important for the SSNIP test to filter out the switching that would have arisen without a price change.

395.    It is also worth noting that the switching into bundles for quality reasons adverted to by Dr Jenkins appeared to contradict the point she made in a different context when she rejected the idea that SPCs were in some way inert or disengaged. She said that they may be positively wishing to remain because there were some quality advantages in having two contracts rather than a bundle. When this question was put to her, she said as follows:

"Well, through this period, because what I am basing this on is the actual evidence of what was going on, so I mean, so we are framing it as a hypothetical monopolist but we are basing it on the switching that BT observed on its customer base. Now, it may be that it was serving some SFV customers with a Voice Only contract because they got a really great deal for TV and broadband from Sky. BT then introduces TV and sport and all of a sudden for that customer they go, oh, okay, now I would prefer to switch to BT for my bundle because I am going to get BT Sport, I can still get the Sky channels through my TV package and that makes sense to me now. That type of switching behaviour could be what is underpinning this."

396.    We did not find that especially convincing either.

397.    Overall, therefore, we reject the notion that the mere existence of switching in the way in which it happened here, itself evidences a price-related phenomenon or a wider market.

*CLA*

The detail of Dr Jenkins' CLA

398.    The critical loss is a way to identify how much switching away from a candidate product would need to occur in response to a SSNIP in order for that switching to provide an effective competitive constraint on the pricing of the hypothetical monopoly supplier. It is derived from a mathematical equation based on the firm's gross margin and a hypothetical increase in price of 5-10%.

399.    The equation is this:

$$\text{critical loss} = \frac{\text{SSNIP}}{m + \text{SSNIP}}$$

where all the units are in percentages, the SSNIP percentage being the postulated price increase e.g. 5%, and $m$ being the firm's gross margin prior to the increase. By way of example, if the SSNIP was 5% and the gross margin was 35%, the critical loss would be 12.5% of the original customer base. The higher the margin, the lower the critical loss percentage and vice-versa.

400.    Having established the critical loss, it is then necessary to assess how much actual switching away from the candidate product occurred or would occur in response to observed price changes. The actual loss must be assessed, based on some kind of data concerning customer movement. The data could be from customer surveys, for example. In this case, the data set used by Dr Jenkins is based on the actual switching data for the SFV Service customers referred to above, but adjusted to take account of a number of non-price factors.

401.    If the actual loss of customers exceeds the critical loss, it indicates that the SSNIP test has failed, because the HM firm is worse off, compared to the position without the price increase. Where the actual loss is equal to the critical loss, this is the breakeven point. The critical loss of customers is thus the maximum amount that the firm could afford to lose before the SSNIP becomes unprofitable.

402.    The ultimate point is that if the actual loss exceeds the critical loss, it suggests that the fear of switching exerts an effective competitive constraint on pricing and therefore supports a wider

market. If the actual loss is less than the critical loss, it shows that the SSNIP is profitable and this supports the existence of a narrow market. See generally, paragraph 4.67-4.76 of HJ1.

403.    In order to ascertain the critical loss at any moment in time, Dr Jenkins needs a gross margin of the HM. For this purpose, she takes BT's own gross margin. There is a detailed calculation of this in Annex 1 to HJ1, in which she extracts BT's relevant revenue and costs of sales. Once a particular price increase is chosen, for example, 5%, the critical loss in terms of percentage of customers can be calculated using the equation.

404.    As against that, Dr Jenkins then determines the actual loss for that period. The foundational data for this is the actual loss of BT SFV customers over 6 particular periods. In relation to each period she calculates a price elasticity based on the number of customers lost over that period and BT's actual price increases. The price increases she uses are those of line rental then expressed as a proportion of ARPU. At footnote 119 to HJ1, she explains that she focuses on the headline changes to line rental as the numerator for her percentage price change in each period because the line rental does not depend on usage patterns, so it would affect all customers the same and it is this change in price, which is most obvious to the customer. The price elasticity calculation from which the actual loss is derived is complex (see paragraph 4.73 of HJ1, and paragraphs A1.47-A1.49 of Annex 1), but there is no need to go into the detail. This is first, because the CR's criticisms of her CLA model do not focus on this aspect of it, but also because at the end of the day, the actual loss figures are still derived from the actual observed switching data.

405.    The results of Dr Jenkins' analysis are shown in Table 4.1 below. The comparison between the actual loss percentage and the critical loss percentage of customers is made over the 6 periods, running from January 2014 through to October 2020 and in each period, there has been an actual price rise by BT. These periods do not - and do not need to - coincide precisely with the claim period. This is because the point of the exercise is to determine the question of market definition rather than, for example, whether any price charged by BT within the claim period was excessive and if so, by how much.

**Table 4.1    CLA results**

| Price Change # | 1 | 2 | 3 | 4 | 5[2] | 6[2] |
|---|---|---|---|---|---|---|
| 1st month | Jan-14 | Dec-14 | Sep-15 | Jul-16 | Sep-18 | Apr-20 |
| Last month | Nov-14 | Aug-15 | Jun-16 | Jun-17[1] | Mar-20 | Oct-20 |
| # of months | 10 | 8 | 9 | 11 | 19 | 7 |
| **5% SSNIP** | | | | | | |
| Actual loss | 26.8% | 13.2% | 13.5% | 15.1% | 26.7% | 26.7%[3] |
| Critical loss | 8.4% | 7.6% | 7.3% | 7.2% | 7.2% | 7.6% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |
| **10% SSNIP** | | | | | | |
| Actual loss | 53.7% | 26.3% | 26.9% | 30.2% | 53.4% | 53.4%[3] |
| Critical loss | 15.6% | 14.1% | 13.5% | 13.4% | 13.5% | 14.2% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |

406. The percentage actual loss figures shown in this Table were arrived at <u>after</u> making certain adjustments to the "gross" actual loss figures. First, Dr Jenkins excluded customers who in fact had switched to another SFV service provider, because if BT is here seen as the HM, there would not be such other SFV services available. See paragraph 4.90 of HJ1. As we know, the percentage of BT SFV Services customers who migrated to other SFV Service providers in the real world, as it were, was small. This is because most migrated to bundles. Second, Dr Jenkins excluded departures due to clearly non-price-related factors, such as bereavement or home-moving. For the purpose of making both of these adjustments, Dr Jenkins used BT's cessation codes.

407. After making these deductions. Dr Jenkins arrives at what may be described as her primary figures for actual losses in the relevant periods.

408. However, Dr Jenkins then makes a further adjustment to cater for departures that may still be unrelated to price, and in particular due to the "secular trend". She herself rejects the proposition that there is such a trend. But, in order to make her figures conservative, she reduces her primary figures by 20% to take account of this. See paragraphs 4.93 and 4.94 of HJ1.

409. The detailed calculations for all of this can be found in paragraphs A1.30-A1.59 of the Annex to HJ1. One relevant percentage is the number of customer departures excluded as a result of making the above adjustment expressed as a percentage of the total number of customer departures. This is 69.4% over the first four periods. See paragraph A1.43. She then uses that percentage exclusion for the SPCs in last two periods as well. See paragraph A1.44.

410. Dr Jenkins then expresses the actual customer cessations which are deemed responsive to price changes as a percentage of the customers at the beginning of the period and this will yield the

customer reduction in percentage terms. That percentage is then divided by the actual percentage change in price for the relevant period which will yield the price elasticity figure for that period. That price elasticity is then used to generate a percentage customer loss deemed due to price, by reference to the notional 5% and 10% SSNIP.

411.    The figures which result are the ones shown in Table 4.1. See also Figure A1.2, and paragraphs A1.45-A1.47 in Annex 1.

412.    On the basis of Table 4.1, the actual losses for each period where there was a notional 5% price increase clearly exceeded the critical loss. This yields the inference that there was a wider market consisting of (at least) SFV Services and bundles. The absolute differences are (obviously) even greater with a 10% increase.

413.    What Dr Jenkins then does is to adjust her figures further by way of two "sensitivity checks" to the actual losses shown in Table 4.1.

414.    One adjustment is to give greater credence to the secular trend argument by allowing 40% rather than 20% for it. The results of this allowance are shown in Table 4.2 at paragraph 4.100 of HJ1. As one would expect, the actual losses are now more modest, but they still are more than the critical losses, although in some cases, the difference between them is only a few percentage points.

**Table 4.2     CLA results: scenario with a low proportion of price related switchers**

| Price Change # | 1 | 2 | 3 | 4 | 5[2] | 6[2] |
|---|---|---|---|---|---|---|
| 1st month | Jan-14 | Dec-14 | Sep-15 | Jul-16 | Sep-18 | Apr-20 |
| Last month | Nov-14 | Aug-15 | Jun-16 | Jun-17[1] | Mar-20 | Oct-20 |
| # of months | 10 | 8 | 9 | 11 | 19 | 7 |
| **5% SSNIP** | | | | | | |
| Actual loss | 20.1% | 9.9% | 10.1% | 11.3% | 20.0% | 20.0%[3] |
| Critical loss | 8.4% | 7.6% | 7.3% | 7.2% | 7.2% | 7.6% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |
| **10% SSNIP** | | | | | | |
| Actual loss | 40.3% | 19.8% | 20.2% | 22.6% | 40.0% | 40.0%[3] |
| Critical loss | 15.6% | 14.1% | 13.5% | 13.4% | 13.5% | 14.2% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |

415.    Dr Jenkins then addresses the Cellophane Fallacy point. The Cellophane Fallacy will apply if the starting price was itself the product of market power, and of course that is the CR's entire case here. BT, on the other hand, says that its prices were not excessive (or unfair) to begin with, so to adjust for the Cellophane Fallacy would be to assume the outcome of the dispute. We discuss that point

further below, but at this stage, the relevance of the Cellophane Fallacy is that Dr Jenkins has performed a further sensitivity check based upon it. What she does is to alter the starting price and margin to that of the HPS product. This is lower than the "normal" price and therefore BT's gross margin on it is lower.

416.    She uses the HPS price/margin because in his plea of unfairness (at paragraph 1.36 (B) of the Claim Form), the CR compares BT's actual prices to those of HPS, thereby impliedly asserting that the HPS price was itself not unfair.

417.    Using a lower gross margin base means that the critical loss figure will be higher than shown in Table 4.1. This means that there is a greater chance that actual losses will <u>not</u> exceed critical losses which would then suggest that the market is narrow. The results of that particular exercise are shown in Table 4.3. They are not that much different from Table 4.1 and the actual losses still exceed the critical losses.

**Table 4.3    CLA results: scenario based on Home Phone Saver ARPU as an alternative price path**

| Price Change # | 1 | 2 | 3 | 4 | 5[2] | 6[2] |
|---|---|---|---|---|---|---|
| 1st month | Jan-14 | Dec-14 | Sep-15 | Jul-16 | Sep-18 | Apr-20 |
| Last month | Nov-14 | Aug-15 | Jun-16 | Jun-17[1] | Mar-20 | Oct-20 |
| # of months | 10 | 8 | 9 | 11 | 19 | 7 |
| **5% SSNIP** | | | | | | |
| Actual loss | 26.8% | 13.2% | 13.5% | 15.1% | 26.7% | 26.7%[3] |
| Critical loss | 11.1% | 8.4% | 8.1% | 7.8% | 8.0% | 7.9% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |
| **10% SSNIP** | | | | | | |
| Actual loss | 53.7% | 26.3% | 26.9% | 30.2% | 53.4% | 53.4%[3] |
| Critical loss | 20.0% | 15.5% | 15.0% | 14.5% | 14.8% | 14.7% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |

418.    Finally, Dr Jenkins applies both of her sensitivity checks. The results are shown in Table 4.4. As one would expect, this shows the least difference between actual and critical losses, although, in each case, the former still exceed the latter. However, for Periods 2 and 3, the difference was only 1.5 and 2 percentage points.

**Table 4.4    CLA results: Low proportion of price-related switchers and CR"s alternative price path**

| Price Change # | 1 | 2 | 3 | 4 | 5[2] | 6[2] |
|---|---|---|---|---|---|---|
| 1st month | Jan-14 | Dec-14 | Sep-15 | Jul-16 | Sep-18 | Apr-20 |
| Last month | Nov-14 | Aug-15 | Jun-16 | Jun-17[1] | Mar-20 | Oct-20 |
| # of months | 10 | 8 | 9 | 11 | 19 | 7 |
| **5% SSNIP** | | | | | | |
| Actual loss | 20.1% | 9.9% | 10.1% | 11.3% | 20.0% | 20.0%[3] |
| Critical loss | 11.1% | 8.4% | 8.1% | 7.8% | 8.0% | 7.9% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |
| **10% SSNIP** | | | | | | |
| Actual loss | 40.3% | 19.8% | 20.2% | 22.6% | 40.0% | 40.0%[3] |
| Critical loss | 20.0% | 15.5% | 15.0% | 14.5% | 14.8% | 14.7% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |

419.    In HJ2, Dr Jenkins ran two yet further sensitivities in the light of the fact that Mr Parker claimed that the sensitivity check for the Cellophane Fallacy was not enough because his view was that even the HPS price was excessive. What Dr Jenkins did was to run the two further sensitivities on the basis, not of the HPS price, but the Commitments price. The first sensitivity simply reruns the previous sensitivity check based on the HPS price. This is shown at Table A2 .1 of Annex 1 to HJ2. It shows that in all cases, actual losses still exceed critical loss.

**Table A2.1    CLA results: scenario using Mr Parker's suggested alternative price path**

| Price Change # | 1 | 2 | 3 | 4 | 5[2] | 6[2] |
|---|---|---|---|---|---|---|
| 1st month | Jan-14 | Dec-14 | Sep-15 | Jul-16 | Sep-18 | Apr-20 |
| Last month | Nov-14 | Aug-15 | Jun-16 | Jun-17[1] | Mar-20 | Oct-20 |
| # of months | 10 | 8 | 9 | 11 | 19 | 7 |
| **5% SSNIP** | | | | | | |
| Actual loss | 26.8% | 13.2% | 13.5% | 15.1% | 26.7% | 26.7%[3] |
| Critical loss | 12.2% | 9.9% | 9.0% | 8.8% | 9.3% | 11.3% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |
| **10% SSNIP** | | | | | | |
| Actual loss | 53.7% | 26.3% | 26.9% | 30.2% | 53.4% | 53.4%[3] |
| Critical loss | 21.7% | 18.1% | 16.5% | 16.1% | 16.9% | 20.3% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |

420.    The second sensitivity is to now combine the new Cellophane Fallacy adjustment with the prior sensitivity based on the 40% deduction for switching based on secular trend. This is shown in Table A2.2 of Annex 1 to HJ2, below. Even here, in all but one case, actual loss exceeds critical loss,

although by lower amounts. The exception is Period 2 on a 5% SSNIP where the actual loss is 9.9% and the critical loss is 9.9%.

**Table A2.2   CLA results: Low proportion of price related switchers and Mr Parker's suggested alternative price path**

| Price Change # | 1 | 2 | 3 | 4 | 5[2] | 6[2] |
|---|---|---|---|---|---|---|
| 1st month | Jan-14 | Dec-14 | Sep-15 | Jul-16 | Sep-18 | Apr-20 |
| Last month | Nov-14 | Aug-15 | Jun-16 | Jun-17[1] | Mar-20 | Oct-20 |
| # of months | 10 | 8 | 9 | 11 | 19 | 7 |
| **5% SSNIP** | | | | | | |
| Actual loss | 20.1% | 9.9% | 10.1% | 11.3% | 20.0% | 20.0%[3] |
| Critical loss | 12.2% | 9.9% | 9.0% | 8.8% | 9.3% | 11.3% |
| Implication ("W" for wide; "N" for narrow) | W | N | W | W | W | W |
| **10% SSNIP** | | | | | | |
| Actual loss | 40.3% | 19.8% | 20.2% | 22.6% | 40.0% | 40.0%[3] |
| Critical loss | 21.7% | 18.1% | 16.5% | 16.1% | 16.9% | 20.3% |
| Implication ("W" for wide; "N" for narrow) | W | W | W | W | W | W |

421.    Accordingly, Dr Jenkins maintains that even under these very conservative scenarios, the SSNIP test conducted under the CLA fails, and the market must be the wider one.

    <u>Analysis of the CLA</u>

422.    The CR makes a number of criticisms of the CLA so as to contend that it is fundamentally flawed.

423.    The first is that Dr Jenkins' use of BT's gross margin data (as opposed to that of an HM) is incorrect, because she has thereby conflated the HM with BT, and ignored the incentive that BT has to charge higher SFV prices than the HM would, due to the recapture effect. This, of course, was the very same basis as the criticism that Dr Jenkins made of Mr Parker's market definition analysis. In fact, as we have observed above, it seems clear that BT does have some recapture incentive that one would expect to be priced in to its SFV price, and in the JES, Dr Jenkins accepted that as a multi-product firm BT is likely to set a higher SFV price than it would if it were an HM of SFV. She argued against the criticism that it would not have a significant effect on her findings because Mr Parker had denied that the recapture effect existed, but that is not a logical position to take. She also said that the allowances she already made to account for the Cellophane Fallacy problem would offset this concern to some extent and that the very large amount of observed switching away from SFV in any case gave her a large margin for error in the CLA calculations. None of these points in our view provides a convincing response to the issue.

424.    That said, there is in any event the entirely separate criticism about Dr Jenkins' critical loss figures which relates to the Cellophane Fallacy. In this context, the Cellophane Fallacy problem has two

facets. First, the use of pricing (via gross margin) that may already be excessive, and second, Dr Jenkins' use throughout the CLA of switching rates which are themselves drawn from switching in relation to the actual prices charged and increased by BT over the relevant period. The first facet arises in the context of critical loss and the second in the context of actual loss.

425.  As for the critical loss, Dr Jenkins seeks to cater for this by her first sensitivity which uses HPS pricing (see paragraphs 415-418 above) and then the lower pricing entailed by the Commitments (see paragraphs 419-420 above).

426.  However, one cannot be certain that such adjustments address the Cellophane Fallacy sufficiently. The problem is that the existence of the Cellophane Fallacy just makes it very difficult to conduct a reliable SSNIP test which would show a wider market. The problem is compounded if one takes into account Dr Jenkins' recapture effect point – see paragraph 334 above.

427.  As the Commission noted in *Slovak Telecom*

> "158. In cases which are brought under Article 102 of the Treaty, the SSNIP test would need to be applied using the competitive price as a starting point for the measurement of margins and demand elasticities. A SSNIP test which starts from observed prices would tend to lead to market definition that is wider than what one would find if the SSNIP test was performed at the (lower) competitive price if, as it will be typical in cases brought under Article 102 of the Treaty, the observed price is already inflated relative to the competitive price. This is because margin and demand elasticity faced by the hypothetical monopolist would typically be lower at the competitive price than at the observed price. A SSNIP analysis starting from the correct competitive price would therefore tend to find narrower markets than the SSNIP analysis which (wrongly) starts from the (inflated) observed price. The fact that a SSNIP test analysis starting at an already inflated price will tend to lead to the wrong conclusion of wide relevant markets is called 'cellophane fallacy'. For this reason, the Commission does not normally rely on the SSNIP-test exercise in the context of cases which are based on Article 102 of the Treaty."

428.  However, even if an adjustment could be made for a notional, competitive price, as the starting point for critical loss, this would not itself cater for the second facet of the Cellophane Fallacy, which is that the switching rates (which yield the price elasticity to be used in computing actual loss) must also be those related to the competitive price. Yet that has not happened here, because, regardless of her adjustments, Dr Jenkins has used the switching rates (and hence price elasticities) based on BT's actual pricing. She accepted that her Cellophane Fallacy adjustment was only partial, and that she could not control how observed switching may have been different. (Indeed, it is almost certain to have been different, since demand elasticity will typically be lower at competitive prices - see paragraph 158 of *Slovak Telecom* referred to above). Dr Jenkins also accepted that she did not have good counterfactual data about switching.

429.  It is true that Dr Jenkins sought to deal with this element of the Cellophane Fallacy by using the smallest observed price elasticity which emerged from the 6 periods, which was -2.63 in respect of the second period, and apply it throughout. However, the problem remains that this is still an elasticity based on a demand reaction to the prices actually charged by BT.

430.    For those reasons, we do not think that the adjustments Dr Jenkins has made to her CLA to address the Cellophane Fallacy problem can be relied upon.

431.    A second major criticism made by the CR is that even with a further 20% sensitivity to cater for customers whose switching was not price related, this does not mean that the CLA is underpinned by an accurate market data point on the extent of price-related switching here, as opposed to the effect of the secular trend.

432.    Indeed, this is borne out by the fact that even using the lowest supposed price elasticity, on Dr Jenkins' primary figures at Table 4.1, BT's actual loss would be 13.2% and 26.3% at a 5% and 10% SSNIP, respectively. However, if this really was price-related, it is very hard to see why BT would have raised its prices at all over the 6 periods unless there was a very clear expectation that BT would gain bundle customers and profits when losing SFV customers. As we have noted above, there is in fact no contemporaneous support for the view that BT factored any migration intent into its SFV pricing decisions. It is true that on Dr Jenkins' most conservative scenario, under Table A2.2, there is either no gap or only a very small gap between actual and critical loss, so the previous point would not apply. But once one reaches that level and allows for some margin for error, the result is really that the SSNIP has now been passed.

433.    Further, Mr Parker criticised the way in which Dr Jenkins had reached her assessment of price-based switching in the CLA, arguing that it contained no evidence that would identify the distinction between the secular trend and price-based switching. Even where Dr Jenkins had discounted large amounts of switching, there could be no assurance that her approach was conservative, since to make that assessment one would need to have a proper measure of actual SFV demand elasticity, holding other things constant. We substantially agree with this important criticism, noting that the (imperfect) evidence that does exist on actual demand elasticity does not support the existence of a high rate of price-based switching.

434.    Finally, Mr Parker took issue with Dr Jenkins' "event study". This is dealt with at paragraphs 240 - 244 above. We concluded there that the consequences of the event study amount to important evidence to show that switching is not primarily related to price. It also ran against Dr Jenkins' CLA.

435.    For all of those reasons, we consider that the CR's principal criticisms of the CLA are well-founded and we do not feel able to place any reliance upon it.

*Bundles as Constraints on SFV Pricing*

436.    Here, it is necessary first to establish the underlying facts. It is clear that line rental increases were the same for SFV Services and bundles. So that part of the overall costs of each would be the same.

However, as Mr Bunt explained when dealing with the January 2021 document which set out the history of pricing, average bundle prices were falling, and so the broadband component of the total bundle price fell as well. Thus, even though line rental prices were going up, if the broadband component dropped sufficiently, the average price of the bundle would fall as a result. Later, in reply to questions from the Tribunal, Mr Bunt confirmed that, regardless of what customers saw, if one took the overall revenue from a bundle, there was (apart from line rental) another significant element to play with, namely the broadband charge.

437.    Further, because of the way charges were shown on bills after the ASA Ruling in 2016, a bundle customer would only see the overall total charge. In that context, where a price increase of £2.50 was proposed for a bundle, that in fact included the line rental element of £1, and the rest, one could say, was attributable to the broadband charge. But in reality, there was one overall price to play with, as it were.

438.    Dr Jenkins used the undisputed fact that BT's line rental prices (and increases therein) were applied as much to the voice element of bundles as to SFV Services to infer (at paragraph 4.45 of HJ1) that:

> "On this basis, the competitive dynamics relating to the sale of fixed voice services as part of a bundle would therefore have been an important consideration with respect to the price that BT, or any provider, set for fixed voice services. Too high a price for fixed voice services could have led to an increase in the overall price BT charged for bundles including fixed voice services and lead to a reduction in the number of customers choosing BT for their fixed voice services supplied in a bundle."

439.    However, this assumes that any line rental price increase would automatically increase the overall bundle price by that amount i.e. that it is passed on in full. In fact, it need not be, as explained above, because there are other elements in the bundle price and in particular, BT could adjust the price of the broadband element of the bundle price (referred to as "the incremental broadband price") to absorb some of the increase. Indeed, that this was the position is shown by Figure 1 from DP4 under paragraph 3.23:



**Figure 1    Changes in the price of BT fixed voice services compared to the price of incremental broadband sold as part of BT Dual Play bundles (six month-rolling average), January 2013 – December 2022**

Source:   Frontier Economics based on Dr Jenkins's analysis of the six-month rolling average monthly price of incremental broadband for different BT Dual Play bundles (see Dr Jenkins's Dominance – pricing R analysis, (Script '2. Tracking by Speed _ Data Pack) and Dr Jenkins's analysis of BT's pricing of Standard Line Rental (see Dr Jenkins's CLA model – Excel, Sheet(Landline access prices). Data on the monthly price of incremental broadband for different BT Dual Play bundles is presented in Dr Jenkins's report in Figures 5.5, 5.6, and 5.7).

Note:    Prices are reported inclusive of VAT. Gaps in the chart reflect periods where Dr Jenkins is unable to identify a product in that broadband speed category (see Jenkins 1, Figure 5.6, Figure 5.7).

440.    The same point can be illustrated by the reference, not to the incremental broadband price within a bundle, but the overall bundle price. Figure 2 at paragraph 3.25 of DP4 shows this:

**Figure 2**    **Changes in the price of BT fixed voice services compared to the total price of BT Dual Play bundles (six month-rolling average), January 2013 – December 2022**



Source:    Frontier Economics based on Dr Jenkins's analysis of the six-month rolling average total monthly price of different BT Dual Play bundles (see Dr Jenkins's Dominance – pricing R analysis, (Script '2. Tracking by Speed _ Data Pack) and Dr Jenkins's analysis of BT's pricing of Standard Line Rental (see Dr Jenkins's CLA model – Excel, Sheet(Landline access prices). Data on the total monthly price of different BT Dual Play bundles is presented in Dr Jenkins's report in Figures 5.12, 5.13, and 5.14).

Note:    Prices are reported inclusive of VAT. Gaps in the chart reflect periods where Dr Jenkins is unable to identify a product in that broadband speed category (see Jenkins 1, Figure 5.13, Figure 5.14). **{E/17/140-141}**

441.    In other words, there is not a direct correlation between any line rental increase and the price of the incremental broadband element or the price of the bundle as a whole.

442.    This error on the part of Dr Jenkins has been referred to by the CR as the "bundle pricing fallacy".

443.    At paragraph 3.1.3 of the JES, Dr Jenkins suggests that she had never said that there <u>was</u> a direct link between the two. She said that:

> "There is a link between the prices of SFV Services and fixed voice services sold in bundles, and this is relevant to the assessment of how competitive conditions facing fixed voice services sold in bundles had an impact on SFV pricing. For this competitive interlinkage to be relevant, I do not agree that it is a requirement for the total price of a bundle including fixed voice services to increase one for one with a change in the price of SFV services, nor did I ever state this as my view. Mr Parker's statement that I have committed a 'bundle pricing fallacy' is itself fallacious. In terms of the pricing mechanics, the following linkages are necessarily present:
>
> a) The price of a bundle is necessarily bounded below by the price of SFV services.
>
> b) If the price of SFV services increases, then (taking the example of a dual play bundle) BT Consumer must either raise the price of the dual play bundle; lower the incremental price of broadband within a bundle or some mix of the two. Hence the two are inter-related.…"

444.    However, once Dr Jenkins has accepted (as she seems to do here) that there is no automatic linkage between line rental price increases and bundle prices, it simply cannot follow that the pricing of bundles needs to act as a constraint on SFV Prices at all.

445.    In the hot tub discussion, in answer to a question from Mr Ridyard, Dr Jenkins said that the constraint on BT was not automatic; they may choose to pass on any part of the increase, but they do not automatically do so, and they have to think about the choice. However, we fail to see how that can properly be characterised as a constraint on SFV pricing by bundle pricing. Equally, when Dr Jenkins added that there was a sense in which narrowing the gap was part of the constraint from the bundle market, in the sense of wanting to structure those prices to be as attractive as possible for choosing BT, we fail to see how this has anything to do with the existence of a pricing constraint upon SFV pricing constituted by the bundles.

446.    In this context, it is, finally, worth adding that both sides agreed (see paragraph 6.1.1 of the JES) that while SLR prices were increasing between 2013 and 2022, BT's overall prices for dual play bundles were generally stable or declining over the same period.

447.    Accordingly, we do not accept that Dr Jenkins' points about bundles acting as a constraint on SFV pricing are correct and thus they do not assist BT and market definition.

**Conclusion on Market Definition**

448.    Having considered all of the evidence and arguments discussed above, we have concluded that SFV Services are indeed in a separate market. There is some competitive interaction between SFV and bundles, but not sufficient to reject the hypothesis that SFV Services form a separate market. The pricing of SFV Services is not effectively constrained by the threat that SFV consumers could switch to other products such as bundles. On that basis, it is necessary to move to the next issue which is whether BT was dominant in that market.

## DOMINANCE

**The Law**

449.    We did not understand the law in relation to the assessment of dominance to be in dispute. However, we have in any event set out the relevant principles below, drawn largely from paragraphs 224-228 of the CR's Closing, which we consider to be accurate.

450.    The general position is as set out in *United Brands* as follows:

> "[65] The dominant position referred to in this Article relates to a position of economic strength enjoyed by an undertaking which enables it to prevent effective competition being maintained on the relevant market by giving it the power to behave to an appreciable extent independently of its competitors, customers and ultimately of its consumers.
>
> [66] In general a dominant position derives from a combination of several factors which, taken separately, are not necessarily determinative.
>
> [67] In order to find out whether USC is an undertaking in a dominant position on the relevant market it is necessary first of all to examine its structure and then the situation on the said market as far as competition is concerned."

115

451. However, and as implied by the words "to an appreciable extent" in paragraph 65, it is not necessary to show that the undertaking has the power to behave independently of customers or competitors in all respects - see paragraph 134 of *Socrates v Law Society* [2017] CAT 10.

452. As for the question of market share specifically, this is an important indicator of market power and plays a central role in the assessment of dominance. See *Albion Water v Ofwat* [2006] CAT 36 at paragraphs 118 and 123. The possession of market share above 50% is *prima facie* evidence of a dominant position. See *Churchill Gowns v Ede & Ravenscroft* [2022] CAT 34 at paragraph 55. Indeed, in *AstraZeneca v Commission* Case [2013] 4 CMLR 7, the Court of Justice stated at paragraph 176:

> "The Court has already clarified that, although the importance of the market shares may vary from one market to another, the possession, over a long period, of a very large market share constitutes in itself, save in exceptional circumstances, proof of the existence of a dominant position (Hoffman-La Roche at [41]) and that market shares of more than 50 per cent constitute very large market shares (AKZO Chemie at [60])."

On any view, therefore, a market share of above 50% raises a presumption of dominance which needs to be rebutted.

453. As for other factors going to the question of dominance, these can include constraints from existing supplies from actual competitors and constraints from the credible threat of future expansion/entry – see paragraph 259 of *Hydrocortisone*.

**Market Share**

454. The detail of BT's market share of the SFV Services market is set out at paragraphs 116 - 117 above.

455. Given the size of those market shares, this gives rise to a presumption of dominance. Mr Parker's view was that this was a strong indication of significant market power and at this level, the evidence required to show total absence of barriers to entry and expansion would need to be very strong to avoid dominance. In addition, and it naturally follows, that all of those market shares were very substantially higher than those of BT's competitors.

456. BT's market share did decline, but only very slowly over the relevant period. Its share for VOC declined by 2 percentage points per year and by 0.3 percentage points for SPCs. The converse is that its competitors did not significantly increase their respective market shares.

457. In evidence, Dr Jenkins sought to suggest that these high market shares were insufficient to show dominance, but her arguments here were essentially a re-run of her arguments in favour of a wider market on the issue of Market Definition.

458. So she said this at Day 11/93-94:

> "But what is actually happening is a big chunk of the customers that are there as voice only customers in 2013/14 are actually responding to the competitive offers from the rivals in this market, so the TalkTalk, Virgin Media, Sky and BT itself, and their competitive activity is to actually change the product that they buy and

> move out of this market that we are seeing here and move into another market as we defined it now. So that is a constraint on your behaviour in that market.
>
> If your customers are constantly voting with their feet to go and do something different, then the fact that you may have ——you have a large market, a large share of an ever declining market, can still be a sign that you are constrained in what you can do in that market as so defined, because it is not really meeting the underlying needs of those customers because they are basically shifting to something else."

459.    However, for the purposes of assessing dominance, we fail to see why the movement into bundles makes a difference. Equally, the fact that the market is declining does not mean that BT was not dominant in it over the relevant period.

460.    Dr Jenkins also made a different point as to SPCs at Day 11/123, which was that where the market share here was almost 100%, that is a sign that the market was wrongly defined because it meant that there was a set of customers without any constraint upon them and they were rapidly declining during this period. Again, that is simply repeating the argument about market definition where we have already rejected BT's claimed wider market.

461.    Accordingly, thus far, we see no reason not to give the very high market share held by BT its full weight leading to a finding of dominance.

**Other Factors going to Dominance**

*Barriers to Expansion*

462.    The CR contends that the fact of little movement in the overall market shares of BT on the one hand, and its competitors on the other, shows that there were significant barriers to expansion. In particular, competitors faced high acquisition costs to win over customers from BT. According to Mr Parker, this was because BT was a legacy provider that had in effect inherited a large proportion of its customers upon privatisation. Thus, for example, TalkTalk ceased to offer SFV Services to new customers in 2014. It told Ofcom in 2016 that there was no internal appetite for re-entering the market, even though the margins looked quite high because of the low number of customers who were likely to switch to TalkTalk and so the costs and complexity of pursuing this business were not justified. Reference was also made to customer inertia and the declining market. Indeed, TalkTalk exited the voice-only market altogether by the end of 2016.

463.    Dr Jenkins disagreed, but again, her focus was the interaction between SFV and bundles. Thus, she said that supply-side barriers to entry were low and providers had an incentive to achieve economies of scope by encouraging customers to purchase bundles. We accept that the existence of very low barriers to entry from a neighbouring market could in principle counteract a presumption of dominance arising from a high market share, but that would be something that would need to be established rather than merely asserted. The evidence from TalkTalk (and indeed from Ofcom's analysis of the market) indicates that there were real costs associated with entering the SFV market from the bundles market.

464.    It is indeed the case that many SFV customers had been long-standing. Figure 8.54 of the 2017 Provisional Conclusions says that 77% of BT customers said they had been with BT for more than 10 years. This data was taken from Ofcom's Switching Tracker July-August 2016. On Dr Jenkins' figures, at least 78.5% of those who were still SFV customers in 2022 (a much reduced figure overall, of course) had been there in December 2014. This suggests that the figures on those who joined BT during the claim period (see paragraphs 169 - 171 above) may not be accurate, as already noted.

465.    In the end, Dr Jenkins did accept in the hot tub discussion (Day 11/96) that there were at least some customer acquisition costs for a bundles provider which sought to supply voice only services.

466.    The declining volumes of customers for voice services, noted as a reason by TalkTalk for not seeking new customers, is of some significance. This is not because this decline can be attributed to BT, but rather because it meant that there was a separate disincentive to enter into this market which would have enabled BT to maintain its dominant position.

467.    There were therefore at least some barriers to expansion in respect of BT's competitors. That said, this was not because of high infrastructure costs (not least because Ofcom's regulation of Openreach and its WLR pricing) but rather because of the perceived difficulty of encouraging BT's customers away from it in a declining market. In this case, whilst such barriers are not overwhelming, they do provide a material degree of protection to BT's position as the leading supplier of SFV services, affording it some insulation from effective competition.

*The Position of the Post-Office*

468.    The facts relating to the Post Office's pricing in comparison to BT's and that of other competitors over the period 2014-2021 is set out in the Table and Figure under paragraphs 131-132 above.

469.    These show how the Post Office priced beneath BT and its competitors to a significant extent from 2014 to late 2016 and to a lesser extent from late 2016 until the first part of 2017. At that point it froze its line rental ("LR") prices until the Commitments took effect. It then dropped its price to 50p below the Commitments price until April 2020 when it raised its prices significantly and this remained the position until the Post Office sold off the business in 2021.

470.    Dr Jenkins said that the Post-Office acted as a strong constraint upon BT. However, the threat posed by the Post Office did not stop BT from increasing LR prices, and between 2015 and 2017 the Post Office's market share rose only by 2 percentage points in terms of revenue and 3 percentage points in terms of lines. According to Ofcom, the Post Office gained only 1,700 customers per month from 2013-2017 which was less than 5% of the SFV customer losses suffered by BT over that period. It is true that the Post Office then undercut the LR price after the Commitments, but at this point the

SFV market that is of interest to us comprised only SPCs, and there is no evidence that the Post Office's offer was effective in competing for these customers.

471. BT pointed to the fact that the Post Office's share of VOCs increased from 13% in 2015 to 15% in 2016 and then to 16% in 2017. But these are still modest figures overall. BT also suggests that proof of the Post Office acting as a constraint is the fact of the introduction of HPS. However, while we accept that one aim of HPS was to address competition from the Post Office, that was not the whole story - see paragraphs 268 and 270 - 302 above.

472. As for the views of the Post Office itself, in a s135 response to the 2017 Provisional Conclusions, it said that its two latest campaigns to market to current BT customers had not succeeded. At a meeting with Ofcom in October 2016, it said that there were unlikely to be significant gains, and that view was proved correct, even though it did undertake further campaigns.

473. It is, of course, true that BT did, on occasion, refer in internal documents specifically to the question of churn to the Post Office. We have dealt with such documents at paragraphs 277 - 281 above. As those documents show, the predicted figures for churn to the Post Office do not seem always to be consistent with each other but in any event, it remains the case that overall, the Post Office did not make much of a dent in BT's overall position in the market.

474. In any event, the existence of some competition from the Post Office does not prevent a finding of dominance, because a dominance finding does not require that BT was able to act entirely without constraints; see paragraph 451 above.

*Constraints from Bundles*

475. BT relies upon the fact that it had to be mindful that fixed voice price increases might push SFV customers to a rival's bundle rather than its own. We see that, but of course it did not stop BT from increasing line rental prices. It was then said that to lower the price might then increase the cost of the "step" from an SFV Service to a bundle. BT said that the answer could not then be to reduce the price of the bundles as well, because of the very large drop in revenue which this would entail, and the bundle price was already set at the competitive level.

476. However, while considerations of that kind might show that the situation facing BT was a complex one, we still do not see how, for the purposes of assessing dominance, this means that there was an effective constraint, just as bundles did not act as an effective constraint for the purpose of market definition; see paragraphs 436 - 447 above.

*Price Leadership*

477. Both Mr Parker and Dr Jenkins accepted that in principle, the existence of price leadership can be a factor tending to show dominance. The discussion of price leadership was confined to the tendency for BT to announce line rental price changes and for other retailers (except the Post Office) to follow.

478. We have established three important points that set the background to the assessment of price leadership. First, that in implementing successive line rental price increases, BT considered the risk of losing customers (described as "churn" in BT's documents) but made the assessment that the revenue-increasing aspects of each line rental price increase would outweigh the losses to revenue caused by any such churn. Second, that although the line rental price increases took place against falling or static wholesale line rental costs paid by BT to Openreach, BT's line rental increases were almost entirely offset by other changes that took place in call volumes and prices such that the ARPU for SFV customers was broadly flat from 2007 until the end of the claim period. Third, that this neutral ARPU result masks a substantial increase in SFV profitability (as measured by BT's gross margin) which increased from 30% to more than 60% in the years prior to the claim period and was maintained at that level thereafter.

479. These established facts are all relevant to evaluating BT's market power over SFV customers. The question now is whether any aspects of price leadership by BT in the SFV market add to that picture. Its ability to do so must rest on some tendency for rival suppliers to follow BT's market lead in a way that made market outcomes less competitive than they would be under BT's purely unilateral conduct.

480. At a purely factual level, the extent to which BT's line rental price changes were followed by rivals is reasonably clear. If one returns to the Table and Figure produced under paragraphs 131-132 above, one can see how close the line rental pricing of BT's competitors (other than the Post Office) was to its own pricing. They also show how BT's line rental price increases tended to precede those of the others. It can also be seen from the first tab of the pricing spreadsheet annexed to BT's written closing submissions, itself drawn from Figures 7.5-7.8 of HJ1.

481. As far as the post-Commitments period is concerned, there is not the same price leadership, since the Class now consisted only of SPCs, and Mr Parker accepted that BT did not act as a price leader in this period. However, this is the point at which BT's market share is at its highest.

482. As to all of that, BT's first point is that its price leadership (if that is what it was) was confined to line rental; it could not be said to be a price leader on call charges. We accept this, and it is noteworthy that the position with respect to call charges is complex and does not yield any clear picture as to the competitive positions of rival operators.

483.  BT says that all of this is connected with the notion that the most effective way to compete for customers now was to put line rental prices up so as to drive them into bundles. However, that is really just a reflection of the "migration intent" point which we have rejected (see paragraphs 294 - 303 above). Equally, that question is not affected by BT's motivation in increasing line rental prices, for example, whether it was deliberately targeting SFV customers or because it needed to meet revenue targets in any event.

484.  It is also worth noting BT's own view of the position.

485.  Thus, in the Project Robin 2014/2015 Pricing document dated 29 November 2013, it stated:

> "Medium risk plan delivers £76m
> – 7% is PR recommended ceiling on price changes
> – Line rental at £16.99 will make us £1 clear of nearest competitor; however, competitors have historically followed us…"

486.  As to that, Mr Bunt accepted that this showed that BT expected that its competitors would continue to follow it. However, this expectation applies to the line rental price changes that BT actually chose to implement, and which did not lead to any increase in SFV ARPU. It does not mean that rivals would have followed any conceivable line rental price increase that BT might have chosen to implement. Moreover, to the extent that BT chose not to implement some of the higher line rental price changes that it considered due to concerns about increased churn (though we have noted that these churn concerns were not the only consideration) the evidence is silent on whether that increased churn would have arisen because some or all rivals might not have followed these changes had they occurred.

487.  There is then the 2015/2016 Pricing Plan document from 12 December 2014 which we referred to at paragraph 188 above. Here, Mr Bunt agreed that he was saying that this price change created significant headroom for BT's competitors to do the same, i.e. price up to BT.

488.  Further, in Mr Bunt's Annual Price Change document dated 11 June 2015, ahead of the 2015/16 price change which would increase line rental by £1, he said this:

> "Each year BT changes its prices. Historically this has been approximately inflationary, but increasingly super-inflationary price rises on largely inelastic products has provided significant upside for our business. This capital provides the oxygen for our business in the sense of its investment in content, spectrum etc.
> These changes are reported to different degrees in the media, usually defined by our transparency and clarity as well as how compelling our gives are.
> Reporting of these changes very much drives our thinking on timing (we try to only go once a year) and scale (we choose 6.94% because this is less than 7% which is associated with negative energy company price rises)…
> Our competitors have increasingly aligned their price changes with our in timing and scale:…"

489.  In relation to the last sentence, Mr Bunt accepted that the increasing alignment of BT's competitors was a trend which he was seeing and it would not have been a surprise if they continued to follow BT.

490.    Finally, there is the Consumer Voice Strategy document from 10 March 2015. This is noted at Slide 2 that BT's price change "leads the market enabling increases of the same scale". When asked about this as an indication of price leadership, Mr Bunt said that he did not really know what a price leader was, but certainly this sentence was acknowledging price leadership. See Day 6/31-48.

491.    There is a separate point as to whether BT misled Ofcom in its Response on the question of price leadership. We deal with this below at paragraphs 1215 - 1217 below.

492.    Taking all these considerations into account, we do not consider that descriptions of BT as a price leader add anything to the assessment of dominance that are not already included in the findings we have already made about BT's SFV pricing and margins. It is evident that most of BT's rivals followed BT's line rental price increases in the relevant period, but line rental is only one component of SFV pricing (just as is it only one component of bundle pricing, where no dominance or price leadership concerns have been raised by the CR). Further, we cannot assess whether rivals' decisions to adopt similar line rental price increases allowed them to earn excessively high prices or profits on their SFV customers, since there are strong indications that rivals faced higher costs than BT in this market. The fact that one of the main competitors, TalkTalk, had chosen not actively to pursue SFV customers, even prior to the Commitments, does not suggest that this was a market segment that provided high returns.

493.    The most that can be said is that BT cannot legitimately point to the similarity of line rental prices across the SFV market as a positive argument against its ability to operate independently of the competition, but that does not take matters very far.

**Conclusion on Dominance**

494.    On the basis of all of the above, it is plain that BT had a dominant position in the market for SFV Services at all material times in the claim period. The very size of its market share entails that result and the other factors referred to above either support, or do not displace, that conclusion.

495.    This means that it is now necessary to see whether its pricing was excessive, under Limb 1.

## LIMB 1 METHODOLOGIES: DESCRIPTION

**Introduction**

496.    The parties have each used very different methodologies to ascertain what they say is the relevant competitive benchmark against which BT's prices must be judged. The outcomes of these methodologies are also radically different. For example, according to the model employed by Mr Duckworth, the price for 2015/2016 clearly exceeded the competitive benchmark and across the 3 different line rental products, by a weighted average of 82%, and in the case of the main product, Standard Line Rental, by 74%.

497.  A summary of Mr Duckworth's outcomes can be found in the Limb 1 spreadsheet provided by the CR on 22 March 2024 ("the CR Spreadsheet"). We reproduce below the figures for SLR and the weighted average for all three line rental products:

Difference between Benchmarks and Charges on Standard Line Rental:

|  | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|---|---|
| SLR SFV Services benchmark(£ per line | 144.22 | 148.13 | 149.91 | 151.35 | 149.46 | 148.53 | 156.69 |
| SLR SFV Services ARPU (£ per line) | 250.85 | 275.00 | 284.37 | 270.49 | 270.29 | 261.60 | 250.15 |
| Difference, above benchmark | 74% | 86% | 90% | 79% | 81% | 76% | 60% |

Weighted Average (WA) of three product-specific benchmarks:

|  | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|---|---|
| WA SFV Services benchmark (£ per line | 144.45 | 148.33 | 150.16 | 151.81 | 149.96 | 148.92 | 157.06 |
| WA ARPU (£ per line) | 262.38 | 285.58 | 295.03 | 278.72 | 279.44 | 272.08 | 263.44 |
| Difference, above benchmark | 82% | 93% | 96% | 84% | 86% | 83% | 68% |

498.  The competitive benchmark used is broken down as follows:

Standard Line Rental:

|  | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|---|---|
| SLR direct costs(£ per line) | 96.53 | 99.15 | 99.90 | 100.45 | 98.41 | 97.01 | 101.01 |
| Indirect costs(£ per line) | 34.80 | 35.74 | 36.61 | 37.37 | 37.69 | 38.24 | 41.68 |
| SLR total costs(£ per line) | 131.33 | 134.89 | 136.51 | 137.83 | 136.10 | 135.26 | 142.69 |
| SLR net margin(£) | 12.89 | 13.24 | 13.39 | 13.52 | 13.35 | 13.27 | 14.00 |
| SLR SFV Services benchmark (£ per line) | 144.22 | 148.13 | 149.91 | 151.35 | 149.46 | 148.53 | 156.69 |

Weighted Average Q(£:A) of three product-specific benchmarks

|  | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|---|---|
| SFV average direct costs(£ per line) | 96.74 | 99.34 | 100.13 | 100.87 | 98.88 | 97.37 | 101.35 |
| Indirect costs(£ per line) | 34.80 | 35.74 | 36.61 | 37.37 | 37.69 | 38.24 | 41.68 |
| WA total costs(£ per line) | 131.55 | 135.08 | 136.74 | 138.25 | 136.56 | 135.62 | 143.03 |
| WA net margin(£) | 12.91 | 13.25 | 13.42 | 13.56 | 13.40 | 13.31 | 14.03 |
| WA SFV Services benchmark(£ per line) | 144.45 | 148.33 | 150.16 | 151.81 | 149.96 | 148.92 | 157.06 |

499.  It can be seen that, taking 2015/2016 as an example, and on the basis of SLR, the annual price of £250 was some £105 more than the cost benchmark of £145 (using rounded figures).

500.  By contrast, the outcome of Dr Jenkins' "baseline" case is that, for every relevant year, the price was actually _less_ than the competitive benchmark, so that no question of any excess could possibly

123

arise. See the summary of monthly prices in the Output tab of the spreadsheet provided by BT on 18 March 2024 ("the BT Spreadsheet") reproduced in short form below.

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| Using SAC Combi, 25% margin, and baseline common costs: | 23.32 | 26.13 | 28.47 | 28.64 | 33.11 | 35.24 | 35.61 |
| SFV Services ARPU: | 21.86 | 23.80 | 24.59 | 23.23 | 23.29 | 22.67 | 21.95 |

501.  If, by way of example, the monthly figures for 2015/2016 are converted into annual figures, they become £279.84 for the benchmark and the lesser sum of £262.32 for the price.

502.  It will be noted that the monthly figures for the benchmark and price used by Dr Jenkins' BT Spreadsheet, as set out above, differ slightly from those used at Figure 6.10 of HJ1 (shown at paragraph 551 below). There are two reasons for this. First, the competitive benchmark has changed slightly because BT has now agreed the direct costs figures used by Mr Duckworth. Second, and in relation to ARPU, the economic experts later agreed that the ARPUs used should exclude BT employees, which has the effect of slightly reducing the monthly ARPU.

503.  It is common ground that any proposed competitive benchmark must consist of the following elements:

(1)    Direct costs;

(2)    Indirect costs; and

(3)    A reasonable profit margin.

504.  It is also agreed that indirect costs consist of two elements. The first element consists of indirect incremental costs. The second is concerned with common costs. Dr Jenkins has defined these terms in Table 6.1 of HJ1. A shortened version of those definitions follows:

> "Direct costs:  Costs that can be directly and exclusively attributed to the particular service in question (e.g. cost of network access).
> Indirect costs:  Costs that support the provision of multiple services and are not exclusively attributable to one particular service only (e.g. marketing costs, IT costs and other overheads).
> Incremental costs: Costs directly caused by producing a specified additional product, service or increment of output over a specified time period. The incremental costs of a service can be estimated as the difference between the total costs of a firm in a scenario where the service is provided and the total costs in another situation where the service is not provided. In other words, they are the costs that would be avoided in the long run if a given service is no longer produced.
> Common costs:  Costs which arise from the provision of a group of services but which are not incremental to the provision of any individual service, as they are not directly caused by any individual service."

505.  It should be added that both direct and indirect costs can be either incremental costs or common costs.

506. We did not understand Mr Parker or Mr Duckwo1ih to disagree with the above. The descriptions given by Mr Duckwo1ih at paragraph 3.6 and 3.8 of MD1, on the key aspects of these te1ms, seem to us to be the same.

507. ill this case, the relevant agreed direct costs consist principally of the WLR charges paid by BT to Opemeach. BT said that, in its case, these direct costs were entirely incremental to the provision of voice services, but that different aITangements applied to the wholesale products purchased by other retailers. The agreed figures are now reproduced in the Direct Costs table of the CR's Spreadsheet as follows:

| | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|---|---|
| SLR direct costs(£ per line) | 96.53 | 99.15 | 99.90 | 100.45 | 98.41 | 97.01 | 101.01 |
| LRP direct costs(£ per line) | 96.87 | 99.26 | 100.13 | 101.31 | 99.46 | 97.98 | 102.54 |
| LRS direct costs(£ per line) | 99.21 | 103.62 | 105.04 | 106.72 | 105.92 | 105.73 | 105.57 |
| SFV average direct costs(£ per line) | 96.74 | 99.34 | 100.13 | 100.87 | 98.88 | 97.37 | 101.35 |

508. So, by way of example, for 2015/2016 and on an annual basis, the direct costs of providing SLR were £96.53 or £96.74 on average SLR costs. The latter yields a monthly figure of £8.06.

509. As for indirect costs, for the reasons given below, Mr Duckwo11h's methodology did not distinguish between the incremental costs and common costs elements of indirect costs. Dr Jenkins' methodology did. To use 2015/2016 again as an example, Mr Duckwo1ih's model included £34.80 as the total indirect costs figure on an annual basis. By comparison, Dr Jenkins' total indirect costs figure came to £113.51, so over 3 times as much as Mr Duckwo1ih's. That figure of £113.51 was split into £21.17 for incremental costs and £92.34 for common costs. This would yield monthly figures of £1.76 for incremental costs and £7.69 for common costs.

510. The final element is the reasonable profit margin. This is considered to fonn a paii of the economic cost of supply, since any sustainable competitive price must include sufficient reward to investors to justify the allocation of their assets to the activity in question. The CR's case is that such a mai·gin would be no more than 8.9% on a return on sales (i.e. profit divided by revenue) basis. ill those circumstances, Mr Duckwolih accepted that one could take the maximum reasonable mai·gin on the CR's case as being 10%. For her part, Dr Jenkins says that a reasonable mai·gin would be 25%, with 20% as a conservative fallback.

511. Table 5.1 of HJ2 (an updated version of Table 6.11 of HJl) sets out a compai·ison between Mr Duckwo1ih's and Dr Jenkins' results using annual figures (some of the inputs like direct costs ai·e

slightly different because of agreement over direct costs but the differences are immaterial for these comparative purposes):

Table 5.1    Comparison between Mr Duckworth's and my 'cost plus' benchmark for SFV Services (£/line/year, excluding VAT)

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21[1] | 2021/22[1] |
|---|---|---|---|---|---|---|---|
| **(A) Cost of Sales per line** | | | | | | | |
| Mr Duckworth | 96.68 | 99.22 | 99.96 | 100.52 | 98.36 | 96.70 | 100.49 |
| Dr Jenkins | 92.05 | 99.22 | 100.16 | 100.52 | 98.36 | 96.70 | 100.50 |
| **(B) Relevant Indirect (SG&A and D&A) costs per line** | | | | | | | |
| Mr Duckworth | 34.80 | 35.74 | 36.61 | 37.37 | 37.69 | 38.24 | 41.68 |
| Dr Jenkins | 113.51 | 133.60 | 153.02 | 151.08 | 191.94 | 212.68 | 212.88 |
| Of which: | | | | | | | |
| Incremental SG&A and D&A | 21.17 | 20.30 | 21.21 | 22.23 | 22.69 | 23.31 | 24.96 |
| Contribution to common costs | 92.34 | 113.30 | 131.80 | 128.85 | 169.25 | 189.38 | 187.92 |
| **(C) Total costs per line (A + B)** | | | | | | | |
| Mr Duckworth | 131.48 | 134.96 | 136.57 | 137.90 | 136.05 | 134.95 | 142.17 |
| Dr Jenkins | 205.56 | 232.82 | 253.17 | 251.60 | 290.30 | 309.39 | 313.38 |
| **(D) EBIT margin per line** | | | | | | | |
| Mr Duckworth (8.9%) | 12.90 | 13.24 | 13.40 | 13.53 | 13.35 | 13.24 | 13.95 |
| Dr Jenkins (25%) | 68.52 | 77.61 | 84.39 | 83.87 | 96.77 | 103.13 | 104.46 |
| **(E) "Cost plus" benchmark (C + D)** | | | | | | | |
| Mr Duckworth | 144.38 | 148.21 | 149.97 | 151.43 | 149.40 | 148.19 | 156.12 |
| Dr Jenkins | 274.08 | 310.43 | 337.56 | 335.47 | 387.07 | 412.52 | 417.84 |

**Mr Duckworth's Methodology**

512.    Mr Duckworth's starting point is that what is needed, to reach the competitive benchmark (excluding the reasonable margin element), is the "LRIC+" of the SFV Services. "LRIC" are "long run incremental costs", which comprise all incremental costs, whether direct or indirect, which would be avoided if the product in question was not, or was no longer, supplied. The "+" denoted a further costs element which is not itself incremental. This comprises such proportion of the common costs of the product in question and other products, as is to be borne by the product in question. Since, by definition, common costs cannot be attributed to any particular product, the amount of such costs to be borne by the product in question cannot be determined with the same degree of certainty as the other costs. This, according to Mr Duckworth, is the appropriate starting point, since it gives effect to the "costs plus" determination required under the case-law. We should interpose here to add that Dr Jenkins, while also seeking to establish the competitive benchmark, says that the

126

LRIC+ approach, in this particular context, is inapposite, because it does not take account of the demand and supply side interrelationships between SFV Services and other products and is therefore insufficiently flexible (see JES 7.1.1).

513.    As already noted, the Communications Act 2003 gave Ofcom the power to declare that a given telecoms operator has significant market power in a particular market. Where it did so, it could impose "ex ante" remedies. These included caps on charges. BT was designated as having SMP in 8 separate residential retail fixed voice service markets. From 2003-2006, Ofcom imposed price caps upon it. Another available remedy was a requirement for the body concerned to produce cost accounting statements to ensure that its obligations to customers were being met. This requirement was imposed on BT which had to produce annual Regulated Financial Statements ("RFS") between 2005 and 2009. The RFSs included:

(1)    Primary Accounting Documents ("PAD") which explained the principles applied in formulating the RFS;

(2)    Secondary Accounting Documents ("SAD") which, among other things, set out how costs and revenues were attributed to particular services; and

(3)    Current Cost Financial Statements; these included the published cost accounting information and a statement from Ofcom, a Statement of Responsibility from BT, and an auditor's opinion. For 2009, the latter was provided by PricewaterhouseCoopers LLP ("PWC").

514.    The Current Cost Financial Statements in question ("the CCFS") contained an opinion that they had been prepared in accordance with the PAD and the SAD.

515.    Section 1 of the PAD sets out a number of relevant principles which govern the formulation of the CCFS. The following are material here:

> "Principle 3 - Cost Causality
> Revenue (including appropriate transfer charges), costs (including appropriate transfer charges), assets and liabilities shall be attributed to network components, wholesale services and retail products in accordance with the activities which cause the revenues to be earned or costs to be incurred or the assets to be acquired or liabilities to be incurred.
> Where it is not possible to attribute revenues, costs, assets and liabilities in accordance with the preceding paragraph, the attribution shall be such as to present fairly the revenues, costs, assets and liabilities accounted for in the Regulatory Financial Statement for each SMP Market or Technical Area (as applicable), as disaggregated, where BT has a regulatory financial reporting obligation and to present fairly a comparison between the Markets or Technical Areas (as applicable) as disaggregated.
>
> Principle 4 - Objectivity
> The attribution shall be objective and not intended to benefit either BT or any other Operator, or any product, service or network component.
>
> Principle 5 - Consistency of Treatment
> There shall be consistency of treatment from year to year. Where there are material changes to the Regulatory Accounting Principles, the Attribution Methods, or the Accounting Policies that have a material effect on the information reported in the Regulatory Financial Statements of a Market or Technical Area (as applicable), BT shall restate the parts of the previous year's Regulatory Financial Statements affected by the changes."

516.   As Mr Duckworth states in paragraph 5.69 of MD1, the first part of Principle 3 implies that where possible, costs are attributed on a causal basis so as to arrive at genuinely incremental costs. For non-incremental costs, which would include genuinely common costs, they were to be attributed on a "fair" basis. The PAD does not give any further detail as to what the "fair basis" entailed.

517.   Section 2 of the PAD then sets out how those principles are applied, although even here, the description is at a fairly high level with much more detail coming later (bullet format omitted):

"2. Attribution Methods
2.1 Introduction
The Regulatory Financial Statements is produced using the Accounting Separation (AS) system. The principal objectives of the AS system is:
To provide a high quality mechanism for the production of Regulatory Financial Statements
To provide the foundation for the derivation of LRIC Statement of Costs.
 To provide visibility of cost attributions.
To demonstrate that the costs incurred in providing services and products in downstream Markets include charges equivalent to those paid by other operators and service providers for services supplied from upstream Markets.
That it should be an integrated platform for the production of all BT's regulatory and internal product reporting requirements.

The fundamental feature of the approach applied to attribution is adherence to the principle of causality. Each item of income, cost and capital employed recorded in BT Group's accounts is attributed to the products, services and components which make up the separate Markets in which BT operates.

Attribution methodologies are regularly reviewed and enhancements introduced to reflect, for example, changing technologies while the apportionment bases, which are the practical application of these methods to actual values, are updated at least annually. A BT process has been established to validate all attribution methods to achieve objective bases.

Each item of income, cost and capital employed is attributed to a "cost centre" according to the way in which the activity, element of plant or product gave rise to that income, cost, asset or liability. The pool of costs, assets and liabilities of each cost centre can then be attributed to further cost centres or products until each cost centre is exhausted and all revenue, costs and capital employed are associated with products and services.

2.2 Concepts of Attribution
The fundamental feature of this approach to attribution is adherence to the key principle of causality.  Each item of income, cost and capital employed recorded in BT Group's accounts is attributed to the network components, services and products which make up the separate Markets in which BT operates.

Income and cost items are attributed to the relevant activities and components by either allocation or apportionment.

Allocated income and costs represent items of income, operating costs and capital employed which can be assigned wholly to a particular component, service or product by virtue of information in the accounting records.

Apportioned income and costs represent items of income, cost and capital employed that cannot be identified directly to any one component, service or product, and are shared between two or more components, services or products on an appropriate basis.

BT's approach to apportionment is to seek to identify the appropriate driver for each item and, as far as possible, to use objective operational and/or financial data relevant to that driver to generate apportionment bases.

This approach to the process of attribution of financial information to components, services and products can be summarised as follows:
Review each item of cost and revenue, assets and liabilities.
Establish the driver, i.e. the process that caused the cost to be incurred or the revenue to be earned.

Use the driver to attribute the cost to components, services or products.
Use the driver to attribute revenue to retail products or wholesale services.
The general concepts of attribution in Accounting Separation are set out below:
Revenue: Revenue is recorded in the accounting records in such a manner that it is usually possible to allocate it directly to wholesale services or retail products. Where it is not possible to allocate directly, revenue is attributed to the relevant service or product using information from BT's billing systems

Costs: Costs are drawn from the accounting records. The processes applied to the costs, which vary according to the nature of the costs and the way in which they are recorded, are set out below.

o Allocation: Certain costs can be directly associated with particular activities and plant groups and, therefore, do not require apportionment. These costs include most of the provision and installation costs, maintenance costs and depreciation directly related to customer-facing activities, such as installation of private circuits or maintenance of customer premises equipment. They also include the direct plant costs, which are the prime operational costs of activities that relate to BT's network. Some of these costs can be directly attributed to primary plant groups, such as local lines, local exchanges, or transmission. There are other plant group costs, such as some of the costs of plant testing and power equipment costs, which are allocated to support plant groups and then apportioned to primary plant groups.

o Apportionment: Other costs cannot be directly associated with particular activities and plant groups, and require apportionment. In the case of network costs this process makes extensive use of engineering data reflecting not only each plant group type (e.g. local lines, transmission equipment) but also the type of technology (e.g. metal and fibre local lines, PDH and SDH transmission equipment). Certain other costs can be identified within the accounting records as relating to a discrete function such as repair centre costs, computing or billing. A review of this function, often by the means of work/application analyses or a survey of staff activity, establishes the cost driver and is used to apportion its costs between activities and, if applicable, plant groups.
The remaining costs to be apportioned cover a number of central support units (e.g. motor transport, accommodation) and other specialist departments that support network activities, customer facing operations and head office functions (e.g. the legal department).
Hence costs are initially either linked to directly allocated costs or apportioned to support functions, activities or plant groups using appropriate cost drivers. BT uses a number of techniques and sources to apportion these costs, such as surveys of staff activity, analyses of research programmes, application analyses, or operational data such as space occupancy records.

o Corporate Costs: Although BT utilises, wherever possible, objective data relating to these cost drivers, there is, however, some corporate expenditure for which no specific apportionment bases can be readily derived. These corporate costs are apportioned to activities and plant groups so as to reflect the value added by management effort as reflected in the pay and fixed assets within each activity or plant group. So, any individual Market will be charged on the basis of all corporate costs divided by pay plus a percentage of fixed assets multiplied by that Market's pay plus the percentage of fixed assets."

518.    Mr Duckworth's view is that the methodology underlying the RFS was likely to produce accurate estimates of the LRIC+ cost of residential fixed voice services, because the production of the RFS was a regulatory requirement, and BT had to expend significant resources on determining costs in accordance with it. The footnote to paragraph 5.70 of MD1 recorded that in 2007, BT said that the regulatory financial reporting obligations cost it several million pounds each year. BT has not suggested to the contrary. Mr Duckworth also noted that there was the audit opinion referred to above. At paragraph 5.71 he said that he therefore considered that the operating cost categories in the RFS, on a per-line basis, provided an appropriate estimate of the LRIC+ cost of the corresponding activities for SFV Services (including access) for BT in 2009. Also, the CCFS dealt with voice services specifically and therefore, according to Mr Duckworth, they were an appropriate

proxy for the SFV Services, bearing in mind that in 2008/2009, BT was still not permitted to provide bundles.

519.    Of course, the relevant starting point for these claims is not 2009, but 2015/16. There were no more RFSs (in relation to retail voice services) after 2009 which attributed costs specifically to voice services (or to any particular services within BT Consumer as a whole). Indeed, there were no further relevant RFSs at all. To deal with this issue of timing, what Mr Duckworth did was to update the 2009 figures for indirect costs on the basis of the CPI index, first to reach figures for 2015/16 and then figures for each succeeding year in the claim.

520.    Dealing first with the figures for 2009, what Mr Duckworth does is to take the total costs of providing those voice services, excluding direct costs, in other words all indirect costs. The CCFS did not break these down further into incremental and common costs. See paragraphs 5.66 and 5.67 of MD1. Using the figures provided in Section 9.1 of the CCFS for 2009 (and also some information contained in BT's s135 Response to Ofcom in 2017), Mr Duckworth then calculated that the total access costs were £266m (see the first column in the CCFS p78) and the cost of calls were £174m (see the 2nd to 5th columns). The total is £440m. He then divides this by the number of lines, at the time being 14.73m. This means that the total "non-network" costs were £29.87 per line for 2009, on an annual basis.

521.    Mr Duckworth then applied the CPI index to the £29.87 figure for 2009 to convert it into a figure for 2015/2016. He did this by increasing the £29.87 by 16.51%. This gave a figure of £34.80. He then made a year-on-year increase across the claim period, again using the CPI index. See Table 19 under paragraph 5.86 of MD1.

522.    This is also shown in the table reproduced in the Benchmarks tab of the CR Spreadsheet. See also the comparative tables at Table 6.11 and Figure 6.12 of HJ1, which illustrate the radical differences between Mr Duckworth and Dr Jenkins on the extent of indirect costs (both incremental and common) attributed to SFV Services. Thus, Mr Duckworth's figure for 2015/2016 is £34.80, as noted above, while Dr Jenkins' is £113.51, of which £92.34 represented the common costs contribution from SFV Services.

523.    Mr Duckworth's view was that there was no method other than using the RFS and updating it to determine indirect costs which was either appropriate or practical.

524.    We should add that Mr Duckworth used a number of comparators, along with what Ofcom had said about BT's margin in 2006 (when it was about to be released from its price cap) to support his view. We refer to details of this below when discussing his reasonable margin analysis.

**Dr Jenkins' methodology**

*Derivation of BT Consumer Common and Incremental Costs*

525.    Dr Jenkins' approach is quite different. Her starting point, insofar as data is concerned, consisted of the figures produced by BT Consumer for each of the relevant claim years and in particular its SG&A ("Sales, General & Administrative") costs and its D&A ("Depreciation and Amortisation") costs. These comprised all of the indirect costs for BT Consumer. Since they were not "disaggregated" further for each of BT Consumer's component services (which included SFV, bundles, Sport and TV, among others) Dr Jenkins undertook the following tasks:

(1)    For the whole of BT Consumer, identifying which of the indirect costs, in her view, were incremental and which were common; she did this by first ascertaining which of the costs were common – whatever was not said to be common was deemed to be incremental;

(2)    Of the incremental costs so ascertained, estimating what part of them were incremental to SFV Services only;

(3)    Of the common costs so identified, identifying what contribution to those costs should be made by SFV Services only.

526.    Dr Jenkins' allocation of indirect costs to their incremental or common components is critical to her entire competitive benchmark analysis. She first considered each SG&A and D&A cost item shown in BT Consumer's Profit and Loss data, so as to establish a reasonable estimate as to which proportion of such costs were likely to be incremental and which were likely to be common across the board. This had to be done to avoid simply assuming that all of such costs were common. The exercise of apportioning incremental and common costs is set out in Annex 7 to HJ1. Put briefly, Dr Jenkins considered the descriptor given for each particular class of costs and "scored" it in terms of its likelihood of being a common or incremental cost. See the terms used as set out in A7.1 of Annex 7. It follows that the exercise undertaken by Dr Jenkins assumed that all of the common costs within the reported SG&A and D&A cost items were common to every aspect of BT Consumer. In other words she did not take account of the possibility that some indirect costs might be common as between voice and broadband services but not to (say) TV.

527.    The result of this scoring exercise is at Tables A7.2 – A7.4. In each case, the amount of the relevant cost for the year is given and Dr Jenkins then states reasons for her particular score. The overall results of the scoring are then given in Table A7.5 for the SG&A costs and in Table A7.6 for the D&A Costs. In both cases, Dr Jenkins sets out her primary "Baseline" case, but then alternative "Low" and High" scenarios as well.

528. For all years, her baseline case for SG&A costs is that over 30% of them were common, and in the case of D&A, over 60% were common. On a combined basis, the common costs over the claim years ranged from 39% to 46% of BT Consumer's total SG&A and D&A costs. See Table A7.7.

### Table A7.5    Proportion of SG&A costs deemed common costs

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19[1] | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| "Baseline" scenario | 33% | 32% | 32% | 33% | 39% | 40% | 37% |
| "Low" scenario | 21% | 19% | 20% | 20% | 25% | 26% | 24% |
| "High" scenario | 46% | 45% | 45% | 46% | 54% | 55% | 51% |

### Table A7.6    Proportion of D&A costs deemed common costs

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| "Baseline" scenario | 64% | 65% | 65% | 65% | 65% | 65% | 65% |
| "Low" scenario | 49% | 50% | 50% | 50% | 50% | 50% | 50% |
| "High" scenario | 79% | 80% | 80% | 80% | 80% | 80% | 80% |

### Table A7.7    Proportion of Total SG&A and D&A (combined) costs deemed common costs

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| "Baseline" scenario | 40% | 39% | 39% | 42% | 45% | 46% | 43% |
| "Low" scenario | 27% | 26% | 26% | 29% | 31% | 31% | 30% |
| "High" scenario | 53% | 52% | 52% | 56% | 60% | 61% | 57% |

529. Since the actual amounts for SG&A and D&A costs are given, Dr Jenkins' scoring exercise is then able to yield particular figures for common costs and incremental costs separately, applying the percentages she gave in the scoring exercise.

530. In this context, Dr Jenkins said that where there was no, or only a limited, description of the relevant costs item, she also made use of (as a guide and no more), the approach taken by Ofcom in its "Fixed Access Market Reviews Approach to the VULA Margin - Confidential Statement" of 19 March 2015 ("the VULA Margin Statement"). VULA stands for "Virtual Unbundled Local Access" which is a wholesale product sold by Openreach (then a wholly-owned BT subsidiary forming its "access division"). The VULA product is necessary for those communication providers who wished to provide superfast broadband. Ofcom's concern was that BT (through Openreach) could set a price for VULA provision which meant that there was an insufficient margin between that price and the

retail superfast broadband price; this would give rise to the risk of a "margin squeeze" on BT's competitors seeking to enter and operate in the superfast broadband market. The object was to impose a condition requiring BT to set the VULA charge so as to maintain a minimum VULA margin, with a requirement on BT to provide the data necessary to monitor compliance every six months. This would be consistent with Ofcom's regulatory aim to ensure that BT could not use its SMP in the wholesale market to set the VULA margin, such that it would cause retail competition in superfast broadband to be distorted. See paragraph 7.1 of the VULA Margin Statement.

531.   The VULA margin exercise conducted by Ofcom was relevant here, according to Dr Jenkins, because part of it involved Ofcom seeking to allocate a proportion of BT Consumer's SG&A costs. Ofcom gave its view as to which particular SG&A costs could be considered "short-run variable" ("SRV") or "long-run variable" ("LRV"), which Dr Jenkins said approximated to incremental and common costs, in the sense that an item labelled SRV would have a lower proportion of common costs than one labelled LRV. Dr Jenkins set out Ofcom's categorisation of the relevant costs at paragraph A7.7 in Annex 7. But she emphasised that she used the VULA Margin Statement as a guide only.

532.   The next stage in Dr Jenkins' analysis was to allocate a proportion of the incremental costs (as opposed to common costs) of BT Consumer which she had identified, to SFV Services. Unlike the RFS, which used the principle of costs causality to allocate incremental costs, Dr Jenkins used the so-called EPMU (Equi-proportional mark-up) approach. This allocated incremental costs in proportion to direct costs. She did this because she said she did not have a means of allocating those costs on the basis of costs causality, as she had no costs causation drivers. She added that, had she allocated the incremental costs on the basis of number of lines or number of customers, the outcome would not be materially different.

*SAC Combi*

533.   That then left the task of deciding how BT Consumer's total common costs (as now ascertained by Dr Jenkins) should be borne by its various constituent services and in particular, by the SFV Services.

534.   For this assessment, Dr Jenkins uses a SAC Combinatorial ("SAC Combi") approach. SAC stands for "Stand-Alone Costs". These are the costs that would have been hypothetically incurred in producing a given service or increment if it was offered on a standalone basis, i.e. by a firm producing only the relevant service or increment. Accordingly, if BT Consumer's only service was provision of the SFV Services, <u>all</u> of its common costs would have to be recovered from SFV Services. What that would look like, according to Dr Jenkins, is shown, on a monthly basis for

2015/2016, at Figure 6.7 of HJ1. On that footing, common costs would represent by far and away the most significant element of the competitive benchmark.

535.   However, as Dr Jenkins explained at paragraph 6.134, this would not be an appropriate way to recover common costs from SFV Services because, of course, there were in fact other services within BT Consumer that make, and would be expected to make, a contribution to the recovery of common costs overall. The question then is how to distribute those contributions across all of BT Consumer's services, and in particular, ascertaining what contribution should be made by SFV Services. This is where the SAC Combi approach comes in.

536.   At this point we should say something more about the conceptual basis for the SAC Combi approach. The idea behind it is to replicate what would happen in contestable markets – i.e. a market where effective competitive constraints were exerted by a credible threat of easy entry into each and every activity. The question that drives the SAC Combi approach is: how much flexibility would a multi-product firm have to recover its common costs, if it was subject to a credible threat of entry from rival suppliers who produced each and every possible combination of those products? This assessment is conducted within the overall competitive constraint that the sum of all the profit contributions across the products that share common costs should not over-recover those common costs.

537.   To take an example, suppose a firm supplies 4 products A, B, C, D that share common costs and the issue is the reasonable common cost recovery achieved on product A. If an entrant tried to compete on the basis of product A only, it would need to recover the whole of its common cost from sales of A, so this would correspond to the SAC of product A. That would therefore represent a comparatively high reasonable price benchmark for product A. But if the entrant instead chose to compete on the basis of A+B, or A+C, or A+B+C, etc., the entrant would be able to recover the same common costs across a broader base of sales and this could well lead to a lower reasonable price benchmark for product A. By exploring these different entry options (or combinations) the SAC Combi test yields a benchmark that imposes a stronger standard on the incumbent firm when setting the price of A.

538.   The aim of Dr Jenkins' use of this approach is thus said to be to assess the contribution to common costs which products other than SFV Services (but which share the same common costs as SFV Services) actually make towards the recovery of common costs. To the extent that such common costs are not recovered from the sale of these other products, they are then attributed to SFV Services.

539.  As there are a variety of products within BT Consumer, the SAC Combi exercise required that different combinations of the individual services be tested together, so that the range of differing contributions to common costs could be fully ascertained.

540.  Dr Jenkins therefore decided to use a total of 25 combinations of services for the period up to April 2018, and 24 combinations for the period thereafter. The reason for the difference in numbers is that after April 2018, the Voice Only element of SFV Services became irrelevant due to the Commitments. The different combinations are defined and set out at paragraphs 6.141-6.145 and Table 6.9 of HJ1.

541.  For each combination of services, there was actual data in terms of (a) combined revenue, and (b) direct costs (dealt with in detail in Annex 6 to HJ1). There was also data as to the relevant amount of incremental costs as a result of Dr Jenkins' allocation exercise set out above. There was also, of course, the total common costs of BT Consumer as also ascertained by Dr Jenkins.

542.  The next steps are set out at paragraphs 6.146-150 of HJ1 and described in more detail at Annex 8.

543.  In summary, for each combination, Dr Jenkins first calculated a putative ARPU (as a proxy for price) which consisted of the entire BT Consumer common costs, the direct costs, the allocated incremental costs (all of which Dr Jenkins here refers to *en bloc* as SAC) together with a margin which would represent 25% of the putative revenue. 25% was chosen because that is the reasonable profit margin which Dr Jenkins separately considers should be allowed to SFV Services. Mathematically, this means that the putative ARPU can be calculated by multiplying the SAC (as here defined by Dr Jenkins) by 4/3. She refers to this as the "Benchmark Combination Revenue" ("BCR").

544.  The next step is to calculate the <u>actual</u> revenue for all the elements in a particular combination (including SFV Services) for the year in question, which Dr Jenkins calls "the Observed Revenue" ("OR"). This is done on an annual basis. The differential between BCR and OR is then calculated. If the OR is less than the BCR, it means that the OR could in theory be increased to the point at which all of the SAC are recovered plus the margin i.e. the BCR. If, on the other hand, the OR was higher than the BCR, then it would have to be decreased so as to avoid the making of excessive profits which are here defined as profits over and above the revenue required to discharge all the SAC plus the margin.

545.  As it happens, on the basis set out by Dr Jenkins and taking 2015/2016 as an example, the OR was always below the BCR, which meant that there was "headroom" in theory for the revenue (i.e. the price) of the total combination to increase.

546.    The annualised differential figure is then divided by the number of lines to reach a per line annual differential. Here, it is important to note that Dr Jenkins uses the total number of BT's voice lines, whether within SFV Services or within any bundled product. She says that she does this in order to reflect the commercial strategy on the part of BT to have a single price for voice, whether provided on a stand-alone basis or with other products.

547.    Dr Jenkins then divides the per line annual differential into a monthly differential so as to reach an increment which should be added to the actual SFV price so as to enable that particular combination to achieve its BCR. This exercise is shown at Table A8.2 in Annex 8. The final uplifted figures for SFV Services are shown for 2015/2016, by way of example, at Figure 6.8 of HJ1. The putative benchmark price will vary across each Combination because the revenue, incremental and direct costs for each Combination will be different, even if the total common costs figure is the same.

548.    For Combination 1, which is SFV Services only, a putative ARPU of £28.47 is generated by taking 4/3 of the SAC which was £21.35. Then £7.12 is added, being 25% of £28.47 which is the margin for that case. See Figure 6.7 of HJ1. In other words, in order to recover all of the SAC (which includes <u>all</u> of BT Consumer common costs) together with a reasonable margin, the price would have to be £28.47. The figures here are easy to calculate because this is in truth not a combination at all, but simply SFV Services. It follows that the competitive benchmark yielded for that "combination" will be the highest of any combination, because there is no prospect of a contribution to common costs coming from any other product.

549.    The final part of the SAC Combi exercise for any given year is then to select the lowest competitive benchmark for SFV Services entailed by the different Combinations. Dr Jenkins explains the basis for this in HJ1 as follows:

> "6.150 In order to ensure that my SAC Combinatorial "cost plus" benchmark does not allow SFV Services to over-recover common costs (i.e. does not include common costs which are not reasonably attributable to SFV Services), I identify the lowest "cost plus" benchmark for SFV Services from the range of combinations, which I call the "binding constraint".
>
> 6.151 The "binding constraint" is the lowest level "cost plus" benchmark for SFV Services that ensures that no relevant combination earns returns above its SAC plus a 25% EBIT margin. The "binding constraint" for each financial year is therefore my "cost plus" benchmark for SFV Services for that financial year."

550.    Figure 6.8 shows that the lowest monthly putative ARPU for 2015/2016 is £22.84, being the figure generated for Combination 23.

551.    Figure 6.10, shown below, then compares the benchmarks resulting from the SAC Combi exercise for each relevant year with the actual known ARPUs for SFV Services for each year. It can be seen that in no case, does the actual ARPU exceed or even reach the competitive benchmark. On that basis, according to Dr Jenkins, there is no excess pricing for the purposes of Limb 1, since the actual price never exceeds the competitive benchmark at all. These figures are updated and changed

slightly in the Results tab of the BT Spreadsheet for the reasons given above, but the difference in result is not material.

**Figure 6.10    Comparison between SFV Services ARPU and the SAC Combinatorial "cost plus" benchmark (baseline common costs scenario)**



552. It will be seen from the results for 2015/2016, that the monthly contribution to common costs is about £8 per line. The total monthly common costs for all of BT Consumer's services, as shown in Figure 6.7, is £11.92 per line. In other words, the competitive benchmark figure for 2015/2016 includes about two thirds of BT Consumer's total common costs (as identified by Dr Jenkins).

553. The annual figures for all of this are shown in Table 5.1 of HJ2 set out at paragraph 511 above.

554. According to Dr Jenkins, the use of a SAC Combi exercise is appropriate, because it recognises both that it cannot be correct to load all of BT Consumer's common costs on to SFV Services, given the other services that exist and contribute, but also that considerable flexibility should be permitted to the operator in terms of how common costs are recovered. This is especially because, by definition, there is no principle of causality which can attribute such costs across the different services.

*DSAC Cross-Check*

555. In addition, and as a cross-check, Dr Jenkins also undertook an analysis on a Distributed Stand-Alone Costs ("DSAC") basis. This involves, again, an allocation of common costs to the different individual services. Her starting point is the same as for the SAC Combi exercise, namely her ascertainment of what part of BT Consumer's SG&A and D&A costs are common, as opposed to incremental, and then her allocation of incremental costs to different services. The difference with

the DSAC approach is that instead of allocating common costs as a result of the SAC Combi exercise, they are allocated to individual services within a "broad increment" of services on a simple EPMU basis. On this alternative footing, according to Dr Jenkins, there is still no excessive pricing. See paragraphs 6.156-6.158 and Figure 6.11 of HJ1 (itself set out under paragraph 860 below).

*Dr Jenkins' Sensitivities*

556.    Finally, Dr Jenkins then applies two conservative sensitivities to her conclusions from the SAC Combi exercise. First, she has her "low" common costs scenario as set out in Annex 7, and second she has an alternative reasonable margin of 20% instead of 25%. The effect of using these sensitivities is shown at Table 6.10. This shows that price was still below the costs benchmark where the margin is 25% but with a low common costs scenario. For baseline costs and 20% margin, price exceeded the benchmark only in 2015/16 and 2016/17 and then only very slightly. For low common costs and a 20% margin, price exceeded the benchmark only in 2015/16 and 2016/17 and then only by 9.3% and 2.9% respectively. A further comparative table with all the different alternatives is at the Results tab of the BT Spreadsheet.

*Comparative Tables*

557.    A useful comparison between the very significant difference in outcomes from Mr Duckworth's and Dr Jenkins' respective analyses is shown at Table 6.11 and Figure 6.12 of HJ1, reproduced below (Table 6.11 has been updated in Table 5.1 of HJ2, set out at paragraph 511 above):

**Table 6.11      Comparison between the CR's and HJ my "cost plus" benchmark for SFV Services (£ per year, per line, excluding VAT) [Confidential: Information for Financial Years 2020/2021 and 2021/2022]**

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
| **(A) Cost of sales per line** |  |  |  |  |  |  |  |
| CR | 96.68 | 104.86 | 99.95 | 100.49 | 98.44 | 96.76 | 100.51 |
| Dr Jenkins | 92.05 | 99.22 | 100.16 | 100.52 | 98.36 | 96.70 | 100.50 |
|  |  |  |  |  |  |  |  |
| **(B) Non-network costs per line** |  |  |  |  |  |  |  |
| CR | 34.80 | 35.74 | 36.61 | 37.37 | 37.69 | 38.24 | 41.68 |
| Dr Jenkins | 113.51 | 133.60 | 153.02 | 151.08 | 191.94 | 212.68 | 212.88 |
| Of which: |  |  |  |  |  |  |  |
| Incremental SG&A and D&A | 21.17 | 20.30 | 21.21 | 22.23 | 22.69 | 23.31 | 24.96 |
| Contribution to common costs | 92.34 | 113.30 | 131.80 | 128.85 | 169.25 | 189.38 | 187.92 |
|  |  |  |  |  |  |  |  |
| **(C) Total costs per line (A + B)** |  |  |  |  |  |  |  |
| CR | 131.48 | 140.60 | 136.56 | 137.86 | 136.13 | 135.00 | 142.19 |
| Dr Jenkins | 205.56 | 232.82 | 253.17 | 251.60 | 290.30 | 309.39 | 313.38 |
|  |  |  |  |  |  |  |  |
|  | **2015/16** | **2016/17** | **2017/18** | **2018/19** | **2019/20** | **2020/21** | **2021/22** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **(D) EBIT margin per line** | | | | | | | |
| CR (8.76%) | 12.62 | 13.50 | 13.11 | 13.23 | 13.07 | 12.96 | 13.65 |
| Dr Jenkins (25%) | 68.52 | 77.61 | 84.39 | 83.87 | 96.77 | 103.13 | 104.46 |
| | | | | | | | |
| **(E) "Cost plus" benchmark (C + D)** | | | | | | | |
| CR | 144.11 | 154.10 | 149.67 | 151.09 | 149.20 | 147.96 | 155.84 |
| Dr Jenkins | 274.08 | 310.43 | 337.56 | 335.47 | 387.07 | 412.52 | 417.84 |

558.  On an annualised basis Dr Jenkins' analysis (see Annex 3 to BT's Closing and Table A6.3 of Annex 6 to HJ1) is as follows:

| | Unit | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|---|
| Number of SFV Services Lines | #m | 2.67 | 2.09 | 1.67 | 0.59 | 0.46 | 0.37 | 0.28 |
| Number of Voice lines across BT Consumer | #m | 9.56 | 9.29 | 8.93 | 8.41 | 7.07 | 7.65 | 6.93 |
| Proportion of SFV Services to total voice lines | % | 28% | 23% | 19% | 7% | 6% | 5% | 4% |
| SAC Combi Baseline Scenario | | | | | | | | |
| Total BT Consumer Revenue | | 4,373 | 4,676 | 4,709 | 4,682 | 4,486 | 4,114 | 4,253 |
| Total BT Consumer Costs | | 3,564 | 3,887 | 3,988 | 3,982 | 4,114 | 3,988 | 3,815 |
| Total BT Consumer Cost of Sales | | 2,580 | 2,912 | 2,963 | 2,911 | 2,885 | 2,748 | 2,837 |
| Total indirect costs (SG&A and D&A) | £m | 983 | 975 | 1025 | 1071 | 1229 | 1240 | 1261 |
| Common costs across BT Consumer | £m | 390 | 379 | 398 | 427 | 548 | 562 | 541 |
| Amount allocated to SFV Services (under 25% margin scenario) | £m | 243 | 241 | 225 | 79 | 80 | 73 | 55 |
| % of BT Consumer common costs | % | 62% | 64% | 57% | 19% | 15% | 13% | 10% |
| % of BT Consumer total Costs | % | 11% | 10% | 10% | 11% | 13% | 14% | 13% |
| | Unit | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Amount allocated to SFV Services (under 20% margin scenario) | £m | 217 | 218 | 205 | 69 | 72 | 67 | 49 |
| % of BT Consumer common costs | % | 56% | 58% | 52% | 16% | 13% | 12% | 9% |
| Total SFV Services Revenue | £m | 784 | 681 | 592 | 464 | 408 | 365 | 283 |
| SFV Services Revenue as a percentage of BT Consumer Revenue | % | 18% | 15% | 13% | 10% | 9% | 9% | 7% |
| Total Revenue from voice in bundles | £m | 1,684 | 1,801 | 1,850 | 1,769 | 1,663 | 1,579 | 1,571 |
| Total voice in bundles Revenue as percentage of BT Consumer Revenue | % | 68% | 73% | 76% | 80% | 80% | 81% | 85% |

559.  For the sake of completeness, we should add that both sides (but principally BT) have produced other analyses, taking into account points made by the other. These will be referred to below.

## REASONABLE MARGIN

### Introduction

560.  Although the assessment of the reasonable rate of return in the costs-plus analysis is, in one sense, at the end of that analysis - because it is added to the costs to arrive at the competitive benchmark - it is necessary to consider it at the outset here.

561.  This is principally because Dr Jenkins' SAC Combi exercise itself involves the application of the margin - see paragraph 543 above.

562.  In addition, however, Dr Jenkins introduces an "upper-bound" element to the eventual margin she adopts.

563.  In very broad terms, the extent of the dispute between the parties is this: Mr Duckworth postulates an 8.9% margin, but in the hot tub discussion, he was prepared to move somewhat to say that the maximum could be 10%. For the sake of clarity this 10% margin would imply an 11.1% margin if calculated as a mark-up over costs excluding the margin itself. The discussion below employs the margins discussed by the experts on the former rather than the latter basis, although the difference

140

of calculation is purely mathematical. The former basis is referred to as the EBIT margin which is operating profit divided by total revenue.

564.   For her part, Dr Jenkins' primary EBIT margin is 25%. That is itself the 90th percentile of a range of margins which she produces. But as an alternative, she would accept 20%, which is the midpoint of her 75th and 80th percentiles. For the sake of completeness, we would add here that her aggregated median percentile is about 14%. See Table A5.8 in Annex 5 to HJ1, shown in paragraph 615 below.

565.   Unlike the calculation of the underlying costs (see below), in the context of a reasonable margin, it is not the case that the experts have each chosen entirely different models. Instead, they have considered, in the main, (a) a number of different but allegedly comparable firms and industries, (b) what EBIT margins have been reported by BT at various stages, and (c) what Ofcom has said on the subject. We concentrate on these three different aspects, along with Dr Jenkins' upper bounds model.

**The Law on Reasonable Margin**

566.   The case-law recognises that a company may legitimately want to cover its cost of capital which corresponds to the profit which enables it to remunerate its investors at the appropriate level. It must therefore in general reflect the minimum sustainable return that investors would expect to earn in the relevant business in order to make it worthwhile for them to commit funds to it. In economic terms, this minimum sustainable (or "normal") return is part of the cost of providing the good in question, since investor funds are a resource that is required for the good to be supplied, and investors will provide that resource only if they receive adequate compensation for doing so, just as would be the case for any other necessary input to the supply of the product.

567.   The cases do not, however, prescribe any particular approach to the determination of a reasonable margin other than the fact that it should be a "reasonable", as opposed to the highest possible such margin. One approach may be to look at return on capital employed ("ROCE"). Another is return on sales ("ROS"). Both sides here have adopted some form of ROS approach on the basis that an ROCE approach does not work here, given the nature of the SFV business.

**Mr Duckworth's Approach**

*BT's Reported Margins 2004-2006*

568.   Mr Duckworth obtained his 8.9% figure from BT's reported net EBIT margins for its retail residential fixed voice services for 2004-2006 being 9.9% (the CR's Closing says 10.1% but Figure 5 of MD1 shows it as slightly lower, though the difference is immaterial here), 8.8%, and 8.9%, respectively. He chose 8.9% as the latest reported margin within those years. Mr Duckworth then sought to corroborate that figure, as it were, by a number of other data points.

569.    First, we consider the correctness or otherwise of taking BT's reported margin from 2006. Mr Duckworth fixed on this year because it was the last year in which BT's voice charges were regulated by Ofcom. This therefore suggested that margins at that level were considered not excessive, and moreover, that it was not now necessary to constrain them. An important point made by Mr Duckworth here was that at this stage, Ofcom's own perception of the market was that there had been considerable change, with substantial growth in competition which would develop further. Ofcom also noted the decline of BT's market share. The markets were becoming dynamic, competition was growing and with competitive pressure on BT increasing, this looked set to continue. Technical developments continued apace. All of this led to the need to consider whether price regulation was still necessary, and Ofcom found that it was not. See paragraphs 4.37-4.41 of its 2006 Statement.

570.    Mr Duckworth's view was that this growth in competition suggested that BT's prices - and hence its margins – were at or above a competitive level by 2006. It would therefore be wrong to discount the reported 2006 margin as irrelevant simply because it reflected a regulated price. We agree with that.

571.    There was much discussion between the experts in the hot tub (Day 14/146-Day 15/22) as to what exactly Ofcom was doing in 2006, and the extent to which it expected BT's margin to go up because this would lead to entrants coming in, and whether, in doing so, Ofcom was looking at this as a short-term measure because ultimately, such market entry would drive BT's margins down.

572.    In the end, we were not much assisted by the exercise of trying to divine Ofcom's true thinking in 2006, especially as Ofcom was in any event entitled to look at things differently, as indeed it did in 2009 and 2017. And of course, we are not ultimately bound by Ofcom's views and decisions.

573.    Of course, in the event, BT's voice services' reported margin did increase after 2006 to reach just under 21% by 2009 (see the RFS). It had been 16% in 2008. Yet, as is pointed out by BT, Ofcom did not intervene. Indeed, at that point, it removed regulation from BT's residential voice services altogether on the basis that it no longer had SMP. See Ofcom's 2009 Statement. It is to be noted that in the summary, Ofcom stated that price regulation had been removed in 2006 "Given the improvement in competition in the market". It also said that as at 2009, "The market was effectively competitive" with competition likely to increase.

574.    BT therefore suggests that the 21% margin earned by it in 2009 is a better starting point than 2006 for a reasonable margin analysis if one is looking at BT's previous reported voice margins. We can see the force of this point, although it is possible that this higher margin might be consistent with the outcomes that arise from workable competition, and yet still be higher than the minimum profit level that would be necessary sustain competition.

575.    Ofcom also noted in 2009 that BT's costs had decreased faster than revenues. It said that the evidence suggested that BT had maintained profitability by reducing costs, but strong conclusions were difficult to make from gross margin data. However, Ofcom clearly felt that the increased margins (in some cases, accompanied by increased prices) could not simply be put down to BT's market power, and obviously Ofcom concluded that it did not at that stage have SMP.

576.    Mr Duckworth, for his part, concluded that there was an element of market power at this point, because the significant cost savings made by BT were not being passed on to the customers, which it is argued is what would necessarily happen in conditions of workable competition. We understand this argument, but it largely reflects the general position of the CR and its experts, which sought to equate the zero excess profits of perfect competition with the more nuanced concept of workable competition.

577.    A further point made by Dr Jenkins was that BT Consumer's margins had fluctuated considerably between 2012 and 2021. They were 14% in 2012/13, rising to about 20% in 2014/15 and then declined to 3% in 2020/21. While there was a degree of circularity in using BT Consumer's own margins to assess the reasonable level of return here, she said that the range of returns here supported the idea of using an "upper bounds" approach.

578.    In fact, and as Mr Duckworth notes at Figure 3 at p59 of MD2, between 2015/2016 and 2020/2021, BT Consumer's actual margins were lower than its margins, shorn of the alleged excessive margin in SFV Services, and significantly so between 2015/2016 and 2017/2018. For that latter period, the adjusted margin for BT Consumer was between around 11% and 14%, with much lower margins for the following 2 years. Of course, there is some circularity here as well because Mr Duckworth has used the CR's full case on the excess pricing; as he says at paragraph 5.118 he subtracted Mr Parker's estimate of the quantum of overcharge in each year of the claim.

579.    In the light of what we have said above, we do think there are some problems with Mr Duckworth's use of 2006 as a starting point, although BT's alternative starting point of 2009 is not free from difficulty either. However, we do need now to consider what Mr Duckworth describes as cross-checks for his 10% figure, which consist of a number of comparators, together with what Ofcom said about BT's margin in its Conclusions in 2017.

*Mr Duckworth's Comparators*

580.    Mr Duckworth's comparators consist of other UK telecoms companies, namely the Post Office, Virgin Media, TalkTalk, Utilities Warehouse and Phone Co-op.

581.    The Post Office margin data relied upon by Mr Duckworth are notable for relating specifically to the Post Office's SFV activities. Mr Duckworth points out that the Post Office's SFV margins were

always less than 10% for the period when it operated in the voice-only market, i.e. 2014-2017, the actual percentages being -15%, 10%, 5% and 10% respectively. See Table 22 at MD1 p84.

582.   The other comparator margins relied upon by Mr Duckworth related to broader sets of services than specifically SFV. Over the period 2010 to 2019, the average margins for Sky, Virgin Media, TalkTalk, Utilities Warehouse and Phone-Co-op were 16.9%, 7.4%, 6.9%, 5.3% and 2% respectively (see Figure 7 in MD1 which relates to their overall EBIT margins). He said that these companies were engaged in similar activities with a similar business model to BT Consumer. Also, his approach was conservative, because all the comparators had a higher capital intensity than SFV Services which would tend to increase the margins required (we deal further with the question of capital intensity in paragraphs 630 - 632 below).

583.   Sky, with its 16.9% margin, is the obvious outlier here if one compares it to Mr Duckworth's 10% figure. Mr Duckworth says that it is a less reliable comparator because a high proportion of Sky's revenue comes from Pay-TV, which has a different and higher capital intensity element than SFV Services. He further notes that Sky took significant risks in entering this market and was likely to have significant intangible assets, such as content rights and brand and subscriber relationships, which potentially justify higher returns.

584.   In the hot tub discussion on Day 15, Dr Jenkins said that this is not a reason to exclude Sky from consideration altogether, and it should form part of the range. She added that merely because a comparator had a differentiated offering, that was not a reason to discount it on the basis of a particular product mix, since that is just how the market is. Mr Duckworth agreed that differentiation is important in this market, but said that from an investor point of view, differentiation is just a means to an end, and that investors will not require different returns just because there are differentiated strategies within different suppliers. We see this, but overall, we would not rule out Sky as a comparator, broadly for the reasons given by Dr Jenkins, although we note its particular position, and of course, it does not support a margin as high as Dr Jenkins' 20-25% figure.

585.   On Virgin Media (7.4%), Dr Jenkins said that it had to be remembered that Virgin was a vertically integrated company. Her point was that Mr Duckworth had criticised her choice of comparators for including vertically integrated companies which would tend to have higher capital intensities, and yet here, he was including one such company. However, that point does not go anywhere because, as Mr Duckworth observed, if one took the approach that companies with more assets would have higher margins, then this would mean that 7.4% for Virgin should be regarded as the top end of the scale. Mr Duckworth therefore accepted that Virgin Media was not a perfect comparator, but argued that this imperfection made his estimate conservative.

586.  As for TalkTalk at 6.9%, Mr Parker thought that this was probably the closest comparator, although, as Dr Jenkins pointed out, it stopped actively marketing voice-only services in 2014, shortly before the claim period. Moreover, it expressed the view to Ofcom that there was not much incentive to stay in the voice-only market, even bearing in mind BT's high margins. See paragraph 462 above. The fact that TalkTalk later decided to cease supplying voice-only services altogether (save for existing customers) suggests that its margin was below the minimum sustainable level. So one needs to apply some caution to TalkTalk's margin in our view.

587.  On any view, however, Mr Duckworth's range of margins here are considerably below Dr Jenkins'.

588.  We accept that Mr Duckworth uses only 6 comparators and Dr Jenkins criticises this as being too few in number. However, the fact remains that they are all in (or include) a market which supplied voice-only services, and we consider that we should attach weight to them although of course they are hardly conclusive on the point.

589.  Mr Duckworth then looks at the margins in postal, energy and water sectors. Here, Ofcom had found that 5-10% was a reasonable margin for Royal Mail. In its energy market investigation, the CMA noted that margins were around 3.5% for 2009-2014 and that 1.5% was consistent with competition for an established supplier. Finally, Ofwat set a margin of 1% for domestic water supply. See paragraphs 5.132-5.133 of MD1.

590.  However, Dr Jenkins observed that these were very different business models and in the end, Mr Duckworth accepted that he did not place a huge amount of weight on them as comparators. He said that he recognised that there was potentially more innovation in the telecoms market. On that basis, we do not place any significant weight on these utility sector comparators. We would note, however, that if margin comparisons drawn from industries that differ from SFV and other retail telecom activities are inherently problematic, this problem could apply equally to the broader industry margin comparators on which Dr Jenkins relies for her analysis.

*Ofcom's 2017 Provisional Conclusions and a 10% margin*

591.  The CR relies upon various passages in the 2017 Provisional Conclusions to show that in 2017, when Ofcom was considering imposing price regulation on SFV Services, it took the view that a 10% EBIT margin was appropriate for VOCs. To understand this, it is necessary to set out a number of passages from the 2017 Provisional Conclusions and the Annex thereto.

592.  First, in the conclusions themselves, Ofcom stated as follows:

> "8.2 In developing proposals for the appropriate level of prices for an SFV control, we have considered the following factors:
> • Protecting consumers from prices above costs: as set out in Section 6, our analysis suggests that BT's prices of SFV services are above what we would expect to see in a competitive market. Given past price increases

and BT's current level of profitability, customers of SFV services are paying considerably more than they should be.
• Promoting competition in the provision of SFV services: in Section 7 we discuss remedies to support increased consumer engagement and encouraging competitive entry and expansion. These remedies will not be effective in promoting competition if we reduce the price of SFV services below the level at which it is profitable for other CPs to acquire SFV customers. When dealing with SFV customers, these acquisition costs may be quite substantial, although such costs should be reduced if engagement remedies prove to be effective.

8.3 We therefore face a trade-off between controlling prices in a way that protects consumers and ensuring that we do not reduce them by so much that we weaken the scope for growth in competition (taking into account the impact of any engagement remedies discussed in Section 7). We can strike this trade-off in various ways with a range of options on a price control….

8.17 BT currently earns revenue of approximately £["24] per month (ex VAT) from SFV subscribers on average. Our estimates of BT's costs suggest it achieved profitability (ROS) for SFV services in 2015/16 of c.34-42%, which equates to profit of about £8-10 per line per month (ex VAT). Our analysis suggests that a ROS of no more than 10% is consistent with a cost based estimate of profitability for a provider of retail voice services, which equates to profit of between £["1] and £[2.50] per month. We could therefore reduce prices for SFV services by around £[8] per month (ex VAT) in order to reduce BT's profitability on these consumers to a cost based level, which equates to a decrease in prices that consumers experience of between £8-10 per month (inc VAT).

8.18 However, as discussed below, an adjustment of this size would be highly likely to make it uneconomic for other CPs to compete in offering SFV services and acquiring customers. Other CPs incur substantial acquisition costs when acquiring customers, which BT does not incur when serving its existing SFV subscriber base. These costs make other CPs less profitable when compared to BT. Even if the engagement remedies we discuss in Section 7 are effective, some acquisition costs will remain meaning it is unlikely that other CPs would be able to profitably supply SFV customers if prices were set on the basis of BT's costs. We would therefore only use an £8-10 reduction in prices if we were not also imposing engagement remedies. We discuss below the level of price reduction that is still consistent with competition emerging.

**A competitive benchmark for SFV retail prices**
8.19 In order to understand how much we could reduce prices by and still expect competition to emerge, we have looked a number of different measures in order to estimate a competitive benchmark. Analysis of these options is set out in more detail in paragraphs A5.70 to A5.86.

**BT's historic levels of profitability for SFV voice services:**
8.20 In 2009 we removed retail regulation on the basis that the retail market was competitive. BT's level of retail profitability at this time was at a level at which we believed regulation was no longer necessary, given the market circumstances. At that time BT was struggling to maintain its market share and, despite the removal of retail price controls in 2006 did not appear to have the commercial freedom to raise retail prices. Accordingly, the level of profitability that BT achieved on retail services at that time provides us with a starting point for the level of profitability that we believe is consistent with a market that is sufficiently competitive not to require regulation.

8.21 In 2009, we assessed BT's profitability using ROS and have used the same approach for this assessment. Our assessment of ROS in 2009 suggests a margin for BT of c.20% is consistent with emerging competition. If a similar margin was applied today, BT's monthly line rental would need to be reduced by approximately £["5.80] (ex. VAT)."

593.   The CR relies in particular on the statement at paragraph 8.17 which we have underlined for emphasis.

594.   However, Figure A5.14 in Annex 5 to the 2017 Provisional Conclusions is also relevant. It provides as follows:

**Figure A5.14: BT's estimated EBIT margins for SFV services [✂]**

| Line rental (£/month inc. VAT) | Estimated EBIT margins in 2016/17 financial year | Comment |
|---|---|---|
| £18.99 | BT: ~ 34-42%<br>Other CPs: ~ [■■■■■■■]% | BT's current price |
| £13.99 (£5 adjustment) | BT: ~ [✂<25]%<br>Other CPs: ~ [■■■■■■■]% | Lower estimate consistent with promoting competition |
| £11.99 (£7 adjustment) | BT: ~ [✂<20]%<br>Other CPs: ~ [■■■■■■■]% | Upper estimate consistent with promoting competition |
| £10.99 (£8 adjustment) | BT: ~[✂<15]%<br>Other CPs: ~ [■■■■■■■]% | Similar to BT's estimated EBIT margin for fixed voice and fixed broadband combined |
| £8.99 (£10 adjustment) | BT: ~[✂<10]%<br>Other CPs: ~ [■■■■■■■]% | |

595. BT contends that the statement in paragraph 8.17 of the conclusions is effectively irrelevant. This is because Table A5.14 shows that if there were to be a £7 price drop (which transpired to be the case in the Commitments), then this would still be permitting BT to make an EBIT margin of 20%, which is Dr Jenkins' alternative margin. So BT positively relies on the 20% figure here.

596. However, we think that the position is not as simple as that. What the Table shows is that a margin for BT of 20% is consistent with promoting competition. This obviously refers back to what Ofcom had said in the passages quoted at paragraph 592 above, namely that Ofcom would want to set a price which nonetheless enabled effective competition to emerge, given that competitors face higher customer acquisition costs than BT. Thus, there needed to be a trade-off between controlling the price to protect consumers, but also ensuring that the scope for growth of competition in the market was not weakened. See in particular paragraphs 8.2 and 8.3. Effectively, as we see it, this is all about providing sufficient incentives for sustaining competition in the market by other suppliers. Ofcom's Figure A5.14 implies that in view of the cost asymmetries between BT and its rivals, allowing BT to earn an SFV margin of 20% would enable rivals to sustain their SFV operations at a margin of between ■% and ■%, and that this latter range is a truer depiction of Ofcom's view of the competitive margin.

597. We also agree that as a matter of law, the reasonable margin for the purpose of the cost-plus analysis under Limb 1 should not be based on a price designed to incentivise entry into the market. In *Liothyronine*, the Tribunal dealt with an appeal from a decision of the CMA that the various pharmaceutical company appellants had abused their dominant position (they had raised prices by

147

over 1,100%) and the imposition of a financial penalties which totalled £101m. The appeal against the decision as to abuse was dismissed, although the financial penalties were reduced in some respects.

598.    In its judgment, where there were many grounds of appeal, the Tribunal agreed with the approach taken by the CMA in rejecting the use of comparators consisting of entry-incentivising prices as a valid competitive benchmark. While the use of the latter expression in paragraphs 317 and 318 of the judgment might suggest that what was being referred to here was the benchmark for Limb 1 purposes, in fact, both the CMA and the Tribunal said that it was more appropriately to be considered in the context of Limb 2. This does not matter for present purposes. The Tribunal said that it would be incorrect to use entry-incentivising prices in this way because to allow a position whereby a dominant firm's pricing could not be regarded as unfair so long as it was below an entry-incentivising price, instead of protecting consumers, could allow the firm to benefit from high barriers to entry. See generally, paragraphs 137 and 317-320 of the judgment.

599.    It is, of course, correct, that the facts in *Liothyronine* (especially as to barriers to entry, the hypothetical nature of the entry-incentivising price levels that were presented, and the excessive prices charged) were very different from this case. It is also true that at least in part, the appellants in *Liothyronine* had advocated that the CMA was obliged to consider comparators such as entry-incentivising prices, whereas here they are being considered simply in the context of analysis of how Ofcom was regarding BT's margin as part of the exercise of determining a reasonable margin under Limb 1. Nonetheless, and as the CR contends, we think that *Liothyronine* has some application here and for that reason, we do not think that BT can simply seize upon Ofcom's reference to a 20% BT margin in the context of proposing a £7 reduction as support for its claimed margin of 25% or 20%.

600.    On the other hand, the reference by Ofcom to 10%, as referred to in paragraph 8.17 of the 2017 Provisional Conclusions set out at paragraph 592 above, is not free from difficulty either if it is to be used to justify a reasonable margin of that order in this context. After all, Figure A5.14 above shows that a margin of 15% was similar to BT's estimated margin for fixed voice and fixed broadband combined. That figure would have been the result, according to Ofcom, of an £8 reduction rather than £7 reduction in line rental. This was one of the options which Ofcom considered in paragraph 8.17 save for the point about promoting competition. Indeed, the margin of 15% in the Ofcom Figure makes no reference to promoting competition at all.

601.    On that basis, and for the purposes of Limb 1, we do not agree that the CR can rely strongly on what Ofcom said in paragraph 8.17 about a 10% margin, though it is not wholly irrelevant. We think that if weight should be attached to what Ofcom said about the margin here, it is equally valid to refer

to the 15% figure as well. What we also agree is that BT cannot place any real reliance here on the 20% figure for the reasons we have given in paragraphs 598-599 above.

602.   Yet further, as matters turned out, while some of BT's competitors had already stopped actively marketing SFV services prior to the introduction of the Commitments (see paragraphs 118-119 above) what the Commitments (including the associated engagement remedies) did not do was lead to a general increase in competitors promoting SFV Services in order to acquire greater market share. ███████████ Virgin Media ███████████ was no longer strongly promoting SFV Services from August 2021. On that basis it would suggest at least that the margin required by BT's competitors to sustain their SFV operations was towards the top end of the Ofcom ███ % margin range (if not above it).

**Dr Jenkins' analysis**

*The Upper Bounds Point*

603.   First, we deal with Dr Jenkins' "Upper bounds" approach. This denotes Dr Jenkins' approach to the collections of the various margins she has taken from her data-sets to select those margins which constitute the 90th percentile of the ranges which amounts to 25%. As an alternative to that, she takes the margin at the 75th/80th percentile which yields 20%. That is, in contradistinction to, for example, taking the median margin. As it happens, the overall median margin taking the aggregate of all the different comparator datasets is about 14%. See Table A5.8 under paragraph 615 below.

604.   Dr Jenkins says that it would be wrong to take the average of all the margins because "this would imply that at least half the firms were earning excessive returns", and that conclusion should not be drawn from the data.

605.   The position of Mr Parker and Mr Duckworth is that the average should be used. Mr Parker also points out that any given margin above the average would not necessarily fall to be judged excessive in the Limb 1 sense. There are many reasons why one firm may be able to charge more in a particular market than another. It does not follow that one firm's pricing is necessarily excessive, or that any of them is a precise comparable for SFV services. Further, any excess has to be significant and persistent. For our part, we do not see why the upper bounds approach is required for the particular exercise of ascertaining a reasonable margin. After all, what one is trying to do here is to get a sense from the comparators as to what margin the other companies actually achieve. This is of considerable evidential value, but it does not mean that one has to take the upper bound of the range.

606.   In the hot tub discussion and in her report, Dr Jenkins expressed the reason for the upper bound by saying that taking the upper end is reflecting the natural reward for the risks being taken, innovation and investment, and suppliers at this level having judged the challenge well. Mr Duckworth and Mr

Parker disagreed with this. They point out, as is the case, that the question of rewards for innovation and risk-taking are not really relevant here, since SFV Services constitute a mature legacy product.

607.   Further, to the extent that it was suggested that the margin should be increased to take account of other factors, such as a general need for caution in the exercise or flexibility, Mr Parker and Mr Duckworth say that these are matters that should more properly be considered in connection with the issue of "significant and persistent" or perhaps under Limb 2. Mr Parker said that if one uses too much discretion at the stage of assessing the reasonable margin, one might reach a margin which makes the costs plus benchmark so high that "anything goes". We agree with this. It is also consistent with the Commission's decision in *Aspen*. There, the Commission adopted as the reasonable margin, the median measure of the relevant comparators which yielded a margin of 23%. There was then a separate question as to whether Aspen's prices were significantly in excess of that benchmark. See paragraphs 132-136 and 139 of *Aspen*.

608.   A further justification ventured by Dr Jenkins was that the upper bound was needed to signal to other investors that there were opportunities to earn a return. We recognise that in many workably competitive markets there will be a range of different margin outcomes across different firms, but as noted above, we see the task of defining the reasonable margin benchmark as being to describe the minimum sustainable margin that could justify the continued support from investors in the business concerned. Further, and to the extent that this suggested that there was no previous entry and expansion at all, that is not correct, as there was growing competition from at least 2006, according to Ofcom. See paragraphs 569 and 571 above.

609.   In the JES, Dr Jenkins also sought to justify the upper bounds approach on the basis that there were different common costs and demand and supply side relationships within the comparators. However, we do not see the relevance of this, since common costs is separately addressed here and demand-side factors do not really assist on what is a reasonable margin. Dr Jenkins added that the upper bound would "reduce Type 1 errors (over-enforcement)," and assist in the analysis of significance. Of course, one needs to take a careful approach in determining the competitive benchmark to ensure that the approach as to what is a significant excess is not erroneous, and use caution where appropriate. But that does not itself justify an upper bounds model here. Nor do we see how the upper bound approach would assist on the separate question of significant excess anyway.

610.   Indeed, the dangers of Dr Jenkins' approach can be seen by paragraph 599 of BT's Closing as follows:

"Moreover, in taking an upper bound approach to the rate of return, Dr Jenkins has constructed a Cost Plus benchmark that (as she put it in the hot tub on Quantum) not only "*recognises the dispersion [in prices] by taking the upper end of the distribution of returns*" but "*is capturing some elements of economic value, brand, efficiency, all of those elements*". Her benchmark thus reflects a price that is *fair*, in the sense that it makes

appropriate allowance for the full range of prices that would be consistent with workable competition and thereby captures the considerations that are relevant to both Limb 1 and Limb 2 of the *United Brands* test."

611. This is to conflate separate elements of Limbs 1 and 2, and if that is what Dr Jenkins' approach is doing, then it is not only incorrect as a matter of legal analysis, but it becomes inherently uncertain. The remedy for this is not the dropping of the reasonable margin down to 20% based on the 75th/80th percentile; it is to remove the upper bounds approach from the Limb 1 assessment altogether.

612. Finally, and as already explained, the upper bounds approach leads to an increase in the common costs assessment within the SAC Combi approach since the relevant costs margin is built into the calculations for each combination. See below.

613. For all of those reasons, we do not accept Dr Jenkins' upper bounds approach. It seems to us to be sensible to select for consideration an average or a midway point in terms of the outcome of her review of comparators.

*Dr Jenkins' comparators*

614. Dr Jenkins comparators are of two kinds:

   (1) Clusters of companies in industries which can be considered similar to BT Consumer i.e. other telecoms operators ("Similar Industries Cluster"); and

   (2) Clusters of companies with similar financial metrics to BT Consumer, regardless of the nature of the products ("Similar Metrics Cluster").

615. Dr Jenkins then compiles tables of results, including all percentiles for each of these sets and then produces an aggregate set of results. This is at Table A5.8 in Annex 5 to HJ1, shown below:

**Table A5.8    Operating Profit (EBIT) Margin for all BT Consumer comparators**

|                 | FY 2013-2022 | FY 2013-2017 | FY 2018-2022 |
|-----------------|--------------|--------------|--------------|
| Min             | -98.3%       | -94.4%       | -98.3%       |
| 10th percentile | 3.2%         | 3.1%         | 3.4%         |
| Median          | 14.1%        | 13.7%        | 14.3%        |
| Mean            | 13.6%        | 13.5%        | 13.7%        |
| 75th percentile | 19.2%        | 19.0%        | 19.3%        |
| 80th percentile | 21.0%        | 20.8%        | 21.4%        |

|                 | FY 2013-2022 | FY 2013-2017 | FY 2018-2022 |
|-----------------|--------------|--------------|--------------|
| 90th percentile | 25.0%        | 24.5%        | 25.3%        |
| Max             | 57.1%        | 53.1%        | 57.1%        |
| # Companies     | 133          | 127          | 131          |
| # Observations  | 1215         | 580          | 635          |

616. The Similar Industries Cluster is broken down into four elements. The first two come from the MSCI World Index. MSCI is the investment research company Morgan Stanley Capital International. The

first element is companies within two classifications, being "Diversified Telecommunication Services" and "Wireless Telecommunication Services". The second element consists of companies within "Diversified Telecommunication Services" only.

617.    The third and fourth elements come from the database of Professor Damadoran, who teaches corporate finance and valuation at the Stern School of Business at New York University and provides data on industry averages for US and global companies. The third element consists of companies within his European "Telecom Services" and the fourth element consists of that classification of companies plus "Cable TV".

618.    Dr Jenkins has taken the reported margins of a number of companies that fall within one or more of these elements.

619.    For the first element, the reported EBIT margins over the period 2013-2022 or subsets of that period, are drawn from 29 companies. At the 90th percentile, the average margins are between 23.2% and 23.9% while on a median basis, they are 16.6%-16.7%.

620.    The second element relates to 23 companies, themselves a sub-set of the first group of companies. Here the margins at the 90th percentile are 23.1% to 24%, with the median being 16.7% to 17.3%.

621.    The third element draws margins over the same groups of years from 52 to 55 companies, including major or state-owned telecoms companies in Europe. The 90th percentile has a range of 20.9% to 25.7% and the median is 9.3% to 11.3%.

622.    The fourth element, which adds in Cable TV companies (on the basis that BT Consumer also supplied TV services) has between 57 and 60 companies, which include those in the third element. On that basis, the margins at the 90th percentile were 23.5% to 27.6% and the median was 12.7% to 13.1%.

623.    One then turns to Dr Jenkins' Similar Metrics Cluster. This concerns margins from datasets relating to companies which are said to have similar financial characteristics to BT Consumer, though not in terms of particular products or marketing. This cluster consists of three elements.

624.    The first element contains 11 or 12 companies, whose capital intensity is within the range of BT Consumer's (if one includes EE and Plus net). The 90th percentile margin is between 27.6% and 28.9% and the median of 15.6% to 16.9%.

625.    The second element contains 17 companies whose ratios of D&A to Opex (operating expenses), lie within BT Consumer's range of such ratios. Here the 90th percentile has margins of 21.9% to 24%, with the median being 10.1% to 11.3%

626.    The third element contains 43 or 44 companies whose D&A to Revenue ratios lie within the range of BT Consumer's such ratios. Here the 90th percentile yields margins of 24.5% to 26% and a median of 12.3% to 13.6%.

627.    As already noted, the results from both clusters are drawn together and aggregated in Table A5.8, shown in paragraph 615 above.

628.    As the relevant margins all vary somewhat, depending upon which group of years is being considered, Dr Jenkins has taken the mid-point of the 90th percentile, and that gives the 25% margin, which is her starting point.

629.    As to all of her comparators, the CR criticises first, the Similar Industries Cluster, on the basis that some of the companies are vertically integrated with high capital intensity, and operate networks as well as retail services. Also, they include capital intensive companies that are not "asset light", as it is agreed that SFV Services in particular, and BT Consumer as a whole, are. Mr Duckworth considers that such companies that own an infrastructure network would need higher margins to compensate their investors for the capital invested in the networks, in addition to the capital employed in the retail part of their businesses. So they would be more likely to resemble returns for BT Group, which includes an asset-heavy infrastructure, such as Openreach. So to that extent, they are not useful comparators because the margins will be skewed upwards.

630.    On the point of using comparators with high capital intensity, Dr Jenkins agreed that there is a correlation between capital intensity and margin, but in practice it is not a very strong one. In particular, she said at paragraph 7.2.4 of the JES that firms with low capital intensity can earn a wide range of returns, and while BT Consumer is "asset light", based on the accounting book value of the assets in its accounts, this does not mean that the economic value of its assets on which investors require a return on investment, is low. For example, the book value of an asset may not reflect its current market value and may also omit intangible assets such as brand value, investments in customer acquisition and other economic rights which are not recorded as assets in a company's accounts due to accounting conventions. To support all of this she produced Figure 3, in Section B4f in the Annex to the JES. This "scatter plot", shown below, displays an extremely varied relationship between EBIT margins and capital intensities of a very large number of companies, and a simple regression result that shows the extent to which margins increase with capital intensity. Therefore, overall, she considers that the point about capital intensity has limited force:

**Figure 3**    **Relationship between EBIT Margin and Capital Intensity for the MSCI World constituents for the period FY2013–FY2022**



Note: Total number of observations: 10,830. Capital intensity is the independent variable, EBIT margin is the dependent variable. The p-value of the slope coefficient is 0 under the null hypothesis that the slope coefficient equals 0.The sample only includes observations for which a value for both the capital intensity and the EBIT margin is available in a given year. I exclude all observations that have a capital intensity which falls outside the range [0,5] and/or have an EBIT margin that falls outside the range [-25%,100%].

631.    Mr Duckworth disagreed, on the basis that the scatter plot in Figure 3 could contain asset measurement discrepancies related to book value and discrepancies based on whether brand value was taken into account.

632.    Overall, here, we think there is more force in Mr Duckworth's point about capital intensity than Dr Jenkins would allow, and which is not simply answered by the scatter plot. Indeed the red regression line on the scatter plot shows, on an average basis, a positive relationship between margins and capital intensity, although it is fair to say that no evidence was provided on the statistical significance or robustness of that relationship.

633.    So far as the Similar Metrics Cluster of companies is concerned, Mr Duckworth says that the comparators are inappropriate because they are very different businesses and in very different markets (for example, BMW, Nippon Steel and Starbucks). They also include large global businesses which are not asset-light. Also, on the capital intensity comparators, Dr Jenkins has used data from BT Consumer, which includes EE and Plus net. However, EE is vertically integrated as it operates a network, so this would again skew the results.

634.    As for the second and third elements within this cluster, which focus on D&A ratios, Mr Duckworth says that D&A does not include any amortisation which is not shown on the balance sheet. Also, there would be a difference in the nature of the assets used and their operational lives, with BT Consumer's assets tending to be relatively short lived and there could be accounting differences as well. All of that could skew the margins upwards.

635. As to all of that, Dr Jenkins responded that it is usual to take a broad range of comparators which is what competition authorities and regulatory bodies do when trying to work out a benchmark for return on sales. We see that and accept that it is not possible to find perfect comparators. We also think that (as is perhaps inevitable in an exercise of this kind) there are weaknesses in the particular clusters of companies that Dr Jenkins has chosen. This is the corollary of the similar point that we made, and which Mr Duckworth accepted, concerning the dangers of relying on return on sales margins from non-comparable utility companies.

636. As already noted, we also think that comparators drawn from similar telecoms operators in the UK (as Mr Duckworth has selected) are likely to be of more assistance, although they are by no means perfect comparators.

637. In fact, much of the difference between the experts here lies in Dr Jenkins' use of the upper bounds approach, since her median figure is in fact about 14%.

638. One then needs to consider Dr Jenkins' cross-checks. We have already dealt above with BT Consumer's margin in 2009 and the treatment of its margin in the 2017 Provisional Conclusions.

639. However, there are further data-points relied upon by Dr Jenkins. First, she referred to another part of the 2017 Provisional Conclusions where Ofcom stated that rivals' margins for voice customers were similar to BT's - see paragraph 8.21. However, Ofcom also said at paragraphs 8.24 and 8.25 that such figures should be treated with caution, since there was an element of price leadership and issues over data reliability. There could also be an element of price dispersion depending on the quality of the services. Ofcom's own figures were therefore caveated.

640. Dr Jenkins also relied upon Ofcom's estimate of BT's margins for dual play (a competitive market) of 15-20%. However, Mr Duckworth considered Ofcom's approach here was over-simplified. This is because it is assumed that profitability was a combination of profitability per line for voice and broadband, adjusted for BT Sport costs. But that ignored the differences in the mix of services provided to SFV customers and bundle customers, and variations in price. In any event, margins drop significantly after 2017. Again, we see those points but do not consider that such margins were wholly irrelevant. See also the specific reference by Ofcom to 15% in Table A5.14 referred to in paragraphs 600-601 above.

641. Finally, as already noted, one cannot simply rely upon BT Consumer's reported results from 2012 to 2022 (3% to 20%) because this includes the returns on SFVs which are themselves alleged to be excessive. If these returns were adjusted to remove the excessive element (though of course we accept there is something of a circularity here, as noted above), they would be much nearer 10%.

**Conclusion on reasonable margin**

642.    We have taken all of the evidence on margin referred to above into account, giving it such weight as we consider appropriate, recognising that the material before us does not lead to one clear answer.

643.    In our judgment, having regard to all the matters discussed above, we consider that the appropriate reasonable margin is 13.5%. In summary, this level of margin lies well below the 25% margin advocated by Dr Jenkins, and her alternative 20% for the reasons described above. It does, however, come close to her median figure of 14%. However, it lies above Mr Duckworth's preferred value of 10%, reflecting the variation that we observe in the margins historically earned by BT's voice business even at times when Ofcom judged it to be operating under conditions of effective competition, along with the fact that the figure of 10% ascribed by Ofcom in 2017 is not really any more reliable than its alternative figure of 15%, and the observation that the ██% range of margins projected by Ofcom for competing retailers at the time of the Commitments appears not to have succeeded in encouraging the sustainable development of rival SFV offers. We have, of course, also taken account of the evidence referring to the margins of the comparators used to the extent noted above. The 13.5% is on a percentage of revenue basis, which is how the experts proceeded (the 13.5% margin as a percentage mark-up over costs would be 15.6%).

## LAW ON COMBINATORIAL AND OTHER TESTING - PPC

644.    In the specific context of combinatorial testing, it is then necessary to refer to the decision of the Tribunal in *BT v Ofcom* [2011] CAT 5 ("*PPC*"). This was BT's appeal against a determination made by Ofcom in a dispute between BT, on the one hand, and various other communications providers on the other (referred to collectively as Altnets). The dispute centred on allegations that BT was overcharging the Altnets for the provision by it to them of partial private circuits ("PPCs"). It is not necessary to describe PPCs in detail. Suffice to say that PPCs are used to provide access from the site of a particular telecoms customer of an Altnet, often a business, to the BT network. Two particular elements of PPCs (though not both present in all PPCs) are these: first, a terminating segment, which connects a local exchange to which the link from the third party site is connected, to a main BT exchange and second, a trunk element. The latter is required if the Altnet concerned wishes the link from the third party site to go to a particular main exchange other than the default main exchange. The complaints made by the Altnets as to overcharging concerned BT's pricing for these two elements.

645.    In its *Review of the retail leased lines, symmetric broadband origination and wholesale trunk segments markets 2004* ("the 2004 LLMR Statement"), Ofcom concluded that BT had SMP in various telecoms markets, including the two PPC elements referred to above. As a result, and pursuant to its statutory powers it imposed a condition obligation upon BT that it must:

"secure and to be able to demonstrate to the satisfaction of OFCOM that each and every charge offered, payable or proposed for Network Access covered by the condition in question was reasonably derived from the costs of provision based on a forward looking long run incremental cost approach and allowing an appropriate mark up for the recovery of common costs and an appropriate return on capital employed."

("The Condition").

646.  The 2004 LLMR Statement also decided in principle that financial reporting obligations should be imposed on BT. The nature of these obligations were themselves subject to a consultation process. On 22 July 2004, Ofcom published a final statement and notification entitled "The regulatory financial reporting obligations on BT and Kingston Communications final statement and notification" ("2004 Financial Reporting Notification").  Among other things, this obliged BT to prepare RFSs supported by audit opinions. The broad purpose of the RFS was so that BT could demonstrate (among other things) that its costings complied with whatever cost orientation obligations had been imposed upon it by Ofcom, in relation to the various markets in which it had SMP.

647.  The RFSs produced by BT pursuant to the 2004 Financial Reporting Notification included annual Current Cost Financial Statements and Primary Accounting Documents, the latter explaining in detail the accounting principles employed in producing the former. In the context of the RFS used by Mr Duckworth in his methodology to arrive at a competitive benchmark, we shall explore those documents in more detail below. However, in the context of *PPC*, the RFS obligations upon BT included reporting in respect of the two elements of PPC which were the subject of the dispute.

648.  The Tribunal in *PPC* distinguished the LRIC of a product from its fully allocated cost ("FAC"). It noted that if a multi-product firm prices one of its products at SAC (thereby recovering all the firm's common costs) and then charged more than the LRIC for another of its products, there would be an over-recovery of common costs and so the firm would be making excessive profits. The Tribunal then referred at paragraphs 76-78 of the judgment to "contestable market theory". This states that where there are no barriers to entry, if a firm prices a product at more than its efficient SAC, this will attract other firms to enter the market for that product.

649.  The Tribunal then observed as follows:

"79. Matters become more complex when the fact that firms will often sell many products or services, sharing common costs, is taken into account. For prices to be sustainable in a contestable market, it is then not enough for each individual price to be at or below its SAC, but for each and every combination of services also to be below the efficient SAC for the combination. If this is not the case, while entry to supply only the individual products is not profitable, it may be profitable for firms selling groups or combinations of products with shared common costs.

(e) The problem of common costs
80. Of course, the theory of contestable markets is just that – a theory – and electronic communications is far from being a contestable market. SAC does, however, give a measure of what a competitive outcome would be in the absence of barriers to entry.  As such, it is used as a test for identifying prices that are excessive. In the case of a single product firm, a price significantly and persistently above SAC is to be regarded as excessive and unreasonable.

157

81. A problem arises in the case of multi-product firms, where it is possible to price an individual product well below SAC, whilst nevertheless over-recovering common costs.

82. Some method of ensuring that common costs are recovered – but not over-recovered – is clearly essential. This was recognised by OFCOM in paragraph A11.6 of Annex 11 of the Determination:

"Because of the existence of significant common costs between BT's activities, BT will only recover costs overall if at least some of its charges are above LRIC. However, there may be many different ways of attributing these common costs to different services, none of which may be uniquely correct or uniquely reasonable. The maximum proportion of these common costs which it is reasonable for BT to recover from any given service is generally given by SAC, which includes all (relevant) common costs."

83. In short, whilst it is obvious that if a multi-product firm prices at LRIC it will make a loss (because there will be no recovery of common costs), and if it prices at SAC it will make an unreasonable profit (because there will be multiple recovery of common costs), it is much less obvious how common costs are to be treated."

650.    The Tribunal thus agreed with Ofcom that none of the three approaches for the allocation of common costs, namely, SAC Combi, FAC and DSAC could be regarded as uniquely correct or reasonable. We think that this reinforces the notion that it is necessary to allow flexibility to a firm as to how it recovers its common costs, although that flexibility is not unlimited.

651.    The Tribunal then said this about combinatorial tests:

"89. One way of assessing whether a particular charge for a particular product might be regarded as excessive or not, is to consider whether the prices for different combinations of products lie between the LRIC and SAC of those combinations. Where all the different combinations satisfy this test, there is no over-recovery of common costs.

90. A problem with this approach, however, is that depending upon the size of the product portfolio of the firm, and the types of common costs, the number of combinatorial tests could be impracticably high."

652.    In considering the complaint before it, Ofcom used the data contained in BT's 2009 RFS, as well as data contained in earlier, revised RFSs. As part of its determination, Ofcom considered that BT's prices for the termination and trunk elements of the PPCs should be considered separately, whereas BT said they should be considered together. The Tribunal agreed with Ofcom on this point.

653.    Furthermore, in its determination, Ofcom had used a DSAC approach to see if BT had met its cost orientation obligations. In its 2004 Financial Reporting Notification, Ofcom observed as follows:

"5.67 BT also claimed in its Response that by focussing on DSAC, Ofcom is implying that this is the only appropriate mark-up of common costs when in fact the SMP obligation entitles BT to make "an appropriate" mark-up to recover common costs. However, BT is incorrect to suggest that the DSAC approach only permits one specific pattern of common cost recovery. In fact, it allows for a very wide range of possible sets of mark-ups. The sum of all of the DSACs exceeds BT's total costs (unlike FAC). Where FAC is used as the cost basis, charges below FAC must be offset by charges of an equal magnitude above FAC in order that incurred costs are fully (but not overly) recovered. This is not true for DSAC, where charges for services can be below DSAC and still allow for full cost recovery. BT could therefore allocate common costs in a myriad of different ways and still price its services in accordance with DSACs…

5.90 …[DSAC] allows BT reasonable flexibility to efficiently recover its common costs"

654.    Accordingly, Ofcom saw the use of DSAC as giving effect to the need for reasonable flexibility.

655.   The DSAC analysis undertaken by Ofcom showed that BT had not met its cost orientation obligations in significant respects, and had indeed charged excessive prices to the Altnets.

656.   The Tribunal held that the cost orientation obligations here did not dictate any particular method for the recovery of common costs, provided that it was an appropriate method.

657.   For its part (and leaving aside the issue over whether the two relevant PPC elements should be disaggregated or not), BT used 3 different tests to justify its pricing as compliant. These were a combinatorial test, "circuit analysis" and international benchmarks. The latter two tests can be disregarded for present purposes.

658.   Although BT's expert had agreed in cross-examination that his view was probably that combinatorial testing was "a bit of a waste of time", the Tribunal said this:

"254.   As a general proposition, we do not agree with this. As we have described in paragraphs 89 to 90 above, combinatorial tests are one way of assessing whether or not a firm is over-recovering its common costs, and in some cases will be an entirely appropriate approach. The drawback of combinatorial testing, as we have also noted, is the number of permutations or combinations that may have to be undertaken where a firm sells a large number of products/services that share common costs. In some cases – and this is one of them – this purely practical difficulty may render combinatorial testing inappropriate.

255.   The problem is simply stated: it may very well be that the price for a single product lies between LRIC and SAC; but that does not mean that the firm is not over-recovering its common costs. As the Determination notes in paragraph 7.118:

"...it would not be sufficient to demonstrate that the charges for an individual service are/were below the (efficient) SAC for that service. The existence of significant common costs requires BT to also demonstrate that those common costs are/were not over-recovered from all the services that share them. Therefore, BT must also undertake a series of combinatorial tests to ensure that each and every combination of services that shares common costs with the service in question (in this case 2Mbit/s trunk) does not lead to an over-recovery of common costs."

256.   Had BT demonstrated an absence of over-recovery of common costs through a series of combinatorial tests, then this would have been an appropriate way of demonstrating an appropriate mark-up for the recovery of common costs. However, at the end of the day, it was common ground that such combinatorial tests as were conducted by BT during the course of the Dispute Resolution Process were insufficient to establish this. The point is very clearly put in the Determination:

"7.120 The exact combinations of services to be considered by the combinatorial tests are determined by the number of other services which share common costs…

7.121 As we have explained above, the aim of any such combinatorial analysis is to ensure that common costs are not over-recovered. Where all common costs are not shared by the same services, separate combinatorial tests are required for each of the common costs, as well as for combinations of the common costs. Where firms have numerous products and many types of common costs, as is the case with BT, this can lead to a very large number of combinations being required to satisfy the test. For example, with 10 services sharing common costs, there are over 500 combinations. For 11 services this increases to over 1,000 combinations and for 12 services to over 2,000 combinations.

7.122 In its Response, BT reported the results from six different combinatorial tests, based on a range of different combinations of PPC trunk and terminating segment services.

[These were then described.]

7.123 …all of the combinatorial tests contained in BT's Response focus exclusively on combinations of services from the three PPC markets regulated in the 2004 LLMR Statement (ie trunk and the two terminating service bandwidths). BT did not provide results for any tests that consider services other than PPCs in its Response.

7.124 If all the common costs that are incurred by 2Mbit/s trunk (as the service of interest) were exclusively shared by the combinations tested by BT, the approach to specifying combinations adopted would be sufficient. However, as BT's inclusion percentages tables show, the SAC estimates

in all cases include common costs that are shared with non-PPC services…in excess of 75% of BT's SAC estimates in each year consist of trench (effectively duct), optical fibre and transmission equipment common costs, which are shared by numerous other (non-PPC) services."

257. Given the nature of BT's business, inevitably the number of combinatorial tests that would have to be carried out in order to show that BT was only making "an appropriate mark up for the recovery of common costs" would be vast."…

259. It is right to say that, during the course of the Dispute Resolution Process, BT did ask OFCOM what combinatorials it might undertake in order to satisfy OFCOM as to BT's cost orientation. The problem is that – in this context – this was an impossible question to answer, save to say that a very large number of tests would have to be carried out.

260. Ultimately, as we have noted, … it was BT's responsibility to carry out appropriate combinatorial tests if this could feasibly be done, or (if, as we find, it could not be done) find some other way to demonstrate that 2 Mbit/s trunk charges were cost orientated.

261. The limited combinatorial tests carried out by BT were insufficient to demonstrate that BT had complied with its cost orientation obligation under Condition H3.1. [ie the Condition]"

659.   The Tribunal thus rejected BT's combinatorial analysis as inconclusive. However, it approved Ofcom's DSAC approach as follows:

"281. Although there was some suggestion to the contrary in the draft determination, DSAC is not a proxy for combinatorial tests. It operates in a very different way. Whereas combinatorial tests seek to assess cost orientation by what is in effect a properly representative sampling of the prices for multiple products sharing common costs, DSAC distributes the SAC of a broad increment of services pro rata amongst each of the services within that increment. It is very different from combinatorial testing. In particular, it avoids the practical difficulties of combinatorial testing that arise when many products share common costs."

660.   It went on to reiterate that combinatorial testing was "simply not practicable here". In passing, the Tribunal noted that had FAC been used, it would have effectively imposed a single price on BT and that was why BT would not have wanted to use it. In the event, the Tribunal dismissed BT's appeal. It also seems to us that, in approving Ofcom's approach here, the Tribunal was endorsing Ofcom's view that there should be reasonable flexibility in the recovery of common costs, as set out in paragraphs 653 - 654 above.

661.   In its submissions here, BT drew a distinction between the combinatorial testing undertaken by BT in *PPC* (which involved 6 combinations) and that undertaken by Dr Jenkins which involved 25 combinations for the first period and 24 for the second period. However, this point assumes that if the number of combinations analysed by BT in *PPC* had been somewhat larger, its combinatorial testing would have been satisfactory in the eyes of the Tribunal; but that does not follow, because in *PPC*, the Tribunal endorsed the proposition that if combinatorial testing was to be undertaken in that case, it had to be done across all combinations of all relevant products (i.e. all the products that shared the same set of common costs). With a firm like BT, and in the context of *PPC,* that was simply impracticable. On the other hand, the exercise might not be impracticable in respect of a firm which had only 2 or 3 products.

662.   In our view, therefore, and in the context at least of BT in that case, the Tribunal was indeed saying that combinatorial testing can be impracticable where large combinations of products are involved

and it so found in that case. Although the relevant set of products that shared common costs with SFV Services is not the same as those wholesale products sharing the same common costs in *PPC*, which included the terminating and trunking segments, the risk of impracticality remains. We therefore consider that *PPC* is a relevant case when it comes to assessing the appropriateness or otherwise of Dr Jenkins' SAC Combi analysis, as discussed below.

## ANALYSIS OF THE RFS METHODOLOGY

### Introduction

663.    As set out above, and save on the question of direct costs, the methods employed by Mr Duckworth on the one hand and Dr Jenkins on the other, to reach a competitive benchmark are very different. Each model has been formulated and explained in considerable detail.

664.    That said, in oral closing arguments, Mr Beard KC somewhat downplayed the significance of Dr Jenkins' SAC Combi test by characterising it as simply a sense-check to show that the RFS method was clearly wrong.

665.    While we must consider these competing methods in detail, we do accept the proposition that if the RFS methodology is fundamentally or inherently defective, then the CR's case on Limb 1 is not going to be "saved", as it were, because the SAC Combi methodology is also defective. This observation recognises therefore that the CR has the burden of proof.

666.    On the other hand, we also recognise that in relation to a number of arguments deployed by BT as to the inadequacy of the RFS methodology, it is important to ascertain whether such arguments are essentially speculative in circumstances where BT, had it so wished, could have adduced evidence of its own on the point but did not do so. We refer to this in paragraphs 676, 693, 703-704 and 715 below. Indeed, the CR invites us to draw appropriate adverse inferences due to the failure of BT to adduce relevant evidence - see paragraph 371 of its Closing. We do not think it necessary or appropriate to draw adverse inferences as such from the absence of such evidence. The simple point is that BT could have adduced relevant evidence and it did not, so such evidence is simply not there.

667.    For the above reasons, it makes sense, first to consider the RFS methodology and the criticisms made of it and then, in the light of that, the SAC Combi methodology.

### Objection as a matter of principle to the RFS model as an appropriate way of calculating a competitive benchmark as at 2009

668.    BT's criticisms of the RFS methodology fall into two distinct categories. The first contains arguments to the effect that even in the context of 2009, the RFS model is wrong in principle. The second is that even if it is broadly appropriate as at 2009, it cannot sensibly be "uprated" by the CPI index, so as to produce a competitive benchmark for the years of the claim period.

669.    At this stage, we deal with the objections in principle to the RFS methodology altogether. There are essentially two:

(1)    the RFS model is expressly based on the concept of FAC which is itself inappropriate here; and

(2)    the purpose for which the RFS was required is (too) different from the purpose of ascertaining a competitive benchmark in the present context, so that it is of no or no sufficient use.

*Use of an FAC model*

670.    The RFS's methodology is a form of LRIC+ model, using FAC as a workable proxy for LRIC+. It was designed to achieve such an outcome for each of the relevant services, and it says as much. Thus far, we did not understand BT to be in disagreement. Like the SAC Combi method, FAC was sensitive to the need to have common costs, as well as all genuinely incremental costs, attributed to the relevant service. Both models are designed to ensure that common costs are recovered (but not over-recovered) across all relevant services (see paragraph 6.63 of HJ1).

671.    However, BT contends that an FAC model is not appropriate here, because, while it will ensure that common costs are not over-allocated (and therefore over-recovered), it imposes an arbitrary rule as to how those common costs should be recovered across the services that share them. Such an approach is unduly rigid because it does not reflect the more flexible way in which common costs are recovered in workably competitive markets. The level of such contribution depends on that service's revenue - how much of it (after discharging direct and indirect costs and an allowance for a margin) was actually available to discharge part of the common costs; see, for example, paragraph 6.65 of HJ1.

672.    As against that, the CR says that first, the level of profit of BT Consumer Services other than SFV Services is not relevant when setting a benchmark to see if SFV Services prices were above the costs of production. Taken by itself, we think that this answer is too prescriptive; we see no reason in principle why there should not be a degree of flexibility in terms of how a business recovers its common costs.

673.    In this regard, paragraph 338 (a) of the CR's Closing says this:

> "BT and Dr Jenkins criticise Mr Duckworth's use of a FAC approach, based on the BT RFS, on the basis that it "does not allow for an assessment of whether the firm actually recovered (or over-recovered) its common costs across all services". That criticism is unfounded:
> (a) Applying the FAC standard to SFV Services does not explicitly assess the level of common cost recovery across the wide range of products offered by BT. However, the level of profitability of BT Consumer services other than SFV Services is not a relevant factor when assessing whether SFV prices are above the cost of production…"

674.    We do not think that the position is as stark as that. It is reasonable to argue that the profitability of unconnected business activities should not be a factor that determines the reasonable profits of SFV

Services, but that criticism does not apply where the different services in question share common costs. In this scenario, the different businesses are inherently connected, and so the profitability of other products can be a relevant factor. For example, to take a variant of the coffee and cake shop example posited by Mr Parker at Day 13/79-82, Mr Parker is right to observe that if the cake supplier failed to deliver cakes to one particular shop in a particular week it would hardly justify increasing the price of coffee in that shop in order to pay the rent for that week. However, if cake wholesale prices go up so that retail margins earned by all shops become very tight on that product, it is quite plausible that a market-wide cost shock such as this could affect the competitive equilibrium and the margins that shops need to charge for coffee in order to sustain the continued existence of the sector. How much the price of coffee could be increased would depend on how consumers reacted to the increase in prices for both cake and coffee, but the fact is that the common cost across the two products make their pricing interdependent.

675.    We accept that there should be flexibility in the recovery of common costs from a particular product. On the other hand, this cannot be a licence for what would amount to cross-subsidisation. See paragraphs 111 - 112 above. Indeed, this is precisely what the CR says BT has done here, using the excess profits from SFV Services to fund quite separate products, such as BT Sport. We deal with the question of BT Sport below, but the point to be made here is that in this context, we would restrict the notion of a cross-subsidy to those cases where one product is being subsidised by another where the price of the former is itself below its incremental cost. The fact that there is no cross-subsidy, strictly so called, of course, does not mean that there might not be an unacceptable level of common costs recovery from one particular product.

676.    The CR then makes a separate point about the appropriateness of the FAC exercise in this case. It is that this exercise was undertaken by BT itself in the RFS, albeit that it had been required to produce RFSs as a matter of regulation. Incremental costs were attributed on a costs causality basis with the remainder which could not be so attributed, allocated on a "fair" basis. BT does not suggest that the particular approach, taken by itself, in giving effect to the fairness requirement in the RFS was somehow inappropriate, and the CR is entitled to assume that it was not. This is an example of where BT could have adduced evidence on the point had it wished to do so, but it did not. Subject to the separate point about the particular context of the RFS (dealt with in paragraphs 692 - 694 below) it is very hard to see why this particular manifestation of a FAC, carried out by BT itself in considerable detail and accompanied by an auditor's opinion, should not be considered as at least an appropriate method of allocating common costs. This is of course subject to BT's more general point about the need for flexibility in how common costs are to be recovered, as already noted. We return to the limits on such flexibility in paragraph 685 below.

677. A further point made by the CR in various contexts is that BT did not incur a significant amount of common costs anyway in order to provide SFV Services, in which case particular concerns about the way in which common costs are recovered becomes much less important. We deal with the factual point made here in paragraphs 761 - 777 below. But in any event, we do not consider that this would entitle the CR to disregard altogether issues of principle concerning the recovery of common costs.

678. However, it does seem to us that Dr Jenkins' criticisms here could only have real weight if it could be demonstrated that there is some workable alternative that does fairly or appropriately take into account the contribution to common costs actually made by the other services. Here she relies on her SAC Combi method. But as we point out in paragraphs 781 - 856 below, there are difficulties with it.

679. Overall, we do not accept that just because the RFS methodology adopts a FAC approach, this renders it inappropriate as a matter of principle for deriving a competitive benchmark.

680. In addition, the CR says that there cannot be unbounded flexibility conferred upon BT. This is because the emphasis is on ascertaining the costs "reasonably attributable" to the product in question, not other products; see *Albion Water II*, referred to in paragraphs 60-61. Further, it points out that the case law referred to in paragraphs 110 - 111 above shows that the emphasis is on the product in whose market the business has a dominant position, because it has a special responsibility to consumers there. Practices which suggest true cross-subsidisation must be carefully examined.

681. In Section 4.2.3 of DM1, Mr Matthew says that Ofcom itself had noted that where there are significant common costs, causing prices to be tied to FAC can be unduly restrictive. He relied on three particular Ofcom documents. In the case of two of the documents, and as pointed out by Mr Duckworth in cross-examination, the context there was quite different, dealing with wholesale prices where there were very large common costs, and where Ofcom had imposed a price-cap. There was also a costs orientation provision which prevented a disproportionate recovery of fixed and common costs. In the case before us, of course, there is no relevant price cap.

682. The third document relied upon by Mr Matthew is the VULA Margin Statement. At paragraph 5.127, Ofcom stated as follows:

> "5.127 As we have previously set out, the total fibre portfolio approach provides BT with the flexibility to determine the margins on individual products within the portfolio. We consider that flexibility is particularly desirable given two aspects of the VULA margin assessment. First, fibre services are still developing, with various technologies such as G.FAST likely to increase speeds. Second, since we consider that a LRIC+ standard should be applied (see paragraphs 5.54 to 5.56) flexibility would allow BT to determine what contribution to common costs (i.e. the 'plus' in the LRIC+ calculation) is made by different products. Such flexibility would allow BT to experiment when setting the relative prices of different superfast broadband products and to respond to differences in consumer demand for different superfast broadband packages. By contrast, we considered that the limits on BT's flexibility under the both the fibre product group approach and

> the individual product approach would on their own mean that each of these are disproportionate when compared to the total fibre portfolio approach."

683.  We see that, but the flexibility there was limited to products within the superfast portfolio (being the portfolio regulated). BT was not permitted to extend this flexibility into other BT products.

684.  Having said the above in respect of those three documents, we are conscious of the *PPC* case where (as noted in paragraphs 654-660 above) Ofcom's approach to cost-orientated prices, which was ultimately endorsed by the Tribunal, did involve an explicit desire to allow some flexibility in common cost recovery.

685.  A further point made by the CR is that in any event, in conditions of workable competition, a multi-product company would not be able to exercise too much flexibility in terms of how it recovers common costs. This is because if, notionally, it set a particularly high price for one product because it wished that product to make a large contribution to common costs, the market would not tolerate it. Competitors would move in with significantly lower prices, precisely because they had chosen not to require their prices to cover a large amount of common costs.

686.  During the exchanges between the experts at the hearing, Mr Parker noted that firms operating in competitive markets faced the problem of how to recover common costs across multiple products all the time, citing the example of a supermarket that had to earn margins on various different grocery categories in order to recover the common cost of the land on which the store and its car park were sited. He argued that the competitive process defines how such costs are recovered, and that one does not observe what he described as an 'anything goes' approach to common cost recovery, in which any single supermarket would choose to recover all its common costs on the sale of just one product category. He argued that a supermarket that sought to do so would face an adverse reaction from consumers who would, given alternative competitive options, choose to buy the grocery category in question from a rival store.

687.  Dr Jenkins did not disagree with this particular example, but claimed that in practice firms in this position would nevertheless exercise considerable flexibility in the margins they charged for different categories, depending on a variety of factors including the different competitive pressures they faced across their product portfolios. She did not accept that there was a rigid price-cost rule that could determine how such common cost recovery should or would occur in workably competitive markets.

688.  Mr Parker did not agree with this notion of pricing flexibility, and argued that his preference for a more deterministic outcome was supported by an article written by Christopher Bliss in 1988 entitled "Theory of Retail Pricing". The reference to this article emerged here, only in the course of the JES discussions. At that stage, the point he was making was that in a competitive market, one

would expect to end up with only a single competitive benchmark, as opposed to a range. This is expressed in the JES at paragraph 7.3.1 and in the references to Professor Bliss' article.

689.    There was some discussion in the hot tub discussion between, in particular, Mr Parker and Dr Jenkins, about the article, which showed that common cost recovery under competitive conditions would proceed on the basis of a version of so-called 'Ramsey pricing'. Specifically, this predicts that margins for individual products will vary in inverse proportion to the demand elasticity for each item, subject to the added complication that the inter-relationships between products must also be taken into account (a factor referred to as the need to account for the "super-elasticities" of each product).

690.    However, we do not consider that Mr Parker's introduction of the Bliss article at a rather late stage in the debate between the experts provided much clarity. We certainly would not see it as a basis for saying that multi-product firms must charge identical price-cost margins across all the products that share a common cost, or that there cannot be a range of possible competitive benchmarks. As was observed in the experts' discussion of supermarket pricing, competitive market outcomes can exhibit a variety of price-cost margins. However, we do think that there is force in Mr Parker's observation that, in a competitive market, there is likely to be a limit to the ability of a company to price in too much of the common costs. Of course, in a market which is not competitive and where the relevant company is dominant (which is the case in the SFV Services market) there is a danger that the company can do precisely that. If so, this does not necessarily mean that the recovery of common costs with that effect is automatically fair or reasonable for the purposes working out what a competitive benchmark should be for Limb 1 purposes.

691.    Overall, and for the reasons given above, we do not consider that the RFS model is inappropriate *per se* on the basis that it is too inflexible so that it should be rejected out of hand.

*The Regulatory Purpose of the RFS*

692.    The second point, although it was not clear by the end of the trial to what extent it was still pursued, concerns the purpose of the RFS. Of course, it was required by Ofcom in the exercise of its statutory powers and on the basis that BT had SMP. It was also in a context where BT was still prevented from offering bundles, although that was about to change. However, we do not see that this context by itself rules out the RFS methodology. After all, BT chose the particular attribution methodologies used, which in any case could hardly be described as controversial or arbitrary i.e. a FAC model and, in relation to indirect costs, the application of the principle of costs causality with the remainder of the costs allocated on a fair basis.

693.    Yet again, if BT had wished to adduce particular evidence to show how the output of the RFS was specifically inappropriate to be used as a template for pricing in this context, it could have done so. It did not.

694.    So there is nothing in this further point.

695.    For those reasons, there is no basis for ruling out the RFS methodology *ab initio* because of the regulatory context, either.

**Objections to the use of the RFS methodology in respect of the claim years**

*Introduction*

696.    We therefore turn to the second broad reason given by BT for rejecting the RFS methodology, namely that it cannot sensibly be uprated in the way chosen by Mr Duckworth, so as to constitute relevant figures for the claim years. We refer to this as the Timing Point.

*The use of "actual data"*

697.    BT initially submitted that as a matter of law, the RFS methodology could not be used because its data was from 2009 and what was required was "actual data" from the claim years.

698.    In this context, Mr Beard KC relied on the reference to "costs of production" and "actual costs incurred" in *United Brands*, referred to at paragraph 43 above. This was not to suggest that there has to be absolute precision in the costs model used to determine the competitive benchmark, but that it should be based on the actual underlying costs of the company at the relevant time. As the RFS model did not do this, its application was contrary to *United Brands* and wrong in law (see Day 26/161).

699.    Just pausing there, we do not consider that this can possibly be right. After all, the later cases referred to in paragraphs 46-73 above stressed that there was no single correct method and it was permissible in theory to use comparators instead of the dominant undertaking's own costs. Indeed, to be fair to Mr Beard KC, he did not labour this as a point of law. His alternative contention was that in any event, there was no sense in which the RFS model captured BTs actual data for the relevant period on the facts, as it were; nor was there any form of cross-check with the actual data available undertaken by Mr Duckworth. In those circumstances, the RFS model could not succeed here.

700.    As to this, the first point concerns what is meant by "actual data". From BT's perspective, it is perfectly true that Dr Jenkins used BT's actual costs data for the relevant period, but at a much more general level, namely the indirect costs of BT Consumer as a whole, of which SFV Services only formed a relatively modest part, something like 18% of the revenue of the business in 2015/16, and decreasing thereafter. See paragraph 558 above. The whole question was then how to extrapolate the relevant costs for SFV Services. On the other hand, from the CR's perspective, his starting point

was a set of actual costs for BT's voice services in 2009 (i.e. from the relevant market), but they had to be uprated. It is very hard to see why the former method is permissible in principle, but the latter is not. Again, Mr Beard KC later accepted that he could not say that there was an absolute bar to using pre-claim data; rather it was a question of how the uprating was done.

701.    In that context, he did make the point that there should, on any view, have been a cross-check with BT Consumer's actual data for the claim period. Mr Duckworth accepted that he did not do so, but he explained that this was because it would not have been a useful exercise. That is obviously because, again, the BT Consumer costs were not themselves the relevant costs. We refer to some more detailed submissions by BT on the size of the indirect costs in the claim period, in paragraphs 710 - 737 below.

702.    This leads on to another general point. The position of Mr Duckworth (and Mr Parker) is that because there was no specific costs data in relation to SFV Services for the claim period, they had to look elsewhere, and that is where the RFS for 2009 came in. BT informed the CR that it did not have specific costs data for the SFV Services. It is perfectly true that there was a very substantial amount of disclosure from BT on the question of costs. However, it was not suggested - nor could it be - that this opened the window, as it were, to indirect costs information that was specific to SFV Services. Had it done so, no doubt Dr Jenkins would have availed herself of it. So, BT's argument that the CR somehow wrongly failed to make use of relevant disclosure does not hold water. There is ample evidence that BT did not maintain appropriately granular records for SFV Services as opposed to BT Consumer.

703.    On the other hand, there was nothing actually stopping BT from producing, admittedly after the event, some more focused analyses that did drill down into the indirect costs that could be said to relate to SFV Services. This was by no means an impossible exercise. First, as it emerged when the evidence about "unit costs" from Mr Cackett was explored in detail at the hearing, it turned out that some "rough and ready" P & L accounts for voice services did exist, although not in any formal way. But this suggests that it was at least possible to do work towards that end. In its s135 response to Ofcom in 2017, BT estimated that it would take approximately 2 months' systems development work, at a cost of £120,000, together with an operational headcount for 3 months at £60,000, plus a further financial management cost of £80,000, to create retail reporting on SFV Services using BT's then accounting system. Given the sums at stake here, such an exercise might be regarded as involving only modest costs and not disproportionate. Indeed, it transpires that BT is now working towards a model of that kind but it is forward-looking only.

704.    Clearly, the only party which could have produced that information was BT. It did not do so. That is its right, but in those circumstances, it cannot be said that Mr Duckworth's decision to use an

alternative model in the absence of specific information pertaining to SFV Services was unreasonable. The real question is whether that alternative model is helpful, and if so, to what extent.

*Legal Certainty*

705.    BT contends that the use of the RFS model, based as it is on 2009 data as the starting point, violates the principle of legal certainty. This principle was referred to by the Court in *Deutsche Telekom AG v European Commission* ECLI:EU:C:2010:603. Here, the context was the importance of carrying out a price/costs test using the dominant undertaking's own data, rather than that from a different firm. In particular, the Court said at paragraph 202 that using the former data was:

> "consistent with the general principle of legal certainty in so far as the account taken of the costs of the dominant undertaking allows that undertaking, in the light of its special responsibility under Article 82 EC, to assess the lawfulness of its own conduct. While a dominant undertaking knows what its own costs and charges are, it does not, as a general rule, know what its competitors' costs and charges are."

706.    However, that point only goes so far in this case for three reasons. First, the data used by Mr Duckworth was indeed BT's own data, albeit from 2009. Second, had BT wished to undertake a "meaningful self-assessment" as Ms Kreisberger KC put it, it could have done so. And after all, BT was on notice and from January 2014 of Ofcom's interest in its rental prices. While the RFS of 2009 did not relate to the years in question, or the putative years ahead, when BT might wish to ascertain whether it was at risk of abusing its dominant position, it had the wherewithal to make adjustments to it going forwards, if it wished to do so.

707.    Third, given the complexities and drawbacks of Dr Jenkins' SAC Combi model (discussed below) it is far from clear that its operation is any less uncertain than that of the RFS model.

708.    We should add that the principle of certainty invoked by BT here is all in the context of the application of the Limb 1 test to particular facts. It is not about the underlying principles themselves. We fully accept that the principles should be clear and certain. That is why, for example, any upwards deviation by the dominant undertaking from the competitive benchmark must be "significant and persistent". But we are not dealing with the adequacy or otherwise of the underlying legal principles under Limb 1, here.

709.    Accordingly, we do not consider that the EU principle of legal certainty renders the RFS model deficient.

*Use of the CPI Index and reported indirect costs before and as at 2009*

710.    The tool used by Mr Duckworth to project the results of the RFS forward to the claim years is the CPI Index. It is hard to see why doing this (as opposed to some other method of uprating) could be wrong in principle. In fact, Dr Jenkins accepted that she did not have a better index to use and would not recommend a different one; rather, it was that any index would not capture what actually happened to indirect costs going forwards (Day 13/125-126). Quite so, but then the question is what

can be drawn from the available data about possible increases (or decreases) in indirect costs for SFV Services. We refer to the pre- and post-2009 costs data below.

711.    First, however, it is necessary to deal with why Mr Duckworth says that in fact, his model, based on the use of the CPI Index, is itself conservative. He says it is because of the likelihood of cost efficiencies being made going forwards from 2009, which Mr Duckworth has not taken into account as such. As to this, there is specific evidence that BT conducted a Consumers Cost Transformation Programme with the aim of reducing costs and increasing efficiency. In particular, BT stated that there was a costs saving of £104m in terms of SG&A between 2008 and 2009, related to voice services.

712.    There were also costs transformation efficiencies reported by BT between 2010 and 2012 although this was now in relation to BT Retail (of which BT Consumer is a part) as a whole. The cost reductions were reported as £299m, £339m and £262m in the years 2010, 2011 and 2012 respectively. See Table 18 in MD1.

713.    In addition, Mr Cackett said in evidence that BT Consumer expected to make efficiency gains each year (Day 8/185). This was reflected at page 17 of BT Retail's Operational Review of September 2009 which said that it was continually striving to improve efficiency and reduce costs.

714.    As to the making of costs efficiencies, BT submits that it does not follow that every intended cost efficiency would succeed; and when asked in re-examination whether BT Consumer always made the cost efficiencies which it had forecast, Mr Cackett answered, perhaps unsurprisingly, not always. In addition, Mr Duckworth accepted that he had used BT's 5 year MTP from 2020 which had expected a 5% reduction year-on-year. He did not know if, in fact, that reduction had been achieved and he had not undertaken an explicit forecast of the intended efficiency gains. But he added that he thought the MTP was informative as to expected efficiency gains, and was not merely aspirational. (It was also put to him that Mr Cackett had said that the plans were "often not met"; actually he said that they were not always met - see above.)

715.    We follow all of that but there is no specific or detailed evidence from BT on areas where particular planned cost efficiencies had in fact failed. It could surely have been produced easily.

716.    So in truth, we see little reason to doubt that in general terms, some form of cost efficiencies were being made by BT over the relevant years which affected SFV Services. As already noted, Mr Duckworth did not take the making of cost efficiencies into account directly, but what he did was to invoke this point as a rebuttal of certain points against his use of the CPI Index, made by BT. We deal with those matters in context below.

717. At this stage, we should make reference to Figure 5.4 of HJ2. This shows the total indirect costs for BT's residential fixed voice services, as disclosed in the RFSs for the 5 years up to and including 2009.



Figure 5.4    Relationship between the indirect costs attributed to residential fixed voice services within the RFS and the number of BT fixed voice lines

718. The fall of over £100m between 2008 and 2009 could be seen as a reflection of the £104m cost saving referred to in paragraph 711 above. On the other hand, and as BT points out, indirect costs were rising significantly in the earlier years shown in Figure 5.4 despite the fact that customer numbers were falling steadily. Dr Jenkins thus questions why Mr Duckworth's starting point should be 2009, since there were RFSs from previous years available, though showing higher costs. She suggests that this is therefore an arbitrary starting point, quite apart from the correctness or otherwise of using the CPI Index as a way of ascertaining costs going forward beyond 2009. We accept that it is problematic to base a forward projection on just one data point where there is considerable year-on-year variation in this data point in the prior years. However, we think that there are two countervailing factors here. First, it remains the case that 2009 is the closest available data set to the claim period. Second, if costs savings were indeed being made as from 2006 (and were expected to continue as a trend), that suggests that 2009 is not an inappropriate starting point. As against this, Mr Beard KC argued that if one assumes that indirect costs were going up by the CPI index each year, then that approach would fall down if one attempted to "back-calculate" the CPI index increase from 2009 to 2008 and 2007. This is because the result of such a back calculation would be that the 2007 and 2008 costs would each be taken to be less than the costs for 2009, yet we know that in fact they were more. See Figure 5.4. Hence, he argued, the exercise of starting from 2009 is necessarily arbitrary. We do not agree because, again, we think that there is sufficient in the materials to show that costs efficiencies were being made in the two years prior to 2009.

719. Overall and for the reasons given above,

171

(1)  while we accept the need for caution in using the single data point of 2009, we do not agree that it falls to be rejected entirely, and

(2)  as for the use of the CPI index *per se* (i.e. without looking at other matters), the CPI index does seem to us to be conservative, and in any event not arbitrary.

*Indirect Costs Data from 2015/16 going forward*

720.  However, it is then necessary to consider the indirect costs data from 2015/16, which of course is shown only in relation to BT Consumer as a whole. The relevant figures, drawn from Tables 4 and 5 of the letter from S & S dated 18 February 2024 ("the February Letter") are set out below. They also appear in the Table at paragraph 558 above.

| £m | 2015/6 | 2016/7 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| Total Revenue | 4,373 | 4,676 | 4,709 | 4,682 | 4,486 | 4,114 | 4,253 |
| Total Costs | 3,564 | 3,887 | 3,988 | 3,982 | 4,114 | 3,988 | 3,815 |
| Costs of Sale | 2,580 | 2,912 | 2,963 | 2,911 | 2,885 | 2,748 | 2,837 |
| Actual Indirect Costs total | 983 | 975 | 1,025 | 1,071 | 1,229 | 1,240 | 1,261 |
| Of which: SG&A | 782 | 774 | 819 | 838 | 948 | 957 | 978 |
| D&A | 201 | 201 | 206 | 233 | 281 | 283 | n.a |

721.  This shows (among other things) that BT Consumer's actual indirect costs did increase somewhat from 2017/18, and more significantly as from 2019/20. In addition, Dr Jenkins noted at paragraph 5C.3 of HJ2 that there were significant increases in SG&A costs of BT Consumer between 2012/13 and 2015/16 being from £600m to £782m.

722.  BT points out that these increases would have exceeded Mr Duckworth's CPI Index, and significantly more so, in the later years. It makes the broad point that this shows that costs did indeed increase, notwithstanding the supposed costs efficiencies. We see that, but the difficulty is that it is not possible to say how much of those increases in indirect costs can be attributed to SFV Services.

723.  Mr Duckworth's approach was to say that the indirect costs figures, of course, included incremental costs and common costs. One would not expect common costs to increase suddenly, unless there were changes to the outputs. So cost increases linked to expanding output to deliver, for example, triple play (TV, broadband and voice) would not be concerned with the costs of production of SFV Services; rather they would be incremental to those other services that caused them, not to SFV Services. Mr Parker added that one explanation for the increased SG&A costs overall may have been the provision of more bundles (as was undoubtedly occurring), and marketing aimed at that

172

product. The same could be said of the creation and promotion of BT Sport. So none of this shows that the indirect costs which could properly be allocated to SFV Services were themselves going up.

724.  As a counter to this, Dr Jenkins said that in fact there were substantial changes to the design of call packages (as set out in paragraphs 11-50 of JB3) and all of these would require central office support, product design and development which would affect common costs across the board. In the course of the hot tub discussion on these points (see Day 14/107-120) Dr Jenkins said that money was being spent on, for example improved billing services, the "onshoring" of customer care and improving the BT brand generally. All of these were elements of SG&A that would be relevant across the board i.e. SFV Services, along with other elements of BT Consumer. She thought there were too many examples of things that were changing, and that meant that BT was very likely spending as much on their fixed voice customers as on the bundle customers. She said that more work on the actual costs that were incurred would have to be done to be able to say that none of them were relevant to the SFV Services Group. We see that, but then it is BT which would have the information to undertake such further work.

725.  We also think that there is force in Mr Duckworth's point that essentially, SFV Services were the same "legacy" product year-on-year. There was not the same kind of technological shift as for bundles (for example the move to superfast broadband) or investment in television. And after all, this is where BT was facing its most direct competition.

726.  Overall, on this point, we thought there was more force in Mr Duckworth's view than that of Dr Jenkins which we found to be somewhat speculative. Of course, BT could have provided examples of increases in SG&A that related to SFV Services as much as other elements of BT Consumer, but it did not.

727.  Dr Jenkins added that the costs of providing BT Sport were not indirect costs anyway - see Day 14/114-115. As to that, we do not think that this can be correct across the board, because there must have been some indirect costs in relation to BT Sport as opposed to the direct costs of delivering it.

728.  At this point we should deal with the fact that according to BT, the way in which it classified its SG&A costs changed as from 2019/20, but with alternative figures being given for 2018/19 as well. As already noted, and as can be seen from the table at paragraph 720 above, such costs increased significantly as between 2018/19 and 2019/20. The common costs which Dr Jenkins derived from such SG&A costs similarly increased, from £427m in 2018/19 to £548m in 2019/20.

729.  In its letter dated 30 November 2022, S&S explained the matter thus:

> "…The SG&A calculations represent the total of all of BT Consumer's direct SG&A costs plus an allocation of fixed overhead costs, or recharges, from other BT cost centres, such as the Technology Service Office (now subdivided into Networks and Digital) and Corporate Units.

In FY 2019/20, BT amended the methodology it used to recharge fixed overhead costs to its Customer Facing Units ("CFUs"), including BT Consumer. As set out further in the enclosed 2019 paper from BT's Audit and Risk Committee outlining the proposed changes to BT's methodology for recharging fixed overhead costs to its Customer Facing Units, the amendments reflected the fact that changes to BT's trading dynamics and organisational structure (e.g. the merger with EE, the creation of the Consumer and Enterprise Units, the formation of Openreach Limited, and further transfers of accounts between Global Services and Enterprise) had significantly changed the structure of the business and therefore changed the relative size and scope of the CFUs and their use of Technology Unit ("TU") and Corporate Unit ("CU") assets and resources. In addition, it was found that some Technology assets were no longer used by, and should not be allocated to, Openreach. Overall, BT considers that the changes more closely aligned the percentage of BT recharges received by each CFU with their percentage share of BT earnings (as measured by EBITDA).

As a result of the above, there is a variance in the SG&A figure for FY 2018/19 in the BT P&L Tables tab (I57) and the SG&A figure in the SG&A Breakdown tab (K23). Following the change in recharges methodology, BT issued restated FY 2018/19 annual accounts in accordance with the new methodology. The figure in I57 of the BT P&L Tables tab is based on data in the original annual accounts for FY 2018/19."

730. Some further detail is then given in the attachment to that letter, which is a paper from BT Group Finance dated April 2019 ("the 2019 Paper"). It states, among other things, as follows:

"1. The purpose of this paper is to update the Committee on a proposal to amend the methodologies used to recharge fixed overhead costs reported within EBITDA. These changes would impact the Group's external segmental reporting.
2. We have undertaken this review of internal recharging at this time because:
i. Recent changes to the Group's trading dynamics and organisation structure (e.g. Creation of Consumer and Enterprise Units, formation of Openreach Limited, further transfers of accounts between Global Services and Enterprise) have changed the relative size/scope of Units and their use of Technology and Corporate Unit assets and resources.   With the exception of a limited refresh for the addition of EE in 2016/17, the Technology and Corporate Unit asset and cost allocations had not been revised for at least 5 years.
ii. Based on a detailed review of operational assets early in 2018/19, we identified some Technology assets (MSAN & TDM) that are no longer used by, and should not be allocated to, Openreach in either the RFS or financial accounts.
Subject to BARC approval, we would implement the proposed changes to internal recharges in the financial accounts and external segmental reporting starting in the 2019/20 financial year.
3. The proposed changes would more closely align the percentage of Group recharges received by each CFU and their percentage share of Group EBITDA generated.
4. The proposed changes would also more closely align the Openreach internal recharges in the Annual Report and Accounts (ARA) and the Regulatory Financial Statements (RFS). The current EBITDA difference between these two reports is £575m (based on proforma 2017/18); these proposals would reduce this to £236m.
5. A detailed review of all recharge elements has highlighted a need to (i) update a number of calculation input values and (ii) revise calculation methodologies to better align to the current trading dynamics and organisational operational structure of BT, in particular with the consolidation of CFUs….

"• Openreach currently accounts for 49% of the Group's recharges and 33% of Group EBITDA. The proposed allocation reduces recharges to 36%, increasing the share of Group EBITDA to 37%.
• Consumer currently accounts for 30% of the Group's recharges and 34% of Group EBITDA. The proposed allocation increases recharges to 36%, reducing the share of Group EBITDA to 32%...

The higher Consumer percentage of recharges (36%) to EBITDA (32%) vs the other CFUs is primarily due to the inclusion of mobile network costs in the Technology recharges."…

"9. The proposed changes would more closely align the Openreach internal recharges in the Annual Report and Accounts (ARA) and the Regulatory Financial Statements (RFS). The current difference in internal recharges in EBITDA between the ARA and RFS is £575m (based on pro-forma 2017/18 accounts); the proposals would reduce this difference to £236m. The residual £236m is largely due to different approaches to the allocation of property and technology costs…".

731. There is no further evidence, or detail, about this underlying change to the accounting for internal charges. At paragraph A7.5 of Annex 7 to HJ1, Dr Jenkins simply refers to the F28 data and the

S&S letter of 30 November 2022. She also states that she takes the lower SG&A charge for 2018/19 of £838m rather than the restated amount of £959m.

732. As for Mr Duckworth, at paragraphs 5.34 and 5.35 of MD2, he noted the changed accounting for the recharges, and said that a robust approach to estimating common costs should not be affected by a "reclassification of costs". Otherwise, the point was not debated in the JES, nor was it the subject of detailed debate in the evidence.

733. What we consider we can safely take from the 2019 Paper is that the change in approach to internal recharges was due to recent changes in how BT Group was operating in terms of its trading dynamics and structure. There were also some operational assets that were not now being used by Openreach and should therefore not be allocated to it. The changes were more closely aligned with internal recharges in its annual reports and its RFS. However, it is also clear that (following the acquisition of EE in 2016/17), the higher percentage of recharges to BT Consumer, as opposed to other CFUs in BT Group, was due to mobile network costs.

734. Any indirect costs deriving from mobile network internal recharges cannot possibly be regarded as common to SFV Services. Further, while we accept that changes in the operation of BT Consumer could have genuinely led to some higher overheads, it is difficult to see why the entire increase in overheads, said to derive from a reallocation of internal charges, can be justified from the point of view of BT's common costs and there is at least some force in Mr Duckworth's point about reclassification.

735. We note that Dr Jenkins has not used the higher restated overhead figure for 2018/19 (and in fact the new policy on recharges was stated in the 2019 Paper to apply only to 2019/20 onwards). We agree with her approach, not least because it is clear that a significant reason for the change in policy at that stage was the implication of recent changes at BT Group on the recharges. In any event, BT has not sought to use the higher 2018/19 figure.

736. However, and returning to the more general debate about common costs here, Dr Jenkins made a broader point, which was that if there were common costs directed to promoting bundles, BT Sport etc, they were still relevant to SFV Services since the object of the exercise was to attract customers to bundles and many of them would have been taking SFV Services previously. Therefore, the common costs (and any increases in them) should be attributable at least to some extent to SFV Services. We disagree. We prefer Mr Duckworth's approach which is to say that a cost of enlisting someone who had previously taken SFV Services to taking bundles should be seen as a cost of the bundle and not a cost of the SFV Services. That is particularly because, of course, a significant number of VOCs and SPCs did not switch at any particular moment in time, and the CR's allegations of excessive pricing relate specifically to those who remained SFV customers.

737.    Overall, we do not think that the material before us suggests that there would have been such significant increases in common costs as far as SFV Services are concerned. We therefore reject the idea that Mr Duckworth's CPI Index cannot be used at all.

*Particular cost events that might affect common costs*

738.    BT makes the point that Mr Duckworth had not specifically considered the question of whether the significant cost of "onshoring" its call centres might be a relevant and substantial common cost which would not be captured simply by the application of the CPI Index. Mr Duckworth said that his approach was more high level. He said in the hot tub discussion that an exercise could be done to look at onshoring costs over time, but this would also need to take into account any resulting cost efficiencies and other quality changes. In the absence of discrete information going to these particular matters it is difficult to see what more Mr Duckworth could have done.

739.    Similar points were also made about the provision of BT's "Gives" for voice services, but in fact, Mr Duckworth did deal with those in the context of direct costs.

740.    We do not think that this point adds much, save to form part of any exercise to make some general adjustments to Mr Duckworth's model or its outcome which we refer to below.

*Changes in call pricing and competition*

741.    BT also contends that the RFS model did not take account of ongoing pricing practices for VOC and (after 2009) bundle customers. Nor did it take into account the ratio of fixed calls to those made within a particular call plan, or indeed the general decrease in the volume of calls made. However, BT did not really explain why such matters were relevant to the question of common costs and again, we do not think that this point really adds anything.

*Economies of scope and size of common costs*

742.    A further point made by BT is that there would have been economies of scope for SFV Services after 2009 and into the claim years. This is because voice and broadband were supplied down the same physical line; by way of example, BT would not pay WLR to Openreach twice where it was supplying a bundle, although there was a separate further charge from Openreach for the supply of broadband, so that BT actually took two products from Openreach. Its competitors, when supplying bundles, tended to take one blended product from Openreach to cover voice and broadband, although there were some further costs as well. If competitors were supplying voice only, they tended to take them from Openreach by WLR. On any view, there were economies of scope which is relevant, because it is common costs that cause such economies.

743.    In the course of closing argument (Day 25/34-41) we questioned whether the relevant costs synergies might be pertinent to the setting of the competitive benchmark. This related to four

particular questions asked by Mr Ridyard. Ms Kreisberger KC said that they would not be, at least not in any way detrimental to the CR's case. If, for some reason, the costs synergies went to indirect costs and led to economies of scope, that would only lower costs and not increase them. However, that was not a satisfactory answer because we are here dealing with common, not incremental costs.

744.    At paragraph 517 of its Closing, BT accepted that efficiencies in wholesale costs only went to direct costs. However it was said still to be relevant here because it reinforced the importance of the competitive benchmark being set at a level which allowed BT flexibility as to how it recovered its indirect costs across its services. We are not sure that, as expressed, this captures the real point about the significance of economies of scope.

745.    However, that does not matter because we think that the real economies of scope between SFV Services and bundles do give some support to the notion of the existence of significant common costs. The more common costs there are, the more such costs might be capable of being borne by one particular product by reason of the principle of flexibility.

*Economies of Scale*

746.    The total number of BT stand-alone voice lines in 2009 was 14.4m. By 2015/16, there were only 9.5m voice lines in total, and most of these (6.89m) were in bundles. Therefore, according to Dr Jenkins (see paragraph 5.71 of HJ2), the "per line" unit costs (which Mr Duckworth's model uses) would change upwards, as there were many fewer customers to share fixed costs (i.e. costs of providing voice services that do not vary with the number of voice lines). She says that Mr Duckworth's model based on 2009, and simply uprated by the CPI Index, does not take account of this.

747.    As to that, the CR says, first, that in any event, the fixed common costs of the SFV Services are likely to be low; again we deal with this at paragraphs 761 - 777 below. Second, Ms Kreisberger KC points to the fact that, according to BT, costs had reduced as a result of the decrease in the number of lines. Section 9.3 of the CCFS section of the RFS at p82 states that:

> "Retail operating costs have also decreased as a result of the fall in numbers of connections and rentals.
> A strong focus on cost control has driven down the SG&A costs for these markets."

748.    Here, she adds that the second sentence of this quotation also supports the notice of BT making costs efficiencies.

749.    Another way of putting this might be to say that the cost efficiencies being made at the time counteracted any increase in unit costs due to the decreased number of lines.

750.    But in any event, in her submissions on Day 25/24-28, Ms Kreisberger KC also pointed to the absence of any evidence to suggest that there were particular blocks of large fixed costs that were

common to voice services and not to other services within BT Consumer, and which therefore should be spread across voice lines only.

751.   In this context, we then have to deal with the example of this economies of scale point made here by BT. This is set out in its Closing as follows:

> "511. To illustrate why Mr Duckworth is wrong to assert an unchanged LRIC+:
> a.   Suppose that in 2009, all of the incremental costs of residential fixed voice services were fixed (£100 million), and that there were no additional common costs between voice and other products. With 14.4m lines, the LRIC of voice would be £6.94 (100 ÷ 14.4) and the LRIC+ measure (which Mr Duckworth says is relevant) would be exactly the same, there being no common costs in this simplified example.
> b.   Suppose that by 2015, there were 9.5m fixed voice lines in total and – in line with Mr Duckworth's (unsubstantiated) assumption – suppose for the purposes of this example that those lines would still have the same £100m of fixed costs (ignoring for present purposes the question of CPI). Now, however, this sum would be considered to be common across SFV and voice sold in bundles. The LRIC of SFV Services would be zero (there being zero incremental SFV costs), whereas the '+' would be £10.53 (100 ÷ 9), so the LRIC+ measure would be £10.53.
>
> 512. It can be seen from the above that (i) the mix between incremental and common costs has shifted significantly from all incremental in 2009 to all common in 2015; and (ii) the LRIC+ of SFV Services would be c.50% higher in 2015 compared to 2009. Mr Duckworth's approach cannot identify (i) and fails to adjust for (ii). And that is before one even attempts to vary his other assumptions."

752.   However, we consider that this is highly artificial. It assumes £100m of wholly incremental costs (i.e. they vary across the number of lines supplied) with no common costs at all. This is in fact different from Dr Jenkins' own analysis which proceeds on the basis of common costs which are common across the whole of BT Consumer. We do not consider that there is any real force in the example given and of course, it was not supported by any factual or indeed expert evidence.

753.   In fact, in oral argument, Mr Beard KC accepted (Day 27/81) that there was nothing more to the economies of scale point than the suggestion that if there was a fixed cost from one year to the next which literally could not change, and it had to be distributed over fewer lines, there would be a higher unit cost. But as an abstract point, we do not think this takes the matter much further. Nor does Mr Beard KC's suggestion that in fact, the example at paragraph 511 was concerned both with economies of scale and scope. In this regard, we have noted Mr Duckworth's evidence in the hot tub session at Day 22/80, but do not consider it adds anything here. In conclusion on this point, we do not think that it is fatal to Mr Duckworth's use of the CPI Index. Once again, if BT felt that there were significant economies of scale that led to higher unit costs as voice lines declined, or the existence of important common costs between SFV Services and bundles, it was open to BT to provide evidence on either or both of these factors. It did not do so.

*Different Cost allocations in the claim years*

754.   BT says that an important defect of the RFS in this context is that the methodologies used in the 2009 RFS were not fixed in stone and they could be changed. That is correct, although it was not suggested by BT that the allocation principles of cost causality for incremental costs and fairness for common costs had actually changed in the course of the RFSs or would have done so had they

continued. It was also said here that the allocation of costs according to such principles involved an exercise of judgment. That, of course, is true but if it is exercised appropriately and in accordance with settled principles and by BT itself and its auditors, we do not think that this is a reason to deprive the RFS model of force going forwards.

755.   Mr Duckworth was cross-examined about this at some length (see Day 15/124-164). He drew a distinction between attribution methodologies in the RFS which would be reviewed regularly, as opposed to apportionment bases which were updated at least annually - see Section 2.1 of the PAD referred to at paragraph 517 above. He accepted that for those indirect costs which could not be allocated on a costs causality basis and would then have to be apportioned on a fairness basis, there were potentially different ways of doing that. So if there was a BT brand-driven campaign, that would be an example of a cost common to all the services provided by BT and there would have to be an apportionment. He further accepted that in relation to advertising, for example, there could be differences in the overall spend from year-to-year but also differences in the nature or focus of particular advertising campaigns. He agreed that in a later year from 2009, there could be a shift, probably an increase in overall advertising expenditure, to cater for a new product line like BT Sport. But whether that meant that the unit costs which would be attributable to SFV Services would go up or down was a different question. We interpose to say that if there was that kind of increase in advertising expenditure focussing on BT Sport, it is very hard to see how it would be a common cost across all services rather than an incremental cost for BT Sport alone.

756.   It was then suggested to Mr Duckworth that, hypothetically, BT might wish to publicise, by advertising, the virtues of its telephony services both on a stand-alone basis and within bundles. He accepted that in such an event, the question of apportionment of such costs would be completely different from a situation where the advertising campaign was directed solely to bundles. He later said that the new situation would involve apportionment of some common costs but that others might be incremental and therefore attributed on a cost causality basis. He also agreed that from a costs causality point of view, there would be a shift in the proportions as customer numbers changed.

757.   Mr Duckworth also accepted that "onshoring" customer service was an additional cost and would therefore increase incremental costs. He also agreed that if there was a "fundamental dislocation" in the way that customer care services were delivered, the attribution outcome, even with the same numbers of staff, could be completely different. He then agreed that if the office accommodation estate of BT changed, there could be differences, not only in the unit costs of staff due to different rental prices but also apportionment would change as well.

758.   Finally, in this context, Mr Beard KC put to Mr Duckworth the example of a new IT billing system introduced after 2009 and which would enable single billing of multiple services for customers and

which was a very large investment. The question then was whether an RFS for that year would have radically different cost allocations from the previous year, the implication being that at least some of the additional costs of introducing the new billing system would fall on SFV Services. Mr Duckworth's first response was to say that with such a new system, the real beneficiaries would be the bundle customers because they were the ones with multiple services. For SFV Services customers, the position was as before. So even with a new IT billing system, it is hard to see how this should be attributed to SFV customers or treated as a common cost. He also said that the attribution methodologies might change. He finally agreed that if the 2009 attribution method was applied in 2010 to a brand-new IT System, the level of costs and their outturn could be radically different as far as changes in costs and distribution were concerned.

759.    In relation to that last example, it was posited as a hypothesis. The only document put to Mr Duckworth was the BT Operational Review of September 2009 which stated at page 14 that in respect of bundles, new IT systems would enable single billing to customers of multiple services. The problem with that example, and generally here, is that a number of hypotheticals were put to Mr Duckworth. Unsurprisingly, if there was a radical or fundamental change to the operation of BT Consumer based on some very large investment, that could make a change to the level of costs and how they were distributed. However, again, there is no real evidence of any of that adduced by BT.

760.    Overall, we do not consider that this part of the cross-examination of Mr Duckworth itself cast any serious doubt on his use of the CPI Index.

*Likely Size of Common Costs BT Consumer*

761.    It can be seen from what we have said above in relation to some points made against the RFS model by BT, that the CR has submitted that in any event, the common costs of BT Consumer were inherently likely to have been small or insignificant. If that point is correct, it would obviously significantly affect adversely the level of common costs ultimately attributed by Dr Jenkins to SFV Services. It is convenient to deal with this topic at this point in the judgment.

762.    Both the common costs of BT Consumer as a whole, as attributed by Dr Jenkins, and the proportion of such common costs recovered by revenues from SFV Services using the SAC Combi, are set out in paragraph 558 above. So, to take the year 2015/16 as an example, the common costs of BT Consumer in Dr Jenkins baseline scenario were said to be £390m, while revenues from SFV Services contributed £243m to such common costs.

763.    As to this, the starting point is that it is agreed between the experts that both BT Consumer in general and SFV Services in particular were asset-light, as opposed to, for example, BT's wholesale product (see e.g. paragraph 6.94 of HJ1). Mr Parker's view, albeit expressed in general terms, was that

common costs in retail telecoms businesses were not, in reality, significant or should not be so, and Mr Duckworth agreed.

764.    Obviously, Dr Jenkins disagrees, in the sense that her figures suggest very significant common costs, both in relation to BT Consumer as a whole and as allocated to SFV Services by her. There is her reliance on Ofcom's VULA Margin Statement and the TSO charges (considered at paragraphs 801-815 below) and there is then her analysis of the descriptors (considered at paragraphs 784-794 below). That analysis is not, however, as persuasive in the present context, as direct and detailed evidence from BT on the size of BT Consumer's common costs which was not adduced, would have been.

765.    Dr Jenkins did suggest that relevant common costs could include software licences and support systems, but that would not explain the size of the common costs figures. The evidence of Mr Cackett did not assist materially here. When addressing the MTP for voice services in RC1, he explained that indirect costs such as staffing were recorded at BT Consumer level and were not attributed to any particular product or service, as they were common to all. No formal attribution to individual services was made although the informal "unit economics" analysis (referred to above) made some estimate of how such costs were spread across different divisions. Although we asked Mr Cackett some questions about this exercise, and raised its significance (or otherwise) with the parties, the position was that these were treated as no more than informal estimates and neither side sought to rely upon them. Mr Cackett did, however, make clear in cross-examination that some central costs like those of networking and digital teams would include those who dealt with particular services like BT Sport, in which case such costs would, of course, be incremental and not common.

766.    A further argument made by the CR which assumed some significance in the course of the trial is that if the common costs figures were anything like those suggested by Dr Jenkins, then other similar telecoms operators could not have afforded to enter the market, and yet they did. Strictly, the relevant common costs are those of BT Consumer as a whole, in other words £390m for 2015/16, because they would have to be incurred if there was simply an SFV Services stand-alone product. In the hot tub discussion, Mr Parker made the point that common costs of that order would have to have been incurred by other operators precisely because they were common. Where the cost of entry might be incremental, that would be irrelevant because, by definition, the relevant costs to be considered here are common costs (see Day 13/160). Later in the discussion, Dr Jenkins and Mr Matthew sought to diminish the notion that if there were general common costs in relation to BT providing its SFV Services, then they were *prima facie* relevant to any other operator seeking to

provide an equivalent service (see Day 13/161-165). We deal below with the particular points made by BT in this regard.

767. Tables 1-3 of MD2 make a comparison between Dr Jenkins' suggested common costs figures and those pertaining to 3 other operators, namely the Post Office, SSE and PlusNet. The latter is part of BT Group, but it functions as a separate company. For the year 2015/16, the Post Office's total costs for all of its telephony services were £142m, with £78m allocated to its SFV Services. SSE's total costs across voice and broadband were £███ and PlusNet's total costs were £281million. All of these were markedly less than £390m.

768. As for the Post Office and SSE, BT made the point that these were companies which otherwise operated very large businesses, so they were not stand-alone telephony companies. Rather, the provision of telephone services was added to their existing range of products, and the costs reported for their telecoms businesses might well be the incremental costs of providing this service, given the common costs already incurred in creating their primary businesses. The new service could therefore be expected to rely upon existing infrastructure with its own set of common costs, and so the costs cited by Mr Duckworth were uninformative as to the size of any costs that are common between the telecoms and other operations of these firms. We think there is force in this point.

769. However, the CR also relied upon the example of Phone Co-op, a much smaller operator. This company was referred to in MD1, although in the context of his reasonable margin analysis. In oral closing, Ms Kreisberger KC referred to the Phone Co-op's s135 response to Ofcom in 2017 which showed its costs and revenue for a three-year period. It had around 20,000 customers while it was in the market ███████████████████████. The point made by Ms Kreisberger KC is that the Phone Co-op could not have operated in the voice market at all if it had to bear common costs of the order of magnitude suggested by Dr Jenkins. In criticising the use of this exemplar, Mr Beard KC described Phone Co-op as a "minnow". Ms Kreisberger KC agreed, but said that this was the point: it was still able to operate in this market ███████, from 2013-2017. And if it did, then this suggests that some of these costs were scalable, depending on the size of the customer base, and that in turn rather suggested that they were not common costs at all, but incremental. We see that, but in this context, Mr Matthew observed that the focus should be on an operator seeking to have "real weight" in the market (like BT) as opposed to other, small standalone operators like Phone Co-op. Thus the common costs necessarily to be attributed to other suppliers might be different for good reason. We think there is force in this point, too.

770. Finally, the CR also relied upon references in MD1 in the reasonable margin section to TalkTalk and Utility Warehouse. As with the Phone Co-op, Mr Duckworth was not there dealing with such companies from the perspective of the common costs as such. Nonetheless, the general point was

made that these two operators could not have entered the voice market if common costs were anything like as high as suggested by Dr Jenkins.

771.    We see that, but we think there is a further point here. The likely existence (or not) of important common costs can be inferred from the observed pricing patterns in the market. It is evident that there are large discounts available to UK telecoms consumers who buy bundles, compared to the prices charged for standalone voice and broadband. In the 2017 Provisional Conclusions, for example, Ofcom noted as follows at para 3.41.1 p23:

> "Our analysis (see Annex 8, Figure A8.43) shows that on average a split purchaser paying a combined price for standalone voice from BT and standalone broadband from BT, Sky or TalkTalk could save £8 per month (more than 20%) by switching to an equivalent dual-play service from their broadband provider at standard prices, and just over £14.50 per month (more than 35%) at promotional dual-play prices..."

772.    These price patterns are broadly similar to the price differentials that Mr Parker relied on in his market definition analysis, in which he argued that if the gap between the price of buying a dual play bundle and the sum of the prices of standalone voice and broadband contracts was greater than 5-10%, this price differential would indicate that dual play and SPC purchases must lie in separate product markets.

773.    Dr Jenkins also referred to the extent of bundle discounts in her evidence on Day 13/83, as follows:

> "if you actually look at the pricing of Standalone Fixed Voice now and standalone broadband products now they are very similar at between £26-£28 and of both of them offer the alternative product for £5 extra. So if you take a standalone broadband you can add Voice for £5 if you take Standalone Fixed Voice you can take broadband for £5."

774.    Dual Play and other bundle deals were first offered by BT's competitors. They provided consumers with advantageous price terms that were typically advertised by focusing solely or mainly on the add-on to the line rental price (which in turn in many cases mirrored BT's SLR). In 2016, however, as already noted, the ASA Ruling required all firms offering bundles to advertise the full price of the bundle, preventing retailers from focusing solely on the incremental price of broadband over line rental. This was due to concerns that such price advertising might be misleading. Bundling of various other services (TV, mobile etc.) along with voice and broadband was also highly prevalent in the industry.

775.    Taken at face value, the existence and prevalence of deep discounts for bundles over the stand-alone equivalents does indicate the existence of supply-side synergies, which in turn are likely to come from common costs. If the cost of supplying a bundle of A+B is less than the sum of the costs of supplying A and B separately, this provides a competitive explanation for the bundle discounts. It is the low marginal cost of supplying the second or third product that makes it commercially attractive to offer such price structures. This will be true whether the synergies and common costs arise from direct costs (for example if the costs incurred by telecoms retailers when buying in wholesale services from Openreach create incentives to bundle) or indirect costs (such as the ability

to profit from a common brand name or head office infrastructure when selling related services). The common cost synergies claimed by Dr Jenkins fall into this latter category of indirect cost synergies.

776.    The parties did not, however, provide any detailed evidence on the existence or otherwise of such common cost synergies, beyond the claims made by Dr Jenkins regarding the scale of the indirect common costs. The CR contended that observed price discounts might exaggerate the underlying common cost synergies between voice and other services, since BT's pricing in particular contained a deliberate policy of charging higher gross margins on voice than on bundles. Nevertheless, the prevalence of bundle discounts across all operators in the market does seem to us to indicate that there are some important synergies arising from joint provision, and this albeit indirect evidence tends to discount the CR's claims that common costs are immaterial.

777.    Overall, we do not feel that the evidence adduced by the CR clearly establishes that the common costs of BT Consumer are so insignificant or immaterial that any discussion of them becomes irrelevant. To that extent, we reject the CR's reliance on such a proposition. Nonetheless, we do attach some weight to the notion that it would be surprising if the common costs were as high as Dr Jenkins has suggested. So this is a matter which we take into account when assessing the competitive benchmark overall.

**Conclusions on the RFS Methodology**

778.    For all the reasons given above, we find it quite impossible to reject the RFS model altogether as being "not fit for purpose" as BT contends.

779.    We do, however, consider that on any view, the reliance which can be placed on its outcomes should be tempered by the observations we have made above and in particular with (a) the fact that such outcomes are built upon only one data-point which begins and ends with 2009, (b) the fact that the uprating by use of the CPI Index may underestimate any costs increases and (c) the fact that the RFS has no flexibility so far as the recovery of common costs is concerned.

780.    Precisely how these concerns are taken into account in our ultimate findings will be considered after we have undertaken our analysis of Dr Jenkins' SAC Combi methodology, which follows.

## ANALYSIS OF DR JENKINS' METHODOLOGY

**Introduction**

781.    Dr Jenkins' overall approach was described at paragraphs 525 - 558 above. As with Mr Duckworth's methodology to arrive at a competitive benchmark, we now analyse in detail each part of Dr Jenkins' approach.

782.    Before doing so, however, we would add the following. Dr Jenkins' approach is to identify a competitive benchmark based on BT's own costs (which include common costs). She does, of course, refer to comparators (as did the CR) but only on the question of reasonable margin. However, Mr Matthew's evidence was that in many workably competitive markets there will be a range of cost levels among rival firms. See paragraph 139B of his DM1 and Figure 1 beneath it. At some points, BT deployed this evidence in support of the argument that it was appropriate to fix a higher competitive benchmark than might be the case if one looked at a costs plus calculation for BT alone, or that a range of costs levels would affect whether any excess over the competitive benchmark could be considered significant and persistent. Implicit in this argument is that BT would be permitted a higher level of profitability before its prices would be considered excessive. We do not accept such arguments, because we consider that for the purposes of Limb 1 (and consistent with what we said at paragraphs 53 and 607-611 above) at this stage, the focus should indeed be on the costs of the firm in question. However, arguments of this kind would be relevant under Limb 2

**Dr Jenkins' Derivation of the Common Costs of BT Consumer**

*The Relevant Figures*

783.    It will be recalled that Dr Jenkins' baseline approach, taking 2015/2016 as an example, was that out of a total of £983m of BT Consumer's indirect costs, which represented 28% of its total costs, £390m were taken to be common costs and the balance, £593m, were incremental costs. That meant that common costs were 11% of the total costs of BT Consumer. See the Table at paragraph 558 above.

784.    Dr Jenkins' low scenario version of her model is based on making a 15 percentage points reduction in the likelihood of any particular indirect cost being common. In other words, where, for example, a cost was assessed in Annex 7 to HJ1 as having a 35% chance of being a common cost, it would now be assessed as having a 20% chance. See Table A7.1 On that basis, £262m were common costs, representing a reduction from Dr Jenkins' base case of around one third, with the balance of £721m, being incremental cost and this meant that common costs now represented 7% of the total costs.

785.    The relevant aggregate percentages here are shown in Table A7.7 of Annex 7 to HJ1:

**Table A7.7    Proportion of Total SG&A and D&A (combined) costs deemed common costs**

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| "Baseline" scenario | 40% | 39% | 39% | 42% | 45% | 46% | 43% |
| "Low" scenario | 27% | 26% | 26% | 29% | 31% | 31% | 30% |
| "High" scenario | 53% | 52% | 52% | 56% | 60% | 61% | 57% |

Note: No D&A data for 2021/22 was available from BT. I therefore assume that the D&A charges for 2020/21 are equal to the D&A charges in 2020/21. I further assume that the proportion of D&A charges that are deemed common in 2021/22 is equivalent to the proportion in 2020/21.

786.    In addition to her primary exercise of deciding the probability that a particular cost item was a common cost, as referred to at paragraphs 526 - 531 above, and discussed in detail below, Dr Jenkins performed what she describes as a cross-check using internal charges from BT's Technology, Services and Operations ("TSO") ("the TSO Cross-Check"). According to this, common costs were £269m with incremental costs being £714m, so that common costs represented 8% of total costs. It will be seen that these results are very similar to Dr Jenkins' low scenario figures.

787.    The 4 comparisons across the claim years are summarised at Annex 3 to BT's Closing.

788.    To complete the picture, and again taking 2015/2016 as an example, on Dr Jenkins' baseline scenario, 33% of BT Consumer's SG&A costs were deemed to be common and 64% of its D&A, costs were so deemed. The respective percentages on her low scenario basis were 21% and 49%. See Tables A7.5 – A7.7 in Annex 7 to HJ1. Taking the deemed common costs as a percentage of BT Consumer's total indirect costs (i.e. the sum of D&A and SG&A), common costs are between 39% and 46% of indirect costs across the claim years on the baseline scenario, and 26-31% on the low scenario.

*Dr Jenkins' Primary Approach*

789.    The key criticism made by the CR of Dr Jenkins' estimates of common costs relates to the process of analysis which she used so as to derive the common costs figures. That process is summarised at paragraphs 526 - 529 above and is described in detail in Annex 7 to HJ1. Table A7.2 sets out the results of the exercise. The various columns in that table can be explained as follows, by reference to their headings:

(1)    "Label in financial disclosure" is the description given to a set of costs in BT's disclosure for these proceedings; it is not therefore contemporaneous;

(2)    "BT description of cost line" is how BT described the costs line in the SG&A and D&A sections of its P&L accounts for BT Consumer; it is, in other words, BT's own descriptor;

(3)    "my mapping of cost item to Ofcom category (Ofcom cost type)"; this column sets out how (if at all) Ofcom described the costs line for the purpose of its VULA Margin Statement;

(4)    "size of cost item (average over 2015/16 to 2019/20)"; this is the monetary amount involved;

(5)    "my categorisation (proportion of this cost item which is common costs)" sets out Dr Jenkins' assessment of the probability that the item is a common cost; and

(6)    "Reasoning for my categorisation" sets out her reasons.

790.    As Table A7.1 of Annex 7 shows, Dr Jenkins, uses 7 different probability measures. On the baseline case, an item which is not a common cost at all is shown by 0% and certainty that it is a common cost is shown by 100%, as one would expect.

791.    Once Dr Jenkins' probability percentages have been applied to each cost item, it is then possible to arrive at a total common costs figure. It follows that the balance must be incremental costs. Because Dr Jenkins' analysis started with deriving a figure for common costs, there was no separate or independent attribution of incremental costs. They are arrived at simply by a process of deduction.

792.    The first point made by the CR is that Dr Jenkins' assessment of the probability of any particular cost line being a common cost is arbitrary because it is simply an exercise of judgment. And if one looks at any particular descriptor, there is not enough information to indicate with any real degree of assurance that it tends to show a common rather than an incremental cost.

793.    As to that, obviously, it is an exercise of judgment, which Dr Jenkins has tempered, to some extent, by providing a set of low scenario figures as an alternative to the baseline results. But the use of judgment is not *per se* an obstacle, in our view. And in fact, some of the descriptors, assisted by further details, as shown in Table A7.2 do seem informative, especially in the context of D&A costs. Further, the CR did not cross-examine Dr Jenkins at all on her individual allocation of percentage probabilities.

794.    More telling, however, is the CR's related point which is that, however useful her own exercise of judgment may have been, Dr Jenkins could - and should - have been assisted by BT itself in performing this exercise. There is no reason to think that BT could not have provided input as to the status of the costs line (as common or incremental) by reference to much more detailed descriptions of what these costs were actually for, which Mr Duckworth describes as the missing "quantitative evidence".

795.    This is then contrasted with the position under the RFS where the costs were allocated by BT on a costs causality basis as far as possible, with the remainder - the common costs - dealt with on a fair basis and by reference to an extensive and sophisticated set of data. It is of course the case that the RFS did not state which of the indirect costs were incremental and which were common. But at least

it started by seeing which costs must have been incremental by using costs causality. Accordingly, we do think that there is force in this part of the CR's criticism.

796.    At paragraph 6.131 of HJ1, Dr Jenkins says that:

> "I estimate the SAC of SFV Services in every financial year for which I have financial data from BT Consumer as the sum of the following elements:
> (a) the incremental costs of SFV Services (comprising the Cost of Sales and the incremental SG&A and D&A costs);
> (b) all BT Consumer common costs; and
> (c) a reasonable rate of return of 25% EBIT margin."

797.    At paragraph 5.15 of MD2, Mr Duckworth says that implicit in that statement is an assumption that the costs she identifies as fixed (i.e. not incremental) are common to all products, so she does not consider the existence of fixed costs within BT Consumer which are not common to SFV Services. Such costs would include: product development costs relating to the provision of broadband, television and mobile services, or bundles, product management costs relating to such services, advertising and marketing costs for non-SFV products, and other fixed costs relating to television, or bundles, including television, such as the cost of the acquisition of content rights which would be independent of the number of customers or the cost of TV production. In other words, costs which have no apparent connection to the SFV product and would not have to be to be incurred by a standalone SFV provider. From this, Mr Duckworth suggests at paragraph 5.16 that:

> "Dr Jenkins' simplified approach does not allow for fixed costs which are not required for the provision of BT SFV Services to be correctly classified and implicitly assumes that these costs would be incurred in the provision of SFV Services on a standalone basis. As a result of this, Dr Jenkins over-estimates the level of fixed and common costs associated with the provision of SFV Services."

798.    Dr Jenkins' response to this in the JES is essentially to rely on the TSO Cross-check. We deal with this response at paragraphs 808 - 815 below, in the context of the TSO Cross-check generally, but should say here that we do not find it a complete answer to the point made by the CR.

799.    Overall, while we would not by any means simply disregard the primary approach taken by Dr Jenkins in saying what should be regarded as the common costs of BT Consumer, there are clearly some difficulties with it such that her ultimate figures cannot simply be adopted without more.

800.    However, we then need to consider the support which Dr Jenkins says she has obtained from (a) Ofcom's treatment of some of these costs in the VULA Margin Statement and (b) her use of the TSO Cross-check.

*VULA Margin*

801.    As for the VULA Margin Statement, it will be recalled that VULA is the mode of access to superfast fibre broadband. One can see that in the VULA Margin Statement, for most of the SG&A cost lines (but none of the D&A cost lines), there were descriptors applied by Ofcom being either "short-run variable" ("SRV") or "long-run variable/fixed" ("LRVF"). The former are taken by Dr Jenkins to describe incremental costs and the latter to identify common costs. They may not in fact be a

complete proxy because long run fixed costs can in fact be incremental to a particular product or group of products, only as opposed to being common to all. That would be the case if a building was taken on a lease in order to service the administrative requirements of some but not all products. This would be a long run "fixed" cost but ultimately it would be incremental to the products concerned, rather than common to all.

802.    At this point, it is necessary to say something more about the exercise being undertaken by Ofcom in the VULA Margin Statement. The purpose was to regulate the margin between BT's wholesale and retail superfast fibre broadband prices, so as to avoid a margin squeeze by BT on its competitors in the retail market. Ofcom's requirements here were limited to a minimum margin. They did not extend to imposing particular price caps, thereby continuing its approach since 2014, that BT should retain broad flexibility over its VULA prices in what was a review period.

803.    The margin condition imposed was arrived at by Ofcom by, among other things, its assessment of BT's costs in respect of superfast broadband on a LRIC+ basis, i.e., including an allocation of common costs. This in turn led Ofcom to assess which elements of BT's SG&A costs should be regarded as SRV or LRVF, apparently on the basis that short run variable costs were more likely to be incremental to whichever service they were associated with, whereas costs that remained fixed had a higher probability of being invariant to changes in output levels, and therefore had properties closer to the notion of a common cost that did not belong definitively to any individual output or service.

804.    All that is relevant in the present context is the application of one or other of these labels to particular costs lines within BT's SG&A costs. These are set out at Guidance Table 1 of the Margin Statement. The source of the information in the table (presumably the description as opposed to Ofcom's designation) is said to be BT's responses to various statutory requests for information made by Ofcom in August and October 2013. Ofcom did not analyse D&A costs, and that is why Dr Jenkins' analysis in that regard makes no reference to any Ofcom designation.

805.    We understand why Dr Jenkins has sought to make use of the Ofcom designation, at least as a guide, even if the concepts of SRV and LRVF costs are imperfect as proxies for incremental and common costs. However, there must be a caveat, in that Ofcom's exercise involved a different focal product, indeed at the opposite end of the technological spectrum, to a simple voice line and so it does not follow that all of the costs labelled LRVF would be common to SFV and other services within BT Consumer as well.

806.    In addition, Ofcom employed an FAC methodology in the Margin Statement and so actually determining whether costs here were common or incremental would not affect the results of Ofcom's costing exercise.

807.  Nonetheless, we do not consider that it was unreasonable of Dr Jenkins to seek some assistance from the simple way in which Ofcom chose to designate particular SG&A costs lines. Accordingly, we give some weight to it as a guide, which is how she describes it. However, we do not consider that it provides an answer to the problems we have identified in Dr Jenkins' primary approach.

*The TSO Cross-check*

808.  That then leaves Dr Jenkins' TSO Cross-check. The outcome of this cross-check is described in paragraph 786 above. Again, one starts with the VULA Margin Statement. For Ofcom's purposes, BT had referred to a list of TSO activities and said that these costs were recharged internally. At paragraph 6.198 of the Margin Statement, Ofcom said that TSO could be thought of as the "back office" of BT which provided support and services to all the market-facing units ("MFUs"). At paragraph 6.200 Ofcom said that there were three broad categories of TSO costs, namely, direct, indirect and fixed costs. Here, Ofcom was using fixed costs as another word for common costs because it stated that fixed costs were costs that could not be directly or indirectly attributed to an MFU and were mainly related to BT-wide activities or in support of TSO activities. They included accommodation, energy and TSO overheads. Ofcom then included a proportion of all three categories of TSO costs in its margin assessment. It allocated all of the TSO costs on a Revenue basis.

809.  We now turn to Dr Jenkins' reliance on the TSO costs. She refers to a BT compliance model for the limited purpose of the VULA margin requirement, which was submitted by BT to Ofcom in October 2016 ("the Compliance Model"). In it, the TSO costs for 2015/2016, were described by BT as being "direct", "indirect," or "fixed". The designation of particular TSO costs by BT as "fixed", as opposed to "direct" or "indirect" was itself drawn from an Ofcom Decision dated 21 October 2014, which responded to a complaint made by TalkTalk that BT was guilty of a margin squeeze in relation to superfast broadband. In the course of reaching its decision that there were no grounds for action against BT, Ofcom undertook a LRIC exercise in respect of BT's costs. In respect of 7 categories of TSO costs, it concluded that two categories were fixed, namely Accommodation and Energy and TSO Functions (Overheads). In its Compliance Model, using those categories, BT said that a total of £127m of costs fell into those two categories and were therefore fixed. This is out of a total amount of TSO costs of £170m. It therefore followed that in the Compliance Model, BT had designated 75% of its total TSO costs as fixed.

810.  Dr Jenkins then applied that percentage to the cost lines within BT Consumer's P & L accounts which made express reference to TSO (for example, Fixed Recharges). In other words, she attributed a 75% probability that they were common. For the purpose of this exercise, she did not regard any

other of the costs lines as involving common costs at all. The results of this exercise correspond closely to Dr Jenkins' low scenario, as stated in paragraph 784 above.

811. The CR's response to this is twofold. First, it again made the point that it was not clear that the TSO fixed cost recharges were limited to costs which were common across all the MFUs, in other words the same point as was made generally, noted at paragraph 796 above.

812. As to that, Dr Jenkins said that at least in relation to the TSO costs, there could be no issue that the common cost element thereof would apply to SFV Services, given the definition of "fixed costs" referred to in paragraph 808 above. Moreover, this cross-check exercise was itself conservative, because it excluded other common costs which would arise if one looks simply at her primary analysis. Further, in the hot tub discussion (Day 14/54-56), Dr Jenkins made the point that Ofcom in the VULA Margin Statement was seeking to characterise as much of the indirect costs as possible as being incremental, leaving relatively little for common costs. So if one was relying on TSO costs only, they would be unlikely to over-state common costs by including costs that were not common to SFV Services. We see that, although of course it only goes so far, since if one was relying just on the TSO Cross-check, the results would be significantly below her baseline scenario.

813. The CR also makes a second point here by reference to a set of slides produced by BT on 19 December 2016 called "Ofcom's Proposed Retail Narrowband Market Review". Paragraphs 7 and 8 of that document are headed "our financials demonstrate that increasing value provided is driving down profitability for Solus Customers." In the hot tub discussion, Mr Duckworth pointed to the fact that, against the cost lines referring to TSO Direct, Indirect and Fixed, there was a rubric "significant downweight - proportion of number of products c3-4%".

814. Mr Duckworth said that this showed that BT reduced the proportion of such costs being allocated to SFV Services (i.e. "line-only") to reflect the fact that such costs were not all fixed and common to SFV Services, or should not be treated as such. Mr Duckworth then referred to an underlying spreadsheet showing that, actually, only 20% of the TSO costs were allocated to accessing the SFV Services. He made the same point in relation to the same rubric applied to "Total Marketing and Sales Costs". As to that, Dr Jenkins pointed out that the BT slides were allocating all the indirect costs, as opposed to separating out common and incremental costs. It is also fair to say that Mr Cackett was not cross-examined on these matters. Mr Beard KC said that it was not clear what was going on in the BT slides document. In our view, although we understood what Mr Duckworth was saying about the slides, we did not feel we could draw anything useful from them; there was simply not enough information about what was going on here.

815. Overall, while we think that the TSO Cross-check has some value, it does not provide a complete answer to the difficulties we already identified with Dr Jenkins' primary approach.

*Conclusion on BT Consumer Common Costs*

816. In our judgment, looking at the evidence overall, we consider that the common costs of BT Consumer, as stated by Dr Jenkins in her baseline scenario cannot be taken as reliably established and there is a significant risk that they have been overstated. We also come back to the observation that reliance on Dr Jenkins' judgment and a series of imperfect cross-checks is inferior to an approach that would have been based on BT's own detailed knowledge of cost causation, and which BT chose not to undertake for the current case. We set out below the extent and impact of this.

**The SAC Combi Exercise**

*Insufficient number of combinations*

817. It is common ground that Dr Jenkins has not undertaken her SAC Combi exercise on every possible combination of the relevant BT products. In particular, her SAC Combi analysis did not explore combinations that broke down the different elements within BT's bundles. Instead one component, which features in 13 of the first 25 combinations was called "Bundles". In relation to this, Dr Jenkins stated as follows in HJ1:

> "6.143 The Bundles service is a broad category that includes the provision of TV services and BT Sport, in addition to fixed voice services and broadband services sold in bundles. BT TV services always require the purchase of a broadband line, and are therefore always sold in bundles, whereas BT Sport was a service launched by BT to support its broadband business and, in particular, to increase customer acquisition and retention on superfast broadband packages. I therefore consider it reasonable to consider Bundles as a broad category of services including TV and BT Sport (however sold).

> 6.144 Furthermore, I have not disaggregated Bundles into dual-play, triple-play and quad-play as separate services from which to derive relevant combinations. In my view, doing so would not materially assist in determining whether SFV Services were priced excessively. Any potential differences in the final "cost plus" benchmark identified in Step 3 that might arise from testing these further granular bundle types in combination with SFV Services would be capturing BT's relative pricing decisions within its portfolio of bundles. In my view, the appropriate allocation of common costs for SFV Services should be judged against the contribution to common costs of Bundles as a whole. In addition, the number of combinatorial tests to run would grow exponentially and potentially render my preferred SAC Combinatorial approach impractical to implement."

818. The CR's first criticism of this approach is that Dr Jenkins has not employed a sufficient number of combinations, which would be very much more, if, for example, her "Bundle" was disaggregated into its various constituent products, and the CR argued that products such as television and BT Sport needed to be treated separately.

819. In effect, the CR contends that (a) there is a general defect with Dr Jenkins' SAC Combi because it does not test for all possible combinations, and (b) there is a particular problem with the failure to separate out BT Sport and which, in effect, means that BT's profits on SFV Services are subsidising the losses incurred on BT Sport. Obviously, both points are related, but we deal with each in turn.

<u>The General Defect</u>

820. As to this, Mr Duckworth disagreed with the approach taken by Dr Jenkins and, as set out in the paragraphs of HJ1 referred to in paragraph 817 above, his view was that combinatorial testing was

meant to be a theoretical model, designed to see if the focal product's price would entail an over-recovery of common costs or not. In this context, Mr Duckworth noted that for 2015/16, Dr Jenkins' "Bundle" accounted for 78% of BT Consumer's revenue. The point is that Dr Jenkins did not differentiate between different types of bundle and all the elements within it that had different characteristics, costs, prices, and therefore margins. If the bundle included loss-making products (or ones whose costs were inefficiently incurred) that would reduce the profitability of the bundle and would therefore increase the share of common costs that the model would permit to be contributed by SFV Services. He explained this persuasively, in our view, in the hot tub discussion at Day 14/5.

821.    Mr Duckworth also considered that Dr Jenkins' approach was inconsistent with what the Tribunal said in *PPC* (see paragraphs 658-659 above).

822.    As for Mr Parker, he demonstrated how a failure to consider all different combinations did indeed lead to a greater share of common costs being attributed to the focal product. In the hot tub discussion at Day 14/8-10, he showed this by reference to Dr Jenkins' initial model which explained combinatorial testing at Box 6.1 of HJ1. If Dr Jenkins' very broad "Bundle" category happened to contain two elements, one of which was profitable and the other loss-making, it is intuitive that running an alternative combination which included only the profitable bundle category would generate a higher bundle contribution to common costs, and therefore allow lower headroom for SFV to make a common cost contribution within the overall constraint of no over-recovery of such costs. The broader the set of products within Dr Jenkins' "Bundle", the greater is the scope for some such sub-bundle to exist which would yield a less favourable SAC Combi result for SFV Services.

823.    In response, Dr Jenkins, in the hot tub discussion at Day 14/14, and at a general level, again justified her choice of combinations by emphasising that the relevant "competitive arena" was bundles, so there was no need to disaggregate the various bundles involved. Mr Duckworth thought that this was wrong in principle and that if one shows combinations according to one's view of BT's underlying strategy (which may change over time), that introduced a degree of subjectivity, whereas the test should be applied almost mechanistically. Dr Jenkins' response was that to test every single combination would make the SAC Combi exercise "infeasible and someone had to be pragmatic and it made sense in that context to take into account the behaviour of BT and its rivals in the market".

824.    However, the problem about that is that, in the context of BT, and as the Tribunal in *PPC* observed, it may be the case that combinatorial testing is simply not practical because of the number of combinations needed. If that is correct here (and it seems to us that it is), it does seem to us that Dr Jenkins' approach is inconsistent in that respect with *PPC*.

825.    In any event, it may not even have been necessary for Dr Jenkins to have tested every single combination. She could at least have employed a number of combinations which disaggregated the bundles. But she was not prepared to do this.

826.    There is therefore a problem at a general level with Dr Jenkins' selection of the combinations.

BT Sport

827.    We now turn to the question of BT Sport. First, it is necessary to set out some background facts. BT Sport was introduced in 2013 and was supplied free of charge with BT Broadband. This stopped in 2015. For the period thereafter, the revenues and LRIC costs generated by BT Sport are set out by Mr Parker at Table 2 to DP4. This shows that, taken by itself, BT Sport has been significantly loss-making in each of the relevant years. The losses range between £443m in 2015/16 and £612m in 2019/20 with an average loss across the claim years of £566m. In 2015/16, BT Sports' negative gross margin was 74.5% compared to, for example, positive broadband gross margins of 50%, and voice at 64%.

828.    If one compared this with the revenues and LRIC costs of Dr Jenkins' "Bundles", there are here profits ranging from £601m to £968m, with average profits of £828m. And if one looks at Bundles without BT Sport as a constituent, profits are between £1,180m and £1,580m, with an average of £1,394m.

829.    Mr Parker goes on to say (Table 4 of DP4), that if BT Sport was removed from the Bundle, the exercise would then produce a competitive benchmark which was significantly lower than the relevant ARPU for all of the claim years, except for 2020/2021, where the ARPU was less than the benchmark by 57p, and where, for the first 4 years of the claim, the monthly ARPU was about £6 more than the benchmark. This comes about because removing the losses of BT Sport from BT's bundles significantly increases the profits of bundles, and this in turn means that under SAC Combi there is significantly less common cost that is unrecovered when the calculations come to assess the headroom that is available to SFV Services.

830.    The arithmetic here is clear enough, but the substantive question is whether removing BT Sport from the BT bundle is consistent with the contestable market theory that underlies the SAC Combi approach. Dr Jenkins' contention is that it would not be valid to do so, since the appeal of (and hence the revenues attracted by) BT bundles was inherently dependent on the fact that such bundles were predominantly supplied alongside the attractive BT Sport product. If a hypothetical standalone supplier of BT bundles absent BT Sport would fail to attract the revenues that were associated with BT's actual bundle sales, then the high profits ascribed to this hypothetical "Sport-less" BT bundle would be illusory, and it would not therefore be consistent with the SAC Combi rationale to include a bundle that excluded Sport.

194

831. Dr Jenkins said that one should regard BT's strategy as not involving it being a retailer of BT Sport alone, but rather that it offered BT Sport to promote the sale of its bundles. Here, she relies, first, on what Ofcom said in the VULA Margin Statement paragraph 5.90:

> "BT's investment in sports content was to support its broadband business and, in particular, including increasing customer acquisition and retention on superfast broadband packages."

832. This was in fact in the context of Ofcom rejecting arguments made by BT that the revenues and costs of BT Sport should be excluded from the assessment of its VULA margin.

833. Dr Jenkins also relied upon the Financial Factbook produced by BT on 5 July 2016, which, at page 26, recited that BT Sport was established in 2013 and that it "has helped to drive customer acquisition and retention in Voice, Broadband and TV" and that "the benefits of improved customer acquisition and churn across our core products sit within Voice, Broadband and TV P&Ls".

834. We see all of that, and of course it would be naïve to think that BT's commercial strategy did not at least include using BT Sport to drive sales of bundles, among other things. That said, there was no direct factual evidence from BT on the point.

835. At Table 10 in Section B4b to the JES, Dr Jenkins has provided figures to show the percentage of BT Sport lines sold in a bundle which included voice (and hence BT lines sold on a stand-alone basis by a process of deduction). The proportions forming part of bundles across the claim years were 93%, 85%, 70%, 67%, 63%, 60%, and finally 57%. In addition, Figure 2 of Section B4c shows that, of those BT customers switching from SFV Services to a BT bundle, 47% switched into a bundle which included BT Sport. The proportions doing so in subsequent years of the claim were 38%, 31%, 30%, 23%, 9% and 10%.

836. As to that, Mr Parker said, if, say, 40% of BT Sport lines were sold separately, that is still significant, and the same could be said about Dr Jenkins' reliance on the proportions of BT customers switching into bundles which included BT Sport. The proportion doing so was always less than 50% and very much less so by the end of the claim years.

837. Mr Parker accepted in the hot tub discussion that if there were no stand-alone sales of BT Sport at all, and it could only ever be purchased in the bundle, his objection based on the inclusion of BT Sport in the "Bundle" would be less of an issue. However, he then pointed out that in fact, there was "a whole chunk of stand-alone sport being operated". In any event, the SAC Combi exercise still had to be done properly and this could involve a service that did include BT Sport and one that did not.

838. Overall, it does not seem to us to be clearly established that, across the entire claim period, the primary purpose of BT Sport was to act as a driver for the purchase of BT Consumer's other products and as we said above, there was no direct factual evidence on the point.

839. However, even if one accepts Dr Jenkins' claim that BT Sport existed primarily as a device to attract consumers to BT bundles, the exchanges between the experts on BT Sport also revealed a further issue that creates problems for including the BT Sport losses in the SAC Combi calculations. As we note above, the losses actually incurred by BT Sport during the claim period were very substantial. Mr Duckworth questioned whether it was appropriate for the large discrete costs incurred by BT Sport in acquiring content to be accounted for on a cash basis, or dealt with as assets that should be depreciated over the years over which the rights were held. Dr Jenkins responded that to take this approach would be to convert the profit assessment to a return on capital ("ROCE") approach that would be inconsistent with the return on sales model on which all of the profit assessment was based.

840. On a separate point, Mr Parker pointed to the possibility that BT might have adopted other approaches to creating content that attracted consumers to bundles, and argued that such alternatives might have very different consequences for the outcome of the SAC Combi calculations.

841. To deal with these concerns fully, it would have been necessary to conduct a detailed review of the rationale for BT's investments in BT Sport and the accounting treatment. However, the brief exchanges between the experts on these questions did not allow us to reach an informed view on these complex factual questions. In circumstances where there is no evidence as to the underlying investment or costing decisions made in connection with BT Sport, for example, there is no way of knowing whether BT Sport's losses were due to inefficiencies or because some other, less unprofitable strategy to promote bundles (if that is what it was) could have been adopted. This last point reflects Mr Duckworth's evidence on Day 14/5, referred to at paragraph 820 above.

842. In our assessment, this fact highlights a more general concern with reliance on Dr Jenkins' SAC Combi results for assessing the competitive benchmark. Whilst, as we have acknowledged above, the sharing of common costs across different activities means that there is an inevitable interdependence between the profitability of those activities, this feature also means that the task of accounting for all such interdependencies is extremely complex. Where, as in the case of BT Sport, the view taken on the profits of any one element has a potentially transformative impact on the SAC Combi result for SFV Services, this seriously compromises the reliance that can be placed on such results. We see this as a further manifestation of the problem – identified in *PPC* – that the theoretical attraction of SAC Combi can be outweighed by the practical problems that arise from its implementation.

843. Having regard to all of the above, in our judgment, there are two problems with the failure to disaggregate BT Sport from the "Bundle". The first is that, notwithstanding any commercial rationale to use BT Sport to drive bundle sales, it is difficult to conclude on the evidence that it

existed purely as a form of advertising, as it were, for bundles. But secondly, even if there were no case at all to disaggregate BT Sport from the "Bundle", as a result of the foremost commercial function (which was not satisfactorily established), there remains this further problem: on Dr Jenkins' model, the huge losses made by BT Sport - its extreme lack of profitability - are driving a very high proportion of common costs to be borne by SFV Services even though BT Sport is an entirely different product from SFV Services. Moreover, this is a conclusion on the particular combinations selected by Dr Jenkins.

<u>Conclusion on the combinations chosen for the SAC Combi exercise</u>

844.    Overall, on this issue, we do not find that Dr Jenkins' SAC Combi approach, or the competitive benchmark that flows from it, can be said to provide a reliable basis for the Limb 1 assessment. If the SAC Combi is to be invoked, it needs to be done in a way that addresses the concerns that have been identified with taking this approach. Ideally, that would involve addressing all combinations. If it is impracticable to do this, there must at a minimum be a proper appreciation of the problem and a credible method must be found for dealing with this deficiency. For reasons we have outlined above, we do not think Dr Jenkins has met this test. Attempting to select particular combinations (and not others) by reference to perceptions of BT's commercial strategy is not an answer to this point. Further, in the context of the particular SAC Combi exercise undertaken by Dr Jenkins for the purpose of ascertaining a competitive benchmark, this deficiency has real consequences, as is demonstrated by the issue of BT Sport. The view we take here is in keeping with the observations of the Tribunal in *PPC*. While we accept that a firm such as BT is entitled to some flexibility in the way in which it seeks to recover common costs, we do not find that the results of Dr Jenkins' SAC Combi provide a credible basis for defining the reasonable limits of that flexibility.

*The "Number of Lines Error"*

845.    It will be recalled that a critical part of Dr Jenkins' calculation of the competitive benchmark for SFV Services generated by each combination for any given year is ascertaining the "permitted" price increase. This was done by taking the annual amount of the increase, dividing it by the number of lines and then calculating the monthly increase.

846.    However, Mr Parker suggested that there was an error in this calculation. Since the relevant increase was to be added to the actual price of SFV Services i.e. the focal product, it should be calculated by dividing the annual sum by only the lines within SFV Services. However, Dr Jenkins divided it by the much larger number of voice lines existing across the board. The effect of this approach was to understate the allowable SFV price per line under the SAC Combi method i.e. it made Dr Jenkins' estimates of the reasonable cost-related price for SFV significantly *lower* than they would be had she used the number of SFV lines as the denominator in the calculation. What Dr Jenkins should

have done, according to Mr Parker, is to divide the annual sum by the number of SFV Services lines only. The increasing difference between the number of SFV lines and all voice lines over the years is shown at Table 5 in DP4.

847.    Mr Parker says that Dr Jenkins' error is one of logic. That is because it is inconsistent with a theoretical approach whose purpose is to identify the recovery of the differential from SFV Services and therefore its customers, not those who have taken voice services as part of a bundle as well.

848.    Mr Parker noted that Dr Jenkins said that her approach was correct on the basis that the same voice prices were set by BT, whether for stand-alone SFV Services or for the voice element within bundles. However, he pointed out that this did not mean that prices for SFV Services and bundles would reflect those voice prices as they changed. This is because bundles overall (which is the relevant "product" to consider) were priced much more competitively. In other words, Dr Jenkins' argument here is simply another manifestation of the "bundle pricing fallacy". We have referred to this at paragraphs 439-447 above.

849.    Mr Parker then sets out the consequences of what he says should have been Dr Jenkins' approach in Tables 6 and 7 of DP4. If one divides the annual differential by the number of SFV Services lines only, the resulting competitive benchmark is much higher than in Dr Jenkins' results. Further, since the number of SFV lines decreases over time, compared with all voice lines, this effect is magnified in later years.

850.    If Mr Parker is correct and there is this error which, if corrected, would entail the figures shown in Tables 6 and 7, the results do become implausibly high. On that basis, Mr Parker suggests that it shows that the underlying SAC Combi model is defective.

851.    As a further example, he shows in Annex A4 to the JES that if the focal product was stand-alone broadband rather than SFV Services (the former, like SFV Services, having relatively few customers compared to bundles) BT could raise its prices from 2019/2020 by around 6,500% before they could be considered excessive. He said that this was in part a function of the fact that Dr Jenkins SAC Combi approach allows a large proportion of overall common costs to be recovered from a product with relatively few customers.

852.    In answer to all of this, Dr Jenkins says that the "implausibly large" benchmarks which Mr Parker pointed to only arose because he had departed from giving effect to the commercial practices of BT. His set of prices would not be observed in practice. That was, indeed, because there would only be a single relevant voice price set by BT across-the-board. Dr Jenkins says that this is not a manifestation of the "bundle pricing fallacy" because whether, upon any price increase for voice services across the board, the overall bundle price increases by as much, is irrelevant to the

calculation of the "upper bound" of the cost benchmark for SFV Services (see JES at paragraph 7.1.27).

853.   She explained further that when setting how individual products should make up the "revenue gap" there was an element of judgment and pragmatism, which here means that sharing the cost of the differential across all voice lines was appropriate. She said that this was reasonable, having regard to what Ofcom had identified as one particular problem with SAC Combi tests, in its *PPC* Decision of 14 October 2009 at paragraph 5.71. The problem was how to identify particular services within a combination that had led to excessive pricing, where the combination had therefore "failed" the SAC Combi test. However, we do not see how this observation justifies Dr Jenkins' approach here which, in any case, is in a context where the relevant combinations were under-pricing rather than over-pricing in terms of the results of the SAC Combi test.

854.   In the hot tub discussion (see generally Day 14/44-52) Dr Jenkins also suggested that spreading the cost across all voice lines was appropriate because it was "better matched" to the scale of common costs and avoided the problem of excessive loading of common costs upon a small group of customers. However, it seems to us that this is not really a principled application of the competitive benchmarks yielded by Dr Jenkins' SAC Combi model. In reality, we think that what Dr Jenkins was doing, understandably enough in one sense, was mitigating the effect of her competitive benchmarks by spreading the common costs more widely which would then avoid some of the extreme outcomes pointed to by Mr Parker. That is all well and good, but it does not really answer the point that if the proper application of the SAC Combi model, strictly applied, would produce implausibly high figures, that must cast doubt on its reliability. We agree with Mr Parker about the fact of such results probably also reflecting Dr Jenkins' inputs which would include her choice of combinations and the common costs figure within BT Consumer that she arrived at in the first place.

855.   For all those reasons, we consider that there was a "Number of Lines Error" on the part of Dr Jenkins, and its correction also suggests that there is a serious problem with her SAC Combi model.

*Conclusions on Dr Jenkins' SAC Combi methodology*

856.   Overall, we consider that Dr Jenkins' approach, insofar as it is based on the SAC Combi exercise, is seriously deficient, and it cannot justify the competitive benchmarks which are said to result from it. However, before dealing with the consequences of that view, we now need to consider. Dr Jenkins' alternative analyses based on DSAC and FAC, albeit these were invoked by her simply as a "cross-check" to her SAC Combi methodology.

**DR JENKINS' DSAC CROSS-CHECK**

857.    Dr Jenkins has undertaken an alternative DSAC analysis as a "cross-check" to her SAC Combi. As is also noted in *PPC*, in contrast to SAC Combi, the DSAC approach does not benefit from being based on the economic theory of contestable markets, but as Dr Jenkins noted (as indeed was the case in *PPC*) DSAC had been recognised as a pragmatic alternative to combinatorial testing, especially where the number of required combinations would be infeasibly large. In fact, as we have pointed out, that problem exists for the combinatorial testing here, as it did in *PPC*.

858.    Dr Jenkins calculated the DSAC she considers appropriate here, as follows: she first defined a "broad increment" of services, across which the relevant common costs figures would be applied. This increment contained all the SFV Services (i.e. SLR, Line Rental Saver ("LRS")) and Line Rental Plus ("LRP") along with HPS and BT Basic.

859.    She then took the common costs figure which she had already derived in her initial exercise (see the table at paragraph 558 above) and allocated it to each individual service within the increment on an EPMU basis, i.e. using the direct costs of each service as the driver. To this figure, she then added the LRIC costs, again, as previously calculated, and the 25% margin. This produced a total annual cost which was then divided by the number of SFV Services lines, and that annual cost was then divided by 12 to reach the monthly competitive benchmark on this basis.

860.    The results of that exercise are shown at Figure 6.11 in HJ1:

**Figure 6.11    Comparison between SFV Services ARPU and the DSAC "cost plus" benchmark (baseline common costs scenario)**



861.    It will be seen that the competitive benchmark figures start at £26.24 per month for 2015/16 and rise each year, with the benchmark for the final year being £57.41. As can be seen by comparing Figure 6.11 with Figure 6.10, which set out the competitive benchmarks arising from the SAC Combi (as adjusted - see paragraph 500 above), the DSAC benchmarks are significantly higher than the former for every year. In fact, by 2019/20 the ARPU is below the benchmark by around £25 and increasing.

862.    The CR makes a number of criticisms of Dr Jenkins' approach here.

863.    First, it is said that, since the DSAC model uses the same derivation of BT Consumer's common costs as Dr Jenkins had used as a precursor to her SAC Combi, the CRs criticisms there apply equally here. That is correct, and we have already concluded that there are problems with that common costs analysis - see paragraph 816 above.

864.    Second, insofar as 25% is not the correct margin, the CR says that this again adversely affects the results of the DSAC model. That is obviously correct, and see our conclusions on margin at paragraph 642 above. Third, and in our view critically, Mr Parker and Mr Duckworth both say that Dr Jenkins' choice of the elements of the increment are essentially arbitrary in a way which is inappropriate here. In particular, the increment does not include any bundle, including the "Bundle" used as one of the combinations in Dr Jenkins' SAC Combi. They both consider that her selection of the elements is arbitrarily small.

865.  Mr Parker illustrates this by Table 8 in DP4. This shows that if the Bundles were included in the increment, then the level of competitive benchmark is much lower and is then below the relevant ARPU for all of the claim years, and markedly so for the first four of them.

866.  In the hot tub discussion, Dr Jenkins defended her choice of increment elements on the basis that this case relates to certain SFV Services which are alleged to have been excessively priced i.e. the focal products. The increment elements should therefore be those services and the other SFV Services which are close to them i.e. HPS and BT Basic, but no other products. It was therefore reasonable to view the increment as being confined in that way. We do not see why this necessarily follows, or why, as a matter of principle, other services (especially those which constitute a large percentage of BT Consumer's services) should not be included as well.

867.  On the question of including the bundles, Dr Jenkins said, both in the JES and in the hot tub discussion, that if this was done, then it would yield results almost indistinguishable from the LRIC+/FAC approach. We do not think that this is much of an answer, since if that would be the result, then it might suggest that the sort of LRIC+/FAC approach said to be inherent in the 2009 RFS was itself cross-checked by this iteration of the DSAC model. On any view, it hardly means that such an iteration could not be appropriate.

868.  In the hot tub discussion, Dr Jenkins said that if one added bundles to the increment, one was back to asking how common costs should be allocated and then a range of allocators could be used. Otherwise, she just said that she thought that the group she had selected for the increment was the right one. It was therefore another useful piece of information to judge the pricing flexibility that would be observed in the working competitive market. We did not consider that any of these points really address the argument that to use a model which, almost by definition loaded all of the common costs onto just one (decreasing) segment of BT Consumer was arbitrary and inappropriate. As Mr Parker observed (Day 14/64-65):

> "All I have done here is just to illustrate, you could pick another arbitrary combination by also including bundles, and if you do that then you get a much, much lower benchmark. You can see that in Table 8. By the end of the period we are talking about magnitudes of a difference of sort of 250%, if not more. I do not think this really tells you anything, to be honest. I think it just tells you that if you pick an arbitrarily small combination to recover your common costs over at any level of common costs, that will give you a high number relative to picking a broader combination. I think to the extent that all firms in this market seem to be operating on a multi−product basis, I am not sure why you would restrict your attention just to SFV services. So, for me, this does not really add much. This is just a different way of cutting the common cost cake that Dr Jenkins suggests is the right level of common costs."

869.  He added that, in fact, pricing at this level (up to around £50) would simply not arise in workable competition.

870.  We consider that the CR's criticism of Dr Jenkins' DSAC model in this respect is well-founded. The criticisms made by Mr Parker seem to us to reflect a number of the concerns we have already

identified with Dr Jenkins' SAC Combi approach, and the difficulties associated with how to account for the BT Sport losses also continue to apply here. We therefore do not consider that the way the DSAC model has been applied by Dr Jenkins in this case provides any greater reliability or certainty.

871. There was a separate debate about the extent to which there was positive endorsement of DSAC models by the Tribunal in cases like *PPC*. The point made by Mr Duckworth was that the DSAC approach approved by the Tribunal there was in the context of the cost orientation obligation exercise (which we described above at paragraphs 646-648) and where some flexibility was indeed allowed to BT by Ofcom, but also in a context (wholesale markets) where there was already an overall regulated price. (In fact, of course, on the DSAC test used by Ofcom, BT was in breach of the cost orientation obligation anyway).

872. Mr Duckworth distinguished that situation from the instant case, where there was no regulated price, and so there was no overall restraint in place to limit excessive pricing and which might therefore imply that any flexibility to recover common costs should be seen in a more limited way. He went on to say that the exercise here was to understand the costs of production and a reasonable attribution of common costs under workable competition.

873. As against this, BT argued that, while there may have been differences in the context of *PPC* and this case, they were essentially irrelevant and in any event, there was an effective price cap here as from 2018 as a result of the Commitments. We are not sure that this latter point goes very far since there is no claim on behalf of VOCs after 2018 and there was no price Commitment as far as the SPCs were concerned. More broadly, however, we would not see Dr Jenkins' use of DSAC as flawed, just because the context here was somewhat different to that in *PPC*. As she said in evidence, it is simply a model to allocate common costs.

874. The real point, as it seems to us, is that for the reasons already given, we considered that her DSAC analysis does not act as a meaningful crosscheck to her SAC Combi.

875. That then leaves Dr Jenkins' further cross-check in terms of her FAC exercise.

## DR JENKINS' FAC ANALYSIS

876. This first emerged in HJ2 as a "sensitivity" to Mr Duckworth's RFS approach, which involves a consideration of indirect (i.e., incremental and common) costs as a whole, as derived from the 2009 RFS (uprated by the CPI), which did not distinguish between the two.

877. What Dr Jenkins does is to take the total of BT Consumer's indirect costs, as represented by its SG&A and D&A figures, and allocate them to each service by the use of 3 alternative allocation rules. These are EPMU (direct costs), Revenues and Customers/Lines. Figure 5.2 of HJ2 shows that

on an EPMU-allocated basis, the indirect costs of SFV Services are very similar to those used by Mr Duckworth via the 2009 RFS model - around £40 per year. However, if allocated on a Revenue or Customers basis, the indirect costs yielded by her analysis are significantly higher and the Customer-allocated indirect costs are themselves significantly higher than the Revenue-allocated costs. Further, for the last 3 years of the claim period, the indirect costs allocated on a Customer basis are around the same as Mr Duckworth's competitive benchmark.

878.    These differences, as they are worked through to produce competitive benchmarks, are then set out in Tables 6, 7 and 8, at section B4a to the JES, where they are compared to Mr Duckworth's competitive benchmarks. Dr Jenkins points out, as is shown in Table 8, that if Mr Duckworth's 8.9% margin is used instead of 25%, then the ultimate competitive benchmarks as between Dr Jenkins and Mr Duckworth are very similar where the cost driver is EPMU. She uses this fact to suggest that, although Mr Duckworth's position was that, certainly for the allocation of incremental costs, the EPMU costs driver was inappropriate, her analysis suggested that this criticism must also undermine Mr Duckworth's own RFS approach, because the results are so similar. Mr Duckworth's response to this somewhat forensic point is that the similarities were simply a coincidence. Either way, Dr Jenkins' EPMU-based FAC analysis hardly assists her position since it, at least, appears more to corroborate Mr Duckworth's benchmark rather than her own.

879.    As to the individual allocation rules, the position of Mr. Duckworth was that none of these were appropriate so far as incremental costs were concerned. That is because the correct allocation method should be costs causality as used in the RFS.

880.    Mr Duckworth made some more general criticisms about the individual allocation rules as well. As for Revenue, he said this was an inappropriate driver because there is no reason to think that the level of Revenue correlated to indirect costs, and that was especially so where there might be excessive pricing (of the SFV Services) in the first place because the very fact of excessively high prices would tend to boost the cost measure stated by this approach, thus hiding the very phenomenon one is seeking to measure. As for Customers, Mr Duckworth said that there would be some incremental costs which were not applicable to SFV Services at all (for example, broadband or TV), but this method would attribute some of such costs to SFV Services. Also, he said that this method took no account of the difference in the cost incurred by BT between supplying a customer who has a voice-only product, and another who takes a bundle. The effect of this would be to under-attribute full incremental costs of the bundle services. In the case of both Revenue and Customer allocation rules, there was the point already made that these were not costs causality principles which are the relevant ones so far as incremental costs are concerned.

881.    As to this, Dr Jenkins stated that both Revenue and Customers drivers could be appropriate. As for Revenue, she pointed to two particular instances in the Detailed Attribution Methods ("DAM"), document underlying the 2009 RFS where there were references to revenue as an allocator of incremental costs. She referred to the following two statements within this very long document:

> "Product-specific marketing and sales campaign costs are identified and attributed directly to the relevant Products or Line of Business (LoB) revenue streams, with further apportionment's generally derived on a revenue-basis." …and "Residential bad debts are apportioned to Products on the basis of revenue".

882.    The context of the first was Marketing and Sales, and looking at the context, the statement appears to refer to some form of sub-apportionment. The second reference concerns Billing and Finance. We do not consider that these points add very much. They arose in the overall context of an extremely detailed method statement applying the general principle of costs causality to the allocation of incremental costs.

883.    Dr Jenkins then refers to Guidance Table 2 in the VULA Margin Statement, where the costs allocator for certain items within BT's SG&A costs were on a Revenue basis. However, this was all in the context of where BT did not show a reasonable breakdown to individual product lines. Here, Ofcom allocated to superfast broadband on a *pro rata* basis using Customers, Product or Revenue. Revenue was only used where there was "no obvious cost driver". We do not think that this reference is of any real assistance, either.

884.    As to the problem of Revenue allocation where there is alleged excessive pricing, Dr Jenkins suggested that this was not a real problem overall, because there would be greater revenue shown for bundles. However, Mr Parker said that this is not an answer since the question concerns the allegedly excessive revenue for the focal product. We agree. Further, BT itself accepted in paragraph 570 of its Closing that Dr Jenkins acknowledged the potential circularity of using this driver in an excessive pricing case.

885.    Overall, we think there is significant force in the CR's criticism of the use of the Revenue driver for the allocation of indirect costs as a whole. That criticism is heightened in relation to the incremental element of indirect costs where costs causality should be the overriding principle. Once again, we are drawn to comment that Dr Jenkins' reliance on a mechanistic rule here, in the absence of detailed information about what does drive costs, is attributable to BT's decision not to provide the detail that would be required to provide the evidence that would best inform this issue.

886.    As for Customers, the CR accepts that for some incremental costs which are proportionate to the number of customers, this costs driver may be appropriate; in effect, it would be a manifestation of the costs causality principle. But many indirect costs may only apply to certain products. And this costs allocation rule does not distinguish between customers of voice lines only, and those who take

bundles, as noted above. See, for example, how Mr Parker put it on Day 16/67-68 and at paragraph 7.1.4 of the JES.

887.   Dr Jenkins' response is to note the use of a Customer driver in the 2009 RFS and in the VULA Margin Statement. We do not consider that the examples provided are of any more use than those in the context of the Revenue driver. Dr Jenkins also says in effect that the failure to distinguish between voice only and bundle customers does not matter, given the extent of the effort expended by BT in seeking to maintain the volume of its customers. See paragraph 7.1.4 of the JES. However, we do not see how this observation of Dr Jenkins really answers the problem. Nor do we see how the fact that BT is a customer-driven business answers the problem.

888.   BT also suggests that the problem goes away because of the relatively modest size of the SFV Services customer base as compared to that for BT Consumer as a whole. But we do not see how this affects the fact that there is no differentiation between the different customers.

889.   So there are similar problems with the Customer allocation rule to those with the Revenue allocation, and again, this is especially so where it would displace the operation of the costs causality principle.

890.   As for EPMU, the CR's overall point is that while there may be justification for the allocation of common costs on this basis, again it is not appropriate for incremental costs because there is no necessary connection between such costs and direct costs. Indeed, Dr Jenkins accepted that "EPMU is not always a correct assumption" and needs to be considered along with other allocators. In the context of her use of EPMU as the cost allocator for BT Consumer's incremental costs (see above), she justifies this on the basis that using her figure, the allocation of incremental costs would not change very much if she used Revenue or Customer drivers instead (see Table 11 and Annex B4d to the JES). We see that, but this is largely a function of the fact that on her analysis, incremental costs form a very small proportion of total indirect costs, because of her view on the scale of common costs. In any event, BT did not in the end rely much upon the FAC analysis based on EPMU. One can see why, since its results generally produce competitive benchmarks similar to those of Mr Duckworth.

891.   A further point made by Mr Duckworth concerns the fact that the number of customers does not exactly match the number of lines. In the event, this was true only for those customers who took BT Sport as a stand-alone product, and Dr Jenkins stated that these were not counted (see her Note to Table A4.1 in HJ2).

892.   As to this, it is certainly correct to say that at the beginning of the claim period, that discrepancy was not likely to make much difference (and see our reference to the BT Sport figures at paragraphs 827- 836 above). Later on, however, there is some difference in the resulting benchmarks, as is set

out in the new tables shown at paragraph 577 of and also Annex 4 to the BT Closing. Following the exchange of closing submissions, the CR took exception to this material, as there was no backup evidence for the new tables, and yet Dr Jenkins must have been involved in creating them. It is also correct that there is no detail as to how the addition of the relevant BT Sport customers was translated into the underlying calculations.

893.    Nonetheless, we take account of paragraph 577 of the BT Closing. In reality, it is a matter of common sense that in a period where nearly all BT Sport customers were not stand-alone anyway, to add those who were was unlikely to make any real difference, whereas later on, it did.

894.    As it happens, we do not think that the separate point about a discrepancy between the total number of customers and number of lines, while it is correct in respect of BT Sport, is a major point against Dr Jenkins' FAC Customer analysis. But there are other points which, as already noted, showed real problems with it.

895.    In general, on her FAC analyses as a whole and their role as a form of cross-check, Dr Jenkins suggested that all of these exercises show that one needs to use a range of allocators. This criticism might have some validity in a situation where there was no information available at all regarding cost drivers, but in the current case we do have such information (in the form of the RFS, albeit that this exercise related to a prior time period) and, more significantly, the absence of contemporaneous information about cost drivers and common costs is entirely due to the decisions BT has taken not to do the work to provide it, even though it was feasible to do so.

896.    Nor do we accept BT's submission that Dr Jenkins' cross-checks show that a range of possible competitive benchmarks are consistent with workable competition. This is because there are real difficulties with each of her cross-checks. Just because there is a number of different analyses, and permutations thereof, it does not follow that all of them are correct, or that the right approach is to be found in a simple average from the various individual flawed approaches.

## OVERALL CONCLUSION ON THE COMPETITIVE BENCHMARK

### Introduction

897.    It will be seen from the above that we do not reject either expert's methodology entirely, and thus we do not accept in either case that no reliance can be placed on the other's expert methodology at all, although each party invited us to do just that.

898.    Instead, and perhaps unsurprisingly, we considered that, because each side's methodology contained a number of problems, it is necessary to strike a balance in terms of the outcome that reflects the weight which we consider should be given to each methodology in respect of:

(1)     the starting point for common costs, being the proportion of BT Consumer's total indirect costs that should be represented by common costs ("the Common Costs Starting Point");

(2)     the proportion of such common costs that should be borne by SFV Services ("the SFV Services Common Costs Contribution"); and

(3)     the application of the 13.5% margin on the total costs of sale ("Application of Margin").

899.    This exercise will result in a specific competitive benchmark which can then be compared to the ARPU for the year in question. The percentage excess over the competitive benchmark can also be shown. On the basis of those figures, an assessment will be made as to whether there is an excess of the ARPU over the competitive benchmark that can be regarded as significant.

900.    The above exercise will be undertaken, first, in relation to 2015/2016. We will then consider the most appropriate method of dealing with the figures for the following years, and again, ultimately assessing the nature and extent of any excess of the ARPU over the competitive benchmark.

901.    The question as to whether any excess over the claim period is also persistent will also be addressed.

902.    We should add, equally unsurprisingly, that it is impossible in an exercise like this to be able to reach figures as if undertaking a scientific calculation. Indeed, both sides' experts accept that their approaches involve the exercise of their own, albeit professional, judgment. The same is true of our approach here. We have endeavoured to reach figures on the basis of the totality of the materials (including expert views and the parties' submissions) put before us that seem to represent the most appropriate outcomes. We have done so on the additional basis that if there were to be a minor adjustment here or there to our figures, the overall outcome will not be materially affected.

**2015/2016**

*The Common Costs Starting Point*

903.    Dr Jenkins' baseline scenario uses a starting point of BT Consumer's common costs being £390m out of a total indirect costs figure of £983m. The former thus represented about 40% of the latter. See the tables at paragraphs 558 and 785 above. On her low scenario, such costs became £262m or 27% of the total indirect costs.

904.    We should add that in this context, there is no Common Costs Starting Point figure from Mr Duckworth which can feed into the analysis here. This is because the RFS contains no information on the split between incremental and common costs, and neither Mr Duckworth nor Mr Parker provided any estimation of BT Consumer common costs except to argue that they were very low. For the reasons given above, we do not accept that they were very low.

905.    In our judgment, the appropriate Common Costs Starting Point is £250m. This recognises the problems with Dr Jenkins' approach which mean that in our view, even her low scenario common costs figure is too high.

*The SFV Services Common Costs Contribution*

906.    Having established the size of the common costs within BT Consumer as a whole, the next task is to assess what proportion of that common cost can reasonably be recovered from SFV Services. Looking at the picture overall, we consider that a reasonable balance is struck where SFV Services are permitted to recover around 40% of the total common costs. Here, we bear in mind that under Dr Jenkins' SAC Combi approach, and applying an assumption of a 25% margin, the SFV Services' contribution to common costs would be 62%. It would fall to 56% if a 20% margin was deployed (because of the way in which the margin is itself part of each SAC Combi calculation), and of course we proceed upon the basis of a 13.5% margin, which would suggest (using Dr Jenkins' approach) a contribution to common costs of a little below 50%.

907.    Some context for this is provided by the fact that the SFV Services voice lines constituted only 28% of the total number of voice lines in 2015/16. Equally, so far as revenue is concerned, SFV Services revenue, as a percentage of BT Consumer revenue, was 18% in 2015/16. See the Table at paragraph 558 above. Hence, allowing SFV services to recover as much as 40% of common costs reflects the principle that firms in competitive conditions should enjoy a considerable degree of flexibility in how those costs are recovered, recognising of course that this flexibility is not unbounded.

908.    40% of the starting common costs figure of £250m (see above) is £100m on an annual basis. That figure, on a per line annual basis becomes £37.45 and on a monthly per line basis becomes £3.12.

909.    It is possible to make an approximate comparison between the approaches of Dr Jenkins and Mr Duckworth on this aspect, so as to identify where our conclusion falls between the opposing experts' positions. It will be recalled that Mr Duckworth arrived at a total indirect cost per SFV line in 2015/16 of £32.86 per annum, which, with 2.67m SFV lines, implies a total indirect cost for SFV of some £88m. Since we know that the actual SG&A and D&A costs of BT Consumer totalled £983m in 2015/16, the £88m of SFV indirect cost in Mr Duckworth's approach amounts to some 9% of the total.

910.    Due to the nature of the incremental cost+ approach adopted in the RFS, there is no way to identify specifically how Mr Duckworth's £88m of SFV indirect cost splits between incremental and the common cost contribution that he believes it is reasonable for SFV services to make. However, it is possible to make a broad inference of this split by comparing the results of Dr Jenkins and Mr Duckworth. In her base case, Dr Jenkins estimates that the incremental indirect cost per SFV line is £1.76 per month, or £21.12 per annum. If we subtract that incremental cost figure from Mr

Duckworth's "incremental + " figure of £32.86, the difference – which is £11.74 – represents a measure of the annual common cost per SFV line that lies within Mr Duckworth's competitive benchmark. Across the 2.67m SFV lines in 2015/16, that would generate an implied common cost contribution of around £31m. This can be compared with the £100m of common cost contribution that we have permitted to be made by SFV services and the £242m that is implied by Dr Jenkins' base case. (The comparison on a monthly common contribution per SFV line is £0.98, £3.12 and £7.75 for Mr Duckworth, our conclusion and Dr Jenkins respectively).

911.    We then need to make one further adjustment before proceeding to a calculation of the competitive benchmark. As we have adjusted the estimate of total common costs within BT Consumer's indirect cost downward to below Dr Jenkins' base case, it follows that some of those costs now removed, as it were, would constitute incremental costs that should be allocated to SFV Services. There is no definitively correct way to do this (in the absence of a proper cost causality exercise), but we recognise that some upward adjustment to Dr Jenkins' incremental cost figure of £1.76 is required to compensate for this. We use her figure of £1.76 as a reasonable starting point because there is no alternative incremental costs figure from the CR and it is conservative (in the sense of being relatively low) because of both the high proportion of BT Consumer's overhead costs that Dr Jenkins deemed to be common costs, and because it allocates the remainder of those overheads to the different BT Consumer products on the EPMU basis which is the rule that assigns the smallest share of incremental costs to SFV.

912.    Here, it will be recalled that for 2015/16, Dr Jenkins' base case was for £390m of common costs. If the figure we have proposed of £250m is used instead (see above), there is then £140m of indirect costs that must necessarily be deemed to be incremental over BT Consumer as a whole. If one allocates these costs on the basis of the proportion of SFV Services' lines to the total number of lines in 2015/16, in other words, 28%, this would yield an upward adjustment to SFV incremental cost of £1.22 per month. If, alternatively, one allocates these costs in line with the 9% ratio between Mr Duckworth's estimate of SFV indirect cost and actual BT Consumer overheads this would yield a smaller upward adjustment of £0.39 per month.

913.    We consider it is reasonable to take a pragmatic approach here, and adopt a position mid-way between these alternative approaches. The midway point between 28% and 9% is 18.5%. Allocating 18.5% of the £140m to SFV incremental cost yields an upward adjustment of £0.81 per line, which in turn yields an adjusted total incremental cost figure for SFV Services of £2.57 per month in 2015/16.

*Application of Margin*

914.    The 13.5% margin, which we consider is the appropriate one, expressed as a percentage of total revenue, including the margin, is then applied. This yields a monthly net profit figure of £2.15 per SFV line.

*Resulting Figure for 2015/16*

915.    The calculation entailed by the above, on a monthly per line basis, is as follows:

    (1)    Total costs excluding margin: £13.75;

    (2)    Margin: £2.15;

    (3)    Therefore Competitive benchmark: £15.90 ( (1) plus (2) above);

    (4)    ARPU: £21.86;

    (5)    Therefore excess of ARPU over competitive benchmark is £5.96, or, in percentage terms, 37.5%.

916.    We consider that, on the facts of this case, an excess of this magnitude is significant.

917.    We then have to consider the position going forwards over the entire claim period. We should reiterate here that neither side suggested that we should "slice up" the claim so that there may be particular years where there is a significant excess and others where there is not, and in any event we have to consider whether the excesses that are entailed by our calculations are persistent as well as significant. We therefore turn now to the following years.

**The following years to 2021/22**

918.    Going forward from 2015/16, the approach of the two experts again differed. Mr Duckworth's CPI index uprates the total incremental costs figure from 2015/16 to the later years. Dr Jenkins, on the other hand, re-does (a) the BT Consumer common costs calculation for each successive year, with the reported overheads (SG&A and D&A) for each year as the starting point and then (b) the SAC Combi exercise for each year, which produces the ultimate competitive benchmark which itself includes a per month per line incremental cost allocation and common costs contribution.

919.    Because there are uncertainties surrounding the increases in the reported overheads and whether such increases in truth, represent or include increases in costs that are common to all or some of the BT Consumer services, underlined SFV Services (which we discussed at paragraphs 720-737 above), we do not consider that it is appropriate simply to use each year's total reported overheads as a starting point across the whole period. In particular, we have taken the view that a significant element of the increase in overheads in 2019/20 which was said to be due to a reclassification of

internal recharges must in fact have been due to costs which were not common across the different products sold by BT Consumer.

920. A further, and more significant, concern with Dr Jenkins' SAC Combi results is the way in which they generate an increasingly large positive gap between her competitive benchmark and BT's SFV ARPU. Whereas in 2015/16, Dr Jenkins' competitive benchmark permits SFV Services to make a monthly contribution of £7.50 per line to common costs, this figure increases to over £11 in 2017/18 and exceeds £16 by 2021/22. Since we do not accept that the SAC Combi approach provides a reliable basis for the competitive benchmarks chosen by Dr Jenkins in this case, and we also have significant misgivings with the way in which Dr Jenkins has applied the SAC Combi theory to SFV lines, we see no reason why our competitive benchmark should need to reflect the profile that arises from Dr Jenkins' calculations over the claim period.

921. Instead, we consider that a fair and reasonable approach is to create an index, drawn from an adjusted set of BT Consumer reported overheads. That index can then be applied directly to the monthly per line common costs contribution which we considered was appropriate for 2015/16, adjusted as described above for the costs in Dr Jenkins' base case that we have disallowed for the purposes of our assessment, and allocated to incremental cost. The basic incremental costs figure calculated by Dr Jenkins for each year is applied without modification.

922. As for the index itself, until 2019/20, this is based on the percentage increase (or decrease) in the total reported BT Consumer overheads. However, when it comes to the more substantial increase in 2019/20, which was something of a "step change" we consider that the position is different for the reasons given in paragraph 919 above. The precise adjustment to be applied is obviously somewhat broad-based, especially as we have no information about the reclassification, other than the document attached to the 30 November 2022 letter. Nonetheless, and taking a cautious approach, having carefully considered that document, we consider that a reasonable adjustment is to set a figure for 2019/20 which is £1,150m, as opposed to the reported figure of £1,229m. In money terms, this means that the increase we are prepared to allow is £79m, half of the £158m.

923.    Going fo1wards beyond 2019/20, we then use the amount of the increase repo1ied each year, but
now applied to the modified figure of £1,150m, rather than £1,229m. The index and its derivation
is set out in the table below.

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| Actual BTC overhead (£m) | 983 | 975 | 1,025 | 1,071 | 1,229 | 1,240 | 1,261 |
| Adjusted BTC overhead (£m) | 983 | 975 | 1,025 | 1,071 | 1,150 | 1,161 | 1,182 |
| Adjusted BTC overhead index | 100.0 | 99.2 | 104.3 | 109.0 | 117.0 | 118.1 | 120.2 |

924.    This index is applied to the reasonable common costs contribution per SFV line which we set for
2015/16 and to the adjustment to the incremental cost figure that we described above for 2015/16.
We then put this together with the actual annual data for ARPU, direct costs and Dr Jenkins' estimate
of incremental cost for each of the claim period years, which allows us to compare SFV revenues
with a competitive benchmark across the claim period.

925.    The results are summarised in the table below. It is notable that the estimated overcharge increases
substantially over the first 3 years of the claim period, and then falls back, especially in the final
year 2021/22. There are several factors at play here, but much of this pattern is explained by the
trends in two variables: the ARPU, which increases and then falls back; and the index we have
calculated from BT Consumer's overall indirect costs (as adjusted in the manner described above)
which causes the allowable common cost recove1y per line to increase towards the latter pali of the
claim period. The simple average overcharge across the 7 years of the claim period is 38%.

|  | 2015/16 | 2016/17 | 2017/18 | 2018/19 | 2019/20 | 2020/21 | 2021/22 |
|---|---|---|---|---|---|---|---|
| ARPU (£/month) | 21.86 | 23.8 | 24.59 | 23.23 | 23.29 | 22.67 | 21.95 |
| Direct costs | 8.06 | 8.73 | 8.32 | 8.37 | 8.2 | 8.06 | 8.38 |
| Incremental costs | 1.76 | 1.69 | 1.77 | 1.85 | 1.89 | 1.94 | 2.08 |
| Common cost per line plus incremental cost adjustment | 3.93 | 3.90 | 4.10 | 4.28 | 4.60 | 4.64 | 4.73 |
| Total cost excl margin | 13.75 | 14.32 | 14.19 | 14.50 | 14.69 | 14.64 | 15.19 |
| Margin (at 13.5%) | 2.15 | 2.23 | 2.21 | 2.26 | 2.29 | 2.29 | 2.37 |
| Comp benchmark inc margin | 15.90 | 16.55 | 16.40 | 16.77 | 16.98 | 16.93 | 17.56 |
| Excess profit as % como benchmark | 37.5% | 43.8% | 49.9% | 38.6% | 37.2% | 33.9% | 25.0% |

213

926.    In respect of those figures, we consider that any excess would have been significant if it was 20% or more above the competitive benchmark. Given the figures which we have found, it follows that for each year of the claim period, the percentage excess is clearly established as significant. Even if a significance threshold was as high as 25% (which we do not accept) the relevant excess would be established. Yet further, even if that were not the case for the last year in particular, it remains the case that on an average basis across the claim period, the percentage excess would be significant.

927.    In the light of the figures above, we also conclude that the excess was persistent, because it applied across the whole period.

**Overall Conclusion on Limb 1 Figures**

928.    It follows from the above that the Limb 1 threshold is met because the prices charged by BT for the SFV Services over the claim were significantly and persistently in excess of the competitive benchmark we have arrived at.

929.    This means that it is necessary, finally so far as liability is concerned, to consider, under Limb 2 of *United Brands*, whether such excess was unfair, so that an abuse of dominant position on the part of BT is made out.

930.    Given that we have concluded that there was excessive pricing overall, it is not necessary to consider the CR's alternative case which was that there was such pricing at least in relation to line rental. It will be evident from our earlier discussion, however, that we would see significant problems in drawing any conclusions on the competitiveness of the SFV market from focusing on line rental alone, due to its inherently partial nature.

## LIMB 2 (1): UNFAIRNESS "IN AND OF ITSELF"

**Introduction**

931.    It is worth summarising at the outset, the key elements of each party's case on this first category of unfairness (as distinct from unfairness by comparison).

*The CR's case*

Excessive Price

932.    So far as the CR is concerned, its starting point, and a major one at that, is that the extent of the excess here was very substantial. On a weighted average basis, the excess over the period was between 74% and 90% for each of the claim years except 2021-22 when it was 60%. If one took the average excess, according to the CR, it would have been 78%. See the table at paragraph 497 above.

933.    In fact, of course, the CR cannot use that starting point, or anything like it, because we have concluded that the excess is between 33.9% and 49.9% for all of the claim years bar the last one,

where it was 25%, yielding an overall average excess of 38%. This figure is just under half of the CR's average of 78%.

934. This is a dramatic difference in the starting point, in our view, and it reduces the ability of the CR to say (as it has here) that the extent of the excess here is so substantial that it either entailed unfairness in and of itself, or, in any balancing exercise, it would be a strong factor against BT.

### No distinctive value provided by BT

935. The CR also contends that there was no real economic value to put into the equation by reason either of BT's Gives, or BT's brand value. Furthermore, on the question of brand value, there was, in truth, no real evidence of positive or strong customer satisfaction.

### Ability of SFV customers to switch

936. A primary point of principle taken by the CR is that the ability of customers to switch did not, and could not, demonstrate economic value in BT's SFV Services. On that footing, the ability to switch and the fact of switching were irrelevant to a consideration of unfairness. In any event, even if they were relevant, they did not actually assist BT here.

### Market Dynamics

937. Insofar as BT would rely upon any migration intent or rebalancing, these do not stand up to scrutiny and in any event, are not relevant to unfairness.

### BT's conduct was exploitative

938. Next, the CR submits that there was a significant element of customer exploitation here - BT knew that it had real market power, and it knowingly sought to get what it could out of the VOCs and SPCs in a declining market. In this regard, it was also acting in a non-transparent fashion. Further, it so acted in the knowledge of Ofcom's increasing concern over its pricing.

### The views of Ofcom

939. The CR also relies upon the views of Ofcom to support its position because the CR maintains that Ofcom's views were, in reality, to the effect that BT's pricing was unfair.

*BT's case*

### Excessive Price

940. For BT, necessarily, if the Limb 2 stage has been reached, as it has been, it means that BT has lost on Limb 1, and there was indeed a significant and persistent excess. Having contended otherwise, it did not adopt an alternative position for Limb 2 which assumed a particular level of excess. Nonetheless, it is obviously implicit in BT's position that the lower the excess which has actually been found by us, the more there is to play for in relation to other factors which are relevant to unfairness. Subject to that point, the key aspects of BT's position are set out below.

Provision of Distinctive Value

941. Contrary to the CR's position, BT submits that there was indeed real economic value in the SFV Services provided, which included the value of the Gives and BT's brand value. Moreover, there was in fact sound evidence of positive customer satisfaction.

Ability of SFV customers to switch

942. In contrast to the CR, BT contends that as a matter of principle, the availability of the alternatives, and the ability of the SFV customers to switch, as demonstrated by the fact of their switching, is indeed relevant and, on the facts, highly so, as a counterweight to the excessive pricing. It indicates that those who stayed with BT (while they stayed with BT) were ascribing positive subjective value to the landline product and/or the brand.

No exploitation

943. Next, BT denies that there was, on the facts, any exploitative conduct on its part towards the relevant customers.

Market Dynamics

944. Contrary to the CR's submission, BT contends that wider market dynamics, such as migration intent, declining call volumes and rebalancing can and should be taken into account in its favour.

Flat ARPUs

945. BT also points to the fact that whatever may be said about its gross margin for SFV Services or the existence of the excessive pricing, ARPU itself remained broadly flat.

Price Dispersion and Workable Competition

946. BT argues that it is important to adopt a workable competition standard when assessing Limb 2, and not one of perfect competition. A workable competition approach should in turn be informed by the kind of variability in prices and margins that is observed under real world competition, and in BT's Closing in particular it drew attention to the dispersion that is present in the bundles market, which the CR and its experts agree to be workably competitive, as a guide to this task.

The position of Ofcom

947. BT rejects the position taken by Ofcom in the 2017 review as lending significant support to the CR's case. In particular, it points out first, that Ofcom took no remedial action in terms of price regulation as against the SPCs. Second, it found that BT's call pricing (which formed an essential part of its pricing overall) was competitive. Third, Ofcom was acting within a regulatory framework which therefore limits what support can be derived from it; indeed, the Tribunal should be careful not itself to engage in "regulatory overreach" when considering whether there was an abuse of dominant position here. Fourth, Ofcom had a particular motivation in relation to seeking a price reduction for

VOCs because of their perceived vulnerable characteristics which may be seen as a policy goal distinct from the Chapter II criteria and market power exploitation *per se*.

*The Tribunal's analysis*

948.    The above set of key points ascribed to the parties is not an exhaustive list of their submissions on unfairness, but it gives an overall picture and illustrates the main areas of dispute between them.

949.    Against that background, we propose to deal with the following matters, in this order:

    (1)    Extent of the excess;

    (2)    Provision of economic value:

        (a)    Generally;

        (b)    Gives;

        (c)    Brand value;

        (d)    Ability of customers to switch;

        (e)    Conclusions;

    (3)    Workable Competition Factors;

    (4)    Existence or otherwise of exploitation by BT of its price insensitive customers;

    (5)    Price Rise revenue used to fund non-SFV investments;

    (6)    Disproportionate impact of price increases on SFV customers;

    (7)    Lack of transparency;

    (8)    Price Rises during period when Ofcom expressing concern;

    (9)    Market Dynamics;

    (10)   Ofcom's own findings;

    (11)   Regulatory Framework considerations;

    (12)   Conclusions.

950.    Finally, we should add that we take VOCs and SPCs together, in the sense that they both form elements of the Class, even if some factors going to unfairness apply to them in different ways, or to different extents. Indeed, as already noted, the CR's case does not include an alternative claim for VOCs only. It stands or falls on establishing abuse in relation to both elements of the Class.

**Extent of the Excess**

951.    We have already noted in paragraphs 932 - 934 above the dramatic difference between the excess we have found and the excess contended for by the CR. In our view this means that the significantly lower applicable excess which we have found carries much less weight in the overall balancing exercise entailed by this part of Limb 2, than would have been the case with the higher Limb 1 excess contended for by the CR.

**Provision of Economic Value: (a) Generally**

*Introduction*

952.   It will be apparent from our analysis below that although neither side confined itself to examining whether BT's excessive prices (as now found) bore a reasonable relation to the economic value of SFV Services, the answer to this question formed a major part of their submissions.

953.   In particular, and as will be seen in detail below, and as noted above, BT contended that the provision of the Gives by BT and its brand value as perceived by its SFV customers showed that its prices did bear a reasonable relation to their economic value. That conclusion was supported in a significant way, contends BT, by the fact that in this case, the SFV customers were not "captive", in contrast to the purchasers in the pharmaceutical cases. On the contrary, there were no barriers to SFV customers switching to alternative voice-only suppliers or to bundles. Moreover, such switching did indeed occur to a very substantial extent each year.

954.   For its part, the CR did not agree with any of the core propositions advanced here by BT; there was no, or no sufficient, additional value provided by the Gives, nor did the SFV customers in fact ascribe a positive value to BT's brand, and finally, any question of ability to switch was simply irrelevant.

955.   The dispute between the parties here revealed two issues of principle which we should resolve at the outset:

   (1)   The extent or level of economic value that needs to be shown; and

   (2)   The relevance or otherwise of the ability of customers to switch.

*The Extent or Level of Economic Value Required*

956.   In evidence, Mr Parker adopted what we consider was too high a threshold for the existence of any relevant economic value, by using the expression "unique". In the event, the CR, in his closing submissions, did not go so far. Rather, he contended that there needed to be some "distinctive" value provided. The expression "distinctive" derives not from *United Brands* or *Phenytoin,* which simply referred to whether the price bears a "reasonable relation" to economic value. As already noted at paragraphs 76-81 above, the expression was deployed in *Hydrocortisone* and we are content to adopt it in the way set out in paragraphs 82-83 above.

*The Relevance of the ability to switch (or not)*

957.   We have already noted the undoubted fact of extensive switching on the part of SFV customers either to other voice-only providers or (in more cases) to bundles, in paragraphs 163-177 above. We have also concluded that the principal reason for such switching was not as a reaction to the

particular prices charged by BT but because of the secular trend away from voice-only services or separate voice and broadband contracts, towards bundles instead – see paragraphs 211-303 above.

958.    BT relies upon the ability of SFV customers to switch, and the fact of their switching, as a significant factor in the determination of unfairness or otherwise. This is not because it is some free-standing further economic value point in and of itself (see Day 28/35). Rather, BT contends that it suggests that since customers could (and did) switch, for those who stayed (while they stayed) they should be assumed to have ascribed positive economic value to their BT landline. See also paragraph 689-701 of BT's Closing. This contention is then said to be supported by Dr Hunt's evidence.

959.    On the other hand, Ms Kreisberger KC argued that the ability to switch is irrelevant at the Limb 2 because it has nothing to do with the economic value of the SFV Services.

960.    For our part, and as a matter of principle, we would accept that in theory, the ability to switch and the fact of switching (or not switching) can be relevant to economic value. For one thing, the fact that a product may have some additional economic value cannot itself be a defence to a claim based on unfair pricing if the customers are in a truly captive market in all respects and have nowhere else to go. This is the essence of the Willingness to Pay fallacy. In such a case the excessive price will not bear a reasonable relation to its economic value. On the other hand, if the customers are not captive, then it would be easier to ascribe a reasonable relation to the underlying economic value. This reflects what Dr Jenkins said at paragraph 6.104 of HJ2, referred to at paragraph 690 of BT's Closing.

961.    Put another way, it may be possible to infer that those who stay with the product have actively chosen to stay (since it was open to them to switch but they have not) because they subjectively attach a positive value to the product or the brand. Of course, all of this depends on the facts and the whole question of the existence or otherwise of customer inertia here (dealt with below); but in principle, we consider that the phenomenon of switching can be legitimately relevant in this way.

962.    Beyond stating those principles, it seems to us that the existence of a reasonable relation to economic value (or not) is highly fact-sensitive, as well as being a matter for the exercise of judgment. The resolution of this question also depends, of course, on the extent of the excess of the price over the competitive benchmark because the particular price is the "thing" which must bear a reasonable relation to the economic value.

**Provision of Economic Value: (b) Gives**

963.    We consider the specific features and points made about each of the Gives below. We then consider some other points relevant to the Gives.

964.    Before doing so, we should mention one important point of context. It is that there was evidence from Dr Hunt (which was not seriously challenged) that a number of surveys showed that the SFV customers, and in particular VOCs, tended to use their landlines more to make outgoing calls than BT customers generally or indeed UK landline customers generally. In particular, in 2016, the SFV customers made on average 246 minutes of outgoing calls per month which fell somewhat to 213 minutes by 2022. The equivalent figures for BT customers overall and all UK landline customers were 155/140 and 90/66 respectively. Further, although landline usage had declined generally between 2016 and 2022 this decline was far less pronounced for BT's SFV customers. See paragraphs 389 and 397 of SH1. Dr Hunt's evidence was that this preference for use of landline services existed despite 72% of VOCs and 92% of SPCs having access to a mobile phone, according to Ofcom's 2017 Narrowband Market Review residential survey. Dr Hunt, by way of explanation, pointed us to evidence that VOCs valued traditional telephony for better sound quality and reliability, and also because it tended to give them easier access to their social networks. Increased usage of landlines would therefore arguably make some of the Gives, like Onshoring, Call Protect, and Care Level 2/Fault Fix Guarantee more valuable to SFV customers than others.

*Onshoring of Customer Call Centres*

965.    This was the process of having all of BT's call centres for BT Consumer customers (including those with and without voice services) located in the UK. It started in 2016 and by 8 January 2020, BT had brought 100% all of its call centres onshore. According to slides produced by BT dated 30 November 2016 ahead of a meeting with Ofcom in respect of its proposed Retail Narrowband Market Review, the cost of onshoring for 2017/18 was £42.2m.

966.    Although this was available to all BT Consumer customers, as Ms Blight made clear in evidence, almost all of such customers had voice services; the exception were those who subscribed only to BT Sport, which was a small proportion.

967.    At paragraph 51 of MB1, Ms Blight said that onshoring was a specific response to customer feedback in 2016, and was against the trend of the industry at the time. In fact, it seems that by 2015, Sky had two contact centres in Scotland and three in England, although it is not suggested that Sky had no offshore call centres at that time. On this point, Dr Hunt's evidence was that by 2016, about 60% of BT's call centres were in the UK, and BT was the first company to achieve 100% onshoring in 2020.

968.    Ms Blight also said at paragraph 51 that having onshore call centres was important to the perception of good value for money and improved customer service. She added this:

> "For a subsection of the customers that frequently called contact centres, connecting them to an advisor with a local accent was important. We learned that some of BT's customers found it difficult to understand foreign accents, especially certain older customers or those with hearing difficulties. Now we route calls locally as it

is easier for customers to understand people that are local to them, and they perceive this as better customer service."

969.    In cross-examination, Ms Blight said that, while the only benefit she had identified was an adviser with a "local accent", others at BT would say that the service was better with onshore contact advisers, and her customer services colleagues would feel that they got better results and outcomes, leaving aside the question of local accents, although she herself could not speak to this. Later on, she said that someone from customer services who was more *au fait* with the onshored contact centres would say that there were fewer repeat calls, less aggression and things like that. Calls to the contact centres took place not just when something went wrong, but also when a customer wanted to change their contract or plan, or when they were moving home. She also said that she was cynical about the level of latent racism that might be involved in the perception of the benefit of a local rather than a foreign accent.

970.    Notwithstanding Ms Blight's cynicism in that respect, we think that the thrust of her written and oral evidence was that consumers ascribed real benefits to having all contact centres onshored. This impression is supported by the BT Consumer Business Unit Review for Q1 2017/2018, dated 20 July 2017 at page 32 where it stated that BT was answering 86% of service calls onshore, with improvements in the average answer time down from 1 minute 43 seconds in Q4 to 1 minute 11 seconds in Q1 and the overall environment was more stable and predictable. BT's Consumer Brand NPS Heartbeat report for August 2017 also stated that one of the things which customers were talking about that month was that "service was getting better since bringing the contact centre back into the UK". (NPS stands for Net Promoter Scores. It is explained in paragraphs 1034 and 1035 below.)

971.    It is quite true that the onshoring of the call centres was for the benefit of all BT customers. However, we do not consider that this detracts from its value to SFV Services customers, as a sub-group of BT Consumer.

972.    Further, it cannot be said that there was only "limited uptake" of this Give since it operated whenever a customer wished to call a BT call centre.

973.    We accept that this Give was not technically innovative as such, but this does not prevent it from having some real positive value for customers, which was achieved ahead of the competition, and we consider that it did.

*Call Protect*

974.    This was introduced in November 2016 as a free service to all voice customers (i.e. including those who had bundles) and it followed the 2015/16 price change, which took effect on 3 July 2016.

975. According to a BT document dated 15 October 2015, it was estimated that it would cost £3.2m to provide. However, slides produced by BT dated 30 November 2016 ahead of the meeting with Ofcom referred to above, gave it a total 2017/18 cost of £11.8m.

976. Ms Blight said as follows about this in MB1:

> "47. BT Call Protect is a service which helps prevent customers from receiving scam or nuisance calls. This product allowed customers to report the numbers associated with scam or nuisance calls, which were then blocked for them and the rest of the BT Consumer customer base. The more customers that used the product and reported scam numbers, the better it was for all our customers, and particularly our vulnerable customers. That's why providing it for free as a customer give made it a much improved and more effective product (as this resulted in more people using it, meaning we were able to block more scam numbers) than if we had charged for it.

> 48. I felt very passionately about BT Call Protect and we talked about it a lot with Ofcom. The feedback we were getting from customers (which I believe started in 2014/2015) was that customers who used landlines frequently were annoyed by scam and nuisance calls. However, customers that didn't really use their landlines to make calls only tended to interact with their landlines when receiving these scam calls and so found them even more troubling. We wanted to give customers more control and protection from scammers. We had previously developed a landline handset with protective calling features, but we wanted to create a product that would help all customers without requiring them to buy a new phone. I recall that the Citizens Advice Bureau and Ofcom published their concerns on this issue. There was also an industry wide consultation with the Department for Culture, Media and Sport in early 2016. I remember attending cross industry discussion forums in Parliament to discuss the issue of nuisance calls and what we, as an industry, should be doing about it. I believe BT was the first service provider to launch a product of this nature and, in my opinion, it was the best on the market. BT Call Protect didn't receive much media attention on its initial launch in 2015/2016 so we promoted it during the following price change in 2016/2017 to encourage customer uptake and further improve the service."

977. That evidence, as such, was not challenged. We infer from Ms Blight's evidence, that there was clearly some public concern about the issue of scam or nuisance calls in 2015/16, requiring a public consultation and discussions in various industry forums which all suggests it was a significant issue at the time. As is implied by Ms Blight there and confirmed in oral evidence, customers did have to make a positive choice to use the service and to report numbers associated with scam or nuisance calls they received, but then the numbers were blocked for them and indeed for all BT Consumer customers.

978. There was no suggestion that the product was ineffective. Indeed it was reported (BT's Q1 Consumer Unit Business Review, 20 July 2017) that BT's Call Protect was diverting about 2m calls per week from numbers associated with scam and nuisance callers; this also supports the thrust of Ms Blight's evidence that this was an important problem for BT and the industry as a whole.

979. As already noted, Call Protect started operating in November 2016 following the price change on 3 July 2016. However, it had been prefigured in advance. BT's Q1 2016/17 Operational Review dated 29 June 2016 noted at page 37 that 43,000 customers had already signed up in advance; in fact, page 63 of the same document said that 56,000 customers had expressed interest. In cross-examination, Ms Blight said that while the total voice customer base was around 9m, this was a huge "advance uptake" ahead of the actual launch of the product.

980.   By 20 July 2017, 2.2m customers had Call Protect (see BT's Q1 Consumer Unit Business Review of that date referred to above). This would have been out of all of BT Consumer customers who had a landline.

981.   However, in Annex 2 to its Closing, the CR has pointed to a BT document on drivers for value for money ("VFM") dated 21 December 2017, which suggested that only 8% of BT voice customers were signed up, while 69% of customers were unaware of Call Protect. These figures seem inconsistent with the figures referred to in paragraph 980 above. This document was put to Dr Hunt in cross-examination. It had not been cited by him in his report. He accepted its contents, but questioned what the survey base was and whether it included the online base of voice customers. On this particular point, we agree that there is an uncertainty which may explain the discrepancy with the earlier figures. We should add that the conclusion on this page of the document was that Call Protect had a positive influence on the VFM scores of the BT customers surveyed, but not to the same extent as competitor offers, in terms of its impact or reach. The strength of those conclusions might, of course, have been affected by the same uncertainty as to the base surveyed.

982.   Further, a BT document dated 14 March 2021 shows that of the then 800,000 landline-only customers, 45% now had Call Protect.

983.   We suspect that the discrepancy in the figures is explained by whether the relevant group is landline-only customers or all customers who had voice. After all, in terms of who was registered, this must be a matter of fact. If so, there is no reason to doubt the actual take-up figures in any of the documents. In addition, since any number blocked from calling a particular customer was also blocked across the BT Consumer customer base, the numbers who benefited would be considerably more than just those registered to use it.

984.   Subsequent to the introduction of Call Protect, Sky introduced a similar product called Talk Shield in June 2017, and in January 2018, TalkTalk introduced Call Safe. Further, Phone Co-op provided a "Choose to Refuse service". It is not clear when this was first introduced, but we do note that there was a maximum number of telephone numbers that could be blocked, which was 10. We also note that Ms Blight had said in paragraph 48 of MB1 that the BT product was the best in the market. More significantly, we do not accept the proposition that just because other suppliers had introduced similar products, this meant that the product of the firm in question cannot add significant value, especially where BT appeared to be ahead of its competitors, at least initially.

985.   It is true that there was also the Telephone Preference Service offered by Ofcom and referred to in its Consumer Guide to Nuisance Calls and messages produced in 2015. This offered partial protection for customers, as Dr Hunt accepted in cross-examination. But it was clearly not as extensive as Call Protect, and it was not suggested by the CR that it was.

986.   Ms Blight was also asked about Call Protect in the context of the price changes. In emails sent on 28 September and 10 October 2016 in relation to the next price change, which was 2017/2018, Laura Van-Daal, Head of Broadband and Voice, expressed the concern that customers might question why Call Protect was being used as a justification for more than one price change, namely 2016/17 (even though it was not implemented until November 2016) and 2017/18. While the action points in this document noted that there should be "very careful positioning" in pre-notification communications and "strong defence statements" for advisers, this document does not say what they were. Ms Blight considered that, nonetheless, the main message about the Give came in 2017/18, as it was already in operation, then, and this email was just a matter of "people's interpretations". We do not think that this is really an answer to the obvious points being made in the email. That said, we see no reason in principle why, for the purposes of assessing value, that value is necessarily diminished simply because during its subsistence, there is a price increase.

987.   Overall, we consider that there was real and positive value to Call Protect, even though customers had to take the step of reporting the scam and nuisance calls made to them. In our view, the value extends beyond the active users, i.e. those who had reported a nuisance call which was then blocked, and indeed beyond those who had registered for the service. This is because such customers had the reassurance that there was a free service from which all received protection. This must have assisted with the customer concerns that Ms Blight mentioned in MB1 referred to in paragraph 976 above.

*Care Level 2/Fault Fix Guarantee*

988.   Prior to the 2015/16 price change, all voice customers were entitled (through BT) to Openreach's Care Level 1 ("CL1") service, whereby all faults on the line were supposed to be fixed within two working days. With this price change, BT provided all voice customers with Openreach's Care Level 2 ("CL2"), which came at an additional wholesale charge to BT of 53p per customer. This level of service provided for faults being fixed by the next day. According to Ms Blight, this came at a cost to BT of some £40m. A BT Consumer document recording a meeting on 24 October 2018 put the CL2 cost at around £50m per annum.

989.   In fact, CL2 proved not to be much of an improvement on CL1, since the actual fault repair rate under CL1 often fulfilled the service level of CL2. So customers who experienced faults might not have noticed much of a difference. Accordingly, BT decided that there should be a more tangible commitment to a particular level of service, which led to the introduction of the Fault Fix Guarantee ("FFG"), under which BT would pay all voice customers £20 by way of compensation if the engineer took longer than 2 days to attend, or his attendance was cancelled on less than 24 hours' notice. Initially, FFG was provided in addition to CL2, as from the April 2017 price change. We should add that, according to Ms Blight, FFG came in earlier, because she was the one who launched

it, which means that it would have to have been introduced prior to her going on long-term leave in the autumn of 2016. We accept this, as she clearly had first-hand knowledge of the launch.

990.   Subsequently, the provision of CL2 was terminated for all voice customers, apart from those who had BT Basic, HPS or LRP. A BT document of 24 October 2018 stated that this change would be implemented in April 2019. FFG itself ended in April 2019 when BT joined Openreach's Automatic Compensation Scheme.

991.   It is correct that FFG was another "opt-in product", as opposed to some form of automatic compensation being paid as a result of a delay in attending to a problem.

992.   However, even so, this seems to us to constitute a positive benefit. Moreover, and as Ms Blight explained, this was more than just compensation for the period when the landline was not available and in this respect it differed from competitors' products. The latter just offered a "pro-rata" compensation depending on the time lost, which would be very much lower than the fixed sum of £20 or £25 being offered by BT. So, for example, if 3 days were lost and the customer was paying £18 per month, then the total compensation received from a competitor would be £1.80.

993.   Dr Hunt was taken in cross-examination to Ofcom's Automatic Compensation consultation paper dated 24 March 2017. This made the point at paragraphs 4.6 and 4.7 that the compensation offered by the 4 largest landline and broadband providers (including BT) had to be asked for by the customer, and that most customers do not ask for compensation. Under paragraph 4.28, BT's compensation terms were set out, dealing with loss of service, delayed provisioning and missed appointments. The last one would appear to be the area which FFG was to address. Here, it was said that where an appointment was not kept, a one-off fixed rate payment of £10 could be claimed. If it is correct that FFG was launched in late 2016, then this may have been the missed appointments provision referred to in the Ofcom document. The only question is the payment of £10 since the evidence otherwise points to £20 or £25, but perhaps it was increased from £10 at an early stage. In any event, we do not consider that this document adversely affects the value or otherwise of FFG.

994.   It is true that there may have been a period for most customers when CL2 had been removed, but FFG remained in place. It is suggested that this shows that the total amount of benefits had reduced. However, in our view, this is unrealistic, given that Openreach seem to have achieved CL2 timetables even while customers were on CL1, which was the reason BT thought it was uneconomic to keep paying for the CL2 service. The real change was FFG and this was clearly different from the offerings of competitors.

995.    Overall, we consider that there was positive value here although, it did require the customer to take action first, and it was not in place for the whole of the claim period.

*Right Plan*

996.    This was introduced with the December 2014 Robin/Window price change. It was a digital tool available for all voice customers and it would advise them as to whether, on the basis of their existing voice usage, they were on the best plan in terms of costs, and if they were not, the plan they should transfer to. Customers could register for it online but it also appears that they could do so by calling BT's Contact Centre. It was discontinued in October 2017.

997.    In cross-examination, Ms Blight suggested that the Right Plan tool could also be used by advisers in BT's call centres, although when customers called to discuss their contracts, the advisers should simply go directly to what would be a more beneficial calling plan, for example. This was in the context of Ms Blight being asked to consider an email dated 18 May 2015 from Hazel Morgan to Ms Van-Daal, Mr Bunt and others, following a training call the previous day about the impending Laika price changes for 2015-16. This email read, in part, as follows:

> "Right Plan
> A refresher on what it is and where it sits on useful links on Agent. Advisors should not promote sign-up but should be aware where it sits should a customer ask them to sign them up if they can't be steered online."

998.    While Ms Blight agreed that sign-up to Right Plan should not be actively promoted, according to this email, she said it did not really matter because advisers were expected to recommend the best deal for the customer (for example, retention deals) in any event. We see that, but nevertheless, the uptake of Right Plan could obviously have been more, if it was actively promoted.

999.    Subject to all of that, however, Ms Blight accepted that it would not be of much use to someone who did not have access to the internet.

1000.    A BT document from January 2017, consisting of briefings to various parties, suggested that since the inception of Right Plan, 200,000 (of a total number of voice customers of 9m) had registered for Right Plan and those customers who switched as a result saved over £11.24 per month which is obviously a significant saving. The actual number of customers who did switch and made the saving is not given. A point was made by Mr Armitage to Ms Blight in cross-examination that this was not really conferring any additional value because the customer should have been on the cheaper plan anyway. Ms Blight agreed, assuming that their usage had remained the same as the previous month. However, for our part we do not think that this deprives Right Plan of any value it would otherwise have had. Where there are various options for the customer, and they are not on the cheapest deal, there is a saving to the consumer to be told expressly that there are cheaper options, especially where their usage had changed during the contract.

1001.  It is, of course, true that for the majority of customers who did not use Right Plan, some may have missed out on having a better deal. Ms Blight agreed but added that the sort of people who would register for Right Plan would be those who already thought their bills were too high, in other words, the people who did not may have been on the correct plan anyway. We think this is too speculative, not least because those who thought their bills were too high might call the contact centre anyway and if so, Right Plan would probably not figure at all.

1002.  At the outset of Right Plan, there was a Project Window 2014/15 update dated 7 March 2014. At page 3, Right Plan was summarised thus:

> "Optimiser - Concept updated to "Right Plan"
> – a service that customers can sign up to on BT.com and through call centres
> – By signing up, customer gives us consent to analyse their usage every month (for 6 months) and to send an e-mail with a recommendation to move to the right calling plan
> • This has the following benefits –
> – Significantly lowers volume risk in call centres as no immediate saving for an agent to offer customers
> – Limits financial exposure due to the need to click through an e-mail/send coupon to redeem offer
> – More relevant recommendation for customer as it is based on latest usage"

1003.  The reduced volume risk to call centres is understandable since the more that appropriate price plans were activated via the link on the email advising the customer of the best plan or, it seems, by redeeming a coupon which accompanied a letter sent to the customer, the fewer would need to contact the call centre. The reference to "limits financial exposure" seems to suggest, and Ms Blight in the end agreed, that this was about the lower revenue entailed by putting people on a cheaper plan, because customers still had to jump through some "hoops" to be put on the better plan. In fact, pages 6 and 7 of the same document make this clear. There is there a reference to sending a letter. The service operated for 6 months, with monthly communications and there would only be one offer for the customer in that period. Because of the steps needed to take up the offer, and assuming to begin with that 400,000 users took up Right Plan in 2014/15, the ultimate cost to BT in terms of lost revenue was said to be £0.8m.

1004.  Finally, Ms Blight was taken to a BT "16/17 Pricing Portfolio" document, dated 13 January 2016. Here, there was said to be an impact on Financials of £0.1m, and Ms Blight accepted that this looked like the cost to BT, although it could have been just the cost for that year's iteration of Right Plan, which was there described as Right Plan III.

1005.  Overall, we consider that although a useful tool for those customers who used it via the internet or otherwise were referred to it when calling the call centre, it is overall of very limited significance and value. Of course, it terminated in 2017, anyway, part way through the claim period.

*Caller Display*

1006.  This was introduced in 2005 (or possibly 2008, but in any event prior to the claim period) which allowed all voice customers to see the number of the person calling them.

1007.   This was not one of the key Gives relied upon by BT or the subject of Ms Blight's evidence. Indeed, Dr Hunt accepted in cross-examination that he thought everyone offered it and it was not distinctive.

1008.   BT had offered it free of charge originally, but then charged for it. From January 2014 it continued to do so until prohibited by Ofcom in September 2018. On the other hand, as at November 2015, both Sky and TalkTalk were offering a similar product free of charge.

1009.   In this regard, we thought that paragraphs 449 and 450 of SH1 overstated the value of Caller Display, as became clear when he was cross-examined about them.

1010.   In those circumstances, we do not consider that anything of real value was added by Caller Display and it may be disregarded.

*Other Points about the Gives*

Cost and imitation by others of Gives

1011.   Mr Parker suggested that a Give should be discounted if inexpensive to provide. In fact, it cannot be said that Onshoring, Call Protect or CL2 were inexpensive to provide. However, in any event, just because a Give may be inexpensive to provide does not mean that from the customer's point of view, it does not confer real value.

1012.   Mr Parker also suggested, as part of his "uniqueness" argument which we have already addressed in general above, another reason to discount a Give is if it was later copied by rivals. We do not agree with this, either. It does not alter the fact that, here the SFV customers enjoyed something of value which had not previously been available.

Email exchanges in June 2016

1013.   In an email to John Petter dated 14 June 2016, the then CEO, Kevin MacDonald attached a summary of NPS, and said, among other things, that 66% of the customers stated that they were aware of at least one of the "gives" with the price rise, the most common gives being recognised were more Wi-Fi hotspots and increasing broadband speeds. He sent a similar email to Ms Blight on 17 June in which he said:

> "In terms of awareness of the 'gives', we have 66% of customers aware of at least one of them.   The challenge we have is that there is relatively low awareness of several of the 'gives' – we do need to boost this in order to reinforce our value for money credentials.   The big hit we're currently taking on NPS is directly related to a declining performance with VFM."

1014.   Ms Blight's response was to say:

> "It would be great if we could discuss this as it is quite different from the feedback we've had elsewhere and implies we should be taking quite a different strategy. It could have a big impact on our approach for 1718"

1015.   In cross-examination, where it was suggested that the Gives were therefore not feeding through into better NPS, Ms Blight said that at this stage, prior to the implementation of the price change on 3 July 2016, these were relatively early days for assessing the NPS of Gives. We did not fully

understand that response, as there were a number of Gives in operation by that stage. On the other hand, this exchange seemed to be about BT Consumer customers generally (or certainly includes those who had broadband) and in any event, Ms Blight's response at the time was to say that the feedback she had had was quite different. So we do not think this exchange is really a point against BT.

Annex 1 to BT's Closing

1016.   This summarises BT's price changes for line rental and call charges for each year of the claim period and the preceding price changes, in addition to (i) other proposed or considered price changes for a given year, (ii) gives and propositions considered and/or offered for that price change, and (iii) references to key witness and documentary evidence, as relevant.

1017.   We have considered this document to assist on the detail of the price changes and the 5 Gives, and other offerings.

1018.   As for the detailed references to how proposed price changes were considered, debated within BT and ultimately implemented (or not) we do not take issue with the factual narrative set out in Annex 1. In particular we accept that in general, BT would seek to provide (or continue to provide) Gives at around the same time as the price changes.

1019.   We also recognise that there were various other promotional offers at different times. For example:

(1)     BT gave, in relation to the 2014/15 price change, 12 months free evening and weekend calls to customers who re-contracted;

(2)     In 2015/16, free calls to BT mobiles were added to inclusive call periods, and physical handsets which allowed customers to choose the type of call they received were offered at a discount to re-contracting customers;

(3)     For 2018/19, a personalised calling plan called My Anytime Calls was introduced.

1020.   We note matters such as these but do not consider that they materially add to whatever value was in the 5 Gives.

1021.   We note from Annex 1 that there were a number of price changes, or other Gives which were not ultimately implemented. We do not see the relevance of this, save that, unsurprisingly, BT gave careful consideration to its landline offerings on a regular basis. But there is no suggestion that its competitors did not do likewise.

The Aim of the Gives

1022. The CR submits that a principal purpose of providing the Gives was to mitigate bad press and regulatory scrutiny when BT raised prices. In other words, there was a degree of cynicism about providing the Gives. Two particular documents are relied upon.

1023. First, the Project Window 2014/15 Pricing Update dated 24 February 2014. This stated that one of the objectives was to avoid negative criticism of price changes by "Regulator, Public Affairs and the Media", among others, with the introduction of Right Plan having as one of its objectives, mitigating bad press from price changes by giving a positive message.

1024. Second the Stakeholder plan for pricing dated 4 April 2016. This stated as follows;

> "Problem statement:
> We face increasing regulatory scrutiny of price changes focussed particularly on the treatment of vulnerable customers. We face criticism that our increases in Line Rental disproportionately impact digitally excluded customers, who don't benefit from competitively priced Broadband and associated discounts from that service.
>
> "This year's price change has a number of gives for these customers
> • Existing BT Basic and HPS customer don't see a price change
> • Customers can save money and freeze their price until 2019 by taking Home Phone saver 2019
> • All Standard Line Rental Customers see an improvement in Care Level
> • UAC customers get free calls to BT Mobiles and an extremely competitive SIM offer
> • UK Call Centres news (which could be even bolder for the regulator)
> • BT Nuisance Call Protect"

1025. The above was then said to tackle "regulatory and customer concerns head on".

1026. Further, Ofcom's 2017 Provisional Conclusions at paragraph 4.61 stated that:

> "…internal documents from BT suggest that adding additional services when introducing price increases is driven by the desire for a positive PR message and regulatory concerns about pricing rather than pre-empting a competitive response."

1027. Finally, it was pointed out that Mr Bunt had accepted in cross-examination that deflecting regulatory scrutiny and mitigating criticism and bad press were some of the purposes of the Gives.

1028. We do not think that there is anything in this point. We would be surprised if BT (or any other major provider to consumers) was not conscious of its PR image or the attention of the regulator. At the end of the day, the question is still what value to consumers the Gives really provided. If they gave real value, it is hard to see why BT's motivation in providing them, if simply for PR or to deal with regulatory attention, for example, should matter. Equally, putting the point a different way, if the Gives added no real value, the fact that they were well-intentioned would not alter the position.

Gives being available to all bundle customers as well

1029. The CR says that the fact that the Gives were also available to all bundle customers, where pricing, on any view, was more competitive, means that they cannot constitute any or any significant economic value in the context of at least the SPCs since they could not justify the differentials

between the prices charged to the SPCs and bundle pricing. We do not agree; it does not mean that Gives cannot constitute economic value from the point of view of the Class Members, which ultimately has to be assessed by reference to the impact on those customers and the excess which we have found.

### Gives did not materially enhance Class Members' perceptions of their SFV Services

1030.    The CR here relies upon the NPS documents which we consider below in the context of brand value. In our conclusions here, we take into account what we say at paragraphs 1047-1072 below about NPS, insofar as they are relevant to this point.

### Customer indifference towards SFV services

1031.    The CR here relies upon the "Solus - Landline only - customers - NPS and customer experience insight" survey document which was referable to VOCs ("the March 2019 Survey") which, again, we discuss below at paragraphs 1061-1067. Our conclusions here take account of what we say there.

*Conclusions on the Gives*

1032.    We consider that Onshoring, Call Protect and CL2/FFG did constitute distinctive value for the reasons given above.

**Provision of Economic Value: (c) Brand Value**

*Introduction*

1033.    At this point it is necessary to say something in general about BT's NPS (Net Promoter Scores) documents, because there is an issue as to the extent to which (if at all) the CR was entitled to rely upon a number of them for the purpose of submitting that they demonstrated that by reason of low levels of customer satisfaction, it could not be shown that SFV customers attributed any or any significant value to the BT brand.

*What are NPS?*

1034.    The use of NPS is not, it seems, unique to BT. It is a form of measurement of customer experience (sometimes referred to in the documents as "CX") used by a number of businesses. Footnote 291 of SH1 refers to the Net Promoter website which explains NPS thus:

"



% PROMOTERS - % DETRACTORS = NPS (NET PROMOTER SCORE)

The NPS Calculation

Calculate your NPS using the answer to a key question, using a 0-10 scale: How likely is it that you would recommend [brand] to a friend or colleague?

Respondents are grouped as follows:

- **Promoters** (score 9-10) are loyal enthusiasts who will keep buying and refer others, fueling growth.

- **Passives** (score 7-8) are satisfied but unenthusiastic customers who are vulnerable to competitive offerings.

- **Detractors** (score 0-6) are unhappy customers who can damage your brand and impede growth through negative word-of-mouth.

Subtracting the percentage of Detractors from the percentage of Promoters yields the Net Promoter Score, which can range from a low of -100 (if every customer is a Detractor) to a high of 100 (if every customer is a Promoter)."

1035.  This is reflected in the body of Dr Hunt's footnote and we did not understand his explanation to be controversial. It will be noted that the middle band of responses (scores of 7-8/10) are not part of the "netting-off" exercise. It follows that an overall positive score indicates that of those surveyed, a greater proportion were Promoters rather than Detractors and vice versa.

*Use of BT's NPS documents at trial*

1036.  A number of these NPS documents, which dealt with customer perceptions of BT's brand and VFM generally, were put to Dr Hunt in cross-examination and relied upon by the CR in closing submissions. On Day 18, Mr Parker was asked about the NPS documents and the background to their production. He accepted that he had requested sight of them in January 2024 (so after he had produced DP4 and after the JES had been produced), but he did not refer to them for the purposes of the JES. Because they had not been raised earlier, they were not referred to by Professor Loomes in his report and Mr Parker only made a brief comment in DP4 about NPS, which itself was a response to what Dr Jenkins had said in HJ1 in the context of customer inertia. The NPS documents were uploaded to the Opus system during the trial on 15 February, i.e. after BT's witnesses had finished giving evidence.

1037.  BT objected to this reliance by the CR on the NPS documents, on the basis that all such documents could and should have been put to Mr Bunt and Ms Blight, who could plainly have shed light on various aspects of them, as they were both very familiar with them and made general references to them in their WSs. Therefore, BT submitted that we should not place any material weight on them at all, although it did not seek their exclusion as such. We therefore deal first with this objection.

1038.  At a broad level, there cannot be any real doubt about the essential nature and purpose of these documents. They were explained by Ms Blight in paragraph 45 MB1 as follows:

"45.  In our pricing strategy, and in considering which customer gives to offer, we would monitor our NPS, which included a consideration of value for money perception amongst customers. A company's NPS is based on a survey asking respondents how likely they are to recommend that company to a friend or colleague on a scale of one to ten. Customers are also able to add comments to their response. We used both transactional

> NPS (meaning after a customer had an interaction with one of our contact centres, they would receive a text message asking for feedback) and brand/product NPS (where we would go to a specific section of the customer base and ask how they felt about BT and the products they had with us). My team would go through this data to understand the drivers of our score going up or down. This informed our marketing, pricing and how we communicated with our customers, because it provided valuable insight into customers' perception of value for money and their experience of our service."

1039.  In cross-examination, she accepted that she was there saying that NPS was a key metric used to analyse things like the effect of Gives.

1040.  It is also fair to say that the NPS-related documents which we have seen show that, whatever lack of clarity there may have been in some instances as to precisely which group of customers was interviewed and how, BT obviously placed considerable importance on the NPS. It is unrealistic to suggest that in those circumstances, if one or more of these documents were put to Mr Bunt and Ms Blight, they would have sought to deny their general significance.

1041.  However, with "first-hand" experience of the documents, as it were, they might well have explained particular NPS documents or scores in context, and they were simply not given the opportunity to do so. For example, the June 2016 email exchange referred to at paragraphs 1013-1015 above shows that Ms Blight's immediate reaction to the points made by Mr MacDonald about the NPS was that it did not match the feedback her team had received. We also recognise (and deal with below) some uncertainty as to the extent to which VOCs were involved in the surveys carried out for the purpose of collecting NPS. The documents could easily could have been put to them and they clearly had the experience and ability to comment on each of them.

1042.  In the event, a number of the NPS documents were put to Dr Hunt in cross-examination (which BT did not object to), in the course of which he indicated the ones that he had seen before, even if not quoted in his report. In re-examination, he said that he had seen many of the documents before and then said that he had seen some of them before he wrote his report, but probably not every single one. He also said that for the purpose of writing his report, he relied mainly on the WSs of the BT witnesses. He would then "drop into" BT's documents, where he felt it necessary to understand more of what was going on. That approach does not seem very satisfactory to us because either not all the relevant BT documents were supplied or made available to him, or his use of them was selective.

1043.  However, he appeared to us to be very familiar with the nature and purpose of such documents. Indeed, he relied upon NPS documents in this way at Section 7.4 of SH1:

> "430.  Furthermore, internal BT documents suggest that customer service improvements have had a direct impact on uplifting its Net Promoter Score (NPS), which is a measure of how likely customers are to recommend their provider to a friend or family member.
>
> 431.    In conclusion, notwithstanding the fact that customer service does not appear to be the most important value driver for Class Members, BT has been making investments over time to develop and improve the quality

of its customer service. The market outcomes (as can be seen from the metrics on problem resolution and the NPS index) support the notion that BT is offering good quality customer services."

1044. In those circumstances, the CR was well-entitled to put the NPS documents to Dr Hunt.

1045. In the light of all the above, we disagree that we should give no weight at all to any of the NPS documents relied on. However, in considering their weight, we very much bear in mind that they were not put to Mr Bunt or Ms Blight.

1046. With that caveat in mind, we will consider each of the NPS documents relied on and give it (and the NPS documents generally) such weight as we think fit. We turn to that assessment now, followed by our assessment of other materials said to go to brand value, as invoked by BT and Dr Hunt.

*Survey Base for NPS documents*

1047. We now turn to the question of the customer survey bases used for the NPS. At a high level, and as pointed out by Ms Blight in paragraph 45 of MB1, the surveys took the form of customer feedback, either following a particular interaction with BT or in response to targeted enquiries of a particular group of customers.

1048. In evidence, the NPS documents were first referred to by Mr Parker (and then Dr Hunt) in the Limb 2 hot tub discussion on Day 17. We deal below with what they drew from the contents of such documents, but the point is that they were discussed at that stage.

1049. In the context of discussing reaction to Gives, Dr Hunt said that the NPS surveys were conducted through ongoing online panels and the only people on those panels were those who regularly used the internet. He went on to say that where Gives consisted of innovations over time, it may be that the main beneficiaries would be those without the internet so their views about Gives would not be captured by NPS. We see that although, since SPCs did have internet access, there would be no reason why they at least could not take part in an NPS survey.

1050. Mr Parker suggested that the references in certain NPS documents to "line only" must have meant line-only BT customers. The difficulty with that is that such customers could have been SPCs as well as VOCs. Indeed, the November 2019 Consumer Brand NPS Report stated at page 8 that due to the nature of online surveys, "line only" customers were mainly BT customers with broadband from another provider i.e. SPCs.

1051. Mr Parker also relied upon a reference to "fieldwork" which he interpreted as connoting face-to-face discussions. However, the March 2019 Survey document which was referable to VOCs only, referred at page 4 to fieldwork using the usual approach for quantitative surveys with self-completion. So "fieldwork" does not mean face-to-face surveys. Both this error, and the previous one noted in paragraph 1050 above illustrate the problems with an expert to some extent having to

speculate on documents on important points where there is no clear underlying factual underpinning (such as detailed explanations given by Mr Bunt and Ms Blight in cross-examination)

1052.  As for Dr Hunt, he accepted in cross-examination that NPS surveys would encompass SPCs although he did not know in what proportions. He also accepted that some VOCs could be covered in the surveys. In fact, in SH1 at paragraph 172, he said that on the basis of Ofcom's Residential Consumer Survey, 35% of VOCs accessed the Internet roughly every day and a further 6% did so once a week. That gives a total of 41%. This was all in the context of discussing the true characteristics of Class Members. Of course, and as Dr Hunt fairly said, this does not mean that all of such VOCs would have done an online survey although there was no reason in principle why they could not.

1053.  In broad terms, it appears that the NPS surveys were done online by the customer answering questions and giving scores, and such customers could include SPCs who had internet access just like any other customer who had a bundle. It would also in theory be possible for VOCs to participate also, since in practice, a significant proportion accessed the internet in other ways, but the proportion of VOCs that did so here is unknown and probably not large. That said, in cross-examination, Mr Parker also accepted that the NPS documents he relied on did not themselves set out the detail of the method or any concerns about it which might be extremely important.

*Particular NPS documents*

Introduction

1054.  The key purpose for the CR's reliance on the NPS documents is to support the claim that this data in general does not demonstrate any real value or importance given to the BT brand, or its landline products, by the SFV customers. Although a number of these documents are referred to in order to make different points, we think it is most helpful to consider all the relevant aspects of each document in one go, as it were, and to do so chronologically.

Consumer Brand NPS Heartbeat report, September 2017 ("the September 2017 Brand NPS report")

1055.  This recorded that BT's Brand NPS was -6, one up from the previous month which was -7. This made the BT Brand the second lowest performer, with TalkTalk at -7, Sky at 9 Virgin at 5 and Plusnet (owned by BT but a separate company) at 20. However, this score is of limited assistance since it is referable to all of BT Consumer's customers. The same is true for page 19, where on the VFM scores, BT was the lowest at 22 with Sky at 27, Virgin Media at 29, TalkTalk at 42, Plusnet up 57 and EE (also owed by BT) at 36.

1056.  However, page 14 stated that while BT results for other products had improved, its score for "Line Only" was -13, which was a reduction of 1 from its previous score. Dr Hunt accepted that this would

delineate SFV Services but with the caveat that for reasons already given, the customers surveyed here would be principally SPCs. Nonetheless they form part of the Class and so this statement is at least of some significance. This page also stated that improvement was more likely for better products, and Dr Hunt accepted that this document was saying that landline only was not one of the better products.

<u>The Drivers of Value for Money - 23 November 2017</u>

1057.  This is specifically directed to the metric of VFM, described as a key driver of NPS, Churn and Acquisition and accounting for 25% of Brand NPS.

1058.  Page 5 repeats the Brand NPS scores given in the September 2017 Brand NPS report. Page 7 repeats the VFM scores. There were said to be 11 different drivers for VFM across 4 groups namely Price, Brand, Product and Relationship. BT's net score across these drivers was significantly worse than its leading competitors in each case. BT did not "own" any particular driver, in other words have a leading score. On "Trust", BT was 13 points behind the leading competitors. Product was said to be a better performing area for BT which should focus on points of difference to derive "Unique Offer", later said to be Sport, Ultrafast, so not landline. In cross-examination, Dr Hunt accepted that this showed that BT was not viewed as a distinctly trustworthy service provider across all products for the whole online consumer base. That is obviously what the document says but again, this is the whole BT Consumer customer base rather than only SFV customers.

<u>Consumer Brand NPS Report, March 2019 ("the March 19 Brand NPS report").</u>

1059.  This report set out different NPS sectors within BT Consumer, one of which was "Landline Relationship NPS". At page 5, BT was shown as the worst performing at -5, with Virgin Media at -3, Sky at 5, TalkTalk at 6 and Vodafone at 11. As Dr Hunt accepted, this was a measure of the likelihood of the customer recommending the landline service to a family member or colleague. The CR accepts that here, landline relationship refers to all customers who had a landline i.e. it would include bundle customers. However, page 4 listed Brand NPS by cohort/product holding, and under "Single Landline", BT's score was -25. It was circled in red to indicate that BT was the lowest performing brand although with this cohort, no other provider had a score. Dr Hunt accepted that this cohort was confined to SFV customers, but again with the caveat that they would principally be SPCs. Given BT's very high share of SPCs, it seems hard to envisage a situation in which a panel research study would derive meaningful comparisons between BT and other SPC providers, and this probably explains the absence of any rival operator score on this measure.

1060.  All of this data was referable to the period March 2018-March 2019.

<u>The March 2019 Survey</u>

1061.  This was produced on 13 March 2019. It shows the results of a survey which consisted of telephone interviews with 1,000 VOCs between 29 January and 11 February 2019. By then, of course, such VOCs were paying the discounted line rental price following the introduction of the Commitments the previous year. BT considered that this was a large-scale statistically robust base to analyse. It noted as follows:

> This difference in methodology, and the fact that the interviews are interviewer-administered, rather than self-completion, can lead to more positive ratings as respondents seek to please the interviewer.
>
> This means scores <u>cannot</u> be compared with those from the Brand & Relationship NPS survey (which are the published Consumer NPS results each month).

1062.  Although the survey had a second purpose, which considered reaction to different letters sent to customers about the Carmen (i.e. Commitments) discount, the first purpose and the only one considered in this document, was NPS and customer experience including value, ease-of-use, recognition and call quality, in other words limited to the landline product. It should be remembered that by this stage, the number of VOCs was no more than around 1m.

1063.  The overall NPS was 31, indicating that more than half the base were Promoters (i.e. customers who gave scores of 9 or 10). BT's analysis of the survey data showed that value was the main driver for positive recommendations at 44%, although feeling valued/recognised and that personal needs were being met, drove 40% of the NPS, and reliability drove 15%. BT considered that it was nonetheless underperforming on value, notwithstanding the very high scores being given by many of those surveyed, and that the overwhelming sentiment was that BT was "OK, nothing more". Stronger advocates were few and far between, but on the other hand, many were happy with the *status quo*, even if they had problems. BT felt it could do more, by, for example, giving more customers Call Protect. Overall there was a very high claimed loyalty i.e. customers who did not intend to leave BT even if they gave low scores.

1064.  The overall conclusion was this:

**Solus – Landline-only – customers give high scores, and are not looking to go anywhere, but we could still do more to demonstrate that we value this base**

| WHAT? | WHY? | WHAT NEXT? |
|---|---|---|
| Landline-only base fall into a certain demographic | • The solus base are old, retired and on lower incomes<br>• They appear to be a naturally loyal base – to BT and their landline – with very little interest in switching to another product or provider<br>• There is some interest in Broadband, but low levels of ownership of relevant devices | • Bear in mind that this base are essentially fine as they are, but seek to pick off relevant upsell opportunities |
| Customers are generally positive – albeit passively – about their BT landline | • They give high scores for NPS and are broadly satisfied with most aspects of their experience.  NB – some of this comes from methodology and base (telephone interviews with older customers)<br>• However, verbatim comments are relatively passive, rather than effusive ("no complaints", Likelihood to recommend 9) | • Continue to deliver a service that works for this cohort |
| But they could feel more 'looked after' | • Customers give higher scores for the more functional aspects of their experience, e.g. Line reliability, Call quality<br>• Where they're relatively less positive is around Price and Value, but also Personal, Recognition and treating existing customers well<br>• Verbatims suggest BT could do more about nuisance calls | • Consider what can be done to make this base feel more 'loved' without migrating them onto dual<br>• Call Protect could cut through |

1065.    The CR says that this document is adverse to BT's case on brand value, because of the overall "OK" sentiment referred to above. We think that this understates the significance of the document. After all, the CR places great weight on low NPS in relation to a number of other documents, yet here the NPS was very high.

1066.    That said, we need to bear in mind, especially on value, that these customers were now in receipt of reduced line rental prices and also, as the document points out, there may be a bias towards giving high scores so as to please the live interviewer. Further, this particular group of VOCs were, by definition, no longer members of the Class. And of course, it says nothing about the SPCs.

1067.    Nonetheless, the impression we gain from this document is that there was a significant element of satisfaction and brand loyalty at least for this particular group of VOCs.

Consumer Brand NPS Report, May 2019 ("the May 2019 Brand NPS report")

1068.    Page 3 shows that the "Single Landline" score had fallen to -27.

Consumer Brand NPS Report, November 2019 ("the November 2019 Brand NPS report")

1069.    Page 5 shows that the "Single Landline" score had fallen to -31. Page 8 noted that this score was much lower than that from other cohorts i.e. other groups of customers.

Conclusions on the NPS documents

1070.    We would conclude from the above that on the face of the documents and when it comes to the SPC group of Class Members there was a very low propensity to recommend BT. On the other hand, the NPS documents were not measuring brand value as such. Further, the position was that at least for those VOCs surveyed for the purposes of the March 2019 Survey, there was positive brand loyalty.

In addition, we should add that these are not documents which span the entire claim period. There is one from September 2017, the March 2019 Consumer Brand Report, which covered March 2018-March 2019, the (positive) March 2019 Survey and the May and November 2019 reports.

1071. We must also bear in mind that other points more favourable to BT may well have been made by Ms Blight and Mr Bunt, had they been given an opportunity to deal with them in cross-examination.

1072. On any view, however, it is difficult to see how Dr Hunt could properly have made the statements about improved NPS in paragraphs 430 and 431 of SH1, quoted at paragraph 1043 above, because the documents we have just reviewed do not support such statements. In re-examination, he said that the views he expressed in Section 7 of his report, on the one hand, and the material contained in the NPS documents were "two different stories so I think there are things that are broadly consistent across the two…. two very different stories about two very different customer bases and very different products and these things and these kinds of things, just to be clear." It is hard to square that with the evidence.

1073. We now turn to the other materials placed before us.

*Ofcom Materials*

Introduction

1074. Dr Hunt uses various Ofcom materials and surveys to support his conclusion that Class Members, especially VOCs, were very satisfied with their SFV Services, valued the reliability of their landlines more than dual-play customers, and that the former saw BT as a market leader in reliability and generally. They placed greater emphasis on trustworthiness of their product and perceived BT to be the most trustworthy. See paragraphs 383 and 457 of SH1. This, he said, was reflective of consumers placing positive value on BT's brand.

2016 Switching Tracker Data

1075. This is data taken by Ofcom from all telecoms customers, not just those of BT. However, it produced discrete results for BT customers, among others. This showed that 73% of BT VOCs were very satisfied and a further 23% were fairly satisfied overall with their service provider. The respective figures for SPCs were 61% and 32% for SPCs (excluding certain services) and 53% and 37% for dual play. In relation to satisfaction with landline VFM, it was 52% and 30% for VOCs, 47% and 34% for SPCs and 28% and 56% for dual play.

Comparison Documents

1076. Dr Hunt then refers to Ofcom's 2016 and 2017 "Comparing Service Quality Reports" and its 2023 "Comparing Customer Service Interactive Report". These looked at all landline customers and this was, of course, before the Commitments came into effect.

1077. For the period 2016-2022, the proportion of BT customers who said they were "fairly" or "very" satisfied was generally above average each year. BT came first or second for each of these years and on average was the second-best provider. At page 75 of SH1, Mr Hunt produced the following table, drawn from the 2016 and 2023 reports:

**Table 7: Overall satisfaction with landline service**

|  | Average | BT | EE | Plusnet | Sky | TalkTalk | Virgin Media |
|---|---|---|---|---|---|---|---|
| **2016** | 89% | 92% | [*] | [*] | 90% | 83% | 85% |
| **2017** | 87% | 88% | 90% | 81% | 90% | 82% | 84% |
| **2018** | 86% | 88% | 90% | 89% | 86% | 81% | 83% |
| **2019** | 85% | 90% | 82% | 83% | 88% | 83% | 77% |
| **2020** | 77% | 78% | 81% | 78% | 79% | 82% | 69% |
| **2021** | 77% | 81% | 80% | 83% | 79% | 75% | 69% |
| **2022** | 77% | 78% | 90% | 78% | 77% | 73% | 70% |
| **Average** | 84% | 85% | 86% | 82% | 84% | 80% | 77% |

Highest score
Second highest score

1078. In addition, the 2023 report stated as follows in relation to customers perception of the clarity of their telephone line:

**Table 10: Satisfaction with clarity of the line**

|  | Average | BT | EE | Plusnet | Sky | TalkTalk | Virgin Media |
|---|---|---|---|---|---|---|---|
| **2017** | 89% | 90% | 92% | [1] | 90% | 89% | 88% |
| **2018** | 89% | 91% | 91% | 86% | 88% | 87% | 90% |
| **2019** | 87% | 91% | 85% | 85% | 87% | 88% | 82% |
| **2020** | 80% | 82% | 77% | 75% | 79% | 82% | 78% |
| **2021** | 80% | 83% | 80% | 73% | 81% | 80% | 77% |
| **2022** | 80% | 81% | 88% | 75% | 77% | 79% | 80% |
| **Average** | 84% | 86% | 86% | 79% | 84% | 84% | 83% |

Highest score
Second highest score

1079.  The same report also yielded the figures shown below in Dr Hunt's Table 11:

**Table 11: Satisfaction with landline service reliability**

|  | Average | BT | EE | Plusnet | Sky | TalkTalk | Virgin Media |
|---|---|---|---|---|---|---|---|
| **2016** | 91% | 93% | [1] | [1] | 91% | 88% | 91% |
| **2017** | 90% | 91% | 92% | 87% | 90% | 87% | 91% |
| **2018** | 90% | 92% | 93% | 90% | 89% | 85% | 89% |
| **2019** | 89% | 93% | 83% | 83% | 89% | 86% | 85% |
| **2020** | 82% | 84% | 85% | 82% | 83% | 86% | 77% |
| **2021** | 84% | 89% | 87% | 87% | 86% | 83% | 76% |
| **2022** | 84% | 86% | 91% | 84% | 82% | 82% | 81% |
| | | | | | | | |
| **Average** | 87% | 90% | 89% | 86% | 87% | 85% | 84% |



Highest score
Second highest score

1080.  We should add that EE had been owned by BT since January 2016.

<u>2016 – 2022 Switching Tracker Data</u>

1081.  In addition, Dr Hunt looked at the cumulative results of Ofcom's Switching Tracker data from 2013-2016. This showed that for this period, between 78% and 82% of SFV customers were totally satisfied while between 9% and 12% were totally dissatisfied.

<u>Analysis</u>

1082.  On those figures, there can be little doubt that there were high or relatively high levels of satisfaction with BT's landline services, especially by VOCs. This would reflect the results of the March 2019 Survey at least as far as its NPS were concerned. Moreover, the introduction of the Commitments does not appear to have made any real impact on the figures.

1083.  As to all of that, the CR makes the point that this does not show that BT was providing services of distinctive value. For example, while Table 7 shows an average score for BT of 85%, this is only 1 percentage point above the average. The same could be said for Tables 10 and 11 where the performance for BT as an average was 86% as against 84% for the general average and 90% as against 87% respectively. It also pointed to the fact that in one year, BT came third and in another, it came fourth out (Mr Parker's summary of the results in paragraph 6.95 of DP4 do not appear to be wholly accurate).

1084.  We should add that the 2016 Switching Tracker data was showing high percentages of satisfaction overall especially with VOCs. Here, however, it was not shown what the satisfaction levels for other providers were; it would be a reasonable assumption to suppose that they were of the order shown

in Tables 7, 10 and 11, in which case the point made by the CR noted in the preceding paragraph would apply here as well.

1085. As to the CR's point here, while the extent to which BT exceeded the average was not large in percentage terms, if one compares BT's performance directly with those companies which it did not own, i.e. Sky, TalkTalk and Virgin Media the percentages differences are generally larger. Also, if all satisfaction levels are very high there is not much headroom to show superior performance. Overall, we do not see why these tables do not provide evidence of the ascription of positive value to the BT brand.

1086. Mr Parker then made some more general criticisms of Dr Hunt's approach here. First, he said that overall satisfaction levels are not of any particular weight in the context of assessing economic value. That is because if it were otherwise, it would suggest that in a case where pricing was excessive under Limb 1, it would not be unfair for the purposes of Limb 2, simply because customers were satisfied. That said, in cross-examination he accepted that one could still have satisfaction as a relevant metric of assessing economic value without it meaning that satisfaction measures simply exclude the possibility of excessive pricing.

1087. Second, and particularly in relation to VOCs, they may respond positively despite having experienced frustrations with the service, as the March 2019 Survey suggests.

1088. On the question of satisfaction levels where they were high, Professor Loomes sought to diminish their significance by saying that if a customer had been with BT for 10 or 15 years, they were unlikely to say that they were dissatisfied because of "cognitive dissonance" i.e. their desire not to express a view which would appear to be contrary to the fact that they had stayed with BT for so long. We do not think there is anything in this, certainly not so as to render insignificant the figures on customer satisfaction.

1089. As to those points, BT accepts that by themselves, satisfaction levels do not somehow prove economic value without more (see paragraph 729 of its Closing). However, when taken together with other evidence they can (and do here) show economic value. We agree.

1090. Next, BT rejected Mr Parker's high threshold test for economic value such that there would have to be "massively higher" levels of satisfaction (in comparison to other products) and linked to some objective better performance before they could count. As already noted, we agree that this is too high a test for economic value.

1091. Dr Hunt said that satisfaction was quite a useful metric in relation to how customers feel about a particular product and it had been used in competition work. Mr Parker accepted that it came up

sometimes in competition investigations but said that he did not think much weight was placed on it.

1092.  In fact, evidence of satisfaction levels was not simply rejected in the competition context as a metric when considering whether a particular market was working well. It could be of use, as Ofcom made clear in its 2013 Narrowband Markets Review, when it referred to customer satisfaction and switching as factors going to showing that the market remained competitive.

1093.  Mr Parker relied specifically on the CMA's 2016 Retail banking market investigation final report which said this:

> "5.100  Several parties submitted that the high levels of satisfaction suggested that the market was working well. However, we consider that customer experience metrics such as satisfaction will be determined at least in part by customers' expectations of product or service quality. Since this expectation is likely to be influenced by the range of service offered by current providers, high absolute levels of satisfaction cannot necessarily be interpreted as implying that the market is delivering good outcomes for customers. For this reason our analysis of customer experience measures is largely focused on the comparative performance between banks."

1094.  However, as was pointed out in cross-examination, the CMA also said this in an earlier paragraph:

> "Indicators of overall quality
> 5.88 Customer experience metrics, such as customer satisfaction and advocacy ratings, can be useful as indicators of the overall quality of service received by customers, and are widely used as a measure of overall service quality, by both private companies and regulators."

1095.  What we derive from the above is that it would be wrong to dismiss satisfaction levels as simply being irrelevant to an assessment of economic value; however, the weight to be placed upon them does depend on the other available evidence and is highly fact-sensitive.

1096.  In this particular case, we consider that the weight to be given to the satisfaction levels reported by BT Customers must be ascertained in the context of two particular matters, namely the results shown by the NPS documents considered above, and the significance of switching (or not switching).

1097.  So far as the NPS documents are concerned, while we give them some weight (while bearing in mind that they were not put to Mr Bunt or Ms Blight), they do not all point in the same direction and we consider that overall the Ofcom materials present a better guide to satisfaction.

1098.  As to the significance of switching or not, we now consider this latter topic before expressing our overall conclusions on brand value.

**Provision of Economic Value: (d) Ability of Customers to switch**

1099.  We consider first the evidence of Dr Hunt, since it is BT which makes a positive connection between the ability to switch (or not) and the ascribing of value to the landline product or BT's brand by reference to those who did not.

1100.  His key point is summarised in section 6.3.3 of SH1 as follows:

> "**6.3.3 Non-switching as a deliberate act**

336. I now turn to consider the extent to which Class Members who did not switch made a deliberate act. I do this by examining various sources of evidence including a range of evidence which I set out under Section 7 and which sets out the specific preferences of Class Members as well as the extent to which they derive value from their SFV Service.

337. As I explained in Section 5.5, analysis of switching rates alone ignores people who thought about switching but made a deliberate choice to stay put. Professor Loomes does not consider this. But the fact that so few Class Members consider switching to be difficult and the extensive outreach from BT and its competitors suggests that Professor Loomes should not interpret customers who do not switch as disengaged consumers.

338. Furthermore, his analysis is inconsistent with Ofcom, who has previously defined 'engaged' consumers both as people who actually switched as well as those considering and shopping around. For example, evidence from Ofcom shows that in 2016, 2% of BT

SFV customers were 'actively looking to switch' or had started looking, and a further 2% 'considered switching but did not look'.

339. This means that in addition to those who did actually switch, a further 4% of Class Members were considering switching. Professor Loomes considered neither of these categories, which Ofcom and I consider to be relevant evidence regarding consumer intention and speaks to a portion of people who are assessing their options and on that basis can make a choice about whether to switch or not.

340. In addition, Professor Loomes ignores that consumers may not switch because they consider their current product offering best meets their needs, and on that basis are highly satisfied. For these consumers, staying put could simply represent reasonable decision-making rather than a lack of engagement."

1101. All of this is developed in Section 7 of SH1. The key question is the extent to which it can be said that those who (at any time in the claim) did not switch thereby made a positive or deliberate choice to stay, and in that sense were sufficiently engaged, as opposed to being simply inert and disengaged so that no inference of any attribution of value could be made from them staying. We should add, of course, that merely because customers were engaged, it does not necessarily establish the relevant level of economic value, but it does at least enable an inference to be made that they were capable of making a positive choice to stay because of the value ascribed for example to the BT brand - if this is what they did.

1102. The CR's position is that little or nothing can be inferred as to a positive choice to stay because the customers were indeed generally disengaged. It is important to note that this is not because the Class Members as a whole are considered to have some particular vulnerabilities or characteristics as a class. Professor Loomes specifically eschewed this approach. Rather it was because of what can be said from a behavioural economics point of view about how consumers act (or not) generally. Dr Hunt, for his part, noted that VOCs were generally in an older demographic (see paragraph 379 of SH1) for the purposes of his analysis of their engagement, and of course BT made reference to their age demographic in the March 2019 Survey.

1103. It is necessary therefore to consider what the level of engagement was, on the part of those who (at some point) remained as VOCs or SPCs.

1104. First, it seems to us that we can infer a level of engagement in those Class Members who later switched at some point. The fact of switching suggests that they were not inert and were sufficiently engaged to explore other options which included (in the case of about 50%) switching to other

providers. And in the case of the (former) SPCs, of course, they obviously had access to the internet and used it, otherwise they would not have had a broadband service. Moreover, on our findings, their reason for switching is not likely to have been price driven. We add that it was probably not quality driven either. Rather it was part of the secular trend. But this does not affect the question of engagement or otherwise. This reinforces the point that the SFV customers were not captive; there were no barriers to them taking alternative options.

1105.  Of course, it is perfectly true that there remained, across all or much of the claim period a "rump" of those who never switched and who will be predominantly VOCs. However, they by no means constitute the majority of Class Members or anything like it, especially as they were not part of the Class at all after April 2018.

1106.  Professor Loomes suggested that nonetheless, those who did not switch were a "different kind of person" from those who did. We do not accept that - it seems to us to be speculation on his part. The more realistic analysis is that certainly for most Class Members, there was an ongoing dynamic process by which they would switch at some point sooner or later.

1107.  Next, there were of course those who remained BT SFV customers but who switched internally within BT by taking up call plans, for example rather than paying charges per call. BT was encouraging customers to do this. Professor Loomes said that such customers could not be called "switchers" otherwise there would be a huge number of such switches. We agree, but the point is that considering and moving to call plans because they were cheaper and more convenient is surely a sign of engagement.

1108.  Another factor is that a significant number of Class Members are constituted by those who joined BT as VOCs or SPCs, having been with other providers. They constituted at least 10% of the total SFV customers each year between 2014 and 2019. See paragraphs 169-171 above. It may be that many of them later switched again. Nonetheless, it is some evidence of the existence of a positive choice in favour of BT and the existence of engagement.

1109.  We next turn to the question of "triggers". These are various forms of stimuli to customers which can then prompt them to become engaged about their BT service. We accept that Class Members received communications from BT either by email or by post. These would include price change notifications ("PCNs") which BT was obliged to send to their customers, announcements of price increases in the press, bills and (where the customer had consented) marketing communications including promotional offers.

1110.  The question then is the extent to which BT customers were engaged with, in the sense of reacting to or at least considering, the communications which they received.

1111.  In relation to PCNs, it appears to be common ground that typically, the first page of a PCN letter (whether posted or emailed) tended to refer to the fact of a price change and also the non-price changes, with the detail of the actual price change appearing on the second page.

1112.  An example of this is a letter dated January 2020 stating on the first page that prices would go up by CPI plus 1.3% from 31 March and making references to a new calling plan introduced, together with Call Protect. Page 2 then set out the detail of the price changes in a tariff.

1113.  However, at least in some cases, page 2 could only be accessed on the BT website. Thus, a letter dated March 2021 which supplemented an earlier letter dealing with price changes said that line rental would increase by CPI +3.9% but did not identify the level of CPI or state what the new price would be. It also said that the cost of calls on "pay-as-you-go" plans would increase by that percentage from 20p to 20.9p. The letter then said this:

   "For details of all prices that are increasing visit BT.com/tariff guide and head to page 2."

1114.  It is not clear if letters in that form were sent before 2021.

1115.  It is worth adding at this point that Mr Bunt said in evidence that BT (and other telecoms operators) would have to have its PCNs approved by Ofcom. He said that as far as he was aware, BT's always were, without changes being required whereas those of BT's competitors had often to be rewritten.

1116.  In addition, and as a result of the Commitments, BT was obliged to send annual statements to SPCs, to show their annual spend and potential cost savings as well as information on switching to a different provider. Also, since February 2020, BT had to send annual "best tariff" notices to all Class Members now out of contract as well as an "end of contract" notification. Finally, unless opted out, there would be marketing communications.

1117.  It is likely that Class Members would also have received offers from other providers.

1118.  There would have been other sources of information available to Class Members about their landlines. Thus the Ofcom 2015 Consumer Experience Report said that 19% of landline customers received information from family and 14% received information from friends about alternative tariffs.

1119.  There then arises the question of the extent to which BT customers would actually read the communications sent to them.

1120.  It seems reasonably clear that BT customers would at least be aware in general of price rises. In this regard Dr Hunt relied on a number of reports or studies.

1121. First there was a report produced for BT by a consultancy called Firefish in 2014. This suggested that older VOCs had a general awareness of their landline package including costs and call features. It also suggested that these customers were usually aware of what they were currently paying.

1122. He also relied upon Ofcom's 2015 Consumer Experience Research Report to the effect that the internet was the most trusted source of information. Further, Dr Hunt relied upon various FCA papers produced while he was at the FCA, which in particular found that older people tended to be more responsive to communications about their service because they actually have more time. In one case, 60% of those surveyed recalled a particular letter even two or three months after receiving it.

1123. A further point made was that for those customers still paying their bills at the Post Office they would obviously be aware of the current prices for their landlines. The same is likely to be true for those not paying by direct debit.

1124. On the other hand, in GL1, Professor Loomes relied, first on a qualitative study to support Ofcom's 2017 Provisional Conclusions. One of its aims was to understand the attitude of SFV customers to switching, and to explore what would encourage them to engage with the market and consider switching. The study was called "Enriching understanding of Stand-alone Voice Customers". The survey included VOCs and SPCs. It considered the impact of four different kinds of letter, all designed to encourage greater engagement. Professor Loomes accepted that the results had to be treated with some care because of the subjectivity of the responses to a qualitative survey, and also because there could be a bias in favour of greater engagement because the survey members had all agreed to be part of the survey.

1125. From this survey, Professor Loomes concluded that the VOCs were heavily dependent on their landline and were broadly content with their current provider and many had been with BT since before privatisation. They had little awareness of other providers and the products and did not know whether their own deal was good value for money. They were more likely to read correspondence from their own provider than from others. There were some barriers to switching including customer loyalty sticking to what they knew and believing that because BT owned the lines, they were more likely to offer the best service. So there was little incentive to switch. There was a lack of knowledge about the internet which made it harder to obtain information necessary for a switching decision. They tended to rely more upon family and friends for information. They also had insufficient information about the consequences of switching. Thus, Professor Loomes suggested that this was evidence that those customers who remained with BT were more likely to have done so as a consequence of not engaging with any exploration of switching rather than this being a conscious and informed choice.

1126. As for the SPCs, Professor Loomes said that there were various elements within the group with different levels of engagement, only one of which consisted of customers who had made a conscious decision to split their purchase. That at least suggested that the notion that all SPCs made active choices required substantiation.

1127. In answer to this, Dr Hunt suggested that this was nonetheless consistent with those customers being broadly content with the service they received and not therefore wishing to change. On the basis that there was some significant brand loyalty on the part of VOCs in particular, we can understand this. This would be consistent with the additional value placed on landlines by SFV customers, as noted in paragraph 964 above.

1128. A second study was commissioned jointly by Ofcom and BT in the course of the negotiations for the Commitments in 2016-17. This was called "Telecoms Sector: Engagement Trial for BT's Standalone Voice Customers". It concerned only VOCs and involved a set of field experiments to explore the effectiveness of different communication methods for promoting greater engagement. Here, engagement was taken to be the customer changing their calling package, adding a product to their plan or closing their account within three months of receiving a particular letter. Baseline levels of engagement in the control groups ranged between 7.5% and 9.9% with only a minority of these cases of engagement involving switching as opposed to some other course of action. The two letters which promoted the most engagement were the ones which dealt with landlines and specifically mentioned HPS with the price being fixed for three years, and an average spend letter which was a personalised statement breaking down the total charges that the customer had paid into recurring charges and extra charges. Overall then, for 9 out of 10 VOCs in the trial, there was no further engagement at all.

1129. Here, Dr Hunt made the point that while the various letters did not prompt a change in consumer behaviour, it does not mean that the customers did not read the letters. The lack of engagement (in the limited sense defined by the study) did not really say anything, since it would be consistent with the customers being broadly happy with the existing service and not wanting to undertake any of the three types of action specified. As a counter to this, Professor Loomes suggested that given the letters, one would have expected to see a significant reaction but that did not happen.

1130. In our view, and on the basis of the above materials, there would appear to be sufficient forms of information communicated to and available to the Class Members. In particular, the VOCs, even without access to the internet, were likely to read the letters sent to them. Professor Loomes suggested that there might have been too many communications, so that Class Members suffered from "information overload" and simply ignored them. However, we think that this is just further speculation.

1131. The next question is why there was not more switching to another landline provider or to a bundle. For those SPCs who did not switch, the position appears especially odd, given the price benefits available to them of moving to a bundle. That said, the position of SPCs, according to Mr Bunt, was more nuanced, and he referred to them as a "mixed bag". Some of the SPCs decided to stay with BT, because they could get free broadband when taking Sky, while retaining their landline, and that was a positive decision so far as the landline is concerned. See Day 5/101-102. We see the force of that.

1132. Here, the experts both suggested various theories. Dr Hunt suggested that customers may have deliberately chosen not to read or act upon a communication as an act of "rational inattention". Or perhaps to put it another way, they could not be bothered, by reason of time or other constraints. If this is what happened, we can see some force in his point. Another possibility suggested by Professor Loomes is that such customers were simply inert and gave the communications no thought at all, even if they read them. They were simply stuck in their ways and stayed with BT as a result. However, as we see it, this would not be inconsistent with such customers ascribing value to BT on the basis that they simply preferred to stay with the supplier they had known for a long time. We accept that there is a degree of speculation on the part of both experts here, but we are prepared to give some weight to what they say, with the upshot being a degree of value being ascribed to BT, however one wants to describe it. This favours BT rather than CR in this respect.

1133. At this point we should deal with HPS. Those customers who took HPS are, of course, excluded from this claim. Nonetheless, the point is made that if customers were fully engaged, surely more of them would have taken this product. The difficulty with that argument is that HPS as a product was, in our view, a retention deal and not fully promoted. See paragraphs 270-301 above.

1134. Overall, and in the light of the matters referred to above, we consider that it seems likely that a substantial number of those who stayed (while they stayed) probably did so out of a sense of loyalty to a brand to which they had been attached for probably many years. They were not generally inert, as is shown by the fact that most of them (eventually) did switch, and all the indications suggest that those who remained SPCs are continuing to switch to bundles, as there were 1.87m such customers in 2014 and only 0.49m by 2022.

*Conclusions on Brand Value*

1135. Overall we consider that there is significant evidence that the SFV customers as a whole did engage with their SFV products. We cannot possibly identify the individual motivation of each and every customer, and the evidence and interpretations offered by the experts, unsurprisingly, did not yield a definitive picture. However, for those who remained BT SFV customers (or while they remained),

we consider there is sufficient evidence that for at least a substantial number, their decision to do so implies a degree of positive value that they attached to the BT brand.

**Provision of Economic Value: (e) Conclusions**

1136.  Having taken into account all the matters referred to above, and recognising that they do not always point in the same direction, our overall conclusion is that the (relevant) Gives and value ascribed to the BT brand did constitute distinctive value. In the context where the excessive prices were at the level we found them to be (see paragraphs 932-934 above), we conclude that they did bear a reasonable relation to the economic value of the SFV Services.

**Workable Competition Factors**

*Introduction*

1137.  As has already been noted, the overarching test for abuse, in broad terms, is whether the dominant undertaking has reaped trading benefits which it could not have obtained in conditions of "normal and sufficiently effective" competition i.e. "workable" competition. Where the price bears no reasonable relation to the economic value of the product or service in question this is an example of such an unfair price. See paragraph 97 of *Phenytoin* cited at paragraph 49 above. Both sides noted this, also. See paragraph 488 of the CR's Closing and paragraph 673 of BT's Closing.

1138.  It follows that it is relevant to consider what the position might be in the putative workably competitive market. This is a different and broader question than that asked under Limb 1, which is whether the price charged is excessive by reference to the notional competitive benchmark, itself set by reference to all direct and indirect costs plus the reasonable margin.

1139.  There was, however, some divergence as to how this workable standard should be applied, with the most important difference between the parties being their view as to whether firms could earn profits in excess of the competitive level in conditions of workable competition. Specifically, Ms Kreisberger KC for the CR claimed that workable competition involved the market price being driven down to a level of zero excess profit. In her oral closing she submitted that in a workably competitive market, the price will be driven down to cost-plus, so zero economic profits, but if the firm could point to some unique feature that distinguishes it from the market, then it may be able to put its prices above cost-plus.

1140.  BT did not agree, arguing that workable competition was consistent with a wide range of prices and price-cost margins, and that it certainly did not entail a zero profit constraint, which was a standard associated only with perfect competition. As the Tribunal stated at paragraph 129 of its judgment in *Liothyronine*:

> "Normal, sufficiently effective and workable competition, as well as being distinct from abnormal, insufficiently effective competition, is also distinct from perfect, maximally competitive or idealised

competition. As the Tribunal noted in Phenytoin, normal, effective competition is the "most that should be expected in the real world" as distinct from "idealised or near perfect competition which is a theoretical concept.""

1141.  We consider that BT's approach is the correct one and that the zero profit presumption advocated by the CR is unrealistic. Of course, this does not justify an 'anything goes' approach to the definition of workable competition and we bear that in mind.

1142.  For the purposes of the unfairness analysis in this case, we consider that there are two relevant considerations:

(1)      Price dispersion; and

(2)      Cost efficiencies dispersion.

*Price Dispersion*

Introduction

1143.  BT's primary position on the question of price dispersion was that it relates to the setting of the competitive benchmark under Limb 1. See paragraph 618 of its Closing. However, its alternative position was that it should be considered under Limb 2. Thus, in Mr Beard KC's oral closing at he said this:

> "The recognition of subjective economic value through Limb 2 can be taken into account by ensuring you use benchmarks that allow for the variety of outcomes you see in workable competition…the way that you can sensibly bring to bear the economic value subjective considerations in limb 2 is essentially to think about the benchmarks being higher for costs and margin, because in doing that what you are implicitly doing is affording the market that spread of prices…in order for the Class Representative to say that the price is unfair, they have to be saying, effectively, that in the conditions of workable competition, consumers would not have the sort of subjective preferences that can create the price dispersion which would be represented by their subjective appraisal of economic value, at the very least in relation to Limb 2."

1144.  For our part, we would not seek to "shoehorn" such arguments into the concept of economic value. We see them as more free-standing points raised within the broad ambit of workable competition. However on the substance of what Mr Beard KC was saying here, we agree that Limb 2 is the more appropriate forum for such considerations and we rejected an approach which brought them into Limb 1, consistent with our desire to take a "cleaner" and more "objective" basis for the assessment of whether the price is excessive under Limb 1. We said as much in paragraph 53 above when dealing with economic value, but we think that this reasoning applies as much to matters like price dispersion.

Relevant Facts

1145.  To consider what price dispersion there might be in the putative workably competitive market for SFV Services, we consider it instructive to look at variations in pricing in the adjacent market for bundles, which is accepted by both parties to be workably competitive. We have already adverted to this in the context of considering Mr Parker's price differential analysis as between SPC pricing and bundle pricing, noting that some customers for bundles were paying list (or "back book" prices)

while others were paying cheaper promotional (or "front book") prices. See paragraphs 365 and 366 above.

1146. The figures quoted there were drawn from Ofcom's Pricing Trends report of 9 January 2020. Its Figure 16 showed as follows:

**Figure 16: Average available monthly list and promoted prices for dual-play standard and superfast broadband**

£ per month (September 2019 prices)



*Source: Ofcom / Pure Pricing UK Broadband Updates.*
*Notes: Represents average of the cheapest available tariff from BT, Plusnet, Virgin Media, TalkTalk, Sky and EE at the end of each quarter; promotions include the promoted price and any 'gifts' offered; adjusted for CPI (September 2019); standard broadband products are those with an advertised speed <30Mbit/s; superfast broadband products are those with an advertised speed ≥30Mbit/s.*

1147. Ofcom noted that the differential between list and promotional prices had increased between 2014 and 2018 although it then narrowed in the year ending March 2019. At that point, the differential in relation to dual play bundles was £8 per month rather than £12 per month the previous year, while the differential in relation to superfast dual play bundles was around £10 compared with £13 previously.

1148. Looking at Figure 16 as a whole, one could take an example of a list price for standard dual play at £30 with the promotional price at £20. The latter is one third less than the former. So this is quite a significant price differential across an average of all the relevant suppliers. There could therefore be a greater (or lesser) dispersion when comparing any one supplier with another.

1149. Further, if one assumes from the above that the average dual play bundle price was £25, i.e. the mid-point between the promoted and list price, and where the typical BT gross margin on its bundles is said to be 38% (see paragraph 139 above), this would then suggest that BT's gross margin on the list price was 48% and it was 22.5% on the promotional price. Again, this is a very significant

variation in the gross profit contributions made on different transactions in the same workably competitive market.

1150. Price and gross profit variations of this magnitude for what appear to be essentially identical products would not be consistent with notions of a perfectly competitive market, where the "law of one price" would hold. The fact that such variations are the focus of Ofcom's published analysis of the market might reasonably imply that there is some legitimate scope for public and regulatory policy intervention to encourage measures (such as encourage greater consumer engagement and/or information) to bring about a reduction in such dispersion. However, the fact that we do observe this degree of dispersion, in a market that is the close neighbour of the SFV market, and in which workable competition is accepted to be present, does helpfully illustrate the kind of divergence from the law of one price that we might regard as normal, if imperfect, competition within a workable competition framework.

1151. BT did not put forward any particular figure or calculation taken from this which could be applied directly to BT's SLR pricing. However it did submit that this feature of the putative competitive market should be factored into the assessment of unfairness and we agree. We therefore take it into account, and consider that this first element of dispersion counts against a finding of unfairness under Limb 2. We should add that we do not consider that this factor has already been taken into account when we dealt with the issue of the appropriate common costs recovery for BT under Limb 1. That was a separate exercise undertaken in relation to determining the "costs plus" figure. So there is no double-counting.

*Cost Efficiencies Dispersion*

1152. The premise for this point is that in many workably competitive markets there will be a range of cost levels among rival firms and if the equilibrium market price needs to cover the costs of the marginal source of supply, this will often mean that at the workably competitive price level, lower cost sources of supply (and lower cost suppliers) will earn returns in excess of that minimum level. One instance where this phenomenon can apply is in markets where there are significant economies of scale due to the existence of some fixed costs. In such markets, the more suppliers there are, the higher will be the price that is required to remunerate the costs of the firms that compete within it. This can give rise to a trade-off between the advantages that more suppliers can create for more rivalry and competition in a market, and a disadvantage associated with more suppliers increasing total industry cost. For the detail of this basic proposition (which we did not understand to be in dispute) see paragraph 139B of Mr Matthew's DM1 and Figure 1 beneath it.

1153. To the extent that this point was used by BT to justify a higher level of profitability before its prices would be considered excessive, we rejected that argument in the context of Limb 1 at paragraph 782 above.

1154. However, and as with price dispersion, we can see that the differential in costs efficiencies resonates under Limb 2 instead. Again, this is because of the overarching workable competition test. In other words, even in the case of putative workable competition in the SFV Services market, there can be variations, perhaps significant variations, in the profitability of essentially the same service, sold by different suppliers. It would then be unreasonable and unfair to penalise BT, simply because of its lower cost base. This is the scenario that was explicitly recognised in the Tribunal's *Hydrocortisone* judgment, in which its "Case 1" was described as a situation where, while prices may be relatively similar, one producer may enjoy a higher surplus because it is more efficient.

1155. The CR's response to this (made in the context of Limb 1 but it would apply equally to Limb 2, if correct) is that BT enjoys its cost advantages simply because of its position as the legacy provider of telephone services from the time when it had a statutory monopoly over their supply. It is not as if it has achieved its market power through innovation or extraordinary levels of investment which took many years to recoup. Accordingly there was nothing unfair about disregarding the fact that BT had lower unit costs than its competitors.

1156. We do not agree with the CR here and consider that its response is over-simplistic. After all, BT was privatised some 40 years ago, in 1984. It then went through a long period of regulation where it was only free of control in 2006 and then the other restraints, including being unable to sell bundles, in 2009. It remained under positive regulatory scrutiny ever since, culminating, of course, in the Commitments. In other words, the environment was not one of "regulatory failure". Moreover this is in a context where such barriers to expansion as do exist are due principally to a degree of brand loyalty on the part of those of BT's customers in a declining market, who have not yet switched into the principal market where BT and its competitors now operate i.e. bundles (paragraphs 462- 467 above). In other words, this is not a case where BT, as a dominant undertaking has simply sat back on its corporate hands, as it were, and simply collected excess profits. This view of BT is mirrored by what we have said about the value of the Gives, brand value and the lack of any material  exploitative intent on its part (see paragraphs 1159-1172 below).

1157. Accordingly, we consider that this second element of dispersion also counts against a finding of unfairness under Limb 2.

1158. We should add that we have considered whether this second dispersion point falls foul of the approach taken by the Tribunal in *Liothyronine*, as discussed in paragraphs  597 - 599 above. In our view it clearly does not. The point here is based on a simple observation about the discrepancy in

profitability rates between the competitors in the putative workably competitive market. It is not about "setting" a price in order to incentivise entry into or expansion by competitors in the market.

## Existence or otherwise of exploitation by BT over its price insensitive customers ("the Exploitation Point")

*Introduction*

1159.   Here we address the CR's argument that BT did indeed exploit its market power in this way. If there was such exploitation, the CR contends that it effectively corroborates its claim that the excessive prices charged were not justified by economic value but can only be explained by the exercise of BT's market power over this class of customers.

*Price insensitivity of SFV customers*

1160.   We have already concluded in the Market Definition section above at paragraphs 216-303 that the primary reason for switching was not price-related, and that BT was aware of that fact.

*BT sought to maximise value from a declining market and regular price increases*

1161.   It is common ground that there was a declining market for SFV Services. The switching data referred to at paragraphs 163-177 above shows this. It is not suggested that BT was not aware of it. BT sought to maximise value from that declining market and did so through regular line rental price increases that it judged to be beneficial for its SFV revenue. But as the flat ARPU figures show, there were other factors at play here and the ever-increasing gap between BT's line rental prices and wholesale line costs did not generate successive increases in BT's SFV profitability.

1162.   The CR here relies on, first, a March 2012 Board Strategy document from Gavin Patterson, the then CEO of BT Retail entitled "Returning to Profitable Revenue Growth in UK Consumer and Business Markets". At page 17, the document stated that:

> "We will maximise value from our legacy fixed voice business and build new personal communications offers…
> We are driving unlimited packages to defend ARPU and increase usage…
> Overall the fixed voice market is in decline
> We are managing revenue and margin via price rises and migration to unlimited plans
> 38% of our base are on Unlimited Anytime Plans, which drives increased usage"

1163.   Mr Bunt accepted that this showed that one element of the strategy to maintain revenue in this declining market was to increase line rental prices. There were, of course, price increases between January 2013 and January 2016. In fact, this reflects the point already made in paragraphs 181-195 above that the immediate causes of the line rental increases were the revenue targets which the Voice Division had to meet. That said, as Mr Bunt also pointed out, another part of the strategy was to move customers on to UAC packages from the cheaper packages which they were presently on, but under which they had to pay per call. The thinking was that while the cost of the UAC package was more, the customer did not then need to be concerned about how many calls they made because they

were included in the price. This would lead to them making more calls and becoming more engaged with their landline product instead of, for example, switching over to just using a mobile phone.

1164. There is then the Price Change 18/19: Strategic Review document dated 14 July 2017. This noted that the base of customers from which BT could price change (i.e. increase prices) had decreased because there were likely to be limits on price increases for VOCs (which emerged in the Commitments), and some other pricing decisions were freezing out a large number of other customers. At page 9 it further stated:

> "This means we have an even greater challenge to using price change to meet MTP-we need an intelligent approach to pricing what remains in our control…
>
> We should recognise declining markets and price accordingly to maximise value (e.g. split purchase Solus)."

1165. In cross-examination, Mr Bunt agreed that the approach stated here was to maintain or maximise revenue through price increases, although he added that there was also the separate objective to move customers over to bundles anyway, which were regarded as more profitable in the long run, and we think that is a fair qualification. The objective stated in the document was realised in the sense that there were significant price increases for SPCs from September 2018 onwards, (though, as noted, these did not raise ARPU).

1166. BT points out that it was seeking to maximise revenue across the board i.e. across all of its customers; we see that but we do not think it detracts from the specific references in the two documents above to maximising value from the "declining market" which is SFV Services.

1167. That said, given we have been taken to just two documents, we do not place much weight on this factor.

*No price competition from competitors*

1168. We have already concluded that in respect of most competitors' pricing, BT's line rental price changes were typically followed by rival operators. See paragraph 480 above. However, that does not mean that BT could do what it liked on pricing. Indeed, Ms Blight was concerned that one day, its competitors might start to take advantage of the "headroom" created by BT's pricing, and the risk of "churn" was one of the factors that deterred BT from increasing line rental prices more than it did. And certainly, although the proportion of all SFV customers who switched to the Post Office was relatively small, the internal documents show a real resolve to try and stem those customer losses to a competitor that had chosen to undercut BT on line rental prices.

1169. As an associated point, and for the reasons given in paragraphs 477 - 493, we do not think that this is a case where there is a significant price leadership factor pointing towards unfairness on the part of BT's prices.

*Conclusions*

1170. It is obvious from the above that when BT was increasing line rental prices, it felt that it was able to do so and it ultimately did so because there was an imperative to meet revenue targets. That is not to say that the question of any price rise and related matters like Gives were not carefully considered; see Annex 2 to BT's Closing, referred to at paragraphs 1016-1021 above, and in general, the detailed and numerous price change documents produced ahead of each proposed price change. Of course, there were not line rental price increases in every year of the claim, because line rental prices were frozen between April 2017 and September 2018. In addition, and more importantly, it is clear that the price increases, when other changes to call volumes and call package charges are factored in, did not succeed in increasing ARPU. However, we have already found that for each year of the claim period, the prices charged were excessive and so BT was able to use price increases to maintain that excess over the whole of the claim period. Further, BT seems to have been aware that SFV customers were highly profitable.

1171. We would accept that this perception by BT is some evidence of the fact that the excessive prices were brought about by the exercise of its own market power. We should also add that the fact that BT's price increases were driven wholly or mainly by the need to meet revenue targets cannot amount to a justification for the excess.

1172. However, looking at the documents and evidence referred to above, we do not think that this is a case where BT set out deliberately to target the Class Members with excessive pricing. The position was much more nuanced than that. After all, the Gives were the subject of real and genuine consideration, in our view, regardless of their ultimate value or not. Further, the major objective, or at least a significant aim, for BT was to "upsell" the Class Members to bundles. We are also conscious that we have been shown only a selection of documents here. We do not accept that in the context of a declining market, BT's aim was simply to "make hay while the sun shines" in terms of its pricing to Class Members.

**Disproportionate impact of price increases on SFV customers ("the Disproportionate Impact Point")**

1173. The CR then makes a separate point that further evidence of unfairness is constituted by the fact that BT knew that the line rental increases had a disproportionate effect on SFV customers because they were not able to take advantage of the discounts available to bundle customers.

1174. The CR contends that this is an example of price discrimination which is a form of unfairness for the purposes of abuse of dominant position. It makes reference to the decision of the European Court of Justice in *Google v Commission* T612/17, 10 November 2021. The Court stated the following at paragraph 155 of the judgment:

"The abuse may take the form of an unjustified difference in treatment (see, to that effect, judgments of 17 July 1997, *GT-Link*, C-242/95, EU:C:1997:376, paragraph 41; of 24 October 2002, *Aéroports de Paris* v *Commission*, C-82/01 P, EU:C:2002:617, paragraph 114; and of 7 October 1999, *Irish Sugar* v *Commission*, T-228/97, EU:T:1999:246, paragraph 140). In that regard, the general principle of equal treatment, as a general principle of EU law, requires that comparable situations must not be treated differently and different situations must not be treated in the same way unless such treatment is objectively justified…"

1175. However, this statement was made in the context of a case itself where the allegation of abuse was not excessive pricing; rather it was an appeal against a Commission decision which had held that the favourable treatment, within Google's general results pages, of links to Google's own shopping services, as compared to links to competing specialised shopping services, was capable of infringing Article 102 TFEU. Since the main focus of the observations of the Court concerned the ability of Google to use its market power as a provider of search to distort outcomes between its rivals' competing businesses in a downstream online shopping market, we do not see that the *Google* case is directly relevant here.

1176. That said, we deal below with the documents relied upon here by the CR.

1177. In notes made by Mr Bunt in October 2013 he said this:

"Solus Churn Trial – is owned by Kelly L. 5m solus out of 10, of which 60% are high propensity BB so we offer them BB bundles to upsell and ensure we keep. Of the remaining 2m what do we do with them… given their low propensity to BB (some we don't want to touch because they are likely to wake up and realise how over-priced we are if we do), others are more sticky or already on the way out so we can try offers on them to keep them, especially the high value ones. Essentially high value customers are the least rational/conscious in behaviour. They will have UWC and the call on evenings and day times."

1178. Mr Bunt accepted that (as in fact is obvious from the document) what he was saying there was about VOCs. These were notes that he made in his first week and they reflected the conversation he was having with one of his colleagues at that point. He said it was hard for him to say what the received wisdom was in the team at that point, but he did not demur from the views that he was expressing at the time. They included his perception that there was at least an element of the 40% of VOCs who did not have a high propensity to adopt broadband, so BT would not therefore try to "upsell" to them, and who were somewhat inert unless "prodded" as it were. That said, this amounts to a relatively small proportion of the Class Members as a whole.

1179. Then, in BT's "Stakeholder plan for pricing" dated 4 April 2016, page 4 said this:

"**Problem statement:**
We face increasing regulatory scrutiny of price changes focussed particularly on the treatment of vulnerable customers. We face criticism that our increases in Line Rental disproportionately impact digitally excluded customers, who don't benefit from competitively priced Broadband and associated discounts from that service."

1180. This speaks for itself, but Mr Bunt accepted that it was identifying that the price rises hit the VOCs (being the "digitally excluded") the hardest.

1181. A statement to the same effect was contained in another April 2016 document which was the draft of a briefing to go to Ofcom. In a marginal comment to this draft, Ms Blight wrote:

"Should we be as overt as accepting this?"

258

1182. We would also refer to the document quoted at paragraph 1164 above, because it is referring to maximising value from a particular sector.

1183. In a post-Commitments PR brief on voice elements of price change from June 2018, Mr Bunt noted that:

> "For me the important point in general is that customers who are Truly Solus, tend to be older, poorer, more landline dependent and by definition don't benefit from the world of broadband, where prices generally are falling."

1184. A similar point was made by BT in a January 2021 briefing document concerned with the origin of the Commitments and also this present litigation:

> "That price had steadily increased since 2009 at a rate of ~£1 a year as a mechanic for driving revenue growth in the consumer base (graph below as employed by Ofcom)
> • Whilst average bundle price fell over the period, Landline-only customers did incur those increases along with increases to calls and calling plans, but offset for BT by declining volumes (c14% YoY)"

1185. In this context, we would refer back to our consideration under Market Definition of whether bundles acted as a constraint on SFV pricing, because we explain why we do not accept that overall, the line rental increases led to a pound for pound increase on bundle prices in the way that they did for SFV prices. See paragraphs 436-447 above.

1186. Overall in relation to the above, we accept that such materials show that BT was aware that it had much greater flexibility to raise prices with the SFV customers than it did with bundle customers. In a way, that is obvious because BT clearly knew that SFV Services were less competitive than bundles and knew it was making more profit on SFV than elsewhere. However, we do not see this as adding materially to the overall question of unfairness. It does not change the conclusion we reached in paragraph 1172 above.

**Price Rise revenue used to fund non-SFV investments ("the non-SFV Investments Point")**

1187. A document dealing with Consumer Voice Strategy for 2015-16 onwards, dated 19 March 2015, stated that:

> Using core products to drive revenue to enable our bold and ingenious developments can undermine our warmth, care and honesty.
>
> Open to criticism that we exploit the vulnerable to subsidise new customers (e.g. caller display, increases to line rental, especially on true solus)

1188. In Mr Bunt's Annual Price Change document dated 11 June 2015, ahead of the 2015/16 price change, increasing line rental by £1, he said this:

> "Each year BT changes its prices. Historically this has been approximately inflationary, but increasingly super-inflationary price rises on largely inelastic products has provided significant upside for our business. This capital provides the oxygen for our business in the sense of its investment in content, spectrum etc.
> These changes are reported to different degrees in the media, usually defined by our transparency and clarity as well as how compelling our gives are.
> Reporting of these changes very much drives our thinking on timing (we try to only go once a year) and scale (we choose 6.94% because this is less than 7% which is associated with negative energy company price rises)…
> Our competitors have increasingly aligned their price changes with our in timing and scale:…"

259

1189.   Mr Bunt accepted that "content" referred to the Pay-TV channel, for example BT Sport, and that "spectrum" refers to mobile phones. These were not SFV Services. He agreed that revenue from those services was used to invest in the former although he added that the revenue from price changes was used to invest in all products. In fact, the proposed £1 price increase was duly implemented.

1190.   The CR contends that the fact of this investment in other products is itself a matter tending to show unfairness. We disagree. We would accept that investment in other products from SFV revenue cannot assist BT in showing fairness, but that is as far as it goes. The real question at this stage is the extent of the pricing excess considered alongside matters such as economic value.

## Lack of Transparency ("the Lack of Transparency Point")

1191.   The CR here argues that there was deliberate non-transparency on the part of BT in relation to customers, the press and Ofcom. Lack of transparency is a matter which can go to unfairness.

*Customers*

1192.   The lack of transparency alleged here relates solely to HPS and the fact that, until BT was concerned about regulatory intervention it was not actively marketed. We have already agreed with that proposition when we dealt with HPS in paragraphs 270-301 above. We agree that this shows an element of seeking to keep SFV customers on the "normal" prices unless they were taking active steps to leave, for example. That said, this is a very limited point. Further, we have already found that there was sufficient communication with the SFV customers by which they could be made aware of price rises. See paragraphs 1109-1116 above.

1193.   There is no evidence that there was a general lack of transparency with regard to the Class as a whole or over the whole of the claim period. Indeed, as noted below, BT made press announcements of price changes too.

*The Press*

1194.   The first point to make here is that, unlike its competitors, BT did proactively announce its price changes to the press, as well as through its mandatory PCNs, and indeed many customers might learn about the price changes first from the press. However, that did not stop BT from considering ways of managing the story, as it were. Thus, Mr Bunt accepted that BT's PR objective was to mitigate press attention or press response and so the less of a story they created, the better. He thought that the engagement of the media or the response of the media depended on how much information they were given in the first place.

1195.   This approach was reflected in a "2014/15 Project Window: Execution Update" dated 24 June 2014, at page 13:

"Announce 22nd August to avoid Sport and spring and use the bank holiday weekend to buffer and fracture criticism.
Story will be seeded to journalists on late 21st so the print comms don't appear until 22 August"

1196.  Mr Bunt accepted, as is obvious, that the criticism referred to was that of the price increase.

1197.  An additional point was made about how any percentage price increases were described. A draft of a briefing to a particular set of journalists said that prices were generally going up by around 6.5%. Against that, Mr Bunt added a comment that:

"We are deliberately not raising a single price by more than 6.49% so that they can't round up to 7% in the headline which we saw last year {I'm told). We could even claim 6%"

1198.  We do not think there is much in this point. It would be understandable to wish to avoid journalists rounding up a 6.5% increase to 7%. Equally, it would have been disingenuous for BT to claim that the increase was only 6% but while Mr Bunt referred to this, it is not suggested that this is what BT did.

1199.  Overall, we do not think that there was a real lack of transparency to journalists in the sense of, perhaps misleading them or withholding key information. The fact that BT wanted to "manage the story" seems to us to be little more than a desire to manage its PR as most large companies would.

*Ofcom*

1200.  We deal here with a number of documents relied upon by the CR.

1201.  The first is an exchange of emails between Mr Bunt and others, following a meeting with Ofcom which had taken place on 20 January 2016. At that meeting, Ofcom had presented a number of slides dealing with, among other things, BT's Voice ARPU. Mr Bunt and his colleagues clearly took issue with some of the figures which Ofcom presented. In that context he said this:

"Slide 4 BT Basic monthly call spend (excluding the small allowance) is £3.29 not £23! That's disgraceful! Voice ARPU is 2014 was closer to £27 that £19 (I don't want to tell them what our ARPU is but it that number is miles out."

1202.  Mr Bunt acknowledged in evidence (as is obvious from the text) that he did not want to reveal BT's actual ARPU. This was in the context of his observing that the figure that Ofcom had come up with was wrong. However, Ofcom was not asking BT for its actual ARPU at that stage, it had simply been commenting on what it thought were comparative ARPUs between different telecoms providers, so it is not as if BT was misleading or withholding information from Ofcom. We accept that it could, no doubt, have told Ofcom more at this stage had it wished, but we do not think much turns on the fact that it did not.

1203.  The next document is an email from Mr Bunt dated 26 May 2016 just ahead of a meeting with Ofcom later that afternoon and in respect of which he and his colleagues were finalising a deck of slides. In part of that email he said this:

"Did we conclude on opening up HPS to all of COT? – I included the sizing in the email I sent to the chain yesterday at 5.35 (attached) and no one responded either way  …..the costs are £0.6m in 16/17 and £3.6m in

17/18 and I'd recommend against it. Either way though, I'd definitely not talk to Ofcom about it, because it exposes the current position."

1204. In cross-examination, Mr Bunt accepted that he was "absolutely" saying that he did not want BT's position on HPS to be exposed to Ofcom and that it was "another example" of BT "holding back information" from it. However, in re-examination he explained that if Ofcom was told that HPS would now be opened to all of the COTs, this would suggest that this had not been the position before. This was not in the context of information sought by Ofcom, but the meeting was part of BT having wider conversations with it where BT was being proactive. Again, as we see it, it was not in fact an example of holding back information that had been sought from BT. It was not suggested to Mr Bunt that there was some overarching duty on BT to disclose all of its commercial information to Ofcom in some unstructured way.

1205. There was the lengthy email exchange from July 2016 about a letter which was to be sent to Ofcom following a recent meeting with them. Ms Blight was cross-examined about this at Day 8/39-59. One of the features which BT wished to emphasise to Ofcom was HPS and the savings which this would entail for customers who took it. Mr Petter, the then CEO, Ms Blight and others debated whether to give an actual price for the proposed new HPS products, because that might imply that BT would be increasing prices (again) in the following year, namely 2017/18. At this stage, the 2016/17 price change had just been implemented. (In the event of course, prices were frozen for VOCs until 1 April 2018 when the Commitments came into effect and until 16 September 2018 for SPCs).

1206. On the other hand, there was the concern that if actual prices for HPS were not given, this might give the appearance of concealing something. Thus there were the following comments within the email exchange:

> "Re the new tariffs. I worry here that pitching the pricepoints cited here presume an increase to our base tariffs of £1 – the problem with that is that it confirms OFCOM's suspicion that we always take a £1 without thinking. Would it be clearer to say that the low volume of calls variant would be priced at the same price as standard line rental; and that the other variant would be priced in line with whatever change we make to standard LR prices today relative to the current HPS price? The one point where our meeting got awkward was where it was obvious we were assuming we could just take a £1 next year.[Murray,SC,Stuart,SLA1 R] I think we're stuck here. In the meeting we proposed pricing and agreed to confirm the pricing we would offer (we had a bit of confusion if you remember about what the price of each variant would actually be). I've adjusted the text for the HPS EWC product, but think we still need to include the proposed charge for the HPS UAC package, and least said here might be best. Would welcome James and Meg's thoughts." [email from Mr Petter]

> " Not sure I'm getting the final point. The two price points for HPS are both compared with today's prices aren't they? I would agree with general point that we should not signal in any way our plans about future price changes" [email in response from Mr Tickel]

> "What I really need is help on the text to deal with John's point, as we really have to put in a number, otherwise Ofcom won't take it seriously. The problem is that the number might indicate a plan next year to again increase standard line rental." [email in response from Mr Murray]

> "I agree with John's concern. The fact is, we have an MTP assumption for line rental but we don't have an agreed decision on timing or amount. I just had a kick off with Hugo and Pete were we debated if we would go to £19.99 or £19.49 (on standard line rental) so it is definitely a live issue." [email from Ms Blight]

1207.  In respect of all of that Ms Blight commented:

> "I agree with John's recommendation as we shouldn't really commit to a price point until we know what line rental price will be next year…. I can see how committing to the prices does help us a bit but if we do, there is actually a chance that we commit to higher prices than we need to!"

1208.  The bottom line was that BT at this stage did not want to disclose its price change intentions for the following year especially if it was a further £1 increase. Ms Blight described it in cross-examination as a Catch-22 situation because setting the price now for the proposed HPS would necessarily reveal commercially sensitive information about any price increases for the following year. In this context Mr Murray had made a reference in the email chain to "the Devil and the deep blue sea".

1209.  Ms Blight explained the problem at Day 6/53 as follows:

> "I think he is saying the options available to us: we either do not give them a price and talk about the delta, we give them a price that could be too high and reveals that we have been ──we have a planning assumption of a £1 increase, or the third would be put in the wrong pricing and then either need to stick with it , or have a lower price than we would otherwise commit to. So none of the options in front of us are a good one. If we want to communicate in ──we are trying to communicate as clearly as we can but when we do not have the answers."

1210.  Later, but in that context, she said this at Day 6/53:

> "Yes, the challenge at this point was that we had not yet made the decision as to what next year's price change would be, which would be the 17/18 price change. So we were ──we had just launched or put into effect the previous price change. We were in process of planning  for the next one. The budgetary assumption was this £1 that I have mentioned before. But we were being asked by Ofcom to make a commitment as to what Home Phone Saver would be the following year, but if you do not know what your line rental price will be, it is very hard to make a commitment as to what your Home Phone Saver price will be in a year's time. So that is why there was a debate and a discussion: how do we ──do we just make a commitment now, not yet knowing what line rental will be, or do we express it as a discount, or do we just make ──decide that it is going to be £1 next year, without having gone through all the normal research we would do? That was the challenge we were in to."

1211.  In the end, the letter, as sent to Ofcom, did not state the actual price of HPS but described what the savings would be as against the current tariff, and noted that they would necessarily be more, if the price later went up.

1212.  In the end, as Mr Armitage said, he was making a limited point in cross-examination here to the effect that BT did not want to give Ofcom the impression that line rental would go up the following year by £1. That is undoubtedly true, but Ms Blight explained why there was a concern especially at the point which was one year ahead of any further price change. Yet again, BT could have volunteered to Ofcom all of its commercial thinking for the following year at that stage insofar as it actually knew what would happen in the 2017/18 price change. However we do not think much turns on the fact that it did not, or that it had an obligation to do so.

1213.  We then turn to three particular points made about passages contained in BT's Response to Ofcom's 2017 Provisional Conclusions.

1214. Under section G of the Response, contending that Ofcom's pricing analysis had ignored the broader context of switching to bundles driven by lower incremental broadband prices, paragraph 168 dealt with each of the arguments made by Ofcom on pricing. In each subparagraph, the point made by Ofcom is in italics and then BT's response follows.

1215. Paragraph 168 (c) read thus:

> "*There is evidence that BT acts as a price leader, with other CPs following its increases in line rental in terms of both timing and magnitude;*
>
> There is no reliable evidence of BT playing a price leadership role. Oxera has reviewed the limited evidence presented by Ofcom and concludes that (i) Ofcom's sample is too small to reach meaningful conclusions (ii) in recent years BT has implemented price changes first but in prior years other CPs have changed their prices first, and price changes do not follow an annual adjustment pattern in any event."

1216. We have found in paragraph 480 above line rental price changes were generally followed by its rivals, and in answer to a question from the Tribunal, Mr Bunt accepted that the passage at paragraph 168 (c) (which he did not write) was misleading. In fact, as can be seen from the whole of this passage, the answer was summarising what Oxera, instructed by BT, had said in paragraph 2.4.5 of its report (entitled "is Ofcom's approach robust from an economic perspective ?") which formed Annex 3 to the BT Response. Here, it said as follows:

> "Despite this, Ofcom argues that prices have converged as a result of price increases and, in particular, that other CPs have followed price changes implemented by BT over the period April 2014 to January 2017 (RMSLTS, para. 4.52).
>
> We do not consider that this provides any reliable evidence of BT playing a price leadership role for a number of reasons.
>
> The period is too short to make any meaningful inferences. As noted by Ofcom, CPs appear to be updating their prices on an annual basis (para A8.63). As a result, the period considered by Ofcom (2014–17) contains a sample of only three price adjustments (Figures A8.26–A8.28).
>
> What might appear to be price leadership is likely to reflect BT implementing its annual price changes earlier within the year for recent years—indeed, the assumption that price adjustments are annual is incorrect to begin with. In 2014, BT raised prices in December, in 2015 it raised prices in October and in 2016 it raised prices in July (Figures A8.26–A8.28).
>
> If prior years are taken into account, other CPs adjust their prices prior to BT. In particular, in 2013, Virgin Media adjusted its price first; in 2012, Sky adjusted its price first; and prior to that price adjustments were implemented more than once per year, such that it is no longer meaningful to speak of a CP changing price before or after another CP.
>
> The view taken by Ofcom—that BT is a price leader—is therefore not clear from the limited evidence Ofcom presents."

1217. It can be seen that this is quite a nuanced and limited point. Once the context of what Oxera was saying (and addressing) is considered, it is not as misleading as might first appear. We accept, of course, that BT internally had considered that the line rental prices it did choose to implement were likely to be followed by the competition during the claim period, and it did not volunteer those thoughts here.

1218.  Then, at paragraph 168 (d), the Response said this:

> "*price discrimination to offer greater discounts to more engaged customers (for example, through its Home Phone Saver tariff) allows BT to increase prices for (largely unengaged) SFV customers whilst limiting the risk to the revenues it earns from more active customer groups.*
>
> Given the active marketing by BT of the Home Phone Saver product, there can be no suggestion of a price discrimination strategy. Rather BT created this product in the face of competition from the Post Office."

1219.  We have dealt with this point specifically at paragraphs 297-299 above. The short point is that as at 19 May 2017, it may well have been correct to say that HPS was being actively marketed.

1220.  Finally, at paragraph 12 of the Response, in the Executive Summary, BT said this:

> "Going forward, the ASA's intervention (which prevents broadband providers from advertising the price of broadband and line rental separately) is likely to change these dynamics by reducing incentives to raise the line rental price. Firms may, therefore, consider line rental reduction as a further means of competing for voice-only customers alongside product innovation and discounts (although dual play providers may still balance this with promoting further uptake of bundles by keeping implicit broadband prices low)."

1221.  This was all in the context of disagreeing with Ofcom's approach to market definition, and was the subject of detailed commentary at, for example, paragraphs 57 and 58, and where the former paragraph said that Ofcom itself had accepted that the ASA Ruling meant that there would be less pressure on CPs to increase line rental prices for SFV services to match increases in line rental prices for dual play tariffs. Oxera then dealt with the subject in its report, in connection with market definition, in its sections 1 and 2.

1222.  What in fact happened, of course, was that prices were frozen for SFV customers and then reduced for the VOCs but with price increases for SPCs as from September 2018.

1223.  Plainly, if one looks at SPCs' line rental, it did not reduce and the economic point made by Oxera proved not to be correct. But this hardly means that there was some deliberate cover-up by BT.

*Conclusions*

1224.  While there were, no doubt, occasions when BT could have chosen to reveal to Ofcom in its discussions with it, more detail about its commercial strategies or plans (if made) and while there may have been some occasions when it could be said that BT was disingenuous, we do not conclude that there was an overall pattern of non-transparency in the sense required to act as a factor driving unfairness.

**Effect of the Exploitation, Disproportionate Impact, non-SFV Investments and Lack of Transparency Points**

1225.  We do not accept that these points, whether taken individually or collectively either "corroborate" the CR's case on economic value, or otherwise materially act as factors pointing towards unfairness.

**Price Rises during period when Ofcom expressing concern**

1226.  A further point made by the CR is that BT knew that Ofcom had "rung the alarm bell" at the start of 2014 but continued to push through SFV price increases.

1227.  By way of preliminary, the CR contends that if this was the case, then it contributes to or constitutes unfairness for the purpose of Limb 2. In this regard it cites paragraph 88 of *Aspen*:

> "Aspen implemented this strategy, even though it was met with strong concerns from within Aspen and from Aspen's distributors. [Aspen employee] expressed serious concerns about such a strategy: "*this is totally unrealistic in today's environment*"; "*who ever came up with these numbers has no connection with the reality of the pharmaceutical market in Europe*".

1228.  This observation was in the context of the Commission's narrative about Aspen's pricing policy for the relevant drug product, where patients depended on them and where there was no substitute in Europe. We do not think that this assists on what constitutes unfairness in our case but in any event, as we shall show, we do not think there is much in the substance of this point.

1229.  As to the facts, it is of course correct that in January 2014, Ofcom published its report on the Cost and Value of Communications Services in the UK ("the 2014 Report"). At Section 2.1.6, it commented as follows:

> "Some standalone line rental charges have risen over recent years but cheaper alternatives are available There is an active market in the UK for standalone (i.e. not bundled) fixed line rental services. Retail competition is enabled by regulated access to wholesale line rental, the price of which has fallen and will continue to fall. This has enabled the provision of competitive services by other providers. For example, the Post Office currently offers a standalone landline service for £12 per month.
>
> Social tariffs are also available as a low cost option for low income users. The price of BT Basic, the principal social tariff, is lower now in real terms than it was six years ago. This is a good choice for eligible consumers with low outbound call usage (for example, for consumers who rely more on receiving than making calls to keep in touch). Eligibility is defined as being in receipt of certain benefits available to low income households
>
> Despite this range of choice and the overall positive trend in fixed voice costs, some retail prices for line rental have increased in recent years. This is related to the fact that landlines generally tend to be sold as a bundle with other products – historically with voice calls, more recently with broadband. Market competition has tended to focus on the headline price of the bundle, which has generally fallen. Consequently consumers buying a landline service without broadband may not benefit fully from the effects of competition. Furthermore, some providers (TalkTalk and Virgin Media) have recently ceased their standalone landline service. Ofcom will continue to monitor this situation carefully."

1230.  A chart at page 10 showed decreasing WLR prices and BT's line rental prices, which were generally rising.

1231.  We accept that it is unfortunate, to say the least, that the 2014 Report was not included in the list of documents provided to Mr Matthew. It was also unrealistic for him to describe what was said at Section 2.1.6 as merely an "observation". It was somewhat more than that, although not entirely negative. After all, the action point was that Ofcom would monitor the situation going forwards.

1232.  In cross-examination, Ms Blight accepted that she would have been aware of the 2014 Report at the time and that it was not giving BT a "clean bill of health" in respect of landline only customers and

she was aware of Ofcom's concerns. Indeed, BT's Project Window 2014/2015 Pricing Update of 24 February 2014 (also referred to at paragraph 1023 above) at page 26 said that it would develop propositions to build a strong defence against the key issues highlighted in the 2014 Report. One such issue was described as non-switchers being subject to "punishing price changes". The recommended propositions were Fixed Phone Saver (to become HPS) and an online optimiser (which became Right Plan).

1233. That said, Mr Bunt said that the perceived level of urgency and focus on the part of Ofcom came after the speech by Sharon White in October 2015. Ofcom's concerns were then highlighted in an exchange of emails in December 2015 following a discussion between Mr Benson and Ofcom which was concerned that BT and other providers were too focused on dual play and that most of the marketing/discounts were for customers taking bundles and it asked for a meeting to discuss these matters. Ms Cheek commented that this was "a bit of a worrying development, although not unexpected…". Mr Petter was also reported as saying that the price increases were a worry for him. As that email exchange also makes clear, by this stage, BT had been engaging with Ofcom to a significant extent including by providing much information.

1234. This was followed in February 2016 by Ofcom's Initial Conclusions from its Strategic Review of Digital Communications, which noted that line rental prices were increasing, despite falling WLR prices. There was also BT's perception of criticism in relation to "digitally excluded customers" which is referred to in the document quoted at paragraph 1024 above.

1235. Reference is also made to Mr Oxley of Ofcom telling Mr Shurmer, BT's Group Director of Regulatory Affairs to "look into my eyes, we will re-regulate" in June 2016, and the fact that BT still made a price increase the next month. That is correct but the implied criticism of BT here is somewhat unrealistic. The price increase had already been notified in April 2016, and in any event BT was at the time engaged with Ofcom making various proposals.

1236. In answer to a question from the Tribunal about the LR price freeze in January 2017, Mr Bunt said that by then, BT was conscious of Ofcom's ongoing review and indeed that BT already had conversations with Ofcom about a price freeze and even a price decrease, prior to January 2017.

1237. We follow all of the above. However, we do not see that the fact that BT made some price increases since 2014 and up to January 2017 during which time Ofcom had expressed some concerns (but without intervening as such), really adds to or creates unfairness. Very large companies supplying consumer products in the position of BT are obviously aware of regulatory scrutiny and indeed Ms Cheek was in BT's Regulatory Group. A company such as BT may or may not react more or less quickly when there is a concern over prices. However, the real question, as it seems to us, is whether there was actual unfairness by reason of the prices charged and other factors. Put another way, if

BT's pricing was not otherwise unfair, the fact that some price increases took place when Ofcom was expressing some concerns would not make it so.

**Market Dynamics**

1238. BT contends that (if necessary) there were two aspects of how it dealt with market dynamics which served as justifications for any excessive pricing, namely:

    (1)    Migration Intent; and

    (2)    Rebalancing.

*Migration Intent*

1239. This can be dealt with briefly. We have already rejected the existence of any such intent on the facts. See paragraphs 317-326 above.

*Rebalancing*

    <u>Introduction</u>

1240. The argument here is that the line rental price increases prices offset the decline in fixed call volumes and revenue. The CR accepts that there was this phenomenon. However, it denies that it can constitute a justification for excessive pricing.

1241. We address this argument in the way in which it is now formulated in paragraphs 746-758 of BT's Closing.

1242. It begins with the (agreed) proposition that ARPU was broadly flat over the claim, and indeed for some time before. The flat ARPU is a reflection of the fact that although line rental prices went up, there were other changes, including declining call volumes and changes to the ways in which calls were priced that had an offsetting effect on BT's revenues. That, too, is uncontroversial.

1243. BT then makes two specific points under the subject of Rebalancing, although we think the first is not really a rebalancing argument as such.

    <u>Flat ARPU and subjective value</u>

1244. BT first contends that the fact that prices for the customer had not gone up in "real terms", because of the flat ARPU, goes to the assessment of the subjective value which they would ascribe to their landline product. Reference is made to what Dr Jenkins said in cross-examination on Day 18/108-111. In fact, although Dr Jenkins certainly said that the flat ARPU goes to unfairness (or not) she did not bring in the question of subjective value, at least not expressly.

1245. At all events, we reject the general proposition that flat ARPU can affect the issue of fairness without more (which appears to be what BT is saying), in circumstances where the price across the claim period has already been found to be excessive under Limb 1. The fact that BT does not then change

the price in terms of what the customer actually pays does not seem to us to be relevant. After all, ARPU was itself taken as a measure of price for the purpose of the Limb 1 exercise.

1246. Secondly, we think it unrealistic to suppose that customers actually did place subjective value on their landline product because of the flat ARPU, i.e. because they know that the amount they were spending each year on their SFV Service was in fact about the same. There is no evidence to support this at all and indeed if it were correct, it is very odd that BT spent the time that it did considering its price increases, albeit that they tended in the end to be inevitable, save over the price freeze period.

1247. So there is nothing in this first point.

ARPU and rebalancing

1248. The second respect in which BT relies upon the flat ARPU is the rebalancing argument, properly so-called. Dr Jenkins deals with this at paragraph 7.25-7.41 of HJ1 and in her Annex 9. She says that the rebalancing effected by compensating for a decrease in call revenue by line rental increases is recognised and is a rational response on the part of BT. It is therefore a legitimate explanation and justification for the excessive prices charged.

1249. However, because Dr Jenkins has used ARPU as the "price" for the purpose of Limb 1 (so the rebalancing has been included, as it were) she says at paragraph 7.26 that the rebalancing argument is relevant for the CR's alternative claim which is concerned with excessive pricing in relation to line rental only. However, we are here dealing with the CR's primary claim. It is true that Dr Jenkins goes on to say that rebalancing is also relevant "to an understanding of the line rental price in the context of BT's pricing as a whole" but it is not clear how. Indeed, she says that her assessment of the primary claim "includes any price rebalancing effects". See her footnote 361, and also her comments at paragraph 8.1.7 of the JES.

1250. On that basis, we cannot see how the rebalancing argument is relevant to fairness on the primary claim. In any case, we think that there are further problems with it.

1251. First, if excessive prices are being charged, it hardly follows that there is a right for BT to charge or keep on charging them, just because of declining call revenues. It is not as if BT was now failing to break even on the landline product as a whole and its gross margin, at around 65% was significant.

1252. Second, BT itself recognised at one stage that declining call volumes did not result in a distinct cost increase that could justify the rate of line rental price increases. This arose in the context of when Ofcom was already engaged in discussions with BT about its line rental prices. There was the following email exchange in July 2016 in relation to some draft letters due to go to Ofcom:

"[From Mr Tickel to Ms Blight and Mr Murray]

eg

> Is there anything we can add in here about cost pressures and why we and other players have been looking to increase certain charges? The strength of points in the letter is undermined by fact that in competitive markets with informed and engaged customers, prices would be expected to converge towards efficient costs.
> [From Mr Murray to Mr Tickel]
> James, I get your point about prices falling towards efficient costs, but… the problem here is that Jonathan would say, looking at costs from a solus lines and calls made over those lines perspective only, that we are making a significant return. Whilst we can argue that the revenue and profit made on calls has reduced as: (i) call volumes have reduced, and (ii) more customers take – to a greater or lesser extent – inclusive call packages, the high profitability that Jonathan points to, does persist? I'm not sure how we get round this? I don't see an obvious argument to justify (in a way that would satisfy Jonathan [Oxley of Ofcom]) why line rental has increased at the rate that it has (leaving aside the justification this year created by the change in care level)?"

1253. Finally, the argument here is limited. This is because at paragraph 8.1.8 of the JES, Dr Jenkins said that according to her model, there was a clear decline in gross margin earned on fixed calls from 2014 onwards, which itself would explain approximately 28% of the increase in annual line rental charges. So it could not explain the major part of them.

1254. Overall, we do not accept the rebalancing argument as a justification for the excessive prices, nor even as a factor going towards the question of fairness or otherwise. It is, however, evident that the changes in call volumes and pricing do interact with line rental price changes, and mean that it is overly-simplistic to equate the growing gap between line rental prices and wholesale costs as reflecting ever-increasing profitability across the claim period. But all of this is incorporated in our Limb 1 analysis: BT's SFV prices were in excess of the competitive level at the start of the claim period and they remained so throughout it.

1255. We should add that there is other evidence from 2015 and 2016, in the context of press and Ofcom scrutiny, that BT itself was finding it difficult to provide a justification for the line rental increases. This goes to the migration intent as well as the rebalancing arguments, if further points were needed.

1256. In August 2015, Mr Bunt was being asked how a colleague should respond to a question from a journalist who had initially asked what had caused the cost of line rental to increase so sharply when inflation had been flat, and when he was given an answer which did not address the point he said that he wanted to know what were the factors that were causing the line rental increase specifically. Mr Bunt agreed with his colleague that she could say that the investments being made by BT affected the prices of all of its products, and further:

> "His original question assumes there is a cost based cause for increasing Line Rental which there isn't. We can't answer in that way, so I would keep it vague."

Apart from a general remark about investments, Mr Bunt felt that there was nothing else that could really be proffered in relation to price increases.

1257. Then, ahead of a meeting with Sharon White of Ofcom, Mr Tickel emailed Mr Murray on 27 April 2016 thus:

> "I am looking.
> Trickiest Q:
> Why have you/others been focussing price increases on line rental and calls charges?"

1258. Mr Murray replied:

> "Whatever the answer, it's unlikely to be attractive...
> Story is probably not that there is a focus on increasing line charges, rather there has been a
> focus on the vast majority of customers who buy dual / triple play and getting the pricing right
> for those customers. And solus has been a secondary consideration, rather than primary focus?"

1259. Finally, the document referred to at paragraph 1252 above is also relevant here.

*Conclusion on Market Dynamics*

1260. It follows from the reasons given above that we do not accept that the two market dynamics points made by BT, on migration intent and rebalancing, assist it on unfairness.

**The significance or otherwise of Ofcom's 2017 Provisional Conclusions and Statement**

1261. The CR places emphasis on these documents ("the Ofcom Reports") as supporting evidence for its claim here. We accept that Ofcom's findings there were adverse to BT in the respects there set out. We have referred to some of them at paragraphs 156-161 above. Indeed, at the certification stage, considerable reliance was placed upon them and the fact of the Commitments by Mr Parker in DP1 and DP2, although these reports included analysis by him as well. At that stage, we considered it right to give weight to Ofcom's Reports in the context of satisfying ourselves that the claim had at least a real prospect of success, as opposed to being hopeless. All of that was a legitimate approach at that point, but it did not mean that we would then be bound by the Ofcom Reports at trial (or, we would add, bound to give them particular weight at trial) as was noted by the Court of Appeal at paragraph 100 of the judgment of Green LJ in *FX*, referred to at paragraph 106 above. As we have noted generally at paragraphs 105 - 108 above, it is for us to decide what weight, if any, to give to the Ofcom Reports. Pursuant to what we said in paragraph 108, we have in fact made reference above to various aspects of the Ofcom materials (including the 2017 Provisional Conclusions) on specific points. However, what we are concerned with here is the CR's reliance on the Ofcom Reports in relation to their general findings.

1262. In fact, matters have moved on considerably from the certification stage in at least the following respects which were material so far as Ofcom was concerned:

(1)  Pricing Metric: The focus of the Ofcom Reports and indeed the CR, were very much upon increases in line rental across the claim period. In fact, and as both parties accepted, the appropriate price metric for Limbs 1 and 2 was ARPU; this is important because ARPU remained flat;

(2)  Switching: Ofcom grossly underestimated the level of switching. The actual levels were far greater than the 1% of customers which Ofcom thought had switched in the previous 12 months;

(3)    Customer characteristics: Ofcom saw VOCs having the particular characteristics of being elderly and vulnerable, and disengaged. Indeed initially, this was the focus of the CR; by trial, however, the CR's case did not essentially rest on any particular characteristics of this group of customers, as opposed to consumers in general;

(4)    Common Costs: this was the subject of much more evidence and consideration than under the Ofcom Reports;

(5)    Expert Evidence: by the time of trial, there was a very considerable body of expert evidence and the experts themselves have had access to far more data than had been available to Ofcom. That is hardly surprising given, in particular, that Ofcom did not proceed to a final conclusion and formal price regulation. There was expert evidence here on every step of the *United Brands* exercise, albeit that it was more extensive on some elements (for example Market Definition and Limb 1) than on others.

1263.   We should add to this that of course, Ofcom was not obliged to and did not conduct a strict s18 analysis. It did not undertake a full Limb 1 consideration of excessive pricing, although it did find BT's prices to be above competitive levels. Nor did it address unfairness directly in the Limb 2 sense.

1264.   Further, there remains the fact that Ofcom did not ultimately propose a reduction to the pricing for SPCs. We accept, of course, that it did find them to be above competitive levels and at that stage, it could not distinguish between VOCs and SPCs. However, it accepted the engagement undertakings offered by BT in respect of SPCs. The CR says that this difference of treatment is irrelevant because it only relates to a question of "remedy". We think it is rather more nuanced than that, because Ofcom clearly saw the two groups as different. Ofcom did not regard SPCs as vulnerable in the way that it regarded VOCs. And while Ofcom had another opportunity to reconsider the position of the SPCs in 2020, it simply maintained the existing position.

1265.   Mr Parker ventured a speculative suggestion as to why Ofcom may have taken this approach to SPCs consistent with it regarding the position for them as unfair as it was for VOCs. For example, he suggested that this was simply a product of the negotiations with BT and Ofcom, who decided to go down the route of a speedy settlement rather than full-blown findings which could be appealed. However, at the end of the day he rightly accepted that what Ofcom did was ultimately a matter for it and he could not speak for Ofcom.

1266.   In this context, we do consider there is force in Mr Matthew's point (which is obvious as a matter of analysis anyway) that at the end of the day, and notwithstanding what it said as recited in

paragraphs 156-161 above, Ofcom was dealing with *ex ante* regulation with regard to a number of factors. It was not making *ex post* findings. Ofcom's intervention on VOCs must also have partly been motivated by its duties to protect vulnerable customers, which is a distinct regulatory objective as opposed to the Chapter II considerations that lie before us in this case.

1267.  In fact, this case demonstrates the pitfalls of attempting a rigid "read-across" from the findings of a regulatory body, especially where there was no final conclusion. Such pitfalls include experts being asked to divine the body's thinking at certain points and inviting a specialist tribunal such as this then to draw inferences as to why it did or did not make a particular finding or adopt or not adopt a particular remedy where its own documents do not themselves make the position clear.

1268.  As against that, we have here been presented with what might be described as the primary materials on the issues in question (although we have pointed out where evidence which could have been adduced was lacking). In such a situation, it is very hard to see why it is then necessary to ascribe any material weight to the Ofcom Reports. The matter can be tested this way: if our conclusion is that BT's pricing was unfair without regard to the Ofcom findings, then they are not necessary. On the other hand if we would conclude that its pricing was not unfair, having taken into account everything but the Ofcom findings, it would be remarkable if they could then transform the position into one of unfairness.

1269.  Of course, what weight to ascribe to related regulatory findings or decisions, or those of other tribunals, is highly fact-sensitive. Sometimes (as in *FX*), they may be of particular use. In this case however, and for all the above reasons, we do not consider that Ofcom's overall findings here amount to supporting evidence of unfairness to which we must give material weight.

**Conclusion on Unfairness In and Of Itself.**

1270.  For all the above reasons, we conclude that BT's pricing was not unfair in and of itself. We therefore turn to the CR's alternative case based on unfairness by comparison.

## LIMB 2 – (2) UNFAIRNESS BY COMPARISON

**Introduction**

1271.  We have explained above how the "by comparison" element of Limb 2 works, in the context of unfairness generally. Given our conclusion on the "in itself" element, the short point is that if we conclude that there is also no unfairness by comparison, then overall, the conclusion must be that BT's pricing was not unfair.

1272.  We consider that the assessment of unfairness by comparison is often not a straightforward exercise. For one thing, even where the firm in question is in a dominant position, there can still be price

dispersion in the market, and it does not follow that because the firm's price is above that of its competitor, even if significantly so, this renders it abusive without more.

1273. Further, it can be difficult to obtain comparators which are truly comparable. In this case, the position is made more complicated because the "price" which we have been assessing is the ARPU for BT's SFV Services, rather than line rental in isolation. A comparison which only looks at line rental will certainly be incomplete and for this reason may therefore be inadequate.

1274. Yet further, the result of the comparison exercise has to be that the prices charged by the firm in question are unfair. As with the first approach to Limb 2 ("in and of itself") the mere fact a price exceeds those of comparators does not make it unfair without more.

1275. The following comparators arise for consideration here:

    (1)    From the CR's perspective, line rental pricing (a) under the Commitments and (b) as charged by the Post Office; and

    (2)    From BT's perspective, (a) its competitors' line rental pricing, (b) that of HPS and (c) pricing under BT's Business tariff.

1276. The CR contends that its comparators show that BT's pricing was unfair and that BT's own comparators are inapplicable. BT contends precisely the opposite.

**Commitments Pricing**

1277. The preamble to the Commitments, which is in Recital (B) to the Ofcom Statement, says as follows:

> "BT now voluntarily provides the commitments set out below and, in particular, provides the greatest possible price reduction for our true voice only customers consistent with a competitive outcome."

1278. The CR says that pricing under the Commitments is a good comparator because BT would not have agreed to price reductions below the competitive level. Further, it is not as if BT has adduced any evidence to show that the pricing under the Commitments was or has turned out to be uneconomic. Mr Parker has undertaken a comparison of line rental prices by subtracting £7 from each of the relevant BT SFV Services as adjusted for inflation. This reveals that BT's pricing exceeded the comparator price by 30-50% throughout the claim period. This amounts to a significant and persistent differential (using the language of Limb 1) and thus fortifies the conclusion that the pricing was unfair. As we understand it, there is no dispute as to these actual figures.

1279. However, BT contends that this is not a relevant comparison. First, it is said that this part of the Commitments was offered in respect of VOCs only, to address what Ofcom had said were specific concerns about what it perceived was a particular problem with vulnerable customers who did not have an internet service. In other words, Ofcom was addressing a different policy goal from that which motivated Chapter II. Moreover, Ofcom's proposal, as accepted by BT, was not in fact the

product of any formal or other actual finding of unfairness. It was also forward-looking only and therefore did not address previous pricing.

1280. Furthermore, although Ofcom proposed a price which it thought would enable competition from other suppliers to be sustained, this did not in fact happen. Indeed, suppliers such as TalkTalk and Sky had stopped actively marketing to voice-only customers before the Commitments, suggesting that even the pre-Commitment prices and high profits earned by BT at that stage did not provide an attractive commercial proposition for these rivals.

1281. We think there is force in these points made by BT. Moreover, the fact that BT was prepared to reduce its prices for VOCs (but not SPCs) does not itself mean that its pricing otherwise was unfair. This follows from the fact that, as we see with price dispersion, there is a range of possible pricing outcomes for any one product that is potentially consistent with workable competition. To conclude that the higher price is unfair requires a broader assessment of the differentials and their causes.

1282. The position of the Post Office is slightly different and we discuss this specifically below.

**The Post Office**

1283. The one competitor who did match (in fact slightly undercut) the Commitments pricing, initially, was the Post Office. It maintained that position from May 2018 through to March 2020. It then raised its prices but stayed in the market until it sold its business to Shell in 2021.

1284. The question, of course, is why the Post Office put its price up significantly from March 2020 to around £15, where the Commitments price was £11.99. It may have been because it was not economic, at least not if it did not gain market share. In fact, BT increased its market share over the Post Office in this period. It may also have been that in the absence of any increased market share, it thought that it might as well try and earn more from the customers it already had. We do not have evidence from the Post Office about this.

1285. Overall, however, we do not think that the example of the Post Office, which was something of an outlier here, and over a relatively short period before increasing its prices, is a persuasive comparator. Nor does it make it easier to accept the Commitments price as a comparator.

1286. On that basis, had we stopped there, we would not consider that the CR had made out its case on unfairness by comparison.

1287. However, we should consider BT's comparators as well.

**The Pricing of BT's rivals**

1288. First, BT relies upon the pricing of its rivals, principally TalkTalk, Sky and Virgin Media. None of them reduced their VOC prices down to anything like the level of the Commitments price.

1289. The CR's essential response to this is to say that the rivals' prices were not meaningful because they were not set in truly competitive conditions. Rather they were within a distorted market and this was symptomatic of price leadership by BT. As to that, we have already expressed the view that, although most of BT's rivals chose to follow BT's line rental price increases, there is no evidence that in doing so they were able to earn excessively high profits; see paragraph 492 above.

1290. Rather, and this does not depend on the presence or absence of price leadership, if one looked at call prices, BT's call prices were often similar to, if not below, those of its rivals and there was no suggestion that call pricing by itself, was unfair. The call prices were the same as those charged to bundle customers. Mr Parker thought that there could be a difference because a larger proportion of SFV customers than bundle customers would remain on "back book" (i.e. higher) prices due to the length of time they had been with BT. However, there was no real evidence about that, nor was Mr Bunt asked about it in cross-examination although he dealt extensively with call pricing in JB3. Further, it is not as if SFV customers did nothing about elements of their bills. For example, as at 2016, 88% had changed some aspect of their line or call plans, as BT noted in its s135 response to Ofcom. So they could equally have gone from back to front book, as it were.

1291. We consider, therefore, that the position of BT's competitors is at least some evidence that its prices were not unfair and in any event is a counterbalance to the CR's comparators, if it were needed.

**HPS**

1292. We considered this product, in the context of market definition, at paragraphs 270-301 above.

1293. Originally, HPS was put forward as a comparator by CR. See paragraph 136B of the Re-Re-Re-Amended Claim Form. However, it was then deleted from the final iteration of the Claim Form dated 11 December 2023.

1294. Before that deletion, Dr Jenkins had addressed it in HJ1. She undertook a comparison of BT's SFV ARPUs with those of HPS. See Figure 7.13 under paragraph 7.87 of HJ1. This showed that BT's SFV ARPU was always above, or at least no lower than, HPS's ARPU. She pointed to the similarity of the services offered by HPS to SFV Services and the fact that (as she saw it) HPS was offered as a reaction to the competition of the Post Office. As to the latter point, we considered that this was not the only purpose - see paragraph 287 above. In any event, Dr Jenkins took note of some of HPS's bespoke features and that it was addressed to only one segment of BT's customers. Overall, she did not consider it to be particularly informative for testing whether BT's pricing was unfair.

1295. At trial, the CR's position was that HPS was positively inappropriate as a comparator, because it was itself excessive. Here, Mr Parker calculated a costs benchmark for HPS and said that the HPS pricing exceeded it by between 42% and 56%. Of course, those figures are based on Mr Parker's

conception of a competitive benchmark. Perhaps the better point is that on Dr Jenkins' figures, the SFV Services prices were around 11% above those of HPS. However, that would not, in our view, point to BT's pricing being unfair. To reiterate, merely because the price of a comparable product is cheaper does not itself show that the price in question is abusive.

**BT's Business Tariff**

1296.  This was the final comparator relied upon by BT. We have considered this separately in the context of quantum, and concluded it was not an appropriate comparator for the purpose of unfairness. See paragraphs 1324-1330 below.

**Conclusion on unfairness by Comparison**

1297.  It follows from what we have said above that we do not conclude that BT's pricing was unfair by comparison, either.

1298.  That then leaves the CR's case on unfairness by reference to line rental prices alone. This was barely pressed in the course of the trial although Ms Kreisberger KC did not formally abandon it. Accordingly, we deal with it below.

## ALTERNATIVE CASE BASED ON LINE RENTAL PRICE ONLY

1299.  In our judgment, a claim put in this way is bound to fail. This is because, on any view, it is not sensible to consider the question of line rental divorced from the elements of prices for SFV Services. Hence both sides accepted that the correct measure of price was ARPU. It is correct that in its 2017 Provisional Conclusions, Ofcom focussed on line rental. However, even if this made sense for Ofcom's purpose, it does not for ours. Accordingly, any alternative claim based on the pricing of line rental alone fails.

## OVERALL CONCLUSION ON LIABILITY

1300.  It follows that the CR's claim as a whole must be dismissed. This makes it strictly unnecessary to deal with any further aspects of this case. However, because they have all been argued and lest this case go further, we propose to deal briefly with the following further matters:

(1)  The overall approach to quantum, the correct "excess" to apply and the Counterfactual;

(2)  The position of Business Customers;

(3)  The position of Class Members who were given free elements of their service.

(4)  Removal from the Class of those members who died without a personal representative;

(5)  Compound Interest;

(6)  Damages in respect of Inflation; and

(7)  The rate of any simple interest.

1301.  What we will not address is the argument that even if successful on liability, the Class Members failed to mitigate their loss. This is because an analysis of this partial defence would have to be based upon the facts found which led to a finding of unfairness. But as we did not find unfairness, we cannot meaningfully discuss a defence which can only be raised if we had done so. It would involve us assuming too many factual matters. Therefore, failure to mitigate will not be dealt with. Accordingly we turn to the other quantum issues noted above.

## QUANTUM (1): BASIS OF OVERCHARGE

1302.  Had we found that BT's prices were unfair, the CR would have invited us to take as the relevant loss per customer, the difference between the price (i.e. ARPU) for any given month, less the competitive benchmark.

1303.  However, BT contends that this would overcompensate Class Members because, in any counterfactual which would require BT to have charged lawful and not unlawful prices, a lawful price would be any price which did not amount to a significant excess above the competitive benchmark. It should not be assumed that BT would have confined itself, in the counterfactual, to a price no more than the competitive benchmark itself.

1304.  At first blush, there would appear to be force in BT's point. After all, there will be a margin for pricing above the competitive benchmark before it qualifies as a significant and persistent excess above it. Why should the undertaking found to have engaged in abusive pricing not be assumed to have set prices at the maximum it could do, before they would be rendered excessive under Limb 1?

1305.  However, there are two obstacles to such an approach. First, in *Albion Water Limited v Dŵr Cymru Cyfyngedig* ("*Albion Water III*") [2013] CAT 6, which dealt with the quantification of damages on a follow-on basis, the Tribunal had to grapple with this very point. There, the previous Tribunal held that a price of $14.4p/m^3$ would not have been an infringing price. This figure was itself the average of 3 different competitive benchmarks, being $15.8p/m^3$, $13.8p/m^3$ and $13.6p/m^3$. On the evidence, the Tribunal found that the Defendant ("Dŵr Cymru") would have offered that price in the counterfactual.

1306.  However, Dŵr Cymru submitted that the starting point of the assessment of damages should not be $14.4p/m^3$, but rather the highest of the 3 benchmarks i.e. $15.8p/m^3$, which, by definition, would not be infringing, and then an increase of 5% above it. This was to give effect to the argument that a price of 5% above the competitive benchmark would not be material (so could not be significant) and therefore would not have failed the Limb 1 test, as it were.

1307. It should be noted that Dŵr Cymru did not take the point there to its "logical conclusion" as the Tribunal put it. This is because, on that argument, there could have been a price which was more than 5% above the competitive benchmark, while less than the actual price under scrutiny, which would also not have been ultimately considered unfair, depending upon what factors were taken into account in the Limb 2 analysis.

1308. The Tribunal rejected Dŵr Cymru's argument. First, it said that attempting to design the claimed counterfactual price would be extremely difficult if not impossible:

> "69. We reject Dŵr Cymru's submissions on this point as wrong in principle, as well as entirely impracticable. It will be very rare that an infringement decision, whether adopted by a domestic competition authority or by the European Commission, or indeed on appeal as in Case 1046, will determine the precise borderline between lawful and unlawful conduct. If Dŵr Cymru is right that the claimant in a follow-on damages claim will have to show precisely where that line should be drawn, that will often involve the court in re-doing much of the work done in the earlier infringement decision. Further, it is a task that is almost impossible to accomplish, as is demonstrated in this case. If 16.5p/m3 is not abusive (a point we do not decide), what about 16.6p/m3 or 16.7p/m3, or 16.8p/m3? We do not see how a claimant could prove that one rather than the other is the tipping point between lawful and unlawful conduct. Dŵr Cymru has recognised the impracticability of the test by making the two tactical concessions that we have described. The fact that the Tribunal's task would be impossible in the absence of those concessions (which Dŵr Cymru was not of course obliged to make) indicates to us that the test proposed cannot be the right one."

1309. The Tribunal then said that Dŵr Cymru's position was wrong in principle, referring to what Lord Hoffmann had said in *Banque Bruxelles v Eagle Star* [1997] A.C. 191 at p.221, where the House of Lords considered the issue of counterfactuals in respect of a negligent valuation. Lord Hoffmann held that, if the figure put forward by the valuer is found to be wrong, the correct figure for the purposes of calculating the loss caused is the average one which a non-negligent valuation would have produced, and not the highest valuation which would not have been negligent. The Tribunal considered that the same approach applied by analogy to the position of Dŵr Cymru. The assessment of damages, therefore, used the price of 14.4p/m$^3$ as being the reasonable price which would have been offered in the counterfactual.

1310. Given what was said in *Albion Water III*, we do not think that it would have been open to us to accept BT's arguments here.

1311. In fact, there is a further difficulty in our case, as the CR points out. This is that BT did not adduce any evidence as to what, in fact, it would have done in the putative counterfactual arising out of any finding of abuse. In a way, that is understandable, since BT's position was that Limb 1 would never have been reached and even if it had been, its prices were neither excessive nor unfair. It is simply not possible, absent such evidence, for a Tribunal to make any assumptions as to what BT would have done. There are, of course, cases where the question of a counterfactual, in the context of causation and loss, is not dealt with until after a trial on liability has been concluded, so that it can be assessed in the context of the particular findings already made. But that is not this case.

1312.  We should add, since it is a point made by BT, that if the real issue was the taking into account of factors such as price dispersion (see paragraph 855 of its Closing), these are matters for Limb 2, not quantum.

1313.  Accordingly, had it been relevant, we would not have acceded to BT's overcharge point here.

## QUANTUM (2): BUSINESS CUSTOMERS

### Introduction

1314.  There are three live issues on quantum which relate to members of the Class who were business customers, although taking residential SFV Services ("Business Customers") as opposed to those taking BT's Business tariff who do not form part of the Class anyway.

1315.  These three issues are:

(1)  Should Business Customers be excluded from the Class altogether, so that the overall damages awarded would be reduced by the proportion of the Class represented by such customers ("the Exclusion Issue");

(2)  What proportion of the Class is made up of Business Customers? This question needs to be answered, not only if the Exclusion Issue is determined in favour of BT, but also because it is common ground that damages should be reduced by the amount of VAT which could be reclaimed by Business Customers. While the proportion of Business Customers who were VAT registered has been agreed at 24.3%, the overall proportion of Business Customers within the Class has not; this second issue is also relevant to the Pass-On Issue below; we refer to this as "the Proportion Issue";

(3)  Should there be any reduction in damages for Pass-On of charges paid by Business Customers (if not otherwise excluded altogether)? We refer to this as the "Pass-On Issue";

### The Exclusion Issue

1316.  As foreshadowed in its Re-Amended Defence dated 27 July 2023, BT argued that Business Customers should be excluded from the Class. This is because BT's SFV Services were only for household personal use, not for trade, business or professional use, and this was clearly stated in its terms and conditions. In particular, BT relied on clause 6 (a) of the applicable BT Consumer terms as follows:

> "Each service is just for you and your household for personal use (meaning that it should not be used for any trade, business or profession). You're responsible for how each service and the loaned equipment are used."

1317.  As the CR pointed out in his Re-Amended Reply of 8 September 2023, BT had not made this particular objection at the certification hearing (as opposed to then raising a question about pass-on), nor had it sought to amend the Class at any stage earlier than the Re-Amended Defence. For

those reasons, the CR submitted to us that, for BT to take the point as late as it did amounted to an abuse of process and we should simply disregard it.

1318. We disagree. Notwithstanding the particular features of the certification of collective actions, including the important exercise of defining precisely the Class, the point now taken by BT amounts, in our view, to a late amendment. As it happens, the CR did not in fact oppose this particular amendment when it was made. Whether the point now taken by BT should be entertained is essentially a question of where the balance of justice lies.

1319. The point was raised some 6 months before trial and on analysis, it is a short point. The concomitant question of assessing the proportion of the Class that were Business Customers, has to be dealt with in any event, as noted above. Nor did the CR say that it was not able to deal with the substance of the point. Accordingly, we would reject the abuse of process argument and turn to the substance of the point.

1320. Any individual was entitled to purchase residential SFV Services for personal use. However, the question of entitlement also depended on the capacity in which, and purpose for which, the service was used. Occasional business calls from residential lines did not affect the purpose for which a residential line had been taken, but where businesses took residential lines for business purposes, BT says that they should be taking the BT Business tariff. There was therefore no basis for saying that these Business Customers were entitled to BT's SFV Services and thus they should not be entitled to damages in respect of their unfair pricing.

1321. Another way of putting the same point was to say that for Business Customers, the CR had failed to explain why BT's prices for services used by them would be excessive or unfair in circumstances where the services were sold only for their household use. Business Customers using those residential services paid less than they would have paid if they had purchased BT's Business tariff. Hence those customers had suffered no loss.

1322. In that context, from the evidence before us, it was unclear whether BT had in fact ever taken issue with customers using residential SFV Services for business purposes. The evidence did, though, suggest that business usage of SFV Services was well known to Ofcom and so BT was knowingly receiving revenue from Business Customers using residential SFV Services for many years. It is true that BT had written to Class Members who were operating businesses and using SFV Services at the time of the Commitments, but that was only for the purpose of eligibility for the discount, rather than pursuing any potential breach of contract. Thus, it was not clear to us exactly how an alleged breach of an unenforced contractual term, in itself, provided a defence to a claim to abuse of dominance in circumstances known to the dominant company and from which the dominant company has benefited.

1323.  We also accept that there was no economic rationale for the exclusion of this group. Business Customers did pay for BT SFV Services. Also, many were micro-businesses or sole traders working from home and using BT SFV Services for both business and residential purposes, and BT's Business tariffs included services not required by these business users. We note the point made by BT that, if Business Customers had taken the correct service i.e. the BT Business Tariffs, they could have no claim. It is then said that it could not be unfair to them if they were deprived of their claim when taking the wrong product. That is all very well, but it is answered by the point that BT was aware of this phenomenon and chose to do nothing about it. Indeed, it did nothing about it, even though it made its own attempts to identify who the Business Customers were, for the purpose of eligibility for the discounted Commitments price.

1324.  However, there was a more specific point about unfairness made by BT. This was to the effect that if one considered Business Customers as a sub-set of the Class, there was no unfairness by comparison. That is because the appropriate comparator for them would be BT's Business Plan, which, in broad terms, tended to be more expensive than the SFV Service which they were in fact using. In our Limb 2 analysis, we did not consider this point in the context of unfairness by comparison, but indicated that we would deal with it here.

1325.  In the context of market definition, both experts agreed that the BT Business Plan services were in a different market. Thus, for example, at paragraph 4.36 of HJ1, Dr Jenkins said that the reason for treating those services differently included different pricing structures, product features and characteristics and the target audience for those services. See also paragraph 4.55 of DP3.

1326.  However, at paragraph 6.89 of HJ2, Dr Jenkins said that for Business Customers, the obvious and logical comparators were products that were in fact designed for business customers. She considered that when the residential and business tariffs were combined in each case with an unlimited call pack option, they were sufficiently comparable. However, the monthly cost of line rental and unlimited calls was higher for the business tariff than for SFV Services. See Figure 6.1 under paragraph 6.94 of HJ2.

1327.  Mr Parker disagreed that BT's business tariff was an appropriate comparator. In particular, one needed to consider some specific features of quality considerations. He summed these up at A6b in Annex A to the JES. As a starting point, and as recognised by Dr Jenkins, the unlimited call pack for BT Business included calls to all UK landlines and mobiles, whereas for the domestic tariff calls to mobiles were not included; instead, there was an allowance of minutes for calls to BT mobiles and a discounted price for calls to non-BT mobiles. Further, purchasers of BT Business plans could include additional features such as call barring and three-way calling and options for upgrades to targeted fault fix times. Further detailed differences are set out at paragraph 10.35 (a) – (f). These

include the free provision of 1571 voicemail for the Business plan, whereas it was chargeable on the residential tariff. Business plans also included a 24/7/365 support service. Certain business lines were also compatible with a phone system (involving multiple and interconnecting lines used for call handling, conference calling etc) which was not the case for residential lines. Finally, there were additional voice services available to BT Business customers which were not available to residential customers.

1328.  In evidence, Mr Parker referred to lower call prices and some of the additional features such as assurances, quality of service, better fault repair, billing and call waiting for the Business plans. He maintained that the two tariffs were simply too different to provide a useful comparison.

1329.  As for Dr Jenkins, she accepted that they were not perfect comparators and that she had not priced in better fault fix times and things which were not available to a residential customer. However, she saw the tariff essentially as "swings and roundabouts" so that residential customers would be no worse off than if they took the business tariff.

1330.  We see that, but in our view, we think there are simply too many differences between the products to allow the BT Business tariff to act as an appropriate comparator for Business Customers on the question of unfairness. As a result, pricing for this sub-group within the Class would not be rendered fair in a context where unfairness generally had already been established by reason of the first element of Limb 2.

1331.  For all the above reasons we would not have accepted that Business Customers should be excluded from the Class.

**The Proportion Issue**

1332.  There is a significant difference between the parties over the proportion of the Class represented by Business Customers. Thus for BT, Dr Jenkins provides proportions for each of the claim years which are between 14.1% and 28.6%; see Table A11.8 in Annex 11 2 HJ1. These figures are extrapolated from Ofcom surveys of SMEs undertaken in 2016 and 2018 which were designed to understand the communications purchasing behaviour of SMEs in the UK.

1333.  On the other hand, Mr Parker for the CR says the figure should be 10.4% across the board. This figure is the average of two other figures. The first is 4%, taken from a number of internal BT documents. The second is 17%, taken from Ofcom's 2016 survey.

1334.  We comment first on the BT internal documents relied upon by Mr Parker. As an example, there is the BT Consumer Pricing document dated 27 April 2016. This states that out of a total of 2.6m SFV customers, 100,000 are to be treated as business customers. That would yield a proportion of 3.85%

as being Business Customers, which Mr Parker has rounded up to 4%. However, at least from the face of the document itself, the methodology used to calculate the 100,000 figure is unclear. Mr Parker did point to an email from Ms Cheek dated 4 May 2016 which said as follows:

> "A mixture of data sources was used to arrive at the numbers that John presented to Sharon last week. 2.6m total BT Line Only Customers came from our BT Consumer customer database, as did the 520k on BT Basic, Line Rental Saver or Home Phone Saver. The 1.2m of those who have BB with another CP has been estimated from publicly-available competitor reports, analyst sources and some extrapolation. Income and age data came from Acxiom data matched to our BT Consumer customer database. The figure of 0.1m for second lines/businesses was sourced from our BT Consumer customer database. This was an aggregated count of customers with multiple voice assets on the same billing account, those receiving multiple bills at the same address, those receiving J type bills relating to VAT receipt request, and those with a name and address match to customers with business descriptions on their billing address e.g. & son & partner associates etc. All counts were de-duped for overlaps between the cohorts."

1335. That gives some information, but it was not a document put to Ms Cheek in cross-examination. Further, it is clear from the way the figures are set out that the 100,000 figure could only relate to VOCs and not SPCs. So its usefulness is limited.

1336. Mr Parker himself accepted that such internal documents could not be entirely reliable, which is why he considered the 17% figure drawn from Ofcom's 2016 survey. He felt that this could not be correct itself because this was a market-wide survey as opposed to one directed at BT customers only. There may have been a lower (or higher) proportion of BT customers who were Business Customers than would be the case for telecoms customers overall. This is why Mr Parker chose a midway point between the 4% and this 17% figure.

1337. By the time of DP4, Mr Parker had identified further relevant BT documents. One, from March 2018, indicated that 190,000 customers would be sent a coupon to opt-into the Commitments discount. They were told that they would only be eligible if (a) they had no broadband at all and (b) did not use their residential line for business purposes. They had been identified by BT as potentially Business Customers. On the basis of 2.1m SFV customers, this would suggest a proportion of 9%. On the other hand, later documents in 2019 and 2021 suggested that 1% of the SFV customers had multiple lines which was taken as a sign that they were business customers. Mr Parker also pointed out that the internal documents suggested that the proportion of Business Customers was decreasing over the claim period. He contrasted this with Dr Jenkins' figures which suggested the opposite. In the light of that, and the fact that some of Dr Jenkins' assumptions in extrapolating the figures from the Ofcom surveys were questionable, Mr Parker maintained that his 10.4% figure continues to be a reasonable one and indeed is probably an overestimate.

1338. On the other hand, BT points to significant deficiencies in the internal documents, for present purposes. This was explained by Mr Bunt at paragraphs 23-29 of JB1 on which he was not challenged. He explained that only VOCs were eligible for the discount and within them, any who used their landlines for business purposes were ineligible. However it was very difficult for BT to

identify such customers. It could only be done by running manual checks against Companies House records which would pick up business customers who were not registered for VAT. That is why the coupons sent to potentially eligible VOCs to a large extent trusted them when they said they were eligible.

1339. Further, most of the documents relied upon by Mr Parker were concerned with the proportion of VOCs who were Business Customers, and therefore the proportion of SPCs who were Business Customers would not be captured. In addition, insofar as BT focused on customers who had multiple lines, that was likely to lead to a large underestimate of true Business Customers as Mr Parker accepted in cross-examination.

1340. As for the Ofcom surveys, the 2016 survey sampled 1,501 SMEs based on a list of small and medium-sized enterprises from Dun & Bradstreet. The 2022 survey was based on a similar methodology for 2,109 SMEs. One of the questions asked in the surveys was whether the SME concerned purchased a residential landline. Using the responses to this and other questions, Dr Jenkins extrapolated the proportion of SMEs in the UK that used residential lines. She then estimated the total number of SFV customers in the UK and then the ratio of SMEs to residential SFV lines. Finally, she estimated the number of residential lines purchased by SMEs. All of this is set out at Annex 11C to HJ1. Mr Parker accepts that the surveys were in themselves valid data points.

1341. However, he questioned whether the preferences of SMEs across the whole telecoms market in the UK could be assumed to be the same for SMEs who were BT customers. We understand the point, but do not see why this assumption should not be made. The CR refers to the fact that in evidence, Dr Jenkins said that this assumption might be incorrect. But what she said in context was this:

> "But I disagree with Mr Parker's view that those assumptions are problematic or increase uncertainty. I think all of the steps are reasonable. I am just using things like ⸺the main assumption I have to make is that BT is similar to the whole market. That is the main assumption. That may be somewhat incorrect. However, I think it is the CR's case that there are very few other split purchase suppliers other than BT. So, you know, overall I do not think this is an overly aggressive set of assumptions or likely to be unrealistic or make these estimates unreliable in any way."

1342. Second, Mr Parker considered that these surveys might pick up customers who only made business calls from their home landlines very occasionally and who would not be regarded as Business Customers for our purposes. The surveys could therefore produce an overestimate. That is theoretically possible, but the surveys were themselves directed (and directed only) to SMEs which had to answer questions about their use of residential landlines. Also, if working from home was captured, it was likely to be so because the home was given as the SME's registered address. Further, those surveyed were asked to state the SME's primary place of business and to exclude homeworking if it was not the primary place of business. But if their home was their primary place

of business it is very hard to see why there would only be the occasional business call made from there.

1343. Broadly, we consider that the data relied upon by Dr Jenkins is much more persuasive than the BT internal documents referred to by Mr Parker. Since we can see no sensible objection to Dr Jenkins' exercise of extrapolating figures from the surveys, there is no real basis for simply choosing a half-way house of 10.4%. Indeed, we see no basis here for making any material reduction in Dr Jenkins' figures as this would be arbitrary. Accordingly, the percentages of the Class which should be treated as consisting of Business Customers are those set out in Table A11.8 in Annex 11 to HJ1.

**The Pass-On Issue**

1344. BT contends that Business Customers would be expected to maintain their margins in the face of any overcharge, especially because of the prices they paid (for residential SSC BT Business Tariffs). Accordingly, they should be treated as having passed on the additional costs in their entirety.

1345. For her part, Dr Jenkins was less certain. She said that Business Customers may have been able to pass on some of the additional costs, though this could vary across different Business Customers, and she accepted that she could give no estimate of the extent of any pass-on. There was no specific evidence on this matter from BT, although in terms of factual matters, that was true of the CR as well. However, in collective proceedings, one would not expect to see individualised evidence from Class Members.

1346. In any event, Mr Parker did consider the question of pass-on specifically at paragraph 7.63-7.72 of DP3. In short, he did not consider that there would be any material impact from any overcharge on the prices charged by Business Customers; in other words, there was no real likelihood of any-pass on. This was because the Class Members were unaware of the overcharge at the time, the relative amount of the overcharge and the business in question were likely to be small and where other firms in the same market faced no such overcharges, and where there was no evidence of any direct relationship between BT's SFV Services and the products or services whose prices would have been increased due to any pass-on.

1347. We consider that there is real force in all of those points and accordingly we would have made no deduction at all for any possibility of pass-on.

## QUANTUM (3): BT EMPLOYEES WITH GIFTED SERVICES

1348. BT argues that a reduction should be made to the Class to remove nominated friends or relatives of BT employees who were in receipt of free gifted services. These were DP bundle customers who, because they received a gift in respect of their broadband component, were treated in BT's systems as split service customers. The net price they paid for the bundle was only the SFV price which was

accounted for in the BT systems accordingly. It was just an accident of the way the billing system worked to treat them as split service customers. However, in reality, they should be treated for present purposes as bundle customers, in which case they would be outwith the Class and/or they had not suffered any unfairness.

1349.   As against that, the CR contended that regardless of the gift of broadband, the customers concerned had still paid any landline or calls price component found to be unlawful. BT's choice to offer a broadband price benefit is irrelevant to the high price of the SFV Services – the gift of free broadband would remain in any lawful counterfactual, absent the imposition of excessive SFV prices.

1350.   We consider that the CR's analysis is clearly the correct one. In consequence, we see no basis for treating such customers differently from any other Class Members. So had there been unfair pricing, there would have been no reduction in damages on their account.

## QUANTUM (4): DECEASED CLASS MEMBERS

### Introduction

1351.   The Class definition includes living Class Members and UK-domiciled personal representatives of Class Members who have, or will have, died before the distribution of any damages award. It is common ground that deceased individuals without a personal representative at the date of distribution are to be excluded from the Class and thus from any award of damages. The actuarial experts had therefore to produce percentage reductions from the aggregate award of damages which reflect that exclusion.

1352.   According to Mr Punter, the reduction to be applied is 3.6% for VOCs and 2.3% for SPCs on the basis of an assumed final distribution date of 31 March 2026. For Mr Scott, on the other hand, the reductions are greater, being 13.4% for VOCs and 6.8% for SPCs. His reduction percentages are "translated" from the results of the "decrement" exercise he has performed – see the Table produced under cover of a letter from S & S dated 28 February 2024.

1353.   In order to arrive at the final percentages, two issues have to be addressed.

1354.   First, the method of calculating the number or rate of Class Members expected to have died by the distribution date (the "Mortality Question"). The differences between the experts have been narrowed here so that there is only one essential question which is the correct methodology to use; this dispute is reflected in Issue 25 in the Actuarial JES.

1355.   In that regard, the parties have agreed to accept the mortality assumptions of the expert whose overall methodological approach is preferred by the Tribunal. See paragraph 1 of the Appendix to the letter from S & S dated 7 March 2024 (the "7th March Letter").

1356.  The second issue concerns the number or proportion of those deaths where there is no personal representative by that date (the "Personal Representative Question"). It is on this issue where there is most dispute between the experts.

1357.  Once these issues are determined, the economic experts can apply them to their quantum calculations. We consider each of these issues below.

**The Mortality Question**

1358.  So far as methodology is concerned, Mr Punter arrives at an overall percentage reduction for each of the VOC and SPC sub-classes.  He allows for every Class Member as they join the Class through time, with the putative adjustment for those likely to die without a personal representative stopping only at the point of the assumed distribution date. As he put it in evidence, in relation to Class Members, those who have been with BT for a long time within the claim period would have more substantial losses due to the overcharge than those who were only there for a short time. Because of his methodology, however, Mr Punter treats them equally.

1359.  On the other hand, Mr Scott's methodology is sensitive to the differing periods of time for which Class Members were with BT, in particular to those who were with BT for only a short time. Such "transient" members were generally considerably younger than average, even in relation only to SPCs, as opposed to VOCs who tended to be older. There were, according to Mr Scott, a significant number of such transient members. According to him, if they were simply treated equally with much more long-standing Class Members (as Mr Punter has done) the average age of the class and the mortality rate overall would reduce. This would ultimately affect the size of the percentage reduction to damages. Moreover, the loss suffered by the transient members would obviously be much less than for more long-standing members.

1360.  Accordingly, there had to be some method of "weighting" the Class Members to take account of the differential in terms of the period for which they were a customer of BT within the claim period. The way that Mr Scott did this was to produce a set of monthly decrement tables, one for VOCs and one for SPCs. The percentage for each month represented the proportion of the members of the relevant sub-class within the total Class for that particular month, who were likely to be alive, alternatively deceased but with a personal representative, by the assumed date of distribution. What this meant was that Class Members who were such for only a brief period of time would not "count" to the same extent as those who were more long-standing Class Members. This "weighting" was achieved by the monthly decrement exercise, since in any given month, those who had already left, by definition, would not be counted. For these purposes, a "transient" Class Member was defined by Mr Scott as a customer who joined and left BT within one year.

1361. In this way, Mr Scott's exercise would take account of the fact that the effect on any award of aggregated damages would be much less for a transient Class Member than others. Equally, the mortality rate overall would be less because the putatively younger age of transient members would have less effect on the average.

1362. Mr Scott said that his methodology would avoid a significantly lower mortality rate. He said that over a one-year period, using a non-rated methodology would result in a lower mortality rate for the Class as a whole than the average mortality rate at any point during the year.

1363. Mr Scott demonstrated this in the hot tub discussion, by referring to the spreadsheet supplied under cover of the letter from S & S dated 28 February 2024. The basic point was that if there were 12 different transient members for each month during a given year, they would "count" for the purposes of working out the mortality rate much more than if there was assumed to be simply one transient member across the whole year.

1364. In the hot tub discussion, Mr Punter recognised that a calculation of this kind could be done if it was required, although he did not produce a competing one, as it were, himself. Nonetheless, the CR made a number of objections to Mr Scott's methodology.

1365. First, Mr Punter noted that the majority (70%) of Class Members were members at the start of the claim period or had joined by the end of 2015, and that over 95% of the Class had joined it by the end of 2020. He thought that the results concerning the Class would largely be driven by those joining at the start and, therefore, the impact of later (transient) joiners would be relatively slight. There is not much in this point because if Mr Scott's methodology was justified in principle, the fact that it might not make much difference is not an argument against it, and in any event, Mr Punter thought that it did.

1366. Second, the CR also criticised the approach taken by Mr Scott as encroaching on the Tribunal's role in distributing damages by an approach which was: "effectively weighted for Class Member loss", rather than confining himself to assisting "in calculating the size of the Class". BT disputed that Mr Scott's calculation amounted to any pre-judgment of the Tribunal's decision on loss and entitlement calculations. His work was based on the number of lines (as he confirmed in the hot tub on Day 20/173), if the Tribunal were to award aggregate damages, not a view as to the loss any Class Member may or may not have incurred, so there is no inappropriate pre-judgment of the Tribunal's assessment of loss. We agree with Mr Scott here.

1367. Third, the CR suggested that Mr Scott's calculations would somehow exclude transient Class Members who joined and left within a given calendar year. This was on the basis that Mr Scott's calculations involved taking snapshots at each 1 January, so that a Class Member who, for example,

came in in February and left in December would not count at all. However, Mr Scott explained that his age distribution did take into account their existence and characteristics across the relevant year, so that looking at the picture in January there would be, for example, one Member and one transient Member, and the same would apply the following year even though the identity of the transient Member would have changed. He explained all of this carefully on Day 20/128-131.

1368. Finally, the CR says that Mr Scott's methodology relies upon a number of assumptions which risk unsafe conclusions. For example, there were assumptions made as to age distributions and movements of transient Members. However, the basis for the assumptions was explained by Mr Scott in the hot tub on Day 20/124-5 and overall, our conclusion from the written evidence, argument and the discussion in the hot tub is that the assumptions were appropriate for the task in hand.

1369. For all those reasons, we would have approved Mr Scott's methodology for application in accordance with the agreement set out in the 7th March Letter.

**The Personal Representative Question**

*Introduction*

1370. The legal definition of a personal representative for these purposes is now agreed. There are four situations in which a deceased person will have a personal representative in place so that their estate is to be included in the Class for that purpose. They are as follows: where the deceased person:

   (1)    had a will, with a named executor(s) to whom a grant of probate is made;

   (2)    had a will, with a named executor(s) but these declined to act and, instead, letters of administration are awarded to an administrator (usually a close relative);

   (3)    had a will, with a named executor(s) but no grant of representation (as in sub-paragraph (1) or (2) above) is made. In this situation, although the estate does not 'go through probate' a personal representative is in place. This occurs in roughly half of all deaths, as in many situations no such grant of representation is required;

   (4)    had no will (died intestate) but nonetheless letters of administration are granted to a personal representative.

1371. In short, the experts thus agreed that it was necessary to determine the rates of Class Members dying: (i) with a (valid) will identifying an executor ("Category 1") and (ii) with no (valid) will, but an administrator appointed by letters of administration ("Category 2").

1372. The most significant difference between the experts in terms of their results here was attributable to the different ways in which they had applied the shared definition of "personal representative" to

290

determining the rates of Class Members who will have died at the assumed date of distribution, without a personal representative.

1373. In relation to Category 2, Mr Punter (at paragraph 51 of the Actuarial JES) observed that the differences between the experts, in relation to the assumptions they adopted, did not produce a material difference in the results. The 7 March Letter thus records the agreement between the parties on how members of the Class who had intestate letters of administration should be dealt with.

1374. As a result, the parties agreed that there is now only the Category 1 issue to be dealt with, in other words, the likelihood of a deceased Class Member having an executor. This in turn depends on rates of will-writing. Once determined, the rate of will-writing will affect the calculations regarding Category 1.

1375. Here, Mr Punter produces a higher rate of will writing than Mr Scott. The only available evidence on this subject is a limited set of 17 surveys and studies undertaken between 2005-2023, there being no official statistics. The difference between the experts lies in their assessments of that data.

1376. There is a further difference because Mr Scott then makes a 20% reduction to the rates of will-writing that he derives from survey evidence. The CR regards any adjustment as unjustified on the evidence and points out that some factors may point towards the need for an upwards adjustment.

*Rate of will-writing*

1377. The difference between the experts' conclusions on the rate of will-writing can be seen from Figure 39.1 under Row 39 of the Actuarial JES:



Figure 39.1 Assumed will likelihood by age (before adjustment for any of the factors in proposition 43)

1378. Mr Punter's review of the evidence led him to undertake a meta-analysis, based on the available data, as seen at paragraph 4.4.7 of JP1. Consistent with that analysis, he assumed an upward linear relationship between the likelihood of having a will and a person's age up to 85 years, which then slows to reach a plateau of 90% at age 90 and above, accepting that the linear upward trend could not continue without limit. This is shown in the above Figure.

1379. On the other hand, while Mr Scott agreed in principle that the evidence showed a strong positive correlation that the likelihood of having a will increases with age, he assumed a constant likelihood of having a will after the age of 75 years. More particularly, as shown above, he models an upward linear relationship to age 55 years, a more pronounced upward linear relationship between 55 and 75 years, and a plateau at 83% of will writing at age 75 or more. His model is based on key reference points from that survey data showing a prevalence of will writing at 38% across all ages, 66% at ages above 55 and 83% at age 75 or more.

1380. Mr Punter considered that Mr Scott's approach was incorrect. He said that assumption that the upward trend immediately stops at age 75 was not supported. Mr Scott's approach also overstated the level of will writing between the ages 75 on the one hand and the weighted average age of surveys over this age, and understated it thereafter.

1381. Further, Mr Punter said that his percentages for those having wills beyond the age of 75 was supported by survey evidence. In particular, the NCSR and Cardiff University study 2010, the WillSuite 2020 report and the Canada Life survey all showed to varying extents that there were people over the age of 75 who started to think about writing a will for the first time. He also said that the surveys and academic studies also showed that people over the age of 75 had a greater likelihood of having a will. Here he relied upon the NCSR and Cardiff University and Canada Life studies which showed an upward trajectory in will-making over the age of 75 and a higher percentage of those with a will in that 75+ age group, and also the Just Group 2021 study which showed fewer people in the 75+ group having not already arranged a will, compared to younger age groups.

1382. Moreover, Mr Scott's flatline at age of 75 was not actually faithful to the survey evidence. This is because there was no reason or evidence to suppose that all those responding were in fact aged precisely 75. Rather, the age band "75 and over" represents some average age higher than 75. Mr Punter's evidence was that the average age of those within the '75 and over' group would be around 82.

1383. Finally, the Jospeh Rowntree Foundation 2005 (JRF 2005) study showed that same upwards trajectory in the rate of will-making and also a higher percentage of those with a will in the 80+ age

group compared to younger age groups. The CR argued that Mr Scott had not taken that study into account in either of his reports, although he was aware of it at the time of the Actuarial JES.

1384.   For all those reasons, the CR said that Mr Punter's approach should be preferred.

1385.   For his part, Mr Scott said that whilst the prevalence of will writing does increase with age, there was no evidence that it keeps increasing throughout the overall age range. The highest age referenced in the surveys was actually 75, from which Mr Scott took the likelihood of having a valid will to be constant beyond that age. He regarded that as consistent with the Willsuite report which shows virtually no wills are written after age 85.

1386.   Further, it was common ground that none of the surveys actually reported a will-writing result as high as 90%, and that only a minority broke down their results for respondents over age 55 years into narrower age bands, such as age 70 or more or age 75 or more. Yet further, the only survey that reported on respondents aged 80+, namely JRF 2005, concluded that 84% of respondents in their eighties had a will. This was close to the 83% plateau modelled by Mr Scott, and the survey anyway cautioned that its figures may overstate reality, being higher than reported in previous research and potentially reflecting some who felt that they ought to have a will and so said they had one when in fact they did not.

1387.   Mr Scott added that Mr Punter's calculation of the prevalence of will writing was then applied to the average age in the age band. This might not be valid, because there were small numbers in each age band in the surveys and thus uncertainty about the average age of the people surveyed.

1388.   He also said that the criticism of his model, that it flatlines at age 75, making no allowance for new wills written thereafter, was misplaced. The actual proportion of any age group having a will may not be constant. Mr Scott explained that over that age, there will be people making wills, people who had wills who die (reducing the group of age 75+ with wills), some will remarry (revoking their will), some may lose their will or destroy it, for some, their wills will turn out to be invalid, and some will-writing may be re-writing a will that has already been drafted.

1389.   In discussion with the Tribunal, Mr Scott confirmed that the survey evidence to which he was being faithful showed the percentages at each age range, and they were the percentages that he mapped into. This mapping was reflected by Mr Scott's curve flattening at the data point for age range 75+.

1390.   In summary, there was no good reason to assume that the modelled relationship between age and will writing continues on an upward trend to age 90, nor to assume that 90% of persons at or above that age have a will. Mr Scott's more closely modelled relationship, adhering more to the survey evidence, should be preferred.

1391. Overall, we found the position taken by Mr Scott to be more persuasive. On the evidence, we were not convinced by the assumptions of an upward trend to age 90, and of 90% of persons at or above that age having a will. It is common ground that none of the surveys reported as high a proportion as 90% with wills at any age and the only survey that reports on those aged 80 or more concluded that 84% of respondents had a will. We consider that Mr Scott's average of the surveys in respect of those aged 75 or more, which comes out at 83%, is, on the balance of the evidence, to be preferred. We think that his approach more particularly responded to such data points as could be derived from the surveys and reports on which both experts had to rely.

1392. Accordingly, on this first point, Mr Scott's analysis of the rate of will-writing should be used.

*The 20% adjustment*

1393. Mr Scott reduces his rates of will-writing derived from credible survey evidence by 20%. He does so for a number of reasons.

1394. First, he argued that that there was survey bias, in that people who responded to a survey by saying they had a will may, in fact, not have had a will, but did not want to admit that. However, this supposed bias was not supported by evidence, and considering there were 17 different studies/surveys over two decades without such adjustment, there is no reason to doubt their design. The surveys were carried out by professional firms or academics, well-versed in bias issues and how to structure their surveys to avoid bias. None of them suggest adjusting base results up or down for any purpose. Some of the surveys anyway used neutral, factual questions to avoid possible bias and since they show the majority of respondents across all ages saying they do not have a will, no social desirability or acquiescence bias is evident, and a significant proportion of these studies were online 'self-response' studies, so there was no questioner to 'please'. As to that, Mr Scott responded that many of the surveys did not contain sufficient information to allow the presence of such issues to be ascertained, and Mr Punter was taking it on trust that any bias issues will already have been adequately addressed.

1395. Second, it was suggested that will invalidity should be adjusted for. Most wills are, however, written with professional help. There was also no or little evidence that most or all of home-made wills were invalid, and the requirements for validity are long-established, obvious and straightforward. Furthermore, the Probate Office reported very few wills presented for probate as being (ultimately) invalid. While a significant number were poor quality, and required further work, they would be made valid. As to that, Mr Scott said that there was no quantitative assessment of "very few", nor of whether the Probate Office would see all invalid wills in any event.

1396. There was evidence from the 2011 Legal Services Consumer Panel that about 8% of wills were not validly executed, but that was based only on a sample size of 100 interviews. On the other hand, it

was not suggested that the number of wills invalid from the outset or becoming invalid could be zero. While Mr Punter said that any such risk was immaterial (pointing to the fact that will-writing tended to occur at older ages, when events that give rise to invalidity, such as marriage, have already taken place) this ignored wills invalidly executed in the first place and was anyway an over-generalisation, according to Mr Scott.

1397. Third, Mr Scott also argues that a downward adjustment is required because a will may not have been updated following marriage or civil partnership. However, since marriage typically occurs at lower ages, whilst will writing typically occurs in older age groups, this is likely to be immaterial. Moreover, marriage is often a prompt to will writing (as at least one of the studies observed) and there is no other evidence adduced to suggest a large number of such revocations, or that revoked wills are not replaced by valid wills. Finally, the revocation rule is not an absolute rule: wills written in contemplation of marriage or civil partnership are unaffected.

1398. Mr Scott then justified a downward adjustment on the basis that a will may have been revoked or destroyed. He accepted, however, that he had no evidence that will destruction was a common occurrence.

1399. He then said that the surveys, some of which were conducted online, and which reported results for those aged '75 and over', were not actually representative. He added that in fact he could arguably have made a considerably higher adjustment than 20% because 48% of deaths were likely to be intestate, placing reliance on a Law Commission comment. However, the Law Commission itself said it was not possible to know whether or not there was a will. Moreover, an estate does not need to go through probate for a personal representative to be in place and also, the Commission was looking at deaths at all ages, not just with deaths at older ages as are relevant to the case.

1400. Finally, Mr Scott pointed out he had to avoid the risk of double counting between will writing and intestate grants of administration.

1401. Having regard to all of those supposed justifications for the 20% adjustment, that figure was not allocated as between the various factors and indeed, as BT's Closing said, the issues and evidence in relation to bias and invalidity simply do not permit of a granular enquiry into every factor. Overall, Mr Scott was using his expert judgment in the round, taking into account all the relevant sources to reach a 20% reduction.

1402. We follow these general points of concern, although we have already pointed out their shortcomings in particular instances. Added to that is their general nature and the lack of clear evidence of their specific impact on the Class with which we are concerned. Overall, we do not accept that there

should be the claimed 20% adjustment. Nor is there a basis for selecting some other, lower, percentage adjustment.

1403.  Accordingly, we would have found in favour of the CR on this second issue.

## QUANTUM (5): INTEREST AND RELATED MATTERS

**Introduction**

1404.  There are 3 issues relating to interest and other matters which we would have to have determined had we made an award for damages. Consistent with our approach in dealing with quantum issues anyway, we will still deal with these further matters, albeit in short order.

1405.  The 3 issues are:

(1)    Inflation;

(2)    Compound interest;

(3)    Simple interest.

**Inflation**

1406.  The CR postulates that, had the Class Members not been overcharged, they would have more money than otherwise at the time. In relation to that extra money, they would either have saved it or they would have spent it. Mr Parker has used Class Members' marginal propensity to consume ("MPC") to conclude that of the extra money in any given month, 38% of it would have been spent and the balance of 62% would have been saved.

1407.  As for the money spent, the CR contends that the appropriate way to compensate Class Members for not having had the use of that extra money at the time of their notional spending, is not by an award of interest. Rather it is to compensate them on the basis that it would now cost significantly more to purchase the goods or services that they otherwise would have purchased in the claim period because of inflation. Such compensation would be achieved by uprating the relevant portion of damages for inflation by use of the CPI Index.

1408.  The principal question here, in our view, is whether such a claim to compensate for inflation is permissible as a matter of law at all, in this context. There is no authority to suggest that it is.

1409.  Thus, for example, the *Judicial College Guidelines for the Assessment of General Damages in Personal Injury Cases* regularly revises its suggested awards to take account of the changes in the value of sterling. Equally, where the issue relates to damages to compensate the claimant in a personal injury or clinical negligence case for future loss in respect of expenses yet to be incurred, the Court will consider the likely costs as at the date of the judgment rather than the date of the underlying breach of duty. The case before us is quite different from those examples.

1410.  Nonetheless, the CR prays in aid the general principle of "full compensation". However, that simply describes the requirement that the successful claimant should be put in the same position they would have been in had the tort or breach of contract not occurred. It is not a mandate for uprating damages for inflation.

1411.  The CR also relies upon what was said by the Tribunal in *Merricks v MasterCard* [2021] CAT 28 ("*Merricks Remittal*"). The context here was whether the Tribunal was in a position to award compound interest on an aggregate basis which arose for consideration on the application for a CPO. At paragraph 87, the Tribunal, following the decision of the Supreme Court in *Sempra Metals v IRC* [2008] 1 AC 561 noted as follows:

> "We therefore do not accept as an accurate reflection of the legal position the submission of Ms Demetriou that compound interest is "parasitic" on primary loss. That is correct only in that if there is no primary loss, then there can be no claim for compound interest. But under the Sempra Metals principle, compound interest constitutes a distinct head of loss, which must be separately established and cannot be presumed. In that regard, it is fundamentally different from the award of simple interest under statute."

1412.  The Tribunal then considered if there was a sufficient basis for it to be able to award compound interest in the collective proceedings if it decided to award damages. It considered that there were different ways of calculating compound interest on an aggregate basis . So, for example, it stated at paragraph 92:

> "The problem with both approaches is not any limitation on the data that might be available. As the SC Judgment made clear, that is not a basis for denying certification: the Tribunal has to do its best with the data that is available. But the first approach is based on the assumption that anyone who was a saver or a borrower would have used the small amount by which each of their purchases would have been cheaper (i.e. in the absence of the Overcharge) to reduce their borrowings or add to their savings. The second approach rests on the same assumption limited only to borrowers. However, as Ms Demetriou recognised in her oral submissions, the relevant question is: "if [the class members] hadn't suffered the overcharge, what would they have done with the additional money that they would have received?" Both the above approaches assume the answer to this question and fail to take account of the need to show, as a matter of probability, that the money would not have been used simply for a little extra expenditure. Indeed, if either approach was valid, it would mean that most claims for monetary loss by individuals in the courts would result in an award of compound interest. But that is manifestly not the position."

1413.  The CR refers to the reference to extra expenditure in support of his contention that damages should be uprated by inflation but as the full paragraph shows, all the Tribunal was doing was to point out that, with the putative extra money available to Class Members, it did not follow that they would have saved all of it, as opposed to spending it. So this decision is no support for the CR's position.

1414.  We should add here that in the end, the Tribunal held that any claim for compound interest would be outwith the Collective Proceedings:

> "96 In this regard, s.47C(2) which enables the Tribunal to award damages on an aggregate basis and on which Ms Demetriou placed great emphasis, does not assist. If there was a credible or plausible means of estimating the aggregate Overcharge paid each year by the proportion of the class that is likely to be entitled to compound interest on a Sempra Metals basis, we do not suggest that each relevant class member would have to establish his or her claim to compound interest on an individual basis.
>
> 97 In the SC Judgment, Lord Briggs, for the majority, held that the requirement of suitability of a claim for aggregate damages in r.79(2)(f) is to be interpreted in a relative sense, meaning "suitable for an award of aggregate rather than individual damages". We consider that in the absence of a credible or plausible method

of estimating what loss by way of compound interest was suffered on an aggregate basis, this head of claim is not suitable for an aggregate award. We have regard to the various factors set out under r.79(2). It is accepted, in the light of the SC Judgment, that the claim for the principal loss is suitable for collective proceedings. But unlike the claim for the Overcharge, we consider that the claim here for loss by way of compound interest cannot be fairly resolved in these collective proceedings. Accordingly, we find that it is not suitable for collective proceedings and should be excluded. The class members will of course remain entitled to seek simple interest under statute."

1415. For all of those reasons, and as a matter of principle, we would have rejected the claim for damages to be uprated for inflation. What is left, therefore, is an award of interest.

## Compound Interest

1416. As we have already noted, the Tribunal in *Merricks Remittal* was careful to note the restrictions on an award of compound interest as laid down in *Sempra Metals*. There can therefore be no doubt that *Sempra Metals* applies just as much to cases such as that before us as to cases outside the competition arena.

1417. However, the CR maintains that compound interest can be awarded on an aggregate basis here. At paragraph 749 of his Closing, he refers to what the Tribunal said in *Royal Mail v DAF Trucks* [2023] 5 CMLR 6. Here, we would refer to the following important paragraphs of its judgment:

"762 For some reason, lawyers and judges seem particularly averse to compound interest. By contrast, economists have no problem with compound interest as it is what happens in the real world in borrowing and lending arrangements. Both experts seemed to agree that it properly captures what Mr Earwaker described as the "the real-life consequences that Royal Mail would have suffered". Mr Delamer did not disagree but said that he thought this was a legal issue and therefore was outside of his expertise…

764 Mr Lask, who made submissions on this topic and tax on behalf of the Claimants, referred to the helpful summary of the position by Males J (as he then was) in Equitas Ltd v Walsham Brothers & Co Ltd [2013] EWHC 3264 at [123]. This included the following:
"ii) Second unless there is some positive reason to do otherwise, the law will proceed on the basis, at any rate in the commercial context, that a claimant kept out of its money has suffered losses as a result. That represents commercial reality and everyday experience. Specific evidence to that effect is not required and, even if adduced, may well be somewhat hypothetical and thus of little assistance…Accordingly the question in such a case is not whether a loss has been suffered, but how best that loss should be measured.
…
v) If a conventional borrowing cost is to be adopted in this way, the question whether interest should be simple or compound answers itself. While simple interest has the virtue of simplicity as Lord Hope observed, it also has the certainty of error and injustice. As their Lordships noted, it is impossible to borrow commercially on simple interest terms. I respectfully agree with Lord Nicholls that the law must recognise and give effect to this reality if it is to achieve a fair and just outcome when assessing financial loss. To conclude that, at least in a typical commercial case, the normal and conventional measure
of damages for breach of an obligation to remit funds consists of compound interest at a conventional rate is therefore both principled and predictable, as well as being in accordance with what was actually awarded in Sempra Metals."
In the light of those comments it is perhaps surprising that compound interest is not ordered more often and the law still seems to be wedded to simple interest.

767 As to the alleged lack of evidence, Males J's comments in Equitas Ltd v Walsham Brothers & Co Ltd [2013] EWHC 3264 are relevant and in any event the sort of evidence that DAF are demanding would be hypothetical. There is ample evidence before the court and considered by the experts as to what Royal Mail actually did at the time in terms of investment and debt finance. For example, Mr Jeavons referred to Royal Mail having borrowed from the Government at a rate of 12%

> 768 We have no difficulty in favouring a compound interest calculation over simple interest. This accords with economic reality and there is no legal bar to compounding the appropriate interest rate that we find to be applicable. This is what happens in the real world and it therefore corresponds to Royal Mail's actual losses. If it is appropriate to charge interest on a financial transaction, then it is self-evidently appropriate to apply interest also on any interest that has accrued between one period and another."

1418. Since it is obviously the case that the Tribunal has the power to award compound interest the question is whether it can or should do so here.

1419. In our judgment, the fact that in collective proceedings, damages are to be assessed on an aggregate basis does not mean that there can be claims for compound interest which are not specifically evidenced in some way, as they clearly were in *Royal Mail* and as they clearly were not in *Merricks Remittal*.

1420. That approach is supported by what the Tribunal said in *UK Trucks Claims Ltd v Stellantis and others* [2022] CAT 25, where it approved a CPO on an opt-in basis. Here there was a claim for compound interest by the proposed class members in respect of their acquisition of new vehicles on finance by using a personal contract purchase or a hire purchase agreement. It was proposed to identify the proportion of vehicles purchased using finance rather than cash, and then to obtain information about the average period over which new vehicles were held under the financing arrangement and the average rate of interest for new car finance. This was the evidence in support of an award of compound interest.

1421. Nonetheless, at paragraph 91, the Tribunal said this:

> "Whilst the class in both of the present cases is very significantly smaller than in Merricks, the amount referable to each PCM is significantly greater and, as we have observed, the inclusion of compound interest makes a substantial difference in financial terms. Although the factual circumstances of some PCMs may support a claim for compound interest, those of other PCMs may not. In the counterfactual where they were not subject to an overcharge, some PCMs may have used the money they therefore did not have to spend on trucks (i.e. their avoided expenditure) to reduce borrowings (including financing costs of the trucks) and accordingly suffered a loss by way of additional payment of compound interest. But others may have used this money to increase expenditure on other aspects of their business. Accordingly, the fact that the PCMs here are businesses not consumers does not, in our view, mean that they are necessarily entitled to compound interest on the primary damages."

1422. In our case, what Mr Parker did to support the claim for compound interest is set out at paragraph 7.125-7.132 of DP3. Here, he explained why it would be appropriate to award any interest on a compound basis, by reference to the interest payable on typical savings accounts or the interest due on credit cards. At paragraph 7.130 he said that these examples illustrate that compound interest is clearly more reflective of real-world lending and borrowing.

1423. We see all of that, but it is a submission which could be made in virtually any case. However, it does not conform to the strict evidential requirements laid down in *Sempra Metals*. Accordingly, had it been necessary to award interest, it would not have been open to us to do so on a compound basis. We reach that conclusion with no particular enthusiasm, given that, as the Tribunal observed

in *Royal Mail*, to restrict the award of compound interest does not reflect the prominence of compound interest in the real world. Not to compensate consumers here seems anomalous.

**Calculation of simple interest**

1424.   BT proposes that simple interest should be awarded at the rate of 2% above base rate for the relevant periods. This conventional approach, where the claimant is an individual, has been accepted by the Tribunal in other competition cases.

1425.   However, the CR proposes a different approach to calculating simple interest. See paragraphs 7.114-7.120 of DP3. What Mr Parker did here was to consider a mix of savings and debt which would apply typically to Class Members. In fact, his approach would apply to anyone, with the qualification that he took into account the age distribution of Class Members. He relied upon data from the ONS' Wealth and Assets Survey which included information on the average distribution of assets and liabilities across various categories of savings and debt for the UK population. He also looked at data available on the average rate of interest incurred on different categories of savings and debt from a range of publicly available sources. He combined this with the estimated distribution of assets and liabilities for an average Class Member across different categories of savings and debt to allow for a weighted-average rate of interest to be calculated. The ultimate rates of interest entailed by this exercise are shown at Table 34 of DP3. The lowest rate was -3.09% in 2018 which was the only year for a negative rate, and otherwise the rate varied between 2.34% and 10.15%. On any view, the total interest which would result would be significantly in excess of an award based on 2% above base.

1426.   There was discussion about this approach in the hot tub on Day 22/63-70. A number of valid points were made by Dr Jenkins as to why this approach could be wrong, including assumptions about asset mix, the reality of part-payment of mortgages where the amount of extra money was relatively small, and factors of that kind.

1427.   We consider that the better, and much less complex approach is the conventional one under Section 35A of the Senior Courts Act 1981. Accordingly, we would have awarded interest at the rate of 2% above base.

## OVERALL CONCLUSION

1428.   In the event, and for the reasons given above, this claim must be dismissed. We are extremely grateful to Counsel for their most helpful submissions and assistance throughout the trial, as we are to the parties' legal teams generally.

The Hon. Mr Justice Waksman                    Eamonn Doran                    Derek Ridyard
Chair

Charles Dhanowa O.B.E., K.C. (Hon)                        Date: 19 December 2024
Registrar



Neutral Citation Number: [2024] EWHC 2710 (Ch)

FL-2020-000051

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**FINANCIAL LIST (CH D)**

**25 October 2024**

Before:

**MR JUSTICE LEECH**

- - - - - - - - - - - - - - - - - - - - -

**B E T W E E N:**

**ALLIANZ FUNDS MULTI-STRATEGY TRUST**          **Claimants**
**(on behalf of ALLIANZGI BEST STYLES**
**GLOBAL EQUITY FUND) AND OTHERS**

**- and –**

**BARCLAYS PLC**          **Defendant**

- - - - - - - - - - - - - - - - - - - - -

**MS HELEN DAVIES KC, MR MICHAEL WATKINS** and **MR TOM FOXTON** (instructed by **Latham & Watkins (London) LLP**) appeared on behalf of the Defendant.

**MR JONATHAN NASH KC, MR ALEX BARDEN** and **MS CAROLA BINNEY** (instructed by **Signature Litigation LLP**) appeared on behalf of the Claimants.

**Hearing dates: 22-23 July 2024**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**This judgment was handed down remotely at 10.30am on 25th October 2024 by circulation to the parties or their representatives by email and by release to the National Archives.**

**Mr Justice Leech:**

## I.   The Applications

1.   By Application Notice dated 28 March 2024 (the "**Strike Out Application**") the Defendant, Barclays plc (the "**Bank**"), applied to strike out 241 of the Claimants' claims under section 90A ("**S.90A**") and Schedule 10A ("**Schedule 10A**") of the Financial Services and Markets 2000 ("**FSMA**") on the basis that the Claim Form and Particulars of Claim disclosed no reasonable cause of action in relation to those individual claims or, alternatively, for summary judgment under CPR Part 24.2 because those claims have no real prospect of success. The Strike Out Application was supported by the fourth witness statement of Mr Oliver Middleton also dated 28 March 2024 ("**Middleton 4**"). Mr Middleton is a partner in Latham & Watkins LLP ("**Latham & Watkins**"), the Bank's solicitors.

2.   The Bank's case was (and is) that the Claimants do not allege and cannot prove that the relevant funds or sub-funds acquired, continued to hold or disposed of the Bank's shares in reliance on published information within the meaning of Schedule 10A, paragraph 3 ("**Paragraph 3**"). It was also the Bank's case (and remains its case) that the Claimants have not alleged and cannot prove that they suffered loss as a result of a delay by the Bank in publishing information within the meaning of Schedule 10A, paragraph 5 ("**Paragraph 5**"). The Bank does not apply to strike out any of the Claimants' claims under section 90 ("**S.90**").

3.   On 30 May 2024 the Claimants filed the fifth witness statement of Ms Rebecca Hogan in answer to the Strike Out Application and on 26 June 2024 they filed an amended version of that witness statement ("**Hogan 5**"). Ms Hogan is a partner in Signature Litigation LLP ("**Signature**"), the Claimants' solicitors, and she exhibited the expert's report of Mr Riccardo Curcio dated 17 December 2021 and the expert's report of Dr Andrew Hildreth also dated 17 December 2021 which had been filed or exchanged in the *RSA Litigation*. The Bank pointed out that the Court had not granted permission to the Claimants to rely on expert evidence but did not object to the Court considering it.

4.   By Application Notice dated 26 June 2024 the Claimants applied for permission to amend their Particulars of Claim and their Particulars of Quantum (the "**Amendment**

**Application**"). The Claimants did not apply to amend their case in relation to Paragraph 3 but to amend their case in relation to Paragraph 5 and the parties were agreed that the Court could deal with this application at the hearing of the Strike Out Application. Ms Helen Davies KC, who appeared with Mr Michael Watkins and Mr Tom Foxton on behalf of the Bank, approached the Strike Out Application on the assumption that the Court could consider the proposed amendments in deciding whether to strike out the relevant claims or to grant reverse summary judgment and I do the same. When I refer to the "**Particulars of Claim**" and the "**Particulars of Quantum**" or "**POQ**", therefore, I intend to refer to the draft Amended Particulars of Claim and the draft amended Particulars of Quantum for which the Claimants applied for permission to amend.

## II.    Background

5.    I set out the detailed background to this action and its procedural history in my judgment on the Claimants' applications to amend the names of individual Claimants in the Claim Form and the Particulars of Claim and to substitute a number of additional Claimants: see [2023] EWHC 2015 (Ch) at [1] to [44]. I also set out the procedural developments between that judgment and the first Case Management Conference ("**CMC1**") in my judgment dated 12 January 2024 following that hearing: see [2024] EWHC 235 (Ch) at [1] to [7]. In relation to the issue of reliance I ordered 20 Claimants to complete the Reliance Questionnaire and 80 Claimants to complete the Reliance Questionnaire Lite: see [8] to [18]. I brought the procedural developments up to date in my judgment dated 2 July 2024 following the second case management conference ("**CMC2**"): see [2024] EWHC 2124 (Ch).

6.    In this judgment, I adopt the defined terms and abbreviations which I have used in each of the three earlier judgments. It should be obvious from the context what those terms mean without the need to repeat those definitions here. Further, the issues which I have to decide on the two applications before me and my reasoning ought to be intelligible to any reader without the need to repeat the detailed background and procedural history again. However, if there is any doubt about the meaning of the terms which I use or the background to the present applications, I refer the reader to the passages which I have identified above.

7.    In considering the case management issues raised by the parties, I will also have to refer

to the terms of the Order dated 11 and 12 January 2024 which I made after CMC1 (the "**CMC1 Order**") and the terms of the Order dated 1 and 2 July 2024 which I made after CMC2 (the "**CMC2 Order**"). But, again, if there is any doubt about the effect of those Orders or the context in which I made them, I refer to the judgments which I gave following each hearing.

## III.    The Statements of Case

A.    The Claimants' Case

*(1)    The Particulars of Claim*

8.    In section A of the Particulars of Claim the Claimants set out the factual basis for the claims. On 26 June 2014 the Bank issued an RNS to the London Stock Exchange disclosing that the Attorney General of the State of New York had made the Complaint against the Bank. By close of trading on 1 February 2016 the price of the Bank's ordinary shares had fallen from £1.86 a share to £1.828 a share.  On 31 January 2016 the Bank entered into a settlement agreement with the NYAG and submitted to the SEC Order under which the Bank agreed to pay US \$35 million to the State of New York and US \$35 million to the SEC. In relation to themselves the Claimants allege as follows:

> "3. The Claimants are investors who acquired, continued to hold and/or disposed of ordinary shares issued by Barclays Plc and admitted to trading on the London Stock Exchange during the Relevant Period, and/or interests therein. For the purposes of these Amended Particulars, references to such shares include references to interests therein. The details of the Claimants are set out in Appendix A.
>
> 4. Some of the Claimants acquired shares pursuant to a rights issue carried out in September 2013 by which Barclays Plc raised approximately £5.8 billion by way of additional share capital ("**the Rights Issue**"). The Rights Issue proceeded by way of prospectus dated 16 September 2013 ("**the Prospectus**")."

9.    Section B sets out the relevant legal regime. The Claimants allege that the Bank's shares were relevant securities for the purposes of section 90 of FSMA ("**S.90**") and S.90A and that the Prospectus was a prospectus in respect of relevant securities for the purposes of S.90. They also allege that the Bank was under an obligation to disclose inside information on a recognised information service without delay under the Disclosure, Guidance and Transparency Rules (the "**DTR**").

Approved Judgment: Leech J          **Various Claimants v Barclays Bank PLC FL 2020 000051**

10.   In section C the Claimants allege that the Bank operated a "dark pool" trading system known as "Barclays LX" or "LX Liquidity Cross" ("**LX**") which formed part of its Equities Electronic Trading Division ("**EETD**"). They allege that the Bank made false representations to the public, clients and market participants about the extent of the high frequency trading in its dark pool and its safety as a trading environment and that the Bank promoted its "Liquidity Profiling" service as providing protection from predatory trading whereas in fact it did not apply Liquidity Profiling to certain categories of trading or overrode it altogether. They also allege that the Bank made false representations about the algorithms which it used and its smart order router system whereas, in truth, it directed orders into its dark pool where they were executed by high frequency traders or routed to other trading venues which favour the Bank.

11.   The Claimants make a number of specific allegations about the operation of the dark pool. They go on to allege that the Bank claimed to have "End to End Client Protection" in place which protected client orders and minimised information leakage whereas in truth it was operating its algorithms, smart order router and dark pool to favour high frequency trading, that it did not subscribe to a direct market data feed in breach of a US financial regulation imposed by the SEC, that it did not monitor credit and capital thresholds, that it failed to restrict access to confidential trading information to the appropriate employees, that it failed to provide required information to the SEC and that this conduct amounted to violations of US state and federal laws. I consider some of the specific allegations in the more detailed analysis below.

12.   In section D the Claimants set out the detailed reasons why the Bank was under an obligation to disclose the true facts about the LX trading system pleaded in section C in published information to which Schedule 10A applied. In particular, they allege that those facts gave rise to a principal risk or uncertainty which required a fair review of the Bank's business for the purposes of the DTR, Rules 4.1.8 and 4.2.7: see paragraph 55. They then continue:

> "57. Accordingly, for the reasons set out in this Section D:
>
> a. Barclays was at all material times during the Relevant Period under an obligation to announce to the market via an RIS the matters set out in Section C above.
>
> b. Barclays was under an obligation to include the matters set out in Section C above in the Prospectus.

c. Barclays was at all material times during the Relevant Period under an obligation to include the matters set out in Section C above in its management reports and interim management reports.

58. For the avoidance of doubt, Barclays' announcement on 26 June 2014 did not amount to an announcement to the market of the matters set out in Section C above. To the contrary, that announcement did not set out those matters, and did not accept that any of them were true, as it should have done. Barclays subsequently maintained the public position, as recorded in Mr King's speech referred to at paragraph 9 above, that following internal investigation the allegations were not justified."

13.    In section E the Claimants set out particulars of the false and misleading statements which they allege that the Bank made in its 2011, 2012, 2013 and 2014 annual reports, its 2011, 2012, 2013 and 2014 interim results announcements and in the Prospectus. They then continue as follows (and in the passage below they propose to amend to add the word "dishonestly" in paragraph 69):

"67. The matters set out in Section E1 amounted to the inclusion of untrue and/or misleading statements in Barclays Plc's published information within the meaning of paragraph 3(1)(b)(i) of Schedule 10A.

68. Further or alternatively, the omission to include within Barclays Plc's published information during the Relevant Period the matters set out in Section C above amounted to an omission from that published information of any matter required to be included in it, within the meaning of paragraph 3(1)(b)(ii) of Schedule 10A.

69. Further or alternatively, Barclays Plc dishonestly delayed throughout the relevant period the inclusion in its published information of the matters set out in Section C above, within the meaning of paragraph 5(1)(b) of Schedule 10A."

14.    The Claimants allege that Mr William White, who was the head of the EETD, the Managing Director and Global Head of Product Development and Platforms for Markets and also a member of the Bank's Markets Executive Committee, was a person discharging managerial responsibility (a "**PDMR**"), that he acted dishonestly in causing or permitting the Bank not to disclose the true facts about LX in its published information during the relevant period and that this also amounted to dishonest concealment of material facts. The Claimants also propose to amend to allege that this "amounted to dishonest delay in the publication of such information". Finally, they also allege that he made the untrue and misleading statements set out in section E. They make very similar allegations against Mr Thomas King from 8 September 2014 (at the latest) and allege that it is likely that other PDMRs were guilty of the same misconduct.

15.    Section F is headed "Loss and Damage" and in this section the Claimants allege that they
relied upon the Bank's published information:

> "82. The Claimants purchased and/or continued to hold shares in reliance
> on Barclays Plc's published information. In support of this averment the
> Claimants are entitled to rely on a presumption of reliance, namely that it
> is to be inferred that they were induced or influenced in their investment
> decisions by Barclays Plc's misstatements and omissions, in circumstances
> where those misstatements and omissions were, for the reasons set out
> above, matters which were likely to play a part in the decision-making of
> a reasonable investor. Further and in any event, it was reasonable for them
> to rely on that published information in circumstances where Barclays Plc
> did not issue any correction or disclose the matters set out in Section C
> above.
>
> 83. Had Barclays Plc not delayed and/or omitted to publish to the market
> the matters set out in Section C above, and/or had Barclays not made the
> misstatements set out in Section E1 above:
>
> a. The Claimants would not have purchased Barclays Plc ordinary shares
> in the Relevant Period. Further or alternatively, any Barclays Plc ordinary
> shares they did acquire would have been acquired at a lower price.
>
> b. The Claimants would have disposed of their Barclays Plc shares at a
> higher price. In particular, had prompt disclosure been made of the position
> at the earliest possible opportunity, although it is likely that there would
> have been some fall in the share price, that fall would not have been as
> great as it was following the NYAG's 25 June 2014 announcement or its
> 1 February 2016 announcement."

16.    Finally, the Claimants allege that they suffered loss and damage as a result of the untrue
or misleading statements made by the Bank in its published information. In particular,
they allege that from (at least) 2011 the market price for the Bank's ordinary shares was
artificially inflated and in excess of their true value and rely on the falls in the market
value of those shares following the publication or disclosure of the Complaint and the
SEC Order.

*(2)    The Particulars of Reliance*

17.    On 24 November 2023 the Claimants served a document headed "Claimants' Particulars
of Reliance Categories" (the "**POR**") and in paragraph 1 they stated that the purpose of
these particulars was to set out three categories into which the respective cases on reliance
of the different Claimants and sub-funds could be divided together with a brief
description of the nature of the reliance falling within each sub-category. In paragraph 3
they set out a number of reservations including the statement that the categories were

without prejudice to the Claimants' case that it was unnecessary to show reliance in relation to claims under Paragraph 5 and S.90. They also defined "**Published Information**" for the purpose of their pleaded case as "all of Barclays Plc's published information referred to in the Particulars of Claim, including the Prospectus where relevant". Under the heading "The Claimants' Reliance – General" the Claimants then pleaded as follows:

> "4. As set out at paragraph 82 of the Particulars of Claim:
>
> a. Each of the Claimants purchased and/or continued to hold ordinary shares in Barclays Plc in reliance on Barclays Plc's Published Information.
>
> b. The Claimants are entitled to rely on a presumption of reliance, namely that where Barclays Plc's misstatements in, and omissions from, its Published Information were such as likely to induce or influence the making and/or holding of investments by a reasonable investor in Barclays shares, it is to be inferred that any such investor was in fact induced or influenced by such matters. In this respect:
>
> i. The Published Information in this case was (both generally and in relation to the specific matters of complaint), and/or the relevant statements in, omissions from, and/or delays in the production of, the Published Information were, of a nature which was likely to play a part in the making and/or holding of investments by a reasonable investor, given the seriousness and potential consequences of the relevant matters.
>
> ii. In light of the presumption, service of these Particulars of Reliance Categories is without prejudice to the question of what facts, if any, a Claimant is required to prove in relation to reliance.
>
> c. It was in any event reasonable for each of the Claimants to rely on the Published Information during the whole of the Relevant Period, in circumstances where Barclays Plc did not disclose the relevant matters, and did not issue any relevant correction or clarification."

18.  The Claimants allege that they were all professionally managed institutional investors with different investment processes and that a particular Claimant or sub-fund might fall into more than one category. They also allege that as a matter of statutory construction S.90 and S.90A were intended to grant a remedy to investors whose investment processes are wholly or partially "passive", "index-linked or "tracking" in nature for a number of reasons including the fact that at all relevant times a substantial proportion of investors fell within those categories.

(i)    Category A

19.  The POR then go on to identify three categories of Claimants. The first category

("**Category A**") consists of those Claimants who read and relied on the relevant Published Information directly "in that they read and considered Barclays Plc's relevant Published Information".

(ii)    Category B

20.    The second category ("**Category B**") consists of those Claimants who relied on the relevant Published Information indirectly through other sources which acted as a conduit for the substantive contents of the Published Information. The Claimants provide the following, non-exhaustive particulars of the sources which provided the conduit through which they relied on the Published Information and the activities which they allege amounted to reliance:

> "a. Reviewing transcripts of investor relations calls between Barclays Plc (or its agents or advisers) and financial professionals such as investment analysts, in which the contents of Published Information were the subject of discussion and questions.
>
> b. Meetings and/or discussions with Barclays Plc (or its agents or advisers) which covered matters contained in the Published Information and in which Barclays Plc itself relied on or referred to the Published Information.
>
> c. Reviewing the reports of brokers or financial analysts in relation to Barclays Plc (including "buy", "hold" and "sell" recommendations) which themselves relied upon or referred to the Published Information.
>
> d. Meetings with brokers or financial analysts to discuss Barclays Plc where such brokers or analysts relied upon or referred to the Published Information.
>
> e. Reviewing news reports and/or financial data and/or analysis from news or investment information outlets which themselves relied on or referred to the Published Information."

(iii)   Category C

21.    The third category ("**Category C**"), which is the most important for present purposes, consists of Claimants who are alleged to have suffered losses as a consequence of movements in the share price of the Bank. The POR describe Category C as exhibiting "**Price/Market Reliance**" and they plead that Category C Claimants relied on the Published Information in the following sense:

> "12. Claimants or Sub-Funds in Category C relied on the relevant Published Information in that:

a. Their investment processes proceeded on the basis that:

i. Barclays Plc was a FTSE listed entity required to produce Published Information compliant with the relevant requirements. As set out in paragraph 5 above, such Published Information would therefore include all relevant negative information and would be correct, complete, timely, true and fair; and/or

ii. Barclays Plc's share price (and/or the movement therein) on the London Stock Exchange would reflect the contents of the Published Information, and would thus take account of all information included in the Published Information, including any negative information.

b. In their investment processes, they took account of Barclays Plc's share price (and/or any movements therein) and/or its status as a listed issuer with relevant obligations as set out in paragraph 5 above, including:

i. By making judgments and/or including Barclays Plc within its investment processes on the basis that Barclays Plc was a listed issuer with relevant obligations as set out at paragraph 5 above; and/or

ii. By making judgments taking into account the price and any relevant movements; and/or

iii. By including and/or by taking account of such matters within an algorithm or other numerically-driven system or decision-making process; and/or

iv. By taking account of such matters and/or their effect on Barclays Plc's market capitalisation as the constituent of an index or benchmark (such as the FTSE 100 or FTSE 250) – for example by adjusting its holding in Barclays Plc shares to "track" the value of Barclays Plc shares as a proportion of the total value of the FTSE 100 or FTSE 250.

13. In this regard, and so far as necessary, it will be the Claimants' case that:

a. The LSE is (alternatively, that the Claimants proceeded on the basis that it is) an efficient market in which the price of Barclays Plc's shares was determined and/or influenced by the contents of its Published Information including the omission of relevant matters from Published Information).

b. By behaving in the manner set out above, they relied indirectly on Barclays Plc's Published Information.

c. It was reasonable for an investor to rely on the share price of Barclays Plc in the manner set out above, as reflecting the contents of Barclays Plc's Published Information."

22.  In their Skeleton Argument dated 17 July 2024 Ms Davies, Mr Watkins and Mr Foxton stated that on the face of the pleadings 241 of the funds or sub-funds whom the Claimants represent or constitute fall within Category C and that their claims were alleged to be worth £330 million. In their Skeleton Argument dated 18 July 2024 Mr Nash, Mr Barden and Ms Binney accepted these figures and also stated that there are 219 funds or sub-

funds which fall within Categories A and B and that their claims are worth £210 million. Hogan 5 (below) provides further information about the claims.

*(3)    The Particulars of Quantum*

23.    The Claimants allege that the fraud measure of loss is applicable to their claims under S.90A and that they are entitled to be put in the position in which they would have been had they not purchased or continued to hold shares in the Bank in reliance on the Published Information during the "**Relevant Period**" (defined as 1 January 2011 to 1 February 2016) or if the Bank had not delayed in publishing information regarding the relevant misconduct. They plead that damages should be assessed by two alternative measures:

> "5. The Claimants therefore claim (in summary) the difference between (i) the price paid for the Barclays Plc shares or (depending on when acquired) the value of the shares when the relevant Claimant continued to hold such shares in reliance on the Published Information (as the case may be); and (ii) the price of the Barclays Plc shares when sold or (depending on when sold) the value of the shares following the disclosure of at least part of the misconduct identified in the Amended Particulars of Claim to the market ("**Measure 1**") (Section D below).
>
> 6. With respect to the dates on which at least part of the misconduct became known to the market, the Claimants rely on the following dates ("**the Relevant Dates**"):
>
> a. 26 June 2014 (the date the filing of the NYAG Complaint was announced by RNS) ("**Relevant Date 1**"); and
>
> b. 1 February 2016 (the date the NYAG Settlement Agreement was announced by RNS) ("**Relevant Date 2**").
>
> 7. Each Claimant also relies on an alternative measure of loss, calculated by reference to the amount of the inflation in the market price of Barclays Plc shares associated with the misrepresentations and omissions alleged in the Amended Particulars of Claim (the "**Misleading Information**") and/or with Barclays Plc's delay in disclosing the true position. On this alternative measure, the Claimants' loss is calculated as the product of the amount of the inflation in the share price arising from the matters revealed on 25 June 2014 and/or 1 February 2016 and the number of Barclays Plc shares held on the associated Relevant Date (Section E below)."

24.    It is unnecessary to set out the detailed way in which both measures are developed in the POQ and, for present purposes, it is sufficient to note that the Claimants accept that the assessment and calculation of their losses requires them to persuade the Court to accept a particular methodology and to make a number of assumptions in their favour:

"8. In order to compare sale and purchase prices for Barclays Plc shares, it is necessary to match sale and purchase pairs. Because Barclays Plc shares are fungible, this requires the application of a matching methodology. Each Claimant relies on a 'last in, first out' ("**LIFO**") method for matching share sales with prior purchases so as to identify 'purchase-sale pairs' ("**PSPs**"). The case for each Claimant is also set out by reference to two further, alternative matching methodologies: (i) weighted average ("**WA**") and (ii) 'first in, first out' ("**FIFO**").

9. In summary, these methodologies operate as follows:

a. <u>LIFO matching</u> – sales of Barclays Plc shares are matched to the most recent shares purchased prior to the sale in question. The LIFO matching process is repeated until the sold shares are fully allocated to a previous purchase or purchases. Once purchased shares are matched to sold shares, they are removed from the holding inventory when matching to subsequent share sales.

b. <u>WA matching</u> – it is assumed that Barclays Plc shares sold are sold in proportion to the relative percentages of shares in a Claimant's portfolio up until the date of the sale in question. By way of an example:

i. On a given date, a Claimant holds 500 shares in total: (i) 200 shares purchased on a given date ("**Day One**"); (ii) 100 shares purchased on a day following Day One ("**Day Two**"); and (iii) a further 200 shares purchased on a date following Day Two ("**Day Three**").

ii. On the given date after Day Three, the Claimant sells 50 shares.

iii. Applying WA matching: (i) 20 of the 50 shares sold are assumed to be shares that were purchased on Day One; and (ii) 10 and 20, respectively, of the remaining 30 shares sold are assumed to be shares that were purchased on Day Two and Day Three.

c. <u>FIFO matching</u> – sales of Barclays Plc shares are matched to the oldest shares purchased prior to the date in question. The FIFO matching process is repeated until the sold shares are fully allocated to a previous purchase or purchases. Once purchased shares are matched to sold shares, they are removed from the holding inventory when matching to subsequent share sales."

*(4)    Reliance Questionnaires*

25. In the CMC1 Order, I ordered the Claimants to answer 20 Full Reliance Questionnaires and 80 Reliance Lite Questionnaires to be selected equally by the parties. Five of the Claimants who completed Full Reliance Questionnaires advanced a case based on Price/Market Reliance only. C68, the DBX ETF Trust, answered the following questions in the questionnaire with the following answers (and the answers given are set out in bold):

"1. Does the Claimant or Sub-Fund advance a case that, in acquiring, holding or disposing of shares in Barclays plc ("Barclays Shares"), it relied

on specific statements in Published Information alleged to be untrue or misleading, or on the impression created by specific statements read together? **No.**

2. Does the Claimant or Sub-Fund advance a case that, in acquiring, holding or disposing of Barclays Shares, it relied on documents comprising Published Information as a whole?  **No.**"

"4. Does the Claimant or Sub-Fund advance a case that it relied indirectly by means of other sources of information that acted as a conduit for the substantive contents of the Published Information? **No. Not applicable.**"

"5. Does the Claimant or Sub-Fund advance a case that: (i) it knew of and relied on the price of Barclays Shares in acquiring, holding or disposing of Barclays Shares; and (ii) it believed that the prevailing market price of Barclays Shares reflected the value of those shares based on the information disclosed by Barclays being true and complete? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**Yes. The fund tracked an index in the period 1 January 2011 – 1 February 2016 -XTRKR MSCI ALL COUNTRY WORLD US Dollar Hedged Index. XTRKR MSCI ALL COUNTRY WORLD US Dollar Hedged Index hedges to USD the current exposures of its parent index, the ALL COUNTRY WORLD. The ALL COUNTRY WORLD Index is weighted by market capitalization.  Tracking was carried out by an adviser DBX Advisers LLC. The fund's portfolio was re-balanced quarterly during the Relevant Period.**

6. Does the Claimant or Sub-Fund advance a case that it relied on Barclays' status as a listed issuer with relevant obligations as pleaded in paragraph 5 of the PORC? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**Which Individual: an adviser DBX Advisers LLC.**

**When: Reliance occurred each time an investment decision was taken in respect of Barclays Shares, including decisions to initiate the transactions identified in the Trading Data.**"

"7. Does the Claimant or Sub-Fund advance a case of reliance based on a general or invariable practice of reviewing information of a similar nature to the Published Information before making an investment decision? **No.**

If yes, when and by which individual did the Claimant so rely? **Not applicable.**

8. Does the Claimant or Sub-Fund advance a case based only on reliance on alleged material omissions from the Published Information? **No.**

If yes, when and by which individual did the Claimant so rely?

**The Claimant does not advance a case based only on reliance on**

alleged material omissions from the Published Information (an "Omissions Case"). The Claimant advances an Omissions Case in addition to the other reliance cases identified in these. As to the Claimant's Omissions Case, the information provided in the Answers to Questions 5 to 6 is repeated.

9. Does the Claimant or Sub-Fund rely on specific communications with the Defendant (including in meetings)?

**No.**

If yes, when and between whom (and where in the case of meetings) did the communications and meetings take place? **N/A.**

10. On the basis of what (if any) facts and matters which do not necessarily apply to all Claimants does the Claimant or Sub-Fund say that its reliance was reasonable? **None.**

11. If the Claimant or Sub-Fund has answered yes to any of Questions 1 to 9 above, will it be able to give disclosure in relation to the case it advances?

**No. It is unlikely that this Claimant would have any relevant documents**."

26.     C95, the Folksam Ömsesidig Livförsäkring Livak, also completed a Full Reliance Questionnaire. It answered Questions 1, 2 and 4 in the same way as C68 and answered Questions 7 to 10 either "No" or "Not applicable". It answered Questions 5, 6 and 11 in the following way (and, again, the answers are in bold):

"5. Does the Claimant or Sub-Fund advance a case that: (i) it knew of and relied on the price of Barclays Shares in acquiring, holding or disposing of Barclays Shares; and (ii) it believed that the prevailing market price of Barclays Shares reflected the value of those shares based on the information disclosed by Barclays being true and complete? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**Folksam ömsesidig livförsäkring LIVAK was a tracker fund during the Relevant Period (1 January 2011 – 1 February 2016). It tracked the MSCI World Ex Sweden Index. However, the index has been slightly customized for Folksam ömsesidig livförsäkring due to its ESG criteria. The index was weighted by market capitalization. Tracking was carried out by fund managers employed by a third-party asset manager (Swedbank Robur). Tracking was carried out quarterly. Re-balancing of the fund's portfolio would have depended on factors related to risk and return in relation to the above index. By factors related to risk and return in relation to the above index this means changes in risk and return character in the index composition, the portfolio composition or company specific risk and return factors. Inflows and outflows from the portfolio and changes in ESG-data are**

also factors that can cause a sell or buy decision. For example, the fund uses a "best in class" ESG approach, changes in ESG scores may cause a buy or sell in the portfolio. The fund permitted a 0.5% deviation from the index for equities and fixed income.

6. Does the Claimant or Sub-Fund advance a case that it relied on Barclays' status as a listed issuer with relevant obligations as pleaded in paragraph 5 of the PORC? **Yes**.

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

Which Individual: **the fund manager, third party agent**.

When: **Reliance occurred each time an investment decision was taken in respect of Barclays Shares, including decisions to initiate the transactions identified in the Trading Data.**"

"11. If the Claimant or Sub-Fund has answered yes to any of Questions 1 to 9 above, will it be able to give disclosure in relation to the case it advances?

**No. The portfolio management is conducted based on a quantitative portfolio analysis where the share's market cap, risk and return characteristics are taken into account (rather than in a fundamental analysis, where analyst's reports or interim reports can be used to a greater extent).**"

27.  C132, the Verdipapirfondet KLP AksjeGlobal Indeks I, also answered Questions 1, 2 and 4 in the same way as C68. In answer to Questions 5, 6 and 11 it did not allege that it relied on the price of the Bank's shares in making investment decisions but on the prices of the constituent companies in the Index. It answered Questions 5, 6 and 11 in the following way (and, again, the answers are in bold):

"5. Does the Claimant or Sub-Fund advance a case that: (i) it knew of and relied on the price of Barclays Shares in acquiring, holding or disposing of Barclays Shares; and (ii) it believed that the prevailing market price of Barclays Shares reflected the value of those shares based on the information disclosed by Barclays being true and complete? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares?

**The Verdipapirfondet KLP AksjeGlobal Indeks I Claimant relies on holding the relevant knowledge and belief with respect to the prices of shares of the constituent companies of the Index (as opposed to the specific price of Barclays Shares on a given date). In addition, Verdipapirfondet KLP AksjeGlobal Indeks I Claimant intends to demonstrate that the tracker fund industry, and the creation of tracker funds by market participants (including the Verdipapirfondet**

**KLP AksjeGlobal Indeks I Claimant and the Manager), operates among other things on the basis that issuers (such as the issuers who were constituents of the Index) disclose true and accurate information to the market at all relevant times. The Verdipapirfondet KLP AksjeGlobal Indeks I Claimant was set up to operate, and did operate, on this basis.**

Which Individual: **On the basis of the above, the Verdipapirfondet KLP AksjeGlobal Indeks I Claimant contends that it is not necessary for it to identify specific individuals who held the relevant knowledge and belief (and therefore who relied in the manner described).**

When: **Reliance occurred each time an investment decision was taken in respect of Barclays Shares, including decisions to initiate the transactions identified in the Trading Data.**

6. Does the Claimant or Sub-Fund advance a case that it relied on Barclays' status as a listed issuer with relevant obligations as pleaded in paragraph 5 of the PORC? **Yes.**

If yes, when and by which individual did the Claimant so rely, and in respect of which of its decisions to acquire, hold or dispose of Barclays Shares? **Yes. Please refer to Answer 5.**"

"11. If the Claimant or Sub-Fund has answered yes to any of Questions 1 to 9 above, will it be able to give disclosure in relation to the case it advances?

**The Verdipapirfondet KLP Verdipapirfondet KLP AksjeGlobal Indeks I Claimant does not operate a document deletion or destruction process. The Verdipapirfondet KLP Verdipapirfondet KLP AksjeGlobal Indeks I Claimant has not conducted a search for disclosure in relation to the case it advances, so it does not know if it will be able to identify and disclose relevant documents.**"

B.    The Bank's Case

28.    The Bank denies liability. Again, it is unnecessary to set out the detailed defence which it advances in relation to the Claimants' allegations about the operation of LX. For present purposes it is enough to note that although the Bank admits that the Complaint was made (and subsequently amended) but denies its contents. It also admits the SEC Order and the settlement agreement, it denies that the limited admissions which it made in answer gave rise to any liability under S.90A. I set out below the summary of the Bank's defence (footnotes omitted):

"7. For the reasons pleaded in more detail below, Barclays Plc denies that the Claimants are entitled to the relief claimed or to any relief. The claim is fundamentally flawed on a number of levels:

7.1 As noted, the foundation of the Claimants' claim is a repetition of the

allegations contained in the NYAG Amended Complaint as set out in Section C of the Particulars of Claim.

7.2 Barclays Plc denies the allegations in Section C save insofar as Barclays has admitted certain limited facts and matters, including relating to a small number of the allegations that were made in the NYAG Amended Complaint, as set out in a settlement agreement dated 31 January 2016 entered into between Barclays and the New York Attorney General (the "**NYAG Settlement Agreement**") and a settlement between Barclays Capital Inc. and the SEC contained in an order of the SEC (the "**SEC Order**") of the same date, and save insofar as expressly admitted or not admitted below. The admitted facts and matters as set out in the NYAG Settlement Agreement and the SEC Order are referred to herein as the "**Admitted Conduct**". To the extent that Section C of the Particulars of Claim is consistent with the Admitted Conduct, it is admitted.

7.3 The balance of the Claimants' allegations in Section C which adopt allegations of wrongdoing in the NYAG Amended Complaint are referred to herein as the "**Alleged Conduct**", and are denied.

7.4 Further and in any event, it is denied (insofar as it is alleged) that the Admitted Conduct or the Alleged Conduct (which is in any event denied) would have caused any prejudice to users of the dark pool.

7.5 It is denied that the Prospectus and/or any of the published information referred to in the Particulars of Claim contained any material omissions as alleged or otherwise.

7.6 Further, it is denied that the Prospectus and/or the other relevant published information contained any statements which were false or misleading (at all, or alternatively to a material extent) as alleged or otherwise.

7.7 Further and in any event:

7.7.1 As to the claim under s.90 FSMA, (a) the Claimants have failed to identify and allege that any individual employees or officers of Barclays Plc who were involved in or responsible for the preparation of the Prospectus had any knowledge of either the Admitted Conduct or the Alleged Conduct (which is in any event denied); (b) in any event, Barclays Plc is not liable because it reasonably believed at the time the Prospectus was submitted for approval that the statements in the Prospectus referred to by the Claimants were true and were not misleading and/or did not contain any material omissions.

7.7.2 As to the claim under s.90A FSMA, of the two individuals identified by the Claimants as persons discharging managerial responsibility on behalf of Barclays Plc, one was not a relevant person discharging managerial responsibility, but in any event neither knew or were reckless as to whether any statements made were untrue or misleading and/or knew any omissions to be a dishonest concealment of a material fact.

7.8 In the premises and in any event, it is denied that the conditions for liability under s.90 and/or s.90A FSMA are satisfied.

7.9 Further and in any event, no admissions are made as to whether any of

the Claimants reasonably relied on any alleged misstatements and/or omissions (and it is specifically denied that the Claimants are entitled to rely on any presumption of reliance). The Claimants are required to plead and prove these allegations on a Claimant-by-Claimant basis. At present, the Particulars of Claim do not contain a properly particularised case in these respects and Barclays Plc reserves the right to strike out and/or seek summary dismissal of the Claim.

7.10 In any event, it is denied that the Claimants suffered any loss and damage."

29.     The Bank accepts in these proceedings that it admitted a number of limited facts and matters and a small number of the allegations set out in the Complaint but denies that it had any duty to disclose the Alleged Misconduct (as it defines the misconduct which it denies) in its published information or that any statements which it made in its published information were misleading or untrue. In relation to reliance and loss, the Bank made its position clear (original emphasis):

"54. As to paragraph 81, no admissions are made. Each of the Claimants is put to strict proof as to the nature and extent of its alleged dealings in Barclays Plc's ordinary shares during the Relevant Period. Paragraphs 3 and 4 above are repeated.

55. As to paragraph 82:

55.1 No admissions are made as to whether, or the extent to which, any of the Claimants purchased and/or continued to hold shares in Barclays Plc during the Relevant Period. Paragraph 4 above is repeated.

55.2 Save as aforesaid, paragraph 81 is denied. Without prejudice to the generality of the foregoing denial:

55.2.1 It is denied that the Claimants are entitled to rely upon a presumption of reliance as alleged in the second sentence: on the contrary, it is averred that each of the Claimants is required to plead and prove actual reliance in support of its claim under sections 90 and 90A FSMA. In particular, each of the Claimants is required to identify the specific allegedly untrue or misleading statements and/or omissions in Barclays Plc's published information upon which it claims to have relied, to particularise the nature of its alleged reliance on each such statement or omission, and to plead the basis on which it alleges that its reliance was reasonable. The Particulars of Claim do not contain a properly particularised case in these respects and, unless this fundamental deficiency is rectified, Barclays Plc reserves the right to apply to strike out and/or seek summary dismissal of the Claimants' claims under section 90 and/or 90A FSMA.

55.2.2 In any event, if and insofar as the Claimants are held to be entitled to rely upon a presumption as to reliance in support of their claims under section 90 and/or 90A FSMA, Barclays Plc will contend that the

presumption is at most a rebuttable evidential presumption and, accordingly, Barclays Plc will reserve the right to plead, following disclosure from each of the Claimants, that the presumption falls to be rebutted in respect of all or some of them.

56. As to paragraphs 83-84:

56.1 The share price movements (and other figures) pleaded in paragraphs 84(c)(i) and (ii) are admitted. (For the avoidance of doubt, the reference to 26 June 2013 in paragraph 84(c)(ii) is understood to be intended as a reference to 26 June 2014.)

56.2 Save as aforesaid, paragraphs 83-84 are so vague and inadequately particularised that it is not possible to plead a full response. For the avoidance of doubt, the Claimants are required to plead and prove their allegations as to causation and loss on an individual Claimant-by-Claimant basis. The Particulars of Claim do not contain a properly particularised case in these respects and, unless this fundamental deficiency is rectified, Barclays Plc reserves the right to apply to strike out and/or seek summary dismissal of the Claimants' claims under section 90 and/or 90A FSMA. Without prejudice to the generality of the aforesaid, Barclays Plc will say (without limitation) as follows:

56.2.1 Certain of the pleaded causal chains are mutually exclusive, for example, the allegation that in the counterfactual the Claimants would not have purchased Barclays Plc shares and the allegation that they would have acquired the shares at a lower price. It is denied that any individual Claimant can simultaneously advance both cases.

56.2.2 In any event, as regards all of the Claimants the pleaded case on loss is internally inconsistent. In particular, paragraph 83(b) (which alleges that if earlier disclosure had been made, there would have been some fall in the share price but such fall "*would not have been as great as it was following the NYAG's 25 June 2014 announcement or its 1 February 2016 announcement*") is inconsistent with paragraph 84(c)(iii) (which alleges that the combined fall following the NYAG's 25 June 2014 or 1 February 2016 announcements is likely to reflect the "*difference between the price the Claimants in fact paid and the price they would have paid had the true position been known*").

56.2.3 Further and in any event, if and insofar as there was any inflation in the share price of Barclays Plc during the Relevant Period as alleged (which is denied), each of the Claimants must give credit for any gains received as against the loss which it is claiming."

30.   The Bank also denies that the Claimants are entitled to rely on the fraud measure of damage or that any fall in the share price of the shares which the Claimants held were the result of any statements which were alleged to be untrue or misleading. Given the Claimants' allegation that the London Stock Exchange was an efficient market in which the price of the Bank's shares was determined or influenced by the contents of the Published Information (upon which they rely), it is also important to set out the Bank's

case in relation to the perception of the market:

> "(a) It is specifically denied that the share price fall which occurred on 26 June 2014 (pleaded at paragraph 84(c)(i)) represents a loss incurred by any of the Claimants as a result of any of the allegedly untrue or misleading statements and/or alleged omissions pleaded in the Particulars of Claim; on the contrary, it is averred that the share price fall was caused (or, alternatively, was predominantly or at least in part caused) by other factors, including prevailing market conditions on that date, and the manner in which the New York Attorney General presented the allegations that were made against Barclays in the NYAG Complaint at his press conference on 25 June 2014, and in particular a perception amongst market commentators that, given the tone and content of the Attorney General's presentation, the allegations might ultimately lead to Barclays Plc's licence to carry out banking business in the US being suspended or withdrawn if the allegations in the NYAG Complaint were proved. Accordingly, it is specifically denied that the share price fall which occurred on 26 June 2014 is a reliable proxy for the impact which prior disclosure by Barclays Plc of the Admitted Conduct and/or the Alleged Conduct (which is in any event denied) would have had on the price of Barclays Plc's shares. This will be a matter for evidence in due course.

> (b) Save as aforesaid, no admissions are made as to whether prior disclosure by Barclays Plc of the Admitted Conduct would have caused any or any significant impact on the price of Barclays Plc's shares. Without prejudice to the generality of the foregoing denial, it is specifically denied that the share price fall which occurred on 1 February 2016 (pleaded at paragraph 83(c)(ii)) represents a loss incurred by any of the Claimants as a result of any of the allegedly untrue or misleading statements and/or alleged omissions pleaded in the Particulars of Claim or is a reliable proxy for the impact which prior disclosure by Barclays Plc of the Admitted Conduct would have had on the price of Barclays Plc's shares. This will be a matter for evidence in due course."

31.   Finally, the Bank pleads that the Claimants are required to prove on a Claimant by Claimant basis that they would not have bought its shares or would have acquired them at a lower price or sold them at a higher price as a result of the Bank's conduct. It also pleads that they must give credit for any gains which they received as a result of purchasing or holding or disposing of its shares.

C.    The Evidence

(1)   *Middleton 4*

32.   Mr Middleton gave evidence in support of the Strike Out Application. He summarised the Claimants' case as the Bank and its team understood it and set out the relevant

procedural history. As might have been expected, Ms Hogan did not accept the accuracy of Middleton 4 in her evidence but in my judgment nothing turns on this disagreement. Mr Middleton did not, however, have any relevant evidence to give on the substantive issues in support of the reverse summary judgment element of the Strike Out Application and I need not consider Middleton 4 further.

*(2)   Hogan 5*

33.   Ms Hogan provided helpful evidence which put the Claimants' case on reliance in context. She began by dealing with the number and value of the claims (which the Bank did not dispute). There are currently 135 Claimants who represent or constitute 465 individual funds or sub-funds. All but one of these Claimants advance claims under S.90A with a total claim value of £560 million. 98 funds also advance claims under S.90 with a total claim value of £12 million. 38% of the claims fall within Category A amounting to £194 million, 10% of the claims fall within Category B with a total claim value of £18.5 million and 52% of the claims fall within Category C with a total claim value of £332 million. However, there are 241 funds making claims within Category C and 229 or 95% of those funds are also making claims under S.90 and all of them make claims for dishonest delay.

34.   Ms Hogan did not suggest that any of the 241 funds within Category C claims to have read or considered any of the Published Information pleaded in the Particulars of Claim when deciding to acquire, hold or sell the Bank's shares which are the subject matter of the claim. In a letter dated 18 April 2024 Latham & Watkins contended that it was necessary for an investor to apply their mind to a statement in the pleaded Published Information (or the absence of such a statement) and that the relevant statement (or omission) must have induced the investor to transact on the terms which they did. Ms Hogan's response to this contention was as follows:

> "The Claimants disagree. In very short summary, the Claimants' case at trial will be that, on a proper construction of the legislation, having regard to its wider purposes and the operation of the securities markets, it is sufficient for an investor to have "relied" on Published Information containing misstatements and/or omissions by relying on the fact that the Issuer is a listed company with relevant disclosure obligations, including to disclose full and accurate information, and/or on the price of the shares which is affected by the information published by an issuer."

35.   Ms Hogan also gave evidence about index or tracker funds which do not make an "active" judgment to invest in securities transaction by transaction but invest in a basket of shares based on tracking an index such as the FTSE 100 or the FTSE 250. She described these funds as "passive" but used the term "**Tracker Funds**" to refer to such funds collectively (as do I). Her evidence about those funds was as follows (footnotes omitted):

> "38. Tracker Funds were well established when s.90A was introduced in 2006: it is estimated by the Investment Management Association that in 2006 between 20% and 25% of total assets in the UK were managed according to indexing strategies. By 2010, "Tracker funds under management [had] reached £29.5 billion, the highest on record and 59% up on the 1st Quarter last year." By the end of 2020, such funds accounted for 34% of the total UK investment market (or around £3 trillion) and that percentage appears to be growing year on year.

> 39. A finding that Tracker Funds are not entitled to rely on the protections against the fraudulent preparation of published information contained in s.90A FSMA would render that section entirely ineffective in respect of around a third of the investment market, by reason of characteristics of the potential claimants themselves (rather than the degree of wrongdoing on the part of the defendant issuer). Nothing in the wording of FSMA indicates that Parliament intended that s.90A would be so severely fettered in its operation."

36.   Ms Hogan also stated that it was very likely that the Claimants would wish to rely on expert evidence in support of their case in relation to Category C claims at trial and she exhibited the reports of Mr Curcio and Dr Hildreth as examples of the kind of evidence which they would wish to call. It is not necessary for me to set out or analyse those reports in detail and sufficient to set out the relevant parts of Hogan 5 and the points which Ms Hogan invited the Court to draw from them (again footnotes omitted):

> "41. Mr Curcio's evidence relates to the fund management market and the role of Tracker Funds. He also covers the general process of rebalancing of those funds and how the funds track indices that are typically weighted by reference to the market capitalisation of its constituent issuers. The market capitalisation is a product of the share price of an issuer and the number of outstanding shares at any given time. As Mr Curcio sets out, Tracker Funds are not homogenous in their approach. He explains, for example, that: "*...although index-tracking funds are generally believed to be operated in a mechanistic way (with the funds replicating exactly what the index does), in practice, fund managers employ some discretion in the day-to-day management of index-tracking funds. Some of this discretion can result in a management of the fund that is akin to being selective, such as with enhanced indexing strategies.*" (paragraph 2.3.8)

> 42. As Mr Curcio further explains: "*There isn't a clear demarcation*

> *between index-tracking funds and selected portfolio funds, with many funds adopting strategies that combine aspects of both index-tracking and selective portfolio management*" (paragraph 2.5.2).
>
> 43. Dr Hildreth's evidence covers (i) whether the market in RSA shares was efficient during the relevant period and, (ii) whether the published information and/or the alleged untrue or misleading statements and omissions affected the price of RSA's shares. As is clear from Dr Hildreth's evidence, market efficiency is a question of degree: a market can be strongly or weakly efficient. The Claimants anticipate that they will likely wish to adduce similar evidence with respect to the market for Barclays shares in advance of the trial at which reliance will be considered, to the extent that this remains a disputed issue. In this context, it is likely that the Claimants will seek to establish at trial that the price of Barclays shares reflected an aggregation of lots of pieces of information including the Published Information, such that the Claimants can be presumed to have relied on the Published Information as reflected in the share price.
>
> 44. It is clear from the reports of Mr Curcio and Dr Hildreth that reliance is a factually complex issue, occurring across a spectrum. At this early stage and prior to the provision of witness evidence by individual Claimants, that spectrum has been divided into 3 broad categories, of which Price/Market Reliance is one. That division is necessarily broad-brush, and the Claimants' position is that the Court will be in a far better position to determine where the reliance threshold lies for the purposes of s.90A once it has factual evidence (documentary and/or witness evidence) before it from the individual sample Claimants as to how the relevant sub-funds operated, in addition (as necessary) to expert evidence."

37.    For the purposes of the Strike Out Application I assume that the Claimants will be able to demonstrate these facts at trial. Dr Hildreth also gave evidence in the *RSA Litigation* that economists distinguished between three levels of market efficiency according to the information available. A market is "weak form" efficient if prices fully reflect all historical prices. A market is "semi-strong form" efficient where market prices reflect all information publicly available and a market is "strong form" efficient where all information (both public and private) is known to all. His evidence was that RSA's shares were traded in a strong or semi-strong form efficient market on the LSE between 2009 and 2013 as one of the largest listed stocks and included in the FTSE 100. He also gave evidence that the published information upon which the claims group relied was material to RSA's share price. For the purposes of the Strike Out Application I assume that Dr Hildreth (or another expert) would give the same evidence in relation to the Bank's shares.

## IV.    **The Law**

**Approved Judgment: Leech J**          **Various Claimants v Barclays Bank PLC FL 2020 000051**

D.    The Statutory Regime

*(1)    S.90*

38.    Liability for untrue or misleading statements in a company prospectus has a long history. Although S.90 was introduced by FSMA, it is the statutory successor to section 3 of the Directors Liability Act 1890 which imposed liability to pay compensation for untrue statements in a prospectus to all persons subscribing for securities "on the faith of such prospectus". In its current form S.90(1) to (7) provide as follows:

> "(1) Any person responsible for listing particulars is liable to pay compensation to a person who has— (a) acquired securities to which the particulars apply; and (b) suffered loss in respect of them as a result of— (i) any untrue or misleading statement in the particulars; or (ii) the omission from the particulars of any matter required to be included by section 80 or 81.
>
> (2) Subsection (1) is subject to exemptions provided by Schedule 10.
>
> (3) If listing particulars are required to include information about the absence of a particular matter, the omission from the particulars of that information is to be treated as a statement in the listing particulars that there is no such matter.
>
> (4) Any person who fails to comply with section 81 is liable to pay compensation to any person who has— (a) acquired securities of the kind in question; and (b) suffered loss in respect of them as a result of the failure.
>
> (5) Subsection (4) is subject to exemptions provided by Schedule 10.
>
> (6) This section does not affect any liability which may be incurred apart from this section.
>
> (7) References in this section to the acquisition by a person of securities include references to his contracting to acquire them or any interest in them."

*(2)    The Transparency Directive*

39.    On 15 December 2004 the European Parliament and the Council of the European Union issued Directive 2004/109/EC on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market (the "**Transparency Directive**" or "**TD**"). The recitals to the directive included the following:

> "(1) Efficient, transparent and integrated securities markets contribute to a

genuine single market in the Community and foster growth and job creation by better allocation of capital and by reducing costs. The disclosure of accurate, comprehensive and timely information about security issuers builds sustained investor confidence and allows an informed assessment of their business performance and assets. This enhances both investor protection and market efficiency.

(2) To that end, security issuers should ensure appropriate transparency for investors through a regular flow of information. To the same end, shareholders, or natural persons or legal entities holding voting rights or financial instruments that result in an entitlement to acquire existing shares with voting rights, should also inform issuers of the acquisition of or other changes in major holdings in companies so that the latter are in a position to keep the public informed."

"(7) A high level of investor protection throughout the Community would enable barriers to the admission of securities to regulated markets situated or operating within a Member State to be removed. Member States other than the home Member State should no longer be allowed to restrict admission of securities to their regulated markets by imposing more stringent requirements on periodic and ongoing information about issuers whose securities are admitted to trading on a regulated market."

"(17) Appropriate liability rules, as laid down by each Member State under its national law or regulations, should be applicable to the issuer, its administrative, management or supervisory bodies, or persons responsible within the issuer. Member States should remain free to determine the extent of the liability."

40.    Chapter II was headed "Periodic Information" and Articles 4 to 8 provided for an issuer to make public its annual reports, half-yearly annual reports and interim management statements and the chapter specified in general terms the contents of those documents (subject to certain exemptions). Article 7 provided as follows:

> "**Responsibility and liability**
>
> Member States shall ensure that responsibility for the information to be drawn up and made public in accordance with Articles 4, 5, 6 and 16 lies at least with the issuer or its administrative, management or supervisory bodies and shall ensure that their laws, regulations and administrative provisions on liability apply to the issuers, the bodies referred to in this Article or the persons responsible within the issuers."

41.    Chapter III contained a number of provisions dealing with the provision of ongoing information and Chapters IV and V dealt with general obligations and also competent authorities and their powers. Chapter VI was headed "Implementing Measures" and it included Article 28 which provided as follows:

"**Penalties**

1. Without prejudice to the right of Member States to impose criminal penalties, Member States shall ensure, in conformity with their national law, that at least the appropriate administrative measures may be taken or civil and/or administrative penalties imposed in respect of the persons responsible, where the provisions adopted in accordance with this Directive have not been complied with. Member States shall ensure that those measures are effective, proportionate and dissuasive.

2. Member States shall provide that the competent authority may disclose to the public every measure taken or penalty imposed for infringement of the provisions adopted in accordance with this Directive, save where such disclosure would seriously jeopardise the financial markets or cause disproportionate damage to the parties involved."

*(3)   S.90A*

42.   Section 1270 of the Companies Act 2006 introduced S.90A to give effect to these provisions and it took effect on 8 November 2006. The Explanatory Note to the section explained that it established a regime for civil liability to third parties by issuers admitted to trading on a regulated market in respect of disclosures made public in response to provisions implementing obligations imposed by the Transparency Directive. In its original form it provided as follows (so far as relevant):

"**90A Compensation for statements in certain publications**

(1) The publications to which this section applies are– (a) any reports and statements published in response to a requirement imposed by a provision implementing Article 4, 5 or 6 of the transparency obligations directive, and (b) any preliminary statement made in advance of a report or statement to be published in response to a requirement imposed by a provision implementing Article 4 of that directive, to the extent that it contains information that it is intended– (i) will appear in the report or statement, and (ii) will be presented in the report or statement in substantially the same form as that in which it is presented in the preliminary statement.

(2) The securities to which this section applies are– (a) securities that are traded on a regulated market situated or operating in the United Kingdom, and (b) securities that– (i) are traded on a regulated market situated or operating outside the United Kingdom, and (ii) are issued by an issuer for which the United Kingdom is the home Member State within the meaning of Article 2.1(i) of the transparency obligations directive.

(3) The issuer of securities to which this section applies is liable to pay compensation to a person who has– (a) acquired such securities issued by it, and (b) suffered loss in respect of them as a result of– (i) any untrue or misleading statement in a publication to which this section applies, or (ii) the omission from any such publication of any matter required to be

included in it.

(4) The issuer is so liable only if a person discharging managerial responsibilities within the issuer in relation to the publication– (a)knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or (b) knew the omission to be dishonest concealment of a material fact.

(5) A loss is not regarded as suffered as a result of the statement or omission in the publication unless the person suffering it acquired the relevant securities– (a) in reliance on the information in the publication, and (b) at a time when, and in circumstances in which, it was reasonable for him to rely on that information.

(6) Except as mentioned in subsection (8)– (a) the issuer is not subject to any other liability than that provided for by this section in respect of loss suffered as a result of reliance by any person on– (i) an untrue or misleading statement in a publication to which this section applies, or (ii) the omission from any such publication of any matter required to be included in it, and (b) a person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(7) Any reference in subsection (6) to a person being subject to a liability includes a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.”

*(4)     The Davies Review*

43.    Section 1270 of the Companies Act 2006 also inserted a new section 90B into FSMA which gave HM Treasury power to make further provision about liability for published information and to do so by amending any primary or subordinate legislation. In October 2006 the Economic Secretary to the Treasury invited Professor Paul Davies QC, who was then the Cassel Professor of Commercial Law at the London School of Economics, to carry out a review of issuer liability (the “**Davies Review**”). In March 2007 Professor Davies circulated a discussion paper for comment to a wide range of recipients (“**Davies 1**”). He sought views on the following key questions:

“i. Should the trigger for liability be fraud (ie. recklessness or intention) or negligence? Should there be liability for misstatements even if those making the statements honestly (but carelessly) believed them to be true? What is the right standard of liability to incentivise disclosure of timely, accurate and meaningful disclosures without imposing undue cost burdens on issuers? (paras 71-78).

ii. Should the statutory liability regime currently in place under section 90A be extended to ad hoc disclosures? What is the current position in relation to Market Abuse Directive disclosures? Should there be liability for fraudulent misstatements in ad hoc reports? (paras 79-83).

iii. Should there be liability for statements that are accurate but late? Or are the FSA's rules sufficient, given that much of their enforcement action has focused on delayed disclosure? What about deliberate delays in withholding information in order to mislead the market? (paras 84-88)

iv. What counts as an ad hoc statement? Just disclosures of inside information required under MAD? Or also ad hoc disclosures required under the DTR? Other announcements or statements? (paras 89-94)

v. Should section 90A apply also to non-regulated markets? How would it affect the regimes operated by AIM and Plus markets'? How might the courts apply the principles of the common law to non-regulated market liability anyway? Should there be a level playing field between regulated and non-regulated markets? (paras 95-99)"

44.   In Davies 1, Professor Davies summarised the existing law. He pointed out that the reports and accounts provisions were of long standing and pre-dated EU law. He also pointed out that the Transparency Directive did not apply to securities traded on AIM or PLUS. He then set out the following background which applied to issuers on regulated markets (footnotes omitted):

"15. For issuers on regulated markets, notably the main market of the London Stock Exchange, the TD requires annual financial reports (Article 4), half-yearly reports (Article 5) and interim management statements (Article 6). The annual report is in essence that required by the companies legislation, though now termed an 'annual financial report'. The half-yearly report (which is not required to be audited) must contain a condensed set of financial statements and an interim management report. The interim management report must indicate the important events that have occurred during the first six months of the financial year and their impact on the financial statements and the principal risks and uncertainties for the remaining six months. Article 6 requires the publication of quarterly interim management statements by issuers of shares (but not quarterly financial statements). The issuer is required by Article 21 to disseminate the required information 'in a manner ensuring fast access to such information on a non-discriminatory basis' and to do so 'throughout the Community'. In fact, this requirement is applied not only to information required to be disclosed by the TD, but also to any additional information requirements imposed on issuers by Member States beyond the TD (see para 17 below) and to information required by Article 6 of MAD (see para 19 below). Such information is referred to collectively as 'regulated information'.

16. The TD requires transposition into UK law and this has been done via amendments to FSMA 2000. These amendments confer new rule-making powers on the FSA, which the FSA has exercised so as to produce 'Disclosure and Transparency Rules' (DTR) in place of the previous 'Disclosure Rules' (DR). The TD's periodic reporting requirements are transposed in DTR 4 and (for dissemination) DTR 6. In particular, where

the UK is the home state of the issuer, the periodic reports are to be distributed through a Regulated Information Service (RIS) and are to be made available on a website. Again, the RIS is an established feature of the markets and is also the required dissemination channel for the information required to be reported periodically by AIM companies.

17. Because, unlike the PD, the TD is a 'minimum harmonisation' directive, it is open to the Member States to add to its disclosure requirements. The FSA has done so, through what it calls 'super-equivalent requirements'. These are set out in the Listing Rules. LR 9.8 requires certain information relating to the company's financial position to be included in the annual financial report beyond that required by the DTR; certain non-financial items, such as the requirement to comply, or explain non-compliance, with the Combined Code on Corporate Governance; and the provision of a directors' remuneration report. However, the Listing Rules no longer require the publication of a preliminary statement of annual results, though they do regulate how such a preliminary statement is to be made if the issuer chooses to make one; and a public statement of a board's dividend or other distribution decisions is still required as soon as possible after it has been made. For companies listed on the main market of the LSE, therefore, the periodic disclosure requirements are now mainly in the DTR but still in part in the LR."

45.   Professor Davies then dealt with ad hoc disclosure requirements and, in particular, Article 6 of Directive 2003/6/EC (which he described as the "**Market Abuse Directive**" or "**MAD**"). He then turned to civil sanctions for breaches of disclosure obligations and began with the tort of deceit:

"26. The tort of deceit required proof of various other elements, beyond the lack of a belief in the truth of the statement made. First, there must actually be a statement. There was no liability at common law for non-disclosure, though the law was sufficiently robust to impose liability for half-truths (ie statements which were true as far as they went but implied something false as a result of what was omitted). However, there could be no liability if the defendant said nothing and merely stood by and let the claimant deceive him or herself, even if such conduct on the part of the defendant were intentional. Second, the defendant must intend the claimant to rely on the untrue statement, or at least intend a class of persons, of whom the claimant was a member, to rely on it. Hence, a company could be said to intend a subscriber for shares to rely on the prospectus, even if it did not know the identity of the subscriber when it issued the prospectus. Third, the claimant must in fact rely on the statement, as part of which requirement the claimant would have to be aware of the statement. This requirement is taken to rule out the theory of 'fraud on the market,' whereby a misstatement which has an effect on the market price can be said to cause an investor loss, even though that particular investor was not aware of the misstatement. And, of course, the claimant must suffer loss. Provided these and the other elements of the tort

of deceit are satisfied, the common law regards the defendant as having acted fraudulently. There is no need to show that the defendant had any particular dishonest intention: even a 'white lie' intended to be and in fact acted on which causes the claimant loss constitutes the tort of deceit. Normally, of course, the maker of a fraudulent statement is also dishonest.

27. Parliament did not think the result in *Derry v Peek* an acceptable one in relation to prospectuses, and so it passed the Directors' Liability Act the following year. That imposed liability for negligent misstatements in prospectuses, ie the defendant would be liable even if belief in the truth of the statement were honestly held, if that belief had been arrived at carelessly (negligently). The present version of the liability imposed by the 1890 Act is to be found in section 90 of FSMA 2000. It is now a very wide-ranging provision. Any person may sue who 'acquires' securities to which the prospectus applies and suffers loss as a result of any untrue or misleading statement in the prospectus or of any omission from the prospectus of a matter which ought to have been included. The use of the verb 'acquires' indicates that the possible range of claimants includes those who buy shares in the after-market as well as those who subscribe for shares from the company. The absence of a requirement that the claimant should have 'relied' on the misstatement (the section requires simply that the claimant should have suffered loss as a result of it) indicates that, provided the misstatement affects the market price of the security, it does not matter that the claimant was unaware of it. And the section covers omissions."

46.     Professor Davies then turned to discuss S.90A in its original form. He stated that the section had two objectives: one relating to the common law of negligence and the other relating to the tort of deceit. He stated that as far as negligence was concerned, it confirmed the existing law that there was no liability and so far as deceit was concerned, the approach was "essentially confirmatory" but made some adjustments for periodic disclosures: see Davies 1, §47. He discussed the way in which the section was modelled on the common law in the following passage and summary upon which Ms Davies and her team placed considerable reliance:

"54. The liability on the part of the issuer is to anyone (so, to any investor, whether already a shareholder or not) who acquires securities and suffers loss as a result of the misstatement or omission, where that person relied on the information at a time when it was reasonable for him to do so. This statutory liability is clearly modelled on the common law tort of deceit. In two ways it goes beyond the common law, however. First, although the claimant will recover only if he in fact relied on the publication and that reliance must be reasonable, it is not required that the issuer should have intended the claimant to rely on the publication. The requirement of intention on the part of the issuer as to the reliance by the claimant on the publication made the common law tort of deceit of only marginal relevance

to misstatements in periodic reports, as contrasted with prospectuses, where such intention was easy to show. Second, the liability of the issuer is applied to pure omissions from the publication, whereas the common law applied only to omissions which rendered what was said misleading. However, it is to be noted that in the case of omissions, it is not enough that the omission was intentional or reckless, it must amount to a 'dishonest concealment.' Without these two changes from the common law of deceit, it is arguable that the liability for intentional misstatements created by the section would have been meaningless in practice. For that reason, it can be argued that, without these changes, the United Kingdom would have been in breach of its obligation under Article 7 of the Directive and under the general requirements of Community law to have an effective civil liability regime in place for Transparency Directive disclosures. Although Article 7 merely requires Member States to extend their civil liability regimes to the disclosures required by the Directive, it is strongly arguable that this does require the Member State to have some liability regime to be extended. On this basis, it would not constitute compliance with Community law for a Member State to say that it had no liability regime or a liability regime which in practice was wholly ineffective.

55. On the other hand, the statutory regime retains two features of the common law of deceit which restrict its impact. First, and most important, the claimant can succeed only if it relied on the publication. As we have seen above in para 27, the statutory prospectus liability regime does not require reliance. It adopts a 'fraud on the market' theory. If the misstatement in the prospectus affected the market price of the securities, that is enough, even though the claimant may not have known of the misstatement. Section 90A by contrast, by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken. Second, the defendant's reliance on the publication is required to have been reasonable. Thus, a claimant might not succeed under the section if it had some available way of checking the publication but chose not to use it.

56. Finally, it should be noted that the regime based on intentional or reckless misstatements operates only in respect of those who acquire securities, and not in favour of those who sell or hold securities. This restriction was criticised by many to whom I talked.

57. Summary: Within its scope of operation, the statutory regime introduced by section 90A of FSMA adopted the prior common law by excluding liability in negligence to investors at large. It also adopted the prior common law on deceit and applied it to issuers (but only them) and in favour of acquirers of securities (but only them). The deceit rules are adopted under the statutory regime with two extensions: to bring in pure omissions and to remove the need to prove the issuer intended the claimant to rely on the publication. Overall, the new statutory regime confirms the prior law and, where it does change it, does so in favour of investors (though the changes can be argued to be marginal). What appears clearly to be the case is that section 90A did not deprive investors of rights to sue on grounds of negligence which they previously held at common law."

47.    In Davies 1, section II Professor Davies framed the key questions. He addressed first the range of disclosures to be covered and whether they should be extended to either negligent statements or ad hoc statements. He then moved to particular issues which arose in relation to liability for fraudulent ad hoc statements and the first of those was the issue of delay:

> "83. However, respondents, who were in favour of the extension of section 90A, raised a couple of very important issues about the scope of such an extension. One was the question of how section 90A would operate in relation to ad hoc statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules. This was a significant problem because the FSA's rules were thought to be very demanding about the promptness of the required disclosure and to provide few reasons for non-disclosure. We have also noted that the FSA's public enforcement action has focussed heavily on delayed disclosure. It should be noted, however, that the German reforms do impose liability for delay in parallel terms to those used for inaccuracies. See WpHG section 37b in Annex B.
>
> 84. Where a disclosure was delayed, it was pointed out, to impose liability only on the basis of intention would be no protection for issuers, because the decision to make the announcement at time $t_2$ rather than earlier time $t_1$ would often have been a deliberate one. Moreover, it would always be possible for claimants to argue that the disclosure should have been made somewhat earlier and, in the case of a heavily traded stock, the range of potential claimants could be quite large.
>
> 85. Although section 90A goes beyond the common law by imposing liability for omissions, and late disclosure could be analysed as an omission (ie during the period between $t_1$ and $t_2$), it seems clear that the section does not cover this type of omission. The section contemplates liability only for omissions from the statement which is made ('omission from any such publication of any matter to be included in it') rather than liability for failure to make any statement at all. Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point.
>
> 86. Most of those who raised this issue wanted to maintain the regime of no civil liability for late disclosure. It has to be said, however, that it is unattractive not to impose liability where an issuer deliberately withholds information in order to mislead the market and to create a false market in its securities. It is suggested that an appropriately narrow liability could be crafted in such a case. First, it is already the case under section 90A that, in relation to omissions, a deliberate omission is not enough to lead to liability. There must be 'a dishonest concealment' of a material fact. There must be dishonesty as well as deliberateness, so that this test, applied to

late disclosures, would not mean an issuer was liable simply because it decided to delay publication for a short period in order to check the accuracy of its proposed statement. Second, however, there is the issue of reliance. It is difficult to see how that requirement could be retained in the case of liability for late publication. An investor can hardly be said to rely on something of which he or she is not aware. However, a substitute for the reliance requirement in the case of late disclosure could perhaps be found by focussing on the purpose of the delay, ie that the purpose of the delay should be to mislead the market. This approach is adopted by section 397 of FSMA 2000 which imposes criminal liability for dishonest concealment of material facts 'whether in connection with a statement… or otherwise' but only where the purpose of the concealment is (under that section) the inducement of, broadly put, an investment decision."

48. In Davies 1, section III Professor Davies dealt with some over-arching issues the first of which was whether "super-optimal levels of fraud-based litigation" could be avoided. He addressed concerns raised about the US experience of private securities class actions and identified a number of differences between the two jurisdictions. He drew particular attention to the absence of any reliance requirement under US law:

"116. In connection with the formation of the class, it is also important to revert again to the reliance requirement in section 90A (see para 55 above). In the United States a typical class is constituted by those who bought shares after the misleading statement was made and still held the shares at the point the truth emerged. Under the 'fraud on the market' theory, adopted in the US for misleading continuing disclosures as well as for misstatements in prospectuses, it is not necessary for the claimant to show knowledge of and reliance on the misstatement in question. Thus, class formation is easier and classes are larger than where reliance has to be shown."

49. In June 2007 Professor Davies published his final report ("**Davies 2**"). In the first few paragraphs he addressed the argument which had been put to him that there should be no liability to investors even for fraudulent misstatements. He met that argument in the following way:

"4. I am thus less troubled than these respondents by the principle of requiring the company to compensate investors whom it has misled. Indeed, specifically to enact that there should be no liability on the part of issuers to investors in the case of fraudulent misstatements would be to remove rights which investors have at common law, even if the precise scope of those rights is unclear. However, this does not mean that I think that liability for misstatements to the capital markets should be freely and extensively imposed. There seem to me to be strong reasons for proceeding cautiously (but not good reasons for not proceeding at all). As indicated in

the DP (Introduction), it is important that any liability regime should not provide incentives for companies to become more cautious in their disclosures to the market. The compensation regime for investors should not be at the expense of a free flow of accurate, timely and helpful information to them from issuers. Rather, if possible, the liability regime should contribute to the incentives for accurate disclosure by issuers. Thus, I share the reservations expressed by a number of respondents about the possible disutility of increased securities litigation. I set out below a set of proposals, which build on the existing but partial statutory regime imposing liability on issuers for fraudulent misstatements and which, I believe, will meet the legitimate interests of investors but not hamper the flow of information to the market."

50.    Although a majority of respondents were against the proposal, Professor Davies recommended the introduction of liability for dishonest delay. He accepted that deliberate delay should not be sufficient to impose liability (because there might be good commercial reasons for delay in publication of financial information) but met this as follows:

> "49.    The need to define dishonesty appropriately is indeed a key requirement of this proposal. In my view the solution to this problem is to focus on the purpose of the delay and to impose civil liability only if the purpose (or predominant purpose) for the delay falls within the prohibited category. One could take an analogy from section 397 of FSMA, imposing criminal liability for dishonest concealment of material facts, whether in connection with a statement of not. Under that section, criminal liability is imposed only if the concealment is for the purpose of inducing someone to take or not to take a certain course of action (broadly to take or not take an investment decision). Translated into the context of this Report, there would be liability only if the person deliberately delayed publication for the purpose of inducing investors to acquire (or possibly dispose of) securities. More narrowly, the prohibited purpose could be defined as making a profit on the part of the defendant or inflicting a loss on the person who acquired the securities during the period of delay. In either case, delay in order to obtain the full facts of the situation or even delay in order to permit the company to deal more easily with the situation which had arisen, would not fall within the scope of the civil liability regime, though such delay might constitute a breach of the FSA's rules. On the other hand, delayed disclosure of bad news on the part of the issuer in order to enable the directors of the company to exercise their options and sell the shares at a more attractive price would fall within the civil liability regime, at least on the second of the two approaches to dishonesty."

51.    Professor Davies dealt with a wide range of issues and made a number of different recommendations in the Davies Review which go wider than the issues which I have to consider. I therefore set out only the first three questions and first three recommendations

at the end of Davies 2:

> "**Question 1**:
>
> What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liability in the British context? Is fraud an appropriate basis for liability?
>
> *Recommendation*: That fraud should be maintained as the basis of liability for the statutory regime and that the relaxation of the common law's requirements – whereby the claimant need only show that his own reliance on the misstatement was reasonable and not also that the issuer intended that he should rely on it – should continue as part of any extended statutory liability regime.
>
> **Question 2**:
>
> Should the statutory regime should be extended in principle to ad hoc statements?
>
> *Recommendation*: Yes, the statutory regime should be extended to ad hoc statements.
>
> **Question 3**:
>
> Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?
>
> *Recommendation*: That the statutory regime should encompass liability for dishonest delay in making RIS statements."

*(5)    The Treasury Consultation*

52.    In July 2008 HM Treasury began an extended consultation in relation to S.90A (the "**Treasury Consultation**"). It began by publishing a consultation paper ("**Treasury 1**") proposing to implement Professor Davies' recommendations and, in particular, to extend S.90A to "multi-lateral trading facilities" such as AIM and PLUS and ad hoc disclosures and also to permit recovery for dishonest delay. The Treasury also published draft regulations under S.90B to introduce a new Schedule 10A which would give effect to these proposals. They framed the policy issue in the introduction to Treasury 1:

> "The question of whether and how far companies (issuers of securities) should be liable in damages for inaccurate statements made to the market upon which investors rely to their detriment is an important one but the answer is not obvious. On the one hand, timely, comprehensive and complete reporting by companies is a crucial element to promote the allocative efficiency of capital markets. Appropriate incentives for such disclosure are thus important. Public enforcement through FSA investigation and sanctions and private litigation by investors have the

potential to reinforce each other, providing effective incentives for prompt and accurate disclosures. On the other hand, private litigation to enforce investors' rights, particularly if there is uncertainty about the scope of liability, can operate perversely by encouraging speculative litigation and settlements by issuers based on a desire to terminate litigation rather than on the harm done to shareholders."

53.   In Treasury 1, section 5 the authors stated that the Government agreed with Professor Davies' recommendation and proposed that the scope of disclosure to which the statutory regime applied should be extended to all information published by an issuer using a recognised information service, and also other information where its availability had been announced using such a service. They also proposed to accept the recommendation that S.90A should be extended to investors who sold securities but not to the holders of shares: see paragraph 7.7. The authors also addressed the question of information acquired from a secondary source:

> "5.16 A question arises as to liability where the information relied on is acquired from a secondary source (e.g., its republication in a news item), rather than directly from a recognised information service (the primary source). Under the statutory regime, liability will arise where the investor has relied on the relevant information, irrespective of its precise source. While the Government proposes to define the relevant information by reference to its primary source, this is simply the most convenient way of defining scope. It would be unfair to deny a remedy simply because the plaintiff could not show that the information was obtained directly from a recognised information service. Indeed it could impose an unnecessary evidential hurdle to valid claims. Accordingly, provided that an investor can prove that the information in question was published on a recognised information service, he will not have to prove that he obtained the information himself from the recognised information service.
>
> 5.17 The Government proposes that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service."

54.   The authors of Treasury 1 considered the question whether to introduce liability for dishonest delay to be a finely balanced issue but agreed with Professor Davies' recommendation that the statutory regime should be extended in this way. They accepted that the more restrictive the definition of delay, the greater the certainty for issuers:

> "6.3 The Government recognises the concerns of issuers and their advisers about the risks involved in creating a liability for dishonest delay. Assessing the truth or falsity of a statement is a question of fact. Delay is

qualitatively different to misstatement, in that it requires a greater element of judgement as to what delay may be permissible. Thus it is more difficult to infer honesty or dishonesty from the circumstances of any delay. This uncertainty could increase the vulnerability of issuers to litigation and increase defensive behaviour. The uncertainty is increased by the potentially wider scope and less predictable application of private law remedies, compared to the public law remedies available through the FSA tribunal process.

6.4 Equally, the Government understands investors' concern that dishonest delay in making disclosures can be just as effective as a direct misstatement in creating a false market and harming the interests of buyers and sellers of securities. Indeed, Davies noted that no one identified a principled (as opposed to a practical) reason why dishonest delay should not be the subject of civil litigation.

6.5 This is a finely balanced issue. The Government's view is that it is appropriate to create a liability for dishonest delay to reinforce the incentives for prompt disclosure, provided that the scope of liability can be precisely drawn to ensure that legitimate delay is not penalised and defensive behaviour on the part of issuers is not promoted.

6.6 The more restrictive the definition of delay that attracts liability, the greater the certainty for issuers and the greater the difficulty for investors in securing redress. Davies considered whether requiring that delay should be deliberate would be sufficient but concluded that it would provide too broad a scope for liability. The basis for delay must be more than intention, since most delays will be intentional and often for good reasons (to check the facts before publication, for example). Issuers would face great pressures in approaching any decision to delay release if it could be challenged afterwards on this basis. A requirement for recklessness would also be insufficient. There would be considerable uncertainty as to what delay would be considered to be "reckless" for these purposes, and though this might be a more difficult standard to meet, there would justifiable fear that some forms of negligent delay would be drawn into the net.

6.7 Hence, Davies has recommended that liability should only attach to dishonest delay. He further suggests that the definition of dishonesty should focus on the purpose of the delay, and that civil liability should only be imposed if the purpose, or the predominant purpose, fell within a prohibited category. Drawing on the test for criminal behaviour under section 397 of FSMA, he suggested that such a purpose could be inducing investors to acquire (or possibly dispose of) securities, or, more narrowly in his view, to enable a gain to be made or to inflict a loss on a person who acquired or sold the issuer's securities during the period of delay.

6.8 The Government agrees that such a test is appropriate. This would ensure liability in those cases where directors, for example, deliberately delayed disclosures in order to buy or sell securities on non-public information. It would ensure that some important cases where disclosure was deliberately delayed, for example, to give the board time to consider the implications of disclosure, to conclude contractual negotiations or to check the accuracy of a disclosure before publication, would not incur

liability for dishonest delay."

55. There were a number of differences between the draft Schedule 10A which the Treasury produced for the consultation and Schedule 10A in its final form. However, the principal difference between paragraphs 4 and 5 of the draft and Paragraphs 3 and 5 in their final form was that S.90A was ultimately extended to include liability not only to buyers and sellers of securities but also to holders. (Schedule 10A involved some re-ordering of the provisions in the draft which explains why paragraph 4 of the draft ultimately became Paragraph 3.)

56. On 17 July 2008 Ms Kitty Ussher, the Economic Secretary to the Treasury, also published an impact assessment which accompanied Treasury 1. It stated that approximately 3,500 issuers of securities were affected by the proposals and it contained an analysis of the costs and benefits. Under the heading "Litigation Costs" it anticipated that any increase in costs would be small and for the following reasons:

> "However, clarifying the liability for misstatement, albeit subject to a demanding test of issuer fraud, is likely to increase the incidence of litigation in cases of fraudulent misstatement. The increase is likely to be small. But the potential costs of such cases are significant, even when settled before trial. It is reasonable to envisage perhaps 2–3 cases over the next ten years, with costs in the region of £1-2 million for each side. It is reasonable to expect that a similar number of cases would be settled before trial with costs of £0.25–0.5 million for each side. This gives a ten year cost range of £5–15 million, or an annual average transaction cost range of £0.5-£1.5 million. Note that the costs of damages or settlement are excluded from the IA. These are not a transaction cost, but a sanctioned transfer of wealth between parties, and as such do not represent an economic cost. The statutory regime has deliberately been shaped, principally by selecting a demanding fraud test for liability, to minimise the potential for speculative litigation and the corresponding pressure on issuers to settle in order to terminate litigation, rather than compensate for harm done to shareholders. Accordingly, we do not anticipate incremental costs from speculative litigation."

57. In March 2010 the Treasury published its response to the consultation ("**Treasury 2**"). The authors reported that the Government had made no change to most of the proposals although some of the wording in the draft regulations had been clarified. They stated in terms that they proposed "to make no change to the current basis of liability (i.e. fraud)". For present purposes, the most significant change to the proposals was to extend the statutory regime to holders as well as sellers of securities. The authors of Treasury 2

justified the extension on the basis that all of the relevant investors would have to prove reliance:

> "5.7 The Government, having weighed up all the points of view carefully, has decided to extend the statutory regime to include holders of securities as well as sellers. The potential to have two divergent regimes, one for sellers and purchases but another for holders would not be conducive to investor and issuer certainty. Furthermore, there is very little principled reason for seeking to bring sellers within the regime but to leave holders out.
>
> 5.8 However, as the Regulations make clear, there must be reliance on information published by the issuer in deciding to continue holding securities. There is a clear difference between an active holder and a passive holder – the latter will not be entitled to bring an action as they would not be able to show reliance upon the statement in making their investment decision.
>
> 5.9 To be able to bring an action a claimant would, for example, have to demonstrate that as a result of reliance on a fraudulent misstatement he instructed his broker to cancel a sell order and instead retained the holding of securities. A holder of securities who continued to hold without giving the matter any thought would be considered to have held those securities passively and thus not able to demonstrate the necessary reliance on the information to bring a claim."

58.    The authors of Treasury 2 recorded that there had been a debate about "out of hours" disclosures which issuers of securities were required to make under the DTR if a recognised information service was closed but maintained the view that liability should be imposed for information derived from secondary sources:

> "**Source of information**
>
> 6.16 The Government proposed that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service.
>
> **Respondents' views**
>
> 6.17 There was majority support for this proposal – it was seen as a non-contentious issue.
>
> 6.18 Some respondents queried how the liability regime would apply when there was not verbatim reporting of primary material through a secondary source.
>
> **The Government's response**
>
> 6.19 The Government remains of this view and therefore liability will attach to statements put out on a recognised information service, even if a claimant does not obtain the information directly from the recognised

information service.

6.20 The rationale for liability arising even where an investor relies on information acquired from a secondary source was it was felt to not do so would impose too high an evidential burden on valid claims. Any statement put out through a recognised information service will be within the scope of the liability regime if that statement contains a fraudulent misstatement."

59.    Finally, the authors recorded that there were a range of views in relation to the extension of liability for dishonest delay including a concern that the Court would apply a civil test of dishonesty rather than the criminal test (as it was then understood). They also recorded that the Government's response was as follows:

"7.11 The Government acknowledges that the argument that liability for dishonest delay should only attach to statements that are required to be made has some merit in terms of reducing the risk of opportunistic litigation. However, in order to be successful a claimant would have to demonstrate that a particular statement should have been made at a previous point in time and in fact wasn't, and the act of so doing, was as a result of dishonest behaviour intended to enable a gain to be made or to cause loss to another or expose another to the risk of loss. This is a very high evidential hurdle that claimants will have to satisfy and thus reduces the possibility of opportunistic litigation."

"7.13 The Government acknowledges that there is a risk that the courts would adopt the civil, as opposed to criminal, test for dishonesty. Therefore to prevent this, the Regulations expressly define dishonesty using the criminal test so that a person will be "dishonest" in respect of a delay where that person's conduct would be regarded as dishonest by those who regularly trade in the markets in question, and, in addition, the person concerned was aware that their conduct would be regarded as dishonest."

60.    In October 2009 and between Treasury 1 and Treasury 2, Professor Eilis Ferran of Cambridge University published an article in the Journal of Corporate Law Studies discussing the Treasury proposals and called "Are US style investor suits coming to the UK?": see (2009) 9 JCLS 315. She pointed out that to establish misrepresentation at common law it is sufficient that a misstatement was an inducement to enter into a transaction and not the sole cause. She also pointed out that an inference of reliance may in certain circumstances be drawn from the facts. She continued as follows:

"An inference drawn from the facts is to be distinguished from a legal presumption of reliance. The classic "fraud on the market" theory developed in US securities law, which affords investors trading in efficient markets a rebuttable legal presumption of reliance, has not been adopted

in section 90A/schedule 10A. However, the thinking that underlies the fraud on market theory, which is that in an informationally efficient capital market the price of securities reflects all publicly available information, could potentially be of some relevance so far as the UK remedy is concerned because it is possible that it could influence determinations on the facts as to reliance/materiality. In many cases it should be relatively straightforward for an investor to show on the facts that the pre-trade price of the securities was material to its investment decisions, on the basis that the price served as a reference point for its trading strategy. From there, arguably it is not a large step to seek to use the efficient capital markets hypothesis to form the basis of an argument that (inferred) reliance on market prices was tantamount to (inferred) reliance on the information itself. If that argument were to succeed, the claimant could have done enough to transfer the burden of proof to the defendant.

This would be a novel argument so far as the English courts are concerned and the likely judicial reaction is hard to predict. Looking to jurisprudence elsewhere in the common law world, *Mondor v Fisherman*, a decision of the Ontario Superior Court of Justice, suggests that there may be some life in an argument based on inferred reliance. However, this was merely a preliminary ruling in which the court refused to strike out a class action by secondary market purchasers and it could be unwise therefore to attach too much significance to it. The counterview—that the inferred reliance argument is really fraud on the market by the back door and, as such, it would be inconsistent with the legislative intent to apply it in the context of section 90A/schedule 10A seems likely to carry considerable weight. Furthermore, in view of developments in financial economics that have undermined the once seemingly unassailable position of the efficient capital markets hypothesis as an accurate explanation of how capital markets actually work, any attempt to use that hypothesis in the interpretation of the section 90A/schedule 10A remedy would certainly merit a cautious reception from the judiciary."

*(6)    Schedule 10A*

61.    On 1 October 2010 the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010 substituted a new S.90A for the provision which I have set out above. It provided for Schedule 10A to make provision for the liability of issuers of securities to pay compensation to persons suffering loss as a result of a misleading statement, dishonest omission or a dishonest delay in publishing information. In its current form Schedule 10A provides as follows:

"1.(1) This Schedule applies to securities that are, with the consent of the issuer, admitted to trading on a securities market, where— (a) the market is situated or operating in the United Kingdom, or (b) the United Kingdom is the issuer's home State.

(2) For the purposes of this Schedule— (a) an issuer of securities is not

taken to have consented to the securities being admitted to trading on a securities market by reason only of having consented to their admission to trading on another market as a result of which they are admitted to trading on the first-mentioned market; (b) an issuer who has accepted responsibility (to any extent) for any document prepared for the purposes of the admission of the securities to trading on a securities market (such as a prospectus or listing particulars) is taken to have consented to their admission to trading on that market.

(3) For the purposes of this Schedule the United Kingdom is the home State of an issuer if— (a) the transparency rules impose requirements on the issuer in relation to the securities, or (b) the issuer has its registered office (or, if it does not have a registered office, its head office) in the United Kingdom.

2.(1) This Schedule applies to information published by the issuer of securities to which this Schedule applies— (a) by recognised means, or (b) by other means where the availability of the information has been announced by the issuer by recognised means.

(2) It is immaterial whether the information is required to be published (by recognised means or otherwise).

(3) The following are "recognised means"— (a) a recognised information service; (b) other means required or authorised to be used to communicate information to the market in question, or to the public, when a recognised information service is unavailable.

(4) A "recognised information service"  means— (a) in relation to a securities market situated or operating in the United Kingdom, a service used for the dissemination of information in accordance with transparency rules; (b) in relation to a securities market situated or operating outside the United Kingdom, a service used for the dissemination of information corresponding to that required to be disclosed under transparency rules; or (c) in relation to any securities market, any other service used by issuers of securities for the dissemination of information required to be disclosed by the rules of the market.

3. (1) An issuer of securities to which this Schedule applies is liable to pay compensation to a person who— (a) acquires, continues to hold or disposes of the securities in reliance on published information to which this Schedule applies, and (b) suffers loss in respect of the securities as a result of— (i) any untrue or misleading statement in that published information, or (ii) the omission from that published information of any matter required to be included in it.

(2) The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

(3) The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4) A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities— (a) in reliance on the information in question, and (b) at a time when, and in circumstances in which, it was reasonable for him to rely on it.

4. An issuer of securities to which this Schedule applies is not liable under paragraph 3 to pay compensation to a person for loss suffered as a result of an untrue or misleading statement in, or omission from, published information to which this Schedule applies if— (a) the published information is contained in listing particulars or a prospectus (or supplementary listing particulars or a supplementary prospectus), and (b) the issuer is liable under section 90 (compensation for statements in listing particulars or prospectus) to pay compensation to the person in respect of the statement or omission.

5.(1)  An issuer of securities to which this Schedule applies is liable to pay compensation to a person who— (a) acquires, continues to hold or disposes of the securities, and (b) suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies. (2) The issuer is liable only if a person discharging managerial responsibilities within the issuer acted dishonestly in delaying the publication of the information.

6. For the purposes of paragraphs 3(3) and 5(2) a person's conduct is regarded as dishonest if (and only if)— (a) it is regarded as dishonest by persons who regularly trade on the securities market in question, and (b) the person was aware (or must be taken to have been aware) that it was so regarded.

7. (1) The issuer is not subject— (a) to any liability other than that provided for by paragraph 3 in respect of loss suffered as a result of reliance by any person on— (i) an untrue or misleading statement in published information to which this Schedule applies, or (ii) the omission from any such published information of any matter required to be included in it; (b) to any liability other than that provided for by paragraph 5 in respect of loss suffered as a result of delay in the publication of information to which this Schedule applies.

(2) A person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(3) This paragraph does not affect— (a) civil liability— (i) under section 90 (compensation for statements in listing particulars or prospectus), (ii) under rules made by virtue of section 954 of the Companies Act 2006 (compensation), (iii) for breach of contract, (iv) under the Misrepresentation Act 1967, or (v) arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned; (b) liability to a civil penalty; or (c) criminal liability.

(4) This paragraph does not affect the powers conferred by sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution).

8.(1) In this Schedule— (a) "securities" means transferable securities as defined in Article 2(1)(24) of the markets in financial instruments regulation, other than money market instruments as defined in Article 2(1)(25A) of that regulation that have a maturity of less than 12 months (and includes instruments outside the United Kingdom); (b) "securities market" means— (i) a regulated market as defined in Article 2(1)(13) of the markets in financial instruments regulation, or (ii) a multilateral trading facility as defined in Article 2(1)(14) of that regulation.

(2) References in this Schedule to the issuer of securities are— (a) in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading as mentioned in paragraph 1(1), to the issuer of the securities represented; (b) in any other case, to the person who issued the securities.

(3) References in this Schedule to the acquisition or disposal of securities include— (a) acquisition or disposal of any interest in securities, or (b) contracting to acquire or dispose of securities or of any interest in securities, except where what is acquired or disposed of (or contracted to be acquired or disposed of) is a depositary receipt, derivative instrument or other financial instrument representing securities.

(4) References to continuing to hold securities have a corresponding meaning.

(5) For the purposes of this Schedule the following are persons discharging managerial responsibilities" within an issuer— (a) any director of the issuer (or person occupying the position of director, by whatever name called); (b) in the case of an issuer whose affairs are managed by its members, any member of the issuer; (c) in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication.

(6) The following definitions (which apply generally for the purposes of Part 6 of this Act) do not apply for the purposes of this Schedule: (a) section 102A(1), (2) and (6) (meaning of "securities" and "issuer")."

62.    In *Bennion, Bailey and Norbury on Statutory Interpretation* 8th ed (2020) the editors state that where an Act uses a concept that has an established legal meaning it will generally be interpreted as having the same meaning: see section 25.2 (p.829). They also state as follows at p.830 under the heading "Incorporation by reliance on similar concepts":

"An Act sometimes uses language which describes a concept in terms that are similar but not identical to an existing legal concept. The question then is whether the legislative intention was to incorporate or attract the common law rules, wholly or in part, or to start afresh. External aids to construction may help to shed light on the legislative intent.

EXAMPLE

In *Milne v Express Newspapers Ltd* the Court of Appeal held that the words 'had reason to believe' in the Defamation Act 1996, s 4(3), imported the legal concept of recklessness as discussed in earlier case law. In doing so they relied on the fact that this interpretation was consistent with recommendations made in the report of the Supreme Court Procedure Committee on Practice and Procedure in Defamation (the Neil committee, 1991), which the Act implemented.

EXAMPLE

In *Jones v Tower Boot Co Ltd* the question was whether the words 'in the course of his employment' in the Race Relations Act 1976, s 32(1), incorporated the common law rules relating to vicarious liability. The claimant had been subjected to racial abuse by two fellow employees. The employer denied liability on the basis that it was only responsible under s 32 for things done by an employee 'in the course of his employment' and, drawing on the common law doctrine of vicarious liability, this excluded the acts complained of. It was held that, having regard to the purpose of the Act, the words were to be given their natural everyday meaning and not to be construed restrictively by reference to the principles governing vicarious liability at common law.

EXAMPLE

The Suicide Act 1961, s 1, abolishes the crime of suicide. Section 2(1) as originally enacted went on to state that a person who 'aids, abets, counsels or procures' the actual or attempted suicide of another commits an offence. Despite using the normal language of secondary liability, the aided party commits no crime so the defendant must in fact commit the offence as a principal rather than a secondary party. It is unclear whether the wording was intended, impliedly, to bring in the usual ancillary rules governing aiding, abetting etc (for example as to the need for and nature of mens rea)."

63. One of the issues which I have to decide is whether the legislative intention was to incorporate the common law concept of reliance or whether Parliament intended to "start afresh". I also have to decide how much weight to attach to the Davies Review and the Treasury Consultation. Lord Hodge DPSC gave guidance in relation to that issue in *R(O) v Secretary of State for the Home Department* [2022] UKSC 3, [2023] AC 255 at [30]:

"External aids to interpretation therefore must play a secondary role. Explanatory Notes, prepared under the authority of Parliament, may cast light on the meaning of particular statutory provisions. Other sources, such as Law Commission reports, reports of Royal Commissions and advisory committees, and Government White Papers may disclose the background to a statute and assist the court to identify not only the mischief which it addresses but also the purpose of the legislation, thereby assisting a purposive interpretation of a particular statutory provision. The context disclosed by such materials is relevant to assist the court to ascertain the meaning of the statute, whether or not there is ambiguity and uncertainty,

and indeed may reveal ambiguity or uncertainty: Bennion, Bailey and Norbury on Statutory Interpretation, 8th ed (2020), para 11.2. But none of these external aids displace the meanings conveyed by the words of a statute that, after consideration of that context, are clear and unambiguous and which do not produce absurdity."

E.    Reliance

*(1)    A textbook definition*

64.    I turn next, therefore, to reliance in the law of deceit. Ms Davies relied upon Cartwright Misrepresentation, Mistake and Non-Disclosure 6th ed (2019) for a textbook definition or description of reliance in the law of misrepresentation. Professor Cartwright described what we mean by reliance in this context at 3—54:

> "**"Reliance" as the core requirement** It is often misleading to talk in terms of a statement having caused loss; at least, a statement "causes" loss in a different way from an act. A badly built wall may fall over and injure a passer-by. It is not difficult to see that the defective workmanship caused the injury. But if I advise you that a wall is safe, and you walk past it and it falls over, your injury is "caused" in a different way: you took my words, trusted them and yourself took an action which put you in a position in which you suffered damage. A statement affects the decision-making processes of the person who reads or hears it, and that person then takes his own action in the light of the statement. For many of the remedies, therefore, rather than using the language of "causation", it is more usual to speak of the representee's reliance on the statement; by "reliance" we are focusing on this causal link between the statement and the representee's own actions which then gave rise to the harm of which he complains, whether it is entering into the contract or doing some other act which resulted in his suffering loss."

65.    Professor Cartwright distinguished between actual reliance and reasonable reliance (e.g. in the tort of negligence) and also between materiality and reliance. He pointed out that materiality is neither necessary nor sufficient to establish liability. Materiality may establish an inference that the representee relied upon the representation but the strength of that inference will depend on the context and may transfer the burden to the representor of adducing evidence to rebut the inference: see 3—55 and 3—56. But he also stated that the presumption of reliance or inducement cannot "trump" the requirement that the representee was aware of the statement (citing *Leeds City Council v Barclays Bank plc* below): see footnote 267. He then continued at 3—57:

"**The difficulty of proving reliance; multiple causes** The courts'
willingness to infer reliance from the materiality of a statement is a
consequence of the difficulty faced by a representee in proving why he
entered into a contract. "It is impossible so to analyse the operations of the
human mind as to be able to say how far any particular representation may
have led to the formation of any particular resolution, or the adoption of
any particular line of conduct. No one can do this with certainty, even as
to himself, still less as to another." Using as the paradigm case the pre-
contractual misrepresentation, the starting-point is clear: look for evidence
that the statement caused the representee to enter into the contract—or, at
least, was one of the causes. The decision to enter into a contract is
generally based on a range of motives and as long as any one of those
motives is vitiated by the misinformation given by the other party, it is
enough to undermine the whole transaction: the misrepresentation need not
be the sole cause of the representee's decision to enter into the contract."

*(2)    The prospectus cases*

66.    Ms Davies also relied on three well-known 19th century cases which made a major
contribution to the development of the law of deceit. As it happens, all three involved
claims by investors that statements in a prospectus were untrue and were decided in the
decade immediately preceding *Derry v Peek* (1889) 14 App Cas 337 and the enactment
of the Directors Liability Act 1890. In *Arkwright v Newbold* (1881) 17 Ch D 301 the
plaintiff alleged that the promoters of a company had falsely represented in the
prospectus that they agreed to pay £32,500 and that this was untrue because the true price
was £28,500 and the balance had been misappropriated by the directors personally. Fry
J held that the claim was made out but the Court of Appeal overruled his decision on the
basis that although there had been misconduct by the directors, the prospectus did not
contain a false representation. Cotton LJ also considered that there was no evidence that
the claimant had been deceived. He stated this at 324-5:

"I have dealt with that point in order to shew that, in my opinion, there is
no ground for reliance on that part of the prospectus as maintaining this
action; but I ought to add that in an action of deceit the Plaintiff cannot
establish a title to relief simply by shewing that the Defendants have made
a fraudulent statement: he must also shew that he was deceived by the
statement, and acted upon it to his prejudice. But in this case, although the
Plaintiff knew from the defence how the Defendants put their case, and
probably knew it from what had taken place previously, he does not in his
pleading allege that, even according to the Defendant's own case, the
statement of the prospectus as to the remuneration of the directors was
false. I should be reluctant to decide the case on the ground of pleading,
but the Plaintiff does not carry the case further in his evidence. All he says

is this: "I saw that there was no promotion money to be paid, and I saw Mr. Grimes' name, whom I knew as a retired paper-maker, and I thought he would know if it was a profitable concern." Therefore he does not allege that he relied on the prospectus as saying, "The directors shall get nothing from anybody except what they get from the shareholders, and that shall be a commission only on the profits." In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement, according to the construction put on it by the Court, is false, when the plaintiff does not venture to swear that he understood the statement in the sense which the Court puts on it. If he did not, then, even if that construction may have been falsified by the facts, he was not deceived."

67.     In *Smith v Chadwick* (1884) 9 App Cas the House of Lords held that a statement in a prospectus was ambiguous and capable of two interpretations and that the plaintiff had failed to prove that he had understood the words in the sense in which they were false. In *Crossley v Volkswagen AG* [2021] EWHC 3444 (QB), [2023] 1 All ER (Comm) 107, a case which I will have to consider in greater detail below, Waksman J provided the following summary of the decision at [51] to [57] (which I gratefully adopt):

> "51.   *Smith v Chadwick* (1884) 9 App Cas 187, [1881–5] All ER Rep 242 was a decision of the House of Lords. The claimant alleged that he had been induced to buy shares by a statement contained in the defendant's Prospectus which stated that: '… the present value of the turnover or output of the entire works is over £1,000,000 sterling per annum.'
>
> 52.   That statement admitted of two interpretations. It could have meant that the actual turnover for the year exceeded £1m in which case it was plainly false. Or it could have meant that the works were capable of producing that output, in which case it was true.
>
> 53.   Prior to trial, the claimant was served with interrogatories asking him to say what his understanding of the words was. Somewhat unhelpfully, he said that he understood the words to mean 'that which they obviously convey' and added that he could not express in any other words what he understood to be their meaning. At trial, the claimant was neither examined nor cross-examined about his understanding. He succeeded at first instance and recovered £5,000 damages for fraudulent misrepresentation. The Court of Appeal reversed that judgment and dismissed the action.
>
> 54.   In the House of Lords, Lord Bramwell upheld the decision of the Court of Appeal, even though he thought that the representation could only mean a reference to actual output and was therefore false. However, he was not satisfied that the statement had been made fraudulently.
>
> 55.   The lead judgment, with which the Earl of Selborne LC and Lord Watson agreed, was given by Lord Blackburn. He stated ((1884) 9 App Cas 187 at 195, [1881–5] All ER Rep 242 at 246) that whatever the statement meant, the claimant had not sufficiently proved that it did

influence him. Later, he said that the claimant must prove damage and if he did not act upon the representations he showed no damage. He went on to refer to the fact that it was not always necessary to call the claimant as a witness to prove that he acted upon the inducement. If it could be proved that the defendant, with a view to inducing a person to enter the contract, had made a statement to the representee which was such as would be likely to induce a person to enter into a contract and it was proved that the claimant did enter into the contract, it was a fair inference of fact that he was induced to do so by the statement.

56. Lord Blackburn thought that the words used here could plausibly have had the sense contended for by the defendant (and indeed Cotton LJ in the Court of Appeal thought they bore that meaning). However, he went on to say that he could not see why the claimant did not give evidence as to whether he understood the words to mean what his case alleged, rather than as the defendant alleged. He thought that the claimant's own counsel did not wish to examine him in case he gave the wrong answer and vice-versa for the defendant's counsel wishing not to cross-examine him. But the burden was on the claimant to show that he had been induced by the representation to buy the shares.

57. Here, the point was not that the claimant had not seen the words in question. It was rather that they bore two possible meanings and he had put forward no positive evidence to establish the sense in which he understood them, which was critical to the question of reliance. Accordingly, awareness as such was not the key issue but rather it was his understanding. That said, I take the point made by VW here that it is hard to see how the relevant understanding (whatever it was) did not involve awareness of the words in question."

68.  Because of the nature of the argument in the present case, it is necessary to analyse *Smith v Chadwick* in a little more detail. At first instance, Fry J held that the prospectus contained a number of false statements and that they led the plaintiff to subscribe for shares. The Court of Appeal allowed the appeal see (1882) 20 Ch D 27.  Sir George Jessel MR held that Fry J had made a number of errors in his judgment and that the turnover statement was ambiguous and not untrue: see 63. He described the prospectus at 67 as in some respects careless but a fair, honest and bona fide attempt to state the truth. In the early part of his judgment he articulated the following test at 44:

"Again, on the question of the materiality of the statement, if the Court sees on the face of it that it is of such a nature as would induce a person to enter into the contract, or would tend to induce him to do so, or that it would be a part of the inducement, to enter into the contract, the inference is, if he entered into the contract, that he acted on the inducement so held out, and you want no evidence that he did so act; but even then you may shew that in fact he did not so act in one of two ways, either by shewing that he knew the truth before he entered into the contract, and therefore,

> could not rely on the mis-statements; or else by shewing that he avowedly did not rely upon them, whether he knew the facts or not. He may by contract have bound himself not to rely upon them, that is to take the matter at his own risk whether they were true or false (which was the conclusion to which the House of Lords came in the recent case of *Brownlie v. Campbell*, or he may state that he did not rely upon them in the witness-box, which I think is so in one instance here. But unless it is shewn in one way or the other that he did not rely on the statement the inference follows."

69.     Sir George Jessel found that this test was not satisfied and that even if the statement bore the meaning found by Fry J it was not a material inducement: see 66. Cotton LJ disagreed with him on the question whether the statement in the prospectus was untrue but he concurred in the result. He stated (at 68) that it must be shown that: "the Plaintiff was deceived, and induced by the deceit that was practised upon him to do something to his prejudice, in respect of which prejudice he claims damages." He then stated his conclusion at 74-5:

> "Now, under these circumstances, in my opinion, even although the construction may be that which Mr. Justice Fry put upon it; yet how can we come to the conclusion in that state of the evidence that the Plaintiff was induced to act to his prejudice by any false statements made by the Defendants in that respect? Of course it may be that where there is a positive statement in clear terms, it is unnecessary for a man to come forward and say how he understood it; where there is a precise statement of a fact about which statement there can be no mistake, then, if that is shewn to be false, it may be assumed that the Plaintiff understood it in the meaning which alone it can have; but here where there is a statement at least of doubtful interpretation, I adhere to what I said in *Arkwright v. Newbold*, that the Plaintiff, coming as he does here, cannot call upon the Court to grant him relief, even if the statement is shewn to be incorrect, and made by the Defendants under such circumstances as to render them subject to liability in consequence of the misstatement so made. Those I think are all the grounds on which the Plaintiff here relies for relief. In my opinion he has not established that there were statements incorrect in fact made by the Defendants by which he was induced to act to his prejudice; or if there is any statement which is incorrect that it was made by the Defendants knowingly or recklessly so as to render them liable."

70.     Lindley LJ also found that the turnover statement in the prospectus was ambiguous. But he also held that the plaintiff had not been induced to acquire shares in reliance on any of the statements in the prospectus. He set out his conclusion at 80:

> "Now I come to the last question, whether the Plaintiff has proved that he took his shares in this company on the faith of any of the statements in the

prospectus which are alleged to be untrue. I have read his evidence with the greatest possible care, and I cannot come to that conclusion as a matter of fact. The conclusion at which I have arrived, after carefully studying his evidence, is that he knew something about Messrs. Hannay —I think nothing very much—but he knew them to be an old-established firm; he knew something in the same way of Messrs. Chadwick; he had confidence in them that they would not pass off rubbish or be guilty of issuing a fraudulent prospectus; and his knowledge of the two firms induced him to take the shares, but there was no particular expression in the prospectus which he relied on. He relied on the prospectus as a whole; and as a whole I have not the slightest hesitation in saying I think it is an honest prospectus. We have prospectuses varying in point of fraud in every conceivable degree; many of them are tissues of lies from beginning to end. Here is an extreme case in the other direction. I believe it is a thoroughly honest prospectus; and but for one single awkward expression it appears to me the Plaintiff would have no ground of complaint whatever."

71.    The House of Lords upheld the decision. Lord Blackburn gave the principal speech and the Earl of Selborne LC and Lord Watson both agreed with him (as Waksman J pointed out in *Crossley*). It is clear from his speech that he considered it necessary for the plaintiff to prove that the relevant representation had influenced him to act and that he had acted upon it. He stated this at 195-196:

> "I have come to the conclusion that whatever be the meaning of that statement the plaintiff has not sufficiently proved that it did influence him. I do not say that there is no evidence on which a verdict for the plaintiff might be found. I certainly think that, if trying this cause with a jury, I should not be justified in withdrawing it from the jury. I do not even say that a verdict for the plaintiff if found by a jury would be so unsatisfactory that there should be a new trial. But I should have accompanied my direction to the jury with the same observations which I shall hereafter submit to your Lordships as justifying the conclusion to which the Court of Appeal have come and to which I myself come, and to which I ask your Lordships to come; and I think that the jury would, on hearing them, have probably found for the defendants.
>
> Before going further I wish to make some observations; for though I very nearly agree in what is said by the late Master of the Rolls, he does not quite state what I conceive to be the law. I do not mean to go through the numerous decisions on the subject of an action of deceit. All those which were decided before the date of the last edition of Smith's Leading Cases are to be found collected in the notes to *Chandelor v Lopus* and *Pasley v Freeman*. In *Pasley v Freeman* (3) Buller J. says: "The foundation of this action is fraud and deceit in the defendant and damage to the plaintiffs. And the question is whether an action thus founded can be sustained in a court of law. Fraud without damage, or damage without fraud, gives no cause of action, but where these two concur an action lies, per Croke J."

Whatever difficulties there may be as to defining what is fraud and deceit, I think no one will venture to dispute that the plaintiff cannot recover unless he proves damage. In an ordinary action of deceit the plaintiff alleges that false and fraudulent representations were made by the defendant to the plaintiff in order to induce him, the plaintiff, to act upon them. I think that if he did act upon these representations, he shews damage; if he did not, he shews none. And I think the plaintiff in such a case must not only allege but prove this damage. It is as to what is sufficient proof of this damage that I wish to make my remarks. I do not think it is necessary, in order to prove this, that the plaintiff always should be called as a witness to swear that he acted upon the inducement. At the time when *Pasley v Freeman* was decided, and for many years afterwards, he could not be so called. I think that if it is proved that the defendants with a view to induce the plaintiff to enter into a contract made a statement to the plaintiff of such a nature as would be likely to induce a person to enter into a contract, and it is proved that the plaintiff did enter into the contract, it is a fair inference of fact that he was induced to do so by the statement. In *Redgrave v Hurd*[1] the late Master of the Rolls is reported to have said it was an inference of law. If he really meant this he retracts it in his observations in the present case. I think it not possible to maintain that it is an inference of law. Its weight as evidence must greatly depend upon the degree to which the action of the plaintiff was likely, and on the absence of all other grounds on which the plaintiff might act. I quite agree that being a fair inference of fact it forms evidence proper to be left to a jury as proof that he was so induced. But I do not think that it would be a proper direction to tell a jury that if convinced that there was such a material representation they ought to find that the plaintiff was induced by it, unless one of the things which the late Master of the Rolls specified was proved; nor do I think he meant to say so. I think there are a great many other things which might make it a fair question for the jury whether the evidence on which they might draw the inference was of such weight that they would draw the inference. And whenever that is a matter of doubt I think the tribunal which has to decide the fact should remember that now, and for some years past, the plaintiff can be called as a witness on his own behalf, and that if he is not so called, or being so called does not swear that he was induced, it adds much weight to the doubts that the inference was a true one. I do not say it is conclusive."

72.    In *Edgington v Fitzmaurice* (1889) 29 Ch D 459 the directors of a company issued a prospectus inviting shareholders to subscribe for debentures. They stated in the prospectus that the purpose of the issue was to enable the company to carry out alterations to their premises, to buy horses and vans and to develop a supply of cheap fish. In

---

[1] *Redgrave v Hurd*  was decided the previous year but is reported in the law reports immediately before the decision of the Court of Appeal in *Smith v Chadwick*: see (1881) 20 Ch D 1. The passage to which Lord Blackburn was referring (above) is on p.21 of the law report in which Sir George Jessel MR stated the presumption of inducement was "an inference of law" which could be rebutted by proof that the claimant knew the truth or clear evidence that he or she did not rely on the representation.

substance, these statements gave the impression that the company was looking to expand rather than being in dire financial trouble. The plaintiff subscribed for £1,500 mistakenly believing that the debentures would be secured by a mortgage over the company's property and that a second charge would be paid off. Denman J held that the statements in the prospectus were false and gave judgment for the plaintiff.

73.    The Court of Appeal dismissed the appeal on the basis that the statements of intention were actionable and that the plaintiff had relied on them. On appeal the defendant's counsel, Mr Horace Davey QC (later Lord Davey), squarely argued that the plaintiff had not been misled by the statements of purpose in the prospectus because he gave evidence that he was induced to subscribe for debentures in the belief that he would have a charge on the company's property and now admitted that this was a mistake: see 477. Cotton LJ dealt with this argument at 480-1:

> "But it was urged by the counsel for the Appellants that the Plaintiff himself stated that he would not have taken the debentures unless he had thought they were a charge upon the property, and that it was this mistaken notion which really induced the Plaintiff to advance his money. In my opinion this argument does not assist the Defendants if the Plaintiff really acted on the statement in the prospectus. It is true that if he had not supposed he would have a charge he would not have taken the debentures; but if he also relied on the misstatement in the prospectus, his loss none the less resulted from that misstatement. It is not necessary to shew that the misstatement was the sole cause of his acting as he did. If he acted on that misstatement, though he was also influenced by an erroneous supposition, the Defendants will be still liable. Did he act upon that misstatement? He states distinctly in his evidence that he did rely on the Defendants' statements, and the learned Judge found, as a fact, that he did, and it would be wrong for this Court, without seeing or hearing the witness, to reverse that finding of the Judge. We must therefore come to the conclusion that the statements in the prospectus as to the objects of the issue of the debentures were false in fact, and were relied upon by the Plaintiff."

74.    Bowen LJ agreed with Cotton LJ that the statements had been made fraudulently and that the plaintiff had relied upon them. He began his judgment by identifying the ingredients of the tort of deceit at 481-2:

> "This is an action for deceit, in which the Plaintiff complains that he was induced to take certain debentures by the misrepresentations of the Defendants, and that he sustained damage thereby. The loss which the Plaintiff sustained is not disputed. In order to sustain his action he must first prove that there was a statement as to facts which was false; and

secondly, that it was false to the knowledge of the Defendants, or that they made it not caring whether it was true or false. For it is immaterial whether they made the statement knowing it to be untrue, or recklessly, without caring whether it was true or not, because to make a statement recklessly for the purpose of influencing another person is dishonest. It is also clear that it is wholly immaterial with what object the lie is told. That is laid down in Lord Blackburn's judgment in *Smith v. Chadwick*, but it is material that the defendant should intend that it should be relied on by the person to whom he makes it. But, lastly, when you have proved that the statement was false, you must further shew that the plaintiff has acted upon it and has sustained damage by so doing: you must shew that the statement was either the sole cause of the plaintiff's act, or materially contributed to his so acting."

75.   After making the famous observation that "the state of a man's mind is as much a fact as the state of his digestion" he dealt with the argument that the plaintiff did not rely on the statement in the prospectus because he only subscribed for the issue in the belief that the debt would be secured on the company's property (at 483-4):

> "Then the question remains - Did this misstatement contribute to induce the Plaintiff to advance his money. Mr Davey's argument has not convinced me that they did not. He contended that the Plaintiff admits that he would not have taken the debentures unless he had thought they would give him a charge on the property, and therefore he was induced to take them by his own mistake, and the misstatement in the circular was not material. But such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the Defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a mistake himself could make no difference. It resolves itself into a mere question of fact."

76.   Finally, Fry LJ (who had tried both *Arkwright v Newbold* and *Smith v Chadwick* at first instance) upheld the judge's decision that the plaintiff had relied on the false statements in the prospectus. He stated as follows at 484-5:

> "The next inquiry is whether this statement materially affected the conduct of the Plaintiff in advancing his money. He has sworn that it did, and the learned Judge who tried the action has believed him. On such a point I should not like to differ from the Judge who tried the action, even though I were not myself convinced, but in this case the natural inference from the facts is in accordance with the Judge's conclusion. The prospectus was intended to influence the mind of the reader. Then this question has been raised: the Plaintiff admits that he was induced to make the advance not merely by this false statement, but by the belief that the debentures would

give him a charge on the company's property, and it is admitted that this was a mistake of the Plaintiff. Therefore it is said that the Plaintiff was the author of his own injury. It is quite true that the Plaintiff was influenced by his own mistake, but that does not benefit the Defendants' case. The Plaintiff says: I had two inducements, one my own mistake, the other the false statement of the Defendants. The two together induced me to advance the money. But in my opinion if the false statement of fact actually influenced the Plaintiff, the Defendants are liable, even though the Plaintiff may have been also influenced by other motives. I think, therefore, the Defendants must be held liable. The appeal must therefore be dismissed."

77.    These authorities have been consistently applied in a modern context. For example, in *Marme Inversiones 2007 SL v NatWest Markets plc* [2019] EWHC 366 (Comm) Picken J cited the passages in Cartwright (above) and *Arkwright v Newbold* and traced their modern application at [281] to [286]. Indeed, he cited both *Arkwright v Newbold* and *Smith v Chadwick* at [285]:

> "As Mr Howe QC observed, this passage was cited with approval by Asplin J in another express representation case, *Bonham-Carter v SITU* [2012] EWHC 3589 (Ch), at [131], as supporting the proposition that "the representee must establish that he subjectively interpreted the representation in the sense in which the court has found it to be false". It was also, previously, cited by Rix LJ in *The Kriti Palm* [2007] 2 CLC 223 at [253] and, again, at [278] when dealing with the absence of evidence from a Mr Whitaker as to what his understanding was in relation to a particular conversation where the representation was said to have been made (see [274]). It was, indeed, the absence of similar evidence in a claim for misrepresentation where the critical words in a company prospectus ("the present value of the turnover or output of the entire works") were ambiguous which led the House of Lords in *Smith v Chadwick* (1884) 9 App Cas 187 (Lord Bramwell dissenting on this point on the facts) to decide that the claim could not succeed. In that case, the claimant gave evidence merely that he understood the words to mean "that which the words obviously conveyed" without explaining the meaning he understood them to convey."

*(3)    The implied representation cases*

78.    In *Edgington v Fitzmaurice* the directors were found to have lied about the purpose for which they needed to raise capital. By contrast, *Marme* was a case in which the defendants were alleged to have made implied representations. Financial institutions may make factual statements about their operations or their systems and controls which are alleged by borrowers or investors to carry a degree of assurance about their integrity or that their officers and employees have conducted themselves honestly. The borrowers or

investors may contend that factual statements were obviously designed or intended to reassure them but may be unable to persuade the Court that the individual decision-maker actively considered this issue or was consciously re-assured by the context in which the express statements were made. Further, the more detailed or complex the implied representations are said to be, the more difficult it is to prove that a decision-maker relied on them and the harder it is to resist the conclusion that they are no more than a lawyer's construct.

79.    In *Marme*, for example, a borrower alleged that a number of banks had impliedly represented that they and other banks had not manipulated EURIBOR rates and had acted honestly in relation to setting those rates. Picken J held that the relevant representations had not been made. But he also held that reliance had not been established because the decision-maker did not understand that any of the implied representations had been made to him and that those representations (or something approximating to them) were not and could not be "actively present to his mind": see [288].

80.    In *Property Alliance Group Ltd v The Royal Bank of Scotland plc* [2016] EWHC 3342 (Ch) Asplin J (as she then was) held that a term was to be implied into the relevant swaps contracts that the parties would conduct themselves honestly when performing the contract. But she dismissed the claim on the basis that the banks had not made the specific representations alleged and the borrower had not relied on them. The Court of Appeal disagreed with the judge about the scope of the representations but affirmed her decision on reliance: see [2018] EWCA Civ 355, [2018] 1 WLR 3529.

81.    A third case in which the Court had to consider reliance on implied representations in the context of interest rate swaps was *Leeds City Council v Barclays Bank plc* [2021] EWHC 363 (Comm), [2021] QB 1027. This important decision was also an application to strike out the claim and Cockerill J conducted an extensive review of the authorities on reliance before concluding that awareness of the implied representation was a requirement of liability: see [144]. She also held that the borrowers had no real prospect of success in establishing liability on the basis of their pleaded cases: see [154] to [162].

82.    Cockerill J was asked to revisit her decision in *Leeds* at the trial of the subsequent claim in *Loreley Financing (Jersey) No 30 Ltd v Credit Suisse Securities (Europe) Ltd*: see [2023] EWHC 2759 (Comm). That case did not involve interest rate swaps but a credit

default swap backed by residential mortgage-backed securities. The investors purchased US $100 million of notes through a private placement and alleged that the issuer had made implied representations in relation to both the honesty of its past and future conduct and the credit-rating of the notes (together with certain other representations). These allegations all failed: see [321] to [373].

83. Cockerill J also held that the investors' case on reliance failed: see [374] to [436]. In *Loreley* the question whether it is an ingredient of the tort of deceit that the representation must be actively present to the mind of the claimant was critical because the claimants had adduced no evidence that they had read the relevant term sheets or understood the issuer to be giving the implied assurances which they alleged: see [426] to [435]. Moreover, in reaching her decision Cockerill J also had to consider not only whether her own decision in *Leeds* was correct but also whether it could stand in the light of Waksman J's decision in *Crossley v Volkswagen AG* (above).

84. *Crossley* was also a decision on an application to strike out and for reverse summary judgment (as in *Leeds* and as in the present case). In that case Waksman J refused to strike out claims for deceit brought by a claims group of purchasers of VW cars based on the implied representation that the vehicles which they had purchased complied with all statutory and regulatory requirements including emissions limit. The judge began his analysis of the law with *Smith v Chadwick* and I have set out the relevant passage above when dealing with the prospectus cases. He dealt with *Edgington v Fitzmaurice* at [58]:

> "58. *Edgington v Fitzmaurice* (1885) 29 Ch D 459, [1881–5] All ER Rep 856, was another prospectus case, decided by the Court of Appeal. The key question was whether the claimant could maintain the claim where he was partly influenced by his own mistake but also partly by the defendant's material misstatement of fact. Again, therefore, awareness of the relevant representation was not itself in issue. Cotton LJ stated ((1885) 29 Ch D 459 at 481, [1881–5] All ER Rep 856 at 860) that: 'It is not necessary to shew that the misstatement was the sole cause of his acting as he did. If he acted on that misstatement, though he was also influenced by an erroneous supposition, the Defendants will still be liable.'
>
> 59. Bowen LJ stated ((1885) 29 Ch D 459 at 483, [1881–5] All ER Rep 856 at 861–862) that: '… Such misstatement was material if it was actively present to his mind when he decided to advance his money. The real question is, what was the state of the Plaintiff's mind, and if his mind was disturbed by the misstatement of the defendants, and such disturbance was in part the cause of what he did, the mere fact of his also making a statement himself could make no difference.'"

85.  Waksman J reached his decision principally for pragmatic, case management reasons. But it is right to say that he was not prepared to accept that the members of the claims group had no real prospect of succeeding at trial even if they were unable to demonstrate that they had each been aware of the implied representation. He distinguished *Leeds* on the basis that the factual basis for the claims was very different and he set out his detailed conclusions at [94] to [98]:

> "94. The case before me is very different from *Leeds* (and indeed *PAG* and *Marme*). The conduct, and the representations to be implied therefrom, as pleaded at para 63 of the GPOC (albeit at some length) are both in fact relatively simple. They are not to be spelled out from a complex web of communications. And while in *Leeds* it was to be assumed that the implied representations have been made out, it cannot be denied that the whole context was one where the implied representations might have been difficult to establish and indeed were positively rejected in *PAG* and *Marme*.

> 95. In my judgment, at the end of the day, and for present purposes, it is the approach to summary judgment taken by Cockerill J that is as important as her analysis of the law. Absent *PAG* and *Marme*, if *Leeds* had to be considered in a vacuum, it seems likely that she would have found that this was an unsuitable case for determining the relevant issue at the summary judgment stage as opposed to at trial. In that sense, this case is being dealt with in a vacuum.

> 96. One then has to remember that *Leeds* will be heard by the Court of Appeal on 22 February 2022. Cockerill J must have taken the view that there was a real prospect of a successful appeal on the point of law and/or that there was a compelling reason for an appeal because she granted permission.

> 97. In addition, I do think there are real questions arising from what is to be drawn from the fact that an implied representation from conduct is established which means that the reasonable representee would assume or infer the content of the representation from the conduct observed. It was put to me in argument by the Claimants that it would be odd if a reasonable representee was found to have made that assumption or inference, and yet such an assumption or inference was not sufficient on the part of the actual representee. I appreciate that the former question is an objective one whereas the latter is subjective, depending on the state of mind (or direction of thought) of the actual representee. Nonetheless, I think that there are particular issues raised where implied representations by conduct are alleged and which have yet to be fully worked out. Given also the decisions of the Court of Appeal in *Spice Girls* and *Gordon* and the House of Lords in *Ray*, and notwithstanding *Smith v Chadwick* and the other cases referred to above where the question of awareness was not directly for decision, there is in my view a real prospect of success for the Deceit Claim

here. This is in circumstances where a relevant assumption or CFOT[2] must be taken to exist or at any rate is likely to be established or at least there is a real prospect of it being established. Further, I do not consider that the whole issue of the Awareness Condition could seriously be described as a 'short point of law' which I should grapple with now. Accordingly, I do not determine that issue at this stage.

98. There are other points, too. First, I understand why VW says that there is an underlying utility in disposing of the Deceit Claim if there were nothing in it, even if there remains a substantial trial. However, the trial here is likely to remain very extensive and involved. It is not as if one would be able by this course to reduce a trial listed for a week or two down to a day or two or at least narrow it substantially. Second, and this is allied to the first point, VW's conduct in relation to the defeat device and its alleged dishonesty (assumed before me for the purpose of these applications) will still be relevant at trial. Apart from anything else, there is a claim here for exemplary damages. Yet further, the whole issue of reasonable consumer expectations will figure prominently in respect of the contractual, CPUT and unfair relationship claims, or at least it is plausible to think that they will. Indeed, on the Claimants' SQ Application (to which I will refer shortly) VW's own position is that this sort of evidence will be highly important. It is indeed why there is a sense in which the two applications before me are both somewhat double-edged. It is impossible in my view, and at this stage of the process, to draw a clear differentiation between the evidence that will be relevant and admissible on the Deceit Claim on the one hand, and on the Satisfactory Quality and further claims on the other. Yet further, in my judgment, the law in this area cannot be said to be complete or fully developed. This is a classic case where I should on any view avoid determining it ahead of trial and in the absence of all relevant findings of fact. For all of those reasons, even if there were no real prospect of success on the Deceit Claim, these are all compelling reasons for a trial.

99. It therefore follows that the principal part of the Deceit Claim Application must be dismissed."

86. In *Loreley* Cockerill J analysed *Crossley* closely but reached the same conclusion as she had done in *Leeds,* namely, that it was necessary to prove awareness of the statement or statements: see [388]. She also pointed out that *Leeds* had settled just prior to the hearing of the appeal: see [374]. She expressed her overall conclusions in the following passage at [421] to [425]:

"421. I conclude that the law does require that a representation (however made) is received by the representee and that to satisfy the requirements of reliance the representee must be aware of it/have it actively present to their mind when they act on it.

_____

[2] The counterfactual of truth.

422. Mr Lord endeavoured to persuade me that in this context a test of "present to the mind" would suffice. This I regard as a dangerous step away from where the authorities stand, essentially because such a test too easily elides into assumption. "Actively present to the mind", becomes "present to the mind", from which it is but a short distance to "at the back of my mind" - which was exactly where L30 wanted to go because that was what Dr Bauknecht said. But where something is at the back of the mind is it because of assumption or representation? Very often it will be only because of an assumption unconnected to what has been said or done. Accordingly I consider that this approach merely provides another route to dissolve the distinction between representation and assumption – which is also the division between representation and non-disclosure. This is a problem which is particularly acute when (as here) one is dealing with implied representations as to honesty, because it turns every contract into a contract of utmost good faith.

423. I return finally to the fault line which plainly exists in the cases. The authorities above show that there are cases where on the particular facts in play reliance/inducement is found without any distinct evidence of understanding or awareness being identified. It is fair to say that when placed under the analytical microscope those cases do offer a different flavour to those which I have decided establish the orthodoxy which applies where a question arises as to reliance based on an issue as to the operativeness of a representation. But it can be seen that these cases where no evidence of understanding/awareness is separately discernible are, in type, very different cases to the ones where this issue is really live. There are two hallmarks which appear to drive the distinction. The first is that in the *Gordon v Selico*/*Spice Girls* type case the representation is simple and cannot well be missed by the representee. There is no issue as to whether the representation is discerned so as to be operative. In the *Leeds* and current type case, the representation is being said to be capable of being implied despite complex contractual provisions, usually in complex multifaceted transactions. That pushes to the fore a need to see what has been registered or understood.

424. The second (related) distinction is that in the *Gordon v Selico*/*Spice Girls* type case the representation is one which is at the heart of the transaction. Are you buying a good flat or a money pit? Are you buying the star power of a flourishing or an imploding group? Both of these factors mean that the question of awareness is one to which the answer is obvious (the representee cannot miss it) and where the whole question of reliance is, in the light of that, likely to be susceptible of being decided by the presumption of inducement. As noted above, it would have taken a brave counsel to raise this point in *Gordon v Selico* (when the court had been prepared to find a representation). In *Spice Girls* a similar flavour emerges from the use of the word "inconceivable" in [72] of the Court of Appeal judgment. In the banking cases awareness is far from obvious; so much else is being said more explicitly that there are real questions as to whether a particular implicit message is received and understood. A proffering of a complex transaction such as this is not analogous to the ordering of a meal or the raising of an auction paddle.

425. All of this of course feeds back in to the question of making of the representation. In these more complex cases the question will often arise either contingently (as here – arising only if I am wrong about the making of the representations) or (as in *Leeds*) based on an assumption which might never be made out; but the facts that drive the first conclusion impact on the situation where causation arises. In the simpler cases the answer is often either so obvious that there is no dispute, or the court may be prepared (instinctively, but I would suggest technically incorrectly) to elide the question into the presumption of inducement. That is in essence the point being made by Longmore LJ in *BV Nederlandse v Rembrandt Enterprises* [2019] EWCA Civ 596 [2020] QB 551 at [45] to which Mr Lord alluded in reply. None of this however affects the logic of the argument. Because points are not in some cases taken, does not mean that they are not there."

87.    The final authority on implied representations to which I was taken was *Farol Holdings Ltd v Clydesdale Bank plc* [2024] EWHC 593 (Ch). That case involved four test claims brought by the borrowers of business loans who had agreed to pay a fixed interest rate calculated by reference to a basic rate plus an additional margin cost. They alleged that the bank had made an express representation about the break costs of those loans: see [20](1). But they also alleged that the bank had made a series of implied representations in relation both to the break costs and the interest rate: see [20](2) and [26]. These included representations that the margin was the only profit which the bank was making from the loans, that it did not include any hidden additional margin or profit and that the interest rate was a market rate fixed by reference to external sources. The borrowers brought claims in both negligence and deceit.

88.    Zacaroli J (as he then was) dismissed all of the claims for a number of detailed reasons which it is unnecessary for me to rehearse here. However, he set out the elements of inducement and reliance in the tort of deceit more generally at [216] to [219]:

"216. Fifth, the representee must in fact have been induced to take action – for example entering into a contract – in reliance on the representation. The misrepresentation need not be the only reason for the representee's decision to enter into the contract, but the representee will have no cause of action if it would have entered into the contract on the same terms even if the representation had not been made. If it is proved that a false statement is made which was material – in the sense that it was likely to induce entry into the contract – then there is an evidential presumption (of fact, not law) that the representee was so induced. The presumption is stronger if the representation was made fraudulently.

217. The relevant question in this respect is whether the claimant would have entered into the contract if the representation had not been made at

all, not whether it would have done so if it had been told the true position: see *Raiffeisen* (above) at [180], approved by the Court of Appeal in *SK Shipping Europe Ltd v Capital* VLCC 3 Corp [2022] EWCA Civ 231; [2022] 1 Lloyd's Rep 521 , per Males LJ at [61].

218. The identification of the appropriate counterfactual if the statement had not been made, however, is a question of fact, and in some cases this may necessarily involve asking what would have happened if the truth had been told. That might be the case where, if the representation had not been made, the true position would have been revealed as a result of questions asked by the representee: *Raiffeisen* at [182] to [185]; *SK Shipping* at [61]. Even then, however, the "truth" is that which is sufficient to correct the falsity of what was said: *Raiffeisen* at [192] to [193].

219. It is well established that the representee must have understood, at the time, that the representation – in the sense that the court ascribes to it – was being made: see, e.g. *Cassa di Risparmio della Repubblica di San Marino SpA v Barclays Bank Ltd* (above), per Hamblen J at §224, citing *Raiffeisen* at §87. As Hamblen J pointed out, this is probably not a separate requirement of a misrepresentation claim but rather is part of what the claimant needs to show in order to prove inducement. That follows from the fact that the essential question is one of causation: was the claimant induced to take action in reliance on the representation made? If the claimant did not appreciate at the time that the representation was made in the sense pleaded by the claimant, then it cannot show that, but for that representation being made, it would have acted differently."

89.   He then addressed the question whether there was a separate or distinct requirement that the representation must be "actively present" to the representee's mind and whether they must have given it "contemporaneous conscious thought". He cited *Leeds*, *Loreley* and *Crossley* before stating as follows:

"221. The issue identified in the relevant passages in those cases was that sometimes the court has found that a misrepresentation was relied on, apparently without a finding that the representee gave conscious or active thought to the representation (see for example the cases conveniently summarised at §380 of *Loreley*). An extreme example (discussed from §105 of *Leeds*) is the representation by a diner at a restaurant, made by the conduct of ordering a meal, that they have an intention to pay for it (see *DPP v Ray* [1974] AC 370, a criminal case but often cited in the cases dealing with misrepresentation in civil law). It is highly unlikely that the waiter who took the order gave any thought to whether such an implied representation was being made.

222. As Cockerill J noted, at §423 and §424 of *Loreley*, the cases in which inducement has been found without distinct evidence of understanding or awareness are where the representation is simple and cannot be missed by the representee, and where it is at the heart of the transaction. In such cases, it might be said that the fact represented, albeit implied from some other conduct or statement, is so obvious it goes without saying. Unless,

therefore, the representee actively thinks about it and decides not to rely on it, it might be said that it goes without saying that the representee relied on it. That would explain, for example, cases where someone who gives their opinion on a matter – where the facts are not equally known by both sides – may be held to make an implied statement "that he knows facts which justify his opinion": *Smith v Land and House Property Corp* (1884) 28 Ch D 7, at p.15 . It will be rare, if ever, that a representee thinks further than that they trust the person giving the opinion and assume that he knows facts which support it. Yet the court is unlikely to require evidence that the representee actively thought at the time that the representation was being made.

223. I doubt the utility (as did Cockerill J) of breaking down this causation question into distinct elements and seeking to find a single universally applicable test for those elements. It is essential to keep in mind that in every case it is necessary to show, as a matter of fact, that the claimant's decision to take the action (or refrain from taking action) which caused it loss must have been caused by the representation made by the defendant. The evidence required to satisfy that requirement will differ greatly depending on where on the spectrum the case lies (from "it goes without saying", at one end, to a complex representation said to be implied from conduct and statements, at the other).

224. In relation to the Break Costs Representations, whether or not there is such a requirement is academic, since I am satisfied for the reasons set out below that the claimants understood at the time that the simple form of representation (i.e., that the amounts quoted were the break costs to which CB was contractually entitled) was being made.

225. The point is of most relevance to the implied Fixed Rate Representations. As developed in Part C below, these are inherently complex representations. In each case, the pleaded implied representation is far from the obvious or only interpretation of what was expressly said or done. It is well established that where there is any ambiguity in the conduct or statements relied on in support of an implied representation, it will always be necessary to establish that the representee appreciated at the time the representation was made that it was being made in the sense relied on by the claimant: see, for example, the decision of the Court of Appeal in *Spice Girls Ltd v Aprilia* [2002] EWCA Civ 15; [2002] EMLR 27, at §67, distinguishing cases such as *E.A. Grimstead & Sons Ltd v McGarrigan*, unreported, Court of Appeal 27th October 1999, referred to by Waksman J in Crossley at §81. Without such understanding, the essential causal link cannot be established."

*(4)    Autonomy*

90.    The only case to which either counsel referred in which the Court had considered the meaning of reliance in Paragraph 3 was *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) (to which I will refer as "**Autonomy**"). The facts of that case were very different to the facts of the present case but in the course of his detailed judgment

Hildyard J considered the meaning of "reliance" in Paragraph 3 and also Davies 1 (above). He stated his conclusions at [501] to [506] under the heading "Reliance on what?":

> "**Reliance on what?**
>
> 501. Sch 10A paragraph (1)(a) refers to the payment of compensation to a person who acquires, continues to hold or disposes of securities "in reliance on published information to which this Schedule applies". (Its predecessor, s. 90A, related only to acquisitions of shares and referred to compensation to a person who acquired shares "in reliance on the information in the publication"). The loss claimed must be caused by reliance on that statement or omission.
>
> 502. The focus is on statements or omissions in published information on which reliance is demonstrated to have been placed. Paragraph 3(2) refers to the issuer being "liable in respect of an untrue or misleading statement". Further, paragraph 3(1) states that compensation is only to be paid where the acquirer "suffers loss in respect of the securities as a result of—(i) any untrue or misleading statement in that published information, or (ii) the omission from that published information of any matter required to be included in it."
>
> 503. As Dr Lynch submitted in his written closing, it would not be enough for Bidco to show that it relied in some generalised sense on a piece of published information (e.g. the annual report for a given year): I accept the Defendants' submission that it cannot have been intended to give an acquirer of shares a cause of action based on a misstatement that he never even looked at, merely because it is contained in (say) an annual report, some other part of which he relied on. The requirement that loss suffered as a result of the untrue or misleading statement can only be satisfied where the person acquiring securities applied his mind to the statement in question, and where that statement induced the acquisition or (more relevantly for this case) induced the acquirer to transact on the terms he did.
>
> 504. This view gains support from the Davies Review on Issuer Liability. Discussing s. 90A, Professor Davies QC said this: "Section 90A …by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken." The same reasoning would apply in relation to Sch 10A .
>
> 505. Similarly, the requirement for reliance cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all: again, see *Marme v Natwest Markets Plc* at §§281-288. The statement must "have been present to the claimant's mind at the time when he took the action on which he bases his claim." Unless a document was reviewed, it cannot have been relied on. In this case, the Claimants have referred to alleged misstatements or omissions in a number of documents (for instance transcripts of earnings calls, and Quarterly Reports from long before the acquisition) which were not reviewed by or on behalf of any of the

Claimants. These cannot found a claim, though they may be relevant evidence of intention.

506. That said, statements (or omissions) may in combination create an impression which no single one imparts. In my view, if the overall impression thus created is false it may found a claim, if the other conditions of liability are also met."

91.    The judge then went on to consider the degree of reliance required to establish liability. He rejected a submission that only a weak causal connection was required between the false statement and the acquisition of shares. He accepted, however, that the presumption of inducement (which he treated as an inference of fact) applies no less in a claim under Schedule 10A than it does in a claim for common law deceit. He stated as follows at [515]:

"(1) It is enough that a fraudulent representation has had "an impact on the mind" or an "influence on the judgement" of the claimant (see per Lord Goff of Chieveley in *Pan Atlantic Insurance Co Ltd v Pine Top Insurance Co Ltd* [1995] 1 AC 501, as quoted by Lord Clarke of Stone-cum-Ebony JSC in *Zurich Insurance Co plc v Hayward*). There is no "but for standard" in that context; and the fact that other considerations may have been predominant does not negate the deception if it did have some impact or influence, for (as Lord Cross of Chelsea said in *Barton v Armstrong* [1976] AC 104, 118-119) "in this field the court does not allow an examination into the relative importance of contributory causes."

(2) I was originally minded to agree with the Defendants that the so-called 'presumption of inducement' should not be read into the FSMA test; and that it would be difficult to integrate with the test of reasonable reliance which is expressly introduced by FSMA. On reflection, I think this would be to treat the "presumption of inducement" as, in effect, one of law: and as Lord Clarke explained in the *Zurich Insurance* case, it is simply an inference of fact. I have ultimately concluded that the presumption applies in the context of a FSMA claim no less than in other cases of deceit. The reason is simple: it aphoristically expresses the reality that once it has been established that a representor fraudulently intended his words to be taken in a certain sense and that the representee understood them in that sense and entered into the contract, it is natural to suppose, unless the presumption is rebutted on the facts, that the representee was induced to make his investment decision on the faith of the representor's statement.

(3) It remains a question of fact to be determined on the balance of probabilities whether having regard to all the circumstances it did in fact have "an impact on the mind" or an "influence on the judgment" (as Lord Goff put it in the *Pan Atlantic* case) of the representee in making that investment decision. But the presumption is difficult to shift.

(4) In *Hayward v Zurich Insurance Co plc*, Lord Clarke noted (at [36]) that the authorities are not entirely consistent as to what is required to rebut the

presumption of inducement: and in particular, "whether what must be proved is that the misrepresentation played "no part at all" or that it did not play a "determinative part", or that it did not play a "real and substantial part". It was not necessary to decide how the test should be worded in that case since it was found that the presumption was not rebutted in that case on any of the formulations; but Lord Clarke did go on to say that "the authorities…support the conclusion that it is very difficult to rebut the presumption", citing Baroness Hale of Richmond DPSC's observation in *Sharland v Sharland* [2015] UKSC 60; [2016] AC 871 that a party who has practiced deception with a view to a particular end, which has been attained by it, cannot be allowed to deny its materiality or that it actually played a causative part in inducement.

(5) It seems to me that, it would be in accordance with the approach in the authorities cited above to avoid semantic debate and leave the issue to be determined according to a value judgment whether in all the circumstances the misrepresentation(s) should be taken as having influenced the decision, without entering into an assessment of its relevant importance amongst any other influences.

(6) Further, the additional requirement of FSMA that the reliance, if established, must also be shown by the claimant to have been reasonable does not remove, but does, in my view, mitigate the effect of the presumption. In my judgment, it introduces an additional test requiring consideration of whether it was reasonable for the representation so to have impacted on the mind and judgment of the representee; put another way, it seems to me that the claimant must show that the representation had a sufficient impact on its mind or influence on its judgment for it to have been reasonable in all the circumstances for the claimant to have relied on it: and see further paragraphs [517 ff] below.

(7) It is also important to keep in mind that the propensity of a statement to influence the mind only gives rise to the presumption (if applicable) if it is shown to have been read or heard and understood by the representee in its deceptive sense and/or the claimant would have entered into the contract even if the misrepresentation had not been made: see *Leni Gas & Oil Investments v Malta Oil Pty Ltd* [2014] EWHC 893 (Comm) (Males J, at §§18, 19 and 171-172): if it did not influence the mind, or if the representee understood it in some different sense and it was by reference to that different meaning that he acted, the presumption does not arise: and see the discussion about ambivalent or ambiguous statements in the recent decision of Cockerill J in *Leeds City Council and others v Barclays Bank plc* and another [2021] 2 WLR 1180.

(8) I agree, therefore, with Mr Miles that the Court should not assume reliance by Bidco on every statement alleged by the Claimants to be potentially false or misleading, drawn from hundreds of pages of financial statements and transcripts going back months or years before the acquisition of Autonomy, merely because the Claimants allege that these statements were deliberately false or misleading."

F.    Summary Disposal

*(1)    Strike Out*

92.    CPR Part 3.4(2)(a) confers a power on the Court to strike out part of a statement of case
if it appears to the Court that it discloses no reasonable grounds for bringing or defending
a claim. CPR Part 3.4(3) also provides that when the Court strikes out part of a statement
of case it may make any consequential order it considers appropriate. The parties did not
cite any authorities giving particular guidance about the way in which the Court should
exercise these powers in the present case and both approached the Strike Out Application
on the basis that the test under CPR Part 3.4(2) and the test for reverse summary judgment
were for present purposes the same.

93.    The parties were agreed that even if the Court identified a defect in the pleaded case
which would render the claim unarguable, the Court should not strike it out without
giving the relevant party an opportunity to amend. Mr Nash also reminded me of the
Court's case management jurisdiction not to decide a strike out application where it
considered it inappropriate to do so for case management reasons. The parties approached
the Strike Out Application (as do I) on the basis that the Court had granted permission to
amend the Particulars of Claim and the POQ.

*(2)    Summary Judgment*

94.    There was no real dispute between the parties either in relation to the principles which
the Court should apply in deciding whether to grant summary judgment. Both parties
cited the familiar decision of Lewison J in *Easyair Ltd (t/a Openair) v Opal Telecom Ltd*
[2009] EWHC 339 (Ch) at [15] (which has been cited on many occasions both at first
instance and in the Court of Appeal):

> "As Ms Anderson QC rightly reminded me, the court must be careful
> before giving summary judgment on a claim. The correct approach on
> applications by defendants is, in my judgment, as follows:
>
> i) The court must consider whether the claimant has a "realistic" as
> opposed to a "fanciful" prospect of success: *Swain v Hillma*n [2001] 2 All
> ER 91;
>
> ii) A "realistic" claim is one that carries some degree of conviction. This
> means a claim that is more than merely arguable: *ED & F Man Liquid
> Products v Patel* [2003] EWCA Civ 472 at [8]
>
> iii) In reaching its conclusion the court must not conduct a "mini-trial":
> *Swain v Hillman*

iv) This does not mean that the court must take at face value and without analysis everything that a claimant says in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporaneous documents: *ED & F Man Liquid Products v Patel* at [10]

v) However, in reaching its conclusion the court must take into account not only the evidence actually placed before it on the application for summary judgment, but also the evidence that can reasonably be expected to be available at trial: *Royal Brompton Hospital NHS Trust v Hammond (No 5)* [2001] EWCA Civ 550;

vi) Although a case may turn out at trial not to be really complicated, it does not follow that it should be decided without the fuller investigation into the facts at trial than is possible or permissible on summary judgment. Thus the court should hesitate about making a final decision without a trial, even where there is no obvious conflict of fact at the time of the application, where reasonable grounds exist for believing that a fuller investigation into the facts of the case would add to or alter the evidence available to a trial judge and so affect the outcome of the case: *Doncaster Pharmaceuticals Group Ltd v Bolton Pharmaceutical Co 100 Ltd* [2007] FSR 63;

vii) On the other hand it is not uncommon for an application under Part 24 to give rise to a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it. The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim or successfully defending the claim against him, as the case may be. Similarly, if the applicant's case is bad in law, the sooner that is determined, the better. If it is possible to show by evidence that although material in the form of documents or oral evidence that would put the documents in another light is not currently before the court, such material is likely to exist and can be expected to be available at trial, it would be wrong to give summary judgment because there would be a real, as opposed to a fanciful, prospect of success. However, it is not enough simply to argue that the case should be allowed to go to trial because something may turn up which would have a bearing on the question of construction: *ICI Chemicals & Polymers Ltd v TTE Training Ltd* [2007] EWCA Civ 725."

95. Ms Davies and her team accepted that summary judgment may not be appropriate in an area of developing jurisprudence unless the claims are plainly and obviously bad (e.g. because there is no real prospect of the law developing sufficiently to enable the claim to succeed): see *Hudson v HM Treasury* [2003] EWCA Civ 1612 at [59] to [67] (Jonathan Parker LJ). They also drew my attention to *Getty Images (US) Inc v. Stability AI Ltd* [2023] EWHC 3090 (Ch) where Joanna Smith J stated as follows at [38]:

"On the issue of "compelling reason", it may be inappropriate to grant summary judgment where similar issues would remain to be determined at a full trial and extensive factual and expert evidence would have to be called, meaning that there would be much less in terms of saving costs and court time than is normal (see *Iliffe v Feltham Construction Ltd* [2015] EWCA Civ 715 at [71]-[73] per Jackson LJ). However, as the Defendant submitted, the mere existence of other arguable claims which must go to trial cannot, of itself, be a compelling reason why an unarguable claim must proceed to trial."

96.    Mr Nash and his team placed particular emphasis on paragraphs vi) and vii) from the principles in *Easyair* (above) and cited *Crossley* (above) for the proposition that where an application involves a novel point of law, that may provide a compelling reason for deciding the issue at trial when all of the facts are known regardless of the view which the Court may have taken to the merits. In *Crossley* Waksman J stated as follows at [15]:

"In this case, and as will be explained below, both sides contend in respect of the applications made against them, that even if the claim or defence has no real prospect of success, there is in any event a compelling reason for a trial of it. In this regard, two important examples of a compelling reason are:

(1) the fact that the application concerns a developing area of the law; here, it may be desirable that the disputed legal questions should be resolved against the background of the facts as already found at the trial, and not hypothetical facts;

(2) where summary judgment will not dispose of the whole case; this will be so where there will be a trial anyway, regardless of the outcome of the summary judgment; it is particularly relevant if, at the trial, there will be or is likely to be evidence concerning the same or similar factual matters as those traversed in the application."

**V.    Paragraph 3**

G.    Submissions

*(1)    The Bank*

97.    The Bank submitted that on a plain reading of Paragraph 3 there could be no claim unless the investor actually read the specific statement which was said to have been untrue or misleading or the specific piece of published information which was said to have contained an omission. Ms Davies relied on the use of the word reliance in both paragraph 3(1)(a) and paragraph 3(4). She submitted that reliance on the Bank's status as a listed company or its share price was plainly not "reliance on published information" or

"reliance on the information in question".

98.   Ms Davies also submitted that the meaning conveyed by the language of the statute was confirmed beyond doubt by the legislative background. She took me through the common law principles of deceit, Davies 1 and 2 and also Treasury 1 and 2 (above). She placed particular reliance on Davies 1 and the passages in which Professor Davies contrasted the statutory prospectus regime (now S.90) and in which he regarded the reliance requirement as a distinguishing feature from US litigation in which the "fraud on the market" theory has been adopted and class formation is much easier. She also relied on the passage in Treasury 2 where HM Treasury stated that the Government had decided to extend S.90A to holders of shares but regarded the reliance requirement as a brake on litigation and gave a directly relevant example: see Treasury 2, §5.8 and §5.9 (at [57] above).

99.   Finally, Ms Davies relied on *Autonomy* as the only authority on the meaning of reliance under Paragraph 3. She did not submit that I was bound to follow Hildyard J's decision unless I was satisfied that it was plainly wrong or that I should follow it as a matter of comity but submitted that I should follow it because it demonstrated that Paragraph 3 had a plain and obvious meaning and that I could be satisfied both that it was correct but also that it was appropriate to grant summary judgment.

*(2)   The Claimants*

100.   The Claimants submitted that Parliament could not have intended to adopt the common law concept of reliance from the tort of deceit because it extended liability to omissions which are not actionable at common law. Mr Nash also submitted that Parliament could not have intended to require investors to prove that they applied their minds to the absence of a particular statement and that an omission could not be categorised as "the information in question" but rather "an absence of information". He relied on the decision of the Federal Court of Australia in *TPT Patrol Pty Ltd v Myer Holdings Ltd* [2019] FCA 1747 that it is conceptually incoherent to require an investor to prove inducement or reliance in relation to an omission and the absence of information: see [1643]. In their Skeleton Argument Mr Nash and his team submitted as follows:

> "56. By contrast, this issue does not arise under Cs' interpretation. The first question is whether the investor relied on the Published Information.

The second question is then whether any loss the investor suffered was caused by the misstatement or omission. That reflects the difference in the statutory wording applied to causation and reliance.

57. If weight is being placed on the Treasury papers, it is also notable that paras 6.16 to 6.19 of the Second Treasury Report clearly contemplate that an issuer can be liable even if a claimant does not obtain information from the RIS (Published Information), but is relying on a "secondary source". That view would suggest that s.90A does indeed contemplate that reliance which occurs via others in some way (contra D's para 21(3)) is capable of giving rise to a claim. The question of where any line is drawn is obviously fact-sensitive.

58. A similar point is implicit in Professor Ferran's article cited by D at para 44(3). She observes that s.90A does not embody a "fraud on the market" concept, but makes clear that it is an open question whether determinations on "reliance/materiality" should involve a consideration of whether "(inferred) reliance on market prices was tantamount to (inferred) reliance on the information itself".

59. D is not correct to suggest (at para 22) that Price/Market Reliance would apply to "every claimant in every s.90A claim". The liability regime covers a wide range of securities, from issuers of listed shares in the LSE premium market, to obscure debt on relatively illiquid markets which may not be efficient in the relevant sense. It covers a wide range of investors, from professional investors such as Cs to holders of inherited family interests or strategic holdings by public authorities who may not hold by reference to price at all. It is not the case that any investor in respect of any issuer would be able to demonstrate such reliance. This is a question of fact."

101. Mr Nash also relied on the fact that it remains highly controversial whether claimants must demonstrate that they applied their minds to the statement in question. He relied on *Crossley* and the outstanding debate whether *Leeds* and *Loreley* were correctly decided. He also relied on the earlier cases cited by both Cockerill J in *Loreley* and Zacaroli J in *Farol Holdings* in which the Court of Appeal had made no mention of a separate requirement that the representee must have read or heard the relevant statement or that it must be present to the mind. Finally, he relied on the fact that where it is actionable, non-disclosure does not require reliance: see, e.g., section 8 of the Insurance Act 2015 (below).

## H.    The Test

### (1)    Does the common law test apply?

102. Paragraph 3(1) imposes liability upon an issuer to pay compensation upon an issuer to a

person who acquires, continues to hold or disposes of securities "in reliance on published information to which this Schedule applies". The term "reliance" is used in the first instance, therefore, to limit the class of persons to whom an issuer is liable to those persons who have relied on published information. Paragraph 3(1) is to be contrasted with S.90(1)(a) which imposes liability to pay compensation to a person who has acquired securities to which listing particulars apply.

103. Paragraph 3(4) also provides that a loss is not to be regarded as suffered as a result of a statement or omission unless the person suffering it acquired, continued to hold or disposed of securities "in reliance on the information in question". The term "reliance" is used again, therefore, to limit the losses which are recoverable under Schedule 10A to those suffered by persons who have relied on the information which contained the untrue or misleading statement or from which the relevant matters were omitted. Again, paragraph 3(4) is to be contrasted with S.90(1)(b) which imposes liability to pay compensation for losses suffered as a result of any untrue or misleading statement in the relevant listing particulars or any omission from them.

104. I agree with Ms Davies that Parliament must have intended to give the term "reliance" some content and to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or omission being made to the market. Otherwise, the framers of Schedule 10A would have adopted very similar language to S.90. Indeed, when Parliament amended S.90A to include liability for delay it adopted exactly that course as a brief comparison between S.90 and Paragraph 5 will demonstrate. It follows that the Court must give effect to the term "reliance" which goes beyond causation of loss and requires investors to prove a separate ingredient of liability.

105. The obvious test for Parliament to adopt in Paragraph 3 was the common law test for inducement or reliance in the tort of deceit. The detailed analysis of the prospectus cases which I have set out above shows that by *Edgington v Fitzmaurice* (by the latest) the requirement for inducement or reliance was a separate ingredient of the tort: see, in particular, the formulation of the test by Bowen LJ at 481-2 (see [74] above). Moreover, the critical ingredients of the test had also been established in the prospectus cases:

(1)    It is necessary to show that the investor was deceived by the statement and acted

upon it to their prejudice (see Cotton LJ in *Arkwright v Newbold* and *Smith v Chadwick*).

(2)  The Court may draw an inference of fact that the investor has been induced to subscribe for securities from the fact that the statement was material and the fact that the investor made the investment even if the investor does not give evidence. But this is an inference of fact and not a presumption or inference of law (see Lord Blackburn in *Smith v Chadwick*).

(3)  It is not necessary to show that the untrue or misleading statement was the sole inducement if it was actively present to the investor's mind and did induce the investor to make the investment (see Bowen LJ in *Edgington v Fitzmaurice*).

106.  Moreover, the Courts have consistently applied this test and these principles for almost 150 years and one can almost draw a straight line between the prospectus cases and the test for inducement or reliance applied in modern cases. I have cited two examples. First, in *Marme* Picken J traced the evolution of reliance from the prospectus cases and in *Farol Holdings* Zacaroli J adopted the same test and the same three principles: see [216] and [219]. The test has been refined in the intervening period and may not have completed its evolution at least in relation to implied representations (as I consider further below). But the nature of the test and the core principles have been settled for almost 150 years.

107.  In my judgment, therefore, the obvious interpretation of Paragraph 3 is that Parliament did not intend to "start afresh" but recognised that the Courts have developed a settled test of reliance in the tort of deceit where proof of liability requires a claimant to prove both reliance and causation as separate ingredients of the tort and incorporated both tests into Paragraph 3. The Davies Review and the Treasury Consultation confirm that this was the legislative intention and that reliance was intended to be a separate requirement of liability and to limit recovery: see, in particular, Davies 1, §26 and §55 (see [45] and [46] (above)), Davies 2, the recommendation in answer to Q1 (at [51]), the Treasury's impact assessment (at [56]) and Treasury 2, §5.7 to §5.9 (at [57]). The example given in Treasury 2 at §5.9 demonstrates that the authors had the test for fraudulent misstatement in mind.

108.  I accept Mr Nash's submission that the Davies Review and the Treasury Consultation (including the impact assessment) can only have a secondary role in the interpretation of

Paragraph 3 and that I should not give them decisive weight: see *R(O) v Secretary of State for the Home Department* at [30] (see [63] above). But in my judgment, those materials do no more than confirm the obvious interpretation of Paragraph 3. They disclose the background to Schedule 10A and identify the purpose of the independent requirement of reliance, namely, to limit recovery to those investors who can prove that they relied on the published information in which the untrue or misleading statement was made or from which any matter which should have been included in that published information was omitted.

*(2)    What is the common law test?*

109.  In my judgment, the test for reliance as it applies to express representations (whether made orally or in writing) requires the claimant to prove that they read or heard the representation, that they understood it in the sense which they allege was false and that it caused them to act in a way which caused them loss. I agree with Professor Cartwright at 3—54 (above) that this is because the test is one of causation and a statement can only cause an individual to act or operate on their decision-making process if they hear or read the statement or if the statement (or the gist of it) is communicated to them by a third party. If (as I have found) the common law test applies to misleading and untrue statements in Paragraph 3, then I agree with Hildyard J in *Autonomy* that the requirement for reliance in Paragraph 3 cannot be satisfied in respect of published information which the Claimants did not read or consider at all: see [505] (at [90] above).

110.  I turn now to consider whether any of the individual arguments which Mr Nash advanced on behalf of the Claimants displace the obvious interpretation of Paragraph 3 which I have adopted. I also address Mr Nash's argument that the common law test is uncertain and the Court should follow *Crossley* and defer deciding whether the Claimants in Category C can satisfy the test until trial.

*(3)    Omissions*

111.  Mr Nash was right, in my judgment, to focus his submissions on liability for omissions. The common law does not impose liability for the failure to speak unless that failure falsifies a positive representation (whether express or implied) and S.90A introduced a liability for omissions which is purely statutory. Indeed, I might well have accepted Mr Nash's argument that Parliament must have intended a wider test for reliance than the

common law test if I had also agreed with him that the effect of adopting that test would require investors to prove that they applied their minds to the absence of a particular statement. But in my judgment, Schedule 10A does not impose such a requirement upon investors for the following reasons:

(1)    I agree with Mr Nash that the term "reliance" must mean the same thing whether investors allege that they relied on an untrue or misleading statement or that they relied on an omission. This is no more than a consequence of the way in which both paragraph 3(1)(a) and paragraph 3(4) are drafted. Moreover, it is highly unlikely that Parliament intended to use the same term in different senses in the same paragraph of the schedule.

(2)    I also agree with Mr Nash that it would be almost impossible for investors to prove that they consciously considered whether matters had been omitted from published information and that if Schedule 10A imposed such a test, it would be virtually impossible to establish liability to omissions. As Mr Nash put it, liability would be limited to "known unknowns" and even then investors would have very similar problems to those claimants who seek to rely on implied representations (as the authorities above demonstrate).

(3)    However, in my judgment the framers of both S.90A and Schedule 10A were alive to this issue. They did not require investors to prove that they had relied on the omission itself (i.e. that they appreciated that the issuer had failed to include facts or matters in its published information). They required investors to prove that they had relied on the published information itself. S.90A(5)(a) excluded liability unless investors proved that they acquired the relevant securities "in reliance on the information in the publication" and Paragraph 3(4)(a) now requires investors to prove that they acquired, held or disposed of securities "in reliance on the information in question".

(4)    This makes sense in the context of liability for both misleading statements and omissions. I agree with Mr Nash (and the Federal Court of Australia in *TPT Patrol*) that an investor cannot rely on information which has been omitted from an annual report or a periodic statement if they do not know or cannot guess what has been omitted. But this is not what they have to prove. What they have to prove is that

they relied on the annual report or the periodic statement itself and that their reliance in doing so was reasonable. The materiality of the facts or matters which the issuer has omitted and whether they would have made a difference to the investment decision will go to causation and the quantification of loss.

(5)     I accept that Hildyard J appeared to go further than this in *Autonomy* (above) at [503] and [515] where he accepted the submission of Mr Robert Miles QC (as he then was) that the claimants had to prove that they relied on the individual statements in the published information. However, the judge was considering liability for misleading or untrue statements and not for omissions. Moreover, it is unnecessary for me to decide on this application whether he was correct to go this far. For present purposes, it is enough that I agree with him that "the requirement for reliance cannot be satisfied in respect of a piece of published information which the acquirer did not consider at all": see [505].

112.   I can illustrate the way in which Paragraph 3 operates by an example taken from the Particulars of Claim. In section C the Claimants make specific allegations that the Bank operated LX to favour high frequency traders and that they did not use a direct data feed from the New York Stock Exchange. They also allege that the Bank omitted this information from its published information during the Relevant Period:

> "C4: Barclays' EETD Systems did not adequately safeguard clients' interests and in fact assisted HFT Firms
>
> 40. Barclays represented to clients and potential clients, that it had implemented special safeguards to protect clients from high-frequency trading in its dark pool. For instance, Barclays represented that it had "End-To-End Client Order Protection" by which its electronic trading products and services (algorithms, smart order router, and dark pool) worked together to "protect client orders and minimize information leakage" to "maximize fill rates" and "minimize market impact" (meaning whether prices move against a client). That is, Barclays represented that it would use its algorithms, router, and dark pool for its clients' best interests, not its own, by seeking to increase the number of its clients' trades that were executed, secure better prices for those trades, and minimize the ability of HFT firms to anticipate the orders and trade ahead of them.
>
> 41. In fact, Barclays operated its algorithms, smart order router, and dark pool to favour HFTs over other clients and actively sought to attract HFTs by providing HFT firms with: a. Favourable prices and/or lower rates; b. Information not provided to institutional investors including the routing logic of Barclays' order router, a breakdown of trades executed in the dark pool by participant type, and a breakdown of trades executed in the dark

pool by "toxicity" levels; and c. Technological tools to assist HFTs to take advantage of institutional investors in its dark pool including by permitting HFTs to "cross-connect" to its servers and by processing market data slowly to allow latency arbitrage to be employed by HFTs.

C5: Barclays' EETD Systems did not use a direct data feed from the New York Stock Exchange

42. US Regulation National Market System ("Regulation NMS") requires trading centres to have and enforce policies and procedures reasonably designed to prevent executions at prices that are inferior to prices that are displayed and available at another market centre.

43. Barclays represented to clients that it used direct data feeds for major exchanges.

44. In fact, and in contravention of Regulation NMS, LX did not during the relevant period subscribe to a direct market data feed from the New York Stock Exchange."

"68. Further or alternatively, the omission to include within Barclays Plc's published information during the Relevant Period the matters set out in Section C above amounted to an omission from that published information of any matter required to be included in it, within the meaning of paragraph 3(1)(b)(ii) of Schedule 10A."

113. Appendix C contains extracts from the Bank's 2011, 2012, 2013 and 2014 annual reports. The Claimants also rely on the Bank's interim announcements for the years 2011, 2012 and 2013 and the Prospectus itself. The Bank admits that it did not disclose any of the information in section C in any of its published information but denies various of the underlying allegations in paragraphs 41 to 44 (above) and denies that it made any material omissions: see the Defence, paragraph 46.

114. The Claimants may be able to prove the specific facts alleged in paragraphs 41 and 44 (above). They may also be able to satisfy the Court that the DTR imposed a duty on the Bank to publish those facts in its annual reports, interim announcements or the Prospectus and that it omitted those facts from each of these publications. For example, they may be able to prove that the Bank should have published those facts in its 2011 annual report and that Mr White or Mr King deliberately and dishonestly withheld those facts from the market when the 2011 annual report was being prepared and published. If they prove these facts, then the Claimants will succeed in establishing liability under Paragraph 3 subject to questions of reliance and causation.

115. To satisfy the common law test for reliance, however, it will not be necessary for each Claimant to satisfy the Court that a decision-maker or adviser read the 2011 annual

report, considered the paragraphs on risk set out in Appendix C and asked themselves the question whether the Bank might have omitted information about the way in which it operated LX (or its algorithms, smart order router and dark pool) or whether it had complied with Regulation NMS. It will be enough for the Claimants to prove that the decision-makers or advisers reviewed the 2011 annual report in order to decide whether to acquire, hold or dispose of Barclays' shares and, if so, whether it was reasonable for them to do so. If the Claimants are also able to prove that they would not have acquired or continued to hold shares in the Bank or would have acquired or sold them at a different time and at a different price if the Bank had published the facts pleaded in paragraph 41 and 44 (above) in the 2011 annual report, then they will be entitled to compensation.

116. Finally, although I would be very reluctant to decide such an important issue on a pleading point, I do consider it of some significance that the Claimants have pleaded their case in exactly this way. They do not allege that they relied on the omission or absence of any of the information in section C (including paragraphs 41 and 44) from the published information in Appendix C. They plead that they purchased or continued to hold shares in reliance on the Bank's published information: see paragraph 82 (which I have set out in full at [15] above).

*(4)    The presumption of inducement*

117. I agree with both Hildyard J in *Autonomy* and Zacaroli J in *Farol Holdings* that the presumption of inducement is an inference of fact which the Court may properly make if the claimant has established that the defendant made the representation with the intention to mislead the claimant, who understood it in the sense which it was intended to have. I also accept that although it always remains open to the defendant to prove otherwise, the presumption is "difficult to shift": see *Automony* at [515](3). This is because it hardly lies in the mouth of the maker of a fraudulent statement to say that a victim, who understood the statement in the way in which it was intended, could not have placed any reliance upon it.

118. But whether or not it applies to claims under Schedule 10A, the presumption does not assist the Claimants in Category C. They allege that it is to be inferred that they were induced or influenced in their investment decisions by the Bank's statements and omissions: see paragraph 82 (above). But if I am right that the test for reliance requires

them to prove that they read the untrue or misleading statements or that their gist was communicated to them by third parties, then the POR and the Questionnaires are sufficient by themselves to rebut any presumption and to prevent the Court from drawing such an inference. The Claimants in Category C do not allege that they read the statements in Appendices B to D and the three sample claimants (above) all answered Questions 1, 2 and 4 in the Reliance Questionnaire in the negative.

119. Moreover, this is not simply a case in which the Claimants in Category C rely on the plain and obvious meaning of the words which the Bank used in its published information. They also allege that the overall impression which the Bank's published information gave, was false:

> "62. The statements set out in Appendix B were untrue and/or misleading in that: a. Read fairly, they presented the impression that Barclays was committed across its business to (i) integrity and ethics, (ii) putting customers' interests at heart of what they did, (iii) transparency and (iv) undergo cultural change with a view to putting ethics at the centre of what it did."

> "63. The statements set out in Appendix C were untrue and/or misleading in that: a. Read fairly, they presented the impression that while general risks were being described, Barclays was not aware of specific material risks other than those identified (being involvement in benchmark rates including LIBOR, ISDAfix, foreign exchange rates and gold prices, interest rate hedging products, and PPI), which were discussed in the relevant documents."

> "64. The statements set out in Appendix D were untrue and/or misleading in that: a. Read fairly, they presented the impression that Barclays was applying a strong (alternatively, an adequate) system of risk management and control to provide reasonable assurance that internal controls were effective to minimise risk."

120. The Claimants in Category C do not, however, allege that their decision-makers or advisers read and understood the documents in Appendices B to D or took away the impression set out in these paragraphs from reading them. It follows, therefore, that the Claimants in Category C are in the same position as the plaintiff in *Smith v Chadwick* and the presumption does not arise. But there is a common sense answer too. The presumption of inducement gives rise to a genuine inference of fact and it is not intended to be a legal fiction. I consider it inconceivable that the Claimants in Category C will be able to persuade me at trial that I should draw the inference that they were induced to act by the statements in Appendices B to D when they accept that nobody who had any

responsibility for their investment decisions read the Bank's Prospectus or its annual reports or its interim announcements at all.

121. Finally, I am not satisfied that Professor Ferran's article provides any assistance to the Claimants in Category C either. She made it clear that the "fraud on the market" theory developed in US securities law gives rise to a rebuttable presumption of law and that it would be novel for an English court to adopt it. I agree with the counterview which she set out in the passage from her article which I have quoted. In my judgment, it would be inconsistent with Parliament's legislative intent to apply a legal presumption of reliance to Paragraph 3 and would deprive the concept of "reliance" of the meaning which it was intended to have. I accept Ms Davies submission that if "Price/Market Reliance" falls within reliance in paragraphs 3(1) and 3(4), then it applies to "every claimant in every s.90A claim". When challenged to explain why this was not correct, Mr Nash and his team gave a wholly unconvincing answer and could not provide an example of a case in which reliance would limit recovery in any way: see their Skeleton Argument, ¶59 (above).

*(5)    Secondary Sources*

122. I do not consider that Mr Nash's appeal to Treasury 2 and the decision to permit reliance on secondary sources provides any real assistance to the Claimants either. The decision to extend reliance to secondary sources is reflected in the drafting of Schedule 10A and, in particular, in paragraphs 2(1)(b) and 2(3). Those paragraphs extend the definition of published information to include not only information published or a recognised information services ("**RIS**") but also to information published by alternative methods where the availability of that information has been published on a RIS and other means required or authorised to be used to communicate with the market where a RIS is not available. These extensions will include many secondary sources. But even if the investor cannot prove that they read or received the published information through any of these means, Schedule 10A does not require investors to prove that they relied exclusively on information published on a RIS. They only have to prove that they relied on the published information itself, however communicated (as the authors of Treasury 2 appreciated).

123. Furthermore, the common law test of reliance is flexible enough to accommodate indirect reliance in the sense that the gist of the published information was communicated to the

investor by a third party (and Mr Nash did not attempt to persuade me otherwise). Indeed, there are examples of cases at common law where the Court has recognised that a misrepresentation may be actionable where the information has been filtered through a third party who took the relevant decision. An example which came to my mind when Mr Nash was developing his submissions was *Banque Bruxelles Ltd v Eagle Star Ltd* [1995] All ER 769 at 793h-796d (Phillips J). Finally, the Claimants themselves distinguish between those Claimants who relied on secondary sources and those Claimants who relied on price movements and the market. The Claimants in Category B fall within the first category and the Claimants in Category C fall within the second. The Bank has not applied to strike out any of the claims in Category B.

124. Indeed, Parliament's intention to recognise claims based on published information communicated through secondary sources demonstrates, in my judgment, that it must have intended liability to be limited to those investors who are able to prove that the published information or the gist of that information was communicated to them and that they either read it or read a summary of it or relied on an agent or third party who read and relied upon it. If it was unnecessary for the Claimants to prove that they received the information published by the Bank by recognised means either directly or indirectly, then it would have been unnecessary to extend Schedule 10A to secondary sources at all. It may well be argued that there is no real reason of policy or principle to draw the line between a Claimant who relied on a broker's report or a "buy" recommendation (which were based on published information) and a Claimant who relied solely on a movement in price (which was also influenced by that same information). That may be so but it is clear that this is where Parliament chose to draw the line and that line must be respected.[3]

*(6)    The Insurance Act 2015*

125. Mr Nash and his team also relied on the fact that when Parliament has legislated for non-disclosure, it has not required a claimant to prove common law reliance. The example which they gave was section 8 of the Insurance Act 2015 which imposes liability for the breach of the duty of fair presentation:

---

[3] I add that there was no argument about the extent to which the Claimants in Category B are entitled to rely on Schedule 10A and the extent to which it enables them to rely on the examples in the text above is a matter to be argued in due course.

"**8 Remedies for breach**

(1) The insurer has a remedy against the insured for a breach of the duty of fair presentation only if the insurer shows that, but for the breach, the insurer— (a) would not have entered into the contract of insurance at all, or (b) would have done so only on different terms.

(2) The remedies are set out in Schedule 1.

(3) A breach for which the insurer has a remedy against the insured is referred to in this Act as a "qualifying breach".

(4) A qualifying breach is either— (a) deliberate or reckless, or (b) neither deliberate nor reckless.

(5) A qualifying breach is deliberate or reckless if the insured — (a) knew that it was in breach of the duty of fair presentation, or (b) did not care whether or not it was in breach of that duty.

(6) It is for the insurer to show that a qualifying breach was deliberate or reckless."

126.  Mr Nash was quite right to point out that section 8 does not require the insurer to prove that it relied on the insured's presentation of risk but imposes a "but for" test of causation. In my judgment, section 8 does not assist the Claimants either. It shows how easy it would have been for the framers of Paragraph 3 to adopt a test of causation only (as in S.90 or Paragraph 5) and reinforces my conclusion that full effect must be given to the requirement of reliance in Paragraph 3 by applying the common law test.

*(7)    Loreley: the "Awareness" test*

127.  Finally, Mr Nash argued that the common law test was in a state of uncertainty and that this is a compelling reason in itself for deferring consideration of the issue until trial. For the purposes of the Strike Out Application I am prepared to accept that the test for reliance as it applies to implied representations or representations by conduct is not "complete or fully developed": see *Crossley* at [98]. I am also prepared to accept that the Court of Appeal might decide that Cockerill J was wrong to conclude that claimants relying on an implied representation must prove that they were aware of the representation and had it actively present to their minds when they acted on it: see *Loreley* at [421] (above). I did not hear full argument on this issue and it would be wrong for me to express a view about it on this application.

128.  But even if it is unclear whether *Loreley* was properly decided, I am not satisfied that the Claimants in Category C have any real prospect of persuading me at trial either that they

do not have to prove that they or their representatives read the published information in section E1 and Appendices B to D and acted on it or, alternatively, that they acted on the advice or at the direction of a third party (or even a chain of third parties) who read that published information. I have reached this conclusion for the following reasons:

(1)   Both *Crossley* and *Loreley* are concerned with implied representations or representations by conduct. There is no suggestion in either of those authorities that the debate whether the claimant was aware of the representation extended to express representations (whether made orally or in writing).

(2)   Moreover, in *Crossley* Waksman J distinguished both *Leeds* and *Loreley* on the basis that the implied representation or representation by conduct upon which the claimants in that case relied was "relatively simple" and did not arise out of a "complex web of communications": see [96]. As Zacaroli J pointed out in *Farol Holdings*, those cases in which the Court has made no finding that the claimant was aware of the representation or had it actively in mind involved clear and obvious statements where it "goes without saying" that the claimants relied on them. Cotton LJ said much the same thing in the Court of Appeal in *Smith v Chadwick*: see [69] (above).

(3)   But even if Waksman J intended to cast doubt on the test for reliance as it applies to express representations (and I do not accept that he did), then I respectfully disagree that there is any doubt about the test. He suggested that the question whether the investor was aware of the representation in the prospectus was not in issue in either *Smith v Chadwick* or *Edgington v Fitzmaurice*: see [57] and [58]. For reasons which I now explain, I do not accept that this conclusion is fully accurate.

(4)   I accept that in *Smith v Chadwick* there was no challenge to the plaintiff's answer to interrogatories stating that he had read or looked at the prospectus. I also accept that the question whether he relied on the statement in the prospectus was not determinative of the appeal because both the Court of Appeal and the House of Lords held the prospectus to be honest. But it was the first issue which Lord Blackburn (who gave the majority speech) addressed and he held that the plaintiff had not been induced to purchase shares by the representation. If it was unnecessary

for him to prove that he read the prospectus or acted on the representation, then this conclusion was unnecessary and wrong.

(5)    By comparison, the conclusion that the representation was "actively present" to the plaintiff's mind did form part of the ratio in *Edgington v Fitzmaurice*. Counsel argued that the plaintiff did not rely on the prospectus and the Court of Appeal rejected that argument and held that he did because it operated on his mind at the same time as his mistaken belief that the debentures would be secured over the company's assets. If Waksman J intended to suggest that he or Cockerill J were not bound by this conclusion – and, as I say, I do not accept that he was addressing the requirement of reliance as it applies to express representations – then, in my judgment, he was not correct to do so.

(6)    Finally, it is clear that Waksman J was influenced by the fact that Cockerill J had given permission to appeal in *Leeds* and that the appeal was to be heard in the near future: see *Crossley* at [96]. However, the parties compromised the case before the appeal was heard: see *Loreley* at [374]. Moreover, Cockerill J has now reconsidered the issue in *Loreley* and Zacaroli J has followed her decision in *Farol Holdings*. As he pointed out, the fundamental question which the Court has to answer is whether the claimant's decision to take the action (or refrain from taking action) which caused it loss was caused by the representation made by the defendant: see [233].

*(8)    Conclusion*

129.    In my judgment, Parliament intended the Court to apply the common law test of inducement or reliance from the tort of deceit to Paragraph 3 and both to misleading statements and omissions. That test requires the Court to determine whether the Claimants were induced to rely on the published information set out in the Particulars of Claim, section E1 and Appendices B to D and whether that published information caused the Claimants to acquire, hold or dispose of the Bank's shares. I agree with Hildyard J in *Autonomy* that the Claimants in Category C cannot satisfy this test unless their representatives read and considered that published information or third parties who directed or influenced their investment decisions read and considered that published information.

130.    I leave open the question whether it is necessary for the Claimants to prove that their

decision-makers or advisers applied their mind to the relevant misleading or untrue statements and that those statements induced them to acquire, continue to hold or dispose of their shares on the terms which they did: see *Autonomy* at [503]. This is a matter for further argument at trial (as is the scope of Category B). But I am satisfied that this is not a requirement of the test applicable to omissions for the reasons which I have given. Paragraph 3 requires reliance on the relevant published information not on the facts or matters which the Claimants allege to have been omitted.

I.    Summary Disposal

131.  Even though I have determined the legal argument against the Claimants, it does not automatically follow that the Bank is entitled to strike out the claims in Category C or to reverse summary judgment. Mr Nash submitted that not all of the 241 funds in Category C operated in the same way and that some of them involved the exercise of discretion by human decision-makers. But the Reliance Questionnaires completed by the sample Claimants in Category C (which I have quoted above) do not assert that any of their human decision-makers or their advisers read or considered any of the published information in section E1 or Appendices B to D (or relied on any secondary sources). Indeed, if they had read or considered that information, they would be included in Category A (or Category B).

132.  Moreover, Ms Hogan gave no evidence to that effect in Hogan 5. If the methodology of any of the Tracker Funds had involved a human fund manager considering the Bank's published information or, indeed, even an AI or computer assessment of that published information, those funds have had ample opportunity to adduce evidence to this effect. If any Tracker Funds had operated in this way, Ms Hogan would have given evidence to that effect. But she did not do so.

133.  Finally, I have considered whether there is any evidence which can reasonably be expected to be available at trial which might lead to a different conclusion. But it is striking that two of the Reliance Questionnaires which I have quoted stated that the Claimants had no relevant documents to disclose and the third stated that the Claimant had not conducted a search for documents. I am not satisfied, therefore, that there are any further contemporaneous documents which the Claimants in Category C could put before the Court. I accept that they may be able to adduce factual and expert evidence about the

way in which they operated. But if they give evidence to the same effect as Dr Hildreth and Mr Curcio, I am not satisfied that the claims of those Claimants in Category C have any real prospect of success.

## VI.  Paragraph 5

### J.  Submissions

#### (1)  The Bank

134.  Ms Davies and her team submitted that Paragraph 5 only applied where the Bank had actually published information but had done so late. She relied on the dictionary definition of the word "delay" as the "action of deferring or postponing something" and also the wording of paragraph 5(2) which only applies where a PDMR has acted dishonestly in "delaying the publication of the information". It followed, so she argued, that Paragraph 5 only imposes liability upon an issuer where publication has taken place. Ms Davies also submitted that if the Court adopted a different construction, it would render the claims under Paragraph 3 redundant and absolve the Claimants from the need to prove reliance at all. In support of this submission, she relied on the statutory context and, in particular, Davies 1, §85 (see [47] above) and Treasury 1, §6.5 (see [54] above) where the Treasury intended to define liability precisely so that legitimate delay was not penalised. Finally, Ms Davies relied upon paragraph 7(1) as providing that the remedies in Paragraph 3 and Paragraph 5 were exclusive of each other.

#### (2)  The Claimants

135.  Mr Nash and his team also appealed to the normal meaning of the word "delay" and relied on the dictionary definition which includes not only "the action of deferring or postponing something" but also "procrastination" or "waiting". He relied on the example of the delivery of a parcel (upon which the Bank had originally relied). He submitted that the recipient would be entitled to complain about the delay in delivery after the due date whether or not it had been delivered (or even lost) and that it was nonsensical to suggest that the customer was not entitled to complain about the delay until the parcel was finally delivered.

136.  Mr Nash pointed out that, although the Bank had later published some information in

answer to the Complaint and in the subsequent settlements, it had not published all the information in section C or all the information which the Claimants alleged that it was under a duty to disclose. Mr Nash submitted that it could not be right that the Bank could avoid liability under Paragraph 5 by failing to publish such information <u>at all</u>. If this was correct, so he submitted, the Claimants would not be entitled to bring a claim at all during any period of non-disclosure and permanent silence would prevent liability from ever arising under Paragraph 5. He had a number of answers to the apparent overlap between the two paragraphs:

> "45. The essential argument put forward by D (paras 64 and 67) appears to be that "every single Claimant could bring precisely the same claim under both paragraph 3 and paragraph 5 in every case", allowing them to escape the para 3 reliance requirement. However:
>
> a) It is not clear why potential overlap is a problem. There are many situations where concurrent claims exist (e.g. contract and in tort, and in the context of statutory claims – e.g. unfair prejudice, derivative actions and just and equitable winding up). D's reliance on the "exclusivity provisions" (as it terms them) in para 7 of Sch 10A is misconceived. These exclude other remedies (e.g. deceit). They do not suggest that there cannot be overlapping liability between limbs of Sch 10A. That is obviously not the case – to take a simple example, a statement which omits certain information such that it is misleading will give rise to claims in both misstatement and omission.
>
> b) On any view the overlap would not be complete. The example above demonstrates a period for which there could be no claim based on omission, because there is no Published Information and thus nothing from which to make an omission. The Davies Discussion Paper (para 85) notes this point in relation to omissions (emphasis added):
>
>> "The section <u>contemplates liability only for omissions from the statement which is made</u> ('omission from any such publication of any matter to be included in it') <u>rather than liability for failure to make any statement at all.</u> Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. <u>There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point</u>."
>
> c) D cites this passage at para 74 – but then proposes a construction which would give no remedy for dishonest delay in exactly that situation, so that dishonest delay would not plug the very gap which has been identified. The passage also raises interesting questions about the relationship between dishonest delay and omissions, and what is characterised as an omission for these purposes.
>
> d) Liability is not coterminous in other respects. For example, an issuer

which had dishonestly delayed in making an announcement, but had not been dishonest in the preparation of an announcement that was eventually made, would be liable under para 5 but not para 3. Conversely an issuer which had delayed for legitimate reasons, but had then acted dishonestly in causing omissions from the statement once made, would be liable under para 3 but not para 5.

e) Liability under paras 3 and 5 might arise in respect of different periods of time. An issuer might, for example, be liable for dishonest delay in not announcing anything at all, and then liable for omissions from the point at which a partial, defective statement was made. It might be liable for continued dishonest delay in relation to matters not announced. In such a scenario, each stage of the analysis might proceed on a different factual basis, with the Court required to apply a different test to different information."

137.    Finally, Mr Nash submitted that this was not an exhaustive discussion but it highlighted the complexity of addressing the question in the abstract without concrete facts or without analysis of a full set of provisions. He also submitted that if the point fell to be decided on a summary basis, the analysis was heavily against the suggestion that dishonest delay is subject to a blanket requirement of subsequent, accurate publication.

K.    The Test

138.    Despite Mr Nash's attractive submissions, I am satisfied that Paragraph 5 only imposes liability upon an issuer of securities in relation to information which has been published on a RIS and does not impose liability where no publication has taken place. I have reached this conclusion for the following reasons:

(1)    I agree with Mr Nash's submission that the natural and obvious meaning of the word "delay" is capable of describing both the situation in which a parcel arrives later than was originally promised by the delivery company but also the situation in which it is not delivered at all. I am not satisfied, therefore, that Parliament intended Paragraph 5 to apply only where publication had taken place just by using the word "delay".

(2)    But that is not the end of the story. Paragraph 5 only imposes liability to pay compensation to a person who acquires, continues to hold or disposes of securities as a result of "a delay by the issuer in publishing information to which this Schedule applies": see paragraph 5(1)(b). Moreover, the issuer is only liable to pay compensation if a PDMR "acted dishonestly in delaying the publication of the

information".

(3)     Paragraph 2 defines the information to which Schedule 10A applies. The schedule only applies to information "published by the issuer" either "(a) by recognised means" or "(b) by other means where the availability of the information has been announced by the issuer by recognised means". It follows that Paragraph 5 has no application to an issuer unless or until it has published the relevant information by recognised means or it has announced the availability of that information by recognised means. It also follows, in my judgment, that Schedule 10A does not apply – and that there can be no liability for delay in publishing information – unless or until it falls within paragraph 2 and has been published.

(4)     In my judgment, this construction of Schedule 10A addresses the mischief which Professor Davies identified in Davies 1, §85. If the PDMRs of an issuer deliberately and dishonestly delay the publication of information, e.g. to take advantage of it personally before the market becomes aware of it, but then later publish it accurately, there can be no liability under Paragraph 3 either for making a misleading statement or for omitting to publish the information. But there will be liability under Paragraph 5. This construction also addresses the need identified in Treasury 2, §6.3 to §6.8 for the liability to be precisely drawn.

(5)     I, therefore, reject Mr Nash's submission that Davies 1, §85 supports his own construction rather than that of the Bank. In that paragraph Professor Davies was drawing attention to the fact that S.90A only imposed liability for omissions from information which had been published and did not apply where there was no publication at all. But it is clear from the last sentence that the lacuna which he identified was the late but accurate publication of information rather than the failure to publish the information at all.

(6)     For example, the Claimants allege that the Bank was under an obligation to announce the facts set out in section C to the market under the DTR and to publish them in the Prospectus and in its management reports and interim management reports. If they establish this and also that the Bank's PDMRs dishonestly and deliberately failed to publish these facts in the Prospectus or the relevant reports, they will establish liability for omissions under Paragraph 3 (subject to reliance and

causation). But if the DTR (or any other regulations) did not impose a duty on the Bank to publish that information on a RIS promptly or within a specified time period or at all, then there can be no liability for delay in publication either.

139. In my judgment, therefore, Paragraph 5 only imposes liability upon an issuer of securities in relation to published information whether one adopts a literal construction of the words used or a purposive construction of the schedule as a whole. The Bank can be liable for misleading or untruthful statements in its published information and for deliberately omitting to include facts in that published information or for delaying the publication of information which was accurate but doing so late. Schedule 10A does not impose liability on the Bank for misleading statements or omissions or delay unless and until it has published information to which Schedule 10A applies.

140. But I am also satisfied that the Claimants' preferred solution would lead to an absurd result. Mr Nash accepted that there was a considerable overlap between Paragraph 3 and Paragraph 5 if liability under the latter was not dependent upon proof of publication on a RIS. Indeed, the Claimants had to say that the Bank was liable to pay compensation to them under Paragraph 5 even if they failed to prove reliance for the purposes of Paragraph 3 because they have applied for permission to amend the Particulars of Claim to plead no additional facts in support of the dishonest delay claim apart from the allegation the Bank delayed publication dishonestly: see the Particulars of Claim, paragraph 69.

141. I can see no reason why Parliament would have intended to introduce a liability for delay in Paragraph 5 which overlapped to such a degree that it would render Paragraph 3 almost redundant in this way. This degree of overlap makes no sense at all given the significance which both the Davies Review and the Treasury Consultation attached to the requirement of reliance in Paragraph 3. The extent of the overlap between the two paragraphs also makes no sense given the Treasury's view that the issue was finely balanced but liability should be introduced provided that it was precisely defined. I found none of the reasons which Mr Nash and his team advanced to explain the subsequent overlap remotely convincing given the background to the introduction of Schedule 10A.

142. Mr Nash's principal reason for justifying the overlap was that there are many situations in which concurrent liability in tort and contract or under statute may exist. But in those cases, each cause of action requires proof of a number of different elements and exists

independently of the others. Put another way, there will be some cases in which liability will overlap but many cases in which it does not. But if Mr Nash's construction of Paragraph 5 is correct, then the liability for delay under Paragraph 5 will always overlap with liability for omissions under Paragraph 3. He advanced no positive reason why Parliament would have intended such a result and it is plainly inconsistent with both the Davies Review and the Treasury Consultation.

143. Moreover, paragraph 7(1) was clearly intended to prevent concurrent liability of this kind arising. I agree with Mr Nash that this provision was primarily designed to ensure that Schedule 10A excluded other, non-statutory remedies such as damages for deceit. But Parliament did not intend S.90A to give rise to concurrent liability under the section and in contract or tort, I can see no reason why would it have amended S.90A to create concurrent liability between Paragraph 3 and Paragraph 5. In my judgment, the exclusivity provisions are consistent with both the Davies Review and the Treasury Consultation and provide further support for my preferred construction of Paragraph 5.

144. Finally, I found neither of Mr Nash's examples convincing. They both assume that no liability for omissions will arise under Paragraph 3 if the Bank has delayed in publishing the information in section C for a significant period of time. But if the Bank had an obligation to publish that information in the Prospectus or in their interim or annual statements (as the Claimants allege), the deliberate failure to do so will give rise to liability under Paragraph 3 provided that the Claimants can prove reliance and causation. The paradigm example of liability under Paragraph 5 is insider trading and the dishonest delay by a PDMR in making an ad hoc disclosure to the market of price sensitive information or holding it back from information which the issuer was imminently about to publish: see Davies 2, §49 (see [50] above).

L.    Summary Disposal

145. The Claimants do not allege that the Bank published any of the information in section C on a RIS or published it by other means where the availability of that information was published on a RIS. Indeed, they expressly plead that the announcement which the Bank made to the market on 26 June 2014 did not amount to an announcement of the matters in section C: see the Particulars of Claim, paragraph 58. Moreover, Mr Nash did not suggest that the Claimants would wish to amend to plead that the Bank had published

any of the specific information in section C but had dishonestly delayed its publication. I am satisfied, therefore, that the Claimants have no real prospect of succeeding on their claims under Paragraph 5 at trial.

## VII.  Case Management

146.  In the CMC1 Order I ordered that Trial 1 should be listed for hearing on the first open date in October 2025 with a time estimate of 8 weeks (later extended to 10 weeks) and it has now been listed to begin on 6 October 2025. In the CMC2 Order I ordered a split trial and that issues of reliance, causation and share price would be tried at Trial 1 in respect of a group of seven sample Claimants. I also made separate orders for disclosure and witness statements in respect of the sample Claimants (and a number of reserve Claimants). I also gave permission to the parties to call expert evidence in three disciplines.

147.  Mr Nash advanced a number of case management reasons why the Court should refuse to grant the Strike Out Application. His primary submission was that all of the Claimants in Categories A and B relied on Price/Market Reliance and their claims would be going to trial. He also relied on the fact that only one sample Claimant in Category C had been selected for trial (C68 above). In my judgment this is not a sufficient reason for refusing to strike out the claims in Category C or strike out the claims for dishonest delay. If I strike out all of the claims in Category C, then it will be unnecessary to call any factual evidence or any experts relating to Price/Market Reliance. This will undoubtedly lead to a saving in time and costs and I agree with Joanna Smith J in *Getty Images (US) Inc v. Stability AI Ltd* (above) that the existence of the claims in Categories A and B is not a compelling reason why the claims in Category C should proceed to trial.

148.  Mr Nash's second case management reason why the Court should refuse to grant the Strike Out Application was that both issues which I have decided are novel points of law and that it is overwhelmingly likely that the Claimants will appeal. I do not fully accept Mr Nash's characterisation of the issues because *Autonomy* provides authority on the scope of reliance under Paragraph 3. But I accept that the Claimants are likely to appeal and, whether or not I grant permission to appeal myself, I have to take into account the possibility that the Court of Appeal will grant permission to the Claimants.

149.  In my judgment, the possibility of an appeal is not a reason either for refusing to strike

out the claims in Category C or to strike out the claims for dishonest delay. It is equally possible that the Bank will appeal given the importance of the issue. Moreover, the directions which I have given in both the CMC1 Order and the CMC2 Order are sufficiently flexible to accommodate a successful appeal (by either party). It will not be difficult to substitute a reserve Claimant for sample Claimant C68 at this stage. The Court can the try the claims in Category A and Category B at Trial 1. If the Claimants in Category C are successful on an appeal, then it ought to be possible to try the question of Price/Market Reliance discretely at Trial 2 (if judgment is handed down after Trial 1).

150. The Claimants do not rely on any additional facts in relation to their dishonest delay claims under Paragraph 5. They rely on the failure to publish the information in section C in relation to both liability for omissions under Paragraph 3 and liability for delay under Paragraph 5 and they allege dishonesty against the same individuals. I accept that there may be a difference between "dishonest concealment of a material fact" for the purposes of paragraph 3(2) and dishonest delay for the purposes of paragraph 5(2) but the overall test for dishonesty is the same: see Schedule 10A, paragraph 6. In my judgment, the findings which the Court makes at Trial 1 in respect of the allegations of dishonest concealment are likely to be determinative of the allegations of dishonest delay even if an appeal is allowed. I am not persuaded that the possibility that the Bank may be required to recall Mr White or Mr King at Trial 2 (or other PDMRs) to deal with the dishonest delay claims is a compelling reason to refuse to strike out claims which have no real prospect of success.

151. Finally, Mr Nash relied on the fact that in other S.90A cases the Court has permitted similar issues to go to trial. However, neither of the two cases upon which Mr Nash relied involved an application to strike out claims based on Price/Market Reliance or the Court delivering a considered judgment. Moreover, in *Various Claimants v Standard Chartered PLC* [2024] EWHC 1108 (Ch) Michael Green J accepted that the question of "common reliance" (which was not identical to Price/Market Reliance) involved "essentially a legal issue" and that it was an important legal point which ought to be decided as soon as possible: see [76]. I note in passing that in *Standard Chartered* Michael Green J heard and determined a strike out application in October 2023 and on 17 June 2024 the Court of Appeal handed down judgment on the appeal: see [2024] EWCA Civ 674.

152. In my judgment, there are no compelling reasons why I should permit the claims in

**Approved Judgment: Leech J**    **Various Claimants v Barclays Bank PLC FL 2020 000051**

Category C and the dishonest delay claims to go to trial having determined that they have no real prospect of success. Moreover, there is in my judgment a compelling reason why I should not permit them to go to trial. The Category C claims involve 241 different funds and have a total value of £332 million which is 60% of the total value of the claims. If I dispose of those claims on a summary basis, this ought to reduce the scope of the claims considerably and promote an early settlement. I will, therefore, do so.

## VIII. Disposal

153.  I am satisfied, therefore, that the Particulars of Claim disclose no reasonable claim for dishonest delay under Paragraph 5. I am also satisfied that the 241 funds or sub-funds who advance claims in Category C have no real prospect of succeeding at trial in proving reliance under Paragraph 3 and that I should grant reverse summary judgment in respect of those claims. I invite the parties to agree a form of order which reflects these findings and I will hear argument on any consequential issues at CMC3 which is listed in a window commencing on 25 November 2024. I will adjourn the final disposal of the Strike Out Application and extend time for any application for permission to appeal until 21 days after CMC3 and I invite the parties to incorporate such a provision in any agreed order.



Neutral Citation Number: [2025] EWCA Civ 40

Case Nos: CA-2024-000149 and 000155

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**
**FINANCIAL LIST**
**MR JUSTICE MICHAEL GREEN**
**[2023] EWHC 3114 (Comm)**

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Date: 23/01/2025

**Before :**

**SIR JULIAN FLAUX CHANCELLOR OF THE HIGH COURT**
**LORD JUSTICE NUGEE**
and
**LADY JUSTICE FALK**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **WIRRAL COUNCIL (As Administering Authority of MERSEYSIDE PENSION FUND)** | **Appellant** |
| - and - | |
| **INDIVIOR PLC** | **Respondent** |
| -and- | |
| **WIRRAL COUNCIL (As Administering Authority of MERSEYSIDE PENSION FUND)** | **Appellant** |
| -and- | |
| **RECKITT BENCKISER GROUP PLC** | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Graham Chapman KC, Alex Barden and Joseph Leech** (instructed by **Mishcon de Reya LLP**) for the **Appellant**
**Conall Patton KC** (instructed by **Freshfields LLP**) for **Indivior PLC**
**Helen Davies KC, Tony Singla KC and Jonathan Scott** (instructed by **Linklaters LLP**) for **Reckitt Benckiser Group PLC**

Hearing dates: 10 and 11 December 2024
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 10.30am on 23 January 2025 by circulation to
the parties or their representatives by e-mail and by release to the National Archives

.............................

**Sir Julian Flaux C:**

Introduction

1.    The question raised by this appeal is whether the claimant ("Wirral") can bring
representative proceedings under CPR 19.8 on behalf of institutional and retail
investors in the defendants who claim under sections 90 and 90A and Schedule 10A of
the Financial Services and Markets Act 2000 ("FSMA") in respect of alleged fraudulent
statements and dishonest omissions in published information. Wirral sought to rely
upon the decision of the Supreme Court in *Lloyd v Google LLC* [2022] AC 1217 to
pursue a representative action seeking declarations as to common issues relating to the
defendants. Issues as to the individual investors such as standing to sue, reliance,
causation and quantum, which are not common issues, do not form part of the
representative proceedings. Wirral contended that this bifurcated approach was
endorsed by the Supreme Court and was appropriate in the present case.

2.    The defendants applied to strike out the representative proceedings on the basis that this
was not an appropriate procedure for these claims under FSMA, contending that the
claims should be brought in the usual way by ordinary multi-party proceedings with
each investor being a claimant. Such multi-party proceedings had in fact been brought
at the same time as the representative proceedings by many of the investors who had
opted in to the representative proceedings.

3.    By his judgment dated 5 December 2023, Michael Green J sitting in the Financial List
acceded to the application and struck out the representative proceedings. Wirral now
appeals against that decision with the permission of Males LJ. In giving permission, he
said that although this was an exercise of discretion by the judge for what appear to be
sound reasons, his decision may have wider significance for other cases and merits
consideration by the Court of Appeal.

Factual and procedural background

4.    The judge set out a summary of the background at [5] to [15] of his judgment. The
essential features are as follows. The case arises from the decades-long opioid crisis in
America. Indivior is the manufacturer of anti-addiction medication, Suboxone, aimed
at combatting that crisis (and was previously a subsidiary of Reckitt known as Reckitt
Benckiser Pharmaceuticals Inc). Between 2006 to 2013, the defendants are alleged to
have been involved in a fraudulent scheme (the "Scheme").  The essence of the Scheme
is said to have been to extend the period of patent protection over Suboxone. The
defendants are alleged to have done so by changing Suboxone from tablet form to a
film version and by making allegedly fraudulent claims that the film version was safer
for children.

5.    On 9 April 2019, details of the alleged Scheme were made public in a US federal
indictment against Indivior. Following the indictment, and related Federal Trade
Commission investigations, Indivior agreed to pay US$600 million in settlement of its
civil and criminal liability. Its US subsidiary, former CEO and Medical Director all
pleaded guilty to criminal charges related to the Scheme.  Reckitt agreed to pay US$1.4
billion in settlement of its own potential liability.

6.    On 21 September 2022, the current representative claims were commenced by Wirral. Also on 21 and 22 September 2022, three further claim forms were issued against the defendants on behalf of a large number of claimants ("the multi-party proceedings"). Those claim forms have not been served and the multi-party proceedings are stayed pending the outcome of this appeal.

Relevant provisions of the CPR

7.    CPR 19.8 provides as follows:

> "(1) Where more than one person has the same interest in a claim–
>
> (a) the claim may be begun; or
>
> (b) the court may order that the claim be continued,
>
> by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.
>
> (2) The court may direct that a person may not act as a representative.
>
> (3) Any party may apply to the court for an order under paragraph (2).
>
> (4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule –
>
> (a) is binding on all persons represented in the claim; but
>
> (b) may only be enforced by or against a person who is not a party to the claim with the permission of the court."

The judgment below

8.    At the outset of the judgment at [3] the judge noted that: "There is no dispute that the applications are to be resolved by the exercise of a discretion so as to give effect to the overriding objective." The fact that the judge's decision involved an exercise of discretion is an important consideration in the determination of this appeal. In the same paragraph, the judge set out what he saw as the essential difference between the parties as being between (i) the defendants' submission that allowing the Representative Proceedings would deprive the Court of its case-management powers by having a bifurcated procedure imposed on it by Wirral, and (ii) Wirral's submission that it was entitled to commence proceedings under r.19.8 and, unless the defendants can show that there was a fundamental flaw in it doing so, the Court should not strike out the claim.

9.    At [17] the judge said:

> "The distinct advantage of the Representative Proceedings from Wirral's and the Multi-party proceedings Claimants' point of view is that there will be no front-loading of costs on claimant-side matters, such as standing and reliance. All the burden will be on the Defendants to deal with the common issues and defend the relief sought in the Representative Proceedings, namely the two declarations set out above. The Defendants say simply that it should be for the Court to decide how to case manage the proceedings and what should be done and when, taking into account both sides' positions and more generally the administration of justice and the overriding objective."

10.  The judge considered it helpful to look first at how securities claims under section 90A and Schedule 10A of FSMA had been managed by the Court since the provisions were introduced in 2010 and then to see if it was appropriate to proceed as Wirral had by reference to *Lloyd v Google LLC*. He observed at [20] that securities claims, like any other form of civil litigation, were to be case managed and tried according to the overriding objective (i.e., justly and at a proportionate cost) and at [21] that they typically gave rise to similar issues, including whether there should be a split trial.

11.  The judge then reviewed the various previous cases of securities claims including Hildyard J in *Manning & Napier v Tesco plc* [2017] EWHC 3296 (Ch), Miles J in *Allianz Global Investors GmbH & Ors v RSA Insurance Group plc* [2021] EWHC 570 (Ch), and Falk J (as she then was) in *Various Claimants v G4S Limited* [2022] EWHC 1742 (Ch). The common theme which he drew from them was that a split trial was regularly ordered with the issue of reliance to be determined in the second trial. However, the Court would also typically require the claimants to provide sample disclosure, further particularisation and/or witness evidence on reliance in parallel with the first trial. This was to ensure that the claimants did not bring speculative claims, were required to undertake substantial work in prosecuting their cases, to mitigate against fading memories, and to assist with settlement efforts. He concluded at [28]:

> "The Representative Proceedings however predetermine those issues of split trial and other matters of case management in the Claimants' favour without being put before the Court. Whether that is appropriate or not needs to be determined by reference to the scope of CPR 19.8 and *Lloyd v Google*."

12.  He then set out CPR 19.8. He noted at [31] that Mr Chapman KC for Wirral placed great reliance on the fact that so long as the *"same interest"* threshold is met, it was entitled *"as of right"* to bring the representative proceedings. He accepted that because that threshold was met, Wirral was entitled under CPR 19.8(1)(a) to commence the proceedings but considered that had no bearing on whether the court's discretion, which arises on an application under 19.8(2) and (3), should be exercised in favour of allowing the proceedings to continue.

13.  The judge then considered *Lloyd v Google* in detail. He noted at [32] that there was no doubt that Lord Leggatt's extensive consideration of the history and availability of representative actions, albeit *obiter*, suggested that a bifurcated process could be appropriate for actions such as in *Lloyd v Google*. However, the judge said it was important to note that in that case the claimant was not seeking bifurcation because the

5

proceedings were unworkable and unviable unless all issues, including damages, could be resolved at the trial of the representative action. The claim was on behalf of some four million iPhone users for breach of the Data Protection Act 1998. Class actions not being available in this jurisdiction other than in competition claims, the claimant sought to use the representative procedure under CPR 19.8. However, as the judge noted at [34] the issue arose not in an application under 19.8(2) but an application for permission to serve the proceedings out of the jurisdiction.

14. At [36], the judge noted that Lord Leggatt in his historical survey had explained that the origins of what is now CPR 19.8 were as a solution to the "*complete joinder rule*" whereby all persons materially interested in the subject-matter of the proceedings had to be parties to them. He also stated that Lord Leggatt had noted that whenever the Courts attempted to narrow the availability of representative proceedings, that tended to be corrected by later appellate decisions which emphasised its broad nature, for example *Duke of Bedford v Ellis* [1901] AC 1.

15. At [37] the judge said that importantly for the present case, Lord Leggatt placed particular emphasis on the decision of Vinelott J in *Prudential Assurance Co Ltd v Newman Industries Ltd* [1981] Ch 229 ("*Prudential*") which was an example of a bifurcated process being used in a representative action. Lord Leggatt clearly regarded this as an important decision, albeit it was overturned by the Court of Appeal on the substantive point as to whether the shareholders had a personal cause of action.

16. At [38] he noted that Lord Leggatt had concluded that the fact that damages were necessarily personal to the members of the representative class was not a bar to a representative action and explained that the decision of the Court of Appeal in *Emerald Supplies Ltd v British Airways plc* [2011] Ch 345 did not decide that a representative action could not be brought if damage was an ingredient of the cause of action. The difficulties identified by the Court of Appeal could have been solved by adjusting the class or by adopting the *Prudential* form of bifurcation.

17. At [40] the judge noted that the only way the claimant in *Lloyd v Google* could bring the claim was by way of representative action. As Lord Leggatt said at [67] of his judgment: "it is better to go as far as possible towards justice than to deny it altogether and that, if you cannot realistically make everyone interested a party, you should ensure that those who are parties will 'fairly and honestly try the right'." At [68] he makes clear that the Court should allow such a claim to be brought with a broad interpretation of the rule, explaining at [69] to [74] that the *"same interest"* threshold requirement should be interpreted purposively in the light of the overriding objective and the rationale for the rule.

18. At [41] the judge noted that all parties relied on [75] of Lord Leggatt's judgment which provides:

> "(ii) The court's discretion
>
> 75 Where the same interest requirement is satisfied, the court has a discretion whether to allow a claim to proceed as a representative action. As with any power given to it by the Civil Procedure Rules, the court must in exercising its discretion seek to give effect to the overriding objective of dealing with cases

justly and at proportionate cost: see CPR rule 1.2(a). Many of the considerations specifically included in that objective (see CPR rule 1.1(2)) - such as ensuring that the parties are on an equal footing, saving expense, dealing with the case in ways which are proportionate to the amount of money involved, ensuring that the case is dealt with expeditiously and fairly, and allotting to it an appropriate share of the court's resources while taking into account the need to allot resources to other cases - are likely to militate in favour of allowing a claim, where practicable, to be continued as a representative action rather than leaving members of the class to pursue claims individually."

19.    At [42] the judge rejected any suggestion that Lord Leggatt was saying there was a presumption in favour of representative proceedings where the *"same interest"* threshold is satisfied:

> "It seems to me that Lord Leggatt was simply making clear that the Court needs to exercise its discretion so as to further the overriding objective and that has to be done by reference to the particular circumstances pertaining to the case before it."

20.    At [43] the judge noted that Mr Chapman KC relied particularly on [80]-[81] where Lord Leggatt said: "Finally, as already discussed, it is not a bar to a representative claim that each represented person has in law a separate cause of action nor that the relief claimed consists of or includes damages or some other monetary relief." As the judge said, Lord Leggatt concluded that the assessment of individual claims for damages can be left to another stage of the proceedings by use of a bifurcated process. The judge said at [44] that Lord Leggatt explained this at [81]:

> "In cases where damages would require individual assessment, there <u>may</u> nevertheless be advantages in terms of justice and efficiency in adopting a bifurcated process - as was done, for example, in the *Prudential* case [1981] Ch 229 - whereby common issues of law or fact are decided through a representative claim, leaving any issues which require individual determination - <u>whether they relate to liability or the amount of damages</u> - to be dealt with at a subsequent stage of the proceedings." (the judge's underlining).

21.    The judge continued at [45]-[46]:

> "45 As one can see, in proposing the bifurcated process, Lord Leggatt referred again to *Prudential*, but he expressly limited his comment to cases '*where damages would require individual assessment*'. He also said that there '*may*' be advantages, not that there always will be. Having said that, he did go on to suggest that not only damages issues but also issues related to liability could be dealt with at another stage. That seems a little inconsistent to the opening words and with the fact that the section was only seemingly dealing with damages. The point is relevant to this case because it is not only damages issues that

7

Wirral wants to avoid at the trial of the Representative
Proceedings, but also issues related to standing, reliance,
causation and limitation.

46 Furthermore, as Mr Chapman KC fairly accepted, there is no
development in Lord Leggatt's judgment as to the nature of the
bifurcation process and how the second stage of the proceedings
would work. Nor is there any reference to the case management
issues that might arise as a result of bifurcation, in particular
whether such a representative action might deprive the Court of
its ability to case manage the claims from start to end. In this
case, Wirral has been very reticent about how the follow-on
claims would work – whether they would be fresh claims, or part
of the Representative Proceedings or the Multi-party
proceedings – and it was only in his oral submissions that Mr
Chapman KC offered some possible options for that second
stage. It seems to me important that both the parties and the Court
are clear as to exactly how the process will work through to a
conclusion so as to be able to judge whether that is an appropriate
course to take."

22.    The judge noted at [47] that Lord Leggatt did not need to deal with these matters as the
claimant was not seeking bifurcation, so his suggestions about bifurcation were *obiter*
though coming from the highest authority and due the utmost respect. He said that no
doubt Lord Leggatt wanted to see more use of the representative action in the absence
of class action rules as a flexible method of getting cases before the Courts. However,
at [48], the judge advised caution as to the application of *Lloyd v Google*:

"But one does have to be careful about the consequences. One
can perfectly understand that the Court should try to ensure that
there is appropriate access to justice for those who would not be
able to bring claims save by way of representative action. But
where there are perfectly feasible non-representative
proceedings, the Court should be able to weigh whether those are
preferable to representative proceedings both from the parties'
and the Court's point of view. I do not think that Lord Leggatt
would have been contemplating the use of representative
proceedings that would effectively deprive the Court of being
able to decide which is the best way to case manage such cases
based on their own particular circumstances."

23.    The judge also advised caution over undue reliance on *Prudential* as a justification for
bifurcation in the present case saying at [49]:

"*Prudential* was a very unusual case where the issue as to
representation by the plaintiff of all other shareholders in their
personal actions against the directors for damages in respect of a
misleading circular and conspiracy only arose at the beginning
of the trial. Vinelott J was, in any event, going to try the
underlying factual issues both in the context of the plaintiff's
own personal action and in the derivative proceedings. So by

allowing the plaintiff to bring the claim also in a representative capacity this did not cause any disruption to the trial or require any particular element of case management."

24.     He noted at [50] that whilst it was true to say Vinelott J adopted a bifurcated process in allowing declarations to be made as to liability but with individual shareholders having to establish their damages claims in a separate action, the nature of such a separate action was not described and it never reached that stage because the Court of Appeal overturned the declarations on the personal action as being misconceived. Also, the bifurcation was clearly limited to damages issues. At [51] the judge pointed out that *Prudential* did not really help on the question of case management at the outset of proceedings (as it had concerned a representative order made at the beginning of the trial).

25.     The judge then dealt with the two reported first instance decisions subsequent to *Lloyd v Google* (both of which have been upheld by the Court of Appeal since the judge's judgment). In *Commission Recovery Ltd v Marks & Clerk LLP* [2023] EWHC 398 (Comm); [2024] 2 All ER (Comm) 949, Robin Knowles J allowed the representative action to proceed on a bifurcated basis on the basis that it was the only way the claims in respect of the secret commission could be brought. The judge noted at [54] that: "*Commission Recovery* does not deal with bifurcation or the case management consequences if there were any such bifurcation, including how the follow-on claims would be managed and tried."

26.     In *Prismall v Google UK Ltd & Ors* [2023] EWHC 1169; [2024] 1 WLR 879, Heather Williams J struck out the representative action brought purportedly on behalf of 1.6 million individuals for the tort of misuse of private information, being medical records. The representative claimant sought to argue that the Court could award "lowest common denominator" damages to avoid any issue about individual assessment of damages, which was rejected by the judge. It should be noted that during the hearing of the appeal in the present case the Court of Appeal handed down judgment dismissing the appeal by the claimant in *Prismall* ([2024] EWCA Civ 1516). It was common ground that there was nothing in the judgment of the Court in that case which was of assistance in relation to the present appeal.

27.     Finally in relation to *Lloyd v Google* the judge said this at [56]:

        "Returning to *Lloyd v Google*, it seems to me that the Supreme Court was advocating for greater use of the representative action, principally where it would provide access to justice that would not otherwise be available to that class of claimants. Lord Leggatt dealt in passing with bifurcation as a potential way round the problem that individual claims to damages could not be tried in the representative action. He did not however explain how bifurcation would work in any particular case and made it clear that the Court should decide each case by reference to the overriding objective. Importantly I do not think that he was suggesting that claimants should be able to bring representative actions in order to bifurcate and thereby avoid what they would otherwise be required to do if they had brought ordinary multi-party claims. Bifurcation is a solution to a particular problem

9

with representative actions; but it is not the purpose of representative actions. Yet bifurcation is the sole purpose and stated advantage, put forward by Wirral, of these Representative Proceedings."

28.     In considering the exercise of his discretion, the judge set out first at [60] and following the arguments of Wirral in favour of the representative proceedings, being principally that: "they would be less risky, costly and burdensome for the represented persons, and would provide access to justice for retail investors who would not otherwise be able to bring such claims in their own names." Bifurcation would mean that there would only be declarations on the common defendant-side issues which would mean no front-loading of costs for represented persons. The judge said at [61]:

> "Mr Chapman KC was quite open about this, that it would mean that the represented persons will get the benefit of the findings on the common issues without having been required to plead their case, provide disclosure or other evidence and without being at risk of being a selected test claimant who might have to provide evidence of reliance before the trial of the Representative Proceedings. Furthermore, it means that an investor would be able to defer any decision on whether to bring their claim until after the declarations have been made or if the declarations are not made, they would save the time and expense of bringing their own claim. Mr Chapman KC also suggested that this process would be more likely to lead to a settlement of these cases, although it is not clear what the evidence for that was."

29.     In relation to institutional investors, the judge said at [62] that: "It perhaps goes without saying that institutional investors would prefer to minimise their risks, costs and expenditure of resources and wait and see if the Representative Proceedings succeed." He referred to the evidence Wirral adduced from two US attorneys, Mr Lange and Ms Mendoza, who said that their institutional investor clients are deterred from pursuing securities claims in this jurisdiction because of procedures requiring them to bring proceedings in their own names and provide information, evidence and disclosure about their cases. The judge said he was unclear as to the status and relevance of their evidence, but summarised what they said. At [63] he noted that Mr Chapman KC fairly accepted that their evidence did not show that any institutional investors had been deterred from joining the multi-party proceedings in this case but maintained that their evidence was compelling that institutional investors are generally put off from litigating here unless their claims are very large because of the prohibitive costs and risks of doing so.

30.     Wirral also relied on a report from Professor Andrew Higgins of Oxford University explaining the comparative position of bifurcated securities claims in Australia, New Zealand and Canada focusing on Australia, where he is qualified to practise. In August 2023, Foxton J ruled that it could not be admitted as expert evidence as it did not meet the requirements for such evidence but could be relied upon as if Professor Higgins had published an article in these terms. The judge considered at [65] that this report had limited weight in the exercise of his discretion.

31.    At [69] the judge noted that Mr Chapman KC concentrated on the retail investors who are the vast majority of shareholders in the defendants, 68% or 11,552 in the case of Reckitt and 89% or 10,566 in the case of Indivior. His solicitor, Mr Leedham of Mishcon de Reya, stated in his witness statement that there are disincentives to retail investors participating in securities claims which would mean instructing lawyers, particularising their cases, including on limitation, reliance and loss and providing disclosure and factual evidence. He said that those requirements of ordinary proceedings are a "*substantial chilling factor on the participation of investors in securities actions (and on the willingness of litigation funders to fund such actions)*." The judge recorded Mr Leedham's evidence that litigation funders were not prepared to fund claims by retail investors as it was not economically viable for them to do so prior to a finding of liability being made. In the representative proceedings, there is funding provided by Woodsford but it is not apparently prepared to fund retail investors who may want to join the multi-party proceedings, which is said to be a barrier to access to justice for retail investors.

32.    At [72] the judge said that, after being pressed to do so, Mr Chapman KC spelt out in oral submissions four options for the second stage of the representative proceedings. At [74] the judge expressed surprise that there was no clear strategy for taking these claims through to a conclusion of investors actually receiving some compensation. As he said:

> "The funders must have contemplated funding the investors all the way through to such recovery (there would be no sense in doing otherwise) and yet they apparently have no idea how the proceedings will work save up to the obtaining of the declarations in the Representative Proceedings."

33.    The judge then set out the arguments of the defendants against the representative proceedings, saying at [76]:

> "The Defendants' main argument is that the Representative Proceedings would prevent the Court from being able to exercise its case management powers in relation to the procedural structure, such as a bifurcated process, and its general control over the shape of the proceedings prior to trial. They say that it should be open to the Court to decide whether the proceedings should be bifurcated and, if so, what should be tried at the first stage and whether progress should be made on second stage issues ahead of the first stage trial. The Court should be able to decide whether in this particular case the same approach as was adopted in the other securities cases of *G4S, RSA* and *Serco* (as described above) by Miles and Falk JJ should be adopted in this case or whether an alternative approach is more suitable. It will still be open to the Claimants to argue that there should be bifurcation and no progress on what would be second stage issues. But it would be up to the Court to decide this, rather than Wirral and its represented persons, who have presented this as a *fait accompli* with which the Court cannot interfere."

34.    He set out the arguments of Ms Helen Davies KC for Reckitt as to the disadvantages of the inability of the court to control its own procedure. First was that not having details

of the individual claimant issues would make settlement more difficult. Particulars of standing, reliance and quantum would enable the defendants properly to assess the claims and value them for settlement purposes. Wirral had offered to provide trading data for the represented persons but she submitted that this was inadequate.

35.     The judge noted at [78] her second point that there was a serious risk of fading memories because some of the published information relied on goes back to 2006. The Court could do something to mitigate this, as had Miles and Falk JJ in *RSA* and *G4S* by having earlier disclosure and witness statements, which would also prevent subsequent evidence being overinfluenced by the findings of the judge at the first trial, a point made at [72] of *G4S*. Her third point followed on from the second, that case management orders on matters such as disclosure and witness statements before the first trial means the parties and the Court would not be starting from a standing start in terms of preparation for the second trial.

36.     At [80] he noted Ms Davies KC's fourth point which was allocation of litigation burden, something which was referred to in other securities cases. As other judges had recognised, claimants bringing such claims should be prepared to undertake substantial work to progress the case and engage properly with it to ensure it is resolved fairly and expeditiously. She submitted that it was self-evidently not in the interests of justice or consistent with the overriding objective or fair to the defendants that the burden should be so lop-sided against them.

37.     As to institutional investors being deterred from litigating here, she submitted that the evidence of the two US attorneys was not helpful or relevant. It is clear from the multi-party proceedings that institutional investors have not in fact been deterred from such proceedings against the defendants. The fact that they would prefer to be involved in the litigation in a minimal way through the representative proceedings does not mean that is consistent with the fair administration of justice or the overriding objective.

38.     As for the retail investors, the judge noted at [82] Ms Davies KC's submission that their position had been exaggerated for the purpose of supporting the representative proceedings. As at the date of the hearing, 231 retail investors had signed up to one or both of the representative proceedings. In a letter sent a few days before the hearing Mishcon de Reya had said none of these retail investors had joined the multi-party proceedings, saying Woodsford was not willing to fund them should they wish to do so because of the "economic and administrative burden" of pursuing such claims said to apply to the funders and retail investors, although that seemingly does not apply to the institutional investors who have funding for both forms of proceedings.

39.     At [83] the judge noted that the actual funding agreement had not been disclosed. He continued:

        "But Ms Davies KC did show me the Costs Sharing and Governance Agreement which contains the terms upon which investors are able to become represented persons in the Representative Proceedings. The represented persons have to agree to costs sharing in order to opt-in to the Representative Proceedings. They have to provide '*valid, accurate and complete trading data*' presumably to prove that they have *prima facie* standing to pursue a claim. By clause 14, unless Wirral

agrees otherwise '*for example because the Third Party has put
in place other funding arrangements acceptable to [Wirral]*', the
Third Party (meaning the party signing up to the Representative
Proceedings) has to pay its estimated share of the incurred
Action Costs and Adverse Costs (as those terms are defined) and
make arrangements to secure its estimated share of the future
Action Costs and Adverse Costs through to the conclusion of the
proceedings. That must be either (i) by way of a written and
binding obligation that an English company with at least 3 years
of audited financial statements and net assets of at least £10m, or
an equally creditworthy entity, will indemnify the payment of
those costs as they are incurred on a month-by-month basis; or
(ii) pay up front and in full a sum corresponding to the investor's
estimated share of future costs."

40.    At [84] the judge pointed out that these were quite stringent requirements and any retail
investors that could satisfy them must be fairly substantial in themselves. Although the
clause suggested that retail investors could come to a different agreement with Wirral,
there was no evidence that this had happened. He said: "On the contrary, as Ms Davies
KC submitted, the clause indicates that retail investors with small claims would be
unlikely to be able to participate in the Representative Proceedings, which would
deprive them of access to justice." Though there were large number of retail investors,
the value of their shareholdings was only some 0.02% to 0.03% of each defendant's
share capital. Accordingly she submitted that there was no proof that the representative
proceedings are actually beneficial to retail investors and the fact that they had been
excluded by the funders from participating in the multi-party proceedings was
something inexplicable and was because of the attitude of Woodsford.

41.    At [85] the judge noted Ms Davies KC's submission that little reliance could be placed
on Professor Higgins' report and in any event it did not support Wirral's arguments. In
the Australian statutory class action procedure, there was no automatic bifurcation and
indeed Professor Higgins explained that the initial trial would normally involve the trial
of all issues in at least one lead claim. Professor Higgins also referred to the
considerable case management powers of the Australian Court prior to the first trial,
including to order sampling and disclosure. This supported the defendants' position that
the Court should be allowed to case manage the proceedings all the way through.

42.    At [86] the judge noted that Mr Patton KC had adopted all Ms Davies KC's submissions
with some additional observations on the policy underlying section 90A and Schedule
10A of FSMA by reference to a Discussion Paper and Report of Professor Paul Davies
KC in 2007. The judge summarised this at [86]-[87] in these terms:

"…That new statutory regime derived from a review carried out
by Professor Paul Davies KC, who produced a Discussion Paper
dated March 2007, followed by a Final Report dated June 2007.
Professor Davies KC's terms of reference from the Government
were to consider the impact of the new regime on '*issuers,
markets, investors and others; the quantity and quality of
information disclosed; the competitiveness of the UK as a good
place to do business*'. Professor Davies KC focused on the
requirements of reasonable reliance and fraud as setting a high

13

bar for liability, that would hopefully prevent the private securities litigation culture that had developed in the US.

87 In his Final Report, Professor Davies KC was keen to stress that it would not be beneficial for the UK financial markets for private securities litigation to follow the course taken in the US, where the availability of funding and lower thresholds for liability had led to extensive private securities actions. He recognised that recent changes in litigation funding rules in the UK may exacerbate the risk of unmeritorious claims being pursued but he considered that this risk could be tempered by making liability fraud-based, rather than negligence-based, and dependent on reasonable reliance by the investors. In other words, he wanted to avoid speculative collective litigation in the UK. The Government agreed, stating in its impact assessment of the new regime that it had '*deliberately been shaped, principally by selecting a demanding fraud test for liability, to minimise the potential for speculative litigation and the corresponding pressure on issuers to settle in order to terminate litigation, rather than compensate for harm done to shareholders*'."

43.    The judge then set out his conclusions on the exercise of discretion in this case. He commented at [88] that a lot of the evidence he had received seemed to him to be more related to policy reasons for exercising his discretion one way or another (which included the reference to the policy behind section 90A and Schedule 10A in Professor Paul Davies KC's papers to which he had just referred) and said at [89] that he was not deciding the application on policy grounds or to say that this is how securities claims in general should be brought, but he was deciding how his discretion should be exercised in this particular case.

44.    At [90] he said:

"While *Lloyd v Google* might be understood to have presaged a new look at the utility of representative actions, I do not think that Lord Leggatt would have contemplated that his judgment would be used to oust the ability of the Court to case manage these sorts of claims from the start. Mr Chapman KC said that if Lord Leggatt had had concerns about the effect of bifurcation on case management, he would have said so. But the trouble with that is that the issue was not before the Supreme Court and it is unclear whether any submissions were made about it. The case was more about whether the representative action could be used where otherwise a very large number of persons would not have any access to justice and where bifurcation simply would not work."

45.    He repeated the point he had made at [56], (cited at [27] above) that he did not believe that the availability of a bifurcated process in representative actions was the reason for using them. He questioned whether it was appropriate to be using the representative action for the express purpose of bifurcation so as to remove any possibility of the Court being able to require the represented persons to do anything in relation to their claims

at the initial stages. He said at [92] that although he understood the desire of the investors and their funders to avoid the risk and costs of pursuing the multi-party proceedings, he did not believe that was a legitimate basis for depriving the Court of its power to case manage such claims. This is particularly so where it is desirable for the Court to set down a procedure at the outset of the proceedings that would take the parties all the way through to a monetary judgment. He said at [94] the investors had nothing to fear in putting case management in the hands of the Court. If there is a good case for bifurcation, that case can be made to the judge managing the case who will decide what is in the best interests of the parties and the administration of justice.

46.    He said at [95] that Wirral's proposition does seem quite extraordinary. It asks the Court to accept that it should have no control over whether the proceedings should be bifurcated, unlike in *G4S* and *RSA* where the judges had carefully balanced all the competing interests in deciding how those cases should be managed. Yet Wirral was saying the investors should be able unilaterally, without any input from the defendants or the Court, to bifurcate the proceedings as they wanted to, depriving the Court of the ability to apply the overriding objective in case managing the claim.

47.    At [97] he noted that the existence of the multi-party proceedings showed that institutional investors had not been deterred from pursuing their claims here by the way securities claims are managed. The fact that they would prefer not to expend cost and effort in preparing and putting forward their cases until after the first trial is unsurprising but contrary to the way litigation is normally conducted in this jurisdiction.

48.    At [98] he said that he had been concerned about the position of the retail investors and the fact that they might be deprived of access to justice if the representative proceedings cannot go ahead. He continued:

> "…But as it emerged from the evidence and the hearing, the retail investors are inexplicably not being allowed to participate in the Multi-party proceedings because of the attitude of the funders. Even though the retail investors who have signed up to the Representative Proceedings, including satisfying the stringent financial conditions, have been allowed to participate in them, including presumably to take their claims to a conclusion in the follow-on claims (although the commitment in the Costs Sharing and Governance Agreement is limited to the Representative Proceedings), they have been denied funding and the opportunity to participate in the Multi-party proceedings.
>
> 99. But this situation has been engineered by the funders. And it has enabled Wirral to say that the retail investors cannot pursue their claims otherwise than through the Representative Proceedings and will be denied access to justice. But without any adequate and coherent explanation from the funders as to why they have apparently discriminated against the retail investors in relation to the Multi-party proceedings, I am not prepared to accept that they can only seek redress through the Representative Proceedings. There is no evidence that retail investors who have opted-in to the Representative Proceedings would not be able to obtain their own funding and issue their own proceedings, which

could then be consolidated or at least managed together with the
Multi-party proceedings."

49. He also noted that Ms Davies KC had referred to the *RBS Rights Issue Litigation*
pursuant to section 90 of FSMA, which included thousands of retail investors and the
*Lloyd/HBOS Group Litigation* which involved claims from some 6,000 investors, both
institutional and retail, which showed that retail investors had been able to bring claims
under the current procedural structure and had access to justice in similar securities
claims, albeit not under section 90A. The evidence did not show that retail investors are
unable to bring their claims otherwise than through representative proceedings.

50. In relation to the overriding objective, the judge said at [101]:

> "In terms of the overriding objective, it seems to me that the case
> management of the other securities claims have shown how the
> Court can deal with these cases fairly, proportionately and by
> allotting an appropriate share of the Court's resources to them.
> If the Claimants are required to provide material in support of
> their individual claims and to engage with the proceedings from
> an early stage, it is more likely that the proceedings will be dealt
> with expeditiously overall. It will mean that there will not be a
> standing start after the first trial and with fading memories it may
> be important that the final trial is not delayed too long and that
> their evidence is recorded at an earlier stage. There was not much
> discussion at the hearing about the possible disruption as a result
> of appeals. But this can be factored in by the Court in making
> sensible, practical case management directions, including by
> putting the parties on an equal footing."

51. He noted at [102] Wirral's suggestion that an advantage of the representative
proceedings was that if it did not obtain the declarations then the time, effort and costs
of follow-on claims would be saved and that settlement would be much more likely if
it succeeded in the representative proceedings. The judge said there was no real
evidence to support this, but more fundamentally, these considerations could be taken
into account by the judge case managing the proceedings from the start.

52. The judge concluded at [104]-[105]:

> "104 So I return to the main point that these issues should be for
> the Judge managing the claims to consider. That will be done by
> reference to the overriding objective. To allow the
> Representative Proceedings to continue would mean that a Judge
> has no power to decide the best way to manage the claims from
> start to end by reference to all relevant factors, including the
> respective positions of the parties, the appropriate use of the
> Court's resources and the administration of justice. They take
> away from the Court one of its prime functions to manage and
> deal with cases justly and at proportionate cost.
>
> 105 I therefore conclude that, in the circumstances of this case,
> my discretion should be exercised against the Representative

> Proceedings and in favour of the Multi-party proceedings,
> should the Claimants wish to proceed with them. They can be
> managed in the normal way so as to further the overriding
> objective and in particular the Claimants can argue for the same
> bifurcated process, with no progress on claimant-side issues in
> the meantime and it will be up to the Judge managing that case
> to decide whether that is appropriate or not. But I think it would
> be unfair and unjust, and contrary to the overriding objective, to
> allow the Representative Proceedings to oust the jurisdiction of
> the Court to case manage the claims from the start."

Grounds of appeal

53.     Wirral contends that the judge erred in law and fact and in the exercise of his discretion
in ordering that it should not continue to act as representative and in striking out the
representative proceedings. His approach did not properly reflect or apply the decision
of the Supreme Court in *Lloyd v Google* as further explained by the Court of Appeal in
*Commission Recovery* [2024] EWCA Civ 9.  The main point in the judgment, that in a
bifurcated representative action the Court cannot manage the second stage of the
proceedings from the outset, is an inherent feature of any action structured in the way
contemplated by the Supreme Court. If this were a bar to such actions or a heavy factor
in the exercise of discretion, few or no such claims could proceed.

54.     Wirral contends that the characterisation of the representative action as ousting the case
management powers of the Court was misconceived as it does not oust the powers but
provides a different procedural regime.  The judgment also wrongly treated
representative actions as limited to cases where access to justice would not otherwise
be available and/or where the bifurcation was only in respect of damages. *Lloyd v
Google* does not support an approach based on such a hierarchy of actions.

55.     Wirral also contends that the judgment failed to give sufficient weight to the evidence
that striking out would preclude 302 existing claims by retail investors, as well as an
unknown number of other potential retail claimants. The judgment also accorded too
much weight to the "usual way" in which previous claims under section 90A have been
brought and managed, as a multi-party action with limited bifurcation.

56.     The judge had disclaimed reference to policy grounds but he should have had regard to
such matters, including the particular benefits of a bifurcated representative claim and
the difficulties associated with multi-party proceedings, which apply to most section
90A claims. The appeal raises a question of principle and/or practice.

The submissions of the parties

57.     Mr Chapman KC began his submissions with that alleged issue of principle, which he
said was recognised by Males LJ in granting permission to appeal. If a representative
action is not to be permitted here and for the reasons given by the judge, it was difficult
to see in what circumstances it might ever be permitted. He submitted that, so far as the
ability of the retail investors to bring claims at all was concerned, this was an all or
nothing situation, but as I pointed out in argument, there is no evidence from the funders
that they are not prepared to fund the retail investors.

58.    He submitted that the judge misapplied and misunderstood the law particularly as found in *Lloyd v Google*. He did not grasp its significance, dismissing it as *obiter* with only passing treatment of the representative action. That starting point infected most of the judge's subsequent analysis which treated a representative action as the exception to the conventional manner of case managing securities claims.

59.    Mr Chapman KC turned to the law, noting that if the threshold requirement of same interest is met, the claimant can commence a representative action as of right and does not have to obtain the permission of the Court, although he accepted that the Court has a discretion whether to allow a representative action to continue.

60.    He then took the Court in detail through *Lloyd v Google*. He noted that at [8] of the judgment Lord Leggatt had said that the claim was doomed to fail because the claimant sought to claim damages on behalf of the members of the class without individual assessment. However, the Supreme Court indicated that, if he had sought to employ a representative action and a bifurcated approach seeking declaratory relief first and individual assessment of damages second, that would have been a permissible approach. Although what follows on the topic of representative actions is *obiter* it is powerful guidance which ought to be followed.

61.    Lord Leggatt turned to collective redress at [24], starting with group actions pursuant to GLOs, noting that the disadvantages of that procedure are that it is opt-in with low participation rates and that the need to prove loss on an individual basis can have the effect of not making the procedure cost-effective. He then dealt with collective proceedings, only available in respect of competition claims. He then turned to representative actions at [33], setting out the history including the correction of the restrictive approach in *Temperton v Russell* [1893] 1 QB 435 by the House of Lords in the *Duke of Bedford* case. In his historical survey, Lord Leggatt got to *Prudential* at [47], saying at [48]:

> "This decision was important in demonstrating the potential for a bifurcated process whereby issues common to the claims of a class of persons may be decided in a representative action which, if successful, can then form a basis for individual claims for redress. More generally, the *Prudential* case marked a welcome revival of the spirit of flexibility which characterised the old case law."

Mr Chapman KC submitted that the judge overlooked this endorsement of the importance of *Prudential* in demonstrating the potential for a bifurcated process.

62.    Lord Leggatt went on to deal with claims for damages and the decision of the Court of Appeal in *Emerald Supplies*. Mr Chapman KC addressed the various options so far as individual claims for damages were concerned if Wirral were successful in obtaining declaratory relief. He noted that what Lord Leggatt seemed to be contemplating in this part of the judgment was a representative action in which declarations were obtained, followed by further proceedings in which individual claimants relying on the declaratory relief would seek to prove their individual claims for loss and damage. This was a possibility which was canvassed in *Prudential* as well. He submitted that this was the first option, fresh proceedings. The second option would be for the represented persons to apply to be joined as parties to the multi-party proceedings. The third option,

which is what seems to have happened in the New Zealand case of *Credit Suisse v Houghton* [2013] NZSC 25 is to amend the claim in the representative action to specifically name the represented persons as claimants. As the members of the Court pointed out in argument, all three of these options might well raise limitation issues, as Mr Chapman KC accepted.

63.    After dealing with Commonwealth cases, Lord Leggatt dealt with the principles applicable to the representative procedure, saying at [68]: "I agree with the highest courts of Australia, Canada and New Zealand that, while a detailed legislative framework would be preferable, its absence (outside the field of competition law) in this country is no reason to decline to apply, or to interpret restrictively, the representative rule which has long existed (and has had a legislative basis since 1873)." He then referred to the "same interest" threshold requirement, which is satisfied here.

64.    Mr Chapman KC then referred to [75] of *Lloyd v Google* dealing with the Court's discretion (quoted at [18] above) pointing out that, as Nugee LJ had also said in *Commission Recovery*, application of the overriding objective was likely to militate in favour of the representative action continuing. In relation to discretion, Lord Leggatt then dealt with matters of discretion such as limiting the represented class and class definition. Mr Chapman KC submitted that it was striking that these did not include the type of case management concerns raised here which are really stage 2 issues: problems of recollection, litigation burden and so on which one would expect to see if they were relevant to deciding whether the claim should proceed by way of representative action. In any event, by starting from the wrong starting point, the judge elevated those case management concerns to a prominence they did not warrant. He submitted that the Court should be looking for knock-out blows not matters of procedural preference before exercising the discretion to strike out the action as the judge did, although he accepted, in answer to Falk LJ, that one did not get that concept of knock-out blow from Lord Leggatt's judgment.

65.    Mr Chapman KC then relied upon [80]-[81] of Lord Leggatt's judgment, to which I have referred at [20] above, submitting that the answer which he gave to the difficulty that damages would need to be assessed on an individual basis was the bifurcated process by reference back to *Prudential* as an available option. [81] also provided a steer as regards the limitation issue, based on *Prudential* and the decision of the Court of Appeal in *Moon v Atherton* [1972] 2 QB 435, that so far as the individual claims by represented persons are concerned, the limitation clock will have stopped running when the representative action was commenced.

66.    Mr Chapman KC then made submissions about the decision of Vinelott J in *Prudential*. He referred to the section on discretion at [1981] Ch 229, 255-6 where the judge said:

> "Then it is said that the effect of allowing the action to proceed will be to add numberless claims founded on fraud and that the court should therefore be slow to admit the amendment as it always is slow to allow an amendment alleging fraud. In my judgment, that submission is misconceived. Allegations of misconduct on the part of the individual defendants as directors and of conspiracy are made in the statement of claim. The effect of allowing the plaintiff to sue in a representative capacity is that if those allegations are proved any member of the class will

> be entitled to rely on the judgment as res judicata. The amendment, therefore, does not add causes of action. It allows a common element in the causes of action of all members of the class to be established in one representative action."

He submitted that this was the position here in terms of the common issues in respect of which Wirral seeks declarations.

67.    He also relied upon the next paragraph of the judgment at 256B:

> "Next, it is said that if the claim had been originally formulated as a representative claim the defendants might have wished to adduce evidence that no member of the class has suffered damage. That objection is, in my judgment, also misconceived. The court cannot in a representative action make an order for damages, though, of course, the plaintiff in its own non-representative capacity will be entitled to pursue its claim for damages."

68.    He noted that the judge took issue with the formulation of the declaratory relief sought in proposed amendments to the pleading but indicated he would permit the declaratory action to continue if the amendments were recast as he suggested, saying at 256F-G:

> "The practical effect of such a declaration would, it seems to me, be no greater and no less than the effect of declarations, first, that the circular was tricky and misleading; secondly, that the individual defendants conspired to procure its circulation in order to procure the passing of the relevant resolution; and thirdly, that in so doing they conspired either to injure the plaintiff and the other shareholders at that date or to commit an unlawful act, or to induce a breach by the first defendant company of its contractual duty to the shareholders. It would, I think, be better that those declarations, which constitute the common element of any claim by any member of the class for damages for conspiracy, should be so spelt out."

69.    Mr Chapman KC submitted that the Supreme Court in *Lloyd v Google* had not qualified its approval of *Prudential* by saying it was a case where the representative action was only brought at trial, so one did not need to worry about case management concerns as the judge did. It did not say *Prudential* is an example of how a bifurcated process might work, but you have to be careful using it because you don't know anything about the individual positions on reliance or the total value of the shareholders' claims or there might be issues about starting from a standing start. He submitted that it was difficult to identify a material distinction between *Prudential* and its endorsement in *Lloyd v Google* and the present case.

70.    In answer to questions from the Court about situations such as the present where another procedure in the form of the multi-party proceedings is available and why it should not be for the Court rather than the claimant to determine which procedure was the more appropriate, Mr Chapman KC accepted that this could feature in the exercise of

discretion, but it could not weigh so heavily as to forestall the procedural option of representative proceedings which the claimant has shown it is entitled to use.

71.    He submitted that one of the advantages of the bifurcated approach is that the parties and the Court can move much more quickly and efficiently to a determination of the common issues which are the only issues at play at stage 1. He accepted that one could try to persuade a Court to adopt the same approach of bifurcation in multi-party proceedings but a bifurcated representative action has this advantage built in from the outset and investors know what they are letting themselves in for.

72.    Mr Chapman KC then made submissions about the decision of the Court of Appeal in *Commission Recovery*. He noted that one objection to the continuation of the representative claim was a pleading point, that there should be an individualised pleading of each represented person's claim. This was rejected by this Court in [69] of the judgment of Nugee LJ:

> "Mr Machell did not spend much time on this ground, and I consider that he was right not to do so. Pleadings are intended to aid in the just resolution of disputes, not obstruct their just resolution. I do not see that at this stage of the proceedings it is necessary for there to be any individualised pleading of the claim of each member of the class, or that any useful purpose would be served by such pleading. The whole point of CRL's core proposition is that it is not necessary at this stage to have an individualised assessment of each claim, as proof of contracting on the standard terms and of payment of commission is enough; what the position will be thereafter depends on whether CRL is right about this, what issues remain to be decided, to what extent individualised assessment is required, and if so whether and to what extent individualised pleadings are required for that purpose. These are all future questions. They are not a reason to regard the pleading as it currently stands as deficient."

Mr Chapman KC submitted that this paragraph was important because it addresses many of the points relied on by the judge in the present case and, consistently with *Lloyd v Google*, suggests matters such as the pleading of individualised claims and other matters related to the individual claimant are stage 2 issues.

73.    From [71] onwards Nugee LJ dealt with discretion. The point made by Mr Machell KC set out at [72] about it being uncertain whether any individual claimant will come forward let alone make a monetary recovery echoed points made in the present case. This was addressed by Nugee LJ at [74] and [75]:

> "74 I think there is a short answer to these points. In general it is a matter for a claimant to decide if the claim he advances is worth pursuing. The Court no doubt does have a discretion to prevent its resources being wasted on pointless litigation, where the game is simply not worth the candle, but save in clear cases I think the Court should be slow on such grounds to prevent a claimant with an arguable case from taking it forward. CRL's very purpose is to advance the claims in this litigation…

75 It may be noted that the application under CPR r 19.8(2) is not premised on CRL being an unsuitable representative, or as having shown itself to be unfit to take on the role. In seeking a direction from the Court that CRL 'may not act as a representative', M&C LLP and LAR are not trying to have CRL replaced by someone more suitable, but to prevent the litigation being taken forward at all. If CRL cannot act as a representative it is not to be supposed that it will pursue the case for the sake of some £6,000, nor is it suggested that others are likely to come forward to take it over. So in effect the question is whether, under the guise of an application under CPR r 19.8(2), the defendants to a claim should be able to have the claim stopped in its tracks entirely. Here I think it is worth recalling the guidance given by Lord Leggatt in *Lloyd v Google* at [75] (paragraph 38 above) that many of the considerations included in the overriding objective:

> 'are likely to militate in favour of allowing a claim, where practicable, to be continued as a representative action rather than leaving members of the class to pursue claims individually.'

That seems to me applicable to the present case."

74.  Mr Chapman KC submitted that eight points of importance and relevance emerge from these cases. First, the representative action is a well-established procedure which has existed for centuries. Second, it is a flexible tool of convenience to be used to advance the interests of justice. Third, the only threshold requirement that must be met is the "same interest" requirement. Fourth, that requirement must be given a purposive and pragmatic interpretation. Fifth, once it has been met, the Court has a discretion as to whether to allow the representative action to continue. Sixth, that discretion must be exercised by reference to the overriding objective, the requirements of which will often militate in favour of allowing the representative claim to continue. Seventh, for a defendant to be able to stop the representative claim in its tracks, there would ordinarily have to be a successful challenge to the representative action itself, such as the suitability of the representative claimant acting as such, problems with the definition of class or, as in *Lloyd v Google*, a representative claimant seeking lowest common denominator damages or even if the common issues were not sufficiently dispositive. Eighth the fact that the represented persons have individual claims for damages requiring individual proof is not a bar to a representative action but it may be appropriate to have a bifurcated process of establishing liability first.

75.  He next submitted that the presence of the multi-party proceedings should not cloud the analysis of whether the representative action is appropriate and should be allowed to continue. If the multi-party proceedings route is in practice not available to particular claimants that is an important factor when it comes to the exercise of discretion. He identified what he submitted were the key benefits of the representative action. The first was that it reduces the burden of litigation at the initial stage so an investor can be a represented person and receive the benefit of any findings on common issues without being required to provide detailed pleadings or disclosure and without the risk of being selected as a test claimant.

76.     Second, that reduction in the litigation burden saves time and expense in terms of what
        follows the determination of the common issues. If the representative action fails at that
        first stage, no costs or Court time need to be expended on stage 2 issues. By contrast if
        liability is established at stage 1, there is likely to be a settlement. The judge erred in
        concluding that had not been established as experience, particularly in other
        jurisdictions, is that settlements tend to be the rule. He referred to the evidence of
        Professor Higgins about this. His instructions were also that the parties in *Commission
        Recovery* had now settled.

77.     His third point was that the representative action provides legitimate advantages of
        efficiency and access to justice particularly for the smaller institutional investors and
        retail investors. He submitted that in terms of cost benefit the game was not worth the
        candle for them in multi-party proceedings, essentially for four reasons. The first was
        the point made by this Court at [78] of *BT Group plc v Le Patourel* [2022] EWCA Civ
        593 about judicial common sense. If it were rational for smaller investors to bring their
        claims and for commercial funders to fund them, they would do so. Second and
        relatedly, no other section 90A claim in the 15 years that such a claim has been available
        has included retail investors in the claimant group. The most natural explanation for
        that is such claims are not viable to bring.

78.     The third reason was in the evidence of Mr Leedham at [29]-[34] of his witness
        statement to the effect that the litigation burden is a powerful disincentive to the
        participation of institutional investors and retail investors in securities claims, even if
        they have a strong prima facie claim. The fourth reason was that the multi-party route
        was not as a matter of economic or administrative burden worthwhile pursuing for retail
        investors or the funders, so that retail investors had not been given the opportunity to
        join the multi-party proceedings. Mr Chapman KC accepted that that was a decision of
        the funders and, even in the representative proceedings, funding for retail investors was
        only on the terms of the cost-sharing agreement. He admitted in answer to questions
        from the Court that there was no explanation from the funders as to the position they
        had taken.

79.     Mr Chapman KC reiterated that the pattern from other jurisdictions is that the bifurcated
        approach encourages overall settlements. The judge had erred in giving insufficient
        weight to that factor, saying at [89] that he was not deciding the case on policy grounds.
        He also submitted that the judge's assessment that the position of retail investors had
        been engineered by the funders was not fair or accurate.

80.     He submitted finally that the case management objections to the representative action
        were not a sound basis for striking it out. The judge was wrong to consider that the
        representative action was ousting the case management powers of the Court. It was just
        a different procedure. The lack of advancement of stage 2 issues would necessarily have
        arisen in the bifurcated proceedings contemplated in *Lloyd v Google* and in fact taken
        forward in *Prudential* and *Commission Recovery*. Neither the Supreme Court in *Lloyd
        v Google* nor this Court in *Commission Recovery* regarded the hiving off of stage 2
        issues as some sort of obstacle, let alone an impermissible feature justifying the striking
        out of the representative action.

81.     Ms Helen Davies KC made the principal oral submissions on behalf of the defendants.
        She submitted that the starting point in relation to this appeal was that the Court had a
        discretion under CPR 19.8, as was confirmed by this Court in *Commission Recovery* at

[38], to determine whether in accordance with the overriding objective, the claims should be permitted to continue by way of representative proceedings. The existence of the discretion meant that Wirral had no unfettered right to choose the procedural manner in which it advanced its claim and, as a matter of principle, there can be no presumption in favour of allowing a claimant to proceed in the procedural manner it alone has chosen or requirement that the defendant demonstrate some kind of knock-out blow or, as Mr Chapman KC had put it, some structural deficiency in the use of the representative procedure. Wirral's various formulations would involve what Falk LJ had described during his submissions as a reverse hierarchy, giving Wirral's choice greater weight than what the case requires in terms of justice and proportionate cost. Given the considerations forming part of the overriding objective, the exercise of the discretion must depend on the particular facts of the case.

82.    She submitted that, in his careful and detailed judgment, the judge had clearly conducted the very multi-faceted analysis required by the overriding objective and concluded in the exercise of his discretion, that in the light of the existence of the parallel multi-party proceedings and his analysis of the evidence about retail investors, it was not appropriate to allow the representative proceedings to proceed. Ms Davies KC submitted that no error of approach had been identified in relation to the judge's analysis and his decision was plainly one well within the generous ambit of his discretion. Accordingly, on well-established principles, there is no basis for this Court to interfere.

83.    Ms Davies KC emphasised that, in claims under section 90A and Schedule 10A of FSMA, there were five elements a claimant must prove to establish a claim. First, standing, which is a twofold test, that the claimant has the requisite personality to sue (for example the trustee of a pension fund should be suing, not the pension fund) and that the claimant has acquired, held or disposed of the relevant securities. Second, that there is an untrue or misleading statement or omission in published information to the knowledge of a person discharging managerial responsibilities ("PDMR"). Third, that there has been reliance on the published information by the claimant in deciding to acquire, hold or dispose of the relevant securities. Fourth, causation, that the claimant would have acted differently in the absence of the information and fifth, that the claimant has suffered loss.

84.    She pointed out that the element of reliance was important in controlling the extent of claims which can be brought under this section, as was recently emphasised by Leech J in *Allianz Funds Multi-Strategy Trust v Barclays plc* [2024] EWHC 2710 (Ch). That case provides a clear illustration of the sort of steps that can be taken in multi-party proceedings to prevent the pursuit of claims by claimants who do not meet those statutory requirements which are simply not available in representative proceedings such as the present. Leech J was able to determine how much of the claim should be struck out because, as part of case management by the Court, the claimants had been ordered to produce particulars of reliance which identified three categories of reliance: A, those who read and relied upon the relevant published information; B, those who relied on the published information indirectly through other sources which acted as a conduit for the substantive contents of the published information; and C, claimants who are alleged to have suffered losses as a consequence of the level of or movements in the share price of the defendant bank, so-called Price/Market Reliance, equivalent to the concept of fraud on the market in the United States. 60% of the total value of the claims

were in Category C. The particulars of reliance enabled the defendant to successfully strike out the Category C claims on the ground that such Price/Market Reliance does not amount to reliance as a matter of English law (see [129] of the judgment). As Ms Davies KC went on to submit, exactly the same issue arose in the present case.

85.    Ms Davies KC submitted that where, as here, there were parallel multi-party proceedings, the judge was right to look critically at what the representative proceedings would actually achieve and what issues would be left over. She submitted that here the representative proceedings would only determine one of the five elements required under section 90A of FSMA, whether there had been untrue or misleading statements or omissions.

86.    She emphasised that all the institutional investors (including the smaller ones to which Mr Chapman KC had referred) were also party to the multi-party proceedings. She referred to the draft Particulars of Claim which had been provided in the multi-party proceedings which are identical to those in the representative proceedings until Section G, an additional section on reliance. [73] stated that all the claimants plead that they acquired, held or disposed of the relevant securities on the basis of Price and/or Index reliance as defined, certain claimants plead that they acquired, held or disposed of the relevant securities on the basis of Conduit reliance as defined and certain claimants plead that they acquired, held or disposed of the relevant securities on the basis of Direct reliance. [74] and [75] then defined Price Reliance and Index Reliance which she submitted were essentially the same as Category C struck out by Leech J in the *Barclays* case. She submitted that if the multi-party proceedings were continuing the defendants could apply to strike out the claims of those claimants who only relied upon Market/Index Reliance. It was not known how many claimants were in each category and although the defendants' solicitors had asked for this information since the *Barclays* judgment, it had been refused on the basis that it was not relevant for the purposes of the representative proceedings.

87.    Given that the representative proceedings would only deal with the issue of whether there had been untrue or misleading statements or omissions and there would be unlikely to be a trial of those proceedings until sometime in 2026, that would lead to further delay in dealing with the other elements of the section 90A claim where some of the published information and meetings date back to 2006. Ms Davies KC submitted that the whole point of the representative proceedings was so that the claimants could avoid having to investigate matters relating to the other elements required under section 90A, including reliance and she said that the defendants suspect that Wirral itself does not know how many of the claimants rely only on Market/Index Reliance as, under the governance arrangements, the represented persons only had to produce trading data. The judge had been right to emphasise at [22] of the judgment that the concerns expressed by Hildyard J in *Manning & Napier v Tesco plc* [2017] EWHC 3296 (Ch) about inadequate assessment of individual claims at the outset and joinder to proceedings *"as a matter of subscription"* could be a description of what the representative proceedings in the present case were seeking to achieve.

88.    Ms Davies KC submitted that it appeared that Wirral and its funders were using the representative proceedings for "book-building". It would be in the interests of the funders because the greater the number of claims, the greater the return to the funders. This approach has been deprecated by the Courts. In *Manning & Napier v Tesco plc* [2017] EWHC 2203 (Ch), Asplin J (as she then was) at [55] said that one does not make

a GLO on the basis that to do so would attract a significant number of additional claimants or to bring claimants out of the woodwork. This was relied upon and endorsed by Trower J in *Moon v Link Fund Solutions* [2022] EWHC 3344 (Ch) at [64]:

> "In particular, Mr Handyside submitted that the possibility or likelihood that a GLO will lead to an increase in the number of claimants is not a legitimate reason for making one. This submission is supported by Mrs Justice Asplin's judgment in *Manning* at [55], and in broad terms I agree with what she says in that passage. GLOs are to facilitate the case management of existing and prospective claims through providing 'access to justice where large numbers of people have been affected by the conduct of others, but individual loss is so small that it makes an individual action economically unviable': see the White Book, paragraph 19.10.0, citing the Access to Justice report. I have seen no support for any suggestion that the procedure is designed to encourage claims to be brought, and Mr Dale essentially eschewed any such submission."

Ms Davies KC submitted that it should equally not be possible to use the representative procedure, where there are nowhere near the same protections as identified in a GLO, to book-build.

89.    Ms Davies KC then turned to the principal grounds of appeal and Wirral's contention that the judge erred in law because the approach he adopted did not properly reflect the decision of the Supreme Court in *Lloyd v Google* or the decision of this Court in *Commission Recovery*. She submitted that it was difficult to identify from Wirral's submissions precisely what error of law it was being suggested the judge had made. What seemed to be being suggested is that *Lloyd v Google* requires the starting point to be that the representative procedure is open to a claimant if the same interest criterion is satisfied and if the claimant decides to use that procedure it should be entitled to do so unless there was some good reason not to or a structural defect, in other words that there is a hierarchical presumption in favour of the representative procedure.

90.    She submitted that at [31] of the judgment (referred to at [12] above), the judge had said that the discretion to which Lord Leggatt referred at [75] was the same discretion as would arise under CPR 19.8(1)(b) or 19.9 and no presumption arises in favour of the representative proceedings by reason of their having been started "as of right" under 19.8. Mr Chapman KC did not take issue with that paragraph nor could he do so. As Lord Leggatt said at [68] the representative procedure is a flexible tool of convenience in the administration of justice which is to be applied as the occasion requires. She submitted that as was clear from [67] what Lord Leggatt had in mind was that in appropriate circumstances the use of the representative procedure could alleviate issues of inconvenience or complete impracticality of multi-party litigation. However, she submitted that where multi-party litigation was neither inconvenient nor impractical, that is to be considered as part of the determination as to whether to allow the representative proceedings to proceed. It was clear that the representative procedure is subject to control by the Court in the exercise of its case management powers.

91.    Ms Davies KC said that it would be quite wrong to treat Lord Leggatt as saying that in effect the Court should be slow to prevent a claimant with an arguable representative

claim from pursuing it. In [75] and [81] he is making it clear that whether or not it is appropriate to do so in any given case is a matter for the Court's discretion. Whilst the defendants recognised, as they had before the judge, that at [75] Lord Leggatt had said that certain aspects of the overriding objective were likely to militate in favour of allowing a claim, where practicable, to be continued as a representative action, he was not saying those aspects would always lead to that conclusion. He was not seeking to prejudge the exercise by the Court of its discretion and it would have been inappropriate for him to do so. The judge's assessment at [42] (quoted at [19] above) of what Lord Leggatt was saying about the exercise of discretion was entirely correct and is incapable of disagreement. The judge also recognised at [47] that Lord Leggatt wanted to see more use of the representative action in the absence of class action rules as a flexible way of getting such cases before the Court.

92.    Ms Davies KC submitted that in circumstances where there were feasible multi-party proceedings available, it is difficult to see how an exercise of discretion in accordance with the overriding objective could be conducted other than by weighing the prospective advantages and disadvantages of the potential procedural routes available. As Falk LJ pointed out in argument, had the judge not done so, there would have been an appeal on the ground that he had not taken into account all relevant considerations.

93.    She submitted that in weighing the respective advantages of the available procedures, the judge had taken account of the case management decisions made in other section 90 and 90A cases including *G4S* and *Serco*. Whilst this approach was criticised by Wirral, she submitted it was unimpeachable because each of those other case management decisions was seeking to further the overriding objective, recognising that if there was to be a split trial with the defendant-sided issues determined at stage 1, there should nevertheless be some progress in tandem on claimant-sided issues for a number of reasons including preservation of documents and evidence, avoiding duplication of evidence and promotion of settlement, together with avoiding a standing start after stage 1 and ensuring an appropriate balance and fairness in the proceedings. The judge took all those matters into account in this case. She said that Wirral's submissions were quite candid. It was employing the representative procedure to avoid the prospect of the Court taking those sorts of case management decisions in relation to the claim and requiring it to do some work, even though that was thought by the Court to be appropriate to further the overriding objective. Ms Davies KC submitted that was not a particularly attractive position to be presenting. However, whatever the position as a matter of generality, none of those concerns have led to institutional investors declining to participate in the multi-party proceedings. As Mr Chapman KC accepted before the judge, there is no evidence that any institutional investor has been deterred from joining the multi-party proceedings.

94.    Ms Davies KC submitted that what Wirral and the funders were seeking to achieve by the representative proceedings was a situation where the claims were being pursued without even the most basic assessment in relation to each claimant of whether there was any prospect that the statutory requirements for establishing liability can be established, effectively a free ride. There was undoubtedly prejudice to a defendant being presented with claims that in fact had no merit but the defendant is not in a position to ascertain that until a long way down the track. There was a risk of a claim of exaggerated magnitude being held over a defendant's head in order to extract a

27

substantial settlement where there may be no basis for it. That was a risk specifically emphasised by the Supreme Court in *Mastercard v Merricks* [2020] UKSC 51 at [154].

95.    In the grounds of appeal, Wirral then assert that the judge started from the wrong premise that the multi-party claim is the default position. Ms Davies KC submitted that this was an unfair characterisation of the judge's reasoning. He was simply weighing the respective advantages and disadvantages of the different procedures available. He was making the point that in the context of the multi-party proceedings, the Court has a whole range of case management tools available to it in relation to the claims as a whole whereas in the representative proceedings the only case management tools are in relation to the common issues identified in the claim form. That must have been a relevant factor in the exercise of his discretion.

96.    The grounds of appeal also asserted that the judge wrongly treated representative actions as limited wholly or mainly to cases where access to justice would not otherwise be available to a class of claimants. Ms Davies KC submitted this was misconceived. From a number of passages in the judgment, it was clear that the judge understood that the representative procedure was not so limited. Just because the bifurcated approach is available in principle, it does not mean it is appropriate in every case and the judge was entitled to conclude, after careful consideration of all the factors, that in this case it was not appropriate.

97.    In relation to *Prudential,* Ms Davies KC submitted that the judge pointed out quite rightly at [49] the unusual features of that case and had in mind the importance attached to it by Lord Leggatt but concluded that it did not really help on the question of case management particularly at the outset of the proceedings rather than, as there, at trial. She submitted his analysis was perfectly correct. She asked the Court to note from the statement of facts at [1981] Ch 232-3 that, in that case the plaintiff had already pleaded as part of its derivative action, that the relevant circular was tricky and misleading and contained statements the second and third defendants could not honestly believe to be true. Those defendants sought at the beginning of the trial to prevent that claim going forward on the basis that it was a purely derivative one. Vinelott J gave judgment on that application on the third day of the trial, 18 June 1979, concluding that it was unnecessary to decide the question since the plaintiff had made it clear that, whatever the outcome of the derivative action, it wished to pursue a personal claim against the second and third defendants for conspiracy and as a representative of all shareholders for a declaration that the circular was tricky and misleading.

98.    The following day, the plaintiff applied to amend its claim to bring that representative claim. That application was heard over five days and Vinelott J gave judgment on 28 June 1979. This was the judgment relied on by the Supreme Court in *Lloyd v Google*. Ms Davies KC referred to the passage in the section on discretion which I have already quoted at [66] above in the context of Mr Chapman KC's submissions. She submitted that one could understand the appropriateness of allowing the amendment in circumstances where the very issue as to whether the circular was tricky and misleading was already before the Court in the trial and the judge was about to hear evidence on it so it was appropriate to make the conclusions on that binding on a broader class. That case demonstrates the use of a representative procedure in a bifurcated way, but she submitted that what one cannot do, as Mr Chapman KC sought to do in his submissions, is to jump from that to suggesting that case management consequences are just not relevant. In that case it would have been hopeless for the defendants in *Prudential* to

raise the sort of points the defendants are raising here because the issues were already before the judge and he was about to hear evidence on them and determine them.

99.    Ms Davies KC submitted that a related point was that Mr Chapman KC had sought to draw assistance from the fact that in *Lloyd v Google* there was no reference to the case management advantages of multi-party proceedings but that is scarcely surprising since that was a case where there was no prospect of a multi-party action with four million individual claimants. It was simply not in contemplation. What one does see at [75] and [81] is Lord Leggatt emphasising the need to exercise the discretion in accordance with the overriding objective.

100.   She submitted that *Commission Recovery* was another case where the choice was representative proceedings or nothing, so it is not surprising the case management considerations the judge took into account in this case were not considered because there were not alternative multi-party proceedings on foot.

101.   The next point in the grounds of appeal was the suggestion that the judge failed to give sufficient weight to the evidence that striking out the representative proceedings would preclude the claims of retail investors and make it not economically viable for them or smaller institutional investors to bring a claim, the access to justice point. Ms Davies KC submitted that the judge did consider the access to justice point in the exercise of his discretion but concluded the concerns raised were not made out, so that one is in the territory where Wirral needs to establish the judge's analysis was so wrong as to be outside the ambit of an assessment that could reasonably be made.

102.   In relation to the retail investors, she noted that 203 of the retail investors in Reckitt signed up to the representative proceedings but not the multi-party proceedings shortly before the hearing before the judge. They were not parties to the representative proceedings when those proceedings were issued or when the strike out application or the evidence in support of it were served. There is no explanation in evidence or correspondence as to how it is they were only signed up to the representative proceedings very shortly before the hearing and, absent such an explanation, the question must legitimately arise as to whether this was a tactic designed solely by the funders to bolster their position on the strike out application or, as this Court said in *Le Patourel,* to game the system.

103.   Ms Davies KC referred to the judge's analysis in relation to the retail investors. This had two parts, the first of which was consideration of the position of the retail investors themselves. The judge noted in [99] (quoted at [48] above) that there was no evidence from those who had joined the representative proceedings that they would not be able to obtain their own funding and issue their own proceedings. The second part was that there was no adequate or coherent explanation as to the decision of the funders not to fund retail investors to participate in the multi-party proceedings.

104.   She emphasised the stringent financial conditions of the cost sharing and governance agreement requiring a participating claimant to pay up front its share of the claimant costs and adverse costs incurred to date and provide an indemnity from an English company with at least £10 million of net assets in relation to future costs (or pay up front its estimated share of future claimant costs and adverse costs). She submitted that if a retail investor was in a position to satisfy those conditions, even if, as Nugee LJ pointed out, its proportionate share of costs might be modest if it had a small

shareholding, it would be in a position to join the multi-party proceedings where a cost-sharing agreement would presumably apply, although there is no evidence about that. Furthermore, as the judge had said at [84], although the opening words of clause 14 of the cost sharing agreement said investors could come to a different arrangement with Wirral, there was no evidence any of them had and this finding was not challenged on the appeal.

105.    Ms Davies KC pointed out that Mr Leedham's witness statement pre-dated any retail investors being allowed into the representative proceedings and does not address the terms on which they have been allowed into those proceedings. There is no transparency about that as there would have to be in the context of a GLO or collective proceedings in the CAT where the Court or the CAT would be scrutinising the funding arrangements. There was no evidence from the funders themselves explaining why they would not fund the retail investors to participate individually in the multi-party proceedings, only a letter from Mishcon de Reya saying that Woodsford was not willing to do so. It was not clear whether its position is that it will not fund the retail investors in any circumstances, for example if the appeal is refused.

106.    In relation to the suggestion that the judge was not entitled to conclude that the position of the retail investors had been engineered by the funders, Ms Davies KC submitted that he was plainly entitled to scrutinise with care the limited materials put before him and not take at face value whatever was said, particularly when there was no evidence from the funders at all. She referred to the letter from Mishcon de Reya, which said Woodsford was not willing to fund the retail investors because of the "economic and administrative burden" but, as she pointed out, if administrative burden meant the burden of producing details of individual claims, that burden would not fall on the funders but on the claimants and their lawyers. As far as the funders are concerned, this must all collapse into the economics of including these additional claims by retail investors in the multi-party proceedings they have already agreed to fund in relation to institutional investors.

107.    The evidence about economic burden is vague and general. Mr Leedham says no more than that it would not be economically viable to fund individual claims at the first stage prior to a finding of liability, but it would be economically viable at the second stage. This assumes that the Court would require significant costs to be incurred by retail investors if afforded the ability by the funders to participate in the multi-party proceedings, but as Ms Davies KC pointed out, this could be addressed at the first case management conference and the Court might be persuaded that the retail investors should only provide limited evidence, for example as to which category of reliance they were alleging, or might order sampling.

108.    In relation to Mr Leedham's suggestion that funders would have more confidence in funding at stage 2 because liability has been established, Ms Davies KC submitted that this ignored the other elements of the cause of action which need to be established. If one posited a situation, as in the *Barclays* case, where only a fraction of the retail investors could establish direct or conduit reliance, there would be no liability to those who could only establish market/index reliance.

109.    Mr Chapman KC had suggested that if claimant-sided costs were only incurred after determination of the common issues, it would reduce the risk of costs being wasted in relation to claimants who only had investments at a time when the Court determined at

stage 1 that no misstatements were made. Ms Davies KC submitted that it was not clear whether a significant proportion of retail investors had claims confined to particular time periods but, in any event, given that the funders were willing to fund all the claimants to bring wide ranging claims in the representative proceedings, it does not lie in their mouth to say by this route we can protect ourselves from adverse costs orders. The reality is what the funders want to achieve is a licence to bring the broadest possible allegations of fraudulent misrepresentation in circumstances where liability might only ever attach to some of the matters pleaded without any constraint on the claimants to investigate other key matters such as reliance.

110.    The other point Mr Leedham made was that the funders' confidence in funding would be increased by the prospects of settlement after success at stage 1, but Ms Davies KC submitted that the judge rightly concluded there was no evidence to support that assumption. Furthermore, it is contrary to the views expressed by every single judge in other securities claim cases. She referred to the judgment of Leech J on the first CMC in the *Barclays* case ([2024] EWHC 235 (Ch) at [14]:

> "I accept the general proposition that the Claimants ought to be required to plead out their individual cases on reliance as a matter of general procedure. But the critical question remains one of timing: when? It seems to me that the answer to this question is a case management decision and that it involves an imperfect balancing exercise. In an ideal world, all of the Claimants would be required to plead out their case in full now. Moreover, this would be a salutary exercise designed to compel the Claimants and their funders to engage with the litigation and commit time and internal resources to it. As Falk J indicated in *G4S* it would also promote settlement by shaking out those cases which are clearly hopeless or where the individual Claimants are simply along for the ride. To use the phrase which I used in argument, it will keep the Claimants (and, perhaps more importantly, their funders) honest."

111.    Because the class of claimants was so large, Leech J in fact ordered (see [17]) a sample of 100 claimant funds to complete a reliance questionnaire as well as requiring all claimants to identify into which of the three categories of reliance they fell, information which enabled Barclays to make the successful application to strike out the claims of 60% of the claimants whose reliance was only market or price reliance. Ms Davies KC submitted that the claimants were adopting the representative procedure here because they do not want to provide the materials that in other cases the Courts have thought it appropriate should be provided. She repeated that Mishcon de Reya had declined to answer how many of the claimants in the representative proceedings were alleging direct or conduit reliance, on the basis that reliance issues do not arise in the representative proceedings or on this appeal. As I said in argument, that is deeply unsatisfactory given that, if the decision of Leech J in *Barclays* stands (which in any event followed Hildyard J in *ACL Netherlands BV v Lynch* ("*Autonomy*") [2022] EWHC 1178 (Ch)), the investors here who only had market/price reliance do not have a claim.

112.    Ms Davies KC submitted that the reality was that, without an ability to progress the claimant-sided issues in tandem with the common issues, the prospects of settlement

Case 2:23-cv-09217-MEMF-KS    Document 114-5    Filed 09/05/25    Page 453 of 1378
Page ID #:4743

Approved Judgment                              CA-2024-000149 & CA-2024-000155: Wirral Council as
                                               administering authority of Merseyside Pension Fund v Indivior PLC

must be significantly reduced, certainly prior to the resolution of the representative procedure. The only material relied on by Mr Leedham in support of his suggestion that the claim will in all likelihood not proceed to stage 2 but the parties will be assisted in reaching a settlement is the commentary by Professor Higgins on the position in Australia. She pointed out that there are material differences between the class action system in Australia and the representative procedure here. To begin with the representative claimants' claim is usually tried in full at stage 1 in Australia and issues of quantum and of market reliance would be tried at that stage. There are also powers to order disclosure by class members or particulars of claims to facilitate settlement.

113.    Mr Chapman KC sought to place emphasis on the fact that there had been no claims by retail investors in other section 90A claims. The judge had noted that there were claims by retail investors in the *RBS Rights Issue* case and in *Lloyds/HBOS* but Mr Chapman KC sought to distinguish these as being section 90 cases where there is no requirement for reliance to be established. Ms Davies KC submitted that it was an unsettled question as a matter of English law whether section 90 does require reliance to be established. Also, *Lloyds/HBOS* was not a section 90 or 90A case at all but a claim based on equitable principles in relation to listing particulars and issues as to standing and reliance did arise, in relation to which certain retail investors gave evidence at trial.

114.    Furthermore, *Moon v Link Fund* is another case where all the investors are retail investors making claims in respect of untrue and misleading statements in the prospectus for what was a Woodford Fund under section 138D of FSMA. It appears from the judgment of Trower J in relation to the GLO sought that the retail investors had obtained funding.

115.    In relation to institutional investors, Ms Davies KC submitted that the fact that some of them might be categorised as small institutional investors, which was unclear, was irrelevant, as they are all signed up to both the representative proceedings and the multi-party proceedings. Any point Mr Chapman KC was making about small institutional investors could thus only relate to prospective investors, so this only relates to the potential for book-building, not a legitimate reason for representative proceedings.

116.    Mr Patton KC adopted Ms Davies KC's submissions, but had one further point which was a contingent one raised by his Respondent's Notice which is that if the Court is getting into questions of policy, it should also look at the policy behind Schedule 10A. He submitted that this was the answer to the points raised by the US attorneys that they consider the way securities litigation is conducted in this jurisdiction not as good as in other jurisdictions whose model we should therefore follow. Mr Patton KC referred to the reports of Professor Paul Davies KC ("the Davies Review") which are widely regarded as shedding light on the policy behind Schedule 10A of FSMA and which had been relied upon by Hildyard J in *Autonomy* and by Leech J in *Barclays*. He submitted that what one got from the Davies Review was that the overriding concern was to guard against creating a securities litigation culture like that in the US. Schedule 10A sought to avoid that consequence by requiring proof of reliance as an essential ingredient of the cause of action.

117.    In his Discussion Paper dated March 2007, Professor Davies said at [110]:

> "During the course of this Review there has been a considerable body of criticism emanating from the United States about the

way that private securities litigation, especially private securities class actions, operate in that country."

He continued at [111]:

"There are strong reasons for thinking that a fraud-based investor action would operate very differently in the UK from the way in which private securities litigation operates in the US."

He made a point first about how fraud in English law as defined in section 90A and modelled on the tort of deceit was much narrower than in US law.

118. At [113] he identified the availability of strike out as an important procedural issue, saying:

"An important procedural issue is how easy it is for a defendant to have the claim against it struck out at an early stage of the litigation, i.e. at the point when the claimant has simply formulated its claim but there has been no (expensive) pretrial disclosure, let alone a trial. It is relatively costless (both financially and in terms of management time) to defend an action up to strike-out. If, however, a strike-out is not available, the costs of the litigation begin to mount and so do the pressures on the defendant to settle the claim (and thus avoid the costs and distractions of the litigation), even if the defendant thinks the claim lacks merit."

Mr Patton KC pointed out that in multi-party proceedings such as *Barclays* there was an ability to strike out unmeritorious claims, as Leech J had done with 60% of the claims which was an important consideration.

119. In what Mr Patton KC submitted was an important passage at [116], Professor Davies emphasised the importance of the reliance requirement as a deterrent to the sort of securities litigation culture that has developed in the US:

"In connection with the formation of the class, it is also important to revert again to the reliance requirement in section 90A (see para 55 above). In the United States a typical class is constituted by those who bought shares after the misleading statement was made and still held the shares at the point the truth emerged. Under the 'fraud on the market' theory, adopted in the US for misleading continuing disclosures as well as for misstatements in prospectuses, it is not necessary for the claimant to show knowledge of and reliance on the misstatement in question. Thus, class formation is easier and classes are larger than where reliance has to be shown."

120. Much the same points were made in Professor Davies' final report in June 2007 in which he said that he remained convinced that fraud-based liability would not give rise to a serious threat of speculative litigation, as in the US. At [17] he said:

> "If one assumes that the financial incentives to law firms and
> others to fund litigation are likely to change significantly in the
> UK, then more weight falls on the other two factors mentioned
> above to discourage speculative litigation in the securities field.
> In particular, basing liability on fraud gives defendants scope to
> secure the strikeout of unmeritorious cases at an early stage, in a
> way which is not likely to be possible in negligence cases
> because of their fact-specific nature."

121.    Mr Patton KC submitted that the risk of speculative litigation was thus a key concern
underlying this legislation and it was addressed by having a fraud-based threshold for
liability. This was picked up in the Treasury response to the Davies Review in the
Impact Assessment in which it was stated:

> "The purpose of the statutory regime [i.e. Schedule 10A] is to
> clarify the existing common law position with regard to issuer
> liability in damages for inaccurate statements made to the
> market. The proposed extension of the statutory regime, working
> in conjunction with the FSA public law regime, aims to ensure
> optimal incentives for prompt and accurate disclosures, without
> encouraging costly speculative litigation and settlements by
> issuers based on a desire to terminate litigation, rather than on
> the harm done to shareholders."

122.    Later the point about the aim of avoiding speculative litigation is made:

> "The statutory regime has deliberately been shaped, principally
> by selecting a demanding fraud test for liability, to minimise the
> potential for speculative litigation and the corresponding
> pressure on issuers to settle in order to terminate litigation, rather
> than compensate for harm done to shareholders. Accordingly, we
> do not anticipate incremental costs from speculative litigation."

Discussion

123.    I agree with Ms Davies KC that the starting point for the appeal is that the judge had a
discretion under CPR 19.8 as to whether to allow the representative proceedings to
continue, as is clear from both *Lloyd v Google* and *Commission Recovery*. Furthermore,
nothing in either of those authorities begins to suggest that the discretion to decide that
the representative proceedings should not continue is somehow fettered or limited, as
Mr Chapman KC submitted, to matters which might be described as structural
deficiencies of the representative procedure, such as the suitability of the representative
claimant to act as such or problems with the definition of the class. The discretion is
quite unfettered, other than that it is to be exercised in accordance with the overriding
objective. That is exactly how the judge did exercise his discretion in the careful and
detailed analysis in his judgment. His decision was well within the generous ambit of
his discretion and there is no basis for this Court to interfere. It follows that the appeal
must be dismissed, although I will set out in more detail my reasons for reaching that
conclusion.

124.    In my judgment, there is no hierarchy of different procedures where a representative action is somehow to be preferred to other available procedures and nothing in *Lloyd v Google* which suggests that. Where, as in the present case, another form of procedure is clearly available in the form of the multi-party proceedings, the judge was clearly right that, in exercising its discretion, the Court must assess the advantages and disadvantages of each, with no predilection towards one form of procedure rather than another. Mr Chapman KC's submission that, whilst the existence of the multi-party proceedings was relevant to the exercise of discretion, it could not weigh so heavily as to preclude the use of representative proceedings in the present case reveals the fallacy in Wirral's case involving the reverse hierarchy to which Falk LJ referred in argument. There is no support for that reverse hierarchy giving preference to representative proceedings in any of the authorities.

125.    In making his assessment, the judge was entitled to have regard to the case management decisions of other judges in section 90A cases, since in all those cases, what emerges is that the Court is seeking to strike a fair balance between the parties and to further the overriding objective. Thus, where the Court has ordered a split trial with defendant-sided issues to be determined at the first stage, it has invariably also ordered some progress in tandem on claimant-sided issues for a variety of reasons, including the need to preserve documents and evidence and the need to be even-handed.

126.    As Ms Davies KC submitted, Wirral had been quite candid about why it wanted to proceed by way of representative proceedings. It wanted to avoid the Court taking the sort of case management decisions which have been taken in other section 90A claims and requiring the claimants to make some progress on claimant-sided issues, if only by identifying which head of reliance each claimant relied upon and/or providing sample disclosure or witness evidence.

127.    The importance of seeking to make some progress, if appropriate by ordering disclosure, pleadings and evidence in a sample of the claims before the Court, is demonstrated by the approach of Leech J in *Barclays*. As noted at [111] above, he ordered a sample of 100 funds selected by the parties to complete a reliance questionnaire and also ordered all the claimants to identify into which category of reliance their claims fell: direct reliance (category A), indirect or conduit reliance (category B) or Market/Price or Index reliance (category C). That exercise had enabled the claims where reliance was only in category C (60% of the claims by value) to be struck out on the basis that the "fraud on the market" concept which that alleged reliance entailed is not one known to English law. Mr Chapman KC sought to argue that the Court of Appeal might give permission to appeal in *Barclays*, but the case in fact settled last month.

128.    It is telling that the draft pleading produced by Wirral in the multi-party proceedings discloses the same three categories of reliance and that all the claimants allege Market/Index reliance, but only some allege Direct or Conduit reliance. As I said in argument, it is extremely unsatisfactory that Wirral has declined to identify which claimants rely on which category of reliance and how many fall into each category, on the basis that this information is contended not to be relevant in the representative proceedings. One obvious advantage to the pursuit of the multi-party proceedings would be that the Court could make similar orders to those made by Leech J and, if it emerged that a number of claimants only relied in the market reliance sense, the defendants could apply to strike out those claims on the same basis as in *Barclays* and

*Autonomy*. That is one of the ways in which it seems to me the exercise by the Court in the multi-party proceedings of its case management powers could facilitate settlement, as indeed has now happened in *Barclays*. In contrast, if the representative proceedings continued with the defendants remaining in ignorance as to how many of the claimants had a sustainable claim, I consider settlement would be less, not more, likely.

129. Mr Chapman KC placed considerable reliance on what Lord Leggatt said in *Lloyd v Google* at [84]:

> "even if only a few individuals were ultimately able to obtain compensation on the basis of a declaratory judgment, I cannot see why that should provide a reason for refusing to allow a representative claim to proceed for the purpose of establishing liability."

He submitted on the basis of that statement that the fact that a substantial proportion of claimants might not recover damages at the end of the day because they could not establish reliance as recognised by English law should not detract from the suitability of the representative procedure to determine the common issues.

130. However, it does not seem to me that Lord Leggatt had in mind a case such as the present, where reliance is an essential ingredient of the cause of action and, if not established, might well mean that a substantial proportion of the claimants had no claim at all. To allow them to pursue a claim in respect of common issues when in reality they have, on this hypothesis, no claim at all, would seem inimical to the overriding objective rather than furthering it, yet it is clear from [75] of his judgment that Lord Leggatt was envisaging that use of the representative procedure would further the overriding objective. To allow the representative proceedings to continue without the Court being able to require the claimants to identify how many of them only rely on Market/Index reliance would be to encourage precisely the sort of speculative litigation which, as the Davies Review confirmed, the fraud-based and reliance requirements of section 90A and Schedule 10A of FSMA are designed to avoid.

131. The approach envisaged by Wirral would also encourage the joinder of claimants to proceedings by subscription deprecated by Hildyard J in *Manning & Napier* referred to at [87] above. I also agree with Ms Davies KC that this approach enables Wirral and its funders to engage in the sort of "book-building" which gets as many claimants as possible joined up to the representative proceedings without having to engage in any work relating to their individual claims in relation to the claimant-sided issues such as reliance and causation unless and until the common issues are decided in the claimants' favour. Such book-building has been discouraged by the Courts, as set out in [88] above. Mr Chapman KC sought to address that point in his reply submissions by reiterating the access to justice point, that this is not book-building, but providing a practicable route to redress which would not otherwise exist for the class of retail investors. The problem with that argument is that, as further set out at [134] below, the reason why the representative proceedings route is alleged to be the only practicable one for retail investors is because the funders for some unexplained reason refuse to fund their participation in the multi-party proceedings.

132. It would also not be just or in accordance with the overriding objective for the claimants to be able, through deploying the representative procedure, to pressurise the defendants

36

into an overall settlement, if in reality some of the claimants (how many of them remains completely opaque because of the refusal to provide information) do not have a claim at all. I consider that the judge was right to conclude that there was no evidence to support the assertion by Wirral that the adoption of the bifurcated representative procedure would increase the prospects of settlement after stage 1. It is also contrary to the views and experience of the judges who have case managed other securities claims, a point neatly encapsulated by Leech J in *Barclays* in the passage from his CMC judgment quoted at [110] above. To the extent that what is relied upon is the Australian experience to which Professor Higgins refers, it is important to have in mind that the class action procedure available in that jurisdiction differs considerably from the representative procedure in this jurisdiction, not least because, as set out at [112] above, the claim of the representative claimants in the class could be tried in full at stage 1 in Australia and the Court has powers to order disclosure by class members or particulars of claims in order to facilitate settlement, powers of which the Court here would be deprived if Wirral were able to dictate that the representative procedure should be followed.

133.    In my judgment, Wirral's submissions on *Lloyd v Google* demonstrate the danger of reading too much into that case. Whilst it is true that Lord Leggatt wanted to encourage more use of the representative procedure as a flexible tool to achieve justice, he was not saying that the representative procedure would always be appropriate. Clearly whether it is or not will always depend upon the circumstances of the case. Furthermore, he was not considering a case such as the present where there is a potential alternative procedure which can be pursued in the form of the multi-party proceedings. Whilst it is correct that Lord Leggatt did not discuss the possibility of multi-party proceedings or the case management advantages they might entail, that is scarcely surprising, since multi-party proceedings involving four million claimants were not feasible and were simply not in contemplation. It follows that nothing in his judgment assesses the relative merits of representative proceedings and multi-party proceedings as the judge did in the present case, let alone suggests that, in that comparative exercise, representative proceedings should always prevail, which in effect is what Wirral contends.

134.    Mr Chapman KC sought to challenge the conclusion that the multi-party proceedings provide an appropriate alternative procedure to the representative proceedings by relying upon the fact that the retail claimants who were allowed into the representative proceedings shortly before the hearing before the judge and any prospective further retail claimants will not be funded by the funders to participate as claimants in the parallel multi-party proceedings. The problem with this argument is that there is no evidence from the funders explaining why this course has been adopted and no cogent or coherent explanation for it. The suggestion made by Mishcon de Reya in correspondence that the funders are not willing to fund retail investors in the multi-party proceedings because of the "economic and administrative burden" is not a coherent explanation. As Ms Davies KC pointed out, any administrative burden of producing details of individual claims would fall on the retail investor claimants and not the funders. It is also difficult to see what economic burden the funders would be facing beyond that of including the retail investors in the multi-party proceedings in circumstances where they have already agreed to fund them in the representative proceedings, hardly a major economic burden. In all probability, if that alleged burden exists, it could be alleviated by the Court making an order at the first CMC similar to

that made in other section 90A claims, that the investors should only provide limited evidence, for example as to which category of reliance they were alleging, or the Court might order sampling. As I pointed out in argument, if there were complete transparency, the Court could engage in case management which would ensure an undue burden was not placed on small individual investors.

135. The additional point made by Mr Leedham in his witness statement about the incremental costs of the individual claims being lower at the second stage if the first stage proceeded by way of representative proceedings is not explained. These are the costs of matters such as standing, reliance, causation and quantum which should surely be broadly the same at whatever stage they are incurred and whichever form of procedure is adopted. There is force in Ms Davies KC's submission that, if anything, delay could increase the cost, as the passage of time could make matters such as document retrieval or the production of evidence more difficult, particularly in circumstances where some of the published information relied upon dates back to 2006. Mr Chapman KC contended in reply that, if the claimants had to give limited disclosure (for example on the reliance issue) or there was sampling at the same time as stage 1, the cost benefit for the claimants and the funders somehow shifts. With respect that is unconvincing, not least because, as Falk LJ pointed out, the cost of all the claimants answering a question as to which category of reliance they relied upon and a sample of claimants then answering a fuller questionnaire (as in *Barclays*) is hardly likely to be expensive in this electronic age.

136. In my judgment, the judge was entitled to conclude, in the absence of any evidence from the funders or cogent or coherent explanation as to why they were not prepared to fund participation of the retail investors in the multi-party proceedings, that this situation where the retail claimants will be funded in the representative proceedings but not in the multi-party proceedings has been engineered by the funders who, as Ms Davies KC submitted, are gaming the system. The suggestion by Wirral that the judge failed to give sufficient weight to the fact that the retail investors would not have access to justice unless the representative proceedings continue is an artificial construct only brought about by this tactical position adopted by the funders. As the judge said at [99], there is no evidence that the retail investors who have been allowed into the representative proceedings could not obtain their own funding to join into the multi-party proceedings.

137. There has been a complete lack of transparency as to the circumstances in which the retail investors have been allowed into the representative proceedings and as to why the funders will not also fund them in the multi-party proceedings. As Ms Davies KC pointed out, the cost sharing and governance agreement for participation in the representative proceedings contains stringent financial conditions requiring a participating claimant to pay up front its share of the claimant costs and adverse costs incurred to date and to provide an indemnity from an English company with at least £10 million of net assets. If a retail investor who is participating in the representative proceedings is able to meet those conditions (and as Nugee LJ said if its shareholding were a small one, its share of the costs will be modest), it is difficult to see why it would not be equally able to meet any cost-sharing requirements of the multi-party proceedings which are likely to be on the same or a similar cost-sharing basis. Whilst the cost sharing and governance agreement did provide that investors could come to a

different financial arrangement with Wirral, as the judge said, there is simply no evidence that any of them has done so.

138.    I do not consider that there is anything in *Prudential* which assists Wirral in its case that the judge erred in the exercise of his discretion. The judge noted the reliance Lord Leggatt placed upon it, but concluded it was an unusual case which did not really assist in making a case management decision at the outset of proceedings, as opposed to during the trial. As Ms Davies KC submitted correctly, it is not surprising that, at the beginning of the trial, Vinelott J allowed the amendment to bring the representative claim, given that the essential factual issue as to whether the circular was tricky and misleading was already before the Court and he was about to hear evidence on it. In those circumstances, the defendants could not have raised the sort of the points being raised by the defendants in the present case. Whilst that case does demonstrate the possibility of using a bifurcated procedure in an appropriate case, it does not in any sense compel the conclusion that the bifurcated procedure which Wirral advocates should have been adopted in the present case.

139.    I also consider that there is nothing in the decision of this Court in *Commission Recovery* which suggests that the judge erred in the exercise of his discretion. That was another case where the choice for the claimants was representative proceedings or nothing, so it is not surprising that the Court did not take into account the case management advantages of multi-party proceedings upon which the judge relied here. Furthermore, that was a case where the common issues to be determined at stage 1, that the class represented were clients of the defendant patent attorneys who contracted on the latter's standard terms of business and that secret commission payments were made to third parties, would be determinative of many of the claims (see [58] of the judgment of Nugee LJ). It is true that potential defences, of (i) disclosure and informed consent and (ii) limitation would be left over to be determined on an individual basis at stage 2, but as Nugee LJ pointed out at [52] it is doubtful how significant an issue the first of these would be in circumstances where there was no suggestion of a routine practice of informing clients about commission. On limitation, he noted at [53] that a significant number of claims would not be statute barred. There is an obvious contrast between the outstanding stage 2 issues in that case and the outstanding issues here, specifically reliance, causation and quantum. As I have already pointed out the reliance issue is one which may well mean that a substantial proportion of the represented claimants do not have a claim at all.

140.    Like the judge, I am unclear as to the status and relevance of the evidence of the two US attorneys, Mr Lange and Ms Mendoza, on which Mr Chapman KC continued to rely. Whatever the position generally as regards institutional investors, as the judge recorded at [63] Mr Chapman KC fairly accepted that their evidence did not show that institutional investors in the present case had been deterred from participating in the multi-party proceedings.

141.    I also consider that the judge was right to give the report or commentary of Professor Higgins limited weight in the exercise of his discretion, first because as a consequence of the order of Foxton J its status was only that of an academic article and second because it focuses on the class action regime in Australia, which is a different procedure to the representative procedure in this jurisdiction.

142.   Like Leech J in *Barclays* at [108] I consider that the Davies Review and Treasury Consultation (including the impact assessment), on which Mr Patton KC particularly placed emphasis, should not be given decisive weight in interpreting Schedule 10A. However, I agree with what Leech J said in that paragraph:

> "But in my judgment, those materials do no more than confirm the obvious interpretation of Paragraph 3. They disclose the background to Schedule 10A and identify the purpose of the independent requirement of reliance, namely, to limit recovery to those investors who can prove that they relied on the published information in which the untrue or misleading statement was made or from which any matter which should have been included in that published information was omitted."

This confirms the importance of the issue of reliance in these securities claims which, as I have said, Wirral seeks to relegate to a later stage by the use of representative proceedings. The requirement of reliance is a significant controlling mechanism in relation to what claims can be brought under section 90A of FSMA, as *Barclays* demonstrates. The effect of the representative proceedings is, as I have said, to deprive the Court of its case management powers to strike out speculative unmeritorious claims, which is inimical to the overriding objective.

143.   In my judgment, the continued pursuit of these securities claims by way of the multi-party proceedings is not only feasible but is in accordance with the overriding objective. Whilst the judge's description of the use of the representative proceedings as ousting the case management powers of the Court is perhaps somewhat emotive, there is no doubt that one of the objects of using the bifurcated representative procedure is to avoid the Court using its case management powers to order Wirral and the represented claimants to advance some of the claimant-sided issues in parallel with the defendant-sided common issues. Pursuit of the claims by way of the multi-party proceedings will not prevent Wirral from seeking to persuade the Court at the first CMC to adopt a bifurcated approach of ordering the trial of common issues as stage 1 and the Court may order that approach if it considers it appropriate to do so, but the Court will still have case management powers to order some disclosure or evidence in relation to individual issues to be produced in tandem. The availability of those powers is an obvious advantage of the multi-party proceedings and will further the overriding objective, in terms of dealing with the case expeditiously and fairly, ensuring that the litigation burden is not one-sided at stage 1 and that stage 2 does not have to proceed from a standing start. Importantly, the availability of those case management powers will enable the Court, as in *Barclays*, to determine at an early stage whether some of the claimants only rely on market/price or index reliance and therefore, on the current state of the law, do not have a claim at all. It also seems to me that, as I have said, the use of those case management powers is more likely to facilitate settlement.

144.   For all the reasons I have given, I consider that the appeal should be dismissed.

**Lord Justice Nugee**

145.   I agree.

**Lady Justice Falk**

40

146.    I also agree.



<u>Neutral Citation Number: [2025] EWHC 698 (Ch)</u>

<u>Case No: FL-2020-000038, FL-2021-000011,</u>
<u>FL-2022-000009, FL-2022-000023</u>

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**FINANCIAL LIST (ChD)**

<u>Royal Courts of Justice, Rolls Building</u>
<u>Fetter Lane, London, EC4A 1NL</u>

<u>Date: 25/03/2025</u>

**Before** :

**<u>Mr Justice Michael Green</u>**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Persons Identified in Schedule 1** | **<u>Claimants</u>** |
| - and - | |
| **Standard Chartered PLC** | **<u>Defendant</u>** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Graham Chapman KC, Shail Patel KC and William Harman** (instructed by **Signature Litigation LLP**) for the **Claimants**
**Adrian Beltrami KC, Natasha Bennett and Dominic Kennelly** (instructed by **Herbert Smith Freehills LLP**) for the **Defendant**

Hearing dates: **11ᵗʰ- 12ᵗʰ February 2025**
- - - - - - - - - - - - - - - - - - - - -
# Approved Judgment

This judgment was handed down remotely at 10.00am on 25 March 2025 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

.............................

THE HONOURABLE MR JUSTICE MICHAEL GREEN

**MR JUSTICE MICHAEL GREEN:**

### A.    Introduction

1.    This is an application by the Defendant ("**SC plc**") to strike out, alternatively for reverse summary judgment in respect of: (a) the Claimants' common reliance claims (the "**Common Reliance Claims**") under para. 3 of Schedule 10A to the Financial Services and Markets Act 2000 ("**FSMA**"); and (b) the Claimants' dishonest delay claims under para. 5 of Schedule 10A FSMA (the "**Delay Claims**").

2.    The issues in relation to the Common Reliance Claims were previously directed by me to be determined at Trial 1 in these proceedings at the request of SC plc. However this application has now been brought by SC plc because of the recent decision of Leech J in *Allianz Funds Multi-Strategy Trust and ors v Barclays plc* [2024] EWHC 2710 (Ch) ("**Barclays**") in which he struck out similar claims, and which SC plc says is indistinguishable from the present claims. Mr Adrian Beltrami KC, appearing with Ms Natasha Bennett and Mr Dominic Kennelly for SC plc, submitted that Leech J has definitively ruled on the meaning of the relevant paragraphs of Schedule 10A FSMA and that, as a matter of judicial comity, I am bound to follow *Barclays* unless I am convinced that it is wrong.

3.    Mr Graham Chapman KC, appearing with Mr Shail Patel KC and Mr William Harman for the Claimants, submitted first of all that I should decline to hear the application, as it would involve prolonged serious argument and will not obviate the need for a very substantial trial. We did hear full argument and so Mr Chapman KC's alternative argument was that *Barclays* is wrong, and/or I should not follow it, and/or it is distinguishable.

4.    SC plc says that if the Common Reliance Claims (which it prefers to call, for obvious reason but perhaps somewhat presumptuously, the "No Reliance Claims") are struck out, it would remove 949 funds that are claiming, representing 68% of the total number of funds and with a claim value of c.£762 million (49% of the total value claimed in the proceedings). There would therefore be a real benefit in having these claims struck out. By contrast, the Claimants point to the fact that, whatever the outcome of the application, this will continue to be very heavy litigation and will continue to Trial 1 which is listed for 76 days from October 2026 in respect of the Individual Reliance Claims and s.90 FSMA claims worth c.£877 million, and without reducing by much either the time or money being spent on the case. Furthermore they say that all the Claimants bring Delay Claims and that, even on the *Barclays'* approach to Delay Claims (which is challenged), it means that all Claimants and funds will continue to advance a claim under s.90A and Schedule 10A FSMA and there will be no reduction in the quantum of the claim. In *Barclays*, Leech J said that the strike out affected 241 different funds with a value of £332 million which was c.60% of the total value of the claims.

5.    Mr Beltrami KC's straightforward point was that Leech J had delivered a carefully-considered and well-reasoned judgment in *Barclays* (as he clearly did) and I am effectively bound by it as being the current state of the law. I should not attempt to reconsider the arguments that failed before him as the point of the rule as to judicial

comity is to avoid duplication of judicial resources and to achieve coherence and consistency in the law. While I fully understand the purpose and utility of the rule, I am in the awkward position of having heard substantial argument on the points in issue (although principally by reference to *Barclays* rather than the underlying authorities) and whether in the circumstances I should exercise my discretion to strike out the claims while also effectively being told that I must follow *Barclays* and strike out unless "*convinced*" that Leech J was wrong. I grapple with this conundrum below.

## B.  Background

6.    I set out the factual background of the claims in my judgment at the first CMC where I heard an earlier strike out/summary judgment application by SC plc reported at [2023] EWHC 2756 (Ch) – see [9] – [38] (upheld by the Court of Appeal at [2024] EWCA Civ 674). I will not repeat what I said there, but incorporate it by reference.

7.    There are presently 217 Claimants representing some 1391 funds claiming c.£1.5 billion. They all bring claims under s.90A and Schedule 10A FSMA under both: para.3 of Schedule 10A FSMA ("**Para. 3**") in respect of alleged untrue or misleading statements in and/or omissions from annual reports, half year reports and other information published by recognised means by SC plc between February 2007 and April 2019 (the "**Published Information**"); and para. 5 of Schedule 10A FSMA ("**Para. 5**") in respect of alleged dishonest delay. The latter has no reliance requirement.

8.    There is also no reliance requirement for claims under s.90 and Schedule 10 FSMA in respect of untrue or misleading statements in and/or omissions from three rights issue prospectuses published by SC plc between November 2008 and November 2015 (the "**Prospectuses**"). There are 167 of the Claimants that bring claims under these provisions in relation to the Prospectuses. They are not subject to this application and will continue to trial in any event.

9.    The Common Reliance Claims are pleaded in [80] to [85] of the Re-Re-Amended Particulars of Claim. (They are also said to be pleaded in [86.2.7] and [86.4] within the Individual Reliance Claims section.) They are made in order to satisfy the reliance requirement in the Para. 3 claims. The Delay Claims under Para. 5 are tersely pleaded in [78] to [79] of the Re-Re-Amended Particulars of Claim. SC plc say that these are merely the same claims as under Para. 3 rebadged to be brought under Para. 5 and probably to avoid any reliance requirement.

10.    Until *Barclays* was handed down on 25 October 2024, there was never any suggestion from SC plc that the Common Reliance Claims and Delay Claims could be summarily dismissed as clearly bad in law. On the contrary, while it applied to strike out other aspects of the Claimants' case, including the Individual Reliance Claims, it proposed at CMC2 on 16 and 17 April 2024 that the Common Reliance Claims be tried by sample at Trial 1 and that there should be directions for factual and expert evidence to deal with those issues. I did make that direction and, at the next CMC3, I approved the selection of three sample Claimants for the Common Reliance Claims to be tried at Trial 1, adjourning whether there should be a fourth Claimant as part of the sample. The Claimants subsequently applied for permission to adduce expert evidence on this issue in four different disciplines. I granted permission for one such expert and adjourned

consideration in relation to the other three. The Claimants have already taken steps to obtain that expert evidence and have exhibited preliminary reports to their evidence on this application. The Claimants have also, in accordance with my earlier direction, served s.2 DRDs for the three confirmed Common Reliance Claims sample Claimants.

11.    The logic behind those directions is that there are possibly different facts applicable to the individual Claimants and that expert evidence may assist in the resolution of these claims. However, now SC plc says that this is all a waste of time as no factual or expert evidence is needed to deal with the Common Reliance Claims or Delay Claims as, based on *Barclays*, they cannot ever succeed.

### C.    Strike Out / Summary Judgment principles

12.    The principles to be applied in considering whether to strike out or grant summary judgment in relation to claims are well known and do not need to be set out in detail.

13.    Mr Chapman KC referred to the summary of strike out principles in [22] of *Re Regis UK Limited (In Administration)* [2019] EWHC 3073 (Ch) and emphasised that: the facts pleaded in the statement of case must be assumed to be true; "*it is not appropriate to strike out a claim in an area of developing jurisprudence since decisions as to novel points of law should be based on actual findings of fact*" made at trial; and that strike out should not be granted unless the court is certain that the claim is bound to fail.

14.    Similarly in the context of summary judgment under CPR 24.2, Lewison J, as he then was, in *Easyair Ltd v Opal Telecom Ltd* [2009] EWHC 339 (Ch) at [15] provided a list of principles to take into account, including that it may be appropriate to decide a "*short point of law or construction*", but only if the Court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument. He explained: "*The reason is quite simple: if the respondent's case is bad in law, he will in truth have no real prospect of succeeding on his claim…*"

15.    Mr Beltrami KC disputed whether, in the light of *Barclays*, this was a "*developing area of law*" as the "*two short points of statutory construction*" (as he put it) had been conclusively decided by Leech J, who had "*grasped the nettle*", despite the prolonged argument that he heard. He referred to what the Chancellor had said in *Wirral Council v Indivior plc* [2025] EWCA Civ 40 ("*Wirral*") at [143], that *Barclays* represents the "*current state of the law*" and enables such claimants to be removed at an early stage of the proceedings.

16.    However I think it would be to ignore reality to suggest that this is not a live and possibly developing area of the law. The *Barclays* decision must have come as a surprise to many involved in this sort of securities litigation, as no other defendant had sought to strike out on that basis. It was probably anticipated that it would be appealed but as it turned out the case settled before an application for permission could be made to the Court of Appeal. It was the first decision on the meaning of Para. 3 and Para. 5. I note that Waksman J in *Crossley v Volkswagen AG* [2021] EWHC 3444 (QB) ("***Crossley***") at [15(1)-(2)], gave two examples where, even if the claim had no real

prospect of success, there may be a compelling other reason for there to be a trial under CPR 24.3(b) namely where:

(1) the fact that the application concerns a developing area of the law; here, it may be desirable that the disputed legal questions should be resolved against the background of the facts as already found at the trial, and not hypothetical facts;

(2) where summary judgment will not dispose of the whole case; this will be so where there will be a trial anyway, regardless of the outcome of the summary judgment; it is particularly relevant if, at the trial, there will be or is likely to be evidence concerning the same or similar factual matters as those traversed in the application.

17.    Mr Chapman KC referred to the Court of Appeal decision in *Partco Group Ltd v Wragg* [2004] BCC 782, which was not cited to Leech J in *Barclays*. Potter LJ held at [27] to [28] that where an application involves prolonged serious argument, the Court should "*as a rule*" decline to proceed to the argument unless it is satisfied that striking out will "*obviate the necessity for a trial or will substantially reduce the burden of the trial itself*". Mr Chapman KC made the point that this was binding on me as it was from the Court of Appeal, and it had itself relied on two decisions of the House of Lords.

18.    In this context, Leech J and Mr Beltrami KC referred to *Getty Images (US) Inc v Stability AI Ltd* [2023] EWHC 3090 (Ch), in which Joanna Smith J said at [38]:

"…as the Defendant submitted, the mere existence of other arguable claims which must go to trial cannot, of itself, be a compelling reason why an unarguable claim must proceed to trial."

## D.    Common Reliance Claims

### (a)    Introduction

19.    The Common Reliance Claims, which are sometimes called claims based on "*price/market reliance*" or "*fraud on the market*", are pleaded to satisfy the "*reliance*" on Published Information element of a claim under Para. 3. They assume that the particular Claimant, or their agent, has not actually read or considered the Published Information, but has relied on the market to have set the price of SC plc's shares, having taken account of the Published Information that is alleged to have been untrue and misleading. In other words, the price of the shares is said to reflect the fact that other participants in the market read and considered the Published Information, which meant the price at which the shares were being traded was based on the truthfulness and accuracy of the Published Information. The Common Reliance Claimants are said to have acquired or continued to hold shares in reliance on the price of those shares and that they therefore were induced to do so at a false and artificial price.

20.    In *Barclays*, Leech J held that Parliament must have intended the requirement for "*reliance*" to have some content and that meant that investors had to prove something more than that they suffered loss because of a false and misleading statement or omission being made to the market. He went on to hold that the test that Parliament

intended to apply was the common law test for inducement or reliance in the tort of deceit. He then considered what that common law test was and concluded that it required a claimant to prove that they read or were aware of at least the gist (possibly through their agent) of the representation and understood it in the sense in which it was alleged to be false and that it caused them to act in a way which caused them loss.

21. Having so held that that was the meaning of "*reliance*", he struck out what were called the "*Category C*" claims, which were the broad equivalent of the Common Reliance Claims in this case, because there was no real prospect of them succeeding at trial in proving reliance under Para. 3, based purely on reliance on the price of the shares. The question is whether he was right to do so and whether I should follow him and do the same in this case.

### (b)  Para. 3

22. Leech J in *Barclays* set out a comprehensive survey of the origins of s.90 and s.90A FSMA, and in particular Schedule 10A FSMA in Section IV D - [38] to [63] - of his judgment. This provided the building blocks for his conclusions as to Parliament's intention as to the meaning of "*reliance*" in Para. 3 and the reason why it was included in the legislative framework. In particular he referred to the "**Davies Review**", in which Professor Paul Davies QC, who was at the time the Cassel Professor of Commercial Law at the London School of Economics, was asked by the then Government to review the existing legislation on issuer liability. Professor Davies' final report was published in June 2007, and, following an extended consultation by HM Treasury, a new s.90A and Schedule 10A were introduced into FSMA by the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010.

23. I will gratefully rely on Leech J's helpful and detailed background to the enactment of Para. 3 (and Para. 5 in due course) as necessary below. It is only necessary for me to set out the terms of Para. 3 which are as follows (with emphasis added):

> "**3    Liability of issuer for misleading statement or dishonest omission**
> (1)    An issuer of securities to which this Schedule applies is liable to pay compensation to a person who—
>
> (a) acquires, continues to hold or disposes of the securities <u>in reliance on published information to which this Schedule applies</u>, and
>
> (b) suffers loss in respect of the securities as a result of—
>
> > (i) any untrue or misleading statement in that published information, or
> >
> > (ii) the omission from that published information of any matter required to be included in it.
>
> (2)    The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was

untrue or misleading.

(3)    The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4)    A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities-

(a) <u>in reliance on the information in question</u>, and

(b) <u>at a time when, and in circumstances in which, it was reasonable for him to rely on it.</u>"

### (c)  Pleadings and evidence

24.    As noted above, the Common Reliance Claims are pleaded in [80] to [85] of the Re-Re-Amended Particulars of Claim. [80] and [81] are introductory, with the latter referring to the "*presumption of inducement applicable to cases of fraudulent misrepresentation which presumption "is very difficult to rebut" (Hayward v Zurich [2017] AC 142, at [37] per Lord Clarke)*" (hereinafter: "***Hayward***"). Mr Chapman KC relied on *Hayward* in his submissions before me to demonstrate that issues of reliance and inducement were questions of fact that would have to be determined at trial.

25.    In [82], the Claimants plead as follows:

"82. Acquiring or continuing to hold SC Shares at a price which was rendered false and artificial by the Untrue or Misleading Statements or Material Omissions (as set out in Section D above) is sufficient to satisfy paragraph 3(4) of Schedule 10A FSMA. Proof of this does not require any evidence to be adduced as to reliance other than evidence establishing that a Claimant acquired or continued to hold SC Shares at a price artificially inflated by untrue and misleading statements and material omissions."

26.    In [83], the Claimants plead as follows:

"83. As to that, and while it is a matter of legal submission, the Claimants will say:

83.1. The Untrue or Misleading Statements and Omissions influenced, by artificially increasing and/or maintaining, the price of SC Shares;

83.2. It is to be presumed that the influence on the price of the SC Shares induced the Claimants to acquire or continue to hold interests in SC shares (and it in fact did so);

83.3. Buying or continuing to hold interests in SC Shares in such circumstances amounted to reliance because the Claimants were induced to act to their detriment in buying or continuing to hold SC Shares at a false and artificial price; and

83.4. Further or alternatively the Claimants relied indirectly on the Published Information by believing or assuming that (a) information published by SC plc was fair, full, true and accurate (b) that other participants generally in the listed securities markets relied upon published information of SC plc as being fair, full, true and accurate and (c) as a result, the price at which they acquired or held SC shares reflected wholly or partly the published information of SC plc being fair, full, true and accurate."

Mr Chapman KC relied quite heavily on the pleading of "*belief*" in [83.4] to distinguish this case from *Barclays* in which he said there was no similar plea and where the claimants in that case alleged that they simply "*proceeded on the basis of various matters*". Mr Beltrami KC said that this was a distinction without a difference.

27. In [84] the Claimants plead that they relied on SC plc's compliance with the rules and criteria governing its membership of the FTSE 100 and other relevant share indices, and that such membership depended on SC plc's compliance with the requirements for the publication of correct, complete, timely, true and fair Published Information. And in [85] the Claimants assert that s.90A FSMA was intended to grant a remedy in particular to tracker funds so as to protect investors and deter misconduct in the market by issuers.

28. As was recognised expressly by the Claimants, the pleading was largely legal submission. This has been supplemented by the evidence the Claimants have filed on this application, namely: the eleventh witness statement dated 6 January 2025 of Mr Rory Spillman, a partner in the Claimants' solicitors, Signature Litigation LLP; and a witness statement dated 3 January 2025 of Mr David Murphy who is a director within the investment team of California State Teachers' Retirement System ("**CalSTRS**"), one of the Claimants in these proceedings. The Claimants have obtained some preliminary expert reports, originally in support of the application for permission to adduce expert evidence but now deployed on this application as exhibits to Mr Spillman's witness statement. These reports are from: (a) Dr Andrew Hildreth, a Senior Consultant with Resolution Economics in Los Angeles; (b) Dr Riccardo Curcio of Berkeley Research Group; and (c) Mr Neil Crowder, an independent consultant working for Valerie Capital Partners LLP. As Mr Beltrami KC pointed out, the first two, Drs Hildreth and Curcio, had produced reports that were before Leech J in *Barclays* and he accepted, for the purposes of considering whether to strike out, that the Claimants would be able to prove at trial whatever the experts had said as to the operation of the market.

29. The evidence can be summarised as follows:

(1) Dr Hildreth's evidence is to the effect that, in efficient markets, disclosures by issuers to the market leads to investors revising their expectations as to future prices, which then prompts investors to trade the stock, which changes the price until it has moved to the position where it will earn the expected rate of return.

(2) Dr Hildreth goes on to say that the interaction between "*sell-side*" equity analysts and professional investors plays an important role in stabilising expectations to reflect all available information. Those analysts form expectations about the company's future share price and disseminate their findings to professional investors on the "*buy-side*" and that leads to "*consensus estimates*" emerging that forms a kind of "*received wisdom*" in the market.

(3) Dr Curcio concentrated on the behaviour of index-tracking funds which aim to replicate or marginally exceed the performance of an index. He said that index-tracking funds do adopt some selection strategies and therefore published information by issuers influences not only the transaction price but also the decision whether to transact at all in circumstances where the company's weight in the index is generally determined with reference to the share price.

(4) Mr Crowder explained the way the efficient market in SC plc's shares worked. The price of SC plc's shares generally adjusted to new published information in a single day. It would therefore play a key role, if not the key role, in determining if investors would acquire, continue to hold or dispose of shares and/or do so at a particular price during the relevant period. He went on to say that the false representations in the Published Information were of such a nature that they would have played a very key role in the decision making of reasonable investors and market participants.

30.    As for Mr Murphy's witness statement, Mr Chapman KC submitted that this shows the kind of factual evidence that the Claimants would be putting forward at trial, albeit that it would be far more developed if he had had more time and a complete disclosure review. Mr Murphy's evidence was to the effect that it is one of CalSTRS' "*investment beliefs*" that global public equity investment markets are largely efficient and process information rapidly at very low cost. As such, CalSTRS's passive trading strategies "*depend on other market participants... reading and making investment decisions based on the information published by the listed issuers in the efficient market*". Accordingly, CalSTRS actively seeks out efficient markets for its passive investments and generally invests passively "*only in jurisdictions where the market is well-established and known to be subject to strict rules regarding transparency*".

31.    Mr Beltrami KC said that all this evidence is irrelevant. He focused on the category of Claimants that this application is concerned with by reference to the Reliance Questionnaires. The Claimants were required to respond to the Reliance Questionnaire that was annexed to the Order I made on 16 January 2024. I am only concerned with the Common Reliance Claimants who have been defined by reference to whether they answered "*no*" to each of questions 1, 2 and 5 of the Reliance Questionnaire. By their answers, those Claimants are not advancing a case that they: (i) relied on specified statements in the Published Information; (ii) relied on the Published Information as a whole; or (iii) had a general practice of reviewing one or more of the conduit sources before making an investment decision. The reliance on conduit sources, whereby the Claimant was not reading the Published Information themselves but was reviewing or receiving the "gist" of that Published Information through communication with their

agents, brokers or other conduit sources, is pleaded broadly in [86.2] of the Re-Re-Amended Particulars of Claim. By one means or another, through a conduit source, the gist of the Published Information was conveyed to the Claimant. The dividing line between reliance on conduit sources and the Common Reliance Claims is not clear and this is examined below.

32.     Mr Beltrami KC submitted that these categories of reliance coincide precisely with the categories in *Barclays*. In [19] to [21], Leech J explained Categories A to C as follows:

> (a)    Category A claimants were those who read and relied on the    Published Information in making their investment decisions – this could be    called    "*direct*" reliance;

> (b)    Category B claimants were those who relied on Published  Information indirectly through other sources which acted as a conduit for    the    substantive contents of the Published Information – this could be called    "*conduit*" or "*indirect*" reliance;

> (c)    Category C claimants were those with whom Leech J was principally concerned as they were relying solely on share price and the listed status of Barclays – Leech J called this "*price/market*" reliance.

33.     Subject to the point about the pleading of a "*belief*" as referred to above, the Common Reliance Claimants put forward pretty much the same arguments as were put on behalf of the Category C claimants in *Barclays*, including relying on very similar proposed expert evidence. Mr Beltrami KC emphasised that on this application we are only focussed on the Common Reliance Claims and therefore those Claimants who did not read or rely on the Published Information directly or indirectly through any of the conduit sources.

### (d)  *Barclays*

34.     I now turn to Leech J's judgment in *Barclays*. His core findings on Para. 3 are as follows:

(1) Parliament must have intended that the term "*reliance*" must mean something as it was not a requirement for claims under s.90 FSMA and Para. 5, but was specifically included in Para. 3. At [104], he said:

> "104.    I agree with Ms Davies that Parliament must have intended to give the term "reliance" some content and to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or omission being made to the market. Otherwise, the framers of Schedule 10A would have adopted very similar language to S.90. Indeed, when Parliament amended S.90A to include liability for delay it adopted exactly that course as a brief comparison between S.90 and Paragraph 5 will demonstrate. It follows that the Court must give effect to

the term "reliance" which goes beyond causation of loss and requires investors to prove a separate ingredient of liability."

(2) Parliament intended to adopt the common law test for reliance and inducement in the tort of deceit. At [107], he said as follows:

> "107.    In my judgment, therefore, the obvious interpretation of Paragraph 3 is that Parliament did not intend to "start afresh" but recognised that the Courts have developed a settled test of reliance in the tort of deceit where proof of liability requires a claimant to prove both reliance and causation as separate ingredients of the tort and incorporated both tests into Paragraph 3. The Davies Review and the Treasury Consultation confirm that this was the legislative intention and that reliance was intended to be a separate requirement of liability and to limit recovery: see, in particular, Davies 1, §26 and §55 (see [45] and [46] (above)), Davies 2, the recommendation in answer to Q1 (at [51]), the Treasury's I impact assessment (at [56]) and Treasury 2, §5.7 to §5.9 (at [57]). The example given in Treasury 2 at §5.9 demonstrates that the authors had the test for fraudulent misstatement in mind."

(3) The common law test as it applies to express representations requires the claimant to prove that they read or heard the representation and understood it in the sense in which it is alleged to be false. At [109] he said as follows:

> "109.    In my judgment, the test for reliance as it applies to express representations (whether made orally or in writing) requires the claimant to prove that they read or heard the representation, that they understood it in the sense which they allege was false and that it caused them to act in a way which caused them loss. I agree with Professor Cartwright at 3-54 (above) that this is because the test is one of causation and a statement can only cause an individual to act or operate on their decision-making process if they hear or read the statement or if the statement (or the gist of it) is communicated to them by a third party. If (as I have found) the common law test applies to misleading and untrue statements in Paragraph 3, then I agree with Hildyard J in *Autonomy* that the requirement for reliance in Paragraph 3 cannot be satisfied in respect of published information which the Claimants did not read or consider at all: see [505] (at [90] above)."

The reference to "*Autonomy*" is to the long and detailed judgment of Hildyard J in *ACL Netherlands BV v Lynch* [2022] EWHC 1178 (Ch) ("*Autonomy*") in which the facts were very distant from both *Barclays* and this claim. However Hildyard J did consider the requirement for reliance in Schedule 10A FSMA and held that a claimant must have been aware of and applied their mind to the statement in question.

(4) After dealing with some of the claimants' arguments concerning the impact on omissions claims and implied representations, his overall conclusion was contained in [129] and [130] which stated as follows:

> "129.    In my judgment, Parliament intended the Court to apply the common law test of inducement or reliance from the tort of deceit to Paragraph 3 and both to misleading statements and omissions. That test requires the Court to determine whether the Claimants were induced to rely on the published information set out in the Particulars of Claim, section E1 and Appendices B to D and whether that published information caused the Claimants to acquire, hold or dispose of the Bank's shares. I agree with Hildyard J in *Autonomy* that the Claimants in Category C cannot satisfy this test unless their representatives read and considered that published information or third parties who directed or influenced their investment decisions read and considered that published information.
>
> 130.    I leave open the question whether it is necessary for the Claimants to prove that their decision-makers or advisers applied their mind to the relevant misleading or untrue statements and that those statements induced them to acquire, continue to hold or dispose of their shares on the terms which they did: see *Autonomy* at [503]. This is a matter for further argument at trial (as is the scope of Category B). But I am satisfied that this is not a requirement of the test applicable to omissions for the reasons which I have given. Paragraph 3 requires reliance on the relevant published information not on the facts or matters which the Claimants allege to have been omitted."

It can be seen that Leech J recognised that there is potentially a different test of reliance applicable to omissions, but that that did not affect his overall conclusion that "*reliance*" required the application of their minds, whether directly or through those directing or influencing investment decisions, to the Published Information.

35.    As the Category C claimants in *Barclays* could not satisfy that test, they had no real prospect of succeeding at trial in proving "*reliance*" under Para. 3, and Leech J granted reverse summary judgment in respect of those claims.

36.    Mr Beltrami KC's submission was that Leech J was plainly correct and, with his comprehensive examination of the issue, I cannot possibly be "*convinced*" that he was wrong. I must therefore, on the grounds of judicial comity, follow him in relation to the Common Reliance Claims. He sought to bolster that position with the following submissions.

37.    First, he said that the wording of Para. 3 makes its meaning clear because it refers to "*reliance on published information*". That could not include reliance on a company's share price or its status as a listed issuer as that is not information which has been published within Schedule 10A FSMA.

38.    Second, he said that the aim and scope of Para. 3 was demonstrated by the legislative materials to which Leech J referred to extensively. Both Professor Davies and HM Treasury were well aware of the "*fraud on the market*" theory which underlies these sorts of claims and are prevalent in the US and were clear that this was not intended to be introduced into UK legislation.

39.    Third, Leech J was not the first to consider this point, as it had been dealt with by Hildyard J in *Autonomy*. He submitted that I would have to be convinced that both Judges were wrong if I were minded to depart from their conclusions.

40.    Fourth, he said that Leech J was obviously correct to apply the common law test of reliance in the law of deceit rather than a new, uncertain and unknown test that would be unique to Para. 3. He said that the common law test of reliance is bound up with issues of inducement and causation and that requires a representee to have read or heard the relevant statement or its gist for it to have operated on their mind. Mr Beltrami KC accepted that the common law accommodates the situation where the gist of a statement is passed on indirectly via third parties and he referred to *Brown v InnovatorOne plc* [2012] EWHC 1321 (Comm) ("***Brown***") at [884]. This is the conduit sources category of reliance or Category B in *Barclays*. And it also embraces the situation where a representation is made to and relied on by an agent, as the ordinary application of the law of agency.

41.    Mr Beltrami KC's thesis, based on the old prospectus cases which were dealt with thoroughly in *Barclays*, was that, in every case, the representee must have been aware of the statement and must have understood it to bear the meaning which is found to be false. "*Awareness*" and "*understanding*" are used interchangeably in the cases and probably amount to the same thing. The 19th century prospectus cases in which this was said to be established are: *Arkwright v Newbold* (1881) 17 Ch 301 (CA), *Smith v Chadwick* (1884) 9 App Cas 187 (HL) and *Edgington v Fitzmaurice* (1885) 29 Ch 459 (CA). He said that this had been affirmed in multiple recent cases in the Commercial Court and Chancery Division, including *Brown* at [884].

42.    Anticipating the Claimants' arguments on implied representations, Mr Beltrami KC submitted that the same elements apply equally to all representations, whether express or implied. Again he referred to *Brown* at [906] where Hamblen J, as he then was, said: "*In so far as the Claimants were alleging implied representations it was incumbent on them to prove that such representations were understood to have been made since otherwise there could be no reliance.*" However by reference to some more recent cases, Leech J was prepared to accept that the common law test for reliance in implied representations cases was not "*complete or fully developed*": see *Barclays* at [127] and the quote from [98] of *Crossley*.

43.    Mr Beltrami KC's fifth point was that Leech J's conclusion is consistent with the views of leading textbook and journal authors. He referred to the following:

        (a)    *Gullifer & Payne, Corporate Finance Law, Principles & Practice* (3rd Ed: 2020): at p. 588, the authors observed (by reference to Treasury 2) that a "*passive holder*" of shares, who continued to hold without giving the statement any thought, would have no claim because "*they would not be able to show reliance upon the statement in making their investment decision.*"   When comparing s.90 and s.90A FSMA, the authors commented (p. 590):

"… in section 90 there is no requirement for the claimant to demonstrate that they have relied on the statement, or even that they have read the prospectus in order to establish a cause of action. This is sometimes described as 'fraud on the market' since the misstatement can be said to have caused the investor loss even though the particular investor was unaware of the misstatement. **No such fraud on the market concept has been adopted for the section 90A provisions**, and the claimant must therefore demonstrate that they relied on the publication, although it is possible for an inference of reliance to be drawn from the facts." (Emphasis added)

(b)      Gore-Browne on Companies, 45th ed. (Ch 43) states, at [12A], that a claimant has to show "*reliance on (presumably actually have read) the published information, not just a 'fraud on the market' claim*".

(c)      In an article following the introduction of s.90A FSMA , (2009) 9 JCLS 315, Professor Eilis Ferran commented that "*[t]he classic "fraud on the market" theory developed in US securities law, which affords investors trading in efficient markets a rebuttable legal presumption of reliance, has not been adopted in section 90A/schedule 10A*" (p. 327). Professor Ferran considered whether "*the efficient capital markets hypothesis [could be used] to form an argument that (inferred) reliance on market prices was tantamount to inferred reliance on the information itself*." She concluded that this would be a "*novel argument*" and "*would certainly merit a cautious reception from the judiciary*" (pp. 328-329). (A fuller quote was set out in [60] of *Barclays*.)

44.    Mr Beltrami KC also sought to place reliance on the references to *Barclays* in *Wirral*. In *Wirral*, the Court of Appeal upheld my decision that the representative procedure under CPR 19.8 was not appropriate for those claims under ss.90 and 90A FSMA and that they should be brought in the usual way by ordinary multi-party proceedings. Sir Julian Flaux C (with whom Nugee and Falk LJJ agreed) used *Barclays* as an example of the sort of issues that could not be tested at an early stage if the representative procedure was allowed to continue. He said at [128]:

"One obvious advantage to the pursuit of the multi-party proceedings would be that the Court could make similar orders to those made by Leech J and, if it emerged that a number of claimants only relied in the market reliance sense, the defendants could apply to strike out those claims on the same basis as in *Barclays* and *Autonomy*."

Similarly at [142], Sir Julian Flaux C quoted from [108] of *Barclays* and then said:

"This confirms the importance of the issue of reliance in these securities claims which, as I have said, Wirral seeks to relegate to a later stage by the use of representative proceedings. The requirement of reliance is a significant controlling mechanism in relation to what claims can be brought under section 90A of FSMA, as *Barclays* demonstrates. The effect of the

> representative proceedings is, as I have said, to deprive the Court
> of its case management powers to strike out speculative
> unmeritorious claims, which is inimical to the overriding
> objective."

And at [143]:

> "Importantly, the availability of those case management powers
> will enable the Court, as in *Barclays*, to determine at an early
> stage whether some of the claimants only rely on market/price or
> index reliance and therefore, on the current state of the law, do
> not have a claim at all."

45.    However, the Court of Appeal in *Wirral* did not hear argument about the correctness or
otherwise of the substantive issues in *Barclays*. The focus was on the case management
tools which might in principle be available in a multi-party action as opposed to
representative proceedings. *Barclays* was a good example of the effective deployment
of those case management tools.

### (e)  Claimants' criticism and distinguishing of *Barclays*

46.    Mr Chapman KC attacked *Barclays* on a number of fronts but in particular he said that
Leech J was wrong to apply the common law test for reliance in the tort of deceit to
Para. 3 and he was also wrong to conclude that the common law test required proof that
representees read or heard express representations.

### (i)   Application of the common law test to Para. 3

47.    Mr Chapman KC's arguments in this respect concentrated on the way reliance would
work in relation to omissions from Published Information, rather than untrue and
misleading statements. Leech J also recognised that this was an important area to focus
on – see [111]. It must be right, and Leech J so found in [111(1)], that "*reliance*" in
Para. 3 means the same in the context of untrue or misleading statements and omissions.
Parliament distinguished the fault requirements for untrue or misleading statements and
for omissions in Paras. 3(2) and (3), but did not separate them when it came to reliance
and causation in Paras. 3(1)(b) and 3(4).

48.    Mr Chapman KC submitted that Parliament could not have intended to apply the
common law test of reliance to omissions, as there is no such test for omissions and, as
Leech J accepted in [111(2)], it would be virtually impossible to establish that an
investor was aware of and consciously considered that a matter had been omitted from
published information. It would be difficult to see how such a claimant could ever prove
that they relied on an omission.

49.    Further, Mr Chapman KC submitted that Leech J was wrong to consider that there was
a choice between incorporating the common law test of reliance or "*starting afresh*"
with a new definition of "*reliance*" – see [63] and [107] of *Barclays*. He said that
because the same test had to be applied to both express misstatements and omissions,
Parliament could not have intended the common law test of reliance to apply but left it

Case 2:23-cv-09217-MEMF-KS    Document 114-5    Filed 09/05/25    Page 478 of 1378
Page ID #:4768
THE HONOURABLE MR JUSTICE MICHAEL GREEN                    Various Claimants v Standard Chartered plc
Approved Judgment

to Judges to decide what "*reliance*" meant, and it could incorporate some elements of the common law but not a complete adoption of the common law test, which could not work for omissions.

50.    Leech J said that Parliament was alive to this problem and the answer to it is to be found in the wording of Para. 3, which requires an investor to prove reliance on the published information itself, not the omission – see [111(3)]. They do not have to prove that they read a particular part of the published information, say an annual report, that was said to have omitted disclosable information. The only requirement is that they or the relevant third party read and considered the published information from which there was omitted material information, and that they acquired, continued to hold or sold shares in reasonable reliance on what they had read and considered.

51.    Mr Chapman KC submitted that Leech J was thereby creating a novel test for reliance that did not accord with what he had concluded in relation to the common law test. In [109] of *Barclays*, Leech J relied on *Autonomy* to state that the common law test required a claimant, in relation to express representations: "*to prove that they read or heard the representation, that they understood it in the sense which they allege was false and that it caused them to act in a way which caused them loss.*" (emphasis added). But that is inconsistent with the meaning of "*reliance*" in relation to omissions. Leech J appeared to revise that test in [129] by focusing on the published information rather than the particular misstatement relied on.

52.    Leech J may well be right that the wording of Para. 3 suggests that Parliament intended that an investor could only claim if they, or a relevant third party, had read and considered the published information. But that gives rise to certain practical and conceptual difficulties that Mr Chapman KC drew my attention to. In particular it seems to me to be odd that an investor or third party only needs to have read and considered the published information in general terms. What if some of the published information was read, but not all of it? And what if the part that was said to have omitted relevant information was not read, but other parts were? Mr Chapman KC also pointed out difficulties and inconsistencies that would arise depending on whether the actual published information was read or a secondary source, such as a report of it in the newspaper.

53.    In [130] of *Barclays*, Leech J expressly left open whether reliance had to be on the relevant untrue or misleading statement, as Hildyard J held in *Autonomy*, or on the published information as a whole. But he made clear that in the case of omissions, it had to be on the published information itself. But if reliance has the same meaning for both, that would surely mean that the test for reliance in relation to untrue or misleading statements is more broadly stated than the common law test for reliance. It seems to me that these issues are not easy to resolve on a summary basis, and if they were it could have an impact on all reliance claims as to where the line is to be drawn.

54.    There is also force in Mr Beltrami KC's submission that these interesting questions as to where the line is drawn and which bit of the Published Information needs to have been read and relied upon in making investment decisions do not affect the position of the Common Reliance Claimants because they have admitted that they did not read or consider the Published Information at all, and merely relied on the price of the shares.

(ii)  The Requirements of the Common Law Test

55.    Mr Chapman KC took issue with the way Leech J defined the elements of the common law test for reliance in the tort of deceit, in particular in his conclusion that it always requires representees to prove that they, or their agents, read or heard express representations.

56.    His first point was that reliance at common law is a causation test and the fundamental question is whether the representee was influenced by the misrepresentation to act in some way. Reliance is often referred to interchangeably with "*inducement*", as Leech J did. As such, Mr Chapman KC submitted that it is therefore ultimately a question of fact. In this respect, he referred to *Hayward* (also referred to in the pleading – see [24] above) which he said was not cited to Leech J. In the leading judgment in that case, Lord Clarke held that: "*the authorities show that questions of inducement and causation are questions of fact*" at [25]; and that the basic test was that: "*The claimant must have been influenced by the misrepresentation*" at [27]. Mr Beltrami KC submitted that the case was only dealing with "*belief*" that the representations were true, and said nothing about the awareness requirement, which was not in issue in the case.

57.    I think of more relevance was Mr Chapman KC's reliance on the cases dealing with indirect reliance and implied representations. As to the former, this comes within Category B in *Barclays* and the conduit source category in this case. SC plc does not seek to strike out these claims, it being accepted that the common law test of reliance can accommodate indirect reliance where the gist of the representation was communicated to the investor by a third party. Normally this would be via an agent but it is not limited to that route.

58.    Mr Chapman KC again referred to *Brown* in this context, saying that Hamblen J was prepared to accept that fraudulent misrepresentations made to a claimant's financial advisor which induced the latter to recommend the investment may be actionable in the same way as if the representation itself had been passed on – see [888]. This may have influenced what Leech J said at [124] of *Barclays* as to a "buy" recommendation from a broker:

> "It may well be argued that there is no real reason of policy or principle to draw the line between a Claimant who relied on a broker's report or a "buy" recommendation (which were based on published information) and a Claimant who relied solely on a movement in price (which was also influenced by that same information). That may be so but it is clear that this is where Parliament chose to draw the line and that line must be respected."

I have to say that I find it difficult to know where that line is being drawn and I am not sure that I could say that it is clear where Parliament has drawn the line, if it is accepted that the movement in price was also as a result of third parties reading the published information. Leech J accepted in [129] that the test would be satisfied by "*third parties who directed or influenced [the Claimants'] investment decisions read and considered that published information*".

59.    Mr Chapman KC took me to the decision of Park J in *Yianni v Edwin Evans* [1981] 3 WLR 843, in which it was held that a residential property buyer had been entitled to rely on a valuation report obtained by his lender even though the buyer had never seen the report. The buyer had understood that, because the lender had decided to advance

the money, the house must have been "*good*" (at 851H). This decision was subsequently approved by the House of Lords in *Smith v Bush* [1989] 2 WLR 790. Reference was also made to *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1995] 2 All ER 769 for the same point (this was cited by Leech J in [123]). Mr Chapman KC submitted that there is not a mechanistic reading or consideration requirement in the common law test and the courts apply a broad, fact-sensitive causation test.

60.    As to implied representations, the recent cases of Cockerill J in *Leeds City Council v Barclays Bank plc [2021] EWHC 363 (Comm), [2021] QB 1027*, and *Loreley Financing (Jersey) No 30 Ltd Ltd v Credit Suisse Securities (Europe) Ltd* [2023] EWHC 2759 (Comm) ("*Loreley*"), together with Waksman J's case of *Crossley* and Zacaroli J's (as he then was) case of *Farol Holdings Ltd v Clydesdale Bank plc* [2024] EWHC 593 (Ch) were carefully considered by Leech J in [81] to [89] of *Barclays*. To summarise the debate, it is whether the representee was aware of the implied representation and had it actively on their mind when they acted on it. There was no issue in those cases as to whether the representee had read or heard the words from which the implied representations were said to have arisen.

61.    Leech J (in [127]) accepted Waksman J's conclusion in *Crossley* at [98] that the test for reliance in relation to implied representations or representations by conduct is not "*complete or fully developed*". He also accepted that "*the Court of Appeal might decide that Cockerill J was wrong to conclude that claimants relying on an implied representation must prove that they were aware of the representation and had it actively present to their minds when they acted on it.*"

62.    Mr Chapman KC submitted that this shows that the common law test is not an area of law that has hard and fast rules and that it is much more flexible than that, as demonstrated by *Hayward*. Accordingly it is not possible, at this summary stage of the proceedings, to establish the parameters of the statutory liability regime under Para. 3, particularly when it is purportedly based on the uncertain boundaries of the common law. In response, Mr Beltrami KC said that whatever the precise boundaries of the test are, it is clear that the Common Reliance Claimants are way beyond what is contemplated by "*reliance*" in Para. 3 because they unquestionably did not read or consider any Published Information, and nor did anyone on their behalf. That is essentially what Leech J found in *Barclays*.

(iii) External aids to construction

63.    As noted in [22] above, Leech J relied on certain external evidence as to Parliament's intentions in relation to Para. 3, including the Davies Review, HM Treasury's Consultation and Professor Ferran's article. He said that these could only have a "*secondary role*" in the interpretation of Para. 3 (see [108] of *Barclays*) but he was clearly fortified by them in his conclusions on the meaning of Para. 3.

64.    Mr Beltrami KC introduced during the course of the hearing the Explanatory Memorandum to the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010 by which the new s.90A and Schedule 10A were enacted, bringing in claims for dishonest delay. At para. 4.2 of the Explanatory Memorandum, it said: "*Section 90A introduced a statutory liability regime for the disclosures required by the Transparency Directive, confirming the prior common law situation – that issuers are not liable to investors in negligence, and extending the prior common law on deceit,*

*applying it only to issuers and in favour of purchasers of shares*." However there is no reference to the requirement of "*reliance*" and it is probably talking about "*extending*" the common law because the old prospectus cases were based on deceit but did not extend generally to false statements put out to the market. A big limiting factor on the pursuit of claims under s.90A and Schedule 10A FSMA is the requirement to prove dishonesty.

65.     Mr Chapman KC referred to Professor Davies' original discussion paper issued in March 2007 (see [43] to [48] of *Barclays*) in particular at para. 26 where he said that a claimant "*must in fact rely on the statement, as part of which requirement the claimant would have to be aware of the statement*." Mr Chapman KC submitted that there is no analysis of the common law test; nor consideration of the indirect reliance cases (which in any event largely post-date the paper); and there is no explanation as to how this would apply to omissions. As to the "*fraud on the market*" theory referred to by Professor Davies as being available in the US because there is no reliance requirement under US law (see [45] and [48] of *Barclays*), Mr Chapman KC submitted that Leech J had been led into error by Professor Davies because there is a reliance requirement under US law but this has been held to be satisfied by a legal presumption known as "*fraud on the market*". Accordingly he said that it cannot properly be said that a "*reliance*" requirement would rule out a "*fraud on the market*" claim.

66.     Mr Chapman KC made various other submissions on the external aids to construction. But the main point that he made is that none of the material before me and Leech J actually considered what "*reliance*" means either under Para. 3 or at common law. Leech J concluded, correctly in my view, that Parliament must have intended it to have some content and for it to be a limiting factor on those who are able to claim. But it is correct to say that exactly where the line is to be drawn on reliance does not appear clearly from the external aids.

(iv) Common Reliance Claims are a form of Indirect Reliance

67.     Mr Chapman KC argued that Leech J did not consider whether his analysis of the potentially broad definition of indirect reliance might be satisfied by the Category C claims or the Common Reliance Claims in this case. Leech J concluded at [129] that it would be sufficient to satisfy the test for reliance if "*third parties who directed or influenced their investment decisions read and considered that published information*". In [124] (set out in [58] above), Leech J recognised that the line between a claimant receiving a "buy" recommendation from a broker and a claimant relying on a price movement "*(which was also influenced by that same information)*" may be difficult to draw.

68.     Mr Chapman KC said that the evidence shows that the Common Reliance Claims satisfy the way that Leech J characterised the conduit sources or indirect reliance claims in that they are based on the following: (a) market participants including analysts and active investors reading and considering the Published Information; and (b) those market participants influencing the Claimants' investment decisions because their trading in the shares was in reliance on the Published Information and the resulting price influenced the Claimants' decisions in relation to acquiring, continuing to hold or selling shares. Furthermore Mr Chapman KC said that there was no principled basis for distinguishing the influence that market participants through the medium of price and say a third party broker issuing a "buy" recommendation have on the Claimants when

both are based on reading and considering the Published Information. They are both types of indirect reliance in which a third party has read and considered the Published Information and only differ in the way they have caused the Claimants to act. Indeed he said that price is a more effective conduit for Published Information than a "buy" recommendation because price reflects all the Published Information, whereas the latter may not. Leech J accepted that the Claimants could be influenced by AI or computers – see [132] – but that is little different to price movements in an efficient market.

69.    Mr Beltrami KC rejected these points principally on the basis that there are multiple factors affecting the price and there could never be evidence that shows that the particular movement in price was as a result of market participants taking into account the Published Information. I agree that it may be difficult to prove, but that only goes to show that this is a matter for the evidence to be tested at trial to see if it can establish what the Claimants are alleging.

(v)  Distinguishing *Barclays*

70.    As indicated above, Mr Chapman KC has pointed to a distinction on the pleadings between *Barclays* and this case in that some of the Claimants had the positive belief that the market share price of SC plc shares was based on all the information available, including the Published Information. The Reliance Questionnaire asked the following in relation to the Common Reliance Claims:

> "4.    Does the Claimant advance a case that (i) it knew of and relied on the price of the Shares in acquiring, holding or disposing of the shares, and (ii) it believed that the prevailing market price of the Shares reflected the value of those shares based on the information disclosed by the Defendant being true and complete?"

71.    From the analysis of the answers to the Reliance Questionnaires it appears that not all Claimants answered "*yes*" to questions 4(i) and (ii). Only two of the three sample Claimants answered "*yes*". As all Claimants are pursuing Common Reliance Claims, that means that there are some that do not assert a positive belief that the price at which they acquired or held shares reflected the Published Information as being true and complete. Also, the fact that SC plc wanted answers to this question indicates that it saw "*belief*" in such respect to be material to the Common Reliance Claims.

72.    In *Barclays*, there was no consideration of the impact of such a positive "*belief*" as it was not pleaded in that way. Instead the claimants pleaded that their investment processes "*proceeded on the basis*" that the bank's share price would reflect the contents of the published information, which is more akin to a passive "*assumption*" than an active "*belief*". Mr Murphy's evidence highlighted what the Claimants' evidence might be as to this. I cannot determine at this stage whether it will have any impact on the outcome of the Common Reliance Claims, save that it may have some impact. Mr Chapman KC said that the Claimants with such a belief are indistinguishable from, for example, the buyers in *Yianni* who relied on a valuation report that they did not read but believed that their lender did and that it would have relied on it when deciding whether to lend to them.

73.    Mr Beltrami KC said that there is no real distinction between "*believed or assumed that*" and "*proceeded on the basis that*" and this was just different counsel's drafting.

Furthermore he said that the claimants in *Barclays* were largely the same as the Claimants in this case, so it is unlikely that there would be any difference in terms of their belief and understanding as to what the market price represented. He also fairly pointed out that, as set out in [25] of *Barclays*, precisely the same question as to belief was asked in their reliance questionnaires.

74.    However Leech J does not deal with this point, presumably because it was not argued before him. I, like Leech J in [116], would not want to decide this application on a pleading point, but I do think that the fact that "*belief*" was not considered in *Barclays*, is a valid distinction that can be made, and if it is relevant, that the testing of the evidence as to that could be significant.

75.    Another point of distinction with *Barclays* is the Claimants' extensive reliance on implied representations, whereas in *Barclays* there was only one implied representation being relied on. Leech J accepted that the test for reliance on implied representations is developing. Mr Chapman KC submitted that those claims could not possibly be struck out in those circumstances and that it would be impractical and contrary to authority just to strike out the claims based on express representations or omissions, as they are all bound up together.

(vi) The Claimants' solution

76.    After all these criticisms of Leech J's judgment, what do the Claimants suggest should be the test for reliance that Parliament intended? Mr Chapman KC submitted that "*reliance*" in Para. 3 imposes a broad inducement test that could encompass the counterfactual of truth ("**CFOT**") approach that Waksman J held was arguable in *Crossley*. The CFOT looks at how a claimant would have acted if they had been told the truth. In this case, because liability for omissions is based on an issuer failing to tell the market something that it should have disclosed, Mr Chapman KC said that it would be natural to look at what the investor would have done, or not done, if the issuer had disclosed what it was duty-bound to include in its published information. This would get to the heart of what it means to be influenced by an omission. Much more so than in a misstatement case, where there is doubt as to whether the counterfactual is no statement at all, or a true statement, the causative effect of omissions can only sensibly be tested in this way.

77.    Mr Beltrami KC criticised this suggestion for throwing out all the authorities as to the awareness requirement in the common law test of reliance. He also said that it would make no sense to look at the CFOT for Claimants who accept they never read, considered or knew about the Published Information, or even the gist of it, and simply look at what they would have done if they had been aware of the omitted information. This would basically let in every claimant to every s.90A claim.

78.    I think that is slightly to misunderstand what is being said. For the Common Reliance Claims, the CFOT must be to test how the market price would have been affected if the Published Information had been true and complete and the influence that would have had on the Claimants' decisions as to whether to buy or continue to hold the shares. As identified above, there are problems with the test for reliance in relation to omissions because such a test does not exist at common law. Accordingly it is not beyond the realms of possibility that, as reliance is so bound up with inducement and causation, there could be a place for the CFOT test applying at least in relation to omissions. Mr

Chapman KC submitted that, if it is arguable that it applies to omissions, then because the test for omissions and misstatements should be the same, it must also be arguable that a reliance or inducement test short of "*reading and considering*" the Published Information may also apply in relation to misstatements. Alternatively, Mr Chapman KC submitted that this at least shows that the test for reliance is a developing area of law and should only be decided after a trial on the facts.

### (f) Conclusion as to the Common Reliance Claims

79.    I have little doubt that, had I been hearing this application in relation to Para. 3 without the benefit of Leech J's judgment in *Barclays,* I would have refused to strike out the Common Reliance Claims or grant reverse summary judgment. In my view it is clearly a developing area of law, in that there had been no decision on the meaning of "*reliance*" in Para. 3 and certain elements of the test of reliance in the common law are not fully established. I would agree with Waksman J in *Crossley* that such disputed legal questions should be resolved on the basis of actual facts established at a trial, and not on assumed or hypothetical facts.

80.    Furthermore, there will in any event be a very substantial trial of this action in which all factual issues as to SC plc's liability under Para. 3, as well as under Para. 5 and s.90 FSMA will be explored in great detail. A strike out of the Common Reliance Claims will not dispose of the case by any means and it will not "*substantially reduce the burden of the trial itself*" (see [17] above). Trial 1 has been listed for 76 days and SC plc anticipates that it will have spent c.£43.17 million by June 2025. It had said at CMC2 that the Common Reliance Claims would not materially increase the duration, costs or complexity of Trial 1, and I agreed with that when deciding that they should be part of Trial 1. Because of my directions to such effect, the parties have already spent time and costs in preparing the Common Reliance Claims for trial.

81.    Mr Beltrami KC said that the expert evidence on the Common Reliance Claims had been estimated to cost c.£450,000. Therefore if both sides produced such evidence together with factual evidence and the cost of making legal submissions, there would be a saving of over £1 million if the Common Reliance Claims are struck out. Even though that is a lot of money on any view, there is no escaping the fact that it is a relatively small amount by comparison with the overall costs that are and will be expended on this litigation. While the Court will always be keen to encourage parties to spend less on their litigation, it seems to me that such a saving cannot in itself carry much weight in considering whether the Claims ought to be struck out.

82.    *Barclays* was unquestionably smaller in scale to this case in terms of the length of trial (8-10 weeks), the extent of disclosure, the amounts at stake and what it would cost. By Leech J's judgment, 60% of the value of the claim was removed. There had also not been any directions in relation to the trying of the Category C claims and so little, if any, time or money had been spent on them. These are points of distinction between the two cases that may be relevant to the exercise of discretion, or whether there is another compelling reason why the claims should go to trial even though they have no real prospect of success.

83.     There is a further point that I should deal with and that is about settlement. Leech J considered that disposing of such a large proportion of the claim ought to "*promote an early settlement*" – see [152] – and that this was a compelling reason why the Category C claims should not be permitted to go to trial. The Court of Appeal in *Wirral* appeared to endorse that approach, saying that the strike out of those claims "*is more likely to facilitate settlement*" – see [143] – although that was said after it was known that *Barclays* had actually settled.

84.     Mr Chapman KC said that settlement would not be more likely to happen in this case because, if the Delay Claims are allowed to continue, there is still the full value of the claim being pursued. Furthermore, it is difficult to read anything into the settlement of the claims in *Barclays* and it could have been nothing to do with the judgment. All other multi-claimant s.90A FSMA claims have settled before or at trial, without any such strike out or summary judgment application having been made. Whilst obviously wishing to encourage settlement, I do not think that the possibility of settlement can really be taken into account in my decision not to strike out.

85.     The difficulty for me is that I am not deciding the matter afresh as I have the benefit of *Barclays* and Leech J's clear conclusion that the Category C claimants could never satisfy the reliance requirement in Para. 3. I am not "*convinced*" that Leech J was wrong about that. Indeed he could well be right. But, because of what the Claimants have submitted to me, I do have my doubts as to whether it is right to say that the common law test for reliance was intended by Parliament to be adopted for the requirement to prove "*reliance*" in Para. 3. That is mainly because of the curious case of omissions and how the common law test, imposed on the statutory wording, can work consistently with its application to misstatements. I think it is arguable that a broader test for reliance is contemplated by Para. 3, in order to accommodate omissions, and there is also the uncertain and developing law in relation to implied representations. I think, as did Leech J, that the precise line between conduit/indirect reliance and the Common Reliance Claims based on price, is not easy to draw. There may also be something in Mr Chapman KC's point about positive belief, which could only be resolved after hearing and testing the evidence in such respect.

86.     In relation to the principle of judicial comity, Mr Beltrami KC referred me to *Lornamead Acquisitions Ltd v Kaupthing Bank HF* [2011] EWHC 2611 (Comm), a decision of Gloster J, as she then was. At [53] she quoted Volume 11, para. 98 of *Halsbury's Laws* which said as follows:

> "There is no statute or common law rule by which one Court is bound to abide by the decision of another Court of co-ordinate jurisdiction. Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice   is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong…"

Then at [56] Gloster J concluded that "*despite [her] doubts*" she would follow an earlier decision of Burton J "*in the interests of comity*" because she was not "*convinced*" that he was wrong. The principle has been applied recently: see *Commercial Bank of Dubai*

*PSC v Al Sari* [2024] EWHC 3304 (Comm) at [114]; and *Steel v Spencer Road LLP* [2023] EWHC 2492 (Ch).

87.    However I find it difficult to apply this to the application before me. Even though I am not convinced that Leech J was wrong in his conclusions on the legal points before him as to the meaning of "*reliance*" in Para. 3, I do not think it would be right in this case to strike out the Common Reliance Claims. There are points of difference between this case and *Barclays* that I have referred to above. But the principal reason is that, as I have sought to explain above, there are complications with the application of a consistent test for reliance to both misstatements and omissions and there remain doubts as to the parameters of the common law test. I therefore do not think that it is as clear as perhaps Leech J saw it and that it is a developing area that has potentially a huge impact on a number of different claims. There are factual matters that, in my view, require determination and the expert evidence might assist in understanding the extent to which the Published Information would have affected the market price and its influence therefore on the decisions made by the Claimants.

88.    While respecting the principle of judicial comity, in particular the need for coherence, consistency and predictability in the law, I think that there are two issues here: (i) if I was actually deciding in this case the meaning of "*reliance*" in Para. 3, I would be bound to follow *Barclays* because I am not "*convinced*" it is wrong; but (ii) if I am deciding whether to defer a decision on that legal question to trial by not striking out the Common Reliance Claims, I am not bound to follow Leech J's decision to grant summary judgment on the Category C claims. He did so on the basis of his legal conclusions on Para. 3 but also the particular circumstances pertaining in *Barclays*. I do not consider that I have to be convinced that he was wrong to do so before deciding in this case that the right thing to do is not to strike out the Common Reliance Claims. In other words, it is open to me, as a matter of case management, but also in the light of my uncertainty as to the correct answer to the legal question, to leave it to be determined at trial.

89.    I appreciate the difficulties that the Common Reliance Claims face and these have been carefully articulated both by Leech J and Mr Beltrami KC. But while it may be an uphill struggle for the Claimants, I do think that they should have the opportunity of putting the Common Reliance Claims forward at trial and for a decision in relation to them to be based on all the evidence, both factual and expert.

90.    I am of course mindful of what the Court of Appeal said in *Wirral*, both as to the reliance requirement "*being a significant controlling mechanism in relation to what claims can be brought under*" s.90A FSMA, and also the case management benefits of weeding out at an early stage unmeritorious claims that are bad in law. The desire to avoid speculative US style securities litigation is clear from the external aids that I and Leech J were referred to. But one serious limiting factor to control this type of litigation is the requirement to plead and prove dishonesty. And the extent to which "*reliance*" in Para. 3 provides a further limitation on these sorts of claims is something that I consider needs to be explored further at trial and that difficult question is unsuitable to be decided at this stage. If, at trial, the Common Reliance Claims are found to be unsustainable and bad in law, no doubt that will be a significant decision that will affect future such claims.

### E.  Delay Claims

### (a)  Introduction

91.   The Delay Claims under Para. 5 are pleaded in very abbreviated fashion and were clearly designed to be an alternative way of putting the Claimants' main case under Para.3. At [78] to [79] of the Re-Re-Amended Particulars of Claim the Claimants plead as follows:

> "78.    The Claim PDMRs[1] knew of the Untrue and Misleading Statements and Omissions as aforesaid. Each PDMR was also aware of his and SC plc's obligation to publish correct information, and did not take steps to publish the true information. Consequently, between the date of such knowledge and 9 April 2019 the relevant Claims PDMRs acted dishonestly in delaying the publication of the true information.
>
> 79.    The Claimants suffered losses as a consequence of such delay are entitled to damages and/or compensation under paragraph 5 of Schedule 10A of the Act".

92.   Mr Beltrami KC says that this is a wholly inadequate plea, particularly as it is one of dishonesty. There are no facts pleaded in addition to the facts pleaded as to the alleged untrue and misleading statements in, and omissions from the Published Information that are relied upon in the Para. 3 claims. There is no reliance requirement under Para. 5 and Mr Beltrami KC suggested that the Para. 3 claims, which do have a reliance requirement, have simply been repackaged to come within Para. 5 to take advantage of this.

93.   Mr Chapman KC accepted that the Delay Claims have been concisely pleaded and may require amendment. However he fairly pointed out that the Re-Amended Defence to the Delay Claims does not plead the issue that SC plc seeks to argue on this application arising out of *Barclays*. SC plc merely pleads as follows in [69.3] of the Re-Amended Defence:

> "The Claimants' claims are in reality claims based on untrue or misleading statements in (or omissions from) Published Information. It is denied that they are properly characterised as claims for delay within the meaning of Schedule 10A, paragraph 5."

94.   The point that was decided in *Barclays* by Leech J was that Para. 5 only imposes liability on an issuer for dishonest delay if the issuer has actually later published the delayed information on a recognised information service ("**RIS**") or by "*recognised means*". Para. 5 does not say that expressly but Leech J concluded that: (i) that was its meaning; (ii) it addresses the mischief identified in the Davies Review for the introduction of dishonest delay liability; and (iii) any other construction would lead to an "*absurd result*".

---

[1] Persons discharging managerial responsibilities – defined in para. 8(5) of Schedule 10A FSMA

95.    *Barclays* was the first time, it appears, that this point was taken. It was not being run by SC plc, as is apparent from its Re-Amended Defence. And different points were taken about the construction of Para. 5 in other similar cases such as the claims against Glencore plc and RSA Insurance Group Ltd. (This was explained in Mr Spillman's witness statement and the Glencore plc Amended Defence was before me.)

96.    It is important to note that the Claimants' Delay Claims are expressly limited to the period from the date of knowledge of the obligation to publish correct information and 9 April 2019. As everyone knows, the 9 April 2019 date is in the pleading as an oblique reference to Published Information issued on that day which included the publication of the outcome of the 2019 Settlements, which are a part of the Relevant Misconduct as so defined in the Re-Re-Amended Particulars of Claim. The Claimants argue that Leech J was wrong in his interpretation of Para. 5. But even if he was correct and I decided to follow him, they say that there was a corrective publication on 9 April 2019 that would satisfy the element of the cause of action that Leech J held existed under Para. 5.

   **(b)  Para. 5**

97.    I therefore turn to the wording of Para. 5 itself which states as follows:

   "5.    (1) An issuer of securities to which this Schedule applies is liable to    pay compensation to a person who-

   (a)    acquires, continues to hold or disposes of the securities, and

   (b)    suffers loss in respect of the securities as a result of delay by the issuer in publishing information to which this Schedule applies.

   (2) The issuer is liable only if a person discharging managerial    responsibilities within the issuer acted dishonestly in delaying the    publication    of    the information."

98.    Leech J's analysis of Para. 5 was dependent on the reference to "*information to which this Schedule applies*" in Para. 5(1)(b). He then relied on para.2(1) of Schedule 10A FSMA to explain what that means:

   "**2.    Published Information to which this Schedule applies**

   (1) This Schedule applies to information published by the issuer of securities to which this Schedule applies-

   (a) By recognised means, or

   (b) By other means where the availability of the information has been announced by the issuer by recognised means."

"*Recognised means*" normally means through a RIS.

99. Leech J also relied on the apparent mischief as to what was lacking in the original s.90A FSMA in terms of issuer liability which was sought to be addressed by the introduction of dishonest delay claims in Para. 5. He referred to para. 85 of Professor Davies' original discussion paper dated March 2007 which said as follows:

> "Although section 90A goes beyond the common law by imposing liability for omissions, and late disclosure could be analysed as an omission (ie during the period between $t_1$ and $t_2$), it seems clear that the section does not cover this type of omission. The section contemplates liability only for omissions from the statement which is made ('omission from any such publication of any matter to be included in it') rather than liability for failure to make any statement at all. Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication' could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point".

### (c)  Textual Analysis

100. In [138(1)] of *Barclays*, Leech J agreed that the word "*delay*" can mean when something happens late or when something does not happen at all. He gave the example of a parcel either being delivered late or not at all. Both situations are covered by the word "*delay*". Hence, the use of that word itself does not mean that there would have to have been a corrective publication. It would be necessary to find other words than "*delay*" in Para. 5 by which Parliament required there to be a later publication to establish liability for dishonest delay. SC plc does not dispute this.

101. As noted above, Leech J found those other words in Paras. 5(1)(b) and (2), and Para.2(1). In [138(3)] of *Barclays* Leech J said that: "*Paragraph 2 defines the information to which Schedule 10A applies.*" Actually, it seems to me that that might not be wholly correct, as Para. 2 defines the "*published information to which this Schedule applies*" (emphasis added). It applies to Para. 3 claims as well, and so defines the sources of published information that are relevant to claims brought under Schedule 10A. So for instance, as discussed above, an omissions claim depends on showing that information was dishonestly omitted from particular published information. If there was no published information within Para. 2, there can be no omissions claim and obviously no reliance on it.

102. Leech J however regarded Para. 2 as requiring information to be published. He held at [138(3)] that:

> "It follows that Paragraph 5 has no application to an issuer unless or until it has published the relevant information by recognised means or it has announced the availability of that information by recognised means. It also follows, in my judgment, that Schedule 10A does not apply – and

> that there       can be no liability for delay in publishing information –
> unless or until it falls within paragraph 2 and has been published."

103.   But I am not sure that Para. 2 requires publication in that sense. It also seems to me a little extraordinary that such an apparently straightforward condition of liability – that there has to have been a later corrective publication – was not clearly spelled out in Para. 5. It would be easy to do. If Parliament really intended this to be a condition, I do not think it would have been done in a roundabout way through Para. 2.

104.   Leech J relied on para. 85 of Professor Davies' discussion paper quoted above which identified the mischief as there potentially being no liability under the statutory regime where there is a dishonest delay in publishing inside information for personal advantage. As Mr Chapman KC pointed out, Professor Davies refers to the lacuna in the issuer liability regime as being where there is a "*failure to make any statement at all*." It would be odd to fill that lacuna by making liability for that delay dependent on a later statement being made. That would not, in my view, be a way of addressing the mischief.

105.   Mr Beltrami KC and Leech J preferred to focus on the last sentence of para. 85, but I think that Mr Chapman KC is correct in analysing that sentence as being about liability for omissions under Para. 3, as it talks about reliance and the requirement that there had to have been published information which was relied on. If the omitted information is finally published, there can be no liability thereafter because there will be no Para. 3 claim, whether on the basis of omissions or untrue and misleading statements.

106.   Mr Chapman KC also referred to para. 86 of Professor Davies' discussion paper to which Leech J did not refer in [138] (he did set it out in [47]). There, Professor Davies concluded that there should be liability for delay because it would be "*unattractive not to impose liability where an issuer deliberately withholds information in order to mislead the market and to create a false market in its securities*". Professor Davies does not mention any requirement to publish the correct position; nor does he suggest that this is necessary to address the identified mischief.

107.   The other external aid to interpretation that Leech J cited at [138(4)] are paras. 6.3 and 6.8 of Treasury 2 where HM Treasury identified the need for liability to be precisely drawn. However, those passages do not suggest that the mechanism by which this is to be achieved is to limit delay claims to accurate but late disclosures. Actually at para. 6.7, HM Treasury noted that Professor Davies had recommended that liability should only attach to dishonest delay, and the definition of dishonest delay should "*focus on the purpose of delay*" and ensure that liability is only imposed "*if the purpose, or predominant purpose, fell within a prohibited category*". Dishonesty appears to have been the control mechanism for delay claims that HM Treasury were more concerned about.

108.   I therefore think that there are substantial arguments against the textual analysis and use of external aids that Leech J adopted in relation to Para. 5.


**(d)  Overlap with Omissions claims under Para. 3**

109.    Mr Beltrami KC strongly supported Leech J's conclusions in [140] to [144] of *Barclays* that, unless there was a later corrective publication, it would lead to an "*absurd result*" and render Para. 3 omissions liability and the requirement to prove reliance "*almost redundant*". He made these comments because of the perceived substantial overlap between dishonest delay and omissions claims and he thought that that degree of overlap did not sit well with the Davies Review and the Treasury Consultation which placed much emphasis on the requirement of reliance under Para. 3. It seems that many hypothetical examples were considered to test the extent of the overlap and how both Paras. 3 and 5 would work, with and without the requirement for later publication. Leech J found the examples provided by Counsel for the claimants in *Barclays* to be unconvincing.

110.    Further, Mr Beltrami KC emphasised the important distinction between omission and delay claims by reference to the dishonesty that has to be proved. For omissions claims under Para. 3, the dishonesty is as to the contents of a publication; whereas for delay claims, the dishonesty has to relate to the delay or the timing of the publication. He said that these are qualitatively different and yet the Claimants appeared to be relying on the same particulars of dishonesty to support both claims. I agree with him that this is an important distinction. But this is really a pleading point and SC plc has not sought fit to ask for further information and to try to drill down on the pleading of dishonesty. I do not think that this is material to the point in issue on this application, which is whether the cause of action under Para. 5 requires the truth to have been published at some later time.

111.    The main problem that I have with this is that I do not see how the imposition of a requirement to publish the correct information prevents the substantial overlap. Mr Chapman KC provided the example of an issuer dishonestly delaying publishing inside information on a RIS from 2007 to 2019 when it does eventually publish. Even on Leech J's construction of Para. 5, there is potentially a dishonest delay claim for the whole period and also a Para. 3 omissions claim, subject to proof of reliance. If Leech J is wrong on this point, and there was no later publication, then the same claims under Para. 5 and Para. 3 would still be available.

112.    I think there is a danger in trying to construe Para. 5 by reference to multiple hypothetical examples demonstrating the extent of the overlap with Para. 3. Far better, it seems to me, would be to decide the requirements of liability under Para. 5 by reference to the actual facts in the case, as applied to the wording of the statute. There is no particular vice in an overlap between the Paras. and it is not surprising that there is such an overlap given that dishonest delay claims were only inserted into the existing regime by amendment. It is relevant to be reminded of what I said above about other defendants in s.90A FSMA proceedings making alternative suggestions as to the construction of Para. 5 and the overlap with Para. 3.

### (e) Arbitrary Requirement

113.    Mr Chapman KC submitted that to require later corrective disclosure is an arbitrary requirement that is quite separate from the dishonest delay that is said to have caused loss. It is not clear from Leech J's judgment whether a claimant needs to have read the later published information in order to make a delay claim or what the point of such

disclosure is. The purpose of the legislation is to encourage "*accurate, comprehensive and timely information*" being disclosed to the market (see recital 1 to the Transparency Directive set out at [39] of *Barclays*). In fact, if there is a requirement as proposed by Leech J, it provides a perverse incentive on an issuer not to publish the corrective information so as to avoid liability under Para. 5. Furthermore, if the corrective information is not published until a very long time later, it could be that the limitation period will only start running from the date of publication as that is when the cause of action is complete. That could mean issuers remaining liable for many years after the relevant wrongdoing and the investor has suffered loss.

114.    There might also be difficulties in establishing whether the corrective information actually covers all of the misconduct alleged. As in this case, where SC plc says that the 9 April 2019 Published Information only related to the 2019 Settlements and not the Brutus or Bribery Scheme Allegations, it would be somewhat artificial to have to pick apart the later disclosure if the claimants could establish that there had indeed been dishonest delay.

115.    In *Barclays*, the claimants had alleged that there had at least been a partial disclosure by Barclays of its wrongdoing and settlements with the authorities but it is unclear if Leech J directly dealt with whether partial disclosure would be sufficient. He seemed to be under the impression in [145] that there had been no later disclosure by Barclays. By contrast in this case, later disclosure is (rather elliptically) pleaded by the reference to 9 April 2019 in [78] of the Re-Re-Amended Particulars of Claim and this is perhaps a point of distinction with *Barclays*. I do not think I could possibly strike out the Delay Claims while the Claimants may be able to establish that they have satisfied the publication requirement, at least to the extent of the claims in relation to the 2019 Settlements.

**(f)  Conclusion in relation to the Delay Claims**

116.    Mr Beltrami KC again submitted that I am bound by the principle of judicial comity to follow Leech J's decision on the requirements of Para. 5 unless I am convinced that he was wrong. He also said that *Barclays* is indistinguishable from this case in this respect and so the Delay Claims should be struck out or reverse summary judgment granted to SC plc.

117.    I am not going to do that, for much the same reasons as in relation to the Common Reliance Claims. I have to say that I have more doubts about whether Leech J was correct to conclude that dishonest delay claims are dependent on the issuer publishing corrective information at some stage. I do not think that such a requirement necessarily fits with the objective of imposing liability in respect of a dishonest delay and doubt whether it serves any useful purpose. Most importantly perhaps, I am not sure that I would agree with the construction of Para. 5 together with Para. 2(1).

118.    I understand the point that the introduction of Para. 5 was intended to cover a quite narrow lacuna in issuer liability and that, as such, it should probably be construed to be quite confined in its reach, so far as possible. But the requirement of later publication does not seem to me to cure that problem or necessarily lead to a tightening of the boundaries of issuer liability. On the contrary, it could lead to some arbitrary anomalies

in the extent of the overlap with Para. 3. I also fully appreciate the desire to ensure that there is as little overlap as possible. But again, the wording cannot be stretched to such an extent so as to prevent any overlap. In any event, the solution proposed by Leech J and now adopted by SC plc, does not prevent there being a substantial overlap, as I have explained above.

119. I have said above that it is better to decide this novel point of law – and this really was a novel point on Para. 5 – on the basis of the actual facts, rather than assumed or hypothetical facts. That is consistent with the position I adopted in relation to the Common Reliance Claims and it holds good for the Delay Claims too. Without *Barclays*, I would definitely have left this matter to be determined at trial. Because of my doubts about the correctness of *Barclays* in this respect, I do not think my judgment should change as a result of the clear conclusions that Leech J arrived at as to the meaning of Para. 5. The Delay Claims covered by the 9 April 2019 Published Information would have to continue anyway, even if *Barclays* is correct. There is no good case management reason therefore for removing other Delay Claims from the trial, where the requirement for later publication will be fully argued by reference to the facts in this case, including the extent of the disclosure on 9 April 2019.

120. In all the circumstances, it would be inappropriate to strike out or grant summary judgment in respect of the Delay Claims and I refuse to do so.

## F.   Overall Conclusion

121. For the reasons set out above, I dismiss both parts of SC plc's application. Both the Common Reliance Claims and the Delay Claims will proceed to trial. The parties may well need to look at their pleadings in relation to both of these Claims and ensure that they cover everything that they wish to rely on at trial. It seems to me that there are a number of potential deficiencies in the way they have been drafted in this respect.

122. I would ask the parties to prepare an Order reflecting my judgment. I hope that consequential matters can be agreed, but if not, I could deal with any such disputes in writing, or at a hearing, if the parties think that is necessary.

**Editorial introduction**

**3.0.1**     Section I of this Part (Case Management) (rr.3.1 to 3.11) provides the court with the powers which it is essential for the court to have in order to undertake active case management. The powers fall into five main categories:

- General powers, including notably, power for the court to make orders of its own initiative (rr.3.1, 3.2, 3.3 and 3.10);
- Coercive powers (rr.3.1(3) and (5), 3.4, 3.5 and 3.7);
- Power to give relief against sanctions (rr.3.6, 3.8 and 3.9).
- Power to make civil restraint orders against parties abusing the court's process (r.3.11, added by SI 2004/2072);
- Costs management powers to ensure that parties are not required to incur costs which are disproportionate to the matters in issue (rr.3.12 to 3.19, added by SI 2013/1974).

**Related sources**

**3.0.2**     • Part 24 (summary judgment)

**Forms**

**3.0.3**     The number of court forms is vast. A selection of forms concerned with case management is listed below.

- **N19** Limited Civil Restraint Order
- **N19A** Extended Civil Restraint Order
- **N19B** General Civil Restraint Order
- **N244** Application Notice
- **PF 52** Order in the King's Bench Division for case management and costs management directions in the Multi-Track
- **PF 52A** Shortened **PF 52** in the King's Bench Division for multi-track case and costs management directions in Mesothelioma and Asbestosis claims
- **CH1** Case Management Directions for normal use in Chancery Division (replaces Proc01A)
- **CH2** Full Draft Case Management directions (replaces Proc01)
- **PF 84A** Request for Judgment on failure to comply with an order made under r.3.5(1) (previously PF 85A)
- **PF 84C** Application for entry of judgment on failure to comply with an order made under r.3.5(1) (r.3.5(5))
- **PF 85A** Application for order arising on failure to comply with a condition imposed under r.3.1(3)

**Practice Directions**

**3.0.4**     Section I of this Part is supplemented by PD 3A (Striking Out a Statement of Case) (see para.3APD.1), PD 3B (Sanctions for Non-Payment of Fees) (see para.3BPD.1) and PD 3C (Civil Restraint Orders) (see para.3CPD.1). Until 1 October 2022, Pt 3 was also supplemented by PD 3D (Mesothelioma Claims). However, as a result of the 149th CPR Update (July 2022), this practice direction has been omitted from Pt 3 and now supplements Pt 49 (Specific Proceedings): see PD 49B (para.49BPD.1).

Section II is supplemented by PD 3D (Costs Management) (see para.3DPD.1). Practice Direction 3E (Costs Capping) supplements the rules in Section III. Following the removal of the former PD 3D to Pt 49 (see above) rr.3.12, 3.15, 3.15A and 3.20 now refer to the practice directions supplementing Sections II and III as PD 3D and PD 3E respectively.

By CPR Update 104 (February 2019), PD 3F was added (with effect from 6 April 2019). It inserted as a Practice Direction the text of a Memorandum of Understanding agreed between the Attorney General and the Lord Chief Justice, dated 19 December 2001, on the appointment of an Advocate to the Court (amicus curiae). The Memorandum was published in previous editions of the *White Book* at paras 39.8.1 to 39.8.4.

## I.  Case Management

## The court's general powers of management[1]

**3.1**     **3.1—(1)  The list of powers in this rule is in addition to any powers given to the court by any other rule or practice direction or by any other enactment or any powers it may otherwise have.**

**(2)  Except where these Rules provide otherwise, the court may—**

**(a)  extend or shorten the time for compliance with any rule, practice direction or court order (even if an application for extension is made after the time for compliance has expired);**

---

[1] Amended by the Civil Procedure (Amendment No.3) Rules 2006 (SI 2006/3435), the Civil Procedure (Amendment) Rules 2013 (SI 2013/262), the Civil Procedure (Amendment No.7) Rules 2013 (SI 2013/1974), the Civil Procedure (Amendment No.4) Rules 2015 (SI 2015/1569), the Civil Procedure (Amendment No.2) Rules 2017 (SI 2017/889) and the Civil Procedure (Amendment No.3) Rules 2024 (SI 2024/839).

    (b)  **adjourn or bring forward a hearing;**

    (c)  **require that any proceedings in the High Court be heard by a Divisional Court of the High Court;**

    (d)  **require a party or a party's legal representative to attend the court;**

    (e)  **hold a hearing and receive evidence by telephone or by using any other method of direct oral communication;**

    (f)  **direct that part of any proceedings (such as a counterclaim) be dealt with as separate proceedings;**

    (g)  **stay(GL) the whole or part of any proceedings or judgment either generally or until a specified date or event;**

    (h)  **consolidate proceedings;**

    (i)  **try two or more claims on the same occasion;**

    (j)  **direct a separate trial of any issue;**

    (k)  **decide the order in which issues are to be tried;**

    (l)  **exclude an issue from consideration;**

    (m)  **dismiss or give judgment on a claim after a decision on a preliminary issue;**

    (n)  **order any party to file and exchange a costs budget;**

    (o)  **order the parties to engage in alternative dispute resolution; and**

    (p)  **take any other step or make any other order for the purpose of managing the case and furthering the overriding objective, including hearing an Early Neutral Evaluation with the aim of helping the parties settle the case.**

  **(3)  When the court makes an order, it may—**

    (a)  **make it subject to conditions, including a condition to pay a sum of money into court; and**

    (b)  **specify the consequence of failure to comply with the order or a condition.**

  **(3A)  Where the court has made a direction in accordance with paragraph (2)(c) the proceedings shall be heard by a Divisional Court of the High Court and not by a single judge.**

  **(4)  Where the court gives directions it will take into account whether or not a party has complied with the Practice Direction (Pre-Action Conduct) and any relevant pre-action protocol(GL).**

  **(5)  The court may order a party to pay a sum of money into court if that party has, without good reason, failed to comply with a rule, practice direction or a relevant pre-action protocol.**

  **(6)  When exercising its power under paragraph (5) the court must have regard to—**

    (a)  **the amount in dispute; and**

    (b)  **the costs which the parties have incurred or which they may incur.**

  **(6A)  Where a party pays money into court following an order under paragraph (3) or (5), the money shall be security for any sum payable by that party to any other party in the proceedings.**

  **(7)  A power of the court under these Rules to make an order includes a power to vary or revoke the order.**

  **(8)  The court may contact the parties from time to time in order to monitor compliance with directions. The parties must respond promptly to any such enquiries from the court.**

**Rule 3.1: Effect of rule**

    The powers listed in r.3.1(2) enable the court to carry out its duty to actively manage cases (r.1.4(1)) so as to further the overriding objective (r.1.1). The list of powers is not exhaustive (see r.3.1(1) and r.3.1(2)(m)).  **3.1.1**

**Rule 3.1(2)(a): Extending (or shortening) time limits**

    Under r.3.1(2)(a), the court may make an order extending or shortening the time for compliance with any rule, practice direction or court order and may grant such an order retrospectively, i.e.  **3.1.2**

*CPR 3*

tion 51R relates to Online Civil Money Claims and provides that a claim for a specified sum of money may be started online under the pilot if it satisfies certain conditions. The conditions differ depending on whether the claimant is legally represented or not. The pilot runs from 7 August 2017 until 1 October 2025. Practice Direction 51ZB relates to the Damages Claims Portal and applies to claims for damages only. All claims issued on or after 4 April 2022 which meet the conditions set out in para.1.6(3) of PD 51ZB must be issued in accordance with the pilot procedure. It should be noted that PD 51ZB only applies to claims by claimants who are legally represented by a legal representative who has been registered with MyHMCTS and has been granted access to the Damages Claims Portal. The pilot will run from 28 May 2021 to 1 October 2025. Claims under either of these online procedures will be treated as being issued at a Courts and Tribunals Service Centre which act as an administrative office for all such claims until they are transferred to either a County Court hearing centre or the CNBC.

**Claim form**

**7.2.3**   The expression "statement of case" (which, broadly, has replaced the term "pleadings") includes a claim form (r.2.3(1)).

**Part 23**

**7.2.4**   General Rules about applications for court orders. Part 23 is referred to in the note in brackets immediately after r.7.2. The "application notice" referred to in r.23.1 is a further dilution of the principle that all claims are made by one simple claim form in the sense that Pt 23 applies where an application is made before a claim has been started (r.23.2(4)) or in relation to proceedings which are taking place in another jurisdiction.

**Prescribed Forms**

**7.2.5**   See Practice Direction at paras 7APD.1 et seq.

**7.2A**   **7.2A[1]   Practice Direction 7A makes provision for procedures to be followed when claims are brought by or against a partnership within the jurisdiction.**

## Right to use one claim form to start two or more claims

**7.3**   **7.3   A claimant may use a single claim form to start all claims which can be conveniently disposed of in the same proceedings.**

**Starting two or more claims**

**7.3.1**   In the simplest case, in a single claim form one claimant (C) brings one claim against one defendant (D). The more complicated situations are these (or some mixture of them); in a single claim form:

    (1)    C brings two (or more) claims against D;
    (2)    C brings a claim (or claims) against D1 and D2;
    (3)    C1 and C2 bring a claim (or claims) against D (or against D1 and D2);
    (4)    C1 brings a claim against D1 and C2 brings a claim against D2.

Traditionally, by a mixture of procedural and substantive rules applying various tests the law has regulated the circumstances in which parties and claims may be joined in the same originating process. The assumption has been that, for a variety of reasons, there should be limits. On the whole, constraints on party joinder have been more severe than constraints on claims joinder. Further, with some exceptions, the joinder rules have been permissive and not mandatory. However, a party who failed to join a claim when they might have done so may run the risk that, on limitation grounds or on *res judicata* or issue estoppel grounds, they will be prevented from pursuing it subsequently on separate originating process. Obviously, the parameters of a claim are not fixed by rules regulating the joinder of claims and parties in originating process but may be expanded or contracted subsequently by amendment (see particularly Pt 19 (Addition and substitution of parties) and Pt 17 (Amendments to statements of case)).

Over the years, the trend has been towards liberalising the rules restraining joinder and encouraging the joinder in the same proceedings of all claims and interested parties. This has had the advantages of (1) avoiding a multiplicity of proceedings (and attendant costs and delays), and (2) minimising the risk that claims might be defeated on technical grounds. The liberalising trend is continued by r.7.3. (The Civil Procedure Act 1997 s.1(3) states that the rule-making power shall be exercised "with a view to securing that the civil justice system is accessible fair and efficient". Joinder provisions can be regarded as being consistent with that policy.)

**Multiple claims against the same defendant**

**7.3.2**   Rule 7.3 provides that a claimant may use a single claim form "to start all claims which can be conveniently disposed of in the same proceedings". Under this rule the joinder in the one claim

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2006 (SI 2006/1689) and amended by the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390).

(2) and (3) of r.19.6. Another exception to the general rule concerns cases to which s.33 applies and this exception is carried forward in r.19.6(4). In cases covered by ss.11 or 12 of the Act, r.19.6(4) gives the court an restricted power to allow a change of parties to be made in the course of an action even after the expiry of a time limit which previously applied, if at the same time it grants (absolutely or conditionally, see r.19.6(4)(b)) an application under s.33.

By way of example, consider a personal injury claim arising out of a road accident which is commenced within the time limit specified by s.11 and which names "X" as the defendant and correctly describes him as the owner of the vehicle allegedly driven carelessly. Assume that, after the expiry of the s.11 time limit the claimant seeks an order substituting the driver, "Y", as defendant. If that application is made under r.19.6(3)(a) it must fail; there is no mistake here as to the identity of X; the mistake here is as to whether X is liable in negligence. However, if the application is made under r.19.6(4) and is combined with an application under s.33, the court may, in its discretion, allow the substitution if, on the application under s.33, if "it directs that ... section 11 ... shall not apply to the claim ... against the new party".

Rule 19.6(4)(b) avoids a problem which would arise if the court was not able to determine the s.33 application at the same time as the r.19.6(4)(a) application. Applications under s.33 which turn on seriously disputed issues of law and fact can be difficult and expensive to determine. In the interest of case management, the court may make an order granting the s.33 application subject to a confirmatory order being made by the trial court.

In *Pawley v Whitecross Dental Care Ltd* [2021] EWCA Civ 1827 the Court of Appeal discussed but did not decide whether the test for addition or substitution of a new party under r.19.6(4) was one of desirability or necessity.

## Special rules about parties in claims for wrongful interference with goods[1]

**19.7—(1)  A claimant in a claim for wrongful interference with goods must, in the particulars of claim, state the name and address of every person who, to the claimant's knowledge, has or claims an interest in the goods and who is not a party to the claim.**    19.7

**(2)  A defendant to a claim for wrongful interference with goods may apply for a direction that another person be made a party to the claim to establish whether the other person—**

> **(a)  has a better right to the goods than the claimant; or**
>
> **(b)  has a claim which might render the defendant doubly liable under section 7 of the Torts (Interference with Goods) Act 1977 .**

**(3)  Where the person referred to in paragraph (2) fails to attend the hearing of the application, or comply with any directions, the court may order that that person is deprived of any claim against the defendant in respect of the goods.**

**(4)  The application notice must be served on all parties and on the person referred to in paragraph (2).**

**Rule 19.7: Effect of rule**

This rule was inserted by the Civil Procedure (Amendment) Rules 2001 (SI 2001/256) and in effect reinstates former RSC Ord.15 r.10A.    19.7.1

### II.   Representative Parties

**Editorial introduction**

The rules in this section of Pt 19 of the CPR were inserted by the Civil Procedure (Amendment)    19.8.0
Rules 2000 (SI 2000/221) r.9 and Sch.2. They replace the provisions dealing with representative parties in RSC Ord.15 (Causes of action, counterclaims and parties) and CCR Ord.5 (Causes of action and parties) as re-enacted in Schs 1 and 2 of the CPR. The rules in this section were renumbered and amended by the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

The residual provisions of RSC Ord.15 were revoked in December 2002 (SI 2002/2058).

Rule 19.14 was amended by, and the rules following it in this section of Pt 19 were inserted by, the Civil Procedure (Amendment) Rules 2007 (SI 2007/2204); see further para.19.14.1 below.

The rules in Pt 19 Section II make provision for claims to be brought by or against one or more persons as representatives of others in the claim. They recognise that it is not always practically convenient to join all interested persons as parties. This may be because they are very numerous or

---

[1] Introduced by the Civil Procedure (Amendment) Rules 2001 (SI 2001/256) and amended by the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

because they are unborn, cannot be found or cannot easily be ascertained. The rules in this section recognise there are a wide variety of situations in which the appointment of a representative party are likely to further the overriding objective.

### Representative parties with same interest[1]

**19.8**   **19.8—(1)   Where more than one person has the same interest in a claim–**

  **(a)   the claim may be begun; or**

  **(b)   the court may order that the claim be continued,**

**by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.**

  **(2)   The court may direct that a person may not act as a representative.**

  **(3)   Any party may apply to the court for an order under paragraph (2).**

  **(4)   Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule–**

  **(a)   is binding on all persons represented in the claim; but**

  **(b)   may only be enforced by or against a person who is not a party to the claim with the permission of the court.**

  **(5)   This rule does not apply to a claim to which rule 19.9 applies.**

**Editorial note**

**19.8.1**   This rule was inserted in the CPR by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221) r.9 and Sch.2, and replaced (in much simpler terms) RSC and CCR provisions formerly found in Schs 1 and 2 of the CPR, specifically RSC Ord.15 r.12 and CCR Ord.5 r.5. This rule was formerly rule 19.6. It was renumbered as rule 19.8 and sub-rule (5) amended by the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

**The representative rule**

**19.8.2**   CPR r.19.8 contains the current version of the representative rule having its origins in the procedure of the Court of Chancery before the Supreme Court of Judicature Act of 1873. The rule was comprehensively reviewed by the Supreme Court in *Google LLC v Lloyd* [2021] UKSC 50; [2022] A.C. 1217; [2021] 3 W.L.R. 1268 (judgment given on 10 November 2021) on appeal from [2019] EWCA Civ 1599. The Supreme Court agreed with the highest courts of Australia, Canada and New Zealand that the rule should be treated as "a flexible tool of convenience in the administration of justice" and "applied to the exigencies of modern life as occasion requires". The commentary below uses the headings of the Supreme Court's judgment and draws closely on its content. References in square brackets are to paragraph numbers in the judgment.

**The "same interest" requirement**

**19.8.3**   The representative procedure under r.19.8 is only available where the representative party has "the same interest" in the claim as those they represent. The phrase "the same interest", as it is used in the representative rule, needs to be interpreted purposively in light of the overriding objective of the civil procedure rules and the rationale for a representative procedure ([71]). The purpose of requiring the representative to have "the same interest" in the claim as the persons represented is to ensure that the representative can be relied on to conduct the litigation in a way which will effectively promote and protect the interests of all the members of the represented class. That plainly is not possible where there is a conflict of interest between class members ([71]). Where the interests merely differ or diverge somewhat, there is no reason why a representative party cannot properly represent the interests of all members of the class, provided there is no true conflict of interest between them. In line with adopting a less rigid approach, any procedural objection could be overcome by bringing two (or more) representative claims, each with a separate representative claimant or defendant, and combining them in the same action ([72]). In some cases a bifurcated process may be appropriate ([78]–[84]) where common issues of fact or law are decided in the representative part of the claim and other issues, which may raise separate matters, party by party, are to be left until later. A bifurcated process of this kind was adopted in *Barclays Bank UK Plc v Terry* [2023] EWHC 2726 (Ch). The "same interest" requirement was found to be satisfied in *Commission Recovery Ltd v Marks & Clerk LLP* [2023] EWHC 398 (Comm) involving claims by clients of patent attorneys in respect of undisclosed commissions for references to a service provider. An important consideration was that this was the only way claims for secret commission could be brought. This decision was upheld on appeal at [2024] EWCA Civ 9. It is permissible to appoint representatives by reference to specific issues rather than requiring separate claim forms to be issued raising separate issues. This is known as an "issue based" representation order: see *Capita ATL Pension Trustees Ltd v Zurkinskas* [2010] EWHC 3365 (Ch); [2011] 1 W.L.R 1274,

---

[1] Amended by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221) and the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

*Avon Cosmetics Ltd v Dalriada Trustees Ltd* [2024] EWHC 317 (Ch) at [16] and the Chancery Guide 2022 para.26.22 at 1A-263.

**Discretion**

Where the same interest requirement is satisfied, the court has a discretion whether to allow a claim to proceed as a representative action. The court in exercising its discretion seeks to give effect to the overriding objective. Many of the considerations specifically included in that objective are likely to militate in favour of allowing a claim, where practicable, to be continued as a representative action rather than leaving members of the class to pursue claims individually ([75]). It would however be wrong and contrary to the overriding objective to allow a claim to proceed as representative proceedings where to do so would prevent the court from case managing the claim effectively and, for example, considering what form of split trial to direct. Claimants should not be allowed to bring representative proceedings so as to prevent the court from case managing the claim in a way it has done in other claims of a similar nature: *Wirral Council v Indivior Plc* [2023] EWHC 3114 (Comm) involving claims under ss.90 and 90A of, and Sch.10A to, the Financial Services and Markets Act 2000. It was held that the effect of allowing the representative proceedings to proceed would be to place all the burden on the defendants to deal with the common issues without the claimants having individually to satisfy the court that the statutory requirements for claims of this type were met. In that case, separate multi-party proceedings had been issued at the same time and stayed. **19.8.4**

**No requirement of consent**

The consent of the persons represented is not required by the terms of the rule. The claimant does not require permission to issue a representative action. Rule 19.8(2) enables the court to retain control by directing that a person may not act as a representative. The rule does not confer a right to opt out of the proceedings. However, it is always open to the judge managing the case to impose a requirement to notify members of the class of the proceedings and to establish a simple procedure for opting out of representation, if this is considered desirable. Where appropriate, it is open to the case management judge to limit the represented class to persons who have positively opted into the litigation ([77]). **19.8.5**

**The class definition**

The Supreme Court stated that whilst it is plainly desirable that the class of persons represented should be clearly defined, the adequacy of the definition is a matter which goes to the court's discretion whether or not it is just and convenient to allow the claim to be continued on a representative basis rather than being a precondition for the application of the rule. Membership of the class should not depend on the outcome of the litigation (affirming the first reason of the Court of Appeal in *Emerald Supplies Ltd v British Airways Plc* [2010] EWCA Civ 1284 for holding that the claim in that case was not maintainable as a representative action under CPR r.19.8). Beyond that, whether or to what extent any practical difficulties in identifying the members of the class are material must depend on the nature and object of the proceedings. In some cases, it will not matter that the class will be a fluctuating one. In other cases, as for example where the viability of a claim for damages depends on demonstrating the size of the class or who its members are, such practical difficulties may well be significant ([78]). **19.8.6**

**Liability for costs**

A represented person will not ordinarily be liable to pay any costs incurred by a representative claimant or defendant as they themselves will not normally have been joined as parties to the claim. This does not prevent the court where it is in the interests of justice to do so from ordering a represented party to pay or contribute to costs and giving permission for the order to be enforced against that person pursuant to CPR r.19.8(4)(b) ([79]). **19.8.7**

**The scope for claiming damages**

It is not a bar to a representative claim that each represented person has in law a separate cause of action. Nor is it a bar that the relief claimed consists of or includes damages. What limits the scope for claiming damages in representative proceedings is that in the ordinary course the compensatory principle necessitates an individual assessment which raises no common issue and cannot be carried out without the participation of the individuals concerned. A representative claim is not a suitable vehicle for such an exercise. In some cases, a bifurcated approach may be advantageous. Common issues of fact or law are decided through a representative claim. Issues requiring individual determination whether relating to liability or quantum could be left to be dealt with at a subsequent stage of the proceedings ([80]). It is clear from Lord Leggatt's analysis at [80]–[82] that if individualised assessment of damages is required for class members' claims this precludes a representative action seeking damages on behalf of that class, where a bifurcated process is not proposed: *Prismall v Google UK Ltd* [2023] EWHC 1169 (KB) at [113]–[116]. **19.8.8**

**Other options where there are a large number of claimants**

Prior to the judgment of the Supreme Court in *Google LLC v Lloyd*, the authorities on r.19.8 had been reviewed by the Court of Appeal in *Jalla v Shell International Trading and Shipping Co Ltd* [2021] EWCA Civ 1389 at [31] to [48] when dismissing the appellants' appeal from [2020] EWHC **19.8.9**

2211 (TCC). The Court of Appeal's judgment in *Jalla* drew attention at [49] and [50] to two other options more commonly chosen where there are large numbers of claimants with some or even many facts common to their individual claims but where there are also not insignificant differences. The first is the making of a GLO under r.19.22. The second is for all the claimants to be parties to the claim in their own name and for a representative sample to be selected as lead claimants for the purpose of deciding the substantive issues in the case. At [51], what were referred to as the requirements and limitations of r.19.8 were set out. The summary at [51] of matters relevant to whether a claim should be allowed to proceed as a representative claim under r.19.8 needs to be read in the light of the more flexible approach adopted to r.19.8 in the Supreme Court's judgment but provides a detailed and illuminating review of the considerations relevant to the circumstances of that claim. The circumstances in which it is permissible to issue a single claim with multiple claimants under r.19.1 and r.7.3 was reviewed by the Court of Appeal in *Morris v Williams & Co Solicitors* [2024] EWCA Civ 376. In assessing the question of joinder under CPR r.7.3 the Court of Appeal in *Morris v Williams & Co Solicitors* stated that "the acid test" of joinder is whether it is convenient to do so and that no gloss should be put on the meaning of convenience. In *Adams v Ministry of Defence* [2024] EWHC 1966 (KB) two further points were noted. First that in assessing convenience the court is not to focus solely on the parties' perspective. The court is required to take into account the capacities of the court and the court systems. CPR r.1.1(2)(e) expressly refers to allotting to a case "an appropriate share of the court's resources". Secondly, claims that were originally properly joined to one claim form may be disaggregated and an order for separate trials or other suitable form of order made where continuing the claim as an omnibus claim would embarrass or delay the trial or has otherwise become inconvenient.

**19.8.10**   *Collective proceedings*—In *BT Group Plc v Le Patourel* [2022] EWCA Civ 593 the Court of Appeal upheld the decision of the Competition Appeal Tribunal to order that a claim should proceed on an opt-out, rather than opt-in, basis under the Competition Act 1998 Pt 1 s.47B. This arose in the context of collective proceedings. The relative benefits of different types of opt-in and opt-out proceedings other than representative proceedings under CPR r.19.8 were considered by the Supreme Court in *Google LLC v Lloyd*.

### Where a representation order is not appropriate

**19.8.11**   *Conflicting interests between class members*—The power of the judge managing the case to impose a requirement to notify members of the class of the proceedings and to establish a simple procedure for opting out of representation, cannot cause the "same interest" test to be re-defined, stretched or widened. If the members of a class have conflicting interests, and not merely divergent interests, it would be an error to permit a representative action to proceed on the basis of that class, whatever requirements as to notice were imposed: *Genius Sports Technologies Ltd v Soft Construct (Malta) Ltd* [2021] EWHC 3200 (Ch).

**19.8.12**   *Where the representative party does not itself have a properly arguable claim (or defence) in which the issue between the parties falls to be decided*—A non-profit organisation with the intention of representing local residents after oil spills were found on a local beach did not itself have any possible cause of action arising out of the oil spills. It did not have a sufficient interest to bring proceedings that the residents themselves could have brought. It only came into existence after the oil spills had occurred: *La Brea Environs Protectors v The Petroleum Company of Trinidad and Tobago (Petrotin)* [2022] UKPC 22.

### Binding character of judgment in representative proceedings

**19.8.13**   Rule 19.8(4) provides that, save in two respects (mentioned below) in claims in which a party (whether a claimant or a defendant) was acting as a representative under this rule, any judgment or order made is binding upon the represented persons in the same way as it is binding upon the parties. The represented persons may subsequently be added as parties if an application is made, by or against them, to enforce that judgment or order. The two qualifications to this rule are (i) the judgment or order is not binding upon or enforceable by or against the persons represented, if the court expressly directs otherwise (this is so whether such directions are included in the judgment or order itself or are made subsequently); and (ii) represented persons cannot seek to enforce the judgment or order, nor can it be enforced against them, without the permission of the court.

In *Howells v Dominion Insurance Co Ltd* [2005] EWHC 552 (QB) (Cox J) the background to this rule was considered and it was confirmed that individual members of a club do not have to authorise the litigation for a judgment to be enforceable against them. On the question of enforcement, permission would be granted only on a case by case basis having regard to whatever special circumstances may be shown to exist, if any, in relation to each of them.

In *Chandra v Mayor* [2016] EWHC 2636 (Ch); [2017] 1 W.L.R. 729 (Judge Purle QC) a wrongful dismissal claim, judgment for damages and costs was obtained against a defendant who had been sued in a representative capacity on behalf of the members of the executive committee of an unincorporated association. That defendant successfully obtained an order joining the other ten members of the executive committee as parties and claimed against them an order for contribution in respect of the order for costs. No special circumstances having been advanced which would have

justified the refusal of enforcement, both the claimant and the original defendant were given permission to enforce the costs order against the new defendants, and directions were given as to the contribution claim.

## Representation of interested persons who cannot be ascertained etc.[1]

**19.9**—(1)  This rule applies to claims about–    **19.9**
    (a)   the estate of a deceased person;
    (b)   property subject to a trust; or
    (c)   the meaning of a document, including a statute.

(2)  The court may make an order appointing a person to represent any other person or persons in the claim where the person or persons to be represented–
    (a)   are unborn;
    (b)   cannot be found;
    (c)   cannot easily be ascertained; or
    (d)   are a class of persons who have the same interest in a claim and–
        (i)   one or more members of that class are within sub-paragraphs (a), (b) or (c); or
        (ii)   to appoint a representative would further the overriding objective.

(3)  An application for an order under paragraph (2)–
    (a)   may be made by–
        (i)   any person who seeks to be appointed under the order; or
        (ii)   any party to the claim; and
    (b)   may be made at any time before or after the claim has started.

(4)  An application notice for an order under paragraph (2) must be served on–
    (a)   all parties to the claim, if the claim has started;
    (b)   the person sought to be appointed, if that person is not the applicant or a party to the claim; and
    (c)   any other person as directed by the court.

(5)  The court's approval is required to settle a claim in which a party is acting as a representative under this rule.

(6)  The court may approve a settlement where it is satisfied that the settlement is for the benefit of all the represented persons.

(7)  Unless the court otherwise directs, any judgment or order given in a claim in which a party is acting as a representative under this rule–
    (a)   is binding on all persons represented in the claim; but
    (b)   may only be enforced by or against a person who is not a party to the claim with the permission of the court.

**Editorial note**

This rule was inserted in the CPR by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221) r.9 and Sch.2, and replaced (in much simpler terms) RSC and CCR provisions formerly found in Schs 1 and 2 of the CPR, specifically RSC Ord.15 r.13 (Representation of interested persons who cannot be ascertained, etc.) and CCR Ord.5 r.6 (Representation of person or class). This rule was formerly rule 19.7. It was renumbered by the Civil Procedure (Amendment) Rules 2023 (SI 2023/105) as rule 19.9 .    **19.9.1**

**Rule 19.9: Effect of rule**

Rule 19.9 provides for the making of representation orders in claims of the type described in r.19.9(1) in respect of persons or classes of persons as described in r.19.9(2). It is important to note the exact scope of these categories because, in cases to which r.19 applies, r.19.8 does not (see r.19.8(5)).    **19.9.2**

Rule 19.9(1) sets out the types of claim to which r.19.9 applies. Rule 19.9(2) sets out the circumstances in which a representation order under r.19.9 may be made. The purpose of the rule

---

[1] Amended by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221) and by the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

is to ensure that all interested persons are represented if they are not parties. Orders under rule 19.9(2) may be made at any stage of the proceedings. The separate interests to be represented must however be identified well before the final hearing to avoid the risk of an adjournment if proceedings are not properly constituted.

An order under r.19.9(1)(a), (b) or (c) may be made in respect of one or more persons. Rule 19.9(1)(d) applies where there is a class of members having the same interest in a claim. Rule 19.9(1)(d)(ii) may be used where there are numerous beneficiaries with the same interest under an estate or trust. The use of one or more representative beneficiaries to represent the interests of members of a pension scheme governed by a trust deed and rules is a standard feature of most pension claims. In such cases it will often be appropriate to make an "issue based" representation order by which the representative is appointed to represent all those interested in an issue being decided in a particular way. For further commentary on representative beneficiaries in pensions cases, see the Chancery Guide 2022 in Vol.2 at para.1A-263. See also the Chancery Guide 2022 Ch.2 at para.1A-9 (representative parties) and Ch.25, Trusts, at para.1A-246 (parties).

The rule also applies to claims about "the meaning of a document, including a statute" (r.19.9(1)(c)). This covers cases, for example where issues of construction arise in relation to a financial instrument affecting different classes of lender according to the determination of the issues.

**19.9.3**   *General approach*—As under r.19.8, the court will be guided by the need for effective case management and the principles of fairness and proportionality underlying the overriding objective. The number of representatives and classes represented will be kept to the minimum to ensure that the court will have heard full argument on behalf of all those interested.

In contrast to r.19.8, under r.19.9 a claim cannot be begun as a claim by or against a represented group; an order appointing a representative must first be applied for. That application can be made by the person seeking the appointment or by a party to the claim and can be made "at any time before or after the claim has started" (r.19.9(3) and (4)). In contrast to r.19.8, r.19.9 contains provisions dealing with a court approval of any settlement affecting the interests of represented persons (r.19.9(5) and (6)), noted in para.19.9.4).

Unless the court otherwise directs, any judgment or order given in a claim in which a party is acting as a representative under this rule, is binding on all persons represented in the claim, but may only be enforced by or against a person who is not a party to the claim with the permission of the court: r.19.9(7). In *Re PD Teesport Ltd* [2009] EWHC 1693 (Ch); [2009] Pens. L.R. 263, the claimant was intending to seek a representation order under r.19.9 which would have the effect of providing representation for a company against its will. That company pre-empted the claimant's application by applying to be added as defendant. Proudman J granted the company's application; an important factor in her decision was the prospect that, if its application were not granted, the company would in due course take advantage of r.19.9(7), and resist enforcement of any judgment, thereby in effect re-litigating some of the issues which the court had already decided in the main action. The purpose of a representation order is to include not exclude. It is not its purpose to shut out someone who is ready and willing to appear to represent their own interests at their own risk as to costs: see *Aercap Ireland Ltd v AIG Europe SA* [2023] EWHC 96 (Comm) where an application by an insurer to leave the representative structure and be added as a defendant was granted.

Careful consideration needs to be given as to whether it is appropriate for one law firm to act for a trustee applicant as well as for representative classes of beneficiaries. This may be appropriate whether the court's approval of a settlement is being sought affecting represented persons and approval of the settlement is not opposed by any other party. The possible perception by persons who were not parties to the claim that there might have been collusion in allowing the claim to proceed undefended is an important consideration. The instruction of a law firm which had no prior involvement in the underlying transaction provides a degree of added stringency: *South Downs Trustees Ltd v GH* [2018] EWHC 1064 (Ch).

### Court's approval of settlement of claim affecting represented person

**19.9.4**   Where an order has been made for the representation of persons interested in a claim and the claim is settled, the court's approval of the settlement is required (r.19.9(5)). The court may approve a settlement only if it is satisfied that the settlement is for the benefit of all the represented persons (r.19.9(6)). If, before approval is obtained, it becomes known that any persons represented dissent from a settlement affecting them, the court should be informed: see *Glover v Barker* [2020] EWCA Civ 1112 at [8] where represented beneficiaries and their mother had been kept in the dark about the main proceedings. If the court is satisfied that the settlement is for the benefit of all the represented persons, the rule does not prevent the court from approving the settlement so as to bind a known dissentient. The arguments of the dissentient and the merits of the compromise in all the circumstances would need to be considered. The court's power to approve a settlement under r.19.9(6) should not be used to bind a missing single defendant where proceedings brought by a single claimant raised issues of disputed fact: see *Cotton v Official Solicitor* [1989] C.L.Y. 3045.

### Application for an order that a judgment should not bind a represented person

**19.9.5**   An application for a direction under r.19.9(7) should be brought in the same claim and the right to apply is not capable of being assigned to a third party: *Twin Benefits Ltd v Barker* [2017] EWHC

# SECTION A

# CIVIL PROCEDURE RULES 1998

| | | |
|---|---|---|
| Part 1 | Overriding Objective...................................... | 1.0.1 |
| | Practice Direction 1A—Participation of Vulnerable Parties or Witnesses.................................... | 1APD.1 |
| | Practice Direction Relating to the Use of the Welsh Language in Cases in the Civil Courts in or Having a Connection with Wales............................... | 1MPD.1+ |
| | Artificial Intelligence (AI)—Guidance for Judicial Office Holders........................................... | 1PG.1 |
| Part 2 | Application and Interpretation of the Rules............. | 2.0.1 |
| | Practice Direction 2A—Court Offices.................. | 2APD.1 |
| | Practice Direction 2B—Allocation of Cases to Levels of Judiciary............................................. | 2BPD.1 |
| | Practice Direction 2C—Starting Proceedings in the County Court......................................... | 2CPD.1 |
| | Practice Direction 2E—Jurisdiction of the County Court that may be Exercised by a Legal Adviser ...... | 2EPD.1 |
| | Practice Direction 2F—Court Sittings ................. | 2FPD.1 |
| | Practice Direction—County Court Closures........... | 2MPD.1+ |
| Part 3 | The Court's Case and Costs Management Powers.... | 3.0.1 |
| | Practice Direction 3A—Striking Out a Statement of Case.................................................. | 3APD.1 |
| | Practice Direction 3B—Sanctions for Non-Payment of Fees ................................................. | 3BPD.1 |
| | Practice Direction 3C—Civil Restraint Orders ........ | 3CPD.1 |
| | Practice Direction 3D—Costs Management............. | 3DPD.1 |
| | Practice Direction 3E—Costs Capping ................. | 3EPD.1 |
| | Practice Direction 3F—Requests for the Appointment of an Advocate to the Court.......................... | 3FPD.1 |
| Part 4 | Forms ..................................................... | 4.0.1 |
| Part 5 | Court Documents......................................... | 5.0.1 |
| | Practice Direction 5A—Court Documents.............. | 5APD.1 |
| | Practice Direction 5B—Communication and Filing of Documents by E-mail ................................. | 5BPD.1 |
| | CPR E-mail Address List ............................... | 5MG.1 |
| Part 6 | Service of Documents.................................... | 6.0.1 |
| | Practice Direction 6A—Service within the United Kingdom ................................................ | 6APD.1 |
| | Practice Direction 6B—Service out of the Jurisdiction............................................. | 6BPD.1 |
| | Notes on Heads of Jurisdiction in Paragraph 3.1 of Practice Direction 6B ................................ | 6HJ.1 |
| | Practice Direction—Claims relating to EU and EEA EFTA Citizens' Rights Under Part 2 of the Withdrawal Agreement and Part 2 of the EEA EFTA Separation Agreement ................................. | 6MPD.1 |
| Part 7 | How to Start Proceedings—The Claim Form............ | 7.0.1 |
| | Practice Direction 7A—How to Start Proceedings— The Claim Form ........................................ | 7APD.1 |
| | Practice Direction 7B—Production Centre............. | 7BPD.1 |
| | Practice Direction 7C—Money Claims Online .......... | 7CPD.1 |

BTE insurance it was not clear that there were a sufficient number of claimants who seriously intended to proceed, there being no submissions to the court on which the judge could come to the conclusion that the claimants would ultimately have the benefit of a PCO; and (ii) there was insufficient information about the claims. The claimants in that case had the benefit of CFAs but not insurance either before or after the event. This would not necessarily be fatal if the evidence was that the claimants would still proceed. Furthermore in this case the Court of Appeal opined that "far more than two claimants are necessary to constitute a viable group action".

The inclusion of the words "common or related issues" is significant: the interests of the individuals do not have to be the "same" as in Representative Proceedings; see the Supreme Court decision in *Lloyd v Google LLC* [2021] UKSC 50. This and the following rule are often misunderstood in practice and in particular where a number of claims which are in fact entirely separate, arise out of the same incident or circumstances. The rule refers to "issues" within litigation that are common, whether of fact or law and the purpose of the GLO is to ensure that any such issues are decided so that the decision binds all claims on the register. Hence, in a situation in which (1) many claimants have similar claims, even against the same defendant, but each of them is in law a separate claim (though it may arise out of the same circumstances) in which individual liability and quantum need to be proved and (2) there is no common issue which if decided would be binding in each case, it is unlikely that a GLO will be appropriate and consideration should be given to consolidation or to bringing all the claims in one action with multiple claimants or to the making of an individual Practice Direction or order by the High Court, under which all such cases are, wherever and whenever issued, transferred to one court to be dealt with by the same judge. The wording of r.19.22 which refers to claims giving rise to GLO issues goes to reinforce the point that this form of order is intended for the determination of an issue or issues which is or are common to all the claims or at least groups of claims within the overall group. The question of whether one defendant is in fact liable to multiple claimants, when each claimant's claim is separate as a matter of liability as well as quantum of damages, is not a common issue and not a GLO issue.

In *Schmitt v Depuy International Ltd* [2016] EWHC 638 (QB) the court declined to make a GLO in a number of product liability claims against the same manufacturer, even though it accepted that there were common or related issues of fact and law and a large enough group of claimants, because it concluded that the claims within the group, when subjected to scrutiny, were atypical, would not benefit from a GLO, and were not likely to be informative to the court in respect of other GLOs made in respect of other manufacturers of similar products.

A GLO had not yet been made in proceedings that were the subject of the Court of Appeal decision in *Municipio de Mariana v BHP Group (UK) Ltd* [2022] EWCA Civ 951, but the decision is likely to be of some relevance to some future GLO applications. The claim was brought by over 200,000 Brazilian claimants against defendants for the damage caused by the collapse of a Brazilian dam in 2015. Although a form of class action had been brought in the Brazilian courts and many claims had been resolved, the largest group action had been stayed. The defendants brought a strike out application on grounds of abuse of process, and the judge at first instance granted the strike out application on such ground, finding that the claims would be unmanageable and would risk irreconcilable judgments from parallel proceedings in Brazil. The CA allowed the claimants' appeal, finding that the mere fact that the litigation would place a significant burden on the courts could not be an independent basis for a finding of abuse. They treated the claims as prospective group litigation and made reference to the Supreme Court's decision in *MasterCard v Merricks* [2020] UKSC 5; [2020] 1 W.L.R. 1033 at [74]. The CA held that in any event a conclusion that proceedings were unmanageable could not be sustained when the proceedings were at an early stage. It was also held that the risk of irreconcilable judgments should not have played any part in the finding of abuse, where the claim was otherwise arguable.

## Group Litigation Order[1]

**19.22—(1)  The court may make a GLO where there are or are likely to be a number of claims giving rise to the GLO issues. The multiple parties may be claimants or defendants.**  **19.22**

**(Practice Direction 19B provides the procedure for applying for a GLO where the multiple parties are claimants.)**

**(2)  A GLO must—**

**(a)  contain directions about the establishment of a register (the "group register") on which the claims managed under the GLO will be entered;**

**(b)  specify the GLO issues which will identify the claims to be managed as a group under the GLO;**

---

[1] Amended by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221), the Civil Procedure (Amendment No.2) Rules 2009 (SI 2009/3390) and the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

(c) **specify the court (the "management court") which will manage the claims on the group register; and**

(d) **be made in the King's Bench Division with the consent of the President of the King's Bench Division; in the Chancery Division with the consent of the Chancellor of the High Court; or in the County Court with the consent of the Head of Civil Justice. Such consent will be sought by the court to which the application for the GLO is made.**

(3) **A GLO may—**

    (a) **in relation to claims which raise one or more of the GLO issues–**

        (i) **direct their transfer to the management court;**

        (ii) **order their stay**[GL] **until further order; and**

        (iii) **direct their entry on the group register;**

    (b) **direct that from a specified date claims which raise one or more of the GLO issues should be started in the management court and entered on the group register; and**

    (c) **give directions for publicising the GLO.**

**Editorial note**

**19.22.1**    Rule 19.22(1) does not specify who may apply for a GLO to be made. Either the claimants or a defendant may apply, or the court may make an order of its own initiative.

**Procedure for making an application for a GLO**

**19.22.2**    Paragraphs 3.3 to 3.7 of Practice Direction 19B (see below at 19BPD.1) specify that applications should be made to the Senior Master or Chief Chancery Master (or to a senior judge of the specialist lists) in the RCJ, to the presiding judge on circuit, or to the designated civil judge in the county court. Before an order can be made, the approval is necessary of the President (in the King's Bench Division and on circuit), the Chancellor (in the Chancery Division), or the Head of Civil Justice (in the county court). This may be sought before or after the hearing of the application for the GLO. This is an unusual provision, signalling the importance for the courts of effective case management, including by the senior judiciary.

    **PF19** should be used with appropriate adaptations. Parties are invited to submit to the Senior Master or the Chief Chancery Master in advance of the hearing their own draft order, to enable a check to be made on whether the necessary ingredients have been included. In the Chancery Division parties should contact the Chancery Lawyer, Ms Yvonne Jacobs-Jones (Room D01-010 Rolls Building, 100 Fetter Lane, London EC4, tel. 020 7947 6080) and in the King's Bench Division the Senior Master's listing clerk Mr Jonathan Eves at *jonathan.eves@justice.gov.uk*, tel. 020 7947 6062 at the earliest opportunity if they are contemplating making an application for a GLO.

**The Group register**

**19.22.3**    As the rule and practice direction do not provide guidance on whether, when, by whom, and how, any specific criteria might be drawn up and applied to control entry to the register, clear parameters should be set in the GLO, (or the first case management directions), otherwise a situation could arise whereby individuals entered onto the register but later are held not to "qualify". The practice direction (at para.6.4) does provide for parties to apply to the court in respect of a dispute about entry to the register.

    The GLO register will usually be maintained by the solicitors acting for one of the parties (frequently the claimants' solicitors). In the Chancery Division the register may alternatively be maintained by the lead solicitors but kept by the court, or it may be kept and maintained by the court (the distinction is relevant to the rules for inspecting the register under PD 19B para.6.6).

    Practice Direction 19B (see para.19BPD.13) provides that claimants must issue a claim form (and pay the issue fee) before their claim can be entered on a group register. See the dicta of Lord Woolf in *Boake Allen Ltd v Revenue and Customs Commissioners* above. CPR r.19.1 provides that any number of claimants may be joined as parties to a claim, so a large number of claimants in a prospective GLO may be added into one claim and registered in respect of that claim.

    In *Baker v Volkswagen Aktiengesellschaft* [2022] EWHC 810 (QB) it was held that the failure of claimants to populate their information on a group register by the cut-off date was a serious and significant breach. There was no good reason for the breach and they were refused relief from sanctions in respect of the automatic striking out of their claims.

**Number of claims**

**19.22.4**    Rule 19.22(1) does not specify a minimum number of claims for a GLO to be made, but see *Austin v Miller Argent (South Wales) Ltd* [2011] EWCA Civ 928; [2011] Env. L.R. 32 at para.19.21.1 above.

**The Public List of GLOs**

**19.22.5**    The Senior Master of the King's Bench Division and the Chief Chancery Master arrange for details of GLOs made in their divisions to be published on the gov.uk website "List of group litiga-

tion orders—GOV.UK" (*https://www.gov.uk/government/publications/group-litigation-orders/list-of-group-litigation-orders*). Claimant solicitors should send the details of GLOs for publication to *GLO-KBD@justice.gov.uk* or *GLO-Chancery@justice.gov.uk* as appropriate. Where GLOs are made in the County Court the details should be sent to *GLO-CC@justice.go.uk* (the latter email address is monitored by the King's Bench Division).

**The Law Society Multi-party Action Information Service**

**19.22.6**   Practice Direction 19B requires the Law Society to be notified of any GLO made. Solicitors for one of the parties (usually the claimants' solicitors or lead solicitors, if appointed) should provide the court with information about new claims to be entered on the register and provide the Law Society with information so that the Law Society Multi-party Action Information Service can be kept up to date: see PD 19B.

**The requirement to specify GLO issues**

**19.22.7**   The requirement to specify GLO issues might help the parties and the court to make decisions on a number of pertinent matters, including criteria for entry on to the register, and cut-off dates for entry, but the detail of the issues between the parties is not likely to emerge until later in the litigation.

See *McGlone v Chief Constable of South Yorkshire Police* [2016] EWHC 3359, where the court considered whether it would be appropriate to defer a decision to make a GLO because the GLO issues identified may not be final, or whether the GLO should be made and a stay imposed for a limited time to allow the outcome of independent investigations and time for drafting generic Particulars of Claim. The court concluded in that case that there was no advantage to deferring the making of a GLO where all parties, and the court, were of the view that the case was suitable for a GLO. A similar decision was reached in *Evans v Secretary of State for Health* [2017] EWHC 3572 (QB).

**Publicising the GLO**

**19.22.8**   Rule 19.22(3)(c) and Practice Direction 19B (para.11) cover publicising a GLO. The intention is to enable the court to order the solicitors for the group to "advertise" the making of the order and any cut-off dates for joining the register (see r.19.3) to minimise the risk of individuals trying to start their own separate proceedings at a later date. However, neither the rule nor the practice direction give guidance on the form of any publicity, or on who might be ordered to pay the costs of placing the appropriate advertisements. However in *Weaver v British Airways Plc* [2021] EWHC 217 (QB) Saini J held at [48]–[49] that the advertising costs were not recoverable costs, relying on the authority of *Motto v Trafigura Ltd* [2011] EWCA Civ 1150; [2012] 1 W.L.R. 657, especially the judgment of Lord Neuberger at [110], where he said:

> "It seems to me that the expenses of getting business, whether advertising to the public as potential clients, making a presentation to a potential client, or discussing a possible instruction with a potential client, should not normally be treated as attributable to, and payable by, the ultimate client or clients. Rather, such expenses should generally be treated as part of a solicitor's general overheads or expenses, which can be taken into account when assessing appropriate levels of charging, such as hourly rates."

## Effect of the GLO[1]

**19.23**   **19.23—(1)   Where a judgment or order is given or made in a claim on the group register in relation to one or more GLO issues—**

> (a)   **that judgment or order is binding on the parties to all other claims that are on the group register at the time the judgment is given or the order is made unless the court orders otherwise; and**
>
> (b)   **the court may give directions as to the extent to which that judgment or order is binding on the parties to any claim which is subsequently entered on the group register.**

**(2)   Unless paragraph (3) applies, any party who is adversely affected by a judgment or order which is binding on them may seek permission to appeal the order.**

**(3)   A party to a claim which was entered on the group register after a judgment or order which is binding on them was given or made may not—**

> (a)   **apply for the judgment or order to be set aside [GL], varied or stayed [GL]; or**
>
> (b)   **appeal the judgment or order,**

**but may apply to the court for an order that the judgment or order is not binding on them.**

---

[1] Amended by the Civil Procedure (Amendment) Rules 2000 (SI 2000/221) and the Civil Procedure (Amendment) Rules 2023 (SI 2023/105).

**Court's discretion as to costs[1]**

**44.2**    **44.2—(1)  The court has discretion as to—**

(a)  **whether costs are payable by one party to another;**

(b)  **the amount of those costs; and**

(c)  **when they are to be paid.**

(2)  **If the court decides to make an order about costs—**

(a)  **the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party; but**

(b)  **the court may make a different order.**

(3)  **The general rule does not apply to the following proceedings—**

(a)  **proceedings in the Court of Appeal on an application or appeal made in connection with proceedings in the Family Division; or**

(b)  **proceedings in the Court of Appeal from a judgment, direction, decision or order given or made in probate proceedings or family proceedings.**

(4)  **In deciding what order (if any) to make about costs, the court will have regard to all the circumstances, including—**

(a)  **the conduct of all the parties;**

(b)  **whether a party has succeeded on part of its case, even if that party has not been wholly successful; and**

(c)  **any admissible offer to settle made by a party which is drawn to the court's attention, and which is not an offer to which costs consequences under Part 36 apply.**

(5)  **The conduct of the parties includes—**

(a)  **conduct before, as well as during, the proceedings and in particular the extent to which the parties followed the Practice Direction— Pre-Action Conduct or any relevant pre-action protocol;**

(b)  **whether it was reasonable for a party to raise, pursue or contest a particular allegation or issue;**

(c)  **the manner in which a party has pursued or defended its case or a particular allegation or issue;**

(d)  **whether a claimant who has succeeded in the claim, in whole or in part, exaggerated its claim; and**

(e)  **whether a party failed to comply with an order for alternative dispute resolution, or unreasonably failed to engage in alternative dispute resolution.**

(6)  **The orders which the court may make under this rule include an order that a party must pay—**

(a)  **a proportion of another party's costs;**

(b)  **a stated amount in respect of another party's costs;**

(c)  **costs from or until a certain date only;**

(d)  **costs incurred before proceedings have begun;**

(e)  **costs relating to particular steps taken in the proceedings;**

(f)  **costs relating only to a distinct part of the proceedings; and**

(g)  **interest on costs from or until a certain date, including a date before judgment.**

(7)  **Before the court considers making an order under paragraph (6)(f), it will consider whether it is practicable to make an order under paragraph (6)(a) or (c) instead.**

(8)  **Where the court orders a party to pay costs subject to detailed assessment, it will order that party to pay a reasonable sum on account of costs, unless there is good reason not to do so.**

---

[1] Amended by the Civil Procedure (Amendment) Rules 2013 (SI 2013/262) and the Civil Procedure (Amendment No. 3) Rules 2024 (SI 2024/839).

**Editorial note**

Before the re-enactment of Pt 44 by the Civil Procedure (Amendment) Rules 2013 (SI 2013/ **44.2.1**
262), with effect from 1 April 2013, this rule was r.44.3. Paragraph (9) of the former rule is now
r.44.12 (Set off). As re-enacted, substantive amendments were made to paras (7) and (8), but paras
(1) to (6) remained unchanged. Paragraph (7) was changed from a mandatory to a discretionary
provision. Paragraph (8) was amended significantly. Previously it stated:
> "Where the court has ordered a party to pay costs, it may order an amount to be paid on ac-
> count before the costs are assessed."

Otherwise, subject to three exceptions, r.44.2 has remained in the same terms as when first
brought into effect on 26 April 1999. By SI 2006/3435 significant amendments were made to Pt 36
and as a consequence para.(4)(c) of the rule was amended. (As enacted originally that sub-paragraph
stated that the court should have regard to any admissible offer to settle made by a party which is
drawn to the court's attention "whether or not made in accordance with Part 36".) By SI 2008/3327
para.(5)(a) was amended for the purpose of making it clear that "the conduct of the parties"
includes the extent to which parties followed, not only the relevant pre-action protocol, but also the
Practice Direction (Pre-Action Conduct). By SI 2013/262 the terms of para.(7) were revised.

**Additional commentary on court's discretion as to costs**

The rules in Section I of Pt 44 came into effect on 1 April 2013. However, by operation of vari- **44.2.2**
ous transitional and savings provisions, some rules in Pt 44, as they stood immediately before that
date, for an indefinite period continue to have effect on and after that date for certain purposes
(together with the directions in the Costs Practice Direction supplementing them) (see para.44.0.3
above).

The text of Pt 44 as it stood before 1 April 2013 is contained in this edition of the *White Book* at
para.7B-8+ et seq. Therein, what is now r.44.2, but what was (before 1 April 2013) r.44.3, is found
at para.7B-10+. In previous editions of the *White Book*, the text of r.44.3 was followed by extensive
commentary relevant to the terms of that rule. In this edition of the *White Book* that commentary
has been transferred to the commentary on, what is now, r.44.2.

**The costs which are within the court's discretion—"costs of and incidental to"**

Section 51 of the Senior Courts Act 1981 states that the court shall have full power to determine **44.2.3**
by whom and to what extent costs are to be paid (s.51(3)); the costs that shall be in the discretion of
the court are "the costs of" and "the costs incidental to" all proceedings (s.51(1)) (see Vol.2 para.9A-
199, and commentary following). There is no statutory definition of the word "costs" or the expres-
sion "costs of or incidental to". The rules about costs in the CPR Pt 44 et seq apply to all costs that
the court has power under the statute to determine be paid, and do not define or indicate what
expenses constitute "costs of or incidental to" proceedings (save that r.44.2(6)(d) (former r.44.3(6)(d))
expressly recognises that costs may be incurred before proceedings have begun) (see *ENE Kos v
Petroleo Brasileiro SA ("The Kos")* [2009] EWHC 1843 (Comm); [2010] 1 Lloyd's Rep. 87 (Andrew
Smith J), where the origins and development of the expression are explained).

For the purposes of s.51(1) costs incurred in applying for permission to appeal to the Court of
Appeal are "incidental to" proceedings in that Court, and so are within the discretion of the Court
(*R. (Tesfay) v Secretary of State for the Home Department* [2016] EWCA Civ 415; [2016] 1 W.L.R. 4853,
CA).

In r.44.1(1) it is stated that in Pts 44 to 47, unless the context otherwise requires, "costs" includes
fees, charges, disbursements, expenses and remuneration, and certain other costs recoverable by a
lay representative acting in proceedings allocated to the small claims track, and by a litigant in
person.

In circumstances where the profit costs of a successful party's legal representative attract an ad-
ditional costs liability in the form of a success fee, care may have to be taken in distinguishing
profit costs from disbursements. The distinction was considered in *Crane v Cannons Leisure Centre*
[2007] EWCA Civ 1352; [2008] 1 W.L.R. 2549, CA, where a majority of the Court of Appeal held
that the fee of a costs draftsman, engaged by the successful party's solicitor to attend a detailed as-
sessment, should be treated, not as a disbursement, but as part of the solicitor's profit costs.

A simple order that one party pay another party's "costs of ... proceedings to be assessed on the
standard basis" gives an entitlement to costs both of and incidental to those proceedings (*Newall v
Lewis* [2008] EWHC 910 (Ch); [2008] 4 Costs L.R. 626; [2008] W.T.L.R. 1649 (Briggs J and asses-
sors), at para.16). But if a particular item of expenditure is neither "of" or "incidental to" particular
proceedings, then there is simply no jurisdiction to include it within recoverable costs (above).
(That is not a matter of discretion, but a matter of fact and legal analysis.) In most cases, there is
unlikely to be any issue as to whether the costs claimed, or part of them, are otherwise than costs
"of" or "incidental to" the proceedings, but the issue does sometimes arise.

It is clear that costs incurred prior to proceedings are capable in principle of being recoverable
as costs in the proceedings (see *Société Anonyme Pêcheries Ostendaises v Merchants' Marine Insurance Co*
[1928] 1 K.B. 750, CA, at p.757; *Frankenburg v Famous Lasky Film Service Ltd* [1931] 1 Ch. 428, CA).
If the court determines that costs were "of" or "incidental to" the proceedings, then they are
recoverable, subject of course to questions to be considered upon assessment as to whether the
expense was reasonable and whether it was proportionate. There is a general principle that the

costs of a claim do not include costs incurred by a party in seeking funding either for the prosecution or for the defence of that claim (*National Westminster Bank Plc v Kotonou* [2009] EWHC 3309 (Ch); [2010] 2 Costs L.R. 193 (Briggs J and assessors), at para.26).

In his judgment in the case of *Re Gibson's Settlement Trusts* [1981] Ch. 179, Sir Robert Megarry VC (a judgment that repays reading in full) gathered together a number of relevant authorities and set out some principles or guidelines (since widely quoted and followed) to be applied in assessing whether costs incurred for work done prior to any civil proceedings being commenced may be recoverable as costs of and incidental to the proceedings. (Of particular usefulness is the guidance given therein on the potentially difficult question whether preparation for proceedings of one type is properly to be regarded as giving rise to costs of and incidental to subsequent proceedings of a narrower scope.) His lordship noted that the costs "incidental to" proceedings go beyond those "of" the proceedings. In summary, his lordship stated that disputes antecedent to the proceedings which bear no real relation to the subject of the litigation, could not be regarded as part of the costs of the proceedings, but disputes which are in some degree relevant to the proceedings, as ultimately constituted and the other parties' attitude made it reasonable to apprehend that the litigation would include them, could be allowed.

In *Contractreal Ltd v Davies* [2001] EWCA Civ 928, CA, the Court of Appeal reviewed the authorities and concluded that they showed that the expression "of and incidental to" has received a limited meaning, and in particular that the words "incidental to" have been treated as denoting some subordinate costs to the costs of the action (para.41). Principles derived from Sir Robert Megarry's judgment, and subsequent authorities, were applied in *Roach v Home Office* [2009] EWHC 312 (QB); [2010] Q.B. 256 (Davis J and assessors), where it was held that the costs of participating in an inquest could be incidental to the costs of a subsequent civil claim, and could therefore form part of the costs of that claim, and also in *ENE Kos v Petroleo Brasileiro SA ("The Kos")* [2009] EWHC 1843 (Comm); [2010] 1 Lloyd's Rep. 87 (Andrew Smith J), where it was held that the costs of obtaining and servicing a bank guarantee by way of security incurred by shipowners who brought proceedings against charterers were incidental to the proceedings and therefore recoverable.

In *National Westminster Bank Plc v Kotonou* [2009] EWHC 3309 (Ch); [2010] 2 Costs L.R. 193 (Briggs J and assessors), an appeal from a decision made by a costs judge on a preliminary issue raised in detailed assessment proceedings, the court explained (1) that the need to negotiate interim solutions to difficulties thrown up by contemplated or pending claims is a common feature of modern civil litigation, (2) that they include questions as to security for costs, questions as to the liberty of the defendant to use his assets (or assets claimed from him in the proceedings) for his own purposes pending trial, including for the purposes of funding the litigation, and issues as to the interim custody of, and dealings with, property the subject matter of the claim, and (3) that such issues are very frequently resolved without either party having to make an interim application, for example during pre-action stages, or by solicitors' correspondence and oral negotiations shortly after the commencement of a claim. The court held that costs incurred in the reasonable negotiation of interim solutions to problems arising between the parties in connection with issues to be decided in contemplated or pending litigation fall within the category of costs (identified in the authorities) as related to the creation of materials "ultimately proving of use and service in the action" or as being costs the incurring of which was "proper for the attainment of justice", and can (subject to the usual questions of proportionality and reasonableness) form part of the costs of those proceedings.

In *McGlinn v Waltham Contractors Ltd* [2005] EWHC 1419 (TCC); [2005] 3 All E.R. 1126 (Judge Peter Coulson QC) the judge held that the expense of complying with a pre-action protocol in respect of claims which were brought in subsequent proceedings were properly classified as costs "incidental to" those proceedings, but save in exceptional cases, costs incurred by a defendant "at the stage of a pre-action protocol, in dealing with and responding to issues that are subsequently dropped from the action when proceedings are commenced", cannot be costs "incidental to" those proceedings" (at para.11).

The costs of a separate, standalone ADR process, particularly if it takes place before the proceedings are commenced, will not usually form part of "the costs of or incidental to the litigation" (*Roundstone Nurseries Ltd v Stephenson Holdings Ltd* [2009] EWHC 1431 (TCC); [2009] 5 Costs L.R. 787 (Coulson J)). Often it is agreed by the parties that each party will bear their own costs of such a mediation, with the result that the costs cannot subsequently be sought by one or other party in the proceedings. In such circumstances, the costs of a pre-action mediation will not normally be recoverable (above, and *Lobster Group Ltd v Heidelberg Graphic Equipment Ltd* ([2008] EWHC 413 (TCC); [2008] 2 All E.R. 1173 (Coulson J)).

In *Aiden Shipping Co Ltd v Interbulk Ltd* [1986] A.C. 965, HL, the judge at first instance (1) dealt with two motions together (though the proceedings had not been consolidated), one brought by a shipowner (C) against a charterer (D) and the other by the charterer against a sub-charterer (X), (2) dismissed both, and (3) in relation to the first, ordered that C should pay D's costs, such costs to include any costs paid by D to X in the sub-charter proceedings. The House of Lords (and the Court of Appeal) rejected the submission that the costs which D were ordered to pay X were "incidental to" the proceedings brought against them by C, even though D's unsuccessful proceedings against X were the inevitable consequence of C's unsuccessful action against D (but upheld the order on non-party costs liability grounds).

### Reasons

The Court of Appeal has repeatedly stated that, when making an order for costs, judges should **44.2.4**
clearly state their reasons, particularly where the costs incurred are disproportionate to the amount
in issue: see *English v Emery Reimbold & Strick Ltd (Practice Note)* [2002] EWCA Civ 605; [2002] 1
W.L.R. 2409, CA; *Lavelle v Lavelle* [2004] EWCA Civ 223; [2004] 2 F.C.R. 418, CA. The reasons
for a judge's costs order made at the end of a trial may be largely discernible from the transcript of
the judgment, but where counsel are not sure they should seek from the judge a note of the
reasons for the order (*Darougar v Belcher* [2002] EWCA Civ 1262, at [7] per Keene LJ).

### The indemnity principle

Costs between parties are awarded as an indemnity to the party incurring them and a successful **44.2.5**
party cannot therefore recover a sum in excess of their liability to their own solicitor (*Gundry v
Sainsbury* [1910] 1 K.B. 645). For the circumstances when costs can still be recovered even though it
was never realistically expected that the successful party would pay their own solicitor, see *R. v
Miller & Glennie* [1983] 1 W.L.R. 1056; [1983] 3 All E.R. 186, following *Adams v London Improved
Motor Coach Builders Ltd* [1921] 1 K.B. 495. See also *Hazlett v Sefton MBC* [2000] 4 All E.R. 887 DC;
*R. v Liverpool Justices Ex p. McCormick* [2001] 2 All E.R. 705, DC; and *Kitchen v Burwell Reed &
Kinghorn Ltd* [2005] EWHC 1771 (QB); [2006] 1 Costs L.R. 82 (Gray J and assessors), at [22]–[36].
The message to be drawn from these cases is that the court is hostile to indemnity principle chal-
lenges, and will find the principle satisfied even if the liability of the beneficiary of the costs order
to pay costs is close to notional (*Thornley v Lang* [2004] EWCA Civ 1484; [2004] 1 W.L.R. 378). The
relevant question for the court is whether the receiving party has become liable to pay the costs
claimed; who actually pays the costs is not relevant (*Edwin Coe LLP v Popat* [2013] EWHC 4524
(Ch), (Vos J)).

For the impact of the principle where advocacy or litigation services are provided to a client
under a CFA, see r.44.1(3). For information on the indemnity principle generally, see para.47.14.7,
Guide to Summary Assessment of Costs paras 17 et seq (para.44SC.13), SCCO Guide section 2.6
(Vol.2 para.1C-24).

### Costs orders—order displacing the general rule—"a different order"

In the exercise of its discretion as to costs the court may make an order about costs or not make **44.2.6**
such an order (r.44.2(1)(a) and (2)). In the latter event, the costs incurred by the parties lie where
they fall, leaving the matter of costs wholly for the parties to agree amongst themselves. In deciding
whether to make an order about costs the court will have regard to all the circumstances (r.44.2(4)).

On its true construction, r.44.2(2) deals with the manner in which, not the time at which, the
court's discretion to order, or not to order, costs is to be exercised. There are certain costs orders
which the court will commonly make in proceedings before trial, for example, "costs in any event";
see para.4.2 of Practice Direction 44 (para.44PD.4 below).

If there is a split trial, the court may defer the issue of costs until the conclusion of the case as a
whole, especially if it is unclear whether the successful party will ultimately be successful overall, or
if an offer has been made which either cannot be communicated to the court at the relevant time,
or the effectiveness of which cannot be judged until the conclusion of the litigation as a whole; see,
e.g., *Powell v Herefordshire Health Authority* [2002] EWCA Civ 1786; [2003] 3 All E.R. 253, CA; *Weill
v Mean Fiddler Holdings Ltd* [2003] EWCA Civ 1058, at [31] to [33]; *HSS Hire Services Group v BMB
Builders Merchants Ltd* [2005] EWCA Civ 626; [2005] 1 W.L.R. 3158, CA; *Shepherds Investments Ltd v
Walters* [2007] EWCA Civ 292; [2007] C.P. Rep. 31, CA; *Ted Baker Plc v AXA Insurance UK Plc*
[2012] EWHC 1779 (Comm); [2012] 6 Costs L.R. 1023 (Eder J).

In some cases, the parties may be able to resolve all of the issues between them other than costs,
and invite the court to decide the incidence of the latter. There is no tradition that when a dispute
is not judicially resolved the correct order is "no order as to costs" (*Brawley v Marczynski* [2002]
EWCA Civ 756; [2003] 1 W.L.R. 813, CA). However, in all but straightforward cases a judge is
entitled to say to the parties that if they have not reached an agreement on costs, they have not set-
tled the dispute, and where the substantive issues have been compromised the judge should be slow
to embark on a determination of disputed facts solely in order to put himself in a position to make
a decision about costs (*BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2003] EWCA Civ 939;
[2004] F.S.R. 9, CA; *Venture Finance Plc v Mead* [2005] EWCA Civ 325; [2006] 3 Costs L.R. 389,
CA). Where the court decided not to determine an application, because it would not be possible to
do so proportionately, the applicant should pay the costs as it was unsuccessful. This was different
to the kind of case identified in *BCT*, where the settlement of the substantive dispute left the court
with no proper basis for determining the winner: *Deepchand v Sooben* [2020] EWCA Civ 1409.
Where the court does decide the incidence of costs after the parties have settled the substantive is-
sues, an appellate court will be even more reluctant to interfere with the costs order: *Tradition
Financial Services Ltd v Bilta (UK) Ltd* [2023] EWCA Civ 112. Particularly as the judge will have had
to adopt a relatively broad-brush approach: *Bowser v Smith* [2023] EWCA Civ 923.

Where a hearing is ineffective for some non-culpabale cause, such as a civil jury failing to agree
(*Camiller v Commissioner of Police of the Metropolis, The Times*, 8 June 1999, CA) or papers being
delayed in the post (e.g. brief to counsel for a heavy application) (*Hitchman v CBAS Services Ltd*
[1983] 5 WLUK 276; (1983) 127 S.J. 441, CA), it will usually be appropriate to make a costs order,
but of costs in the case or in the application.

For certain consequences which may follow where the court makes no order for costs (including the deeming of costs orders), see r.44.10 (Where the court makes no order for costs).

**Rule 44.2(6): Costs orders—orders which the court may make under r.44.2**

**44.2.7**   Rule 44.2(2) states that, if the court (having "regard to all the circumstances") decides to make an order about costs "the general rule" is that the unsuccessful party will be ordered to pay the costs of the successful party (r.44.2(2)(a)), but the court may make "a different order" (r.44.2(2)(b)).

When contrasted with comparable provisions in the RSC, provisions in the CPR are much more specific as to the types of costs order which a court may make and as to the matters to which a court should have regard in deciding what order should be made. As was intended, this greater level of detail invites courts to adopt a more flexible approach, in particular for the purpose of making orders for costs which more accurately reflect the level of success achieved by the receiving party (*AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 W.L.R. 1507, CA, at 1522 and 1523 per Lord Woolf MR).

As to "all the circumstances", see commentary on: (1) the "conduct" of the parties (r.44.2(4)(a) and r.44.2(5)) (paras 44.2.20 to 44.2.25 below); (2) whether a party has succeeded "on part of its case", even if that party "has not been wholly successful" (r.44.2(4)(b)) (para.44.2.18 below); and (3) whether any admissible offer was made (not being an offer for which costs consequences are governed by Pt 36) (r.44.2(4)(c)) (para.44.2.19 below).

The general rule does not apply to certain family and probate proceedings in the Court of Appeal (r.44.2(3)); see para.44.2.15 below.

As to "successful" and "unsuccessful" parties, see para.44.2.13 below.

As to whether a party "has succeeded on part of its case" (r.44.2(4)(b)), see para.44.2.18 below.

The effect of an order in the form of the general rule is that it requires the unsuccessful party to pay the whole of the successful party's costs. Before the CPR came into effect the equivalent provision in the RSC stated that the court should order the costs "to follow the event" (an expression that has survived in legal parlance), except where it appeared to the court that in the circumstances of the case "some other order" should be made as to the whole or any part of the costs (RSC Ord.62 r.3(3)).

It is not the position that, in a given case, the existence of particular circumstances relevant to the exercise of the costs discretion will mandate an order in accordance with the general rule rather than a different order.

No single legal shorthand has emerged for the purpose of describing an order about costs made in accordance with the general rule. References may be found to "general order", "general rule order", "follow the event order", "standard order", "normal order", and "default position order". The Supreme Court has used the expression "unqualified order" (see *Flood v Times Newspapers Ltd (No.2)* [2017] UKSC 33; [2017] 1 W.L.R. 1415, SC, [68] and [71]).

Because the individual provisions of r.44.2 "tend to pull in different directions" their application in a given case for the purpose of determining what type of costs order (if any) should be made and for what reasons is rarely straight-forward and recourse to such guidance as may be obtained from the relevant authorities is usually required (*Multiplex Constructions (UK) Ltd v Cleveland Bridge UK Ltd* [2008] EWHC 2280 (TCC); [2009] 1 Costs L.R. 155 (Jackson J) at [46] and [72]).

The court may make a "different" order to an order following the general rule (r.44.2(2)(b)). Paragraph (6) of r.44.2 contains a list of "different orders" which a court (having "regard to all the circumstances") may make "under this rule" (subparas (a) to (g)). It is not, and is not intended to be, an exhaustive list. There was no provision comparable to this in the RSC, but orders of each variety could and were made by the courts before the CPR came into effect and tended to be known collectively as "special orders", a term which is still sometimes used in this context. Whereas before the CPR came into effect special orders were not routinely made since then they have become common place.

Included in r.44.2(6) are orders requiring a party to pay interest on costs from or until a certain date, including a date before judgment (r.44.2(6)(g)). As is explained elsewhere, where at judgment the court makes an order for costs, whether it be an unqualified order or a different order, the court may order that interest should be paid on the costs (as agreed or assessed) generally from the date they were incurred to the date of judgment. See further para.44.2.29 below. Further, when a costs order has crystallised into a judgment debt, interest becomes payable on the debt from the judgment date, not by an order under r.44.2, but by operation of statutory provisions referred to in r.40.8. As is explained elsewhere, the court has power to order that such interest should run on the amount of costs owing from a date other than the judgment date. See further para.40.8.2 above. Orders of these varieties concerning interest are not aptly described as "different orders" or "special orders". They do not allocate costs as between the parties, but award interest on costs as allocated.

The other "different" costs orders listed in r.44.2(6) are in terms based on expressions found in pre-CPR case law. They do not hang well together in legislative form, but their intention is clear enough. The various types of costs orders so listed are not mutually exclusive; in a given case, orders of more than one type may be included in the same costs order. Further, it is not the position that, in a given case, the existence of particular circumstances relevant to the exercise of the costs discretion will mandate a different order of one type rather than of any other.

The most strikingly different order would be an order which was completely the reverse to an order in accordance with the general rule, that is to say, an order requiring the successful party to bear its own costs and in addition pay the unsuccessful party's costs. Less so would be an order (as r.44.2(6) provides) that the unsuccessful party pay only "a proportion of" the successful party's costs (r.44.2(6)(a)) (sometimes colloquially known as "percentage orders"), or only "a stated amount in respect of" those costs (r.44.2(6)(b)), or only those costs "from or until a certain date" (r.44.2(6)(c)), or costs relating only "to a distinct part of the proceedings" (r.44.2(6)(f)), or any combination of such different orders.

As a practical matter, the particular (but not sole) significance of those various different orders is that they may be made for the purpose of reducing the costs that the unsuccessful party would otherwise be required to pay to the successful party were the general rule applied.

Rule 44.2(4)(b) and r.44.2(6)(f), in combination, have formed the context for the development of a different order usually described as an "issue-based" costs order. See further para.44.2.10 below.

It is to be noted that para.(7) of r.44.2 states that, before the court considers making an order under r.44.2(6)(f), for example, an issue-based order, it will consider whether it is practicable to make instead a proportionate order (r.44.2(6)(a)) or an order requiring costs to be paid "from or until a certain date only" (r.44.2(6)(c)). (Before 1 April 2013, this provision read: "Where the court would otherwise consider making an order under paragraph (6)(f), it must instead, if practicable, make an order under paragraph (6)(a) or (c).") The purpose of this provision was examined by the Court of Appeal in *English v Emery Reimbold & Strick Ltd (Practice Note)* [2002] EWCA Civ 605; [2002] 1 W.L.R. 2409, CA; see further para.44.2.10 below.

Where a judge concludes that he or she should make an order (whether under para.(a), (c) or (f) of r.44.2(6)) relieving the unsuccessful party from having to pay the successful party's costs on a particular issue, being an issue which the latter raised and on which it failed, it is necessary to be clear as to what those costs are. Normally, as the overall winners the successful party should have their general costs of the claim, and should only suffer a deduction to the extent that their costs were increased by the taking of the issue on which they failed (e.g. *Liverpool City Council v Rosemary Chavasse Ltd* [2000] C.P. Rep. 8; [1999] C.P.L.R. 802 (Neuberger J), and *R. (Viridor Waste Management Ltd) v Commissioners for HM Revenue and Customs* [2016] EWHC 2502 (Admin); [2016] 4 W.L.R. 165 (Nugee J)).

### Rule 44.2(6)(a): Costs orders—party must pay "a proportion of another party's costs"

**44.2.8**

In numerous cases the Court of Appeal has stressed that the courts should be ready to make proportionate (or percentage) costs orders which reflect, not merely the overall outcome of the proceedings, but also the loss on particular issues.

In *Multiplex Constructions (UK) Ltd v Cleveland Bridge UK Ltd* [2008] EWHC 2280 (TCC); 122 Con. L.R. 88, a case where many claims and counterclaims were brought (some of which succeeded and some of which failed) Jackson J, after reviewing the authorities on r.44.2 generally as they then stood, extracted from them eight "principles" ([72(i)] to [72(viii)]), including two principles relevant to proportionate costs orders, in particular (1) that in many cases the judge can and should reflect the relative success of the parties on different issues by making a proportionate costs order ([72(v)]), and (2) that in assessing a proportionate costs order the judge should consider what costs are referable to each issue and what costs are common to several issues; it will often be reasonable for the overall winner to recover not only the costs specific to the issues which he has won but also the common costs ([72(viii)]). As to the latter principle, see also *Mears Ltd v Leeds City Council* [2011] EWHC 2694 (TCC); [2012] 4 Costs L.O. 456, (Ramsey J) at [28].

In *Kew v Bettamix Ltd* [2006] EWCA Civ 1535; [2007] 4 Costs L.R. 527; [2007] P.I.Q.R. P16, CA, the claimant (C) lost a preliminary issue as to whether his personal injury claim was statute barred but succeeded on his application to disapply the limitation period. The judge ordered the defendants (D) to pay the whole of C's costs of the hearing notwithstanding D's success. The Court of Appeal allowed D's appeal against the costs order, substituting an order requiring D to pay 65% of C's costs. The court found that the judge did not adequately take into account the fact that C's submissions on the limitation point, which had added significantly to the length of the hearing, "simply could not succeed". The court explained (1) that a claimant is entitled to put his case at its highest (for example, in relation to many heads of damage in a personal injuries claim), but there is a distinction between that and advancing a claim for relief on a basis that fails (especially if it is entirely unsupportable) (above at [49] per Leveson LJ), (2) that courts should not be slow to make a reduction in the costs that a successful party should recover if they form the view that bad points have been argued and lost (at [58] per Waller LJ).

The difficulties inherent in making a percentage costs order have been noted by judges in a number of cases and it has been stressed that the exercise "has to be a broad brush one" (*Sycamore Bidco Ltd v Breslin* [2013] EWHC 583 (Ch); [2013] 4 Costs L.O. 572, (Mann J) at [28]). In a given case, it is unlikely (certainly in a case of any complexity) that measuring the amount of court time, the volume of documents, the number of witnesses, the time and effort of lawyer preparation and other indicia relevant to the incurring of costs devoted to one issue and that devoted to another will be a simple exercise. Such measures "can only be indicia to be taken into account"; the best that can be achieved "is an estimate which is necessarily going to be somewhat crude" (*SmithKline Beecham*

*Plc v Apotex Europe Ltd (No.2)* [2004] EWCA Civ 1703; [2005] F.S.R. 24, CA, at [27] and [28] per Jacob LJ).

In *Budgen v Andrew Gardner Partnership* [2002] EWCA Civ 1125; [2003] C.P. Rep. 8, CA, where the claimant recovered significantly less than was claimed, the trial judge ordered the unsuccessful defendant to pay the claimant's (C) costs, reduced by 25% because C had failed on one issue, being an issue which had taken up a substantial part of the trial and which (as the judge found) should not have been pursued. The Court of Appeal upheld the order, rejecting D's submission that the judge should have made an issue-based order. The Court explained that there was no question here of a percentage order not being "practicable" (r.44.2(7)), and on the material available to him the judge was only able to make "a very broad brush" assessment of the costs attributable to the issue on which C failed (at [28] per Simon Brown LJ). The fact that the parties had not provided the judge with more precise information about those costs did not have the effect of requiring the judge to make an issue-based order rather than a percentage order (above).

In *R. (Viridor Waste Management Ltd) v Commissioners for HM Revenue and Customs* [2016] EWHC 2502 (Admin); [2016] 4 W.L.R. 165 (Nugee J), where the defendants (D) were wholly successful in defending the claimants' (C) claim, but in the course of resisting the claim relied on a ground which the court rejected, the judge made a proportionate order reducing by 15% those costs of D's which C were required to pay (rejecting the submission that D should pay C's costs of that issue).

In *Grupo Hotelero Urvasco SA v Carey Value Added SL* [2013] EWHC 1732 (Comm); [2013] 5 Costs L.R. 669 (Blair J), a complex case where the losing claimant succeeded on three important issues, the trial judge concluded that the costs order should reflect, in a substantial way, the defendant's failure to make good a particular argument, and, at least to an extent, the outcome of two other issues, and ordered that the defendant's costs should be reduced by 25%.

### Rule 44.2(6)(b): Costs orders—party must pay "a stated amount of another party's costs"

**44.2.9**
The costs orders which the court may make as listed in r.44.2(6) include an order that a party must pay "a stated amount in respect of another party's costs" (r.44.2(6)(b)). In *SCT Finance Ltd v Bolton* [2002] EWCA Civ 56; [2003] 3 All E.R. 434, CA, the Court of Appeal referred to, but did not have to decide, the question whether the terms of that provision, on a strict view at least, are apt to cover an order for detailed assessment subject to the ceiling of a stated amount (at [25] per Wilson J). The Court noted that r.44.2(1)(b) states that the court's discretion as to costs includes "the amount" of costs payable by one party to another, and did not doubt that a court can properly identify the amount payable as being such costs as are calculated by detailed assessment, subject to a quantified ceiling; but the manner by which the court's discretion should be exercised in that respect is subject to other provisions in r.44.2 (which the judge in this case failed fully to recognise) (above).

### Rule 44.2(4)(b) and (6)(f): Costs orders—"issue-based" orders

**44.2.10**
Rule 44.2(4)(b) provides that, among the circumstances which the court should take into account, in deciding what order (if any) to make about costs, is whether a party has succeeded on part of its case, even if that party has not been wholly successful, and r.44.2(6)(f) provides that, among the "different" orders as to costs which the court may make, is an order requiring a party to pay costs "relating only to a distinct part of the proceedings". As was explained above (para.44.2.7), these two provisions have in combination formed the context for the development of a "different" costs order in the form of a so-called "issue-based" (or "issues-based") order (an order of a type well-established before the CPR came into effect, but not commonly made).

As the authorities referred to below indicate, in summary, the position is that, where a party successful overall has been unsuccessful on an issue (or issues), being an issue which that party raised, pursued or contested, a court (1) should consider adopting an issue-based approach, and (2) in deciding what order to make in relation to that issue (or issues) may decide (a) that party should be deprived of his costs of that issue, or a proportion of those costs, or those costs from or until a certain date; or even (b) that that party should pay the costs of the otherwise unsuccessful party on that issue, or a proportion of those costs, or those costs from or until a certain date. Perhaps inevitably, given the width of the costs discretion and the enormous range of circumstances that may be relevant to its exercise, it is not easy to discern from the authorities clear guidance as to whether the case merits depriving the successful party of his costs of an issue, but does not merit taking the further step of making him pay the unsuccessful party's costs of that issue (*R. (Viridor Waste Management Ltd) v Commissioners for HM Revenue and Customs* [2016] EWHC 2502 (Admin); [2016] 4 W.L.R. 165 (Nugee J), at [11]).

In r.44.2 there are references to "issue", to "allegation" (r.44.2(5)(b) and (c)), to "part of case" (r.44.2(4)(b)), to "particular steps taken in proceedings" (r.44.2(6)(e)), and to "distinct part of proceedings" (r.44.2(6)(f)). It is assumed that what these words and expressions mean in the contexts in which they are used will be readily understood. The assumption appears to be well-founded. In most reported cases dealing with the "issue-based" approach to costs the issues subjected to scrutiny are what lawyers would describe (using the language of pleading) as "pleaded issues", or "points of claim", or "heads of claim", or "allegations" of breaches of duty or of negligence. An "issue" in this context could be described as anything upon which, standing alone, a court could grant relief, but it may mean something less than that. In any event, it has to be

something arising in the proceedings upon which one party can be said to have been "successful".

Shortly after the CPR came into effect the law as to the making of issue-based costs orders under r.44.2 was considered by the Court of Appeal in *Johnsey Estates (1990) Ltd v Secretary of State for the Environment* [2001] EWCA Civ 535; [2001] L. & T.R. 32, CA, and *Summit Property Ltd v Pitmans* [2001] EWCA Civ 2020; [2002] C.P.L.R. 97, CA. In the *Johnsey* case landlords brought proceedings against tenants and the discrete issues on which the landlords succeeded and failed were, respectively, (a) for breach of a repairing covenant, and (b) for breach of a clause requiring compliance with regulations. In the *Summit Property Ltd* case solicitors were successful overall in proceedings brought against them by a property investment company, and the discrete issues on which the claimants succeeded and failed were, respectively (a) breach of retainer, and (b) causation (to which the defendants successfully pleaded, by late amendment, confidentiality owed to a third party).

In these two cases, the Court of Appeal stated that (1) a judge (a) may make different orders for costs "in relation to discrete issues", and (b) should consider doing so where a party has been successful on one issue but unsuccessful on another issue, (2) in that event, a judge may make an order which not only deprives a successful party of his costs of a particular issue but also an order which requires him to pay the otherwise unsuccessful party's costs of that issue, (3) it was no longer necessary for a party to have acted unreasonably or improperly before he can be required to pay the costs of the other party of a particular issue on which he (the first party) has failed. The explanations given in the *Johnsey Estates* and *Summit Property Ltd* cases of the manner in which these propositions may be related to the terms of r.44.2 have been frequently repeated in subsequent cases (e.g. *Fleming v Chief Constable of Sussex* [2004] EWCA Civ 643; [2005] 1 Costs L.R. 1; [2004] Po. L.R. 251, CA; *Aspin v Metric Group Ltd* [2007] EWCA Civ 922; [2008] 2 Costs LR. 259, CA; *Flanagan v Liontrust Investment Partners LLP* [2016] EWHC 446 (Ch); [2016] 2 Costs L.O. 247 (Henderson J)). The point that unreasonableness is not a pre-condition to the making of an issue-based order has been re-iterated by the Court of Appeal on a number of occasions (see, e.g., *Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] EWCA Civ 1032; [2017] C.P. Rep. 38; [2017] 4 Costs L.R. 669, CA at [41]).

There are two aspects to the policy objectives underlying the development of the issue-based approach to costs. First, in the *Access to Justice Interim Report* (June 1995), it was stated that, as the new approach to case management (subsequently introduced by the CPR) involves "breaking down the issues which make up the litigation", the court has to be prepared "to make different orders for costs in relation to different issues to support the new approach to case management" (Section V Ch.25 para.22). Secondly, in the *Access to Justice Final Report* (July 1996) criticism was made of the fact that the English courts "are wedded to the dual concept that costs should be treated as a whole and that costs should follow the event" and it was recommended that the courts should use to the full their very wide statutory discretion over costs to support the conduct of litigation in a proportionate manner and to discourage excess" (Section II Ch.7 paras 8 and 9). In *AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 W.L.R. 1507, CA, in elaborating on that criticism, Lord Woolf MR explained that too robust application of the dual concept (a) discourages parties from being selective "as to the points they take", and (b) by enabling them to proceed on the safe assumption that, if they are successful overall they can expect to recover costs on all issues (including those on which they fail), increases costs and adds to delays. (Put shortly and colloquially, the policy objective is to discourage by costs risks a "kitchen sink" approach to litigation.)

Rule 44.2(7) states that, before the court considers making an order under r.44.2(6)(f), for example, an issue-based order, it will consider whether it is practicable to make instead an order that a party must pay "a proportion of another party's costs" (r.44.2(6)(a)) or "costs from or until a certain date only" (r.44.2(6)(c)). (Before 1 April 2013, this provision read: "Where the court would otherwise consider making an order under paragraph (6)(f), it must instead, if practicable, make an order under paragraph (6)(a) or (c).") The policy considerations underlying this provision are readily discernable. Where there are identifiable "issues" in the proceedings, so that issues on which the successful party failed can be distinguished readily from those on which that party succeeded, an "issue-based" approach is possible. However, other considerations suggest that such an approach is impractical, particularly at the assessment stage. Issues, though distinguishable, may nevertheless overlap, for example, where the same contested point of law or question of fact is relevant to two issues (and possibly is not determinative of either). It may be the position that much of the evidence, oral and documentary, could properly be said to be relevant both to issues on which the party successful overall had lost, as well as to issues on which that party had won. Further, whether there is overlap or not, it may not be possible (or at least be an extremely difficult and expensive exercise) to apportion to the several issues the discrete costs actually incurred by the parties in relation to each. See *English v Emery Reimbold & Strick Ltd (Practice Note)* [2002] EWCA Civ 605; [2002] 1 W.L.R. 2409, CA, at [115] and [116]; *SmithKline Beecham Plc v Apotex Europe Ltd (No.2)* [2004] EWCA Civ 1703; [2005] F.S.R. 24, CA, at [45]; *Multiplex Constructions (UK) Ltd v Cleveland Bridge UK Ltd* [2008] EWHC 2280 (TCC); 122 Con. L.R. 88 (Jackson J) at [72(iv)]; *Grupo Hotelero Urvasco SA v Carey Value Added SL* [2013] EWHC 1732 (Comm); [2013] 5 Costs L.R. 669 (Blair J) at [9] to [11].

In *Boynton v Williams* [2003] EWCA Civ 904, the trial judge set off the damages awarded on the counterclaim against the sums claimed, gave the claimant judgment for the balance, and awarded the claimant the costs of the entire action. In dismissing the defendants' appeal the Court of Ap-

peal rejected the submission that an issue-based order should have been made reflecting the success of the defendant on a number of issues, because matters in the claim and counterclaim were inextricably intertwined.

In *Webster v Ridgeway Foundation School* [2010] EWHC 318 (QB); [2010] 6 Costs L.R. 859 (Nicol J) the trial judge made an issue-based costs order, distinguishing a claim concerning allegations under the Human Rights Act 1998, for which costs were ordered on the indemnity basis, from other issues arising in the proceedings, for which costs were ordered on the standard basis. The judge was satisfied that the Human Rights claim was a discrete issue in the proceedings and there was sufficient clarity as to which costs were attributable to it to treat it differently from other costs.

Since the CPR came into effect, applications for issue-based orders have become common place and "a modern industry" has emerged (*Gemstar-TV Guide International Inc v Virgin Media Ltd* [2009] EWHC 3552 (Pat); (2010) 33(4) I.P.D. 33023 (Mann J)). Routinely, judges approach the matter by asking themselves three questions: first, who has won?; secondly, has the winning party lost on an issue which is suitably circumscribed so as to deprive that party of the costs of that issue?; and thirdly, is it appropriate in all the circumstances of the individual case not merely to deprive the winning party of its costs of an issue in relation to which it has lost, but also to require it to pay the other side's costs? (*Hospira UK Ltd v Novartis AG* [2013] EWHC 886 (Pat) (Arnold J)).

In many cases attention has been directed to the question whether, as r.44.2(5)(b) states, "it was reasonable for a party to raise, pursue or contest a particular allegation or issue". Frequently, that question is complicated by submissions to the effect that costs relevant to particular issues were aggravated because offers to compromise them should have been made or accepted, or because they were exaggerated. Commonly, submissions to the effect that a judge erred in either adopting or not adopting an issue-based approach have been based on arguments to the effect that certain circumstances are, not only obviously relevant, but are "principles" which, if not observed, are dispositive one way or the other. Such submissions have been resisted, both at first instance and on appeal.

The question presented for the court by r.44.2(5)(b) is whether it was reasonable for a party to pursue a particular issue. If a party is going to suggest that the other party did not behave reasonably it is good practice that they should say so in clear terms (*R. (Viridor Waste Management Ltd) v Commissioners for HM Revenue and Customs* [2016] EWHC 2502 (Admin); [2016] 4 W.L.R. 165 (Nugee J) at [13]).

The fact that the judge has such a wide discretion under r.44.2 means that predicting the outcome of an issue-based approach is extremely difficult. Different judges may take strongly diverging approaches in similar cases, without falling into error and their decisions being amenable to appeal. Criticism has been made of "a growing and unwelcome tendency" by first instance courts and by the Court of Appeal to depart from the "starting point" of the general rule "too far and too often" (*Fox v Foundation Piling Ltd* [2011] EWCA Civ 790; [2011] C.P. Rep. 41, CA, at [62], per Jackson LJ). That criticism applies principally to departures from the general rule by the adoption of an issue-based approach.

Propositions that may be derived from the authorities and which may be stated with a degree of confidence are as follows.

1.  The rules themselves impose no requirement to the effect that an issue-based costs order should be made only "in a suitably exceptional case", and none is to be implied, although "there needs to be a reason based on justice" for departing from the general rule, and that the question of the extent to which costs of a particular issue are to be disallowed should be left to the evaluation and discretion of the judge, "by reference to the justice and circumstances of the particular case" (*F&C Alternative Investments (Holdings) Ltd v Barthelemy (No.3)* [2012] EWCA Civ 843; [2013] 1 W.L.R. 548, CA, at [47] and [49] per Davis LJ (a case where a proportionate costs order, made in relation to two issues on which the parties who had succeeded overall had not succeeded, was upheld)).

2.  The reasonableness of taking failed points can be taken into account, and the extra costs associated with them should be considered (*Antonelli v Allen*, *The Times*, 8 December 2000, unrep. (Neuberger J); *Sycamore Bidco Ltd v Breslin* [2013] EWHC 583 (Ch); [2013] 4 Costs L.O. 572 (Mann J)).

3.  Where the circumstances of the case require an issue-based order in the form of an order expressed by reference to the costs of the issue, that is what the judge should make; however, generally, because of the practical difficulties which this causes, the judge should hesitate before doing so and, where practicable, the order should be expressed as a percentage or with reference to a distinct period of time (r.44.2(7)) (*Multiplex Constructions (UK) Ltd v Cleveland Bridge UK Ltd* [2008] EWHC 2280 (TCC); [2009] 1 Costs L.R. 155 (Jackson J) at [72(iv)]).

4.  There is no automatic rule requiring a successful party's costs if he loses on one or more issues (*HLB Kidsons v Lloyds Underwriters* [2007] EWHC 2699 (Comm); [2008] 3 Costs L.R. 427 (Gloster J) at [10]). The mere fact that the successful party was not successful on every last issue cannot, of itself, justify an issue-based costs order (*J Murphy & Sons Ltd v Johnson Precast Ltd (No.2)* [2008] EWHC 3104 (TCC); [2009] 5 Costs L.R. 745 (Coulson J) at [10]).

5.  The courts recognise that in any litigation, especially complex commercial litigation but

including personal injury litigation, any winning party is likely to fail on one or more issues in the case (possibly issues on which the losing party could have taken steps to protect himself, at least to an extent, to costs liability). That point is frequently made; see e.g. *Budgen v Andrew Gardner Partnership* [2002] EWCA Civ 1125 at [35] per Simon Brown LJ; *Travellers' Casualty and Surety Co of Canada v Sun Life Assurance Co of Canada (UK) Ltd* [2006] EWHC 2885 (Comm), (Christopher Clarke J) at [12]; *Goodwin v Bennetts UK Ltd* [2008] EWCA Civ 1658, at [13]; *Pindell Ltd v Airasia Berhad* [2010] EWHC 3238 (Comm) (Tomlinson LJ) at [12]; *Fox v Foundation Piling Ltd* [2011] EWCA Civ 790; [2011] C.P. Rep. 41, CA, at [47] to [49].

**Protective costs orders**

Normally, orders made by the court in the exercise of the discretion to award costs, stated in the Senior Courts Act 1981 s.51(1) and re-iterated in r.44.2(1), are made at the end of the proceedings to which they relate (whether interlocutory, final or appeal). However, the discretion is wide enough to enable the court to make an order for costs in advance, based on assumptions as to the possible outcomes (and, therefore, the possible costs liabilities) of the proceedings. Such orders are described as "protective" (or "pre-emptive", "prospective" or "anticipatory") costs orders. For general circumstances in which such orders may be made, see commentary on s.51(1) in Vol.2 para.9A-202. The power of the court to make protective costs orders and judicial review costs capping orders must be distinguished from the powers to make "costs management" orders (see Section II of CPR Pt 3 at paras 3.12 et seq above), and to make "costs capping" orders (limiting the amount of future costs which a party may recover pursuant to an order for costs subsequently made) (see Section III of CPR Pt 3 at paras 3.19 et seq above). With effect from 8 August 2016, ss.88 to 90 of the Criminal Justice and Courts Act 2015 removed the ability of the High Court and the Court of Appeal to make costs capping orders in judicial review proceedings unless specified criteria are met (for texts of these sections, see Vol.2 paras 9A-1312+ to 9A-1314+). The rules of court supporting this regime are contained in Section VI of Pt 46. This dedicated form of costs order is defined as a "judicial review costs capping order" (JRCCO) (r.46.16(1)(a)). The general principles and procedure relating to JRCCOs are set out in paras 24.2 and 24.3 of the Administrative Court Judicial Review Guide (Vol.2 paras 1BA-144 and 1BA-145). See further paras 46.16.1 and 54.6.3 below.

**44.2.11**

**Rule 44.2(8): Payment on account of costs**

The rule stated in para.(8) of r.44.2 came into being as a consequence of the recommendations made in the *Access to Justice–Final Report (July 1996)* Ch.7 para.40, and was revised following recommendations made in the *Review of Civil Litigation Costs–Final Report (December 2009)* Ch.45 para.5.10.

The rule provides that where the court orders a party to pay costs subject to detailed assessment, "it will order that party to pay a reasonable sum on account of costs, unless there is good reason not to do so". The object of the rule is to enable a receiving party to recover part of his expenditure on costs before the possibly protracted process of carrying out a detailed assessment (*Days Healthcare UK Ltd v Pihsiang Machinery Manufacturing Co Ltd* [2006] EWHC 1444 (QB); [2006] 4 All E.R. 233 (Langley J)). This may be important, particularly (but not only) in cases where the paying party has limited resources and the receiving party would otherwise be forced to engage in detailed assessment proceedings before receiving any money at all (*Allason v Random House UK Ltd*, 27 February 2002, unrep., (Laddie J)). The making of an order under the rule may have the effect of reducing the points of dispute in the detailed assessment proceedings and of discouraging the paying party from seeking to prolong such proceedings (*Mars UK Ltd v Teknowledge Ltd* [2000] F.S.R. 138 (Jacob J) at 153). It may also avoid an application for an interim costs certificate under r.47.16 (which may only be made after the receiving party has filed a request for a detailed assessment hearing).

The power to order a payment on account applies to all proceedings to which the general rules about costs in CPR Pt 44 apply. Such payments are routinely ordered in general litigation in the King's Bench Division and the Chancery Division and may be ordered in proceedings in the Administrative Court (which is part of the KBD); e.g *R. (London Oratory School) v The Schools Adjudicator* [2004] EWHC 3014 (Admin); [2005] E.L.R. 162 (Jackson J), where an order was made in favour of a successful claimant, a charitable body which was bound to recover a substantial sum by way of costs.

In *Bank St Petersburg PJSC v Arkhangelsky* [2018] EWHC 2817 (Ch) (Hildyard J), where the trial judge gave judgment for the claimants with costs and refused the defendants (D) permission to appeal, the judge rejected D's submission that their inability to pay could constitute good reason for not making an interim payment order under r.44.2(8). That there are costs orders in both directions may not be a reason to refuse only one party a payment on account: *Benyatov v Credit Suisse Securities (Europe) Ltd* [2020] EWHC 682 (QB) (Roger Ter Haar QC).

The court has jurisdiction to order a payment on account of costs where a costs order is deemed to have been made under the provisions of r.44.9 on discontinuance of a claim: *Barnsley v Noble* [2012] EWHC 3822 (Ch) (Proudman J). The court may also order a payment on account of costs following the acceptance of a Part 36 offer within the relevant period: *Global Assets Advisory Services Ltd v Grandlane Developments Ltd* [2019] EWCA Civ 1764. There was no reason to conclude that the power to make such an order could only be exercised by the judge who heard the substantive proceedings.

**44.2.12**

Where in proceedings arising out of catastrophic injuries at birth, the defendant's liability had been agreed at 90%, the claimant would recover more than the interim payments of damages, no Part 36 offer had been made and damages would not be assessed for another three years, it was appropriate that the defendant should be ordered to pay the claimant's costs of quantum to date and should pay a substantial sum on account of those costs: *I v Hull & East Yorkshire Hospitals NHS Trust* 25 February 2019, unrep. (HH Judge Robinson, Sheffield County Court). The Court of Appeal refused to grant permission to appeal.

Before the reforms taking effect on 1 April 2013, the comparable provision (r.44.3(8)) was in broader terms than that now contained in r.44.2(8) and stated that, where the court has ordered a party to pay costs, "it may order an amount to be paid on account before the costs are assessed". In a number of cases it was emphasised that the court had a wide discretion, both as to whether it should or should not make an order and as to the amount. After the tightening up of the rule in both respects ("will order" and "a reasonable sum", subject only to the proviso "unless there is good reason not to do so"), such guidance as could be derived from those cases has now to be treated with appropriate caution.

In *Blakemore v Cummings (Practice Note)* [2009] EWCA Civ 1276; [2010] 1 W.L.R. 983, CA, where a receiving party, who had delayed in making an application for detailed assessment, applied for a further payment on account, the Court of Appeal held (1) that the delay was a proper consideration for the judge to take into account, and (2) that the consideration that a receiving party should not be kept out of moneys which will almost certainly be demonstrated to be due to him any longer than is necessary was important, and would normally carry significant weight, but gave rise to no presumption.

In the case of *PIP Breast Implant Litigation* [2015] EWHC 1151 (QB) (Thirlwall J), the judge, having ordered the defendants to pay the claimants' costs of and occasioned by the adjournment of the trial (pending the resolution of litigation between the defendants and their insurers), went on to order a payment on account of those costs even though the claim was funded by conditional fee agreements and the claimants were not (or not yet) the successful parties. (The CFAs contained (as is commonly the case) a provision that the claimants would be liable to pay their solicitors if an order for payment on account was made in their favour. The judge rejected the defendants' submission that a payment on account order would involve a breach of the indemnity principle.)

Necessarily, the determination of "a reasonable sum" involves the court in arriving at some estimation of the costs that the receiving party is likely to be awarded by the costs judge in the detailed assessment proceedings or as a result of a compromise of those proceedings. In a case of any complexity, the evidence and submissions arguably relevant to that exercise may be extensive. The court has to guard against the risk that it may be drawn into costly and time-consuming "satellite" litigation. There is no rule that the amount ordered to be paid on account should be the "irreducible minimum" of what may be awarded on detailed assessment (*Gollop v Pryke*, (Warren J)). The relevant authorities were reviewed in *Excalibur Ventures LLC v Texas Keystone Inc* [2015] EWHC 566 (Comm), (Christopher Clarke LJ), where the judge concluded that what is "a reasonable sum on account of costs" will have to be an estimate dependent on the circumstances, the chief of which is that there will, by definition, have been no detailed assessment and thus an element of uncertainty, the extent of which may differ widely from case to case as to what will be allowed on detailed assessment. The judge explained ([23] and [24]) that a reasonable sum would often be one that was an estimate of the likely level of recovery subject, to an appropriate margin to allow for error in the estimation. This can be done by taking the lowest figure in a likely range or making a deduction from a single estimated figure or perhaps from the lowest figure in the range if the range itself is not very broad. In determining whether to order any payment and its amount, account needs to be taken of all relevant factors including the likelihood (if it can be assessed) of the claimants being awarded the costs that they seek or a lesser and if so what proportion of them; the difficulty, if any, that may be faced in recovering those costs; the likelihood of a successful appeal; the means of the parties; the imminence of any assessment; any relevant delay and whether the paying party will have any difficulty in recovery in the case of any overpayment.

The procedure contained in Section II of CPR Pt 3 for the filing, exchange, and approval by the court of the costs budgets of parties (introduced as part of the costs reforms taking effect from 1 April 2013) significantly affects the approach of the court to orders for payments on account of costs. The procedure is designed to control costs in proceedings to which it applies, to make the level of costs likely to be incurred by the parties predictable, and to restrict costs recoverable by parties to sums stated in approved budgets. In cases where the court has made a costs management order under r.3.15, the receiving party's budget, insofar as it has been agreed between the parties or approved by the court, may be a sensible starting position for determining the "reasonable sum" to be paid on account under r.44.2(8). That is because, on detailed assessment, the court will not depart from an agreed or approved budget unless satisfied that there is good reason to do so (r.3.18(b)) (see *Thomas Pink Ltd v Victoria's Secret UK Ltd* [2014] EWHC 3258 (Ch); [2015] 3 Costs L.R. 463 (Birss J), where payment on account ordered in sum amounting to 90% of the claimant's approved budget).

Where an application for an order is made to a judge at the end of a trial the judge has the advantage of having detailed knowledge of matters likely to affect the outcome of the detailed assessment and his assessment is likely to be close to the figure the costs judge will arrive at. By

contrast, where an application for a payment on account is brought before a judge who knows very little about what has gone on between the parties and the breadth of the dispute between them, the judge, though clearly not lacking jurisdiction to make an order, is at a considerable disadvantage. In *Beach v Smirnov* [2007] EWHC 3499 (QB), (Ouseley J), where the claimant recovered substantial damages for catastrophic personal injuries, it was held that the fact that there may be difficulties of assessment (large sums involved and great disputes) should not inhibit a judge from making an order, provided there can be a reasonable assessment of the sum that is very likely to be awarded. In *Dyson Ltd v Hoover Ltd (No.4)* [2003] EWHC 624 (Ch); [2004] 1 W.L.R. 1264 (Laddie J), where in advance of an inquiry as to damages in a patent action the parties settled and the successful claimants applied for an interim payment on account of its costs of the inquiry (estimated to be in excess of £2.5 million) the judge dismissed the application principally (but not solely) on the ground that, in the circumstances, he was not in a position to make an informed and reasoned assessment of the costs likely to be payable. An unexpectedly high claim for a payment on account by a litigant in person, which would require detailed examination, was a good reason not to make an order: *Invenia Technical Computing Corp v Hudson* [2024] EWHC 1481 (KB).

In *German Property 50 SARL v Summers-Inman Construction and Property Consultants LLP* [2009] EWHC 2968 (TCC); [2010] B.L.R. 179 (Coulson J), the claimant's (C) claim was struck out and the defendant's (D1) Pt 20 claim against a third party (D2) was discontinued on terms that D1 would pay D2's costs, agreed at £250k. The judge ordered that C should pay (1) D1's costs of defending C's claim, (2) the costs which D1 had incurred in bringing the Pt 20 claim, and (3) the costs which D1 had to pay to D2 in the amount agreed. On D1's application for a payment on account the judge noted that in contemporaneous TCC cases such payments had been ordered at a figure of about 50% of the total costs and (1) held that the sum paid by D1 to D2 was a reasonable settlement of a claim for costs which was recoverable by D1 from C in full, and (2) ordered that C should make a payment on account of £355k made up of 50% of D1's costs in the main action plus the whole of the £250k paid by D1 to D2.

Under the court's general powers of case management the court may order the stay of an order for payment of costs on account (r.3.1(2)(g)), and may grant a stay, either at the time of making the order or subsequently (e.g. *Amin v Amin* [2011] EWHC 641 (Ch) (Warren J)).

The question whether a stay should be granted is likely to arise where an application for permission to appeal is pending (e.g. *Renewable Power & Light Plc v Renewable Power & Light Services Inc* [2008] EWHC 3584 (QB), (Lewison J)) or where such application has been granted (e.g. *Ackerman v Ackerman* [2012] EWCA Civ 768; [2012] 4 Costs L.R. 746). Unless the appeal court or the lower court orders otherwise, an appeal does not operate as a stay of execution of any order for payment on account made by the lower court (CPR r.52.16). Conceivably, the paying party applying for a stay may be the would-be appellant or the putative respondent, but most likely the former. In this respect and others the circumstances in which a stay may be sought pending appeal can differ significantly, and the facts relevant to the exercise by the court (whether appeal or lower) of its discretion can vary enormously. Guidance as to the manner in which the discretion should be exercised can be found in the authorities dealing with stay pending appeal of execution of orders generally, and the imposing of conditions on permission to appeal (see commentary following r.52.16 and r.52.18).

Where a paying party has refused to comply with orders requiring them to make a payment on account towards the receiving party's costs a costs judge dealing with the detailed assessment proceedings has the power to make an unless order, stipulating that unless the order was complied with the party in default would be debarred form participating further in the detailed assessment proceedings (*Days Healthcare UK Ltd v Pihsiang Machinery Manufacturing Co Ltd* [2006] EWHC 1444 (QB); [2006] 4 All E.R. 233 (Langley J)). However even where the paying party is in default, there may be good reason not to make a debarring order, for example where the paying party has a right of set off (*Kaneria v Kaneria* [2016] EWHC 2823 (Ch), (Catherine Newman QC))

Where an amount has been paid by one party to another in compliance with an order for payment on account of costs, and subsequently the court orders that the whole or a part of that amount should be repaid, the court has power to order that the repayment should include interest (*Multiplex Constructions (UK) Ltd v Cleveland Bridge UK Ltd* [2008] EWCA Civ 133; 118 Con. L.R. 16, CA). This power resides either in r.52.10(2)(d) or in r.44.2(6)(g) read in the context of r.44.2(8) (formerly, respectively r.44.3(6)(g) and r.44.3(8)). In *Reed Executive Plc v Reed Business Information Ltd* [2004] EWCA Civ 887; [2004] 4 All E.R. 942, CA, the Court of Appeal (at [7]) ordered that the interest should be calculated, not at the judgment debt rate, but at the commercial rate.

## Rule 44.2(2)(a): The general rule—"successful and unsuccessful" parties

If the court decides to make an order about costs, the general rule is that the "unsuccessful party" will be ordered to pay the costs of the "successful party" (r.44.2(2)(a)); but the court may make a different order (r.44.2(2)(b)). If, following the general rule, an unsuccessful party is ordered to pay the costs of the successful party, as opposed to part of those costs, the unsuccessful party must pay the whole of the costs, subject to assessment. The overall concern of the court must be to make the order which justice requires; an order in favour of the successful party is generally to be adopted as calculated to achieve this end (*Bank of Credit and Commerce International SA v Ali* (1999) 149 N.L.J. 1734, [7] (Lightman J)). The general rule accrues to the benefit of the successful

**44.2.13**

party. Cases have arisen in which the judge has concluded that there is no clear successful party (or "winner") and therefore no presumption that the general rule applies (e.g. *Cantor Gaming Ltd v GameAccount Global Ltd* [2007] EWHC 1914 (Ch); [2007] E.C.C. 24; [2008] F.S.R. 4; [2007] L.L.R. 591 (D.S. Alexander QC)). An order (for example) that, in all the circumstances, the unsuccessful party should pay, not the whole of the successful party's costs, but only a percentage of those costs would not be an order in accordance with "the general rule", but would be "a different order"; as too would be an order that the successful party should pay the unsuccessful party's costs, or a proportion thereof, or that each party should bear their own costs (see para.44.2.6 above).

In Pt 36 (Offers to Settle), r.36.17 (Costs consequences following judgment) applies where, upon judgment being entered, a claimant fails to obtain judgment "more advantageous" than a defendant's offer, or judgment against the defendant is "at least as advantageous" to the claimant as the offer. The question whether a judgment is or is not "more advantageous" or "at least as advantageous" for a party in that context is distinct from the question whether a party is or is not a "successful party" in the context of r.44.2. Part 36 is a separate, self-contained code and has to be applied as such (*Shovelar v Lane* [2011] EWCA Civ 802; [2012] 1 W.L.R. 637, CA, at [52] per Ward LJ).

In deciding what order (if any) to make, including in deciding whether to make an order in accordance with "the general rule" or "a different order", the court "will have regard to all the circumstances", including the circumstances listed in r.44.2(4), as elaborated in r.44.2(5).

As a practical matter, r.44.2(2) poses two questions: (1) who is the successful party? (and who is the unsuccessful party?), and (2) when should the general rule be applied? (or not applied?). The two questions tend to get conflated and therefore muddled.

In *Widlake v BAA Ltd* [2009] EWCA Civ 1256; [2010] 3 Costs L.R. 353, CA, the Court of Appeal stated ([21]) that, because the court must take into account all the circumstances of the case when it exercises its discretion as to costs, every case will depend on its own facts; consequently, although points of principle may be derived from decided cases, generally a close analysis of the facts of such cases will not be very enlightening. That observation applies to the task of identifying who was the successful party as much as to any other aspect of the court's discretion as to costs.

On numerous occasions the Court of Appeal has emphasised that where a particular party is the successful party it is important that proper weight be attached to that and that judicial reasoning towards a costs order which justice requires should start with the general rule that the unsuccessful party should pay his or her costs. In *ACT Construction v Mackie* [2005] EWCA Civ 1336, CA a building contractor (C) brought a claim against householders (D) for the balance due and D entered a defence and made a counterclaim (alleging that the work was incomplete). At trial the judge awarded C £22,000 on its claim (being 60% of the amount claimed) and D £4,500 on their counterclaim (being 25% of the amount claimed). In the course of trial the judge granted an application made by C for permission to call additional witnesses. As to costs the judge made two orders to the effect (1) that D should pay C 80% of his costs, and (2) that C should pay D 100% of their costs. On appeal by C the Court of Appeal found that the judge had erred as his orders did not sufficiently reflect the fact that C was overall the successful party. The Court held (1) that D should pay C 75% of his costs of the claim and of defending the counterclaim, and (2) that the second order should be quashed. The court explained (1) that C was the successful party and that (as the trial judge had determined) some deduction in the costs payable to him was justified, principally because of the time taken up by the late application to call further evidence and the consequences of that, and (2) that, in the circumstances, there was no justification for an order entirely in D's favour on the counterclaim.

In this context, the successful party is the party successful in the proceedings, and not a party successful on a particular issue (*Kastor Navigation v AGF MAT* [2004] EWCA Civ 277; [2005] 2 All E.R. (Comm) 720; [2004] 2 Lloyd's Rep 119, CA, [143], where the claimants succeeded to the full extent of their claim, but only on one of the alternative ways in which they put the claim). The identification of the successful party is often a contentious matter; this is not surprising given the multifarious circumstances in which civil proceedings may arise, and the complexity of much of it (*Pindell Ltd v AirAsia Berhad* [2010] EWHC 3238 (Comm), [4] (Tomlinson LJ)). Numerous attempts have been made (none wholly successful) to state in a short compass how the successful party may be identified. For example, in *Roache v Newsgroup Newspapers Ltd* [1998] E.M.L.R. 161, CA, Sir Thomas Bingham MR said: "The judge must look closely at the facts of the particular case before him and ask: who as a matter of substance and reality has won?" Further, it has been said that "success" is not a technical term but "a result in real life" to be determined with the "exercise of commonsense" (*Bank of Credit and Commerce International SA v Ali*, op cit); that "to recover judgment for more than what was offered is legitimately regarded as success" (*Gibbon v Manchester City Council* [2010] EWCA Civ 726; [2010] 1 W.L.R. 2081, CA, [40]); and that in money claims the most important thing "is to identify the party who is to pay money to the other even in a case of personal injury" (*A L Barnes v Time Talk (UK) Ltd* [2003] EWCA Civ 402; [2003] B.L.R. 331, CA, at [28]; *Widlake v BAA Ltd* [2009] EWCA Civ 1256; [2010] P.I.Q.R. P4 at [36]), by deciding "who has to write the cheque at the end of the case" (*Day v Day* [2006] EWCA Civ 415; [2006] C.P. Rep. 35, CA, at [17] per Ward LJ). In *Widlake*, op cit, the Court of Appeal recognised some differences in the approach of the courts to determining which party was the unsuccessful party and attempted to reconcile those differences. In group litigation a limited number of claimants were successful at the

trial of preliminary issues and some were unsuccessful. It was inappropriate to view the claimants as a whole as successful on the basis of who has to write the cheque and the appropriate order was no order as to costs: *Atlasjet Havacilik Anonim Sirketi v Kupeli* [2018] EWCA Civ 1264.

Where private law proceedings are settled it is usually possible to identify with some precision the extent to which a party has been vindicated. However, as the Court of Appeal explained in *R. (Tesfay) v Secretary of State for the Home Department* [2016] EWCA Civ 415; [2016] 1 W.L.R. 4853, CA, for various reasons the position following compromise of public law proceedings, in particular judicial review claims, is often not so clear cut (see further para.44.2.30 below).

Where a defendant (D1), in order to protect his position, joins another party (D2) as an additional party, and the claimant's (C's) claim against D1 is dismissed, with the result that D1's claim against D2 is also dismissed, both D1 and D2 are successful parties, and according to the general rule, C would be liable for D1's costs and D1 for D2's costs. In all likelihood, the costs payable by D1 to D2 would be recoverable by D1 from C, but where C was impecunious, D1 would be faced with the prospect of being doubly out of pocket (being unable to recover any costs from C whilst remaining liable in costs to D2). In *Johnson v Ribbins* [1977] 1 W.L.R. 1458, CA, the Court of Appeal stated that, nevertheless, it would not be right to deprive D2 of his costs as against D1. In *Arkin v Borchard Lines Ltd (Nos 2 & 3)* [2005] EWCA Civ 655; [2005] 1 W.L.R. 3055, CA, the Court held that, in the ordinary run of cases under the CPR, the same principle will be applied.

Where two parties, whether co-claimants or co-defendants, are both successful parties, prima facie their unsuccessful opponent faces the prospect of being liable for two sets of costs. Obvious unfairness to the paying party would arise where the cases run by the successful parties were identical or virtually the same with their respective costs being incurred, not only for the same end, but by the same means. The authorities demonstrate that, in certain circumstances, one successful party may be denied their costs (in whole or in part), especially where the fact that that party is a public body is an added circumstance affecting the exercise of the court's discretion as to costs. The relevant law was explained in *Berkeley Burke SIPP Administration LLP v Charlton (Costs)*, 3 October 2017, unrep. (Teare J), where a financial services company brought an arbitration claim against an investor under the Arbitration Act 1996 s.69 alleging an error of law in arbitral proceedings. The claim was made on the basis that an award in favour of D made by the Financial Services Ombudsman (X) upon a complaint against C made by D was an award to which s.69 applied. X intervened in the proceedings and joined D in successfully submitting (at the hearing of the point as a preliminary issue) that X's award had not been given pursuant to an arbitration agreement and therefore s.69 did not apply. On the matter of costs the judge ruled that X's interest was not of sufficient force to make it appropriate to order C to pay, not only D's costs, but also X's costs. X was a public body, it had incurred costs in establishing the position in its general interest, and there was no prejudice if an order for payment of its costs was not made. See further, *Ryanair Holdings Plc v Competition and Markets Authority* [2015] CAT 15; [2015] Comp A.R. 312; *Bolton MDC v Secretary of State for the Environment (Practice Note)* [1995] 1 W.L.R. 1176, HL; *Cadbury UK Ltd v Comptroller General of Patents Designs and Trade Marks* [2016] EWHC 3055 (Ch); [2016] Bus. L.R. 872 (John Baldwin QC). As to the "two sets of costs" question in judicial review proceedings, see para.44.2.33 below.

Where a claimant (C) brings a claim against one defendant (D1), and in the alternative, a similar claim against another defendant (D2), and succeeds against one (say D1) but fails against the other (D2), generally D1 will be liable in costs to C, but C will be liable to D2. However, the relationship between D1 and D2 may be such as to require costs orders to different effect. In *Threlfall v ECD Insight Ltd* [2013] EWCA Civ 1444; [2014] 2 Costs L.O. 129, CA, the former employee (C) of a company (D1) brought a contractual claim against D1 and its sole director and shareholder (D2). At trial, C succeeded against D1 but failed against D2. Accordingly the judge gave judgment for C and, on basis that D1 was substantively liable but D2 was not, ordered D1 (subsequently insolvent) to pay C's costs. In doing so, the judge rejected C's submission that D1 and D2 should be jointly and severally liable for his costs. The Court of Appeal allowed C's appeal, substituting an order that D2 should pay C's costs. The Court explained that C's application for costs against D2 "should be considered by analogy" with a claim for costs against a non-party. The important point about such orders is that they are ex hypothesi made against persons against whom there is no substantive cause of action. In circumstances where a non-party costs order would have been justified had the successful party not been a party, it would be wrong for that party to avoid liability for costs simply because it had been joined as a party. The analogy with non-party costs orders where there are two defendants, one successfully defending the claim and the other not, was referred to by the Court of Appeal again in *Grizzly Business Ltd v Stena Drilling Ltd* [2017] EWCA Civ 94, CA. In that case the claimant (C) brought proceedings for recovery of a fee under a consultancy agreement, initially solely against an English company (D1), but upon D1 contending that it was not the contracting party, C joined as a second defendant an associated company (D2) (a Bermudan company with nominal assets) and made an alternative claim against it. Thereafter D1 controlled and funded the defences of both defendants. At trial the judge held that D2 and not D1 were the contracting party and gave judgment for C accordingly. In these circumstances the Court of Appeal, invoking the analogy with non-party costs orders, declined to interfere with the judge's proportionate order that D1 should pay 90% of C's costs. The reduction of 10% reflected the fact that D1 had succeeded on the issue of which defendant was contractually liable.

In *Fox v Foundation Piling Ltd* [2011] EWCA Civ 790; [2011] C.P. Rep. 41, CA, the Court of Appeal noted that a large number of authorities have accumulated around the provisions of Pt 36 (Offers to Settle) and their interrelationship with r.44.2 ([36]), including a number of decisions of the Court of Appeal itself (e.g. *Painting v University of Oxford* [2005] EWCA Civ 161; [2005] 3 Costs L.R. 394, CA; *Hall v Stone* [2007] EWCA Civ 1354; [2008] 3 Costs L.R. 450, CA; *Morgan v UPS* [2008] EWCA Civ 1476; [2009] 3 Costs L.R. 384, CA; *Widlake v BAA Ltd* [2009] EWCA Civ 1256; [2010] 3 Costs L.R. 353, CA; *Gibbon v Manchester City Council* [2010] EWCA Civ 726; [2010] 1 W.L.R. 2081, CA). After reviewing the authorities (not ad idem in all respects) Jackson LJ, in giving the lead judgment of the Court, explained ([46]) that a not uncommon scenario is that both parties turn out to have been over-optimistic in their Part 36 offers. The claimant recovers more than the defendant has previously offered to pay, but less than the claimant has previously offered to accept. The Court held that in such a case the claimant should normally be regarded as "the successful party" within r.44.2(2). Where a claimant has been forced to bring proceedings in order to recover the sum awarded, and has done so, his claim has been vindicated to that extent. The Court deprecated what it saw as "a growing and unwelcome tendency" for courts to depart "too far and too often" from the "starting point" set out in r.44.2(2)(a) ([62]). The next stage is to consider whether, in all the circumstances, "a different order" should be made, including the particular circumstances in r.44.2(4).

In three earlier Court of Appeal cases the defendant was identified as the successful party even though the claimant had been awarded damages. In *Islam v Ali* [2003] EWCA Civ 612, CA, the claimant recovered more than the defendant offered, but still only 10% of what he claimed. In *Painting v University of Oxford* [2005] EWCA Civ 161; [2005] 3 Costs L.R. 394, CA, the claimant recovered around £25,000 in a claim she had valued at £400,000. In *Marcus v Medway Primary Care Trust* [2011] EWCA Civ 750; [2011] P.I.Q.R. Q4, a case in which no offers were made, the claimant recovered £2,000 on a claim for £525,000.

The controversy apparently settled by the decision of the Court of Appeal in *Fox v Foundation Piling Ltd*, op cit, may be a sterile one, as even if the claimant who narrowly betters a Part 36 offer is to be regarded as the successful party, notwithstanding the general collapse of its case, an award of costs to that claimant is only a starting point, and the starting point may be modified having regard to the claimant's failure on specific issues. Where a claimant exaggerates or falsifies aspects of its case, the starting point may also be departed from on grounds of misconduct. The outcome in cases like *Painting*, op cit, can readily be justified on both grounds, as in that case the claimant lost on the issue which dominated the trial, and was moreover exposed in deliberately exaggerating her claim. In the *Marcus* case, op cit, the majority, having held that the defendants were the winners, awarded them 75% of their costs; the dissenting judge (Jackson LJ), while concluding that the claimant was the successful party, was of the opinion that he should be awarded (as the trial judge had ruled) only 50% of his costs (while considering even that rather generous).

To the extent that there are inconsistencies in the authorities, and excepting instances where damages are nominal or derisory, it is submitted that the approach in the line of cases endorsed by the Court of Appeal in *Fox v Foundation Piling Ltd*, op cit, is generally to be preferred. Where a money claim is brought and the claimant recovers more money by pressing the litigation than it would have been able to recover without doing so, then that claimant is the successful party. Prima facie that claimant will be entitled to its costs, but subject always to the court's power to modify that outcome if that is what the justice of the case demands.

### Where there is success both ways (claims and counterclaims and costs of issues)

**44.2.14**    Where there is a claim and a counterclaim and each party succeeds on one the usual order is that each party has the costs of the claim in which they succeeded. However as Denning LJ noted in *Chell Engineering Ltd v Unit Tool and Engineering Co Ltd* [1950] 1 All E.R. 378, CA (at 383E), where both parties succeed, in most cases it will be desirable that the judge should consider whether a special order should be made as to costs "because the issues are often very much interlocked, and the usual order does not always give a just result". A counterclaim may be by way of a defence to the claim, raising the same issues as the claim, or it may be a cross-action, raising unrelated issues. In most cases therefore an order giving the overall winner a proportion of its costs may be preferable to orders for costs going in opposite directions.

In deciding what order to make the court may also wish to consider the "rule in *Medway Oil*" as to the assessment of costs where one party succeeds on and is awarded the costs of the claim and the other succeeds on and is awarded the costs of the counterclaim. In short, the party who is awarded the costs of the counterclaim will, on assessment, be allowed only those costs which are specifically referable to the counterclaim. All of the other costs will be costs of the claim and will not be apportioned between claim and counterclaim. The party who is awarded the costs of the counterclaim but ordered to pay the costs of the claim may therefore be at a particular disadvantage if the same issues arise in both the claim and the counterclaim. In *Medway Oil and Storage Co Ltd v Continental Contractors Ltd* [1929] A.C. 88, HL, the claimant failed in its claim and the defendant failed in its counterclaim and both were dismissed with costs. The headnote, which has always been taken as accurate, states: (1) where a claim and counterclaim are both dismissed with costs, upon the taxation of the costs, the true rule is that the claim should be treated as if it stood alone and the counterclaim should bear only the amount by which the costs of the proceedings have been

increased by it, (2) no costs not incurred by reason of the counterclaim can be costs of the counterclaim, (3) in the absence of special directions by the court there should be no apportionment, (4) the same principle applies where both the claim and the counterclaim have succeeded. The order made by the Court of Appeal ([1928] 1 K.B. 238, CA) had provided that where the matters in controversy were common to both claim and counterclaim, the costs, so far as common to both, should be apportioned by the costs judge. In setting aside that order, Viscount Haldane LC observed that the rule chosen by the House of Lords had the advantage of being intelligible, definite and capable of being easily applied by costs judges, and lifted the subject out of "the somewhat vague regions of apportionment" (above at 98). His lordship conceded that the principle "may work out apparently harshly in exceptional cases"; the remedy in such an event is for the aggrieved party "to apply at the trial for special directions as to issues and details" (above). Further, to avoid harshness, the costs judge should supervise the costs of claim and counterclaim closely and "split up" (i.e. divide) costs of items which are required by both (e.g. by splitting a single brief fee for both claim and counterclaim into two notional fees, one attributable to the claim and the other to the counterclaim) (above at 102).

Making an issue-based costs order may not avoid the harshness of the rule in *Medway Oil*, for the same principle will apply. In *Cinema Press Ltd v Pictures and Pleasures Ltd* [1945] K.B. 356, CA, judgment was given for the claimant for £5 with costs, save that the costs on the issue of damages after the date of payment of the sum of £25 into court should be the defendant's. The Court explained (1) that the rule in *Medway Oil* applied where the costs of an issue are ordered to be borne by the party to whom the general costs of the action are given; and accordingly (2) that there was no difference for this purpose between (a) a case where the plaintiff succeeds on his claim and loses on the counterclaim, and (b) one in which he succeeds on one issue in his claim and is defeated on another. The rule in *Medway Oil* applies in both cases. (See also *Dyson Technology Ltd v Strutt* [2007] EWHC 1756 (Ch); [2007] 4 Costs L.R. 597 (Patten J).) The problem of determining "the amount by which the costs of the proceedings have been increased" by, as the case may be, a counterclaim, some particular issue, or part of the proceedings, can be a very difficult one and leads to complicated assessments. In the *Cinema Press* case the Court of Appeal thought it was one worth avoiding and urged that if the whole costs of the action are not intended to be given to a party, judges should award costs in such proportions as they think fair.

A common situation is where C sues for a debt and D counterclaims for damages for breach of contract or negligence. Most of the costs will be incurred on the counterclaim and the usual order may not produce a just result. In *Burchell v Bullard* [2005] EWCA Civ 358; [2005] C.P. Rep. 36, CA, a builder (C) sued property owners (D) for £18,000 for work done. D defended and brought a counterclaim against C for £108,000 for defective work. Most of the parties' costs were incurred in contesting the counterclaim. The trial judge gave judgment for C in full on his claim with costs, and judgment for D for £14,000 on their counterclaim with costs. On C's appeal the Court of Appeal accepted that if the costs orders stood the application of the rule in *Medway Oil* at detailed assessment would have resulted in an injustice to C as he might recover perhaps only 25% of his trial costs, because "most of the contest centred on the counterclaim". The Court held that (1) the judge had erred in principle in making his order as to costs, because he had fettered his discretion by not considering the alternatives to an order following the general rule (apart from the issue based alternative which he properly rejected on complexity grounds), (2) the starting point was that C (as the successful party) was entitled to his costs of the proceedings, that it so say, the costs of the claim and counterclaim taken together, and (3) in the circumstances, the appropriate order was that D (as the unsuccessful party) should pay C 60% of those costs.

This approach is preferable both to an issue-based costs order and to an order giving special directions as to assessment designed to avoid the rule in *Medway Oil*. An example of the latter is *NV Amsterdamsche Lucifersarbrieken v H & H Trading Agencies Ltd* [1940] 1 All E.R. 587, CA ("the Dutch match case"), where the claim had been admitted at an early stage and where most of the costs had been incurred on D's successful counterclaim but the usual cross-orders as to costs had been made at trial. On appeal, the Court of Appeal ordered that D's costs should be assessed as if they were successful on the only matter litigated and that C should recover only limited costs after its claim had been admitted. A more recent example is *Connell v Mutch* [2012] EWCA Civ 1589; [2013] C.P. Rep. 11, CA. D was ordered to pay C's costs of the claim and C was ordered to pay D's costs of the counterclaim. The court then issued guidance to the costs judge as to how the assessment should be conducted. In dismissing C's appeal, the Court of Appeal said that most judges would simply have awarded C a proportion of his costs; that was best practice, as reflected by r.44.2(7), and it would have been preferable had the judge adopted that course. However no order could be safely substituted for the judge's order which would reliably carry through his assessment of the manner in which the relative levels of success and failure should be reflected in the costs and it would be a costly exercise to remit the matter for the judge to craft such an order. No encouragement should be given to such appeals.

In *Universal Cycles Plc v Grangebriar Ltd* [2000] C.P.L.R. 42, CA, C succeeded on its claim for the price of goods sold (£109,000), and D succeeded on its counterclaim for damages on the basis that the goods were defective (£25,000 as against £79,000 claimed). The trial had been spent mostly on establishing whether C or D were responsible for the defective state of the goods, and on that issue D had succeeded (though "not to anything like the extent claimed"). Instead of making the usual

cross-orders for costs the judge ordered that C should pay half of D's costs, but that D should pay C's costs up to the service of defence and counterclaim. The effect of C having to pay half of D's costs would have meant that C would have to pay D more in costs than D would have to pay C in satisfying the judgment on the claim. The Court of Appeal allowed C's appeal, (1) holding that the judge had erred in adopting an approach which had that effect, and (2) substituting an order that D should pay C's costs other than the costs of the trial hearing itself, and otherwise making no order as to costs. The Court noted that apparently the judge had felt it appropriate "to take up the invitation" in *Medway Oil*, to make a special order, effectively apportioning costs to achieve a result which was just in the circumstances. However where the claim succeeds on some issues and not on others, it is one thing to award the claimant only a portion of his own costs; but it is quite another thing to order him to pay the costs of the other side in establishing his rights. The judge was trying to reflect the amount of time that had been devoted to the substantive issues in dispute, but in doing so had failed to take two relevant points into account: (1) whether D had admitted liability or whether D had effectively forced C to go to court, and (2) the extent to which either side protected themselves against costs by making a realistic assessment of the likely outcome.

In *The Square Mile Partnership Ltd v Fitzmaurice McCall Ltd* [2006] EWHC 236 (Ch) (Mann J), the judge held that, in the circumstances, it was appropriate to treat both parties as successful; to treat the claimant (C) as such because it got a substantial judgment, and to treat the defendant (D) as such because it resisted a very large part of the claim and succeeded on the counterclaim. The judge explained that, as to costs in these circumstances, the starting point was that C should be awarded the costs of the claim, and D the costs of the counterclaim, but noted that that was not an order which the parties would welcome (because of the difficulties it would raise on assessment). Taking that into account, and also the time, effort and costs consumed in dealing with various issues at trial, the appropriate order was to make no order as to costs, leaving each side to bear their own.

In *Horth v Thompson* [2010] EWHC 1674 (QB); [2011] 3 Costs L.O. 249 (Rafferty J), a road traffic accident case, liability as between the claimant (C) and the defendant (D) was apportioned as, respectively, 35% and 65%, and the damages awarded to C on his claim exceeded by £311 those awarded to D on his counterclaim. The trial judge ordered that each party should pay the costs of the other. The amount of base costs actually incurred by each party was about the same (£5,800), but the costs recoverable by D (who had the benefit of a CFA) from C (who did not) was more than double that amount (£13,000). On appeal by C it was held that the trial judge's decision was "well within reasonable limits" and not wrong because it did not reflect the apportionment of liability.

### Proceedings to which the general rule does not apply

**44.2.15**   Rule 44.2(3) states that the general rule, that is the rule that if the court makes an order as to costs, the unsuccessful party will be ordered to pay the costs of the successful party, "does not apply" to the family and probate proceedings in the Court of Appeal listed therein. That provision does not prevent the Court of Appeal from making a costs order in accordance with the general rule or perhaps even (in a particular case) from taking the general rule as its "starting point" when considering what order to make.

Insofar as it applies to family proceedings, r.44.2(3) has antecedents which pre-date the CPR, which were in force at a time when the general rule was applied much more rigorously than subsequently, and which then had the effect of displacing it much more easily than, and in circumstances which would not apply, in other proceedings (*Gojkovic v Gojkovic* [1992] Fam. 40, CA, at 56 and 57 (costs in ancillary relief proceedings)).

Where r.46.1 (formerly r.48.1) applies (pre-commencement disclosure and orders for disclosure against a person who is not a party), the general rule is that the court will award the person against whom the order is sought that person's costs. Applications against an innocent party involved in the tortious act of others, whereby he comes under a duty to disclose information (a *Norwich Pharmacal* application), are not ordinary adversarial proceedings where the general rule is that the unsuccessful party should pay the costs of the successful party but are more akin to proceedings for pre-action disclosure. In general the costs incurred on such an application should be recovered from the wrongdoer rather than from the innocent party, who should be paid his costs of the application, and of making any discovery ordered, by the applicant; these costs may however be claimed as part of the costs of subsequent proceedings to which the applications were incidental (*Totalise Ltd v The Motley Fool* [2001] EWCA Civ 1897; [2002] 1 W.L.R. 1233, CA). In *Filatona Trading Ltd v Quinn Emmanuel Urquhart & Sullivan UK LLP* [2024] EWHC 2751 (Comm) a failure to engage with the issues founding the application for disclosure caused the usual order for costs of the application to be awarded to the respondent to be reduced to 70%.

In *Spiers v English* [1907] P. 122 (Sir Gorell Barnes P) it was said that in contentious probate proceedings there are two exceptions to the general rule. One is the principle that if a person who makes a will or persons who are interested in the residue have been really the cause of the proceedings, a case is made out for costs to come out of the estate. The second is the principle that, if the circumstances lead reasonably to an investigation of the matter, then the costs may be left to be borne by those who have incurred them. Where the first exception applies the unsuccessful party may be awarded his costs out of the estate. Where the second exception applies the appropriate order is likely to be that each side will be left to bear its own costs. The extent to which it can be

said that these "exceptions" or "principles" have survived the CPR, and how they relate to r.44.2(2), have been considered at first instance; see *Kostic v Chaplin* [2007] EWHC 2909 (Ch); [2008] 2 Costs L.R. 271; [2008] W.T.L.R. 655 (Henderson J); *Wharton v Bancroft* [2012] EWHC 91 (Ch); [2012] W.T.L.R. 727 (Norris J). Note also r.57.7(5)(b) (court will not make an order for costs against a defendant giving required notice unless it considers there was no reasonable ground for his opposing the will).

See, further, para.44.2.27 below (Application of r.44.2 in family proceedings—party conduct).

For orders for costs against children and their litigation friends see para.46.4.2.

**Costs of interim injunctions**

Where the purpose of an interim injunction is to "hold the ring" until trial, the costs of the application will usually be reserved: *Richardson v Desquenne et Giral UK Ltd* [1999] C.P.L.R. 744; [2001] F.S.R. 1, *Picnic at Ascot v Kalus Derigs* [2001] F.S.R. 2. The *Desquenne* principle overrides the usual rule that the unsuccessful party bears the costs because, in a case where the injunction is granted on the balance of convenience, at that stage there is no winner or loser: *Wingfield Digby v Melford Capital Partners (Holdings) LLP* [2020] EWCA Civ 1647. Where however the injunction is granted not merely on the balance of convenience and the issues considered on the application will not be revisited in the substantive proceedings, if there is a winner and a loser on those issues, the loser should pay the winner's costs: *Koza Ltd v Koza Altin Isletmeleri AS* [2020] EWCA Civ 1263.

**44.2.15.1**

**Costs where regulatory body unsuccessful party**

In *Baxendale-Walker v Law Society* [2006] EWHC 643 (Admin); [2006] 3 All E.R. 675, DC, proceedings were brought against a solicitor (D) by his professional body (C) in the appropriate disciplinary tribunal. Two allegations of "unbefitting conduct" were made. C admitted the first. The tribunal (1) dismissed the second, (2) suspended D from practice for a period, and (3) ordered C to pay 30% of D's costs (reflecting C's failure to make out the second allegation). A Divisional Court (1) dismissed D's appeal against the suspension, and (2) allowed C's appeal against the costs order, substituting an order that D should pay 60% of the costs of the disciplinary proceedings. The Court said the principles relevant to an award of costs by a tribunal in these circumstances can be derived from a number of cases summarised in *R. (Gorlov) v Institute of Chartered Accountants in England and Wales* [2001] EWHC Admin 220; [2001] A.C.D. 393 (Jackson J) at paras 30 to 35, in particular *City of Bradford MDC v Booth* [2000] C.O.D. 338, DC, para.23 et seq. per Lord Bingham CJ. The Court explained (at para.43) (1) that a regulator brings proceedings in the public interest in the exercise of a public function which it is required to perform, (2) that in those circumstances the principles applicable to an award of costs differ from those in relation to private civil litigation, (3) that absent dishonesty or a lack of good faith a costs order should not be made against such a regulator unless there is good reason to do so, and that reason must be more than that the other party has succeeded, (4) that, in considering making such an order, a tribunal must consider, on the one hand, the financial prejudice to the party against whom proceedings are brought, weighed against the need to encourage public bodies to exercise their public function of making reasonable and sound decisions, without fear of exposure to undue financial prejudice, if the decision is successfully challenged. The approach adopted by the Divisional Court was approved by the Court of Appeal on D's unsuccessful appeal against the costs order as substituted, see *Baxendale-Walker v Law Society* [2007] EWCA Civ 233; [2008] 1 W.L.R. 426, CA, at [27] to [41], where the relevant authorities are again examined. However the Supreme Court has explained that there is no general principle that public bodies should be protected from costs orders merely because they have exercised their public functions in the public interest. Rather, the important factor will be whether there would be a chilling effect on the conduct of the public body if costs orders were routinely made against it. In the types of case referred to above there was a general risk of a chilling effect: *Competition and Markets Authority v Flynn Pharma Ltd* [2022] UKSC 14.

In *Bass v Solicitors Regulation Authority* [2012] EWHC 2457 (Admin); [2013] 5 Costs L.O. 651 (Bean J), where the authorities were further reviewed, a High Court judge allowed in part the appeals of solicitors against determinations of the SRA and directed that the appellants should have their costs in the High Court against the SRA. In doing so the judge held that the decision in the *Baxendale-Walker* case does not govern the costs of such an appeal.

See, further, Administrative Court Judicial Review Guide para.23.12 (Costs against courts and tribunals) (Vol.2 para.1BA-140).

Under various statutes, appeals may be made to the Privy Council against determinations by the disciplinary committees of professional bodies. In *Walker v Royal College of Veterinary Surgeons (Costs)* [2008] UKPC 20, the Privy Council explained that in cases where appeals by practitioners have been successful it has in practice made orders for the costs of such appeals against the professional bodies concerned and has on occasion made no order for costs where the appeal failed on liability but succeeded on penalty (see [5] and authorities referred to there). In that case the Privy Council granted the appellant's application for an order against the professional body for the whole of his costs of the appeal and in doing so rejected the body's submissions that (1) a split order should be made because certain submissions had not been accepted, and (2) the fact that the appeal had been supported by an appeal fund raised by other members of the profession was relevant to the application.

**44.2.16**

**Rule 44.2(4): "all the circumstances"—generally**

**44.2.17**     In deciding what order (if any) to make about costs, the court "will have regard to all the circumstances" (r.44.2(4)). There is no rule or statutory provision which prevents evidence relevant to costs from being considered by the court if it has not already been admitted during the trial, e.g. evidence as to a document which had no probative value on what was in issue at the trial but which is of considerable relevance on costs. It is a matter for the court in its unfettered discretion to admit any evidence (oral or written) which it considers relevant (*Computer Machinery Co Ltd v Drescher* [1983] 1 W.L.R. 1379, at 1385 and 1386 (Sir Robert Megarry VC), approved in *Cutts v Head* [1984] Ch. 290, CA).

If the trial has been contested, generally the judge, by the process of having heard evidence and reached conclusions on factual issues arising (either agreed by the parties or determined by the judge), will be well-placed without the need for evidence to evaluate any conflicting submissions made by the parties as to circumstances relevant to "deciding what order (if any) to make about costs" (r.44.2(4)), though of course frequently there will be matters relevant to such submissions (in addition to offers to settle and without prejudice communications between the parties) which will not have been ventilated at trial or during the judge's pre-trial management of the case and which may be matters in dispute. (Whether the judge would be similarly well-placed to summarily assess the amount of costs is a different matter.)

Where the proceedings are settled, either on the steps of the court or after the trial of a preliminary issue, and the only unresolved issue is that of costs, the judge enjoys no such advantage. There are inherent difficulties in asking a judge to exercise the court's discretion in respect of the costs of an action which he or she has not tried. A particular problem is this: how can a judge be expected to reach a view as to which party is the unsuccessful party (r.44.2(2)(a)) and as to matters referred to in para.(4) of r.44.2, being matters which were not resolved by the settlement (e.g. matters relevant to the conduct of the parties), even if they could have been (e.g. one party's success on part of its case) and which are not agreed?

Before the CPR came into effect the Court of Appeal had had occasion to refer to the undesirability of putting a judge in the position of having to decide an important issue in a dispute which no longer existed, simply for the purpose of determining who pays the costs of proceedings which had otherwise come to an end (*R. v Holderness BC, Ex p. James Roberts Developments Ltd* (1993) 66 P. & C.R. 46, CA, at 56 per Butler-Sloss LJ).

In *BCT Software Solutions Ltd v C Brewer & Sons Ltd* [2003] EWCA Civ 939; [2004] C.P. Rep. 2, CA, where the parties settled the action shortly after the trial had begun but were unable to reach a compromise on costs, the Court of Appeal recognised these difficulties and gave guidance, frequently referred to subsequently, not only in cases where the question of who was the unsuccessful party is left unresolved by the compromise of the substantive issues, but also where matters relevant to the circumstances referred to in paras (4) and (5) of r.44.2 are not agreed by the parties (e.g. whether a successful party exaggerated his claim); see [4] to [7] per Mummery LJ and [22] to [26] per Chadwick LJ. Where it is clear which party is unsuccessful and which successful a judge may be more willing to determine outstanding issues of costs even if for whatever reason the parties are not agreed; however a judge should be slow to embark on the determination of disputed facts solely in order to put himself in a position to make a decision about costs (*Morton v Portal Ltd* [2010] EWHC 1804 (QB) (Walker J), at [39]). The court should not depart from the normal order unless it is in a clear position to do so on a proper basis of agreed or determined facts which enable the court to decide what other order should be made (*Business Environment Bow Lane Ltd v Deanwater Estates Ltd* [2008] EWHC 2003 (TCC); [2008] E.G.L.R. 105 (Judge Toulmin QC), at [102]).

There is no "tradition" that where a dispute is compromised and not judicially resolved the correct order is "no order as to costs" (*Brawley v Marczynski (No.1)* [2002] EWCA 756; [2003] 1 W.L.R. 813, CA).

In *Morton v Portal Ltd*, op cit, where liability was admitted and quantum was settled without trial, the parties sought an order for costs "on a broad brush basis" but disputed whether, because of the successful party's exaggeration of his claim (in particular as to loss of future earnings), a different costs order should be made. The judge decided that, without the advantage of oral evidence and detailed submissions, it was not possible to reach conclusions as to the claimant's conduct (r.44.2(4)(a) and (5)) such as would warrant a departure from the general rule as to costs.

**Rule 44.2(4)(b): Whether party "has succeeded on part of its case"**

**44.2.18**     Among the circumstances to which the court will have regard, in deciding what order (if any) to make about costs, is whether a party has succeeded on part of its case, even if that party has not been wholly successful (r.44.2(4)(b)). This circumstance may become relevant in various contexts. For example, it may be called in aid by a party submitting, where it is a contested point, that it (and not their opponent) is the successful party in whose favour an order for costs should be made in accordance with the general rule stated in r.44.2(2)(a), even though it has not been "wholly successful". And it may be called in aid by an unsuccessful party (D) submitting (1) that it should not be required to pay the costs incurred by the successful party (C) on those parts of C's case on which it (C) failed, and/or (2) that C should pay D's costs on those parts. Where this circumstance is relevant the court is likely to be faced with submissions that the costs order which the court should make should be of the type referred to in para.(a) or in para.(f) of r.44.2(6), that is to say,

an order that a party must pay a proportion of another party's costs (see r.44.2(6)) or costs relating only to a distinct part of the proceedings (see para.44.2.10 above ("issue-based" costs orders).

Rule 44.2(4)(b) is relevant only in relation to a costs regime where the general rule stated in r.44.2(2)(a) applies, and has no relevance where the general rule is disapplied, for example, proceedings referred to in r.44.2(3), and first instance proceedings about children (*Re T (Children) Care Proceedings: Costs*) [2012] UKSC 36; [2012] 1 W.L.R. 2281, SC, at [11]). See, further, para.44.2.27 below (Application of r.44.2 in family and probate appeals).

As a practical matter, the principal significance of r.44.2(4)(b) is that it provides a clear basis upon which the court may order an unsuccessful party to pay the costs of the successful party in accordance with the general rule, even though the latter party has not been wholly successful. Put the other way around, the general rule does not cease to apply simply because the successful party raises issues or make allegations on which it fails. But where the raising of issues or making allegations on which a successful party fails has caused a significant increase in the length or costs of the proceedings that party may be deprived of the whole or part of the costs, whether or not that party acted unreasonably or improperly in so doing (*AEI Rediffusion Music Ltd v Phonographic Performance Ltd* [1999] 1 W.L.R. 1507, CA, at 1523, referring to the summary by Nourse LJ in *Re Elgindata (No.2)* [1992] 1 W.L.R. 1207, CA, at 1214).

The circumstance stated in r.44.2(4)(b) is distinct from that in r.44.2(4)(a) (the conduct of all the parties), the effect of which is (in combination with r.44.2(5)(b)) to provide that the court will have regard "to whether it was reasonable for a party to raise, pursue or contest a particular allegation or issue". The importance of the distinction was drawn out in *Stocznia Gdanska SA v Latvian Shipping Co (Costs), Times,* 24 May 2001 (Thomas J), where it was held that, in having regard to the circumstance "whether a party has succeeded on part of its case", it was not necessary for the court to take into account whether it was reasonable for the party to raise, pursue or contest that "part". This construction gives effect to the particular policy objective of encouraging parties to be selective as to the points they take, thus decreasing the costs of proceedings.

In *Shirley v Caswell* [2000] Lloyd's Rep. P.N. 955, CA, a professional negligence case, the claimants (C) abandoned certain issues before trial and did not pursue other issues at trial. The trial judge gave judgment for C, holding that the defendant (D) had been negligent, but not in all respects alleged by C. Thus, this was a case where, within the meaning of r.44.2(4)(b), C had succeeded on part of its case, but had not been wholly successful. As to costs, the judge made a "different order" of the variety provided for by r.44.2(6)(a) (a proportionate order) under which D was ordered to pay 60% of C's costs, and C to pay 40% of D's costs. On appeal to the Court of Appeal in relation to the first of those costs orders the Court held that D should pay C 100% of their costs. The Court reasoned (1) that C were entitled to recover the costs properly incurred in relation to the issues fought at trial, save in so far as the judge thought it right to deprive them of costs on issues on which they failed and which ought never to have been advanced, but (2) that in arriving at the proportion of 60% the judge had also taken into account the costs which had been incurred on the issues which C had abandoned or not pursued and in that latter respect the judge had erred, because (3) the costs on those issues were costs which C would be disallowed on detailed assessment, as prima facie they were costs which had been unnecessarily incurred, and (4) that the judge, by taking those costs into account in making a "different" costs order, created the risk that C would be doubly penalised. In *Dooley v Parker* [2002] EWCA Civ 1188, the Court of Appeal rejected the submission that its decision in *Shirley v Caswell*, op cit, limited a court's power to make a proportionate costs order under r.44.2(6)(a). The court explained (1) that if a trial judge makes an order disallowing part of a receiving party's costs, then the costs judge must take account of that fact when making the assessment of costs and take great care to make sure that a double penalty is not imposed, (2) that in the Shirley case the court was not satisfied on the facts of that case that the judge was alive to the risk of double penalty, (3) that to interpret the court's judgment in that case as meaning either that there is no power to make an order that a party receive only a proportion of his costs or that, if there is such a power, it should never be exercised in case the costs judge will penalise the paying party twice over, is to misunderstand it ([33]).

Ordinarily where a defendant, in some interlocutory application where the rest of the matters go on to trial, succeeds in striking out a claim or claims or issues raised by the claimant as unsustainable and unarguable, he is likely to obtain an order striking out those claims or issues with costs. In those circumstances, if subsequently the claimant succeeds on a claim or claims not struck out, the claimant is, as r.44.2(4)(b) recites, a party who has succeeded on part of its case, but is not wholly successful, and so is the defendant. In *Nugent v Michael Goss Aviation* [2002] EWHC 1281 (QB); [2002] 3 Costs L.R. 359 (Burton J), on the defendant's (D) interlocutory application in a fatal accident claim, two of the three claims made by the claimant (C) were struck out and C obtained judgment on the third claim, in relation to which D had made a payment in. At that point an order for costs was made, but not an order providing that C should pay D the costs of the claims struck out. Instead the court ordered that D should pay C their costs of the action up to the date of payment in, and C should pay D their costs of the action from that date. On detailed assessment, on the basis that an order for costs covers all costs including costs of those issues on which the receiving party was unsuccessful, and that costs should be disallowed only where there is misconduct, a costs judge refused D's application for a preliminary ruling to the effect that, although C should have their costs of the action (being the successful party), he should disallow C their costs of pursu-

ing the two claims struck out by the court. D's appeal was allowed, the court holding that those costs should be disallowed because (1) costs are unreasonably incurred if they are incurred in respect of pursuing a hopeless, unsustainable or unarguable claim, and one which is struck out on that basis, and (2) r.44.3(1) states that, where a court is to assess costs (whether by summary or detailed assessment) it will assess those costs on the standard or indemnity basis but will not in either case allow costs which have been unreasonably incurred.

**Rule 44.2(4)(c): Admissible offer to settle**

**44.2.19**
In para.(c) of r.44.2(4) it is stated that "all the circumstances" includes "any admissible offer to settle" made by a party which is drawn to the court's attention and which "is not an offer to which costs consequences under Part 36 applies". (Nothing in Section I of Pt 36 prevents a party making an offer to settle in "whatever way that party chooses" (r.36.2(2).) That provision came into its present form as a consequential amendment made when a new and substantially revised Pt 36 was introduced into the CPR (with effect from 6 April 2007) in which what did or did not count as a Part 36 offer with Pt 36 costs consequences was specified more carefully than previously (see Civil Procedure (Amendment No.3) Rules 2006 (SI 2006/3435)). Beforehand, it read that "all the circumstances" included "any payment into court or admissible offer to settle" made by a party which is drawn to the court's attention "whether or not made in accordance with Part 36". (For an explanation of these rule developments, see *French v Groupama Insurance Co Ltd* [2011] EWCA Civ 1119; [2012] C.P. Rep. 2, CA, at [42] to [46], per Rix LJ). Authorities dealing with the effect of r.44.2(4)(c) against the background of certain provisions in Part 36 as they stood before their substantial amendment in 2007 must be treated with caution, particularly where the terms of those provisions appear to have played a significant part in the court's reasoning. A further new and substantially revised Pt 36 was introduced into the CPR (with effect from 6 April 2015) (see Civil Procedure (Amendment No.8) Rules 2014 (SI 2014/3299)), but no amendment consequential or otherwise to r.44.2(4)(c) was occasioned thereby. In between those complete re-castings of Part 36 other significant amendments were made to the Part from time to time. See further para.36.0.2 above.

It may be noted that, in terms, paras (a) to (d) of r.44.2(5) do not expressly refer to a party's conduct in relation to admissible offers to settle, either as to the making or the accepting of such offers. However, by r.44.2(4)(a) the court should have regard to "the conduct of all the parties", and this presumably includes their conduct in relation to admissible offers.

In the context of r.44.2 there is no agreed legal short-hand for admissible offers to settle within para.(4)(c) of that rule, but references are found to "rule 44.2 offers" and "Part 44 offers" (possibly inspired by the terms of the parentheses following r.36.2(2) and r.36.17), and to "offers outside Part 36".

Generally, parties who negotiate on a wholly "without prejudice" basis do so in the faith and expectation that what they say cannot be used against them, even on the question of costs; thus offers to settle made entirely without prejudice are not admissible for the purposes of costs unless the parties agree (*Reed Executive Plc v Reed Business Ltd* [2004] 1 W.L.R. 3026, CA, at [21] per Jacobs LJ). On the other hand, open offers, and offers made "without prejudice save as to costs" are "admissible" within the meaning of r.44.2(4)(c). The term "*Calderbank* offer" is used to describe an offer made without prejudice save as to costs, and is commonly applied to any offer outside Part 36 (*Fox v Foundation Piling Ltd* [2011] EWCA Civ 790; [2011] C.P. Rep. 41, CA, at [4] per Jackson LJ). The term is derived from *Calderbank v Calderbank* [1976] Fam. 93, a matrimonial case in which the device was first countenanced, and was continued in use as a term of wider application after the device was recognised by the Court of Appeal in *Cutts v Head* [1984] Ch. 290, CA, as extending to general litigation. In the latter case, the Court said (1) that such offers were admissible in all cases where the issue was more than a simple money claim so that a payment into court was not an appropriate way of proceeding, and (2) that, in the particular circumstances of that case, when the offeror's offer to settle was taken into consideration, the right order would be to award the offeror all his costs from the date when his offer ought reasonably to have been accepted by the offeree. The decision in *Cutts v Head* vindicated the opinion of Sir Robert Megarry VC stated in *Computer Machinery Co Ltd v Drescher* [1983] 1 W.L.R. 1379, where his lordship said (at 1382–1383) that whether an offer is made "without prejudice" or "without prejudice save as to costs", the courts ought to enforce the terms on which the offer is made so as to encourage compromises and shorten litigation; the latter form of offer has the added advantage of preventing the offer from being inadmissible on costs, thereby assisting the court towards justice in making the order as to costs. (The effect of the decision in *Cutts v Head* was enacted in the RSC and the CCR as, respectively Ord.22 r.14 and Ord.11 r.10.)

As a practical matter, where the claimant's claim is for non-monetary relief, the defendant must decide what he is content to concede openly and what more (if anything) he is willing to offer confidentially, be that "without prejudice", "without prejudice save as to costs", or under Pt 36. In *RJ v HB* [2018] EWHC 2958 (Comm) (Andrew Baker J) it was explained (at [29]): (1) that the extent of any open concessions, and in consequence the nature and extent of the issues the defendant chooses to contest, will define the case that comes to be fought, (2) that that definition will prima facie drive any consideration of who has won and lost overall so as to have the benefit of the general costs rule under r.44.2(2)(a), and (3) that any offers made that the court is shown only as to costs may then displace that rule to whatever extent may be appropriate, applying the costs consequence rules of Pt 36 or r.44.2(4)(c), as the case may be.

A party may make an offer to settle outside Pt 36 for one or several of various reasons; commonly because the party wishes to offer specific terms as to the costs of the proceedings, being terms which cannot be attached to a Part 36 offer. The Court of Appeal has accepted that Part 36 offers can have unjust and disproportionate consequences which in fairness a party ought to be able to avoid by making an admissible offer (*Medway Primary Care Trust v Marcus* [2011] EWCA Civ 750; [2011] 5 Costs L.R. 808, CA, at [51] and [52] per Tomlinson LJ).

In *Summers v Fairclough Homes Ltd* [2012] UKSC 26; [2012] 1 W.L.R. 2004, SC; [2012] 4 All E.R. 317, SC, the Supreme Court acknowledged that Pt 36 may be of little assistance in protecting defendants against fraudulent claims since, on acceptance by the claimant of a Part 36 offer made by the defendant, the defendant would have to pay the claimant's costs (r.36.13). Lord Clarke suggested that the defendant in such a case could make an offer outside Pt 36, in particular a form of *Calderbank* offer, to settle the genuine part of the claim on terms that the claimant pay the defendant's costs incurred in respect of the fraudulent or dishonest aspects of the claim on the indemnity basis ([53] and [54]).

Where, when the court is deciding what order (if any) to make about costs, a party draws to the attention of the court an admissible offer made outside Pt 36 the question which immediately arises is: in exercising its discretion as to costs (assuming a principled approach is required), according to what principles should the court "have regard" to the circumstance of the offer? Part 44 contains no rules as to the way in which the court is to have regard to admissible offers. In particular, and most obviously, even in the case of a money claim, there are no provisions equivalent to those imposed in cases where r.36.17 applies.

An admissible offer to settle is unlikely in normal circumstances to be of much if any relevance if the offeree has achieved significantly more at trial. From a practical point of view, the principal issue that is likely to arise is that of properly taking into account an admissible offer made by a defendant where the claimant fails to obtain a judgment more advantageous than that offer. Before the enactment of the CPR the exercise of the court's costs discretion in those circumstances was a fairly simple matter; if the claimant ought reasonably to have accepted the defendant's offer generally the defendant was entitled to all his costs from the date of the offer. The innovations introduced by the CPR, in particular the more flexible application of the costs follow the event rule encouraged by the terms of r.44.2 and the offers to settle regime in Pt 36, complicated matters. No longer could a successful party generally assume that he would be awarded all of his costs, and no longer could a party who made an admissible offer generally assume that he would be awarded all of his costs from the date of the offer. Under r.44.2 the court is required to have regard to all the circumstances; it will be an unusual case where the only circumstance is an admissible offer within r.44.2(4)(c). In a given case it is highly likely that in determining an order about costs the judge will have to take into account the proper effect of the circumstance of an admissible offer (whatever that effect might be) together with the effect of other circumstances, with the result that the normal consequences of the admissible offer are diffused. Further, the judge may also be required to take into account, in addition to an admissible offer, a Part 36 offer (perhaps even several of them) made by one party or another (especially where the judge is minded to make an issue-based cost order).

In *F & C Alternative Investments (Holdings) Ltd v Barthelemy (No.3)* [2012] EWCA Civ 843; [2013] 1 W.L.R. 548, CA, where the defendant's offer was neither in substance nor in form compliant with Pt 36 (indeed it was expressly designed for good reason not to be a Part 36 offer), the Court of Appeal held (at [64], per Davis LJ) that the judge was wrong in principle to take as directly analogous and as applicable the potential costs consequences had it been a Part 36 offer (in particular consequences as to the award of indemnity costs and interest on costs from the date of offer).

In *Walker Construction (UK) Ltd v Quayside Homes Ltd* [2014] EWCA Civ 93; [2014] B.L.R. 215, CA, where the claimants (C) made a *Calderbank* offer to settle their claim and the defendant's (D) counterclaim (inclusive of costs), the Court of Appeal, in allowing C's appeal against the trial judge's costs order requiring them to pay the majority of D's costs, stated (1) that the judge did not appear to have given appropriate weight to the fact that C could not realistically have made a Part 36 offer, because that would have had the automatic consequence (r.36.13(1)) that, if the offer were accepted, D would have been entitled to all its costs of the proceedings to date ([86]), and (2) that C's offer represented a reasonable offer to settle, having regard to (a) the judgment ultimately achieved by D, (b) the appropriate proportion of D's costs that C might reasonably have expected to pay on the basis of such a recovery, and (c) the amount of such costs, assessed on a standard basis, subject to relevant set offs and reductions ([89]). The Court (1) held (a) (contrary to the judge's conclusion) that D had not beaten that offer, and (b) that the judge should have found that it was an offer which D should have accepted ([92]), and (2) substituted a costs order which recognised the effectiveness of the offer ([98]).

In *Capita (Banstead 2011) Ltd v RFIB Group Ltd* [2017] EWCA Civ 1032; [2017] C.P. Rep. 38; [2017] 4 Costs L.R. 669, CA, the claimants (C), having compromised a claim against them, brought proceedings against the defendants (D) for an indemnity. D made a *Calderbank* offer open for 21 days, that is, to 28 November 2013. This was followed by a Part 36 offer by D which expired on 3 January 2014. Neither offer was accepted. Both offers were for amounts in excess of that ultimately recovered by C. After trial and an appeal to the Court of Appeal, C failed on their principal

ground concerning the interpretation of the indemnity, but succeeded on a subsidiary point, and recovered 58% of the settlement sum paid in the compromised claim. As to costs, the position being that the majority of costs had been incurred on each side in relation to the issue on which C had lost, the judge ordered that there should be no order as to costs for the period up to 28 November 2013 and that from that date to the end of trial, C should pay 80% of D's costs. On appeal the Court of Appeal rejected C's submission that they should pay 80% of D's costs, not from 28 November 2013, but from 4 January 2014 (the day after expiry of the Part 36 offer). The Court explained that whether or not a case is an appropriate one for a *Calderbank* letter from a defendant to be treated as having the same costs protection effect as a Part 36 offer "is quintessentially a matter for the discretion of the trial judge" ([45]).

In *Coward v Phaestos Ltd* [2014] EWCA Civ 1256; [2015] C.P. Rep. 2, CA, an intellectual property case, the defendants (D) succeeded at trial (in March 2013), both in defending the claimant's (C) claim and (to a very substantial extent) on their counterclaim. On the matter of costs C drew to the attention of the trial judge an offer made by him (on 30 July 2012) without prejudice save as to costs and submitted that, by reason of D's failure to accept the offer, D should pay his costs incurred since the date of that offer. The judge rejected that submission, finding (1) that in material respects C's offer fell short of what D recovered at trial, and (2) that the offer was not one which, without further clarification and addition, could have been accepted when made. The judge awarded D the bulk of the costs of the proceedings and C some of his costs of the counterclaim. On C's appeal to the Court of Appeal, C submitted that the judge was required to have regard to the disparity between C's liability to pay a very large sum by way of costs to D and the "limited extent" to which the order at trial represented an improvement on the terms of C's offer and erred in failing to do so. The cases of *Walker Construction (UK) Ltd v Quayside Homes Ltd* [2014] EWCA Civ 93; [2014] B.L.R. 215, CA, and *Fulham Leisure Holdings Ltd v Nicholson Graham & Jones* [2006] EWHC 2428 (Ch), (Mann J), were cited in support of this submission. In rejecting it the Court explained that in both of the cited cases the nominally successful parties recovered only a small fraction of their claims and the offers provided them with everything that they recovered or everything except a trivial sum. Further, in the first case the defendant could on any basis expect to recover only a fraction of its costs, representing that part which was attributable to the element of its counterclaim on which it had succeeded, and in the second the claimant's recovery was so trivial as to be irrelevant to the proper order for costs in a case which had been brought and fought by the claimant for a quite different and massively larger loss.

In Pt 36, the costs consequences following judgment provided for in r.36.17 turn on whether the Part 36 offer was "more advantageous" or "at least as advantageous" as the judgment obtained and r.36.17(2) states that, in relation to any money claim or money element of a claim, "more advantageous" means better in money terms "by any amount, however small" and "at least as advantageous" shall be construed accordingly. In *Coward v Phaestos Ltd*, op cit, the Court of Appeal rejected (obiter) the submission that, as a matter of principle the effect of a *Calderbank* offer is to be assessed by analogy with the terms of r.36.17(2). The Court explained (at [93] to [98], per David Richards LJ) (1) that Pt 36 and Pt 44 are separate regimes with separate purposes; (2) that while Pt 36 is highly prescriptive in its terms, and highly restrictive of the exercise of any discretion by the court in any particular case, r.44.2 confers on the court a discretion in almost the widest possible terms and contains no rules as to the way in which the court is to have regard to admissible offers; (3) that there is no warrant in the terms of r.44.2 for applying, by analogy or otherwise, a test equivalent to the rigid test in r.36.17(2), even in money claims.

Where a party makes an admissible offer and then achieves a more advantageous result, it may well be appropriate for the court to order the party which rejected the offer to pay all costs since the date when that offer expired (*Fox v Foundation Piling Ltd* [2011] EWCA Civ 790; [2011] C.P. Rep. 41, CA, at [45] per Jackson LJ). In *Multiplex Constructions (UK) Ltd v Cleveland Bridge UK Ltd* [2008] EWHC 2280 (TCC); [2009] 1 Costs L.R. 155 (Jackson J), the judge examined the authorities on individual provisions in r.44.2, including r.44.2(4)(c), and concluded that among the principles to be derived from them was the principle that, if (a) one party makes an offer under Pt 36, or an admissible offer under r.44.2(4)(c), which is nearly but not quite sufficient (a "near miss"), and (b) the other party rejects that offer outright without any attempt to negotiate, then it might be appropriate to penalise the second party in costs ([72(vii)]). As the Court of Appeal explained in *Dufoo v Tolaini* [2014] EWCA Civ 1536; [2014] 6 Costs L.R. 1106, CA, that principle was rendered inaccurate by the subsequent addition (with effect from 1 October 2011) to Pt 36 of (what became) r.36.17(2), reversing the effect of earlier decisions (at [39] per Jackson LJ). In *Hammersmatch Properties (Welwyn) Ltd v Saint-Gobain Ceramics and Plastics Ltd* [2013] EWHC 2227 (TCC); [2013] B.L.R. 554; 149 Con. L.R. 147 (Ramsey J) it was stated that the court should not approach r.44.2(4)(c) on the basis that it supports a special "near miss" rule that may be invoked to penalise a successful party in costs, because, to do so, would be to seek to use that provision to give to "near miss" offers an effect similar to that which existed in relation to Part 36 offers before r.36.17(2) was enacted, and would introduce an unwelcome degree of uncertainty.

In *Patience v Tanner* [2016] EWCA Civ 158; [2016] 2 Costs L.R. 31, CA, the parties settled on the basis of an open offer made by the defendants (D) on the eve of trial. That offer was in the same terms as an admissible offer made by D six months beforehand, which C had not accepted and which D had withdrawn. The Court of Appeal upheld the judge's costs order insofar as it

provided that C (though the successful party) should have his costs only up to the date of the offer (there being no good reason for C not accepting that offer), but for the order that C should pay D's costs thereafter the Court substituted an order of no order for costs. The Court concluded that the judge failed to take into account that D's conduct after the offer date (especially their withdrawal of the offer for no good reason) contributed substantially to the case coming before the judge when it should long since have settled, and that as a material omission.

The automatic costs consequences following judgment prescribed by r.36.17 do not apply to a Part 36 offer which has been withdrawn (r.36.17(7)(a)). It is established that such an offer may constitute an "admissible offer to settle" within r.44.2(4)(c) (see e.g. *Fox v Foundation Piling Ltd* [2011] EWCA Civ 790; [2011] C.P. Rep. 2, CA, at [53] per Jackson LJ, and *Rehill v Rider Holdings Ltd* [2014] EWCA Civ 42; [2014] 3 Costs L.R. 405, CA, at [14], per Lewison LJ, where the offers had been withdrawn). In *Thakkar v Patel* [2017] EWCA Civ 117; [2017] 2 Costs L.R. 233, CA, the Court of Appeal accepted, on the basis of the authority of *Stokes Pension Fund Trustees v Western Power Distribution (Southwest) Plc* [2005] EWCA (Civ) 854; [2005] 1 W.L.R. 3595, CA, that, where a purported Part 36 offer is made and then withdrawn, "the crucial question is whether the offeree acted reasonably or unreasonably in failing to accept the offer while it was on the table" (at [23] per Jackson LJ). If costs have been incurred because of the unreasonable conduct of the offeree in failing to accept an offer which ought to have been accepted, then the offeree will usually have to pay those costs (*Owners and/or Bareboat Charterers and/or Sub Bareboat Charterers of Samco Europe v Owners of MSC Prestige* [2011] EWHC 1656 (Admlty); [2011] 2 C.L.C. 679 (Teare J) at [26]). In those cases where an offeree wishes at a later stage to settle on terms which have been withdrawn by the offeror the offeree can protect himself against future costs by making an offer in those terms himself (above). See further para.36.10.3 above.

An offer made without prejudice should not be drawn to the attention of the court unless the parties agree, and an offer "without prejudice as to costs" should not be drawn to the attention of the court until the matter of costs arises for determination by the court. In *Tullett Prebon Plc v BGC Brokers LP* [2010] EWHC 989 (QB); [2010] 6 Costs L.R. 891 (Jack J), the defendants (D) made *Calderbank* offers in circumstances where the claimant's (C) claim for an injunction was to be tried before their claim for damages. Following their success in the first trial, C applied for an order for their costs down to the date for acceptance of D's offer. The judge ruled that the question of who should pay the costs should await the assessment of damages, because if C failed to beat the offer it was possible that it would not recover a balance of costs overall. See also commentary following r.36.16 (Restriction on disclosure of a Part 36 offer).

However, the court was right to award costs to the party who had succeeded at a trial on liability, even though it had been told that a *Calderbank* offer had been made, but not its terms or which party had made it. The offer was not "admissible" at that stage and should not be treated as equivalent to a Part 36 offer: *McKeown v Langer* [2021] EWCA Civ 1792.

### Rule 44.2(4)(a) and (5): "conduct of all the parties"

In deciding what order (if any) to make about costs, the court "will have regard to all the circumstances" (r.44.2(4)). It is expressly provided in para.(4)(a) of r.44.2 that those circumstances include "the conduct of all the parties", and it is further expressly provided in para.(5) that the conduct of all the parties includes conduct of the types listed in paras (a) to (d) thereof. That the exercise of the court's discretion as to costs should take into account all the circumstances including the conduct of all the parties is obvious enough and it might be thought that it would be sufficient if the rule stopped there. The elaboration in the rule of what the conduct of the parties might include was made when the CPR came into effect for the purpose of expressly implementing the general recommendation made by Lord Woolf that the courts should exercise their discretion over costs so as "to support the conduct of litigation in a proportionate manner and to discourage excesses", for example, by using the discretion to render more effective the (then innovative) pre-action conduct Practice Direction and pre-action protocols, and the particular recommendation that courts should pay greater regard to the manner in which "the successful party has conducted the proceedings" (see *Access to Justice: Interim Report (June 1995)* Ch.25 para.24, and Recommendation 122).

Provisions to the effect that the court "will have regard to all the circumstances" including "the conduct of all the parties" also appear in r.44.4 (Factors to be taken into account in deciding the amount of costs). Thus it is conceivable that, in a given case, party conduct will have a dual relevance, first as to the exercise of the court's discretion under r.44.2(1), and secondly, as to the question whether costs ordered to be paid should be assessed on the indemnity basis (r.44.3(1) and r.44.4(3)(a)). As to the relevance of the conduct of parties to the detailed assessment of costs, see para.44.2.26 below.

It should be noted that the detailed provisions in paras (a) to (d) of r.44.2(5) amplifying "the conduct of all the parties" are not, and are not intended to be, exhaustive. Obviously, the fact that they have been expressly identified has tended to draw attention to them. In terms those provisions are not mutually exclusive; in a given case a party's conduct may be referable to one or more of them.

**44.2.20**

### Party conduct—generally

As to party conduct "before proceedings" as distinct from "during proceedings" (r.44.2(5)(a)), see para.44.2.25 below.

**44.2.21**

By r.44.2(4)(a), in deciding what order (if any) to make about costs, the court is enjoined to have regard to "the conduct of all the parties", and that includes the particular forms of conduct referred to in r.44.2(5). The variety and range of party conduct that could conceivably be relevant to the determination of the questions (a) whether an order for costs should be made and, if so (b) whether the order should be in accordance with the general rule or a different order, and, if the latter (c) the form that the order should take, is enormous. And, in a given case, the room for reasonable disagreement between parties as to how party conduct should affect the court's exercise of discretion can be very wide (even in cases where the contested substantive issues are straightforward) and may generate extensive and sophisticated submissions and counter submissions which a judge has to evaluate in determining those questions.

Reports of cases available to practitioners where courts have grappled with these questions are legion. Cases raising and determining points of principle or providing useful illustrations of practical points are comparatively rare. Periodically the Court of Appeal and judges at first instance have complained about the lack of discrimination shown by parties in the citation of authorities in support of submissions concerning party conduct. For example, in *Sulaman v Axa Insurance Plc* [2009] EWCA Civ 1331; [2010] C.P. Rep. 19, CA, Longmore LJ stated ([12]) that, although occasionally a useful statement of principle can be found in a previous decision, it is not usually helpful to compare factual details in one case with factual details in another because on examination it will be apparent that each turned on its own facts, and it is not permissible to conclude that because in one case a party forfeited some of his costs on grounds of mis-conduct, so it should happen in another. Unfortunately, this stricture and others do not seem to have discouraged parties from submitting, routinely and often at length, that, because in earlier cases mis-conduct of particular types resulted (or did not result) in orders for costs of particular types, then the same order should (or should not) be made in an instant case where the mis-conduct is arguably similar.

The jurisdiction of the judge, in making an order for costs, to deprive a successful party of costs where the judge found that party's conduct of the proceedings "reprehensible" or "blameworthy" was considered by the Court of Appeal in *Abbott v Long* [2011] EWCA Civ 874; [2012] R.T.R. 1, CA, a road traffic accident case where at trial the judge found that C had failed to show proper regard for the duty to mitigate and to keep expenses incurred for a credit hire of a substitute motor vehicle to an appropriate level and awarded C only one-sixth of what was claimed for those expenses. The judge made no order for costs, and in reaching that decision a determining factor was that the litigation "had been run as a commercial enterprise by the hire company". The Court of Appeal dismissed C's appeal. The court explained that criticisms made by the judge of the conduct of C were well outside that of a misjudgment on his part; it amounted to a finding of blameworthy conduct in relation to the conduct of the litigation. The court repeated that, if a court is going to deprive a party of costs on the grounds of misconduct which has not been causative of a waste of costs, it should be satisfied that that sanction is a proportionate sanction (see *Widlake v BAA Ltd* [2009] EWCA Civ 1256; [2010] 3 Costs L.R. 353, CA, at [41] per Ward LJ, and *Walsh v Singh* [2011] EWCA Civ 80; [2011] 2 F.L.R. 599, CA, at [25] per Arden LJ). The Court accepted that C's misconduct had been taken into account in the order made at trial for the payment of damages, but rejected the submission that, for that reason, it should not also be taken into account in relation to costs as well.

In *Barber v BDW Trading Ltd* [2012] EWHC 2489 (TCC); [2012] B.L.R. 531; [2013] 1 Costs L.R. 72 (Coulson J), the judge, after reviewing a number of the relevant authorities on various aspects of party conduct, concluded (at [42]) that, in general terms, for costs to be shifted as a result of conduct, so that the claimant who recovered something at trial still has to pay the defendant's costs, there needed to be more or less total failure on the issues that went to trial (*Hullock v East Riding of Yorkshire CC* [2009] EWCA Civ 1039), or a failure to accept an offer made outside Pt 36 that would have put the claimant in a better position than going on (*Fulham Leisure Holdings Ltd v Nicholson Graham & Jones* [2006] EWHC 2428 (Ch), (Mann J)).

In *R. (Royal Free London NHS Foundation Trust) v Secretary of State for the Home Department* [2013] EWHC 4101 (Admin), (Coulson J) the judge observed that, whilst reliance on the conduct provisions in r.44.2(4)(a) and (5) might reduce and sometimes eliminate an unsuccessful party's obligation to pay costs to a successful party, and could lead to orders in favour of the unsuccessful party on certain issues, it appeared that in no authoritative case had a court held that on conduct alone an unsuccessful party should recover the totality of its costs from the successful party ([14]).

In *Flood v Times Newspapers Ltd* [2014] EWCA Civ 1574, where the claimant (C) brought proceedings for libel against a newspaper (D), at the assessment of damages (after D had conceded liability), matters stated by D's legal representative in open correspondence with C, subsequently conceded by D's counsel to be "aggressive" and "unpleasant", were relevant to the question whether D's behaviour had increased the distress and anxiety of C, and were taken into account by the judge in making a damages award of £60,000. On the matter of costs, the judge's attention was drawn to that correspondence and other communications between the parties made "without prejudice as to costs", in which both parties made offers to settle (in the vicinity of £17,500). The judge ordered D to pay C's costs of the action, including the costs of the quantum trial and the reserved costs of the trial, as a preliminary issue, of D's defence of Reynolds privilege (on which D succeeded) ([2013] EWHC 4336 (QB) (Nicola Davies J)). The Court of Appeal dismissed D's appeal against the costs order, holding that the judge was entitled to view aspects of D's behaviour as

demonstrating an intransigent (or "die hard") approach to the litigation and settlement, including "unsubtle threats to the personal situation of the claimant", and to take that into account when considering the question of costs ([46] to [51] per Sharp LJ). In dismissing D's further appeal the Supreme Court stated that the correspondence between the parties demonstrated that it was undoubtedly D's "negotiating stance", far more than that of C, which prevented the claim from being settled; the judge was entitled to regard D's attitude in the open discussions and in the correspondence as a reason which militated against departing from the prima facie position, namely an unqualified costs order in favour of C ([2017] UKSC 33; [2017] 1 W.L.R. 1415, SC, at [71]).

### Party conduct—dishonesty

**44.2.22**  Lord Clarke, giving the judgment of the Supreme Court in *Summers v Fairclough Homes Ltd* [2012] UKSC 26; [2012] 1 W.L.R. 2004, SC, stated (obiter, at [53]) that, in the ordinary way it would be expected that a judge would penalise a dishonest and fraudulent claimant in costs by ordering the claimant "to pay the costs of any part of the process which have been caused by his fraud or dishonesty" and moreover to do so by making orders for costs on an indemnity basis ([53]); the prospect of an order to that effect was likely to be a real deterrent. His lordship acknowledged that such costs orders may often be in substantial sums perhaps leaving the claimant out of pocket.

The authorities on the effect that the dishonesty of a successful party may have on an order for costs were examined at first instance in *Bank of Tokyo-Mitsubishi Ufj Ltd v Baskn Gida Sanayi Ve Pazarlama AS* [2009] EWHC 1696 (Ch); [2010] 5 Costs L.R. 657 (Briggs J), and separate references to them need not be made here. Put briefly, the judge concluded that the principles are: (1) there is no general principle that, where an otherwise successful party has put forward a dishonest case, the general rule that costs follow the event is thereby wholly displaced; (2) the court's powers include (a) disallowance of the successful party's costs in advancing the dishonest case, (b) an order that they pay the other party's costs attributable to proving that dishonesty, (c) the imposition of an additional penalty which might extend to disallowance of the whole of the successful party's costs, or (d) an order that they pay all or part of the unsuccessful party's costs; and (3) there is no general rule that a losing party who could establish dishonesty had to receive all their costs of establishing that dishonesty, however disproportionate they might be.

In *Hutchinson v Neale* [2012] EWCA Civ 345; [2012] 5 Costs L.O. 588, CA, where the Court of Appeal accepted that the relevant principles were as identified in the *Bank of Tokyo-Mitsubishi Ufj Ltd* case, the court stated (at [28], per Pitchford LJ) that there is no general rule that a finding of dishonest conduct by the successful party will replace the usual starting point, that is that costs should follow the event; what is required is an evaluation of the nature and degree of the misconduct, its relevance to and effect upon the issues arising in the trial, and its tendency to create an unwarranted increase in the costs of the action to either or both of the parties.

The principles identified by the judge in the *Bank of Tokyo-Mitsubishi Ufj Ltd* case have informed the approach adopted in subsequent first instance decisions; see e.g. *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 888 (Ch); [2010] 5 Costs L.R. 709 (Morgan J).

In *Sulaman v Axa Insurance Plc* [2009] EWCA Civ 1331; [2010] C.P. Rep. 19, CA, the trial judge found that a successful party, a defendant to a Part 20 claim brought by an insurance company alleging fraud, had lied to him in two respects in her evidence at trial and had told untruths in her witness statements, and, notwithstanding that she had made a Part 36 offer which the insurance company had failed to beat, awarded her only one-third of her costs. The Court of Appeal held that in the light of the lies which the party had told the judge had been entitled to make an order depriving her of some part of the costs she would otherwise have recovered. It was argued that the judge had made insufficient calculation of the time and expense taken up by the lies. That submission was rejected. Lies maintained and repeated in a complex case were insidious. It was incontrovertible that litigation was made more difficult, and the judge's task more intractable as a result of the party's lies.

In *Owners of the Ariela v The Owners and/or Demise Charterers of the Kamal XXVI and Kamal XXIV* [2009] EWHC 3256 (Comm); [2010] 2 Lloyd's Rep 247 (Burton J), at trial of liability the defendants (D) were found wholly responsible and, by an agreed order, D were to pay the claimant's (C's) costs of the action to date. At the subsequent quantum trial, where C abandoned most of their claim as to damages, the judge found that C's claim had been largely fraudulent from the outset and gave C judgment for merely US $6,245 and ordered that C should pay D's costs of that trial on the indemnity basis. In addition, the judge ordered that a similar order should be substituted for the costs order made at the liability trial because, at the time of the making of that order D did not know of, or know sufficient of, and/or waive the fraud.

### Rule 44.2(5)(d): Party conduct—whether successful party "exaggerated its claim"

**44.2.23**  Where the extent of a claimant's recovery in a claim is significantly less than what was initially claimed against the defendant it may be that the discrepancy is so great as to raise on the matter of costs the question whether the claimant and not the defendant is the "unsuccessful" party (see para.44.2.13 above). Where that question does not arise, or has been determined in the claimant's favour, the unsuccessful defendant's submission is likely to be (perhaps joined with other "party conduct" submissions) that, on the ground that the successful claimant "exaggerated its claim"

(r.44.2(5)(d)), the judge should make no order for costs or an order different from the normal order.

Where the explanation for a successful party's recovery of much less than what was initially claimed is that party's misconduct, for example, dishonesty, concoction of claims or even fraudulent behaviour, the court may deprive that party of costs (see para.44.2.22 above). A submission based on r.44.2(5)(d) is likely to be accompanied by alternative submissions (concerning the claim alleged to have been exaggerated) based upon paras (b) and (c) of r.44.2(5). Again, although paras (b), (c) and (d) of r.44.2(5) are not mutually exclusive, care should be taken to ensure that the several submissions are properly analysed.

An exaggerated claim can be innocent, perhaps resulting from the claimant's subconscious preoccupation, even obsession, with a grievance giving rise to the claim. On the other hand, an exaggerated claim can be dishonest in whole (resulting in the dismissal of the claim), but more likely in part only (with recovery limited accordingly) (*Shah v Wassim Ul-Haq* [2009] EWCA Civ 542; [2010] 1 W.L.R. 616; [2010] 1 All E.R. 73, CA, at [17] per Smith LJ). Rule 44.2(5)(d) applies to exaggerated claims of either variety. In many cases where this provision is invoked the exaggeration consists of the dishonest exaggeration of a genuine claim. (There is no general rule of law to the effect that the court should dismiss in whole a claim dishonest in part, no matter how egregious the dishonesty (ibid.).)

It is not surprising that the costs rules should identify (in r.44.2(5)(d)) the exaggeration of claims by ultimately successful parties as being a matter relevant to the making of costs orders. As well as causing an increase in the costs incurred by the parties it can have a distorting effect on the proceedings. In *Business Environment Bow Lane Ltd v Deanwater Estates Ltd* [2008] EWHC 2003 (TCC); [2008] E.G.L.R. 105 (Judge Toulmin QC), the judge explained ([104]) that the effect of such exaggeration may be to prevent the parties having realistic settlement discussions at an early stage or prevent a successful mediation, and it may also prevent a defendant from being able to assess realistically the value of the claimant's case and make an appropriate offer, particularly where only the claimant is able in the first instance to evaluate its own losses.

Cases in which the Court of Appeal has had cause to examine particularly the scope and effect of r.44.2(5)(d), either on its own, or together with other "party conduct" provisions in r.44.2, include: *Molloy v Shell UK Ltd* [2001] EWCA Civ 1272; [2002] P.I.Q.R. P7, CA, *Painting v University of Oxford* [2005] EWCA Civ 161; [2005] 3 Costs L.R. 394, CA, *Jackson v Ministry of Defence* [2006] EWCA Civ 46, CA, *Hall v Stone* [2007] EWCA Civ 1354; [2008] 3 Costs L.R. 450, CA, *Straker v Tudor Rose* [2007] EWCA Civ 368; [2007] C.P. Rep. 32; [2008] 2 Costs L.R. 205, CA.

These decisions were reviewed by the Court in *Widlake v BAA Ltd* [2009] EWCA Civ 1256; [2010] C.P. Rep. 13, CA, at [18] to [32] per Ward LJ. In the *Widlake* case, at the trial of quantum in a personal injuries action, on the claimant's (C) claims for £11,000 for pain and suffering etc and £24,000 specials, the judge awarded, respectively, £3,250 and £2,000. The judge (1) found that C had misled certain experts as to aspects of her medical history, (2) noted that C had made no counter offer to the defendant's (D) offer of £4,500, and (3) ordered C to pay D's costs of the action. The Court of Appeal held that on the matter of costs the judge had misdirected himself, in particular he had erred in characterising C's actions as an attempt to manipulate the civil justice system on a grand scale tantamount to an abuse of the court's process. The Court allowed C's appeal and substituted an order of no order for costs. The Court explained that (1) the manner in which the court is to "have regard" to conduct of the variety referred to in paras (b) and (d) of r.44.2(5) is principally to enquire into its causative effect, in particular, to the extent to which the conduct caused the incurring or wasting of costs, (2) in determining such effect there may be no need for the court to determine which party was the "winner" on a particular point falling for decision by the trial judge, (3) where the causative effect of an exaggerated claim by a successful party is to put the other party to the incurring or wasting of costs, some compensation to that other party should be granted, and (4) in addition, where the court finds that the misconduct was so egregious that a penalty should be imposed, it may deprive the offending party of costs by way of punitive sanction. In the instant case there was, as the judge found, gross exaggeration by the successful claimant, and that was conduct to be taken into account in disapplying the general rule as to entitlement to costs (r.44.2(2)(a)).

The judgment in *Widlake v BAA Ltd*, op cit, though not confined to the application of para.(5)(d) of r.44.2, is routinely relied on where that provision arises for consideration, in the Court of Appeal and in lower courts. The dictum in the lead judgment in the Widlake case, to the effect that there is a considerable difference between "a concocted claim" and "an exaggerated claim", and that judges must be astute to "measure how reprehensible the conduct is" ([41]), has been noted in subsequent cases. An example is *Morton v Portal Ltd* [2010] EWHC 1804 (QB) (Walker J), where the judge stated ([49]) that it could not have been intended that r.44.2(5)(d) is satisfied "merely because a genuine claim was overestimated"; for these purposes, "exaggeration", without needing to involve concoction, must nevertheless include "conduct meriting criticism". In *Gregson v Hussein* [2010] EWCA Civ 165, where the claimant (C) succeeded on all the issues, namely of negligence and damages, though was not wholly successful, the court substituted a proportionate costs order (requiring the defendant to pay only 75% of C's costs) for the order made by the trial judge. The court found (1) that, although it was reasonable for C to claim for both the general and special damages, his conduct could be condemned insofar as he exaggerated his claim for special damage,

and (2) that the exaggeration, extended the time of the trial and caused a waste of costs (so it had a causative effect).

In *Barber v BDW Trading Ltd* [2012] EWHC 2489 (TCC); [2012] B.L.R. 531; [2013] 1 Costs L.R. 72 (Coulson J), the judge, after reviewing a number of the relevant authorities, concluded ([42]) that the pursuit of exaggerated claims may deprive the claimant of some or all of its costs (*Islam v Ali* [2003] EWCA Civ 612; *Fulham Leisure Holdings Ltd v Nicholson Graham & Jones* [2006] EWHC 2428 (Ch), (Mann J)), but it is usually only where the exaggeration is deliberate that the claimant has been ordered to pay the defendant's costs (*Painting v University of Oxford* [2005] EWCA Civ 161; [2005] 3 Costs L.R. 394, CA; *Ford v GKR Construction Ltd (Practice Note)* [2000] 1 W.L.R. 1397, CA).

**Party conduct—unreasonable refusal to agree to ADR**                                   **44.2.24**

Most civil proceedings settle before trial as a result of party-to-party negotiations. In various ways provisions in the CPR, in related practice directions and in pre-action protocols, seek to promote effective party negotiation, including by "encouraging the parties to use an alternative dispute resolution procedure" (r.1.4(2)(e)), and do so partly for the purpose of attempting to reduce court caseloads to manageable proportions by increasing the rate of settlements. In modern times such encouragement, in particular of third-party assisted negotiations in the form of mediation, has come to include the use by the court of costs sanctions. The authorities referred to hereafter pre-date the addition of r.44.2(5)(e), which came into force on 1 October 2024, and which requires the court to consider the conduct of the parties in failing to comply with an order for alternative dispute resolution, or unreasonably failing to engage in alternative dispute resolution.

In *Halsey v Milton Keynes General NHS Trust* [2004] EWCA Civ 576; [2004] 1 W.L.R. 3002, CA, the Court of Appeal considered the question: when exercising its discretion under r.44.2 when should the court impose a costs sanction against a successful party on the grounds that it has refused to take part in an alternative dispute resolution (ADR) procedure? In answering this question the Court of Appeal noted that, in deciding what order to make about costs, the court must have regard to all the circumstances, including the conduct of the parties, and concluded that: (1) the court's discretion as to costs includes power to deprive a successful party of some or all of its costs on the ground that it has refused to agree to ADR, (2) the burden is on the unsuccessful party to show why, for reason of such conduct, there should be a departure from the general rule, (3) such departure is not justified unless it is shown that the successful party acted unreasonably in refusing to agree to ADR, (4) in determining whether the successful party conducted itself unreasonably the court should have regard to all the circumstances of the particular case, (5) factors which may be relevant will include (a) the nature of the dispute, (b) the merits of the case, (c) the extent to which other settlement methods have been attempted, (d) whether the costs of ADR would be disproportionately high, (e) whether any delay in setting up and attempting ADR would have been prejudicial, and (f) whether the ADR had a reasonable prospect of success.

In *PGF II SA v OMFS Co 1 Ltd* [2013] EWCA Civ 1288; [2014] 1 W.L.R. 1386, CA, the Court of Appeal noted that the *Halsey* guidelines had stood the test of time, and "the crucible of application in subsequent reported cases" in most of which the party refusing to engage in ADR had communicated its refusal to the inviting party, with succinct reasons for doing so. By contrast, this case raised the question (for the first time as a matter of principle): what should be the response of the court to a party which, when invited by its opponent to take part in a process of ADR, simply declines to respond to the invitation in any way? The Court held that (1) silence in the face of an invitation to participate in ADR is, as a general rule, of itself unreasonable, regardless whether an outright refusal, or a refusal to engage in the type of ADR requested, or to do so at the time requested, might have been justified by the identification of reasonable grounds, (2) a finding of unreasonable conduct constituted by a refusal to accept an invitation to participate in ADR or a refusal even to engage in discussion about ADR, produces no automatic results in terms of a costs penalty, but is simply an aspect of the parties' conduct which needs to be addressed in a wider balancing exercise, (3) the proper response in any particular case may range between the disallowing of the whole, or only a modest part of, the otherwise successful party's costs, (4) in principle, the court might go further and order the otherwise successful party to pay all or part of the unsuccessful party's costs, but that Draconian sanction should be reserved for only the most serious and flagrant failures to engage with ADR.

In *Gore v Naheed* [2017] EWCA Civ 369; [2017] 3 Costs L.R. 509; [2018] 1 P. & C.R. 1, CA, Patten LJ noted (at [49]) that a failure to engage on the matter of ADR, even if unreasonable, does not automatically result in a costs penalty, but is simply a factor to be taken into account by the judge when exercising his costs discretion, and explained that he had "some difficulty in accepting" that the desire of a party to have his rights determined by a court of law in preference to mediation can be said to be unreasonable conduct, particularly when those rights are ultimately vindicated.

Paragraph 11 of Practice Direction (Pre-Action Conduct and Protocols) states (in part) that a party's silence in response to an invitation to participate or a refusal to participate in ADR might be considered unreasonable by the court and "could lead to the court ordering that party to pay additional court costs" (see para.C1-006 below).

The court cannot order disclosure of "without prejudice" negotiations against the wishes of one of the parties to those negotiations. In *Reed Executive Plc v Reed Business Information Ltd (No.2)* [2004] EWCA Civ 887; [2004] 1 W.L.R. 3026, CA, the Court of Appeal held (at [34]) that the decision of the Court in the *Halsey* case created no exception to that rule where it was contended that

the disclosure of such negotiations would reveal whether one side or the other was unreasonable in refusing ADR. The Court explained that it was always open to a party to make open or *Calderbank* offers of ADR, and the other party could respond to such offers either openly or in *Calderbank* form; the reasonableness or otherwise of going to ADR could be fairly and squarely debated between the parties, and under the *Calderbank* procedure, made available to the court when the question of costs came to be considered (above at [35]).

In a given case, the applicability of the guidelines stated by the Court of Appeal in the *Halsey* case in 2004, as extended by the Court in the *PGF II SA* case in 2013, to the particular relevant facts arising may be vigorously disputed by the parties. Where a judge, in considering whether to make an order for costs under r.44.2 and, if so, what type of order, concludes that the successful party's conduct in relation to ADR was unreasonable, there remains the questions whether therefore that party should be deprived of some or all of its costs and, if so, how and to what extent. Necessarily, first instance decisions illustrating the application of the guidelines and the answers given to these questions by judges in the exercise of their broad discretion under r.44.2 must turn on their own facts and will be of very limited value (if any) as precedents. It is unlikely that a case will arise where the only party conduct circumstance arguably relevant to the question whether the successful party should be denied costs to which he or she is otherwise entitled is that party's refusal to engage in ADR. Not uncommonly the judge will have to take into account as well other party conduct circumstances related to settlement negotiations; see for example, *Northrop Grumman Mission Systems Europe Ltd v BAE Systems (Al Diriyah C41) Ltd* [2014] EWHC 3148 (TCC); [2014] T.C.L.R. 8 (Ramsey J) (successful defendant unreasonably refusing to mediate but making a *Calderbank* offer which the claimant had not beaten).

See further Vol.2 s.14 (ADR in the context of the CPR), para.14-11 (Case management and costs sanctions) and para.14-13 (Costs sanction where ADR declined).

See also *Jackson ADR Handbook* (2013) Ch.11, where the relevant principles to be derived from cases where a refusal to engage in an ADR process has been considered are summarised (available on websites referred to in para.11 of Practice Direction (Pre-Action Conduct and Protocols) (para.C1-006 below)).

### Rule 44.2(5)(a): Party conduct—conduct "before the proceedings"

**44.2.25**    Paragraph (5)(a) of r.44.2 states that conduct of the parties includes conduct "before, as well as during, the proceedings", and refers specifically to the extent to which parties followed Practice Direction (Pre-Action Conduct and Protocols) or any relevant pre-action protocol (see paras C1A-001 et seq below). Generally it will be the case that the requirements imposed on parties by the Practice Direction and any relevant pre-action protocol will have exhausted themselves before proceedings are commenced, but that will not always be the position. So the extent to which parties complied with those requirements not only before but also during the proceedings may be relevant.

In *Groupama Insurance Co Ltd v AON Ltd* [2003] EWCA Civ 1846; [2004] 1 All E.R. (Comm); [2004] C.P. Rep. 18, CA, insurers (C) brought a claim in the Commercial Court against a counterparty (D1) to a retrocession agreement, and upon D1 alleging in their defence that, by altering a draft fax, insurance brokers had acted negligently and without authority, C then joined the brokers (D2) as second defendants (confronting them with a potential liability of £10 million). At trial, the judge (1) rejected D1's defence and gave judgment for C in their claim against D1, but (2) dismissed C's claim against D2. The judge ordered D2 to bear their own costs, principally for the reason that, by their conduct of altering the fax, D2 had given rise to an argument (rejected at trial) without which the proceedings would never have been started. The Court of Appeal allowed D2's appeal, holding that D1 should pay D2's costs, subject to a disallowance of 10% because of the conduct of D2 to which the judge took exception. The appeal provided an opportunity for the Court to explain (1) that, before the advent of the CPR, it was well settled that, in exercising his discretion as to the costs of any proceedings, a judge was entitled to consider any relevant aspect of the conduct of the parties, whether it be their conduct (a) in the proceedings themselves, (b) in the period that led up to the issue of proceedings, or (c) in relation to the matters that gave rise to the proceedings, and (2) that nothing in the language of paras (4) and (5)(a) of r.44.2 suggests that there was any intention to alter the position ([29] to [32] per Brooke LJ). Put shortly, the Court's conclusion was that, although the judge was right to take into account D2's conduct in relation to matters that gave rise to the proceedings, he erred in penalising them so heavily as to "their anterior conduct", being conduct "that was not even dishonest". It may be noted that in this case the Court of Appeal expressly departed from its earlier decision in *Hall v Rover Financial Services Ltd (GB)* [2002] EWCA Civ 1514; [2003] C.P.L.R. 285, CA, where it had stated that to be good reason to deprive a successful claimant of his or her costs, the conduct of that party must be conduct "in relation to the litigation", not conduct which is "extraneous to it". Brooke LJ (at [38]) thought that in that earlier decision the Court may not have been taken to all of the relevant authorities nor to the precise wording of r.44.2.

There is no strict rule to the effect that pre-action conduct is relevant to costs only if causative of the bringing of an unsuccessful claim, or of increased expense in the subsequent litigation, although that would plainly be of primary relevance in the court's decision to what extent to penalise a party for inappropriate pre-action conduct when making or refusing an order for costs (*Bank of Tokyo-Mitsubishi Ufj Ltd v Baskn Gida Sanayi Ve Pazarlama AS* [2009] EWHC 1696 (Ch); [2010] 5 Costs L.R. 657 (Briggs J) at [23]).

Where a defendant offers the full amount of the claim before the issue of proceedings but declines to offer to pay the claimant's costs, there is no principle that the claimant cannot properly bring proceedings to obtain a costs order and recover the pre-action costs: *Ayton v RSM Bentley Jennison* [2018] EWHC 2851 (QB) (May J).

**Rules 44.2(4)(a) and 44.4(3)(a): Taking into account party conduct in costs order and in detailed assessment**

**44.2.26**  In *Drew v Whitbread* [2010] EWCA Civ 53; [2010] 1 W.L.R. 1725, CA, a judge gave judgment for the claimant (C) in the trial of a personal injury claim proceeding on the multi-track at which both liability and quantum were contested. The judge found that C was 25% responsible for his own injuries, and held that his claim of £18,325 for future losses should be rejected, but he should be awarded £9,300 for other losses. As to costs the judge ordered that the defendant (D) should pay C's costs of the action, to be assessed on the standard basis. In doing so the judge considered but rejected D's submission that, because of C's failure to negotiate, his exaggeration of his claim, and his unreasonable conduct in relation to the agreement of the joint experts, a different (or special) order should be made. C's solicitors lodged a bill of costs for £78,500, including a 100% success fee. In the detailed assessment proceedings the costs judge (1) finding that, as from a particular pre-trial date, it should have been apparent to the parties that the case was one that should have been pursued on the fast track, restricted C's costs to fast track costs from that date, and (2) awarded C costs of £41,800. The Court of Appeal allowed C's appeal and remitted the matter for re-consideration, holding that the costs judge was not entitled, in effect, to rescind the judge's order by ruling that the trial costs should be assessed as if the case were on the fast track. The Court reviewed the relevant authorities, in particular *Aaron v Shelton* [2004] EWHC 1162; [2004] 3 All E.R. 561; *Northstar Systems Ltd v Fielding* [2006] EWCA Civ 1660; [2007] 2 All E.R. 983, CA; *Lahey v Pirelli* [2007] EWCA Civ 91; [2007] 1 W.L.R. 998, CA, and stated that r.44.2 (Court's discretion as to costs) and r.44.4 (Factors to be taken into account in deciding the amount of costs), although they have different functions, are intended "to work in harmony" and that the parties' conduct (for example) may have to be considered under both rules (see r.44.2(4)(a) and r.44.4(3)(a)). The Court explained that (1) it is open to the costs judge to disallow costs relating to an issue on the grounds that the costs were unreasonably incurred, (2) a trial judge may be in a good position to help a costs judge on such a point, but the fact that it was not raised with the trial judge should not preclude a party from raising the matter with the costs judge, (3) in this case, D did not seek to obtain from the trial judge (a) an order that costs should be limited to those recoverable on a fast track basis, and (b) in particular, a ruling that only one day's trial costs should be allowed, even though the case had gone into a second day, (4) but the fact that such submissions were not made did not prevent D from raising them before the costs judge, whose duty to consider "all the circumstances of the case" included considering the question whether the case was in reality a fast track case, (5) D did submit to the trial judge that C's claim had been exaggerated, but failed to obtain from the judge a different order in relation to that submission, (6) nevertheless, the costs judge was entitled to consider how, if lawyers had been properly instructed, the case should have been fought and in particular whether it would have ended up as a fast track case.

In *Morton v Portal Ltd* [2010] EWHC 1804 (QB) (Walker J), where liability was admitted and quantum was settled without trial, the parties sought an order for costs from the trial judge and the unsuccessful defendant submitted that because part of the claimant's claim was exaggerated they should recover all or part of the related costs. The judge decided that, without the advantage of oral evidence and detailed submissions, it was not possible to reach conclusions as to the claimant's conduct such as would warrant a departure from the default position as to costs. In the circumstances, and bearing in mind the sums at stake, the proper course was that issues about appropriateness and proportionality should be dealt with as part of detailed assessment by a costs judge ([60]).

In *Hussain v Amin* [2012] EWCA Civ 1456, at the trial of a road traffic accident claim, the defendant (D), in attempting to raise doubts as to the genuineness of the claim, relied to a considerable extent on a number of inconsistencies in the claimant's (C) witness statements. In giving judgment for C, the judge referred to these inconsistencies and said that they were the result of "sloppy preparation" by C's solicitors. As to costs, the judge ordered that D should pay C's costs, rejecting D's submissions that a different order should be made, but directed that all questions of C's solicitor's conduct of the proceedings should be reserved to the costs judge. The Court of Appeal (referring to *Drew v Whitbread* op cit) approved of the course that the judge had taken; it was clear that the judge thought that he was not himself in a position to make findings on the conduct question and that the most efficient way of dealing with it was to leave the matter to the costs judge (at [12] per Lord Dyson MR).

In *Rehill v Rider Holdings Ltd* [2014] EWCA Civ 42; [2014] 3 Costs L.R. 405, CA, at the trial of a road accident personal injury claim, which the defendants (D) contended, though genuine in principle had been dishonestly inflated, the claimant (C) failed to obtain judgment for an amount in excess of D's Part 36 offer, the last of three offers made by D. The judge ordered C to pay D's costs on the standard basis with effect from the date for acceptance of that offer, but made no order as to costs incurred before that date. The judge was of the opinion that C's conduct, though reprehensible, was not "so egregious" as properly to warrant "any further penal order of costs", for

example, an order making C pay the costs before the Part 36 offer, but included in the order a term to the effect that neither party should be "prevented from raising issues of conduct" in any detailed assessment proceedings. On appeal the Court of Appeal accepted D's submission that C ought to have accepted the second of two of their earlier offers and substituted an order that C should pay D's costs with effect from date of that offer. The court rejected D's submission that the judge was wrong in not marking in his costs order the court's disapproval of C's dishonest prosecution of an inflated claim. The Court explained that r.44.11 (Court's powers in relation to misconduct), if properly applied at detailed assessment, would result in the disallowing of any part of C's costs incurred in advancing a dishonest case, and might also result in his having to pay D's costs of combating that dishonest case.

### Rule 44.2(3): Application of r.44.2 in family and probate appeals

**44.2.27**    The general rule, stated in r.44.2(2)(a), that the unsuccessful party will be ordered to pay the costs of the successful party, does not apply to the proceedings in the Court of Appeal on an application or appeal made in connection with proceedings in the Family Division (r.44.2(3)(a)) or from a judgment, direction, decision or order given or made in probate proceedings or family proceedings (r.44.2(3)(b)).

### Successful defendant's costs payable by unsuccessful defendant (Sanderson and Bullock orders)

**44.2.28**    Where in the same proceedings a claimant (C) sues two defendants (D1 and D2) and succeeds against one only (say D1) there are two successful parties (C and D2) and two unsuccessful parties (C and D1); C is both a receiving party and a paying party. A strict application of the general rule as to costs would require that C should pay D2's costs and that D1 should pay C's costs. But the court's discretion "as to whether costs are payable by one party to another" (r.44.2(1)(a)) is wide enough to enable it to order that the costs payable by C to D2 should be recoverable by C from D1 as part of C's costs in the proceedings. So C pays to D2 and recovers from D1. Such an order is known as a "*Bullock* order" (see *Bullock v London General Omnibus Co* [1907] 1 K.B. 264, CA).

The court may adopt a simpler approach and order that D1 (the unsuccessful defendant) should pay the costs of D2 (the successful defendant) directly to D2. Such an order is known as a "*Sanderson* order" (see *Sanderson v Blyth Theatre Co* [1903] 2 K.B. 533, CA) (an order commonly used where C is legally-aided).

The term "*Bullock* order" has often been used to describe both forms of order (*Mayer v Harte* [1960] 1 W.L.R. 770, CA). The form of the order is in the discretion of the court.

Where, in these circumstances (that is, where D2 is successful and D1 unsuccessful), there is no rule or even a general principle, which governs the question of costs. They remain as always in the discretion of the court. The generally discretionary nature of the exercise, both whether to make an order that D1 pay or contribute to the costs of D2, and, if so, whether by *Bullock* order or *Sanderson* order, was emphasised by the English Court of Appeal in cases decided before the CPR came into effect (e.g *Mayer v Harte* [1960] 1 W.L.R. 770, CA; *Goldsworthy v Brickell* [1987] Ch 378, CA). The approach of the courts reflected in the pre-CPR decisions was that, where a claimant had behaved reasonably in suing both defendants, he should not normally end up paying costs to either party even though he succeeded only against one of the defendants (*King v Zurich Insurance Co* [2002] EWCA Civ 598, at [33] per Keene LJ). The jurisdiction to grant the orders survived the CPR, though the exercise of the discretion must be guided by the overriding objective and the specific provisions of r.44.2 (formerly r.44.3) (*Irvine v Commissioner of Police for the Metropolis* [2005] EWCA Civ 129; [2005] 3 Costs L.R. 380, CA, at [2]). Nowadays, it should go without saying (but in the past the courts have felt obliged to say it), there is no rule of law compelling the court to make an order of either variety (*Hong v A & R Brown Ltd* [1948] 1 K.B. 515, CA).

It is, of course, one thing to absolve C from liability for D2's costs (or a proportion of them), but quite another thing to make D1 liable for those costs (or a proportion of them), either directly (through a *Sanderson* order) or indirectly (through a *Bullock* order). The Court of Appeal has explained that the particular usefulness of this discretionary power lies in the fact that it avoids injustice to C in a case where he does not know which of two defendants (D1 or D2), or more, should be sued for a wrong done to him, and is at risk of having what he recovers in damages from D1 eroded or eliminated by an order for costs against him in respect of his action against D2; but it has to be recognised that, because its exercise entails making D1 liable for the costs of more than one party, it is a power capable of working injustice to D1 (*Irvine v Commissioner of Police for the Metropolis*, op cit, at [22]). If C fails against both defendants, the justification for a *Bullock* order or *Sanderson* order does not arise, even if D1, when faced with C's claim, blamed D2 (*Beoco Ltd v Alfa Laval Co Ltd* [1995] Q.B. 137, CA, *McGlinn v Waltham Contractors Ltd* [2007] EWHC 698 (TCC); [2008] Bus. L.R. 278 (Judge Peter Coulson QC)).

The leading modern authorities are *Irvine v Commissioner of Police for the Metropolis*, op cit, and *Moon v Garrett* [2006] EWCA Civ 1121; [2006] C.P. Rep. 46, CA; [2006] B.L.R. 402, CA; they are routinely relied on at first instance; see e.g. *Jabang v Wadham* [2017] EWHC 1993 (QB); [2017] 4 Costs L.R. 807 (Nicol J). The judgments therein stress that there are no hard and fast rules, but are replete with illustrations of factors that may be relevant to the questions whether D1 may be made liable for D2's costs. They indicate that the dominant consideration, but not the only one, is whether the original joinder of D2 in the proceedings was reasonable. If the joinder was unreason-

able C cannot seek to pass costs payable by him to D2 over to D1 Where it was reasonable that of itself does not entitle C to an order that D1 should pay D2's costs, either directly (as a *Sanderson* order) or indirectly (as a *Bullock* order). But the reasonableness of the original joinder is certainly a relevant factor. The fact that the respective claims against D1 and D2 were made in the alternative will be material, but the fact that the claims were not truly alternatives does not mean that the court does not have power to order D1 to pay D2's costs. A further relevant factor is whether the causes of action relied on against D1 and D2 are connected with each other or independent causes of action. The fact that one defendant blamed the other is a relevant factor but on its own does not make the joinder reasonable. Even if the joinder was reasonable at the outset, the position must also be looked at from the point of view of D1. If D1 has done nothing to cause or contribute to the joinder of D2, that will be a point in D1's favour. The converse also applies (*Lane Group Ltd v D I & L Paterson Ltd* [2000] 1 N.Z.L.R. 129, CA, at [84]).

In *Dixon v Blindley Heath Investments Ltd* [2016] EWCA Civ 548; [2016] 4 Costs L.O. 627, CA, the Court of Appeal differed with the judge's approach to the ambit of the *Bullock* jurisdiction in certain respects in "the peculiar circumstances of an awkward case". In examining the reasons given by the judge for not making an order, the Court explained (1) that the fact that the claimant was not suing two or more defendants for the same loss (albeit the paradigm situation, but not a necessary condition) was not a powerful factor against the making of an order, (2) that one of two or more defendants sued should have blamed the other is a relevant consideration but it is not determinative, (3) that the claimant's case against one group of defendants (ostensibly seeking rescission and/or damages) was inconsistent with its claims against another group (seeking registration of the transfer of shares) was not "a disqualifying feature" (at [74]–[79] per Hildyard J).

In *Rackham v Sandy* [2005] EWHC 1354 (QB); [2006] 1 Costs L.R. 34 (Gray J), a libel action in which qualified privilege was conceded from the outset, D1 was ordered to pay two thirds of C's costs and C was ordered to pay one quarter of D2's costs (against whom C had failed to establish malice). The defendants had not blamed one another. The judge ruled that in all the circumstances it would not be just to make a *Sanderson* order.

Where it is the position that C's success against D1 is for significantly less than C claimed, it is conceivable that the costs recoverable by C from D1 will be less than those payable by C to D2. The prospect of that outcome may make it inappropriate to make either a *Bullock* order or a *Sanderson* order (*Whitehead v Searle* [2007] EWHC 2046 (QB) (Griffith Williams J), at [24]).

It has been stated at first instance that, nowadays, *Bullock* orders and *Sanderson* orders are appropriate only where D1 and D2 are joined in the proceedings on the ground that C did not know which party was at fault (*Whitehead v Searle* above).

Under CPR r.44.2, by adopting an issue-based approach in exercising its discretion as to costs, the court may make orders closely reflecting the success or lack of success of parties on particular issues arising in the proceedings and departing from the general rule that the unsuccessful party should pay the successful party's costs. In proceedings where claims are made against several defendants, the flexibility of those powers may be utilised to advantage in circumstances where alternatively, but perhaps less satisfactorily, *Bullock* orders or *Sanderson* orders might be made.

### Rule 44.2(6)(g): "interest on costs from or until a certain date"

**44.2.29**    In respect of the amount payable to a receiving party under an order for costs (whether agreed or as assessed), that is to say, payable when the costs order has crystallised into a judgment debt, that party is entitled to interest on that amount at the statutory rate of 8% per annum (a rate which the court may not vary). The entitlement to such interest begins on the date upon which the order for costs was made (not the date upon which the costs were assessed) unless the court otherwise orders. The court may order that interest shall begin to run from a date before the date that judgment is given (*Bristol-Myers Squibb Co v Baker Norton Pharmaceuticals Inc* [2001] EWCA Civ 414; [2001] R.P.C. 45, CA) or after. The law in these respects is not derived from para.(g) of r.44.2(6) or from any of the other provisions in r.44.2(6) as to types of costs orders, but from legislation (primary and secondary) applicable to judgment debts generally, that is to say, from s.17 of the Judgments Act 1838, s.74 of the County Courts Act 1984, as interpreted (so far as orders for costs are concerned) by decisions of the House of Lords (in particular *Hunt v RM Douglas (Roofing) Ltd* [1990] 1 A.C. 398, HL, *Thomas v Bunn* [1991] 1 A.C. 362, HL), and from CPR r.40.8 (Time from which interest begins to run). In cases where costs orders are deemed to have been made, statutory interest runs from the date on which the event which gave rise to the entitlement to costs occurred (r.44.9(4)). On these aspects of the law of interest on costs, see further para.40.8.2 above, and para.44.9.4 below.

It has to be noted that in *Simcoe v Jacuzzi UK Group Plc* [2012] EWCA Civ 137; [2012] 1 W.L.R. 2393, CA, the Court of Appeal held that r.40.8 is "ineffective" in the County Court, at least temporarily (see para.40.8.1 above). The commentary in the paragraph immediately above and in the paragraphs below, insofar as it is based on the effectiveness of that rule (in the High Court at least), must be read in the light of that decision.

However, it has been noted that, in terms, there is some overlap between r.40.8(2) and (in part) r.44.2(6)(g) (*Fattal v Walbrook Trustees (Jersey) Ltd* [2009] EWHC 1674 (Ch); [2009] 4 Costs L.R. 591 (Christopher Clarke J) at [25]; *Dupont Nutrition Biosciences ApS v Novozymes A/S* [2013] EWHC 483 (Pat), (Floyd J) at [26]). Rule 40.8(2), states that the court may order that interest in respect of a

judgment debt "shall begin to run from a date before the date that judgment is given", and r.44.2(6)(g) in part states that, in making an order for costs, the court may order that a party must pay interest on costs "from ... a date before judgment". Rule 40.8(2) applies where interest is payable on amounts due on judgment debts generally, and r.44.2(6)(g) applies where interest is payable on amounts due on costs orders particularly. To that extent both provisions fulfil the same function, with r.44.2(6)(g) adding nothing to r.40.8(2) except drawing attention (albeit inelegantly) to what otherwise might not be understood readily. However, as is explained further immediately below, when read in full, it can be seen that r.44.2(6)(g) fulfils a further and quite different function as to interest on costs.

In full, para.(6)(g) of r.44.2 states that the court may order that a party must pay interest on costs "from or until a certain date, including a date before judgment". No comparable provision appeared in the costs rules in the RSC or the CCR. The significance of it is as follows. Generally, civil proceedings operate on a "pay as you go basis", with the parties engaged paying the costs that they have incurred in the proceedings as they arise throughout, and paying those costs out of their own pockets or financing them through interest bearing borrowings or the indulgence of their lawyers. As a result, when at the end of the proceedings the time comes for the court to consider what order for costs should be made the parties may have been out of pocket to the extent of those payments for a period of time or may be indebted to lenders for interest on loans. An order that a party in such a position should be paid their costs as assessed (if not agreed) will not, without more, be an order which will include any compensation for that party for being out of pocket in this respect or being so indebted. A receiving party worsened in this way may seek such compensation by requesting the court when making a costs order under r.44.2 to exercise its power under r.44.2(6)(g) to award interest on incurred costs (the amount of such costs to be assessed if not agreed).

In *Bim Kemi AB v Blackburn Chemicals Ltd* [2003] EWCA Civ 889; [2004] 2 Costs L.R. 210, CA, the Court of Appeal noted (at [18]) the effect of r.44.2(6)(g) in this respect and commented that, in principle, there seems no reason why the court should not exercise the power to include in a costs order an award of interest on costs "from or until a certain date, including a date before judgment" where a party "has had to put up money paying its solicitor and been out of the use of that money in the meanwhile" (cf. *McPhilemy Times Newspapers (No.2)* [2001] EWCA Civ 933; [2002] 1 W.L.R. 934, CA, at [23] per Chadwick LJ, where reference was made to the "perceived unfairness" arising from "the general rule that interest is not allowed on costs paid before judgment"). This power is nowadays routinely exercised.

Under r.44.2(6)(g), the determination of the dates from which or within which interest should run are a matter for the discretion of the court. In *Douglas v Hello! Ltd* [2004] EWHC 63 (Ch); [2004] 2 Costs L.R. 304 (Lindsay J) the judge ruled ([24]) that, when seeking to measure the extent to which a party has been out of pocket, the appropriate dates from which interest should run would be the dates on which the invoices for costs were actually paid by the party, rather than from the dates on which they were rendered, and that such interest should continue until the date when the costs became payable by the paying party under the order for costs as a judgment debt and the statutory rate of interest began to run (see r.40.8); see also, *Bim Kemi AB v Blackburn Chemicals Ltd*, above, at [18]; *Involnert Management Ltd v Aprilgrange Ltd* [2015] EWHC 2834 (Comm); [2015] 5 Costs L.R. 813 (Leggatt J) at [7].

Further, where the court makes an award of interest in respect of a period before judgment, the rate of interest is at large and in practice is made at a commercial rate. This was confirmed by the Court of Appeal in *ABCI v Banque Franco-Tunisienne* [2003] EWCA Civ 205; [2003] 2 Lloyd's Rep. 146, CA (at [88] to [91]), where a rate of base rate plus 1% was substituted by the Court for the statutory judgment rate (8%) awarded by the judge, and *Bim Kemi AB v Blackburn Chemicals Ltd* [2003] EWCA Civ 889; [2004] 2 Costs L.R. 210, CA, at [18]. See also *J Murphy & Sons Ltd v Johnston Precast Ltd* [2008] EWHC 3104 (TCC); [2009] 5 Costs L.R. 745 (Coulson J), and authorities referred to there (where the judge rejected a submission that the rate should be enhanced because the receiving party made offers which the paying party would have been well advised to accept); and *Fiona Trust and Holding Corp v Privalov* [2016] EWHC 2657 (Comm), (Males J) at [9]. Where the payee can prove that a rate of interest higher than base rate plus 1% was actually incurred, the higher rate may be awarded (*Amey LG Ltd v Cumbria CC* [2016] EWHC 2946 (TCC); [2016] 6 Costs L.R. 1113 (Judge Stephen Davies) at [70] and [71], plus 2% was awarded). The judge has to bear in mind the fact that, as a result of the international financial upheaval in September 2008, the gap between the bank rate and the actual costs of borrowing has widened. In *KR v Bryn Alyn Community (Holdings) Ltd* [2003] EWCA Civ 383; [2003] C.P. Rep. 49, CA, interest at the rate of 4% over base rate was awarded ([23]); see also *MacInnes v Gross* [2017] EWHC 127 (QB); [2017] 4 W.L.R. 49 (Coulson J), at [12] to [14].

The factors to be considered by the judge in determining the appropriate rate (including whether the borrower was classed as a first class borrower, an SME or a private individual) were explained by the Court of Appeal in *Jones v Secretary of State for Energy and Climate Change* [2014] EWCA Civ 363; [2014] 3 All E.R. 956, CA, [17] and [18]. Ultimately, the court conducts a general appraisal of the position having regard to what is reasonable for both the paying and the receiving parties; the principles to be applied do not materially differ from those applicable to the award of interest on damages under s.35A of the Senior Courts Act 1981 (above). Where the party is based overseas and incurred the costs in a foreign currency, the rate of interest should be related to that

currency rather than to the Bank of England base rate; for example, the US Prime Rate, where the costs were incurred in dollars. Where the costs were incurred in euros, the court awarded the ECB main refinancing operations rate plus 1.5%: *Phones 4U Ltd (In Administration) v EE Ltd* [2023] EWHC 3378 (Ch).

In *Hurndell v Hozier* [2011] EWHC 321 (Ch); [2011] 2 Costs L.O. 194 (Morgan J), the paying party, in resisting the submission of the receiving party (D) that the order should include interest on costs which had been incurred and paid by D before judgment, argued that D had not shown either (1) that they had any particular investment purpose in mind for money which they had spent on costs, or (2) that, at some cost to themselves, they had borrowed money for that purpose. The judge concluded that those points may bear upon the rate of interest chosen by the court but did not affect the decision whether to award interest.

The power of the court, when making a costs order under r.44.2, to award interest under r.44.2(6)(g) is quite distinct from, and must not be confused with, the power to award interest on costs at a rate not exceeding 10% above base rate ("enhanced interest") under r.36.17 (costs consequences where claimant fails to obtain judgment more advantageous than Part 36 offer etc.) (r.36.17(4)(c)). It is conceivable that the making of a costs order in a given case will involve consideration by the judge of both r.36.17 and r.44.2(6)(g). The power of the court under r.36.17 is in addition to any other power it may have to award interest. Where the court orders interest under r.36.17 and also awards interest for the same sum and for the same period under any other power, the total rate of interest must not exceed 10% above base rate (r.36.17(6)). See further commentary following r.36.17.

As to interest payable where the court orders that costs paid on account (or part of them) should be repaid, see para.44.2.12 above.

### Exercise of costs discretion in judicial review proceedings

**44.2.30**  Generally, the provisions in r.44.2 dealing with the making of costs orders apply to costs in judicial review proceedings as they apply to costs in other proceedings regulated by the CPR. See para.54.16.9 (Costs) below.

However, in judicial review claims the court's discretion as to costs is affected by special considerations in certain circumstances. For example, it is the established practice of the High Court to make no order for costs for or against an inferior tribunal or court which plays no active part in a judicial review of one of its decisions. In *R. (Davies) v Birmingham Deputy Coroner* [2004] EWCA Civ 207; [2004] 1 W.L.R. 2739, CA, the Court held that an order for costs should only be made in favour of a successful party against an inferior tribunal if the tribunal appeared in court in "more than a neutral way", or there had been a flagrant instance of improper behaviour on the part of the tribunal. See also *R. (Gudanaviciene) v Immigration and Asylum First Tier Tribunal* [2017] EWCA Civ 352; [2017] C.P. Rep. 21, CA. This practice is not inconsistent with r.44.2 and may apply to any judicial or quasi-judicial body: *R. (Gourlay) v Parole Board* [2020] UKSC 50. Also, special provisions for the payment of costs by those who intervene in judicial review proceedings affecting the court's discretion are contained in the Criminal Justice and Courts Act 2015 s.87; applications invoking those provisions are made under r.46.15.

Further, in judicial review claims, the determination of appropriate orders for costs may involve consideration of certain practical matters not arising (or commonly arising) in other proceedings and which should be noted here briefly; viz. (a) costs at the permission stage, (b) determining the successful party where claim compromised, and (c) the award of two sets of costs.

### Judicial review claim—costs at the permission stage

**44.2.31**  A claim form for a claim for judicial review must be served on the defendant and on interested parties within seven days after the date of issue (r.54.7). Any person served "who wishes to take part in the judicial review" must file an acknowledgment of service stating, amongst other things, a summary of grounds for contesting the claim (r.54.8), a task inevitably involving some costs-incurring work. (The consequences of not complying with the requirements of r.54.8 are set out in r.54.9.) The claimant may not proceed with the claim unless the court gives permission (r.54.4). Normally, the application for such permission will be dealt with on paper without an oral hearing. In Practice Direction 54A it is provided that, where there is a hearing, parties other than the applicant need not attend unless the court orders otherwise (para.8.5). Further, where the defendant or any party does attend a hearing the court will not generally make an order for costs against the claimant (para.8.6). Where an application for permission is successful, and whether there has been a hearing or not, normally the court's order for costs will be (or will be deemed to be) "costs in the case" and whether the claimant will be able to recover those costs will depend upon the outcome of the case (*Practice Statement (Judicial Review: Costs)* [2004] 1 W.L.R. 1760). Where the application is unsuccessful a discrete procedure for determining costs applies, based on the provisions in Practice Direction 54A referred to above and on guidance given by the Court of Appeal, principally in *R. (Mount Cook Land Ltd) v Westminster City Council* [2003] EWCA Civ 1346; [2004] C.P. Rep. 12, CA, and *R. (Davey) v Aylesbury Vale DC (Practice Note)* [2007] EWCA Civ 1166; [2008] 1 W.L.R. 878, CA. The general rule is that a successful defendant (or other party) at the permission stage who has filed an acknowledgment of service should recover from the claimant the costs of doing so, whether or not that party attended any permission hearing. An unsuccessful applicant may be liable for the costs of more than one defendant and any interested parties: *Campaign to Protect Rural*

*England v Secretary of State for Communities and Local Government* [2021] UKSC 36. For details of the procedure, see para.54.12.5 below, and para.23.4 of the Administrative Court Judicial Review Guide (Vol.2 para.1BA-132).

**Judicial review claim—determining the successful party where claim compromised**

**44.2.32**    Where private law proceedings are settled it is usually possible to identify with some precision the extent to which a party has been vindicated. However, as the Court of Appeal explained in *R. (Tesfay) v Secretary of State for the Home Department* [2016] EWCA Civ 415; [2016] 1 W.L.R. 4853, CA, for various reasons the position following compromise of public law proceedings, in particular judicial review claims, is often not so clear cut. In that case the Court of Appeal held, after a review of the relevant cases ([7] to [12]), that success in public law proceedings must be assessed "not only by reference to what was sought and the basis on which it was sought and on which it was opposed, but also by reference to what was achievable". The Court explained (at [57] per Lloyd Jones LJ) (1) that proceedings for judicial review are brought by persons dissatisfied with decisions of public bodies, (2) however, the courts are not the decision-makers and often in public law the most that can be achieved is an order that the decision-maker reconsider on a correct legal basis, (3) that may not lead to ultimate victory for the claimant because the new decision may be a lawful decision against the interests of the claimant, (4) nevertheless, to achieve an order for reconsideration will often be a substantial achievement.

In the *Tesfay* case the Court of Appeal affirmed the approach adopted by the Court in *R. (M) v Croydon LBC* [2012] EWCA Civ 595; [2012] 1 W.L.R. 2607, CA, at [58] to [63], per Lord Neuberger MR (where it was held that a judge had been wrong to make no order as to costs in a case where a local authority had conceded a claim made by an asylum seeker in relation to his age but were not prepared to agree to pay his costs of proceedings), a case in which the Court departed to a degree from the guidelines stated in *R. (Boxall) v Waltham Forest LBC* (2001) 4 C.C.L. Rep. 258, at [22] (Scott Baker J) and subsequently relied on in first instance and appeal decisions. In the Croydon case the Master of the Rolls, in setting out the principles to be followed by a judge determining the incidence of costs in relation to judicial review proceedings which have been compromised, distinguished three different types of outcomes. They are (1) where a claimant has been wholly successful whether following a contested hearing or pursuant to a settlement, and (2) where he has only succeeded in part following a contested hearing, or pursuant to a settlement, and (3) where there has been some compromise which does not actually reflect the claimant's claims (paras 60 to 63). His lordship gave guidance as to the points to be considered in relation to each case. The principles were applied in *R. (Agyemang) v Haringey LBC* [2017] EWCA Civ 1630; (2018) 21 C.C.L. Rep. 101, CA, where the Court of Appeal, though disagreeing with the manner in which the judge applied the principles, agreed with him that there should be no order as to costs. See also *R. (SM (Afghanistan)) v Secretary of State for the Home Department* [2018] EWCA Civ 32, where the decision of a judge making no order for costs was upheld. Where the claimant had obtained, by agreement made for practical reasons, the result that he sought (resisting removal from the UK) but where the claim would have failed had it been determined on its merits, the claimant had not been successful and should not be awarded his costs. That the claimant was publicly funded was not relevant: *ZN (Afghanistan) v Secretary of State for the Home Department* [2018] EWCA Civ 1059.

The decision of the Court of Appeal in *R. (M) v Croydon LBC*, op cit, by exposing public authorities to liability in costs in circumstances in which generally they had been immune previously, had the effect of encouraging the early settlement of public law cases (*R. (Gudanaviciene) v Immigration and Asylum First Tier Tribunal* [2017] EWCA Civ 352; [2017] C.P. Rep. 21, CA, at [24] per Longmore LJ). However, for reasons mentioned above (para.44.2.30), the encouragement given by that case has no application to judicial review claims against courts or tribunals (*R. (Gourlay) v Parole Board* [2017] EWCA Civ 1003; [2017] 1 W.L.R. 4107; [2017] 4 Costs L.O. 489, CA, at [53] to [5]7 per Gloster LJ).

See further, Administrative Court Judicial Review Guide (2016) para.23.5 (Costs after settling) (Vol.2 para.1BA-133).

**Judicial review claim—award of two sets of costs**

**44.2.33**    The problem of whether an unsuccessful party should be ordered to pay the costs of more than one successful party arises in various procedural contexts. Frequently it arises in judicial review proceedings, typically where the parties include, not only the claimant and the defendant, but also an interested party or parties (a not uncommon occurrence). Where the claimant is unsuccessful, generally the court does not order that party to pay two sets of costs, that is to say, the costs of the defendant and the costs of the interested party. The court may award two sets of costs where the interested party deals with a separate issue not dealt with by the defendant or where the defendant and the interested party have separate and distinct interests which require separate representation (*Bolton MDC v Secretary of State for the Environment (Practice Note)* [1995] 1 W.L.R. 1176, HL, *R. (Luton BC) v Central Bedfordshire Council* [2015] EWCA Civ 537; [2015] 2 P. & C.R. 19, CA, at [80], affirming [2014] EWHC 4325 (Admin), (Holgate J) at [221]).

See further, para.54.16.9, and Administrative Court Judicial Review Guide para.23.6.1 (Vol.2 para.1BA-134).

**Official Solicitor**

**44.2.34**    The Official Solicitor may become engaged in civil proceedings as a party, for example, as a trustee of a deceased's estate appointed by the court, or as the representative of a party, for

WOOLF, Harry Woolf, Bar



# ACCESS
## TO
# JUSTICE

*Final Report*

*By The Right Honourable the Lord Woolf,
Master of the Rolls*

**JULY 1996**



**Final Report**

**to the Lord Chancellor**

**on the civil justice system**

**in England and Wales**

**London: HMSO**

C  O  N  T  E  N  T  S

*Introduction*                                                                    Page

*Section I*                    **Overview**                                          1

*Section II*                   **Case Management**                                Page

*Chapter 1*                    Introduction                                        14
*Chapter 2*                    Fast Track: General                                 20
*Chapter 3*                    Fast Track: Detailed Procedures                     32
*Chapter 4*                    Fast Track: Costs                                   43
*Chapter 5*                    The Multi-Track                                     59
*Chapter 6*                    Sanctions                                           72
*Chapter 7*                    Costs                                               78
*Chapter 8*                    The Supporting Structure                            91

*Section III*                  **Procedure and Evidence**                         Page

*Chapter 9*                    Introduction                                       104
*Chapter 10*                   Pre-action Protocols                               107
*Chapter 11*                   Offers to Settle                                   112
*Chapter 12*                   Practice and Procedure                             116
*Chapter 13*                   Expert Evidence                                    137
*Chapter 14*                   Appeals                                            153

*Section IV*                   **Special Areas**                                  Page

*Chapter 15*                   Medical Negligence                                 170
*Chapter 16*                   Housing                                            197
*Chapter 17*                   Multi-Party Actions                                223
*Chapter 18*                   The Crown Office List                              250
*Chapter 19*                   Specialist Jurisdictions                           260

*Section V*                    **Rules of Court**                                 Page

*Chapter 20*                   The New Rules                                      272

*Section VI*                   **Maintaining the Pace of Change**                 Page

*Chapter 21*                   Information Technology                             284

*Recommendations*                                                                Page

                                                                                  299

*Chapter 17   Multi-Party Actions*

**Introduction**

**1.** The second part of my Inquiry was partly intended to deal with types of litigation causing particular problems for the system of civil justice. It was also designed to examine specific developments which would further access to justice. Clearly the arrangements for multi-party actions must be near the top of the list in both respects. As the National Consumer Council said in its submission to the Inquiry:

> "As we become an increasingly mass producing and mass consuming society, one product or service with a flaw has the potential to injure or cause other loss to more and more people. Yet our civil justice system has not adapted to mass legal actions. We still largely treat them as a collection of individual cases, with the findings in one case having only limited relevance in law to all of the others."

**2.** Unlike the position in some other common law countries, there are no specific rules of court in England and Wales for multi-party actions. This causes difficulties when actions involving many parties are brought. In addition to the existing procedures being difficult to use, they have proved disproportionately costly. It is now generally recognised, by judges, practitioners and consumer representatives, that there is a need for a new approach both in relation to court procedures and legal aid. The new procedures should achieve the following objectives:

(a)   provide access to justice where large numbers of people have been affected by another's conduct, but individual loss is so small that it makes an individual action economically unviable;

(b)   provide expeditious, effective and proportionate methods of resolving cases, where individual damages are large enough to justify individual action but where the number of claimants and the nature of the issues involved mean that the cases cannot be managed satisfactorily in accordance with normal procedure;

(c)   achieve a balance between the normal rights of claimants and defendants, to pursue and defend cases individually, and the interests of a group of parties to litigate the action as a whole in an effective manner.

**3.** In 1992 the Court of Appeal said that there might be a strong case for legislation to provide a jurisdictional structure for the collation and resolution of mass product liability claims *(Nash v Eli Lilly & Co.* [1993] 4 All ER, at p.409). The Legal Aid Board has called for new procedures tailored to multi-party litigation, which will emphasise the central issues rather than

making the action as a whole unviable. While criteria for entry will be of most concern in 'creeping disaster' cases including pharmaceutical and environmental claims, I see a clear need to establish equivalent criteria in all multi-party situations.

**53.** Agreement on criteria should assist in drawing up standard questionnaires, agreed between the parties, the court and the Legal Aid Board. These would ensure that the initial information obtained from potential claimants enables all concerned to make a clearer assessment of the number of claimants who might actually have a case. They would enable the Board to make a more accurate cost-benefit assessment, than it can at present. They would provide the criteria for the merits test for the initial wave of entrants to a register if the Board decides to grant legal aid.

**54.** In legally aided cases, the present arrangements for assessing the merits of potential multi-party actions rest largely with the Legal Aid Board. Many commentators consider that it has proved difficult to establish appropriate and satisfactory arrangements despite repeated endeavours. Suggested refinements include the obtaining of an independent opinion from counsel on the merits and allowing representations from defendants as in Scotland.

**55.** Through the registration of an MPS the court will be involved from an early stage and will determine the shape and progress of the action. It will provide an independent focus on the preliminary investigative effort and will provide a more natural context in which to consider the defendant's representations. The Legal Aid Board has difficulty, at least procedurally, in dealing with these and getting the claimants' response to the defendants' allegations. It is difficult for the Board to 'adjudicate' between them. This essentially adversarial process is more naturally controlled by the court. The alternative is parallel assessment of the merits by the court and the Board. The preferred approach is for the court to delineate the shape of the action and determine the criteria which must be met by those wishing to join the action. The Board would make its decisions on funding in the light of the court's decision.

**Costs of multi-party actions**

**56.** The Chief Taxing Master drew attention, at the Inquiry's seminar, to the need for the court to address the question of costs at an early stage, and for the judge to make costs sharing orders in respect of both claimants and defendants. These orders have to apply both to the costs of clients in respect of their own solicitors and of the opposing party should it obtain an order for costs. Orders on costs may need the assistance of the Taxing Masters if appropriate.

**57.** If the treatment of costs is not examined from the outset, the result is either subsidiary litigation or protracted problems when the matter comes to taxation. My general proposals for information on costs to be made available at every stage when the managing judge is involved are all the more important in relation to multi-party actions, where many claimants will be legally aided and have no direct control over costs and where costs can escalate dramatically. At every stage in the management of the MPS the judge should consider, with the help of the parties, the potential impact on costs of the directions that are contemplated, and whether these are justified in relation to what is at issue. Parties and their legal representatives, as in other cases on the multi-track, should provide information on costs already incurred and be prepared to estimate the cost of proposed further work. It has been suggested that such examination should occur at intervals of three months. That must be for the managing judge to determine in each individual case.

**58.** Other common law jurisdictions with a cost-shifting rule have not changed it when introducing special rules for multi-party actions. Multi-party actions are not so significantly different from ordinary litigation as to justify such a change. However, there are several respects in which the ordinary approach to costs needs to be modified.

**59.** The court needs a wide discretion in deciding what are costs for the purposes of the ordinary rule. Multi-party actions involve costs which do not normally arise in individual litigation, such as co-ordinating and communicating within the group and liaising with the media in what are often high profile cases. At present the costs of action groups or claimants' co-ordinating committees are not generally met on taxation, although they have been in some cases. Yet without such groups it may be difficult to co-ordinate an action. It is also probably the case that effective co-ordination of the action saves defendants costs overall. It is necessary that the costs of action groups should be met on taxation and that a reasonable basis for acknowledging these, and any others considered necessary or appropriate, should be established and applied by the court from the start. The Law Society's working party recommended that work done to co-ordinate between claimants and their solicitors should be recoverable *inter partes* and I support this.

**60.** Thirdly, in some cases it will be fair that the group as a whole bears a proportionate share of any costs. This was the approach in the well known decision involving the drug Opren, *Davies (Joseph Owen) v Eli Lilly & Co.*

[1987] 1 WLR 1136, CA. However, this approach cannot be adopted as an invariable rule for multi-party litigation. The Scottish Law Commission has cogently set out the reasons (op.cit., p.278):

> "Similarly, we think it is only reasonable that the members of a class should contribute to the expenses of a class action brought on their behalf. It would be difficult, however, to give effect to this policy in a class action procedure with an opt out scheme. It is significant that in those jurisdictions with opt out schemes the other class members are not obliged by the rules to contribute to the representative party's expenses. It would obviously be impossible to enforce an order for contribution against class members who could not be identified, and inequitable to enforce it only against those who could be identified."

**61.** The result of always adopting the Davies approach would be that in non-legally aided cases there would be a denial of access to justice. Indeed, this was evident in the Opren litigation itself. The claimants' legal advisers hoped that the lead cases could be chosen entirely from those legally aided claimants with nil contributions. When the Court of Appeal in Davies held that costs should be borne equally amongst all claimants, the privately funded clients were advised to discontinue because of the threat which costs posed to them. Ultimately a private benefactor agreed to underwrite their costs and the case was soon after settled without trial.

**62.** It is therefore essential that the court approves any cost sharing arrangement at the outset, and that this includes any arrangements between the privately paying and legally aided claimants. Information on costs already incurred and to be incurred in the future will allow claimants to assess their eventual liability as the case develops.

**Legal aid funding**

**63.** At present in most group actions the Legal Aid Board is underwriting the majority of claimants' costs. The Lloyds litigation, although it is largely privately funded, includes a number of legally aided claimants. In other smaller cases, notably housing cases, there is often a mix of legally aided and private claimants. Until now the cost of large product liability actions has been a significant deterrent to unassisted claimants. It therefore seems sensible to consider whether it would be possible for future actions affecting substantial numbers of people to be handled in a way which either combines funding from legal aid and private sources or extends financial eligibility to those who might normally be ineligible.

civil litigation. There are also useful lessons to be learned from the study of previous inquiries and subsequent litigation. It was not part of the remit of my Inquiry to investigate this area but, despite the difficulties identified by the Scottish Law Commission, I consider that this is an area which requires further work, in particular in relation to its potential to inform or in part replace litigation in appropriate cases.

**Conclusion**

**87.** Although in the Inquiry's issues paper I encouraged consideration of more radical alternatives to the new rule proposed by the Law Society's working party, I have been persuaded by the strength of the response that such approaches are not yet necessary, given the continuing development of more effective ways of handling multi-party actions. I hope that my proposals of a multi-party situation, of pro-active judicial control and prospective arrangements as to how costs should be dealt with (although not the actual amounts involved) as well as the other recommendations in this chapter, will contribute to that process. It will be for the Lord Chancellor, if these proposals meet approval, to develop them in conjunction with the relevant interests.

**Recommendations**

My recommendations are as follows.

(1)     Where proceedings will or may require collective treatment, parties or the Legal Aid Board should apply for a multi-party situation (MPS) to be established. This would suspend the operation of the Limitation Act. The court may also initiate an application. Within the MPS, part of the proceedings could be common to some or all of the claimants, and other parts could be limited to individual claimants.

(2)     Individual claimants would be able to join the MPS at the application stage and subsequently by entering their names on an initial register.

(3)     The court should certify an MPS if it is satisfied that the group or groups will be sufficiently large and homogeneous, and that the cases within the MPS will be more viable if there is a collective approach than if they are handled individually.

(4)     Lower value or local cases should be dealt with locally at appropriate courts by either a High Court or Circuit judge.

(5)     A managing judge should be appointed at or as soon as possible following certification and should handle the action throughout.

(6)     In appropriate cases additional support may be provided by the appointment of a deputy Master or deputy district judge from those

practitioners who already have considerable experience of multi-party litigation.

(7)   The court should have a residual power to approve the lead lawyer if a difficulty arises in appointing one.

(8)   The court should usually aim to treat as a priority the determination of the generic issues while establishing economic methods of handling the individual cases.

(9)   The court should have power to progress the MPS on an 'opt-out' or 'opt-in' basis, whichever contributes best to the effective and efficient disposition of the case.

(10)  In reaching a decision on notice of the action to potential claimants, the court must take into account the cost of such notice and its usefulness.

(11)  The court should be responsible for determining whether the action has merit and should proceed and the criteria which must be met by those wishing to join the action.

(12)  The court should determine the arrangements for costs and cost sharing at the outset. The costs of action groups should be recoverable on taxation.

(13)  The Lord Chancellor's Department and Legal Aid Board should consider the possibility of extending the upper limits of financial eligibility on the basis of increased contributions. In appropriate cases, with tight judicial management and control on costs it may be possible for assisted persons' liability to be assessed and fixed in advance.

(14)  The possibility of a contingency legal aid fund should be reconsidered in the context of these proposals.

(15)  The court has a duty to protect the interests of claimants, especially those unidentified or unborn.

(16)  In appropriate cases the court should appoint a trustee.

(17)  Multi-party settlements should be approved by the court especially where the defendant offers a lump sum settlement.

(18)  The court should require an identified and finite group of claimants to have in place from the outset a constitution including provisions relating to acceptance of settlement.

# Davies Review of Issuer Liability

## Liability for misstatements to the market:

## A discussion paper by Professor Paul Davies QC

March 2007

# Davies Review of Issuer Liability

## Liability for misstatements to the market:

## A discussion paper by Professor Paul Davies QC

March 2007

© Crown copyright 2007

The text in this document (excluding the Royal Coat of Arms and departmental logos) may be reproduced free of charge in any format or medium providing that it is reproduced accurately and not used in a misleading context. The material must be acknowledged as Crown copyright and the title of the document specified.

Any enquiries relating to the copyright in this document should be sent to:

Office of Public Sector Information
Information Policy Team
St Clements House
2-16 Colegate
Norwich
NR3 1BQ

Fax:  01603 723000
E-mail:  HMSOlicensing@opsi.x.gsi.gov.uk

**Contacts**

This document can be found on the Treasury website at:

**hm-treasury.gov.uk/davies**

For general enquiries about the review, contact:

Davies Review of Issuer Liability
Room 4 / 20
HM Treasury
1 Horse Guards Road
London
SW1A 2HQ

Email:  davies.review@hm-treasury.gov.uk

ISBN:  978-1-84532-299-1

Printed on at least 75% recycled paper.
When you have finished with it please recycle it again.

PU189

# Contents

**Page**

Letter from Professor Paul Davies QC: Invitation to comment……………………....  3

Background: How to respond………………………………………………………..  5

Executive summary………………………………………………………………...  6

Liability for misstatements to the market: A discussion paper

    I.

         Introduction………………………………………………………………...  8
- The main disclosure obligations on issuers
- Civil sanctions for breaches of the disclosure obligations
- Sanctions for misstatements in the hands of public bodies

    II.

         The nature of the problem………………………………..………………..  30
- Negligence or fraud?
- The range of disclosures to be covered
- Particular issues about liability for fraudulent ad hoc statements
- Application of the statutory regime to non-regulated markets
- Defining the scope of liability for fraudulent misstatements

    III.

         Some overarching issues……………………………………………....…  44
- Can optimal levels of fraud-based litigation be avoided?
- The benefits and limitations of private actions to enforce securities law

    IV.

         Appendices…………………………………………………...………  50
- Table 1: FSA cases
- Annex A: Sections 90A and 90B of FSMA 2000 (section 1270 of the Companies Act 2006)
- Annex B: Sections 37b and 37c of the WpHG

List of questions for response...…………………………………………...…….  55

Terms of reference…………………………………………………...………  56

**Davies Review of Issuer Liability**
HM Treasury
1 Horse Guards Road
London SW1A 2HQ
Tel: 020 7270 6426
davies.review@hm-treasury.gov.uk
www.hm-treasury.gov.uk/davies

**Invitation to comment**

March 2007

Dear Colleague

The Government has asked me to carry out an independent review of liability in respect of damage or loss suffered as a consequence of inaccurate, false or misleading information disclosed by issuers or their managements to the market (including to their own shareholders) or of failure to disclose relevant information promptly or at all.

Efficient markets depend on the efficient flow of timely, accurate information from companies to market participants. So what incentives are needed to encourage issuers and their managements to disclose meaningful, accurate and timely statements? To what degree should they be liable for losses suffered as a result of investment decisions taken on the basis of inaccurate, false or misleading information? To whom should they be liable? What rights of claim should those who have suffered such damage or loss have? A sensible liability regime must balance the interests of issuers and investors, providing appropriate incentives to make timely and accurate disclosures in compliance with statutory rules, as well as an appropriate right to recover losses.

The Review is examining the law relating to liability for corporate misstatements and considering whether the statutory liability regime currently in place should apply equally to periodic and ad-hoc disclosures, whether it should apply only to issuers on a regulated market or also to those on alternative markets, what the standard of liability should be, against whom should a right be enforceable, who should be able to sue for damages and how should such damages be measured.

Having reviewed in more depth the issues raised by respondents to the Government's consultation last year (on extending the scope of the statutory damages regime for disclosures required under the Transparency Directive) and having had the benefit of informal discussions with a number of interested parties, this discussion paper sets out my analysis of the problem and further issues arising. I invite you or your organisation to submit comments and views on the questions raised. Please also comment on other related issues if you wish.

I want to ensure that the Review is an open process that takes full account of the views of a wide range of stakeholders. The paper is therefore being sent out to broad cross-section of interested parties – main market and alternative market listed issuers, the legal and accountancy professions, financial advisers and intermediaries, relevant industry associations, investor groups, regulatory bodies and economic and academic experts in the field. Your input will be of great value in helping to shape the direction of my final report and recommendations to the Government.

I would be grateful if you could send your submission to the Review Secretariat by Friday 27 April 2007. I look forward to hearing from you and thank you in advance for your input into this important work.

Yours faithfully

**Professor Paul Davies QC**

## BACKGROUND

In October 2006, the Economic Secretary to the Treasury invited Professor Paul Davies QC, the Cassel Professor of Commercial Law at the London School of Economics to carry out a review of the liability of issuers in respect of damage or loss suffered as a consequence of inaccurate, false or misleading information disclosed by issuers or their managements to the market or of failure to disclosure relevant information promptly or at all.

The Davies Review follows a Government consultation last year on extending the scope of the statutory damages regime for disclosures required under the FSA disclosure rules implementing the Transparency Directive (2004/109/EC). Responses to that consultation confirmed that this was a complex area in which it is vital to get the policy right, but were not conclusive. The Government therefore decided to include a power to amend, limit or extend the scope of the new liability regime introduced by Section 1270 of the Companies Act 2006 (as new Sections 90A and 90B to the Financial Services & Markets Act 2000). The aim of the Davies Review is to make recommendations to the Government on whether to exercise this power and, if so how.

If the Review recommends that the Government should introduce further provisions about liability for published information or that changes should be made to the existing statutory regime, the Government will, when it publishes its response to the Review:

- consult fully on the Government's response to the review's proposals;
- publish a full regulatory impact assessment of these proposals; and, subsequently
- bring forward legislation for the new regime.

The Government's previous consultation documents, together with current information on the Davies Review can be found at the following web address: **www.hm-treasury.gov.uk/davies**

## How to respond

The deadline for responses to the Review is <u>Friday 27 April 2007</u>.

We would prefer <u>electronic submissions</u> where possible. Please state clearly on the covering note in the body of your submission if you do not want your response to be posted on the Davies Review website.

Responses should be sent by email to: **davies.review@hm-treasury.gov.uk**

Davies Review of Issuer Liability
Savings and Investment Team (SAVI)
HM Treasury
1 Horse Guards Road
London SW1A 2HQ

Contact: Anthea Heffernan, Secretary to the Davies Review, tel: 020 7270 6426

## EXECUTIVE SUMMARY

- The central questions this discussion paper seeks to address are: What incentives are appropriate to encourage issuers to disclose meaningful, accurate and timely statements? Should companies, managers or advisers be liable to investors for losses suffered as a result of investment decisions taken on the basis of inaccurate information? To whom should they be liable? If there is to be liability, should the basis of that liability be negligence (carelessness) or deceit (making a statement without an honest belief in its truth)? Are statutory provisions needed to bring about the appropriate liability regime or can that task be left to the common law by way of judicial development of the relevant rules? What is an appropriate balance between public and private enforcement of companies' disclosure obligations?

- It is clear that neither the current state of the law in relation to liability nor its policy rationale are easy to state simply. The paper therefore first sets out the background to the problem: outlining main types of disclosure obligations to which issuers are subject (paras 9-22); evaluating the civil sanctions for breaches of those disclosure obligations (paras 23-57); before turning to public enforcement of the disclosure rules and the role of the FSA (paras 58-67).

- Until 2006, there was no statutory regime for inaccurate statements other than those contained in prospectuses, where liability was imposed on the basis of negligence. Nor did the common law routinely provide liability for misstatements in periodic or ad hoc statements, though the possibility of liability for deceit (fraudulent misstatements) existed. The Caparo case of 1990 excluded common law negligence liability except where the defendant knows that someone is likely to use the statement for a particular class of transaction. The adoption of the Transparency Directive in 2004, which imposes requirements for periodic disclosures specifically for the purpose of investor protection, raised concerns as to whether the Caparo principle would be undermined. Similar concerns exist in relation to ad hoc disclosures, now regulated by the Market Abuse Directive 2003.

- The Government responded by introducing a statutory liability regime (via a new section 90A to FSMA 2000) for disclosures required by the Transparency Directive and prelim announcements (and via section 463 of the Companies Act 2006 for reporting required under Part 15 of that Act). Section 90A first confirms the prior common law situation of no negligence liability to investors, and second, adopts and adapts the prior common law on deceit applying it only to issuers and in favour of purchasers of shares – in effect changing the law marginally in favour of investors. Section 90A does not deprive investors of previously held common law rights to sue.

- Public enforcement of the disclosure rules is largely in the hands of the FSA, who may exercise various powers of sanction under FSMA 2000. FSA powers under the Disclosure and Transparency Rules in relation to periodic and ad hoc reporting apply only to main market issuers. But FSA powers in relation to market abuse apply also to AIM and Plus Market companies. The main responsibility for supervision of disclosures made by AIM companies lies with a "Nominated Adviser" (nomad), which all AIM companies are required to have.

- The second half of the paper (from para 68) discusses two distinct approaches to solving the problem and the issues arising: the first looks at section 90A as a legal

mechanism to preserve the common law position on liability; the other considers what would be an appropriate liability regime in principle. Possible reforms to section 90A cannot be evaluated in the absence of a sense of the appropriate policy balance in this area.

- Key questions on which views are sought include:
  i. Should the trigger for liability be <u>fraud (ie. recklessness or intention) or negligence</u>? Should there be liability for misstatements even if those making the statements honestly (but carelessly) believed them to be true? What is the right standard of liability to incentivise disclosure of timely, accurate and meaningful disclosures without imposing undue cost burdens on issuers? (paras 71-78).

  ii. Should the statutory liability regime currently in place under section 90A be <u>extended to ad hoc disclosures</u>? What is the current position in relation to Market Abuse Directive disclosures? Should there be liability for fraudulent misstatements in ad hoc reports? (paras 79-83).

  iii. Should there be <u>liability for statements that are accurate but late</u>? Or are the FSA's rules sufficient, given that much of their enforcement action has focused on delayed disclosure? What about deliberate delays in withholding information in order to mislead the market? (paras 84-88)

  iv. What <u>counts as an ad hoc statement</u>? Just disclosures of inside information required under MAD? Or also ad hoc disclosures required under the DTR? Other announcements or statements? (paras 89-94)

  v. Should section 90A apply also to <u>non-regulated markets</u>? How would it affect the regimes operated by AIM and Plus markets'? How might the courts apply the principles of the common law to non-regulated market liability anyway? Should there be a level playing field between regulated and non-regulated markets? (paras 95-99)

- If section 90A were to be extended, this raises a number of further issues:
  vi. Should investors' claims be subordinated to those of the other unsecured creditors? (para 100)
  vii. Does section 90A serve as sufficient deterrent on those making fraudulent misstatements? Would imposing liability on directors serve a deterrent purpose? What about other advisers? (paras 101-104)
  viii. Should statutory protection as in section 90A also be extended to sellers and holders of shares? (paras 105-107)
  ix. What should be the measure of damages? Should this be left to courts? Should the deceit or negligence measure of damages be adopted? (paras 108-110)

- Finally, paras 111-123 address some overarching issues about: (i) whether development of fraud-based investor action in the UK would encourage a private securities litigation culture similar to that of the US – concluding probably not; and (ii) the benefits and limitations of private actions to enforce securities – concluding that the arguments for facilitating private litigation outweigh those for excluding it where fraud is involved.

# LIABILITY FOR MISSTATEMENTS TO THE MARKET:
# A DISCUSSION PAPER

## I. Introduction

1. It is a widely accepted proposition that the efficiency of the price formation process in a securities market depends in large part upon the mechanisms whereby information is produced, verified and analysed to or in that market.[1] Effective price formation operates so as both to protect investors and, more generally, to promote the efficient allocation of financial resources in the economy as between competing projects. To put the matter another way, a securities market in which the supply of information is slow, inaccurate and poorly analysed is not likely to attract investors, especially where competing markets are available which do not suffer from these defects. Markets which do not attract investors will not attract issuers either.

2. This Discussion Paper is concerned with only one part – albeit an important part – of the mechanism whereby information is produced to the market and, to some degree, by which it is verified. It is concerned with the sanctions for non-compliance with the growing list of requirements on companies to release publicly information which is of use to market participants in the evaluation of securities and in making decisions whether to trade in those securities. Clearly, these rules do not provide a complete machinery for the effective formation of prices in securities markets, even in relation to company-specific information. The information, once released, needs analysis before investment decisions can be taken. Analysis is a process which is left largely to market participants, subject to some controls dealing, for example, with analysts' conflicts of interest. However, the release of information by companies constitutes a crucial initial step in the process of price formation, and so it is important that there should be an appropriate set of inducements for compliance with the disclosure rules.

3. In many cases companies might wish to release the information in question in any event,[2] but the rules which constitute the background of this Discussion Paper require them to make the disclosures, whether they wish to or not. The rules thus operate to reduce the asymmetry of information as between companies and market participants. The imposition of a potentially costly burden on companies to produce information, sometimes to have it verified by persons paid for by the company, and to make it public is an implicit subsidy by companies to analysts working in the securities markets. It can be justified as a more efficient way of making company-specific information available to the market than leaving analysts with the whole burden of information acquisition. That would be likely to result in fewer companies being followed by analysts and thus to a less

---

[1] Ronald J Gilson and Reinier Kraakman, *The Mechanisms of Market Efficiency Twenty Years Later: the Hindsight Bias* (2003) 28 *Journal of Corporation Law* 715, reprinted in John Armour and Joseph A McCahery (eds), *After Enron* (Oxford: Hart Publishing, 2006). This proposition remains robust despite the recent developments in behavioural finance which focus on the role of 'noise' or irrational traders.

[2] The paper also looks to some extent at the practice of companies of making statements to the market, even when they are not required to do so.

efficient price formation process, especially outside the area of the largest companies.[3]

4.  However, the 'subsidy' approach does not tell one how big the subsidy should be: should companies bear only the cost of producing and, to some degree, verifying the information, or should they also be liable to investors for the losses suffered as a result of investment decisions taken on the basis of inaccurate information? This is the central question which the Discussion Paper will address.

5.  Many of the disclosure obligations in question derive today from European Community law, as a result of the development and implementation at Community level of the Financial Services Action Plan. This is not to say that Community law has introduced entirely novel disclosure obligations into the laws of the United Kingdom: in most cases the Community rules replace (and sometimes extend) what were previously purely domestic disclosure rules. With regard to sanctions for non-compliance, moreover, the relevant Directives, as is common with Community law, give the Member States considerable freedom of action, though that freedom is not completely unconstrained by Community-level rules. Enforcement of the disclosure obligations by private parties, through litigation in the courts, to secure compensation for disappointed investors is one possible enforcement mechanism. However, since the creation of the Financial Services Authority and the steady expansion of its powers, public enforcement by the Authority has become an important element in securing compliance with companies' disclosure obligations. Those powers include now not only the imposition of financial penalties but also the initiation of criminal proceedings and other regulatory action. An important question for this Discussion Paper is, therefore, how to find an appropriate balance between public and private enforcement of companies' disclosure obligations, and to examine possible linkages between the two.

6.  Non-legal market sanctions also play an important role in enforcing disclosure obligations, as was emphasised to me by a number of respondents. A company which is discovered to have put out inaccurate information is likely to suffer, not simply a drop in its share price when the truth comes out, but a continuing scepticism on the part of market participants about the information it discloses in future. If, after the truth is revealed, the company's securities continue to trade at a lower level than would otherwise have been the case, the company's cost of capital will be higher and this will be a penalty on the company, possibly of a significant amount. Equally, the directors' reputations may well suffer and this will reduce their value in the executive job market. Thus, as is common in most walks of life, legal sanctions do not have to carry the full burden of securing compliance with the law.

7.  However, as is also common in other areas of social activity, adequate levels of compliance with the disclosure obligations cannot be expected to be secured solely through social sanctions. The future cost to the company (ie the shareholders) or to the directors themselves of the publication of information later discovered to be inaccurate may be outweighed in their minds by the immediate benefits of non- or inaccurate disclosure. It is difficult, perhaps

---

[3] John C Coffee, 'Market Failure and the Economic Case for a Mandatory Disclosure System' (1984) 70 *Virginia Law Review* 717.

impossible, to quantify the extent to which adequate enforcement fails to be secured by social (or market) sanctions, but clear examples of priority being given to short-term considerations over the need for accurate disclosure can readily be found. Thus, in a prosecution brought by the FSA under section 397 of the Financial Services and Markets Act 2000 ('FSMA 2000'), the defendants were found by the trial court recklessly to have made a statement to the effect that the company had binding contracts for the supply of software programs, even though the contracts had not been concluded, at a time when the revenue from the contracts was needed if the accounts were to show that the company had met its expected turnover and profit. The court later commented that 'the putative contracts were illusory'.[4] Again, in a case involving civil liability for the payment of unlawful dividends, Robert Walker L J stated: 'The judge made a specific finding that the former directors were dishonest in the preparation of the 1991 accounts, in order to deceive the market into the belief that the group was much more profitable than it actually was.'[5]

8.    Thus, it seems reasonable to conclude that legal sanctions, of one sort or another, are needed to supplement social sanctions in this area. This brings us back to the central question of the balance between private sanctions through litigation and public sanctions, mainly in the hands of the FSA. There is some international and comparative research which associates the presence of deep and liquid securities markets above all with the presence in those jurisdictions of a vigorous system of private enforcement of obligations under securities law.[6] This thesis would suggest that the present, somewhat restricted, possibilities for civil litigation in the UK for breaches of the disclosure obligations of companies (see below) are in need of substantial expansion. However, later work by Jackson and Roe argues that 'measures of public enforcement are more strongly associated with robust financial markets.'[7] However, the latter authors do not claim that public enforcement can be used to replace private enforcement but rather that 'both play a role in promoting strong capital markets.' Nor do those authors claim to have identified which type of public enforcement activity is most likely to be effective. Perhaps the only safe conclusion to be drawn from this evidence is that it would be unwise for any country to put all its enforcement eggs in either the public or the private basket, but that the balance between the two forms of enforcement remains an open question for discussion.

**The main disclosure obligations on issuers**

9.    As a preliminary to a discussion of the sanctions for non- or inaccurate disclosure, it is perhaps useful to set out at this stage a short description of the main types of disclosure obligation to which issuers are subject. For the purpose of analysis, it is useful to see the rules as requiring disclosure through three main categories of document: prospectuses and other fund-raising documents; periodic corporate reports, whether produced annually, half-yearly or quarterly; and ad hoc corporate announcements. Although those I talked to did not press for

---

[4] *Rigby and Bailey v R* [2006] 1 W L R 2067 at [5].
[5] *Bairstow v Queens Moat Houses* [2001] 2 BCLC 531 at [63], CA.
[6] La Porta, Lopez-de-Silanes and Schleifer, 'What Works in Securities Laws?' (2006) 61 *Journal of Finance* 1.
[7] Howell E Jackson and Mark J Roe, 'Public Enforcement of Securities Laws: Preliminary Evidence' (Draft of March 2007, forthcoming on ssrn.com).

change to the civil liability rules in relation to prospectuses, which are in any event outside my terms of reference, the prospectus liability rules provide a useful check on reform proposals for the other classes of document, precisely because the prospectus rules are uncontroversial and, indeed, long-standing. Thus some description of the prospectus rules is required. In light of the tough legal regime applying to prospectuses, however, it should be borne in mind that the prospectus is a 'selling document', produced by the issuer to promote its securities to investors, whereas periodic and ad hoc reports are expressions of routine reporting requirements which do not typically coincide with a selling effort on the part of the company.

### (a) Prospectus disclosure rules

10.   Subject to certain exceptions, section 85 of FSMA 2000 requires a prospectus to be produced whenever (a) transferable securities are to be offered to the public in the United Kingdom *or* (b) transferable securities are to be admitted to trading on a regulated market situated or operating in the United Kingdom. A 'regulated market' is a concept of European Community law,[8] but it is important to note that the operator of a public market in securities is not obliged to obtain the status of a 'regulated' market in order to operate in the United Kingdom. It may choose to forego the benefits and burdens of regulated status, as both the Alternative Investment Market and the Plus Market have.[9] However, the statutory prospectus requirements will bite if there is a public offering of shares,[10] even if the shares are to be admitted to trading on a non-regulated market, such as AIM. In other words, to avoid the statutory prospectus regime for AIM-listed securities, the fund-raising process must involve a placing which does not amount to a public offer.[11]

11.   The detailed requirements of what has to be set out in a prospectus are now to be found in Commission Regulation 809/2004/EC. This is a very extensive and lengthy document made by the European Commission, after consulting the Committee of European Securities Regulators. It is made by the Commission under authority given it by Directive 2003/71/EC of the European Parliament and the Council (the 'Prospectus Directive' or PD). The Commission Regulation (because it is a Regulation rather than a Directive) has become part of the law of the United Kingdom without any need for national legislation to transpose it into domestic law. It is also a maximum harmonisation instrument, ie Member States may not add to its requirements (except where the opportunity to do so is specifically provided within the Regulation).

12.   In addition to what is said in the Commission Regulation, the PD contains some supplementary provisions on the content of prospectuses, which, because the PD

---

[8] The relevant rules are now to be found in Title III of Directive 2004/39/EC on markets in financial instruments.
[9] However, a non-regulated securities market will need to obtain the authorisation of the FSA to operate in the United Kingdom: see FSMA 2000, Part XVIII.
[10] Defined in s. 86.
[11] In the rare case where, without a public offer, securities are introduced to the main market of the LSE and a prospectus is not required (usually because the securities do not fall within the definition of 'transferable securities' – see FSMA 2000, Schedule 11A), the FSA requires the production of listing particulars, which require disclosure of some of the information required for a prospectus. See the FSA's Listing Rules, LR 4.

is a Directive, have required transposing into national legislation. Following the PD, section 87A of FSMA contains a sweeping up provision. Even if the specific requirements of the Commission Regulation have been met, further information may have to be disclosed in the prospectus if it is 'necessary to enable investors to make an informed assessment of' the position of the issuer or the rights attaching to the securities on offer. Further, again following the PD, section 87G requires the production of a supplementary prospectus if significant new information appears or an error is discovered after the initial prospectus was issued. Finally, the FSA has made 'Prospectus Rules' under the powers conferred on it by section 84 of FSMA 2000. The FSA plays an important role in relation to prospectuses, for example, in checking that information is presented under all the headings required by the Commission Regulation and FSMA.

13.    Even if an issuer avoids a public offer and secures the admission of its securities to trading on a non-regulated market, this does not mean it escapes prospectus-type disclosure obligations. These obligations are to be found, however, not in statute but in the rules of the relevant exchange and are binding on the issuer by way of contract, as part of the process by which the issuer seeks to have its securities admitted to that market and the operator of the market agrees to accept the issuer. Thus, an issuer seeking admission of its securities to AIM needs to produce an 'admission document' which must disclose significant information of the type required under the statutory regime, but in some respects to a less demanding level.[12]

### (b) Periodic disclosure requirements

14.    The reports and accounts provisions of British company law are of long standing, dating back to the nineteenth century, though more recently Community law has shaped those requirements.[13] As now formulated, the directors of companies[14] must produce reports and accounts annually, have the financial statements and parts of the reports audited, circulate them to the shareholders and lay them before the shareholders in general meeting, and file them at Companies House, so that they are available to the public. For quoted companies the rules of public securities markets have also long supplemented these Companies Act requirements, notably by requiring the production of more frequent reports and accounts. By virtue of Directive 2004/109/EC on transparency requirements in relation to issuers (the 'Transparency Directive' or 'TD') Community law now lays down the basic reporting requirements (both annual and more frequent) for companies whose securities are traded on *regulated* markets. The TD thus does not apply to issuers whose securities are traded on AIM or Plus, nor is there in the TD an equivalent to the public offer trigger in the PD, which might have an indirect impact on non-regulated markets. Once again, however, the absence of statutory regulation beyond the requirements in the Companies Acts does not mean that companies listed on non-regulated markets are subject to reporting

---

[12] London Stock Exchange, *AIM Rules for Companies*, February 2007, para. 3 and Schedule 2. See also Plus Market, *Rules for Issuers*, paras. 4-5 and Appendix 1.

[13] Notably the Fourth and Seventh Directives on companies accounts in the company law series of directives, the revised Eighth Directive on auditing, and Commission Regulation 1725/2003/EC adopting international accounting standards.

[14] The requirements are set out in Part VII of the Companies Act 1985 and will be replaced in due course by Parts 15 and 16 of the Companies Act 2006. Small or private companies are exempt from some of these obligations, but the exemptions are not relevant to this Discussion Paper.

requirements only on an annual basis. AIM- and Plus-listed companies are required to produce non-audited half-yearly reports.[15]

15.　For issuers on regulated markets, notably the main market of the London Stock Exchange, the TD requires annual financial reports (Article 4), half-yearly reports (Article 5) and interim management statements (Article 6). The annual report is in essence that required by the companies legislation, though now termed an 'annual financial report'. The half-yearly report (which is not required to be audited) must contain a condensed set of financial statements and an interim management report. The interim management report must indicate the important events that have occurred during the first six months of the financial year and their impact on the financial statements and the principal risks and uncertainties for the remaining six months. Article 6 requires the publication of quarterly interim management statements by issuers of shares (but not quarterly financial statements). The issuer is required by Article 21 to disseminate the required information 'in a manner ensuring fast access to such information on a non-discriminatory basis' and to do so 'throughout the Community'. In fact, this requirement is applied not only to information required to be disclosed by the TD, but also to any additional information requirements imposed on issuers by Member States beyond the TD (see para 17 below) and to information required by Article 6 of MAD (see para 19 below). Such information is referred to collectively as 'regulated information'.[16]

16.　The TD requires transposition into UK law and this has been done via amendments to FSMA 2000.[17] These amendments confer new rule-making powers on the FSA, which the FSA has exercised so as to produce 'Disclosure and Transparency Rules' (DTR) in place of the previous 'Disclosure Rules' (DR). The TD's periodic reporting requirements are transposed in DTR 4 and (for dissemination) DTR 6. In particular, where the UK is the home state of the issuer, the periodic reports are to be distributed through a Regulated Information Service (RIS)[18] and are to be made available on a website. Again, the RIS is an established feature of the markets and is also the required dissemination channel for the information required to be reported periodically by AIM companies.[19]

17.　Because, unlike the PD, the TD is a 'minimum harmonisation' directive, it is open to the Member States to add to its disclosure requirements. The FSA has done so, through what it calls 'super-equivalent requirements'. These are set out in the Listing Rules. LR 9.8 requires information relating to the company's financial position to be included in the annual financial report beyond that required by the DTR; certain non-financial items, such as the requirement to comply, or explain non-compliance, with the Combined Code on Corporate Governance; and the provision of a directors' remuneration report.[20] However, the Listing Rules no longer require the publication of a preliminary statement of annual results, though they do regulate how such a preliminary statement is to be

---

[15] *AIM Rules for Companies*, para. 18 and Plus Market, *Rules for Issuers*, para. 30.
[16] TD, art 2(1)(k).
[17] The changes are set out in Part 43 of the Companies Act 2006 and were brought into force on the date that Act was passed.
[18] A RIS requires the approval of the FSA according to criteria developed by the regulator. The term includes equivalent service providers established in other EEA states, which do not need FSA approval.
[19] *AIM Rules for Companies*, para. 10.
[20] See LR 9.8.4, 9.8.6 and 9.8.8 respectively.

made if the issuer chooses to make one; and a public statement of a board's dividend or other distribution decisions is still required as soon as possible after it has been made.[21] For companies listed on the main market of the LSE, therefore, the periodic disclosure requirements are now mainly in the DTR but still in part in the LR.

### (c) Ad hoc disclosure requirements

18.   Companies whose securities are traded on public markets are now subject to a range of ad hoc disclosure requirements. Some are relatively routine, such as reporting to the market information which has been provided to the company by others. Examples are notifications which the company has received from its directors or major shareholders as to their acquisition or disposal of voting rights in the company.[22] Some disclosures are not aimed at the market principally, but the company's shareholders, such as disclosure of significant or related-party transactions. In the case of significant transactions of the largest size (Class 1 transactions) a circular to shareholders and shareholder approval is required before the transaction becomes binding on the company.[23] Similar provisions apply to related-party transactions, except for small or routine transactions, and in addition the related party may not vote on the resolution for approval.[24] However, such transactions, including class 2 or 3 transactions, which do not require shareholder approval, must be notified through the RIS as soon as the transaction has been agreed. To this extent, the division between notifications to shareholders and notifications to the market is blurred.

19.   The most important of the market-regarding ad hoc disclosure rules is that contained in Article 6 of Directive 2003/6/EC on insider dealing and market manipulation (the 'market abuse directive' or MAD). Article 6(1) requires issuers of financial instruments on *regulated* markets to inform 'the public' as soon as possible of inside information 'which directly concerns' the issuer and to post on their internet sites the publicly disclosed inside information. This is not a new requirement in principle. It can be traced back to Directive 82/121/EEC, though article 6 implements[25] the principle in a particularly rigorous way. Article 6 is transposed into UK law by conferring power on the FSA to make rules (originally the DR, now the DTR). DTR 2 lays down the disclosure obligation and requires that the information be disseminated through a RIS.

20.   Again, although Article 6 of MAD applies only to regulated markets and it has not been applied more widely on transposition into domestic law, requirements similar to Article 6(1) are imposed on AIM and Plus companies.[26] The provisions say, in rather similar terms, that (to take the Plus Market version): "An issuer must announce as soon as possible any change in its sphere of activity, financial position, the performance of its business, or its expectation of its performance,

---

[21] LR 9.7A.
[22] These provisions were previously in the Companies Act 1985 but have been or will shortly be repealed and be replaced by DTR 3 and 5.
[23] LR 10.5.
[24] LR 11.
[25] Supplemented by Commission Directives 2003/124/EC and 2004/72/EC.
[26] *AIM Rules for Companies*, para 11; Plus Markets, *Rules for Issuers*, para. 20.

which, if made public, would be likely to have a significant effect on the price of its securities."

21.    The MAD, of course, is centrally concerned not only with disclosure of inside information but also with penalizing market abuse, including insider dealing. Here, it should be noted that the Directive's provisions sanctioning market abuse, although also confined to regulated markets by the Directive, have been applied more widely in the United Kingdom, so as to cover any prescribed market.[27] Both AIM and Plus are prescribed markets.[28] Cases of inaccurate or non-disclosure of inside information can quite easily become cases of market abuse[29] and these functions are thus exercisable in relation to AIM and Plus companies, even though the DTR rules apply only to regulated markets.

### (d) Linking the periodic and ad hoc disclosures

22.    Over the course of a year a company might issue a large number of ad hoc statements, of which it might be difficult for investors to keep track. Article 10 of the PD requires companies whose securities are admitted to trading on a regulated market to publish and file with the competent authority of its home Member State an annual statement containing or referring to all the information made public over the previous year, including that made available in other countries. This is translated into domestic law by PR 5.2, which requires only a list of the required statements to be filed with the FSA, rather than their text. Moreover, some matters mentioned in ad hoc statements to the market might be sufficiently important to require repetition in a subsequent periodic report. Both provisions blur the line between periodic and ad hoc disclosure.

### Civil sanctions for breaches of the disclosure obligations

23.    Having set out the bare bones of the current disclosure obligations, it is now possible to turn to the central issue of this Discussion Paper, ie the sanctions for non- or inadequate disclosure. Here again, however, the question of possible reforms of the current law cannot properly be evaluated without setting out the current law. This will be done in relation to both private and public enforcement of the disclosure rules. Unfortunately, on the civil side at least, a full understanding of the current situation requires a substantial explanation of how we got to where we are. It was clear from my conversations with respondents that neither they nor I found the current state of the law or its policy rationale easy to state simply. In consequence, we found the assessment of reform proposals equally challenging. Since, however, rationale debate of the future requires an understanding of the present, I set out, briefly, my understanding of the development of the law.

---

[27] FSMA 2000, s. 118.
[28] Prescribed markets include 'all markets which are established under the rules of a UK recognised investment exchange': Financial Services and Markets Act 2000 (Prescribed Markets and Qualifying Investments) Order 2000, art. 4.
[29] See Part VIII of FSMA 2000.

24. The civil liability rules for misstatements in the different classes of document discussed above have a rather uneven history. By the end of the nineteenth century the position in relation to prospectuses had become clear, partly as a result of developments in the common law and partly because of the introduction of a statutory liability regime. In relation to liability to investors for misstatements in periodic and ad hoc reports, however, the law remained undeveloped and is still subject to substantial uncertainties – hence the need for this Discussion Paper.

### (a) The position up to the decision in Caparo v Dickman (1990)

25. By the third quarter of the nineteenth century the courts had established civil liability in relation to fraudulent prospectuses through development of the common law tort of deceit. In 1889, however, the House of Lords blocked further development of the tort of deceit in the case of *Derry v Peek*.[30] It held that that tort was committed only if the defendant had made a statement which the defendant knew to be untrue or if the defendant had acted recklessly as to its truth, ie had made the statement not caring if the statement were true or false. The tort of deceit could not be committed by a defendant who believed the statement to be true, and this would be so no matter how unreasonable the defendant's belief was. In other words, an honest belief in the truth of the statement would protect the defendant, even if the defendant had acted carelessly in the way that belief had been arrived at (for example, where there had been a failure to take proper steps to check the accuracy of the statement). It is true that showing the belief to be wholly unreasonable might persuade the court that the belief was not genuinely held by the defendant. However, that would be a matter of evidence, not of the substantive test to be met. A wholly unreasonable belief, if honestly held, would not amount to deceit.

26. The tort of deceit required proof of various other elements, beyond the lack of a belief in the truth of the statement made. First, there must actually be a statement. There was no liability at common law for non-disclosure, though the law was sufficiently robust to impose liability for half-truths (ie statements which were true as far as they went but implied something false as a result of what was omitted). However, there could be no liability if the defendant said nothing and merely stood by and let the claimant deceive him or herself, even if such conduct on the part of the defendant were intentional. Second, the defendant must intend the claimant to rely on the untrue statement, or at least intend a class of persons, of whom the claimant was a member, to rely on it. Hence, a company could be said to intend a subscriber for shares to rely on the prospectus, even if it did not know the identity of the subscriber when it issued the prospectus. Third, the claimant must in fact rely on the statement, as part of which requirement the claimant would have to be aware of the statement. This requirement is taken to rule out the theory of 'fraud on the market,' whereby a misstatement which has an effect on the market price can be said to cause an investor loss, even though that particular investor was not aware of the misstatement. And, of course, the claimant must suffer loss. Provided these and the other elements of the tort of deceit are satisfied, the common law regards the defendant as having acted fraudulently. There is no need to show that the defendant had any particular

---

[30] (1889) 14 App Cas 337.

dishonest intention: even a 'white lie' intended to be and in fact acted on which causes the claimant loss constitutes the tort of deceit. Normally, of course, the maker of a fraudulent statement is also dishonest.

27.   Parliament did not think the result in *Derry v Peek* an acceptable one in relation to prospectuses, and so it passed the Directors' Liability Act the following year.[31] That imposed liability for negligent misstatements in prospectuses, ie the defendant would be liable even if belief in the truth of the statement were honestly held, if that belief had been arrived at carelessly (negligently). The present version of the liability imposed by the 1890 Act is to be found in section 90 of FSMA 2000. It is now a very wide-ranging provision. Any person may sue who 'acquires' securities to which the prospectus applies and suffers loss as a result of any untrue or misleading statement in the prospectus or of any omission from the prospectus of a matter which ought to have been included. The use of the verb 'acquires' indicates that the possible range of claimants includes those who buy shares in the after-market as well as those who subscribe for shares from the company. The absence of a requirement that the claimant should have 'relied' on the misstatement (the section requires simply that the claimant should have suffered loss as a result of it) indicates that, provided the misstatement affects the market price of the security, it does not matter that the claimant was unaware of it. And the section covers omissions.

28.   The range of defendants is any person responsible for the prospectus or a part of it. Those persons are identified in the FSA's Prospectus Rule 5.5, so as to include the issuer, its directors, and any person who is stated in the prospectus as accepting responsibility for any part of it or who, whether this is stated or not, has authorised its contents. Consequently, the principal advisers will often be within the range of defendants. Finally, the standard for liability is negligence and in fact a strong version of negligence liability. Schedule 10 to FSMA 2000 requires the defendant to prove that he or she was not negligent rather than the claimant to prove that he or she was.[32]

29.   The Directors' Liability Act 1890 on prospectus liability was a remarkable development of its day. It influenced the US reforms of the 1930s, when sections 11 and 12 of the Securities Act 1933 were modelled upon it. However, in the Securities Exchange Act 1934 the Congress moved further to introduce a full-scale legislative scheme for the regulation of securities markets of a type not seen in the United Kingdom until the passing of the Financial Services Act 1986. Included in the 1934 Act were continuing disclosure obligations for issuers, both periodical and ad hoc (section 13), the latter by way of a requirement to up-date the company's initial registration statement. Section 18 of the 1934 Act imposed civil liability for misstatements in the continuing disclosure documents to any person 'who, in reliance on such a statement, shall have purchased or sold a security at a price which was affected by such statement.' Unlike in the 1933 Act,

---

[31] The title reveals that directors were the most common targets of liability suits at this time. The accounting profession had not yet developed so as to make itself the target of choice that it now is; and the decision in *Houldsworth v City of Glasgow Bank* (1880) 5 App Cas 317 prevented shareholders from suing their own company (but see now Companies Act 1985 s 111A (Companies Act 2006, s 655) apparently reversing this decision).

[32] There are some complex provisions dealing with the interrelationship of experts and non-experts as far as liability is concerned.

liability was imposed only if the person making the statement knew the statement was false or misleading (the burden of disproving this being on the defendant). Thus, when moving beyond the prospectus, Congress adopted a standard for liability which was modelled on the tort of deceit. In fact, however, much more important for civil liability in the United States has turned out to be section 10b of the 1934 Act (and Rule 10b-5 made by the Securities Exchange Commission) which prohibits 'any manipulative or deceptive device or contrivance' in connection with the purchase or sale of any security. Although not on their face providing for a civil remedy, the US courts have interpreted them as so doing. I shall look at these provisions further below.

30.    In the United Kingdom, by contrast, the question of the liability of issuers (and others) to those who traded on the basis of misstatements in the company's continuing disclosures was not addressed at this time. This was despite the fact that there has long existed a statutory obligation upon companies to produce annual reports and accounts. However, perhaps because that obligation was located in the Companies Acts in the UK, rather than in securities laws, as in the US, that statutory regime did not address the question of liability to investors for misstatements.

31.    It might have been thought that, even if statute ignored the issue of liability for misstatements in periodic and ad hoc corporate disclosures, that question could arise by way of common law. If a company made inaccurate statements in its continuing disclosure documents, could not the rules the courts had developed for prospectuses be applied? However, the tort of deceit did not give rise to liability for misstatements in companies' periodic reports as easily as it did for those in prospectuses, because of the requirement for liability that the maker of the statement should have intended that the recipient of the statement rely on it. This was a requirement easy enough to satisfy in the case of a prospectus (which was after all a selling document), but more difficult in the case of an annual report, which was primarily a report to shareholders on the directors' stewardship and not obviously intended to induce reliance by way of securities trading.

32.    Alternatively, the common law might have approached the issue via the tort of negligence. This is the most wide-ranging of the torts and covers many types of conduct which fall below the standard set by the law and cause harm to others. The tort was already under development in the nineteenth century, initially to provide compensation for those suffering physical harm as a result of negligent acts, for example in factories or on railways. However, about the time of *Derry v Peek*, the courts decided that the tort of negligence did not apply in principle to negligent statements causing purely economic loss.[33] Not until the 1960s did the common law move away from this 'in principle' denial of liability based on negligence in this class of case.[34] Only at this point was it possible for the common law to confront the question of whether a company, its directors or advisers were liable in negligence for statements in the company's periodic or ad hoc reports upon which investors relied and suffered loss in consequence. An understanding of the answer which was given to this question by the House of

---

[33] *Le Lievre v Gould* [1893] 1 Q B 491,
[34] In *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] A C 465.

Lords in *Caparo Industries plc v Dickman*[35] is absolutely central to understanding the issues at the heart of this Discussion Paper.

> 33.  <u>By way of summary</u>, therefore, it can be said that before the 1960s the common law imposed liability for intentionally or recklessly inaccurate statements in prospectuses and the statute for negligently inaccurate statements in them,[36] whilst neither statute nor common law routinely provided liability for misstatements in periodic or ad hoc statements.

## (b) *Caparo*

34.  Once the courts had accepted that there might be liability for purely economic loss resulting from misstatements, they had to go further and define the circumstances in which such liability would be imposed. This was the question raised in the *Caparo* case. Like many of the cases decided around this period, the factual background of *Caparo* involved the purchase of a company whose economic prospects were discovered after the purchase to be less promising than the purchaser had thought beforehand. Such purchasers then looked around for someone to sue in respect of what was alleged to be the misleading information about the company which had been made available. In *Caparo* the purchase was of a target company listed on the London Stock Exchange by another such company through a takeover offer preceded by share purchases in the market. The action was brought initially against both the directors and the auditors of the purchased company,[37] but proceeded only against the auditors. The target company had issued a profit-warning in March 1984, which caused its share price to halve. In May 1984 the directors of the target made a preliminary announcement in its annual results for the year to March 1984, which confirmed that profits were well short of expectations. This caused a further, though less dramatic, fall in the share price. In June the annual accounts were issued to the shareholders. Shortly before that, Caparo, which had previously owned no shares in the target, began acquiring shares in tranches until it reached a shareholding of 29.9%, at which point it made a general offer for the remaining shares, as the City Code required it to do if it was to acquire any more of the target's shares. Caparo asserted that the 1984 accounts, although gloomy, in fact overvalued the company and that the auditors had been negligent in not detecting the irregularities or fraud which had led to the overstatements in the accounts and in certifying the accounts as representing a true and fair view of the company's financial position.

35.  The trial judge held that the auditors owed Caparo no duty of care in negligence, ie that liability did not arise even if the auditors had been negligent.[38] The Court

---

[35] [1990] 1 All E R 568, HL.

[36] In the normal case, the statutory liability would trump the common law one, for why would a claimant assume the burden of proving intention where the statute required the defendant to show that he or she believed on reasonable grounds in the truth of the statement? However, where the statute did not reach, the common law might still fulfil a useful gap-filling role: *Possfund Custodian Trustees Ltd v Diamond* [1996] 1 W L R 1351.

[37] Suing the purchased company itself would obviously be irrational, since it was now owned by the claimant.

[38] It was assumed for the purposes of the decision that the auditors had been negligent; whether they had been or not was never determined. It was unnecessary to do so, since they were not liable even if they had been negligent.

of Appeal by a majority held that no duty was owed to Caparo in respect of the purchases made before Caparo was registered as a shareholder in the target but was owed thereafter. The House of Lords unanimously upheld the trial judge. Three points can be made about the House of Lords' ruling. First, the court was prepared to accept that the events described above were foreseeable, ie, if the target's auditors had thought about it, they would have realised that the accounts might be used by a bidder as in fact they were used by Caparo. However, in this area of the tort of negligence, the court rejected foreseeability as the touchstone for liability, in spite of its importance in other areas of that tort.

36. Second, the court rejected the narrower version of the claimants' argument which had been accepted by the Court of Appeal, namely, that the provisions in the Companies Acts relating to the accounts and their audit formed the basis for the creation at common law of a duty of care owed by the auditors to the existing shareholders of the company in relation to their purchase of further shares - but not in relation to purchases by non-shareholders. The effect of accepting this argument would probably have been to give Caparo substantially what it sought by way of damages, since only the shares purchased when it was not a shareholder in the target would fall out of consideration in calculating the damages, assuming it could make out the other elements of the tort of negligence.[39] Whilst accepting that the statutory provisions on accounts and audit did form the basis for the recognition of a duty of care owed by the auditors to the shareholders, it was still necessary, the House of Lords said, to ask what was the nature of the duty thus to be recognised at common law. There was no such thing as 'a duty to take care in the abstract but [only] a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained.'[40] It is at this point that the judges needed to embark on their famous analysis of the purpose of the statutory accounts provisions, in order to establish the appropriate scope of the duty of care at common law which could be based on the statute. The view of the House of Lords was that the purpose of the statutory accounts provisions, as far as the shareholders were concerned,[41] was to put them in a position where they could effectively exercise their governance rights over the board (for example, by replacing ineffective management)[42] not to enable them to take investment decisions. Accordingly, a duty of care did not exist in relation to purchases of shares in the company, whether by existing shareholders or non-shareholders.[43]

---

[39] There is some unclarity in the judgment of the Court of Appeal ([1989] 1 All E R 798) as to the time at which the claimant would have to be registered as a shareholder to be able to assert a claim, an unclarity perhaps linked to the question of whether the relevant document for the claim was the annual accounts as circulated to the shareholders or the preliminary announcement of the results.

[40] Lord Oliver at p 599.

[41] Another purpose of the accounts and their audit was also to protect the company itself, for example, by enabling its management to take timely action to stamp out fraud (Lord Oliver at p 583). For this reason, the duty to shareholders would rarely expose the auditors to substantial damages actions by the shareholders, because their loss would normally be reflective of the loss suffered by the company and the company's recovery would take priority. However, if, for example, the accounts negligently undervalued the company, shareholders might be able to recover from the auditors monies expended in convening a meeting of the company and securing the passing of a resolution to remove the existing board.

[42] Lord Bridge at p 580; Lord Oliver at p 583; Lord Jauncey at p 607.

[43] The judges left open the question of whether sales of shares (for example, where the accounts negligently undervalued the company) were within the scope of the duty, on the grounds that only shareholders could sell shares so that sales were necessarily a shareholder activity. However, the judges

37.  Third, however, the House of Lords confirmed earlier cases holding auditors liable when they had assumed responsibility for the accuracy of the accounts in relation to a particular person and in the context of a known transaction. Where the auditor makes a statement knowing that it is going to be made available to a particular person who is likely to rely on it for the purpose of a particular type transaction which is also known or ought to be known to the maker of the statement, a duty of care will normally be found by the court.[44] Most of the post-*Caparo* litigation has been about applying this test to the varying circumstances in which the claimant has sought to get the auditors to stand by or to confirm their audit for the purposes of the particular transaction in respect of which the claimant now wants to sue. Thus, in *Galoo v Bright Grahame Murray*[45]*,* Hillsdown Holdings plc intended to buy a controlling shareholding in companies whose annual statements had overvalued them. Hillsdown sued the companies' auditors and the Court of Appeal held that auditors owed Hillsdown a duty of care. This was because, unlike in *Caparo*, the auditors had sent the accounts to Hillsdown in the knowledge that Hillsdown and the auditors' clients intended to use the financial statements to calculate the purchase price of the shares. On the other hand, no duty of care was owed in respect of loans later made by Hillsdown to the companies, because the auditors did not know Hillsdown intended to use the reports for that purpose[46].

38.  The decision in *Caparo* was reasonably controversial at the time, but more among specialists in the law of torts (because of the court's downgrading of foreseeability as a test for the duty of care) than among company lawyers. It does not seem to have produced pressure at that time from the investment community for a change in the law. This may have been because the effect of the decision was to confirm the existing understanding of the law that auditors (and, by extension, directors and the company itself) were not liable to investors at large (including investors who were existing shareholders in the company) in respect of negligent misstatements in companies' annual reports. On the other hand, the court also made it clear that liability could arise for auditors (and presumably others) where the financial statements were given to a known recipient for a specific purpose of which the auditors were aware and upon which the recipient had relied and acted to his detriment. The decision thus distinguished between liability to the market at large and liability in the context of a particular transaction to a particular claimant. In the former case the imposition of liability ran the risk, as was said by a US court many years ago, of 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'[47] In the latter case, where the auditors were asked to stand by the accounts in the context of a particular, known transaction, they could refuse to do so, negotiate terms for so doing, give the undertaking but disclaim any legal liability for it or

---

showed little enthusiasm for this argument; and a thorough-going governance analysis would seem to exclude sales as well as purchases on the grounds that both are investment, not governance, decisions.
[44] This proposition is set out more fully in the judgment of Lord Oliver in *Caparo* (above) at p. 589.
[45] [1994] 2 BCLC 492, CA.
[46] The outer limits of this type of argument are represented by the decision in *Morgan Crucible Co plc v Hill Samuel Bank & Co Ltd* [1991] Ch 295, CA, where the Court of Appeal refused to strike out a claim by a bidder, where the misstatement was alleged to be contained in a defence document issued by the target company in a hostile takeover, which, the court found, was intended to induce the bidder to raise its offer. The defendants were the target's then directors, auditors and investment bank advisers.
[47] *Per* Cardozo C J in *Ultramares Corp v Touch* (1931) 255 N Y 170, 179.

accept liability. It is also to be noted that the *Caparo* decision has been followed, though not its precise reasoning, by both the High Court of Australia[48] and the Supreme Court of Canada[49].

39.   Summary: the effect of the decision in *Caparo* was to leave undisturbed the law as summarised in paragraph 33 above, except where the defendant knew that a particular person was likely to use the statement in the context of a particular class of transaction of which the defendant was aware or ought to have been.

### (c) The Impact of the Transparency Directive

40.   In 2004 the European Community adopted Directive 2004/109/EC, the Transparency Directive, whose provisions we outlined in paragraphs 14ff. The periodic disclosures required were annual financial reports, half-yearly reports and interim management statements. Despite the fact that these reports were not selling documents, a concern was raised by some corporate lawyers in major law firms that the Directive would undermine the principle laid down in the *Caparo* case. This fear was not based on any explicit provision in the Directive which required Member States to make issuers or directors or advisers liable to investors in respect of losses suffered as a result of trading decisions taken on the basis of negligent misstatements in periodical reports, because the Directive contains no such explicit requirement. On liability, Article 7 of the Directive requires Member States to apply their existing liability regimes to misstatements in the disclosures required by it, rather than to create new ones. The fear was that the British courts (influenced, perhaps, by the European Court of Justice) would interpret the common law in the future differently from the way it had been interpreted in *Caparo* because of the rationale which appeared to underlie the Directive's mandatory disclosure requirements.

41.   More precisely, it was said that the Directive's disclosure requirements seemed to be animated by a theory of investor protection, not a theory of directors giving a stewardship report to their shareholders. This was deduced from the broad statements in the Directive's recitals about its animating purpose. If the courts did come to accept that the purpose of periodical disclosures was investor protection, the narrower version of the claimants' argument, set out in paragraph 36 above, might be accepted by the courts, thus ushering in issuer and director liability to shareholders in respect of their investment decisions.[50] Indeed, by the same token, the wider version of the claimants' argument might be accepted, ie that the periodic disclosure documents created a link between issuer and investors, whether they were shareholders or not.

42.   It is difficult to estimate the size of the risk to the *Caparo* decision which the Transparency Directive represented. The drafting of the Directive, especially of its Article 7, was altered to some extent as a result of British representations during the Community legislative process, but the broad language in the recitals remained. Thus, recital 1 says that 'the disclosure of accurate, comprehensive and timely information about security issuers builds sustained investor confidence

---

[48] *Esanda Finance Corp Ltd v Peat Marwick Hungerfords* (1997) 188 CLR 241.
[49] *Hercules Managements Ltd v Ernst & Young* (1997) 146 DLR (4th) 577.
[50] The arguments are set out in House of Lords, European Union Committee, 15th Report of Session 2003-04, *Directors' and Auditors' Liability*, HL Paper 89, May 2004.

and allows an informed assessment of their business performance and assets. This enhances both investor protection and market efficiency.'[51] Those who feared for the future of *Caparo* argued in essence that the common law had so firmly tied itself to the notion that the purpose of the disclosures determines the availability of a civil action that a change in the purpose of the disclosures (by the Directive) would enlarge the scope of liability at common law, even though the Directive did not intend to bring this change about.[52]

43.  The contrary argument would be that the policy arguments against imposing liability in negligence to investors at large (for example, the indeterminate liability point) would remain as strong as they had previously been regarded, despite the change in the purpose of the disclosures. The purpose of the disclosure may be to inform investors but it is a separate question whether that purpose is to be sanctioned by private actions in damages in addition to public enforcement. Mr Justice Hoffmann (Lord Hoffman as he now is) – a distinguished company law judge - has expressed the view that discussing whether a duty of care exists 'solely in terms of the knowledge, intentions and purposes of the parties' constitutes recourse to 'an impoverished set of concepts.'[53] The Canadian Supreme Court in *Hercules Managements*,[54] whilst coming to the same result as in the *Caparo* case, put most of its emphasis on the policy arguments against imposing liability and only lightly referred to the 'purpose' argument.

44.  On the other hand, it is arguably unfair to present the arguments of those who see a risk to *Caparo* as based on a narrow and technical interpretation of the word 'purpose'. One effect, it can be said, of the Financial Services Action Plan is to place company disclosures in an entirely new context, ie a securities market in addition to a corporate governance context. This involves a strategic shift in the role of corporate disclosures to which, over time, the courts are likely to respond. The force of this argument can be seen particularly in relation to those ad hoc disclosures where there is no internal corporate equivalent, for example, disclosures of inside information. The immediate release of inside information by the company seems to be based wholly on a market-protecting rationale rather than one linked to the company's corporate governance. It can also be argued that the requirement for periodic reporting more frequently than annually – and especially the requirement for quarterly interim statements – makes less sense from a governance perspective, because there is no necessary link to a shareholder meeting, than from a market-protecting perspective.

45.  <u>The best conclusion</u> about the danger to the common law rule from the Directive is probably that arrived at by the House of Lords' European Committee: that the arguments of those worried about the impact of the Directive on the common law were not 'without foundation.'[55]

---

[51] See also recitals 2, 5, 6 and 7. The argument is set out persuasively by Lachlan Burn, 'Only connect--the importance of considering disclosure requirements in the light of their legal consequences' (2007) 2 *Capital Markets Law Journal* 41.

[52] On the use of recitals to interpret a Directive see the Opinion of Advocate General Mazak in Case C-411/05, *Félix Palacios de la Villa v Cortefiel Servicios SA* (not yet reported) and *R (Amicus) v Secretary of State for Trade and Industry* [2004] IRLR 430 at [158] (Richards J).

[53] *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1991] 1 BCLC 18 at 21. His actual decision in the case was overruled by the Court of Appeal.

[54] Above n 49.

[55] Above n 50 at para. 22.

### (d) The Government's response: section 90A of FSMA 2000

46. The Government took the opportunity of using the Companies Act 2006, Part 43 which transposes the Directive into domestic law, to address the fears that had arisen about the common law. This was done in what is now section 90A of FSMA 2000, inserted by section 1270 of the Companies Act 2006 – see Annex A. This section introduces a statutory regime for liability in respect of 'any reports and statements published in response to a requirement imposed by a provision implementing Articles 4, 5 or 6 of the transparency obligations directive and any preliminary statement made in advance of' the annual report, in so far as the preliminary announcement contains information intended to appear in substantially the same form in the annual report.[56] Since the section is bounded by the scope of the Transparency Directive, it applies only to securities traded on a regulated market (and so not to AIM companies). Within its scope, this statutory liability regime replaces common law liability. However, the concepts it uses to define liability are clearly drawn from the common law.

47. It is crucial to note that that the section has two objectives, one of which relates to the prior common law of negligence and the other to the prior common law of deceit. As far as negligence liability is concerned, the statute confirms the prior common law situation of no liability. As far as deceit is concerned, the approach of the statute is also essentially confirmatory, but it makes some adjustments to the prior law so as to make it effective in the context of periodic disclosures.

<u>(i) Negligent statements</u>

48. The section imposes liability on the issuer for fraudulent misstatements but then provides that, apart from this, no one is liable for loss resulting from reliance by any person (including therefore investors, whether shareholders or not) on an untrue or misleading statement in or the omission of information from the documents to which the section applies.[57] Amongst other things, this excludes liability for negligence on the part of the issuer, its directors or advisers. In this way, the section can be said to confirm the *Caparo* decision and so, as far as the law of negligence is concerned, it does not seek to alter the prior law.

49. Three limitations on this exclusion of negligence liability should be noted. First, despite views apparently held in some circles to the contrary, I do not read the section as intended to take away liability where statements accepting responsibility for the accuracy of a document are made outside the company's reporting processes. In the case discussed in paragraph 37 it is suggested that Hillsdown would be able to rely under the statutory regime on the explicit or implicit statement made to it by the auditors that the financial statements were accurate. This would be a statement outside the scope of the section which applies only to misstatements or omissions in the reports required to be produced by the Transparency Directive or in the prelims. Since the risk to which the section is addressed is that investors at large could sue in negligence and that none of the policy issues against such liability apply where the defendant assumes responsibility for the accuracy of the statements to the particular claimant in

---

[56] S.90A(1).
[57] S.90A(6).

respect of a particular transaction, it would be surprising if the courts accepted that the section had a broader effect.

50.   If this view is correct, common law liability in negligence might have some marginal relevance for discussions between company representatives and analysts in the wake of annual reports. However, it should be made clear that merely repeating what is said in the annual reports, even with some gloss, to a group of people is far from accepting legal responsibility for what those people may subsequently do with the information. There are many cases in which auditors have talked to particular parties about proposed transactions without being found by the court to have accepted responsibility for the accuracy of the financial reports for the purpose of the transactions which are subsequently effected.[58]

51.   Second, the section preserves liability at common law *to* the issuer.[59] So, advisers will continue to be liable in contract or tort to the issuer for the negligent performance of their duties, subject, however, to the terms of their contract, including whatever limits on liability auditors may negotiate under the new provisions of the Companies Act 2006. However, the liability of directors in negligence to their companies in respect of the directors' report and the directors' remuneration report (and any summary financial statement derived from them) is excluded by section 463 of the 2006 Act, in order to encourage more open, meaningful and forward-looking narrative reporting. Unlike section 90A of FSMA, section 463 of the CA 2006 does represent a change in the law, so far as the negligence liability of directors to their companies is concerned.[60]

52.   Third, section 90A applies only to civil liability under the general law, but not to liability to penalties imposed by the FSA, to criminal liability or liability under a restitution order made under sections 382 and 384 of FSMA. In short, the public enforcement regime is left untouched by the section.[61]

(ii) Intentional or reckless statements

53.   The major exception to the principle of non-liability stated in section 90A(6) is that the issuer can be liable if it makes a statement in the documents to which the section applies which it knows to be untrue or misleading or is reckless whether that is the case or, in the case of an omission of a required matter, if it knew the omission was 'a dishonest concealment of a material fact.'[62] Only the issuer can be liable to investors under this provision, not directors or advisers. However, a company can only know things if the knowledge of human beings is attributed to it, and the section treats those 'discharging managerial responsibilities' as the relevant persons. Normally, this will be the directors.[63] Thus, the section will normally focus on the knowledge, recklessness or dishonesty of the directors, but

---

[58] See, for example, *Peach Publishing Ltd v Slater & Co* [1998] BCC 139, CA.; *James McNaughton Papers Group Ltd v Hicks, Anderson & Co* [1991] BCLC 163, CA.

[59] S.90A(6)(b).

[60] For an account of the development of the Directive's liability provisions during the Community legislative process see E Ferran, *Building an EU Securities Market* (Cambridge: CUP, 2004) pp. 188-193.

[61] See Case C-97/96, *Daihatsu Deutschland* ([1998] E C R I-6843), holding that the purpose of the requirement in the First Company Law Directive that companies' accounts be publicly available was broader than the protection of members' and creditors' interests and was to enable any 'interested person' to inform themselves about the company's financial information.

[62] S. 90A(4).

[63] S. 90A(9).

for the purposes of making the issuer liable to investors, not the directors. Directors, however, will be liable to the company. Section 463 of the Companies Act 2006 does not protect the director from this liability where the director knows of the untruth of the statement or is reckless with regard to its truth or acts dishonestly in relation to an omission. Thus, the director might have to reimburse the company for the loss suffered by the company in compensating the investor, but the decision to seek recovery from the director would be a decision to be taken by or on behalf of the company.

54. The liability on the part of the issuer is to anyone (so, to any investor, whether already a shareholder or not) who acquires securities and suffers loss as a result of the misstatement or omission, where that person relied on the information at a time when it was reasonable for him to do so. This statutory liability is clearly modelled on the common law tort of deceit. In two ways it goes beyond the common law, however. First, although the claimant will recover only if he in fact relied on the publication and that reliance must be reasonable, it is not required that the issuer should have intended the claimant to rely on the publication. The requirement of intention on the part of the issuer as to the reliance by the claimant on the publication made the common law tort of deceit of only marginal relevance to misstatements in periodic reports, as contrasted with prospectuses, where such intention was easy to show. Second, the liability of the issuer is applied to pure omissions from the publication, whereas the common law applied only to omissions which rendered what was said misleading. However, it is to be noted that in the case of omissions, it is not enough that the omission was intentional or reckless, it must amount to a 'dishonest concealment.' Without these two changes from the common law of deceit, it is arguable that the liability for intentional misstatements created by the section would have been meaningless in practice. For that reason, it can be argued that, without these changes, the United Kingdom would have been in breach of its obligation under Article 7 of the Directive and under the general requirements of Community law to have an effective civil liability regime in place for Transparency Directive disclosures. Although Article 7 merely requires Member States to extend their civil liability regimes to the disclosures required by the Directive, it is strongly arguable that this does require the Member State to have some liability regime to be extended. On this basis, it would not constitute compliance with Community law for a Member State to say that it had no liability regime or a liability regime which in practice was wholly ineffective.[64]

55. On the other hand, the statutory regime retains two features of the common law of deceit which restrict its impact. First, and most important, the claimant can succeed only if it relied on the publication. As we have seen above in para 27, the statutory prospectus liability regime does not require reliance. It adopts a 'fraud on the market' theory. If the misstatement in the prospectus affected the market price of the securities, that is enough, even though the claimant may not have known of the misstatement. Section 90A by contrast, by requiring reliance, seems to require a claimant to have been aware of the statement which subsequently turned out to be misleading and for that knowledge to have played a part in inducing the action which was later taken. Second, the defendant's reliance on the publication is required to have been reasonable. Thus, a claimant might not

---

[64] *Cf* Cases C-382/92 and C-383/92, *Commission v United Kingdom* [1994] ICR 664.

succeed under the section if it had some available way of checking the publication but chose not to use it.

56. Finally, it should be noted that the regime based on intentional or reckless misstatements operates only in respect of those who acquire securities, and not in favour of those who sell or hold securities.[65] This restriction was criticised by many to whom I talked.

---

57. <u>Summary</u>: Within its scope of operation, the statutory regime introduced by section 90A of FSMA adopted the prior common law by excluding liability in negligence to investors at large. It also adopted the prior common law on deceit and applied it to issuers (but only them) and in favour of acquirers of securities (but only them). The deceit rules are adopted under the statutory regime with two extensions: to bring in pure omissions and to remove the need to prove the issuer intended the claimant to rely on the publication. Overall, the new statutory regime confirms the prior law and, where it does change it, does so in favour of investors (though the changes can be argued to be marginal). What appears clearly to be the case is that section 90A did not deprive investors of rights to sue on grounds of negligence which they previously held at common law.

---

**Sanctions for misstatements in the hands of public bodies**

58. Public enforcement of the disclosure rules is largely, though not wholly, in the hands of the FSA.[66] It is probably not necessary to deal specifically with the FSA's sanctions for breach of the prospectus rules and so attention will focus on the periodic and ad hoc disclosure rules.

59. As we have seen, the FSA has been given the power under Part VI of the FSMA 2000 (as amended) to make rules – the Disclosure and Transparency Rules (DTR) – to implement the MAD and TD, and the rules so made constitute an important element in the FSA's 'Part 6 rules.' As far as both the Disclosure and the Transparency Rules are concerned, 'an issuer must take all reasonable care to ensure that any information it notifies to a RIS is not misleading, false or deceptive and does not omit anything likely to affect the import of the information.'[67] Thus, the DTR adopt a negligence standard for compliance with their requirements. An issuer which fails to comply with any obligation imposed on it by the DTR (including the due care requirements) is liable to a penalty to be imposed by the FSA.[68] Although the due care obligation is imposed only on the issuer, section 91(2) of FSMA 2000 also makes liable to a penalty a director of the issuer 'who was knowingly concerned in the contravention' of the DTR. This appears to mean that if a director knows that the issuer has failed to take due care to establish the accuracy of the statement, he or she will be liable to a penalty as well. Instead of a penalty, the FSA may issue a statement of censure. Action for breach of the DTR is subject to a limitation period of two years.

---

[65] S 90A(3).
[66] The Financial Reporting Review Panel plays an important and recently expanded role in monitoring companies' compliance with reporting standards.
[67] See DTR 1.3.4 for the Disclosure Rules and DTR 1A.3.2 for the Transparency Rules.
[68] FSMA 2000, s. 91(1ZA) for the disclosure rules and s. 91(1B) for the Transparency Rules.

60.  In addition to the civil penalty regime, the FSA possesses powers to apply to the High Court (or Court of Session in Scotland) for an order in respect of a person who has infringed the Part VI rules and has made a profit as a result of the contravention or where the contravention has caused other persons' loss. The court order will require an amount it considers just (having regard to the profit made or loss suffered) to be paid to the FSA, for distribution to persons who appear to the court to have suffered loss or to whom the profits are attributable.[69] The FSA also has the power to apply to the court for an injunction to restrain anticipated or repeated breaches of the requirements.[70]

61.  Finally, it should be noted that disclosure of misleading information or non-disclosure of information may constitute market abuse under section 118 of FSMA 2000, notably market abuse in the shape of behaviour 'likely to be regarded by a regular user of the market as a failure on the part of the person concerned to observe the standard of behaviour reasonably expected of a person in his position in relation to the market.' Conduct constituting market abuse triggers independent penalty-imposing powers,[71] but a penalty may not be imposed by the FSA on a person who believed on reasonable grounds that his behaviour did not constitute market abuse or who took 'all reasonable precautions and exercised all due diligence' to avoid acting in a way which constituted market abuse. Since the market abuse prohibition applies to 'any person', it is not confined to issuers. It also carries with it restitution and injunctive relief powers.[72]

62.  Finally, the FSA has the power to bring criminal prosecutions for some offences, of which the most important for our purposes is that contained in section 387(1) and (2) of FSMA 2000. Under this section an offence is committed by a person who makes a statement (broadly defined) which he knows to be misleading, false or deceptive in a material particular or is reckless as to whether it is so, and does so for the purpose of inducing another to take an investment decision (broadly put) or is reckless whether it has that effect. The section also applies to dishonest concealment of material facts.[73]

63.  Turning to the FSA's exercise of its powers, it is clearly reluctant to use its restitution seeking powers other than in relation to consumers. In its enforcement Handbook the FSA states: 'The number of instances in which the FSA might consider using its powers to obtain restitution for market counterparties are likely to be limited.'[74] I could find no case in which the FSA had used its restitution powers in the class of case being considered in the Review. This may well represent an appropriate allocation by the FSA of its limited resources. However, this policy on the part of the FSA does have significance for the view put forward by some respondents, namely, that compensatory actions brought at the initiative of the public authority might (a) solve the funding problems of private litigation and (b) provide a filter, so that

---

[69] S. 382 of FSMA. Under s. 384 the FSA may make such an order itself in relation to authorised persons, but that is not likely to be relevant in the situations we are discussing.
[70] S. 380.
[71] FSMA 2000, s. 123.
[72] Ss. 381 and 383.
[73] S 397(3) creates a criminal liability for market abuse.
[74] ENF 9.3.2.

unmeritorious claims were not brought. This is not a realistic possibility on the FSA's current view of how best to deploy its efforts.

64. As for the FSA's use of its penalty and censure powers, as far as I could establish the recent history of their use is as set out in Table 1 (see Appendices) in respect of the disclosures with which I am concerned. It should be remembered that the TD powers were acquired by the FSA only at the beginning of 2007 and so were not available in the period covered by the table, but, of course, there were periodic disclosure requirements in the Listing Rules before they were transferred to the Transparency Rules.

65. *Table 1:* Two points perhaps emerge from the table. First, the focus of the FSA has been on delayed announcements. Six of the nine cases were based on this complaint alone or together with some other complaint. Under the then applicable version of the FSA's rules the requirements for disclosure 'without delay' of developments or information relating to the company which were likely to have a substantial impact on the price of its securities were contained in LR 9.1 and 9.2. The equivalent today is to be found in DTR 2.2.[75] Second, this is a relatively modest level of public enforcement activity. That the FSA should have made little use of its criminal enforcement powers is not surprising, given the difficulty of proving the elements of intention or recklessness to the required criminal standard of proof.[76] Even so, eight sets of penalties or censures imposed over a period of four years might not seem a high level of enforcement, even though the penalty imposed in the case of Shell was very large in absolute terms – though perhaps less so in comparison with the turnover of that issuer.

66. The FSA's powers under the DTR in relation to periodic and ad hoc reporting apply only to issuers whose shares are admitted to trading on a *regulated* market. Thus, they do not apply to AIM or Plus-listed companies. However, the FSA's powers in relation to market abuse apply to securities admitted to trading on a *prescribed* market,[77] thus including AIM and Plus, whilst the criminal prohibitions in section 397 of FSMA 2000 also apply beyond regulated markets.[78] Through its market abuse powers in particular, the FSA has some supervisory jurisdiction over misleading ad hoc statements issued by AIM-listed companies. However, the main responsibility for supervision in relation to all types of statement made to the market by AIM companies lies with the London Stock Exchange, which has delegated that responsibility on a day-to-day basis to the 'Nominated Adviser'

---

[75] LR 9.3A required reasonable care to avoid misleading, false or deceptive statements being put out through a RIS. For the current requirements to take care as at present see n. 65.

[76] However, its one prosecution under s 397 of FSMA 2000 was reasonably successful. In the prosecutions of Rigby and Bailey, directors of AIT, the FSA secured custodial sentences and also compensation orders against the defendants, the compensation orders apparently being made under the Powers of the Criminal Courts Act 1973. About £340,000 was ordered to be paid by way of compensation to investors who had bought shares on the basis of the misleading statements, about £120,000 being payable to Standard Life and £200,000 to Morley Fund Management. The Court of Appeal took some of the shine off the FSA's initial success, first by reducing the length of the directors' sentences – though it did uphold custodial sentences (*R v Bailey and Rigby* [2006] 2 Cr App Rep (S) 36) - and, second, by defeating the FSA's attempted use of the confiscation powers under Part VI of Criminal Justice Act 1988 (*Rigby and Bailey v R* [2006] 1 W L R 3067) to deprive the directors of the gains they had made from the misleading statements as well as requiring them to pay compensation those investors who had been harmed. For the FSA's summary of this case see: http://www.fsa.gov.uk/pages/Library/Communication/PR/2005/120.shtml.

[77] FSMA 2000, s 118(1).

[78] Financial Services and Markets Act 2000 (Misleading Statements and Practices) Order 2001/3645.

(Nomad), which all AIM-listed companies are required to have at all times. Indeed, if an AIM-listed company ceases for whatever reason any longer to have a Nomad, its shares will suspended; and if a fresh Nomad is not appointed within a further month, its AIM listing is cancelled.[79] The LSE supervision system clearly places considerable weight on the proper discharge of their functions by the Nomad; and Nomads translate the obligations laid upon them into their contracts with their companies. During the course of the review there was some public discussion of the overall quality of the supervision provided by Nomads, which was triggered by the LSE's proposal, now implemented, to produce for the first time a rulebook for Nomads, as a way of setting out best practice.[80] Rule 17 of that rulebook states in general terms: 'The nominated adviser is responsible to the Exchange for advising and guiding an AIM company on its responsibilities under the AIM Rules for Companies both in respect of its admission and its continuing obligations on an ongoing basis. A nominated adviser must be available to advise and guide AIM companies for which it acts at all times.'

## II. The nature of the problem

67. As will be clear from the lengthy discussion above, one very substantial difficulty in discussing the possible extension of section 90A of FSMA is that it is not a section which can be understood as a free-standing provision. Its significance can be evaluated only in the context of the prior common law, whose future development is itself the subject of uncertainty and debate. Very few incontrovertible statements can be made about it. However, among the people to whom I talked, there were two distinct approaches to the issues which could be identified.

68. One approach was to start from the axiom that the prior common law expressed an appropriate policy stance – essentially one of very limited liability in damages to investors – and that the objective should be to preserve that position. The majority of people taking this stance were of the view (a) that section 90A was necessary to preserve the common law position but (b) that it did not do enough to secure that result and ought to be extended so as to cover misstatements made in other classes of document. Some, however, were sceptical as to whether the common law was at risk from developments in Community law and so thought section 90A unnecessary or opposed its further extension.

69. A second set of respondents (which included some from the first set) were more at ease in discussing an appropriate liability regime in principle rather than the intricacies of section 90A or the common law. For them, the legal mechanism whereby the appropriate result was to be achieved was less important than defining that result. They accepted that the substantial extension of corporate disclosure requirements to the market had given rise to a serious issue which needed to be addressed. However, a range of views was expressed as to what the balance should be. Whilst it would be far beyond my terms of reference to devise a comprehensive liability regime for market disclosures, I agree with these

---

[79] London Stock Exchange, *AIM Rules for Companies*, February 2007, Rule 1.
[80] London Stock Exchange, *AIM Rules for Nominated Advisers*, February 2007.

respondents that possible reforms to section 90A cannot be evaluated in the absence of a sense of the appropriate policy balance in this area.

**Negligence or fraud?**

70. Irrespective of the range of documents covered by any statutory liability regime, a central question is whether the trigger for liability should be negligence or fraud (meaning intention or recklessness). Should there be liability for misstatements in corporate disclosures even if those making the statements honestly (but carelessly) believed them to be true? As we have seen, historically this has been the central question for the common law, and section 90A confirms the current common law position of no liability to investors for honestly held, even if negligent, statements.

71. There was a widespread (but not unanimous) agreement amongst those I talked to about the desirability of excluding liability for negligence. Even investor groups were generally cautious about the wisdom of imposing liability for negligence, though they were naturally amongst those who were more open to persuasion as to the potential advantages of such liability. An argument in favour of negligence liability for periodic and ad hoc statements can be made from the fact that, for over a century, such a rule has operated for prospectuses, in an apparently acceptable way. The overwhelming response of respondents to the notion that the prospectus standard should be applied to other disclosures, however, was that it would be very costly and in some cases impracticable. It was accepted that the standard of accuracy in prospectuses was high and that this could be attributed in part to the imposition of a negligence standard. However, it was pointed out that the verification process to which prospectuses are subject is both costly and time-consuming. It was not thought that the benefits of imposing this standard for civil liability beyond prospectuses would outweigh the costs. As for annual statements PwC, which was already investigating this issue, provided me with an estimate that a prospectus-type verification approach to annual statements would increase the audit costs by a fifth and that a similar further increase would be generated by additional legal work which would be involved.

72. However, respondents did not view the costs of a negligence regime solely or even mainly in terms of financial costs to the issuer of providing a higher degree of verification. They were concerned that a negligence standard might reduce the incentives to timely and full disclosure of information to the market, even if the level of accuracy of the information actually disclosed improved. In the case of ad hoc disclosures, it was thought that there would be a cost in slowing down information release (contrary to the thrust of the MAD), even if the negligence standard (of *reasonable* care) might be expected to be less demanding for an ad hoc disclosure than a prospectus or periodic disclosure, which could be planned for in advance to some extent. Whilst some theories might hold that a reasonable care standard would cause the maker of a statement to spend resources on checking the statement up to the point where the cost of the checking exceeded the expected benefits from reduced liability resulting from the checks, this assumes that the maker of the statement has no control over what is said, only over the amount of checking which occurs before the statement is made. Whilst this might be true of some corporate disclosures, in respect of many corporate

disclosures the law can require that a statement be made but not determine how detailed it should be. Respondents, including investor groups, were concerned that liability to the market for negligent misstatement might induce less useful disclosures, so that the overall benefit to investors of such a rule might be slight or negative. Investors in some circumstances would be able to recover losses suffered as a result of relying on inaccurate disclosures, but investors as a whole would suffer from having less information in the market.

73.     On the other hand, when faced explicitly with the question whether they thought the reputation of public securities markets in the United Kingdom would be enhanced if there were no realistic possibility for investors who had been misled by intentionally or recklessly misleading corporate statements to obtain recovery for their losses, no respondent was prepared to give a positive answer. To permit fraudulent statements, it was generally agreed, would have a particularly corrosive effect on market confidence. Moreover, many of the costs of negligence liability do not arise in relation to statements not honestly believed to be true. A person does not have to engage in extensive verification to know whether he or she honestly believes something to be true (as opposed to checking whether it is actually true), whilst it is easy to avoid saying things not believed to be true, without this caution spilling over into statements honestly believed to be true. Some respondents were concerned that the meaning of 'reckless' should be tightly defined, as it is in the current tort of deceit, but all those with whom I discussed the proposition accepted, hardly surprisingly, that a market in which losses caused by fraud could not be recovered would not be attractive to investors or, in turn, to issuers.

74.     It is also worth noting the experience of other countries. In both the United States and Germany legislators have refrained from introducing liability to investors based on the simple negligence of issuers and others. It is particularly important to note this feature of the US federal law, given the prominence which that law has achieved in recent public debates about securities markets. As we noted in para 29, when it imposed civil liabilities for disclosures outside the area of prospectuses, the US legislator retreated to a test of intention: the maker of the statement would escape liability if he could show that he had no knowledge that the statement was false or misleading – usually referred to as the 'scienter' requirement.[81] In fact, private civil actions tend to be brought in the US under section 10(b) of the 1934 Act and Rule 10(b)(5) made under it, although this section appears to give rise to no private right of action. When the courts interpreted the section so as to provide this right, they too adopted a scienter standard.[82] In fact, the standard adopted was more than the making of a knowingly false statement with intention that it be relied upon: there was required to be an intention to 'deceive, manipulate or defraud.' However, later cases have relaxed this standard so as to embrace 'recklessness'; and have then given recklessness a broader meaning than in the United Kingdom, so as to embrace 'an extreme departure from the standards of ordinary care.'[83]

---

[81] Securities Exchange Act 1934, sec. 18(a).

[82] *Ernst & Ernst v Hochfelder* 425 US 185 (1976).

[83] L. Loss and J. Seligman, *Fundamentals of Securities Regulation* (New York, NY: Aspen Publishers, 5th ed, 2004) at p. 1025.

75.   In 2002 Germany reformed its Securities Trading Act (Wertpapierhandelsgesetz –
WpHG) in the light of the collapse of companies quoted on the Neuer Markt,
Germany's secondary market, launched in 1997 but closed in 2002. The aim was
to introduce civil liability for ad hoc statements, the publication of inaccurate ad
hoc reports by companies being perceived as having been a significant
contributing factor to the collapse and investor losses. Section 37c (see WpHG in
Annex B), which applies to all domestic German stock exchanges, imposes such
civil liability (though only on issuers) but provides that: 'Those issuers who can
prove that they were not aware of the inaccuracy of the inside information and
that such lack of awareness does not constitute an act of gross negligence shall
not be liable for damages pursuant to subsection (1).'[84] The recent German law
thus tracks the modern understanding of the scienter requirement in US law.

76.   It might thus be concluded that to introduce liability to investors for ordinary
negligence would be a step further than either the US legislator and courts or the
German legislator have been prepared to contemplate. On the other hand, both
systems are prepared to contemplate a meaning for 'recklessness' which includes
some cases of negligence, ie where the belief is honestly held but on very
unreasonable grounds. By contrast, in the English law of deceit an honest belief
in the truth of a statement defeats a claim of recklessness, no matter how
unreasonable the belief.[85] Consquently, a half-way house between liability for
fraud and liability for negligence might be liabilty for gross negligence. However,
it is difficult to know what legislating for such a standard in the UK would
involve, since 'gross negligence' is not an established term in English civil law,
though it is used in some parts of the criminal law.

77.   Despite the general caution about introducing liability to investors for negligent
misstatement – a view which is supportive of this aspect of section 90A – there
was one view put to me which went in the other direction. This was that
uncertainty as to what impact the TD had on the *Caparo* decision was actually
desirable. On the one hand, because issuers and directors thought they might be
liable, they would take care over announcements. On the other, because it was
not clear that they were, there would be a disincentive to investors to litigate.
This situation represented the best of all possible worlds. Consequently, the
common law operated satisfactorily and section 90A should not have been
adopted and should certainly not be extended. This is a particularly sophisticated
analysis. Two points can be made about it. First, it is far from clear that it is
sustainable in the long run or even the medium term, since at some point the
legal position at common law would be tested in the courts and the beneficial
consequences of uncertainty, if such they are, destroyed. Second, it is not clear
that the costs of negligence liability referred to above depend heavily on the level
of litigation. The costs referred to by respondents were the costs of the steps
needed to be taken to avoid litigation, whether by way of extra verification or less
useful disclosure. Either issuers and directors believe that such liability is a
significant risk, in which case those costs will be incurred, or they do not, in
which case the possibility of liability in negligence has no purchase on their
actions. My impression is that the advice being tendered by the leading

---

[84] Articles 37b and c are set out in the Annex.
[85] John Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (London: Sweet & Maxwell, 2nd ed., 2007) para. 5.14.

commercial firms is that the risk exists and so the costs of negligence liability are being incurred.

**Question 1:**
What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liaiblity in the British context? Is fraud an appropriate basis for liability?

**The range of disclosures to be covered**

78.  The current statutory regime in section 90A of FSMA 2000 applies only to 'statements published in response to requirement imposed by' Articles 4 to 6 of the TD or to material in prelims which will appear in the annual financial report in substantially the same form. Thus, it does not apply to ad hoc disclosures, in particular to disclosures of inside information required by Article 6 of MAD. A central issue for the Review is whether the statutory regime should be extended to ad hoc disclosures.

79.  A number of respondents were of the view that there should be no extension. However, those who took this view were generally sceptical of the need for having section 90A in any event and who therefore thought that there was no need to extend it and some disadvantage in doing so, since a new statutory provision inevitably created some uncertainty as people worked out its implications for them.

80.  The contrary argument was that it was impossible in practice to draw a firm line between ad hoc and periodic disclosures, since some ad hoc disclosures will have to be repeated in periodic statements. To remove the risk of negligence-based liability only for periodic statements whiles leaving open the possibility that the courts might impose negligence liability at common law for ad hoc statements did not constitute a rational way of proceeding.[86] Moreover, it could be argued that the risk to the common law regime as it applies to MAD disclosures is at least as great as that from the TD, because MAD, like the TD, adopts in its recitals a market protecting rationale for its provisions, including the requirement for the disclosure of inside information by issuers. In fact, it can be argued that the risk to the common law regime is somewhat greater for MAD disclosures, since there is no company law equivalent to the MAD requirement that inside information be disclosed. Whereas the periodic reporting requirements have their historical origins in the companies' legislation requirements for reporting to shareholders and are still partly regulated in that legislation, the requirement for ad hoc disclosure of inside information is unrelated to governance by shareholders but rather is linked to informing investors.[87] A court applying the common law of negligent misstatement might still be convinced by policy arguments against imposing liability in damages (especially the point about the indeterminacy of the liability) but it would not have at its disposal the comforting rationale for non-

---

[86] See in particular Financial Markets Law Committee, *Legal assessment of the proposed statutory liability regime in the Companies Bill in relation to Transparency Obligations Directive disclosure*, September 2006.

[87] As the DTR implementing the MAD requirement put it, 'the purpose of this chapter is to promote prompt and fair disclosure of relevant information to the market.' (DTR 2.1.3)

34    Davies Review of Issuer Liability: A discussion paper

liability that the purpose of the disclosure requirement was to promote shareholder governance.

81. Looking at the matter more broadly, it can be said that it would be undesirable to have a liability regime for ad hoc statements (permitting negligence actions) which was more expansive than that for periodic statements (excluding negligence). This is because periodic statements can be planned for to some degree, whereas the triggers for ad hoc statements are often (though not always) events of which the company has little notice. Given the emphasis in the FSA's rules and practice on immediate disclosure of the information to the market (with only limited reasons for delay being acceptable), the risk of an issuer falling below the required standard of care in relation to an ad hoc statement is higher than in relation to a periodic statement. Whilst it is true that the standard of *reasonable* care would adjust to a degree to take account of the pressures on the issuer to communicate quickly to the market, the risk of a court holding ex post that the issuer should have picked up an inaccuracy in the statement remains greater in relation to ad hoc statements than in relation to periodic statements.

82. The extension of the statutory regime to ad hoc disclosures also needs to be viewed from the standpoint, not only of the protection it would afford against negligence liability, but also of the liability it would impose for fraudulent misstatements. None of the respondents I reported above as being in favour of, or at least not opposed to, the imposition of liability for fraud sought to draw an 'in principle' distinction between fraudulent statements in periodic and ad hoc reports. The anti-fraud argument thus constitutes a reason for extending section 90A to ad hoc statements. If it is bad for the reputation of a share market for investors to be left without compensation for fraudulent misstatements in periodic reports, that must equally be the case for ad hoc statements. Indeed, as the German experience suggests, the risk of misleading statements is greater in the latter case, since the issuer may put out an ad hoc statement at any time.

**Question 2:**
Should the statutory regime should be extended in principle to ad hoc statements?

**Particular issues about liability for fraudulent ad hoc statements**

*(i) Delay*

83. However, respondents, who were in favour of the extension of section 90A, raised a couple of very important issues about the scope of such an extension. One was the question of how section 90A would operate in relation to ad hoc statements which were accurate but late, ie should have been disclosed earlier under the criteria set out in the FSA's DTR rules. This was a significant problem because the FSA's rules were thought to be very demanding about the promptness of the required disclosure and to provide few reasons for non-disclosure.[88] We have also noted that the FSA's public enforcement action has focussed heavily on delayed disclosure. It should be noted, however, that the

---

[88] See DTR 2.2.9 (inside information to be disclosed as soon as possible) and 2.5 (especially 2.5.5) – unlikely to be circumstances in which delay justified other than in relation to negotiations whose outcome would be jeopardised by public disclosure.

German reforms do impose liability for delay in parallel terms to those used for inaccuracies. See WpHG section 37b in Annex B.

84. Where a disclosure was delayed, it was pointed out, to impose liability only on the basis of intention would be no protection for issuers, because the decision to make the announcement at time $t_2$ rather than earlier time $t_1$ would often have been a deliberate one. Moreover, it would always be possible for claimants to argue that the disclosure should have been made somewhat earlier and, in the case of a heavily traded stock, the range of potential claimants could be quite large.

85. Although section 90A goes beyond the common law by imposing liability for omissions, and late disclosure could be analysed as an omission (ie during the period between $t_1$ and $t_2$), it seems clear that the section does not cover this type of omission. The section contemplates liability only for omissions from the statement which is made ('omission from any such publication of any matter to be included in it')[89] rather than liability for failure to make any statement at all. Further, it is difficult to see how the section's requirement for reliance 'on the information in the publication'[90] could be satisfied in relation to the period when no statement had been made. There can be such reliance only when the statement is made, but if the statement, when made, is accurate and complete, there can be no liability at that point.

86. Most of those who raised this issue wanted to maintain the regime of no civil liability for late disclosure. It has to be said, however, that it is unattractive not to impose liability where an issuer deliberately withholds information in order to mislead the market and to create a false market in its securities. It is suggested that an appropriately narrow liability could be crafted in such a case. First, it is already the case under section 90A that, in relation to omissions, that a deliberate omission is not enough to lead to liability. There must be 'a dishonest concealment' of a material fact. There must be dishonesty as well as deliberateness, so that this test, applied to late disclosures, would not mean an issuer was liable simply because it decided to delay publication for a short period in order to check the accuracy of its proposed statement. Second, however, there is the issue of reliance. It is difficult to see how that requirement could be retained in the case of liability for late publication. An investor can hardly be said to rely on something of which he or she is not aware. However, a substitute for the reliance requirement in the case of late disclosure could perhaps be found by focussing on the purpose of the delay, ie that the purpose of the delay should be to mislead the market. This approach is adopted by section 397 of FSMA 2000 which imposes criminal liability for dishonest concealment of material facts 'whether in connection with a statement . . . or otherwise' but only where the purpose of the concealment is (under that section) the inducement of, broadly put, an investment decision.

87. However, the criminal law does not have to answer an important question which a civil liability section would have to address: what losses would be subject to compensation in the case of dishonest delay? The core case is one in which the information when published is true, but it is late in arriving. When published, the

---

[89] S. 90A(3).
[90] S. 90A(5)(a).

information may contain good news or bad news about the company. The absence of a reliance requirement would suggest that anyone who, in the case of good news, sold securities in the period between the point at which the information should have been disclosed and when it was disclosed should be compensated for the difference between the sale price and price that would have been paid, had the information been in the market. Similarly for purchases in the case of bad news. This rule would yield a large number of potential claimants. However, the frequency with which the rule would apply would be constrained by the requirement of dishonesty rather than just intention to delay.

**Question 3:**
Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?

### *(ii) What is an ad hoc statement?*

88.    Irrespective of whether civil liability is imposed for delay or only for inaccurate ad hoc statements, there is the question of what counts as an 'ad hoc statement'. This apparently innocuous question is in fact a very difficult one to answer precisely. The narrowest approach would be to focus only on the disclosures required by Article 6(1) of MAD, ie the disclosures of inside information. The rationale for this approach would be that it is in relation to this Article that the threat to the common law exclusion of negligence is at its strongest. One objection is that it is often difficult for companies to judge whether a particular piece of information is in fact inside information (normally because of unclarity about whether it price sensitive) and so companies may put out disclosures through a RIS which strictly they are not required to make. However, section 90A, it is suggested, already deals with this point, since it imposes the statutory regime in relation to 'reports and statements published in response to a requirement' imposed by Articles 4 to 6 of the TD. The formulation 'in response to a requirement' does not confine the statutory regime to statements required by the TD but extends it to statements put out where the issuer thinks it is arguable that disclosure is required. The same approach could be applied to disclosures under Article 6 of MAD.

89.    However, nearly all non-lawyers and many lawyers did not think it attractive to confine any extended regime to disclosures of inside information under Article 6 of MAD. As is made clear in para 18ff above, there are many types of ad hoc disclosure which companies are now required to make. Article 6 itself is not confined to disclosure of inside information by the issuer. Article 6(4) requires those 'discharging managerial responsibilities' to notify their transactions in the shares (and other related financial instruments) of the issuer. As implemented in the DTR, the notification must be to the issuer which has to inform the market through the RIS of the information received.[91] Following Chapter III, Section 1 of the TD, a similar regime now applies to disclosures of major shareholdings in companies.[92] Both sets of provisions were previously in the companies legislation. There are additional ad hoc disclosure requirements in the Listing Rules, notably in relation to significant or related-party transactions.

---

[91] DTR 3.1.
[92] DTR 5.

90.  Most respondents thought that it would be unattractive for issuers and their advisers to have different liability regimes applying to different classes of ad hoc disclosures. One popular suggestion, if there was to be an extension of the statutory regime, was to apply it to all announcements put out through a RIS. However, there are two objections to this approach. First, the Listing Rules (LR 10 and 11) require RIS announcements of significant and related-party transactions, but it is clear that the purpose of these announcements is as much to inform shareholders (whose prior consent to the transaction is often needed) as the market. In *Caparo* the court was concerned to preserve the negligence-based rights of shareholders in relation to the governance of the company. The scope of these rights may be unclear and their financial significance not large (in most, though not all, cases, losses to the shareholders will be indistinguishable from the losses to the company and the latter will take precedence) but it seems wrong in principle to reduce these rights. The extension of section 90A, in its present form, to this class of RIS announcement would exclude the liability of directors or the company itself to shareholders in respect of misstatements made to the shareholders in circulars seeking their approval. A slightly more restrictive approach might be to confine the definition of ad hoc statements to statements put out in response to requirements contained in the DTR, thus excluding the shareholder-oriented disclosures required by the LR.

91.  Second, it was argued by some people that the content of RIS announcements might be repeated in briefings and that liability might be based on the briefing rather than the RIS announcement. However, it is not clear that this is a good argument. Section 90A(6) imposes its principle of non-liability where there has been reliance on an untrue or misleading statement in a publication etc. Although it is clear that this principle applies where the claimant reads the document in question and relies on it, it would seem also to apply where the claimant obtains knowledge of the statement in some other way, ie where the information is repeated to him or her by someone else.

92.  Third, it was pointed out that companies release some types of information through press releases rather than a RIS. In principle, this was not thought to be a problem at present, because where the information is thought likely to be price sensitive, a RIS will be used. However, if a more favourable liability regime (from the issuer's point of view) is established for RIS announcements, there might be thought to be an incentive for issuers to use a RIS where it was inappropriate to do so.

93.  There is also a question about whether statements made in the course of takeover bids should be covered by the definition of an ad hoc disclosure. I am inclined to the view that they should not. They are essentially shareholder-regarding rather than market-regarding statements, and the common law, post *Caparo*, has already been applied to them.[93] There is also a hands-on public regulatory system in place in the shape of the Panel on Takeovers and Mergers.

**Question 4:**
If the statutory regime were to be extended to ad hoc announcements, should it be (a) confined to disclosures of inside information (the most pressing case), (b) applied to all

---

[93] See *Morgan Crucible Co plc v Hill Samuel Bank Ltd* [1991] 1 BCLC 18, CA and *Partco Group Ltd v Wragg* [2002] 2 BCLC 323, CA.

RIS announcements or (c) confined to announcements made under the FSA's Disclosure and Transparency Rules (ie excluding ad hoc announcements made under the Listing Rules)?

### Application of the statutory regime to non-regulated markets

94. Both the TD and the MAD apply only to securities admitted to trading on regulated markets. And section 90A is confined to regulated markets because it applies only to statements made in response to the TD requirements. It might seem, therefore, that the questions discussed in this paper have no relevance to non-regulated markets, such as AIM or Plus. However, as we have seen in paras 14 and 20, the rules of both markets require similar, if less demanding, periodic and ad hoc disclosures. Therefore, on both regulated and non-regulated markets, periodic and ad hoc statements will be made and so the question of the appropriate civil liability regime arises in both cases.

95. Both AIM and Plus pride themselves on their 'light touch' approach to regulation. In their view this has been an important element of the success of both markets, especially of AIM. However, the question of whether section 90A promotes or hinders a 'light touch' regulatory regime remains to be answered and the answer is not obvious. In order to address the question it is important to recall once again the twin effects of section 90A, relating to negligence, on the one hand, and fraud, on the other.

96. As far as negligence is concerned, the section applies the principle of non-liability. One might think that this principle is consistent with the 'light touch' approach. If section 90A continues not to apply to non-regulated markets, then those markets will continue to be regulated by the common law. It might be said that the *Caparo* decision shows that the common law principle is one of non-liability to investors and that the Directives constitute no threat to the common law in relation to non-regulated markets, because they do not apply to them. Consequently, non-regulated markets can continue to rely on the common law to exclude negligence liability in appropriate cases. However, the potential effect of section 90A (whether extended or not) upon the courts' perception of the appropriate liability at common law needs to be considered. A court might take the view that the legislature was prepared to confirm non-liability in negligence for the main market, because of the greater public controls to which it is subject, whilst not being prepared to do that for the non-regulated markets, so that it would be appropriate to modify *Caparo* in its application to the non-regulated markets. It is difficult to assess the weight of this argument about the 'spill over' effect of section 90A on the liability regime for the non-regulated market, but the extension of the statutory regime to non-regulated markets would bring clarity to the liability position.

97. The other effect of the application of section 90A to non-regulated markets is that it would make it clear that there could be civil liability for fraudulent statements. As stated above, no respondent claimed that the absence of liability for fraudulent misstatements would be reputation-enhancing for any securities market, and so it is not apparent that there is any inconsistency between a 'light touch' approach and making liability for fraudulent statements effective. In fact,

making clear that such liability was effective might support steps currently being taken by the London Stock Exchange to increase the effectiveness of its regulation, for example, the introduction of a rulebook for Nomads and the devotion of greater resources on the part of the Exchange to monitoring the quality of Nomads' discharge of their functions.[94] A clear fraud-based liability might be thought to be supportive of the Nomads' work. A number of respondents also made the point that, in relation to deliberate and reckless misstatements, there should be a level playing field as between regulated and non-regulated markets, especially in the light of the movement of issuers between the two markets.

**Question 5:**
Should section 90A apply to non-regulated markets? Does your answer differ according to whether section 90A is extended to cover ad hoc statements?

### Defining the scope of liability for fraudulent misstatements

98.  The thrust of this paper has been to propose the extension of the statutory regime in section 90A of FSMA 2000 for the twin purposes of (a) clarifying the absence of liability in damages for negligent statements and (b) modifying the common law liability for fraudulent misstatements so that it applies effectively to periodic and ad hoc disclosures. In respect of the second aim, a number of detailed issues arise, which are now discussed. In fact, those issues can be said to arise in relation to the existing section and so need consideration whether section 90A is extended or not.

### (i) Priority as between investors and other unsecured creditors

99.  Section 90A imposes liability for fraudulent misstatements only on the issuer. If the company is insolvent, an issue arises as to whether the defrauded investors should be allowed to compete with the other unsecured creditors of the company for a share of the assets or whether the claims of the shareholders as creditors should be subordinated to the claims of the other unsecured creditors (mainly trade creditors). The English position would seem to be that the investors' claims are not subordinated to those of the other creditors. This is the implication of *Soden v British & Commonwealth Holdings plc* (1997),[95] where the court considered the provisions of section 75(2)(f) of the Insolvency Act 1986, which subordinates claims for 'any sum due to a member of the company (in his character of a member) by way of dividend, profits or otherwise' to the claims of the other unsecured creditors. The House of Lords held that this section did not apply to a claim by a shareholder for damages against the company on the basis of a negligent misstatement made to the shareholder by the company, on the faith of which it had acquired shares in the company. Consequently, the investors' claims ranked equally with those to the other unsecured creditors. The same decision was arrived at recently by the High Court of Australia in the *Sons of Gwalia* case,[96] on the basis of similar Australian legislation. The claim in the Australian case

---

[94] See London Stock Exchange, *AIM Rules for Nominated Advisers*, February 2007.
[95] [1998] A C 298. The question of whether B&C had a good claim against the insolvent company was never determined.
[96] [2007] HCA 1.

arose out of an allegation that the company, in breach of the relevant Australian ad hoc disclosure rules, had failed to notify the Australian Stock Exchange that its gold reserves were insufficient to meet its gold delivery contracts and that it could not continue as a going concern. Although the Australian High Court came to the same conclusion as the House of Lords as to the meaning of the statutory provision, some of the judges expressed regret at the policy outcome. By contrast, the US Bankruptcy Code subordinates securities-based claims to those of other general creditors.

**Question 6:**
Should the claims of investors for damages under section 90A or any extension of it be subordinate to the claims of other unsecured creditors?

### (ii) Liability of those who make statements on behalf of the company

100.  Tort law has not only a compensatory but also a deterrent purpose. Where, as under section 90A, liability is confined to the issuer, it is far from clear that any deterrent purpose of tort law is achieved. This is because the liability, falling on the company, is borne by its shareholders, whereas the makers of the fraudulent statements, normally the directors, carry no liability to the investors (though they may have a liability to the company, as explained in para 53). The shareholders may put pressure on the directors as a consequence of the liability imposed on the company, but such deterrence would operate only indirectly. The question thus arises as to whether, in relation to fraudulent misstatements, there should be liability on those who make the fraudulent misstatement on behalf of the company. Where they meet the requirements of the tort of deceit, for example, where they themselves know that the statement they are making on behalf of the company is false, directors and senior managers are liable at common law. At present, this is the rule that applies to ad hoc disclosures, but section 90A applies a different rule to periodic disclosures.

101.  It might be said that imposing liability on the directors would not in fact secure any deterrent purpose, because D&O insurance is likely to transfer the costs of the liability back to the company, even if the law apparently provides otherwise. Even if D&O insurance is generally unavailable to cover fraudulent behaviour, it may be that such cover would extend to directors' liabilities under settlements of claims brought by investors in which the directors do not admit liability. If this is the case, imposing liability on directors might simply add to the incentives for defendants to settle investors' claims out of court. It is also the case that the cost of the misstatements will be transferred back to the company if the company undertakes to provide to the directors an indemnity against liability to third parties, as is now permitted by section 309B of the Companies Act 1985.

102.  As to foreign experience on this point, in the United States section 10b of the Securities Act 1934 is not confined to issuers, though in practice the system of D&O insurance operates so that little liability remains with the directors.[97] In Germany the reform of the WpHG in 2002 imposed liability only on issuers. In 2004 there was a further reform proposal which would have extended liability to those who acted on behalf of the company, but this reform was not proceeded

---

[97] John C Coffee Jr, *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*, Columbia Law School, Center for Law and Economic Studies, Working Paper No. 293, March 2006.

with after lobbying by German business.[98] In France, there is the general doctrine of the separate legal personality of the company which protects directors from liability whilst they are acting on behalf of the company, at least before the French civil courts, though the criminal courts are more sceptical of this doctrine.

103.   This question arises not only in relation to directors and senior managers, but also in relation to advisers. Again, the requirements of the fraud action would have to be satisfied by the adviser in question, ie the adviser would have to know that the statement was false or be reckless as to its truth and reliance by the investor would have to be reasonable in the circumstances. There may be a particular worry about imposing this liability on auditors, because of the particular structure of the international audit market, though that worry exists, I believe, more in relation to negligence-based liability than fraud-based liability. The provisions of Chapter 6 of Part 16 of the Companies Act 2006 would not seem to benefit the auditor in this situation because they apparently deal with the auditor's liability to the company, not to third parties.

**Question 7:**
Should statutory liability for fraudulent misstatements be extended to those who make the statement on behalf of the company?

*(iii) Compensation for sellers and holders?*

104.   Section 90A provides compensation only to those who acquired securities on the basis of misleading statements and who suffered loss in consequence.[99] Those who sell securities or hold securities on the basis of false misstatements are not entitled to claim. The exclusion of sellers of securities was criticised by all those respondents who commented on the issue. Some respondents also thought holders of securities should be able to claim. I am inclined to view these two classes of potential claimants as raising rather different questions, which their common feature of being excluded from the current version of section 90A rather obscures.

105.   The problem with giving a right to compensation to a person who simply continues to hold securities (let alone a person who decides to continue as a non-holder of securities in the issuer) is the difficulty of establishing that, in the absence of the misstatement, they would have sold the securities in question or bought (more of) them, as the case may be. This is a counter-factual which may be very difficult to prove. On the other hand, without proof of the counter-factual it will not be possible to say that the claimant relied on the misstatement, reliance being a pre-requisite of liability under section 90A. It is tempting to say that questions of proof can be left to the courts and only those claimants who can show reliance will succeed in their claims. Thus, if I can prove that I telephoned my broker to instruct him to sell my shares in a company but that he drew my attention to an optimistic statement the company had just put out and I told him not to proceed with the sale, I might succeed in my claim. However, in general such cases will be difficult to prove and there might be thought to be a public interest in not giving to the courts the task of making factual

---

[98] See for a critical account of this:
 http://www.jura.uni-augsburg.de/prof/moellers/aktuelles/kapinhag_gestoppt.html.
[99] Section 90A(3).

determinations for which there will normally be little reliable information. It is interesting to observe that neither the US nor Germany (two countries having statutory liability for misleading disclosures) confers protection on those who simply hold securities or remain as non-investors in the company. In the case of Germany it was an explicit decision to require a market transaction before there could be liability.[100]

106.  In the case of a seller of securities, acting in reliance on a false statement put out by the company, the issues of identifying and proving loss might be thought to be the same as with an acquirer of securities. It may be in the nature of things that companies more often put out misleading optimistic statements and so generate purchases of securities than misleadingly pessimistic ones which generate sales. However, in principle it is not clear why reliant sellers should not recover if reliant purchasers do.

**Question 8:**
Should statutory protection be extended to sellers and holders of securities as well as to buyers?

*(iv) The measure of damages*

107.  Section 90A of FSMA 2000 does not deal with the measure of damages to be awarded if an investor's claim is successful. It seems likely that the courts would apply the same approach as is followed in the case of common law claims for deceit, since the section is closely modelled on the common law tort. In *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* (1996)[101] the House of Lords used a test which was generous to claimants. In particular, the court held, damages in deceit were not limited to that part of the loss which flowed from the fact that the misrepresentation was false. In this case a vendor of shares (Citibank, through one of its employees) made directly to the claimant (Smith New Court) a fraudulent misstatement in connection with a block of shares in Ferranti which the claimant was proposing to purchase as a long-term holding. The effect of the fraudulent misstatement was that there were other bidders for the shares held by Citibank. After the claimant had purchased the shares, it appeared that an entirely unconnected fraud within Ferranti meant that the price of the shares in the market was overvalued. The claimant eventually sold its holding at a considerable loss and recovered the whole of the difference between the purchase and the sale prices, even though much of that loss represented the effect of the unconnected fraud.

108.  The approach in the tort of deceit is in contrast to the measure of damages in negligence, where the recoverable loss is defined by reference to the scope of the duty broken. Thus, in *South Australia Asset Management Corpn v York Montague Ltd* (1996)[102] the same court as in the *Smith New Court* case applied a different test where a surveyor had negligently valued properties for a lender proposing to take security over the properties. In this case, the surveyor's liability was limited to the loss caused to the lender from having a security worth less than it had expected,

---

[100] See Ulrike Ehricke 'Deutschland' in Klaus J Hopt and Hans-Christoph Voigt (eds), *Prospekt- und Kapitalmarktinformationshaftung* (Mohr Siebeck, Tübingen, 2005) pp 280-282.
[101] [1997] A C 254, HL.
[102] [1997] A C 191, HL.

but the surveyor was not liable for the loss caused by the subsequent drop of values in the property market generally.

109. As was explained to me by NERA Economic Consulting the focus in private securities litigation in the United States is on identifying the loss caused to the investors by the misstatement, ie the approach is much closer to that for the tort of negligence in the UK than that for the tort of deceit, despite the fraud basis of the US substantive law. NERA, who provide expert evidence to defendants in class actions in the US, have developed a sophisticated methodology for distinguishing the adverse impact on the stock price when the truth emerges from adverse impacts arising from other causes, such as a fall in the overall market which occurs at the same time; and for predicting what the course of the share price would have been if the misstatement had not been made. In the new German rules dealing with misstatements in ad hoc disclosures, it is disputed whether the measure of damages is the loss caused by the misstatement ('Kursdifferenzschaden') or whether the investor can claim to be put in the position he was in before the transaction was entered into ('Vertragsabschlussschaden'), which is in effect the deceit measure in English law. The better view is that it is only the former which can be recovered.[103]

**Question 9:**
Should the deceit or the negligence measure of damages be adopted in the statutory regime?

## III. Some overarching issues

### Can super-optimal levels of fraud-based litigation be avoided?

110. During the course of this Review there has been a considerable body of criticism emanating from the United States about the way that private securities litigation, especially private securities class actions, operate in that country. In particular, in December 2006 the Committee on Capital Markets Regulation, directed by Prof Hal S Scott of Harvard Law School, delivered its Interim Report.[104] Although its views are not universally accepted in the US legal and business communities, there is no doubt that the Report reflects a substantial degree of dissatisfaction with private securities class actions in the US, despite the reforms which had been made in that area as recently as 1995 in the Private Securities Litigation Reform Act. The report makes proposals for various reforms of private securities litigation in the United States, though it should be noted that it falls very far short of proposing that the right to bring such litigation should be removed. The question is thus raised as to whether similar problems would occur in the UK if fraud-based actions by investors became generally available.

111. There are strong reasons for thinking that a fraud-based investor action would operate very differently in the UK from the way in which private securities litigation operates in the US. First, as has been pointed out in para 74 above, the

---

[103] Klaus J Hopt and Hans-Christoph Voigt, 'Grundsatz- und Reformprobleme der Prospekt- und Kapitalmarktinformationshaftung' in Hopt and Voigt (eds), above n 98. pp. 130-133.
[104] Available on: http://www.capmktsreg.org/pdfs/11.30Committee_Interim_ReportREV2.pdf.

definition of 'fraud' in section 90A and, indeed, in the tort of deceit upon which it is modelled, is narrower than that used by the US courts in 10b litigation. 'Fraud' for the purposes of section 10b of the Securities Act 1934 has been interpreted by the courts as including cases of gross negligence, whereas an honest, even if unreasonable, belief in the truth of the statement prevents a finding of fraud in English law. This point was settled for good by the House of Lords as long ago as 1889 in *Derry v Peek*.[105] As a leading authority has put it: 'The core of the action of deceit is *fraud* on the part of the representor, by which the claimant was *deceived*: this has been clear since the late eighteenth century. During the course of the nineteenth century there was some debate about the exact meaning of "fraud" for the purposes of this tort, but in 1889 this debate was definitively settled by the House of Lords in *Derry v Peek* , and since then the tort has remained in substance unchanged.'[106]

112. Besides this very important difference in the definition of fraud, there are substantial differences in the operation of the civil litigation systems in the two countries, which are probably as important as the differences in the substantive law. These differences in procedural law tend to reinforce the differences in the substantive law, ie to discourage private securities litigation in England[107] and to encourage it in the US.

113. An important procedural issue is how easy it is for a defendant to have the claim against it struck out at an early stage of the litigation, ie at the point when the claimant has simply formulated its claim but there has been no (expensive) pre-trial disclosure, let alone a trial. It is relatively costless (both financially and in terms of management time) to defend an action up to strike-out. If, however, a strike-out is not available, the costs of the litigation begin to mount and so do the pressures on the defendant to settle the claim (and thus avoid the costs and distractions of the litigation), even if the defendant thinks the claim lacks merit. In *BCCI v Price Waterhouse*[108] Laddie J put the significance of the courts taking a robust view of the strike-out as follows:

> "However it is common knowledge that in many cases like this in which enormous sums of damages are sought, the dispute does not reach the stage of a judgment. The sums claimed, the sheer cost of the litigation which in a case like this will be in many tens of millions of pounds, the enormous time which will be needed for the trial and the dislocation that will impose on the parties means that there will be very great pressure on them to settle. That pressure may be felt particularly acutely by the defendants. In fact during another application before me in this action some little while ago, counsel for the plaintiffs (but not the counsel appearing before me on this application) suggested that, no matter how weak the Plaintiffs' claim might appear in a case of this type, the defendants or their insurers would normally succumb to the pressure to offer a settlement. He appeared to suggest that such proceedings therefore justified themselves. I wish to make it clear that I am not suggesting that that is the motive behind these proceedings or that that was being suggested by counsel. But I have little doubt that it reflects what happens in some cases. In a legal system where even success in the litigation leaves the winning party bearing a substantial costs burden, the incentive to do a deal must be significant. Soldiering on as a matter of principle frequently is not a commercially sensible course to adopt. The result is that a significant part of the case law consists of cases concerning applications to strike out."

---

[105] (1889) 14 App. Cas. 337.
[106] Cartwright, above n 83 at para. 5.01.
[107] These remarks are confined to English civil procedure, though it is not believed that the overall position is significantly different in Scotland. Comments from those familiar with Scottish procedure are invited.
[108] [1999] BCC 351.

In spite of some relaxation in the strike out rules in English law in recent years, it remains the case that in the case of fraud the statement of case must allege fraud clearly and that allegation must be supported with particulars, which are capable of supporting the allegation of fraud.[109] Fraud cannot be 'averred generally'. In addition, under the Bar Council's Code of Conduct a barrister may not draft a statement of case making 'any allegation of fraud unless he has clear instructions to make such allegation and has before him reasonably credible material which as it stands establishes a prima facie case of fraud.'[110] Thus, the stricter definition of fraud in the UK combines with the rules on formulating statements of case to make it more difficult for a claimant who does not have evidence of fraud to get past the strike-out stage, in the hope that pre-trial disclosure by the defendant will produce the evidence that was previously lacking – or that the costs of the disclosure process will pressurise the defendant into a settlement. Although the 1995 reforms attempted to move the US system of civil procedure away from general averments of states of mind and towards greater particularity, it appears that this reform has not been uniformly interpreted across the various Circuits of the federal court system.[111] In the US a very small proportion of private securities actions which are commenced actually reach trial, whilst the percentage of claimed losses (which may well be over-inflated) which is actually met in settlements is very low (about 3 per cent currently).[112]

114. In the United States securities class actions are routinely tried by juries, who determine both liability and damages. This is regarded by potential defendants as substantially increasing the chances of claimants obtaining a large damages award and by claimants as adding significantly to the pressures on defendants to settle. A significant recommendation of the Scott committee is that companies should be able to opt for judge trials (not only in relation to securities litigation).[113] Although fraud actions remain one of the areas where jury trials are still in principle to be used in civil actions in England, this requirement does not apply if 'the court is of opinion that the trial requires any prolonged examination of documents or accounts';[114] and it appears that jury trials are rare in the class of case with which this Review is concerned.

115. However, the factor which was mentioned most often by respondents as promoting securities litigation in the United States were the financial incentives for law firms to initiate litigation. These incentives seem to depend on two matters, neither of which is replicated in the United Kingdom. First, class actions in the US operate on an 'opt out' basis, whereas the closest analogy here under the Civil Procedure Rules is the 'group litigation order' which operates on an 'opt in' basis. Under the US system a court will award recovery for all the members of the class (for example, investors who bought securities after the false statement was made and before the truth emerged) unless they choose to take themselves out of the class action at an early stage. The burden is on the investor to do so, not on the claimant's lawyer to seek their consent to be included in the class.

---

[109] *Three Rivers District Council v Bank of England (No. 3)* [2001] 2 All E R 513, HL.

[110] Bar Council, *Code of Conduct*, para. 704(c).

[111] Though the Supreme Court this term will address this issue in the case of *Tellabs Inc v Makor Issues & Rights Ltd*.

[112] NERA, *Recent Trends in Shareholder Class Action Litigation*, April 2006, pp. 7- 8. The dollar amounts recovered, however, are often substantial.

[113] Above n. 102 at p. 11.

[114] Supreme Court Act 1981, s. 69.

Under a Group Litigation Order under the CPR[115] the court's judgement will benefit only identified claimants, either those who are on the 'group register' when the judgment is handed down or, if the court so directs, claimants who bring claims in the future. Consequently, to maximise the size of the recovery under the British system, the lawyers must identify the full range of class claimants and seek to obtain the permission of as many of them as possible to join in the litigation and have their claims entered on the register.

116. In connection with the formation of the class, it is also important to revert again to the reliance requirement in section 90A (see para 55 above). In the United States a typical class is constituted by those who bought shares after the misleading statement was made and still held the shares at the point the truth emerged. Under the 'fraud on the market' theory, adopted in the US for misleading continuing disclosures as well as for misstatements in prospectuses, it is not necessary for the claimant to show knowledge of and reliance on the misstatement in question. Thus, class formation is easier and classes are larger than where reliance has to be shown.

117. Second, *contingent* fee arrangements in the United States permit lawyers to enter into agreements whereby they take in a successful case a significant proportion of the recovery awarded to the claimants (thus reinforcing the 'opt out' rule from the point of view of the lawyers) but are not remunerated at all if the case is unsuccessful. In the UK section 58 of the Courts and Legal Services Act 1990[116] permits *conditional* fee arrangements, by which lawyers can agree to no payment if the case is unsuccessful and an increase of their normal fee (but *not* a share of the recoveries) if the case is successful. Such agreements may lead to a doubling (but no more) of the fees otherwise payable.[117] The overall effect of the UK provisions is, it would seem, to give law firms a much less powerful incentive to promote private securities litigation than in the US.[118] There seem to be no law firms in the UK, as there are in the US, whose business model is based wholly or mainly on the promotion of private securities litigation, though the arrival in Europe from the US of such a firm was often mentioned as a possibility by respondents. However, it is clear that the issue of the funding of civil litigation in the United Kingdom is still the subject of debate and that the current rules cannot be assumed to represent the situation which will continue in the future.[119]

118. A particular issue about funding of securities litigation which came to the fore during the Review was that of funding by third parties (as opposed to the law firm representing the claimants). Section 58B of the Courts and Legal Services Act 1990[120] permits third-party funding of litigation, on a similar basis to that for conditional fees. Section 58B is not in force and I understand there are no immediate plans to bring it into force. In the area of insolvency litigation, however, recent changes appear to permit a liquidator to assign a cause of action to a third party in exchange for a share of proceeds, if the litigation is

---

[115] CPR 19.10 ff.
[116] As amended by the Access to Justice Act 1999, s. 27.
[117] The Conditional Fee Arrangements Order 2000/823.
[118] The UK costs shifting rule in the case of unsuccessful litigation is a further factor in discouraging litigation.
[119] See, for example, Civil Justice Council, *Improved Access to Justice – Funding Options and Proportionate Costs*, August 2005.
[120] Also introduced by the Access to Justice Act 1999 (s 28).

successful,[121] and that third party funders have emerged to take advantage of this possibility.[122] This is a basis for funding litigation which is clearly closer to the US contingent fee model than to the British conditional fee one. However, this facility appears to apply only to claims by companies (brought through the insolvency practitioner), not to claims against them by investors.[123]

**The benefits and limitations of private actions to enforce securities law**

119. It is traditionally said that the law of tort (of which the law of deceit is part) has two, sometimes conflicting, goals. These are compensating those who have suffered from the wrongful act and deterring the commission of such acts in the future. On deterrence, we have already noted that section 90A of FSMA does not impose liability on the makers of misleading statements on behalf of the company. This does not mean that the private litigation has no deterrent effect on those who make the statements, because they may suffer reputational and other losses as a result of being involved in the litigation. Nevertheless, it does mean that at present direct sanctions on the makers of misleading statements lie in the area of public enforcement of the disclosure rules, notably by the FSA.

120. As for compensation, we have seen that there are two issues here. On the one hand, the measure of damages rule might seem over-generous to claimants. On the other, the US evidence suggests that most private litigation to enforce securities litigation is settled for a relatively small amount of the damage suffered. The former problem could be fixed by altering the measure of damages rules. The latter is more difficult because it may be very near impossible, and probably undesirable, to change the incentives of issuers, and their directors, to settle litigation rather than to go to trial.

121. It can also be argued that, for long-term only investors, the financial benefits of being able to sue for damages may be small, if their position is looked at over time. They are as likely, it might be said, to be among the shareholders in the issuer which has made the misleading statement as among the investors who were misled. They benefit in the latter capacity but lose out in the first. Over time, their financial position may not be significantly different than if they could not sue at all, except that they will have borne the transaction costs of the litigation. Thus, on both the compensation and deterrence fronts, the achievements of private litigation are limited.

122. However, none of the above arguments is a good reason for excluding private litigation entirely where fraud is involved. First, to do so would be exclude almost any possibility of compensation being provided to investors misled by fraud, given the FSA's decision not to allocate its scarce resources to routine use of its restitution powers under FSMA in the case of non-retail investors. Although some investors may appear as often on one side of the litigation equation as on the other, this cannot be guaranteed to be the case for all investors. Those whose

---

[121] See J Armour and A Walters, 'Funding Liquidation: A Functional View' (2006) 122 *Law Quarterly Review* 303.

[122] Notably IM Litigation Funding. See http://www.insolvencymanagement.co.uk/default.htm.

[123] In Australia, where third-party funding is more generally available, there are a number of such providers and the largest, IMF, is quoted on the Australian Stock Exchange. See http://www.imf.com.au/.

position is asymmetrically on the investor side, will be out of pocket if they have no possibility of suing for fraud. Second, given the adverse effect on market confidence of fraud, it can be said to be unwise from a broader public policy standpoint to rely entirely on public sanctions to combat it. The FSA has a wide range of statutory objectives to fulfil and needs to harbour its resources with care. Private litigation both relieves some of the pressure on those resources and provides an alternative forum within which decisions can be taken about devoting resources to combating fraudulent disclosures by issuers. Third, in the areas covered by EU Directives, it can be argued that making fraud-based liability effectively available would help promote an 'equity culture' which is a subsidiary aim of the EU-level reforms.

# IV. Appendices

*Table 1:* FSA cases[124]

| Company | Date | Breach | Sanction |
|---|---|---|---|
| Eurodis | 12/09/2005 | Delayed announcement LR9.2 | Censure |
| My Travel | 14/07/2005 | Delayed announcement LR9.2 | Fine 240k |
| Pace Micro | 26/01/2005 | Omission from interim results and failure to announce: LR9.2 and 9.3A | Fine 450k |
| Shell | 24/08/2004 | Market abuse | Fine 17m |
| Universal Salvage | 19/05/2004 | Delayed announcement LR9.1 | Fine 90k company 10k director |
| Sportsworld | 29/03/2004 | Delayed announcement LR9.2 | Public censure and 45k on directors |
| SFI | 11/12/2003 | Misleading preliminary results LR9.3A | Censure |
| Marconi | 11/04/2003 | Delayed announcement LR9.2 | Public statement |
| AIT | 2002 onwards | Reckless statement in trading statement FSMA s397 – criminal prosecution | Custodial sentences, disqualification from being a company director, compensation order, confiscation order quashed |

---

[124] Source: www.fsa.gov.uk

***Annex A:*** **Sections 90A and 90B of FSMA 2000 (section 1270 of Companies Act 2006)**[125]

### 1270  Liability for false or misleading statements in certain publications

In Part 6 of the Financial Services and Markets Act 2000 (c. 8), after section 90 insert—

#### "90A  Compensation for statements in certain publications

(1)  The publications to which this section applies are—

    (a)  any reports and statements published in response to a requirement imposed by a provision implementing Article 4, 5 or 6 of the transparency obligations directive, and

    (b)  any preliminary statement made in advance of a report or statement to be published in response to a requirement imposed by a provision implementing Article 4 of that directive, to the extent that it contains information that it is intended—

        (i)  will appear in the report or statement, and

        (ii)  will be presented in the report or statement in substantially the same form as that in which it is presented in the preliminary statement.

(2)  The securities to which this section applies are—

    (a)  securities that are traded on a regulated market situated or operating in the United Kingdom, and

    (b)  securities that—

        (i)  are traded on a regulated market situated or operating outside the United Kingdom, and

        (ii)  are issued by an issuer for which the United Kingdom is the home Member State within the meaning of Article 2.1(i) of the transparency obligations directive.

(3)  The issuer of securities to which this section applies is liable to pay compensation to a person who has—

    (a)  acquired such securities issued by it, and

    (b)  suffered loss in respect of them as a result of—

        (i)  any untrue or misleading statement in a publication to which this section applies, or

        (ii)  the omission from any such publication of any matter required to be included in it.

(4)  The issuer is so liable only if a person discharging managerial responsibilities within the issuer in relation to the publication—

    (a)  knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or

    (b)  knew the omission to be dishonest concealment of a material fact.

---

[125] See www.opsi.gov.uk/ACTS/acts2006/ukpga_20060046_en.pdf

(5) A loss is not regarded as suffered as a result of the statement or omission in the publication unless the person suffering it acquired the relevant securities—

   (a) in reliance on the information in the publication, and

   (b) at a time when, and in circumstances in which, it was reasonable for him to rely on that information.

(6) Except as mentioned in subsection (8)—

   (a) the issuer is not subject to any other liability than that provided for by this section in respect of loss suffered as a result of reliance by any person on—

      (i) an untrue or misleading statement in a publication to which this section applies, or

      (ii) the omission from any such publication of any matter required to be included in it, and

   (b) a person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(7) Any reference in subsection (6) to a person being subject to a liability includes a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.

(8) This section does not affect—

   (a) the powers conferred by section 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution);

   (b) liability for a civil penalty;

   (c) liability for a criminal offence.

(9) For the purposes of this section—

   (a) the following are persons "discharging managerial responsibilities" in relation to a publication—

      (i) any director of the issuer (or person occupying the position of director, by whatever name called),

      (ii) in the case of an issuer whose affairs are managed by its members, any member of the issuer,

      (iii) in the case of an issuer that has no persons within sub-paragraph (i) or (ii), any senior executive of the issuer having responsibilities in relation to the publication;

   (b) references to the acquisition by a person of securities include his contracting to acquire them or any interest in them.

### 90B Power to make further provision about liability for published information

(1) The Treasury may by regulations make provision about the liability of issuers of securities traded on a regulated market, and other persons, in respect of information published to holders of securities, to the market or to the public generally.

(2) Regulations under this section may amend any primary or subordinate legislation, including any provision of, or made under, this Act.".

***Annex B:* Sections 37b and 37c of the German Securities Trading Act
(*Wertpapierhandelsgesetz – WpHG*)**[126]

Section 37b
Liability for damages due to failure to immediately publish inside information

(1) If an issuer of financial instruments that are admitted to trading on a German
stock exchange fails to immediately publish inside information that directly affects
that issuer, it shall be liable to compensate a third party for the damage resulting from
the omission if the third party

1.  has bought the financial instruments after the omission and still owns the
    financial instruments upon disclosure of the information or

2.  has bought the financial instruments before the existence of the relevant insider
    fact and sells them after the omission

(2) Those issuers who can prove that the omission was made neither deliberately nor
in an act of gross negligence shall not be liable for damages pursuant to subsection
(1).

(3) Damage claims pursuant to subsection (1) shall not exist if, in the case of
subsection (1) no. 1, the third party knew about the undisclosed fact at the time of
purchase and, in the case of subsection (1) no. 2, the third party knew about the
undisclosed fact at the time of sale.

(4) Damage claims pursuant to subsection (1) are subject to a limitation period of one
year from the date on which the third party learned of the omission, but not more
than three years after the omission.

(5) This is without prejudice to further contractual claims or claims in intentional tort
which may be raised under the provisions of civil law.

(6) Any agreement which reduces the claims to be brought by an issuer against the
members of the board of management based on damage claims against the issuer
pursuant to subsection (1) or which relieves the members of the board of
management of such claims shall be deemed invalid.

Section 37c
Liability for damages based on the publication of false inside information

(1) If an issuer of financial instruments that are admitted to trading on a domestic
stock exchange publishes false inside information that directly affects that issuer in a
notification pursuant to section 15, he shall be liable to compensate a third party for
the damage resulting from the fact that the third party relied on the accuracy of the
inside information, if the third party

---

[126] Source: www.bafin.de

1. has bought the financial instruments after publication and still owns the financial instruments at the point in time at which it becomes publicly known that the information was inaccurate or

2. has bought the financial instruments before publication and sells them before it becomes clear that the information was inaccurate.

(2) Those issuers who can prove that they were not aware of the inaccuracy of the inside information and that such lack of awareness does not constitute an act of gross negligence shall not be liable for damages pursuant to subsection (1).

(3) Damage claims pursuant to subsection (1) shall not exist if, in the case of subsection (1) no. 1, the third party knew that the inside information was inaccurate at the time of purchase and, in the case of subsection (1) no. 2, the third party knew that the information was incorrect at the time of sale.

(4) Damage claims pursuant to subsection (1) are subject to a limitation period of one year from the date on which the third party learns of the inaccuracy, but no more than three years after publication.

(5) This is without prejudice to further contractual claims or claims in intentional tort which may be raised under the provisions of civil law.

(6) Any agreement which reduces the claims to be brought by an issuer against the members of the board of management on grounds of damage claims pursuant to subsection (1) or which relieves the members of the board of management of such claims shall be deemed invalid.

## LIST OF QUESTIONS FOR RESPONSE

**Question 1:**
What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liaiblity in the British context? Is fraud an appropriate basis for liability?

**Question 2:**
Should the statutory regime should be extended in principle to ad hoc statements?

**Question 3:**
Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?

**Question 4:**
If the statutory regime were to be extended to ad hoc announcements, should it be (a) confined to disclosures of inside information (the most pressing case), (b) applied to all RIS announcements or (c) confined to announcements made under the FSA's Disclosure and Transparency Rules (ie excluding ad hoc announcements made under the Listing Rules)?

**Question 5:**
Should section 90A apply to non-regulated markets? Does your answer differ according to whether section 90A is extended to cover ad hoc statements?

**Question 6:**
Should the claims of investors for damages under section 90A or any extension of it be subordinate to the claims of other unsecured creditors?

**Question 7:**
Should statutory liability for fraudulent misstatements be extended to those who make the statement on behalf of the company?

**Question 8:**
Should statutory protection be extended to sellers and holders of securities as well as to buyers?

**Question 9:**
Should the deceit or the negligence measure of damages be adopted in the statutory regime?

# TERMS OF REFERENCE

Section 1270 of the Companies Act 2006 establishes a new statutory regime for liability in damages to third parties in respect of disclosures under the Transparency Directive (2004/109/EC). The Government consulted last year on whether the statutory regime should be extended. Responses to the consultation confirmed that this was a complex area in which it is vital to get the policy right, but were not conclusive.

The Government want to strike the right balance between the interests of investors and issuers, providing appropriate incentives to make timely and accurate disclosures in compliance with statutory rules, and an appropriate – but limited – right to recover losses. Section 1270 of the Companies Act amends the Financial Services and Markets Act 2000, inserting a new section 90B that provides for a power to amend the statutory regime.

The Government appointed Professor Paul Davies, the Cassel Professor of Commercial Law at the London School of Economics in October 2006 to undertake a review of issuer liability. The Davies Review will:

- Consider the law relating to liability in damages of issuers of securities traded on a regulated market or alternative markets (such as AIM or Plus Markets) in respect of statements and publications made to the market and which are incorrect, false or misleading or have not been made promptly;

- Consider how any such liability may be affected by regulatory obligations attaching to issuers and directors;

- Consider the case for providing for a specific right to damages by those relying on such statements and publications in the context of securities market activities, in particular: the circumstances that might give rise to a right, against whom a right might be enforceable and the consistency with the effect of corporate governance and conventions, standards or rules affecting the information that issuers publish to shareholders and others and how they publish it;

- Consider the impacts on:
    - issuers, markets, investors and others;
    - the quantity and quality of information disclosed;
    - the competitiveness of the UK as a good place to do business;

- Take into account the liability of issuers and their managements in other centres of financial services in Europe or more widely including the USA;

- Make recommendations to the Treasury on whether to exercise the section 1270 power and, if so, how.

In making recommendations to the Treasury, the Review will advise on:
- options for a new regime if recommended;
- who might bring actions to sue for damages;
- the kinds of damages that might be awarded and potential effects of paying those damages on issuers, including effects on their business and employees, directors or senior executives, and on the supply of qualified individuals willing to take on director and non-executive director roles in consequence;
- and other related matters.

ISBN 978-1-84532-299-1

9 781845 322991 >

# Davies Review of Issuer Liability:
## Final Report

by Professor Paul Davies QC

June 2007

# Davies Review of Issuer Liability:
## Final Report

by Professor Paul Davies QC

June 2007

© Crown copyright 2007

Published with the permission of HM Treasury on behalf of the Controller of Her Majesty's Stationery Office.

The text in this document (excluding the Royal Coat of Arms and departmental logos) may be reproduced free of charge in any format or medium providing that it is reproduced accurately and not used in a misleading context. The material must be acknowledged as Crown copyright and the title of the document specified.

Any enquiries relating to the copyright in this document should be sent to:

Office of Public Sector Information
Information Policy Team
St Clements House
2-16 Colegate
Norwich
NR3 1BQ

Fax:  01603 723000
E-mail:  HMSOlicensing@opsi.x.gsi.gov.uk

**Contacts**

This document can be found on the Treasury website at:

**hm-treasury.gov.uk/davies**

For general enquiries about the review, contact:

Davies Review of Issuer Liability
Room 4 / 20
HM Treasury
1 Horse Guards Road
London
SW1A 2HQ

Email:  davies.review@hm-treasury.gov.uk

ISBN:  978-1-84532-306-6

Printed on at least 75% recycled paper.
When you have finished with it please recycle it again.

PU246

# Contents

**Page**

Foreword by the Economic Secretary to the Treasury………..……………………….   2

Preface by Professor Paul Davies QC……………………………………………………   3

Executive summary………………………………………………………………………   4

Davies Review: Final Report…………………………………………………………..   7

- *Question 1*: Fraud, negligence and gross negligence…………………………   9
    - o   Fraud or simple negligence
    - o   Fraud or gross negligence
    - o   The definition of fraud

- *Question 2:* Extension of the statutory regime to ad hoc statements……..…   19

- *Question 5:* Extension to exchange-regulated markets……………………..   20

- *Question 4:* How are relevant disclosures to be identified?……………….   21

- *Question 3:* Liability for dishonest delay…………………………………   23

- *Question 8:* Should liability extend to sellers and holders of securities?………24

- *Question 7:* Should liability be confined to issuers or be extended to directors and advisers?……………..…………………………………………   25

- *Question 9:* Assessment of damages………………………………………26

- *Question 6:* Subordination of investors' claims………………………………27

- Applicable law…………………………………………………………………27

Summary of recommendations.…………………………………………………………   29

Terms of reference…………………………………………………………………………   31

List of contributors.………………………………………………………………………   32

Further information & next steps……..……………………………………………   33

## Foreword by the Economic Secretary to the Treasury

Last summer, in the course of implementing the Transparency Directive through the Companies Bill, I was presented with compelling arguments from a wide range of companies, accountancy firms and from the legal profession, asking that I take action to set out in law the liability of listed companies for the financial statements that they were required to publish by the Transparency Directive.

Accepting these arguments, and taking this policy forward, it became clear that everybody agreed that this was a complex area, in which it is vital that we get the policy right. However, there was no clear agreement on what the right policy was.

Following consultation, I presented to Parliament a framework of legislation that sought to achieve the correct balance between ensuring that investors had the right to take action against companies in respect of financial statements that turned out to be fraudulent, and enabling companies to release accurate, timely and meaningful statements to investors. However, many of those who commented on the proposals argued that they should cover a wider range of financial statements. In recognition of this, and the enormous challenge of striking the balance correctly, I also asked for the power to be able to make amendments to the legislation.

The appointment of Professor Paul Davies QC to conduct this independent review is the crucial component to make sure that in this vital area we get the policy right. When I first met Paul we discussed the effects that his work could have on the efficiency and international competitiveness of the UK's capital markets. The UK's statutory and legal framework is rightly seen across the world as a key competitive advantage.

The thorough analysis and clear explanation that Paul presents in his final report allow the reader to gain a remarkable insight into this difficult policy area, as well as to understand clearly the rationale behind his conclusions.

**Ed Balls MP**

# Preface by Professor Paul Davies QC

Ed Balls MP
Economic Secretary
HM Treasury
1 Horse Guards Road
London SW1A 2HQ

Dear Economic Secretary

You asked me in October last year to carry out a review of issuer liability to investors in respect of misstatements to the market and, in particular, to consider the exercise the powers conferred by the new section 90B of the Financial Services and Markets Act 2000 (inserted by the Companies Act 2006).  My appointment followed an earlier consultation carried out in the summer of 2006 by the Treasury, whose results confirmed that this was a complex area in which it is vital to get the policy right but were inconclusive.  I issued a Discussion Paper in March 2007 and I now submit my Final Report.  The Executive Summary which follows sets out the main conclusions and recommendations of my Report.

I am grateful to all those who gave of their time to discuss the issues with me.  They came from a wide range of backgrounds within the securities markets and their users, and I learned something from all of them.  I am grateful also to those (often, but not always, the same people) who responded in writing to the Discussion Paper and did so, more or less, within the short time limit set by me for responses. Taken as a whole, the responses were thoughtful and reflective. I refer to some of those responses in this Report. However, reading them through sparked for me trains of thought, whose inspiration I cannot no longer precisely identify. So, I apologise to those unacknowledged respondents, especially where they think my views bear an uncanny resemblance to their own.

I am grateful to four LSE graduate students for research assistance on this project which was provided quickly and flexibly, and with serious detriment to their Christmas vacations: Florian Burnat, Joanna Hemingway, Stefan Papst and Alisa Valderrama.

Above all my thanks go to Anthea Heffernan, Secretary to the Review, without whose organisational and distilling skills this Review would not have been completed in such short order.

Yours sincerely,

**Paul Davies**

# Executive Summary

- Section 90A of the Financial Services and Markets Act 2000 (introduced by section 1270 of the Companies Act 2006) establishes a new statutory liability regime under which issuers will be liable for fraudulent misstatements in periodic disclosures to the market as required under the Transparency Directive (2004/109/EC).  However, in response to industry concerns raised last summer about the limited scope  of the new statutory liability regime and whether common law rights of shareholders were at risk, the Government appointed Professor Paul Davies QC, the Cassel Professor of Commercial Law at the London School of Economics, to carry out an independent review of liability for corporate misstatements to the market and to recommend whether or not changes should be made to the existing statutory regime.

- Key to the independent Davies Review's inquiry has been striking the right balance between incentives needed to encourage companies to disclose accurate, timely and meaningful information and the rights of investors who rely on misleading statements to make investment decisions to claim damages for losses suffered.  The Review has considered both existing regulatory obligations and penalties, including criminal penalties, and the potential for liability in damages under existing common law jurisprudence. It has also looked at the position in other EU member states and more widely in the jurisdictions of other substantial financial services markets.

- The Review's Discussion Paper published in March 2007 invited comments on nine questions relating to liability for corporate misstatements to the market.  This Final Report, which takes account of the views of a broad cross-section of over 40 respondents, presents the Review's conclusions and recommendations to the Government, making the case for exercising the powers conferred by the new section 90B of FSMA 2000 to extend the existing statutory liability regime in section 90A in certain ways.

- The first and most difficult question raised by the Review was what should be the basis of liability: fraud or the less demanding standard of negligence?  Or is gross negligence a viable middle way?  The Review recommends that fraud be maintained as the standard of liability for misstatements to the market, on the grounds that: (a) negligence is a fact dependant standard of liability, with very limited guidance as to how the courts might apply it case by case, and which therefore would encourage defensive and bland reporting;  (b) careless reporting will not go unsanctioned because negligence is the standard adopted for FSA penalties and censures;  (c) creating a civil liability based on a negligence standard risks generating unmeritorious claims for large sums in a way that fraud-based liability does not; and (d) gross negligence, as a new and untested standard, would create legal uncertainties and risk the same problems of defensive reporting and speculative litigation as simple negligence.

- In response to those concerned that fraud is too restrictive a standard of liability, the final report notes that fraud-based liability does not take away existing investor rights, since negligence will remain open as a basis for investor claims in respect of their rights *as shareholders* in the company.  Further, the existing statutory regime makes fraud claims easier to bring than at present at common law, because the claimant need only show that his own reliance on the misstatement was reasonable and not

also that the issuer intended that he should rely on it. The Review recommends that this should continue to be a feature of the extended statutory regime.

- On the basis of maintaining fraud as the standard of liability, the Review recommends the following changes:

  o extend the statutory regime to cover ad hoc disclosures, on the basis that: (a) some ad hoc statements will later appear in periodic disclosures required by the Transparency Directive; (b) it is confusing to have different liability regimes according to whether a disclosure is required under the Transparency or Market Abuse Directives; and (c) issuers and investors alike saw no principled distinction between ad hoc and periodic disclosures in terms of liability;

  o extend the statutory regime to apply to disclosures by issuers with securities traded on exchange-regulated markets, including AIM and Plus Market, and to all 'multilateral trading facilities' and other trading platforms for securities, on the grounds that while investors in these markets should accept the risk of different levels of disclosure than on the main market, they should still be protected from dishonest disclosure;

  o apply the statutory regime to all RIS announcements, on the grounds that this is the easiest rule for companies and investors alike to understand, but draft the provisions in such a way so as not to affect the rights of shareholders and others arising out of company circulars addressed to them;

  o extend the statutory regime to encompass liability for dishonest delay in making RIS statements, on the basis that where the purpose of the delay is fraudulent, this should be subject to claims for damages; and

  o extend the statutory regime to confer rights on both buyers and sellers of shares, on the basis that sellers in principle should not be excluded from claiming for losses suffered, but exclude those who continue to hold (or not to buy) shares from suing in respect of misstatements in RIS announcements.

- The areas where the Review recommends no change to the statutory liability regime under section 90A at present are:

  o confine statutory liability to issuers only and not impose statutory liability on directors or other advisers or third parties in respect of misstatements in RIS announcements, on the basis that this is not necessary for deterrent purposes. This is so because: (a) the sanctions and censure of the FSA and market operators themselves provide an alternative source of deterrence on directors; (b) exposing a director personally to large compensation claims will likely induce extreme and undesirable caution in order to avoid liability; (c) D&O insurance may shift the loss from director back to the company; (d) the company has the ability to seek compensation from the director for breach of duty or from advisers or others; and (e) shareholders may bring an action against the director under the new derivative action procedures in the Companies Act 2006;

- o leave the assessment of damages to the courts, on the grounds that it is too difficult to formulate effective rules in statute which would not tie the courts' hands in an undesirable way in handling particular cases; and

- o the Government to consider further the issue of subordination of investors' claims to those of unsecured creditors, in part because of the ramifications outside the area of securities litigation.

- Finally, the Review considered the potential for companies to be subject to claims by investors resident in different jurisdictions. The Final Report concludes that it would be best if a single legal regime applied to investor claims, possibly the law of the jurisdiction where the issuer is incorporated or has a primary listing, but this issue cannot be solved through the exercise of the section 90B power and is outside the Review's terms of reference.

# FINAL REPORT

1.  The Discussion Paper (DP) issued in March 2007 set out the regulatory framework for continuing disclosure by issuers (both periodic and episodic or ad hoc); analysed the development of the common law and the extreme reluctance of common law to impose liability for negligent misstatements where this would result in 'liability in an indeterminate amount for an indeterminate time to an indeterminate class';[1] and discussed the circumstances which led to the insertion of section 90A into the Financial Services and Markets Act 2000 by the Companies Act 2006. I shall not repeat that material in this Report, though I refer to specific parts of the DP from time to time and it constitutes the background to this Report. I begin with two responses which raised issues not falling within the specific question I asked in the DP, though the issues were considered towards the end of the DP under 'overarching issues' (paras. 110ff of the DP).

2.  The law firm, Clifford Chance, argued in its response that there should be no civil liability on the part of companies to investors even for fraudulent misstatements.[2] One of its points was put on the following basis: "Unlike many fraudulent misstatements, therefore, the benefit of the misstatement [to the market] does not accrue to the issuer. Instead, investors who have not sold their securities are penalised twice - through the fraud and through the subsequent payment of compensation." This is an important argument of principle which is worth dealing with at the outset. I do not find it persuasive. First, I am not clear how it can be said that investors in the company who do not rely on the fraudulent statement can be said to be 'penalised'. Their loss appears only to be a result of the company subsequently paying compensation to those who did rely on the statement. Second, I think that fraudulent statements are often made in what the directors conceive (or misconceive) to be the interests of the issuer, for example, deceiving the market so as to keep the company's business alive for a while longer, in the hope that things will turn around.[3] This may be a foolish policy which ultimately inflicts harm on the company and thus on its shareholders, except those who are fortunate enough to sell out before the mistake emerges. However, in this respect it is no different from any other ill-advised or illegal policy adopted on behalf of the company by its directors, the company (ie the shareholders) being required, by law or for reputational reasons, to compensate those harmed by it. The nub of the objection, I suspect, is rather to the compensation of one group of investors, who have suffered from the fraud, by the company (ie the other investors). That, however, is not a novel proposition: the law has provided for such liability for more than a century in relation to fraudulent and even negligent prospectuses,[4] and clearly does so in the case of investors dealing directly with the company to whom the management makes fraudulent statements. I also take the view that it would not be good for the reputation of the British capital

---

[1] Per Cardozo C J in Ultramares Corp v Touche (1931) 255 NY 170, 179, an American decision but much cited in the relevant British cases.

[2] The implication, presumably, though it was not expressly drawn, is that section 90A of FSMA, discussed below, should be repealed.

[3] See the case of R v Bailey and Rigby [2006] 2 Cr. App. Rep. (S) 36, discussed in the DP at para. 65.

[4] A liability which, on the better view, extends to purchasers in the after market and not just to those who take the securities directly from the company: see J Cartwright, Misrepresentation, Mistake and Non-Disclosure (London: Sweet and Maxwell, 2007) para. 7.52.

markets to have them operate under a regime in which investors were not entitled to compensation for fraudulent statements made by issuers.[5]

3. A similar argument was put in the Minority Response of the Law Society's Company Law Committee, but with the conclusion, in this case, that there should be no liability on the issuer but there should be liability on the directors (in the case of fraudulent misstatements). They say: "it would be more appropriate for the liability to fall exclusively on those persons discharging managerial responsibilities who are responsible for the statement or omission which gives rise to the loss."[6] It is unclear to me why it would be appropriate to exclude corporate liability. The proposition seems to fly in the face of the principles underlying the general law of vicarious liability, ie the liability of companies and other principals for wrongs committed by their agents (including directors) or employees. Here it is established that there will be liability on the principal if what the agent does, even if dishonest, is sufficiently closely connected with the class of acts the agent has been appointed to perform, and this will be so even if what the agent has done can be characterised as performing his or her duties in an improper manner, for an improper purpose or by improper means.[7] Thus, I think the exemption of the company from liability for the actions of its agent would be contrary to the general principles of our civil law. In the absence of much fuller argument as to why it would be 'appropriate' to disapply the principal in this area, I cannot recommend it. However, there clearly is an important and in some ways analogous issue as to whether directors' liability should be retained in addition to the liability of the company, which I address below when dealing with the responses to Question 7.

4. I am thus less troubled than these respondents by the principle of requiring the company to compensate investors whom it has misled. Indeed, specifically to enact that there should be no liability on the part of issuers to investors in the case of fraudulent misstatements would be to remove rights which investors have at common law, even if the precise scope of those rights is unclear. However, this does not mean that I think that liability for misstatements to the capital markets should be freely and extensively imposed. There seem to me to be strong reasons for proceeding cautiously (but not good reasons for not proceeding at all). As indicated in the DP (Introduction), it is important that any liability regime should not provide incentives for companies to become more cautious in their disclosures to the market. The compensation regime for investors should not be at the expense of a free flow of accurate, timely and helpful information to them from issuers. Rather, if possible, the liability regime should contribute to the incentives for accurate disclosure by issuers. Thus, I share the reservations expressed by a number of respondents about the possible disutility of increased securities litigation.[8] I set out below a set of

---

[5] Clifford Chance acknowledged in their response that it was difficult to identify a principled reason for not imposing liability for fraudulent misstatements.

[6] Although they put the point as a response to Question 2 (see below at para 31), it is clear that theirs is a more fundamental objection than just to the extension of section 90A of FSMA to ad hoc statements, for they say that they 'question the logic of section 90A'.

[7] *Dubai Aluminium Co Ltd. v Salaam* [2003] 2 A C 366, HL – solicitors' firm liable to a third party when one of its partners had dishonestly participated in a scheme to defraud the third party, even though neither the partner nor the firm received any of the proceeds of the fraud.

[8] Clifford Chance say and I agree: "We do not believe that it would be beneficial for the UK financial markets for private securities litigation in the UK to follow the course that has been followed in the US, with extensive private securities actions." I also use a slightly different version of their argument about one

proposals, which build on the existing but partial statutory regime imposing liability on issuers for fraudulent misstatements and which, I believe, will meet the legitimate interests of investors but not hamper the flow of information to the market.

5.  Section 90A imposes liability (i) for fraudulent misstatements (ii) upon issuers (only) (iii) in favour of acquirers of securities (only) (iv) in respect of statements made in response to the requirements of the Transparency Directive (TD) or in preliminary announcements of results, and thus (v) the section applies only to issuers with securities traded on a regulated market (notably, the Main Market of the London Stock Exchange but not AIM or Plus Markets) and (vi) it does not impose liability for delay in making announcements.  Each of these limits on the scope of section 90A can be seen as raising an issue of principle which needs to be addressed in considering a more general statutory regime. However, it is clear that one cannot take a 'pick and mix' approach in discussing these issues. In particular, the answer to the first question (fraud or some version of negligence as the basis for liability) raises the fundamental question in this area, and many respondents made it clear, explicitly or implicitly, that their answers to at least some of the further questions were dependent upon this initial issue having been settled in the way they favoured. I therefore begin with this question, then proceed to the others indicated above, and finally consider a couple of further issues which are not expressly dealt with in section 90A but which emerged from my discussions and researches in this area.

### *Question 1:* Fraud, negligence and gross negligence

(a) Fraud or 'simple' negligence

6.  The first issue was presented in the DP (at paras. 70–77) principally as a choice between a fraud basis of liability and a negligence basis. There were thirty responses to the Question 1, which posed this issue, and since only one respondent, the UK Shareholders Association, was in favour of negligence as the standard of liability, it might be thought that this issue needs no further elaboration in this Report. However, the matter does deserve detailed consideration because of the need to be clear about the meaning of 'fraud' and because of the positive responses on the part of two further experienced investor groups (Association of British Insurers (ABI) and the Investment Management Association (IMA))[9] to the question also posed in the DP as to whether a 'gross' negligence standard constituted an available half-way house between fraud and 'simple' negligence. The arguments for and against the gross negligence standard cannot be fully understood before one has seen how they play out in relation to the 'simple' negligence standard.

7.  In order to present the issue as sharply as possible, the DP based the competing approaches on the existing concepts elaborated by the common law in the torts of negligence, on the one hand, and deceit, on the other. My understanding is that section 90A adopts the fraud definition from the common law of deceit. In negligence, the standard of conduct required is that of the reasonable person in the position of the defendant. This is a highly flexible standard of liability. The tort of

---

investor group compensating another below in discussing the advantages and disadvantages of liability based on negligence.

[9] The Investor Relations Society was in favour of gross negligence but only if the problems of definition, which I think are insuperable (see para 25 below) could be overcome.

negligence needs such flexibility because it applies across a very wide range of activities in society, many of which are far removed from making statements to the capital markets, for example, driving a motor vehicle, operating a railway or factory, carrying out a medical procedure. As with all standards, the degree of guidance as to what the law requires, which can be obtained from the wording of the standard itself by those contemplating undertaking an activity to which the standard applies, is very limited. It is the application of the standard by the courts to the facts of particular cases which reveals its requirements, but that is a revelation which comes only after the event. Of course, examining a run of prior court decisions in a particular area enables the reader to deduce some prior guidance about the law's requirements. Nevertheless the application of the standard is always a fact-specific exercise, since what a reasonable person would do in the circumstances in which the defendant was placed can often not be determined without detailed examination of the facts of the case and debate about how the hypothetical reasonable person would have reacted in those circumstances. Thus, the scope for arguing that any particular set of facts giving rise to a potential claim is different is some significant respect from those of the previously decided cases is always large (though not unlimited).

8.  By contrast, the tort of deceit is a form of wrongdoing developed by the common law specifically to deal with misstatements. It is formulated in much more precise terms. As laid down by the House of Lords over a century ago in the case of *Derry v Peek*,[10] a person is liable in this tort only if he or she knew the statement being made was false or did not care whether it was true or false (and it was in fact false). A genuine belief in the truth of the statement will protect one from liability, no matter how easily the falsity of the statement might have been discovered. The tort of deceit contains something much closer to a rule than a standard:[11] do not make a statement unless you believe it to be true. It is therefore much easier for someone contemplating speech to know in advance what the tort of deceit requires than in the case of a negligence standard. In addition, since the enquiry in a deceit case is only as to what the defendant knew or believed (rather than what a reasonable person would have done in the same situation), the range of facts upon which liability is dependent is much narrower.

9.  The main reason put forward for rejecting a simple negligence standard (by both the majority who wanted fraud only as the basis of liability and those few who would add gross negligence as a basis of liability) was that a negligence standard would not promote comprehensive and timely disclosure but would rather encourage defensive and bland reporting. Alternatively, issuers might report more slowly (taking more time, and incurring more expense, to check the accuracy of what was said). However, given the insistence in the FSA's rules (see below) on speedy reporting, less informative rather than less speedy information disclosures is, in my view, the more likely response to the imposition of negligence liability in respect of episodic reporting requirements. Even though most of the disclosures with which this Review is concerned are mandatory, nevertheless the rules cannot specify comprehensively the content of announcements which issuers are required to make. A negligence standard for civil liability would push issuers towards the less helpful and less forthcoming end of the spectrum of possible approaches to the discharge of the disclosure obligations. In other words, there was agreement, at least as far as simple

---

[10] (1889) 14 App. Cas. 337. For a detailed analysis see J Cartwright, above n. 4, para. 5.13ff.
[11] On the distinction between rules and standards see L Kaplow, 'Rules vs Standards: an Economic Analysis' (1992) 42 *Duke Law Review* 557.

negligence was concerned, that the gain in terms of accuracy from the imposition of negligence liability was likely to be outweighed by the loss in terms of the content of what would be disclosed.

10. A number of respondents favouring the fraud rule acknowledged that it would constitute a narrow basis for liability, and, seeking to reduce the force of this argument, pointed out the that standard for liability under FSA's rules is negligence: 'an issuer must take all reasonable care to ensure that any information it notifies to a RIS is not misleading, false or deceptive and does not omit anything likely to affect the import of the information.'[12] Thus, there was, it was said, sufficient incentive, in the shape of the FSA's rules and enforcement powers, to ensure that issuers did take proper care over disclosures to the market. However, this argument generates something of a conundrum: if the FSA's rules do not generate an adverse impact on the quality of disclosures to the market, even if they are based on a simple negligence standard, why should one expect civil liability rules based on the same standard to do so? And if the FSA's rules do have this adverse impact, what is the point of confining civil liability to the fraud standard, since this pass has been sold already?

11. These points lead me to the view that it is better to reformulate the question slightly differently and more broadly. The question is not whether there should be a negligence standard of liability for disclosures to the market but whether that negligence standard should be enforced solely by the FSA, primarily through its penalty-imposing powers, or whether civil litigation by investors seeking damages should also play a role in enforcing the negligence standard. The virtually unanimous response in favour of excluding civil liability based on simple negligence in this field reflected in my view three considerations. One was that the extent of the liability in civil litigation is measured by the loss suffered by the claimants, which in the case of a heavily traded stock could be very substantial. In principle, it is the loss caused to those who acquired securities during the period between the making of the false statement and the emergence of the truth (known in the US as the 'class period'), provided the securities were still held at the end of the period. Such losses would not necessarily be related (perhaps typically would not be) to the degree of fault on the part of the issuer in making the inaccurate misstatement. The prospect of a very large liability for only a very minor deviation from the standard of conduct of the reasonable person is likely to induce potential defendants to stay well on the non-liability side of the line, and, as part of that, to engage in 'defensive' and unhelpful disclosure. By contrast, the FSA is required by statute to have regard to the seriousness of the contravention in fixing its penalty,[13] so that a minor departure from the required standard will not necessarily trigger a large penalty. The FSA is thus in a position to relate its penalties to the degree of fault involved and thus not trigger excessively defensive reporting.

12. The second concern was a fear that private litigation would lead to over-enforcement of a negligence standard, coupled with the view that enforcement of the negligence standard by the FSA did not and would not suffer from the same defects. Third, at least in terms of issuer liability, where the costs of litigation fall on the current shareholders in the company, there was scepticism about the overall social utility of a

---

[12] DTR 1.3.4 and 1A.3.2.
[13] FSMA 2000, s. 93(2)(a). ENF 13.3.3(3) makes it clear that the FSA will take into account, among other things, the financial resources of the firm, when fixing the amount of the penalty. To like effect is LSE, *AIM Disciplinary Procedures and Appeals Handbook*, February 1007, p. 2.

mechanism which shifted investment losses from one group of investors to another. I now look at each the second and third arguments in a little more detail.

13. The fear that private litigation, especially collective private litigation, will lead to over-enforcement of the negligence standard results from an analysis which concludes that the civil litigation process permits the bringing of unmeritorious or speculative litigation (ie litigation based upon only weak arguments that the negligence standard has been breached) but which the defendant will prefer to settle rather than litigate to trial. The problem would be exacerbated if lawyers or other third party funders of litigation had an incentive to bring such litigation because, for example, a substantial proportion of such settlements would go to them. Respondents were influenced by the system of securities class actions in the United States and by analyses of that system to the effect that private enforcement of securities laws operates in that country so as to distort the securities markets and to make them less attractive to issuers.[14] If, it was said, the civil litigation system could develop in this way in a country where the basis of liability was 'fraud' (albeit fraud interpreted so as to mean 'gross negligence' – see below), the risk would be even greater for a system where liability was based on 'simple' negligence. How realistic are such fears in the United Kingdom?

14. It should not be thought that speculative litigation is in some way a cultural phenomenon of the United States, rather than one associated with the structure of the civil litigation process. Where the structure of the civil procedure rules permits such litigation in the United Kingdom, it certainly does occur. In the DP I quoted a description of such speculative litigation by Laddie J., to be found in his decision in *BCCI v Price Waterhouse*,[15] which was a case brought *by* a company (through its liquidator) against its auditors. It is perhaps worth repeating it here.

"However it is common knowledge that in many cases like this in which enormous sums of damages are sought, the dispute does not reach the stage of a judgment. The sums claimed, the sheer cost of the litigation which in a case like this will be in many tens of millions of pounds, the enormous time which will be needed for the trial and the dislocation that will impose on the parties means that there will be very great pressure on them to settle. That pressure may be felt particularly acutely by the defendants. In fact during another application before me in this action some little while ago, counsel for the plaintiffs (but not the counsel appearing before me on this application) suggested that, no matter how weak the Plaintiffs' claim might appear in a case of this type, the defendants or their insurers would normally succumb to the pressure to offer a settlement. He appeared to suggest that such proceedings therefore justified themselves. I wish to make it clear that I am not suggesting that that is the motive behind these proceedings or that that was being suggested by counsel. But I have little doubt that it reflects what happens in some cases. In a legal system where even success in the litigation leaves the winning party bearing a substantial costs burden, the incentive to do a deal must be significant. Soldiering on as a matter of principle frequently is not a commercially sensible course to adopt. The result is that a significant part of the case law consists of cases concerning applications to strike out."

Thus, the question is not whether speculative litigation can occur in this country – it clearly can – but whether the civil procedure rules would encourage or discourage it in respect of the enforcement of securities laws by investors against issuers.

---

[14] See Committee on Capital Markets Regulation, Interim Report, December 2006 (available on: http://www.capmktsreg.org/index.html).
[15] [1999] BCC 351.

15. I discussed this issue in relation to fraud-based litigation in the DP (at paras. 110 – 118) and remain convinced of the conclusion there arrived at that fraud-based liability does not give rise to a serious threat of speculative litigation. However, there are certainly grounds for thinking otherwise in relation to negligence-based liability. In relation to fraud-based liability I pointed to three contrasts with the United States. The first was the absence of jury trials in this area in the United Kingdom.[16] That point applies equally to negligence actions. Second, I pointed to the relative ease with which a defendant could obtain an early dismissal (strike out) of a fraud case if the claimant had no evidence of fraud; and difficulties in the way of the claimant simply alleging fraud in order to get past the strike-out stage.[17] Third, I pointed to the lesser incentives to law firms and others to finance speculative litigation in this country, both because funding in exchange for a share of the recoveries was not clearly permitted outside the area of the enforcement of claims by (rather than against) companies in insolvency and because of the British costs rule under which the loser normally pays at least a proportion of the winner's legal costs.[18]

16. In relation to this last point on financial incentives to litigation the DP stated at para. 117: 'it is clear that the funding of civil litigation in the United Kingdom is still the subject of debate and that the current rules cannot be assumed to represent the situation which will continue in the future.' Subsequent events have served to underline this reservation, at least as far as England is concerned. The Office of Fair Trading has produced a consultation document on the subject of collective private actions to enforce the competition laws which envisages a raising of the cap on the additional fees which lawyers can charge if the litigation is successful (currently set at 100% of the normal fee) and some capping of the liability for the other party's costs if the action is unsuccessful.[19] More significant, the Civil Justice Council, whose earlier work was referred to in the DP, is about to produce a report on the funding of civil litigation generally, which, I understand, is likely to recommend that third party funding should be recognised as an acceptable option for mainstream litigation;[20] that research should be undertaken into the acceptability of contingent fee arrangements whereby lawyers' rewards are expressed as a percentage of the recoveries in a particular case (rather than, as at present, as a multiple of the fee normally charged); and some modification in appropriate cases of the rule that the loser pays the

---

[16] The English rules are dealt with in the DP. The view there expressed that the position was for these purposes similar in Scotland still obtains but I add some more detail on the Scottish provisions. For the use of juries in Scotland see Court of Session Act 1988, s. 11.

[17] On allegations of fraud in Scotland see *Drummond's Trustees v Melville* (1861) 23 D 450 at 462, per Lord President McNeil and *Leslie v Lumsden* (1856) 18 D 1046 at 1070, per Lord Ardmillan). As regards the Code of Conduct applying to advocates in Scotland, there does not seem to be an equivalent rule of conduct in relation to the drafting of pleadings in cases of fraud. There is, however, a rule which provides that "an advocate may not put to a witness any question suggesting that the witness has been guilty of a crime, fraud or other illegal or improper conduct unless he has personally satisfied himself that there is evidence which could, if necessary, be led in support of the suggestion". As such a line of questioning in a case alleging fraud would already be outlined in the written pleadings, this rule appears to achieve largely the same result as the rule for barristers in England.

[18] The distinction between conditional and contingent fees obtains in Scotland: section 61A(3) and (4) of the Solicitors (Scotland) Act 1980 and the Act of Sederunt (Fees of Solicitors in Speculative Actions) 1992 SI 1992/1879). The Courts and Legal Services Act 1990 does not apply in Scotland, in particular its s 58B contemplating third-party funding.

[19] OFT, *Private Actions in Competition Law: Effective Redress for Consumers and Business* (Discussion Paper, April 2007, OFT 916).

[20] At the moment it is restricted. See para 118 of the DP.

winner's costs. At the time of writing the precise nature of the recommendations which will emerge from the CJC is unclear as is, of course, the Government's ultimate response to them.[21]

17. I am grateful to Dr Christopher Hodges, of the Centre for Socio-Legal Studies of the University of Oxford, for his response dealing with this issue and for a highly useful subsequent discussion of the likely trends in the funding of civil litigation under these and analogous proposals. If one assumes that the financial incentives to law firms and others to fund litigation are likely to change significantly in the UK, then more weight falls on the other two factors mentioned above to discourage speculative litigation in the securities field. In particular, basing liability on fraud gives defendants scope to secure the strike out of unmeritorious cases at an early stage, in a way which is not likely to be possible in negligence cases because of their fact-specific nature.[22] Disputes over facts can be resolved only at trial but before that the incentives to settle, as described by Laddie J, will have begun to operate.

18. I share the view that there is a real risk, even without changes in the system of funding litigation in this country, that creating a liability to investors based on a negligence standard could generate unmeritorious claims for large sums of money which, for the reasons given by Laddie J, issuers would be under pressure to settle, no doubt for much less than their face value, but nevertheless for significant sums. Future developments in the funding of large-scale commercial litigation, if difficult to identify precisely at this point, seem likely only to exacerbate this problem. By contrast, FSA enforcement of the negligence standard through its penalty-imposing powers is likely to be more measured. It will not be distorted by the financial incentives noted above, which do not apply to it. Moreover, given its statutory obligation to promote 'market confidence' and to have regard to 'the desirability of maintaining the competitive position of the United Kingdom', it can be expected that the FSA will be guided in its enforcement of the negligence standard by the objective of promoting the efficient operation of the capital markets through prompt and informative reporting on the part of issuers. Overall, I am persuaded by the arguments which put the weight of the enforcement burden on public rather than private actors and confine private enforcement to the area of fraudulent claims.[23]

19. My assessment of how best to deal with the frequent lack of fit in civil litigation between the damages payable and the degree of fault involved and with the risk of unmeritorious litigation might well be different if FSA enforcement were not available. If private litigation were the only means for enforcing the negligence or due care standard, then one might want to accept these disadvantages of civil litigation in order to have effective enforcement in meritorious cases. The strategy I recommend thus relies on the continuing availability of public enforcement by the FSA. The primary role in securing the exercise of due care on the part of issuers in meeting their continuous disclosure obligations will continue to fall on the FSA. Those I discussed the issue with took the view that FSA enforcement was currently effective; certainly, no specific proposals for a different approach to its penalty-imposing

---

[21] Some reference to this work is to be found in CJC, *Annual Report 2006*, p. 12.

[22] It is not normally proper for the judge to try to resolve disputes of fact at this stage: *Electra Private Equity Partners v KPMG Peat Marwick* [2001] 1 BCLC 589, CA.

[23] In discussion Dr Hodges confirmed his view that the threat of speculative litigation arose principally in relation to negligence liability and that it was not a significant worry in cases of liability based on fraud, provided, of course, that the deceit definition of fraud was adopted.

powers emerged. Nevertheless, discussants were clearly assuming that the FSA would not reduce its enforcement effort in this area in the future. Further, if there were to be a deterioration in the quality of company disclosure, for example, in a market down-turn, the immediate pressures for a response in that situation would be felt by the regulator, which would not be able to respond that a remedy lay in investors' own hands.

20. One or two discussants wondered whether the FSA could make greater use of its restitution powers to obtain recompense for investors in appropriate cases where they have suffered losses as a result of negligent misstatements to the market.[24] This is an issue upon which the FSA itself has recently consulted. In its Consultation Paper 07/02 (*Review of the Enforcement and Decision-making Manuals*) it said:

> 5.31 We are not proposing to make any substantive changes to our current policy on the use of the powers given to us by the Act to apply to court for restitution and to make an administrative order for restitution, as set out in ENF 9. However, this proposed chapter includes a sentence that does not appear in ENF 9 which confirms that we expect to exercise these formal restitution powers on rare occasions only. This reflects the fact that when deciding whether to use the powers, we will consider other ways that persons might obtain redress, and any proposals by the person concerned to offer redress to any consumers or other persons who have suffered loss. We have also added text which clarifies that in deciding whether to use the powers, we will consider whether this would be the best use of the FSA's limited resources taking into account, for example, the likely amount of any recovery and the costs of achieving and distributing any sums.

This statement reaffirms the FSA's cautious approach to its use of the restitution power, though the absence of an alternative remedy for investors in the case of negligent misstatements to the market would be a factor in favour of its use. Nevertheless, the factors referred to in the final sentence of paragraph 5.31 would continue to operate in favour of a cautious approach. Indeed, to take the opposite extreme, routine use by the FSA of its powers to recover on behalf of investors full negligently-inflicted losses would be open to the same objection, in terms of the impact upon the free flow of information to the market, as would private litigation.

21. The third general consideration supporting excluding liability for simple negligence was the disutility of shifting losses between groups of investors. In a crude form this argument has been around since the emergence of the modern company. In some nineteenth century cases it was said that shareholders should not be able to sue the company because they would be suing themselves. Doctrinally, this makes no sense since the company is a separate legal entity and so shareholders do not sue themselves by suing the company. However, the argument is more persuasive when put in functional terms. A widely dispersed, long-term investor may find that it holds similar proportions of the shares whose acquisition was affected by the misstatement and of the shares which were not traded at the time. If so, there is little reason for it to want to move the loss from where it lies. This situation is particularly likely to obtain if one considers, not a single piece of litigation, but securities litigation over a period of time. As pointed out in para. 121 of the DP, unless an investor thinks that

---

[24] FSMA 2000, ss. 382 and 383; DP paras. 60-63.

there is some reason it will systematically be on one side rather than the other in the litigation, then it may be rational for that investor to support a system of letting the losses lie where they fall, thus saving the transaction costs (lawyers' and court fees) required to shift the loss. It may thus be the case that securities litigation is less attractive to long-term investors than to short-term ones. Hermes put the point in this way in their response to the Discussion Paper: "From a simple public policy perspective, it is hard to see why short-term traders of stock should be advantaged by a liability regime to the detriment of long-term shareowners. If this were to take place, it would seem to run counter to the government's intent to encourage a longer-term outlook on the part of the UK investment industry."

22. Of course, it could be said that the argument put forward in the preceding paragraph amounts to an argument against fraud as a basis for liability as well. However, it can be said that fraud is so corrosive of the basic trust on which the market operates that civil liability for such statements performs a valuable public function in deterring fraud; and that the absence of liability in damages for fraudulent misstatements would fail to meet the legitimate expectations of investors, as the current common law recognises. Moreover, fraud being less prevalent than negligence, even long-term investors may not think that, over a reasonable period of time, their gains from fraudulent statements will outweigh their losses.

23. My conclusion is, along with most respondents, that simple negligence should not be adopted as the basis for private litigation in this area. This is because I think respondents are right to fear that a negligence standard would generate defensive reporting, especially defensive ad hoc reporting, even where such reporting was mandatory. This is not so much because negligence is not an appropriate standard for liability in this area as because it is an inappropriate standard for civil liability in damages, in the light of the three considerations analysed above.

(b) Fraud or 'gross' negligence

24. The definition of 'fraud' adopted in the DP was a restrictive one: the maker of the statement must either know it was untrue or not care whether it was true or not. The latter form of misstatement is usually referred to as 'reckless misstatement'. Belief in the truth of the statement made would mean that there was no liability, even under the heading of recklessness. Whilst no respondent proposed liability based on 'simple' negligence, a minority of respondents (three out of thirty) wished to have a basis for liability in damages which went beyond fraud as defined above. The DP raised the possibility of a gross negligence standard as a half-way house. It is explicitly used in the German legislation (see Annex B to the DP) and in practice the term 'fraud' is interpreted in this way in US securities legislation (see para. 74 of the DP). Not surprisingly the respondents in favour of a gross negligence standard were investor groups. However, the investor groups were not unanimously in favour of a gross negligence standard: both the National Association of Pension Funds (NAPF) and Hermes supported a fraud-only standard.

25. The question is whether 'gross negligence' is a viable middle way. After much thought, I have concluded that it is not. In the common law of negligence (unlike the German civil law) the term 'gross negligence' has no clearly defined meaning because it has not been developed by the courts as a concept distinct from negligence. As

Millett L J said in *Armitage v Nurse*,[25] speaking of the difference between common law and civil law systems: "While we regard the difference between fraud on the one hand and mere negligence, however gross, on the other as a difference in kind, we regard the difference between negligence and gross negligence as merely one of degree. English lawyers have always had a healthy disrespect for the latter distinction." More than one respondent quoted the famous quip of Willes J that 'gross negligence is ordinary negligence with a vituperative epithet.'[26] There is therefore a serious problem about adopting in legislation[27] a term whose meaning is so unclear. The first danger is that cautious lawyers would advise clients to act as if the term used were simple negligence, and thus trigger the defensive reporting which it is the aim of the law to avoid. Further, issuers would have a strong incentive to accept this advice because of the potential size of the damages award. Although the standard of care required by the law would now be set at a higher level than under simple negligence, every potential defendant would have a strong incentive not to contribute to the litigation in which the height of the gross negligence hurdle was considered by the courts. It might be said that the legislation could give the concept a firm meaning rather than simply adopt the term and leave the courts to make of it what they will. However, I am unconvinced that this could be done. Negligence, whether gross or simple, is a standard designed to apply flexibly in a wide range of situations. It is difficult to see what further specification could be given in the statute which would not involve the use of general phrases, to which the interpretative problem would simply be transferred.

26. Further, the danger of speculative litigation would remain. The gross negligence standard, just like the simple negligence standard, requires the courts to establish the facts of the particular case and then to apply the standard to those facts. The striking out of negligence claims is notoriously difficult where the issue is compliance with the standard of care, and that would remain the case no matter where the standard of care was pitched. The risk is therefore that the strike-out would not act as an effective filter of unmeritorious claims and that the incentives to settlement of even unmeritorious claims, noted above, would operate.

(c) The definition of fraud

27. The argument developed above has been that liability should be based on 'fraud' as defined in the tort of deceit. The maker of the statement must either know that the statement is false or not care whether it is true or false; and a genuine belief in the truth of the statement would be a defence to liability. It would be important that this definition should be clearly embodied within an extended statutory regime. 'Recklessness' in particular is a potentially slippery concept. It would be important that it should be clear that a genuine belief in the truth of the statement made did not amount to recklessness. In other words, and contrary to developments in the United States, the proposed regime would make a firm distinction between recklessness (potentially leading to liability in damages) and gross negligence (which would not); and the dividing line between them would be the presence or absence of a genuine belief in the truth of what was said.

---

[25] [1998] Ch. 241, CA.

[26] *Grill v General Iron Screw Collier Co* (1866) 35 LJCP 321, 330.

[27] It is clear that the imposition of liability for gross negligence would require legislative action, given that it is not a concept the common law has deployed in this area.

28. However, it is important not to exaggerate the limitations of the fraud basis of liability. In particular, the maker of a statement would not necessarily escape liability by stating in the witness box that he or she believed the statement to have been true at the time the statement was made. This is because the court might not believe the witness. In other words, the statement of belief in the truth of the statement must be a credible one. A person who could very easily have checked the truth of a statement which he or she had a strong interest in making may not subsequently be believed when asserting a belief in the truth of what was said. Given the ability of human beings to delude themselves about what they did think in the past, the court may well be right to take a sceptical approach. Although this is only a matter of evidence (if the person did genuinely hold the belief, no matter how irrational it was, there should be no liability), this point does dispose of the argument that a fraud basis of liability permits persons to escape liability where belief in the truth of the statement was not genuinely held. The risk of being disbelieved also means that, at the margin, fraud liability generates some incentive to check the facts before speaking.

29. Some of those arguing in favour of a gross negligence standard were fearful that the explicit adoption of a fraud standard could, in the words of the IMA, 'result in a lessening of the standards of care currently exercised and weaken a key link in the chain of accountability.' I am less concerned by this point than the IMA. As explained in the DP (at paras. 34-39), the current (common) law is liability to investors only on the basis of fraud. There is no case in the UK of which I am aware, outside the area of prospectuses, in which investors have succeeded against an issuer on the basis of negligence. Since this is an area where the central players seem to be well advised legally, it is difficult to see why the transference of such a rule from common law to statute should have by itself a significant impact upon standards of behaviour, assuming current levels of public enforcement.

30. In fact, there is one limited, but significant, way in which the current partial statutory liability scheme (set out in section 90A of FSMA), whose extension I recommend, makes the bringing of a fraud claim easier than it is at common law. At common law, besides knowing that the statement is false or being reckless in this regard, the maker of the statement is liable only if he or she intended the recipient for the statement (or a class of person of whom the recipient was one) to rely on it.[28] This requirement creates a potential obstacle to liability in the case of statements to the market, even if the maker of the statement knew it was false. Section 90A(5) substitutes for 'intended reliance' a requirement that the recipient's reliance should be reasonable in the circumstances. This change facilitates the bringing of fraud actions. If an issuer makes a statement which it knows to be false, liability can follow under the section if the investor's reliance on the statement is reasonable in circumstances, without investigation of the issuer's intentions in making the statement. I recommend that this relaxation of the common law's requirements continue to be part of any extended statutory liability regime.

---

[28] See Cartwright, above n 4, at para. 5.19.

*Question 2:* **Extension of the statutory regime to ad hoc statements**

31. At present the statutory regime in section 90A of FSMA applies only to disclosures made by companies in response to the requirements of the Transparency Directive (TD) and to prelims. The TD applies only to companies with securities traded on regulated markets. Thus, two questions arise: should the statutory regime apply to ad hoc or episodic statements, required by the Market Abuse Directive (MAD) and should it apply to statements, periodic or ad hoc, made by companies whose securities are traded on exchange-regulated markets. I deal with the first issue here and the second issue in the next section.

32. Overwhelmingly, respondents thought the statutory regime should be extended to ad hoc statements made by companies with securities traded on regulated markets. Only two out of 30 respondents were against this extension, plus the two respondents not in favour of imposing statutory liability even for periodic reporting. The reasons in support of the extension were three-fold. First, some ad hoc statements would later appear in disclosures required by the TD, and it was thought to be odd to have a different disclosure regime according to which disclosure the investor relied on. Second, and more broadly, it was thought that those subject to the rules would find it confusing to have different liability regimes according to whether the disclosure was required by the TD or MAD, whether there was overlap or not. Third, it was thought that there was no principled distinction between ad hoc and periodic disclosures as far as the appropriate liability regime was concerned.

33. In some cases those in support of the extension of the statutory regime to ad hoc statements made their support conditional on the their preferred answer to the first question (fraud or gross negligence as the basis for liability) being adopted in the statute. In the case of those in favour of fraud as the only basis of liability this makes sense. Not extending the statute would leave the common law rules in operation in relation to ad hoc statements, and, as explained in the DP and mentioned above, the common law imposes liability only for fraud. For those preferring gross negligence as the basis for liability, this argument for not extending the statute seems less compelling, since the common law does not adopt their preferred basis of liability either. In fact, as explained in para 30, the effect of not extending the statutory regime would be to make the fraud claim less easy to bring.

34. Those opposed to the extension as such, rather than to the principle of statutory liability, were Grant Thornton and Price Waterhouse Coopers (both accountants). The objection of both sets of accountants seemed on a fair reading to be to having a statutory liability based on negligence extended to ad hoc statements and to the undermining of the decision in *Caparo*.[29] Since the recommendation above is for liability based on fraud alone, thus confirming the absence of negligence liability, this objection falls by the way.

35. I therefore recommend that the statutory regime be extended to ad hoc statements made by companies with securities traded on regulated markets.

---

[29] [1990] 2 A C 605, CA.

*Question 5:* **Extension to exchange-regulated markets**

36. There was widespread support for the extension of the statutory regime to exchange-regulated markets. In fact, only two respondents rejected the idea, though many respondents made it clear that their support for the proposition was on the basis that the liability regime should be based on fraud alone. No principled reasons were put forward for not making this extension. It needs to be borne in mind that this is a proposal for a common liability regime across regulated and exchange-regulated markets, not a proposal for common disclosure standards across both types of market. As the Institute of Chartered Secretaries and Administrators (ICSA) said in their response: "The investors in these markets know that companies do not have to disclose the level of detail of those in the main market and they expect a higher level of risk. However, we believe that these investors should still be protected from dishonest disclosure."

37. Significantly, those most closely connected with the exchange-regulated markets supported the extension of the statutory regime: AIM, Plus Market and the Quoted Companies Alliance (QCA). AIM thought that different liability regimes would create confusion for both issuers and investors; QCA thought such a move would protect exchange-regulated markets from uninformed criticism; and Plus Market were concerned simply that the extension of the statutory regime should not impede the market authorities themselves from taking disciplinary action (though they did not suggest any reason why it should). I myself am aware of no basis upon which extension of the civil liability regime would have the effect feared by Plus Market.

38. I therefore recommend the extension of the statutory regime to exchange-regulated markets. In fact, I think it is necessary to go further than the inclusion of exchange-regulated markets. In terms of the concepts used in the Markets in Financial Instruments Directive (2004/39/EC), from November 1 2007 markets will be either regulated or 'multilateral trading facilities'. Although many of the latter will be exchange-regulated markets, as we currently understand them, this may not always be the case. I therefore recommend that all trading platforms for securities be brought within the extended statutory regime.

39. However, it needs to be recognised that in the case of exchange-regulated markets the burden of 'public' enforcement lies on the market operator, not the FSA. Thus, the AIM rules require companies (with the help of the their nominated advisers) to take reasonable care to ensure that information required to be put out on a RIS is accurate and complete, but disciplinary action against the issuer or nomad is a matter for the LSE.[30] The Disclosure and Transparency Rules of the FSA do not apply to exchange-regulated markets. However, the market abuse provisions of FSMA[31] do extend beyond regulated markets to embrace 'prescribed' markets (including any market operated by a Recognised Investment Exchange, such as the LSE). The market abuse rules do catch some types of inaccurate disclosure. Thus, in the Shell case, the penalty of £17 million was imposed for market abuse, although breaches of what are now the DTR were found as well. The FSA found that Shell's failure to correct the false or misleading information it had given to the market about the size

---

[30] AIM Rules for Companies10, 42 and 43. To similar effect are the Plus Rules for Issuers 22 and 56.
[31] S 118ff.

of its reserves, despite warnings from a number of sources that the information was false, amounted to market abuse.[32]

**Question 4: How are the relevant disclosures to be identified?**

40. Once the decision is taken to extend the statutory regime to ad hoc announcements and exchange-regulated markets, a crucial issue arises about the precise definition of the disclosures to which the statutory regime should apply. The overwhelming majority of respondents (twenty-two out of twenty-five)[33] favoured all RIS announcements, on the grounds that it would be the easiest rule for companies to apply and for investors to follow. In particular, it would be problematic to have different regimes for announcements required to be put out through a RIS and those which were not so required but which companies had chosen so to disseminate because it was not clear to them whether the RIS route was needed. This situation might arise where there were doubts about whether a particular piece of information was inside information or not. More broadly, it was thought it would be confusing for investors and companies to have different liability regimes for different categories of RIS statements, according to the legal basis of the disclosure requirement. This would have been the consequence of adopting either of the alternatives put forward, ie only disclosures required by MAD or disclosures required by the FSA's Disclosure and Transparency Rules (DTR) but not those required by the Listing Rules (LR).

41. Those favouring a narrower approach (Hermes, Association of Corporate Treasurers (ACT)) were concerned that the broader approach would or could reduce the rights which shareholders have as shareholders as against their companies. This is because the RIS system is required to be used to disclose to the market certain circulars which the companies are required to send to their shareholders, for example, in relation to significant transactions (LR 10) or related-party transactions (LR 11). I think it vital that the statutory regime for investors should not reduce shareholder rights. On the other hand, I think the arguments in favour of extending the statutory regime to all RIS announcements is compelling. Thus, the question becomes whether an 'all RIS' rule is compatible with the preservation of shareholder rights.

42. I have concluded that it is. I think the way forward was indicated by some of the law firms and lawyers groups which addressed the issue. They were in favour of the 'all RIS' rule but equally concerned, as I am, to preserve shareholder rights. Their argument was that the statutory regime could be applied to the RIS announcement without prejudice to rights which shareholders might have as shareholders arising out of the (virtually identical) circular sent to them. As the City of London Law Society put it: "We do not agree that the purpose of [RIS] announcements is to inform shareholders for *Caparo*[34] purposes. Shareholders are informed for the purpose of exercising their governance rights through direct communications addressed to them as shareholders (circular letters prepared in accordance with Chapter 13 of the Listing

---

[32] FSA, Final Notice, 24 August 2004, *The "Shell" Transport and Trading Company plc and The Royal Dutch Petroleum Company N V*. Section 118 has been rewritten subsequently to this FSA action in the light of the transposition of MAD, but not in such a way as to affect the point in the text.

[33] Those not favouring an extension of the statutory regime to ad hoc disclosures (see para 34) said 'none' in answer to question 4 and these responses are not included in the figures given in the text.

[34] The *Caparo* case (above n 29), whilst denying liability on the part of the auditors to investors (including shareholders who decided to acquire shares on the basis of the inaccurate information) nevertheless reaffirmed the auditor's liability to the company and to shareholders collectively. See DP para. 36.

Rules). We think it is important that shareholders' *Caparo* rights in respect of these communications should not be restricted but we do not see why applying the statutory liability regime to the RIS announcements relating to the same transaction would have that effect."[35]  Herbert Smith made the further point that it is probably not even necessary to confine the preserved shareholders' rights to governance rights, thus giving rise to the need to define governance rights in the statutory regime. Whatever rights the shareholders have vis-à-vis the company as a result of inaccuracies in the circulars distributed to them by the company should remain untouched by the statutory regime and be left to development by the courts applying the common law.[36]

43. I thus agree with the view put forward by the ABI: "We consider that real time disclosures made under RIS announcements are quintessentially disclosures to the market and not to shareholders though shareholders may subsequently make use of these announcements for governance purposes. What is important, in point of principle (and as per one of the intentions within the Caparo judgment), is that accountability through liability by directors to shareholders for governance purposes should not be prejudiced. We see no need or justification for a carve-out of certain RIS announcements because they are thought to be primarily governance related. However, liability in respect of contents of circulars sent to shareholders in their capacity as such for governance purposes must be maintained." I believe the way to implement this principle is that indicated in the previous paragraph.

44. The same solution can be applied to circulars issued in the course of a take-over bid. These circulars are different from those considered in the previous paragraph, because they may be issued by the offeror to the shareholders of the target company or, when issued by the target to its own shareholders, have sometimes been considered by the courts as addressed also to the bidder company. Such circulars are also issued as announcements via the RIS. However, the policy reasons for preserving shareholder rights in this case seems to me as strong as the cases discussed in paragraph above. I agree with the IMA who, whilst supporting an 'all RIS' rule, wished to preserve the possibility of negligence liability in relation to takeover circulars.

45. I therefore recommend that the statutory regime should apply to all RIS announcements but that the statutory regime should be drafted so as not to affect the rights of shareholders and others arising out of company circulars addressed to them.

46. Finally, I stated in paragraph 49 of the DP that I did not believe that section 90A affected the negligence liability arising where, for example, an auditor undertook responsibility for the accuracy of the accounts in the context of a specific, known transaction. This principle should apply to any acceptance of responsibility on the part of any person (for example, the issuer) for any statement in such a specific context. As I explained in the DP, it is easy for the potential defendant in such a case to protect itself either by not accepting the relevant responsibility or by accepting it

---

[35] The Law Society's (majority) response was to the same effect: "Shareholders should in any event have more extensive rights than market participants in the case of Class 1 transactions by virtue of the shareholder circular required, notwithstanding that  the circular would have to be published to the market in full text format and/or via a summary and link to a website."

[36] This is not an area which is dealt with in any detail in the Companies Act 2006.

on terms which are satisfactory to it. I do not think it will be difficult in drafting terms to achieve this result.

### *Question 3:* Liability for dishonest delay

47. The DP asked whether there should be liability for dishonest delay. At common law there is in principle no liability for not speaking (unless it makes something already said misleading) and so delayed speaking would in principle be covered by this rule. However, the statutory regime in section 90A of FSMA, following the long-standing policy in relation to prospectuses, does not accept the principle of no liability for not speaking. It does impose liability for the deliberate or reckless omission in a statement of anything required to be included in it, whether or not it renders anything said misleading (s. 90A(3)(b)(ii)). The question, therefore, is whether the common law principle should be eroded further by imposing liability, not only for failing to disclose fully, but for delay in disclosure. The DP accepted that liability could not be imposed simply for deliberate delay. In most cases the delay will be deliberate and often for good reasons, for example, in order to be able to make a fuller and more helpful disclosure when disclosure is made. There is no public policy reason in my view to create legal pressure on companies to make quick but inadequate disclosure. The DP therefore put forward for discussion the suggestion that *dishonest* delay should be the basis for liability. In relation to inaccurate statements intention or recklessness would be enough; in relation to delay, there would be the additional requirement of dishonesty.

48. The majority of respondents were against this proposal. Nevertheless, a significant minority (seven out of twenty-nine), coming from a spread of relationships with the capital markets, supported it: ABI, ACT, Association of Investment Companies, ICSA, Investor Relations Society, KPMG, QCA. In discussions it became clear that some of those opposing liability for dishonest delay using it as a proxy for opposition to the FSA's rules on the timing of ad hoc disclosures, which they viewed as impractically demanding.[37] However, the proposal put forward in the DP was not to attach civil liability whenever there was an unjustifiable delay according to the FSA's rules, but to do so only in the case of dishonest delay. Those supporting the proposal were aware that it was very much in the nature of a back-stop (and so not open to the flood-gates argument); and no one identified a principled reason why dishonest delay should not be the subject of civil litigation. Indeed, many of those opposing the reform recognised that there was a good case in principle for imposing liability but were opposed for pragmatic reasons, which I found unconvincing, or because of uncertainty about the meaning of dishonesty.

49. The need to define dishonesty appropriately is indeed a key requirement of this proposal. In my view the solution to this problem is to focus on the purpose of the delay and to impose civil liability only if the purpose (or predominant purpose) for the delay falls within the prohibited category. One could take an analogy from section 397 of FSMA, imposing criminal liability for dishonest concealment of material facts, whether in connection with a statement of not. Under that section, criminal liability is imposed only if the concealment is for the purpose of inducing someone to take or not to take a certain course of action (broadly to take or not take an investment

---

[37] See DTR 2.2.1 and 2.5. The FSA's decision in the Marconi case seems to have been particularly influential in forming attitudes: FSA, Final Notice, Marconi plc, 11 April 2003.

decision). Translated into the context of this Report, there would be liability only if the person deliberately delayed publication for the purpose of inducing investors to acquire (or possibly dispose of) securities. More narrowly, the prohibited purpose could be defined as making a profit on the part of the defendant or inflicting a loss on the person who acquired the securities during the period of delay.[38] In either case, delay in order to obtain the full facts of the situation or even delay in order to permit the company to deal more easily with the situation which had arisen, would not fall within the scope of the civil liability regime, though such delay might constitute a breach of the FSA's rules.[39] On the other hand, delayed disclosure of bad news on the part of the issuer in order to enable the directors of the company to exercise their options and sell the shares at a more attractive price would fall within the civil liability regime, at least on the second of the two approaches to dishonesty.

50. I therefore recommend that the statutory regime should encompass liability for dishonest delay in making RIS announcements.

*Question 8:* **Should liability extend to sellers and holders of securities?**

51. Only six out of twenty-nine respondents favoured the policy adopted in section 90A of FSMA of giving a right of action to acquirers of securities only. Fifteen would extend the right of action to those who disposed of securities and eight to buyers, sellers and holders. I think it is impossible to draw a principled distinction between acquirers and disposers. Although corporate statements are, no doubt, much more often misleadingly optimistic than misleadingly pessimistic, so that acquirers have in fact more cause to complain than disposers, in principle their complaint is the same. In either case the price paid for the security would have been different if the truth had been known, and so the loss in question is the same, even if its incidence is not. I suspect that the exclusion of sellers from section 90A was due to the fact that the House of Lords in *Caparo* did not have to deal with the position of sellers and left the point open to some degree.[40] In any event, I can see no reason to exclude disposers of securities from a developed statutory regime.

52. I have found the question of holders a very difficult one. In most cases they will not be able to show that their decision to hold was taken as a result of reliance on the statement made. However, this will not always be the case: paragraph 105 of the DP gave an example of a situation where there seemed to be no problems of proof and the Appendix to Herbert Smith's response provided some more. However, if holders of securities are given a cause of action, it is unclear why non-acquirers should not be given one as well, ie a person who, on the basis of a fraudulent statement by the company, decides not to become invested in it. I am influenced by the fact that neither US nor German law gives rights of action to holders but require a securities transaction as a condition for liability. I think there is a risk of the courts being asked to make very difficult findings of fact in cases where there is no transaction and of their getting it wrong (or not clearly getting it right), thus bringing this new legislation into disrepute. As the CBI suggested, in many cases holders will be protected by their rights as shareholders, for example, in respect of misstatements made in shareholder

---

[38] This is the approach taken in section 3 of the Fraud Act 2006.
[39] See DTR 2.5.4G on delay in order to make the handling of the crisis easier.
[40] See para. 36, n. 43 of the DP.

circulars, which rights, it has been recommended above, should continue have effect outside the statutory regime.

53. I therefore recommend that the statutory regime should confer rights on both acquirers and disposers of shares. In respect of holders (and non-acquirers) I recommend that the statutory regime exclude them from suing in respect of statements contained in RIS announcements. However, the common law rights of holders arising out of misstatements in circulars should, as recommended above, remain in existence for development by the courts.

### *Question 7:* **Should liability be confined to issuers or be extended to directors and advisers?**

54. Section 90A imposes liability on the issuer. The DP raised the question whether liability should be extended to directors and advisers, on the ground that this would be a deterrent aimed directly at those making the statement on behalf of the issuer. A number of respondents made the point that it is in fact rare, though not unknown, for advisers to make statements on behalf of the company, as opposed to providing reports upon which the directors rely. Accordingly, the discussion will focus on the position of directors.

55. The majority of respondents (twenty-three out of thirty) were opposed to the extension of liability to directors. Those in favour were mainly, though not entirely, investor groups: ABI, AIC, Investor Relations Society (though very cautiously), NAPF, UK Shareholders Association, KPMG. In addition, the Minority View of the Law Society's Company Law Committee was in favour of liability being imposed on directors alone (see paragraph 3 above). Certainly, on normal principles of vicarious liability, the director or other agent remains liable whilst the company or other principal is made vicariously liable for the agent's wrongdoing. The purpose of imposing vicarious liability on the principal is to increase the chances that the claimant will have a financially viable defendant to sue and to give the principal an incentive to control the actions of the agent. In practice, the agent is rarely sued. The issue is thus whether the threat of suit, although in practice not very large, unless the director is insured, is a useful addition to the armoury of weapons available to deter directors from making fraudulent statements.

56. I am convinced by the arguments of those who say that the imposition of liability upon directors is unnecessary for deterrent purposes. The main alternative source of deterrence are the FSA's sanctions (public censure and penalties), which can be deployed against directors of companies on regulated markets where the company acts in breach of the DTR, requiring accurate disclosures according to a negligence standard, provided the director was 'knowingly concerned' in the contravention on the part of the issuer.[41] The DTR do not apply to companies with securities traded on an exchange-regulated market, but inaccurate disclosures may amount to market abuse, which again triggers the FSA's censure and penalty powers, even in relation to companies on AIM or Plus.[42] However, the main burden of policing the accuracy of disclosures on AIM and Plus and imposing sanctions on offenders lies with the market operators themselves (LSE and Plus). The AIM rules make directors

---

[41] FSMA s. 91(2).
[42] FSMA ss. 118 and 123.

responsible for compliance by their companies with the disclosure obligations contained in the AIM rules, but seem to contemplate the imposition of disciplinary sanctions only against the company or its nominated adviser. The Plus Market rules are similarly constructed.

57. There is also reason to be concerned about how targeted damages are from a deterrence point of view. If the director is in fact personally exposed to large securities losses (enough to bankrupt him or her), then the threat of liability is likely to be over-deterring, ie it will induce extreme and undesirable caution on the part of the director in order to avoid liability. On the other hand, if D&O insurance,[43] or some other mechanism, shifts the loss from director to company, it is unlikely that the threat of liability in damages will add the deterrence mechanisms already in place. Whether making the director wholly or partly liable for the loss suffered by investors is a sensible course of action is thus likely to vary from case to case, according to the insurance and indemnity arrangements in place in any particular company and according the company's view of the utility to the company of proceeding against the director or, on the contrary, protecting him or her from liability. This is not a judgement which investors are well-placed to make or, necessarily, interested in making. The company is better placed to do so and, indeed, can do so as the law stands. If the director's negligent discharge of his or her duties, including the issuance of misleading statements to the market,[44] has caused loss to the company, the company may in principle seek compensation from the director for breach of duty. Directors may be unwilling to sue one of their number, but may do so under shareholder pressure, and no such inhibitions will apply to a liquidator or a new board, appointed after a take-over, for example. Finally, an individual shareholder may make use of the new derivative action procedure contained in the Companies Act 2006 in order to bring an action on behalf of the company against the director.

58. Furthermore, the company is not restricted to waiting until the director has inflicted harm on investors before it takes action. Over the past fifteen years or so, the internal control structures of large companies, especially listed companies but not only them, have improved enormously. Creating an internal control structure which reduces significantly the opportunities for directors to make fraudulent statements, where such structures do not already exist, is feasible. Overall, the above approach is consonant with the theory of vicarious liability which generates incentives for the principal made liable for the harm to exert control over the actions of its agents, either in advance of the harm being inflicted on the third party or afterwards.

59. I therefore conclude that liability under the statutory regime should continue to be confined to the issuer.

*Question 9:* **Assessment of damages**

60. This question asked whether respondents preferred a negligence or a fraud measure of damages. On reflection, I am convinced that this question was posed too sharply in the DP and that it would be difficult to formulate effective rules in the statute which would not tie the courts' hands in an undesirable way in handling of particular

---

[43] D&O insurance could operate in this way, even in the case of fraud. See DP para. 101.
[44] Section 463 of the CA 2006 restricts the director's liability to the company to a fraud basis in the case of misstatements in the directors' report or directors' remuneration report.

cases. I agree with most of the legal respondents that the matter is best left for decision-making by the courts. However, it should be made clear that the effect of this recommendation is that damages are likely to be assessed by reference to the loss caused by reliance on the statement, not the loss caused by its falsity.

*Question 6:* **Subordination of investors' claims**

61. The question here was whether investors' claims should be subordinated to the claims of the other unsecured creditors in the case of the issuer's insolvency, an insolvency possibly brought about by the need to meet the investors' claims. If subordinated, they would rank, presumably, with the claims of the shareholders as shareholders, though they could conceivably rank ahead of pure shareholder claims. If not subordinated, they would compete with the claims of the other unsecured creditors and have priority of the claims of the shareholders as shareholders. There was an almost even split of responses on this issue: fourteen for subordination and thirteen against. I am convinced that this is an important issue. It raises important general issues about the nature of equity investment in companies and about the role of legal capital. A number of those favouring subordination nevertheless put the point very cautiously. As Herbert Smith said: "This issue is however a complex one which would need careful thought. It raises some fundamental questions in relation to insolvency law which would need to be considered further. Also, caution is needed because in some situations subordination would lead to an inequitable result. The wrongdoer, for example the director guilty of deception, could be a substantial creditor of the company.  A subordination of the claims of investors would then favour his position as fraudster over theirs as innocent victim."

62. I conclude that this issue needs further work. The issue has potential ramifications outside the area of securities litigation. However, I also agree with the CBI that the point is not so central that the implementation of the above recommendations should await its resolution. I note that in Australia the issue, arising out of the decision of the High Court in the *Sons of Gwalia*[45] case, has been referred to the (Australian) Corporations and Markets Advisory Committee.[46] I recommend that the Government should consider its resulting report as part of any future policy developments.

**Applicable law**

63. Many companies quoted on the British capital markets will have investors resident in a number of different jurisdictions. Which law governs claims brought by such investors is a complex subject, partly because the British rules determining the answer are not entirely clear and partly because courts in other jurisdictions may use different (but equally complex) rules to determine the answer. It is thus not impossible that such companies may be subject to investor claims under as many differing legal regimes as it has investors in different jurisdictions. This seems to me undesirable. A better result would be one in which a single legal regime applied to investor claims, possibly the law of the jurisdiction where the issuer is incorporated or possibly the law of the jurisdiction where the issuer has its primary listing. I have

---

[45] [2007] HCA 1. See DP para. 99.
[46] The terms of reference to the Corporations and Markets Advisory Committee can be found at:
http://www.camac.gov.au/camac/camac.nsf/byHeadline/PDFReference/$file/Ref_Sons_of_Gwalia.pdf.

not explored this question in any detail because it is clear that it cannot be solved through an exercise of the powers contained in section 90B of FSMA, and so is outside my terms of reference. My understanding is that the Government did advance precisely this point in the discussions on the (now agreed) 'Rome II' Regulation on the law applicable to non-contractual obligations, but without success.

# Summary of Recommendations

*Following the Discussion Paper questions*

**Question 1:**
What should be the basis of liability? Should the basis of liability be simple negligence? Would gross negligence be available as a possible basis for liaiblity in the British context? Is fraud an appropriate basis for liability?

*Recommendation:* That fraud should be maintained as the basis of liability for the statutory regime and that the relaxation of the common law's requirements – whereby the claimant need only show that his own reliance on the misstatement was reasonable and not also that the issuer intended that he should rely on it – should continue as part of any extended statutory liability regime.

**Question 2:**
Should the statutory regime should be extended in principle to ad hoc statements?

*Recommendation:* Yes, the statutory regime should be extended to ad hoc statements.

**Question 3:**
Should a liability for dishonest delay be imposed in the narrow circumstances identified above or should delay be sanctioned only through public enforcement via the FSA?

*Recommendation:* That the statutory regime should encompass liability for dishonest delay in making RIS statements.

**Question 4:**
If the statutory regime were to be extended to ad hoc announcements, should it be (a) confined to disclosures of inside information (the most pressing case), (b) applied to all RIS announcements or (c) confined to announcements made under the FSA's Disclosure and Transparency Rules (ie excluding ad hoc announcements made under the Listing Rules)?

*Recommendation:* That the statutory regime should apply to all RIS announcements but that the statutory regime should be drafted so as not to affect the rights of shareholders and others arising out of company circulars.

**Question 5:**
Should section 90A apply to non-regulated markets? Does your answer differ according to whether section 90A is extended to cover ad hoc statements?

*Recommendation:* That the statutory regime be extended to exchange-regulated markets and that 'multilateral trading facilities' and all trading platforms for securities be brought within the extended statutory regime

**Question 6:**
Should the claims of investors for damages under section 90A or any extension of it be subordinate to the claims of other unsecured creditors?

*Recommendation:* That this issue needs further work and that the Government should consider the outcome of the report of the Australian Corporations and Markets Advisory Committee on the [Australian] High Courts decision in the *Sons of Gwalia* case as part of any future policy developments in this area.

**Question 7:**
Should statutory liability for fraudulent misstatements be extended to those who make the statement on behalf of the company?

*Recommendation:* That liability under the statutory regime should continue to be confined to the issuer.

**Question 8:**
Should statutory protection be extended to sellers and holders of securities as well as to buyers?

*Recommendation:* That the statutory regime should confer rights on both acquirers and disposers of shares but exclude holders (and non-acquirers) from suing in respect of statements contained in RIS announcements. The common law rights of holders arising from misstatements in company circulars should remain in existence for development by the courts.

**Question 9:**
Should the deceit or the negligence measure of damages be adopted in the statutory regime?

*Recommendation:* That this matter is best left for decision-making by the courts. The effect of this recommendation is that damages are likely to be assessed by reference to the loss caused by reliance on the statement, not the loss caused by the falsity.

# Terms of Reference

Section 1270 of the Companies Act 2006 establishes a new statutory regime for liability in damages to third parties in respect of disclosures under the Transparency Directive (2004/109/EC). The Government consulted last year on whether the statutory regime should be extended. Responses to the consultation confirmed that this was a complex area in which it is vital to get the policy right, but were not conclusive.

The Government want to strike the right balance between the interests of investors and issuers, providing appropriate incentives to make timely and accurate disclosures in compliance with statutory rules, and an appropriate – but limited – right to recover losses. Section 1270 of the Companies Act amends the Financial Services and Markets Act 2000, inserting a new section 90B that provides for a power to amend the statutory regime.

The Government appointed Professor Paul Davies, the Cassel Professor of Commercial Law at the London School of Economics in October 2006 to undertake a review of issuer liability. The Davies Review will:

- Consider the law relating to liability in damages of issuers of securities traded on a regulated market or alternative markets (such as AIM or Plus Markets) in respect of statements and publications made to the market and which are incorrect, false or misleading or have not been made promptly;

- Consider how any such liability may be affected by regulatory obligations attaching to issuers and directors;

- Consider the case for providing for a specific right to damages by those relying on such statements and publications in the context of securities market activities, in particular: the circumstances that might give rise to a right, against whom a right might be enforceable and the consistency with the effect of corporate governance and conventions, standards or rules affecting the information that issuers publish to shareholders and others and how they publish it;

- Consider the impacts on:
  - issuers, markets, investors and others;
  - the quantity and quality of information disclosed;
  - the competitiveness of the UK as a good place to do business;

- Take into account the liability of issuers and their managements in other centres of financial services in Europe or more widely including the USA;

- Make recommendations to the Treasury on whether to exercise the section 1270 power and, if so, how.

In making recommendations to the Treasury, the Review will advise on:
  - options for a new regime if recommended;
  - who might bring actions to sue for damages;
  - the kinds of damages that might be awarded and potential effects of paying those damages on issuers, including effects on their business and employees, directors or senior executives, and on the supply of qualified individuals willing to take on director and non-executive director roles in consequence;
  - and other related matters.

# List of contributors

The Davies Review is grateful to the numerous organisations and individuals that provided invaluable input throughout the course of its inquiry through informal discussions and supporting information. The following organisations and individuals contributed written responses to the Discussion Paper:

100 Group of Finance Directors
Allen & Overy
Association of British Insurers (ABI)
Association of Corporate Treasurers (ACT)
Association of Investment Companies (AIC)
Professor Paul Barnes (member, Fraud Advisory Panel)
BT Group plc
Chartered Institute of Management Accountants (CIMA Global)
City of London Law Society Company Law Sub Committee
Clifford Chance LLP
Confederation of British Industry (CBI)
Deloitte & Touche LLP
Environment Agency
General Counsel 100 Group
Grant Thornton UK LLP
Herbert Smith LLP
Hermes Pension Management Ltd.
Dr Christopher Hodges (University of Oxford)
Insolvency Service
Institute of Chartered Accountants in England & Wales (ICAEW)
Institute of Chartered Accountants of Scotland (ICAS)
Institute of Chartered Secretaries & Administrators (ICSA International)
Institute of Directors
International Capital Market Association
Investment Management Association (IMA)
Investor Relations Society
KPMG LLP
Law Society Company Law Committee
Law Society of Scotland
London Investment Banking Association
London Stock Exchange AIM
National Association of Pension Funds
NERA Economic Consulting
Ogilvy Renault LLP
PLUS Markets Group
PriceWaterhouseCoopers LLP
Quoted Companies Alliance
Slaughter and May
Jeffrey Sultoon (Ashurst)
The Takeover Panel
UK Shareholders Association
Robin Woodall (member, LSE Primary Markets Group)

Unless respondents requested otherwise, their responses may be viewed on the Davies Review website at www.hm-treasury.gov.uk/davies.

# Further information & next steps

## Further information

Further information on the background to the Davies Review and links to research commissioned by the Review on the liability regimes in France, Germany, the US and Australia can be found at www.hm-treasury.gov.uk/davies.

## Next steps

The Economic Secretary has committed to consulting fully on the Government's response to the Davies Review's proposals and to publishing a full regulatory impact assessment of these proposals.  For further information contact Jack Middleton at:

Savings and Investment Team (SAVI)
HM Treasury
1 Horse Guards Road
London SW1A 2HQ

Tel: 020 7270 5272
email: Jack.Middleton@hm-treasury.gov.uk

ISBN 978-1-84532-306-6

# Extension of the statutory regime for issuer liability

July 2008

 HM TREASURY



# Extension of the statutory regime for issuer liability

July 2008

© Crown copyright 2008

The text in this document (excluding the Royal Coat of Arms
and departmental logos) may be reproduced free of charge
in any format or medium providing that it is reproduced
accurately and not used in a misleading context. The material
must be acknowledged as Crown copyright and the title of
the document specified.

Any enquiries relating to the copyright in this document
should be sent to:

Office of Public Sector Information
Information Policy Team
St Clements House
2-16 Colegate
Norwich
NR3 1BQ

Fax:  01603 723000
e-mail:  HMSOlicensing@opsi.x.gsi.gov.uk

HM Treasury contacts

This document can be found on the Treasury website at:

hm-treasury.gov.uk

For general enquiries about HM Treasury and its work, contact:

Correspondence and Enquiry Unit
HM Treasury
1 Horse Guards Road
London
SW1A 2HQ

Tel:  020 7270 4558
Fax:  020 7270 4861
E-mail:  public.enquiries@hm-treasury.gov.uk

Printed on at least 75% recycled paper.
When you have finished with it please recycle it again.

ISBN 978-1-84532-480-3
PU561

# CONTENTS

| | | Page |
|---|---|---|
| Executive Summary | | 3 |
| Chapter 1 | Introduction | 5 |
| Chapter 2 | Basis of liability | 7 |
| Chapter 3 | Markets to which the regime is applicable | 9 |
| Chapter 4 | Securities and issuers to which the regime is applicable | 13 |
| Chapter 5 | Disclosures subject to the regime | 17 |
| Chapter 6 | Liability for dishonest delay | 21 |
| Chapter 7 | Other issues | 25 |
| Annex A | Consultation questions | 27 |
| Annex B | Impact assessment | 29 |
| | Draft Statutory Instruments | 39 |

# EXECUTIVE SUMMARY

Section 90A of the Financial Services and Markets Act 2000 (inserted by the Companies Act 2006) established a statutory civil liability regime for issuer misstatements to the market, supplementing existing criminal provisions in that Act. In addition, in section 90B, the Treasury was given power to make further provision about the liability of issuers by regulation. Professor Paul Davies was asked to advise whether changes were needed to ensure the regime was soundly-based and comprehensive. This consultation covers the Government's response to his recommendations and proposes draft regulations to amend the regime.

Professor Davies reviewed the regime and concluded that its basis was sound. He agreed with the threshold for liability in the regime (namely fraud). He agreed that the issuers currently subject to the regime (those with securities admitted to trading on regulated markets) and the statements subject to the regime (periodic disclosures under the Transparency Directive) should remain subject to the regime.

Professor Davies had the opportunity to consult extensively with stakeholders on whether the regime should be extended beyond its current limited boundaries in order to achieve comprehensive securities market coverage. There was strong support for extension of the regime, on the grounds that there were only arbitrary distinctions between the classes of issuer and disclosure subject or not subject to the regime. Extending the statutory regime would improve issuer incentives for prompt and accurate disclosure, while providing both issuers and investors with greater clarity as to the scope of liability.

In line with Davies' recommendations, the Government proposes the following extensions to the statutory regime:

- to issuers with securities admitted to trading on UK multilateral trading facilities (MTFs), as well as those admitted to regulated markets. This would bring issuers on markets such as AIM and the PLUS-quoted market into scope;

- to issuers with securities admitted to trading on an EEA regulated market or MTF, provided they have a registered office in the UK or the UK is their home state under the Transparency Directive;

- to a broad range of ad hoc and periodic disclosures to markets (over and above periodic disclosures required under the Transparency Directive), by extending the regime to information disclosed by issuers by means of a recognised information service. The person claiming damages would not have to show that the relevant information was obtained from the recognised information service. A recognised information service would be defined as any service used to publish regulated information under the Transparency or Market Abuse Directives, or information required to be published under the rules of an MTF;

- to permit sellers, as well as buyers, of securities to recover losses incurred through reliance on fraudulent misstatements;

- to permit recovery for losses resulting from dishonest delay of a disclosure. An issuer would be liable where the delay is a dishonest act and is for the purpose of enabling a gain to be made or to cause loss to another or expose another to a risk of loss.

The basis of these proposals are discussed in the body of this consultation document and draft regulations incorporating these are attached at the end of the document. Responses to consultation are requested by 9 October 2008.

# INTRODUCTION

**1.1**    The question of whether and how far companies (issuers of securities) should be liable in damages for inaccurate statements made to the market upon which investors rely to their detriment is an important one but the answer is not obvious. On the one hand, timely, comprehensive and complete reporting by companies is a crucial element to promote the allocative efficiency of capital markets. Appropriate incentives for such disclosure are thus important. Public enforcement through FSA investigation and sanctions and private litigation by investors have the potential to reinforce each other, providing effective incentives for prompt and accurate disclosures. On the other hand, private litigation to enforce investors' rights, particularly if there is uncertainty about the scope of liability, can operate perversely by encouraging speculative litigation and settlements by issuers based on a desire to terminate litigation rather than on the harm done to shareholders.

**1.2**    The subject of the UK policy on issuer liability for disclosures arose during the implementation of the Transparency Directive into UK law. After consultation, the Government sought Parliamentary approval for a statutory liability regime that was established in section 90A of the Financial Services and Markets Act 2000 (FSMA), in the section inserted by the Companies Act 2006. It was acknowledged, however, that further adjustment to the regime might well be required to address some complex issues that remained unresolved. Accordingly, Treasury was given power in section 90B of FSMA to make further provision about the liability of issuers, including amendments to section 90A, by regulation.

**1.3**    These powers provided scope for a thorough exploration of these issues. The Government asked Professor Paul Davies QC, Cassel Professor of Commercial Law at the London School of Economics, to carry out an independent review of liability in respect of damage or loss suffered as a consequence of inaccurate, false or misleading information disclosed by issuers or their management to the market, or of the failure to disclose relevant information to the market promptly or at all. He issued a first discussion paper entitled 'Liability for misleading statements to the market' in March 2007, which discussed the background to the current state of the law on liability, its policy rationale, approaches to solving the problem, and key questions on the basis of liability and extension of the statutory regime. Professor Davies also discussed the issues extensively with stakeholders – including main market and alternative market listed issuers, lawyers and accountants, financial advisers, industry associations and investor groups – and received a total of 46 formal submissions to his consultation.

**1.4**    Professor Davies then published in June 2007 a final set of proposals for further change to the law in the form of 'The Davies Review of Issuer Liability: Final Report'[1]. The Government has considered these and this consultation elaborates the Government's response and brings forward draft regulations for consultation.

**1.5**    As a result of Professor Davies' work, a broad consensus has emerged on the main issues, which underpins his recommendations to Government. While minority views remain on significant issues, Professor Davies has explained why, on balance, he has reached the conclusions in his report.

---

[1] On the HMT website at www.hm-treasury.gov.uk/davies.

**1.6**     The balance of this paper sets out the principal policy and legal issues in design of a liability regime, Professor Davies' recommendations on these, the Government's response, consultation questions, draft regulations and an Impact Assessment.

**1.7**     Comments are sought on the questions set out in the body of the text and listed at Annex A and the draft regulations at the end of the document. These should be sent by 9 October 2008 to:

Issuer Liability Consultation

Savings and Investment Team

Room 3/20

HM Treasury

1 Horseguards Road

London SW1A 2HQ

Or by email to: issuerliability@hm-treasury.x.gsi.gov.uk

# 2 BASIS OF LIABILITY

**2.1**    The first and fundamental question Davies posed was whether issuers should be subject to civil liability for negligent misstatements, or only for fraudulent misstatements[2]. His recommendation is that liability should be based on fraud.

**2.2**    The term 'fraud' is used in the standard civil (as opposed to criminal) law sense of the term (i.e., as used in the tort of deceit) to mean a statement whose maker knew it to be false or did not care whether it was true or false. Thus, someone who had a genuine belief in the truth of what was said would not be fraudulent, even if that belief were based on inadequate checking.

**2.3**    Negligence, on the other hand, consists of falling below the standard of care required of a reasonable person, and so a misstatement might be found to have been made negligently even if its maker believed it to be true, provided reasonable checking would have revealed the falsity of the statement. The degree of verification necessary to satisfy the standard of a reasonable person is not always apparent, leading to some uncertainty as to when statements would be judged to be negligent.

**2.4**    Those in favour of a negligence standard believe that it provides appropriate incentives to ensure prompt and accurate disclosure. However, a clear majority of stakeholders were in favour of fraud as the basis of liability, on two main bases. First, a negligence standard would be more likely to generate defensive and bland reporting, especially in relation to forward-looking statements, rather than the full disclosure that market participants would find most helpful. Second, a negligence standard is likely to provide much greater opportunities for speculative litigation, driven by the economic interests of law firms or third party funders, than a tightly defined fraud standard.

**2.5**    Davies agreed with the majority of consultees and concluded that simple negligence should not be the basis for private litigation. In doing so, however, he noted that the current partial statutory liability scheme makes the bringing of a fraud claim easier than at common law[3]. At common law, the maker of a fraudulent statement is liable under the tort of deceit only if he or she intends the recipients, or at least an identifiable class including the recipients, to rely on that statement. This would create a potential obstacle to liability in respect of statements to the market, which are not addressed to particular recipients. The statutory regime in section 90A requires instead that the recipients' reliance on the statement be reasonable, facilitating the taking of fraud actions. Davies recommended that this relaxation of the common law continue to be part of an extended statutory regime.

**2.6**    Davies also considered the possibility of a 'gross negligence' standard, as adopted in German law and, in practice, in US law. Five of 28 responses to his review – all from investor groups – favoured a gross negligence standard. Davies concluded that gross negligence would not be a viable third way. Gross negligence would be a new standard in British civil law, so that one would not be building on an established body of precedent generating a firm concept. He was also doubtful about the possibility of defining such a standard adequately in legislation. Indeed, it is inherent in the use of standards that their development is a matter shared between the legislature and the courts.

---

[2] Davies Review of Issuer Liability: Final Report, June 2007, Question 1, pp 9-18.

[3] Davies Review of Issuer Liability: Final Report, June 2007, paragraph 30, page 18.

**2.7**    The consequences of this analysis are as follows. Cautious lawyers would advise their corporate clients that gross negligence was such an uncertain standard that companies should conduct themselves more-or-less on a negligence basis, thus contributing to the bland reporting mentioned above. Secondly, the uncertainty surrounding gross negligence would encourage speculative litigation. The courts would not be in a good position to strike out unmeritorious claims at an early stage of the litigation (as they would be under a fraud standard) because they would be likely to take the view that gross negligence would require a detailed examination of the facts of each case, which could occur only at a trial. Consequently, companies would be under pressure to settle such claims in order to avoid a trial, despite their unmeritorious nature, which is one of the main complaints made about the US system.

**2.8**    However, the choice is not between a wholly fraud-based enforcement regime and one based entirely on negligence. First, the fraud standard will be applied only to claims for compensation for misstatements under the statutory regime. Any claims in negligence which shareholders may have against a company will be expressly excepted from the statutory regime. Secondly, negligent reporting will not go unsanctioned under a regime based on fraud. Negligence is the standard adopted in the FSA rules and sanctioned by penalties which can take account of the degree of fault on the part of the issuer. Taken in the round, the enforcement regime strikes a balance between public and private enforcement of the disclosure and compensation requirements, with private enforcement being given a significant, but nevertheless subordinate, role.

**Government's proposal**    **2.9**    **The Government agrees with this recommendation and proposes to make no change to the current basis of liability (i.e., fraud).**

# 3 MARKETS TO WHICH THE REGIME IS APPLICABLE

**Extension to UK-based multilateral trading facilities**

**3.1**     The liability regime established in the section 90A of FSMA applies to issuers of securities admitted to trading on UK regulated markets[4]. A statutory liability regime was made necessary for such issuers as a result of the implementation of the Transparency Directive into UK law. It was not necessary to provide a statutory regime for those issuers admitted to trading on securities markets not subject to the provisions of the Transparency Directive. The Government consulted on whether it would be desirable to extend the regime to other classes of securities market, but neither issuers nor investors were convinced in the short time available that this would offer significant benefits. Given the lack of clear appetite for extension, when the Government sought the power in section 90B of FSMA, it was not envisaged that it would be used to extend the regime to other classes of securities market.

**3.2**     Since then, there has been time to explore the issues in greater depth. Davies' investigation has shown that while the disclosures made by issuers on other markets are typically mandated by and enforced through the rules of the market, they nonetheless are made in very similar circumstances and in response to the same investor needs, and with issuers facing similar incentives to make prompt and accurate disclosures. Crucially, it was felt that while investors expected the level of disclosures to differ from those on regulated markets, there was no principled reason why they should receive less protection against fraudulent misstatements.

**3.3**     This opportunity for more thorough exploration of the issues has led to a change in views in both the issuer and investor communities. It has been widely accepted that replacing the common law regime with a statutory regime would provide issuers and investors in other markets with the same benefits as in regulated markets, namely greater certainty as to investor rights in the event of fraudulent misstatements by issuers. Conversely, earlier concerns about possible unintended consequences have been replaced by the conclusion that there are no obvious disadvantages to a statutory regime. Davies' conclusions were strongly supported in consultation, in particular by the principal securities markets in the UK that would be affected by an extension of the regime – the AIM and PLUS-quoted markets.

**3.4**     Davies' recommendation[5] is that the statutory regime be extended beyond statements by issuers with securities admitted to trading on UK regulated markets, to include statements by issuers admitted to trading on all trading platforms for securities, or multilateral trading facilities (MTFs). For the purposes of implementation with respect to UK markets, MTFs are defined in Article 4.1(15) of the Directive on Markets in Financial Instruments (MiFID) and defined in FSMA for the purposes of Part VI of the Act in section 102B(6)[6].

---

[4] Currently defined in s.103 FSMA by reference to Article 1.13 of the Investment Services Directive (this will change to the definition in Article 4.1(14) of the Market in Financial Instruments Directive (2004/39/EC) when section 1272 of, and schedule 15 to, the Companies Act 2006, come into force.

[5] Davies Review of Issuer Liability: Final Report, June 2007, Question 5, page 20.

[6] Operating a multilateral trading facility is a regulated activity under Article 25D of the Financial Services and Markets Act 2000 (Regulated Activities) Order 2001, for which permission under Part IV of FSMA is required from the FSA.

**Government's proposal**

**3.5**    The Government agrees with this recommendation and proposes that liability should attach in respect of all[7] securities admitted to trading on a UK regulated market or a UK multilateral trading facility.

**Extension to non-UK markets**

**3.6**    A further question, not directly addressed in Davies but inherent in his recommendation that the regime be extended beyond UK regulated markets, is whether the statutory regime should apply to UK issuers of securities admitted to trading on non-UK markets.

**3.7**    In considering this issue, it is important to be clear that the statutory regime can only be applied in those cases where English law is found to be the applicable law. It will not always be clear which law would be applied to a claim for compensation for fraudulent misstatements when there are conflicting liability regimes.

**3.8**    Where this question arises in a court in the United Kingdom or in the EEA, it is likely to be resolved in accordance with the provisions of Regulation 864/2007 on the law applicable to non-contractual obligations. Where the question arises in another jurisdiction, it will be resolved by the conflicts of law rules applied in the jurisdiction in question.

**3.9**    Under Article 4 of Regulation 864/2007, the applicable law for a tort would be:

- the law of the country in which the damage occurs (irrespective of the country in which the event giving rise to the damage occurred, and irrespective of the country or countries in which the indirect consequences of that event occur); or

- where the defendant and the person sustaining damage are both habitually resident in the same country when the damage occurs, the law of that country.

**3.10**    Article 4(3) provides for these rules to be overridden where:

"it is clear from all the circumstances of the case that the tort is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2, the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort in question".

**3.11**    Thus, where the investor and the issuer are both habitually resident in the UK, UK law may apply, though where the transaction took place on a third country market it may be argued that the damage was sustained there. It is not yet clear how the rules set out in Regulation 864/2007 would apply to such a case.

**3.12**    The decision as to whether English law is the applicable law under the Regulation will depend on the facts of a particular case. There will be cases in which UK issuers can expect to be held liable under the provisions of a law other than that of one of the jurisdictions of the United Kingdom. Even where a claim is brought in the UK courts, a foreign law may be held to be the applicable law. The Government cannot, even if it wishes to do so, exclude the jurisdiction of non-UK courts or the application of non-UK law in the above cases.

---

[7] i.e., securities issued by a UK issuer or non-UK issuer.

**3.13**    In the face of this uncertainty, there are two options: to extend the statutory regime to all cases where English law is found to be the applicable law; or to restrict its extension to those cases where issuers have been admitted to a narrower group of markets, such as UK or EEA markets. If the first option is taken, a UK issuer would be subject to the right of compensation we propose for fraudulent misstatements, wherever in the world its securities were admitted to trading, provided that the claim to compensation was made in a jurisdiction which would apply English law to it. If the second option is taken, the right to compensation would only apply in relation to securities which are admitted to trading in a market in the UK or the EEA.

**3.14**    The reason for extending the statutory regime to all cases where English law is found to be the applicable law is one of principle. It could be argued that it would be inconsistent for UK investors in UK issuers to be denied access to the UK statutory liability regime in such circumstances. Failure to do so could potentially lead to some UK investors having insufficient remedies under a third country securities regime.

**3.15**    The arguments against extending the statutory regime on this basis are more practical.

- First, the number of cases where the courts would apply English law outside the UK and the EEA is likely to be small. Moreover, as most overseas listings occur in jurisdictions with a well-developed securities regime, such as the US, the potential harm investors in these cases might suffer would be minimal.

- Secondly, the impact would be uncertain. The application of the statutory regime would depend entirely on the operation of the conflict of laws rules of the country in question, which could change from case to case, depending on the facts of a particular case.

- Thirdly, it would be difficult to adapt the proposed statutory liability regime which is built around concepts of European law to apply in other third countries. For example, it would be hard to adapt the EU concepts of regulated markets and MTFs or the concept of a recognised information service.

**3.16**    Our judgement is that, on balance, it would not be beneficial to extend the statutory liability regime to UK issuers admitted to trading in any third country in cases where English law is found to apply.

**3.17**    However, the arguments against extension of the statutory regime to third countries are weaker in the case of UK issuers admitted to trading on other EEA markets. European law provides for harmonised minimum disclosure requirements for issuers with securities admitted to trading on a regulated market in the EEA and establishes the principle of home state regulation for those issuers[8]. Only the home state can impose disclosure requirements above the directive minima, irrespective of where in the EEA the securities are admitted to trading.

**3.18**    The effect of minimum harmonisation and the requirement to comply with additional home state disclosure requirements is to make the application of the UK statutory regime more practical, as its interaction with disclosure requirements is clearer. Moreover, it is possible to think of cases, such as where both issuer and investor are resident in the UK, and the securities are admitted to trading on an EEA market,

---

[8] The principle of home state regulation does not apply to issuers with securities admitted to trading on MTFs.

where English law may be held to be the applicable law under regulation 864/2007, so that the UK liability regime would apply.

**3.19**    Accordingly, the Government proposes that statutory regime be extended to UK issuers[9] admitted to trading on EEA markets[10]. The Government is conscious of the difficult issues raised by this question and welcomes comments on these proposals.

**Government's proposal**

**3.20**    **The Government proposes that the statutory liability regime apply to:**

- **issuers of all securities admitted to trading on a UK regulated market or multilateral trading facility; and**

- **issuers of securities admitted to trading on an EEA regulated market or multilateral trading facility, where the UK is the home state for the issuer under the Transparency Directive or the issuer has its registered office in the UK.**

---

[9] The definition of UK issuers requires clarification. To ensure consistency with the Transparency Directive, it is proposed to align the definition of UK issuer with the definition of issuer for which the UK is the home member state under the Directive. Applying this definition to issuers with securities admitted to trading on an EEA MTF, a UK issuer is defined as an entity with its registered office is in the UK. In summary then, a UK incorporated company with its registered office elsewhere in the EU and with securities admitted to trading on a non-UK market would not be subject to the liability regime. On the other hand, a company incorporated outside the EEA with securities admitted to trading on a regulated market in the UK or the EEA and which has chosen the UK as its home member state, would be subject to the liability regime.

[10] As noted above, neither the Transparency Directive, nor the principle of home state regulation, apply to issuers with securities admitted to trading on MTFs. However, it would be excessively complex to extend the statutory regime to issuers with securities admitted to trading on EEA regulated markets but not to EEA MTFs.

# 4 SECURITIES AND ISSUERS TO WHICH THE REGIME IS APPLICABLE

**Securities to which the regime is applicable**

**4.1**  At present the statutory regime applies to securities traded on a UK regulated market. Securities are defined in section 102A of FSMA as "anything which has been, or may be, admitted to the official list", an extremely broad definition. However, the right to compensation created by section 90A applies in respect of securities traded on a regulated market and in relation to information published in response to requirements for periodic disclosures set out in Articles 4, 5 and 6 of the Transparency Directive. Thus the securities that come within the scope of the regime are those defined as "securities" in the Transparency Directive.

**4.2**  Article 2(1)(a) of the Transparency Directive defines "securities" as transferable securities as defined in Article 4(1), point 18 of MiFID, with the exception of money market instruments having a maturity of less than 12 months. In turn, this is the definition of "transferable securities" in section 102A(3) of FSMA. Hence, the securities coming within the scope of the statutory regime, with the exception of the specified short-term money market instruments, are:

> "that class of securities which are negotiable on the capital market, with the exception of instruments of payment, such as:
>
>> (a) shares in companies and other securities equivalent to shares in companies and partnerships or other entities, and depositary receipts in respect of shares:
>>
>> (b) bonds or other forms of securitised debt, including depositary receipts in respect of such securities;
>>
>> (c) any other securities giving the right to acquire or sell any such transferable securities or giving rise to a cash settlement determined by reference to transferable securities, currencies, interest rates, or yields, commodities or other indices or measures"[11]

**4.3**  One of the questions which has arisen in considering extension of the statutory regime is the categories of securities in respect of which there should be a right to compensation. There are a number of options.

- It would be possible to limit the securities covered by the regime to debt and equity securities (including depositary receipts representing such securities). To some observers, this represents the natural scope of the regime. The majority of the disclosures within the scope of section 90A and with the potential to influence value will concern such securities, which include shares, convertible notes, preference shares, depositary receipts, bonds and other forms of transferable securitized debts, equity and debt securities issued by special purpose vehicles[12] and by closed-end investment companies.

- However, as indicated above, the current definition of "securities" has a wider meaning, including derivative instruments which are negotiable on

---

[11] Per Article 4(1), point 18 of MiFID

[12] This raises the question of the liability of the promoters of a transaction using an SPV. Though they would not be "issuers" for the purpose of our proposed provisions, the entity would have a right of action against the promoters in respect of any advice they received from them.

the capital markets in two categories: (a) instruments (such as options or warrants) which give a right to acquire or sell transferable securities, and (b) instruments which give rise to a cash settlement determined by reference to transferable securities, currencies, interest rates, or yields, commodities or other indices or measures (such as some exchange traded funds). There is nothing to indicate that this definition has given rise to any problems in practice (this may reflect the fact that the value of such derivatives is determined by the behaviour of the underlying instruments, and therefore the issuers do not in practice make disclosures of substance in relation to their derivatives).

- Another option would be to extend the definition of "securities" still further, to encompass all financial instruments as set out in Section C of the Annex to MiFID. One factor in favour of such an approach is the proposed extension of the regime to MTFs in the UK and to regulated markets and MTFs in the EEA, as a greater range of financial instruments will be traded on these markets. However, the Government sees no obvious benefit in this approach. The regime is intended to cover disclosures by issuers to the market that have the potential to influence the value of the traded securities that they have issued. As indicated above, issuers of derivatives do not in practice make public disclosures as envisaged by the regime and relied on by investors transacting in the derivatives[13].

**4.4**    Accordingly, the Government is not minded to extend or restrict the definition of securities to which the regime is applicable beyond "transferable securities" as defined in section 102A(3) of FSMA.

**Issuers subject to the regime**

**4.5**    The range of securities within scope also raises the question of whom should be considered the issuer of the security (and so liable to pay compensation for misstatements). For example, in the case of depositary receipts under Article 2(1)(d) of the Transparency Directive the issuer of the securities represented by the depositary receipt (i.e., the underlying securities) is deemed to be the issuer of the depositary receipt. In practice a decision to acquire or sell depositary receipts will be influenced by information published by the issuer of the underlying securities, not the issuer of the depositary receipts (who may not be responsible for the publication of any information to the market). It is therefore reasonable that the issuer of the underlying securities should be liable to pay compensation to investors who have suffered loss by acquiring or selling depositary receipts in reliance on information it has published. The same principle applies in the case of other secondary securities within the scope of Article 4.1(18)(c) that give the right to acquire or sell other underlying transferable securities.

**4.6**    But such a rule is only appropriate where issuer of the underlying securities has <u>consented</u> to the admission of the secondary securities to trading, as only then can it be regarded as having taken responsibility for the securities and, in most cases, any disclosure obligations. The issuer of the underlying securities to which depositary receipts or other securities within the scope of 4.1(18)(c) relate may neither have consented to the admission to trading of these securities, nor even be aware that they have been issued. This risk of this is heightened by the increase in the number and range of markets to which securities can be admitted and to which the liability regime applies. Where the issuer of the underlying securities has not consented to the

---

[13] To the extent that an issuer of a derivative instrument makes fraudulent misstatements which are relied on by investors, they would remain subject to civil actions in the tort of deceit and to the criminal prohibition in section 397 of FSMA against making misleading statements.

admission to trading of the secondary securities, it is not appropriate that it should be liable to compensate investors in such securities for their loss. In such circumstances, the issuer of the secondary securities will remain the issuer who is liable to pay compensation to investors in respect of any misstatements it may make.

**4.7**    In addition, we propose as a general rule under our regime that only securities which have been admitted to trading by or with the consent of the issuer will be within the scope of the regime. The identity of the issuer is to be determined by the requirements in the preceding paragraph. Where the person identified as the issuer has not given consent to admission (e.g., if an exchange were to permit the trading of securities without reference to the issuer), the securities will be excluded from the scope of the regime.

**4.8**    We appreciate that there may be other securities where these principles are relevant, and we would be grateful for consultees' views as to whether the issuer of the underlying securities should be made liable to pay compensation under our regime in relation to any other derivative securities.

**Government's proposal**

**4.9**    **The Government proposes:**

- **that the regime apply to "transferable securities" as defined in section 102A(3) of FSMA;**

- **in the case of depositary receipts and other secondary securities giving a right to acquire or sell other transferable securities, the issuer liable to pay compensation shall be the issuer of the underlying securities, provided that the secondary securities concerned have been admitted to trading by or with its consent;**

- **for depositary receipts and other secondary securities admitted to trading without the consent of the issuer of the underlying securities, and for all other derivative instruments, the issuer of the depositary receipts, other secondary securities or derivative instruments shall be liable to pay compensation under the regime.**

# 5

# DISCLOSURES SUBJECT TO THE REGIME

**Identification of relevant disclosures**

**5.1**    The current statutory liability regime applies to periodic disclosures required under the Transparency Directive from issuers of securities admitted to trading on regulated markets. When Professor Davies consulted, there was a strong majority in favour of the extension of the statutory regime to ad hoc disclosures[14], on the ground that the distinction between periodic and ad hoc disclosures was arbitrary as far as the applicable liability regime is concerned. Professor Davies recommended[15] that the regime be extended to apply to ad hoc disclosures. The Government agrees with this recommendation.

**5.2**    It is important to define the relevant disclosures to which the regime should apply taking into consideration the proposed extension of the regime to issuers admitted to trading on MTFs, as well as on regulated markets. Davies considered the following options for scope of disclosures:

- limiting disclosure to the current requirements, namely announcements required under FSA rules implementing the Transparency Directive;

- extending it to ad hoc disclosures of inside information under the provisions of the Market Abuse Directive (MAD); or

- extending it to all announcements made by way of a Regulated Information Service (RIS).

**5.3**    Davies found unanimous agreement, among those who expressed a view, that the regime should attach to those statements put out through a Regulated Information Service (RIS). This would provide issuers and investors with a consistent and easily understood regime that covered the principal disclosures likely to affect the value of the securities[16].

**5.4**    This definition works well with securities admitted to trading on a regulated market. Under Article 21(1) of the Transparency Directive, the home member state is required to ensure that the issuer discloses regulated information – which includes periodic financial disclosures under the Transparency Directive and ad hoc disclosures under the MAD – in a manner ensuring fast access on a non-discriminatory basis. Under the Transparency and Disclosure Rules, issuers admitted to UK regulated markets are required to use an RIS.

**5.5**    FSA rules do not directly specify the required disclosures for issuers admitted to trading on UK MTFs, nor the channels through which such disclosures must be disseminated[17]. While such issuers are subject to general securities law, typically the rules of the MTF prescribe the required disclosures, the channels for dissemination and the enforcement procedures. Thus the AIM market rules require disclosures to be made to an RIS. The PLUS market rules for issuers require the use of an approved information service, defined as an RIS and Newstrack PLUS. Hence, to provide equivalent treatment

---

[14] Although one consultee would agree to this only if the basis of liability were to be gross negligence.

[15] Davies Review of Issuer Liability: Final Report, June 2007, Question 2, page 19.

[16] Davies Review of Issuer Liability: Final Report, June 2007, Question 4, pp 21-22.

[17] Under MAR 5.3.7 the FSA has provided guidance on the circumstances in which it will impose a variation on the Part IV permission of the operator of an MTF that operates a primary market in shares not admitted to trading on a regulated market in order to satisfy MAR 5.3.1 requirements (which may include disclosure requirements).

**5**

for MTFs, the regime should be applied to disclosures made by means of the service used for the dissemination of information required to be disclosed under the rules of the MTF.

**5.6**    The avenues for disclosure – respectively information services used for the publication of regulated information in pursuance of obligations under the Transparency Directive (including all RISs), and information services used for the dissemination of information which the rules of an MTF require to be published – are hereafter termed recognised information services.

**5.7**    It is possible that the rules of an MTF might not specify information to be disclosed under its rules. This is not the case in relation to the MTFs in the UK, but it may apply in relation to EEA MTFs. In such a case, the statutory regime would only apply to securities admitted to trading on the MTF where the issuer of those securities chose to publish information in relation to them on an information service also used for the dissemination of information required to be published under the Transparency Directive. Where the issuer chose not to use such a service, he would not be subject to the statutory regime. We do not think that this would in practice prove to be a problem, but we would be interested in consultees' views on this question.

**5.8**    Davies recommended that the regime be applied to disclosures made by means of a recognised information service, rather than limited to those required to be made by such means. While perhaps conceptually purer, such a limitation would reduce the certainty of the regime by permitting disputes over whether disclosure was actually required by the rules. This would be undesirable.

**5.9**    Given the appetite for a statutory regime from issuers and their advisers, we would expect them to take advantage of this rule to bring as wide a range of announcements under the regime as possible. This is desirable. Where information has the potential to affect the price of securities, it should generally be subject to the regime; where it does not, the matter is irrelevant. Nor, given the uncertainty over the development of the law, does Davies regard this as impinging materially on plaintiffs' rights.

**5.10**    Consequently, there is a risk that issuers may overload recognised information services (in particular, the RISs) to ensure that all disclosures are subject to the statutory liability regime. However, this may be mitigated as the regime will also apply to information where the availability of that information has been announced by the issuer using a recognised information service. Moreover, responses to Professor Davies suggested that this risk was not perceived as significant and we hope that it would be ameliorated by the cost of making such disclosures. The Government welcomes views on the extent of this risk and whether the proposal below manages it effectively.

**Government's proposal**    **5.11**    **The Government agrees with Davies recommendation and proposes that the scope of disclosure of the statutory regime should be:**

- **all information published by the issuer by means of a recognised information service;**

- **other information where the availability of that information has been announced by the issuer by means of a recognised information service; and**

- a recognised information service for these purposes will include both RISs and information services used to disseminate information which is required to be published by the rules of an MTF.

**Exceptions to the regime**

**5.12**   Davies thought it important that the statutory regime for investors should not reduce shareholder rights as against their companies[18] (notwithstanding that the circumstances in which a claim might successfully be brought are not entirely clear). Consultation responses supported this position. Specifically, he concluded that the statutory regime should not remove existing rights of parties in respect of information released for shareholder purposes (as opposed to information released to the market), but issued through an RIS as a matter of course. Davies considered the position of circulars required to be sent to shareholders but also disclosed via an RIS (e.g., in relation to significant transactions under LR10, related party transactions under LR11 or under the Takeover Code).

**5.13**   The government agrees that the statutory regime, and in particular the protection granted to issuers in respect of certain misstatements, should not remove any rights shareholders may have to bring a claim for negligence against their companies. Accordingly, we propose to provide expressly that the protection conferred by the statutory regime does not affect the rights of a holder of securities in his capacity as such (see paragraph 6(4)(a) of the proposed schedule 10A). We would welcome views as to whether this is sufficient, or whether any further provision is necessary.

**5.14**   Davies also commented[19] that section 90A(6)(b) would not affect negligence liability arising where express responsibility has been taken by an adviser, such as an auditor, for the accuracy of a particular document. In such a case, a claim against the adviser would be founded on the separate statement that the document was accurate, which would not be affected by the regime. We agree, and we do not therefore propose to make separate provision preserving liability in this case.

**Government's proposal**

**5.15**   **The Government agrees with this recommendation and proposes that the statutory regime should provide that the proposed immunity does not affect the rights of a holder of securities in his capacity as such.**

**Application where information is available from multiple sources**

**5.16**   A question arises as to liability where the information relied on is acquired from a secondary source (e.g., its republication in a news item), rather than directly from a recognised information service (the primary source). Under the statutory regime, liability will arise where the investor has relied on the relevant information, irrespective of its precise source. While the Government proposes to define the relevant information by reference to its primary source, this is simply the most convenient way of defining scope. It would be unfair to deny a remedy simply because the plaintiff could not show that the information was obtained directly from a recognised information service. Indeed it could impose an unnecessary evidential hurdle to valid claims. Accordingly, provided that an investor can prove that the information in question was published on a recognised information service, he will not have to prove that he obtained the information himself from the recognised information service.

**Government's proposal**

**5.17**   **The Government proposes that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service.**

---

[18] Davies Review of Issuer Liability: Final Report, June 2007, paragraphs 41-49.

[19] Davies Review of Issuer Liability: Final Report, June 2007, paragraph 46.

# 6

# LIABILITY FOR DISHONEST DELAY

**6.1**    Professor Davies considered[20] if a liability for dishonestly delayed – in addition to inaccurate – announcements should be imposed by the statutory regime, or whether such delay should be sanctioned only through public enforcement via the FSA. Delayed announcements do not give rise in principle to liability at common law and so the extension of statutory liability would create a liability where none currently exists. Davies concluded that liability for dishonest delay is correct in principle in order to reinforce incentives for prompt disclosure to markets.

**6.2**    A majority of consultees replied that delay should be sanctioned only through FSA enforcement. However, among consultees, there was support from investor groups in favour of imposing a liability for dishonest delay.

**6.3**    The Government recognises the concerns of issuers and their advisers about the risks involved in creating a liability for dishonest delay. Assessing the truth or falsity of a statement is a question of fact. Delay is qualitatively different to misstatement, in that it requires a greater element of judgement as to what delay may be permissible. Thus it is more difficult to infer honesty or dishonesty from the circumstances of any delay. This uncertainty could increase the vulnerability of issuers to litigation and increase defensive behaviour. The uncertainty is increased by the potentially wider scope and less predictable application of private law remedies, compared to the public law remedies available through the FSA tribunal process.

**6.4**    Equally, the Government understands investors' concern that dishonest delay in making disclosures can be just as effective as a direct misstatement in creating a false market and harming the interests of buyers and sellers of securities. Indeed, Davies noted that no one identified a principled (as opposed to a practical) reason why dishonest delay should not be the subject of civil litigation.

**6.5**    This is a finely balanced issue. The Government's view is that it is appropriate to create a liability for dishonest delay to reinforce the incentives for prompt disclosure, provided that the scope of liability can be precisely drawn to ensure that legitimate delay is not penalised and defensive behaviour on the part of issuers is not promoted.

**Test for dishonest delay**    **6.6**    The more restrictive the definition of delay that attracts liability, the greater the certainty for issuers and the greater the difficulty for investors in securing redress. Davies considered whether requiring that delay should be deliberate would be sufficient but concluded that it would provide too broad a scope for liability. The basis for delay must be more than intention, since most delays will be intentional and often for good reasons (to check the facts before publication, for example). Issuers would face great pressures in approaching any decision to delay release if it could be challenged afterwards on this basis. A requirement for recklessness would also be insufficient. There would be considerable uncertainty as to what delay would be considered to be "reckless" for these purposes, and though this might be a more difficult standard to meet, there would justifiable fear that some forms of negligent delay would be drawn into the net.

**6.7**    Hence, Davies has recommended that liability should only attach to dishonest delay. He further suggests that the definition of dishonesty should focus on the purpose of the delay, and that civil liability should only be imposed if the purpose, or the

---

[20] Davies Review of Issuer Liability: Final Report, June 2007, Question 3, page 23.

predominant purpose, fell within a prohibited category[21]. Drawing on the test for criminal behaviour under section 397 of FSMA, he suggested that such a purpose could be inducing investors to acquire (or possibly dispose of) securities, or, more narrowly in his view, to enable a gain to be made or to inflict a loss on a person who acquired or sold the issuer's securities during the period of delay[22].

**6.8**    The Government agrees that such a test is appropriate. This would ensure liability in those cases where directors, for example, deliberately delayed disclosures in order to buy or sell securities on non-public information. It would ensure that some important cases where disclosure was deliberately delayed, for example, to give the board time to consider the implications of disclosure, to conclude contractual negotiations or to check the accuracy of a disclosure before publication, would not incur liability for dishonest delay.

**6.9**    However, requiring the claimant to show that the defendant sought to enable a gain to be made may still be too broad a test for civil liability. There are cases where an issuer may wish to delay a disclosure to mitigate serious potential harm. It could be argued that such actions are equivalent to enabling a gain to be made. However, most market participants would not consider these actions to be dishonest, nor is there any obvious benefit in the Government's imposing additional pressure, in the form of potential liability for dishonest delay, on issuers in these cases.

**6.10**    Accordingly, to prevent delays benefiting the issuer but recognised by the markets as appropriate, falling within the scope of the regime, the Government proposes that a further condition must be satisfied before an issuer would become liable to pay compensation. The claimant should also have to prove that those with managerial responsibility within the issuer (who would therefore have been responsible for the delay in publication) have acted dishonestly in delaying the publication of the information. Under the test in *R v Ghosh*[23] this will involve two questions – first, would their conduct in delaying publication be regarded by reasonable and ordinary people as being dishonest, and secondly did those concerned appreciate that their conduct was dishonest.

**6.11**    In such cases the issuer's clear intent will often be referenced by minutes of board discussions and potentially through communications with regulators. This would provide compelling evidence that the issuer is not acting dishonestly in delaying publication.

**6.12**    The proposed test does not, indeed cannot, completely exclude the risk of action against directors for dishonest delay. Potential claimants will explore minutely any avenue for redress and directors will always be aware that, in the event of a finding of dishonesty, the company or its liquidators would seek to recover damages from the directors. However, the chances of success are minimal unless plaintiffs can show that the principal motivation of the relevant officers in delay was to enable someone to make a gain or to inflict a loss, and that reasonable people would consider these actions dishonest.

**6.13**    It can be seen from the above examples that a breach of the FSA's rules would not, on its own, necessarily qualify as dishonest delay giving rise to a right to

---

[21] Davies Review of Issuer Liability: Final Report, June 2007, paragraph 49, pages 23 and 24.

[22] The test in section 3 of the Fraud Act 2006.

[23] [1982] QB 1053.

compensation. This is acknowledged by Davies[24]. Equally, the fact that a delay is not regarded as dishonest would not mean that there was no breach of the FSA's rules. The FSA's rules are intended to have a wider reach than the statutory liability regime by covering delay arising from negligence and recklessness.

**6.14**    The Government welcomes views on whether this proposal strikes the appropriate balance and is captured in the provisions of the draft regulation.

**Government's proposal**    **6.15**    **The Government agrees with this recommendation and proposes to extend the statutory regime to include liability where the issuer:**

- **acts dishonestly in delaying publication of the information; and**

- **by the delay intends to enable a gain to be made or to cause loss to another or expose another to the risk of loss.**

---

[24] Davies Review of Issuer Liability: Final Report, June 2007, paragraph 49, page 24.

# 7 OTHER ISSUES

**Trading off-market**

**7.1** Professor Davies recommended that liability should not depend on whether the relevant transaction takes place on or off market. The appropriate test is that the investor relied on the statement in circumstances where it was reasonable to do so.

**Government's proposal**

**7.2** **The Government agrees with this recommendation and proposes that liability should attach irrespective of whether the relevant transaction takes place on or off market.**

**Extension to sellers of securities**

**7.3** The current statutory regime applies only for the benefit of acquirers of shares. Davies recommends that it be extended to include the sellers, but not the holders, of securities[25].

**7.4** There was no majority in consultation on whether statutory protection should be extended to sellers and holders of securities, as well as to buyers. Fourteen consultees are in favour of extending the regime to sellers only and this comprised a consensus across key investor and issuer stakeholder groups. A mixed group of eight stakeholders are in favour of extending both to sellers and holders on the grounds that there is no justification for treating holders differently from buyers and sellers and the fact that it might be harder for holders to prove a loss should not mean they are deprived of a right of action. Six consultees want no change.

**7.5** Davies recommends extending the regime to include sellers of securities as their loss is the same as that suffered by buyers (i.e., the difference between the price paid and the price which would have prevailed had the truth been known). He is not aware of any foreign regime that excludes sellers, though it is acknowledged that claims by sellers are rare, because issuers' misstatements tend to be optimistic rather than pessimistic.

**7.6** Davies concluded, however, that the regime should not be extended to include holders of securities. While there is an argument in principle for inclusion, the determination of reliance on a misstatement in the absence of a transaction presents severe evidential difficulties. For this reason, foreign liability regimes also tend to exclude holders.

**Government's proposals**

**7.7** **The Government agrees with this recommendation and proposes to extend the regime to include sellers (but not holders) of securities.**

**Application to directors and advisers**

**7.8** An important question is whether the statutory regime should apply to directors and advisers who make statements on behalf of the company. The common law does so, but the statutory regime in section 90A of FSMA, which replaces the common law, applies only to issuers and excludes liability on the part of others. A clear majority of consultation responses reject extending liability beyond the company, with investor groups disagreeing.

**7.9** On the one hand, it was argued that individuals who make fraudulent misstatements should not be protected just because they were making such statements on behalf of a company. In response, it was argued that extension of liability was unnecessary because the company had appropriate remedies against both directors and advisers.

---

[25] Davies Review of Issuer Liability: Final Report, June 2007, Question 8, page 24.

**7.10**    Davies concluded[26] that while there is an argument in principle in favour of extension (at least to directors) because of the deterrent impact upon directors of civil liability, it would nonetheless produce a cleaner legislative package if the statutory regime excluded director and adviser liability. Directors would remain liable to the company in negligence and liable to be sued by the company or by a shareholder on behalf of the company through the new derivative action procedure of the 2006 Act. Directors would continue to be exposed to the FSA's penalty regime if 'knowingly concerned' in the contravention by the issuer (under section 91(2) of FSMA 2000).

**Government's proposal**    **7.11**    **The Government agrees with this recommendation and proposes not to extend the statutory liability regime to directors and advisers.**

**Measure of damages**    **7.12**    Davies asked which measure of damages was appropriate: that for fraud (i.e., the tort of deceit) or for negligence. He concluded[27] that it would be difficult to formulate effective rules that would not tie the courts' hands in an undesirable way and thus recommended, in agreement with most of the legal consultees, that the issue was one better left for the courts to decide. In doing so, he noted that the effect of this would be that damages are likely to be assessed by reference to the loss cause by reliance on the statement, and not the loss caused by its falsity.

**Government's proposal**    **7.13**    **The Government agrees with this recommendation and proposes to make no changes to the statutory regime in respect of assessment of damages.**

**Subordination of investor claims to unsecured creditors**    **7.14**    The current position is that investors' claims under the statutory regime rank with those of other unsecured creditors, and ahead of those of shareholders. On the question of whether investors' claims should be subordinated to those of other unsecured creditors in the case of the issuer's insolvency, there was a near-even split of consultation responses. Davies concluded[28] that it raised important issues about the nature of equity investment in companies and the role of a company's legal capital, with potential ramifications outside the area of securities litigation (for example, in the area of capital maintenance). He agreed with those consultees who argued that the issue required wider consideration, and that also that there is no reason to delay other changes while this is resolved. The Government agrees with his recommendation that this issue needs wider consideration.

**Government's proposal**    **7.15**    **The Government agrees with this recommendation and proposes to consider further the issue of subordination of investors' claims.**

---

[26] Davies Review of Issuer Liability: Final Report, June 2007, Question 7, page 25.

[27] Davies Review of Issuer Liability: Final Report, June 2007, Question 9, page 26.

[28] Davies Review of Issuer Liability: Final Report, June 2007, Question 6, page 27.



# A CONSULTATION QUESTIONS

The Government would be grateful for comments on the following proposals for the statutory regime for issuer liability for misstatements, and for any comments (preferably using the headings below) on their formulation in the draft regulations at the end of the document.

The Government proposes:

1. to make no change to the current basis of liability (i.e., fraud).

2. that liability should attach in respect of securities admitted to trading on a UK regulated market or a UK multilateral trading facility.

3. that the statutory liability regime apply to:

- issuers of all securities admitted to trading on a UK regulated market or multilateral trading facility; and

- issuers of securities admitted to trading on an EEA regulated market or multilateral trading facility, where the UK is the home state for the issuer under the Transparency Directive or the issuer has its registered office in the UK.

4. that the regime apply to:

- "transferable securities" as defined in section 102A(3) of FSMA;

- in the case of depositary receipts and other secondary securities giving a right to acquire or sell other transferable securities, the issuer liable to pay compensation shall be the issuer of the underlying securities, provided that the secondary securities concerned have been admitted to trading by or with its consent;

- for depositary receipts and other secondary securities admitted to trading without the consent of the issuer of the underlying securities, and for all other derivative instruments, the issuer of the depositary receipts, other secondary securities or derivative instruments shall be liable to pay compensation under the regime.

5. that the scope of disclosure of the statutory regime should be:

- all information published by the issuer by means of a recognised information service;

- other information where the availability of that information has been announced by the issuer by means of a recognised information service; and

- a recognised information service for these purposes will include both RISs and information services used to disseminate information which is required to be published by the rules of an MTF.

6. that the statutory regime should provide that the proposed immunity does not affect the rights of a holder of securities in his capacity as such.

7. that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service.

8. to extend the statutory regime to include liability where the issuer:

- acts dishonestly in delaying publication of the information;

- by the delay intends to enable a gain to be made or to cause loss to another or expose another to the risk of loss.

9. that liability should attach irrespective of whether the relevant transaction takes place on or off market.

10. to extend the regime to include sellers (but not holders) of securities.

11. not to extend the statutory liability regime to directors and advisers.

12. to make no changes to the statutory regime in respect of assessment of damages.

13. to consider further the issue of subordination of investors' claims.

# B

# IMPACT ASSESSMENT

| Summary: Intervention & Options | |
|---|---|
| **Department /Agency:** HMT | **Title:** Statutory liability regime for fraudulent misstatements by issuers of securities |

| **Stage:** Consultation | **Version:** 1 | **Date:** 17 July 2008 |
|---|---|---|

**Related Publications:** Davies Review of Issuer Liability, Liability for misstatements to the market, A discussion paper by Professor Paul Davies QC, March 2007; Davies Review of Issuer Liability: Final Report by Professor Paul Davies, June 2007

**Available to view or download at:**
http://www.hm-treasury.gov.uk/consultations_and_legislation/consult_liveindex.cfm

| **Contact for enquiries:** James Templeton | **Telephone:** 020 7270 5000 |
|---|---|

---

**What is the problem under consideration? Why is government intervention necessary?**

Timely, comprehensive and complete reporting by companies is a crucial element in promoting the allocative efficiency of capital markets. Lack of certainty as to the existing common law position with regard to issuer liability in damages for inaccurate statements made to the market was partially resolved by the introduction of a statutory liability regime. These proposals aim to extend the existing statutory regime to ensure complete clarity.

---

**What are the policy objectives and the intended effects?**

The purpose of the statutory regime is to clarify the existing common law position with regard to issuer liability in damages for inaccurate statements made to the market. The proposed extension of the statutory regime, working in conjunction with the FSA public law regime, aims to ensure optimal incentives for prompt and accurate disclosures, without encouraging costly speculative litigation and settlements by issuers based on a desire to terminate litigation, rather than on the harm done to shareholders.

---

**What policy options have been considered? Please justify any preferred option.**

The option of extending the statutory regime to wider classes of issuers and statements by issuers is compared against the base case of making no changes to the existing statutory regime. The preferred option of extension was selected on the basis of the recommendations by Professor Davies' review, reflecting his conclusion as to the policy mix that best balances the rights of investors with the incentives placed on issuers..

**B**    **I**MPACT ASSESSMENT

---

> **When will the policy be reviewed to establish the actual costs and benefits and the achievement of the desired effects?**
>
> The proposed extension to the regime is the result of an extensive independent policy review led by Professor Paul Davies QC. The Government will monitor the impact of the extended regime and review in due course.

*[signature]*

Economic Secretary to HM Treasury

17 July 2008

## Summary: Analysis & Evidence

| Policy Option: | Description: **Extend the statutory liability regime to cover a wider range of disclosures by a larger group of issuers of securities.** |
|---|---|

### COSTS

| ANNUAL COSTS | | Description and scale of **key monetised costs** by 'main affected groups' : |
|---|---|---|
| **One-off** (Transition) | **Yrs** | One off costs of legal advice on the changes to the statutory regime and ongoing costs of increased levels of litigation |
| £3.5m – 5.2 m | | |
| **Average Annual Cost** (excluding one-off) | | |
| £0.4m–1.3m p.a. | 10 | **Total Cost** (PV)     £11.7m |

Other **key non-monetised costs** by 'main affected groups'

### BENEFITS

| ANNUAL BENEFITS | | Description and scale of **key monetised benefits** by 'main affected groups' : |
|---|---|---|
| **One-off** | **Yrs** | Ongoing benefits of more reliable and detailed reporting reflected in a small reduction in the cost of equity capital. |
| £ | | |
| **Average Annual Benefit** (excluding one-off) | | |
| £1.7m p.a. | 10 | **Total Benefit** (PV)     £14.6m |

Other **key non-monetised benefits** by 'main affected groups'
Easier for parties harmed by fraudulent misstatements to secure compensation.  More security for issuers in making detailed disclosures to the market.

Key Assumptions/Sensitivities/Risks

| Price Base Year | Time Period Years | Net Benefit Range (NPV) £ **N/A** | NET BENEFIT (NPV Best estimate) £ **N/A** |
|---|---|---|---|

**B**  IMPACT ASSESSMENT

| | |
|---|---|
| What is the geographic coverage of the policy/option? | UK wide |
| On what date will the policy be implemented? | 2008 |
| Which organisation(s) will enforce the policy? | N/A |
| What is the total annual cost of enforcement for these organisations? | £ to be confirmed |
| Does enforcement comply with Hampton principles? | Yes |
| Will implementation go beyond minimum EU requirements? | N/A |
| What is the value of the proposed offsetting measure per year? | £ N/A |
| What is the value of changes in greenhouse gas emissions? | £ N/A |
| Will the proposal have a significant impact on competition? | No |

| Annual cost (£-£) per organisation (excluding one-off) | Micro voluntary | Small voluntary | Medium | Large |
|---|---|---|---|---|
| Are any of these organisations exempt? | Yes | Yes | N/A | N/A |

| **Impact on Admin Burdens Baseline** (2005 Prices) | | | (Increase - Decrease) |
|---|---|---|---|
| Increase of    £ N/A | Decrease of    £ N/A | **Net Impact   £**   N/A | |

Key:   | Annual costs and benefits: Constant Prices |    | (Net) Present Value |


## Evidence Base (for summary sheets)

**Partial Impact Assessment**

### Proposal

A statutory liability regime with regard to issuer liability in damages for inaccurate statements made to the market upon which investors rely to their detriment was introduced in the Companies Act 2006 which inserted section 90A into the Financial Services and Markets Act 2000. These proposals would extend the statutory regime to cover a wider range of statements by issuers (ad hoc statements and dishonestly delayed statements, as well as periodic disclosures) admitted to trading on a wider range of markets (UK and EEA regulated markets and MTFs, rather than just UK regulated markets).

### Objective

Timely, comprehensive and complete reporting by companies is a crucial element in promoting the allocative efficiency of capital markets. The statutory regime introduced in 2006 clarified the existing position with regard to issuer liability in damages by imposing liability for fraudulent misstatements in respect of disclosures under the Transparency Directive by issuers of securities admitted to trading on regulated markets. These proposals would extend the regime to ensure that the benefits of clarification are extended throughout the market for tradable securities. The revised statutory liability regime would supplement public enforcement through FSA investigation and sanctions, to ensure optimal incentives for prompt and accurate disclosures, without encouraging costly speculative litigation and settlements by issuers based on a desire to terminate litigation rather than on the harm done to shareholders.

### Options

There was strong support from issuers and investors for the extension of the statutory liability regime in Professor Davies' consultation. Accordingly, we have not investigated the option of reversion to the previous common law regime. This impact assessment has been prepared on the basis of the option recommended by Professor Davies, which reflects his conclusion as to the policy mix that best balances the rights of investors with the incentives placed on issuers, and after he had canvassed opinion extensively in both the issuer and investor communities. It assesses the incremental costs and benefits of this option against the base case of making no changes to the existing statutory liability regime.

### Who is affected

Approximately 3,500 issuers of securities admitted to trading on regulated markets (e.g., the main market of the LSE) and on MTFs (such as AIM and PLUS-quoted) in the UK and the investors in those securities. The regime will be extended to ad hoc and dishonestly delayed disclosures for issuers with securities admitted to trading on regulated markets, and to periodic, ad hoc and dishonestly delayed disclosures by issuers with securities admitted to trading on MTFs. A small number of UK issuers admitted to trading on regulated markets and MTFs in other EEA states will also be affected.

## Costs and benefit analysis

The key to identifying the costs and benefits is a robust understanding of the changes in behaviour expected to result from extensions to the statutory regime. The perceptions of the parties affected are a critical signal of expectations about the likely changes to behaviour.  It is significant that both issuers and investors support regulatory intervention by means of an extension to the existing statutory regime, reflecting a belief that the benefits exceed the costs.

In general issuers and their advisers have been the more enthusiastic promoters of the statutory regime.   While it is acknowledged that clarifying issuer obligations by means of a statutory liability regime could increase the overall level of litigation, this additional litigation will be inflicted on parties whose behaviour can be categorised as dishonest.  The use of a demanding fraud test for misstatement means that the majority of issuers will face less risk of speculative litigation and less risk of the courts unexpectedly extending remedies for reckless or negligent misstatement.

Institutional investors have also generally supported a statutory regime, although less enthusiastically than issuers.  They have welcomed the facilitation of legal action in respect of fraudulent misstatements and dishonest delay but have been concerned by the demanding threshold for success and the fact that statutory clarification reduces the potential for the courts to extend remedies in this area.

## Issuer disclosure costs

Some issuers, particularly larger companies with an equity listing, will wish to seek advice on the impact of extending the statutory regime.  Equally, larger issuers with an equity listing tend to be admitted to trading on regulated markets and thus are more likely to be familiar with the existing regime.  Issuers range widely in size, with a significant tail of smaller issuers who are less likely to take advice.   A reasonable estimate of the one-off cost over the range of issuers would be £1,000 - £1,500 per issuer.  Over 3,500 issuers, the potential cost could be in the range of £3.5 – 5.25 million.

There is likely to be little impact on the day-to-day checking process by issuers.  Issuers and directors already face significant financial and reputational penalties for negligent misstatements.  In line with the requirements set out in the Combined Code (for issuers on the main market) and associated guidance, they are required to have robust disclosure assurance processes, which are capable of detecting at the less demanding threshold of accidental or negligent misstatements, as well as the fraudulent misstatements that are intended to trigger liability under a statutory regime.  Moreover, the statutory regime is intended primarily to clarify issuer liability, rather than to expand its scope.  We would not expect scrutiny costs to increase materially if the risk of liability does not change significantly.  Indeed, the greater certainty for issuers and their advisors provided by the statutory regime has the potential to limit or offset growth in the depth and costs of scrutiny.  We are not aware of costs increasing significantly with the implementation of the initial statutory regime and see little reason for material changes to processes as a result of extending the statutory regime.

It has been suggested that expanding the range of statements covered by the regime (from periodic disclosures under the Transparency Directive to include a wide range of ad hoc disclosures) may divert disclosures to recognised information services from other publication media.  Issuers would incur any incremental costs from using the recognised information service, while the services themselves could be at risk of overloading.

We think this is unlikely.  The bulk of the disclosures included in the extended statutory regime – periodic and ad hoc disclosures – are already made by means of a recognised information service.


Comments to Professor Davies' review suggest that the risk of overloading is not seen as significant. It should also be ameliorated by the proposal that a disclosure published elsewhere is subject to the statutory regime if specifically referenced in a disclosure to a recognised information service.

### Litigation costs

However, clarifying the liability for misstatement, albeit subject to a demanding test of issuer fraud, is likely to increase the incidence of litigation in cases of fraudulent misstatement. The increase is likely to be small. But the potential costs of such cases are significant, even when settled before trial. It is reasonable to envisage perhaps 2 – 3 cases over the next ten years, with costs in the region of £1-2 million for each side. It is reasonable to expect that a similar number of cases would be settled before trial with costs of £0.25 – 0.5 million for each side. This gives a ten year cost range of £5 – 15 million, or an annual average transaction cost range of £0.5 - £1.5 milllion.

Note that the costs of damages or settlement are excluded from the IA. These are not a transaction cost, but a sanctioned transfer of wealth between parties, and as such do not represent an economic cost.

The statutory regime has deliberately been shaped, principally by selecting a demanding fraud test for liability, to minimise the potential for speculative litigation and the corresponding pressure on issuers to settle in order to terminate litigation, rather than compensate for harm done to shareholders. Accordingly, we do not anticipate incremental costs from speculative litigation.

### Investment analysis costs

Investors already undertake a broad range of investment analysis and verification and engage with issuers, to improve the quality of their own investment decisions and to improve the performance of the companies in which they invest. There is no reason to expect the extension of the statutory regime to affect these ongoing processes.

### Benefits

The benefits of extending the statutory regime are harder to calculate reliably, although this has not prevented the proposals from gathering widespread support from affected parties.

By clarifying the liability for and thus increasing the likelihood of litigation and substantial damages in respect of fraudulent misstatement, we expect a statutory regime to reduce the incidence of these misstatements. But the relationship is far from a simple linear one. Directors contemplating dishonesty already face an array of penalties and are likely to mislead only in extreme and pressured circumstances.

Such fraudulent misstatements do harm in two ways. First, they transfer wealth between parties. This can be unjust, but does not impose a net economic cost (or benefit). Secondly, the risk of such transfers increases the cost of capital to issuer and the risk to investors with regard to any particular portfolio of investments.

Reducing the incidence of fraudulent misstatement increases the quality of disclosure and improves confidence in reporting. This is an unambiguous benefit to investors, reducing the risk-adjusted return required from an investment, and similarly for issuers, leading to a comparable reduction in the cost of capital. We have not been able to identify any empirical evidence as to the magnitude of the reduction in the risk-adjusted cost of capital or how it might affect different entities. As a

large number of factors impact on the cost of capital it would not be feasible to isolate the impact of this single driver. However, by way of illustration, if the effect of the regime was to reduce the cost of equity capital (thus excluding debt capital) by a very small amount, of the order of one hundredth of a basis point (or 0.0001% p.a.) the effect on UK regulated markets and MTFs with a collective market capitalisation of £1.7 trillion would amount to £1.7 million p.a..

The greater likelihood of litigation and substantial civil damages in cases of fraudulent misstatement will increase the pressure on fraudulent issuers to settle promptly with FSA without admission of liability, even if this means larger fines and restitution to investors. More and faster settlements would mean lower legal and administrative costs. It is not fanciful to assume that these could be of the order of 10 – 20% of litigation costs, or say £100,000 – 200,000 p.a.

Investors would also benefit by being able to secure redress for harm done to them. Again, the compensation is not an economic benefit for the purpose of the IA, but a transfer of wealth from the issuer to the successful litigants. In effect, it represents a transfer from all shareholders in the issuer to a sub-set of shareholders (those who transacted on the basis of a fraudulent misstatement).

### Small firms impact test

The statutory liability regime will apply to 3,500 issuers with securities admitted to trading on regulated markets and MTFs. These are invariably among the largest companies. It will not apply as a rule to the approximately 40,000 medium sized companies in the UK, or the much larger number of small companies.

### Competition

The proposed statutory liability regime is not expected to reduce competition. By improving the quality of disclosure by issuers with securities admitted to trading it would be expected to improve the range of investment opportunities to investors

### Legal aid

Commercial civil action is rarely covered by legal aid and there is no obvious reason for this to change.

### Enforcement and sanctions

The statutory liability regime creates obligations in respect of statements by issuers of securities admitted to trading on a regulated market or an MTF. It is enforced by means of civil action by parties alleging harm and the remedy is damages. It exists alongside a public law regime of FSA rules made under FSMA 2000 and governing disclosures by issuers. The FSA has the power to impose criminal and financial penalties and to order restitution.

### Monitoring and Review

No formal review is scheduled. The Government will monitor the impact of the regime to ensure it delivers the intended policy benefits.

# Specific Impact Tests: Checklist

Use the table below to demonstrate how broadly you have considered the potential impacts of your policy options.

**Ensure that the results of any tests that impact on the cost-benefit analysis are contained within the main evidence base; other results may be annexed.**

| Type of testing undertaken | Results in Evidence Base? | Results annexed? |
|---|---|---|
| Competition Assessment | Yes | No |
| Small Firms Impact Test | Yes | No |
| Legal Aid | No | No |
| Sustainable Development | No | No |
| Carbon Assessment | No | No |
| Other Environment | No | No |
| Health Impact Assessment | No | No |
| Race Equality | No | No |
| Disability Equality | No | No |
| Gender Equality | No | No |
| Human Rights | No | No |
| Rural Proofing | No | No |

*Draft Regulations laid before Parliament under section 429(2) of the Financial Services and Markets Act 2000, for approval by resolution of each House of Parliament.*

---

### D R A F T   S T A T U T O R Y   I N S T R U M E N T S

---

# 2008 No.

# COMPANIES

# The Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2008

|  |  |  |
|---|---|---|
| *Made* - - - - | | \*\*\* |
| *Coming into force* - - | | \*\*\* |

The Treasury make these Regulations in exercise of the powers conferred on them by section 90B of the Financial Services and Markets Act 2000(**a**):

### Citation and commencement

**1.**—(1) These Regulations may be cited as the Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2008.

(2) These Regulations come into force on  [ ] 2008.

### Amendments to the Financial Services and Markets Act 2000

**2.**—(1) The Financial Services and Markets Act 2000 is amended as follows.

(2) For section 90A (compensation for statements in certain publications), substitute—

> **"Compensation: liability of issuers in connection with published information**
>
> **90A.** Schedule 10A makes provision about the liability of issuers of transferable securities to pay compensation to persons who have acquired or disposed of securities and who have suffered loss in respect of those securities as a result of—
>
> > (a)  a misleading statement or dishonest omission in certain published information relating to the securities; or
> >
> > (b)  a dishonest delay in publishing such information."

(3) After Schedule 10, insert the Schedule 10A contained in the Schedule to these Regulations.

---

(**a**)  2000 c.8;  sections 90A and 90B were inserted by section 1270 of the Companies Act 2006 (c. 46).

**Transitional provision**

**3.**—(1) The amendments made to the Financial Services and Markets Act 2000 by these Regulations have effect in relation to information first published on or after [commencement date].

(2) Section 90A of that Act, in the form inserted by the Companies Act 2006, continues to apply to information first published before that date.

*name*
*name*
date                                    Two of the Lords Commissioners of Her Majesty's Treasury

SCHEDULE                    Regulation 2(3)

"SCHEDULE 10A                    Section 90A

COMPENSATION: LIABILITIES IN CONNECTION WITH
PUBLISHED INFORMATION

PART 1

SCOPE OF THIS SCHEDULE

**Securities to which this Schedule applies**

**1.**—(1) This Schedule applies to transferable securities that meet the following two conditions.

(2) The first condition is that the securities—

  (a) are admitted to trading on a regulated market or multilateral trading facility situated or operating in the United Kingdom, or

  (b) are admitted to trading on a regulated market or multilateral trading facility situated or operating elsewhere in the EEA and the United Kingdom is the home State of the issuer.

(3) The second condition is that the securities are admitted to trading as mentioned in sub-paragraph (2) by or with the consent of the issuer.

(4) For the purposes of this Schedule the United Kingdom is the home State of an issuer of securities—

  (a) in the case of securities in relation to which the transparency obligations directive applies, if the United Kingdom is the home Member State for the purposes of that directive (see article 2.1 of the directive);

  (b) in any other case, if the issuer has its registered office or, if it does not have a registered office, its head office in the United Kingdom.

**Published information to which this Schedule applies**

**2.**—(1) This Schedule applies to—

  (a) information published by the issuer of the securities by means of a recognised information service; and

  (b) information published by the issuer of securities otherwise than by means of a recognised information service if the availability of the information has been announced by the issuer by means of such a service.

(2) This Schedule applies whether or not the information is required to be published or announced, or to be published or announced by such means.

(3) A "recognised information service" means a service—

  (a) used in pursuance of article 21 of the transparency obligations directive for the dissemination of regulated information, or

  (b) otherwise used by issuers of securities for the dissemination of information required to be published by the rules of a regulated market or multilateral trading facility.

**Exclusion of listing particulars and prospectuses**

**3.**—(1) This Schedule does not apply to information contained in listing particulars or a prospectus.

(2) In sub-paragraph (1), "listing particulars" includes supplementary listing particulars and "prospectus" includes a supplementary prospectus.

# PART 2

## LIABILITY IN CONNECTION WITH PUBLISHED INFORMATION

### Liability of issuer for misleading statement or dishonest omission

**4.**—(1) The issuer of securities to which this Schedule applies is liable to pay compensation to a person who has—

   (a)   acquired or disposed of such securities issued by it, and

   (b)   suffered loss in respect of them as a result of—

   (i)   any untrue or misleading statement in published information to which this Schedule applies, or

   (ii)   the omission from any such published information of any matter required to be included in it.

(2) The issuer is liable in respect of an untrue or misleading statement only if a person discharging managerial responsibilities within the issuer knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading.

(3) The issuer is liable in respect of the omission of any matter required to be included in published information only if a person discharging managerial responsibilities within the issuer knew the omission to be a dishonest concealment of a material fact.

(4) A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired or disposed of the relevant securities—

   (a)   in reliance on the information in question, and

   (b)   at a time when, and in circumstances in which, it was reasonable for him to rely on it.

### Liability of issuer for dishonest delay in publishing information

**5.**—(1) The issuer of securities to which this Schedule applies is liable to pay compensation to a person who has—

   (a)   acquired or disposed of such securities issued by it, and

   (b)   suffered loss in respect of them as a result of delay by the issuer in publishing information to which this Schedule applies.

(2) The issuer is liable only if a person discharging managerial responsibilities within the issuer—

   (a)   acted dishonestly in delaying the publication of the information, and

   (b)   by the delay intended to enable a gain to be made (by themselves or another) or to cause loss to another or expose another to a risk of loss.

(3) In sub-paragraph (2), "gain" and "loss" have the same meaning as in sections 2 to 4 of the Fraud Act 2006 (see section 5 of that Act).

### Exclusion of other liabilities

**6.**—(1) The issuer is not subject—

(a) to any other liability than that provided for by paragraph 4 in respect of loss suffered as a result of reliance by any person on—

  (i) an untrue or misleading statement in published information to which this Schedule applies, or

  (ii) the omission from any such published information of any matter required to be included in it;

(b) to any other liability than that provided for by paragraph 5 in respect of loss suffered as a result of delay in the publication of information to which this Schedule applies.

(2) A person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss.

(3) References in sub-paragraphs (1) or (2) to a person being subject to a liability include a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.

(4) This paragraph does not affect—

(a) the rights of a holder of securities in his capacity as such;

(b) the powers conferred by sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution);

(c) liability for a civil penalty;

(d) liability for a criminal offence.


# PART 3

## SUPPLEMENTARY PROVISIONS

**Interpretation**

**7.**—(1) In this Schedule—

 "multilateral trading facility" has the meaning given in article 4.1.15 of the markets in financial instruments directive;

"regulated market" has the meaning given in article 4.1.14 of that directive.

(2) References in this Schedule to the issuer of securities are—

(a) in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading as mentioned in paragraph 1(2), to the issuer of the securities represented;

(b) in any other case, to the person who issued the securities.

(3) References in this Schedule to the acquisition or disposal of securities include—

(a) acquisition or disposal of any interest in securities, or

(b) contracting to acquire or dispose of securities or of any interest in securities.

(4) For the purposes of this Schedule the following are persons "discharging managerial responsibilities" within an issuer—

(a) any director of the issuer (or person occupying the position of director, by whatever name called);

(b) in the case of an issuer whose affairs are managed by its members, any member of the issuer;

(c) in the case of an issuer that has no persons within paragraph (a) or (b), any senior executive of the issuer having responsibilities in relation to the information in question or its publication.

(5) The following definitions (which apply generally for the purposes of Part 6 of this Act) do not apply for the purposes of this Schedule:

(a)  section 102A(6) (meaning of "issuer");

(b)  section 102C (meaning of "home State" in relation to transferable securities);

(c)  until paragraph 11(2) of Schedule 15 to the Companies Act 2006 (amendment of definition of "regulated market") comes into force, section 103(1) ("regulated market")."

ISBN 978-1-84532-480-3



# "Improving Access to Justice through Collective Actions"

# Developing a More Efficient and Effective Procedure for Collective Actions

# FINAL REPORT

# A Series of Recommendations to the Lord Chancellor

**November 2008**

**EDITORS**
John Sorabji
Michael Napier CBE QC
Robert Musgrove

**CONTRIBUTING AUTHORS**
Michael Black QC
Ingrid Gubbay
His Honour Judge Graham Jones
Alistair Kinley
Professor Rachael Mulheron
Robert Musgrove
John Sorabji

2

# CONTENTS

**Page
Number**

9          **Foreword**

11         **Introduction**

15         **Part 1 – Executive Summary**

           Key Assumptions (1-4)
           Key Findings (1-11)
           Recommendations (1-10)

25         **Part 2 - Existing Law and Procedure**

           –  Introduction

           Procedural
             - Test Cases
             - Consolidation of Proceedings and the Single Trial of Multiple Actions
             - Group Litigation Orders
             - Representative Actions

37         **Part 3 – Comparative Law – Collective Redress in Other Jurisdictions**

           –  United States' Federal Regime
           –  Canada's Provincial Regime
           –  Australia
           –  Europe

47        **Part 4 - The Impetus for Reform**


The Impetus for Reform – The Policy context and Political Impetus

– Summary
– Introduction
–
– UK (England and Wales)
  Policy Activity – A Brief Chronology
  – Group Litigation Orders (CPR)
  – Representative Claims (LCD 01)
  – Representative Actions in Consumer Protection Legislation (DTI 06)
  – Private Actions in Competition Law (OFT 07)
  – Discrimination Law Review (05 – 08)

– Europe
  – Collective Consumer Redress (EC 05 onwards)
  – Anti-Trust Claims
  – Collective Consumer Redress

– Conclusion


67        **Part 5 - Public Enforcement and The Role of Regulators**


– Ombudsmen
– Regulators


77        **Part 6 - Private Enforcement**


- Introduction
- Private Enforcement: Definition
- Reasons for the Lack of Private Enforcement Actions under existing mechanisms
- Representative Actions
- Group Litigation Orders
- The New Consumer Mechanism
- Suggested Reforms
- Designated Bodies
- Ad hoc Bodies

97        **Part 7 - Evidence of Need for Reform**

          – Overall Conclusion
          – Substantiating Reasons for this Conclusion
          – Concluding Remarks


103       **Part 8 – Implementation – Substantive Law or Rules of Court?**

Does the implementation of an "Opt-out" Collective Action regime require the Enactment of Substantive Legislation or may it be achieved by changes to the Civil procedure Rules?

          - Introduction
          - Background
          - Summary of Rachael Mulheron's Views
          - Summary of John Sorabji's Views
          - Discussion
          - Conclusions
          - Postscript


137       **Part 9 –  An Improved Collective Procedure**

**RECOMMENDATION  1 –** A generic collective action should be introduced. Individual and discrete collective actions could also properly be introduced in the wider civil context i.e., before the CAT or the Employment Tribunal to complement the generic civil collective action.

**RECOMMENDATION 2 –** Collective claims should be capable of being brought by a wide range of representative parties: individual representative claimants or defendants, designated bodies, and ad hoc bodies.

**RECOMMENDATION 3 –** Collective claims may be brought on an opt-in or opt-out basis, subject to court certification (see Recommendation 4). Where an action is brought on an opt-out or opt-in basis the limitation period for class members should be suspended pending a defined change of circumstance.

**RECOMMENDATION 4 –** No collective claim should be permitted to proceed unless it is certified by the court as being suitable to proceed as such. Certification should be subject to a strict certification procedure.

**RECOMMENDATION 5 -** Appeals from either positive certification or a refusal to certify a claim should be subject to the current rules on permission to appeal from case management decisions. Equally, all other appeals brought within collective action proceedings should be subject to the normal appeal rules. Class members may seek to appeal final judgments and settlement approvals.

**RECOMMENDATION 6 –** Collective claims should be subject to an enhanced form of case management by specialist judges. Such enhanced case management should be based on the recommendations of Mr Justice Aikens' Working Party which led to the  Complex Case Management Pilot currently in the Commercial Court

**RECOMMENDATION 7 -** Where a case is brought on an opt-out or opt-in basis, the court should have the power to aggregate damages in an appropriate case. The Civil Justice Council recommends that the Lord Chancellor conduct a wider policy consultation into such a reform given that it affects both substantive and procedural law.

**RECOMMENDATION 8 –** To protect the interests of the represented class of claimants any settlement agreed by the representative claimant and the defendant(s) must be approved by the court within a 'Fairness Hearing' before it can bind the represented class of claimants. In approving a settlement or giving judgment on a collective claim the court should take account of a number of issues in order to ensure that the represented class are given adequate opportunity claim their share of the settlement or judgment.

**RECOMMENDATION 9 -** There should be full costs shifting.

**RECOMMENDATION 10 -** Unallocated damages from an aggregate award should be distributed by a trustee of the award according to general trust law principles. In appropriate cases such a *cy-près* distribution could be made to a Foundation or Trust.

**RECOMMENDATION 11 –** While most elements of a new collective action could be introduced by the Civil Procedure Rule Committee, it is desirable that any new action be introduced by primary legislation.

185    **Part 10 – Draft Collective Proceedings Act and Draft Rules of Court**

- Draft Collective Proceedings Act
- Draft Rules of Court

227    **APPENDICES**

Summaries of Stakeholder Consultations

**Appendix A** – First Event, October 2006
– Second Event, November 2007
**(227)** – Third Event, March 2008
– Fourth Event, June 2008

**Appendix B**    Organisations who have contributed to stakeholder events

**(235)**

**Appendix C**    CJC attendance at other consumer events

**(237)**

**Appendix D**    Material reviewed in the study

**(239)**

**Appendix E**    Executive Summary – Improved Access to Justice Alternative Funding
Structures
**(245)**

**Appendix F**    Executive Summary - Improving Access to Justice - Funding Options and
Proportionate Costs
**(251)**

**Appendix G**    European Union – Ten Consumer Benchmarks

**(257)**

**Appendix H
(259)**                    Minutes of Stakeholder Consultation Events (Chatham House versions)
- October 2006; November 2007; March 2008; June 2008


**Appendix I
(355)**                    Protective Costs Orders – Summary of Case Law


**Appendix J
(367)**                    CPR 3.1 – The Court's Case Management Powers


**Appendix K
(369)**                    Executive Summary – Report and Recommendations of the Commercial Court
Long Trials Working Party


**Appendix L
(379)**                    Mulheron, *Collective Redress Procedure – Sixty Design Options*


**Appendix M
(389)**                    Sorabji, *Class Actions: Reinventing the Wheel*


**Appendix N
(413)**                    Mulheron, *Implementing and Opt-Out Collective Action for England and Wales:
Legislation versus Court Rules*


**Appendix O
(435)**                    An Act respecting the Class Action: Quebec


**Appendix P
(451)**                    Glossary of terms


**Appendix Q
(455)**                    European Economic and Social Committee, *Opinion on Defining the collective
actions system and its role in the context of Community Consumer Law*



**FOREWORD**

This report was published initially in July 2008 as an interim draft. It was published in order to enable various stakeholders and other interested parties to assess the nature of the proposals that would ultimately be made.

It was also published in draft form in order to enable the authors to produce, at the request of a number of interested parties, a set of draft Civil Procedure Rules and a draft Collective Action Act. The aim of both is to stimulate debate and to provide concrete, albeit indicative, examples of the form such rules and statutory provisions could take consistently with the substantive recommendations made. Further research has also been carried out on the present Group Litigation Order in order to assess if, and how, it might be improved in a reformed landscape.

Additionally, given the importance which the Civil Justice Council places on the indivisibility of the right of effective access to justice for claimants and defendants, further work had been carried out to assess how best to ensure that any proposed reform is one which is consistent with equality of arms.

Finally, I would like to thank all those who have contributed to the drafting of this report.

John Sorabji

November 2008

10

## "Improving Access to Justice through Collective Actions"

## Developing a More Efficient and Effective Procedure
## for Collective Actions

**INTRODUCTION**

1. This paper is published as **formal advice to the Lord Chancellor**.

2. The paper makes a series of recommendations that aim to improve, through the proposed civil procedure reforms, access to justice for citizens through collective actions.[1] The recommendations do not seek to change, introduce, or remove citizens' substantive legal rights.

3. The Civil Justice Council has consulted extensively on the findings and recommendations through a series of stakeholder events held throughout 2006-2008. A list of organisations who have contributed appears at **Appendix B**. The authors have also engaged in a considerable number of other consumer events and consultations, a number of which are listed at **Appendix C**. The recommendations it makes are supported by an overwhelming majority view of stakeholders consulted, unless otherwise indicated.

4. The authors have reviewed a substantial volume of research material from a considerable number of common law and civilian jurisdictions. A non-exhaustive list of material reviewed appears at **Appendix D**. It should be noted that the views expressed in this report are not necessarily the individual views of the authors, whose contributions reflected their own areas of expertise.

---

[1] See Glossary for definition.

5. This report should be read in conjunction with "The Future Funding of Litigation -Alternative Funding Structures" published in June 2007, which makes specific recommendations for the funding of collective or multi-party claims (Executive Summary at **Appendix E**). It should also be read in conjunction with "Improved Access to Justice – Funding Options and Proportionate Costs, published in August 2005 (Executive Summary at **Appendix F**).

6. The Civil Justice Council remains committed to the overriding principles published in previous reports.[2] These principles state that the delivery of access to justice is dependent upon

(i)     a meritorious case; the participants having at the outset access to means of funding their case;

(ii)    the lawyers on each side having at the outset access to reasonable remuneration;

(iii)   the cost of (ii) and (iii) being proportionate to what is at stake; and

(iv)    the availability of an efficient and properly resourced civil justice system.

7. The Civil Justice Council intends that the reforms proposed in this report are not only consistent with these principles, but in being so are equally consistent with the principles Lord Woolf identified as basic and necessary features of a civil justice system capable of delivering effective access to justice for all, claimant and defendant alike. Those principles can be summarised as follows. A civil justice system:

1.  should be just in the results it and they deliver;

2.  should be fair and be seen to be fair;

3.  should ensure litigants have an equal opportunity, regardless of their

---

[2] E.g., *The Future of Litigation Funding – Alternative Funding Structures*, (CJC) (June 2007) at 7.

resources, to assert or defend their legal rights;

4.  should ensure that every litigant has an adequate opportunity to state his or her own case and answer their opponent's;

5.  should treat like cases alike (and conversely treat different cases differently);

6.  should deal with cases efficiently and economically, in a way which is comprehensible to those using the civil justice system and which provides litigants with as much certainty as the litigation permits; and do so within a system best organised to realise these principles.[3]

8.  It is these principles, which reflect Lord Woolf's commitment to procedural justice now being as important as substantive justice, which guide the Civil Justice Council in making its recommendations.

9.  The Civil Justice Council **invites the Lord Chancellor to provide a formal response**.

---

[3] Lord Woolf MR, *Access to Justice: Interim Report to the Lord Chancellor on the Civil Justice System in England and Wales* (HMSO) (1995), Chapter 1.3.

14



**PART 1**

**EXECUTIVE SUMMARY**

**KEY ASSUMPTIONS, FINDINGS and RECOMMENDATIONS**

**KEY ASSUMPTIONS**

**Key Assumption 1 -**

It is unrealistic to expect the Government will provide the funds to enable a new method of resolving collective claims outside the civil process.

**Key Assumption 2 -**

Ombudsman or Regulatory Systems are not primarily suited to resolve the very wide range of detriment that can give rise to the need for large scale remedial action.

**Key Assumption 3 -**

Private enforcement is to be preferred to state funded regulatory intervention due to the differing primary aims of private enforcement and regulation.

**Key Assumption 4 –**

Collective action reform is consistent with the Government's policy statements supportive of collective private action and is in addition desirable in the light of European policy which is focused on improving collective redress for consumers.[4]

---

[4] E.g., Her Majesty's Treasury, Budget 2007, (HC 342) at 3.45 – 3.48.

16



**KEY FINDINGS**

**KEY FINDING 1 –**

**Existing procedure does not provide sufficient or effective access to justice** for a wide range of citizens, particularly but not exclusively consumers, small businesses, employees wishing to bring collective or multi-party claims.

**KEY FINDING 2 –**

Existing collective actions are **effective in part**, but **could be improved** considerably **to promote better enforcement of citizens' rights**, whilst protecting defendants from non-meritorious litigation.

**KEY FINDING 3 -**

There is **overwhelming evidence** that meritorious claims, which could be brought are currently not being pursued.

**KEY FINDING 4 -**

There are meritorious claims that could fairly be brought with **greater efficiency and effectiveness** on a collective rather than unitary basis.

**KEY FINDING 5 -**

Effective collective actions **promote competition and market efficiency**, consistent with the Government's economic principles and objectives, benefiting individual citizens, businesses and society as a whole. Equally they are effective mechanisms through which individual rights can be upheld.

**KEY FINDING 6 -**

Collective claims can **benefit defendants** in resolving disputes more economically and efficiently, with greater conclusive certainty than can arise through unitary claims.

**KEY FINDING 7 -**

The Court is the most appropriate body to ensure that any new collective procedure is **fairly balanced as between claimants and defendants**, the latter of which should be properly protected from unmeritorious, vexatious or spurious claims as well as from so-called blackmail claims.

**KEY FINDING 8 -**

The proposed new collective procedure should **apply to all civil claims** which affect multiple claimants.

**KEY FINDING 9 -**

There should be **no presumption** as to whether collective claims should be brought on an opt-in or opt-out basis. The Court should decide, according to new rules, practice directions and/or guidelines, which mechanism is the most appropriate for any particular claim taking into account all the relevant circumstances. In assessing whether opt-in or opt-out is most appropriate the court should be particularly mindful of the need to ensure that neither claimants' nor defendants' substantive legal rights should be subverted by the

choice of procedure.

**KEY FINDING 10 -**

The majority of the proposed procedural reforms could be introduced by **Rules of Court** (the CPR), developing existing procedure and principles laid down in case law. Primary legislation may be considered a more complete option to introduce a modern collective action and will be necessary, given the jurisdictional basis of the civil courts and other civil fora, if discrete reform is introduced in such fora as the CAT or the ET.

20



## SUMMARY OF RECOMMENDATIONS

**RECOMMENDATION 1**

A generic collective action should be introduced. Individual and discrete collective actions could also properly be introduced in the wider civil context i.e., before the CAT or the Employment Tribunal to complement the generic civil collective action.

**RECOMMENDATION 2**

Collective claims should be brought by a wide range of representative parties: individual representative claimants or defendants, designated bodies, and ad hoc bodies.

**RECOMMENDATION 3**

Collective claims may be brought on an opt-in or opt-out basis, subject to court certification (see Recommendation 4). Where an action is brought on an opt-out or opt-in basis the limitation period for class members should be suspended pending a defined change of circumstance.

**RECOMMENDATION 4**

No collective claim should be permitted to proceed unless it is certified by the court as being suitable to proceed as such. Certification should be subject to a strict certification procedure.

**RECOMMENDATION 5**

Appeals from either positive certification or a refusal to certify a claim should be subject to the current rules on permission to appeal from case management decisions. Equally, all other appeals brought within collective action proceedings should be subject to the normal appeal rules. Class members may seek to appeal final judgments and settlement

approvals.[5]

## RECOMMENDATION 6

Collective claims should be subject to an enhanced form of case management by specialist judges. Such enhanced case management should be based on the recommendations of Mr Justice Aikens' Working Party which led to the Complex Case Management Pilot currently in the Commercial Court.

## RECOMMENDATION 7

Where a case is brought on an opt-out or opt-in basis, the court should have the power to aggregate damages in an appropriate case. The Civil Justice Council recommends that the Lord Chancellor conduct a wider policy consultation into such a reform given that it effects both substantive and procedural law.

## RECOMMENDATION 8

To protect the interests of the represented class of claimants any settlement agreed by the representative claimant and the defendant(s) must be approved by the court within a 'Fairness Hearing' before it can bind the represented class of claimants. In approving a settlement or giving judgment on a collective claim the court should take account of a number of issues in order to ensure that the represented class are given adequate opportunity claim their share of the settlement or judgment.

## RECOMMENDATION 9

There should be full costs shifting.

## RECOMMENDATION 10

Unallocated damages from an aggregate award should be distributed by a trustee of the award according to general trust law principles. In appropriate cases such a *cy-près* distribution could be made to a Foundation or Trust.

---

[5] CPR 52.

**RECOMMENDATION 11**

While most elements of a new collective action could be introduced by the Civil Procedure Rule Committee, it is desirable that any new action be introduced by primary legislation.

24



**PART 2**

**EXISTING LAW AND PROCEDURE**

**Summary**

This chapter sets out the current mechanisms for managing claims which involve multi-parties, either claimant or defendant.

**INTRODUCTION**

1.     There are at present a number of different procedural mechanisms which can be used to manage multi-party litigation in the civil justice system of England and Wales (England).[6] They are: the test case; consolidation and single trial of multiple actions; the Group Litigation Order; and the representative action.

**Test Cases**

2.     The simplest way in which the court can manage efficiently a multiplicity of individual claims is via the use of the test case. Unlike other jurisdictions, such as Austria or Germany,[7] England does not have a statutory or a formal test case procedure.[8] English civil procedure has traditionally provided the court with the necessary power to manage litigation so that where a large number of individual claims, each raising a common, or perhaps several common, factual or legal issues all but one or a small number of actions which raise those common issues

---

[6] England and English should be read as a reference to England and Wales or English and Welsh.
[7] See Stuyck et al, *An analysis and evaluation of alternative means of consumer redress other than redress through ordinary judicial* proceedings, (Leuven University) (2007) at 262.
[8] Although see GLOs below.

are prosecuted to final determination.[9] Selection of those actions to go forward is usually a matter for the parties, rather than the court. In order to facilitate the prosecution of the selected actions, the court possesses the power to stay the remainder either on its own initiative or with the parties' consent. The power to stay arose originally under the court's inherent jurisdiction to control its own process. It is now given statutory form by CPR 3.1(2)(f).

3.      Determinations arrived at in test cases have precedential effect in respect of those stayed or any future actions. They do not however in and of themselves finally determine those actions. Recent instances where test cases have been selected as a means to effectively manage a large body of claims arising out of the same issues of law or fact are: the credit-hire litigation;[10] and the bank charges litigation.[11]

**Consolidation of Proceedings and the Single Trial of Multiple Actions**

4.      The prosecution of test cases involves the selection and prosecution of an individual claim or claims which give rise to representative issues i.e., ones common to other actions. In addition to this the CPR provides two mechanisms through which large numbers of individual claims can be prosecuted simultaneously.

5.      In the first instance the court can consolidate any number of individual actions into one single set of proceedings.[12]  In *Lubbe v Cape plc*, for instance, over 3000 claims were consolidated in this way.[13] Once consolidated the claims are treated as if they were and are in fact one single action with multiple parties joined to it.[14]

6.      The consolidation power serves to ensure that parties to litigation, primarily defendants, are not vexed with the cost and delay of having to defend a number of

---

[9] A similar process is evident in the Employment Tribunals, where test cases can be selected and prosecuted to final determination.
[10]  *Dimond v Lovell* [2002] 1 AC 384.
[11] *The Office of Fair Trading v Abbey National Plc & Others* [2008] EWHC 875 (Comm).
[12] CPR 3.1(2)(g).
[13]  [2000] 1 WLR 1545 (HL).
[14] *Civil Procedure 2008*, Vol. 1 (Sweet & Maxwell) (2008) (Waller LJ, ed) (The White Book 2008) at 3.1.10.

separate claims which could have been brought in a single action. It thus seeks to ensure the efficient and economic prosecution of actions in order to give rise to finality of litigation. This was reflected in the original use of the power to facilitate the effective joinder of claims that could and ought properly to have been brought within a single set of proceedings by a claimant or claimants against the same defendant.[15] It can however be exercised more widely than this as it can be used to consolidate proceedings which although commenced as separate claims, could have been joined within a single claim. In this it is not limited to claims where there are common claimants and defendants.[16]

7.      The power to consolidate proceedings is a discretionary one. The discretion is a flexible one. The current provision, CPR 3.1(2)(g), unlike its statutory predecessors, is unfettered by any specific guidance.[17] The power to consolidate under the Rules of the Supreme Court (RSC) and the County Court Rules (CCR) could only be exercised where the various proceedings gave rise to: i) a common question of law or fact; or ii) that the rights to relief claimed in the proceedings arose in respect of or out of the same transaction or series of transactions; or iii) that it was desirable for some other reason to join the claims. As a new procedural code the CPR is not bound by the guidance developed under its statutory predecessors. However, it is likely that because the consolidation power, as with all provisions within the CPR, is subject to the overriding objective, the previous guidance will remain of importance to a court assessing whether to exercise its discretion.[18]

8.      The second management power provided by the CPR is one which enables the court to direct that two or more claims can be tried on the same occasion.[19] This power, unlike the power to consolidate, does not result in the claims being joined in a single action. It is therefore a power used to co-ordinate the effective and

---

[15] *Martin v Martin* [1897] 1 QB 429 (CA).
[16] *Payne v British Time Recorder Co. Ltd* [1921] 2 KB 1 (CA).
[17] RSC Ord. 4 r. 9 (1) and CCR Ord. 13 r. 9 (1).
[18] White Book 2008 at 3.1.10.
[19] CPR 3.1(2)(h).

efficient prosecution of individual claims, which continue to exist as separate claims. The fundamental purpose of this power is, as it is for consolidation, to save litigation time and cost.

**Group Litigation Orders (GLOs)**

9.    The final mechanism whereby English civil procedure enables the court to effectively and efficiently manage a multiplicity of individual claims, which remain as such, is the Group Litigation Order or GLO.[20] The GLO is a relatively recent innovation. It was introduced into the CPR in May 2000 as a consequence of recommendations made by Lord Woolf within his Final Access to Justice Report.[21] It was introduced in recognition of the fact that the existing procedural mechanisms (the test case, consolidation and representative actions) were not sufficient to enable the court properly and effectively to manage large numbers of claims which shared a common legal or factual basis. They were inadequate because they had not been designed specifically to deal with the problems to which large scale multi-party litigation gave rise.[22] This inadequacy was felt particularly sharply during the 1980s and 1990s as the courts were required to deal with a series of multiparty litigation arising from a sequence of transport and product liability disasters; insurance claims; and environmental claims.[23] During the course of the actions arising out of one defective pharmaceutical product, Purchas LJ indicated that in the absence of the introduction of a new form of procedure the court could not adequately deal with such cases under the then procedural regime. He put it this way:

"*There may well be a strong case for legislative action to provide a jurisdictional structure for the collation and resolution of mass product liability claims, particularly in the pharmaceutical field, but this court cannot devise such rules.*

---

[20] For a detailed introduction see: *Andrews*, *English Civil Procedure: Fundamentals of the New Justice System*, (Andrews (2003)) (OUP) (2003) at 974ff.

[21] *Civil Procedure (Amendment)* Rules 2000 (SI 221 of 2000). They were introduced by way of statutory instrument as it had previously been recognised that the court could not itself fashion ad hoc case by case rules to govern group litigation: see *Nash v Eli Lilly & Co* [1993] 4 ALL ER 383 at 409; Woolf, *Access to Justice: Final Report to the Lord Chancellor on the Civil Justice System in England and Wales* (HMSO, London) (1996), Chapter 17.

[22] Woolf (1996) at Chapter 17.7 – 17.13.

[23] Andrews (2003) at 975.

*In this sense we echo the remarks made by Lord Donaldson MR in Davies (Joseph Owen) v Eli Lilly & Co [1987] 3 All ER 94 at 96, [1987] 1 WLR 1136 at 1139 under the heading 'The concept of the "class action" as yet unknown to the English courts'."*

The then existing mechanisms were inadequate because they had not been designed specifically to deal with the problems to which this type of litigation gave rise.[24] Since GLOs were introduced 62 such orders have been made, largely relating to product liability claims, physical and sexual abuse claims, holiday claims, and financial services claims.[25]

10.    The GLO regime is set out at CPR 19.10 – 19.15, which states:

"**Definition**

*19.10    A Group Litigation Order ('GLO') means an order made under rule 19.11 to provide for the case management of claims which give rise to common or related issues of fact or law (the 'GLO issues').*

**Group Litigation Order**

*19.11*
*(1) The court may make a GLO where there are or are likely to be a number of claims giving rise to the GLO issues.*

*(The practice direction provides the procedure for applying for a GLO)*

*(2) A GLO must –*

   *(a) contain directions about the establishment of a register (the 'group register') on which the claims managed under the GLO will be entered;*
   *(b) specify the GLO issues which will identify the claims to be managed as a group under the GLO; and*
   *(c) specify the court (the 'management court') which will manage the claims on the group register.*

*(3) A GLO may –*

   *(a) in relation to claims which raise one or more of the GLO issues –*

---

[24] Woolf (1996) at Chapter 17.7 – 17.13.
[25] For a complete list of such orders see, (http://www.hmcourts-service.gov.uk/cms/150.htm).  The chapter, entitled "Evidence of Need", deals with reported problems and difficulties of the GLO.

*(i) direct their transfer to the management court;*
*(ii) order their stay (GL) until further order; and*
*(iii) direct their entry on the group register;*
*(b) direct that from a specified date claims which raise one or more of the GLO issues should be started in the management court and entered on the group register; and*
*(c) give directions for publicising the GLO.*

### Effect of the GLO

*19.12*

*(1) Where a judgment or order is given or made in a claim on the group register in relation to one or more GLO issues –*

*(a) that judgment or order is binding on the parties to all other claims that are on the group register at the time the judgment is given or the order is made unless the court orders otherwise; and*
*(b) the court may give directions as to the extent to which that judgment or order is binding on the parties to any claim which is subsequently entered on the group register.*

*(2) Unless paragraph (3) applies, any party who is adversely affected by a judgment or order which is binding on him may seek permission to appeal the order.*

*(3) A party to a claim which was entered on the group register after a judgment or order which is binding on him was given or made may not –*

*(a) apply for the judgment or order to be set aside (GL) , varied or stayed (GL) ; or*
*(b) appeal the judgment or order,*

*but may apply to the court for an order that the judgment or order is not binding on him.*

*(4) Unless the court orders otherwise, disclosure of any document relating to the GLO issues by a party to a claim on the group register is disclosure of that document to all parties to claims –*

*(a) on the group register; and*
*(b) which are subsequently entered on the group register.*

### Case management

*19.13  Directions given by the management court may include directions –*

*(a) varying the GLO issues;*

*(b) providing for one or more claims on the group register to proceed as test claims;*

*(c) appointing the solicitor of one or more parties to be the lead solicitor for the claimants or defendants;*

*(d) specifying the details to be included in a statement of case in order to show that the criteria for entry of the claim on the group register have been met;*

*(e) specifying a date after which no claim may be added to the group register unless the court gives permission; and*

*(f) for the entry of any particular claim which meets one or more of the GLO issues on the group register.*

*(Part 3 contains general provisions about the case management powers of the court)*

**Removal from the register**
*19.14*

*(1) A party to a claim entered on the group register may apply to the management court for the claim to be removed from the register.*

*(2) If the management court orders the claim to be removed from the register it may give directions about the future management of the claim.*

**Test claims**
*19.15*

*(1) Where a direction has been given for a claim on the group register to proceed as a test claim and that claim is settled, the management court may order that another claim on the group register be substituted as the test claim.*

*(2) Where an order is made under paragraph (1), any order made in the test claim before the date of substitution is binding on the substituted claim unless the court orders otherwise.*"[26]

11.    It is evident from the foregoing that the GLO regime is a case management regime designed to manage effectively a large number of individual claims, which raise common or related issues of law or fact. A GLO is not a form of representative action. Representative claimants or defendants are not identified or selected under a GLO. On the contrary individual claims are brought within an overarching managerial framework; a framework which, in common with the rest of the CPR, must operate according to the overriding objective (CPR 1.1) so as to

---

[26] CPR PD 19 – Group Litigation Orders, supplements the rules.

promote judicial and party efficiency and economy.[27] That being said the GLO regime does accommodate the possibility that an individual claim can be selected to go forward as a test case within the GLO framework. Where a claim goes forward as a test case any determination will bind the other claims subject to the GLO and can, if the court directs, bind any claims which are subsequently entered onto the group register.[28]

### The Representative Rule

12.    It is a feature of English procedure that any number of parties can be joined to a single set of proceedings.[29] This capability underpins the court's power to consolidate a large number of claims into a single set of proceedings; wherein all the parties to each individual claim so consolidated becomes a party to the new, single action. Multiplicity of parties within a single claim can however lead to practical difficulties. It can, as Zuckerman notes, lead to '*duplication and confusion.*'[30] It can lead to unnecessary cost and delay. It can therefore undermine the proper and efficient administration of justice. This problem has long been recognised by the English courts and resulted in the High Court of Chancery developing the representative action.[31]

13.    Representative actions brought under the representative rule (CPR 19.6) permit one named claimant or defendant prosecuting or defending an action on both his behalf and on behalf of a class of individuals (the represented class).[32] The representative party in this way acts not only for others (the represented class) who have an interest in the litigation but does so on the basis that they, the representative party, has the same interest in the litigation as the represented class.

---

[27] On the cost-saving motivation which lies behind the GLO see: *Boake Allen Ltd v Revenue & Customs Commissioners* [2007] 1 WLR 1386 at 1394 per Lord Woolf.
[28]    CPR 19.12.
[29]    CPR 19.1.
[30]    Zuckerman, *Zuckerman on Civil Procedure, Principles of Practice*, (2006) (2nd Ed) (Sweet & Maxwell) at 508.
[31]    See *Markt & Co Ltd v Knight Steamship Co Ltd* [1910] 2 KB 1021 (CA) (*Markt*) for a discussion.
[32]    The representative party must itself be capable of joinder as a proper claimant or defendant in non-representative proceedings: see CPR 19.6(1).

14.     The represented class, unlike where a number of claims are consolidated, are not
joined to the action. They are not therefore automatically subject to disclosure or
costs obligations.[33] They are however bound by the court's determination of the
claim.[34]

15.     The choice of representative claimant or representative defendant enables the
court to proceed expeditiously and economically to judgment; it thus facilitates
the proper administration of justice. A representative action can take one of three
forms: i) active, where a claimant acts as the representative party; ii) passive,
where a defendant acts as the representative party; or iii) active and passive which
combines both of the former two types of representative action.[35]

16.     The current rule as to representative actions is set out in CPR 19.6, which states
that:

"*19.6*

    *(1) Where more than one person has the same interest in a claim –*
        *a)     the claim may be begun; or*
        *b)     the court may order that the claim be continued, by or*
    *against one or more of the persons who have the same interest as*
    *representatives of any other persons who have that interest.*

    *(2) The court may direct that a person may not act as a representative.*

    *(3) Any party may apply to the court for an order under paragraph (2).*

    *(4) Unless the court otherwise directs any judgment or order given in a*
    *claim in which a party is acting as a representative under this rule –*

        *(a) is binding on all persons represented in the claim; but*
        *(b) may only be enforced by or against a person who is not a party*
        *to the claim with the permission of the court[36].*

    *(5) This rule does not apply to a claim to which rule 19.7 applies.*"[37]

---

[33]  Andrews, *English Civil Procedure, Fundamental of the New Civil Justice System*, (2003) (Oxford) at 989.
[34]  CPR 19.6(4).
[35]  Andrews, *English Civil Procedure, Fundamental of the New Civil Justice System*, (2003) (Oxford) at 987
[36]  See, *Howells v Dominion Insurance Company Ltd*  [2005] EWHC 552.
[37]  This provision is the statutory successor to RSC Ord. 15 r. 12 and CCR Ord. 5 r. 5. The court's power to

17.    The present rule, as did its statutory predecessors, imposes two preconditions upon taking representative proceedings. First, there needs to be more than one potential claimant or defendant. There must be a class of individuals to be represented, even if the class is as small as two. Secondly, the represented class must have the '*same interest.*' Same interest is given a very narrow definition in the authorities; although in recent years the stringency of this test has been somewhat relaxed. In strict terms, as defined by Lord Mcnaughton in *Bedford v Ellis*[38] and explained by the Court of Appeal in *Markt & Co Ltd v Knight Steamship Co Ltd,*[39] '*same interest*' means:

> i)    a common interest arising, for instance, under a common document;
>
> ii)   a common grievance; and
>
> iii)  a remedy beneficial to all, but not damages.

18.    The strict interpretation of the commonality test and the inability to obtain damages has resulted in the representative rule being underused within the framework of English civil procedure.[40] This underuse has continued despite a number of decisions that have attempted to render it of greater utility. *Prudential Assurance Co Ltd v Newman Industries Ltd* [1981] Ch. 229 at 246 – 247, which held that the action could be used in claims arising from tort as well as contract and that a declaration could be made that the represented class were entitled to damages, which could then be pursued on an individual basis. *EMI Records Ltd v Riley* [1981] 1 WLR 923 established that damages were recoverable in a representative action where the global quantum to the entire class was ascertainable. It is thus arguable that but for the *Markt* requirement that there be a common document the Bank Charges litigation could have proceeded under the

---

direct proceedings to continue as representative proceedings originated from the practice of the High Court of Chancery. CPR 19.7 governs representative proceedings brought where the representative prosecutes or defends the proceedings on behalf of interested persons who cannot be ascertained.
[38]  [1901] AC 1 (HL) at 7 – 12.
[39] [1910] 2 KB 1021 (CA); esp. see Fletcher Moulton LJ at 1035. Also see Buckley LJ's dissenting judgment which arguably properly followed the Court of Appeal in Chancery's decision in *Warrick v The Queen's College, Oxford* (1870) LR 6 Ch. App. 716 at 726.
[40] Andrews (2003), *ibid.*

representative rule following *EMI Records* given that the global quantum to the entire class of bank account holders is ascertainable.

19.   Following from these two decisions the Court of Appeal in *The Irish Rowan* explained that it had erred in *Markt* when it, held that the rule had to be interpreted without reference to pre-1873 Chancery practice.[41] It went on to outline how: i) the rule as then drafted had safeguards, consistent with the old practice, for class members who wished to disassociate themselves from the class; that the rule permitted class members to opt-out of the class; that as the class members entered into identical contracts there was sufficient commonality. Relying on *EMI Records* amongst others, it went on to affirm that damages claims were not to be automatically excluded from representative actions.[42]

20.   Most recently Morritt VC in *Independiente Ltd v Music Trading On-Line (HK) Ltd* examined the scope of the rule in its CPR guise: CPR 19.6.[43] He noted that the principles governing the rule were the same post-CPR as they were pre-CPR, albeit the rule had to be interpreted and applied consistently with the overriding objective.[44] In particular the definition of 'same interest' in the rule had to be interpreted flexibly and in conformity with the overriding objective. The test to establish whether the rule was appropriate for the case was that laid down by *Ellis*: common interest, common grievance and relief beneficial to all. There was, contrary to *Markt*, a common interest despite the presence of different defences. Damages were available where they were beneficial to all.

21.   Despite these developments the representative rule remains underused in English civil litigation, despite its self-evident and acknowledged similarities to the US class action, of which it is simply one form.[45]

---

[41]  [1990] 2 QB 206 at 237 – 239.
[42] [1990] 2 QB 206 at 227 – 241.
[43] [2003] EWHC 470 (Ch).
[44] [2003] EWHC 470 (Ch) at [21] & [23].
[45] *Class Actions in the United States of America: An Overview of the Process and the Empirical Literature*, (RAND Institute for Civil Justice, Santa Monica, California, USA (2007) (Pace (2007)) at 7.

36



**PART 3**

**COMPARATIVE LAW – COLLECTIVE REDRESS IN OTHER JURISDICTIONS**

**Summary**

This chapter examines the range of collective action regimes introduced in a number of common law and civilian jurisdictions.

**United States' Federal regime**

1.  The best-known collective action is the class action, which is operative in the federal jurisdiction of the United States (the US class action).  Rule 23 of the US Federal Rules of Civil Procedure (FRCP) has operated in its present form since 1966.  A class action procedure had previously been implemented when, in 1938, the US Federal Rules of Civil Procedure were adopted, although it dates back further than this and shares a common origin in Anglo-American equity proceedings.[46]  However, the previous incarnation of Rule 23, which subdivided classes into 'true', 'spurious' or 'hybrid' actions, was generally considered to be confusing and obfuscatory, and so the rule was redrafted by the Rules Advisory Committee in 1964, and adopted in 1966.

2.  Essentially, FRCP 23 has two parts. Rule 23(a) (entitled, 'Prerequisites to a class action') outlines the four requirements that all class actions must meet (numerosity, commonality, typicality, and adequacy of representation), and in addition to this, the

---

[46] Notes to Rule 23 of the FRCP.
(http://www.federalcivilprocedure.com/FED_RULES_OF_CIV_PRO_E_ARTICLE_04_Rule_23.0_Class_Actions_NOTES.htm).

class action must fall within one of the Rule 23(b)(1) or (b)(2) or (b)(3) categories. The first two of these aforementioned categories generally endorse compulsory class membership (although, rarely, some courts have contemplated a discretionary power to allow opt-outs in these categories), and apply where the class members are not principally pursuing damages, but are, instead, bringing their action against a limited fund, or for injunctive or declaratory relief. In comparison to its (b)(1) and (b)(2) counterparts, the purpose of the rule 23(b)(3) class action is to enable class members to recover *damages*, subject to a right to opt-out of the proceedings (which right must be adequately notified to the class members), and thereafter, all class members who have not opted out will be bound by any decision rendered on the common issues.

3. The four requirements of Rule 23(a) have to be coupled with two further requirements which the Rules Advisory Committee considered to be necessary and appropriate for (b)(3) class actions: that the common issues predominate over the individual issues; and that a class action is superior to other available methods for the fair and efficient adjudication of the dispute.

4. The FRCP was the subject of considerable review over the years, but was not actually amended until 1998, when a new Rule 23(f) was added, effective 1 December 1998, establishing a system for permissive interlocutory appeals from orders granting or denying class certification. Further amendments were introduced on 1 December 2003, relevant to: the timing of certification decision and notice; judicial oversights of settlements; attorney appointment; and attorney compensation. Other statutes have also sought to reform US class actions jurisprudence. In 1995, the Private Securities Litigation Reform Act of 1995 was passed, in order to deal with difficulties which had arisen with the commencement and conduct of securities fraud class actions; and in 2005, the Class Action Fairness Act of 2005 was passed, primarily in order to redress some difficulties with class action settlements (such as coupon settlements, which have received much negative comment from some members of the judiciary and academics) and to expand the jurisdiction of federal courts over class actions.

5. The actual and perceived excesses of the United States' class action model have

attracted much adverse comment in England. However, as law reform and academic commentary have equally observed, the differences between the two jurisdictions are both numerous and significant:

(i)     Although some costs-shifting does occur in US litigation, particularly under certain statutes, the normal US costs rule is that each party bears their own legal costs; in England, costs-shifting is however the norm. Thus, litigants in England who fear an adverse costs award, should they lose, face a significant disincentive to litigation in comparison with their US counterparts. As a necessary corollary of the absence of cost-shifting, security for costs applications are not a feature of the US class action;

(ii)    In the US the disclosure process operates as much as a means to define the nature of the cause of action as it does to secure evidence relevant to the cause of action. It does so not just through documentary disclosure but also through the widespread use of oral interrogatories (depositions). The disclosure obligation is, in addition to this, much wider than it is in England. This use of disclosure is one of the fundamental causes of the high litigation costs associated with the US class action and one of the central bases for the pressure to settle that stems from unmeritorious, so-called, blackmail suits. There is no suggestion that the fundamental role and nature of disclosure in England will, or even ought to, change to broaden it beyond standard or specific disclosure or that the use of oral interrogatories would have to increase if a collective action were introduced. The US system of discovery, particularly its role in framing the nature of the claim, is a feature of its civil justice system *per se* and is not simply a feature of the US class action. It is not a feature of the English civil justice system nor should it be;

(iii)   In the US, jury trials (constitutionally enshrined in the US Constitution's Seventh Amendment in respect of federal trials) are more common than they are in England where they are confined to, e.g., deceit, defamation

actions, actions for malicious prosecution and false imprisonment.[47] The ancillary uncertainties of how a jury would view the merits of a class action and assess damages are significant factors in US class actions litigation which do not apply to or arise in English civil trials;[48]

(iv)     Case management is very much a part of the post-Woolf reforms, and explicit endorsement of case management is to be found in both the CPR and in recent judicial task forces (such as the *Report and Recommendations of the Commercial Long Trials Working Party (December 2007)*). By comparison, some US judges prefer a system whereby courts respond to parties' requests for judicial hearings but do not otherwise involve themselves in the litigation, thereby adopting a less active approach to the case's progress;

(v)      At the present time, percentage-based contingency fee agreements are not available for contentious business in England i.e., for actions brought before courts, whereas they are a common feature of US litigation. Even if contingency fees where to become permissible in England in future, as with the US, it is presumed that they would be subject to court scrutiny. The prospect of large contingency fee awards becoming a feature of English litigation seems remote: they are not an essentially feature of any collective action;

(vi)     The availability of punitive damages is restricted in England under the *Rookes v Barnard* principle. This is in stark contrast to the US, where punitive and treble damages are available more frequently in cases which are brought as class actions.[49] Furthermore the rationale for this wider availability of punitive or treble damages in the US is absent from England: it exists in the US as a consequence of the more widespread use

---

[47] County Courts Act 1984 s66; Supreme Court Act 1981 s 69.
[48] Jury trials remain a possibility in England in respect of, for instance, defamation proceedings. This is however atypical.
[49] *Rookes v Barnard* [1964] AC 1129.

of the civil justice system as a means of private regulation rather than, as in England more straightforwardly, a means of enforcing substantive law rights via the provision of compensatory damages. The nature of the English regulatory system, bolstered by the Macrory reforms and the enactment of the Regulatory Enforcement and Sanctions Act 2008 militates against the need to utilise the civil justice system in a way similar to US approach. It is thus the case that there is little similarity between the US and English approaches to punitive or treble damages at present; nor are the conditions likely to prevails in the future which could arguably justify adopting the US approach. In any event, if such conditions were to change in future they would do so not as a consequence of the reform of collective actions but of a change in substantive social and public policy outwith the remit of the present study;

(vii)    One of the most strident criticisms of the US class actions regime has been the judicial approval of what are perceived to be unfair settlement agreements and some of these deficiencies and problems were the subject of reform in the Class Actions Fairness Act of 2005.[50] By contrast, one would expect English judges to exercise the greatest caution toward, and scrutiny of, any settlement agreement reached between the parties, given the strong case management functions which are already exercised in English litigation, whether under the Group Litigation Order or in complex litigation generally;

6.    On a separate note, the Irish Law Reform Commission noted, as one difference between the multitude of class actions in the US and what might be expected, should an opt-out action be introduced into Irish law, that '*a strong pro bono tradition among lawyers in the United States has facilitated many class actions, particularly in the field of civil rights*';[51]

---

[50] Epitomised most eloquently perhaps by the title given to one US article on the subject: Koniak, *Feasting while the Widow Weeps*, (1995) 80 Cornell L Rev 1045.
[51] Irish Law Commission, *Multi-Party Litigation*, (2003) (LR CP 25-2003), at 2.05.

7. There is some suggestion that the levels of compensatory damages, especially for non-pecuniary heads of damages such as pain and suffering, tend to be higher in the US than in England, thus increasing the incentive to commence class actions in the US (especially when coupled with the greater availability of punitive damages). This again would tend to reflect the nature of jury damages awards, which would not be replicated in England given that such awards are made by the court;

8. There are also some substantive law differences between English and US law, for example, the implementation of the fraud-on-the-market theory in the US, per *Basic Inc v Levinson* 485 US 224 (1988), whereby a shareholder class can seek to rely on a rebuttable presumption of reliance that the market for the shares in question was efficient, and that the class members traded in reliance on the integrity of the market price for those shares, in order to overcome individual causation problems in shareholder disputes. Such substantive law differences could be expected to have some effect on which actions were certified in the respective jurisdictions.[52]

**Canada's provincial regimes**

9. The first jurisdiction to enact collective (class) action legislation in Canada was the civil law jurisdiction of Quebec. It did so through the Act Respecting the Class Action 1978 (see **Appendix O**).  This legislation differs in some respects from the common law provincial regimes which were enacted subsequently (a defendant's appellate rights, and certification criteria such as numerosity, being just two examples).  The first of the common law provinces to introduce a class action was Ontario, through the Class Proceedings Act, SO 1992 (commenced 1 January 1993).  At that time, the Williston Committee, which was engaged in reforming the Ontario Rules of Civil Procedure, stated that '*we are convinced that the present procedure concerning class actions is in a very serious state of disarray*'[53]; that assessment was affirmed by the Canadian Supreme Court in *Naken v General Motors of Canada Ltd* (1983) 144 DLR

---

[52] For a discussion see Mulheron, *Some Difficulties with Group Litigation Orders—and Why a Class Action is Superior* 24 Civil Justice Quarterly (2005) 40, 62–65.
[53] Cited by the Manitoba Law Reform Commission, Class Proceedings (2003) 7.

(3d) 385; (SCC) 410, which held that the standard representative rule (based on the statutory predecessor to CPR 19.6 and construed consistently with *Markt*) which at that time applied in Ontario was '*totally inadequate*' to cope with modern, complex claims involving goods and services consumed on a widespread scale that could give rise to multiple grievances.

10. Other common law provinces gradually followed Ontario's lead, with legislation which is similar, but not necessarily identical to, that of Ontario's. The British Columbia Class Proceedings Act, RSBC 1996[54] is notable, as the Alberta Law Reform Institute has since pointed out, for the fact that its legislature more closely adhered to the Ontario Law Reform Commission's extensive recommendations and draft legislation (contained in Report on Class Actions (1982)) than did the Ontario legislature in several key features (e.g., in respect of some certification features, and funding recommendations). Other provinces have since enacted the following class action statutes: Saskatchewan's Class Actions Act, SS 2001;[55] Newfoundland and Labrador's Class Actions Act, SNL 2001;[56] Manitoba's Class Proceedings Act, CCSM 2003;[57] Alberta's Class Proceedings Act, SA 2003;[58] and New Brunswick's Class Proceedings Act, SNB 2006.[59] The Federal Court of Canada also has a class action procedure in place for those limited matters which fall within its jurisdiction (Federal Courts Rules, S.O.R./98-106, Pt 5.1).

11. The Canadian regimes eschewed the categorisation approach adopted under FRCP 23(b); endorse detailed certification procedures; and are drafted in a fairly detailed manner, in respect of both the commencement and conduct of class actions thereunder.

---

[54] Commenced 1 August 1995
[55] Commenced 1 January 2002.
[56] Commenced 1 April 2002.
[57] Commenced 1 January 2003.
[58] Commenced 1 April 2004.
[59] Commenced 30 June 2007.

**Australia**

12. Pt IVA of the Federal Court of Australia Act 1976 applies only to claimants whose causes of action arise under Federal jurisdiction: the Australian Federal jurisdiction is very wide and far wider than, for instance, the Canadian Federal jurisdiction. As a consequence its class action regime has been quite extensively used.[60]  Although Part IVA refers to a '*representative proceeding*', the Australian model is an opt-out class action.  The only State in Australia to have implemented an opt-out class action is that of Victoria.[61]

13. Pt IVA does not follow precisely the recommendations of the Australian Law Reform Commission report which preceded it. For example, the Australian legislature did not accept the Commission's proposals for contingency fees or a public assistance fund for litigants. Nor did it adopt the Commission's '*grouped proceedings*' approach whereby each group member was to be the equivalent of a party to the proceedings before the court (devised for what the ALRC perceived was a constitutional requirement). Instead, class members are not, in the context of Pt IVA, parties to the proceeding for the purposes of costs or otherwise.

14. As with the Canadian legislatures, the Australian legislature expressly chose not to follow the categorisation approach of FRCP 23.  However, in contrast to all North America opt-out class actions, the Australian legislature did not enact a formal certification requirement within Pt IVA.  Instead, there are certain '*threshold requirements*', i.e., certification criteria dealing with commonality and numerosity, which must be satisfied under s 33C, failing which the defendant may challenge the proceedings as being improperly constituted as representative proceedings.  There are further powers vested in the court to discontinue representative proceedings at least in class actions form under any of ss 33L, 33M or 33N, where the scenarios stipulated in those sections are met. A survey of several decisions on Pt IVA illustrates that defendants have frequently sought to challenge the procedural legality of representative proceedings by mounting twin attacks, based on the arguments that the

---

[60] This commenced operation on 3 March 1992.
[61] See Part 4A of the Supreme Court Act 1986, which commenced operation in 2000.

s 33C criteria have not been met, and/or that the proceedings should be discontinued under, say, one the grounds in s 33N. As some Australian commentators have since noted, it is ironic that the Australian legislature's determination to avoid certification has been rebuffed by litigants' interlocutory challenges that have assumed the role of *de facto* certification hearings in any event.

15. Most recently, the Victorian Law Reform Commission, in its Civil Justice Review, has recommended reform of its class action procedure. Its proposals were that: i) it should be clarified that there is no legal requirement that each member of the represented class have a cause of action against all defendants to the class action provided that all class members have a legal claim against at least one defendant; ii) that class actions can be brought 'on behalf of some of those with the same, similar or related claims even if the class comprises only those who have consented to the conduct of proceedings on their behalf"; and iii) conferring on the Supreme Court a power to make *cy-près* type remedies in appropriate circumstances.[62]

**Europe**

16. The European landscape is a mixed bag of differing collective redress mechanisms. There is the opt-in collective action model, as illustrated, for example, by Sweden's Group Proceedings Act 2002.[63] The legislation was originally contemplated as an opt-out procedure, but this was changed in the final enactment, such that group members must apply to the court to be included within the group.  A further opt-in model of note is the newly-enacted Italian *Azione collettiva risarcitoria*, included as Article 140 of the Codice del Consumo, which came into force on 30 June 2008.

17. There is, on the other hand, the opt-out model, as illustrated by Spain's Law of Civil Judgment 1/2000, which commenced on 1 January 2001, and Portugal's Right of Proceeding, Participation and Popular Action, No 83/95 of 31 August 1995, both of which permit actions on behalf of unidentified group members.

---

[62] Victorian Law Reform Commission, *Civil Justice Review*, (March 2008) (Report No 14) at 12 and 521 – 561
[63] Commenced on 1 January 2003.

18. There are also the recent bi-model class action regimes of Denmark, set out in the Administration of Justice Act, Pt 23, Act No 181/2007 and Norway, under its Civil Procedure Code; both of which have only been in force since 1 January 2008. Both regimes stipulate opt-in to be the main model. They both however permit the use of an op-out collective action where the court is satisfied that certain conditions arise. In Denmark's case, for example, the prerequisites are that the individual claims of group members are low value, and the opt-in model is considered to be an inappropriate method of dispute resolution. In other words opt-out is permitted in order to increase access to justice according to the first of the three principles identified by Lord Woolf (cited *infra*).

19. On a different note again, the Netherlands' model is one which deals is based on collective settlement agreements arising out of mass torts, such as '*mass disaster accidents*',[64] whereas the German system is one which provides an example of a situation-specific regime, e.g., its Kapitalanleger-Musterverfahrensgesetz (The Act on the Initiation of Model Case Proceedings in Respect of Investors), introduced due to the inability of the then state of the German civil justice system with 17,000 claims brought by investors against Deutsche Telekom AG.[65]

20. There are also European jurisdictions which have no generic collective action specifically for damages thus far, such as Ireland. Although the Irish Law Commission recommended the introduction of a GLO regime in 2005.[66]

---

[64] The Act on Collective Settlement of Mass Damages, which commenced on 27 July 2005.

[65] Commenced on 1 November 2005. For a discussion see, Sturner, *Model case proceedings in the capital markets - tentative steps towards group litigation in Germany*, 26 Civil Justice Quarterly (2007) 250.

[66] Irish Law Commission, Multi-Party Litigation, (LRC 76-2005) at 69ff. Its original recommendation was for the introduction of a new class action procedure: see Irish Law Commission (LRC CP 25-2003) at 59. For a jurisdiction-by-jurisdiction survey of Europe see: BEUC, Private Group Actions: Taking Europe Forward (8 October 2007, X/049/2007 also see Stuyck (2007). For further details on the Australian, Canadian and American class action regimes, see: Mulheron, *The Class Action in Common Law Legal Systems: A Comparative Perspective* (Hart, Oxford, 2004).



**PART 4**

**THE IMPETUS FOR REFORM**

**- The Policy Context & Political Impetus**

**Summary**

This chapter examines a range of policy proposals on collective and representative claims from both UK and EU policymakers. The ongoing activity detailed here is indicative of the consensus around the case for taking action to improve collective redress mechanisms beyond those currently available to consumers, employees, small businesses, trade associations and other potential claimants. There is also a consensus that any mechanisms that emerge must be balanced and proportionate.

**Introduction**

*"There may well be a strong case for legislative action to provide a jurisdictional structure for the collation and resolution of mass ... claims".*[67]

1. The question of how most effectively to deal with multiple claims of a similar nature has been raised and considered by Government and other policymakers on many occasions over the last decade or so.[68] The terminology used over this period by different agencies ranges from group litigation, multi-party actions, representative claims and collective consumer redress. Although the terminology may differ, the essential thrust of the various papers and proposals has been towards establishing an

---

[67] *Nash v Eli Lilly & Co* 1993 4 All E R 383, at 409 per Purchas LJ.
[68] See, for instance: *Davies v Eli Lilly* [1987] 1 WLR 1136 at 139; Report of the Review Body of Civil Justice (Cmd 394) at 274 – 276.

efficient and balanced procedure for the resolution of multiple or collective claims which raise similar or common issues of either law or fact.

2.  This central question surrounding any collective mechanism was succinctly framed by the National Consumer Council in a submission to Lord Woolf's "Access to Justice" inquiry in the mid 1990s, quoted below, in a passage which predates the implementation of CPR's the group litigation provisions.

> *"As we become an increasingly mass producing and mass consuming society, one product or service with a flaw has the potential to injure or cause other loss to more and more people. Yet our civil justice system has not adapted to mass legal actions. We still largely treat them as a collection of individual cases, with the findings in one case having only limited relevance in law to all of the others."*[69]

3.  This passage is instructive not only in setting the debate about collective claims firmly in the consumer context but also in alluding to the process and inefficiencies that arise from dealing with such claims as if they were unitary pieces of litigation.

4.  This chapter briefly outlines the last decade's consultations, inquiries and consultations which relate to collective redress in the civil justice system. It concludes that the sustained level of political activity in this area indicates the continuing will among policymakers to work towards establishing an efficient, balanced procedure for the collective resolution of like claims.

**United Kingdom (England and Wales)**

**Policy activity – a brief chronology**

5.  This section sets out relevant policy initiatives on collective redress which have been developed by agencies other than the Civil Justice Council. It does not deal with the CJC's previous reports and recommendations on collective action [which are noted in the introduction to this paper and included in full at **Appendix E and F** below]. Nor does it deal with procedural or policy activity before Lord Woolf's "Access to

---

[69] Woolf (1996) Chapter 17.1.

Justice" reports.[70] Hence it takes the implementation of the GLO) mechanism in the Civil Procedure Rules (CPR) as the starting point from which to examine developments.

**Lord Woolf's Access to Justice Reports**

6. Lord Woolf's starting point was that there was in English procedure no specific rules of court dealing with multi-party actions; albeit this was more a reflection upon the inadequacy of the representative rule as an effective procedural mechanism than an absolute criticism. He noted the difficulties which English procedure had had during the 1990s in dealing with product liability litigation, which gave rise to large numbers of claimants whose claims each arose from the same legal or factual base.[71]

7. Lord Woolf's conclusions were that:

> "(1) Where proceedings will or may require collective treatment, parties or the Legal Aid Board should apply for a multi-party situation (MPS) to be established. This would suspend the operation of the Limitation Act. The court may also initiate an application. Within the MPS, part of the proceedings could be common to some or all of the claimants, and other parts could be limited to individual claimants.
>
> (2) Individual claimants would be able to join the MPS at the application stage and subsequently by entering their names on an initial register.
>
> (3) The court should certify an MPS if it is satisfied that the group or groups will be sufficiently large and homogeneous, and that the cases within the MPS will be more viable if there is a collective approach than if they are handled individually.
>
> (4) Lower value or local cases should be dealt with locally at appropriate courts by either a High Court or Circuit judge.
>
> (5) A managing judge should be appointed at or as soon as possible following certification and should handle the action throughout.
>
> (6) In appropriate cases additional support may be provided by the appointment of a deputy Master or deputy district judge from those practitioners who already have considerable experience of multi- party

---

[70] Woolf (1995) and (1996).
[71] Andrews, *English Civil Procedure*, (Oxford) (2003) at 975 sets out a detailed summary of the many areas where multi-party claims arose during this period; also see Hodges, *Multi-Party Actions*, (Oxford) (2001).

*litigation.*

*(7) The court should have a residual power to approve the lead lawyer if a difficulty arises in appointing one.*

*(8) The court should usually aim to treat as a priority the determination of the generic issues while establishing economic methods of handling the individual cases.*

*(9) The court should have power to progress the MPS on an 'opt-out' or 'opt-in' basis, whichever contributes best to the effective and efficient disposition of the case.*

*(10) In reaching a decision on notice of the action to potential claimants, the court must take into account the cost of such notice and its usefulness.*

*(11) The court should be responsible for determining whether the action has merit and should proceed and the criteria which must be met by those wishing to join the action.*

*(12) The court should determine the arrangements for costs and cost sharing at the outset. The costs of action groups should be recoverable on taxation.*

*(13) The Lord Chancellor's Department and Legal Aid Board should consider the possibility of extending the upper limits of financial eligibility on the basis of increased contributions. In appropriate cases, with tight judicial management and control on costs it may be possible for assisted persons' liability to be assessed and fixed in advance.*

*(14) The possibility of a contingency legal aid fund should be reconsidered in the context of these proposals.*

*(15) The court has a duty to protect the interests of claimants, especially those unidentified or unborn.*

*(16) In appropriate cases the court should appoint a trustee.*

*(17) Multi-party settlements should be approved by the court especially where the defendant offers a lump sum settlement.*

*(18) The court should require an identified and finite group of claimants to have in place from the outset a constitution including provisions relating to acceptance of settlement.*"[72]

8.  These recommendations, and the GLO which they produced, where not simply aimed at introducing a new procedure for disputes involving multiple parties, albeit one

---

[72] Woolf (1996) at Chapter 17, Recommendations.

which built on common law developments, they were intended to achieve three ends. Those ends where identified by Lord Woolf as requiring any new or reformed procedure to:

- *provide access to justice where large numbers of people have been affected by another's conduct, but individual loss is so small that it makes an individual action economically unviable;*

- *provide expeditious, effective and proportionate methods of resolving cases, where individual damages are large enough to justify individual action but where the number of claimants and the nature of the issues involved mean that the cases cannot be managed satisfactorily in accordance with normal procedure;*

- *achieve a balance between the normal rights of claimants and defendants, to pursue and defend cases individually, and the interests of a group of parties to litigate the action as a whole in an effective manner.*[73]

9. These three themes – access to justice, proportionality & efficiency, fairness – remain valid benchmarks to be applied when considering the various consultations and approaches to collective action since Lord Woolf.[74] One of the fundamental drawbacks of the GLO regime which has been identified since its introduction is that it fails to facilitate effective access to justice for individuals whose claims fall within the first of the three goals. Because the GLO, like the opt-in follow-on action in competition claims, requires individual citizens to take positive steps to commence litigation or join the claim register there has been little take up or use of it where claims are individually small even though the totality of the claim when aggregated is extremely large.

10. The fact that the GLO may not have been the ideal solution to the problems of multi-party litigation was itself acknowledged by Lord Woolf, who rightly stated that:

"*In this area of litigation more than any other my examination of the problems*

---

[73] Woolf (1996) at chapter 17.2.

[74] For a recent discussion see: Gibbons, *Group Litigation, Class Actions and Lord Woolf's Three Objectives – A Critical Analysis*, CJQ Vol. 27 (2008) 208.

*does not pretend to present the final answer but merely to try to be the next step forward in a lively debate within which parties and judges are hammering out better ways of managing the unmanageable.*"[75]

Representative Claims – Lord Chancellor's Department (LCD) (2001)

11. Lord Woolf's comments proved prescient. In early 2001 the LCD issued a consultation paper "Representative Claims: Proposed New Procedures".[76] This defined representative claims as:

> "… *claims made by, or defended by, a representative or representative organisation on behalf of a group of individuals who may, or may not be individually named in a situation where an individual would have a direct cause of action.*"[77]

12. The proposals in the paper would, if implemented, have introduced a generic representative action procedure for all civil claims. Pre-action conduct would have been governed by a protocol, after which issue of the representative action would be subject to the court's permission. The person(s) applying to conduct the matter would have had to satisfy the court that it would be an appropriate person to act as the group's representative (by satisfying indicative criteria which could be set out in rules of court or a practice direction) and that the representative claim would be an appropriate way to proceed. The proposals would have allowed both existing designated bodies (for example recognised consumer organisations) and looser, *ad hoc* bodies or groups to apply to be representatives. It would thus have gone beyond either the GLO or the representative rule in CPR 19.6 because it would have enabled claims to be brought on behalf of a represented class by a body or organisation which did not itself have a direct interest in the action i.e., which did not itself have the same or in fact any cause of action against the defendant.

13. As controversially as this proposal at the time, particularly among business and defendant communities, the paper appeared to advocate an "opt out" approach to identifying members of the group; albeit this approach had previously been

---

[75] Woolf (1996) at Chapter 17.6.
[76] http://www.dca.gov.uk/consult/general/repclaims.htm
[77] LCD, *Representative Claims: Proposed New Procedures*, (February 2001) at [13].

recommended by Lord Woolf.[78] Finally the paper alluded to the possibility of costs protection for the representative body if the case was brought in the public interest.

14. Following consultation, the LCD's proposals were not taken forward, with particular comment being made by the senior judiciary, for instance, as to the necessity for primary legislation if representative bodies with no direct interest in the litigation were to be introduced.[79] Even so, some of the themes of the present debate around collective redress, examined in further detail in this report at Part 9 may be discerned from the previous thinking, most notably in:

- the need for the court to control an initial permission or "gate-keeper" stage;

- the test of appropriateness (alternatively superiority) of the group or representative mechanism;

- the "opt out" approach to the group; and

- the possibility of some form of costs protection for the group

Representative Actions in Consumer Protection Legislation – Department for Trade and Industry (2006)

15. Although the LCD's general proposals were not taken forward at the time, limited proposals for representative actions, which built on the proposal that claims could be brought by representative bodies, were enacted in the narrower context of competition law.

16. Section 47B of the Competition Act (inserted by the Enterprise Act 2002) provides for representative actions in competition cases.[80] The section provides for follow on

---

[78] Woolf (1996) at Chapter 17.42 & 17.46.
[79] See, LCD, *Representative Claims: Proposed New Procedures*: Consultation Response (April 2002).
[80] Only bodies designated by the Secretary of State under the Special Body (Consumer Claims) Order 2005 (SI 2005/2365) may bring this type of representative action. Which (formerly the Consumers' Association)

claims only (i.e. after an adverse finding by the regulator), on behalf of named consumers only (i.e., an opt-in mechanism).

17. After the LCD paper, the matter of representative actions more generally was examined again in the-then DTI's consumer strategy published in June 2005.[81] This may well indicate the re-setting of the debate on representative actions and collective redress within the broader overall consumer protection context. The strategy document included an unequivocal commitment on representative actions:

> *We Will*
>
> - ***Introduce representative actions for consumers.*** *Sometimes going to court is the only way for consumers to get justice, but some consumers may not feel capable of doing so. We intend to introduce representative actions for consumers. We will consult further on how this might be done, in particular to avoid inadvertently creating a compensation culture and to avoid businesses facing spurious claims. We expect that only certain organisations would be allowed to bring a representative action and it might be necessary, for example, for pre-approval to be obtained from a court before proceeding.*

18. The consultation paper on representative actions referred to here was subsequently issued in July 2006.[82] The key question it raised was whether representative actions should be permitted on behalf of named consumers only (an opt in mechanism, and the DTI's preferred approach) or on behalf of consumers at large (an opt out mechanism)?

19. The paper set out several further secondary questions, which further developed the themes of the debate identified above in the LCD paper. These were:

---

is the only body to have been so designated to date. It has brought one such action, against JJB Sports, to recover compensation for consumers who purchased replica football shirts at inflated prices.

[81] "A Fair Deal For All  Extending Competitive Markets: Empowered Consumers, Successful Business" http://www.berr.gov.uk/files/file23787.pdf

[82] The DTI paper refers to the earlier LCD consultation at its paragraph 11: *"The LCD consultation received a range of responses and there was general support for the greater access to justice that provisions of this kind would provide. It was decided that provisions of this sort should be introduced only where there is a clear need for them and through primary legislation. This was partly because this would allow greater flexibility and fuller consultation than simply making amendments to the court rules by secondary legislation. In light of these findings we are now setting out proposals to introduce representative actions for consumer protection legislation."*

- whether only designated bodies should bring representative actions?

   (the DTI's preferred approach) and

- whether a permission stage before the court should be required?

20. Other matters relating to defining the scope of the consumer actions to be covered, dealing with multiple small claims and to assessing what types of similar claims might be suited to the representative action were also raised. Whilst there were no express proposals as to funding and costs, the paper did not envisage public funds being available to support representative claims:

> *"We do not intend to fund such cases directly from the public purse but see a role for consumer bodies or other similarly interested groups leading this activity."*

21. The response to the consultation was published in March 2008, by the renamed Department for Business Enterprise & Regulatory Reform (BERR).[83] This reported that business representatives were generally opposed to the proposals with consumer organisations and the Office of Fair Trading supporting them and arguing they should apply to consumers at large.

22. BERR's response also alluded to the European Commission's recent activity in respect of collective redress for consumers, which is detailed below. It concluded that:

> *Building on the responses to the consultation and these policy developments, we consider that further work is needed to examine the evidence base ... In particular we are keen to further examine with enforcement authorities what sort of case studies would suit representative actions, and to what extent could some of these cases be resolved through a restorative justice approach.*

---

[83] http://www.berr.gov.uk/files/file45051.pdf

23. These points are further examined in this paper in Part 4 (Evidence of Need for Reform) and Part 5 (Public Enforcement and the Role of Regulators).

Private actions in competition law: effective redress for consumers and business - Office of Fair Trading (April & November 2007)

24. In contrast to the previous initiatives, which deal with redress for general civil wrongs, the consultation (April) and response (November) issued by the OFT deal with redress for breaches of competition law only.

25. The difference is noteworthy insofar as the competition authorities are empowered to investigate alleged breaches of competition law and to make adverse findings as to the liability of the market participants and to impose fines for anti-competitive behaviour. The prospect of this initial, regulatory, finding of liability should facilitate redress claims – known as follow-on actions – from those who have suffered losses due to the infringements. The general link between regulatory enforcement and civil redress is further explored in Part 5.

26. The OFT consultation paper consulted on proposals grouped around six principles, quoted below. Whilst certain of these are specific to competition law, the more general elements (points 4 – 6) clearly echo the three benchmarks - access to justice, proportionality & efficiency, fairness – set out by Lord Woolf in 1996:

> 1.   *consumers and businesses suffering losses as a result of breaches of competition law should be able to recover compensation, both as claims for damages on a standalone basis as well as in follow-on cases brought after public enforcement action*
>
> 2.   *responsible bodies which are representative of consumers and businesses should be allowed to bring private actions on behalf of those persons*
>
> 3.   *private competition law actions should exist alongside, and in harmony with, public enforcement*

4.      *any changes must be aimed at providing access to redress for those harmed by anti-competitive behaviour, whilst at the same time guarding against the development of a 'litigation culture', in particular the costs, diversion of management time and chilling effects that can arise from actual or threatened ill-founded litigation*

5.      *processes and systems should be available to facilitate effective ways of resolving private competition law actions, and to encourage settlement of cases without going to court or trial wherever possible, and*

6.      *the right balance should be struck between requiring defendants and others to disclose relevant materials to claimants, and ensuring that this process is not abused.*

27. Following consultation, the OFT made a series of recommendations to Government. Once again, these pick up the themes of the collective action debate identified earlier in this chapter. Its main recommendation was that existing procedures should be modified, or new procedures introduced, permitting representative bodies to bring not only follow-on but also standalone representative actions for damages and/or injunctions on behalf of consumers, whether for named consumers only (opt-in) or for consumers at large (opt-out).

28. An identical recommendation was made in respect of representative actions on behalf of <u>businesses</u> (again on either an opt-in or opt-out basis, subject to further consultation). This is of interest in that it for the first time acknowledges that the range of potential claimants goes far beyond the more conventional consumers and similarly injured claimants. It is a range which the evidence of need study has demonstrated through its comparative study of other jurisdictions that goes far beyond consumer interests and encompasses a broad range of actions, from human rights cases to employment disputes. The latter point is already demonstrated within England through the availability of a collective action mechanism in respect of redundancy or Transfers of Undertakings and the proposal that trade associations be given a right to commence representative actions through implementation of

Directive 2004/48 EC.[84]

29. As regards costs, the OFT recommended permitting, in conditional fee cases a success fee uplift greater than 100%, in these cases and recommended costs protection in appropriate cases. It went on to recommend the establishment of a merits-based litigation fund, which appears in marked contrast to the BERR view that public funds should not generally be available to pursue representative claims.

The Budget 2007[85]

30. Perhaps the most authoritative statement in terms of support for private actions in competition claims from Government came in the Chancellor of the Exchequer's (then the Right Honourable Gordon Brown MP) budget report 2007:

> "*Private Actions*
>
> *3.45. Private actions are an important aspect of a well-functioning competition regime. An effective regime would allow those affected by anti-competitive behaviour to receive redress for harm suffered and broaden the scope of cases that can be investigated, promoting a greater awareness of competition law and reinforcing deterrence, without encouraging ill-founded litigation.*"

Discrimination Law Review 2005 – 2008

31. In 2005 the Government launched its Discrimination Law Review, the aim of which was to create a "*clearer and more streamlined equality legislation framework which produces better outcomes for those who experience disadvantage while reflecting better regulation principles.*"[86] Within its terms of reference the Review indicated that one of its key areas of work would be '*an investigation of different approaches to enforcing discrimination law so that a spectrum of enforcement options [could] be*

---

[84] See, for instance, section 189 of the Trade Union and Labour Relations (Consolidation) Act 1992 and regulation 13 – 15 of the Transfer of Undertakings (Protection of Employment) Regulations 2006 (SI 2006/246); The Patent Office, *Consultation Paper: Representative Actions for the Enforcement of Intellectual Property Rights*, (2006).

[85] Her Majesty's Treasury, Budget 2007, (HC 342) at 3.45 – 3.48.

[86] For a summary see: *The Equality Bill – Government Response to the Consultation* (July 2008) (CM 7454) at 11 (http://www.equalities.gov.uk/publications/Government_Response_to_the_consultation.pdf).

*considered*'.[87] In its 2008 response to the Discrimination Law Review consultation, the Government indicated that it would consider, in light of the present report, whether there is a case for introducing representative actions in discrimination cases, and that it would consult on any proposals for reform.[88] While it is not covered in the Civil Justice Council's evidence of need study, it is apparent that there is a strong case for concluding that there is an unmet need for a collective action mechanism to enable the effective prosecution of claims arising out of discriminatory conduct e.g., equal pay, by employers and service providers, and a clear need for such a mechanism to be introduced. In respect of employment, while 24% of BME (black and minority ethnic) individuals report that they believe they have been refused a job during the last five years because of their race or colour (in contrast to just 3% of white job applicants),[89] and 62% of over 50s report that they have been refused employment on grounds of their age (in contrast to just 5.5% of those aged 30 – 39),[90] relatively few such claims are prosecuted. 83% of businesses report that they do not believe they will face any formal investigation of their employment practises or ever be taken to court as a consequence of those practises.

32. In the non-employment field, research has revealed that almost half of all disabled customers are unhappy with the facilities offered by the hospitality trade, with accessibility topping the list of complaints.[91] At the same time, research commissioned by the former DfES to assess the impact of the Disability Discrimination Act 1995 found that many (potential) claimants view the court system and its procedures as daunting, intimidating and complex, and that this could be a disincentive to pursue cases. The researchers concluded that this complexity reinforced the need for expert advice and representation.[92]

---

[87] http://www.equalities.gov.uk/dlr/terms_of_ref.htm
[88] *The Equality Bill – Government Response to the Consultation* (July 2008) (CM 7454) at 6, 11, 70 and 81 – 82.
[89] Department for Communities and Local Government, *Citizenship Survey, April-June 2007*, *England & Wales*, (October 2007) (http://www.communities.gov.uk/documents/corporate/pdf/citizenshipsurveyaprjun2007.pdf).
[90] Department for Communities and Local Government, *Citizenship Survey, 2005, Cross-Cutting Themes* (June 2006).
[91] Caterer and Hotelkeeper Magazine, (6 October 2005).
[92] Institute for Employment Studies, *Monitoring the Disability Discrimination Act (DDA) 1995*, (1999).

33. It is therefore clear that there is an access to justice gap for those suffering unlawful discrimination. This gap is not only preventing individuals from enforcing their rights but also helps to explains why 42% of businesses are unable to articulate reasons why they should take steps to ensure that discrimination does not take place and conversely that equality is promoted.[93] Effective collective action is needed in this area, just as it is needed in other areas such as consumer protection, competition law, contractual disputes and mass torts, to ensure that substantive rights, which may at present be unenforceable due to the lack of effective collective action mechanisms, are rendered enforceable. Moreover it is evident, as was recognised by the Irish Law Commission, in its 2003 Consultation Paper on Multi-Party Actions that collective actions have an important role to play in the effective prosecution of mass claims arising out of discriminatory behaviour in the employment field in order to '*vindicate civil rights.*'[94] That they do so is evident, again as noted by the Irish Law Commission, by the US Supreme Court in its decisions in *East Texas Motor Freight v Rodriguez* 431 US 395 (1977) and *General Tel Co v Falcon* 457 US 147 (1982).

**Europe**

Collective Consumer Redress - European Commission (2005 onwards)

34. EU policy makers have identified meaningful and accessible consumer redress mechanisms (i.e., collective actions for consumers) as being at the heart of the single market across the 27 Member States. Collective redress forms part of the Commission's Consumer Policy Strategy for 2007 – 2013, published in March 2007.[95] The strategy notes that:

*If consumers are to have sufficient confidence in shopping outside their own Member State and take advantage of the internal market, they need assurance that if things go wrong they have effective mechanisms to seek redress. Consumer disputes require tailored mechanisms that do not impose costs and delays disproportionate to the value at stake.*

*It* [the Commission] *will also consider action on collective redress mechanisms for*

---

[93] National Employment Panel, *The Business Commission on Race Equality in the Workplace*, (October 2007) at 13, paragraph 31.
[94] Irish Law Commission (LRC CP 25-2003) at 36.
[95] *EU Consumer Policy strategy 2007 – 2013* (Com (2007) 99).

*consumers both for infringements of consumer protection rules and for breaches of EU anti-trust rules in line with its 2005 Green Paper on private damages actions.*

35. The European Commission's activity is being led, in tandem, by the Competition Directorate General (DG COMP) and the Health and Consumer Protection Affairs Directorate General (DG SANCO).

Anti-trust claims

36. The policy articulated by the European Commission in respect of competition law is arguably the more developed, with a Commission White Paper having been published in April 2008, following the December 2005 Green Paper (noted above).[96] The recent White Paper finds that[97]

*With respect to collective redress, the Commission considers that there is a clear need for mechanisms allowing aggregation of the individual claims of victims of antitrust infringements.*

37. In order to meet this need, the Commission suggests the introduction of representative actions on behalf of consumers and businesses, and further suggests that these be complemented by collective actions (on an opt-in basis) in competition matters.[98]

38. The White Paper also deals briefly with the matter of costs, alluding to the potential need for some form of costs protection or relaxation in relevant cases. Although no specific recommendations are made, the Paper finds that the "loser pays" or costs shifting principle has a dual role – playing an important function in filtering out unmeritorious but equally acting to discourage victims with meritorious claims. The text skirts round this controversial area in suggesting that national courts may need to be empowered to derogate from the principle "*in certain justified circumstances*": see the White Paper.

---

[96] Kroes, *The Green Paper on antitrust damages actions: empowering European citizens to enforce their rights*, (Brussels) (06 June 2006) (Opening speech at the European Parliament workshop on damages actions for breach of the EC Antitrust rules) at 6.

[97] White Paper on Damages actions for breach of the EC antitrust rules, COM(2008) 165 final, at section 2.1.

[98] The text of the White Paper uses "suggests" here, rather than any other formulation such as recommends or advises.

Collective Consumer Redress

39. As regards collective consumer redress more widely cast, in late 2005 DG SANCO
    commissioned Leuven University to research alternative means of consumer redress
    across the EU, other than conventional proceedings. Some two years later, the
    completed Leuven research preceded a significant conference on collective redress in
    Lisbon in November 2007, addressed by both the Competition and Consumer
    Protection Commissioners.[99] In their speeches both went to some length to reassure
    delegates that the Commission is aware of the widespread antipathy across the EU
    towards an aggressive US style class action litigation culture.[100]

40. At the Lisbon conference, Commissioner Kuneva announced a consultation on
    benchmarks that should feature in effective and efficient redress systems. Formal
    consultation on the Commission's ten benchmarks (included at **Appendix G**) ran
    until the end of March 2008.

41. More recently, DG SANCO is in the process of conducting and producing a new
    study focusing specifically on collective redress in the EU. This seeks to evaluate the
    effectiveness and efficiency of existing mechanisms and to assess whether consumers
    suffer detriment in Member States where collective redress mechanisms are not
    available. At the same time, the Commission launched a further study aimed at
    providing more information on the key problems faced by consumers in obtaining
    redress for mass claims.

42. The Commission has stated that it will use the results of these consultations and

---

[99] Stuyck et al, *An analysis and evaluation of alternative means of consumer redress other than redress through ordinary judicial* proceedings, (Leuven University) (2007) at 262.

[100] *"I am well aware of the concerns about importing a system which, in combination with other features, have led to excesses in non-European jurisdictions. Let me repeat today that that it is not what the European Commission has in mind. We have learned from these foreign experiences, their strengths and their weaknesses. But we are not in favour of introducing wholesale a system which would be alien to our European traditions and cultures, or which would encourage unmerited claims."* (Commissioner Kroes - Lisbon, 9 November 2007) and *"To those who have come all the way to Lisbon to hear the words 'class action', let me be clear from the start: there will not be any. Not in Europe, not under my watch."* (Commissioner Kuneva - Lisbon, 10 November 2007).

further studies, together with other information provided by stakeholders and interested parties, to decide whether, and if so, to what extent, an initiative on collective consumer redress is required at EU level. It will also need to decide what form any such initiative might take.

43. As regards timing, the expectation is that the Commission will publish the results of the two studies and a further consultation on collective consumer redress in December 2008.

European Economic and Social Committee (EESC) (2007 – 2008)

44. In February 2007 the EESC on its own initiative decided to examine and issue and opinion on '*[d]efining the collective actions system and its role in the context of consumer law.*'[101] In doing so it examined the role and arrangements '*for a form of collective group action, harmonised at Community level, in particular in the area of consumer law and competition law, at least at an initial stage.*'[102] It did so with the aim of promoting further discussion and analysis of the issues.

45. The EESC in its Opinion arrived at a number of conclusions, which were, *inter alia*, that:

   (1) Appropriate procedures both at EU level and at member state level should be available to uphold substantive (material) rights (at 4.1);

   (2) All EU member states, whether through their own constitutions or incorporation of the European Convention of Human Rights and Fundamental Freedoms affirm the right to fair trial, which includes the right of meaningful and effective access to the courts (at 4.2);

   (3) Existing legal mechanisms do not always provide such practical and

---

[101] The Opinion is reprinted in full, with the kind permission of the EESC, at **Appendix Q**.

[102] European Economic and Social Committee, *Opinion on Defining the collective actions system and its role in the context of Community Consumer Law*, at 1.1.
(http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2008:162:0001:0019:EN:PDF)

meaningful access to justice (at 4.3);

(4) The creation of a European collective action would secure effective access to justice to all consumers. It would also be of benefit to commercial operators through procedural cost savings and through providing legal certainty. It would also lead to a single European jurisprudence in this area. It would benefit the development of private international law within the EU and strengthen consumer law through making it possible for consumers to obtain fair compensation (at 4.4 – 4.6);

(5) The development of collective actions is not necessarily to be limited to consumer or competition law (at 5.5);

(6) A new collective action should not be introduced on the basis that it can only be pursued on behalf of consumers by a representative body such as a consumer body or Ombudsman. Such mechanisms are primarily regulatory and are not generally able to obtain effective redress for consumers (at 7.1);

(7) A new collective action should not take the form of a US class action i.e., it should not incorporate those aspects of a collective action which give rise to negative aspects of the US system, such as: punitive damages; contingency fees; forum shopping across State jurisdictions (at 7.1.2);

(8) The merits and drawbacks of opt-in and opt-out where canvassed. In particular it was noted that there were significant disadvantages to an opt-in system i.e., procedural delay, low take-up right etc. It was also noted that concerns that arose as to whether an opt-out system was compatible with the right to fair trial could be met (at 7.2);

(9) A certification stage, carried out by the court, is necessary as is court approval of any settlement. Proper procedures should be put in place to allow for evidential disclosure. Such actions should only be brought before designated

courts. (at 7.3);

(10)  Compensation for all forms of damage (pecuniary and non-pecuniary) must be available under a collective action. Proper mechanisms should be put in place to calculate damages and distribution of damages to class members, either directly or if necessary indirectly (at 7.4);

(11)  An effective and expeditious appeal procedure should be in place, available to both claimants and defendants (at 7.5);

(12)  Any new action must be self-financing, although a support fund should be established for those litigants who cannot afford, at the outset of proceedings to fund an action. Such a support fund could be funded on a polluter-pays principle (at 7.6)

## Conclusion

46. The widespread developments outlined in this chapter demonstrate that the need to provide proper, efficient and effective access to justice where large numbers of individual citizens have collectively suffered similar losses has been a key concern of a wide range of policy makers over a considerable period of time. Coupled with this has been the explicit recognition that any measures to improve access to justice through reform in this area must be both balanced and proportionate.

47. These two factors – access to justice, delivered via a balanced and proportionate mechanism – remain the touchstones by which proposals to improve the mechanisms through which collective action can be effectively and fairly pursued (including those made in this report) will be measured.

48. The recent policy debate on collective action has been active on two levels, both in England and in the EU. First - and generally the more advanced – relates to competition law, in which a limited representative mechanism already exists in England and Wales and in which proposals have been put forward both the OFT and

BERR and, at the European level, by the Commission. The second level covers civil claims generally and consumer claims in particular. Prior to this report, detailed practical proposals for a generic collective action in England have not been put forward, although the issue had been examined on several occasions by various agencies.



## PART 5

## PUBLIC ENFORCEMENT and the ROLE OF REGULATORS

**Summary**

This chapter considers the present position in respect of non-court based regulatory methods of redress.

1. There are at the present time a number of public enforcement mechanisms, which are able to facilitate the provision of consumer redress. Public enforcement can arise in a number of ways and through a number of vehicles. The following is intended to be an indicative rather than exhaustive study.

**Ombudsman**

2. Ombudsman schemes have been a feature of the regulatory landscape since the early 1960s when the Parliamentary Ombudsman was created.[103] As Seneviratne put it ombudsmen are "*complaint-handlers, [who provide] 'an impartial, accessible, informal, speedy and cheap means of resolving complaints*'"[104] There are a wide variety of such schemes at present, some of which are the product of legislation whereas others have been established by private industry, for example, the

---

[103] See Justice, *The Citizen and the Administration: the Redress of Grievances* (Stevens, 1961). For a detailed account see, Seneviratne, *Professorial Inaugural lecture* (17 April 2000, Nottingham Law School) (http://www.bioa.org.uk/otherinfo/Ombudsmen-2000-Mary%20Seneviratne.pdf).
[104] Seneviratne (2000) at 16, citing: Giddings, *The ombudsman in a changing world* (1998) 8 (6) Consumer Policy Review 202 at 203.

Parliamentary and Health Service Ombudsman, the Financial Ombudsman Service, the Legal Services Ombudsman, the Pensions Ombudsman, the Ombudsman for Estate Agents,[105] the Removals Industry Ombudsman Scheme, and the Telecommunications Ombudsman.[106] In addition to these formal Ombudsman schemes there are similar bodies which fulfil the same role e.g., the Police Complaints Authority or the Broadcasting Standards Commission.[107]

3.  Ombudsman schemes, unlike their counterparts in, for instance, Denmark, do not initiate or fund litigation before the civil courts.[108] Rather they tend to complement the civil justice system by providing an informal, inquisitorial forum for resolving a variety of complaints both economically and efficiently.

4.  Ombudsman schemes have available to them a range of remedies where they find a complaint to have been made out. They can require the subject of the complaint to provide an apology, to change their behaviour or to provide the complainant with compensation, although such compensation will not be an equivalent level to that which would be available in legal proceedings if the matter were justiciable.[109]

**Regulators**

5.  In addition to Ombudsman schemes a large number of industry sectors are subject to regulation. Regulators exist, for instance, in respect of competition law (the Competition Commission, the Office of Fair Trading[110]), the pensions industry (the

---

[105] The Estate Agents' Ombudsman is now capable of requiring payment of consumer compensation as a consequence of the Consumer Estate Agents and Redress Act 2007.

[106] For an exhaustive list see: http://www.ombudsman.org.uk/contact_us/if_we_cannot_help.html\ or the British and Irish Ombudsman Association: http://www.bioa.org.uk/index.php

[107] Seneviratne (200) at 15.

[108] http://www.forbrug.dk/english/dco/. This is despite the suggestion, by, for instance, the CAB that a universal Consumer Ombudsman ought to be introduced to provide a more effective means via which consumers could be provided with compensation. Such a body if introduced would provide a means of providing effective redress for multiple consumer claims which would complement well any new mechanism introduced into the English civil justice system. It would do so as it would facilitate compensation consistently with the proper emphasis on alternative dispute resolution: see Citizens' Advice Bureau, *Representative Actions in Consumer Protection Legislation: Consultation Response to the DTI.* (October 2006) at 2.

[109] http://www.adrnow.org.uk/go/SubSection_15.html;jsessionid=aDU3QMbUnMV5

[110] See, for instance the various powers under Part 8 of the Enterprise Act 2002, such as the implementation of the Injunctions Directive (Directive 98/27/EC) which established a '*common procedure to allow*

Pensions Regulator), financial services (the FSA),[111] health and safety (the Health and Safety Executive) and the railways (the Office of Rail Regulation). A non-exhaustive list of regulators is given in Schedule 5 of the Regulatory Sanctions and Enforcement Act 2008.[112]

6.    Regulatory regimes exist as a means to ensure that certain specific industries or business sectors operate consistently with substantive law. For instance, the Office of Fair Trading seeks to ensure that businesses do not abuse their market position or operate concerted practices to the detriment of market efficiency or consumer welfare. Equally, the Office of Rail Regulation regulates the rail industry in order to ensure, for instance, that train operators do not abuse their monopolistic position and comply with health and safety law.[113]

7.    Regulatory regimes exist where, as Macrory put it ". . . *Government cannot be confident that the whole of the sector covered will voluntarily comply with the standards or achieve desired outcomes.*"[114] Regulators are, in the first instance then, compliance mechanisms. But where compliance with standards is not achieved consumers will often suffer detriment. Regulators will thus, as a corollary of their primary aim, ensure that consumer detriment is kept to a minimum by ensuring proper compliance with relevant standards. Regulatory schemes, in this way, as Macrory saw it rightly, had a number of features. The paramount aim was to ensure that businesses in the regulated sector were punished effectively where they failed to

---

consumer bodies to stop unlawful practices [detrimental] to the collective interest of consumers anywhere in the EU.' The Directive is implemented in English law through section 217 of the Enterprise Act 2002.
[111] See section 382 – 383 of the Financial Services and Markets Act 2000.
[112] The listed regulators are: British Hallmarking Council, Charity Commission for England and Wales, Coal Authority, Competition Commission, Countryside Council for Wales, Environment Agency, Financial Services Authority, Food Standards Agency, Football Licensing Authority, Forestry Commissioners, Gambling Commission, Gangmasters Licensing Authority, Health and Safety Executive, Hearing Aid Council, Historic Buildings and Monuments Commission for England ("English Heritage"), Housing Corporation, Human Fertilisation and Embryology Authority, Human Tissue Authority, Information Commissioner, Local fisheries committees, Natural England, Office of Communications, Office of Fair Trading, Office of Rail Regulation, Pensions Regulator, Security Industry Authority, Statistics Board. Other regulators not included within the ambit of the Regulatory Sanctions and Enforcement Act 2008 are, for instance, Ofwat (water industry), Oftel (television, radio and related media), Ofgem (energy industry), Postcomm (postal services industry).
[113] http://www.rail-reg.gov.uk/
[114] Macrory, *Regulatory Justice: Making Sanctions Effective*, (Final Report) (November 2006) at 15.

comply with regulatory requirements. Punitive measures were to be combined however, where pertinent, with other measures aimed to induce behavioural modification so as to deter future non-compliance. Finally, they existed to ensure that redress was given to those who suffered a detriment as a consequence of established non-compliance.[115] There are however a number of problems with the use of regulatory mechanisms and regulators as the means to provide effective consumer collective redress.

8. First, not all industries or businesses, for instance, operate within a regulated sector, nor is there, as in the case of Denmark, a single body that can initiate proceedings against any business which has caused consumer detriment. There is no omnicompetent regulator nor does there appear to be any suggestion that one either should or might be introduced. Equally, not all regulators have or are likely to be given the power to require compensatory awards to be paid to consumers. Postcomm, for instance, is constitutionally unable to respond to individual complaints and, *a fortiori*, it is unable to provide either individual or collective redress. While it is anticipated that the absence of such compensatory delivery mechanisms is to be rectified to a degree by the Regulatory Sanctions and Enforcement Act 2008, a number of regulators will not to be given the power to require the payment of compensation to individuals, but only it seems where the regulator is certain beyond a reasonable doubt that a relevant offence has been committed.[116] Equally, there always remains the possibility, as the CAB pointed out in their consultation response to the DTI, that a regulator may be disbanded at some future point in time.[117] Taken either singularly or together these points strongly suggest that there will thus be an access to justice gap for those individuals, singly or collectively, who suffer injury as a consequence of action by an actor within a regulated industry where the regulator does not have the power to require compensation payments to be made. Equally, even where the power to award compensation does exist it will only exist to the criminal standard of proof rather than to the civil standard of proof; thus institutionalising an

---

[115] Macrory (2006) at 35.

[116] See section 42 (2) of the Regulatory Sanctions and Enforcement Act 2008

[117] Citizens' Advice Bureau, *Representative Actions in Consumer Protection Legislation: Consultation Response to the DTI.* (October 2006) at 8.

access to justice gap for those citizens who could, if an effective and efficient civil procedural mechanism existed to enforce their rights, have enforced them as other citizens can by satisfying the court to the lower civil standard.

9.   A second difficulty arises however in respect of those regulators who are or will be able to facilitate the provision of compensatory awards to consumers. That difficulty arises from the nature of regulatory regimes, which unlike the civil justice system are not designed to provide full compensatory redress to consumers either singularly or collectively. The primary function of regulatory regimes, is as Macrory makes clear, to ensure compliance with statutory and other regulatory norms. Regulatory sanctions exist and the means to facilitate compliance either through deterrence or punitive sanction.[118] While they may be able to require compensation to be paid such awards may well be a secondary consideration for any regulatory regime. Where such redress conflicts with the regulator's primary role it might well be anticipated that the primary role will take precedence. It would be anticipated that a regulator, in order to ensure future compliance or encourage industry whistle blowing, may well enter into leniency agreements with individual businesses which might give rise to the regulator either taking no action against that business or require it to pay less than full compensation to those consumers who had been adversely affected by its actions. As EC Competition Commissioner Kroes argues, "*[u]nlike courts, which address and enforce the rights of individuals, the authorities act in the general interest.*"[119] She further explains that:

> "*…no matter how closely public intervention mirrors the concerns of consumers, no matter how effectively the fines that we impose punish and deter unlawful behaviour, the victims of illegal behaviour will still not be compensated for their losses. Public enforcement is simply not there to serve this goal. It is there to punish and deter*

---

[118] As evident in Macrory's six penalties principles, *Macrory* (2006) at 10: "*A sanction should: 1. Aim to change the behaviour of the offender; 2. Aim to eliminate any financial gain or benefit from non-compliance; 3. Be responsive and consider what is appropriate for the particular offender and regulatory issue, which can include punishment and the public stigma that should be associated with a criminal conviction; 4. Be proportionate to the nature of the offence and the harm caused; 5. Aim to restore the harm caused by regulatory non-compliance, where appropriate; and 6. Aim to deter future non-compliance.*"

[119] Speech: *Enhancing Actions for Damages for Breach of Competition Rules in Europe* (22 September 2005) at 2, accessible online at: <http://europa.eu/rapid/pressReleasesAction.do?reference=SPEECH/05/533&format=HTML&aged=0&language=EN&guiLanguage=en>.

*illegal behaviour. It cannot make amends for the damage and suffering caused to consumers. Therefore, consumers should be empowered to enforce their rights themselves.*"[120]

10. Thirdly, even in those areas where regulators wish to ensure full compensation is paid to adversely affected consumers, doubts must arise as to whether regulatory action is the most efficient and economic means by which this can be provided. To begin, it is doubtful whether public bodies would be able to act upon every single case of infringement, as Commissioner Kroes states, "*even the best competition authority cannot know at first hand every problem in every sector of the market.*"[121] Furthermore it can be argued that regulators are not themselves in the best position to assess certain types of damage which involve difficult factual questions e.g., non-economic loss such as general damages for pain and suffering, as they may well be required to do following enactment of the Regulatory Enforcement and Sanctions Act 2008. Equally, it is doubtful that regulators are able, absent legal action before for instance a tribunal such as the Competition Appeal Tribunal, to economically and efficiently ensure that compensation is paid where a business contests liability or contends that they have not breached any relevant regulatory norm. Regulatory action taken by the OFT, for instance, arising out of bank charges in 2008 required resort to formal litigation, and only then after a concerted media campaign and large scale individual action before the courts. Not only was regulatory action here essentially reactive but due to the robust defensive stance taken by the relevant businesses it required resort to the civil justice system in any event.

11. Moreover any compensatory award which might be made following the changes effected by the Regulatory Sanctions and Enforcement Act 2008 are unlikely to form an effective means of providing effective access to justice in the context of civil justice given that it requires that compensation should only be awarded where the

---

[120]Speech: *Making consumers' right to damages a reality: the case for collective redress mechanisms in antitrust claims* (9 November 2007) at 3, accessible online at <http://europa.eu/rapid/pressReleasesAction.do?reference=SPEECH/07/698&format=HTML&aged=0&language=EN&guiLanguage=en>.

[121] Speech: *Regulating for Competition and Growth* (17 February 2005), accessible online at: http://europa.eu/rapid/pressReleasesAction.do?reference=SPEECH/05/98&format=HTML&aged=0&language=EN&guiLanguage=en>.

regulator is satisfied to the criminal rather than the civil standard of proof.[122] This places claimants at a distinct disadvantage and one not envisaged by Macrory, who recommended a civil standard of proof.[123] Absent acceptance of a civil standard of proof, which was specifically rejected by the government in respect of Macrory's recommendations, regulation cannot as argued by some, provide an effective means of ensuring collective civil redress.

12. Equally, it can be questioned whether the proposed new compensatory mechanism envisaged by the 2008 Act may well not prove successful given the lack of use of similar powers by the FSA which exist under sections 382 and 383 of the Financial Services and Markets Act 2002. Equally, as Hodges points out similar powers to award compensation which have existed within the wider context of criminal procedure have since their introduction in 1973 '*not been widely used.*' [124] History suggests that the same lack of use may well arise post-enactment of the 2008 Act; even if it were accepted that the access to justice gap which exists in the civil justice fora is properly met through the use of either regulators or the criminal courts applying the criminal standard of proof.

13. Furthermore, regulatory bodies are not equipped with the resources to enable them to fulfil their public enforcement role, nor are they likely to have the resources available to pursue every meritorious compensatory action. The question thus arises as to why certain individuals should be denied effective access to justice because a regulator does not have the resources to pursue an action on their behalf. As OFT Chairman, Philip Collins explained, "*What is clear is that competition authorities cannot, and should not, take on every case. Our work has to be prioritised, limited taxpayers' resources allocated accordingly and the progress of cases speeded up.*"[125] Where a regulator cannot for legitimate reasons take on a case, absent an effective procedural mechanism for citizens to utilise the access to justice gap will remain. Taking these

---

[122] Section 42 (2) of the Regulatory Enforcement and Sanctions Act 2008.
[123] Macrory (2006) at 46ff.
[124] Hodges, *Global Class Actions Project Country Report: England and Wales*, (2007) at 4 (http://globalclassactions.stanford.edu/reports.html#england).
[125] *Public and private enforcement challenges and opportunities* (6 June 2006), at 15: <http://www.oft.gov.uk/shared_oft/speeches/0306.pdf>

factors into account, the argument, as put by Commissioner Kroes that *"[a]nyone harmed by unlawful action should not have to wait for a public body to intervene"*[126] becomes more persuasive. Both Philip Collins and Commissioner Kroes point towards the necessity of their being an available, effective and efficient civil mechanism which at the very least would complement regulatory compensatory action and would do so where it was shown to be a superior compensatory mechanism in the circumstances (i.e., it would be a question for the superiority question at the proposed certification stage).

14. Regulatory mechanisms for collective consumer redress like Ombudsman schemes, are not without problems. They are not all encompassing: they are not just limited to the consumer field but they are not all-encompassing even in that field. Not all regulators are constitutionally able to require compensation payments to be made. It is not necessarily the case that regulatory action is either more efficient or economical than action via the civil justice system. Most significantly however, reliance on regulators as the vehicle for providing compensation is based on a fundamental flaw. Regulators exist to regulate not to ensure the provision of compensation. They are the converse of justice systems, which exist to give proper effect to substantive law and, as a necessary corollary, ensure compensation is paid to those whose substantive rights have been infringed. The co-option of regulators as deliverers of redress is as flawed as the co-option of the civil justice system as a primary means of regulation. The fear must be that a regulator will where necessary to further effective future compliance with regulatory norms sacrifice the requirement that proper compensation is paid to consumers both individually and collectively. The regulatory imperative will inevitably take precedence.

15. In the circumstances while Ombudsman schemes and regulatory mechanisms may provide in certain circumstances more effective and efficient means through which collective action and compensation could be pursued the limits inherent in such

---

[126] *More private antitrust enforcement through better access to damages: an invitation for an open debate* (9 March 2006) at 3: http://europa.eu/rapid/pressReleasesAction.do?reference=SPEECH/06/158&format=HTML&aged=0&language=EN&guiLanguage=en>.

75

schemes are such as to lead to the conclusion that even where they to be effective within their spheres of operation they would not be able to meet the full extent of the access to justice gap to which the present lack of an effective collective action gives rise.

76



**PART 6**

**Private Enforcement: The Case for a Generic Opt Out Collective Action**

**Summary**

This chapter considers the weaknesses in the present procedural mechanisms available to prosecute collective actions. It proposes that those weaknesses can only be overcome through introduction of a new generic collective action.

**Introduction**

1. The recognition that individual citizens have almost no chance of bringing actions against powerful companies has led authorities to explore avenues for shifting the balance of litigation risk in favour of the individual citizen, either as consumer, employee or otherwise, and the small business. To do this effectively a broad international consensus has developed that a collective action procedure is the most efficient and effective means of providing genuine access to justice in the 21st Century world of the global market, the mass production of goods and services, and sale through such media as the internet as well as more traditional market places.

2. While a number of mechanisms exist in England to facilitate the effective prosecution and management of a large number of claims which give rise to substantially the same or similar legal or factual issues (joinder, test cases or GLOs) there remains an access to justice gap. The denial of effective access to justice, as demonstrated by, for

instance, Professor Mulheron's evidence of need study,[127] by the failure of the follow-on Competition law regime to produce more than one action which left, as a consequence of the barriers to entry created by its opt-in nature, vast numbers of those who had suffered actionable detriment uncompensated, and evidence that large numbers of employment (discrimination) claims are unprosecuted, provides strong support for the conclusion that citizens in England are not being fairly served through the provision of sufficient or effective access to justice by the present procedural mechanisms. Access to justice is, despite the present procedural mechanisms, still disproportionately weighted against claimants whether they are groups of consumers, small businesses, employees, or victims of mass torts. This has resulted in few claims being brought, and significantly, demonstrates that a number of meritorious claims simply have not seen the light of day. Where claims have been brought, they have been brought in a manner which is either manifestly inefficient, e.g., the Bank charges litigation, or at procedural disadvantage to the claimants i.e., the Football shirts litigation.

3. The existing CPR mechanisms which could theoretically be deployed to bring consumer and small business claims have been covered earlier. This section summarises the generic weakness in the current mechanisms, including the new consumer vehicle in the competition field, discussing briefly how they may be rendered properly effective and more routinely utilised.

**Private enforcement – Definition**

4. Private enforcement is a term often used interchangeably to describe a mixed function. In this context the primary function is that giving proper effect and enforcement to the substantive rights of those individual citizens who had suffered actionable detriment as a consequence of, for instance, anti-competitive conduct, consumer-related infringements, product liability issues, contractual disputes, mass-

---

[127] Mulheron, *Reform of Collective Redress in England and Wales: A Perspective of Need*, (CJC Research Paper, 2007) esp., 16, 23, 25, 32, 48, 66, 72, Parts V and VI.

torts, employment and discrimination issues. Effective enforcement would involve compensatory damage awards, which were appropriate according to established substantive law principles disgorgement of profits. It is as a consequence of its primarily compensatory function that effective private enforcement arises, through which it provides a real deterrent effect that such actions are said to have on unlawful conduct. In this context both the OFT and the European Commission have publicly stated that they see private actions by victims in competition law as a necessary complement to their own public enforcement efforts, which are intended to be regulatory and where necessary punitive.[128] Consistently with the conclusions drawn in the previous chapter on public enforcement, the OFT, in this context, has emphasised that its role in respect of Competition Act investigations is one of enforcement and deterrence rather than the achievement of compensation for those citizens who have suffered loss as a consequence of anti-competitive behaviour.[129] Aside from the deterrent aspects there appear to be two reasons for this: first, that both private and public enforcement seek to promote economic efficiency by improving the functioning of the market; and secondly that the resources available to private parties can be used as a complement to the (necessarily finite) resources available to the public authorities to pursue infringers and maintain market competitiveness. Greater private enforcement should, then, give public enforcers greater freedom to prioritise their activity where they think it will do most good.

---

[128] European Commission, Report on Public/Private Enforcement (2004) (The Ashurst Report): "The EU must move forward from the 'state of total underdevelopment' of private claims for damages'; *Van Gend en Loos v Nederlandse Administratie der Belastingen* [1963] ECR 1: "*The vigilance of individuals concerned to protect their rights amounts to an effective supervision in addition to the supervision entrusted . . . to the diligence of the Commission and of the Member States*"; as recognised in the Annex to Green Paper on Damages (Com (2005) 672 Final) at 8. See speech of Phillip Collins, OFT Chairman at: http//www.biicl.org.
[129] http://oft.gov.uk/advice_and_resources/ resource_base/ca98'

**Defects in the Present Collective Mechanisms**

**Representative actions under the CPR**

5.  Until the CPR's introduction, the representative rule procedure under RSC Ord. 15 r.
    12 was the only truly available collective action mechanism and was, as Uff noted,
    akin to the US class action contained in Rule 23 of the Federal Court Rules.[130] As
    noted earlier this is now contained in CPR 19.6. Practitioner experience of this rule is
    that despite attempts to increase its flexibility through a number of cases, it remains
    no more effective than the old RSC procedure. It does not for a number of reasons,
    each of which can be explored by reference to the recent Bank charges litigation. It is
    useful to do by reference to this litigation, which saw an extremely large number of
    individual claims being issued on the small claims track against a number of
    defendant banks. Each claim raised a common issue or issues relating to whether
    unauthorised overdraft charges were either penalty charges, and therefore
    unenforceable, or unfair contract terms if otherwise lawful. It is axiomatic that if, the
    first of Lord Woolf's three principles (see *supra*) was capable of being met by
    existing procedure these claims ought properly to have been capable of prosecution
    by one of the extant forms of collective or multi-party action presently available. The
    question is in the present context, why they were not capable of effective prosecution
    under the representative rule?

6.  The primary reason why these claims could not go forward under the representative
    rule is that, just as its predecessor under the RSC was, it is still bound by a very
    stringent interpretation of same interest/commonality.[131] Litigants are required to
    have the same interest in one cause of action. That same interest requires there to be
    one index accident, if a tort, or as in the Bank charges litigation a single contract to
    which all the claimants (claimant class) were party. That the claimants had all entered
    into similar contracts, or even identical contracts, is not sufficient to satisfy the same

---

[130] Uff, *Class, Representative and Shareholders' Derivative Actions in English Law*, Civil Justice Quarterly
(1986) 50 at 56.
[131] *Markt & Co Ltd v Knight Steamship Co Ltd* [1910] 2 KB 1021.

interest requirement. Moreover for a same interest to exist any benefit from the litigation must be common to all. Different defences available as between the defendants and individual members of the claimant class would defeat this as would any difference in the nature of the remedy available to the members of the claimant class. In the bank charges case both of these two points could arguable have been met in the majority of cases as the defences available would have been common to all and the damages could have been assessed globally applying the principle set out in *EMI Records Ltd v Riley* [1981] 1 WLR 923. The class claimants could not however in the Bank charges case, and this is the case more generally, get beyond the same interest requirement re., the basis of the cause of action and this is despite the Court of Appeal's decision in *The Irish Rowan*,[132] which held that there was no necessity for class claimants to all be parties to the same, single contract.[133]

7. On a more general level, while the damages issue arising from the definition of same interest was arguably capable of resolution in the Bank charges litigation the EMI Records approach has not apparently been followed in other litigation. Equally, attempts to ameliorate the strict approach adopted by *Markt* to damages in cases such as *Prudential Assurance Co Ltd v Newman Industries Ltd*[134] have not been widely followed. Difficulties and continuing uncertainties as to damage awards under the representative rule continue to blight its usefulness.

8. In addition to these problems, which militate against the commencement of actions under the representative rule, a further difficulty arises in respect to its application following judgment. Joinder, reflective of its basis as a means to arrive at declaratory or injunctive relief, is mandatory. It therefore suggests that insofar as finality of litigation is concerned for both claimant class members and defendants it is wholly certain as to the effect of its judgment. In order for a judgment under the representative rule to be enforced by or against a party who is only before the court

---

[132] [1991] 2 QB 206 at 222-23.
[133] See, Sorabji, *Class Actions: Reinventing the Wheel* (**Appendix M**); Andrews (2003) at 991ff; Stratford, *Class Actions*, (Brick Court Chambers, 2007) (Seminar Materials) at 85.
[134] [1981] Ch 229.

by way of representation the court's permission is however required (CPR 19.6(4)). This creates a form, albeit a limited one, of opt-out post-judgment. Whether permission for enforcement will be granted is something which must be assessed on the basis of whatever special circumstances arise.[135] Even if a claim succeeds under the representative rule its application in respect of represented class members remains at the present time therefore to a degree uncertain, undermining to a degree any real benefits which might otherwise arise regarding: certainty; finality of litigation; efficiency and economy of procedure.

9.  As it is, the representative rule as presently interpreted ensures that claims which could otherwise be fairly and effectively pursued through it, like the Bank charges litigation, must go forward as unitary claims. From a practical perspective, in that litigation, with so many banks implicated, few major law firms were without some conflict of interest, whilst others were unwilling to test out the important legal principles involved against such powerful adversaries, especially given the likely costs involved, economies of scale, and procedural requirements under the representative rule. While many bank customers did receive payments because the banks took a commercial view to pay, bank customers, like others with individual claims in a class of claimants, were left to the dangers associated with numerous individual suits i.e., the risk of inconsistent judgments; disproportionate litigation delay; disproportionate and likely exorbitant cost to the litigants and the court system as a whole; and adverse publicity for the defendants over a long period of time.[136]

**Test Cases, Joinder and Consolidation**

10. These three traditional mechanisms are inadequate means through which to effectively and efficiently prosecute large numbers of individual claims which arise from a common cause or give rise to common or similar issues of law or fact. Joinder and consolidation, while offering the ability to manage several individual claims within one action become unwieldy when truly large numbers of parties are involved,

---

[135] *Howells & Another v Dominion Insurance Company Ltd* [2005] EWHC 552 (QB).
[136] For a fuller discussion, see Mulheron, *op cit,*  Unitary Actions.

which limits their efficacy and the court's ability to adequately and properly resolve the claims and issues arising within them on their substantive merits. That there were and are inadequate to the task is to a degree well-established given the need in the 1990s to develop at common law what would be codified post-Woolf into the GLO in cases such as *Davies (Joseph Owen) v Eli Lilly & Co [1987] 3 All ER 94 at 96, [1987] 1 WLR 1136* and *Nash v Eli Lilly & Co* [1993] 4 ALL ER 383 at 409.

11. The use of the, or a, test case has a number of advantages in terms of efficiency and efficacy. The selection of a test case, with other similar claims being stayed pending its outcome has clear benefits in these terms. Equally, it enables a judgment to be given, which while it does not bind the stayed by way of res judicata, it does operate insofar as relevant according to the doctrine of precedent. In essence this was the approach taken by the OFT when it initiated proceedings in the Bank charges litigation at the request of seven banks under the '*wider implications process*' (WIP) which provides that, '*where in the respondent's opinion there is an issue raising novel questions of law with significant consequences*' the regulator may consider bringing a test case.[137] Under the costs arrangements agreed at the outset of the case between the OFT and the respondents, each party is to pay its own cost of the action.[138] Consumer associations had asked the OFT to take the case prior to the banks' intervention, but this could not be progressed because of the express limitation that only respondents can make such a request. Given there were/are many thousands of consumers affected and their claims put immense pressure on the court system, this limitation may need to be revisited so that the request may come from other quarters for example the Treasury, or consumer associations with contingent test case budgetary arrangements made accordingly, to ensure the test case mechanism is fair, effective and efficient. In other, and more general cases, selection of test cases is a matter for the court's case management powers. While the effect of the doctrine of precedent only goes so far, it would be anticipated that the individual bank charges claims would settle as a

---

[137] See DISP, chapter 3, for further details of the 'wider implications process', at: http//www.fsahandbook.inf/

[138] See the OFT's statement at: www.oft.gov.uk. For a further explanation of shared responsibilities between regulators and the 'wider implications process', see, www.ombudsmanandfsa.org.uk

consequence of the ultimate result of the OFT test case.

12. Use of the test case, either in civil proceedings or proceedings before the Employment Tribunal, does however bring with it a number of disadvantages. First, which it has in common with joinder and consolidation, it keeps in place a potential barrier to entry to the justice system through requiring individual claimants to issue proceedings. It is predicated on a large number of claims being issued. This is the case not simply before a test case can be or is generally selected but equally is the case post-judgment in the test case. Given the limitations of a test case judgment, see below, individual claims will generally still need to be litigated or at the least issued. The barrier to entry thus remains. Such extant or future claims may however settle, in the latter case following receipt of a letter before claim rather than issue, but they may do so on an unfairly disadvantageous basis given that there may well be significant individual inequality of arms between them and any defendant.

13. Secondly, due to the unitary nature of any claim selected as a test claim it will be determined according to its substantive merits. It will not therefore be able to take account of other, wider issues, which arise in those other cases which are stayed pending its resolution nor will other members of a class of claimants be in a position to influence the conduct of the case, through, for instance, ensuring or at the very least suggesting that certain points be taken or that certain issues be considered. It may therefore be the case that its determination will not provide proper guidance through the doctrine of precedent to large numbers of those other claims, which will then either have to be resolved individually or via further test cases. Equally, it may result in a judgment which prejudices unfairly those parties subject to the stay as they were unable to deploy their own, and possibly, highly pertinent arguments prior to resolution of the point at issue. Moreover the use of a test case may not be suitable due to the nature of the cause of action. While it might be suitable where claims give rise to a common question, as they did in the Bank charges litigation, of contractual interpretation. It will not equally or necessarily be as capable of fairly and efficiently

resolving mass tort claims, where individual damages and causation issues may well predominate.

14. Further problems arise through the use of test cases. The test case may, for instance, settle before judgment. This will leave the issue undetermined. It will result in a new claim being selected and prosecuted with the attendant additional cost and delay, both to the individual litigants and the justice system as a whole, that the replacement of one claim for another *ab initio* brings with it. Equally, undue pressure may be brought to bear against individual litigants by a defendant with, in economic terms, greater market power. Such pressure could result in undue pressure being brought on individual claimants to settle claims for disproportionately low amounts. Moreover the inequality of arms between individual consumers, employees or small businesses may give rise to valid claims not being initiated or continued or being settled at an unjust level as a consequence of realistic fears of repercussions and/or damage to individual or business reputations through proceeding with individual test litigation.

**GLOs**

15. The GLO was introduced as a means to provide effective case management for unitary and individual claims, where there were such large numbers of them that they could not be effectively managed using either joinder and consolidation. The GLO is however flexible enough to combine what is in effective a sophisticated form of joinder or consolidation with the use of the test case within its own procedural framework. The rationale for the GLO's introduction has twice been explained judicially by Lord Woolf. In *Taylor v Nugent Care Society,* he emphasised that the GLO was introduced in order to provide an effective case management system for large numbers of individual claims:

*"The provisions which are contained in the Civil Procedure Rules dealing with group litigation were an innovation which was introduced by an amendment to the rules made in 2000. It was the experience of the courts that if litigation involving a substantial number of claimants was to be managed in the appropriate way, it was*

86

*essential that there should be some procedure which provided the courts with very wide powers to manage the proceedings. It was in the court's interest for the proper dispatch of other litigation that the court should have those powers. It was also in the interests of litigants that the courts should have those powers because it would enable the court to deal with this sort of litigation in a more efficient and economic manner than would otherwise be possible. It would enable the court to provide more expeditious justice.*"[139]

In *Boake Allen Ltd v Revenue & Customs Commissioners* he emphasised that a fundamental rationale of the GLO was that it provide a cost-effective means of prosecuting individual claims.

*All litigants are entitled to be protected from incurring unnecessary costs. This is the objective of the GLO regime.*"[140]

16. In both cases the emphasis was on the effective and efficient prosecution of viable individual claims; viable because they could otherwise be prosecuted independently of each other i.e., as unitary claims. The rationale did not extend to enabling individual small claims to be effectively prosecuted where previously such claims could not be prosecuted at all as individual claims. Implicitly there appears to be an acknowledgement that the GLO cannot meet the first of the three principles underpinning collective action reform Lord Woolf identified in his Final Report.

17. Technically consumer and small business representatives could bring actions in England under the existing GLO procedure. GLOs could, and can, provide a useful and flexible tool for managing multi-party claims consistently with their rationale as explained by Lord Woolf. They are not, however, ideal vehicles for the prosecution of collective claims. Claimants must opt-in through issue of a claim form, rather than opt-out. Barriers to entry, to access to justice, remain therefore a part of the GLO regime, which cannot provide effective access to justice for those individuals whose claims are of limited individual quantum and where the litigation (cost) risk far outweighs the potential value of a successful judgment. Moreover simply being party

---

[139] [2004] 1 WLR 1129 at [9].
[140] [2007] 1 WLR at 1394.

to a GLO remains in itself a relatively expensive exercise for individual litigants in any event, not least because, as an opt-in mechanism, it still requires, as was evident from *Taylor v Nugent* significant front-loading of litigation cost. The GLO does not therefore mitigate, but on the contrary, institutionalises the inability of those litigants, with relatively small claims that give rise to common issues, to prosecute them effectively. The GLO does nothing to satisfy the first of Lord Woolf's three principles which collective actions are required to meet.

18. These problems are further compounded by: the use of cut-off dates which preclude claimants joining the opt-in register but which does not, nor could it, preclude them from prosecuting their claim as an individual claim; the lack of provision to aggregate damages; and the lack of a mechanism whereby the court can scrutinise and approve any proposed settlement. Each of these factors reduce the utility of the mechanism as a means to reduce the number of separate actions which may be commenced arising out of a common cause of action. Where, for instance, as in *Taylor v Nugent*, and individual misses the cut-off date they will still be able to prosecute their action individually. Such an action may be stayed pending the outcome of the group litigation, but it will nevertheless be prosecuted; thus undermining the efficiency and economy benefits of the GLO. Equally, the inability to aggregate damages means that damages will necessarily have to be dealt with on an individual basis, further undermining efficiency and economy savings.

19. Such problems might be ameliorated to some extent by reforming the GLO so that it operated as an opt-out mechanism or permitted claimants to opt-in at judgment or on settlement. Such a reform would in effective turn to the GLO into an opt-out collective action; whereas it is more appropriate for the court to have at its disposal the widest range of procedural mechanisms to manage claims effectively, whether that be on an opt-in basis or an opt-out basis.

**The new consumer mechanism**

20. The most recent addition to the panoply of procedural devices available to manage collective actions is the consumer redress mechanism in the field of competition law. This was introduced through section 19 of the Enterprise Act 2002, which inserted a new section 47B into the Competition Act 1998. It provides that bodies specified by the Secretary of State can bring '*consumer actions*' in the Competition Appeals Tribunal (CAT) on behalf of those who have suffered as a result of an established infringement on a 'relevant prohibition'. The relevant prohibitions are Chapter I and Chapter II of the 1998 Act, Articles 81 and 82 EC and the corresponding provisions the ECSC Treaty. It is what is known as a '*follow on*' action because it can only be used when an infringement has already been established by the OFT or Commission and any appeals have been finally determined.

21. The only body to apply and be designated to date is *Which?* Shortly following on from a decision of the House of Lords to refuse JJB Sports permission to lodge an appeal, *Which?* pioneered the new provision by issuing proceedings in the CAT on behalf of named claimants who had been victims of ten members of a sports cartel convicted in 2003 for the price fixing of replica football shirts.[141] Both the mechanism and a number of the substantive law issues for example, levels of evidence to be accepted, quantification of damages, distribution of the damages were new areas to be decided by the CAT.

22. The single biggest difficulty in bringing the case so long after the event was gathering claimants, a factor the defendants knew would militate against the representative body and was easily exploited.[142] Even while the numbers affected were significant, around 1.2 – 1.5 million, very few claimants were named on the claim form at the end of the opt-in exercise. Had the s47B mechanism been an opt out system *Which?* could simply have had the damages either settled or decided once disclosure had taken

---

[141] *Consumer Association v JJB Sports PLC* : case/n 1078/7/9/07.

[142] See Gubbay, '*Private Action in Competition Law: effective redress for consumers and business*' (April 2007), *Which?'s* response to the OFT discussion paper for more detail.

place, without the burden and strategic vulnerability associated with the opt-in process and, crucially, without the rights being enforced of those who had not opted-in, but who if a more effective and efficient procedural mechanism existed would have taken the opportunity afforded by that mechanism to enforce their rights. Insofar as the rights of those who did not wish to litigate are concerned, such rights are protected within an opt-out regime through effective notice of the action and an effective opportunity to elect not to take part in the litigation. Equally, an opt-out regime would have enabled *Which?* to ensure that any surplus funds, i.e., unclaimed at the end of the expiration period, would have been subject to negotiation with the defendant.

**Suggested reforms**

23. Despite its current limitations the s47B vehicle is superior to its CPR 19.6 equivalent. Its primary advantage is the lack of limitation which arises in respect of CPR 19.6 through its same interest test. Equally, the s47B vehicle is superior to its CPR 19.10 equivalent i.e., the GLO as it enables a large number of claims to be brought on a unitary basis rather than via a managed system of individual claims. There are however, fundamental weaknesses common to both the s47B and GLO procedural mechanisms, which act as serious disincentives to bringing private claims. The barriers common to both mechanisms flow from the fact that they are opt-in mechanisms.[143] The effects of this are multi-faceted as opt-in mechanisms are:

    a. **Resource intensive**: gathering the claimant cohort takes up considerable cost and time. These pre-litigation costs are not recoverable under the normal cost rules;

    b. **Involve front loading of costs**: entry of each of the claimant's names and details onto a group register usually at the time the claim form is lodged, the

---

[143] In brief, an opt-in system is one where all members of the group must be gathered and named at the time the claim is issued. An opt-out system is where an action is brought on behalf of an unidentified group who opt in later in the process, at the point of claiming their damages.

CAT rules however do allow for the joining and substitution of names post-issue of the claim form;

c.  **Require funding**: gathering claimants to satisfy third party funders, and ATE requirements so that there are enough claimants to cover the high cost of bringing the action. Under an opt-out regime funders undertake a risk analysis based on potential numbers in the group, value of the claims and the potential take up rate by other representative bodies; and

d.  **Have cost implications**: In low value collective consumer claims there are real disincentives for lawyers who may assist bodies bringing the claims. Under normal CFA rules the agreement provides that the firm reserves the right to recover those costs from the client where they are unable to recover from the defendants. In these cases the client is unlikely to be in a position to meet those costs and therefore the work would need to undertaken on a CFA-Lite basis. A CFA-Lite agreement means lawyers they would not seek to recover costs from their clients but would agree to only take what they could recover from the defendants which could put them considerably out of pocket. Accordingly some cost protections[144] should be made available in line with the working party's report on litigating public interest litigation.

24. In addition to these generic problems the s47B procedure requires that a body is designated and approved by the Lord Chancellor. In order to do so the Lord Chancellor must be satisfied that the body is: a recognized representative of the group; has integrity and reputation; gives rise to no potential conflicts of interest; has adequate financial means; and has the expertise to bring the action. The application is subject to a three month consultation period where objections may be raised. There then follows final approval with a statutory instrument drafted and laid before Parliament. Having survived this rigorous process, there is a view that a designated body should not be subject to the costs and delays of class certification and

---

[144] For a fuller discussion of costs protection, see: Liberty, *Litigating the Public Interest: report of the working group on facilitating public interest litigation*, (July 2006) (www.liberty-human-rights.org.uk).

permission stage hearings that *ad hoc* representative parties may require. This process, while it protects the public interest is both time-consuming and potentially burdensome for a variety of body's who might otherwise seek designation. This is especially the case where a body, such as an unincorporated association, trade association or trade union, or an individual claimant may only wish or need to act as a representative in a single instance.

25. The introduction of the follow on s47B action in a specialized court was seen as a great step forward and, if reformed so as to become an opt-out action, may still become an ideal procedural mechanism in the CAT. In fact, a procedure based on such a revised s47B action applicable generically and on a standalone rather than simply a follow-on basis could widen the scope of what is currently permissible in the High Court and other civil fora. Equally, its utility could properly be increased through the introduction a court-based approval of ad hoc bodies as representatives (see below) in addition to pre-authorised bodies.

26. The introduction of an opt-out system however, could warrant any action being subject to more checks and balances including close court management, which would include judicial discretion to conduct certification and permission hearings with regards to designated bodies. However, given the cost risks involved and the potential need for third party funders to be satisfied on the case prospects, and the reputational risks, it is highly unlikely that designated or indeed *ad hoc* bodies will bring unmeritorious actions, especially given robust case management, certification and the possibility of the imposition of security for costs.

27. In the US the opt-out regime governed by Rule 23 of the Federal Court Rules class actions are closely managed and, including class certification and permission stages; court approved settlements and fairness hearings so that those who wish to opt out may do so. Lawyers' fees are also court approved. Absent any of the procedural features in England which led to past class actions excesses in the US it may be

advisable to adopt aspects of this process where it is efficient and expedient to do so to satisfy defendants and the court, the actions have merit and good prospects.  While it is clear that collective actions bring benefits insofar as access to justice is concerned, in that they, as Andrews has pointed out, enable do not require an '*alleged victim of a legal wrong*' to take positive steps to bring an action, '*enable rights to be vindicated that cannot readily be enforced by individual action . . . [and redress] procedural inequality between small claimants and large defendants.*'[145]

28. In order to ensure, in the interests of the claimant class, defendants and the court that a collective action is the most appropriate procedural mechanism in terms of efficiency, economy, fairness and access to justice before such an action should be permitted to proceed it should be subject to positive certification by the court. In carrying out the certification process at the initial case management stage the court should assess the proposed collective action according to a number of criteria. Such criteria have been set in a number of jurisdictions with some variations.[146] Broadly they could include:

    a.   Numerosity:  minimum size of the class;

    b.   Preliminary merits of the claim;

    c.   Commonality: a nexus between factual and legal issues between the group members bringing the claim;

    d.   Superiority: whether the collective procedure is superior to other means of resolving the dispute between group members and the defendant; and

---

[145] Andrews, *Multi-Party Proceedings in England: Representative and Group Action*s, Duke Journal of Comparative and International Law (Vol. 11) (2001) 249 at 263.
[146] Mulheron: *The Class Action in Common Law Legal Systems: A Comparative Perspective*, (Hart Publishing) (2004), Part 11.

e. Adequate representation: for the reason that collective actions will bind all group members, Assessment would include whether there is any conflict with interests of group members.

29. Of particular importance in the certification exercise will be the assessment of the preliminary merits. This is of importance as a means to protect defendant interests. While a collective action provides an effective means to increase claimant access to justice it must be remembered that the right of effective access to justice guaranteed both under the common law and Article 6(1) ECHR is an indivisible right. A defendant's right to procedural justice must be equally protected. This is of particular importance in respect of collective actions as they give rise to the risk of the development of what are known in the US and other jurisdictions as *blackmail suits* i.e., generally unmeritorious actions commenced purely as a means to extract a settlement from a defendant.[147] Equally, care must be taken to avoid the risk of a collective action being used as a means to further either the impression that there is a growth in what is termed 'compensation culture' or the existence of such a phenomenon. In order to protect defendant's access to justice rights the court should conduct a robust assessment of the preliminary merits of a proposed collective action prior to and as a precondition to certification.

30. As noted above designation of representative parties could be widened properly and consistently with the recommendations made by the OFT to include representative groups in the human rights (e.g., the Equal Opportunity and Human Rights Commission, which would be able to build on its existing role to launch formal investigations where it suspects that a company may be in breach of discrimination law), trade associations and bodies (e.g., the Federation Against Software Theft) and small business fields, rather than simply consumer groups.[148] There is thus no reason

---

[147] Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the 'Class Action Problem'*, (92) Harvard Law Review 664 (1979).

[148] Trevor Phillips, the Chair of the Equal Opportunity and Human Rights Commission (EHRC), presented powerful arguments for the EHRC to take cases on behalf of individuals, Bevan Foundation lecture, 23 October 2007. Trade unionists at UNITE have also called for a widening of designation for employee disputes such as the equal pay claims currently being brought.

in principle why an opt-out redress mechanism could not have wide application. Equally, there is no reason why it could not, in principle be limited to specific, designated areas. There is also no reason why, as is the case in other jurisdictions, that it could not be used as an effective means of prosecuting employment claims, in for instance the civil courts or the Employment Tribunals. The introduction of such a mechanism in other fora, such as the CAT or the Employment Tribunals (on the model which exists at present in the employment field of representative actions brought by Trade Unions in respect of alleged TUPE breaches) could complement any civil justice reforms or go forward in the absence of civil justice reform. In either case such reform in other fora would bridge the access to justice gap in respect of such claims within those fora and would militate against the necessity of claims having to be brought in the civil justice system.

31. Following the JJB Sports case *Which?* announced publicly it did not intend to bring more actions.[149] Unlike the private profession and regulators who specialize in litigation, cash strapped not-for profit organisations and charities, often have different priorities such as lobbying and campaigning as their core work. Designated bodies may be more likely to participate in the enforcement community if there were an opt out model and some cost protection. Equally and again as noted earlier, court approval of ad hoc representative parties on a case by case basis would improve the utility of an opt-out action as it would enable a much wider pool of potential representatives to prosecute claims; such court approval could only properly occur after it was satisfied that the putative representative was a proper body or individual to prosecute the claim.

32. In order to protect all parties if funding arrangements are entered into as a means to fund the costs of any new collective action it ought to be permissible for the court to assess those arrangements in order to ascertain whether they are fair and just. Factors

---

[149] British Institute of International and Comparative Law, 8th Annual Trans-Atlantic Antitrust Dialogue, London  (15 May 2008).

that could guide such an assessment could include:[150]

    a.  The client demonstrated an interest in suing on its own behalf;

    b.  The funder does not have the capacity to monopolise the litigation;

    c.  No conflict in interest between the funder and the client;

    d.  The funder has fully informed the client about the effects of the funding arrangement;

    e.  The funder has sufficient resources to meet its commitments to the claimants;

    f.  The funder must be willing and able to meet any adverse costs order that may be rendered against the claimants or the funder should the action fail. The funder will not corrupt the legal process; and

    g.  The funder has not negotiated an inordinately high fee.

33. These details could be provided by way of a short written statement, verified by a statement of truth, at the certification hearing.

34. Finally, if a new collective action is introduced it is advisable in the light of experience in other jurisdictions for it to be reviewed within a fixed time period i.e., 3 – 5 years in order to assess the following, and if necessary effect further remedial reform:

    a.  whether the legal risks associated with private enforcement litigation have been reduced;

---

[150] Mulheron, *Third Party Funding; A Changing Landscape*, 28 Civil Justice Quarterly (2008) 312 at [36].

    b.  whether availability of funding has increased; and

    c.  the impacts of private enforcement actions on designated bodies, courts and business.

35. These could be measured in part by recording and analysing the numbers and nature of private claims and settlements to assess the overall effectiveness.



**Part 7**


**THE EVIDENCE OF NEED FOR REFORM**


**EXTRACTED FROM:**

R Mulheron, *Reform of Collective Redress in England and Wales: A Perspective of Need* (2008), pp 157– 61.


*Commencement of extract:*


**Overall conclusion**

1. Research has demonstrably evidenced an 'unmet need' for reform of collective redress mechanisms in English civil procedure. Whether this is to be achieved by the introduction of a new collective redress mechanism or by the supplementation of an existing procedure, 'something more' is required to facilitate the litigation and testing of widespread grievances, in circumstances where, presently, these grievances are not being addressed nor compensated.  … An opt-out collective redress regime would provide much utility in the present procedural landscape.  A number of scenarios discussed in this Research Paper appear to be eminently suited to such a regime.

    …


**Substantiating reasons for this conclusion**

2. Since the GLO was introduced in 2000, there have been notably fewer group actions than the number of collective actions which have been commenced in Australia. Similarly, the number of class proceedings in Ontario (where certification is required at the outset, on criteria which are somewhat more discerning than the GLO's

certification requirements) far exceeds equivalent litigation over the same time period under the GLO regime.

3.  However, it is not just a question of numbers. The *types* of collective actions are also far wider under the opt-out regimes of Australia and Ontario than the types of group claims brought so far under the GLO regime — in circumstances where, feasibly, the same or similar grievance could exist among UK citizens too. Indeed, several categories of grievance brought in Australia/Ontario have no equivalent under the GLO regime (for example, the very small over-charge cases, or real estate disputes involving, say, a dispute between the landlord of a shopping centre and the tenants). Notably, several of the claims in Australia/Ontario were, individually, non-recoverable claims, in which case individual litigation was extremely unlikely — however, the opt-out systems of these jurisdictions have also been used for collective actions in which large-value individual claims have been encompassed by the suit.

4.  There is, in reasonable proximity to England, the long-standing Portuguese opt-out regime, entitled the *Right of Proceeding, Participation and Popular Action*. It has been in operation since 1995, and the consumer organisation DECO has obtained valuable experience in bringing actions under it. DECO's view is that the regime has worked well, although the limited number of collective actions for damages is a direct result of the limited resources which DECO has available to it to prosecute such actions. As always, when turning one's attention to the second of the trio of issues which were outlined in the 'Background' earlier (at p 2) — need, design and costs/funding — the lessons to be learnt from other jurisdictions' legislative design and experiences thereunder are of paramount importance. In that respect, the refinements and improvements proposed by DECO are most interesting for English law reformers. Other opt-out regimes have recently been introduced in Europe (Spain, Denmark, Norway, the Netherlands), each of which has different features and pre-conditions for use.

5.  Where English claimants have sought to 'add on' to class actions instituted in the United States (under rule 23 of the Federal Rules of Civil Procedure), problems have

sometimes ensued, that have resulted in the English claimants being 'dumped out' of the action or treated unfavourably by comparison. Although some of these actions had a 'connection' with the English jurisdiction that would have permitted an action to be brought in England, nevertheless, claimants sought to be joined to a US opt-out action, in the absence of any opt-out regime in England under which the action could have been commenced.  This has not always ended happily for the English claimants, as both judicial decisions under rule 23, and the practical experience of UK law firms attest.

6.  Since March 2006 (when *Which?* launched a direct campaign of consumer awareness), the English county court system has been increasingly overwhelmed by a multitude of bank charges claims being filed by bank customers. The bank charges litigation has also raised other dangers associated with numerous individual suits.  For all litigants, there are the risks of inconsistent judgments and delays in outcome.  For the defendant, there is the added risk of embarrassing and adverse publicity if it overlooks the need to enter a defence to one or more of these unitary actions.

7.  Other contexts in which 'unmet need' is evident are: compensation for loss or damage incurred where unfair terms are identified as standard terms being improperly used by businesses in consumer contracts; where infringing behaviour has been identified and punished by way of fines/penalties in respect of anti-competitive conduct, but where neither 'follow-on' actions nor stand-alone (liability + quantum) claims have been brought by injured parties; and in the employment context, where the numbers of individual claims filed for equal pay, sex discrimination and working time directives, have 'exploded' in the past 1–2 years.  In each of these contexts, a collective opt-out regime would provide better access to justice and judicial efficiency.  Furthermore, calls for better private enforcement procedures have been made by public bodies or publicly-funded bodies in each of these categories — in some instances, by entities that could feasibly act as an ideological claimant in collective actions.

8.  Having regard to these particular contexts, it is not suggested that different collective action frameworks should be implemented in each context — these contexts are

merely provided by way of example, to show an 'unmet need'. A *generic*, *statutory*, 'build the field and they will come'-type regime, which covers all types of scenarios potentially giving rise to collective actions, is preferable, in this author's view.

9.  A Questionnaire distributed to Respondents who have had experience in conducting opt-in group litigation in England produced some interesting insights. The experience in English group litigation indicates that, under an opt-in regime, the opt-in rates vary considerably, from very low percentages (<1%) to almost all (90%), or all, of group members opting to participate in the litigation. In several instances, however, the percentages of opting-in could not be determined because early cut-off dates were established, and the total number in the group was never able to be ascertained before the litigation was finalised. Respondents indicated that the vast majority of the Relevant Actions sustained *some* procedural difficulties because they were conducted under an opt-in regime — and the tasks of identifying and communicating with large classes, together with pleadings requirements at the outset, were especially difficult.

10. Furthermore, the experience derived from English group litigation indicates (per Table 5) that there are almost twenty reasons why group members may not opt in to litigation — reasons that are as diverse as human nature. While some of these reasons will preclude these claimants *ever* choosing to litigate their grievances, many of the reasons for not opting-in that emerged in the study are particularly pertinent when the litigation is in its 'infancy', prior to any determination or settlement of the common issues, and when the litigation inevitably retains such an 'individualised' hue.

11. The exercise of 'crunching the numbers' on opt-in versus opt-out confirms the anecdotal evidence that opt-out '*catches more litigants in the fishing net*'. Where modern empirical data exists, the median opt-out rates have been as low as 0.1%, and no higher than 13%. Where widespread empirical data does not exist as yet, judicial summations of opt-out rates indicate a range of opt-outs between 40% (which is rare, on the cases surveyed) and 0%, with a tendency for the rates of participation under opt-out regimes to be high (that does not, however, guarantee that all class members will come forward to claim their individual entitlements following the resolution of

the common issues. On the other hand, whilst the experience in English group litigation indicates that, under its opt-in regime, the opt-in rates vary considerably, from very low percentages (<1%) to almost all group members opting to participate in the litigation, European experience sometimes indicates a *very* low rate of participation (less than 1%) where resort to opt-in was necessary in consumer claims and where the class sizes were very large. In the United States too, a much lower participation rate has been evident under opt-in than under opt-out. In that respect, the dual pillars — access to justice and judicial efficiency in disposing of the dispute once and for all — are enhanced by an opt-out regime.

**Concluding remarks**

12. The various 'building blocks' which were the subject of research point toward the incontrovertible conclusion that, in England, there is an 'unmet need' for better redress of common grievances which have allegedly given rise to monetary loss and damage to a class of claimants. This is *not* a 'solution in search of a problem'. The need for progressive procedural reform exists, and a more effective method of pursuing collective action in England is urgently required to address it.

102



**Part 8**

**Substantive Law or Rules of Court?**

**Conclusions of the Civil Justice Council's Comparative Law Committee Collective Redress Working Party on the Question of whether the implementation of an Opt-Out Collective Action Regime requires the enactment of Substantive Legislation or may be achieved by changes to the Civil Procedure Rules**[151]

**Summary**

This chapter sets out the Comparative Law Committee of the Civil Justice Council's view on the question of whether the implementation of an opt-out collective action regime requires the enactment of substantive legislation or may be achieved by changes to the Civil Procedure Rules in the light of a divergence of opinions expressed by members of the Working Party.

**BACKGROUND**

1.    The working party's terms of reference were that it was limited to answering the question: "*What changes are necessary to the substantive law of England and Wales in order to introduce an opt-out collective action?*" Whether or not an opt-out model *should* be introduced was agreed to be outside the terms of reference of

---

[151] The Collective Redress Working Party first met on 13th November 2007. Its membership is as follows: Seamus Andrew, Senior Partner of Simmons Cooper Andrew, Solicitors; Michael Black QC, Two Temple Gardens (Chair); Ms Ingrid Gubbay, Consultant in the London office of Cohen, Milstein, Hausfeld & Toll LLP; His Honour Judge Graham Jones, Chairman of the CJC Comparative Law Committee; Professor Rachael Mulheron, Professor of Law, Queen Mary University of London; Robert Musgrove, Chief Executive of the Civil Justice Council; John Sorabji, Legal Secretary to the Master of the Rolls; Nick Thomas, Senior Partner of Kennedys, Solicitors.

the Working Party. Further, the question addressed presupposes that changes to the substantive law of England and Wales *are* necessary to introduce an opt-out model.[152]

2.  On 29th November 2007, Rachael Mulheron produced a short paper at the Civil Justice Council Collective Consumer Redress Event at Theobalds Park, setting out 10 bullet points describing changes to the substantive law that *may* be brought about by a modern opt-out collective action procedure.

- **Limitation periods** – suspending the limitation periods for all group members upon the representative claimant filing his pleadings, until a defined event occurs (such as the group member opting out of the class).

- **Appeal rights** - requiring 'absent class members' (those defined as falling within the class description but who take no active part in the litigation and are only before the court by representation) to forfeit or limit their appeal rights in some circumstances.

- **Modifying *res judicata* for absent class members** - permitting any determination of the common issues argued in the class action to bind the absent class members, hence a modification in the principle of *res judicata*.

- **Aggregate damages assessment** - permitting aggregate (class-wide) assessment of damages, which may also represent a change in the rules governing quantification of damages.

- **Evidence given by another** - permitting the evidence of an absent class member to be given by a representative and not by the class member himself.

---

[152] The terms of reference were agreed at its initial meeting on 13 November 2007.

- **Simplified means of proof** - permitting, by specific evidentiary rules, that evidence on individual issues can be given by expeditious means, including by virtue of amending the rules of evidence or means of proof.

- **Abrogating the *Henderson* rule**[153] - amending the *Henderson* rule so that the class is not required to bring forth its whole case and the defendant will not be judged to be prejudiced by the failure of the class to do so.

- **Standing** - permitting a representative claimant to assert a cause of action against a defendant against whom the claimant has no direct cause of action (the cause of action is against a co-defendant, such that, against each defendant named in the originating proceedings, there is a representative claimant who asserts a cause of action against him).

- **Statistical evidence** - permitting statistical evidence to be used as a means of both establishing liability (for example, as a means of establishing loss), and the quantum of damages.

- ***Cy-près* distributions** - with respect to the related question of damages distribution, permitting a *cy-près* distribution of damages to parties other than the injured or damaged class members.

3.    On 8th February 2008, a substantial Civil Justice Council Research Paper entitled "*Reform of Collective Redress in England and Wales*" authored by Rachael Mulheron was launched. Greeting its publication, the Master of Rolls said:

> *I welcome this research as an important contribution to the debate on whether our existing mechanisms for collective consumer redress provide effective access to justice. As the report makes plain, it is clearly not desirable to import a US style class action system, nor would it be practical to do so. However it is right to consider whether civil procedure can or should be improved whilst ensuring proper protection against unmeritorious claims. The Civil Justice Council will consider these matters further and will provide advice to Government.*

4.    In her conclusions Rachael Mulheron stated:

---

[153] (1843) 3 Hare 100.

*The various 'building blocks' which have been the subject of examination in this Research Paper point toward the incontrovertible conclusion that, in England and Wales, there is an 'unmet need' for better redress of common grievances which have allegedly given rise to monetary loss and damage to a class of claimants. This is not a 'solution in search of a problem'. The need for progressive procedural reform exists, and a more effective method of collective redress in England and Wales is urgently required to address it.*

5.   On 9th March 2008, Rachael Mulheron circulated amongst the Working Party a paper entitled, "*Implementing an Opt-Out Collective Action in England and Wales: Legislation versus Court Rules*". She concluded that a legislative form of implementation will be required, otherwise, any *ultra vires* application brought by a defendant, alleging that a rules-based "opt-out" collective regime under which it is being sued is beyond the powers of the Civil Procedure Rule Committee, is likely to be successful.

6.   Members of the Working Party made a number of comments:

- Ingrid Gubbay asked whether the need for primary legislation might be avoided by amending the Limitation Act by way of a regulatory reform order to give the court discretion in collective actions to suspend the time limit for absentee claimants.

- Rachael Mulheron replied (in summary):

  o   It seems that Legislative and Regulatory Reform Act 2006 provides quite limited scope for Ministers to make regulatory reform orders that could amend the Limitation Act;

  o   Amendment of the Civil Procedure Act 1997 to confer on the CPR Committee the power to make rules amending the substantive law would be unlikely;

  o   The problem with putting *cy-près*, aggregate assessment of damages, etc in subordinate legislation is that some people will certainly argue

that they do not amend the substantive law, and others will take the view that they certainly do -- it will be impossible to get a consensus on that, without either an appellate judicial ruling (when defendants inevitably take the point that they are being sued under an invalid regime) or legislation;

o   There has been plenty of precedent that defendants could point to in order to argue that legislation has been enacted precisely to get around all the potential *ultra vires* problems that judges could be concerned about.  The only way would be to put the collective action in place by some form of subordinate legislation (e.g., the CPR), and then hope for an authoritative appellate ruling that said that both the regime was fine and unimpeachable and that these various orders of aggregate assessment, *cy-près*, suspending the limitation period, etc, were indeed permissible;

o   The question also arises as to whether by the insertion of more detailed provisions, the existing representative rule in CPR 19.6 could be refashioned in to a fully-operational "opt-out" class action.

● John Sorabji was of the view:

o   It is very doubtful that amending the Limitation Act 1980 would fall within the ambit of the Legislative and Regulatory Reform Act 2006;

o   It was doubtful that the Civil Procedure Act could be amended by Statutory Instrument or that from the perspective of proper legislative scrutiny it would be appropriate;

o   The representative rule is one which creates compulsory joinder pre-judgment, but which gives the court the power effectively to allow an absent party to opt out of the judgment post judgment (CPR 19 (4) (a) and (b)). It is thus in effect an "opt-out" class action;

  ○ (Tentatively) that CPR 19 (4) can be used as the vehicle by which a modern class action could be fashioned without resort to primary legislation.

- Nick Thomas expressed the opinion that, based on his experience representing insurers, that, absent primary legislation, any organised and well funded defendant would inevitably seek to argue that an "opt-out" collective regime implemented solely by amendments to the CPR was *ultra vires* because such defendants would be concerned to take all steps possible to stop such a regime in its tracks out of the concern at the "creep" towards issues which are perfectly capable of being addressed by the current regime being henceforth progressed by "class action". He believed that insurers' position would be that, if there were primary legislation, they could raise their concerns about the "creep" issue in consultation with a view to achieving legislation which provided for the acknowledged needs for a collective regime but which at the same time built in safeguards against the feared "creep".

7. Rachael Mulheron's paper was presented at the Civil Justice Council Collective Consumer Redress Event at Beaumont House, on 26th-27th March 2008. At the same event John Sorabji presented a paper entitled, "*Class Actions: Reinventing The Wheel*" in which he argued that except for issues of limitation and *cy près* (which are not essential features of a modern class action) the representative rule can be used, in the absence of a specific class action statute, by the court under its inherent jurisdiction to fashion a modern class action.

8. At the meeting of the Comparative Law Committee meeting on 2nd May 2008, Graham Jones asked the Working Party to consider the divergent views of Rachael Mulheron and John Sorabji and advise the Committee.

9. There was further discussion at the meeting of the Comparative Law Committee meeting on 16th June 2008.

## SUMMARY OF RACHAEL MULHERON'S VIEWS

10.    Rachael Mulheron's views may be summarised as follows:

- Powers of the Civil Procedure Rule Committee -

  o The Civil Procedure Act 1997 empowers the Civil Procedure Rule
    Committee to make rules of practice and procedure. Under Sch 1, r 4,
    the Committee is authorised to make rules to '*modify the rules of
    evidence as they apply to proceedings in any court within the scope of
    the rules*'. Otherwise, there is no provision in either the principal
    sections or in Schedule 1 of the Act that permits the Rule Committee
    to amend the substantive law;

  o In contrast, the Civil Rules Committee in Ontario has much wider
    powers, pursuant to s.66 of the Courts of Justice Act (RSO 1990, c
    C.43). It is permitted to make rules for Ontario's Court of Appeal and
    the Superior Court of Justice in relation to the practice and procedure
    of those courts in all civil proceedings, even though such rules may
    alter the substantive law. Notwithstanding, Ontario's opt-out class
    action regime was statutorily implemented, on the recommendation of
    the Ontario Law Reform Commission. In addition to the view that
    substantive law was affected by an "opt-out" regime, the Commission
    also recommended the legislative route because the implementation of
    such an important piece of reform (important to the public, the litigants
    and the court) '*deserved to be debated fully in the Legislative
    Assembly, rather than passed by way of regulation pursuant to the
    Judicature Act*';[154]

  o Thus, if an opt-out regime amends the substantive law by its
    provisions (which it does), then either the Rule Committee cannot
    make rules introducing such a regime, and to do so would be *ultra
    vires*, or the terms of the Civil Procedure Act 1997 will have to be

---

[154] OLRC, *Report on Class Actions*, 306.

statutorily changed to allow substantive law to be dealt with by the Committee (similarly to Ontario's provisions) to permit the Committee to introduce an opt-out collective redress regime by amendment to the Civil Procedure Rules. As matters presently stand, either expanding the present wording of the representative rule in CPR 19.6 or inserting a new regime in CPR Part 19 (which presently also contains the Group Litigation Order in CPR 19.III) are not safe options.

- How an opt-out collective action regime alters the substantive law by its drafting –

  o The class action is a procedural vehicle, it neither modifies nor creates substantive rights;[155]

  o In reality the regime may amend the substantive law in two ways: first, by the way in which it is drafted; and secondly, by the way in which it is judicially permitted to interact with the substantive law. The former is of immediate relevance and there are, at least, five key areas in which experience in other jurisdictions shows that implementation of an opt-out regime *does* affect the substantive law,

    1. **Limitation** - An opt-out collective action regime will contain a provision which suspends the limitation periods for all Absent Claimants[156] on the representative claimant filing his pleadings, until a defined event occurs (such as the Absent Claimant opting out of the class, or the collective action being decertified). [***It is common ground that suspension of limitation periods will require implementation by primary legislation***]

---

[155] *Bisaillon v Concordia University* [2006] SCC 19, [2006] 1 SCR 666.
[156] A person who falls within the class description, who has not opted out, and who is represented by the representative claimant until the determination of the common issues, but who takes no active part in the litigation until or unless required to prove the individual issue/s pertaining to that person.

2. ***Res judicata* and Absent Claimants** - An opt-out regime will provide that determination of the common issues argued in the collective action will bind the Absent Claimants and will bar them from re-litigating those issues. Lord Philips has expressed the view that this would be a novel concept under English law and was likely to require primary legislation. Sir Andrew Morritt agreed with him.[157] The issue did arise in the courts of Victoria but was superseded by legislation before an appellate decision could be delivered. Law reform commissions in Alberta and Manitoba have expressed the view that to provide that any finding on the common issues binds the Absent Claimants is an amendment to the substantive law requiring legislation. The other aspect of *res judicata* that *may* be affected is the rule in *Henderson v Henderson*.[158] In Canada the issue has arisen in relation to claimants' claims that fall outside the scope of the common issues. Can a representative claimant tailor the claims proposed for certification for tactical reasons, or does the rule in *Henderson* require the claimant to bring forward the totality the claims that are capable of being dealt with as common issues?

3. **Aggregate Assessment of Damages** - An opt-out collective action regime typically permits a court to '*award damages*

---

[157] See, LCD, *Representative Claims: Proposed New Procedures*: Consultation Response (April 2002).

[158] Per Sir James Wigram V-C in *Henderson v Henderson* 3 Hare 100, 114-115: "*In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of <u>res judicata</u> applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time*."

*in an aggregate amount*', as a class-wide assessment, without reference to the individual class members' losses. Lord Justice May has commented that '*[i]f the causes of action and remedies were to go beyond those presently available, they need to be defined and then would probably require legislation*'. The Association of District Judges has also noted that a new representative claim '*might well involve fundamental law reform, for example, of the way in which damages are calculated, and the basis upon which compensation may be awarded for a breach of duty.*' Such issues '*can only be resolved by primary legislation*'.[159] Law reform commissions in Alberta, Manitoba and Ontario have also opined that aggregate assessment of damages brings about a change to the substantive law of damages assessment, and would require implementation by legislation,

4. ***Cy-Près* Distribution of Damages** - where distribution of damages to all or some of the class members is impossible or impracticable, most "opt-out" collective action regimes permit the court to distribute the undistributed balance to people who are not class members (via either a price-rollback order, or by a distribution to an organisation which has purposes similar to the underlying purposes of the litigation). [***It is common ground that the cy-près distribution of damages <u>will</u> require implementation by primary legislation***],

---

[159] See, LCD, *Representative Claims: Proposed New Procedures*: Consultation Response (April 2002).

5. **Multiple Defendants** – it will represent a change in the substantive law of standing if a collective regime permits a representative claimant to assert a cause of action against a defendant against whom the claimant has no direct cause of action (instead, the cause of action is against a co-defendant), because, in unitary litigation, that representative claimant could not possibly sue that defendant. Some class action "opt-out" regimes permit that, as against each defendant named in the originating proceedings, there is *a* representative claimant who asserts a cause of action against it, but that it is not necessary that *every* representative claimant (and class member) can assert a pleadable cause of action against *every* defendant. There is a divergence of views between jurisdictions as to whether this is permissible – Ontario has accepted that it is whereas Australia has not.

- How other jurisdictions have dealt with the issue –

    o There are only two opt-out collective action regimes embodied in rules of civil procedure – the US federal regime and the regime contained in the Federal Court Rules 1998 (Canada). South Australia has a representative action procedure that allows class actions but does not contain opt-out provisions;

    o Ireland and Scotland have proposed implementation of collective redress regimes by procedural rules, but for opt-in rather than opt-out systems;

    o The regimes of Australia (Federal), Victoria (sSate) and Provincial opt-out regimes in Canada have all been implemented by statute;

    o  In Victoria, there was a recommendation for the implementation of an opt-out regime by statute. This was not done and it was, instead, introduced by court rules. The first defendant brought an *ultra vires* challenge. The case was referred to the Victoria Court of Appeal which held (3:2) that the rules were *intra vires*. There was then a further appeal to the High Court of Australia, but before the case reached the High Court the Victoria Parliament hastily introduced legislation to remove any doubts about the legality of the scheme.

## SUMMARY OF JOHN SORABJI'S VIEWS

11.    John Sorabji's paper starts with a quotation from the notes to RSC O.16, r.9 appearing in the 1904 White Book:

> *Intervention by persons and parties – If a person not a party to a class action desires to intervene in any way he should apply to be made a party,* <u>*Watson v Cave*</u> *(1881) LR 17 ChD 19 [CA].*[160]

12.    He asks that if there was reference to class actions in 1904, does the fact that we are now discussing how best to introduce a collective redress action mean that we have abolished the class action between 1904 and 2008? Alternatively, does it still exist, dormant and unused?

13.    He traces the evolution of representative proceedings in equity from the complete joinder rule, through the representative rule to the Bill of Peace and begins his analysis of the modern position in 1899/1900 with *Ellis v Duke of Bedford*.[161]

14.    In that case the House of Lords (by a majority) upheld the majority of the Court of Appeal (Vaughan Williams LJ dissenting). Lord Mcnaghten gave the leading speech. John Sorabji summarises it as follows:

- Representative actions are available where the class has a common interest, a common grievance and the relief sought was in its nature beneficial to all;

---

[160] The expression "class action" is not actually used in *Watson v Cave*.
[161] [1901] AC 1.

- The basis of the common interest and grievance did not have to be the same for each class member;

- That other factors, such as distinct rights between the class members, that may serve to differentiate the class members, are irrelevant. The basis of a representative action is what the class has in common '*not what differentiates the cases of individual members*';

- It did not matter that the represented class was '*fluctuating and indefinite*', the description of the class was sufficient properly to define it.

15. He suggests that Vaughan Williams LJ restricted the application of *Ellis* in the subsequent case of *Markt & Co Ltd v Knight Steamship*[162] and "*set back the development and application of the representative action throughout the 20th Century and did much ... to abolish the class action in England*".

16. The claim was brought by cargo owners on behalf of themselves and the other owners against ship-owners for breach of contract for the carriage of goods by sea. Each of the cargo owners had a different contract with the ship-owners. John Sorabji summarises Vaughan Williams LJ's judgment as follows:

- There was nothing on the writ to show that the bills of lading and the exceptions within them were identical or that the goods shipped were of the same class or kind;

- There was no common purpose or connection amongst the cargo owners to justify a representative action either under the old Chancery practice or under Rule 16 Order 9. The only bond between the class members was that they all had goods on the ship;

- While the cargo owners suffered a common wrong in that their goods were all lost, they had no common right or common purpose and as each class

---

[162] [1910] 2 KB 1021.

member's claim could be defeated by facts and matters unique to them it could not be said that they had the same rights as required per *Ellis*;

- Whether or not (and the implication was not) Lord Macnaghten was right in his summary of the pre-1873 Chancery practice, the court had now to construe the rule consistently insofar as the common law and chancery was concerned '*notwithstanding any prior practice in the Court of Chancery*;

and that of Fletcher Moulton LJ:

- The class had not properly been defined. Simply listing the class members did not define the class;

- Whatever the practice had been in equity, that was now immaterial as the court was now governed by the language of Order 16 Rule 9. That rule was definitive of the court's practice and it was irrelevant whether the rule narrowed or expanded the pre-1873 practice;

- The rule required as an essential condition '*that the persons who are to be represented have the same interest as the plaintiff in one and the same cause of action or matter.*' This was what Lord Macnaghten meant in *Ellis* when he adverted to common interest;

- The same interest could not arise where different defences could be raised against the class members;

- The same interest could not arise where the class members entered into separate contracts with the defendant, even if the contracts were identical, as this would be an impermissible infringement of privity of contract;

- Damages were not an available remedy to representative actions, nor could a declaratory judgment be given declaring a right to damages.

17.    In John Sorabji's opinion after *Markt* the representative rule's utility was severely restricted as the combination of the judgments meant that in order to fall within the scope of the rule a representative plaintiff had to show: i) a common interest arising under a common document; ii) a common grievance; and iii) a remedy beneficial to all, but not damages.

18.    Against that background he considers the present position:

- In *Prudential Assurance Co Ltd v Newman Industries Ltd*[163] Vinelott J held that representative actions available for claims in tort. Insofar as damages were concerned, Vinelott J held that while individual damages claims could not be pursued by a representative plaintiff, a declaration that class members were entitled to damages could be granted, which individual class members would then be entitled to rely on in future individual damages claims;

- In *EMI Records Ltd v Riley* Dillon J held that damages were recoverable in a representative action.[164] They were recoverable because the global quantum of damage to the entire class was ascertainable;

- In *Moon v Atherton* Denning MR, affirmed that only the representative plaintiff was liable for costs and that the represented parties would be bound by the decision. He went on to hold that as limitation continued to run for represented parties the court had sufficient power to substitute one of them for the representative, if the representative wished to discontinue or settle the claim.[165] In an *obiter dictum* he stated that the action, for negligence, could properly be brought as a representative action;

- Then in *The Irish Rowan* the Court of Appeal (Purchas LJ) explained that it had erred in *Markt* when it, that is Vaughan Williams LJ (and Fletcher

---

[163] [1981] Ch. 229.
[164] [1981] 1 WLR 923.
[165] [1972] 2 QB 435.

Moulton although he was not referred to), held that the rule had to be interpreted without reference to pre-1873 Chancery practice.[166] It went on to outline how: the rule as then drafted had safeguards, consistent with the old practice, for class members who wished to disassociate themselves from the class; that the rule permitted class members to opt out of the class; that as the class members entered into identical contracts there was sufficient commonality. Relying on *EMI Records* and *Moon v Atherton*, amongst others, it went on to affirm that damages claims were not to be automatically excluded from representative actions. In essence, it held that the representative action had to be applied, '*within the spirit of flexibility*' which imbued the 19th Century case law.[167] A flexibility available in 1790, reaffirmed in 1990 and *quaere* still available then in 2008.

- Most recently Morritt VC in *Independiente Ltd v Music Trading On-Line (HK) Ltd* examined the scope of the rule in its CPR guise: CPR 19.6.[168] He noted that the principles governing the rule were the same post-CPR as they were pre-CPR, albeit the rule had to be interpreted and applied consistently with the overriding objective. In particular the definition of 'same interest' in the rule had to be interpreted flexibly and in conformity with the overriding objective. The test to establish whether the rule was appropriate for the case was that laid down by *Ellis*: common interest, common grievance and relief beneficial to all. There was a common interest despite the presence of different defences (contrary to *Markt*). Pecuniary relief was available as it was beneficial to all.

19. John Sorabji expresses the view that it is arguable that the representative rule as explained in the jurisprudence could be transformed into a modern class action, with two exceptions. As it stands at the present time the jurisdiction does not accommodate *cy-près* distributions nor does it operate to suspend limitation

---

[166] [1990] 2 QB 206.
[167] Andrews, "*Principles of Civil Procedure*", (1994) (1st Edition) (Sweet & Maxwell) at 148.
[168] [2003] EWHC 470 (Ch).

periods for the represented class. Such reforms would have to be the product of primary legislation and a public policy debate properly carried out by Parliament.

20.    He suggests that the English representative rule is equivalent to Rule 23 of the US Federal Rules of Civil Procedure. Having accepted that global damages awards are available and that the basis of the representative action is flexible, not limited to past precedent, John Sorabji asks whether it is reasonable to conclude that the English jurisdiction could well accommodate damage aggregation, through perhaps treating the class as a single entity which has suffered damage and then leave it for the class members to ascertain their rights *inter se*.[169]

21.    He then turns to the questions of opt-out and mandatory classes. In his opinion it is both a mandatory action and in some circumstances an opt-out action, under the representative rule, where the court has the power to permit an opt-out under CPR 19.6 (4) *cf. The Irish Rowan*. Given the introduction of Article 6 ECHR, CPR 19.6 (4)[170] could not but, in his view, be interpreted now as providing an opt-out power per the interpretative approach exemplified by *Cachia and Others v Faluyi*[171] and *Goode v Martin*.[172] Such an Article 6 compliant interpretation of

---

[169] Since delivering his paper, John Sorabji has drawn the Working Party's attention to an article by Dr Susan M. C. Gibbons, *Group Litigation, Class Actions and Lord Woolf's Three Objectives — A Critical Analysis*" (2008) 27(2) Civil Justice Quarterly 208-243 who points out that: "*Secondly, many leading class action jurisdictions permit courts to make aggregate damages awards. These require a more flexible view of damages than that traditionally accepted in England--one that enables damages to be awarded simply on evidence of injury to the group, without precise evidence that each putative victim has suffered loss and how much. Under CPR Pt 19.III, GLO claims remain separate actions that ultimately must be resolved individually--for example, through individual quantum trials once generic liability and causation have been established. However, in <u>EMI Records Ltd v Riley</u>, a representative party action under CPR Pt 19.II (which procedure is more akin to the class action device than is the GLO), Dillon J. authorised an inquiry as to damages suffered by all members of the represented class on an aggregate basis, to avoid the inconvenience of multiple separate proceedings. Importantly, he could see no objection to aggregate damages awards in principle, so long as the evidence is reliable and a reasonable degree of accuracy can be achieved in determining the total damage suffered by the group as a whole. The Scottish Law Commission favoured precisely the same approach for multi-party actions. The Law Society, too, could see "no very strong argument for banning" lump sum global settlement offers--despite noting the potential for conflicts of interest between claimants--based on the public interest in securing the swiftest, most cost-efficient resolution.*"

[170] Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule –

        (a) is binding on all persons represented in the claim; but
        (b) may only be enforced by or against a person who is not a party to the claim with the permission of the court.

[171] [2001] 1 WLR 1966.

the jurisdiction could not but require the court to operate a sufficient notice requirement prior to certification here as in the US.

22.     He questions the proposition that the introduction of an opt-out class action would be *ultra vires* the rule-making power:  there has been a power since 1873 and beyond to create a mandatory class, the *a fortiori* case. Given the power to create the *a fortiori* case surely it follows by necessary implication that there is a power to create the lesser case, the opt-out class action?

23.     He accepts that insofar as settlement is concerned there appears to be no present basis in the jurisprudence for court-approval of settlements so as to bind the class. That is not to say that the court's power to approve settlements in cases where parties are represented by others e.g., CPR 21.10 (children and patients) could not be extended to cover represented parties. The rationale for approval is the same in both types of case; the parties to be bound are not before the court except by representative. Again the rule could be drafted so as to provide for adequate opt-out notice.

24.     As to disclosure: it was held in 1990 that there was no general power to require disclosure from represented parties as they were not for this purpose parties to the action, but he asks whether this is really a genuine difficulty now. CPR 19 (1) (2) (a) and (b) provide the jurisdiction to add parties to proceedings so that the court can resolve matters or issues in dispute in the proceedings. If there were a necessity to obtain relevant evidence from a represented party he cannot see why the party could not, in principle, be joined as a representative party, in order to obtain the evidence to enable the court to deal with the common issue. Equally, the court may simply utilise its existing powers to obtain evidence from non-parties (CPR 31.17).

25.     John Sorabji accepts he differs with Rachael Mulheron on costs, but suggests "*that is perhaps an issue for the brave new world of third party funding*".

---

[172] [2002] 1 WLR 1828.

26.    As for appeals - equity used to permit non-parties, who could and should have been joined to actions, to appeal against judgments where their interests were affected by the judgment. The represented class members would have been able to take advantage of this rule, which required them to be granted permission to appeal. He suggests that there is no reason why this rule (which the Court of Appeal has just approved as continuing to exist under the CPR[173]) should not apply to represented parties.

27.    Finally, he turns to the *vires point*: if the CPR were to be amended so as to codify the representative rule would a *vires* challenge succeed, the argument being that such a change would be beyond the rule-making power under the Civil Procedure Act 1997? In his view this does not arise on the above analysis. It is to misunderstand the rule-making power. The rule-making power here would be exercised to give shape to an extant jurisdiction; it would not be, as Buxton LJ recently noted in another context, impermissibly creating jurisdiction.[174] It would be codifying a jurisdiction which has been in existence since, at least, the 18th Century and which has been exercised and affirmed by the House of Lords twice. The *vires* point would only arise if the Rule Committee went beyond the ambit of that jurisdiction. The real question then is to identify, as he tried to do, the bounds of the extant jurisdiction.

28.    John Sorabji considers that except for issues of limitation and *cy-près* (which are not essential features of a modern class action) it need not have to go beyond that jurisdiction. Indeed as the Canadian Supreme Court has held in *West Canadian Shopping Centres Inc v Dutton*[175], the representative rule can be used, in the absence of a specific class action statute, by the court under its inherent jurisdiction to fashion a modern class action. The procedural rule in question in that case was based on the old RSC rule, it was operating in a judicial system that evolved out of the English judicial system and is therefore as much a product of the common law and equity as the English courts. He concludes that, absent

---

[173] *MA Holdings Ltd v George Wimpey UK Ltd* [2008] EWCA Civ 12.

[174] *Jaffray v The Society of Lloyds* [2007] EWCA Civ 586, citing *British South Africa Co v Companhia de Mocambique* [1893] AC 602 at 628.

[175] [2001] 2 SCR 534.

statutory intervention, there is on the face of it no reason why the English courts cannot, in this field, follow the path trodden by the Canadian Supreme Court and utilise the existing jurisdiction.

## **DISCUSSION**

29.    This paper proceeds on the assumption that it is the recommendation of the Civil Justice Council that an opt-out model of collective redress procedure should be adopted. This is only as an assumption as it is apparent from the remarks of the Master of the Rolls set out at paragraph 3 above that the final decision as to the nature of the Council's advice to Government has yet to be taken.

30.    It is however worth reminding ourselves of the recommendations of Lord Woolf in his Final Access to Justice Report. In Chapter 17 he addressed Multi-Party Actions:

> *46.    **The court should have powers to progress the MPS[176] on either an 'opt-out' or an 'opt-in' basis, whichever is most appropriate to the particular circumstances and whichever contributes best to the overall disposition of the case.** In some circumstances it will be appropriate to commence an MPS on an 'opt-out' basis and to establish an 'opt-in' register at a later stage.*
>
> *....*
>
> *77.    The Inquiry has heard how action groups can take on the role of an informed client, with formal constitutions established at the outset to provide for later problems, particularly in relation to settlement. Such groups can take account of their members' interests and ensure that these are reflected in the instructions to their legal representatives. **Where there is no formal group representing the interests of the claimants, or where it is considered that the litigants' interests require separate representation, a trustee should be appointed by the court.** There may also be a need for a trustee in cases where there are both privately paying and legally aided litigants, to ensure that the interests of both are taken into account. The trustee would be publicly funded, in some cases by the Legal Aid Board, on the basis that he or she would be fulfilling a role that would otherwise be met by an assisted person's own solicitors, or by arrangements under an 'all work' contract, which would require the lead firm to make arrangements for looking after individual clients as well as fulfilling a wider role.*
>
> *78.    The role of trustee would be flexible but the main elements might be:*

---

[176] i.e., a Multi-Party Situation.

*(a) to identify the objectives and priorities of the parties (by meeting them at an early stage to determine their needs), and to assist with devising a plan to meet those objectives;*

*(b) to maintain a watching brief on the public interest elements of the action to ensure that opportunities to instigate change are not missed;*

*(c) where necessary, to look after the interests of unidentified or unborn claimants and to act as protection against defendants picking out lead cases for settlement;*

*(d) if appropriate, to assist in the formation of an informal support group, if one does not come into being spontaneously (this could be done by advertising and holding regional meetings to inform people of the impending action and put them in touch with one another).*[emphasis added]

31.   It is also undoubtedly the case that, were it ultimately decided as a matter of policy that an opt-out model of collective redress procedure should be adopted, the implementation of the procedure would be achieved more quickly by amendment to the Civil Procedure Rules than by primary legislation. Indeed if primary legislation were adopted, that legislation would still necessitate amendment to the Civil Procedure Rules. Some of the timing deficit could be recovered by the preparation of draft rules in parallel to legislative draughtsmanship.

32.   A further fundamental matter that the Working Party cannot ignore is that even if the Government were to accept advice from the Civil Justice Council to introduce an "opt-out" model of collective redress, Parliament remains sovereign. The same view may therefore be taken as the Ontario Law Reform Commission as noted in Rachael Mulheron's paper (see paragraph 10 above) that such an important reform, '*deserved to be debated fully in the Legislative Assembly, rather than passed by way of regulation pursuant to the Judicature Act*'.[177]

---

[177] In her book, "*The Class Action in Common Law Legal Systems, A Comparative Perspective*" (2004), Rachael Mulheron records at page 8 (original footnote references to views and quotations sourced to law reform commissions, judicial opinion, and academic commentators are omitted in this extract):

*Ontario's Class Proceedings Act 1992 was enacted after lengthy consideration, which commenced in 1976 when the Attorney-General requested the Ontario Law Reform Commission (OLRC) to conduct a detailed study of class actions. At the time, the Williston Committee stated that "we are convinced that the present procedure concerning class actions is in a very serious state of disarray". That damning verdict was reiterated by the Canadian Supreme Court's view in 1983 that Ontario's representative rule was "totally inadequate" to cope with "complex and uncertain" claims involving numerous parties similarly situated. The OLRC study, a three-volume analysis published in 1982, is still regarded as "a seminal work on [the]*

33. This would seem to conflict with the decision of the Canadian Supreme Court in the *West Canadian Shopping Centres* case cited by John Sorabji (see paragraph 28 above). In fact it does not; on the contrary, the case supports the proposition that legislation is desirable. At paragraph 1, the Chief Justice stated:

> *While the class action has existed in one form or another for hundreds of years, its importance has increased of late. Particularly in complicated cases implicating the interests of many people, the class action may provide the best means of fair and efficient resolution. Yet absent legislative direction, there remains considerable uncertainty as to the conditions under which a court should permit a class action to be maintained.*

34. After tracing the judicial history of class actions set out in John Sorabji's paper and noting the reduction in their use following *Markt*, the Supreme Court went on to consider the *Alberta Rules of Court* which substantially embody the English representative rule, and at paragraphs 32 and 33 of the Chief Justice continued:

> *Clearly, it would be advantageous if there existed a legislative framework addressing these issues. The absence of comprehensive legislation means that courts are forced to rely heavily on individual case management to structure class proceedings. This taxes judicial resources and denies the parties <u>ex ante</u> certainty as to their procedural rights. One of the main weaknesses of the current Alberta regime is the absence of a threshold "certification" provision. In British Columbia, Ontario, and Quebec, a class action may proceed only after the court certifies that the class and representative meet certain requirements. In Alberta, by contrast, courts effectively certify <u>ex post</u>, only after the opposing party files a motion to strike. It would be preferable if the appropriateness of the class action could be determined at the outset by certification.*

> *Absent comprehensive legislation, the courts must fill the void under their inherent power to settle the rules of practice and procedure as to disputes brought before them ... However desirable comprehensive legislation on class action practice may be, if such legislation has not been enacted, the courts must determine the availability of the class action and the mechanics of class action*

---

topic." The government of the day did not implement the OLRC's proposals, but again in 1989, following further impetus for the introduction of a class action procedure, the Attorney General of Ontario formed an Advisory Committee on Class Action Reform. The report of this Committee, tabled in the legislature in 1990, prompted the enactment of the statute in 1992. The eleven-year lapse between when the OLRC presented its work, and the eventual implementation of the class actions regime, was aptly referred to by one commentator as "an elephantine gestation period", although it is evident that Australia's legislature took equally as long to ruminate about the introduction of a class action regime. Judicially, it has been observed that the Ontario studies are a useful background when considering the intent of the legislation, but they are not binding.

*practice.*

35.     It is thus clear that the Supreme Court of Canada in fact strongly favours the introduction of "*comprehensive legislation*". The Supreme Court is perhaps uniquely placed to form such a view as it entertains appeals from Provinces that have adopted such legislation (e.g. British Columbia and Ontario[178]) and those that have not (e.g. Alberta).

36.     It may be argued that in *West Canadian Shopping Centres*, the Supreme Court was considering an unamended representative rule, not whether a class action regime could be introduced by subordinate legislation in the form of court rules as opposed to primary legislation. Assuming that it is not alleged that the Chief Justice was imprecise in her language, it is noteworthy that each of the jurisdictions to which she referred, namely British Columbia and Ontario, has adopted primary legislation (in Ontario's case, for the reason set out at paragraph 34). There can thus be no doubt that by "legislation" the Chief Justice meant primary legislation.

37.     Indeed it is common ground that *some* primary legislative intervention will, in any event, be necessary in order:

- To allow suspension of limitation periods for all Absent Claimants on the representative claimant filing his pleadings, until a defined event occurs (such as the Absent Claimant opting out of the class, or the collective action being decertified); and

- Where distribution of damages to all or some of the class members is impossible or impracticable, to permit the court to distribute the undistributed balance to people who are not class members (via either a price-rollback order, or by a distribution to an organisation which has purposes similar to the underlying purposes of the litigation) (i.e. *cy-près* distribution).

---

[178] Being a civil law jurisdiction, Quebec is not directly comparable.

38.    *Cy-près* distribution of unclaimed residual damages is not an essential element of an "opt-out" collective redress regime. It has not been adopted in Australia. It is permitted by statute in Ontario where such distribution has been approved in circumstances where, because of the large size of the class, the small damages per member, and the costs associated with distribution, the parties agreed to distribute the aggregate amount of the settlement by way of a *cy-près* distribution to selected recipient organisations, which would be likely to serve the interests of the class members and where there are significant problems in identifying possible plaintiffs. In the USA *cy-près* distributions under the *Federal Rules of Procedure* have received a mixed reception: it has been approved in some federal districts but remains "*controversial and unsettled*".[179] In the circumstances, it would seem to be inappropriate to regard the necessity for primary legislation to introduce *cy-près* distribution of unclaimed residual damages as a determinative factor in considering whether an "opt-out" regime, as a whole, should be introduced by primary legislation.

39.    On the other hand, the suspension of limitation periods *does* appear to be a common feature in established "opt-out" collective redress regimes, albeit that there are disparities in the various ways in which it has been implemented.[180] In Lord Woolf's "*Access to Justice – Final Report*", he stated:[181]

> *In some circumstances defendants and the Legal Aid Board may be well aware that there are large numbers of people who might be affected by the product in question. In those circumstances the claim may be more manageable if the initial certification puts any further individual applications for legal aid on hold and provides for deemed inclusion of unidentified potential claimants on an 'opt-out' basis until definitive criteria can be established to provide for the effective filtering of potential claims before they are entered on the register.* **There is, however, a need for action to be taken in relation to the limitation period and this can only be effective if there are provisions to suspend or freeze the running of the limitation period on certification of the MPS, as in many other jurisdictions, so that further claimants whose claims were not being considered**

---

[179] Mulheron, op. cit., pp. 428-430, citing (at p 429): A Conte and HB Newberg, *Newberg on Class Actions* (4th edn, Thomson West Group, 2002) vol 4, para 11.20 page 28. Also described in: Mulheron, *The Modern Cy-près Doctrine: Applications and Implications* (Routledge, London, 2006), chh 7, 8.

[180] Mulheron, *op. cit.*, pp. 381 – 388.

[181] Woolf (1996) at Chapter 17.45.

*in detail at this stage were not disadvantaged. **This will require primary legislation.** In the absence of such legislation I have no doubt that courts will continue to exercise their discretion to admit latecomers since the existence of the MPS ensures that defendants are already aware of the potential claims against them.*[emphasis added]

In the circumstances, the Working Party *does* consider that any opt-out collective redress regime will require amendments to be made to the Limitation Act by primary legislation and that this is a matter to be taken into account in considering whether the whole regime should be implemented by primary legislation.

40.     Reverting to the other eight bullet points referred to at paragraph 2, namely:

1)  Requiring Absent Claimants to forfeit or limit their appeal rights in some circumstances.

2)  Permitting any determination of the common issues argued in the class action to bind Absent Claimants, hence a modification in the principles of *res judicata.*

3)  Permitting aggregate (class-wide) assessment of damages.

4)  Permitting the evidence of an Absent Claimant to be given by a representative and not by the class member himself.

5)  Permitting, by specific evidentiary rules, that evidence on individual issues can be given by expeditious means, including by virtue of amending the rules of evidence or means of proof.

6)  Amending the *Henderson* rule so that the class is not required to bring forth its whole case and the defendant will not be judged to be prejudiced by the failure of the class to do so.

7)  Permitting a representative claimant to assert a cause of action against a defendant against whom the claimant has no direct cause of action.

8) Permitting statistical evidence to be used as a means of both establishing liability (for example, as a means of establishing loss), and the quantum of damages.

- **Item 1** – rights of appeal may be regulated by rules of court[182], the Rule Committee may in particular specify the classes of case in which a right of appeal may be exercised only with permission, the court or courts which may give permission for the purposes of this section, any considerations to be taken into account in deciding whether permission should be given, and any requirements to be satisfied before permission may be given, and may make different provision for different circumstances. It follows that any modification of rights of appeal for Absent Claimants will *not* require primary legislation.

- **Item 2 and 6** – it appears to be the view of the Lord Chief Justice and Vice Chancellor, as he then was, that to prescribe that the determination of the common issues argued in the collective action will bind Absent Claimants and will bar them from relitigating those issues, will require primary legislation. It is however worth noting that the current representative rule provides that unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under the rule is binding on all persons represented in the claim.[183]

There does not appear to be any evidence of concluded views on the *Henderson* issue in terms of court rules versus legislation. Indeed the application of the *Henderson* rule has developed in recent years from a mechanistic application to one based on abuse of process. Lord Bingham said in *Johnson v Gore Wood & Co*:[184]

> *It is, however, wrong to hold that because a matter could have*

---

[182] Section 54 Access to Justice Act 1999.
[183] Rule 19.6(4)(a).
[184] [2002] 2 AC 1, 31.

> *been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not.*

It may therefore be argued that the *Henderson* rule is unlikely in the future to have a significant impact on collective actions unless the actions have some element of abuse.

- **Item 3** – it has been suggested (see footnote 14) that *EMI Records Ltd v Riley*,[185] provides a precedent for the award of aggregated damages because Dillon J. authorised an inquiry as to damages suffered by all members of the represented class on an aggregate basis, to avoid the inconvenience of multiple separate proceedings and he could see no objection to aggregate damages awards in principle, so long as the evidence is reliable and a reasonable degree of accuracy can be achieved in determining the total damage suffered by the group as a whole. The case was in fact a hearing for judgment on admissions and the defendant appeared in person. She was a market trader accused of selling pirated recordings. The members of the class (being the members of the British Phonographic Industry Ltd) had consented to all pecuniary remedies granted in respect of actions for *inter alia* infringement of copyright in sound recordings and selling counterfeit records and all sums paid in settlement of such actions being actions conducted by the solicitors to the B.P.I. to be paid to the B.P.I. in order to defray the expenses of detecting and suppressing the pirate and counterfeit record and like trades. The defendant said that she had no comment on that, which the judge took to

---

[185] [1981] 1 WLR 923.

mean that she did not dispute it. She also said that she did not want the action complicated and extended by massive inquiries. On the question of whether an inquiry as to damages would be held, the judge said,

> I think that the fundamental factor is the special position in this particular trade of the B.P.I. This is not a case of a small number of manufacturers getting together as a self-constituted association where there would be a serious likelihood that other pirate cassettes which the defendant may have sold would have nothing to do with the members of the association, because she herself has admitted that nearly all records in this country, and "record" includes discs or tapes or similar contrivances for reproducing sound, are produced, made or distributed by the members of the B.P.I. The matter of substance that underlies this is that if the plaintiffs can only recover damages in respect of tapes in which they individually own the copyright they will have considerable difficulty in establishing which pirate E.M.I. tapes were sold by the defendant among the 2,980 tapes which she admits having sold or among whatever higher number it is found she had sold, but given the admission that nearly all records including tapes are produced, made or distributed by members of the B.P.I., on an inquiry as to damages suffered by all members of the B.P.I. the task will be much simpler since it will be clear and seems to be admitted that nearly all the tapes which the defendant had sold were tapes the copyright in which belongs to members of the B.P.I.

> In the circumstances of the B.P.I. and the pleaded allegations, including paragraph 7 of the statement of claim, and I have already referred to the defence to these, it seems to me that it is appropriate that damages should be recoverable by the plaintiffs in the representative capacity in which they are entitled to sue for an injunction, and it would be a wholly unnecessary complication of our procedure if the court were to insist that for the purposes of the inquiry as to damages all members of the B.P.I. must be joined as co-plaintiffs, or alternatively, all members except for E.M.I. Records Ltd. must issue separate writs and apply for them to be consolidated with the claim for damages of E.M.I. Records Ltd.

> Therefore, in my judgment, it is appropriate that the inquiry as to damages should be in the form set out in the draft minutes of order, but it must be clear that there is to be no duplication of damage in so far as there are claims outstanding as against other defendants.

Thus this was an unusual case where no individual class member was claiming damages for itself. Nor was the point fully argued. The Working Party regards this as an unsafe basis on which to advise that the concept of

aggregate damages in representative actions already forms part of English law, especially when Dillon J specifically distinguished the facts of the case from *Prudential Assurance Co Ltd v Newman Industries Ltd* in which Vinelott J had said in terms:

> *The court cannot in a representative action make an order for damages, though, of course, the plaintiff in its own non-representative capacity will be entitled to pursue its claim for damages.*

- **Items 4, 5 and 8** – these matters may even be within the powers of a trial judge under the present rules. Even if they were not, under Sch 1, r 4 of the Civil Procedure Act 1997, the Civil Procedure Rule Committee is empowered to make rules to '*modify the rules of evidence as they apply to proceedings in any court within the scope of the rules*'. Consequently the Working Party does not consider that it would be necessary to pass primary legislation to deal with these issues.

- **Item 7** – it seems to the Working Party that it would represent a significant change to the substantive law to allow a representative claimant to assert a cause of action against a defendant against whom the claimant has no cause of action. If a representative claimant did not have a cause of action against a  particular defendant (e.g. the representative claimant being a smoker but not of one the brands joined as defendants) it is difficult to see how he could satisfy the current "interest" requirement as derived from English case law. The matter could only be put beyond doubt by primary legislation.

**CONCLUSIONS**

41.   The Working Party has not considered the *replacement* of the current opt-in system, but rather the *addition* of an opt-out alternative to be used in appropriate cases as originally contemplated by Lord Woolf.

42.   The ultimate position is that there is clearly an arguable case that *some* elements of an opt-out collective action could be introduced by way of amendment to the CPR and that the inevitable[186] *ultra vires* challenge in respect of those elements *may* fail. Is it however neither attractive nor desirable:

- To condemn the first litigants under the new regime to protracted litigation that is likely to take them to the House of Lords, or

- That a procedure introduced to meet the needs of access to justice in the 21st century has to be justified by a painstaking examination of jurisprudence dating back to the 18th.

43.   Other elements would have to be implemented by primary legislation in any event. It would be desirable to produce a single coherent and integrated regime rather than to deal with matters piecemeal. Even if the initial draughtsmanship of both the rules and the statutory changes were consistent, the different consultation and approval processes applicable to rule changes and primary legislation respectively could give rise to inconsistencies.

44.   It is accepted that the process of implementation by primary legislation may take longer than that of rule change, especially given the fact that rule change will be necessary to give effect to the provisions of the primary legislation. The delay may however be ameliorated by twin-tracking the legislative and rule draughtsmanship. Further, it is hoped that if a series of appeals can be avoided, litigants will have access to defined and predictable procedures earlier than would otherwise have been the case. It is also hoped that the wider consultation process involved in promulgation by primary legislation may provide all stakeholders

---

[186] See Nick Thomas' view above.

with a greater opportunity for input and may thereby, possibly at least, avoid some satellite litigation.

45.     An alternative approach might be initially to introduce as much of an opt-out system as possible by rule change whilst at the same time initiating the process necessary to introduce primary legislation, not just in relation to amendment of the Limitation Act (and *possibly* in relation to *cy-près* distribution of unclaimed damages), but to establish a comprehensive opt-out system.

46.     There are some attractions in this approach: not least the fact that, on the assumption that there is currently an unmet need for access to justice, that need will be met more quickly than would be the case if the opt-out collective action were to be introduced first by legislation and then by court rules reflecting that legislation. Further, the experience derived from the first claims under a rule-based system would inform the debate over the form of the legislation.

47.     The alternative would still leave the first claimants with the unenviable burden of pioneering the jurisdiction through the appellate courts.  It is possible that the unsatisfactory state of the common law as described by John Sorabji in his paper may mean that the "leap-frog" procedure can be used to accelerate appeals from courts of first instance to the House of Lords. It may also be that primary legislation can be introduced in time to forestall at least some appeals.

48.     The Working Party respectfully adopts the reasoning of the Chief Justice of the Supreme Court of Canada in the *West Canadian Shopping Centres* case as set out at paragraph 34 – a comprehensive legislative regime is highly desirable, trying to craft a remedy using existing rules will lead to protracted litigation that will constrain the courts to develop the jurisdiction on a case by case piecemeal basis. Clearly second best option would be to introduce as comprehensive as possible a system by court rules within the constraints of the limitations placed on the powers of the Rule Committee by the terms of the Civil Procedure Act 1997.

49.    In all the circumstances it is the recommendation of the Working Party that if there is to be an opt-out collective action regime it should be implemented by primary legislation. Alternatively, a shorter time-frame for the provision of access to an opt-out collective action to litigants may be achieved by the initial introduction of the regime through amendments to the CPR, followed by legislation.

## **POSTSCRIPT**

50.    The Working Party was subsequently asked to consider whether there is any evidence that:

- Representative parties were treated as trustees for the representative class in situations other than shareholder or partnership actions pre-1873; and

- They were treated this way in any actions giving rise to financial awards before 1873 and most likely post-1858, when damages became an available remedy in equity?

51.    Given the conclusions reached above, the Working Party has not felt it necessary to consider these two interesting questions. It is however noted that Lord Woolf did recommend the introduction of a concept of trusteeship for the protection of class-members in his final report (albeit in the context of a somewhat different costs regime than that which currently obtains).

52.    The Working Party would therefore recommend that as part of the drafting process of either rules or legislation to implement an opt-out collective action regime consideration is also given to the implementation of Lord Woolf's recommendation. Consideration may also be given to the possibility that aggregate damages form a fund which is administered by a trustee. This may enable:

- The damages to be available in part for funding arrangements while the interests of the beneficiaries of the fund are protected by the trustee;

- Proper supervision of the distribution of damages to claimants who have at that stage opted-in while protecting the fund for the benefit of those who remain under a disability; and

- The use of the *cy-près* doctrine as an incident of general trust law.

136



**PART 9**

**RECOMMENDATIONS**

**An Improved Collective Procedure**

---

**Summary**

This chapter sets out the Civil Justice Council's 11 Recommendations for collective action reform.

---

**RECOMMENDATION 1**

**A generic collective action should be introduced. Individual and discrete collective actions could also properly be introduced in the wider civil context i.e., before the CAT or the Employment Tribunal to complement the generic civil collective action.[187]**

The Civil Justice Council in light of its examination of other jurisdictions and following extensive stakeholder consultation **recommends that a generic collective action be introduced generally**. The introduction of such procedural reform will introduce a more effective, efficient, economical and fair means of increasing access to justice for all, claimant and defendant alike whilst benefiting, through the economies and efficiency gains it brings, the proper administration of justice. **The introduction of a generic**

---

[187] In the context of the present paper a collective action refers to an action brought by a representative party for and on behalf of itself, or simply by the representative body on behalf of, a represented class of claimants or defendants seeking the vindication of substantive law rights, where a nature of the cause of action gives rise to a commonality of interest between the members of the represented class.

**collective action of general application need not nor ought it preclude the development of further reform in other areas both within the civil courts and in other civil and regulatory jurisdictions**. It should not, for instance, preclude consideration of or further reform to the GLO, the further development of regulatory compensatory mechanisms, or the development of specific no-fault schemes in certain product liability areas as has happened in other jurisdictions.

A new collective action mechanism, while it is intended to increase access to justice, to better enable individual citizens vindicate their substantive law rights is not intended to either be an action of first resort or exclusive. In the first instance, consistently with the spirit of the Woolf Reforms, it is understood and accepted that litigation of any sort is an option of last resort. Moreover, the fact that, as is made clear in **Recommendation 4**, in order to bring a collective action the court has to be satisfied that there is no better means of right-vindication (through the superiority criterion) such actions will not be permitted to proceed where, for instance, a regulatory mechanism provides a more effective means of securing the vindication of those rights: see **Recommendation 3**.

While the primary recommendation is that a generic procedure be introduced within the civil courts, that recommendation is made subject to two further sub-recommendations.

The first sub-recommendation is that in order to increase effective access to civil justice individual and discrete collective action regimes could properly be introduced in other civil fora in order to complement the generic civil collective action. Discrete collective actions could, for instance, beneficially be introduced into the CAT or the ET in order to facilitate effective access to civil justice in civil claims, which ought properly be brought before these specialist civil tribunals. Such claims, in the CAT, might be brought on either a follow-on basis, as at present, or on a stand-alone basis. If that were the case, such claims could be prosecuted properly and efficiently before a specialist tribunal to the benefit of claimants and defendants. This would also facilitate the proper and effective administration of justice both in the civil courts, as claims would not have to be brought before those courts thus giving rise to resource savings, whilst enabling them to be prosecuted efficiently within the appropriate specialist tribunal.

The second sub-recommendation is that there is merit in introducing for a short period of time a discrete, rather than generic, collective action within the civil courts ahead of the scheduled introduction of the generic action. An obvious example of how this could be achieved would be through the introduction of a discrete, stand-alone collective action for claims arising out of competition law breaches which have caused harm to individual consumers. A stand-alone action introduced on this basis would have the advantage over the introduction of a trial follow-on action as the latter would presuppose an extent adverse finding against a defendant in regulatory proceedings. It would therefore be a claim with obvious merit and be more likely to be certified and, possibly to succeed. It would thus not prove a useful forerunner of wider reform. It would not because the advantage of introducing a discrete action ahead of wider reform would be to provide an initial assessment of the utility of the form of action, to assess any practical weaknesses and advantages. A true picture of utility would not therefore arise. The advantage of introducing what the Master of the Rolls has acknowledged to be radical reform on a trial basis ahead of generic reform would be to gather the evidence of experience in England of such an action in actual use. Such evidence could then, as Andrews suggests, be used to assess the true utility of the action, where it works and where and how it does not work.[188] Such evidence gathered over a reasonable period of time could then usefully inform the structure of wider reform before the Civil Procedure Rule Committee (CPRC) brings the wider generic action into force.

It is **not** being suggested however that a generic form of action only be introduced if a trial of a discrete form of action is successful. Studies from other jurisdictions demonstrate the undoubted utility of a generic action and that generic actions do not pose any more difficulties than a procedure restricted either initially, or at all, to follow-on or stand-alone actions. Equally it was the clear view of a majority of stakeholders consulted that any reform should be generic rather than limited with the possibility of future roll-out. The purpose of the initial trial would be to enable the CPRC to assess how the generic action should be implemented and **not** to assess whether it should be implemented. There a clear timetable for implementation of: i) any initial discrete action;

---

[188] Andrews (2001) at 265ff.

and ii) of the generic action should be set out within the legislative programme that introduces the new action: see **Recommendation 11** as to the means to introduce the new action.

**RECOMMENDATION 2**

**Collective claims should be brought by a wide range of representative parties: individual representative claimants or defendants, designated bodies, and ad hoc bodies.**

The fundamental premise of a collective action is that there is a class of individuals who are not before the court other than by representation. A collective action, whether opt-in or opt-out, is one where the claim is prosecuted or defended by a single party who represents the represented class and the result of which action binds the represented class members as if they were actual parties to the action even though only the representative party is actually before the court. This position differs from that which arises under a GLO, where each of the class who opted-into the action are parties before the court: they are because the GLO is no more than a sophisticated device for managing multiple singular claims.

Given that the class are not before the court it will be necessary for the court to be satisfied as to the nature and suitability of a representative party to act on their behalf and represent their interests.

Such an assurance is already provided in the context of competition law, where only bodies designated under the Special Body (Consumer Claims) Order 2005 can act as representative parties in follow-on actions brought under s47B of the Competition Act 1998 e.g., *Which?*.[189] At the present time only one claim has been brought by a designated consumer body, *Which?*, on behalf of consumers, This has proved to be a considerable drain on consumer organisation's resources, and of limited success in terms of the number of consumers compensated. Equally, it has stated that it will not in future bring such proceedings.

The CJC concludes that such a practice of designation would if adopted generally so as to

---

[189] Also see: Article 4 of the Enforcement Directive (2004/48)
(http://eur-lex.europa.eu/pri/en/oj/dat/2004/l_195/l_19520040602en00160025.pdf)

apply to any new collective procedure properly protect the public interest and the interests of represented parties. It would protect the public interest as it would continue to ensure that only proper representative bodies, who it should be remembered do not have a direct interest in the litigation *per se* albeit they may have a wider indirect interest in it, would be able to act on behalf of a represented class. It would, through widening the scope of bodies who could be designated enable bodies with greater resources and a public interest remit to seek and obtain designation.

In addition to the 2005 Order procedure such an assurance is also already provided under the present representative rule in civil proceedings brought under CPR 19.6. In order to act as a representative party an individual with a direct interest in the subject matter of the claim must satisfy the court that it sufficiently, properly and fairly represents the interests of the represented class.[190] The Court approves such designation in each case under this rule, in contrast to pre-approval on a general basis by the Lord Chancellor under the 2005 Order.

The Civil Justice Council recommends that the present approach under the 2005 Order and CPR 19.6 be incorporated into any new collective action. In order to facilitate the prosecution, and where pertinent the defence of claims, by representative parties it is recommended that the principle contained within CPR 19.6 is extended so as to enable the following to act as representative parties under a new collective action: i) individual litigants who have a direct interest in the dispute; ii) socially responsible collective bodies, such as, charities, Trade Unions, trade associations, consumer and other public interest bodies, such as the CAB, National Consumer Council, or the Equality and Human Rights Commission, which could be designated as such by the Lord Chancellor on the same basis as the 2005 Order power currently provides for consumer designation; iii) ad hoc bodies, such as, for instance, unincorporated associations,[191] consumer, industry or public interest bodies who while they have not sought or been granted designation under ii) the court is satisfied are capable of acting in the best interests of the

---

[190] *Adair v New River Company* 11 Ves. 429 at 433.
[191] For the benefits of the use of unincorporated associations in respect of opt-in collective actions in mass tort situations, see Roche, *A Litigation Association Model to Aggregate Mass Tort Claims for Adjudication*, Virginia Law Review (Vol. 91) (2005) 1463.

individual claimants as a representative party.

The recommendation as to the use of ad hoc bodies is made having accepted that the present 2005 Order designation system acts as a disproportionate disincentive to bodies who may only wish to or be in a position to act as a representative party in a single action. Formal designation by the Lord Chancellor would thus be reserved to bodies who would be in a sense 'repeat players' and who have necessary resources to bring such actions; whereas court approval of ad hoc bodies would, through application of the same or similar criteria as applied by the Lord Chancellor, ensure greater flexibility within the system whilst maintaining the public interest that only proper bodies are permitted to act as representative bodies

Court approval should take place during the certification process: see **Recommendation 4** (below). Court approval should not simply be limited however to approving ad hoc bodies. The court should retain the discretion to approve, as part of the certification process, bodies already authorised to bring collective proceedings. In such cases, court-approval will serve the purpose of ensuring that the authorised body is acting within the ambit of its authorisation and is the most suitable body to act as the representative party in the immediate proceedings. It might, for instance, be the case that another individual, ad hoc body or authorised body is a more suitable body to act as representative party in the immediate circumstances of any particular case.

One caveat must be made at this stage. During the consultation process concerns were raised that any collective action mechanism might tend to give rise to lawyer-fuelled litigation; a feature of the US class action system. To obviate the prospect of that occurring as a consequence of these recommendations it would be anticipated that law firms, especially alternative business structures, would not be suitable bodies for authorisation or ad hoc certification. Equally, both the court and the professional regulators would need to be particularly mindful of ensuring, through appropriate professional conduct rules and robust enforcement, that law firms and other regulated bodies did not engage in lawyer-led litigation and the attendant abuses to which it can give rise.

144

**RECOMMENDATION 3**

**Collective claims may be brought on an opt-in or opt-out basis, subject to court certification (see Recommendation 4). Where an action is brought on an opt-out or opt-in basis the limitation period for class members should be suspended pending a defined change of circumstance.**

It is noteworthy that Lord Woolf recommended that the court be given '*the power to progress [a] Multi-Party Situation on an "opt-out" or "opt-in" basis, whichever contributes best to the effective and efficient disposition of the case*'.[192] This approach and recommendation is consistent with the Civil Justice Council's findings, from an assessment of comparative approaches in other jurisdictions, that there is a good deal of merit in both opt-in and opt-out approaches to collective actions. This assessment has demonstrated that there is a good deal of evidence to support the proposition that some types of claim are better suited to resolution via an opt-in action whereas others are better suited to resolution through an opt-out action.

For instance, a large number of small claims arising out of a common contractual dispute, holiday claims etc., or a common tortious dispute may be better suited to resolution via an opt-out collective action. If however a consumer claim appears to be inherently suited to individualised litigation that is case managed as a collective action of unitary actions (because, say, the size of the class is very small, and each class member has indicated a wish to sue individually and would probably opt-out to do so, were the proceedings to be brought under an opt-out model), then the certification court could appropriately order that the action be certified as a GLO or, if more advantageous an opt-in collective action. However, if the class of consumers, the nature of their grievances, and the levels of compensation being sought, are such that the progress of the action by a representative claimant on behalf of a described class would be preferable as a means of resolving the parties' disputes, then certification of the action as an opt-out collective action could appropriately be ordered. Opt-in collective proceedings might well be more advantageous in circumstances where a trade association wishes to bring an action on behalf of its

---

[192] Woolf (1996) at Chapter 17.42 , 17.46 and recommendation 9.

members. The trade association would in such circumstances be able to act as representative party, with its members electing to opt-into the proceedings. The court's decision upon the appropriate multi-party procedural vehicle for the dispute will always depend upon the circumstances of the particular case.

The use of opt-out might equally be properly and fairly utilised in actions that seek to vindicate civil or other general rights i.e., equal pay claims; anti-discrimination claims; employment claims, environmental claims, pension claims, competition claims (i.e., private actions arising out of breaches of competition law). Opt-out may be more suitable to such claims given their nature and the general preponderance of common issues of law or fact.

On the contrary, mass tort claims may, depending on the issues which they raise, be in some cases better suited to resolution via either an opt-in or an opt-out action.[193] Where, for instance, a mass tort gives rise a large number of claims which are factually complex and raise considerable differing issues of causation it might be better for those claims to proceed not on an opt-out basis, which might tend to reduce the court's ability to properly assess represented parties' and the defendant's substantive rights, it might be better for the claim to proceed as either a number of discrete opt-in actions, where claims are grouped together in light of their similarities, or to proceed in the first instance as an opt-out action on common issues with decertification to follow and to lead to the claims to then proceed as individual actions, opt-in actions or on a GLO basis.

It should therefore be for the court to determine the most appropriate action certification in any particular proceeding. In doing so it should have regard to: the nature and type of action; fairness to the parties (which would include an assessment as to whether its ability to properly decide the substantive issues which arise in the action can be properly adjudicated); efficiency of disposal; and the public interest. Mixed-certification should also be made where appropriate i.e., opt-out on issues common to all the represented

---

[193] As Roche (2005) notes US Rule 23 was not designed to deal with mass tort actions; also see Moller, *Controlling Unconstitutional Class Actions: A Blueprint for Future Lawsuit Reform*, (2005) Cato Institute Policy Analysis (No 546).

class i.e., where there are common issues as to liability and/or causation, decertification of the opt-out when those issues are resolved with the action continuing either as individual claims or, where appropriate, on an opt-in basis, in order to properly and fairly resolve remaining issues which demonstrate too great a dissimilarity to justify the claim continuing on an opt-out basis. In such circumstances the combination of opt-out on some issues with opt-in on other discrete issues provides an advantage over opt-out being combined with a GLO process. It does so because the use of the GLO would require individual represented class members (represented under the initial opt-out) to bring individual claims on the discrete issues, whereas the use of opt-in would simply require the certification of a representative party for the discrete issue with relevant class members straightforwardly giving notice that they opt-in. Such a process offers a more efficient and effective mechanism to prosecute a mixed-certification claim both from the perspective of litigants and the court.

This approach is one that does **not** therefore recommend the introduction of any form of presumption as to whether a collective action should operate on an opt-in or opt-out basis. It is an approach which places the responsibility for designation with the court at the certification stage. It is notable that all the opt-out regimes in North America include, within their certification criteria, a requirement that the opt-out action be judicially compared with other available procedures (pursuant to a so-called 'superiority criterion'). Hence, a discretion on the part of the court to refuse the opt-out action from going forth is already built into a sophisticated opt-out model—and, most importantly, has been the subject of a close analysis and developed jurisprudence. Hence, it is not the case, anywhere in the world, that an opt-out model is invoked with nary a consideration of other procedural mechanisms and how well-suited those other mechanisms are to the resolution of the dispute.

In conducting its certification exercise under any new collective action procedure such a superiority test should be carried out. In carrying it ought though the court should not be limited as to an assessment of whether opt-in or opt-out are the bases on which the action should continue. In assessing superiority the court should equally have regard to the full range of procedural mechanisms available to it i.e., GLO, action under the extant and to

be retained representative rule, the test or lead case approach, and joinder and consolidation. It should also have regard to any submissions as to whether proceedings in a different fora might be a more appropriate, fair and just means of resolving the dispute i.e., compensation via regulatory enforcement; action by an Ombudsman; action in a different legal fora i.e., before the CAT or in the Employment Tribunal.

It is noted that some commentators have raised concerns as to whether an opt-out collective action might breach the right to fair trial guaranteed by the common law and Article 6(1) ECHR. It is also noted that the position is taken in some European jurisdictions, e.g., Italy, that an opt-out action would be unconstitutional given constitutional guarantees of the right to fair trial.[194] It should be noted however that a comparative examination of collective action mechanisms demonstrates that opt-out actions are well-established in countries, which have strong constitutional commitments to the right to fair trial i.e., the due process commitments guaranteed within the US Constitution are not seen as raising concerns about the constitutionality of Rule 23 of the Federal Court Rules.[195] Ultimately however the question as to whether an opt-out action might breach the right to fair trial as guaranteed in UK law cannot be answered solely by reference to a comparative study of the views of other States. They might act as a guide but their approaches cannot be definitive.

The Civil Justice Council takes the view that the introduction of an opt-out collective does not pose any real Article 6(1) ECHR problem. It does not for a number of reasons.

First, an opt-out collective action aims to create effective access to justice for citizens who would not otherwise have any or any effective access to justice. This is particularly the case where small individual claims are concerned or where litigants who are denied

---

[194] Cf Article 24(1) of the Italian Constitution: "*Everyone may bring cases before a court of law in order to protect their rights under civil and administrative law.*" For a general discussion, see: Cappalli & Consolo, *Class Actions for Continental Europe? A Preliminary Inquiry*, 6 Temple International and Comparative Law Journal (1992) 217. In order not to breach the right of access guaranteed by its Constitution the Italian Parliament introduced a new collective consumer action in 2008, under its Finance Bill 2008, which enables collective actions to be brought by authorised consumer bodies on an opt-in basis: see report in *The Lawyer* (21 April 2008): http://www.thelawyer.com/cgi-bin/item.cgi?id=132330&d=415&h=417&f=416 and see the discussion of other jurisdictions above.
[195] See V and IV Amendment of the US Constitution.

effective access to justice through reasons of individual impecuniosity are concerned. A mechanism which increases effective access to justice to a class of citizens who would previously had none, albeit through a mechanism which eschews the traditional method of requiring the individuals concerned to take active steps to assert their right to effective access to justice, cannot legitimately be said to breach Article 6(1) ECHR. Moreover, it is concluded, the introduction of an opt-out collective action is a proportionate means of ensuring effective access to justice for all.

Secondly, it is wrong to suggest that an opt-out action remains an optional form of action. Unlike the present representative rule which creates a form of mandatory joinder, an opt-out action is one of voluntary joinder. Given that any opt-out collective action must involve as part of its certification process a requirement that proper and effective notice is given to all members of the represented class in order to enable them to opt-out of the action it is clear that any individual who wishes to take no part in the proceedings has an adequate and proper opportunity to exercise their right of party autonomy by giving notice to the representative party or the court. Equally, the court could be given a discretion, similar to that in CPR 19.6(4), to enable a represented party to opt-out of a judgment if, for instance, it could demonstrate that exceptional circumstances arose to justify the taking of such a course of action. Equally, party autonomy rights are protected insofar as settlement is concerned in a sophisticated opt-out action where the represented class are given the opportunity to opt-out of any settlement.

It is of course the case that insofar as the represented class is concerned party autonomy is to a degree denuded in an opt-out collective action, insofar as the represented class members do not have active carriage of the action. They would not for instance have their own legal representatives, who would run the litigation on their behalf. This is however true of opt-in actions, actions brought under the representative rule, actions brought within a GLO where conduct of the litigation is often carried out by a single law firm, and of follow-on actions under section 47B of the Competition Act 1998. In principle therefore there is no difference between loss of party autonomy in this sense under an opt-out action than there is in other forms of extant collective action. In all these cases, opt-in and opt-out, the loss of party autonomy in this sense is an inevitable and

reasonable consequence of the nature of collective actions and the benefits they provide to litigants who would not otherwise be able to prosecute their claims and seek to vindicate their rights either at all or in such an effective and efficient a manner as provided by the collective action, whether opt-in or opt-out.

In the circumstances the Civil Justice Council concludes that given effective and adequate notice so that represented class members can truly opt-out of a collective action and due to the benefits which arise through the prosecution of claims through such a device this type of collective action would actually promote citizen's Article 6(1) ECHR rights rather than frustrate them.

Finally, it is recommended that the introduction of an opt-out mechanism will need, as Lord Woolf noted in his Final Access to Justice Report the introduction of a power to suspend the running of limitation.[196] It is recommended that limitation should be suspended when a putative representative party issues a claim which seeks certification as an opt-out collective action. At that point all the members of the represented class are potentially before the court by way of representation and have therefore potentially issued a claim by representation. The suspension of limitation should be lifted and time should start running for the class members where certification is refused or they opt-out of the action. Equally, the suspension should be lifted if the claim once certified is then at a future stage decertified or if on certification the court draws the boundaries of the class on a narrower basis than the representative party had originally drawn them in the claim as issued or the class member for some other reason ceases to be part of the class.

---

[196] Woolf (1996) at 17.45.

RECOMMENDATION 4

**No collective claim should be permitted to proceed unless it is certified by the court as being suitable to proceed as such. Certification should be subject to a strict certification procedure, which is to include provision for the imposition of security for costs.**

It is apparent from a comparative analysis that a certification stage is an essential element of any mature collective action mechanism. Certification ensures that the court, consistently with the requirement to manage actively cases consistently with the overriding objective, is able to assess and decide on the most appropriate mechanism through which a claim should progress i.e., as an opt-in collective action, opt-out collective action, traditional unitary action, or through a GLO..

By way of example it is anticipated that for single or simple mass torts, e.g., rail or air accidents, industrial accidents or holiday claims and certain clinical negligence claims opt-in certification may well prove superior. In such cases claims are likely to be relatively high value. In addition, in such cases the number of claimant class members should be readily ascertainable and readily identifiable from, for instance, travel booking forms, passenger manifests and purchase ledgers. It is the case however that where class numbers reach a certain level it will become sufficiently large that it would neither be efficient nor effective to classify the collective action as opt-in, or for that matter on as a GLO. In such circumstances, which could only be ascertained on a case-by-case basis, opt-out certification would prove superior.

It is anticipated that opt-out certification would be the most effective and efficient means of prosecuting a claim akin to the Bank Charges litigation i.e., where there are an extremely large number of individual claimants each with a relatively small value claim. Such claims have not proved capable of adequate management through the present GLO. Equally, the use of test cases to resolve that litigation was unable to ensure that large number of small claims were not issued at disproportionate cost to both claimants, defendants and the civil justice system as a whole.

Finally, it is anticipated that opt-out certification would be appropriate in cases where there were large numbers of individual claimant class members and where it was impractical or impossible at the outset of litigation to identify each of those class members. Product liability, consumer and competition claims would provide the most likely source of such claims in the ambit of the civil justice system (including the CAT). Equal pay and discrimination claims would provide the most likely source of such claims in the Employment Tribunals.

The central issue though is that it will be for the court on a case-by-case basis to assess which procedural mechanism is the most appropriate.

Certification serves another and wider purpose. It is not simply aimed at ensuring that the most appropriate form of civil procedure is adopted in the prosecution of any claim. It is also aimed at ensuring that the use of civil process is in and of itself the most appropriate, the superior, means of prosecuting any claim and achieving effective redress. Certification will also therefore require an assessment of non-court based redress mechanisms, such as, where available, Ombudsman and regulatory action. In this way certification provides the mechanism whereby the court can ensure that the use of collective action through the court process forms a complementary aspect of an overarching system of effective redress. It is not proposed that collective actions be the only means of ensuring effective redress, but that their introduction and control through certification, will enable the civil justice system to effectively and efficiently play its proper role in enabling individuals, employees and businesses to enforce their substantive rights. It is anticipated that where more effective non-court based redress mechanisms e.g., regulatory mechanisms or Ombudsman schemes, exist certification would be refused.

Certification also enables the court to ensure that any claim progresses in a fashion which best facilitates effective use of court resources and best facilitates effective access to justice for both claimants and defendants alike. It is not just therefore a mechanism aimed at protecting the public interest in the proper administration of justice *qua* effective court

management but equally through ensuring that all parties to litigation are treated fairly. Absent an express certification process the risk will arise, as was the experience in Australia, that a *de facto* certification process will develop through defendants issuing large numbers of interim applications challenging the legitimacy of any individual claim proceeding on a collective basis. The possibility of such large scale procedural skirmishing must be avoided in any reformed process.

Certification is thus seen by the Civil Justice Council as an absolutely mandatory element of any collective action introduced in England. Certification, consistently with the general approach to case management, should be both available on application by individual litigants and should be capable of order by the court on its own initiative, subject to challenge by the parties as is ordinarily the case in respect of orders made by the court of its own initiative. In this way the court will be best able to maintain strict control of any collective action process and in so doing act as a diligent gatekeeper at the outset of any such action per CPR 1.1 and 3.1. It is noteworthy that this approach is already taken in respect of the GLO. In essence therefore the present position as to certification would be expanded to encompass any collective action.

The Civil Justice Council therefore recommends that any new collective action mechanism should incorporate a certification process, which should take place as early as possible in the litigation and which should be applied rigorously be the court. Rigorous application will require the representative party to satisfy the court of the following:

- the claim can be brought in a way that furthers the overriding objective (CPR 1.1);

- the representative party has the standing and ability to represent the interests of the class of consumer claimants both properly and adequately;[197]

- the claim is not merely justiciable (discloses a genuine cause of action) but has legal merit i.e., certification requires the court to conduct a preliminary merits-test;

---

[197] Although note this requirement will practically be modified or automatically made out if a party is a designated body: see **Recommendation 2** (above).

- there is a minimum number of identifiable claimants;

- there is sufficient commonality of interest and remedy;

- there is a reasonable expectation that the claimants will recover an acceptable proportion of their claim, if the claim is successful;

- the collective claim is the most appropriate legal vehicle to resolve the consumer issues i.e., it is a superior redress mechanism than, for instance, either pursuing the claim on a traditional, unitary, basis through the civil courts or a specialist tribunal or alternatively, through pursuit of a compensatory remedy via regulatory action where that is available and where it is able to deliver effective access to justice;

- the parties have reasonably considered alternative forms of resolution; and

- any funding arrangement is fair as between the parties.

The following table outlines a potential schema of certification criteria (drawn from the experience garnered under opt-out regimes elsewhere):

Certification Criteria[198]

| Broad area of consideration | Questions to be asked | In particular ... |
|---|---|---|
| Minimum numerosity | How many consumers should be necessary in order for the class action to be warranted? | Is a minimum specified number to be selected? Or simply two or more consumers? Or by stating that wherever their joinder or consolidation is impracticable? |
| Preliminary merits | What, if any, preliminary merits filter should be satisfied (apart from the usual requirement that the pleadings disclose a cause of action)? | Should it be necessary to show that the class action has a 'high probability of success', to warrant the fact that it will be consumptive of judicial resources? Is a minimum financial threshold per consumer warranted? Should a cost–benefit analysis be required in the class action's favour? |
| Commonality of issues | How is the degree of commonality to be worded? | How significant must the common issues be? Predominant? Important in moving the litigation forward? Merely a 'triable issue'? How significant are the individual issues to be, before the class action fails certification? |
| Superiority | Must the class action be the superior means of resolving the common issues, or the entire dispute? | What factors will make up that superiority matrix? Costs comparisons between unitary and class litigation? Look at the characteristics of the consumers? Look at whether there is any 'need' for the class action? Should it matter if the defendant is to be adversely affected by the class action? What effect does the institution of separate proceedings have upon superiority? |
| The representative | Should an absence of conflict of interest, adequacy, and typicality, all be required for the representative to pass certification? | How is conflict to be assessed? What factors matter to adequacy, and which are to be considered irrelevant? Is there any place for typicality? If so, does it mean that there has to be an interest in the litigation on the part of the consumers? |

Depending on the answers to these questions the court will be able to certify, or not, any particular action and may do so by reference to the whole range of alternative mechanisms available e.g., opt-in, opt-out, mixed-certification i.e., where a claim is certified as opt-out in respect of liability and then recertified as opt-in in respect of damages where, for instance, that is the most efficient and fair way to progress the claim to final determination, GLO, test case, joinder, consolidation, stay pending action in a

---

[198]  Mulheron, *Justice Enhanced: Framing an Opt-Out Class Action for England*, (2007) *Modern Law Review* 550 at 569.

regulatory forum or before another tribunal or no certification at all.

It is readily apparent that one of the most significant concerns regarding collective actions is the possibility that so-called blackmail suits may proliferate. Such actions are typically unmeritorious and are prosecuted with a view to procuring a settlement from a defendant. Settlement is procured due to the possible large-scale cost consequences that might be incurred in the proceedings combined with the prospect that such costs, from a successful defendant's perspective, would be in practice irrecoverable. Such suits are reported to be commonplace in the US for instance, and may well also be apparent in other jurisdictions e.g., Canada. What evidence there is in respect of jurisdictions outside the US is however anecdotal.  The Civil Justice Council in framing its proposals has been particularly mindful of the possibility that such blackmail suits may arise where opt-out collective action regimes exist. Its recommendations as a whole seek to limit the scope for such actions to occur in England and Wales.

The central basis on which blackmail suits occur in the US are two features of the US civil justice system that do not pertain in England and Wales. First, the absence of cost shifting in the US, in contrast to England and Wales, allows blackmail suits to occur. The incidence of costs incurred by a defendant defending such a claim are always irrecoverable in the US. Secondly, the nature of US pre-trial discovery and the use of deposition evidence to frame cases stands in stark contrast to the English approach to disclosure. Pre-trial discovery and deposition, particularly pre-certification, gives rise to particularly large defendant costs in the US; costs which as noted are irrecoverable. The incidence of such costs and their irrecoverability provides a very strong incentive for defendants to take an economic approach to settlement even in unmeritorious cases. [199] That this is the case provides an equally strong incentive to bring such blackmail suits in the first instance. It should be noted that the anecdotal evidence arising in respect of Canada is likely to stem from the fact that in a number of its jurisdictions (British Columbia, Manitoba and Newfoundland) there is no cost-shifting; in Quebec there is only a low degree of cost shifting, whereas whilst Ontario retains cost shifting in such cases

---

[199] See Kritzer,  *Seven dogged myths concerning contingency fees*, Washington University Law Quarterly (Vol. 80) (2002) 739.

there are exceptions for test cases, novel points or public interest cases. Only one province, Alberta, retains full cost shifting. The evidence from Canada must therefore be viewed as demonstrating the need to retain full cost-shifting as a means to limit the incidence or possibility of blackmail suits.

The Civil Justice Council notes that these two features of the US system are absent from the English civil justice system, and it is not proposed that they be incorporated into any proposed English collective action. In such circumstances, it is thought to be unlikely that blackmail suits would arise in England. However mindful of the possibility that there might remain the prospect that such actions might arise, the issue was raised by the Master of the Rolls as to whether further protection could be afforded to defendants to militate against the prospect that this form of potential abuse of any collective action system might arise.

In order to provide that further protection for defendants whilst not stifling genuine claims a further aspect ought to be built into the certification process: security for costs. It is noted elsewhere in this report that security for costs ought to be a feature of any collective action (see, for instance, **Recommendation 9**). During the certification stage of any collective action the certification court, it is recommended, ought to consider the imposition of a security for costs order against a representative party. This will ensure that representative parties, and their funders, will have to focus their attention on the fact that not only will they, if unsuccessful in the prosecution of their claim, face a costs bill but also that from the certification stage they will be required to provide security for those potential costs. In the circumstances, it is thought unlikely that abusive claims will be pursued as such claimants will not be permitted to prosecute their claim as a collective action absent the ability to provide security for costs. When this is combined with early certification and the English approach to disclosure, it becomes increasingly unlikely that the necessary conditions in which blackmail suits can be pursued will exist under any reformed English procedure.[200] In this way adequate protection for defendants from

---

[200] If an opt-out collective action is also to be introduced in the Employment Tribunals cost-shifting and security for costs will have to become part of its procedure for such cases in order to preclude the potential proliferation of blackmail suits.

abusive claims can be incorporated into the certification process without overly burdening genuine claimants.

**RECOMMENDATION 5**

**Appeals from either positive certification or a refusal to certify a claim should be subject to the current rules on permission to appeal from case management decisions. Equally, all other appeals brought within collective action proceedings should be subject to the normal appeal rules. Class members may seek to appeal final judgments and settlement approvals.**

It is apparent from extensive analysis of other jurisdictions, particularly the United States, Canada and Australia, that the certification stage of any collective action can produce extensive tactical appellate challenges. The main problem with appeals on certification is their automatic use, in particular by defendants to delay proceedings and unnecessarily increase costs in order to try to apply pressure on claimants, leading to withdrawal of claim or forced settlement. Extensive appeals, especially where they are prosecuted for tactical reasons, are therefore to be deprecated, not least because they subvert the aim of the litigation process away from the determination of cases according to their substantive merits.

There is a case for proposing that the appeal rights be altered in collective actions, such that for instance there be no right of appeal from a positive certification, although appeals are permitted from refusals to certify. This is the position in Quebec. While this approach is superficially attractive, as there is a strong likelihood that if replicated in England it would tend to reduce the prospect of tactical appeals its introduction cannot be recommended. It cannot be recommended as the Civil Justice Council considers that such an approach would be in direct conflict with the requirement under both Article 6(1) of the European Convention of Human Rights and CPR 1.1 to ensure equality of arms for both claimant and defendant. An approach which permitted one party to access the appellate process whilst denying access to it to the other party in litigation is, it is considered, unjust.

The Civil Justice Council therefore recommends that any appeals that arise within the context of a collective action, whether case management, or other interim decision,

certification decision, decertification decision or final judgment should be subject to the general rules which govern appeals set out in CPR 52. It recommends that certification and other interim decisions as they are case management decisions ought to be treated as such by the court whilst dealing with permission to appeal applications and that it should do so to ensure that the permission stage of the process operates as an effective filter system in the context of collective actions. Moreover, where permission to appeal is sought for what are patently tactical reasons the court should, as appropriate, utilise the power to make a 'Totally Devoid of Merit' order under CPR 52.10(6).

Class members are not parties to a collective action other than by representation. Their interests are finally determined by any judgment (whether on the merits or by summary judgment or strike out) however and they will be bound by any such judgment or approved settlement. In order to protect their rights they should have the right to seek permission to appeal such a decision if the representative party does not do so *pace* the right of non-party's appeal under the principle affirmed in *MA Holdings Ltd v George Wimpey UK Ltd* [2008] EWCA Civ 12. In order to ensure that a defendant is treated fairly the right of non-parties to seek permission to appeal should be subject to the same time limits as apply to other permission applications and such an application should only go forward if the representative party chooses not to appeal. If the representative party chooses not to seek permission to appeal it ought to be treated as having accepted the judgment. Furthermore the court should then treat the non-party as having become the representative party for the class.

**RECOMMENDATION 6**

**Collective claims should be subject to an enhanced form of case management by specialist judges. Such enhanced case management should be based on the recommendations of Mr Justice Aikens' Working Party which led to the Complex Case Management Pilot currently in the Commercial Court.**

Collective actions are by their very nature complex and tend to take up a considerable amount of court time. That being said through concentrating a multitude of individual actions within a single set of proceedings they are nevertheless a more efficient and economic way of resolving such claims.

To ensure that collective actions are properly and robustly case managed under the existing case management powers set out in CPR 3.1, applied consistently with the overriding objective. A copy of the court's existing case management powers under CPR 3.1 appears at **Appendix J**.

It has been recognised recently that highly complex, lengthy and (by definition) expensive litigation needs a more specialised form of judicial control. Both the BCCI and Equitable Life cases brought to light the considerable difficulties in case managing huge and highly complex pieces of litigation, and the judgment in that case lead to well publicised criticism of the procedures for managing such litigation. There are many similarities in the skills required of the case managing judge in complex commercial cases that can be compared to the need for rigorous case management of collective claims given the complex nature of such cases. In July 2007, a working party of judges and Commercial Court Users, chaired by Mr Justice Aikens, examined the court's approach to the case management of complex cases. Within its report, entitled the "*Report and Recommendations of the Commercial Court Long Trials Working Party*"[201], it recognised that existing case management powers were sufficient for managing complex cases. It did however make a number of recommendations to provide specific further guidance to judges and parties to ensure that those powers were used more effectively and that such

---

[201] http://www.judiciary.gov.uk/docs/rep_comm_wrkg_party_long_trials.pdf

cases were managed equally effectively and efficiently.

Given the similarities in nature between collective actions and complex commercial claims it is recommended that they be managed consistently with the recommendations set out in the Aikens J Working Party's report. This recommendation is made because the Civil Justice Council concludes that it is absolutely essential for the court to exercise such rigorous case management at all stages of a collective action to ensure that the efficiency and economy benefits which arise from such actions are not lost.

The recommendations included enhanced guidance on the management of;

- Pre-action protocols;
- ADR
- Statements of Case and List of Issues;
- Disclosure;
- Witness Statements;
- Expert Evidence;
- Summary Judgment and striking Out;
- Judicial Indications on Merits of the Case or Preliminary Issues;
- the Use of Technology;
- Costs;
- the Pre-Trial Timetable and Trial;
- Client Responsibility for the Litigation; and
- Judicial Resource management;

A copy of the Executive Summary and Recommendation appears at **Appendix K**.

This form of enhanced judicial case management is currently subject to a pilot exercise in the Commercial Court, and by accounts operating effectively.

The guidance following the Working Group's recommendations should however be amended to take account of factors specific to collective actions (for example the

certification procedure, fairness hearings, distribution of damages), and may form the basis for guidance to judges who may be responsible for case managing collective claims.

It should however be particularly emphasised that the Civil Justice Council recognises the central importance of ADR in its many forms. It is particularly important in the context of collective actions, especially those which progress on an opt-out basis as comparative experience shows that a significant proportion of such claims result in settlement rather than dispositive judgment. The court should as part of its active case management should ensure that the parties to a collective action had actively taken steps to engage in ADR as per Lord Woolf's emphasis in his two Access to Justice Reports on the centrality of ADR to the civil justice system and that litigation should be a course of last resort.

Given the nature of collective actions it might well be impractical, especially in those cases which give rise to small value individual claims, for individual class members to have engaged in some form of ADR pre-certification. Individual class members should, of course, seek to arrive at a consensual settlement prior to certification, but it is recognised that in cases where individual damages are likely to be small then this may be impractical. However to ensure that ADR is afforded its proper importance, post-certification it should form a routine part of the case management of a collective action, consistently with the Master of the Rolls' proposals as set out in *The Future of Civil Mediation*, esp., at [17] – [18].[202]

---

[202] http://www.judiciary.gov.uk/docs/speeches/mr_mediation_conference_may08.pdf

164

**RECOMMENDATION 7**

**Where a case is brought on an opt-out or opt-in basis, the court should have the power to aggregate damages in an appropriate case. The Civil Justice Council recommends that the Lord Chancellor conduct a wider policy consultation into such a reform given that it effects both substantive and procedural law.**

The introduction of a new collective action mechanism in general and an opt-out collective action in particular is not intended to affect the substantive law of damages. The introduction of such new forms of procedure is intended to render access to justice through the vindication of existing substantive law more effective. For the avoidance of doubt therefore the Civil Justice Council makes **no** recommendation that the substantive law of damages should be reformed to, for instance, render exemplary or punitive damages or restitutionary damages remedies available through the prosecution of a collective action. Damages should continue to be awarded on established principles of the substantive law and should depend upon the nature of the substantive cause of action, whether that arise in the law of tort, contract or restitution.[203]

The Civil Justice Council notes however that one of the reasons identified as to why the present representative rule has remained '*a procedural backwater rather than a flourishing style of multi-party litigation*' is the absence of a general power to aggregate damages.[204] The general rule in English law is that each individual claimant should prove their own particular loss according to established principles.

Opt-out regimes however typically permit (either explicitly, or as in the case of the US federal class action rule, by judicial determination where the rule is silent on the issue) an aggregate assessment of damages. Equally, there is no reason why an opt-in collective action could not proceed to assess damages on an aggregate basis in an appropriate case.

---

[203] As defined in DCA, *The Law of Damages,* (CP 9/07) at [195], exemplary damages "*aim to punish the wrongdoer*", whereas restitutionary damages "*aim to strip away some or all of the gains by a defendant arising from a civil wrong*".
[204] Andrews (2001) at 253.

Strictly speaking, aggregate assessment or damage aggregation means a computation of damages that does not depend upon the summation of the class members' actual loss and damage. It is a means of quantifying and proving loss not by reference to an individual claimant but by treating the entire class as a unitary entity and assessing the global damage suffered by the entire class. In that respect, an aggregate assessment can practically occur by either a global or lump sum awarded against the defendant, or it may be achieved by a formula applied on a class-wide basis that determines individual class members' entitlements. Once the aggregate award is made then it is either for the court to assess individual class members' entitlement to a share of the global sum or it is for the individual class members to prove their entitlement to a share.

Under opt-out regimes elsewhere, the power to make an aggregate award of damages has been widely endorsed as a means of avoiding costly, time-consuming and inefficient individual damages determinations. It is said that this has a twin-pronged benefit to both class members and to defendants, and that it also constitutes an important factor in the certification process (ie, if aggregate assessment is feasible, then the court may be more inclined to find that an opt-out class action is the superior means of resolving the dispute).

There is already a limited acceptance of damage aggregation under the representative rule: see *Morrison Steamship Co v The Owners of Cargo lately laden on SS Greystoke Castle* [1947] 1 ALL ER 696 (HL) and more recently *EMI Records*. Both those decisions arose out of circumstances where individual loss could be calculated however and the court could have either made several individual awards or one global award to the representative party, who would then distribute it to the represented class. In other words damage aggregation as it stands at the present time is one based on damage summation and not damage aggregation as it is known in opt-out collective regimes in other countries. Notwithstanding this difference it is recommended that that consideration be given to extending this principle to permit damage aggregation in wider circumstances and through the use other techniques to aggregate damages such as by awarded a global lump sum award to the class by treated them as a unitary claimant for the assessment purposes or through the application of an appropriate assessment formula.

As this recommendation goes strictly beyond the field of procedural reform, it is a reform which would facilitate greater access to justice within the framework of an opt-out, as well as an opt-in, collective action. The question as to whether aggregate assessment provisions authorise a departure from the substantive principles governing damages assessment has arisen elsewhere (an issue which is pertinent to the legislation-versus-court-rules debate). Furthermore the measure of accuracy required for an aggregate assessment computation has also been the subject of some debate. Another controversy that has arisen elsewhere is whether provisions permitting an aggregate assessment of monetary relief can apply only when liability has been established, or whether such provisions can be relied upon to prove the fact of the damage so as to establish liability. Given its interrelation with substantive law the Civil Justice Council is constrained to recommend that the Lord Chancellor conduct a wider policy debate as to whether such a reform should be introduced.

The Civil Justice Council would note however that it takes the view, endorsed by Andrews and others, that damage aggregation plays a beneficial and essential role in the development of a mature and successful collective action mechanism. While care must be taken in the use of such a method of damage assessment to protect defendant's procedural and substantive rights, such awards bring with them if properly implemented a number of benefits. Damage aggregation, for instance, ensures that that the defendant has certainty and finality in terms of their liability to all claimants who have suffered detriment (with the court adopting the principle of res judicata), especially where class members who have not yet joined the beneficiaries have an opportunity to opt-in to the award or court approved settlement; the award ensures that each claimant will fair compensation predicated on the totality of harm caused both by the defendant *per se* and to each claimant on an individual basis; it thus serves to ensure that claimants are properly compensated and that defendants are not left in possession of any financial benefit derived from their unjust conduct; it thus through its primarily compensatory basis serves to assist and complement public regulatory action.

168

**RECOMMENDATION 8**

**To protect the interests of the represented class of claimants any settlement agreed by the representative claimant and the defendant(s) must be approved by the court within a 'Fairness Hearing' before it can bind the represented class of claimants. In approving a settlement or giving judgment on a collective claim the court should take account of a number of issues in order to ensure that the represented class are given adequate opportunity claim their share of the settlement or judgment.**

As noted in Recommendation 6 both Lord Woolf's Access to Justice Reports and the CPR emphasise the fundamental importance of the principle that litigation should be a course of last resort. While it will often be the case with collective actions that a consensual settlement of individual claims will not be possible prior to certification, such consensual settlement, through the various forms of ADR, remains a distinct possibility post-certification and in some types of opt-out action a likely outcome.

Where a settlement is proposed and achieved, and experience in other jurisdictions strongly supports the conclusion it is recommended that such a settlement should not be valid and binding unless it is approved by the court following a 'fairness hearing'. The court's approval is necessary in order to protect the interests of the absent claimants, who will be bound by the settlement just as it is necessary in more traditional cases where a party is only before the court by way of representative cf., CPR 21. This is the case whether the claim is pursued on either an opt-in or opt-out basis, as in either case the represented class are not directly before the court. Essentially, the court must be satisfied that the settlement agreement is fair, just and reasonable in light of the circumstances of the case, any objections to the settlement by the represented class, which ought to be given adequate opportunity to submit its views to the court on the settlement.

The fairness hearing should not simply review the terms of the settlement for fairness but also determine how absent claimants should opt-in to the settlement, what reasonable steps should be taken to advertise for absent claimants to notify them of the settlement,, what evidence is required to claim a share of the settlement, what the limitation period

should be set to claim a share and to determine who should administer the judgment (and at what cost). The court should take account of the same considerations and determine the same questions, mutatis mutandis, when determining a collective claim by way of final judgment.

In the light of a study of comparative experience it is clear that a fairness hearing has four benefits.  First, it allows the court to ensure that the interests of absent class members (who, in many cases, are unlikely to have the benefit of legal advice) have been adequately served by the settlement.  Secondly, it also seeks to prevent 'sweetheart deals', by which representative claimants use the class action to improve their own bargaining position to settle their individual claims on terms more favourable than for the other class members. Thirdly, a fairness hearing seeks to ensure that the legal representative's funding arrangements do not compromise the best interests of the class members, and that there is no collusion between class lawyers and the defendant. Finally, a fairness hearing is a means for the court to monitor extortionate settlements to prevent profiteering from vulnerable defendants i.e., so-called blackmail suits. As such, it has been judicially noted under opt-out regimes elsewhere that a fairness hearing forms part of a court's protective jurisdiction; not just for the represented class but also for defendants as it protects their right to effective access to justice, especially to procedural justice.

It is therefore recommended that as fairness hearing should be an essential part of any new collective action procedure. Such a hearing it is recommended should require the court to take account of a number of settlement criteria. A clear example of such criteria, which could properly be adopted here can be taken from US experience, where in order to determine whether a settlement is fair, just and reasonable the court is required to take account of the following:

1.  the complexity, expense and likely duration of the litigation;
2.  the reaction of the class to the settlement;
3.  the stage of the proceedings and the amount of discovery completed;
4.  the risks of establishing liability;

5.  the risks of establishing damages;

6.  the risks of maintaining the class action through the trial;

7.  the ability of the defendants to withstand a greater judgment;

8.  the range of reasonableness of the settlement fund in light of the best possible recovery; and

9.  the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[205]

---

[205] See, *Wal-Mart Stores Inc v Visa USA Inc*, 396 F 3d 96, 117 (2d Cir 2005), citing, *City of Detroit v Grinnell Corp*, 495 F 2d 448, 454 (2d Cir 1974).

172

**RECOMMENDATION 9**

**There should be full costs shifting**

While the court should utilise in appropriate cases the full range of costs measures, such as security for costs, protective costs orders or cost capping orders, the English rule as to costs should be maintained. It should be maintained not least as disincentive to the issue of purely speculative unmeritorious, vexatious or otherwise spurious claims.

The CJC notes however that in other fora, if discrete collective actions were to be introduced, different costs considerations would arise. Collective actions before the CAT would for instance arguably permit contingency fees, which would give rise to distinct issues as to the control of fees from the perspective of both the claimant class and defendants.[206] Actions before the Employment Tribunal on the other hand operate according to the US costs rule i.e., inter partes costs are as a general rule not recoverable. Differences such as these would require further consideration to protect both claimants and defendants and in particular would require the introduction of further safeguards to act as a break on unmeritorious litigation.

The combined issues of funding, and the prospective liability for the other sides costs should a claim fail, were estimated to be the principal reason why over 80% of potential collective consumer actions brought to lawyers did not proceed to a claim.[207]

**Funding Claims**

The Civil Justice Council has addressed the issues of funding in its paper "The Future Funding of Litigation – Alternative Funding Structures" where the Council recommends the establishment of a Supplemental Legal Aid Scheme, the acceptance of properly regulated thirds party funding as a mainstream funding option, and in the absence of other effective funding mechanisms, contingency fees.   Further work continues on

---

[206] See the combined effect of section 12 of the Enterprise Act 2002 and the definition of non-contentious business in the Solicitors Act 1974.
[207] As stated at the CJC first Collective Consumer Redress Event, October 2006.

developing a form of "soft touch" regulation for third party funders, and the funding of collective consumer claims is not addressed further in this paper.

**Liability for Adverse Costs**

England and Wales continues in the main to operate the "loser pays" principle in contentious litigation[208]. The rule is one of general application, although the court has a wide discretion to award full reasonable costs, limited costs, or no costs at all.

When legal aid was more widely available for funding collective consumer claims, the provision of legal aid in itself provided protection for the claimants from exposure to adverse costs awards in most circumstances.[209] With the considerable reduction in collective consumer claims being funded over the past decade (see Mulheron, Evidence of Need, Extracted at Part 7, prospective claimants have needed to seek private forms of funding, which exposes them to full liability for adverse costs. Although lawyers appear to have been willing to take on claims under Conditional Fee Agreements, until very recently there has been no evidence that Insurers have been willing to write After the Event Insurance policies to protect from adverse costs[210].

There is no doubt that costs shifting is a sanction against non-meritorious litigation. This is recognised in the European Union's consideration of developing more effective consumer redress mechanisms, and further afield in the jurisdictions of Australia and Canada.

The United States is generally regarded as operating a non costs shifting regime, although this is only true in part as there is some degree of cost shifting in nearly all elements, in particular in shifting disbursements and costs awards for bad behaviour. The Civil Justice Council will publish a report on the operation of contingency fees and costs shifting in its next paper.

---

[208] CPR 44.3.2(a).
[209] Access to Justice Act 2000 as amended by the Community Legal Service (Scope) Regulations 2000. S.11. Community legal Service (Costs Protection) Regulations 2000 as amended.
[210] There is emerging anecdotal evidence that ATE insurers may now be considering ATE cover for collective consumer claims, following the emergence of a commercial funding market.

There are many critics of the United States system that claim non (or very limited) cost shifting encourages weak cases and so-called blackmail litigation.  Supporters argue that it places the responsibility for the clear assessment of the risks and merits of the case onto the reputations of the lawyers bringing them.[211]

In Canada, liability for costs varies by province (in terms of class actions). British Columbia, Manitoba and Newfoundland have no cost shifting. Ontario has full costs shifting (with cost saving provisions for test cases, novel points, or public interest cases). Alberta has full cost shifting. Quebec has costs shifting although recoverable costs are low (low individual value class action claims may be brought under small claims procedure and costs)

In Australia there is cost shifting against class representatives, although non representative class members are protected.

**Costs Protection and Protective Costs Orders**

In England and Wales, the consideration of cost protection for claimants bringing claims that are determined to be in the public interest, has been led by the Courts in terms of conditions where they would make a full or partial costs  protection order for claimants. **Appendix I** provides a detailed consideration of leading case law (in particular R *v Lord Chancellor ex p CPAG*, and more recently *Re Cornerhouse Research*).

Following *Cornerhouse*, a working group, chaired by Lord Justice Maurice Kay, was established to consider whether the courts should grant cost protection orders in cases of meritorious public interest claims.  Lord Justice Maurice Kay wrote:

*"…it remains the case that there are public interest cases which merit litigation but which are excluded from the courts for reasons of costs.  There are limits to the level of funding available from the Legal Services Commission and, in the area of judicial review, it is difficult to find insurers who will back conditional fee agreements for an affordable*

---

[211] See Kritzer,  *Seven dogged myths concerning contingency fees*, Washington University Law Quarterly (Vol. 80) (2002) 739.

*premium……there is still a significant amount of potential public interest litigation which is deterred by the operation of our traditional approach to litigation costs.*"

The report made the following recommendations:

1. The courts should be prepared to grant PCOs *in public interest cases*;

2. A public interest case for this purpose is one where:

    (i)    the issues raised are ones of general public importance, and

    (ii)   the public interest requires that those issues should be resolved.

3. It should not be a condition for obtaining a PCO that the person or body applying for it have no private interest in the outcome of the case;

4. Nonetheless, the nature and extent of an applicant's private interest was a factor relevant to the decision whether to grant a PCO;

5. Three types of PCO could be identified:

    (i)    an arrangement where the party benefiting from the PCO will not be liable for their opponent's costs if they lose but will be entitled to recover their costs if successful (a Type 1 PCO);

    (ii)   an arrangement where neither side will be liable for the other's costs (a Type 2 PCO); and

    (iii)  an arrangement where the benefiting party's liability for their opponent's costs if they lose is capped in advance (a Type 3 PCO);

6. All three types of order were orders that the circumstances of a particular case might justify and should therefore be options available to the courts;

7. Agreement could not be reached on whether a cap should be placed on the costs incurred by the party benefiting from a Type 1 or Type 3 PCO;

8.  In deciding whether to grant a PCO the courts should place little emphasis on the fact that the lawyers for the applicant are acting or are prepared to act pro bono;

9.  It should not be a condition for obtaining a PCO that the person or body applying for it would not proceed with the substantive proceedings if not granted one – this was, however, an issue that a court could properly take into account;

10. The public interest in a case and the disparity of resources between the parties might justify granting a PCO even though the person or body seeking one might still be able to pursue the case without one;

11. There was no reason in principle why a PCO should not be granted for an appeal; and

12. (With some dissent) There should be a presumption on an application for a PCO that there should be no order as to costs, this rule only to be departed from where a party acts unreasonably.

**Costs Capping and Budgeting**

Again the Courts have taken the lead in developing more sophisticated costs control tools.

The Civil Justice Council's previous report, *The Future Funding of Litigation – Alternative Funding Structures*, provides a summary of case law up to August 2007. Subsequently the Court of Appeal considered the subject in *Willis v Nicholson*,[212] although declined to make specific guidelines on where and how a budget or cap should be imposed.  The matter has now been referred to the Civil Procedure Rule Committee to prepare a report.

There is clearly jurisdiction for the Court to impose costs budgets or caps, but their effectiveness is limited to the control of recoverable, or between the parties, costs and so

---

[212] *Willis v Nicholson* [2007] EWCA Civ 199.

are unlikely to be fully effective against a deep pocketed defendant who is prepared to invest large sums of money defending a claim in the full knowledge that they are unlikely to recover.  This inevitably tips the fair playing field, a major concern expressed by Lord Woolf at the time of the Access to Justice Reports.  Again this emphasises the responsibility of the case managing judge to exercise his or her case management powers effectively.

**Impecunious Claimants**

From studies of other jurisdictions, it is clear that there is some scope for claims to be brought by groups of claimants who for reasons of impecuniosity are effectively immune from costs shifting.  If you have nothing, you can pay nothing.  Defendant businesses and their lawyers make a very clear claim of so-called blackmail suits where lawyers generate litigation with impecunious claimants, who effectively blackmail a settlement from defendant businesses, under threat of racking up huge legal costs that will never be recovered.

Cost shifting will only offer protection to a limited degree, although the existing mechanism to award security for costs could be developed so as to apply to representative parties, just as at the present time it is available in cases brought under CPR 19.6 (see above).

As part of the certification procedure, it should be the responsibility of the court to ensure that any claim where a Costs Protection Order is not granted, is either sufficiently insured, backed by properly capitalised funders, or that the claimants themselves have sufficient means to pay any adverse costs.  This may be achieved by either an effective After the Event Policy (although these are only just emerging on the market), perhaps a grouping of Before the Event policies (in a similar way to recent developments in Austria), a form of Stop Loss insurance, or in the case of a commercially funded claim, the demonstration that the funder has ready access to monies to pay adverse costs.

**Conclusion**

Cost shifting is a deterrent against speculative or so-called blackmail litigation, unless the claimants are impecunious, in which case the courts existing powers to award security for cost should provide protection for defendants against such blackmail claims.

As part of the certification procedure, parties may be at liberty to apply to the court under existing procedure for a Protective Costs Order, and/or a costs budget or cap, to limit the exposure of claimants to adverse where they can convince the court the claim meets public interest criteria (currently being developed by a Working Group of the Civil Justice Council).

Where the Court determines that there should be full or substantial part cost shifting, parties will need to demonstrate to the court that they are good for the money, or are adequately insured.

180

## RECOMMENDATION 10

**Unallocated damages from an aggregate award should be distributed by a trustee of the award according to general trust law principles. In appropriate cases such a *cy-près* distribution could be made to a Foundation or Trust.**

Where collective actions are pursued on an opt-out basis experience shows that there is the likelihood that there will remain an unclaimed residue of the judgment damages award, especially where damage aggregation occurs, or the settlement award. Some jurisdictions, albeit not the US system insofar as judgment awards are concerned, have specifically provided the court with a *cy-près* power so that such a residue can be distributed either for a purpose that will benefit the class generally or benefit, for instance, a charity related to the issue which gave rise to the collective action.

It appears however that experience in those jurisdictions whose systems incorporate such a power can lead to the court being placed in a difficult position as interested groups seek to lobby it in order to secure an award in their favour.

The Civil Justice Council recognises the utility of any residue being applied consistently with the proper use of a *cy-près* power. It however recognises the possibility that giving the court a power to exercise that power itself may lead to difficulties and may tend to undermine the court's perceived independence. It therefore recommends, consistently with Lord Woolf's original recommendation from the Final Access to Justice Report, that a trustee be appointed to administer any judgment or settlement award or alternatively that the representative party hold such a sum as trustee for the class, and that where after a proper period of time with proper and proportionate notice given to the class an unclaimed residue remains that residue be applied by the trustee according to general trust law principles. In appropriate cases, this unclaimed residue could on this basis be distributed to a Foundation or Trust.[213]

---

[213] An appropriate body to which an unclaimed residue could be distributed would be the Access to Justice Foundation established under section 194 of the Legal Services Act 2007.

182

**RECOMMENDATION 11**

**While most elements of a new collective action could be introduced by the Civil Procedure Rule Committee, it is desirable that any new action be introduced by primary legislation.**

While there is considerable scope for reform of CPR 19.6, the Civil Justice Council recommends that it is preferable that reform be taken forward by primary legislation. This will enable those elements of reform which effective substantive law to be debated fully and implemented in a way that would preclude *vires* challenges. Reform through primary legislation is also believed to be the most efficient mechanism to ensure a consistent approach to reform across the spectrum of civil fora.

184



**PART 10**

**DRAFT CIVIL PROCEEDINGS ACT AND RULES OF COURT**

**Summary**

This chapter sets out a draft Collective Proceedings Act and draft Rules of Court.[214] The draft Act is intended to be indicative only. It simply sets out those areas that any future Act will have to cover if the recommendations in this report are to be implemented. The draft Rules of Court have been drafted so as to approximate as near as possible the Civil Procedure Rules. It may well be the case that matters set out within the draft rules ought more properly be placed in primary legislation. Both the draft Act and the draft Rules are a starting point and are not intended to be taken as a final destination.

It should be noted that this report notes that any collective action could operate on the basis that there can be both representative claimants and representative defendants. The draft Act reflects this. The draft rules, for reasons of simplicity of drafting only encompass representative claimants.

Both the draft Act and draft rules incorporate provision for both opt-out and opt-in collective proceedings consistently with the main recommendations in this report. If introduced into the CPR it is anticipated that the draft rules would supplement the existing GLO regime, which would remain as a case management tool for dealing with numerous individual claims.

---

[214] The drafts were prepared by a Working Party constituted of: Michael Black QC, Rachael Mulheron and John Sorabji.

# *Draft* Collective Proceedings Act

*An Act to amend the law about civil procedure in England and Wales; and for connected purposes.*

*Be it enacted by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—*

## ARRANGEMENT OF SECTIONS

1.    Collective proceedings may be pursued or defended in the County Courts of England and Wales and the Senior Courts of England and Wales and the Supreme Court of the United Kingdom.

2.    For the purposes of section 1, collective proceedings are civil proceedings, as defined in the Civil Procedure Act 1997 made, continued or defended by a party (a representative party) on behalf of a class comprising at least two claimants or defendants where the nature of the cause of action gives rise to common or related issues of fact or law between the members of the class.

3.    A representative party may issue, continue or defend proceedings on behalf of a class of claimants or defendants where they are:

    (1)    authorised to do so on an ad hoc basis under the Civil Procedure Rules; or

    (2)    authorised to act as such and on such terms as specified by order of the Lord Chancellor, in accordance with criteria to be published by the Lord Chancellor for the purposes of this section.

        (a)    An application by a body to be authorised under section 3(2) is to be made in a form approved by the Lord Chancellor for the

purpose.

(b)    Before issuing criteria under section 3(2) the Lord Chancellor shall consult the Lord Chief Justice.

(c)    Before authorising a body under section 3(2) the Lord Chancellor shall consult the Lord Chief Justice;

(d)    The Lord Chief Justice may nominate a judicial office holder to carry out the functions under section sections 3(2)(b) and (c);

(e)    "judicial office holder" has the same meaning as in section 109(4) of the Constitutional Reform Act 2005;

(3)    A representative party shall not be required to have an interest in the proceedings.

4.    Civil Procedure Rules may make provision for:

(1)    the definition, nature and type of common to class members;

(2)    the suspension of any applicable limitation period relating to members of a represented class;

(3)    the payment of aggregate or proportional damages;

(4)    the payment of damages to the representative party or another individual or body as trustee for the class members; and

(5)    any other matter relating or incidental to the proper management and conduct of the collective proceedings.

5.    Civil Procedure Rules are those rules made under section 1 of the Civil Procedure Act 1997.

6.    For the purpose of section 4(3) aggregate or proportional damages are damages assessed without the proof of individual loss suffered by each member of the represented class.

7.    Collective proceedings may be issued, continued or defended on behalf of the

represented class either:

(1)    with the express prior consent of each class member (opt-in proceedings); or

(2)    without the express prior consent of any of the class members (opt-out proceedings).

8.    Where opt-out proceedings are issued, continued or defended Civil Procedure Rules shall make provision for:

(1)    fair, reasonable and adequate notice to be given to the class members of the collective proceedings; and thereafter

(2)    a fair, reasonable and adequate period of time in which class members can elect to opt-out of the represented class for the purposes of the collective proceedings.

9.    Proceedings may not continue as collective proceedings unless certified by a court in accordance with rules set out in the Civil Procedure Rules.

10.    For the purposes of section 9 Civil Procedure Rules shall make provision for:

(1)    when certification is to take place;

(2)    the criteria applicable for certification;

(3)    which courts may certify proceedings as collective proceedings.

**Draft Civil Procedure Rules**[215]

**CPR 19**

**Application and Definitions**

19.16        (1) This Section of this Part applies to proceedings to which [section 1 of
the Collective Proceedings Act 200X] applies.

(2) In this Section of this Part unless the context otherwise requires:

(a) 'authorised body' means an incorporated or unincorporated
body whose objects include the pursuit of collective proceedings as
a representative claimant and which is a body specified under
section 47B Competition Act 1998 [or section 3(2) of the draft
Collective Proceedings Act 200X];[216]

(b) 'certified body' means an incorporated or unincorporated body
whose objects include the pursuit of collective proceedings as a
representative claimant and which issues or continues collective
proceedings and is certified by the court as a suitable body to act as
a representative claimant;

(c) 'certification application' means an application for the
certification of a claim as collective proceedings and appointing a
representative claimant in accordance with this Section of this Part;

(d) 'certification order' means an order certifying a claim as
collective proceedings and appointing a representative claimant in
accordance with this Section of this Part;

---

[215] If the recommendation is adopted that collective proceedings be introduced in other civil fora these rules
could be adapted *mutatis mutandis*. Draft civil procedure rules have been prepared as the primary focus of
this study is the civil justice system.
[216] Or any other body authorised under a comparable provision.

(e) 'class member' means a member of a class of persons on whose behalf collective proceedings have been commenced and which may be certified as either opt-in or opt-out proceedings;

  (a) 'collective proceedings' means a claim certified under rule 19.19;

  (b) 'common issues' means common or related issues of fact or law;

(f) 'non-resident class member' means a member of a class of persons on whose behalf collective proceedings have been commenced and who is not resident in England and Wales;

(g) 'opt-in' means a form of collective proceedings that are brought by a representative claimant on behalf of class members and which upon certification are only continued on behalf of those class members that consent to the representative claimant continuing the claim on their behalf;

(h) 'opt-out' means a form of collective proceedings that are brought by a representative claimant on behalf of class members who upon certification are presumed to have consented, unless the contrary is shown, to the representative claimant continuing the claim on their behalf;

(i) 'representative claimant' means a claimant appointed under rule 19.20;

(j) 'sub-class' means a class whose members have claims that raise common issues not shared by all the class members;

(k) 'sub-class representative claimant' means a claimant appointed under rule 19.20.

**Commencing collective proceedings**

19.17    (1)    Any person, certified or authorised body commencing a claim intended to be collective proceedings must at the same time make a certification application.

(2)    Any person, certified or authorised body seeking certification of an existing claim as collective proceedings must make a certification application as soon as practicable.

(3)    The court will hold a case management conference in accordance with the relevant practice direction.

**Applying for certification**

19.18    (1)    An application for certification under rule 19.19 must be made in accordance with Part 23.

(2)    A defendant may make a certification application at any time.

(3)    A certification application must be supported by written evidence.

(4)    The application and written evidence must be filed and served on all parties at least [10] days before the date of hearing of the application unless the court orders otherwise.

(5)    The written evidence referred to in paragraph (3) must—

(a)    set out the material facts on which the applicant intends to rely at the hearing of the application; and

(b)     provide an estimate of the number of proposed class members.

(6)     Any written evidence in response to the application referred to in paragraph (3) must be filed and served no later than [5] days before the date of hearing of the application unless the court orders otherwise.[217]

**Certification of the collective proceedings**

19.19     (1)     Subject to rules 19.19(3) and (4) the court may certify a claim as collective proceedings if—

(a)     there is an identifiable class of 2 or more persons;

(b)     the claims of the class members raise common issues;

(c)     collective proceedings are the most appropriate means for the fair and efficient resolution of the common issues; and

(d)     there is a person, certified or authorised body suitable for appointment as representative claimant.

(e)     the collective proceeding has a real prospect of success.

(2)     The court may certify the proceedings on an opt-in ("opt-in proceedings") or an opt-out ("opt-out proceedings") basis.

(3)     The court will not refuse to certify a claim as collective proceedings on the grounds that:

---

[217] All time limits in square brackets are indicative. It is likely that consultation would reveal that longer time limits are necessary to deal properly with collective proceedings.

(a)    the remedy claimed includes a claim for damages that would require individual assessment after determination of the common issues;

(b)    the remedy claimed relates to separate contracts involving different class members;

(c)    different remedies are sought for different class members;

(d)    the number of class members or the identity of each class member is not known;

(e)    the class includes a sub-class whose members have claims that raise common issues not shared by all class members; or

(f)    the collective proceedings involve separate acts or omissions of the defendant done or omitted to be done in relation to individual class members.[218]

(4)    Where the court finds that the certification criteria specified in rule 19.19(1) have been satisfied, it may nevertheless refuse to certify the claim as collective proceedings if the remedy claimed is or includes payment of money to class members (otherwise than in respect of costs), and the court concludes that it is likely that, if judgment were to be given in favour of the representative claimant, the cost to the defendant of identifying the class members and distributing to them the amounts ordered to be paid to them would be disproportionate, having regard to the likely total of those amounts.

.

---

[218] CPR 19.19(3) is explicitly included in the rules in order to ensure that the strict approach taken by the Court in the *Markt* case is not replicated in any new collective proceeding rule.

(5)     If a class includes a sub-class whose members have claims that raise common issues not shared by all the class members so that the protection of the interests of the sub-class members requires that they be separately represented, the court may refuse to certify the claim as collective proceedings unless there is a person or authorised body suitable for appointment as representative claimant for the sub-class.

(6)     A class that comprises persons resident in England and Wales and persons not resident in England and Wales must be divided into sub-classes comprising respectively those persons resident in England and Wales and those who are not.

(7)     Where the court certifies the claim as collective it shall certify it as either:

(a)     opt-in proceedings; or

(b)     opt-out proceedings.

**Standing and suitability of representative claimant**

19.20     (1)     The representative of a class or sub-class, ('the representative claimant')—

(a) shall be either—

(i)     a member of the class of persons who is resident in England and Wales and who would otherwise be entitled to commence proceedings on his own behalf against the defendant; or

(ii)     a certified or authorised body provided that—

(1) the interests of the class members are linked to the objects of the certified or authorised body; and

(2) in the case of a certified body, its appointment the representative claimant is considered by the court to be in the interests of justice;

(b) shall have prepared a plan for the collective proceedings that sets out a method to the satisfaction of the court for bringing the proceedings on behalf of the class and for notifying class members of the fact and progress of the proceedings; and

(c) shall have provided a summary of any agreements relating to fees and disbursements.

(2)    A person, certified or authorised body will be suitable to act as a representative claimant and approved as such during the certification hearing if that person or body—

(a)    would fairly and adequately represent the interests of the class or sub-class;[219] and

(b)    does not have, on the common issues, an interest that is in conflict with the interests of the class members.

(3)    If, on the application of a class member or party, it appears to the court that a representative claimant is not able adequately to

---

[219] The requirement that authorised bodies are subject to this aspect of the certification may on the face of it appear superfluous as they have already been authorised to act as representative claimants. This sub-rule is relevant insofar as authorised bodies are concerned as it provides the basis on which the court can assess whether the authorised body is in the circumstances of any specific claim the most suitable body to act as the representative claimant in those individual proceedings. It might be the case, for instance, that another authorised body or an ad hoc (i.e., to be court-certified) body or individual could, in the circumstances, of an individual claim be a more suitable representative claimant than the authorised body.

represent the interests of the class members, the court may—

    (a)    substitute another class member, certified or authorised body as representative claimant; and

    (b)    make any other order it considers appropriate.

(4)    A representative claimant may only withdraw as a party to collective proceedings if the court—

    (a)    gives permission for the representative claimant to withdraw; and

    (b)    is satisfied that another person, certified or authorised body meets the requirements of this rule and may fairly be substituted as representative claimant.

(5)    Where a person, certified or authorised body referred to in paragraph (1) has commenced collective proceedings, the person or body retains a sufficient interest—

    (a)    to continue the proceedings; and

    (b)    to bring an appeal from a judgment in the proceedings;

even where the person or body has no or ceases to have a claim against the defendant.

**Opting Out**

19.21          (1)     Where the collective proceedings have been certified as opt-out proceedings the court will fix a date before which a class member may opt out of the collective proceedings ('the opt-out date').

           (2)     A class member may, in the manner and within the time specified in the certification order opt out of opt-out proceedings.

           (3)     A class member who fails to opt out by the opt-out date may not do so after that date, except with permission of the court.

           (4)     The court may grant permission under paragraph (3) if it is satisfied that—

                    (a)     the delay was not caused by any fault of the class member; and

                    (b)     the defendant would not suffer substantial prejudice if permission were granted.

           (5)     The court may, on the application of a class member or party, extend the period during which class members may opt-out of opt-out proceedings.

           (6)     Except with the permission of the court, the hearing of collective proceedings must not commence earlier than the opt-out date.

           (7)     A class member will be excluded from the class if he does

not, before the opt-out date, discontinue or apply to stay any claim brought by him that raises the common issues set out in the certification order.

(8)     This rule does not apply to non-resident class members.

**Opting In**

19.22          (1)     Where the collective proceedings have been certified as opt-in proceedings the court will fix a date before which a class member may opt into the collective proceedings ('the opt-in date').

(2)     A class member may, in the manner and within the time specified in the certification order opt into opt-in proceedings.

(3)     A class member who fails to opt in by the opt-in date may not do so after that date, except with permission of the court.

(4)     The court may grant permission under paragraph (3) if it is satisfied that—

(a)     the delay was not caused by any fault of the class member; and

(b)     the defendant would not suffer substantial prejudice if permission were granted.

(5)     The court may, on the application of a class member or party, extend the period during which class members may opt-into opt-in proceedings.

(6)     Except with the permission of the court, the hearing of collective proceedings must not commence earlier than the opt-in date.

(7)     A class member will be excluded from the class if he does not, before the opt-in date, discontinue or apply to stay any claim brought by him that raises the common issues set out in the certification order.

(8)     This rule does not apply to non-resident class members.

**Opting in – Non-Resident Class Members**

19.23     (1)     A non-resident class member may, in the manner and within the time specified in the certification order, opt-into collective proceedings.

(2)     The court will fix a date before which a non-resident class member may opt-into the collective proceedings ('the non-resident opt-in date').

(3)     A non-resident class member referred to in paragraph (1) who opts-into the proceedings is, from that time, a member of the class involved in the proceedings for every purpose of this Section of this Rule.

(4)     A non-resident class member may not opt-into proceedings under paragraph (1) unless—

(a)     the certification order specifies that the class shall divide into sub-classes; and

(b) the sub-class of which the person is to become a member has or will have, at the time the person becomes a member, a representative claimant who satisfies the requirements of rule

19.20.

(5)     The court, on the application of a non-resident class member or party, may extend the non-resident opt-in date.

(6)     A non-resident class member who fails to opt-in by the non-resident opt-in date may not opt-in after that date, except with the permission of the court.

(7)     A non-resident class member who has failed to discontinue or apply to stay any claim brought by him in England and Wales before the non-resident opt-in date may apply to opt-into the collective proceedings at any time before the determination of the common issues with the permission of the court.

(8)     The court may grant permission under paragraphs (6) and (7) if it is satisfied that—

    (a)     the delay was not caused by any fault of the class member; and

    (b)     the defendant would not suffer substantial prejudice if permission were granted.

(9)     Except with the permission of the court, the hearing of collective proceedings must not commence earlier than the non-resident opt-in date.

**Consent to class membership**[220]

19.24    (1)    The consent of a person to be a class member in opt-out collective proceedings is not required unless the person is a non-resident class member to whom rule 19.23 applies.

**Persons under disability**

19.25    (1)    It is not necessary for a person under a disability to have a next friend merely in order to be a class member.

(2)    A class member who is under a disability may only take a step in the collective proceedings, or conduct part of the collective proceedings, by his next friend.

**Contents of certification order**

19.26    (1)    In this rule any reference to class includes any sub-classes.

(2)    A certification order shall—

(a)    specify whether the collective proceedings are opt-in or opt-out proceedings;

(b)    describe or otherwise identify the class;

(c)    state the name of the representative claimant(s) appointed by the court for the class;

(d)    state the nature of the claim(s) made on behalf of the class;

(e)    state the remedy sought by the class;

---

[220] We believe that this is a matter of substantive law and should be underpinned by a provision in the enabling statute.

(f)     specify the common issues for the class;

(g)     state the opt-out date and the manner and the time within which class members may voluntarily opt out of the collective proceedings;

(h)     state the opt-in date and the manner and the time within which any class member or non-resident class member may opt into the collective proceedings;

(i)     order the publication of a notice to the class members pursuant to rule 19.33; and

(j)     include any other provisions the court considers appropriate.

(3)     In describing or otherwise identifying class members for the purposes of paragraph (2)(b), it is not necessary to name or specify the number of the class members.

### Post-certification amendments

19.27     (1)     The court may amend the certification order on the application of a class member or party.

(2)     If a court amends the certification order so as to alter the class description, it may also make any other orders it considers appropriate, including an order relating to the giving of notice to persons who, as a result of the amendment, will be included in the class and the date before which such persons may either opt into or out of the proceedings if resident in England and Wales and may opt into the proceedings if non-resident in England and Wales.

(3)    If, at any time after a certification order is made, the conditions for certification are no longer satisfied with respect to the collective proceedings, the court will decertify the claim.

## Continuance of litigation

19.28    (1)    If the court refuses to certify a claim as collective proceedings under rule 19.19, or decertifies the claim as collective proceedings under rule 19.27(3), the court may permit the proceedings to continue as one or more claims between different parties and, for that purpose, the court may—

    (a)    order the addition, removal or substitution of parties;

    (b)    order the amendment of the claim form; or

    (c)    make any other order that it considers appropriate.

## Stages of collective proceedings

19.29    (1)    Unless the court otherwise orders, in collective proceedings—

    (a)    common issues for a class must be determined together;

    (b)    common issues for a sub-class must be determined together; and

    (c)    issues that require the participation of individual class members must be determined in accordance with rule 19.37.

    (2)    The court may give judgment in respect of the common issues and separate judgments in respect of any other issue.

**Participation of class members**

19.30   The court may, at any time in collective proceedings, permit one or more class members to participate in the proceedings on such terms as it considers appropriate.

**Disclosure**

19.31       (1)    Subject to this rule Part 31 applies to collective proceedings.

            (2)    A party to collective proceedings may obtain disclosure of documents in the possession of class members other than the representative claimant with the permission of the court.

            (3)    In deciding whether to grant a defendant permission under paragraph (2), the court will consider in particular—

                   (a)    the stage of the collective proceedings and the issues to be determined at that stage;

                   (b)    the presence of sub-classes; and

                   (c)    the approximate monetary value of individual claims, if any.

            (4)    A class member is subject to the same sanctions under Part 31.21 as a party for failure to disclose or to permit inspection.

**Notices generally**

19.32   The non-receipt of or failure to respond to a notice by a class member does not affect a step taken, or an order made, or a judgment given, in collective proceedings.

**Notice of certification**

19.33     (1)     Notice that a claim has been certified as collective proceedings must be given by the representative claimant to the class members in accordance with this rule and the relevant practice direction.

     (2)     Unless the court orders otherwise, notice under this rule shall—

     (a)     describe the proceedings, including the name and address of the representative claimant and the remedy sought;

     (b)     state the opt-out date for class members where the proceedings are certified as opt-out proceedings;

     (c)     state the opt-in date for class members where the proceedings are certified as opt-in proceedings;

     (d)     state the opt-in date for non-resident class members;

     (e)     describe the possible financial consequences of the proceedings to class members;

     (f)     summarise any agreements relating to fees and disbursements;

     (g)     describe any counterclaim being made against the class or any sub-class, including the remedy sought in the counterclaim;

     (h)     state that the judgment on the common issues for the class or the sub-class, whether favourable or not, will bind—

     (i)     class members who do not opt-out of the

proceedings; and

(ii)    class members who opt-into the proceedings;

(i)    describe the rights, if any, of class members to participate in the proceedings;

(j)    give an address to which class members may direct inquiries about the proceedings; and

(k)    give any other information the court considers appropriate.

**Judgment of the court**

19.34    (1)    The court may, in determining a matter in collective proceedings, do any one or more of the following:

(a)    determine one or more of the common issues of law or fact;

(b)    determine individual issues, or otherwise order their determination in accordance with the provisions of rule 19.37;

(c)    give judgment in a specified sum payable to class members or sub-class members in such manner as it considers appropriate;

(d)    give judgment in an aggregate sum in respect of all or any part of a defendant's liability to class members, without specifying amounts awarded in respect of individual class members;

(e)    make such other order as the court considers appropriate.

**Judgment on the common issues**

19.35    (1)    A judgment on the common issues ('the common issues judgment') shall—

    (a)    set out the common issues specified in the certification order;

    (b)    name or describe the class or sub-class members who are affected by it;

    (c)    state the nature of the claims made on behalf of the class or sub-class described in the certification order; and

    (d)    specify the remedy granted.

    (2)    The common issues judgment—

    (a)    binds every member of the class or sub-class, who has not opted out of, or been excluded from, the collective proceedings;

    (b)    binds every class member who has opted into the collective proceedings; and

    (c)    does not bind a party to the collective proceedings in any subsequent proceedings between that party and a person who opted out of, or had been excluded from, the collective proceedings.

**Notice of determination of common issues**

19.36    (1)    When in collective proceedings common issues are determined, the representative claimant must give notice to the class members in accordance with this rule and the relevant practice direction.

    (2)    Unless the court orders otherwise, notice under this rule shall—

    (a)    state that common issues have been determined;

    (b)    identify the common issues that have been determined and explain the determinations made;

    (c)    if common issues have been determined in favour of the class members,

    (i)    state that class members may be entitled to individual remedies;

    (ii)    describe the steps that must be taken to establish an individual claim; and

    (iii)    state that failure on the part of a class member to take those steps will result in the member not being entitled to bring an individual claim except with the permission of the court;

    (d)    give an address to which class members may direct inquiries about the proceedings; and

    (e)    give any other information that the court considers appropriate.

**Determination of individual issues**

19.37    (1)    When the court determines common issues in favour of a class or sub-class and determines that there are issues that are applicable only to certain individual members of the class or sub-class, the court may order that the individual questions be determined in further hearings.

(2)    The court may give any necessary directions relating to the procedures that must be followed in conducting hearings under paragraph (1).

(3)    The court shall set a time within which individual members of the class or sub-class may make claims in respect of the individual issues.

(4)    A member of the class or sub-class who fails to make a claim within the time set under paragraph (3) may not later make a claim under this rule in respect of the issues applicable only to that member, except with the permission of the court.

(5)    The court may grant permission under paragraph (4) if it is satisfied that—

(a)    the delay was not caused by any fault of that person; and

(b)    the defendant would not suffer substantial prejudice if permission were granted.

(6)    The individual class member, and not the representative claimant, may be liable for the costs of the determination of the individual issues.

**Aggregate awards**[221]

19.38　　(1)　　The court may give judgment in an aggregate sum in accordance with this rule if—

　　　　　　　(a)　　some or all class members make monetary claims; and

　　　　　　　(b)　　the aggregate or a part of the defendant's liability to some or all class members can be determined by a reasonably accurate assessment and without proof by individual class members.

　　　　(2)　　Before making an order under paragraph (1), the court must provide the defendant with an opportunity to make submissions to the court in respect of any matter relating to a proposed aggregate award, including the following—

　　　　　　　(a)　　contesting the merits or amount of an aggregate award; and

　　　　　　　(b)　　that individual proof of monetary claims is required due to the individual nature of the claims.

**Average or proportional share of aggregate awards**

19.39　　(1)　　If the court makes an order under rule 19.38, the court may further order that all or a part of the aggregate award be applied so that some or all individual class or sub-class members share in the award on an average or proportional basis if—

　　　　　　　(a)　　it would be impractical or inefficient to—

　　　　　　　　　　(i)　　identify the class or sub-class members entitled to

---

[221] This and the two rules that follow raise matters of substantive law that should be underpinned by provisions in the enabling statute.

share in the award; or

(ii)    determine the exact shares that should be allocated to individual class or sub-class members; and

(b)    failure to make an order under this paragraph would deny recovery to a substantial number of class or sub-class members.

(2)    If an order is made under paragraph (1), any member of the class or sub-class in respect of whom the order was made may, within the time specified in the order, apply to the court to be excluded from the proposed distribution and be given the opportunity to prove that member's claim on an individual basis.

(3)    In deciding whether to exclude a class or sub-class member from an average or proportional distribution, the court will consider—

(a)    the extent to which the class or sub-class member's individual claim varies from the average for the class or sub-class;

(b)    the number of class or sub-class members seeking to be excluded from the average distribution; and

(c)    whether excluding the class or sub-class members referred to in paragraph (b) would unreasonably deplete the amount to be distributed on the average basis.

(4)    Any amount recovered by a class or sub-class member who proves that member's claim on an individual basis must be deducted from the amount to be distributed on the average basis before the

distribution.

**Individual share of aggregate award**

19.40    (1)    If the court makes an order under rule 19.38, the court may further order that all or a part of the aggregate award be divided among class or sub-class members on an individual basis.

(2)    If the court determines that individual claims are to be made by class or sub-class members in order to establish entitlement to part of the aggregate award under paragraph (1), the court will specify the procedures for determining the claims.

(3)    When specifying the procedures under paragraph (2), the court will set a time within which class or sub-class members may make claims under this rule.

(4)    A class or sub-class member who fails to make a claim within the time set under paragraph (3) may not later make a claim under this rule, except with the permission of the court.

(5)    The court may grant permission under paragraph (4) if it is satisfied that—

(a)    the delay was not caused by any fault of that person; and

(b)    the defendant would not suffer substantial prejudice if permission were granted.

**Distribution**

19.41    (1)    The court may direct any means of distribution of any sum awarded that it considers appropriate, including any one or more of the following orders—

    (a)    that the defendant distribute directly to the class or sub-class members the amount to which each class or sub-class member is entitled by any means authorised by the court; or

    (b)    that the defendant pay into court the total amount of the defendant's liability to the class or sub-class members until further order of the court.

    (2)    The court may—

    (a)    order that the costs of distributing sums under this rule, including the costs of any notice associated with the distribution and the fees payable to a person administering the distribution, be paid out of the proceeds of the judgment; and

    (b)    make any further or other order it considers appropriate.

**Undistributed award**[222]

19.42    (1)    The court may order that all or any part of an award of any sum that is due to class or sub-class members and that has not been distributed within a time set by the court ('the undistributed residue') be paid to a Trustee to be applied in any manner that may reasonably be expected to benefit class or sub-class members.

---

[222] This is a matter of substantive law and should be underpinned by a provision in the enabling statute. This rule reflects Recommendation 10 at page 165 of the report of July 2008 which itself reflected the recommendations of Lord Woolf in his final report.

(2)    In deciding whether to make an order under paragraph (1), the court may consider—

    (a)    whether the distribution of the undistributed residue would result in unreasonable benefits to persons who are not members of the class or sub-class; and

    (b)    any other matter the court considers relevant.

(3)    The court may make an order under paragraph (1) even if the order would benefit—

    (a)    persons who are not class or sub-class members; or

    (b)    persons who may otherwise receive any judgment sum as a result of the collective proceedings.

(4)    If any part of any judgment sum which is to be divided among individual class or sub-class members remains unclaimed or otherwise undistributed after a time set by the court, the court may order that that part of the award—

    (a)    be applied against the cost of the collective proceedings;

    (b)    be forfeited to the Crown; or

    (c)    be returned to the defendant.

**Notice of settlement**

19.43     (1)     Notice that an offer to settle has been made shall be given by the representative claimant to the members of the class or sub-class in accordance with this rule and the relevant practice direction.

        (2)     Unless the court orders otherwise, notice under this rule shall—

            (a)     provide a brief account of the conduct of the proceedings;

            (b)     describe any plan for distributing settlement funds; and

            (c)     give notice of the fairness hearing to be held in accordance with rule 19.44.

**Settlement and discontinuance**

19.44     (1)     Settlement of collective proceedings will not take effect unless—

            (a)     the court conducts a hearing ('the fairness hearing') attended by the following persons—

                (i)     the parties to the collective proceedings;

                (ii)     any objectors under paragraph (3) below; and

                (iii)     other persons (including, but not limited to, expert witnesses) as the court thinks appropriate;

            (b)     the representative claimant has given notice of the fairness hearing to the class members in accordance with rule 19.43; and

            (c)     the court approves the content of the settlement agreement

on terms which it considers to be appropriate.

(2)    Any class member may object to a settlement proposal.

(3)    The court may refuse to approve a settlement unless it affords a further opportunity to request exclusion from the settlement to individual class members who had an earlier opportunity to request exclusion but did not do so.

(4)    If the settlement is approved, the representative claimant must give notice of the approval to all class members in accordance with the relevant practice direction.

(5)    The court may order that all or any class members be given a further opportunity to opt out and that the notice given in accordance with paragraph (6) describes that entitlement and the manner in which it may be exercised.

(6)    When approved, the settlement—

    (a)    binds every class member who has not opted out of or been excluded from the collective proceedings;

    (b)    binds every class member who has opted into the proceedings; and

    (c)    does not bind a party to the collective proceedings in any subsequent proceeding between the party and a person who opted out of, had been excluded from or who failed to opt into collective proceedings.

**Settlement of individual claim of representative claimant**

19.45     (1)     A representative claimant may, with the permission of the court, settle his individual claim in whole or in part at any stage of the collective proceedings.

         (2)     A representative claimant who is seeking permission to settle, or who has settled, his individual claim—

                (a)     may nevertheless continue to represent the class; or alternatively,

                (b)     may, with the permission of the court, withdraw as representative claimant.

         (3)     Where a person has sought permission to withdraw as representative claimant under paragraph (2)(a), the court—

                (a)     must be satisfied that notice of the application has been given to class members in accordance with these rules and the relevant practice direction, and in sufficient time for them to apply to have another person substituted as the representative claimant;

                (b)     may, on the application of a class member, make an order for the substitution of another class member or authorised body as representative claimant; and

                (c)     may make such other orders as it considers appropriate.

**Appeals**

19.46   (1)   If a representative claimant does not appeal any of the following judgments or orders, or appeals and later discontinues the appeal, namely—

> (a)   an order certifying or refusing to certify proceedings as collective proceedings;

> (b)   an order decertifying the collective proceedings;

> (c)   a common issues judgment; or

> (d)   an order with respect to an aggregate sum.

Any member of the class for which the representative claimant has been appointed may apply for permission to exercise the right of appeal of the representative claimant within 30 days after—

> (i)   the expiry of the appeal period available to the representative claimant if the representative claimant does not appeal; or

> (ii)   the day the notice of discontinuance was filed, if the representative claimant appeals but files a notice of discontinuance of the appeal.

(2)   A class member may appeal any order determining or dismissing the member's claim in respect of one or more individual issues.

**Liability of class members for costs**

19.47    (1)    Class members, other than the representative claimant, are not liable for costs except with respect to the determination of their own individual claims.

        (2)    Where the court appoints a sub-class representative claimant, that person, and not the representative claimant, is liable for costs associated with the determination of the issues common to the sub-class.

        (3)    Where the court substitutes a representative claimant pursuant to rule 19.20(3)(a), he is not liable for the costs of the collective proceedings incurred before the substitution, unless the court otherwise orders.

**Fees and disbursements**

19.48    (1)    An agreement in relation to the fees and disbursements payable by the representative claimant must be in writing and must—

        (a)    state the terms under which fees and disbursements are to be paid;

        (b)    give an estimate of the expected fee and state whether or not that fee is conditional on success in the collective proceedings; and

        (c)    state the method by which payment is to be made, whether by lump sum or otherwise.

        (2)    An agreement in respect of fees and disbursements is not enforceable unless approved by the court.

(3) If an agreement is not approved by the court, or if the amount due under an approved agreement is in dispute, the court may—

 (a) determine the amount in respect of fees and disbursements; or

 (b) make any other or further order it considers appropriate.

## Limitation periods[223]

19.49 (1) Subject to paragraph (3), any limitation period applicable to a claim in collective proceedings will be suspended in favour of a class member on the commencement of the proceedings, and resumes running against the class member when any of the following occurs:

 (a) the class member opts out of opt-out proceedings;

 (b) an amendment is made to the certification order that has the effect of excluding the class member from the collective proceedings;

 (c) a decertification order is made under rule 19.27(3);

 (d) the collective proceedings are dismissed without an adjudication on the merits;

 (e) the collective proceedings are discontinued with the approval of the court; or

 (f) the collective proceedings are settled with the approval of the court, unless the settlement agreement provides otherwise.

---

[223] This is a matter of substantive law and should be underpinned by a provision in the enabling statute.

(2)    Subject to paragraph (3) any limitation period applicable to a claim in opt-in proceedings will be suspended in favour of a class member on the date on which the class member opts into the proceedings, and resumes running against the class member when any of the following occurs:

    (a)    an amendment is made to the certification order that has the effect of excluding the class member from the collective proceedings;

    (b)    an order is made under rule 19.27(3);

    (c)    the collective proceedings are dismissed without an adjudication on the merits;

    (d)    the collective proceedings are discontinued with the approval of the court; or

    (e)    the collective proceedings are settled with the approval of the court, unless the settlement agreement provides otherwise.

(3)    If there is a right of appeal in respect of an event described in paragraph (1)(a) to (f) and paragraph 2 (a) to (e), the limitation period resumes running as soon as the time for appeal has expired without an appeal being commenced or as soon as any appeal has been finally determined.

**Application of this Section**

19.50         (1)         This Section of this Part does not apply to—

(a)         any proceedings that may be brought in a representative capacity under a statute; and

(b)         any proceedings required by law to be brought in a representative capacity.

**Registration of applications for certification**

19.51   The Central Office at the Royal Courts of Justice shall maintain a register of applications for certification brought under rule 19.18 that shall be available for public inspection in accordance with Part 5.

## PRACTICE DIRECTION

**Case Management**

1.    If proceedings are intended to be collective proceedings, the claimant must apply for a case management conference at the same time as issuing a certification application.

2.    Any party may, at a time earlier than that provided in paragraph 1, apply in writing to the court to fix a case management conference.

3.    The court may fix a case management conference at any time on its own initiative.

4.    At the case management conference the court will consider the directions necessary for the proper conduct of the certification hearing.

5.    A judge ('the managing judge') will be appointed for the purpose of the collective proceedings as soon as possible. He will assume overall responsibility for the management of the claim.

6.    A Master or a District Judge may be appointed to deal with procedural matters, which he will do in accordance with any directions given by the managing judge.

7.    A costs judge may be appointed and may be invited to attend case management hearings.

**Notice**

8.    Notice must be given to class members of the following matters in relation to collective proceedings:

(a)    an application by a defendant for the stay or dismissal of the collective proceedings; and

       (b)     an application by a representative claimant under rule 19.20(4) seeking permission to withdraw as representative claimant.

9.     At any other time, the court may order any party to give notice to the persons that the court considers necessary to protect the interests of any class member or party or to ensure the fair conduct of the proceedings.

10.     Any notice which must be given by a representative claimant of a judgment or order must state whether the representative claimant intends to appeal the judgment or order in whole or in part and must state the date by which it is necessary to file an application for permission to appeal if none has been filed.

11.     If the representative claimant appeals a judgment or order but later discontinues his appeal, he must give notice of discontinuance to all class members in such manner as the court considers appropriate.

12.     The court may order that notice be given by—

       (a)     personal delivery;

       (b)     post;

       (c)     publishing or leafleting;

       (d)     press advertisement, radio or television broadcast;

       (e)     individually notifying a sample group within the class; or

       (f)     any other means or combination of means that the court considers appropriate.

13.    The court will order when and by what means notice is to be given, having regard to—

    (a)    the cost of giving notice;

    (b)    the nature of the remedy sought;

    (c)    the size of the individual claims of the class members;

    (d)    the number of class members;

    (e)    the presence of sub-classes;

    (f)    the number of non-resident class members;

    (g)    whether some or all of the class members may opt out, or have opted out, of the collective proceedings;

    (h)    the places of residence of class members;

    (i)    any other relevant matter.

14.    The court will not order that notice be given personally to each class member unless it is satisfied that it is reasonably practicable, and not unduly expensive, to do so.

15.    A court may order that notice—

    (a)    be given to different class members by different means;

    (b)    be given by any party; or

(c)    be dispensed with if, having regard to the factors set out in paragraph 13, the court considers it appropriate to do so.

16.    Notices referred to in rules 19.32, 19.36, 19.43 shall not be given unless they have been approved by a court.

17.    The court may determine the amount and allocation of expenses in respect of notices and who is to pay those expenses.

18.    Notices shall be written in plain language that will be easily understood by the persons to whom they are addressed.

**Not for addition in the draft Part IV or the draft PD.**

**Security for Costs (by way of amendment to CPR 25.13(2)(f)**

25.13(2)(f) the claimant is acting as a nominal or representative claimant under Part 19.16 and there is reason to believe that he will be unable to pay the defendant's costs if ordered to do so.



**APPENDIX A**

**STAKEHOLDER CONSULTATION**

1. A series of four major stakeholder events have debated in considerable detail whether there is a need for reform of collective redress procedures for consumers or small businesses seeking compensation in collective actions, and if so what shape that reform should take.

2. Detailed minutes of these events (redacted to accord with Chatham House principles at **Appendix H**.

3. The first event invited stakeholders to consider whether there was a deficiency in access to justice for consumers, and whether there should be reform, either in process or in funding.

4. The second considered whether there was evidence of need in support of the consensus for reform, and if so what were the parameters for reform.

5. This third event considered the legal and legislative changes that may be required to achieve the parameters identified in the second event, in particular where some of the principles identified may affect substantive law. The event started to develop a framework for a more effective process, in particular the need for rigorous certification on merits, the need for firm judicial case management, and developing effective protection for defendants against what is seen as "lawyer

driven" litigation.

6. A series of formal papers were prepared for the events, mostly prepared by Professor Rachael Mulheron (Queen Mary University of London), and John Sorabji (a barrister, and Legal Secretary to the Master of the Rolls). Copies of the main papers appear at **Appendices L, M and N**.

**First Event, October 2006**

1. At the first event, held in October 2006, the CJC presented the following propositions:

- There is currently no effective way of protecting consumers who have suffered modest but real losses

- Class actions have no place in this jurisdiction

- The current cost regime prevents many meritorious group actions from proceeding

- Consumer claims and those by businesses are distinct and discreet from each other and should be treated differently in law, costs and procedure

- Public enforcers need active and effective private enforcement to meet policy requirements

2. The general responses of the consultees were:

- There is a lack of access to justice in consumer redress.  Group and representative procedures should be developed further to promote better access to justice.

- The funding of claims was perceived to be the biggest barrier to access to

justice.

- The court should take on a bigger role in controlling multi party proceedings

- procedures in England and Wales could be developed to avoid the perceived excesses

- Reform was inevitable

- There was notable support for opt-out actions for consumer claims, mainly on the grounds of that consumers were "ill-informed", "incapable of running claims", and "completely frightened of conventional court processes". The role of private enforcement as a deterrent was recognised..

**Second Event, November 2007**

3. At the second event the CJC posed the following questions:

- What should be the delineation between the state function the role of recognised consumer bodies, and that of private enforcers?

- Would a court controlled opt-out procedure improve access justice in some consumer clams (especially in the case of vulnerable consumers?

- What should be the role of the court in controlling or regulating claims (in terms of only allowing meritorious clams to proceed, controlling evidence and process, funding, ensuring settlements are in the interest of the consumer)?

- Would the power to award restitutional, aggregate or Cy-près damages be in the best interest of; the consumer; state commitment to the open market;

and provide an effective element of deterrence?

4. In his opening speech the Master of the Rolls expanded these into 13 key questions for consideration:

    1.      What types of complaint are we discussing and against whom?

    2.      What is the nature of the alleged liability? Is it contractual, tortious, quasi-criminal, regulatory or is it a mixture of those? If it is a mixture, how should they be mixed together?

    3.      Is the claimant seeking compensation or what?

    4.      What is the real purpose of the claim? Is it:

        i.     compensation?
        ii.    or is it regurgitation of unlawful profits, and if so to whom should such profits be paid?

    Should it be to:

        a.    the claimant? Even though the claimant's loss may be different than the amount of unlawful profits that have been made.

        b.    a consumer organisation through the operation of *Cy-près* or something like it (where the individual damages are small)?

        c.    the state?

        d.    a bit of each?

    5.      Insofar as the claim is intended to punish the defendant, is this really

the role of private litigation or should that be the role of the state?

6.        If not why not?

**CRITICALLY**

7.        By whom should the litigation be funded?

    a.        The claimant? This is obviously a possibility, but not one that many claimants, especially consumers, could take up.

    b.        The claimant's lawyers?

    c.        The state?

    d.        If otherwise, how?

8.        Is the whole thing worth the candle?

9.        Should the claimant give the defendant security for costs as they do in some parts of Australia? If not, why not?

10.        How should the claims be advanced?

    a.        By test case?
    b.        By representative action?
    c.        By group action?
    d.        By some form of class action if that is different?

11.        How should the claim be funded?

    a.   Out of the claimant's own pocket?

    b.   CFA? If by CFA, should uplift of more than 100% be permitted? Is there any limit to the uplift that could be allowed? How should we decide what the uplift should be? Are there any principles which should inform the answer to that question?

    c.   Contingency fees?

    d.   Third party funding?

    e.   Legal aid contingency fund method? SLAS or something like it?

    f.   State?

12.   If the claimant fails and the defendant succeeds, should the defendant recover his costs from the claimant, or the group he represents, or those who opted in or those who have not yet opted in? If the defendant should not recover his costs why not? Should there be a cap on the amount of costs that the defendant can recover?

5.  In response to the day's debate, His Honour Judge Graham Jones summarised as follows:

    1.   Some additional procedure is needed to enable collective redress to be achieved in appropriate cases..

    2.   We should not shrink from calling it a class action because that is what it is

    3.   We can learn from the American system and experiences about what we must  take care to exclude.

4.        Any additional procedure should be generic.

5.        We may be able to achieve the additional procedure by modifying and
         extending the existing CPR provisions in relation to representative
         actions.

6.        The balance of evidence is weighted in favour of opt-out rather than opt-
         in.

7.        If there is to be such a system, it must be closely controlled by the court.

8.        There must be proper costs protection for defendants.

9.        Currently the system must be compensatory. Punishment and
         disgorgement of excess profit are matters for the state. The *Cy-près*
         doctrine may be considered to be deterrent or punitive in nature. If that
         view is taken, an opt-out system should have some sort of Cy-près
         application of unclaimed damages.

10.       There was an inevitable need to change the substantive law and to
         suspend the   limitation period.

**Third Event, March 2008**

12. The purpose of the third event held by the CJC was to discuss how reform of our
    system of collective redress could be brought about, whether through legislation,
    rules of court, or a combination of the two.

13. Delegates received an address from Professor Mulheron, who argued that some
    primary legislation would be needed to implement substantive changes in the law
    required to enact an opt-out collective action regime. Professor Mulheron's
    presentation touched upon five areas of the proposed opt-out regime which have been

considered by judges and law reform commissions to require a substantive change in the law. These five areas were:

- Limitation periods
- *Res judicata*
- Aggregate assessment of damages
- *Cy-près* distribution of damages
- Standing against multiple defendants

14. The delegation next heard a presentation by John Sorabji (Legal Secretary to the Master of the Rolls) who submitted that the legal basis for a system of collective action was already in place. As such, he argued that although some features of a proposed opt-out regime would require the implementation of substantive changes in the law (e.g. as with the issue of limitation), more reliance could be placed on rules of court as a vehicle for reform.

15. Delegates split off into focus groups to consider the sixty features of a proposed opt-out collective action regime, as provided by Professor Mulheron, and considered how these individual features could be enacted. The feeling expressed by many was that the enactment of such a regime would not need to be underpinned by a comprehensive legislative framework and could instead be introduced through more extensive use of rules of court.

**Fourth Event, 26 June 2008**

The purpose of this event was to discuss the first draft version of the present report and recommendations. That discussion and its conclusions was to form the basis of further refinement and inform the basis of the finalised report.



**APPENDIX B**

**Organisations who have contributed to stakeholder events**

Allianz

Amicus

Berrymans Lace Mawer Solicitors

Citizens Advice

Civic Consulting

Clifford Chance

Cohen, Milstein, Hausfeld & Toll PLLC

Confederation of British Industry

Covington & Burling LLP

Davies Arnold Cooper

Department for Business, Enterprise & Regulatory Reform (BERR)

Edwin Coe LLP

Equality and Human Rights Commission

Expedite Resolution

Financial Ombudsman Service

Fulbright & Jaworski LLP

Government Equalities Office

HM Court Service

HM Treasury

Hugh James Solicitors

Irwin Mitchell

Law Society (London & Brussels offices)

Legal Services Commission (LSC)

Leigh Day & Co Solicitors

Litigation Protection Ltd

Lovells

Ministry of Justice (MoJ)

National Consumer Council

Northern Ireland Legal Services Commission

Norwich Union

Office of Fair Trading (OFT)

Russell Jones & Walker

Thompsons Solicitors

Tilburg University

Two Temple Gardens

University of London

University of Oxford

Weightmans Solicitors

Which?

3-4 South Square


The Master of the Rolls

Senior Master Whitaker

His Honour Judge Graham Jones

Mr Justice Ross Cranston

District Judge Trent

His Honour Judge Stephen Stewart

Senior Costs Judge Hurst

District Judge Suzanne Burn

His Honour Judge MacDuff

Senior Master Turner



**APPENDIX C**

**CJC attendance at other consumer events**

The following list details a number of the events attended by members of the CJC concerning collective redress and collective actions.

- European Union, Portuguese Presidency, Conference on Collective Redress, (Lisbon, 9 – 10 November 2007)

- British Institute of International and Comparative Law, Collective Redress in Europe: where now?, (London, 15 November 2007)

- Oxford University & Stanford University, The Globalisation of Class Actions Conference (Oxford,13 – 14 December 2007)

- British Institute of International and Comparative Law, The Reform of Group Actions under English Law, (London, 16 April 2008)

- Osgoode Hall Law School, 5th Annual Symposium on Class Actions, (Toronto, 10 – 11 April 2008)

- BERR, Making the EU Work for Consumers (London, 08 May 2008)

- DG SANCO, Stakeholder Workshop on Collective Redress (Brussels, 06 June 2008)

238



**APPENDIX D**

**Material reviewed in the study**

Set out below is a non-exhaustive list of material reviewed and which informed the present report.

Andrews, *English Civil Procedure, Fundamental of the New Civil Justice System*, (2003) (Oxford)

Andrews, *Multi-Party Proceedings in England: Representative and Group Actions*, Duke Journal of Comparative and International Law (Vol. 11) (2001) 249

Andrews, *English Civil Procedure: Fundamentals of the New Civil Justice System*, (Andrews 2003)) (OUP) (2003)

BERR, *A Fair Deal For All Extending Competitive Markets: Empowered Consumers, Successful Business*, (http://www.berr.gov.uk/files/file23787.pdf)

BEUC, Private Group Actions: Taking Europe Forward (8 October 2007, X/049/2007)

Cappalli & Consolo, *Class Actions for Continental Europe? A Preliminary Inquiry*, 6 Temple International and Comparative Law Journal (1992) 217

Caterer and Hotelkeeper Magazine, (6 October 2005)

Citizens' Advice Bureau, *Representative Actions in Consumer Protection Legislation: Consultation Response to the DTI*. (October 2006)

Civil Justice Council, *The Future of Litigation Funding – Alternative Funding Structures* (June 2007)

*Civil Procedure 2008*, Vol. 1 (Sweet & Maxwell) (2008) (Waller LJ, ed) (The White Book 2008) at 3.1.10.

Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action*, (1995) 95 Colorado

Law Review 1343

Cramton, *Individualised Justice, Mass Torts, and 'Settlement Class Actions: An Introduction*, (1995) 80 Cornell Law Rev 811

Department for Communities and Local Government, *Citizenship Survey, 2005, Cross-Cutting Themes* (June 2006)

Department for Communities and Local Government, *Citizenship Survey, April-June 2007*, *England & Wales*, (October 2007) (http://www.communities.gov.uk/documents/corporate/pdf/citizenshipsurveyaprjun2007.pdf)

DCA, *The Law of Damages,* (CP 9/07)

European Commission, *EU Consumer Policy strategy 2007 – 2013* (Com (2007) 99)[224]

European Commission, Report on Public/Private Enforcement (2004) (The Ashurst Report)

European Commission, *Green Paper – Damages actions for breach of the EC antitrust rules* (COM (2005) 672)

European Commission, *White Paper on Damages Actions for Breach of the EC antitrust rules* (COM (2008) 165)[225]

European Economic and Social Committee, *Opinion on Defining the collective actions system and its role in the context of Community Consumer Law*, Official Journal 25.06.2008 (C 162/1)

Gibbons, *Group Litigation, Class Actions and Lord Woolf's Three Objectives – A Critical Analysis*, CJQ Vol. 27 (2008) 208

Giddings, *The ombudsman in a changing world* (1998) 8 (6) Consumer Policy Review 202

Glenn, *The Dilemma of Class Action Reform*, (1986) 6 Oxford Journal Legal Studies 262

Government Equalities Office, *The Equality Bill – Government Response to the Consultation* (July 2008) (CM 7454) (http://www.equalities.gov.uk/dlr/terms_of_ref.htm)

Gubbay, *Private Action in Competition Law: effective redress for consumers and business* (April 2007)

---

[224] http://ec.europa.eu/consumers/redress_cons/collective_redress_en.htm
[225] (http://ec.europa.eu/comm/competition/antitrust/actionsdamages/documents.html)

Her Majesty's Treasury, Budget 2007, (HC 342)

Hodges, *Multi-Party Actions*, (Oxford) (2001)

Hodges, *Global Class Actions Project Country Report: England and Wales*, (2007) (http://globalclassactions.stanford.edu/reports.html#england)

Institute for Employment Studies, *Monitoring the Disability Discrimination Act (DDA) 1995,* (1999)

Irish Law Commission, *Multi-Party Litigation*, (2003) (LR CP 25-2003)

Irish Law Commission, Multi-Party Litigation, (LRC 76-2005)

Justice, *The Citizen and the Administration: the Redress of Grievances* (Stevens, 1961)

Koniak, *Feasting while the Widow Weeps*, (1995) 80 Cornell L Rev 1045

Kritzer, *Seven dogged myths concerning contingency fees*, Washington University Law Quarterly (Vol. 80) (2002) 739

Kroes, *The Green Paper on antitrust damages actions: empowering European citizens to enforce their rights*, (Brussels) (06 June 2006)

Liberty, *Litigating the Public Interest: report of the working group on facilitating public interest litigation*, (July 2006) (www.liberty-human-rights.org.uk)

LCD, *Representative Claims: Proposed New Procedures*, (February 2001)

LCD, *Representative Claims: Proposed New Procedures*: Consultation Response (April 2002)

Macrory, *Regulatory Justice: Making Sanctions Effective*, (Final Report) (November 2006)

Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the 'Class Action Problem'*, (92) Harvard Law Review 664 (1979)

Moller, *Controlling Unconstitutional Class Actions: A Blueprint for Future Lawsuit Reform*, (2005) Cato Institute Policy Analysis (No 546)

Mulheron: *The Class Action in Common Law Legal Systems: A Comparative Perspective*, (Hart Publishing) (2004)

Mulheron, *Some Difficulties with Group Litigation Orders—and Why a Class Action is Superior* 24 Civil Justice Quarterly (2005) 40

Mulheron, *Reform of Collective Redress in England and Wales: A Perspective of Need*, (CJC Research Paper, 2007)

Mulheron, *Justice Enhanced: Framing an Opt-Out Class Action for England*, (2007) *Modern Law Review* 550

Mulheron & Cashman, *Third Party Funding; A Changing Landscape*, 28 Civil Justice Quarterly (2008) 312

National Employment Panel, *The Business Commission on Race Equality in the Workplace*, (October 2007)

Ontario Law Reform Commission, *Report on Class Actions*, 306

Pace, *Class Actions in the United States of America: An Overview of the Process and the Empirical Literature*, (RAND Institute for Civil Justice, Santa Monica, California, USA (2007)

Report of the Review Body of Civil Justice (Cmd 394)

Roche, *A Litigation Association Model to Aggregate Mass Tort Claims for Adjudication*, Virginia Law Review (Vol. 91) (2005) 1463

Seymour, *Representative Procedures and the Future of Multi-Party Actions*, (1999) 62 Modern Law Review 564

Shapiro, *Class Actions: The Class as Party and Client*, (1998) Notre Dame Law Review 913

Seneviratne, *Professorial Inaugural lecture* (17 April 2000, Nottingham Law School)

Story, *Commentaries on Equity Jurisprudence as Administered in England and America*, (Little Brown & Co) (1886) (4th Edition) Vol. II

Stratford, *Class Actions*, (Brick Court Chambers, 2007) (Seminar Materials)

Sturner, *Model case proceedings in the capital markets - tentative steps towards group litigation in Germany*, 26 Civil Justice Quarterly (2007) 250

Stuyck et al, *An analysis and evaluation of alternative means of consumer redress other than redress through ordinary judicial* proceedings, (Leuven University) (2007)

The Patent Office, *Consultation Paper: Representative Actions for the Enforcement of Intellectual Property Rights*, (2006)

Uff, *Class, Representative and Shareholders' Derivative Actions in English Law*, Civil Justice Quarterly (1986) 50

Victorian Law Reform Commission, *Civil Justice Review*, (March 2008) (Report No 14)

Woolf MR, *Access to Justice: Interim Report to the Lord Chancellor on the Civil Justice System in England and Wales* (HMSO) (1995)

Woolf, *Access to Justice: Final Report to the Lord Chancellor on the Civil Justice System in England and Wales* (HMSO, London) (1996)

Zuckerman, *Zuckerman on Civil Procedure, Principles of Practice*, (2006) (2nd ed) (Sweet & Maxwell)

244



**APPENDIX E**

**"Improved Access to Justice – Funding Options & Proportionate Costs"**

**The Future Funding of Litigation - Alternative Funding Structures**[226]

**EXECUTIVE SUMMARY**
**KEY ASSUMPTIONS, FINDINGS and RECOMMENDATIONS**
**KEY ASSUMPTIONS**

**Key Assumption 1 -**

**There will be no new Government money to fund the Recommendations**

14. This paper is written on the assumption that the Government will not provide any additional public money either to increase legal aid coverage in civil, or to provide any seed corn funding to "pump prime" a Contingency Legal Aid Fund or Supplemental Legal Aid Scheme.

**Key Assumption 2 –**

**The concept of "No Win, No Fee" is now ingrained in the funding system**

15. This paper accepts that it is current Government policy to continue to support the

---
[226] Civil Justice Council (June 2007)

funding mechanism of Conditional Fee Agreements in their current form, and is written on the assumption that Government has no immediate plans to change this policy.

16. In the absence of Legal Aid for much of civil process, no win, no fee agreements do provide access to justice. However, the current operation of Conditional Fee Agreements, backed by after the event insurance (ATE) is dependent on the sustainability of an insurance market that is perceived as fragile, and is beset with complexity causing additional cost and uncertainty. (For recent case law see Appendix 7).

## KEY FINDINGS

**Key Finding 1 –**

**None of the alternative funding schemes that have been studied in other jurisdictions would operate effectively in England and Wales.**

17. Most schemes operate at very low volumes (no more than 100-120 cases per year, some significantly less), and the majority of their business is in lower value, low risk litigation. Most do not offer any significant form of cost protection.

**Key Finding 2 –**

**None of the studied schemes would be immune from the problem of adverse selection against other funding mechanisms in England and Wales.[227]**

18. The majority of schemes operate effectively because of a lack of alternative options. Where alternatives have emerged, the effectiveness of the schemes studied is diminished

---

[227] Schemes studied: Hong Kong CLAF, SLAS and CLAF schemes in all Australian states, Ontario Class Action Fund, general funding of multi party consumer actions in Vancouver, Quebec Fonds Collectifs.

## RECOMMENDATIONS

### Recommendation 1

**A Contingency Legal Aid Fund (CLAF) should not be established under the current cost regime of England and Wales.**

19. Although there is considerable merit in the concept of a CLAF, there is insufficient evidence from other jurisdictions that a CLAF style scheme could be transported to this jurisdiction. CLAF's can be successful, but suffer variously from insufficient seed funding, adverse selection, and (even where successful) expansion into higher risk (losing) cases that reduce income and threaten the scheme. It is unlikely that a CLAF would be successful in England and Wales due to adverse selection in a system where conditional fee agreements are
operating successfully.

### Recommendation 2

**A Supplementary Legal Aid Scheme (SLAS) should be established and operated by the Legal Services Commission.**

20. A SLAS would expand access to justice by increasing legal aid coverage and good value for money by (i) creating additional funds and (ii) reducing the net cost of the scheme. The SLAS would introduce a form of self-funding mechanism into the legal aid scheme whereby, if a case was won, costs would be recovered and an additional sum would be payable to the fund by means of a levy to be paid as a percentage of damages recovered, or out of recovered costs. The SLAS would offer protection to parties from adverse costs if a case is lost. Positive recovery via the levy could be used to expand public funding for the civil legal aid budget. Also, the SLAS scheme could be engineered to link with Conditional Fee Agreements as a complementary method of funding via a levy on costs/damages recovered.

**Recommendation 3**

**Properly regulated Third Party Funding should be recognised as an acceptable option for mainstream litigation. Rules of Court should also be developed to ensure effective controls over the conduct of litigation where third parties provide the funding.**

21. Third party funding is already established in England and Wales. The case of *Arkin* laid down principles for third parties to fund cases and defined to what extent third party funders may be liable for costs in cases that are lost.

22. The decision of the High Court in the case of Fostif in Australia (where Third Party Funding has been established for more than a decade) undertook a modern review of the notions of champerty and maintenance. The Court provided guidelines on the role and limits of third party funder influence on the conduct of litigation and the relationships between third party funders, lawyers and their clients.

23. Third party funding has the potential to increase access to justice in areas of consumer rights and multi party action. However it must be effectively regulated and rigorously controlled by the courts.

**Recommendation 4**

**In multi party cases where no other form of funding is available, regulated contingency fees should be permitted to provide access to justice. The Ministry of Justice should conduct thorough research to ascertain whether contingency fees can improve access to justice in the resolution of civil disputes generally.**

24. Contingency fees, subject to proper court control may now be an essential method of funding multi party cases where legal aid and/or no other form of funding is available.

25. However, this paper does not recommend the blanket introduction of contingency

fees in contentious business.

250



## APPENDIX F

### "Improved Access to Justice – Funding Options & Proportionate Costs"

### Report & Recommendations[228]

## RECOMMENDATIONS 1 – 20

**Recommendation 1**

**Small Claims Limit for Personal Injury Cases**

The starting point for recovery of costs in personal injury claims below £5,000 should remain at £1,000.

**Recommendation 2**

**Fast Track Limit for Personal Injury Cases**

The Fast Track Limit for personal injury cases should be increased to £25,000. There should be an opt-in option for cases up to £50,000 in value.

**Recommendation 3**

---

[228] Civil Justice Council (August 2005)

**Personal Injury Cases in the Fast Track**

The Predictable Costs Scheme (CPR Part 45 Section II), currently restricted to RTA cases below £10,000, should be extended to include all personal injury cases in the [increased level] fast track and should include fixed costs from the pre-action protocol stage through the post issue process & including trial with an escape route for exceptional cases. Fixed success fees, fixed/guideline ATE premiums and fixed/guideline disbursements should also be part of the scheme.

**Recommendation 4**

**RTA Claims below £10,000**

The vast majority of RTA claims fall below the £10,000 value threshold. The CJC recommends that in the vast majority of such claims where liability is not an issue speedy and prompt resolution would be assisted by a less resource intensive pre action protocol that would reduce unnecessary transactional costs. This should include:

(i) the presumption that the claimant's lawyer will obtain a medical report from an appropriate medical practitioner, at a fixed fee, to be paid promptly by the third party insurer.

(ii) the development of a "tariff" database for the valuation of general damages

(iii) in cases where a police report is necessary, the agreement of a national standardised format, fixed fee & target timescale for delivery.

(iv) a priority objective that all professionals involved in the claim should have regard to rehabilitation of the injured claimant in accordance with the APIL/ABI Rehabilitation Code.

**Recommendation 5**

In addition to personal injury cases, referred to in Recommendations 1 and 2 it would also be desirable to include housing cases within Recommendation 1, and non personal injury cases within Recommendation 2.

**Recommendation 6**

Section 6 of the Costs Practice Direction should be reviewed when the amendments to the Practice Direction, approved in July 2005, have come into effect, to ensure that the giving of an estimate carries a sanction if the estimate is departed from significantly.

**Recommendation 7**

In multi track cases where the value exceeds £1 million, in all group actions and in other complex proceedings there should be a rebuttable presumption requiring the parties to present budgets, supervised by the Court at appropriate stages to ensure compliance with the proportionality provisions of the overriding objective of the CPR.

**Recommendation 8**

Where the parties have agreed or the court has approved an estimate or budget and/or cap, both the receiving party and the paying party should be entitled to apply for detailed assessment but only at a costs risk if a significant increase/reduction in the amount claimed is not achieved.

**Recommendation 9**

**Benchmark Costs**

In all multi track cases benchmark costs should be provided for pre-action protocol work.

**Recommendation 10**

With a view to increasing access to justice and providing funding options in cases where ATE insurance is unavailable, the Legal Services Commission should give further consideration to the Conditional Legal Aid scheme (CLAS) previously proposed by the Law Society, the contingency Legal Aid Fund (CLAF) previously proposed by the Bar Council and JUSTICE, and the Supplementary Legal Aid System (SLAS) operating in Hong Kong.

**Recommendation 11**

In contentious business cases where contingency fees are currently disallowed, American style contingency fees requiring abolition of the fee shifting rule should not be introduced. However, consideration should be given to the introduction of contingency fees on a regulated basis along similar lines to those permitted in Ontario by the Solicitors' Act 2002 particularly to assist access to justice in group actions and other complex cases where no other method of funding is vailable.

**Recommendation 12**

Building on the Protective Costs Order as explained in *R (Corner House Research) v Secretary of State for Trade and Industry* [2005] EWCA Civ 192, to permit access to justice in public law cases, further consideration should be given to the wider import of the judgment.

**Recommendation 13**

Building on the judgment of the Court of Appeal in "*Arkin*" further consideration should be given to the use of third party funding as a last resort means of providing access to justice.

**Recommendation 14**

Encouragement should be given to the further expansion and public awareness of Before the Event Insurance to provide wider affordable access to justice funding complemented where necessary by a strong After the Event Insurance market.

**Recommendation 15**

The particular problems of funding group actions should be taken into account when considering Recommendations 10-13.

**Recommendation 16**

In addition to the presumption relating to the provision of medical reports in RTA cases below £10,000 (Recommendation 4) further work should be conducted by the CJC to develop an industry based agreement for fixed/guidelines fees for medical experts in all personal injury cases in a revised fast track of £25,000 (**Recommendation 2**).

**Recommendation 17**

Between the parties costs should be payable on the basis of costs and disbursements reasonably and proportionately incurred and should be assessed at hourly rates determined from time to time by the Costs Council (Recommendation 19) without prejudice to the ability of solicitors (and barristers) to agree other rates on a solicitor/client basis.

**Recommendation 18**

The CJC endorses the proposed legislation announced by the Government to regulate Claims Management Companies and urges that this be introduced with as much speed and rigour as possible so as to protect consumers and reduce if not remove opportunities for "technical" costs litigation that have bedevilled the Courts at all levels.

**Recommendation 19**

Successful litigants in person should be entitled to a simple flat rate (or fixed fee in a scale scheme) whether or not they have sustained financial loss.

**Recommendation 20**

A Costs Council should be established to oversee the introduction, implementation and monitoring of the reforms we recommend and in particular to establish and review annually the recoverable fixed fees in the fast track and guideline hourly rates between the parties in the multi-track. Membership of the Costs Council should include representatives of the leading stakeholder organisations involved in the funding and payment of costs and should be chaired by a member of the judiciary.

**Recommendation 21**

That the DCA and the professional bodies (Law Society and Bar Council) should work together with the Attorney General's pro bono co-coordinating committee to introduce a pro bono CFA.



**APPENDIX G**

**European Union – Ten Consumer Benchmarks**

The European Commission identified ten benchmarks for the effective and efficient collective redress mechanisms, the aim of which is to give rise to satisfactory consumer redress. Those benchmarks are:[229]

1. The mechanism should enable consumers to obtain satisfactory redress in cases which they could not otherwise adequately pursue on an individual basis.

2. It should be possible to finance the actions in a way that allows either the consumers themselves to proceed with a collective action, or to be effectively represented by a third party. Plaintiffs' costs for bringing an action should not be disproportionate to the amount in dispute.

3. The costs of proceedings for defendants should not be disproportionate to the amount in dispute. On the one hand, this would ensure that defendants will not be unreasonably burdened. On the other hand, defendants should not for instance artificially and unreasonably increase their legal costs. Consumers would therefore not be deterred from bringing an action in Member States which apply the "loser-pays" principle.

4. The compensation to be provided by traders/service providers against whom actions have been successfully brought should be at least equal to the harm caused by the incriminated conduct, but should not be excessive as for instance to amount to punitive damages.

---

[229] http://ec.europa.eu/consumers/redress_cons/collective_redress_en.htm

5. One outcome should be the reduction of future harm to all consumers. Therefore a preventive effect for potential future wrongful conduct by traders or service providers concerned is desirable – for instance by skimming off the profit gained from the incriminated conduct.

6. The introduction of unmeritorious claims should be discouraged.

7. Sufficient opportunity for adequate out-of-court settlement should be foreseen.

8. The information networking preparing and managing possible collective redress actions should allow for effective "bundling" of individual actions.

9. The length of proceedings leading to the solution of the problem in question should be reasonable for the parties.

10. Collective redress actions should aim at distributing the proceeds in an appropriate manner amongst plaintiffs, their representatives and possibly other related entities.



**APPENDIX H**

**Minutes of the Four Collective Redress Events**

**First Collective Redress Event: Minutes**

**October 2006**

There was a strong feeling held by the considerable majority of attendees, that there was a lack of access to justice in consumer redress. There was strong support for the group and representative procedures to be developed further to promote better access to justice.

The **funding** of claims dominated discussions, as this is perceived as the **biggest barrier** to access to justice.

There was a similarly feeling that the **court should take on a bigger role** in controlling multi party proceedings (subject to funding reform allowing meritorious cases to get off the ground in the first place).

There was discussion surrounding the perception of the US class action system, but unanimous acceptance that our procedures could be developed to avoid their perceived excesses (Australia has been running group and class actions for years without the problems of the US).

There was common feeling that reform was inevitable (particularly in the face of anticipated EU reforms), and that it was essential to plan properly for this, to ensure our

systems were effective.  Lawyers from both sides would rather a controlled English system that was "fair", "balanced", and "controlled by the courts", than the potential exposure to US or other EU court systems.

There was notable support for opt-out actions for consumer claims, mainly on the grounds of that consumers were "ill-informed", "incapable of running claims", and "completely frightened of conventional court processes".  The role of private enforcement in as a deterrent was recognised.

One argument in support for opt-out in consumer claims was the opportunity to start a claim much earlier, which could stop the damage to further (ie a greater number of) consumers.

There was unanimity that an English system could be designed that was fair, promoted access justice, but was tougher than other systems (and less punitive).  There was considerable support for the cy pres doctrine which could create funds that couls potentially be distributed to disadvantaged citizens with unmet legal need, such as advice, rights education, and debt management

There was no great concern over fuelling the perception of a compensation culture, save for the need to avoid adopting a US approach which may open the floodgates.  Access to justice was considered to prevail over perception concerns.  This was supported by confidence that the judiciary were capable of controlling any possible excesses, and would be able to curb lawyer or funder driven litigation.

In discussion of potential improvements to the court process, there was support for:

- A Minimum number of clearly identified claimants before an action was commenced.
- No need for "designated" consumer bodies only to bring claims.
- Judges to certify a case before it was allowed to proceed (including a representativeness test on the claimant group or class)

- Judges having the power to say that a case, however meritous, cannot proceed (on grounds of proportionality, or that it simply isn't justiciable in a reasonable amount of time and cost)
- Judicial control over case management (judges to get better specialist training)
- Judicial control on what legal argument will be accepted (ie limitation on running a "death by paperwork" case)
- Judicial control over disclosure (effecting strong limitations, and avoiding "fishing")
- Judiciary imposed costs budgeting, capping, and monitoring (limiting the amount either side can spend on the case)
- Development of costs protection orders as appropriate (public interest test - *Cornerhouse* refers)
- Judiciary to approve all settlements, and means of advertising and distribution (particularly salient if opt-out to prevent "low-balling" by lawyers anxious to get their costs).
- *Cy pres* doctrine (if opt-out), if a judge considers appropriate (deterrent measures).

In discussion of potential improvements to funding, there was support for:

- An acceptance that any funding system would take a percentage of damages
- Green light for a Supplemental Legal Aid Scheme (maybe on a shared basis with lawyers taking cases over on a CFA, the legal aid fund takes a percentage of damages)
- Third party funding to move into the mainstream, but controlled strictly by rules of court and regulation.

**The Civil Justice Council will prepare a supplementary paper as advice and recommendations to the Lord Chancellor on reform of court processes to improve access to justice in multi party consumer redress claims.**

**Second Collective Redress Event: Minutes**


**November 2007**


**Keynote speech by the Master of the Rolls, the Rt Hon Sir Anthony Clarke**



The Master of the Rolls explained that part of the role of the CJC is to facilitate discussion in relation to aspects of the civil justice system. He noted that by holding events such as these in the past, the CJC has succeeded in bringing diverse interests together and finding common ground between them.

The Master of the Rolls touched upon a recent competition judgement of Mr Justice Lewison which contained the following pertinent quotation from *The Wealth of Nations* by Adam Smith:

> "People of the same trade seldom meet together, even for merriment and diversion, but when they do, the conversation ends in a conspiracy against the public, or in some contrivance to raise prices".

The Master of the Rolls expressed his wish to discuss the following set of questions:

1.    What types of complaint are we discussing and against whom?
2.    What is the nature of the alleged liability? Is it contractual, tortious, quasi-criminal, regulatory or is it a mixture of those? If it is a mixture, how should they be mixed together?
3.    Is the claimant seeking compensation or what?
4.    What is the real purpose of the claim?
5.    Is it:
     i.   compensation?
     ii.  or is it regurgitation of unlawful profits, and if so to whom should such

profits be paid?

Should it be to:

    a. the claimant? Even though the claimant's loss may be different than the amount of unlawful profits that have been made.

    b. a consumer organisation through the operation of *cy pres* or something like it (where the individual damages are small)?

    c. the state?

    d. a bit of each?

6.    Insofar as the claim is intended to punish the defendant, is this really the role of private litigation or should that be the role of the state?

7.    If not why not?

CRITICALLY

8.    By whom should the litigation be funded?

    a. The claimant? This is obviously a possibility, but not one that many claimants, especially consumers, could take up.

    b. The claimant's lawyers?

    c. The state?

    d. If otherwise, how?

9.    Is the whole thing worth the candle?

10.    Should the claimant give the defendant security for costs as they do in some parts of Australia? If not, why not?

11.    How should the claims be advanced?

    a. By test case?

    b. By representative action?

    c. By group action?

    d. By some form of class action if that is different?

12.    How should the claim be funded?

    a. Out of the claimant's own pocket?

b. CFA? If by CFA, should uplift of more than 100% be permitted? Is there any limit to the uplift that could be allowed? How should we decide what the uplift should be? Are there any principles which should inform the answer to that question?

c. Contingency fees?

d. Third party funding? The Master of the Rolls mentioned a Times article on hedge funds going into third party funding.[230] Should third party funders be regulated? If so, by whom and how?

e. Legal aid contingency fund method? SLAS or something like it?

f. State?

13. If the claimant fails and the defendant succeeds, should the defendant recover his costs from the claimant, or the group he represents, or those who opted in or those who have not yet opted in? If the defendant should not recover his costs why not? Should there be a cap on the amount of costs that the defendant can recover?

There is already a sophisticated system of compensation in such areas as competition law. Using the Devenish case as his point of reference, the Master of the Rolls outlined the European system of competition law enforcement and follow-on actions. He touched upon the issue of damages which was considered by Mr Justice Lewison and noted that the case raised important issues of substantive law, procedure and principle as well as matters of political and social policy.

**Opening remarks by Michael Napier QC**

Michael Napier extended a warm welcome to delegates. He summarised the genealogy of CJC involvement in collective redress, an issue encapsulated by the conference document, "Introduction to the Event" by Robert Musgrove, Chief Executive to the Civil Justice Council.

---

[230] Michael Herman, "Former litigator hired to invest $100m in court cases for UK hedge fund", *The Times* (28 November 2007), online: Times Online <http://business.timesonline.co.uk/tol/business/industry_sectors/banking_and_finance/article2957156.ece>.

Michael Napier explained that CJC involvement in collective redress emerged as a corollary of its work on funding and access to justice. In August 2005, the CJC produced a report on access to justice in relation to funding, an issue that has driven a lot of the work the CJC has done. Although this report did not address consumer and collective redress, it considered the problem of funding group actions. A second report in June 2007, examined funding and proportionate costs, and looked at alternative structures. At a CJC event in October 2006, the Council began to probe in a preliminary way at this area. The conclusion of that event gave the platform for coming here to look much more closely at this area.

The CJC's June 2007 report stated that, "As further development on consumer redress takes place in the EU and Government, the Civil Justice Council will prepare a supplementary paper of advice and recommendation to the Lord Chancellor on any reform necessary to the CPR to improve access to justice in this area of group consumer litigation."[231] This reference to the CPR is important because any reform, whether it is a group litigation order with tweaks or an opt-out system with brakes, will at most require change to primary legislation and at least amendment to the CPR.

Quoting Robert Musgrove's paper, Michael Napier explained that the event provided the opportunity to consider evidence on whether there is genuine need for reform, or whether that need is merely perceived. Napier asked whether the collective redress debate equated to finding a solution to a problem. He also questioned whether there is a real access to justice gap.

Napier outlined the agenda and introduced the first speaker, John Sorabji, Legal Secretary to the Master of the Rolls and member of the CJC's Collective Redress Committee.

---

[231] Civil Justice Council, *Improved Access to Justice – Funding Options & Proportionate Costs: The Future Funding of Litigation - Alternative Funding Structures*, Paragraph 168 at 71, online: Civil Justice Council <http://www.civiljusticecouncil.gov.uk/files/future_funding_litigation_paper_v117_final.pdf>.

**Discussion following John Sorabji's speech**

**Michael Napier QC:**

Michael Napier commended John Sorabji on his comprehensive review of collective redress. He highlighted the importance of learning from the U.S. experience of class actions. Napier explained that there was a balanced representation of claimant and defendant interests at the event. He queried whether the sole purpose of group litigation orders was to save costs. Napier added that the advent of group litigation orders finally brought into the CPR a regime under which practitioners could work.

**Master of the Rolls:**

The Master of the Rolls asked John Sorabji what restrictions made to the role of the representation order in the 1910 case could be relaxed under the CPR.

**John Sorabji:**

The primary restriction is the three-part test of what constitutes the same interest. This restriction could be relaxed by ending the restriction as to the common interest giving rise to the cause of action and the type of damages claimed.

**Judge 1:**

The judge declared his firm belief that representative actions are the answer, as they are a very good way of getting a swift liability decision. He cast doubt on the severity of the aforementioned restrictions and stated that these problems could fit within 90.6 as it stands now. Judge 1 then alluded to the question of funding.

**Defendant lawyer 1:**

Defendant lawyer 1 asserted his belief that, in practice, representative action procedure

cannot be used sensibly as currently drafted. It would be worth looking at representative procedures in other jurisdictions, such as the U.S., where more discretion is allowed to make orders which would enable cases to be tried more effectively and cheaply.

**Claimant lawyer 1:**

Claimant lawyer 1 remarked that group litigation orders potentially increase costs. He said that the attraction of them is the costs regime. Claimant lawyer 1 added that we might as well use ordinary procedure for large numbers of claims.

**Claimant lawyer 2:**

Claimant lawyer 2 voiced his support of group litigation orders, calling them a fantastic tool. He argued that there are much bigger problems with why cases are not coming forward. Claimant lawyer 2 stated that the two issues which really need to be addressed are:

1. How to get more third party funding in: this has to be developed as public funding is not an option.
2. Causation: the evidential hurdle is too high, allowing defendants such as drugs companies to get away with far too much.

**Master of the Rolls:**

The Master of the Rolls said that this would involve changing the substantive law relating to causation.

**Claimant lawyer 3:**

The City is not desperate to fund lots of individual pharmaceutical cases. After all, the basic criteria is that aggregate damages need to be in excess of £10 million. The representative rule may provide a partial solution if it has the effect of aggregating damages. In the absence of this solution, hedge funds will not go anywhere near group

litigation orders.

**Master of the Rolls:**

The Master of the Rolls asked Claimant lawyer 3 to what extent such a funder would be willing to fund the underlying investigation required to identify the underlying liability.

**Claimant lawyer 3:**

Claimant lawyer 3 replied that the possibility of funding would be increased if the return, expected aggregate damages and chances of success are good enough and the timescale short enough. He added that a procedure which has the ability to aggregate damages and provide a quick answer would mean that more funding might be available.

**Judge 2:**

Judge 2 made the following points:

1. Funding is the basic problem. Sweden has recently brought in a form of class action but there has been very little take up. Sweden does not have provision for contingency fees. The problem therefore is funding. We are driven to contingency fees or some other form of funding.

2. We shouldn't refuse to look at the U.S. class actions system because of its unattractive features. The problems with jury trials, punitive damages and uncontrolled contingency fees are not shared by our system. If we can control funding in some way then there is much in the U.S. system that we can benefit from but whatever you call it, it is a form of class action.

**Michael Napier:**

Michael Napier said that it was tempting to agree with the proposition that the big problem is funding. However, he noted that the purpose of the event was not aimed at the

question of funding, rather its purpose is to examine the procedural side of problem. He informed the delegation that the last time the CJC met, it made the following five conclusions:

1. Funding is the greatest barrier to bringing legitimate multiparty consumer redress claim

2. Alternative funding systems for multiparty claims would take a percentage of damages

3. The current group litigation procedure works reasonably well but could be improved

4. An opt-out procedure would be appropriate in some consumer claims

5. The judiciary should play a more proactive role in controlling and managing multi-party litigation

Michael Napier encouraged the delegation to look at these last three points rather than funding.

**Discussion following the presentation of Steven Altham, OFT**

**Michael Napier:**

Michael Napier asked the delegation how it viewed the recommendations made by the OFT.

**Claimant lawyer 3:**

Claimant lawyer 3 welcomed the OFT recommendations. He articulated the concern that the recommendations focus on a discrete area and yet raise issues that have a much wider impact. He commented that if these reforms were simply focused on the competition arena, they would be open to abuse by litigants pleading competition issues in

commercial disputes to take advantage of a playing field tipped in favour of the claimant, or lawyers seeking success fees of over 100%. He suggested that one answer to that might be that we have a specialist tribunal in UK which may give more scope to be more expansive in terms of rule changes that might be under consideration without having an impact across the CPR for all other claims.

**Steven Altham:**

Steven Altham asked Claimant lawyer 3 how realistic his vision of the potential consequences of the recommendations was.

**Claimant lawyer 3:**

Claimant lawyer 3 responded that in the commercial context, it is a real possibility. He stated that it was seen as the nuclear option in contractual disputes. He questioned how achievable it is to limit reforms to one particular area.

**Consumer representative 1:**

Consumer representative 1 congratulated the OFT on its report, stating that it dealt well with the key issues. Her organisation regards an opt-out scheme as essential as it would be incredibly difficult to run a case on an opt-in basis. Although it would prefer a general opt-out scheme, Consumer representative 1 understood the desire for a mechanism to control it. As the need for opt-out comes up very rarely, to automatically shut down the barriers would be extremely unjust to consumers. Consumer representative 1 considered the expansion of representative bodies a good idea. She expressed her support for special designation in respect of a particular issue rather than simply for life.

**Consumer representative 2:**

Consumer representative 2 echoed the comments made by Consumer representative 1. He concluded that OFT would deal with high profile cases and that consumer organisations

would deal with low risk small cases. Accordingly, he wondered who would deal with the medium level "in-between" cases.

**Claimant lawyer 2:**

Claimant lawyer 2 acknowledged the importance of Consumer representative 2's point. Private enforcement in the cases envisaged by the OFT would pose a massive step for law firms.

**Judge 2:**

Judge 2 questioned the desirability of restricting class actions to particular types of cases.

**Defendant lawyer 2:**

Defendant lawyer 2 similarly expressed opposition to a multi-layered regime. He envisaged that the debate would only move on after various aspects of the U.S. class actions system were handled.

**Master of the Rolls:**

The Master of the Rolls asked whether defendants would be protected at all against claim that fail. Is the defendant to have any protection against costs? If so, whom is it going to be against? He noted that the whole package needs consideration.

**Steven Altham:**

Steve Altham explained that this aspect of the proposals is a work in progress.

**Master of the Rolls:**

The Master of the Rolls stated the need to decide in what classes of case the defendant is to be protected; in what classes of case he is not; in what classes of case the defendant will be made to pay 300% over the base cost if he loses but not give him anything if he wins. The Master of the Rolls noted the complexity of these sorts of issues.

**Claimant lawyer 1:**

Claimant lawyer 1 remarked that resolving the issue of adverse costs is absolutely vital in taking the debate forward. While claimants have some control over their own costs they have absolutely no control over adverse costs, particularly in cartel cases. In such cases, large companies can throw huge resources into the defence over which claimants have no control.

**John Sorabji:**

John Sorabji said that although this discussion is predicated on having a costs regime where the loser pays, in the U.S. and other jurisdictions parties cover their own costs whether they win or lose. He added that if we are to consider costs and funding, we ought to consider whether that might be something we have to move towards.

**Michael Napier:**

Michael Napier moved the discussion onto the OFT's treatment of opt-out.

**Steven Altham:**

Steven Altham explained that the OFT takes an incremental approach and believes in having different instruments available rather than a one-size-fits-all style. Whether an opt-out scheme should be applied ought to be for the individual judge to decide.

**Michael Napier:**

Michael Napier confirmed that this would predicate the power of the judge to implement a rule that allows opt out.

**Claimant lawyer 2:**

Claimant lawyer 2 stated that opt-in schemes would not work in consumer cases. Though he appreciated why the OFT paper sat on the fence, he explained that continued absence of change to the legal architecture combined with judges who have traditionally been involved in opt-in cases, means that opt-out schemes would be little used.

**Claimant lawyer 1:**

Claimant lawyer 1 spoke of the financial risks attached to making unsuccessful opt-out applications to the judge.

**Defendant lawyer 1:**

*[Unclear]*

**Michael Napier:**

Michael Napier confirmed that there is a benefit for defendants in knowing exactly the scale of the problem.

**Defendant lawyer 1:**

Defendant lawyer 1 stated that there are advantages to the defendant in having an opt-out system.

**John Sorabji:**

John Sorabji explained that defendants would favour an opt-out system because of the finality of litigation.

**Defendant lawyer 3:**

Defendant lawyer 3 argued that while opt-in schemes could work for competition and consumer issues, they would not be successful in complex product liability and pharmaceutical cases.

**Steven Altham:**

Steven Altham used this argument as support for having a specific collective action for competition law. He added that it would be a shame not to have a collective redress system at all.

**Defendant lawyer 3:**

Defendant lawyer 3 advised that a measure of flexibility would be required.

**Michael Napier:**

Michael Napier referred to the desirability of a generic procedure for all types of claim.

**Steven Altham:**

Steven Altham said that this would be fine as long as there is a procedure that works.

**John Sorabji:**

John Sorabji argued that having a generic flexible procedure would probably be better

than a subject specific approach. He cautioned that any new procedure would have to be consistent with the Woolf reforms.

**Discussion following Academic 1's presentation**

**Master of the Rolls:**

The Master of the Rolls asked Academic 1 what the essential ingredients of the opt-out system are.

**Academic 1:**

Academic 1 explained that opt-out systems are characterised by three key features:

1. Certification criteria at the outset
2. Due process notice requirements
3. *Res judicata* on the common issues

**Master of the Rolls:**

The Master of the Rolls asked Academic 1 what the effects of opt-out systems are.

**Academic 1:**

Academic 1 responded that opt-out schemes enable individuals to proceed alone or opt out of litigation altogether.

**Master of the Rolls:**

The Master of the Rolls asked Academic 1 to what extent cost protection exists for defendants in Australia and Canada.

**Academic 1:**

Academic 1 summarised the system of costs protection in Australia.

**Master of the Rolls:**

The Master of the Rolls asked Academic 1 how the claimant funds the security.

**Academic 1:**

Academic 1 explained that funds could be lodged in court or the claimant could make guarantees as a precondition of bringing the action further.

**Master of the Rolls:**

The Master of the Rolls asked Academic 1 whether this has worked in the examples listed in her paper.

**Academic 1:**

Academic 1 stated that very few have had security for costs applications brought.

**Master of the Rolls:**

The Master of the Rolls questioned why the defendant is not routinely asked for security for costs.

**Academic 1:**

Academic 1 remarked that courts make this requirement if the public interest demands it. She said she was not aware whether the Australian courts asked for security for costs as a matter of course.

**Master of the Rolls:**

The Master of the Rolls asked whether this meant, in reality, that defendants do not recover their costs in opt-out cases.

**Robert Musgrove:**

Robert Musgrove informed the Master of the Rolls, in Quebec, costs protection is provided by the state, which effectively insures cases and takes a percentage of the damages if the case is successful.

**Academic 1:**

As many cases settle, there is a lack of knowledge regarding how defendants' costs are dealt with.

**Judge 1:**

Judge 1 sought clarification from Academic 1 as to the difference between opt-out and the mandatory class.

**Academic 1:**

Academic 1 expressed her view that the problem with a mandatory class is that it prevents people from opting out with respect to their entitlement to get compensation.

**Judge 1:**

Judge 1 shared his worry about the possibility that those who opt out may still bring their own liability claims.

**Academic 1:**

Academic 1 assured Judge 1 that, in reality, very few opt out. In the U.S., over 99% of litigants remain in the class. In Australia, claims made by those who have opted out are stayed pending the result of the collective action.

**Judge 1:**

Judge 1 expressed an interest in learning how many group litigation order applications are refused and why.

**Academic 1:**

Academic 1 agreed that it would be interesting to discover on what basis group litigation orders are refused e.g. on the grounds of commonality or superiority. The transparency of the Canadian certification process means that this can be found out with considerable ease.

**Claimant lawyer 2:**

Claimant lawyer 2 complimented Academic 1 on her paper and asked whether it presumed the establishment of an opt-out system.

**Academic 1:**

Academic 1 confirmed that under her proposals there would be a presumption of opt-out but with superiority criteria built in. The final decision on the system to be used must always rest with the individual judge.

**Claimant lawyer 2:**

Claimant lawyer 2 voiced his support for the presumption of opt-out in cases of all types.

**Defendant lawyer 4:**

Defendant lawyer 4 questioned Academic 1 on her proposal that at some stage in the opt-out process there has got to be opt-in. He did not understand how that would work and he asked whether there has been any empirical evidence of that sort in any other jurisdiction.

**Academic 1:**

Academic 1 explained that this exists in the U.S., adding that the opt-in rate at the end can be as low as 10%, or as high as 100%. She stated that opt-out converts to opt-in at some point. Academic 1 questioned whether judges or law firms could make a particular claim opt-in at the outset by, for example, defining a class by the damage it has suffered and whether it has a retainer with a particular law firm. One Australian judge deemed that to be an abuse of opt-out regime, holding that an opt-out system is only meant to describe and pull in the class. A later ruling held that it constituted a legitimate way of making a claim opt-in. This decision has been appealed and the case is to be heard shortly.

**Defendant lawyer 4:**

Defendant lawyer 4 stated that if you have opt-out but with opt-in later, effectively it is the same thing as opt-in.

**Academic 1:**

One feature of the opt-out system is aggregate damages. Opt-out pulls people into the class description at the outset, while with opt-in people have to make a proactive decision to join the class. As regards the legal effect, in opt-out cases the class is bound on judgment, which can be for the benefit or disadvantage of the entire class. However, with

opt-in cases, the finality of litigation is not there.

**Judge 2:**

Judge 2 confirmed that when people opt in to a class, all their action means is "I want my money!". He argued that it is misleading to say that opt-out cases become opt-in because they only become opt-in in the sense that members claim their due compensation.

**Master of the Rolls:**

The Master of the Rolls raised the costs implications for the defendant who successfully opposes an opt-out case.

**Robert Musgrove:**

Robert Musgrove suggested that third party funding or legal insurance could handle these situations.

**Professional representative 1:**

Professional representative 1 contended that it was highly appropriate to have the opportunity to pursue class action, adding that he did not see why claims should be run on an exclusively opt-in basis. Using equal pay cases as an example, Professional representative 1 said that claims can be made on different grounds and at different times. With a class action, the court could define the issues to be dealt with and avoid this problem, which wastes a great deal of time and effort. On a related point, Professional representative 1 stated that in the bank charges case only one decision is needed as regards the contractual relationship between the parties.

**Academic 2:**

Academic 2 congratulated Academic 1 on her paper and then made the following points:

1. Would it be a good idea to consider the possibility of public enforcement as part of the superiority test? A system of checks and balances system could be incorporated into this so that if public enforcement failed, the private sector could take over.

2. Dutch experience:

   a. A small but significant percentage opted out of the Dexia settlement. Academic 2 touched upon the dubious role of claim management agencies in this matter, who effectively stimulated those opting out.

   b. Academic 2 cast doubt on the argument made against opt-out that everyone is entitled to their day in court so they can obtain a tailor made solution to their problem. She argued that it was important to consider ways of encouraging litigants not to opt out.

**Academic 1:**

In response to the points made by Academic 2, Academic 1 stated that public enforcement is part of the superiority matrix in Canada. On whether the right to opt out should be limited, Academic 1 explained that other jurisdictions have considered whether it should be the judge's role to decide whether an opt-out becomes a mandatory class because of the need for finality. She added that this has not been implemented in anywhere but there are many reasons why this idea makes sense.

**Consumer representative 1:**

Consumer representative 1 asked whether we have closely analysed which types of claims would be suitable for collective action. She said that she has been struggling to come up with scenarios where her organisation would bring actions if its powers were not just limited to competition actions. The variety of cases and level of competition mean that it would be incredibly difficult to classify things in a way that you could run them either on a group basis or on a test case basis.

**Academic 1:**

Table 2 shows the range of grievances which have been brought in opt-out systems elsewhere. This shows the potential cases which would be suitable for class action here but experience sometimes brings different and unexpected results as the Canadian experience shows us.

**Government representative 1:**

Government representative 1 touched upon the motivations for using the court system.

**Academic 3:**

Academic 3 explored the division between consumer groups in relation to collective redress. While all feel that there are uses for collective action, some would not have the resources to take advantage of such a system.

**Academic 1:**

Academic 1 said that funding was the key issue here. Unless funding and costs protection is secured, collective redress will be underutilised.

**Academic 4:**

Academic 4 congratulated Academic 1 on her research. He asserted the belief that it is dangerous to examine civil justice systems to the exclusion of other solutions such as regulatory and ADR mechanisms. Academic 4 questioned why £3 billion is being wasted on individual cases in relation to the bank charges matter when only one test case is needed to deal with the case and the FSA has said that if the banks lose it will use its regulatory powers to order them to make compensation orders. Academic 4 directed his questions to the government. Firstly, what is the simplest, cheapest, quickest, most cost efficient and cost proportionate methods of solving these problems. Secondly, how do

you balance the different opportunities presented by different systems?

**Michael Napier:**

Michael Napier indicated that it would be more appropriate to deal with these questions in the next session.

**Professional representative 2:**

Professional representative 2 asked Academic 1 to what extent she had come across evidence of need at the European level.

**Academic 1:**

The Consumer Strategy and the existence of add on actions in some European countries demonstrate evidence of need for a collective redress mechanism in Europe. However, constitutional issues make this problematical. Academic 1 added that she could not comment on this particular area with any expertise.

**Presentation by Judge 2**

Judge 2 explained that he was originally billed to deal with substantive law issues. With that in mind, the Civil Justice Council set up a committee to deal with those issues under the chairmanship of Michael Black QC. Judge 2 then congratulated fellow committee member, Academic 1, on her research.

He offered the following thoughts by way of summary for what he hoped would be a discussion to see whether a consensus could be reached to take matters forward:

1. Some additional procedure is needed to enable collective redress to be achieved in appropriate cases. There is a deficiency in our current procedures with Europe it would be desirable to have such procedure.

2. We should not shrink from calling it a class action because that is what it is.

3. We can learn from the American system and experiences about what we must take care to exclude. In undertaking such an exercise we are aided by the fact that our system does not contain the features which make the U.S. class actions system unattractive to us (e.g. jury trials and punitive damages). The issue of contingency fees might be one area of difficulty. Although there seems to be a consensus against the introduction of contingency fees, is collective redress viable without them?

4. Any additional procedure should be generic. It should not be limited to certain areas such as consumer redress or competition. It must be able to deal with collective redress across the whole spectrum.

5. We may be able to achieve the additional procedure by modifying and extending the existing CPR provisions in relation to representative actions. Reference was made to a contractual case limitation as an example of something that could be easily altered using the CPR.

6. Judge 2 stated that in his opinion, the balance of evidence is weighted in favour of opt-out rather than opt-in. It seems from the evidence that opt-in mechanisms do not enable class actions to get off the ground. Although some defendants instinctively react to opt-out, other defendants (and representatives of defendants) support the quantification of liability and finality that an opt-out system brings.

7. If there is to be such a system, it must be closely controlled by the court. The court will need to certify that the procedure is appropriate in the particular circumstances. If contingency fees are permitted the court has to exercise very close control over the arrangements of those fees and the amount of recovery. Unbridalled contingency fees would lead us at least part of the way down the American road.

8. Judge 2 asserted the view that there must be proper costs protection for defendants. The protection given in the Canadian and Australian systems is more illusory than real. In Ontario, there is some state guarantee or state support for the

successful defendant. But given our legal aid history, the story may well be different over here. The playing field would not be level if there was not proper protection for defendants' costs.

9. The system must be compensatory. Punishment and disgorgement of excess profit are matters for the state. The *cy pres* doctrine may be considered to be deterrent or punitive in nature. If that view is taken, an opt-out system should have some sort of cy pres application of unclaimed damages.

10. Judge 2 sees an inevitable need to change the substantive law and to suspend the limitation period.

**Discussion following the presentation of Judge 2**

**Professional representative 1:**

Professional representative 1 indicated his agreement with Judge 2's points. Modification of the CPR would be a step in the right direction, but change to the substantive law would be needed. He suggested that the *cy pres* surplus could be used to pay the defendants' costs in successful cases.

**Judge 1:**

Judge 1 said that he was not averse to the one-size-fits-all idea in relation to representative actions. However, he added that he would not want to see this as a cross border procedure that replaces the group litigation order. Judge 1 also touched upon contingency fees.

**Michael Napier:**

Michael Napier informed the delegation that the most recent Civil Justice Council report on funding looked at contingency fees quite carefully. It concluded in favour of the

Ontarian system of court-supervised contingency fees. Whilst the abolition of the fee shifting rule was not contemplated, it was agreed that if the only way to fund group actions was through a form of contingency fees then this rule would have to be revisited. Though an attempt has been made to confine today's debate to procedural matters, it is clear that funding is an essential part of the debate. The eventual conclusions of the Civil Justice Council will combine past work on funding together with procedural issues.

**Judge 1:**

Judge 1 argued that disgorgement of profit is a better method of ensuring the effectiveness of contingency fees.

**Judge 2:**

Judge 2 explained that the proposed procedure would be supplementary and that the system of group litigation orders would be retained.

**Academic 4:**

Academic 4 advocated the need for a holistic approach to the problem rather than an exclusive focus on the civil justice system. He also spoke of the reluctance of regulatory bodies to get involved in issues relating to compensation.

**Michael Napier:**

Michael Napier asked Academic 4 what system he would be in favour of.

**Academic 4:**

Academic 4 replied that he would favour a public law solution in investigators would have the ability to institute a compensation order. This is the only such system that would satisfy the criteria which Meglena Kuneva has put forward of speed, efficiency,

effectiveness and absence of abuse.

**Michael Napier:**

Michael Napier asked how compensation would be delivered to individuals under such a system.

**Academic 4:**

Academic 4 explained that the threat of an investigation, fine, court action and compensation order would encourage infringing companies to compensate individuals and secure leniency as a result. Where the details of individuals harmed are known, compensation could be in monetary or other form.

**Claimant lawyer 1:**

Claimant lawyer 1 said that such a proposal would deal only with follow-on situations, and would not cover stand-alone cases.

**Academic 4:**

Academic 4 said that public pressure could be used to pressure infringing companies into paying compensation without going through the court system first. This is a cheap and quick solution. Liberalisation of the class action mechanism would on the other hand herald abuse as can be seen through the examples of the U.S. and Australia.

**Claimant lawyer 1:**

Claimant lawyer 1 argued that liberalisation is required to bring about efficiency.

**Academic 4:**

Academic 4 stated that the system is integrated and needs to be effective as a whole.

**Government representative 2:**

Government representative 2 said that while she saw the merits of the system outline by Academic 4 she was not convinced that there are public bodies which cover the very wide range of cases which could be litigated or the organisational capacity to pick up on all infringements. She ended her remarks by stating that it seemed ambitious that regulation could be as perfect as Academic 4 had described.

**Claimant lawyer 4:**

Claimant lawyer 4 argued that the system proposed by Academic 4 was not an "effective quick big stick". He supported this point by reference to a pharmaceutical case in which an investigation into whether a drugs company should be prosecuted took four years. Claimant lawyer 4 then spoke of the fallacy of public pressure, stating that infringing companies often pay large sums to victims in the U.S. but not in Britain regardless of the press they get here. Using environment nuisance as his point of reference, Claimant lawyer 4 also questioned whether regulatory authorities would be capable of investigating the individual effects caused by one infringement.

**Defendant lawyer 1:**

Defendant lawyer 1 referred to Academic 4's plan as "the Holy Grail". He said that a lot of work would need to be done before the plan could be put into action. He raised the concern that alternative methods of resolving the problem would have to sit on the backburner in the meantime. Defendant lawyer 1 added that the proposed change would not make any difference to the two parallel processes currently operated in our system.

**Claimant lawyer 2:**

Claimant lawyer 2 questioned whether regulatory authorities can always know what the problems are and always be able to do what is right. He asserted his belief that it is important for individuals to have the power to group together and bring a claim.

**Consumer representative 1:**

Consumer representative 1 remarked that the regulatory route is attractive because of the issues of independence and public trust. Although Academic 4's idea may not be a good practical solution given the resource and structural constraints, it was still a good solution which should inform future work on this issue.

**Academic 1:**

Academic 1 agreed that Academic 4's proposal was the ideal but noted that it was not supported by the current realities. She spoke of the gap for private law remedies when public authorities are involved and referred to the disadvantages suffered by systems which lack a certification process.

**Academic 4:**

Academic 4 explained that the regulatory framework in the UK is well developed but that it is sometimes difficult to identify because of its sectoral nature. He said that a sectoral compensation scheme, as operated by Nordic states and New Zealand, could deal with the pharmaceuticals problem raised by Claimant lawyer 4. Academic 4 informed the delegation that the Nordic systems work extraordinarily well according to the criteria of speed, low cost and absence of abuse etc. He added his personal belief that the pharmaceutical industry could be persuaded to distribute compensation if they were promised that they would not be hit by a great deal of class action litigation.

**Michael Napier:**

Michael Napier stated that pharmaceutical companies have been asked for a long time to produce their own compensation schemes.

**Claimant lawyer 1:**

Claimant lawyer 1 wondered whether it would be better to pilot the OFT's restricted version rather than trying to introduce sweeping change at once.

**Professional representative 2:**

Professional representative 2 stated that the regulatory debate is a very interesting one but that it was not the focus of this event which is to discuss whether we should have collective redress or not. He remarked that an effective route to private law remedies is needed to deal with multiple private law breaches. He noted that reform is essential and declared support for the propositions advanced by Judge 2. Professional representative 2 then raised his concern about claimants funding costs protection for defendants.

**Judge 2:**

Judge 2 said that this was a good point: costs protection could kill the whole thing.

**Claimant lawyer 3:**

Claimant lawyer 3 spoke of the connection between opt-out, certification, costs capping and security for costs. If you're looking at opt-out, this also links into certification and consideration of costs capping.

**Academic 1:**

Academic 1 suggested that if we had a collective opt-out mechanism, 1-2% of each judgment or settlement could be retained for a fund to provide costs protection for defendants and support future claimant actions which would then remove the requirement for a percentage of contingency fees.

**Claimant lawyer 4:**

Claimant lawyer 4 discussed funding and the opt-out system.

**Claimant lawyer 2:**

Claimant lawyer 2 asked how a case is settled in an opt-out system when there is no real sense of how many individuals have been affected.

**Michael Napier:**

Michael Napier referred to this as a fundamental point. He confirmed Academic 1's view that when a defendant wishes to settle, members of the opt-out class would have to opt in to take the benefit of that settlement so some mechanism would be necessary to quantify who is opting in.

**Academic 1:**

Academic 1 said that in practice it appears that the settlement pressure has come from the assessment of what the class wide damage is, which has been agreed between the parties. Another mechanism is where the court insists on opting in prior to the determination of common issues.

**Claimant lawyer 2:**

Claimant lawyer 2 asked about the timing of notice to the class on opting in for settlement.

**Academic 1:**

Academic 1 explained that the court would determine when the class is closed as part of their case management judicial decision. Notice of opt-in to settlement would be directed at the class in the same way that the opt-out notice originally was distributed.

**Government representative 3:**

Government representative 3 asked what happens to the rights of people who neither opt in nor specifically opt out?

**Academic 1:**

Academic 1 said that if there is an opt-out arrangement and members of the class do not come forward for their claim then *res judicata* applies and they are bound by the judgment of the court.

**Government representative 3:**

Government representative 3 questioned whether this applied to class members who do not receive the notice.

**Academic 1:**

Academic 1 replied in the affirmative, adding that this is why the due process requirements on distributing the notice are extremely important.

**Claimant lawyer 3:**

Claimant lawyer 3 stated that a case could be settled in relation to a review mechanism where applications are made and defendants settle on the basis of an agreed formula, as opposed to settling a case for a fixed amount. He explained that claimants opt in by putting themselves through the formula. Claimant lawyer 3 said he was not sure why the decision to opt in should be taken before the judgment as to liability.

**Michael Napier:**

There has to be flexibility on the timing for opt-in because every case is different.

**Claimant lawyer 1:**

Claimant lawyer 1 asked whether it would be possible to opt out of settlement and continue with proceedings.

**Academic 1:**

Academic 1 said that this has certainly been the case in the United States.

**Concluding remarks**

**Michael Napier:**

Michael Napier explained that this event had taken on a different format to those held in the past. He remarked that today had been much more of a consultative meeting with key stakeholders. He thanked the delegation for their contributions which would inform the final draft of Academic 1's paper. Michael Napier observed that there seemed to be consensus on the need for reform of collective redress mechanisms and noted that there

were no substantive objections to the points made by Judge 2. He added that what shape that should take remains to be seen.  He recognised the need for balance to ensure a level playing field for claimants and defendants. In relation to substantive law, Michael Napier stated that there would be many hurdles to overcome if primary legislation were to be introduced. He noted that funding is a key issue and suggested that in the finalisation of the report the Civil Justice Council might take a more holistic approach and examine both procedural and funding issues. He thanked Academic 4 for his contribution, remarking that is obviously an area that needs to be given full consideration. Michael Napier concluded that the final document will be ready in spring and that it would go before the Council for approval before recommendations would be made to government.

**Robert Musgrove:**

Robert Musgrove indicated that this subject would be revisited with another consultative event in February 2008.

296

**Third Collective Redress Event: Substantive Law and Process Framework: Minutes**

**27 March 2008**

**Opening remarks by Mike Napier QC**

Mike Napier welcomed delegates to the conference and explained that the event would be held according to the Chatham House Rules. He noted the broad constituency of the conference delegation and related it to the representative nature of the Civil Justice Council (CJC) itself. He then described the advisory role of the CJC and explained its interest in access to justice – an issue which permeates the topic of collective redress.

Mike Napier referred to Bob Musgrove's introductory paper as an effective channel for delegates' thoughts and a useful background to the involvement of the CJC in collective redress. He elaborated on the history of CJC work in this field, pointing out that it became involved in collective redress through its work on litigation funding.

Mike Napier touched upon the two fora hosted by the CJC on collective redress and the study it commissioned on evidence of need, completed by Academic 1 earlier this year. He also mentioned that the CJC had been actively engaged with European institutions and stakeholders, where much political and academic work is being undertaken in the field of collective redress.

Mike Napier remarked that the purpose of the conference was to discuss how reform in the area of collective redress should be brought about and he drew attention to the papers which would assist delegates in this regard. Mike Napier concluded his address with an explanation of the format that the event would take.

**Substantive Law Issues**

<u>"Legislation versus Rules of Court" – Academic 1</u>

*Introduction*

Academic 1 explained at the outset that the binary tension contained in the title of her presentation and accompanying document was not intended to dictate the course of ensuing discussions. Her view was that some primary legislation would be needed to implement substantive changes in the law required for the enactment of an opt-out collective action regime. However, she added that other options ought to be taken into account. Academic 1 declared her intention to explain why some change in the substantive law is required and to consider whether this need may be circumvented in any way.

To begin, Academic 1 explained the process of making court rules. She informed delegates that the Civil Procedure Rules Committee (hereinafter "Rules Committee") has responsibility for creating court rules. Academic 1 argued that the Rules Committee is only permitted to make rules governing practice and procedure (Section 1(1) of the Civil Procedure Act) and modifying the rules of evidence (Schedule 1 Rule 4 of the Civil Procedure Act).

Academic 1 stated her belief that the proposed opt-out regime does not fall within those strict parameters. She questioned whether a slight amendment of Section 1(1) of the Civil Procedure Act to extend the powers of the Rules Committee could be enacted to change practice and procedure even where it amends the substantive law. Academic 1 noted that there is a precedent for this elsewhere in the Commonwealth (i.e. Ontario) but added that she was unsure as to how realistic such a course of action would be in England and Wales.

Academic 1 itemised five areas of the proposed opt-out regime which have been considered by judges, reform commissions etc to require a substantive change in the law.

1.      *Limitation periods*

Academic 1 articulated her view that a substantive change in the law would be required to create an opt-out regime whereby the representative claimant files the pleadings initially then the limitation period is suspended for all represented parties thereby allowing them to bring individual proceedings to prove its individual issues down the track without ever having filed its own proceedings in the first place.

Academic 1 supported her argument by reference to the Woolf Report in which it was acknowledged by Lord Woolf himself that a change to the substantive law would be brought about by affecting the limitation period for multiparty litigation.

2.      *Res judicata*

Academic 1 expressed her opinion that modification of the *res judicata* for absent class members would require a substantive change in the law. However, she remained open as to whether the Rules Committee could still tackle this area through the creation of rules of court.

Academic 1 explained that there are two ways in which the *res judicata* issue comes alive in collective actions:

a.      Under the Representative Rule (CPR 19.6), the representative claimant has the common legal issues determined for the described amorphous class. Under this rule, there are no notification requirements. As confirmed by the courts, an express mandate to be represented is not required from all class members either.  Absent class members are already capable of being bound by the determination in a representative action even though they themselves do not file proceedings but are represented.

The problem is that the Representative Rule has not been judicially considered

to be suitable for solely monetary relief because of the way in which the same interest has been defined in that rule. A representative claimant has the same interest as all the members that he is representing if he is bringing declaratory, injunctive or ancillary relief or an action for money that is going into a common fund. However there is judicial concern with respect to the same interest for individual monetary compensation, as evidenced by the case of *Fostiff* where the Australian High Court ruled (5-2) that the representative action was invalidly constituted. Given that monetary relief is a key feature of the opt-out collective action, it is debatable whether *res judicata* falls within the rule-making capacity of the Rules Committee.

b.      Academic 1 informed the delegation that the second way in which the *res judicata* issue comes alive in collective actions is in extended *res judicata*. She suggested that it could be implemented judicially rather than legislatively. However, in Canada, the extended principle of *res judicata* in the *Henderson rule* (requiring parties to bring before the court everything which should be raised in those proceedings preventing defendants from facing further onslaughts of litigation) was overruled by the Class Proceedings Act which allows the class to bring further actions on common issues. Academic 1 spoke of English precedent in *Barrow v Banks*, where the Court of Appeal held that special circumstances may justify exception to the Henderson Rule.

*3.      Aggregate assessment of damages*

Academic 1 reported that the question of whether aggregate assessment of damages constitutes a substantive change in the law was considered by the Victorian Court of Appeal in the *Academy* case. Three judges ruled that it was not, while two argued it was. The judges who ruled that it was not, maintained that aggregate assessment of damages for the class as a whole fell within the parameters of judicial discretion given that the law of damages is an inexact science at best with general damages being, to some extent at least, an approximation.

The minority strongly disagreed contending that it is one thing to say that damages are an inexact science and quite another to argue that damages awarded need not have a commensurate link with the people who have been damaged; the individual members of the class.

The High Court of Australia gave leave to appeal on this very point. However, before it had the chance to give its verdict, the Victorian Parliament decided that the aggregate assessment of damages should be legislated upon and the appeal was vacated.

Academic 1 considered aggregate assessment of damages from the domestic angle, explaining that three judicial responses to the 2001 consultation by the Lord Chancellor's Department on representative claims, considered that aggregate assessment of damages was a substantive change in the law and would require primary legislation.

4.      *Cy-près distribution of damage*

Academic 1 outlined the concept of *cy-près* distribution of damages and its use in overseas jurisdictions. She voiced her belief that it would require a substantive change in the law as it would potentially involve awarding damages to those who have not been harmed by the defendant(s).

In support of her argument, Academic 1 said that the Australian Law Reform Commission refused to countenance *cy-près* distribution because it was punitive rather than compensatory in nature, and as a result, was not introduced by the legislature. Furthermore, U.S. judges have suggested that the *cy-près* distribution of damages constitutes a substantive change in the law.

5.      *Standing against multiple defendants*

Academic 1 questioned whether it was possible for rules of court to enable multiple defendants to be sued by class members where some will not have a cause of action

against some of those defendants. She maintained that this formed a major change to the standing rules as it involves a defendant being sued by people who have no cause of action against it at all.

Academic 1 referred to the experience in Canada where standing against multiple defendants is permitted. She informed delegates that the second action brought under the opt-out regime in Ontario in 1993 tested whether defendants could be sued by people who had no cause of action against them. It was held that they could because there was legislative provision for such situations.

Academic 1 added that in Australia, there has been a major tension between the *Philip Morris* interpretation which holds that each defendant must have a party who is suing it and if there are any defendants and class members who do not have corresponding causes of action then it is not a properly constituted collective action.

*Conclusion*

Academic 1 concluded that of all five areas, she found it difficult to see how limitation, *cy-près*, and standing could be introduced through amendment to the CPR. Although there is precedent of rules in the other areas, she noted that in most cases legislation has been introduced to prevent *ultra vires* claims.

Academic 1 told the delegation that law reform commissions in Ireland and Scotland had considered collective redress and deemed rules of courts to be sufficient. However, she added that each considered opt-in as opposed to opt-out systems and did not examine the issues of limitation, *cy-près* and standing.

Academic 1 recognised that the Representative Rule is an interesting collective device. However, there are several aspects of a sophisticated opt-out regime which the Representative Rule does not cover. Furthermore it presents difficulties with bringing monetary claims, the interpretation of same interest, and the fact that other jurisdictions have introduced opt-out actions after grappling with the Representative Rule which later

proved to be completely inadequate is also instructive in this regard.

Academic 1 commented that the conundrum about legislation versus court rules has to be considered in its wider context. She remarked that there is over 100 years of combined opt-out jurisprudence in America, Australia and Canada. On this basis, Academic 1 advocated the introduction of a third generation statute building on the experience of these other jurisdictions and legislating with certainty on matters which have already taken up an inordinate amount of judicial consideration thus minimising satellite litigation, giving flexibility to the claimant and protection to the defendant, as well as setting the parameters of collective redress internationally.

**Mike Napier:**

Mike Napier thanked Academic 1 for her excellent presentation and asked what a sophisticated opt-out system would encompass.

**Academic 1:**

Academic 1 explained that a sophisticated opt-out system would encompass aggregate assessment of damages, *cy-près* distribution and standing against multiple defendants. She remarked that it would be possible to have an opt-out mechanism in place without these features but added that it would be difficult for it to operate with utility in their absence.

**Mike Napier:**

Mike Napier asked whether any views have been expressed in this jurisdiction on the legislation versus rules conundrum.

**Academic 1:**

Academic 1 stated that she was not aware of any.

**Consumer Representative 1:**

Consumer Representative 1 asked why an opt-out collective regime suspends the limitation period for absent members and questioned whether it was needed. She asked how *cy-près* distribution became a common practice in the U.S. given that it is not enshrined in rules.

**Academic 1:**

Academic 1 replied that if the limitation period was not suspended for absent class members and the representative claimant won on the common issues, they may then be statute-barred from proving their individual issues because their cause of action would not be complete until proven. They could issue their own proceedings if there was time but the reality is that the limitation period would have long passed.

Academic 1 explained that *cy-près* distribution has been invoked in settlements rather than in judgments, having been proposed by inventive and innovative counsel in the 1970s as an alternative to going to trial.

**Claimant Lawyer 1:**

Claimant Lawyer 1 asked why certification does not stop the limitation period.

**John Sorabji, Legal Secretary to the Master of the Rolls:**

John Sorabji explained this is a historical practice founded on the notion that the mandatory class is not considered as a full party and therefore bringing the representative action does not stop limitation for anyone except the representative claimant.

**Claimant Lawyer 1:**

Claimant Lawyer 1 asked whether there is any statutory requirement in relation to costs or whether it would fall within the court's discretion.

**Academic 1:**

Academic 1 answered that only Australia has incorporated immunity from costs in its class action statute for absent class members.

**Claimant Lawyer 1:**

Claimant Lawyer 1 questioned whether there was a need for statutory change in light of this.

**Academic 1**

Academic 1 wondered whether judges already had the power to do this using their discretion or any powers conferred by the CPR.

**Regulator 1:**

Regulator 1 asked why primary legislation would be needed to allow standing against multiple defendants when it only entailed consolidation.

**Academic 1:**

Academic 1 explained that some legislation would be required because it is not a consolidation *per se* and she noted the difficulties of later consolidation using the Australian experience as an example.

**Academic 1:**

Academic 1 led the delegation through her diagrams and explained the question of standing.

**Claimant Lawyer 2:**

Claimant Lawyer 2 questioned whether consolidation would require legislation a representative claimant for each defendant existed.

**Claimant Lawyer 3:**

Claimant Lawyer 3 asked whether courts have struggled to exercise the power of *cy-près* distribution.

**Academic 1:**

Academic 1 replied that North American courts have sought to accommodate *cy-près* distributions where they could, and sometimes even where the overlap between the underlying purpose and class is tenuous.

**Bob Musgrove, Chief Executive of the Civil Justice Council:**

Bob Musgrove supported Academic 1's observations and added that from his experience with Quebec, courts have taken great care in considering how *cy-près* distributions should be made.

**Judge 1:**

Judge 1 stated that regulators at state level have begun to use this technique.

**Claimant Lawyer 4:**

Claimant Lawyer 4 asked Academic 1 whether she had encountered a model elsewhere that adopts that sort of procedure other than in an insolvency situation.

**Academic 1:**

Academic 1 said that she had only encountered this model where the representative rule has been used for monetary recovery where it is ancillary to injunctive or declaratory relief.

**John Sorabji:**

John Sorabji explained that the representative rule in the insolvency jurisdiction shares the same common law origin.

<u>"Class Actions – Reinventing the wheel" – a speech by John Sorabji</u>

See Appendix 1

**Judge 1:**

Judge 1 stated that John Sorabji's presentation rightly identified the potential in the rules. He noted that despite Academic 1's excellent case, there are potential political problems with third generation legislation as it is very difficult to compete for legislative time.

**Claimant Lawyer 2:**

Claimant Lawyer 2 asked why the limitation period issue is considered to be insuperable and as requiring legislation.

**John Sorabji:**

John Sorabji replied that the limitation period issue requires legislation because there is no provision for it in the Limitation Act as it currently stands. He noted that the fact that the represented class are not parties before the court in the full extent and can at any time take active steps to intervene in the class action means that they cannot be deemed by the court in any way to have brought the action as far as limitation is concerned.

**Trade Union Representative 1:**

Trade Union Representative 1 reminded John Sorabji of previous comments he had made in respect of collective redress.

**John Sorabji:**

John Sorabji stood by his previous comments and maintained his belief that, although the process is a difficult one, some form of collective redress action will be introduced as the political will is present. He suggested that all routes – legislative and non-legislative – are explored to this end, and argued that a collective redress mechanism is key to ensuring access to justice.

**Claimant Lawyer 1:**

Claimant Lawyer 1 asked whether the U.K. would be compelled, in any event, to enact legislation regarding a collective redress mechanism given European activity in this field.

**John Sorabji:**

John Sorabji replied that European initiatives will be complementary to national collective redress systems.

**Mike Napier:**

Mike Napier recapped the points of consensus and contention emerging from the two presentations.

He reminded the delegation of the questions to be considered by syndicate groups:

1.  Limitation periods
2.  Modifying *res judicata* for absent claimants
3.  Aggregate assessment of damages
4.  *Cy-près* distribution of damages
5.  Standing against multiple defendants

Assuming a mechanism is required for reform, he asked the delegation to consider the following options:

a.  There might be legislation that only goes as far as enabling legislation and then the rest is left to the Rule Committee
b.  Statute might provide detailed legislative setting of rules so that it would be taken away from the Rule Committee or completely left to legislation
c.  There is no legislation and it's all left to the Rule Committee
d.  Europe: if we don't do anything it may be that a European directive would force our government to go down the reform route

**Report Back to Plenary Session**

**Group A: Claimant Lawyer 5**

Group A first considered and then agreed upon the need for a collective opt-out process. It viewed opt-out group actions as part of the broader regulatory and enforcement picture, and as such, not mutually exclusive. In light of this, it asserted the need to consider other consumer redress methods.

Group A felt there was a need for primary legislation in respect of limitation, perhaps by discrete amendment of the Limitation Act. It talked of a secondary limitation period which would run not from the wrongful act but the date of the decision in respect of competition cases. It asked Academic 1 the position on limitation in respect of the GLO regime.

In respect of *res judicata*, Group A felt there was a strong case for improving the notice provisions as well as access to information about collective claims at the start of the process. It considered that a rules-based approach would be the most appropriate way of dealing with some of the *res judicata* issues at the back end of disputes. Group A suggested different notice provisions within different rules for different types of procedure.

On aggregate assessment of damages, Group A considered it to be a key element of an opt-out regime. On a practical level, it noted that the availability of aggregate damages would make the procedure attractive to third party funders and render it a better-used process than the current multiparty system.

Group A considered that *cy-près* was controversial and would likely hold up the development of the collective redress system itself. It was felt that *cy-près* does not necessarily need to be a feature of an opt-out regime and in fact there could be a mechanism whereby any residual amount could revert to the defendant.

Although Group A acknowledged the problems surrounding standing it did not reach a conclusion on the issue.

As a side note, Group A suggested that opting out should be possible right up to judgment rather than just a limited period at the start of proceedings.

Group A thought that European activity in the field of collective redress was moving far too slowly to force the UK's hand in this respect. That being the case, it felt that the UK

ought to lead by example and create an exemplary system of collective redress to be developed throughout other member states.

Group A considered the legislative route and discussed whether the creation of a collective action mechanism could be incorporated through amendment to existing legislation.

**Group B: Claimant Lawyer 3**

Group B expressed appreciation to Academic 1 and John Sorabji for their thorough and comprehensive presentations and began by distilling the following points of principle:

1.      Any solution has to meet the yardsticks of certainty and predictability.
2.      Legislation in some areas is inevitable and should take the form of enabling or framework legislation, rather than detailed prescription.
3.      Time presents a serious challenge because:
a.      We are already positively exporting group litigation to the US and perhaps in time to individual European jurisdictions
b.      If we wait for an EU directive it might not be suitable or desirable for our purposes.
3.      Group B argued that the UK ought to lead by example and move as effectively and rapidly as possible.

Recognising that legislation produces a tension with time, Group B explored whether some interim rules-based solution might be adopted but constantly hit upon the problem of uncertainty and the risk of satellite litigation risk which would flow from that.

Group B considered that if a collective redress mechanism were to use representative bodies as well as claimants that would create a sixth component that would arguably need legislation.

Group B was not convinced that legislation was essential in relation to limitation and

multiple defendants and thought that those areas needed closer study in relation to existing law and procedure and predicting how the various components might play out in practice.

Group B considered that legislation was required with respect to *res judicata*, aggregate assessment and *cy-près*: *res judicata* because it lies at the root of the opt-out structure; aggregate assessment because it was felt to have a political dimension to it; and *cy-près* because it seemed to be a difficult problem and one that if left alone might produce a struggle. In relation to *cy-près*, Group B suggested offering Parliament a candidate destination (i.e. the Access to Justice Foundation, section 194 Legal Services Act) to ease its passage into law.

Whilst Group B was mindful of the political realities underlying the legislative debate, it remained conscious that as the law is one of the UK's greatest exports and that as our procedure runs alongside it, if the UK lags behind in delivering to the world a procedure that works in the area of collective redress then it is not maximising what it has to offer.

**Group C: Claimant Lawyer 4**

Although Group C recognised that the remit of the CJC was restricted to matters litigated in the civil courts, it concluded that collective redress would need broader consideration in relation to different fora and subject matters.

Group C discussed whether light touch enabling legislation with the Rules Committee filling in the gaps would be the way forward. It felt that the government would be reluctant to cede much power to the Rules Committee and that major constitutional issues relating to the separation of power and rule of law would arise were the Rules Committee permitted to amend substantive law.

Group C examined the possibility of instituting a third generation act with detailed rules, and felt that legislation would provide stronger directive than a rules-based option thus avoiding the risk of satellite litigation. Group C recognised the practicalities of legislating

in a piecemeal fashion rather than enacting a coherent code. It considered the question of riding a lighter form of legislation on the back of another law but it was felt that that would still require consensus across government.

Group C considered not legislating at all, but it was pointed out that there is no provision for an opt-out system in existing legislation.

Group C discussed the issue of limitation and how it would work in relation to an opt-out system, but it did not come to a conclusion on the question of the indivisibility of actions. It felt that this is an issue that requires further study.

Group C felt that it was undesirable to wait for Europe as the collective redress debate has already been going on for several years and there are many different agenda in Europe. In any event, it was acknowledged that it might only recommend an opt-in system more suitable to civil law systems rather than common law systems.

Group C also discussed *cy-près* and the possible use of trust law.

**Mike Napier:**

Mike Napier summarised the points emanating from the group reports. He noted the consensus that the UK should not wait for Europe before implementing its own collective redress mechanism and that the subject of limitation required further study. While Group B considered that legislation in some areas was inevitable, Group C went further leaning more towards the third generation option than a light-touch rules-based solution, and in contrast, Group A appeared to roll back a little. Mike Napier commented on the slight divergence of view on *cy-près* with Group A viewing it as controversial and likely to hold up the procedure and Group B arguing that it should be kept very simple.

**Judge 1:**

Judge 1 agreed with Group B on the need for certainty and the importance of starting from principle, including the principle of access to justice.

**Mike Napier:**

Mike Napier declared that certainty and predictability have always been important to CJC because of the risk of satellite litigation.

**Academic 1:**

In response to the question from Group A, Academic 1 explained that in group litigation orders, limitation stops running from the date that the claim is filed.

**Judge 1:**

Judge 1 asked whether the Limitation Act is applied by rules or a practice direction.

**John Sorabji:**

John Sorabji replied that the system works because in a group litigation order an individual claimant has to issue their entire claim and it is a sophisticated form of joinder.

**Mike Napier:**

Mike Napier added that claimants have to issue their claims within whatever limitation period applies to the claim and that the courts cannot toll the Limitation Act. He concluded that all class actions have the problem of limitation, and that as such, this issue has to be tackled.

**Advice Services Representative 1:**

Advice Services Representative 1 stated that developments with respect to the way that consumer bodies are organising themselves in order to act as representatives is a matter that needs to be taken into account.

**Mike Napier:**

Mike Napier welcomed Advice Services Representative 1's comment and invited contributions from consumer body representatives.

**Developing a Framework for Plenary Reform – Academic 1**

Academic 1 took the delegation through her sixty design points for an opt-out collective action regime (see Appendix 2).

**Mike Napier:**

Mike Napier asked Academic 1 whether the Uniform Class Proceedings Act from Canada is provincial or federal.

**Academic 1:**

Academic 1 replied that it was prompted by the common law provinces rather than the civil law jurisdiction.

**Bob Musgrove:**

Bob Musgrove suggested that the Act seemed to be a legislative hybrid of British Columbia, Ontario and Quebec designed to cover all three provinces.

**Mike Napier:**

Mike Napier explained that he was bringing this Act to the attention of the delegation as it is a piece of legislation which encapsulates the design features identified by Academic 1.

**Academic 1:**

Academic 1 stated that both Canada and Australia share second generation statutes which seek to be more prescriptive over areas which the US left open for judicial examination.

**Claimant Lawyer 3:**

Claimant Lawyer 3 questioned whether the fairness hearing would be heard by the judge running the collective action or a separate judge.

**Academic 1:**

Academic 1 said that her understanding was that in Canada, fairness hearings are dealt with by the judge who has the conduct of the action.

**Professional Representative 1:**

Professional Representative 1 wondered to what extent ECHR compliance had been considered.

**Academic 1:**

Academic 1 answered that this matter was important and open for discussion.

**Group A: Claimant Lawyer 5**

Of the sixty design points for an opt-out collective action regime, Group A was given points 1-31 to consider.

1.    *In accordance with the usual requirements of CPR 3.4(2)(b) and (c), no frivolous, vexatious or abusive claims will be permitted to be brought as collective actions.*

2.    *In accordance with the usual requirements of CPR 3.4(2)(a), the collective action must disclose a reasonable grounds for bringing the claim.*

3.    *In addition to CPR 3.4, the statement of case must also comply with any specific pleadings requirements of a collective action regime (eg, which require the pleadings to specify the common issues of fact or law, or which require the pleadings to define the class, or which require the pleadings to specify the causes of action and the remedies sought), with sufficient particularity.*

Group A agreed with points 1-3.

4.    *As a further brake/moderation on the ability to start a collective action, the claimant class should be required to satisfy legislatively-prescribed preliminary merits test/s.*

Group A expressed concern at what a preliminary merits test might look like and whether it would be costly and onerous. It was initially considered to be unnecessary because defendants would simply apply to strike the process out at that stage and it would not go forward. However, having talked it through, Group A felt that there would be some court scrutiny at the initial stage in any event. Given that the business lobby would be pressing for something that it could see at that stage that would protect its interests it was felt there should be some form of preliminary look at the process although that it ought not be a terribly high bar.

Group A felt that there should be two elements of the preliminary merits test

    a. Touching upon the superiority point: is collective mechanism the right vehicle for the dispute?

    b. The second element of the test would be to give court the opportunity to have an early look at merits. Group A thought that this should fundamentally be a court-led process rather than one that would necessarily involve costs transfer between the parties and attendant costs risks.

5.     *A 'pre-certification protocol' may be preferable, requiring certain 'Woolf-motivated up-front disclosures' (eg, in the context of a collective action, information about the size of class, or information about the likely common and individual issues, or facts that to go prove why a collective action would be superior to other means of resolving the dispute), prior to the certification hearing.*

Group A talked about the possibility of pre-action disclosure applications as part of this protocol process particularly to assist those representing the putative class to work out what the size of the class might be in order to give some boundaries at an early stage. There followed a discussion about how this would work in practice and the group considered whether or not as part of that pre-certification process a defendant ought to disclose whether it had other similar approaches in respect of the same matters. Particularly in respect of consumer matters, Group A felt that the details of the individual class members might well come out at the post-certification stage but that it would be too onerous and unnecessary for them to emerge at this initial preliminary pre-action protocol stage.

6.     *A collective action must be the superior form of resolving the class members' disputes. If another procedural regime, available to claimants, is more efficient and less burdensome, the collective action should not run.*

7.     *The type of monetary remedy that may be sought and awarded in a collective action (eg, damages, disgorgement, restitution, exemplary damages, financial penalties) needs to be carefully considered, and the legislation appropriately*

*drafted to either cover or restrict the field of remedies.*

In respect of point 7, Group A thought that the general law should be allowed to take its course. Its whole discussion was dominated by the principle that we should keep the new features of this process to a bare minimum and borrow as much as possible from what exists elsewhere.

8.    *A collective action must be manageable, from the court's point of view (and the court must be satisfied of that at the outset, subject to one possible exception in point 11 below).*

Group A agreed on this point.

9.    *Whether any type of legal issue should be excluded from the scope of the collective action regime needs to be legislatively prescribed.*

Group A was fairly relaxed about this generic process applying to all sorts of disputes. Although this would lead to collective mechanisms being pursued in specialist tribunals with limited resources, Group A felt that the collective action regime should extend there in any event.

10.    *Appeals from certification orders (eg, who has the right to appeal, whether an appeal is as of right or only with leave) should be legislatively prescribed.*

In respect of appeals, Group A thought that the ordinary rules ought to apply.

16.    *Whether the class definition can 'tie' class membership to an external party (rather than to the series of events out of which the dispute arose), eg, to a law firm representing the class or to a third party litigation funder, needs to be judicially or legislatively prescribed.*

In considering point 16 on lawyer tie-in, Group A turned to the issues of costs and

funding. Group A felt that the tie-in might look unpalatable but was actually needed owing to funding considerations.

27.   *The status of ideological claimants (eg, the criteria permitting their appointment as representative, whether they should act as sole or supplementary / preferred or secondary representative claimants) must be carefully articulated.*

Group A felt that the point regarding ideological claimants was a worthwhile idea and would act as filter on speculative claims. However, it had grave concerns about the resources available for consumer bodies to do this and felt that specially formed *ad hoc* action groups ought to be allowed to act as these sorts of claimants.

**Group B: Claimant Lawyer 3**

Of the sixty design points for an opt-out collective action regime, Group B was given points 32-43 to consider.

Group B felt that the following four areas needed to be addressed before points 32-43 could be considered:

1. How costs are going to be dealt with, from security to questions of capping to exchanges of estimates.
2. The whole question of funding: from third party funding to direct funding etc.
3. The need for an early stage of permission/filter/certification
4. The need for some form of codification of the whole process.

32.   *The class members must be adequately informed about their opt-out rights under the collective action, giving them a realistic opportunity to opt-out.   The manner of giving notice (eg, when and how often the notice should be given, whether it is mandatory or discretionary to do so, whether group or individual notice should be permitted, what appropriate use can be made of the internet and websites for disseminating opt-out notice) should be legislatively or judicially prescribed.*

*33.    Who pays for the opt-out notice needs to be considered, if not articulated.*

*34.    The content of the opt-out notice, the appropriate length of the opt-out period (eg, whether any minimum or maximum opt-out periods should be set), and how to opt out, need to be legislatively or judicially prescribed.*

*37.    When, and how, is the class to be closed?  At some point (and with very limited exception), the class must convert from opt-out to opt-in.  In most scenarios, the class members will have to 'put their feet on the sticky paper' at some point, thereby giving rise to the 'take-up rate' of the action. The parameters of this conversion from opt-out to opt-in must be legislatively or judicially prescribed.*

Group C first considered paragraphs 32-34 and 37. It concluded that the most important was at what was last point was opt-out required. Group B recognised that judicial discretion would be needed to deal with matters on a case by case basis.

*35.    Close judicial case-management of the collective action (in accordance with recently-discussed management practices for complex litigation) would be mandatory.*

*36.    In accordance with the wide-ranging case-management provision of CPR 3.1, the court must have freedom to exercise broad powers (to enable it to narrow/widen the common issues, amend the definition of the class, or to direct amendments to the pleadings, etc), in order to permit the collective action to dispose of the dispute as expeditiously and proportionately as possible, in accordance with CPR 1.1's overriding objective.*

Group C considered the following features as essential in relation to court control, case management and exercise of court powers:

- judicial specialisation;
- allocation to the judge;

- training in handling this type of procedure over and above any training or experience in the substantive law in question;
- definition by the judge of the issues and the common ground;
- a close eye on the tactical attempts that would be there to force issues into or out of the bracket of common issues; and
- a preparedness by the appellate courts to respect as far as possible the case management decisions by the judge charged to run the litigation at first instance.

38.    *The circumstances in which communications can be made by the representative claimant (or the claimant law firm) to the absent class members (as either formal notice which requires court approval, or as general correspondence which does not) will need to be judicially considered, if not legislatively prescribed.*

Group B favoured relative freedom and thought that the control mechanism should be founded on ethics rather than based on court rule.

39.    *The extent (if any) to which a defendant may contact absent class members directly after the collective action is certified (with a view to individually settling with those absent class members) will need to be judicially prescribed, in order to set the parameters of acceptable litigious conduct and to prevent claims of inappropriate or abusive process.*

Group B found this point very tricky and opinions on it diverged greatly. On the one hand, a libertarian outlook was taken towards this issue and on the other, concern was expressed about the abuses that could happen under an unregulated system.

40.    *The person/s (eg, the representative claimant, absent class members) against whom disclosure can be sought with or without leave, should be legislatively prescribed.*

Group B regarded the existing jurisdiction as perfectly adequate and one which would

probably need little addition.

41.    *The circumstances in which the collective action may be de-certified should be prescribed.*

Group B agreed with this point.

42.    *The limitation period will stop running for both representative claimant and absent class members, either when the representative claimant files the collective action, or when (or if) the action is certified. The precise circumstances for when the limitation period stops running must be legislatively prescribed.*

Group B felt that the limitation period should stop running at the point of certification.

43.    *The limitation period will start running again upon certain events happening; these triggers must be legislatively prescribed.*

In conclusion, Group B saw a place for a combined legislative and rules-based solution rather than a full legislative code.

**Group C: Claimant Lawyer 4**

Of the sixty design points for an opt-out collective action regime, Group C was  given points 44-60 to consider.

44.    *Settlement agreements must be subject to a fairness hearing. This is, essentially, to preserve fairness for absent class members and for the defendant.*

Group C agreed that settlement agreements should be subject to a fairness hearing. It was also suggested that there should be a presumption of fairness in relation to a settlement negotiated by an ideological claimant particularly where under competition law the

claimant had already satisfied the concept of designation and that it was fair for the ideological claimant to represent the class. That led on to the idea that it was beneficial to a representative body to have a fairness hearing. Indeed there was some concern that otherwise the representative body may be vulnerable to allegations of low settlement etc and it was important both to have a look at procedural and substantive fairness in relation to any settlement negotiated and also the concept of fairness should apply whether one has an opt-in or opt-out proceeding.

45.    *Adequate notice of the settlement hearing, and further adequate notice about the verdict reached at the settlement hearing, will need to be judicially or legislatively prescribed. In all instances, the timing and content of the notices will likely be required to be judicially approved.*

Group C felt that this point was subsumed in the issue of procedural and substantive fairness and that it was important that absent members of the class should have the opportunity to attend any such hearing.

46.    *The 'fairness criteria' against which the court must subject a settlement agreement should be either judicially or legislatively prescribed. Whether evidence from representative claimants, absent class members, defendant representatives, legal counsel from each side, and experts, would be helpful to the fairness hearing, needs to be considered.*

Group C considered the notion of catch-all criteria and the idea that there should be an element of judicial discretion. It saw that so far as consumers were concerned it was very helpful for them to have a list of criteria by which they could examine any settlement to see whether it satisfied the test of fairness. However, Group C also considered that it might tie down issues and work against innovative and expedient settlements.

47.    *The potential impact of any 'bar orders' (whereby a settling defendant seeks to obtain an order that it is not open to any claims for indemnity and contribution from a non-settling defendant, in the event that the non-settling defendant loses at*

*trial), needs to be considered, if not legislatively prescribed.*

Group C considered this a matter for legislation. However, it thought there should be mechanism to approve a settlement and make a bar order but that it should not be compulsory. Group C felt that the concept of bar orders certainly had place in the class actions structure.

48.     *The procedures by which absent class members can (a) object to a settlement, or (b) opt out of a settlement (if a second opt-out stage is to be permitted at all), need to be judicially or legislatively prescribed.*

This point prompted quite a lot of discussion about the concept of opting out of a settlement and whether by taking such action, a party would be continuing with the action. Group C considered that perhaps a simple answer to the problem opting-out should be prohibited after the fairness hearing to ensure finality and certainty.

49.     *The procedure (if any) by which absent class members can opt back into a class for the purposes of settlement need to be judicially or legislatively prescribed.*

Group C supported the right to opt back into a class for the purposes of settlement on the basis that it would help defendants assess the levels of settlement and provide a measure of finality.

50.     *Damages assessment may be individual, or a class-wide aggregate assessment, depending upon the circumstances. The pre-requisites for aggregate assessment need to be legislatively and judicially prescribed with the utmost clarity.*

Group C agreed with this point.

51.     *Compensation distribution should be permitted to be made to class members directly, or via a cy-pres order.*

Group C agreed with this point.

52.  *A direct distribution to class members may be permitted, not by an individual assessment of each class member's entitlement, but on the basis of an average or pro rata assessment for class members identified at the point at which the assessment is being made.*

Group C agreed with this point.

53.  *Cy-pres distributions (and the pre-requisites governing them) will need to be mandated legislatively, if permitted.*

Group C felt that the basis upon which *cy-près* damaged were distributed would need to be made explicit and there would have to be guidance. However there were disparate views on this question and not enough time to come to any consensus.

54.  *Whether coupon recovery should ever be permitted (compensation 'in like', rather than in monetary terms), needs to legislatively or judicially articulated.*

Group C was divided on this point and ultimately felt it to be a fairness issue to be assessed at a fairness hearing.

**John Sorabji:**

John Sorabji noted that in respect of point 59 on appeal rights, the Court of Appeal had before Christmas held that non-parties can appeal decisions but that they would need to seek permission to appeal.

**Mike Napier:**

Mike Napier thanked delegates for their hard work and valuable contributions. He stated that delegates' contributions would be fed into a paper formulating some draft

recommendations on funding and procedure. Mike Napier remarked that the paper would be consulted on by a larger group of stakeholders at another forum, sent for approval to the CJC for signing off and would then be directed to the Ministry of Justice and Lord Chancellor.

328

**Fourth Collective Redress Event: Draft Recommendations to Government: Minutes**

**Minutes – 26 June 2008**

**Opening remarks by Sir Anthony Clarke, Master of the Rolls**

The Master of the Rolls welcomed delegates to the conference. He recorded his satisfaction that the concerns of defendants had been addressed in the main conference paper, *"Improving Access to Justice for Consumers": Developing Better Redress Procedures for Collective Consumer Claims* (hereinafter "main conference paper"). He then noted the issues of complexity and comprehension surrounding the jargon of collective redress.

The Master of the Rolls informed delegates that the remit of the Civil Justice Council (hereinafter "CJC") is concerned with access to justice and procedure as opposed to substantive law. In this vein, he explained that while the damages debate, the passing on and determination of loss are important and interesting matters, they are not related to matters of procedure but rather of social policy and, accordingly, for Parliament to determine.

The Master of the Rolls touched upon the questions he asked of delegates at the Collective Redress II Conference in November 2007. He stated that the most critical of these questions related to the funding of collective actions and the protection for defendants in such cases.

The Master of the Rolls then turned his attention to two features of the main conference paper. First, in this paper, it is erroneously suggested that only unsuccessful claimants are able to appeal an unsuccessful costs ruling. However, this recommendation was supposed to apply to unsuccessful defendants as well.

The second feature of the paper considered by the Master of the Rolls related to its suggestions regarding the power of the Civil Procedure Rules Committee (hereinafter "CPRC") in relation to costs at the post-certification stage. Although the paper envisages the use of a protected costs order, the Master of the Rolls articulated his view that the CPRC would take a conservative approach to this. He then looked at the paper's suggestion regarding costs capping.

The Master of the Rolls concluded his address in describing the proposals for reform as "radical change". He supported the view that a comprehensive legislative regime would be required to underpin reform to the collective redress system. Though he felt that the system could be improved through rule change, the Master of the Rolls warned that more extensive reform in the absence of primary legislation would lead to endless satellite litigation which "would be a wonderful jamboree for lawyers" but spell misery for everyone else.

**Key issues – Michael Napier CBE QC**

Michael Napier presented the genealogy of the collective redress debate, taking delegates through the relevant conferences and papers that preceded and accompanied the day's event. He touched upon the paper referred to by the Master of the Rolls, explaining that it comprised, *inter alia*, a set of recommendations on the improvement of collective redress in England and Wales which – after refinement by delegates and further editing – would be submitted to the Council for its approval before being sent to the Minister of Justice.

Michael Napier guided attendees through a report by the CJC Collective Redress Working Party, which examines the question of whether the implementation of an opt-out collective action regime requires the enactment of substantive legislation or may be achieved through amendment to the Civil Procedure Rules (hereinafter "CPR"). He then drew the attention of delegates to another paper accompanying the conference entitled *Collective Redress – A Business View*, and explained that it would be accompanied by an oral presentation by its author, Business Representative 1, during the course of the day.

After pointing out key elements of the findings and recommendations of the main conference paper, Michael Napier touched upon the importance of refining the language of collective redress; the respective roles of the civil justice system and public bodies in compensating harm/loss; the importance of private actions to the economy and society as a whole; the role of court control in balancing the relationship between claimants and defendants; the need of each party for certainty; the question whether improvements should apply to all types of claim; the opt-in/opt-out conundrum, and the issue of *cy-près*.

**Assumptions, findings and recommendations – Academic 1**

Academic 1 began her presentation by informing delegates that its purpose was to set the context of the day's event and explain key terminology, especially the opt-in versus opt-out debate. She explained that much of the report distributed to attendees on the day, together with the  recommendations, were authored by the Civil Justice Council itself, and hence, the report's key points and recommendations would be presented to the conference by a CJC member later in the day. She then proceeded to deliver her presentation in four main segments with the use of an accompanying handout.

*1.*      *The square*

Academic 1 first talked about developments in the field of collective redress in the Commonwealth, European Union, United States and England & Wales. She referred to bold nature of the EU Green Paper on *Damages Actions for Breach of the EC Antitrust Rules* (2006) and the bland White Paper that followed it. According to Academic 1, the fact that the Commonwealth is grappling with aspects of class actions jurisprudence at the highest appellate level means that a perfect system does not exist. In similar vein, it is important to remember that the excesses of the US class actions regime that attract publicity are not applicable in England & Wales as our legal systems and cultures differ. Academic 1 concluded this segment of her presentation by articulating the importance of learning from other jurisdictions in creating a collective redress mechanism and she advised delegates of the need to listen to the voices of claimants and defendants in this process.

### 2.    *The line*

Academic 1 outlined the collective redress process describing the opt-out debate; jurisprudence relating to the timing of opt-out; the limited circumstances in which opt-out does not transform into opt-in; the absence of a presumption in favour of an opt-out class action; and the issue of surplus funds.

### 3.    *The angle*

Academic 1 turned her attention to the evidence of need for an improved collective redress mechanism. She argued that this evidence was borne out by the greater breadth and number of collective actions in jurisdictions with established class actions systems, as well as the absence of collective actions in England & Wales following proven cases of group harm/loss. Academic 1 stated that in the absence of an improved system of collective redress, claimants who would otherwise have sued in England may seek to join actions abroad whose subsequent judgments may not be recognised here.  US federal courts seem to be becoming increasingly unwilling to allow 'foreign claimants' to form part of classes in rule 23 actions.

### 4.    *The design aspect*

In the fourth and final segment of her presentation, Academic 1 suggested ways in which an opt-out scheme of collective redress could ensure fair treatment of both claimants and defendants. Such safeguards would include, for example, a tough certification process and cost-benefit analysis, and clear principles of *res judicata* that will give a defendant 'global peace'. Problems encountered by other jurisdictions (e.g. the claimant who reserves part of his case for a second bite of the cherry where their initial claim fails, and where the Henderson rule is interpreted such that the claimant is allowed to do this) should, she argued, be overcome through third generation legislation rather than used as a justification for not developing collective actions here.

**Michael Napier QC:**

Michael Napier asked the meaning of third generation legislation and how this compared to first and second generation legislation.

**Academic 1:**

Academic 1 replied that first generation legislation refers to the light-handed approach taken in the US with Rule 23. The problems encountered in this jurisdiction encouraged the formulation, in Australian and Canada, of more extensive provisions relating to class actions when they developed their own systems (these are the 'second generation' statutes referred to). Academic 1 explained that a third generation statute would take into account the issues grappled with by all of these (and other) jurisdictions in the development of a collective redress mechanism while not being heavily prescriptive on all matters.

**Collective Redress: A Business View – Business Representative 1:**

At the invitation of Michael Napier, Business Representative 1 spoke to his paper on the perspective of business on collective redress. He talked about the importance of this subject to his organisation which has been interacting closely with domestic and international institutions such as the OFT, DG Comp and DG Sanco.

Business Representative 1 remarked that while collective redress is a particularly sensitive topic for global firms that have defended class actions in the US, business would in general subscribe to more effective collective actions. In this regard, he commented on the detrimental effect of cartels on business and the wider economy. Business Representative 1 then considered areas of coincidence with the views expressed by the main conference paper (e.g. the need for a generic private action and balanced solution as well as the importance of funding).

Business Representative 1 explored the broader definition of redress as incorporating ADR and then highlighted the concerns of business. On the subject of funding, he

cautioned against amendment to the loser pays rule, expressed support for the development of third party funding, voiced concern about the funding of speculative claims, and conveyed the opposition of business to the introduction of contingency fee agreements. Business Representative 1 articulated his support for an increased role for public bodies and quickly fielded the idea of establishing an Office of Public Advocate to take up claims that would not otherwise be funded. He warned against the development of an opt-out system of collective redress and the introduction of *cy-près* as a punitive measure.

**Judge 1:**

Judge 1 observed that the following questions seemed to be of particular importance and asked delegates for their views on them:

1) Should collective redress extend beyond litigation and purely consumer claims?

2) In contrast to the impression that may be given by the main conference paper, an opt-out action – and not a new form of opt-in – is being proposed.

3) Is an opt-out action desirable or would it be preferable to have, for example, modification of existing opt-in procedures, compulsory mediation and/or an increased role for public authorities and regulators?

4) What is your opinion on the nature of damages that an opt-out system would entail? Are they to be compensatory or aggregation and a *cy-près* application? Is an opt-out system possible with only compensatory damages? Is *cy-près* appropriate as a means of applying surplus funds?

5) What would happen in cross-border cases? To what extent would *res judicata* apply? Would "forum shopping" emerge as an inevitable consequence?

**Michael Napier QC:**

Michael Napier opened the floor for debate on these questions.

**Judge 2:**

Judge 2 emphasised the importance of exploring the role of public authorities and regulators and its connection to the opt-in/opt-out debate. He expressed his agreement with Academic 1's argument that in the field of collective redress England & Wales have lagged behind other jurisdictions that they once led and that there now exists the responsibility to catch up with them.

**Lawyer 1:**

Lawyer 1 advised that the proposals for an improved system for collective redress are at an early stage of progress and he recommended that delegates remain conscious of the cross-border issue and respectful of developments in Europe.

**Master of the Rolls:**

The Master of the Rolls counselled that any implementing legislation would need to take into account the accompanying need to alter the Brussels regulation.

**Mediator 1:**

Mediator 1 gave his support to a wider interpretation of redress as embracing out-of-court based solutions.

**Trade Union Representative 1:**

Trade Union Representative 1 touched upon the conservatism and fear pervading the

debate on defendants and their security for costs and he questioned whether surplus funds could in fact be used to cover the costs of a successful defendant.

**Lawyer 2:**

Lawyer 2 made the following three points:

1. A future system of collective redress will need to be attractive to funders in order to be workable.
2. *Res judicata* is the key settlement question for defendants and will accordingly need to be addressed.
3. Momentum for an improved regime ought not be slowed down by fears of the costs involved in distributing damages as this is already managed effectively by professional IT providers.

**Judge 3:**

Judge 3 raised the issue of limitation in collective actions in respect of those under a legal disability.

**Lawyer 3:**

Lawyer 3 asked for an update on the two CJC papers on funding. He opined that third party funding is not a panacea but a private solution which does not advance the interests of justice.

**Robert Musgrove, Chief Executive of the Civil Justice Council:**

Robert Musgrove reported that the funding papers touched upon a range of options including third party funding, contingency fees and SLASS. CJC recommendations in respect of SLASS are now with the Legal Services Commission, which is currently preoccupied with its wider reform agenda.  As regards contingency fee agreements,

Senior Costs Judge Peter Hurst and Professor Richard Moorhead have undertaken a study on this matter which is currently in draft. Robert Musgrove informed delegates that the area of third party funding is very active and the CJC has interacted with the Financial Services Authority (hereinafter "FSA"), Law Society and Ministry of Justice in this regard. A proposed code of conduct for the regulation of third party funders is currently being devised and this, he added, will be considered at an event to be hosted by the CJC next month.

**Master of the Rolls:**

The Master of the Rolls asked Academic 1 what systems Canada and Australia deal with the costs of a successful defendant, and if so, how?

**Academic 1:**

Academic 1 said that in Australia, if a third party funder funds the class action, then the third party funder typically covers adverse costs if a representative claimant loses, and she added that this may be enforced by the defendant. In Ontario, in class actions litigation, a CLAS fund operates deducting 10% from every monetary judgment or settlement.  However, this fund has received fewer applications than was originally envisaged, and some successful defendants effectively factor in their legal costs as a cost of doing business.

**Judge 1:**

Judge 1 declared that the Ontarian system does not work.

**Academic 1:**

Academic 1 stated that the Ontarian system is regarded as problematical because of the 10% levy which discourages applications to it, and because the levy only applies to those actions which were supported by the fund, not to *all* class actions which proceed to

judgment or to settlement.

**Master of the Rolls:**

The Master of the Rolls contended that any proposed opt-out scheme would have to make representative claimant personally liable to the defendant for the costs right up to the end of the trial period, and as such, the representative would need to have access to funding.

**Lawyer 4:**

Lawyer 4 stated that it might be useful to consider the criticism levelled against the evidence of need argument.

**Advice Services Representative 1:**

Advice Services Representative 1 suggested the insertion in the main conference paper of a reference to the Consumer Redress Act 2007 which deals with representative bodies in collective actions.

**Robert Musgrove:**

Robert Musgrove stated that it had already been inserted.

**Michael Napier QC:**

Michael Napier asked the four syndicate groups to consider the following questions:

1. Does collective redress extend beyond litigation?

2. Do you favour compulsory mediation?

3. Should collective actions extend beyond consumer cases?

4.  Are you in favour of Academic 1's model of collective redress?

5.  What are your views on damages and how they might be applied?

6.  What do you think of the cross-border issue?

7.  What is your view on Academic 1's grid chart relating to certification procedures?

**Master of the Rolls:**

The Master of the Rolls added a further question:

8.  Should defendants be fully protected for costs throughout? If not, why not? If so, to what extent?

**Judge 1:**

Judge 1 acknowledged the limits applied to contingency fees in practice. He added that the proposal regarding their introduction here envisages court approval of the percentage rate on a case-by-case basis.

**Group A: Lawyer 5**

1.  Group A felt that collective redress extended beyond litigation.

2.  However, it expressed its opposition to compulsory mediation, feeling that it would send out the wrong message and lead to unacceptable behaviour by the parties.

3.  Group A preferred the generic application of collective redress.

4.    Group A was in favour of a sophisticated third generation legislative mechanism with checks and balances.

5.    The question of damages was considered by Group A to be one of the most challenging issues. It was felt that the rationale of an opt-out mechanism would be lost if aggregation of damages did not follow. Group A concluded that the question of compensatory and punitive damages was one of policy and thus for consideration elsewhere.

6.    Group A touched upon the *Italian Torpedo* case. There was the feeling that Europe would impose its own solution on England & Wales as regards the cross-border issue.

8.    On the subject of costs protection, Group A thought that a clear opt-out procedure with aggregate damages would encourage funders who would provide costs protection for defendants.

**Group B: Trade Union Representative 1**

Group B came to similar conclusions as Group A.

1.    Group B felt that collective redress extended beyond litigation.

2.    Group B considered that ADR methods extended beyond mediation and that in any event its use ought to be encouraged rather than made compulsory.

3.    Group B favoured the use of the term collective redress over consumer redress.

4.    Group B favoured the introduction of an opt-out collective redress system with two provisos:

    a.     The need to avoid the potential problems already identified in other jurisdictions

    b.     Wide court discretion to deal with any problems which may arise

5/8.    Group B considered questions 5 and 8 together. It explored the issues of certainty and timing and felt that the approach to damages, protection for defendants and funding would all have to be taken into account. In the context of damages, there was a wide range of views as to what compensation meant and it decided that this was a substantive issue for further consideration.

    Group B looked at what might happen with surplus funds. It raised the issue of trust funds which already exist and anticipated the use of *cy-près*. Some members expressed their support for the Access to Justice fund and the possibility of directing any surplus to worthwhile projects. The idea of returning any surplus to the Exchequer and defendants was also touched upon.

6.    In relation to the cross-border issue, Group B touched upon the *Italian torpedo* case and the Brussels regulations but did not reach any specific conclusions on this matter.

7.    Group B did not have the time to consider Academic 1's grid chart relating to certification procedures.

## Group C: Academic 1

1.    Group C believed that litigation should be of last resort. Although it was noted that the ombudsman scheme had recently been extended it was recognised that the role of redress is not one envisaged by the OFT though this may change in the future. Group C concluded that litigation is merely part of a bigger picture.

2.    Some members of Group C argued in favour of a presumption of a requirement to mediate which could be opted-out of. Others said this should be a matter for

judicial discretion. Group C considered the attendant costs of a compulsory requirement to mediate.

3.      Group C unanimously concluded that collective redress should extend beyond consumers and consumer cases. It noted that the OFT's proposals regarding subject-specific opt-out representative actions could be broadened in practice if introduced.  Group C also noted that SMEs (small and medium enterprises) could comprise members of classes in representative actions, and that these were an often-overlooked, but important, group who could suffer loss and damage from certain types of wrongdoing.

4.      It was suggested that a costs analysis comparing cases conducted on an opt-in basis and those conducted on an opt-out basis could be an important and interesting exercise. Group C unanimously agreed that a new opt-out regime was required and felt that, in addition to in-built protections in the regime itself, such a system would guard against unmeritorious claims through the use of three filters: lawyers, funders and representative organisations.

5.      Group C viewed aggregate assessment of damages as an integral part of an opt-out collective action. It felt that *cy-près* was a controversial political decision for Parliament to take.

6.      Group C did not have the time to consider question 6.

7.      It was considered whether the rules should be fairly prescriptive about which ought to be applied or whether the judge should be granted discretion. One member argued that judicial discretion could give rise to satellite litigation.

8.      Group C expressed the view that a public fund could be a useful tool but that it would have to be thought out and set up carefully. The general view espoused by Group C was that costs shifting should be retained and abandoned only in very limited circumstances.

**Group D: Judge 3**

1.    Group D felt that collective redress should extend beyond litigation.

2.    Group D opposed the compulsory use of mediation. It felt that other ADR methods could be employed and on a more flexible basis with, for example, a pre-action protocol to encourage its use.

3.    Group D believed that collective redress should be generic in nature rather than based solely on consumer claims.

4.    Group D felt that the question of an opt-out system could not be separated from the issue of costs. It identified problems relating to *res judicata* closure for defendants; the identification of claimants; and the identification of those liable for costs.

There was a strong feeling that conditional fee agreements and the after-the-event (hereinafter "ATE") insurance market could not support an opt-out scheme of collective redress. Group D explored the possibility of no costs shifting and no defendant's costs on the one hand, and contingency fee agreements on the other. It concluded that the latter was the preferred option.

Group D felt that Europe would take the initiative in this field but that it would look to England & Wales for a lead. As such, it was concluded that any future model should be sufficiently flexible to be adapted elsewhere and that it should also fit in with the European benchmarks.

5.    Group D expressed the view that damages should be purely compensatory in nature as a general principle and that surplus funds should revert to defendants. However, where the defendants have sought to, or would, profit from wrongdoing the surplus should be distributed amongst claimants or dealt with through the use

of *cy-près*.

6.  Group D did not have the time to deal with *res judicata*. It took the view that England & Wales should devise a collective redress model first and then work with Europe on cross-border issues.

7.  On the subject of certification, Group D was acutely aware of the need for specialist judges. It questioned the level such judges would need to be at and the way in which they ought to be trained. Group D also felt that the issues relating to terms of certification were very important.

**Judge 1:**

Judge 1 asked delegates for their views on costs shifting and the way in which principle should apply in practice.

**Judge 4:**

Judge 4 stated that Group A considered certification as generally quite straightforward. It would be easy to recognise vexatious cases and certification would only become important in the grey areas in between. Group A felt that once there was certification, funding would follow with built-in protection for defendants. However, the real issue concerned where funding would come from for pre-certification where there is going to be satellite litigation over certification. One group member suggested a dual test comprising a prima facie certification process with a later opportunity for the defendant to vary or set aside the certification order.

**Lawyer 1:**

Lawyer 1 informed delegates that Group D was particularly concerned about costs shifting. Given that ATE insurance or contingency fees are unlikely to be available, he asked who would pick up the costs of such cases.

**Michael Napier QC:**

Michael Napier stated that the absence of funding would mean that cases could not be progressed and he asked whether ATE insurers are showing more interest in funding group actions.

**Insurer 1:**

Insurer 1 confirmed that although ATE insurers are indeed showing more interest in funding group actions, they lack the certainty offered by group litigation orders (hereinafter "GLOs") and test cases. He added that, in contrast to ATE insurers, third party funders would be concerned about the punitive *vs.* compensatory damages debate. He then stated the need for substantive legal underpinning of any future collective redress regime.

**Lawyer 2:**

Lawyer 2 remarked that cases are sometimes funded through a combination of insurance and third party funding. He stated that insurers only work on cases prior to certification where there are sufficient aggregate claims. This may suggest that some form of costs limitation at certification with adequate control on both sides could help secure funding.

**Lawyer 1:**

In response to a question by Judge 1, Lawyer 1 explained how contingency fees and costs shifting could operate independently.

**Civil Servant 1:**

Civil Servant 1 confirmed that legal aid immunity for costs meant that the costs shifting

rule did not apply and successful defendants could not recover their costs. He cautioned against treating recoverability for costs by successful defendants as a sacred cow and vital part of any new collective redress system. He stated that the uncertainty surrounding opt-out actions meant that it was difficult to see how costs shifting would work. Civil Servant 1 spoke of the importance of balancing the interests of the parties and the possibility of removing costs shifting in some circumstances.

**Legislation and Procedure – Lawyer 4**

Lawyer 4 guided delegates through a paper drafted by the CJC Collective Redress Working Party. This explored the question of whether implementation of an opt-out collective action regime would require the enactment of substantive legislation or could alternatively be achieved by amendment of the CPR.

Lawyer 4 explained that the impetus for the paper arose from a divergence of opinions expressed by members of the working party. He then summarised these divergent views represented by Academic 1 on the one hand, and John Sorabji (Legal Secretary to the Master of the Rolls) on the other. The former argued that five components of a sophisticated collective redress mechanism – namely limitation, *res judicata*, aggregate assessment of damages, *cy-près* distribution of damages and standing against multiple defendants – would require legislative underpinning. Conversely, John Sorabji traced the evolution of the representative rule in equity and common law, concluding that it could be transformed into a modern class action that could rely on rule change except in the areas of *cy-près* and limitation (where primary legislation would be required).

Lawyer 4 described how the key elements of a sophisticated opt-out collective redress system could be enacted. The working party concluded in favour of Academic 1's position stating that the proposed reform programme is extensive and as such requires the sanction of the legislature. He argued that it was not an attractive prospect to revert to 18th and 19th century authorities to justify reform through amendment to the CPR. Lawyer 4 added that such a move would inevitably lead to an *ultra vires* challenge causing spiralling satellite litigation going all the way to the House of Lords. He also suggested

the possibility of attempting rule change while waiting for a slot in the legislative timetable.

**Lawyer 5:**

Lawyer 5 commented that the draft Civil Law Reform Bill might amend the Limitation Act according to Law Commission recommendations, and he suggested that this could be used to introduce a discrete area of the proposed reforms.

**Group A: Lawyer 2**

Group A expressed the view that a comprehensive legislative solution was the best model and that it should codify the procedures in one place. There was a strong feeling that a parallel rules-based exercise could undermine political will for legislative reform. Group A voiced its belief that political support for an improved collective redress mechanism was required and that future debate should proceed on the basis of draft rules rather than abstract principles.

**Group B: Lawyer 4**

On the one hand, Group B felt it desirable that the reform process be kick started with new rules. However, it also realised that any political decisions on the future of a scheme could not be anticipated.  Group B agreed that matters of policy would require substantive legal change, the timing of which would be uncertain given the present political climate. It was concluded that a "Camp David" method was required, by which Group B meant that a set of rules should be drafted ready for debate.

**Group C: Civil Servant 1**

Group C favoured a comprehensive legislative solution but accepted that this may be difficult to implement given the longer timescales involved and the current political

climate. Group C considered piggy-backing reform on other pieces of legislation and looked at the European Mediation Directive in this regard. Group C worried that reliance on rule change and/or unclear drafting could lead to satellite litigation.

**Group D: Lawyer 1**

Group D suggested that it would not be good to attempt to lead the rest of Europe in the field of collective redress with rules which might very well end up being challenged. Group D considered European directives and enabling legislation as a vehicle for reform. It questioned whether trusts could be established in every major case and was troubled by the concept of an access to justice trust being used to pay the costs of successful defendants as it could encourage unmeritorious claims. Group D felt that the any residual monies should be given to late claimants and ultimately returned to defendants.

**Master of the Rolls:**

The Master of the Rolls stated that the CPRC would be reluctant to look at reform on a piecemeal basis in the absence of detailed public consultation. He argued that it would be beneficial for the whole scheme to be drafted in order to facilitate future debate.

**Judge 1:**

Judge 1 distilled the key elements of the morning debate:

1.   Some form of collective redress in addition to existing mechanisms is necessary:
     a.   England & Wales lags behind other jurisdictions where it once led the way
     b.   There is an access to justice problem caused by the inadequacies of the system as it currently stands

2.   Collective redress is preferred to the term class or collective action so as to include alternative methods of dispute resolution as well as recourse to the civil courts

3.      The apt title is collective redress not consumer redress.

4.      The procedure should be generic and not limited to consumer claims however existing procedures such as the OFT's schemes should be maintained and developed in parallel to this

5.      Though other forms of dispute resolution are to be encouraged, those other forms should not be compulsory

6.      Regulatory and other like bodies they have part to play but there must be recourse to the civil courts in the event of breaches of the civil law

7.      There is general support that court-based redress should be an opt-out system but subject to stringent control and safeguards. There would be no new opt-in procedure; existing procedures considered to be adequate.

8.      There would be close control by the court with certification in accordance with the agreed provision laid down in the rules.

9.      There must be proper protection for defendants. There are some existing controls that weed out frivolous claims.

10.     There was a divergence of view on the difficult area of damages. There was a preponderance of opinion that damages should be compensatory. But then this leads to the question of what this means given that there was also general support for aggregation of damages. These are matters of social and public policy. Should there be disgorgement of profit? Is it appropriate to provide access to civil court for a large number of people with small claims if there is no public mechanism of deterrence? What should happen to surplus?

11.     Funding is obviously the key as any new system will simply not get off the

ground unless there is proper funding for it. There is some support for contingency fees plus costs shifting. It also appears that ATE insurers may be interested in providing funding. The CJC is hosting a TPF event next month which may be an appropriate occasion to consider this further.

12.    Funding is important not only as a means of getting the action off the ground but also because it provides the further safeguards needed for defendants. This must be retained throughout the whole of the procedure.

13.    The difficulties of the cross-border situation are recognised but it is suggested that we get on with our own action

Judge 1 then summarised the afternoon debate:

1.    There is general agreement that there should be a legislative approach

2.    Draft rules might be formulated so that further discussion can focus on something in print.

3.    There was disillusionment in some quarters with the perceived lack of political will

4.    However, some suggested that a European directive requiring member states to provide access to justice in this area view may mean that our current system is deemed inadequate and others suggested that a reform programme could be pushed along by enabling legislation

**Judge 2:**

Judge 2 said that legislation cannot be bolted on to directives as they are enacted by regulation under the European Communities Act.

**Civil Servant 1:**

Civil Servant 1 referred to the importance of regulatory systems and advocated the need to take a holistic approach to the problem.

**Michael Napier QC:**

Although the main conference paper deals with this point, Michael Napier obtained agreement from Robert Musgrove that it would be given more in-depth treatment.

**Trade Union Representative 1:**

Trade Union Representative 1 stated that the litigation process effectively underpins the ADR argument.

**Judge 2:**

Judge 2 voiced his support for the development of draft model rules.

**Lawyer 1:**

Lawyer 1 suggested the improvement of existing representative actions and GLOs as part of the reform package.

**Advice Services Representative 1:**

Advice Services Representative 1 referred to the presentational benefit of pushing forward the reform agenda from the perspective of consumers.

**Lawyer 4:**

Lawyer 4 volunteered the services of the Collective Redress Working Party in drafting

the rules.

**Judge 1:**

Judge 1 ran through responses made to the recommendations of the main conference paper.

| | |
|---|---|
| Recommendation 1: | Nothing to say |
| Recommendation 2: | Reflects what was discussed |
| Recommendation 3: | Perhaps too prescriptive and needs to be made more general |
| Recommendation 4: | Substantial change is needed with costs shifting available throughout the process |
| Recommendation 5: | Needs to be altered through deletion of the first sentence |
| Recommendation 6: | Generally supported |
| Recommendation 7: | Yes except there is reference to disgorgement of profits illegally obtained and there is question that leg would certainly be needed in relation to that |
| Recommendation 8: | Supported |
| Recommendation 9: | Not entirely supported. Divergence of view as to what should happen to such funds. The general sense of the meeting would be reflected by that being put on a broader basis rather than restricted to the Legal Services Act |
| Recommendation 10: | Generally supported[232] |

---

[232] NB: the recommendations at this stage were: RECOMMENDATION 1: A wider range of Representative Bodies should be able to bring claims on behalf of consumers; RECOMMENDATION 2: Collective consumer claims may be brought on an opt-in or opt-out basis; RECOMMENDATION 3: Collective consumer claims should meet strict certification procedure by the Court; RECOMMENDATION 4:There should be full costs shifting prior to the point of certification,; thereafter the Court will determine the costs liability of the parties; RECOMMENDATION 5: There should be no right of appeal against positive certification.  Appeal against a refusal to certify a claim should be subject to extant rules[232] on permission to appeal; RECOMMENDATION 6: The case managing judge should exercise an enhanced form of active case management, along the lines of the recommendations of Mr Justice Aiken's Working Party; RECOMMENDATION 7: Where a case is brought on an opt-out basis, the court should have the power to award aggregate damages; RECOMMENDATION 8: Where a case is settled on an opt-out basis, the court should conduct a "Fairness Hearing"  to ensure that the interests of the consumer claimants are properly and fairly served; RECOMMENDATION 9: Unallocated damages from an aggregate award should be

**Academic 1:**

Academic 1 asked whether Recommendation 1 ('*A wider range of Representative Bodies should be able to bring claims on behalf of consumers*') was intended to preclude those members of the class with a direct action from acting as representative claimants – the way that it was presently worded, it could be taken to mean that only 'representative bodies' could bring the claims.  Judge 1 responded that the present intention was to allow either representative body or a directly-affected class member to bring the claims on behalf of others, and that the recommendation should be reworded to reflect that.

**Lawyer 1:**

Lawyer 1 suggested that the consensus for a Euro-sensitive approach be reflected in the main conference paper.

**Master of the Rolls:**

The Master of the Rolls thanked Michael Napier for facilitating the event and he thanked all the delegates for attending. He noted the consensus that had been reached on many aspects of the debate and expressed his hope that the discussions may be taken forward.

---

distributed to the Access to Justice Foundation, established under S.194 of the Legal Services Act 2007; RECOMMENDATION 10: Any procedural reform to improve access to justice in collective consumer claims should be of general application.

354



## APPENDIX I

### Protective Costs Orders – Summary of Case Law

**CASE LAW - PROTECTIVE COSTS ORDERS**

1. The Court of Appeal has reviewed the law relating to protective or pre-emptive costs orders where costs are to be paid out of a fund.[233]

2. In a case where trustees of a charity applied to the court for directions in relation to an appeal against an order appointing a receiver and manager of the charity, and whether they might be indemnified out of the charity's property in respect of the costs incurred by them in prosecuting the appeal, the court allowed the Attorney-General to be heard and to submit evidence on the application. The court held that the practice in pre-emptive costs applications was that they should be between the parties.[234]  Justice required that a party had a right to be heard before an order was made that the party would bear the whole costs of substantial litigation whether it won or lost. The Attorney-General was, for the purpose of the application, regarded as being in the same position as a beneficiary. There was strong public interest in the Attorney-General being present on an application which, if successful, would involve the expenditure of a large proportion of the charity's funds.[235] A policyholder objecting to a proposed scheme of re-organisation of an insurance company was entitled to a pre-emptive costs order in his favour because his position was closely analogous to that of

---

[233] *McDonald v Horne* (1995) 1 All E.R. 961
[234] CPR 19.9 (derivative claims).
[235] *Weth & Ors v HM Attorney-General & Ors*, November 21, 1997, Mr L. Collins Q.C.  (Deputy High Court Judge) (unreported).

a shareholder bringing a derivative action against the controllers of a company on behalf of the company as a whole, in that he had given consideration in exchange for his interest. The application also enabled the proposed reorganisation to be fully tested by the court.[236]

**Statutory Costs Jurisdiction**

3.  The Court's jurisdiction to deal with litigation costs is based upon section 51 of the Supreme Court Act 1981; this discretion must be exercised in accordance with the Rules of Court and established principles.

**The General Principles**

4.  Costs follow the event (subject to CPR, r.44.3).

**The Special Principle — Costs Out of a Fund**

> (a) Costs of trustees and other fiduciaries: In the case of a fund held on trust the trustee is entitled to his costs out of the fund on the indemnity basis provided only that he has not acted unreasonably or ''in substance for his own benefit rather than that of the fund''.[237]

5.  Trustees are able to protect themselves against the possibility that they may be held to have acted unreasonably or in their own interest by applying at an early stage for directions as to whether to bring or defend proceedings.[238]

> (b) Extensions of special principle to beneficiaries: The Chancery Courts have been willing in certain circumstances to extend to other parties to trust litigation an entitlement to costs in any event by analogy with that accorded to trustees.[239] Kekewich J. said that trust

---

[236] *Re Axa Sun Life Plc* [2000] EW Ch.D., November 1, Evans-Lombe J.
[237] CPR, r.48.4.
[238] See *Re Beddoe* [1893] 1 Ch. 547, at 557.
[239] See *Re Buckton* [1907] 2 Ch. 406, Kekewich J.

litigation could be divided into three categories:

(i)      proceedings brought by trustees to have the guidance of the court as to the construction of the trust instrument or some question arising in the course of the administration: in such cases the costs of all parties are usually treated as necessarily incurred for the benefit of the estate and ordered to be paid out of the fund:

(ii)     cases in which the application is made by someone other than the trustees that raise the same kind of point as in (i) and would have justified an application by the trustees: this trust is treated in the same way as the first:

(iii)    cases in which a beneficiary is making a hostile claim against the trustees or another beneficiary. This is treated in the same way as ordinary common law litigation and costs usually follow the event. The court may sometimes feel sufficiently confident that the case is within (i) or (ii) to be able to make a prospective order that parties other than the trustees are to have their costs in any event.[240]

(c)      Extension of principle to derivative action: In Wallersteiner v Moir,[241] the Court of Appeal said that a minority shareholder bringing a derivative action on behalf of a company could obtain the authority of the court to sue as if he were a trustee suing on behalf of a fund with the same entitlement to be indemnified out of the assets against his costs and any costs he may be ordered to pay to the other party. The Court said that the minority shareholder could make a

---

[240] See *Re Exchange Securities Ltd (No.2)* (1985) B.C.L.C. 392, 395.
[241] [1975] Q.B. 373.

Beddoe application in the same way as the trustee.

(d)     Extension of Wallersteiner to Pension Funds: There is a compelling analogy between a minority shareholder's action for damages on behalf of a company and an action by a member of a pension fund to compel trustees or others to account to the fund. In both cases a person with a limited interest in a fund, whether the company's assets or a pension fund, is alleging injury to the fund as a whole and seeking restitution on behalf of the fund. What distinguishes the shareholder and pension fund member on the one hand from the ordinary trust beneficiary on the other is that the former have both given consideration for their interests, they are not just recipients of the settler's bounty. The relationship between the parties is a commercial one and the pension fund members are entitled to be satisfied that the fund is being properly administered. Even in a long contributory scheme the employer's payments are not bounty, they are part of the consideration for the services of the employee.

6. Pension funds are a special form of trust and the analogy between them and companies with shareholders is so much stronger than in the case of ordinary trusts that in a judgment of the court it would do no violence to established authority if the court were to apply to them the Wallersteiner procedure.[242]

Practice: The power to make a Wallersteiner v Moir order in a pension fund should be exercised with considerable care.[243]

7. The question is whether the claimants have shown a sufficient case for further investigation. Once the judge is satisfied that there are matters which need to be

---

[242] The attention of the court was drawn to a decision of the House of Lords in Chapman v Chapman [1954] A.C. 429 but it was held that the jurisdiction has to be found in s.51 of the Supreme Court Act 1981 which is subject only to rules of court and established principles. The court was not persuaded that any such rule or principle would be violated.
[243] See *Smith v Croft* [1986] 1 W.L.R. 580, Walton J.

investigated, caution should take the form of choosing the most economical form of investigation. This will not necessarily involve authorising a full trial or even full pleadings and discovery. The court should not authorise any legal process until it has explored the possibility of independent investigation by a person or persons acceptable to both parties.

8.  Even if further investigation is required it need not necessarily take the form of a full-scale trial, the court might in the first instance authorise only discovery (preferably limited) or appoint judicial trustees with power to take possession of the documents and investigate for themselves. The court may also think that if the action is to be pursued beyond the stage of investigation and discovery it should be put into the hands of independent judicial trustees in which case the pre-emptive costs order will expire when the handover has been completed.

9.  In general the court should try to secure the fairest and most economical judicial or extra judicial resolution of the dispute.[244]

10. The application for a pre-emptive costs order should be heard by a judge of first instance in the Chancery Division, even if the case was to be heard by the Court of Appeal.[245]

11. Under the CPR the court may take a more robust view about costs to be paid out of the trust fund. Where trustees are able and willing to bring proceedings themselves a successful claimant who is a beneficiary will not necessarily be awarded costs out of the fund.[246]

12. The court should avoid the temptation to be swayed by a comparison between the costs of a potential appeal and the funds in a scheme so as to be generous with the money of another. Trusts did not exist to fund litigation by a minority group of

---

[244] per Hoffman L.J., *McDonald v Horn* [1995] 1 All E.R. 961, CA. 287
[245] *Machin v National Power plc (No.1)*, May 18, 1998, Laddie J. (unreported). See also *Machin v National Power plc (No.2)*, July 31, 1998, Carnwath J. (unreported).
[246] *D'Abo v Paget (No.2)*, The Times, August 10, 2000, Lawrence Collins Q.C.

members at the expense of its members as a whole but to use its assets for the benefit
of all those members in accordance with the rules that defined its existence and
purpose.[247]

## PROTECTIVE COSTS ORDERS IN PUBLIC LAW CASES

13. In *The Queen (on the application of Corner House Research) v Secretary of State for
Trade and Industry*) [2005] EWCA Civ 192 the Court of Appeal considered, in depth,
the question of Protective Costs Orders (PCOs) in public law cases.    The Court
stated that the general purpose of a PCO is to allow a claimant of limited means,
access to the court in order to advance his case without the fear of an order for
substantial costs being made against him.  A fear which could dis-inhibit him from
continuing the case at all.    The Court identified the leading authority on the topic as
the judgment of Dyson J in *R v Lord Chancellor ex p. CPAG* [1999] 1 WLR 347.

14. The Court traced the history of the "English Rule" that costs follow the event, from
the end of the 13th century.  The Chancery Division tempered the effect of the English
Rule principle in cases where there was a "private fund" available.   This fund might
be the assets of a trust[248]; the assets of a company in a minority shareholders
action[249];   the action of a pension scheme[250]; or, the assets involved in the
reorganisation of a life insurance business.[251]   The starting point for Judges was the
proposition that they must do nothing to inhibit the exercise of discretion as to costs,
which would be vested in the Judge conducting the substantive hearing.

15. In relation to costs in public law litigation, the Court pointed out that official bodies
would often appear or intervene in public law proceedings, on the basis that they were
present to assist the court in an amicus curiae role, even if they were respondents in
the proceedings, and in that capacity, in a court which traditionally ordered only one

---

[247] *Chessels v British Telecommunications Plc* [2001] EWHC, Ch. D., December 20: [2002] PENS L.R.
141, Laddie J. (pre-emptive costs order refused).
[248] *In Re: Beddoe:  Downes v Cotton* [1893] 1 Ch 547
[249] *Wallersteiner v Moir (No.2)* [1975] QB 373
[250] *McDonald v Horn* [1995] ICR 685
[251] *In Re Axa Equity and Law Life Assurance Plc (No.1)* [2001] 2 BCLC 447

set of costs, it would neither apply for costs, nor expect an order for costs to be made against it, even if its submissions favoured one side more than the other.[252]    From time to time leave to appeal to the House of Lords is given to a public body, on terms that it would pay both sides costs in the House of Lords and not seek to disturb the orders for costs made in the court below.

16. The decision in *Corner House Research* is concerned with the incidence of costs in a judicial review application at first instance.    The Court indicated that there was a growing feeling that access to justice is sometimes unjustly impeded if there is slavish adherence to the normal private law costs regime.

17. In *R v Lord Chancellor ex p. CPAG* Dyson J heard two applications for PCOs at the same time.  One to enable the Child Poverty Action Group to continue judicial review proceedings, for the purpose of requiring the Lord Chancellor to reconsider the way he exercised his power in relation to the extension of legal aid cover before Social Security Tribunals and Commissioners;   and second, in relation to a legal challenge by Amnesty International UK to a decision made by the Director of Public Prosecutions not to prosecute two individuals for possession of an electro-shock baton without the requisite licence.     Although the respondents conceded that the court possessed jurisdiction to make a PCO.   There was no agreement as to the correct principle.    Dyson J said that it was only in the most exceptional circumstances that the discretion to make a PCO should be exercised, in a case involving a public interest challenge.    He went on to lay down certain guidelines which were further reviewed by the Court of Appeal in *Corner House*.

18. Having reviewed the historical setting of PCOs the Court went on to consider recent developments in Ireland, Canada and Australia.    The Court then set out the governing principles and gave some practical guidance.    The basic governing principles are set out in Section 51 of the Supreme Court Act 1981 and CPR Parts 43 to 48.  CPR 44.3 is of particular importance.   The Court expressed itself satisfied that

---

[252] See *R (Davis) v Birmingham Deputy Coroner* [2004] EWCA Civ 207 the Court cited Justices, Tribunals, Coroners and The Central Arbitration Committee as examples.

there are features of public law litigation which distinguish it from private law and family litigation.    There is a public interest in the elucidation of public law by the higher courts, in addition to the interests of the individual parties.    One should not therefore necessarily expect identical principles to govern the incidence of costs in public law cases.

19. The Court was in broad agreement with the guidelines laid down by Dyson J but decided to reformulate them with greater precision:

> "1.    A PCO may be made at any stage of the proceedings, on such conditions as the court thinks fit, provided that the court is satisfied that:
>
>    (i)      the issues raised are of general public importance;
>
>    (ii)     the public interest requires that those issues should be resolved;
>
>    (iii)    the applicant has no private interest in the outcome of the case;
>
>    (iv)    having regard to the financial resources of the applicant and the respondent(s) and to the amount of costs that are likely to be involved it is fair and just to make the order;
>
>    (v)     if the order is not made the applicant will probably discontinue the proceedings and will be acting reasonably in so doing.
>
> 2.  If those acting for the applicant are doing so pro bono, this will be likely to enhance the merits of the application for a PCO.

3. It is for the court, in its discretion, to decide whether it is fair and just to make the order in the light of the considerations set out above."

20. There is room for considerable variation in the form of order to be used, depending on what is appropriate and fair in each of the cases in which the question may arise. It is likely that a costs capping order for the claimant's costs will be required in all cases, other than one where the claimant's lawyers are acting pro bono, and the effect of the PCO is to prescribe in advance that there would be no order as to costs in the substantive proceedings, whatever the outcome. The court gave further guidance as follows:

"(i) When making any PCO where the applicant is seeking an order for costs in its favour, if it wins, the court should prescribe, by way of a capping order, a total amount of the recoverable costs which will be inclusive, so far as a CFA funded party is concerned, of any additional liability;

(ii) the purpose of the PCO will be to limit or extinguish the liability of the applicant if it loses, and, as a balancing factor, the liability of the defendant for the applicant's costs, if the defendant loses, will thus be restricted to a reasonably modest amount. The applicant should expect the capping order to restrict it to solicitors' fees and a fee for a single advocate of junior counsel status that are no more than modest;

(iii) the overriding purpose of exercising this jurisdiction is to enable the applicant to present its case to the court with a reasonably competent advocate, without being exposed to such serious financial risks that would deter it from advancing a case of general public importance at all, where the court considers that it is in the public interest that an order should be made. The beneficiary of a PCO must not expect the capping order that will accompany the PCO to permit anything other than modest representation, and must arrange its legal representation (when its lawyers are not willing to act pro bono) accordingly."

21. The Court did not think that it had any power to make an order that the defendants should finance the claimant's costs at first instance as the litigation proceeded. The Court went on to set out a suggested procedure and gave an indication of the modest

level of costs it would expect to see (generally not exceeding £5,000 in a multi party case).

22. Certain conditions have to be fulfilled to warrant the making of a protective costs order, one of these being that the applicant should have no private interest in the outcome of the case.    Where the applicant was seeking compensation as part of the relief sought, that amounted to a private interest in the outcome, and the application was refused[253].   When making an application for a protective costs order for the first time at the appeal stage, there is no reason why different considerations from those set out in *R (Cornerhouse Research) v Secretary of State for Trade & Industry* above, should be applied[254].

23. In *R (Ministry of Defence) v Wiltshire and Swindon Coroner* [2005] EWHC 889 (admin); [2006] 1 WLR 134;  [2005] 4 All ER 40, Collins, J, the Judge expressed the view that protective costs orders had until then been made only in favour of claimants in judicial review cases.    The purpose behind such orders is to ensure that, in appropriate cases, a litigant will not be precluded from bring a valid claim because the costs of so doing are likely to be prohibitive, and, more importantly, because the risk, if he loses, of having to pay the other side's costs are such as would inhibit him from bringing that claim.  That is particularly the case where it is considered to be in the public interest that someone challenge a particular matter which has a wide effect, or may have a wide effect and there is, for example, a pressure group or individuals who have an interest in so doing, but who do not have the means to risk an adverse order for costs.

24. The Judge however thought that the principle was a deeper one and a wider one, in that the court's general discretion in relation to costs, and more importantly in ensuring that there is proper access to justice, and if the needs of justice require, appropriate orders can be made.   Collins J could see no reason in principle why a

---

[253] *Weir & Ors v Secretary of State for Transport* [2005] EWHC 24 April (Ch) Lindsay J.
[254] *Goodson v HM Coroner for Bedfordshire & Luton* [2005] EWCA Civ 1172..

protective costs order should not, in an appropriate case, extend to protect the position of a defendant.    It was unlikely in public law cases that a defendant, being a public body, would be in a position where a protective costs order was necessary in the interests of justice but the Judge did not rule out the possibility that that could arise in a given set of circumstances, particularly perhaps where an individual had a public law role and had to make a decision in that role and there was, for whatever reason, no protection given to him in relation to costs by any other body or person.

25. Collins J accepted the circumstances where that could arise would be unusual, and no doubt exceedingly rare, but the possibility was there and the principles relating to protective costs orders could readily be adapted to fit the relevant circumstances.

## OTHER ORDERS FOR THE COSTS OF TRUSTEES

26. Whilst it is normal practice on an application to the court for directions by trustees for the costs to be paid out of the trust funds, the court has a discretion to diverge form that practice where appropriate. Such a course was held to be appropriate where the trustees had decided to adopt a partisan role, where they had argued positively for a specific outcome in the interests of one class of beneficiary against the interests of another class. In those circumstances the court held that the role adopted by the trustees was not neutral and the trustees had to accept that they might be subject to costs consequences. The existence of an exoneration clause within the trustees' terms of office was no protection against a court order, nor was it a factor which inclined the court to exercise its discretion in the trustees favour.[255]

27. Where the Charity Commission appointed a receiver and manager of the charity, and subsequently on his advice appointed new trustees and removed the former chairman of trustees, under section 18 of the Charities Act 1993, the former trustee appealed against the appointment of the receiver and applied for an order indemnifying him out of the charity's property in respect of the costs of the appeal. The trustees' application was dismissed and permission to appeal refused by the Court of Appeal on the basis that the trustee had not been acting for the benefit of the charity (by refusing to

---

[255] *Breadner v Granville and Grossman* [2000] EWHC, Ch. D., July 16, Park J.

compromise an earlier action) and was therefore liable to pay the costs.[256]

28. Where the trustees of a pension scheme brought proceedings, and the beneficiary representative of the active members of the scheme was a defendant, the defendant's application for a pre-emptive costs order was granted taking into account the size of the fund and the fact that the trustees had named the particular beneficiary as a defendant. Even if it could be said that it had not been absolutely necessary for the beneficiary to be joined, the fact that he had been would normally entitle such a party to their costs.[257]

29. In a case where a company went into administration after a shareholder had brought a petition under section 459 of the Companies Act 1985 the administrator sought directions from the court in relation to possible appeals from orders made relating to the petition. The court gave directions relating to the appeals and made pre-emptive costs order in relation to those proceedings in favour of the administrators to the effect that the costs were to be paid out of the estate of the company, in any event in priority to the claims of the other creditors. On appeal it was held that the pre-emptive costs order should not have been made in circumstances where the litigation was hostile. The court was required to be particularly cautious in making a pre-emptive costs order. To make such an order the court needed complete confidence that the administrators would win and that all the costs would be properly incurred. A pre-emptive costs order could be made only on the strongest possible grounds once it was established that there was a more than negligible chance that the administrators might fail. It was potentially unjust to make a pre-emptive costs order.[258]

---

[256] *Weth v H M. Attorney General* [2001] EWHC, Ch. D., February 23.
[257] *Stevens v Bell (Costs)* [2001] OP L.R. 123, Park J.
[258] *Ciro Citterio Menswear Plc* [2002] EWHC, Ch, May 3, Pumfrey J.



**APPENDIX J**

**CPR 3.1 – The Court's Case Management Powers**

CPR 3.1:

3.1

(1) The list of powers in this rule is in addition to any powers given to the court by any other rule or practice direction or by any other enactment or any powers it may otherwise have.

(2) Except where these Rules provide otherwise, the court may –

(a) extend or shorten the time for compliance with any rule, practice direction or court order (even if an application for extension is made after the time for compliance has expired);

(b) adjourn or bring forward a hearing;

(c) require a party or a party's legal representative to attend the court;

(d) hold a hearing and receive evidence by telephone or by using any other method of direct oral communication;

(e) direct that part of any proceedings (such as a counterclaim) be dealt with as separate proceedings;

(f) stay (GL) the whole or part of any proceedings or judgment either generally or until a specified date or event;

(g) consolidate proceedings;

(h) try two or more claims on the same occasion;

(i) direct a separate trial of any issue;

(j) decide the order in which issues are to be tried;

(k) exclude an issue from consideration;

(l) dismiss or give judgment on a claim after a decision on a preliminary issue;

(ll) order any party to file and serve an estimate of costs;

(m) take any other step or make any other order for the purpose of managing the case and furthering the overriding objective.

(3) When the court makes an order, it may –

(a) make it subject to conditions, including a condition to pay a sum of money into court; and

(b) specify the consequence of failure to comply with the order or a condition.

(4) Where the court gives directions it may take into account whether or not a party has complied with any relevant pre-action protocol (GL).

(5) The court may order a party to pay a sum of money into court if that party has, without good reason, failed to comply with a rule, practice direction or a relevant pre-action protocol.

(6) When exercising its power under paragraph (5) the court must have regard to –

(a) the amount in dispute; and

(b) the costs which the parties have incurred or which they may incur.

(6A) Where a party pays money into court following an order under paragraph (3) or (5), the money shall be security for any sum payable by that party to any other party in the proceedings.

(7) A power of the court under these Rules to make an order includes a power to vary or revoke the order.



# APPENDIX K

# Executive Summary – Report and Recommendations of the Commercial Court Long Trials Working Party

## A. Executive Summary of Recommendations of the Working Party[259]

### A1. General (see Section B)

1. The Commercial Court Long Trials Working Party ("WP") was set up under the auspices of the Commercial Court Users Committee in January 2007. The WP gave itself wide terms of reference enabling it to consider all aspects concerning the management of heavy and complex litigation in the Commercial Court.

2. It concluded that the existing procedural code, under the CPR, contained sufficient powers to enable proposals for the more efficient conduct of these cases to be implemented. The WP concluded that there are further ways in which the procedural code can and should be  supplemented and so more effectively used to achieve that greater efficiency, in the interests of the business community served by the Commercial Court. The WP identified a number of respects in which the Admiralty and Commercial Courts Guide ("the Guide") can be used to achieve this. Many of the arrangements recommended by the WP can be applied to, and s should benefit, all Commercial Court cases and not simply the most heavy and complex. The areas in which the Guide will need change have been analysed.

---

[259] Report and Recommendations of the Commercial Court Long Trials Working Party (December 2007) (Judiciary of England and Wales) at 6 – 13.

3. The WP reviewed each of the stages of litigation. It noted that a problem in one stage could lead to problems in other stages. For example long and complex statements of case could lead to problems with disclosure, witness statements, client accountability and length of trial. To take another example, some forms of judicial control of complex litigation could occur too late in the litigation to have a sufficiently useful effect.

**A2. Pre-Action Protocols (see Section C)**

4. The WP concluded that litigants should continue to comply with the general protocols. However, consistently with the need to ensure that cases are developed with the benefit of greater definition and judicial involvement (in particular through the List of Issues: see paragraph 5 below) the WP concluded that, particularly in large cases, the time and burden of pre-action procedure should be kept within limits. Accordingly, it recommended that:

a. The parties should comply with the minimum expectations of the existing pre-action protocol regimes.

b. The Guide should be amended to provide that in such cases the pre-action letter of claim should be concise and do no more than explain the proposed claim sufficiently to enable it to be understood by the potential defendant. Similarly, the potential defendant need only provide a concise response.

c. Generally, there would be no need for the parties at this stage to appoint experts before writing a letter of claim, or responding to one.

d. Compliance with pre-action protocol regimes should not be required in cases where delays in starting proceedings might prompt forum shopping in other jurisdictions.

**A3. Statements of Case and Lists of Issues (see Section D)**

5. The WP noted a tendency of parties (through their lawyers) failing to plead only material facts and, instead, setting out detailed background facts and evidence, as well as law and argument. The WP considered that a client must be able readily to identify the

key aspects of his case and the basis on which his opponent takes issue with them. The WP recommended that:

a. Statements of case should not exceed 25 pages in length without permission of the court and should (except in the case of very brief statements of case) include a short summary.

b. The court should regulate whether further information on a party's statement of case is required.

c. At the first Case Management Conference ("CMC") the court will settle judicially the list of key issues from an initial draft provided by the parties ("the List of Issues"). That list will thereafter become, effectively, a court document. The statements of case will thereafter increasingly have only secondary importance. A draft Model List of Issues is appended to this Report at Appendix 2.

d. "Pleading points" will be actively discouraged by the court.

e. The List of Issues would be used to regulate subsequent disclosure, witness statements and expert reports, all of which must be framed by reference to the issues within the List.

**A4. Disclosure (see Section E)**

6. The WP recognised the importance of disclosure but proposed the following steps to deal with the widely expressed concerns that, particularly in large scale litigation, the administrative burden and therefore cost of disclosure has grown disproportionately to its benefits:

a. Automatic disclosure should not take place until after the CMC scheduled to deal with disclosure.

b. In advance of that CMC the parties should prepare a schedule identifying the

disclosure required by reference to the issues listed in the List of Issues, setting out (with brief reasons) whether "standard disclosure", or less or more, and when, was said to be required on each particular issue.

c. The aim will be to control disclosure on each issue by reference to classes of document, and periods of time, and level of disclosure, that are proportionate to the costs involved and the likelihood of the disclosure assisting the court in determining the issue.

**A5. Witness Statements (see Section F)**

7. The WP concluded that, in general, witness statements are often too long and insufficiently focused on the real issues that the witness can deal with. Accordingly it recommended that:

> a. In appropriate cases the court should impose a limit on the length of witness statements.

> b. The parties should, by headings in the witness statements themselves, identify which paragraphs of the statements relate to which of the issues in the List of Issues.

> c. In appropriate cases, on appropriate issues, the court should dispense with witness statements, order statements of the "gist" of evidence to be served, and/or allow limited examination in chief to be given at trial.

**A6. Expert Evidence (see Section G)**

8. The WP concluded that expert reports in large-scale litigation are often too long and over elaborate. The principal reason for this is the failure of the parties and the court to define with sufficient precision the relevant expert disciplines and issues before the experts write their reports. Accordingly, the WP recommended that:

> a. The List of Issues should identify the expert issues, either when it is first produced or subsequently when they have been properly identified.

b. Expert reports should be framed by reference to those issues.

c. Expert reports should normally be exchanged sequentially.

d. The court should delay settling the List of Issues, to the extent that it relates to expert issues, if more time is needed before doing so.

e. The court should always consider limiting the length of expert reports.

**A7. Summary judgment/ Striking out/ Submissions of No Case to Answer (see Section H)**

9. The WP concluded that it would be inappropriate if not impossible to have, for different types or size of case, different standards by which the court should judge whether to grant summary judgment or to strike out a claim or defence. However, it recommended that:

a. The court should recognise that a more flexible approach to the range of costs orders available where applications for summary judgment or to strike out a claim or defence had failed might encourage parties to explore the use of these powers more.

b. The List of Issues should be used by judges to promote a consideration of whether particular issues were appropriate for summary judgment or strike out applications.

c. In large cases which look likely to generate a large number of interim appeals (which often include summary judgment/strike out applications) a Lord Justice of Appeal with Commercial Court experience should be identified at an early stage in the case to be a member of every appeal panel, and arrangements should be made for appeals to be taken as promptly as possible.

10. The WP does not recommended that there be any change to the present rules and practice regarding a submission of "no case to answer" at the end of a claimant's case. However there may be cases where the judge can isolate one or more important issues and hear all the evidence and submissions on them and then rule on them.

## A8. Indications from Judges as to the Merits of a Case/ Preliminary Issues (see Section H)

11. The WP noted the various occasions when a judge might give an indication of provisional views on the merits of a case. Overall the WP was in favour of this, provided it was done openly, with the parties' consent and the judge made it clear that the view was provisional. The WP recommended that:

a. Judges should be encouraged to give provisional views on the merits of particular issues identified in the List of Issues if it seemed appropriate to do so: eg at a CMC, as well as giving rulings at strike out/summary judgment applications.

b. The parties could agree that views could be given at suitable points in the trial.

c. The court should raise awareness of the existing early neutral evaluation ("ENE") facility referred to in the Guide.

d. More use should be made of preliminary issues, using the new List of Issues as the guide to identifying them.

## A9. Use of Technology – Scope for "paperless" Litigation (see Section I)

12. The WP recognised that at this stage any proposals for paperless trials must be limited. Nonetheless, the WP recommended that:

a. The Guide should contain a specific provision that the parties and the court must consider at an early stage in a case the scope for using IT, particularly at the trial and particularly in long and complex cases.

b. This consideration should include the production in hard copy of only those bundles likely to be referred to reasonably frequently at trial, with electronic copies of the remaining documents available in court.

c. A specialist working party should be set up, consisting of clients and practitioners who will be in and will use the new courts in the new building under construction in Fetter Lane. This group should develop specific proposals on how future trials can, where appropriate, become paperless.

**A10. Costs (see Section J)**

13. The WP considered that many of the existing powers of the court in relation to costs are among the advantages that litigation in the Commercial Court offers over litigation in many other jurisdictions.

14. The WP felt strongly that the introduction of daily Court fees would put the court, and thus the use and development of English commercial law, at a significant disadvantage.

15. The WP further recommended that:

a. The court should be prepared to make a summary assessment of costs where the total costs claimed was £250,000 or less.

b. More use should be made of payments on account of costs where a higher sum for costs than that is claimed.

c. The court should make more use of its power to award costs to discourage parties from behaving unreasonably.

**A11. Management of the Pre-Trial Timetable and the Trial (see Section K)**

16. The WP considered that, by having the List of Issues and then focusing disclosure, witness statements and expert evidence on the issues identified in that list, there should be a narrower and more focused engagement of the parties at trial than has sometimes

been the case in large and complex cases. Its recommendations for trials therefore include the following:

a. No two-party trial, however complex, should ordinarily be listed for more than 13 weeks (3 months).

b. The pre-trial and trial timetable should be organised around careful estimates for each piece of work, with an appropriate contingency built in.

c. At the Pre-Trial Review provisional time limits should be set for every component of the trial, ie. openings, the examination-in-chief (if any), cross-examination of all witnesses and closing speeches. The timetable for preparation of the chronology, and the type required, should always be discussed.

d. The court should make more use of its existing powers to decide the order in which issues are taken at trial and to take certain issues to the point of decision before moving onto other issues.

e. The parties must agree a list of matters of common ground (within the List of Issues) and this should be updated so as to ensure that the trial remains focused on the key areas of difference between the parties.

f. Outline opening arguments should be concise, not normally exceed 50 pages, and be structured in accordance with the List of Issues.

g. No opening speech should ever ordinarily be estimated to exceed two days, even in the heaviest case.

h. Time limits should be set for the examination of witnesses (either individually or collectively) wherever appropriate.

i. Consideration should be given, on a case-by-case basis, to a change in court

sitting hours during trial to meet the needs of those involved and to achieve the objective of efficiency.

j. The court should impose a page limit on the length of written closing arguments, and the oral closing argument by a party should not exceed two days.

**A12. Client Accountability and Responsibility for Litigation (see Section L)**

17. The WP concluded that there were respects in which it was possible to increase client involvement in the litigation, in the interests of ensuring that appropriate senior management responsibility continued to be taken for the litigation, and thus that there was greater client accountability.

18. The WP has proposed the following:

a. Senior client representatives should be required to sign a fresh statement of truth shortly before trial verifying statements of case.

b. At appropriate stages those representatives should also be required to sign a statement to the court indicating whether ADR has been considered internally within the client organisation.

c. The power of the judge to require such representatives to be present in court (by video link if necessary), if the judge considers that doing so will assist in case management or resolution of the dispute, should be emphasised. At the same time care must be taken not to deter foreign clients from litigating in London by requiring their attendance when not really necessary.

**A13. Judicial Resource Management for Heavy and Complex Cases (see Section M)**

19. The WP recognised that its recommendations will require more judicial resources if long and complex cases are to be prepared and managed efficiently before and at the trial. It appreciated that Commercial Judges are called upon to undertake duties away from the Commercial Court.

Accordingly, the WP recommended that:

a. The "two judge team" system should continue to be used where appropriate. It should be the duty of the parties to ask for a two judge team at an early stage, if they think that the case is sufficiently heavy/complex.

b. Steps should be taken to ensure that at all times one or other of the two judges nominated for a heavy and complex case will be available to sit in the Commercial Court to deal with CMCs/interim matters in that case and/or the trial.

c. Arrangements should be put in place to enable the parties in a heavy and complex case to contact one or other of the two judge team informally (ie by telephone or email, via the clerk or the Listing Office), so as to deal with urgent matters or to seek guidance on procedural points.



**APPENDIX L**

**'Sixty (60) Design Issues for an Opt-out Collective Action Regime'**[260]

**CIVIL JUSTICE COUNCIL**

**COLLECTIVE CONSUMER REDRESS EVENT**

**Old Windsor, Berkshire**

**26–27 March 2008**

Prof. Rachael Mulheron

Department of Law

Queen Mary University of London

r.p.mulheron@qmul.ac.uk

**Preamble:**

- There are three parts to any collective action regime: need, design and funding. The 'need' aspect has been previously addressed (***Reform of Collective Redress in England and Wales: A Perspective of Need*** (available at: www.civiljusticecouncil.gov.uk, 'Publications', 8 February 2008).

- This note sketches some points about the 'design framework' of such a regime. The note intentionally does not deal with the treatment of costs and funding (the subject of a separate study).

---

[260] © Rachael Mulheron 2008

- The purpose of this note is to **canvass for wide discussion** the various design conundrums that arise in the procedural aspects of an opt-out collective action— throughout its beginning, its middle, and its end.

- Procedural aspects 'at the beginning' dominate the framework, for this is the 'engine room' which fires up or extinguishes the collective action at the very outset. It is a moot point whether the 'beginning procedures' are overly stated/prescriptive, but at least in Commonwealth jurisdictions, it seems to reflect an attitude of the law reform commissioners and legislatures to ensure, and demonstrably so, that their collective frameworks are not merely transplants of the US opt-out class action regime.

- Not all of these 'design issues' will necessarily require legislative articulation. Some would probably be dealt with sufficiently by establishing judicial precedent. A few *may* be possible to deal with by consideration and negotiation between litigants during the litigious process rather than by legislative prescription or judicial precedent being set down. All, however, have arisen in class actions jurisprudence elsewhere, and for each one of them, *different* solutions are possible. Hence, that is why their consideration within the design of any supplementary opt-out regime implemented for England and Wales (as a 'third generation statute'), and a fulsome debate by stakeholders about the different solutions, are crucial.

## AT THE BEGINNING ...

**Pleadings matters**

1. In accordance with the usual requirements of CPR 3.4(2)(b) and (c), **no frivolous, vexatious or abusive claims** will be permitted to be brought as collective actions.

2. In accordance with the usual requirements of CPR 3.4(2)(a), the collective action **must disclose a reasonable grounds** for bringing the claim.

3. In addition to CPR 3.4, the statement of case must also comply with any **specific pleadings requirements of a collective action regime** (eg, which require the pleadings to

specify the common issues of fact or law, or which require the pleadings to define the class, or which require the pleadings to specify the causes of action and the remedies sought), with sufficient particularity.

**The procedural peculiarities of the collective action**

4. As a further brake/moderation on the ability to start a collective action, the claimant class should be

required to satisfy legislatively-prescribed *preliminary merits test/s*.

5. A *'pre-certification protocol'* may be preferable, requiring certain 'Woolf-motivated up-front disclosures' (eg, in the context of a collective action, information about the size of class, or information about the likely common and individual issues, or facts that to go prove why a collective action would be superior to other means of resolving the dispute), prior to the certification hearing.

6. A collective action must be *the superior form of resolving the class members' disputes*. If another procedural regime, available to claimants, is more efficient and less burdensome, the collective action should not run.

7. The *type of monetary remedy* that may be sought and awarded in a collective action (eg, damages, disgorgement, restitution, exemplary damages, financial penalties) needs to be carefully considered, and the legislation appropriately drafted to either cover or restrict the field of remedies.

8. A collective action must be *manageable*, from the court's point of view (and the court must be satisfied of that at the outset, subject to one possible exception in point 11 below).

9. Whether any *type of legal issue should be excluded* from the scope of the collective action regime needs to be legislatively prescribed.

10. *Appeals from certification orders* (eg, who has the right to appeal, whether an appeal

is as of right or only with leave) should be legislatively prescribed.

11. The circumstances in which a collective action can be certified for the purposes of *creating a settlement class by consent* (and which certification criteria can be 'overlooked' for that purpose) will need to be carefully considered.

**A spotlight on the class**

12. A *sufficient minimum number* of class members must exist to form a class.

13. The class members' claims must be *sufficiently common* to be heard in the one collective action ('commonality' requiring consideration of whether there has to be a common 'cause of action' in play, whether a common issue of fact or law is sufficient, whether some sort of 'predominance' of common issues is necessary or not, etc). Only if the collective action has sufficient commonality will the action run.

14. The collective action must proceed *without any conflict of interests* between representative claimant and absent class members. Otherwise, the collective action should not run.

15. The *class has to be defined (described)* in a way that is fair to both claimants and defendants.

16. Whether the class definition can *'tie' class membership to an external party* (rather than to the series of events out of which the dispute arose), eg, to a law firm representing the class or to a third party litigation funder, needs to be judicially or legislatively prescribed.

17. A permission to allow the *formation of sub-classes* should be legislatively prescribed.

18. The *status of the absent class members* (eg, their right to give evidence at certification or at trial, disclosure against them, the scope of the legal duty of care owed to them by the claimant law firm) needs to be carefully considered.

19. Whether **worldwide classes** can be the subject of a class definition is most unlikely. How foreign class members should thus interact with an English collective action regime should be explicitly stated.

20. Whether any **type of entity/person should be excluded from being a class member** under the collective action (or only permitted to be a class member upon certain pre-requisites being satisfied) needs to be legislatively prescribed.

**A spotlight on the defendant/s being sued**

21. Proper **standing requirements** should apply, where **multiple defendants** are being sued in the collective action. Whether that requires that every class member have a pleadable cause of action against every defendant named in the action, or whether it is sufficient that, as against each defendant, there is a class member (and representative claimant) who can plead a cause of action, needs to be legislatively or judicially prescribed.

22. A collective action must be **fair to the defendant.**

23. Whether any particular **types of defendants should be excluded** from the scope of the collective action regime needs to be legislatively prescribed.

**A spotlight on those prosecuting the collective action**

24. The **representative claimant must be adequate** to represent the absent class members. Otherwise, the collective action should not run (and furthermore, during conduct, the circumstances in which a substitution can occur must be legislatively prescribed).

25. The **representative claimant must have the financial means** to conduct the collective action (including the capacity to meet any **security for costs** order).

26. The **legal representation** must be adequate to represent the absent class members. Otherwise, the collective action should not run (and furthermore, during conduct,

substitution must be permissible if judicially deemed necessary).

27. The *status of ideological claimants* (eg, the criteria permitting their appointment as representative, whether they should act as sole or supplementary / preferred or secondary representative claimants) must be carefully articulated.

**Potential abuse of process issues**

28. The extent (if any) to which a *defendant may contact absent class members directly before the collective action is certified* (with a view to individually settling with those absent class members) will need to be judicially prescribed, in order to set the parameters of acceptable litigious conduct and to prevent claims of inappropriate or abusive process.

29. The extent to which *the Henderson rule* applies to collective actions must be articulated. The operation of this rule has an impact upon the degree of finality of a collective action for a defendant.

30. How *multiple collective actions on the same subject-matter against the same defendant/s* should be handled and resolved, needs to be carefully considered.

31. How *concurrent class members' individual actions* (whether instituted prior to certification of the collective action, or instituted by opt-out class members) should be handled and resolved, needs to be carefully considered.

**DURING THE ACTION ....**

**The opting-out process**

32. The *class members must be adequately informed* about their opt-out rights under the collective action, giving them a realistic opportunity to opt-out. The *manner of giving notice* (eg, when and how often the notice should be given, whether it is mandatory or discretionary to do so, whether group or individual notice should be permitted, what appropriate use can be made of the internet and websites for disseminating opt-out notice) should be legislatively or judicially prescribed.

33. **Who pays for the opt-out notice** needs to be considered, if not articulated.

34. The **content of the opt-out notice**, the appropriate length of the **opt-out period** (eg, whether any minimum or maximum opt-out periods should be set), and **how to opt out**, need to be legislatively or judicially prescribed.

**Court control**

35. **Close judicial case-management** of the collective action (in accordance with recently-discussed management practices for complex litigation) would be mandatory.

36. In accordance with the wide-ranging case-management provision of CPR 3.1, the **court must have freedom to exercise broad powers** (to enable it to narrow/widen the common issues, amend the definition of the class, or to direct amendments to the pleadings, etc), in order to permit the collective action to dispose of the dispute as expeditiously and proportionately as possible, in accordance with CPR 1.1's overriding objective.

**Conducting the collective action**

37. **When, and how, is the class to be closed?** At some point (and with very limited exception), the class must convert from opt-out to opt-in. In most scenarios, the class members will have to 'put their feet on the sticky paper' at some point, thereby giving rise to the 'take-up rate' of the action. The parameters of this conversion from opt-out to opt-in must be legislatively or judicially prescribed.

38. The circumstances in which **communications can be made by the representative claimant (or the claimant law firm) to the absent class members** (as either formal notice which requires court approval, or as general correspondence which does not) will need to be judicially considered, if not legislatively prescribed.

39. The extent (if any) to which **a defendant may contact absent class members directly after the collective action is certified** (with a view to individually settling with those

absent class members) will need to be judicially prescribed, in order to set the parameters of acceptable litigious conduct and to prevent claims of inappropriate or abusive process.

40. The person/s (eg, the representative claimant, absent class members) against whom *disclosure* can be sought with or without leave, should be legislatively prescribed.

41. The circumstances in which the ***collective action may be de-certified*** should be prescribed.

**Limitation periods**

42. The ***limitation period will stop running*** for both representative claimant and absent class members, either when the representative claimant files the collective action, or when (or if) the action is certified. The precise circumstances for when the limitation period stops running must be legislatively prescribed.

43. The ***limitation period will start running again*** upon certain events happening; these triggers must be legislatively prescribed.

**AT THE END ...**

**Settlement of the collective action**

44. ***Settlement agreements must be subject to a fairness hearing.*** This is, essentially, to preserve fairness for absent class members and for the defendant.

45. ***Adequate notice of the settlement hearing***, and further adequate notice about the ***verdict*** reached at the settlement hearing, will need to be judicially or legislatively prescribed. In all instances, the timing and content of the notices will likely be required to be judicially approved.

46. The '***fairness criteria***' against which the court must subject a settlement agreement should be either judicially or legislatively prescribed. Whether evidence from representative claimants, absent class members, defendant representatives, legal counsel

from each side, and experts, would be helpful to the fairness hearing, needs to be considered.

47. The potential impact of any '***bar orders***' (whereby a settling defendant seeks to obtain an order that it is not open to any claims for indemnity and contribution from a non-settling defendant, in the event that the non-settling defendant loses at trial), needs to be considered, if not legislatively prescribed.

48. The procedures by which absent class members can (a) ***object*** to a settlement, or (b) ***opt out*** of a settlement (if a second opt-out stage is to be permitted at all), need to be judicially or legislatively prescribed.

49. The procedure (if any) by which absent class members ***can opt back into a class*** for the purposes of settlement need to be judicially or legislatively prescribed.

**Assessing and distributing the money**

50. ***Damages assessment*** may be individual, or a class-wide aggregate assessment, depending upon the circumstances. The pre-requisites for aggregate assessment need to be legislatively and judicially prescribed with the utmost clarity.

51. ***Compensation distribution*** should be permitted to be made to class members directly, or via a *cy-pres* order.

52. A direct distribution to class members may be permitted, not by an individual assessment of each class member's entitlement, but on the basis of an ***average or pro rata assessment*** for class members identified at the point at which the assessment is being made.

53. ***Cy-pres distributions*** (and the pre-requisites governing them) will need to be mandated legislatively, if permitted.

54. Whether ***coupon recovery*** should ever be permitted (compensation 'in like', rather than in monetary terms), needs to legislatively or judicially articulated.

55. Whether any ***reversionary distribution*** should be countenanced should be legislatively prescribed.

56. The ***representative claimant*** may seek to make a ***claim for compensation*** for the time and effort expended to represent the absent class members; whether such claims should be permissible will need to be considered, if not articulated.

**Treating the class members individually at the end**

57. The means of determining ***the individual issues*** (if any) remaining after the determination of the common issues (whether by judgment or pursuant to a settlement agreement) must be clear and explicit.

58. Whether class members ***have the right to insist upon individual assessment and direct distribution***, or whether, in the interests of proportionality, the managing judge may approve an average distribution or a *cy-pres* distribution, regardless of individual class members' indications to the contrary, needs to be carefully articulated.

**Rights of appeal**

59. ***Appeal rights*** regarding the ***judgment of the common issues*** (who, when, with or without leave), and appeal rights regarding ***judgment on individual issues*** (who, when, thresholds, with or without leave) must be explicitly stated.

60. ***Appeal rights*** (if any) from a judicially-approved ***settlement agreement*** need to be considered, if not judicially or legislatively prescribed.[261]

---

[261] (Please note: a 'best practice' collective action regime, based upon a comparative analysis of the Australian, Canadian and United States' regimes, has been proposed in: R Mulheron, ***The Class Action in Common Law Legal Systems: A Comparative Perspective*** (Hart Publishing, Oxford, 2004) and ***The Modern Cy-Pres Doctrine: Applications and Implications*** (Routledge Cavendish, London, 2006). Almost all of the features mentioned herein are canvassed in much further detail, with comparative treatment and with 'best practice' recommendations, in those books.)



**APPENDIX M**

**CLASS ACTIONS: REINVENTING THE WHEEL**

**CIVIL JUSTICE COUNCIL COLLECTIVE ADDRESS EVENT**

**THEOBALD'S PARK: 26 – 27 MARCH 2008**

**JOHN SORABJI**[262]

**Introduction**

1.    Imagine you've hitched a ride with David Tennant (something which might appeal
      more to some than others) and he's taken you back to 1904. He could take you
      anywhere, to see anyone, but you have the misfortune to land in the chambers of
      Thomas Snow, in the Inner Temple. Because, like Churchill's optimist, you see the
      opportunity in any difficulty, no matter how it might appear to a pessimist to lack
      promise, and because you're fervently committed to expanding your knowledge of
      civil procedure you decide to ask Mr Snow the odd question or two. (You know of
      course that Thomas Snow was the Jack Jacob of his day – the first and founder
      editor of what is now the White Book). You get on like a house on fire and he's as
      interested to hear what's going on in 2008 as you were in finding out what was
      going on in 1904. The conversation turns to collective redress (which you explain is

---
[262] Barrister, Legal Secretary to the Master of the Rolls

the ungainly term for what are sometimes called representative or class actions); and you tell him about the latest developments and the arguments for and against its introduce in England and Wales. This puzzles him and he pulls down from his bookshelf the latest edition of the White Book.

2.  He turns to page 162, looks more puzzled and then asks you when were they abolished? It's your turn to look puzzled and you ask him to explain. He refers you to the notes to RSC Order 16 rule 9, and reads the following:

    "*Intervention by persons and parties – If a person not a party to a class action desires to intervene in any way he should apply to be made a party, Watson v Cave (1881) LR 17 ChD 19 [CA].*"

3.  So when did you abolish the class action he asks again? You might well look confused at this point – I certainly would. We must have abolished it, otherwise why are we discussing how best to introduce a collective redress action.

4.  Must we have abolished it though? Maybe its still there, but we've just lost sight of it. That we've lost sight of it and it has lain unused, underused or unappreciated for what it really is does not mean the jurisdiction has ceased to exist. As was submitted in the ultimately unsuccessful attempt to breathe new life into the old equity bill of review in *Cinpres Gas Injection Ltd v Melea Ltd* [2008] EWCA Civ 9 (at 95)

    "*. . . even if . . . jurisdiction has not been exercised for a 100 years that does not matter: once there is jurisdiction there is always jurisdiction. Jurisdiction does not fade with time.*"

That attempt to breathe life into an old jurisdiction failed not because that submission was rejected but because the common law procedure had overtaken the old equity procedure in that case.

5.    Where does this leave us for today's purposes? Well I know where it leaves me; in the unenviable position of presenting what might be taken as the minority report to Rachael's many, exhaustive and authoritative reports. It leaves me looking at whether what Snow referred to as a class action is available to us today as a means through which to introduce – or reintroduce – an effective collective redress mechanism via procedural reform of the representative action in England and Wales.

6.    In order to consider the modern-day utility of the representative action it is perhaps instructive to give an overview of the jurisdiction.

**Past**

7.    The traditional conception of the purpose of English civil proceedings is, in Lord Brougham's often repeated words, is '*to do justice between man and man.*'[263] To do justice between individuals. This is undoubtedly right and is often used as an explanation or justification for the reticence with which English civil procedure has treated the class action. It is however only a partial picture as it only articulates the common law's approach to litigation. Equity, English civil justice's other parent took a diametrically opposite approach. Equity's aim was in the words of Talbot LC

---

[263] *Speeches of Henry Brougham* (1838) Vol. 2 at 324

in *Knight v Knight* to do '*complete justice and not by halves.*'[264] What did he mean by this?

8.   Talbot LC was adverting here to the practice in equity of ensuring that finality of litigation was reached within one set of proceedings by requiring the joinder of all interested parties. Equity did not simply do justice between man and man but between all those who had an interest in the litigation. As Eldon LC explained the rule in *Cockburn v Thompson*:

"*The strict rule is, that all persons materially interested in the suit, however numerous, ought to be parties: that there be a complete Decree between all parties, having material interests.*"[265]

9.   Through this equity could adjudicate as to the rights of all within one set of proceedings having examined each and every relevant issue; thereby obviating the need for any future or further proceedings. This requirement, known as the complete joinder rule, brought with it a number of procedural disadvantages however. It often resulted in the joinder of large numbers of essentially passive parties, which increased litigation time and expense unnecessarily. This was especially problematic when a party died and proceedings had to be stayed pending joinder of the deceased's heir or heirs. It was equally problematic where an individual who ought to have been joined was, for whatever reason, not joined to the proceedings as they could appeal by way of rehearing at any time after judgment.

---

[264] 3 P. WMS. 331 at 334
[265] 16 Ves. Jun. 321 at 325 – 326.

10.   To obviate the procedural disadvantages of the rule while maintaining its advantages equity developed the representative rule. By this mechanism the complete joinder rule was relaxed so that a single party, for instance the plaintiff, was deemed to represent all other potential plaintiffs, who would thereby be bound by the decision. The basis on which this relaxation of the joinder rule was made was explained in 1722 in *Chancey v May* as arising where

"*it would be impracticable to make them all parties by name, and there would be continual abatements by death and otherwise, and no coming to justice if all were to be made parties.*"[266]

11.   The complete joinder rule gave way when it would be inconvenient if it was strictly applied.[267] It could be relaxed so that there were either representative plaintiffs[268] or defendants, who properly represented the class.[269] It did so because as Cottenham LC put it in *Wallworth v Holt*:

". . . *it is the duty of this Court to adapt its practice and course of proceedings to the existing state of society, and not by too strict an adherence to forms and rules, established under different circumstances, to decline to administer justice, and to enforce rights for which there is no other remedy.*"[270]

12.   The was however a second procedural basis for the representative rule, again consistent with equity's aim of achieving complete justice albeit more obviously contrary to the common law's aim of doing justice between man and man. US

---

[266] Prec. Ch. 592; and see *City of London v Richmond* (1701) 2 Vern. 421.
[267] *Adair v The New River Company* 11 Ves. 429.
[268] *Cockburn v Thompson* 16 Ves. Jun. 321
[269] *Mayor of York v Pilkington & Others* 1 Atk. 282
[270] (1841) 4 My. & Cr. 619 at 635.

Supreme Court Associate Justice Story described it in this way in his magisterial guide to equity proceedings in England and the US:

"*The general doctrine of public policy which in some form or other may be found in the jurisprudence of every civilized country is, that an end ought to be put to litigation, and above all to fruitless litigation . . .If suits might be perpetually brought to litigate the same questions between the same parties or their privies as often as either should choose, it is obvious that remedial justice would soon become a mere mockery; for the termination of one suit would become the signal for the institution of a new one, and the expenses might become ruinous to all parties. The obvious ground of the jurisdiction of Courts of Equity in cases of this sort is to suppress useless litigation and to prevent multiplicity of suits.*

*One class of cases to which this remedial process [by way of a bill of peace] is properly applied is where there is one general right to established against a great number of persons. And it may be resorted to where one person claims or defends a right against many or where many claim or defend a right against one. In such cases Courts of Equity interpose in order to prevent multiplicity of suits; for as each separate party may sue or be sued in a separate action at law [that is to say in a common law action between man and man], and each suit would only decide the particular right in question between the plaintiff and the defendant in that action, litigation might be interminable. Courts of Equity therefore, having a power to bring all the parties before them, will at once proceed to the ascertainment of the general right; and if necessary, they will ascertain it by an action of issue at law, and then make a decree finally binding upon all the parties.*"[271]

13. All the parties did not need to be before the court however. Complete joinder could again be relaxed under the bill of peace as long as '*there was a right claimed that affects many persons, and that a suitable number of parties in interest are brought before the court . . .*'[272]

14. We can already begin to see the contours of the early class action. It was a procedural mechanism aimed at efficiently and economically dealing with disputes

---

[271] Story, *Commentaries on Equity Jurisprudence as Administered in England and America*, (Little Brown & Co) (1886) (4th Edition) (Story (1886)) at Vol. II at 853 – 854.
[272] Story (1886) Vol. II at 857.

involving large numbers of parties all of whom had a common dispute. It obviated as Plumer MR put it in *Meux v Maltby* the '*great inconvenience*' of bringing all the parties before the court.[273] But for the mechanism those claims would either not be litigated at all or would be litigated individually at great cost and expense for the common party and the court. Absent such a procedure there would be, again in Plumer MR's words, '*an absolute failure of justice.*'[274] Rather than allow either of those eventualities to occur the court permitted a single representative plaintiff or defendant to bring or defend proceedings on behalf of those others.

15.   What other features did it have? First of all, the representative party prosecutes the claim at his own expense.[275] He ran the costs risk. He also ran the risk of an order of security for costs.[276] The court would require sufficient representative parties to ensure that the disputed issue was justly and fairly tried.[277] It lay to the court to assess whether the representative could properly and fairly represent the represented class.[278] The represented class could be as wide as the whole world.[279] The decision would bind all the rights of those represented i.e., it would operate as a *res judicata* in respect of the matter decided i.e., the common issue.[280] But only in respect of the matter decided.[281] Where a represented party wished to assert that he did not have an interest in common with the representative and the represented class he could

---

[273] (1818) 2 Swans. 277 at 281.
[274] (1818) 2 Swans. 277 at 283.
[275] *Handforth v Storie* (1825) 2 Sim & St. 196 at 198.
[276] *De Hart v Stevenson & Others* (1875) LR 1 QBD 313 (Div Court)
[277] *Adair v New River Company* 11 Ves. 429 at 433.
[278] *Commissioners of Sewers of the City of London v Gellatly* (1876) LR 3 ChD 610 at 615 per Jessel MR.
[279] (1818) 2 Swans. 277 at 283.
[280] (1818) 2 Swans. 277 at 285; thus answering the view expressed by Lord Phillips MR in his response to the 2001 LCD Consultation on Representative Actions.
[281] *Commissioners of Sewers of the City of London v Gellatly* (1876) LR 3 ChD 610 at 616 per Jessel MR.

and should apply to be joined as a defendant to the action.[282] In order to bring such proceedings the representative party must seek a remedy that was '*in its nature beneficial to all those whom he [undertook] to represent.*'[283] To be beneficial to all, the representative and the represented parties had to have a '*common interest*' or '*general right*'[284] i.e., one common to all.  As Lord Hatherley LC put it in *Warrick v The Queen's College, Oxford*, a decision of the Court of Appeal in Chancery:

> "*I take it that the view of this Court is, that all persons having a common right, which is invaded by a common enemy, although they may have different rights inter se, are entitled to join in attacking the common enemy in respect of that common right . . . although after the common right is established they may have a considerable litigation among themselves as to who are the persons entitled to the gains obtained through that suit.*"[285]

16.    Hatherley LC also makes it clear that the common rights did not need to arise through the same document. All that the represented class need demonstrate was that their rights 'all depend(ed) *upon the same question'*.[286] Where however the representative action was brought by bill of peace the common rights did have to arise out of a single document.

17.    So matters stood at the turn of the 20th Century, when consideration of the representative action came before Lindley MR, Rigby and Vaughan Williams LLJs in the Court of Appeal in *Ellis v Duke of Bedford*. The question before the Court was whether a group of fruit and vegetable growers could maintain an action both

---

[282] *Watson v Cave (No 1)* (1881) LR 17 ChD 19 (CA); *Fraser v Cooper, Hall & Co* (1882) LR 21 ChD 718.
[283] *Gray v Chaplin* (1825) 2 Sim & St. 267 at 272.
[284] *Commissioner of Sewers of the City of London v Glasse* (1871) LR 7 Ch. App. 456 at 646 per James LJ
[285] (1870) LR 6 Ch. App. 716 at 726.
[286] The question was whether a representative action could be brought to determine the validity of numerous identical certificates individually held by the claimants: *Sheffield Waterworks v Yeomans* (1866) LR 2 Ch. App. 8 at 11.

on their own behalf and on behalf of other such growers against the Duke of Bedford in respect of rights to stalls at Covent Garden Market. Lindley MR, who was in all likelihood the leading authority on the use of the representative action, and Rigby LJ held that they could bring the action in a representative capacity. They could do so because despite the fact that there were differences between the represented parties inter se they had a common claim against a common defendant.

18. While Vaughan Williams LJ agreed on the principles, he dissented as to the application of those principles holding that as the plaintiffs had no individual property rights they could have no rights in common. In essence he based his judgment on an earlier decision of the Court of Appeal in *Temperton v Russell* (albeit he did so without reference to it) in which Lindley LJ giving the judgment of the court appeared to hold that representative actions could only be brought where the class held beneficial property rights.[287] That decision had already been explained by Wills J in *Wood v McCarthy & Another* as not going that far but as simply holding that following the Judicature Act reforms this aspect of Chancery procedure was available in all Divisions of the High Court but only on the same basis as it had been in the Court of Chancery. As Wills J put it Temperton simply held that as representative actions could not be used in actions for tort prior to the Judicature Act reforms they could not be used to prosecute such actions post-1873.[288] I gloss over the fact that Lindley, by then MR, felt no need to advert to his previous decision when giving his judgment in *Ellis*.

---

[287] [1893] 1 QB 435.
[288] [1893] 1 QB 775 at 778.

19. The Court of Appeal's decision was upheld by a majority of the Lords in *Duke of Bedford v Ellis & Others*, in which Lord Macnaghten gave the leading judgment.[289] In doing so he provides the most authoritative discussion of the representative rule. Within that discussion he held that:

1) Representative actions are available where the class has a common interest, a common grievance and the relief sought was in its nature beneficial to all;

2) The basis of the common interest and grievance did not have to be the same for each class member;

3) That other factors, such as distinct rights between the class members, may serve to differentiate the class members was irrelevant. The basis of a representative action is what the class has in common '*not what differentiates the cases of individual members*';

4) If *Temperton* held that representative actions were only available where a beneficial property right was in issue it was wrongly decided; the rule was not so limited;

5) It did not matter that the represented class was '*fluctuating and indefinite*', the description of the class was sufficient to properly define it.[290]

20. Lords Morris and Shand delivered concurring judgments. All three emphasised how Vaughan Williams LJ erred in placing any weight on the principle said to be established in *Temperton*. A principle which both Macnaghten and Shand pointed out was contrary to precedent that would have been as binding upon the court in

---

[289] [1901] AC 1.
[290] [1901] AC 1 at 7 – 12.

*Temperton* as it was on the Court of Appeal in *Ellis* (i.e., *Warrick v Queen's College*; a decision of the Court of Appeal in Chancery).

21.    Lindley, by then Lord Lindley, would expressly disavow *Temperton* shortly after the Lords' decision in *Ellis* when giving judgment in the Lords in *The Taff Vale Railway Company v The Amalgamated Society of Railway Servants* where he held that:

> "*The principle on which the rule is based forbids its restriction to cases for which an exact precedent can be found in the reports. The principle is as applicable to new cases as to old, and ought to be applied to the exigencies of modern life as occasion requires. The rule itself has been embodied and made applicable to the various Divisions of the High Court by the Judicature Act, 1873, ss 16 and 23 – 25 . . . and the unfortunate observations made on that rule in Temperton . . . have been happily corrected in this House in . . . Ellis.*"[291]

22.    Vaughan Williams LJ was to have his revenge though. In *Markt & Co Ltd v Knight Steamship* he gave the lead judgment, with which Fletcher Moulton LJ agreed (Buckley LJ dissenting) which explained the House of Lord's decision in *Ellis* in as restrictive a fashion as possible.[292] This judgment set back the development and application of the representative action throughout the 20th Century and did much, in answer to the question our hypothetical Thomas Snow posed earlier, to abolish the class action in England. The claim arose out of the wreck of a steamship. The representative action was brought by various shippers and was an action for breach of contract and duty in and about the carriage of goods by sea. The contracts were the respective bills of lading. Vaughan Williams LJ held as follows:

---

[291] [1901]AC 426 at 443.
[292] [1910] 2 KB 1021 (CA)

1) There was nothing on the writ to show that the bills of lading and the exceptions within them were identical or that the goods shipped were of the same class or kind;

2) There was no common purpose or connection amongst the shippers to justify a representative action either under the old chancery practice or under Rule 16 Order 9. The only bond between the class members was that they all had goods on the ship;

3) While the shippers suffered a common wrong in that their goods were all lost, they had no common right or common purpose and as each class members claim could be defeated by facts and matters unique to them it could not be said that they had the same rights as required per *Ellis*

4) Whether or not, and the implication was not, Macnaghten was right in his summary of the pre-1873 Chancery practice the court had now to construe the rule consistently insofar as the common law and chancery was concerned '*notwithstanding any prior practice in the Court of Chancery.*'

23. Fletcher Moulton LJ held that the claim was not properly brought as a representative action as:

1) The class had not properly been defined. Simply listing the class members did not define the class;

2) Whatever the practice had been in equity, that was now immaterial as the Court was now governed by the language of Order 16 Rule 9. That rule is now

definitive of the court's practice and it is irrelevant whether the rule narrows or expands the pre-1873 practice. The rule is the rule;

3) The rule requires as an essential condition '*that the persons who are to be represented have the same interest as the plaintiff in one and the same cause of action or matter.*' This is what Macnaghten meant in *Ellis* when he adverted to common interest;

4) The same interest could not arise where different defences could be raised against the class members;

5) The same interest could not arise where the class members entered into separate contracts with the defendant, even if the contracts were identical, as this would an impermissible infringement of privity of contract[293];

6) Damages were not an available remedy to representative actions, nor could a declaratory judgment be given declaring a right to damages.


24. Buckley LJ dissented and his judgment reads like the judgment of the single equity lawyer in a three judge Court of Appeal. He held that:


1) Order 16 Rule 9 was intended to apply the equity, which was more flexible than the rigid common law approach to all Divisions (per Macnaghten);

2) It is no objection to a representative action that the rights between the parties arise under separate contracts;

3) A representative plaintiff must be in a position to claim a benefit common to all the class, but he can also claim a benefit personal to himself;

---

[293] A point reiterated by Evershed MR in *Smith v Cardiff Corporation* [1954] 1 QB 210 at 226.

4) The class can have the same interest against a defendant notwithstanding the fact that it can result in different measures of relief to its members;

5) The shippers had a common right against a common enemy (as per *Warrick* and *Ellis*) i.e., that the ship owner should consign their goods to a ship not also carrying contraband, as such they could seek a declaration that the ship owner was in breach of contract. Once liability was established in the class action, further proceedings could be brought by the individual class members for damages, in which proceedings individual defences could be run by the ship owner as to why that particular plaintiff ought not to recover (applying *Warrick; Gellatly*).

25.    Vaughan Williams and Fletcher Moulton LJJs, who I assume (perhaps unfairly and inaccurately) were common lawyers, won the day and effectively put and end to the utility of the representative action. This is said by many commentators to mark the high point of the court's narrow interpretation of the jurisdiction. A more accurate summation would be that it marked the high point of the common law's attempt to improperly emasculate an equitable jurisdiction. But it's wrong to indulge in *ad hominen* comment.

26.    After *Markt* the representative rule's utility was severely restricted as the combination of their judgments meant that in order to fall within the scope of the rule a representative plaintiff had to show: i) a common interest arising under a common document; ii) a common grievance; and iii) a remedy beneficial to all, but

not damages.[294] On its own merits though the decision in *Markt* doesn't stand up to much scrutiny. Both judges ignored binding precedent to the effect that: i) the rule could be used when there were separate contracts, the basis of the common interest need not be the same for all (*Warrick; Ellis*); ii) the differences which existed between the representatives and the defendant were irrelevant, the key issue was the common element (*Warrick; Ellis;*) unless the action was brought by Bill of Peace (long since abolished); iii) the rule had to be interpreted consistently with the old equity practice, the RSC was not to be interpreted on its face alone (*Temperton; Ellis; Taff Vale*).

## Present

27.    The representative rule suffered due to the *Markt* decision until the early 1970s and then again in the 1990s when a number of decisions tried to breathe new life into it. Vinelott J in *Prudential Assurance Co Ltd v Newman Industries Ltd* held that the effect of *Ellis* and *Taff Vale* was to make representative actions available for claims in tort: *Temperton* simply showed that the non-representative plaintiffs had been chosen, if proper representatives had been chosen the action in tort would have proceeded.[295] Insofar as damages were concerned, Vinelott J held that while individual damages claims could not be pursued by a representative plaintiff, a declaration that class members were entitled to damages could be granted, which individual class members would then be entitled to rely on in future individual damages claims [at 257]. In other words he adopted Buckley LJ's approach from *Markt* that the representative action would give a *prima facie* right to damages or

---

[294] Andrews (2003)
[295] [1981] Ch. 229 at 246 – 247.

might operate as an issue estoppels on the common issue, which could be defeated in secondary proceedings where and if there were any special circumstances, defences etc.

28.     In *EMI Records Ltd v Riley* Dillon J held that damages were recoverable in a representative action.[296] They were recoverable because the global quantum to the entire class was ascertainable. Without reference to it Dillon J applied Lord Hatherley's point from *Warrick*, that once a common right was established there might well be considerable litigation between the class members to ascertain their individual right to a share of the common gain.

29.     In *Moon v Atherton* Denning MR, affirmed that only the representative plaintiff was liable for costs and that the represented parties would be bound by the decision. He went on to hold that as limitation continued to run for represented parties the court had sufficient power to substitute one of them for the representative, if the representative wished to discontinue or settle the claim.[297] In an *obiter dictum* he stated that the action, for negligence, could properly be brought as a representative action. He thus affirmed, without reference to it, Vinelott J's conclusion, that *contra Markt*, *Ellis* and *Taff Vale* established that the representative action was available for tortious claims.

30.     Then in *The Irish Rowan* the Court of Appeal (Purchas LJ) explained that it had erred in *Markt* when it, that is Vaughan Williams LJ (and Fletcher Moulton although

---

[296] [1981] 1 WLR 923.
[297] [1972] 2 QB 435 (CA) at 442

he was not referred to), held that the rule had to be interpreted without reference to pre-1873 Chancery practice.[298] It went on to outline how: i) the rule as then drafted had safeguards, consistent with the old practice, for class members who wished to disassociate themselves from the class (at 239); that the rule permitted class members to opt-out of the class (at 241 per Order 15 rule 12 (1)); that as the class members entered into identical contracts there was sufficient commonality. Relying on *EMI Records* and *Moon v Atherton*, amongst others, it went on to affirm that damages claims were not to be automatically excluded from representative actions (at 227). In essence, it held that the representative action had to applied, as Andrews put it, '*within the spirit of flexibility*' which imbued the 19th Century case law.[299] A flexibility available in 1790, reaffirmed in 1990 and still available then in 2008(?).

31.    Most recently Morritt VC in *Independiente Ltd v Music Trading On-Line (HK) Ltd* examined the scope of the rule in its CPR guise: CPR 19.6.[300] He noted that the principles governing the rule were the same post-CPR as they were pre-CPR, albeit the rule had to be interpreted and applied consistently with the overriding objective.[301] In particular the definition of 'same interest' in the rule had to be interpreted flexibly and in conformity with the overriding objective. The test to establish whether the rule was appropriate for the case was that laid down by *Ellis*: common interest, common grievance and relief beneficial to all. There was a common interest despite the presence of different defences (contrary to *Markt* but

---

[298] [1990] 2 QB 206 at 237 – 239.
[299] Andrews, *Principles of Civil Procedure*, (1994) (1st Edition) (Sweet & Maxwell) at 148.
[300] [2003] EWHC 470 (Ch).
[301] [2003] EWHC 470 (Ch) at [21] & [23].

fully in line with *Temperton; Ellis; Taff Vale*). Pecuniary relief was available as it was beneficial to all.

**Future**

32.    Where does all this leave us now and for the future? It is arguable that the representative rule as explained in the jurisprudence could be transformed into a modern class action, with two exceptions. As it stands at the present time the jurisdiction does not accommodate *cy pres* distributions nor does it operate to suspend limitation periods for the represented class. Such reforms would need to be the product of primary legislation and a public policy debate properly carried out by Parliament; within which, for instance, government might consider whether any unclaimed damages could or should be applied to the Legal Aid Fund or a SLAS. Such a use, would arguably, be in keeping with the aim of furthering access to justice for the many. That's the negative, so what's the positive?

33.    We can see that by contrasting the rule with Rule 23 of the US Federal Rules of Civil Procedure, which shapes the US class action. Rule 23 (a) sets out 4 conditions which have to be satisfied in order to certify an action as a class action: i) numerosity i.e., that there are so many class members that joinder of them all is impracticable; ii) commonality i.e., there must be a common question of law or fact; iii) typicality; the claims or defences of the representative parties are typical of the class i.e., that the representative's complaint is typical of the classes complaint, in other words that the representative is a member of the represented class; and iv) the representative parties fairly and adequately protect the interests of the class.

34.   The English representative rule, as I have hopefully shown, contains: a minimum numerosity requirement (*Chancey v May*); a commonality requirement, to which *Markt* was an improper attempt to sidestep binding authority as to the nature of common interest and grievance (*Warrick, Ellis*); a typicality requirement (*Adair v New River Company*); and a requirement that the representative must properly and adequately represent the interests of the represented class (*Gellatly*). Equally its justification and the basis of its jurisdiction is the same as that of class actions throughout the world: to increase access to justice, to enable claims that it would not otherwise be possible to litigate to come before the courts and to prosecute others with greater procedural efficiency and economy than would otherwise be possible.

35.   Rule 23 (b), following the 1966 reforms, introduced into the US the damages class action (Rule 23 (b) (3)). When introduced additional procedural safeguards were also introduced. In order to bring such an action it must be superior to other forms of procedure. The representative rule incorporates the same requirement (*Meux*). Equally, the damages class action must satisfy a common benefit requirement (Rule 23 (b) (3)). This is already a pre-requisite under the representative rule (*Warrick*, *Glasse*, *Ellis*). Further commonalities between the US class action and the representative action are: that the class has to be capable of proper definition (Rule 23 (c) and *Ellis*); they bind the represented class in respect of the common issue (Rule 23 (c) and (*Meux* and others).[302] While damages are available under both

---

[302] Pace, *Class Actions in the United States of America: An Overview of the Process and the Empirical Literature*, (RAND Institute for Civil Justice, Santa Monica, California, USA (2007) (Pace (2007)) at 7

systems, there is a greater practical acceptance and application of aggregate damages claims in the US in contrast to the arguably theoretical basis upon which the English action might embrace them through further developments akin to those acknowledged by Purchas LJ in *The Irish Rowan*.[303]

36.   Having accepted that global damages awards are available and that the basis of the representative action is a flexible one not limited to past precedent (in Lindley's words a flexible action which '*ought to be applied to the exigencies of modern life as occasion requires*'), is it *or perhaps* it is reasonable, to conclude that the English jurisdiction could well accommodate damage aggregation, through perhaps treating the class as a single entity which has suffered damage and then leave it for the class members to ascertain their rights *inter se* as per *Warrick*.

37.   What about opt-in, opt-out and mandatory classes? Professor Mulheron has on occasion noted the difficultly in characterising the representative rule. Is it a mandatory class or not? The answer to that question is yes and no? And the same issue and answer arises in respect of the Rule 23 class action. In the US Rule 23 is a mandatory class action. It's mandatory, with no notice of certification requirement, where injunctive or declaratory relief is sought. Why? Because the relief sought is indivisible for all class members. There is however a power to order notice.[304] Insofar as Rule 23 (b) (3) damages class actions are concerned the class action opt-out operates. The same is true, both as to it being a mandatory action and in some circumstances an opt-out action, under the representative rule, where the court has

---

[303] Pace (2007) at 11ff.
[304] Pace (2007) at 10.

the power to permit an opt-out under CPR 19.6 (4) *cf. The Irish Rowan*. Given the introduction of Article 6 ECHR, CPR 19.6 (4) could not but, in my view, be interpreted now as providing an opt-out power per the interpretative approach exemplified by *Cachia and Others v Faluyi* [2001] 1 WLR 1966 and *Goode v Martin* [2002] 1 WLR 1828. Such an Article 6 compliant interpretation of the jurisdiction could not but require the court to operate a sufficient notice requirement prior to certification here as in the US. (I gloss over Cappalli's and Consolo's suggestion that there may well be a positive duty to introduce class actions so as to give proper effect to constitutional guarantees of access to justice.[305])

38.  It is sometimes argued that the introduction of an opt-out class action would be *ultra vires* the rule-making power. I wonder if this is right. There has been a power since 1873 and beyond to create a mandatory class, the *a fortiori* case. Given the power to create the *a fortiori* case surely it follows by necessary implication that there is a power to create the lesser case, the opt-out class action?

39.  We should perhaps not be surprised at the similarity between Rule 23 and the representative rule, as the Rand Institute for Civil Justice acknowledged last year, Rule 23 is based on rules which had existed since the 19th Century in the US; rules which I have no doubt were based on the English representative rule.[306]

---

[305] Cappalli & Consolo, *Class Actions for Continental Europe? A Preliminary Inquiry*, 6 Temp. International and Comparative Law Journal (1992) 261. Their suggestion relates to the guarantee of access to justice contained within Article 24 of the Italian Constitution; it is equally applicable however to Article 6 ECHR.
[306] Pace (2007) at 2.

40.  Insofar as settlement is concerned there appears to be no present basis in the
jurisprudence for court-approval of settlements so as to bind the class. That is not to
say that the court's power to approve settlements in cases where parties are
represented by others e.g., CPR 21.10 (children and patients) could not be so
extended to cover represented parties. The rationale for approval is the same in both
types of case; the parties to be bound are not before the court except by
representative. Again the rule could be drafted so as to provide for adequate opt-out
notice.

41.  And as for disclosure? It was held in 1990 that there was no general power to
require disclosure from represented parties as they were not for this purpose parties
to the action.[307] I wonder whether this is really a genuine difficulty now. CPR 19 (1)
(2) (a) and (b) provide the jurisdiction to add parties to proceedings so that the court
can resolve matters or issues in dispute in the proceedings. If there was a necessity
to obtain relevant evidence from a represented party I cannot see why they could
not, in principle, be joined as representative parties, in order to obtain that evidence
to enable the court to deal with the common issue. Equally, I wonder why the court
could not simply utilise its existing powers to obtain evidence from non-parties here
(CPR 31.17).

42.  We of course differ on costs, but that is perhaps an issue for the brave new world of
third party funding. And as for appeals. Equity used to permit non-parties, who
could of and should have been joined to actions, to appeal against judgments where

---

[307] *Ventouris v Mountain* [1990] 1 WLR 1370.

there interests where effected by the judgment. The represented class members are non-parties are would have been able to take advantage of this rule, which required them to be granted permission to appeal. There is no reason why this rule, which the Court of Appeal has just approved as continuing to exist under the CPR (*MA Holdings Ltd v George Wimpey UK Ltd* [2008] EWCA Civ 12) should not apply to represented parties.

43.    There is however the *vires* point. If the CPR were to be amended so as to codify the representative rule would a *vires* challenge succeed; the argument being that such a change would be beyond the rule-making power under the Civil Procedure Act 1997. In my view this does not arise on the above analysis. It is to misunderstand the rule-making power. The rule-making power here would be exercised to give shape to an extant jurisdiction; it would not be, as Buxton LJ recently noted in another context, impermissibly creating jurisdiction: see *Jaffray v The Society of Lloyds* [2007] EWCA Civ 586, citing *British South Africa Co v Companhia de Mocambique* [1893] AC 602 at 628. It would be codifying a jurisdiction which has been in existence since the 18th Century and which has been exercised and affirmed by the House of Lords twice. The *vires* point would only arise if the Rule Committee went beyond the ambit of that jurisdiction. The real question then is to identify, as I have tried to do, the bounds of the extant jurisdiction.

44.    Except for issues of limitation and *cy pres* (which are not essential features of a modern class action) it need not have to go beyond that jurisdiction. Indeed as the Canadian Supreme Court has held in *West Canadian Shopping Centres Inc v Dutton*

[2001] 2 SCR 534, the representative rule can be used, in the absence of a specific class action statute, by the court under its inherent jurisdiction to fashion a modern class action. The procedural rule in question in that case was based on the old RSC rule, it was operating in a judicial system that evolved out of the English judicial system and is therefore as much a product of the common law and equity as the English courts. Absent statutory intervention, there is on the face of it no reason why the English courts cannot, in this field, follow the path trodden by the Canadian Supreme Court and utilise the existing jurisdiction.



**APPENDIX N**

**IMPLEMENTING AN OPT-OUT COLLECTIVE ACTION**

**in**

**ENGLAND AND WALES:**

**LEGISLATION versus COURT RULES**

**A Report**

**to the**

**Civil Justice Council of England and Wales**

**Collective Redress Working Party**

**Professor Rachael Mulheron**

Department of Law, Queen Mary

University of London

([r.p.mulheron@qmul.ac.uk](mailto:r.p.mulheron@qmul.ac.uk))



# TABLE OF CONTENTS

List of Abbreviations ...........................................................................................iii
Definitions                                                      .......................iv

I.  Introduction .................................................................................................1

II.  Revisiting the powers of the Civil Procedure Rule Committee  ................................2

III.  How an opt-out collective action regime alters the substantive law by its drafting ...........4

    (1) Limitation periods ....................................................................5
    (2) Modifying *res judicata* for absent claimants...............................6
    (3) Aggregate assessment of damages .........................................8
    (4) *Cy-près* distributions of damages .......................................10
    (5) Standing against multiple defendants....................................12

IV.  How other jurisdictions have dealt with the issue.........................................15


[The pagination reflects the original document.]

# LIST OF ABBREVIATIONS

| | |
|---|---|
| *Alberta Report* | Alberta Law Reform Institute, *Class Actions* (Rep No 85, 2000) |
| *Australian Report* | Australian Law Reform Commission, *Grouped Proceedings in the Federal Court* (Report No 46, 1988) |
| *Federal Court of Canada Report* | Federal Court of Canada Rules Committee, *Class Proceedings in the Federal Court of Canada* (DP 2000) |
| *Irish Report* | Law Commission of Ireland, *Multi-Party Litigation* (Rep No 76, 2005) |
| *Manitoba Report* | Manitoba Law Reform Commission, *Class Proceedings* (Rep No 100, 1999) |
| *Ontario Report* | Ontario Law Reform Commission, *Report on Class Actions* (1982) |
| *Scottish Report* | Scottish Law Commission, *Multi-Party Actions* (1996) |
| *South Australian Report* | Law Reform Committee of South Australia, *Relating to Class Actions* (1977) |
| *Woolf Report* | Lord Woolf, *Access to Justice: Final Report to the Lord Chancellor on the Civil Justice System in England and Wales* (1996) |

## DEFINITIONS

'***Absent Claimant***'    a person who falls within the class description and who has not opted-out, and who is represented by the representative claimant until the determination of the common issues, but who takes no active part in the litigation until or unless required to prove the individual issue/s pertaining to that class member

'***CJC Working Party***'    the Working Party is comprised of:

> Mr Seamus Andrew, Partner, Simmons Cooper Andrew
> Mr Michael Black QC, Two Temple Gardens (Chair)
> Ms Ingrid Gubbay, Legal Consultant
> His Honour Judge Graham Jones, Cardiff Civil Trial Centre
> Prof Rachael Mulheron, Queen Mary University of London
> Mr Robert Musgrove, Chief Executive, Civil Justice Council
> Mr John Sorabji, Legal Secretary to the Master of the Rolls
> Mr Nick Thomas, Partner, Kennedys Lawyers

'***the CPR***'    the Civil Procedure Rules, promulgated pursuant to s 1 of the Civil Procedure Act 1997, c 12.

# I.  INTRODUCTION

The question posed in this Report is whether an opt-out collective regime could be implemented in England and Wales via the Civil Procedure Rules, or whether it could *only* be implemented by means of legislative enactment.

The conclusion postulated in this Report is that **legislative** form of implementation will be required.  Otherwise, any *ultra vires* application brought by a defendant, alleging that a rules-based opt-out collective regime under which it is being sued is beyond the powers of the Civil Procedure Rule Committee, is likely to be successful.

This conclusion is substantiated by dividing the analysis into the following three sections:

II.     Revisiting the powers of the Civil Procedure Rule Committee.

III.    Analysing how an opt-out collective redress regime alters the substantive law by its wording.

IV.    Examining how other jurisdictions have dealt with the rules-versus-legislation issue.

# II.  REVISITING THE POWERS OF THE
# CIVIL PROCEDURE RULE COMMITTEE

**(a)      Limited powers**

The Civil Procedure Rule Committee ('the Committee') was established by s 2 of the Civil Procedure Act 1997, c 12. Its powers are circumscribed, in that it only has power to make rules of 'practice and procedure':

> s 1 (1) There are to be rules of court (to be called 'Civil Procedure Rules') governing the practice and procedure to be followed in:
> (a) the civil division of the Court of Appeal,
> (b) the High Court, and
> (c) county courts.
>
> (2) Schedule 1 (which makes further provision about the extent of the power to make Civil Procedure Rules) is to have effect.
>
> (3) The power to make Civil Procedure Rules is to be exercised with a view to securing that the civil justice system is accessible, fair and efficient.

Under Sch 1, r 4, the  Committee is authorised to make rules to 'modify the rules of evidence as they apply to proceedings in any court within the scope of the rules'.

Otherwise, there is no provision in either the principal sections or in Schedule 1 of the Act that permits the CPR Committee to amend the substantive law.

**(b)      Wider powers could be expressly authorised**

The CPR Committee's powers are to be contrasted with the rules-making power that is sometimes vested in other civil procedure rules committees.

For example, as observed in *Mazzuca v Silvercreek Pharmacy Ltd* (2001), 56 OR (3d) 768, 207 DLR (4th) 492 (Ont CA), para 44, the Civil Rules Committee in Ontario has much wider powers, pursuant to s 66 of the Courts of Justice Act (RSO 1990, c C.43). That Committee is permitted to make rules for Ontario's Court of Appeal and the

Superior Court of Justice in relation to the practice and procedure of those courts in all civil proceedings, even though such rules may alter the substantive law. Section 66(2) specifically allows the Committee to make rules, 'even though they alter or conform to the substantive law'.

Despite this, however, Ontario's opt-out class action regime was statutorily implemented, on the recommendation of the Ontario Law Reform Commission. In addition to the view that substantive law was affected by an opt-out regime, that Commission also recommended the legislative route because the implementation of such an important piece of reform (important to the public, the litigants and the court) 'deserved to be debated fully in the Legislative Assembly, rather than passed by way of regulation pursuant to the Judicature Act': *Ontario Report*, 306.

### (c)    Two options

Thus, if an opt-out regime amends the substantive law by its provisions (which it does: see Section 2), then *either* the CPR Committee cannot make rules introducing such a regime, and to do so would be *ultra vires*, *or* the terms of the Civil Procedure Act 1997 will have to be statutorily changed to allow substantive law to be dealt with by the Committee (similarly to Ontario's provisions) to permit the Committee to introduce an opt-out collective redress regime by amendment to the Civil Procedure Rules.

As matters presently stand, either expanding the present wording of the representative rule in CPR 19.6 or inserting a new regime in CPR Pt 19 (which presently also contained the Group Litigation Order in CPR 19.III) are not safe options.

### III.  HOW AN OPT-OUT COLLECTIVE ACTION REGIME ALTERS THE
### SUBSTANTIVE LAW BY ITS DRAFTING

Fundamentally, the class action is a procedural vehicle only.  The Supreme Court of Canada expressed the position in this way (per *Bisaillon v Concordia University* [2006] SCC 19, [2006] 1 SCR 666, LeBel J, at paras 16–19, 22):

> The class action has a social dimension. Its purpose is to facilitate access to justice for citizens who share common problems and would otherwise have little incentive to apply to the courts on an individual basis to assert their rights. ... The class action is nevertheless a procedural vehicle whose use neither modifies nor creates substantive rights. ... It cannot serve as a basis for legal proceedings if the various claims it covers, taken individually, would not do so ... Thus, unless otherwise provided, the substantive law continues to apply as it would in a traditional individual proceeding [internal citations omitted].

See too, for similar comments: *Reid v Ford Motor Company* [2006] BCSC 712, para 26, citing: *Ontario New Home Warranty Program v Chevron Chemical Co* (1999), 46 OR (3d) 130 (SCJ), para 50; and *Serhan Estate v Johnson & Johnson* (2006), 269 DLR (4th) 279, para 252 (Ont CA); *L (T) v Alberta (Director of Child Welfare)* [2006] ABQB 104, 58 Alta LR (4th) 23 (Alta QB), para 102.

However, in reality, an opt-out regime may seek to amend the substantive law in two ways:

> (A)     by the way in which it is explicitly drafted by law-makers, or

> (B)     by the way in which the class action is judicially permitted to interact with other substantive law (despite the cautionary note adopted in the passage above).

This Report only pertains to the first-mentioned of these categories.  In this section, **five** key changes are highlighted.  These may not be exhaustive of the way in which an opt-out collective action could bring about a substantive change in the law (with regard to the causes of action available to the parties, and the remedies for which they may claim), but

these five areas all have judicial and law reform commission opinion to support the proposition that some change in the law *does* occur as a result of these five features. It should be noted that, to the extent that a sophisticated opt-out collective action regime may bring about other changes to the substantive law (eg, some simplified means of giving evidence), some of these will be within the power of the Civil Procedure Rule Committee to implement (especially via Sch 1, r 4). The five features discussed herein are discussed precisely because they would seem to fall *outside* the scope of the Rule Committee's powers.

### (1)    LIMITATION PERIODS

**(a)    What the provision entails.**  An opt-out collective action regime will contain a provision which tolls (suspends) the limitation periods for all Absent Claimants upon the representative claimant filing his pleadings, until a defined event occurs (such as the Absent Claimant opting out of the class, or the collective action being decertified).

An example of such a provision is s 33ZE of Australia's federal opt-out regime, contained in the Federal Court of Australia Act 1976:

Suspension of limitation periods

(1) Upon the commencement of a representative proceeding, the running of any limitation period that applies to the claim of a group member to which the proceeding relates is suspended.

(2) The limitation period does not begin to run again unless either the member opts out of the proceeding under section 33J or the proceeding, and any appeals arising from the proceeding, are determined without finally disposing of the group member's claim.

**(b)    Judicial opinion.**  There is both English and overseas judicial opinion which states that this provision changes the substantive law governing an individual's

entitlement to bring proceedings.  For example, see Lord Woolf, in the *Woolf Report*, ch 17, para 45;

> There is, however, a need for action to be taken in relation to the limitation period and this can only be effective if there are provisions to suspend or freeze the running of the limitation period on certification of the Multi-Party Situation, as in many other jurisdictions, so that further claimants whose claims were not being considered in detail at this stage were not disadvantaged. This will require primary legislation.

In addition, in *Pauli v ACE INA Insurance* [2002] ABQB 715, 322 AR 126, 12 Alta LR (4th) 332, para 36, Rooke J accepted that limitation periods being suspended by a class action regime would effect the sort of change to substantive law that would lie outside the scope of power of the Alberta Rules of Court Committee (of which he was a member):

> The only limitation to such case management rules or more formal rules by the Alberta Rules of Court Committee would appear to be substantive provisions relevant to limitations and the like.

(c)    **Law commission opinion.**  Some law reform commissions have expressed the view that the tolling of limitation periods is a matter of substantive law, requiring legislation and not rules of court: *Alberta Report*, para 484; *South Australian Report*, p 10–11; *Manitoba Report*, p 38.  The *South Australian Report* (authored by a number of justices of the South Australian Supreme Court) put their opinion in this fashion:

> Class actions require some modification of the rules regarding limitation of actions.  The ordinary limitation provisions must be made subject to the right of individual members of a class to establish their claims after the common questions have been determined, notwithstanding that the time for instituting proceedings has expired.  Some provision must also be made for members of the class who may have delayed their remedy as the result of the class action but who are disappointed in that expectation, as where an order to proceed as a class action is refused or having been granted, is subsequently rescinded.

*(2)*    *MODIFYING RES JUDICATA FOR ABSENT CLAIMANTS*

**(a)**    **What the provision entails.**  The central tenet of an opt-out regime is that it will permit any determination of the common issues argued in the collective action to bind the Absent Claimants who have not filed individual proceedings themselves, yet who will be barred from re-litigating those issues again.  Hence, this tenet represents a modification of the principles of *res judicata*.

A typical provision is provided by s 27(1) of Alberta's Class Proceedings Act, SA 2003, c C-16.5:

> Judgment on common issues is binding
>
>  Subject to subsection (2), a judgment
> (a) on common issues of a class binds every class member, and
> (b) on common issues of a subclass binds every subclass member,
> but only to the extent that the judgment determines common issues that
> (c) are set out in the certification order,
> (d) relate to claims described in the certification order, and
> (e) relate to relief sought by the class or subclass as stated in the certification order.

**(b) Judicial opinion.**  It was seemingly on this basis that the then-Master of the Rolls, Lord Phillips, responding to the Lord Chancellor's Department (LCD) Consultation, *Representative Claims: Proposed New Procedures* (2001) (by response dated 1 May 2001, reproduced in the later document published by the LCD, *Representative Claims: Proposed New Procedures: Consultation Response* (2002)), remarked:

> To permit representative claims on behalf of unnamed individuals would be to introduce a new concept into English law.  I share the view ... that they are likely to require primary legislation.

Primary legislation was also advocated by the Vice-Chancellor, Sir Andrew Morritt, when responding to the same Consultation (response dated 20 April 2001).

In similar vein, in *Schutt Flying Academy (Australia) Pty Ltd v Mobil Oil Australia Ltd (Attorney-General for the State of Victoria intervening)* [2000] VSCA 103, the defendant argued that an opt-out collective action regime that purported to permit a judgment on the common issues to bind Absent Claimants was beyond the scope of the rule-making powers vested in the judges of the Supreme Court of Victoria by s 25(1) of the Supreme Court Act 1986 (especially s 25(1)(f)(i), which gave the judges the power to make Rules of Court 'for or with respect to ... any matter relating to the practice and procedure of the Court').  The only member of the Victorian Court of Appeal to expressly deal with this argument — Ormiston JA, at paras 38–40 — stated that 'one may concede that the binding effect of judgments and the principles of ... *res judicata* and issue estoppel are substantive.'  However, in the end, his Honour formed one of the 3:2 majority which held that the collective action regime *was* within the rule-making power vested by s 25(1).  The precedential value of that conclusion may be somewhat diminished, however, by the fact that special leave on the issue was granted to the High Court of Australia, and in order to be certain of its validity, the Victorian Parliament eventually acted to legislate the collective regime (as Pt 4A of the Supreme Court Act) before the appeal was heard.  Thus, the issue was never determined by the High Court.

The other aspect of *res judicata* that may be amended by a collective action regime is that the *Henderson* rule may be abrogated. It has been considered, in Canada, to be 'necessary to modify the doctrine of *res judicata* in class actions in cases where a plaintiff or plaintiffs have other claims which fall outside the scope of the common issues in the class action', such that the regime's wording 'clearly limits the binding effect of the judgment on the common issues to the common issues described in the certification order': per Keenan J in *Allan v CIBC Trust Corp* (1998), 39 OR (3d) 675 (SCJ), paras 23–24.  Hence, in that case (per 25):

[t]he present Plaintiffs' claims are based on the liability of CIBC Trust

> and the other defendants for breaches of their obligations and negligence prior to and unrelated to the application for appointment for Receiver. The order dismissing the Class action does not address those issues and does not impede the present Plaintiffs from going forward with the present actions. They are not the same cause of action.

Indeed, if the representative claimant can keep parts of his case back, and narrow the common issues in order to obtain a better chance of certification and/or a more favourable prospect of a decision in his favour on the common issues, then this means that either a collective regime is a 'special circumstance' under the *Henderson* rule, or that the *Henderson* rule does truly only require the claimant to bring forth what should have been *dealt with* as common issues (at least as the representative claimant sees it) in the earlier proceedings, and not what should have been *raised* in the earlier proceedings.

For further discussion of this important point, see: R Mulheron, 'Justice Enhanced: Framing an Opt-Out Class Action for England and Wales' (2007) 70 *Modern Law Review* 550, 572–575.

(c)    **Law commission opinion.**  Some law reform commissions have also remarked that any finding on the common issues that binds Absent Claimants is an amendment to the substantive law, and hence, that implementation of that feature would require legislation: *Alberta Report*, para 484; *Manitoba Report*, 38.

## (3)    *AGGREGATE ASSESSMENT OF DAMAGES*

(a)    **What the provision entails.** An opt-out collective action regime typically permits a court to 'award damages in an aggregate amount', as a class-wide assessment, without reference to the individual class members' losses.  The provisions governing aggregate assessment commonly depend upon certain pre-conditions which must be satisfied to allow for such an assessment (eg, the degree of accuracy required, whether liability must have been established in toto, and whether some form of monetary relief must be claimed by the entire class or only

part of the class).

A typical aggregate assessment provision is contained in s 24 of Ontario's Class Proceedings Act, SO 1992, c 6:

Aggregate assessment of monetary relief

(1) The court may determine the aggregate or a part of a defendant's liability to class members and give judgment accordingly where,
(a) monetary relief is claimed on behalf of some or all class members;
(b) no questions of fact or law other than those relating to the assessment of monetary relief remain to be determined in order to establish the amount of the defendant's monetary liability; and
(c) the aggregate or a part of the defendant's liability to some or all class members can reasonably be determined without proof by individual class members.

(b)    **Judicial opinion.**  In the previously-mentioned case of *Schutt Flying Academy (Australia) Pty Ltd v Mobil Oil Australia Ltd (Attorney-General for the State of Victoria intervening)* [2000] VSCA 103, the Victorian Court of Appeal were divided as to whether aggregate assessment provisions effected a substantive change to the law.  The minority of the court thought that they did, per Winneke P (at para 5):

> the authorization given to the Court by rule 25(1)(f) to 'award damages in an aggregate amount', subject to the limitation not to do so 'unless a reasonably accurate assessment can be made of the total amount to which group members will be entitled under the judgment', cannot be equated with a power to assess reasonable damages, according to law, in respect of actual losses suffered by individual group members. Indeed, it is difficult to see how it could be so when the 'opt-out' procedures prescribed by the Rules envisage that, at the time when judgment for an award of damages in an aggregate amount is given, the number of group members and the amount of their individual losses will, or may, not be accurately known. It seems to me, as it does to Brooking JA, that rules which authorize the Court to assess damages which are incommensurate with the actual loss suffered by individual group members are rules which go beyond the boundaries of permissible rule-making and intrude into the field of rule-making with respect to the substantive rights of litigants.

See too, Brooking JA's judgment at paras 15–29.

The majority of the Court of Appeal (Ormiston, Phillips and Charles JJA), on the other hand, did not consider that aggregate assessment provisions brought about a substantive change in the law.  As mentioned, special leave to appeal to the High Court was granted, but was eventually vacated when the Victorian Parliament decided to remove the collective action from rules of court (as Order 18A of the General Rules of Civil Procedure) and implement it (including the aggregate assessment provisions) as legislation (as Pt 4A of the Supreme Court Act 1986).

In response to the Lord Chancellor Department's Consultation, *Representative Claims: Proposed New Procedures* (2001), Lord Justice May recommended primary legislation, so that '[i]f the causes of action and remedies were to go beyond those presently available, they need to be defined and then would probably require legislation' (response dated 24 April 2001).

Similarly, in their response to the same Consultation, the Association of District Judges noted that a new representative claim 'might well involve fundamental law reform, for example, of the way in which damages are calculated, and the basis upon which compensation may be awarded for a breach of duty.'  Such issues 'can only be resolved by primary legislation' (response dated 24 April 2001).

(c)    **Law commission opinion.**  Some law reform commissions have also opined that aggregate assessment of damages also brings about a change to the substantive law of damages assessment, and would require implementation by legislation: *Alberta Report*, para 484; *Manitoba Report*, p 38; *Ontario Report*, 306.

*(4)*    *CY-PRÈS DISTRIBUTIONS OF DAMAGES*

(a)    **What the provision entails.**  Where distribution of damages to class members is

impossible or impracticable, then most opt-out collective action regimes permit the court to distribute the unclaimed sum to people who are not class members (via either a price-rollback order, or by a distribution to an organisation which has purposes similar to the underlying purposes of the litigation).

A typical provision is contained in s 34 of Manitoba's Class Proceedings Act, CCSM c C130:

---

Undistributed award

34(1) The court may order that all or any part of an award under this Division that has not been distributed within a time set by the court be applied in any manner that may reasonably be expected to benefit class or subclass members, even if the order does not provide for monetary relief to individual class or subclass members.

34(2) In deciding whether to make an order under subsection (1), the court must consider
(a) whether the distribution would result in unreasonable benefits to persons who are not members of the class or subclass; and
(b) any other matter the court considers relevant.

34(3) The court may make an order under subsection (1) whether or not all the class or subclass members can be identified or all their shares can be exactly determined.

34(4) The court may make an order under subsection (1) even if the order would benefit
(a) persons who are not class or subclass members; or
(b) persons who may otherwise receive monetary relief as a result of the class proceeding.

---

**(b)**    **Judicial opinion.**  In the United States, the Ninth Circuit has stated, in *In re Telephone Charges*, 500 F 2d 89, 90 (9th Cir 1974) that *cy-près* distributions significantly alter substantive law, and was 'clearly prohibited' by the Rules Enabling Act promulgating the Federal Rules of Civil Procedure, given that such rules were not permitted to 'abridge, enlarge or modify any substantive right' (Rules Enabling Act, 28 USC, s 2072 (1976)).  In addition, the Second Circuit

held, in *Eisen v Carlisle and Jacquelin*, 479 F 2d 1005, 1018 (2nd Cir 1973), that *cy-près* distributions were 'illegal, [and] inadmissable as a solution' to damages distribution.

Although *cy-près* distributions constitute a significant component of many judicially-approved *settlements* in American class actions jurisprudence, the status of *cy-près* distributions, in respect of *judgments*, remains unclear and unsettled.

Along the same lines of reasoning, in Canada, one court has described the notion of a *cy-près* distribution as 'novel': *Smith v Canadian Tire Acceptance Ltd* (1995), 22 OR (3d) 433 (Gen Div), para 41.

(c)    **Law commission opinion.**  Perhaps the most strident statement of how *cy-près* distributions are perceived to change the substantive law is contained in the *Australian Report*, paras 237–39, where that Commission refused to countenance such distributions.  Three principal reasons were given.  First, class actions were supposed to achieve compensation for class members, whereas *cy-près* distributions did not achieve that, but instead promoted deterrence.  Secondly, any damages award payable by the defendant should be closely matched to the class members' entitlement to damages, and a *cy-près* distribution to some persons who were not class members removed the prospects of a 'close match'.  Thirdly, a windfall to non-class members who were not themselves injured would not be permitted under unitary litigation, nor should it under collective action regimes.

Ultimately, the Australian legislature did not enact *cy-près* provisions, on this recommendation against by the *Australian Report*. However, Canadian opt-out collective action regimes have favoured *cy-près* provisions, but as the reasoning above shows, they require a policy decision and, where implemented, represent a change in the substantive law of damages distribution.

Notably, the *Ontario Report*, at 306, also noted that its recommendations as to distribution of damages (which included *cy-près* distributions) arguably involved

some changes to the substantive law.


*(5)*     ***STANDING AGAINST MULTIPLE DEFENDANTS***


If a collective regime permits a representative claimant to assert a cause of action against a defendant against whom the claimant has no direct cause of action (instead, the cause of action is against a co-defendant), then that represents a change to the substantive law of standing — because, in unitary litigation, that representative claimant could not possibly sue that defendant. Some class action opt-out regimes permit that, as against each defendant named in the originating proceedings, there is *a* representative claimant who asserts a cause of action against it, but that it is not necessary that every representative claimant (and class member) can assert a pleadable cause of action against every defendant.

For example, as the litigation in *Bendall v McGhan Medical Corporation* (1994), 106 DLR (4th) 339, 14 OR (3d) 734 (Gen Div) demonstrates, this is acceptable under Ontario's regime, for no class member in this case had received breast implants from both breast implant manufacturers sued in the class action:



class members who received implants
from Dow Corning Corp (and rep plaintiff)                    Dow Corning Corp
+
class members who received implants
from McGhan Medical Corp (and rep plaintiff)                 McGhan Medical Corp

Thus, in Ontario, this is the position, with respect to standing against multiple defendants:

[In original version of paper, a diagram was inserted here which was reproduced from: R Mulheron, *The Class Action in Common Law Legal Systems: A*

*Comparative Perspective* (Hart Publishing, Oxford, 2004), p 149.]

However, some Australian judges have not taken nearly as liberal a view on this issue. In *Symington v Hoechst Schering Agrevo Pty Ltd* (1997) 78 FCR 164, 167, Wilcox J held that the representative:

> must himself or herself have standing to sue the particular respondent and, where there is more than one respondent, each of them. It is not enough that the applicant has standing to sue one respondent and other people have claims against some other respondent which arise out of similar or related circumstances and give rise to a substantial common issue of law or fact.

This was later endorsed, and became known as the '*Philip Morris*' interpretation (arising out of the tobacco litigation in Australia, whereby many of the class members had only smoked the brand of one defendant manufacturer and not the brands of all defendants sued in the action; the action was incompetently instituted, held the Full Federal Court): *Philip Morris (Australia) Ltd v Nixon* (2000) 170 ALR 487, paras 126–27. The Australian construction of what constitutes valid standing, however, was relaxed somewhat by a differently-constituted Full Federal Court in: *Bray v Hoffmann-La Roche Ltd* [2003] FCAFC 153, [248].

The issue is a very important one, upon which English law-makers would need to adopt a position. As Sackville J noted in *Hunter Valley Community Investments Pty Ltd v Bell* (2001)37 ACSR 326 (FCA), para 57, collective actions against multiple defendants (where conspiracy among them cannot be alleged) is a relatively common phenomenon, and Spender J stated in the *Philip Morris* case that the issue of multiple defendants 'seriously compound the difficulties [of standing]' for collective regimes.

## IV.  HOW OTHER JURISDICTIONS HAVE DEALT WITH THE ISSUE

So far as the author is aware, only two opt-out collective action regimes are contained within rules of civil procedure:

☐    the United States federal regime, contained in r 23 of the Federal Rules of Civil Procedure; and

☐    the opt-out regime contained within the Federal Court Rules 1998 (Canada), as r 334.1–334.40 (unlike the US regime, this particular Canadian rules-based regime includes explicit provisions governing aggregate assessment of damages, per r 334.334.28, and appears also to contemplate *cy-près* distributions, per r 334.28.)

The South Australian 'representative action' is also embodied in court rules — as rule 34 of the Supreme Court Rules 1987 — but, whilst it permits an action on behalf of a described class (per r 34.04(a)), there are no opting-out provisions of the type witnessed in the classic collective action regimes mentioned above.

Closer to home, some nearby jurisdictions — Ireland and Scotland — have recommended the implementation of collective access regimes via rules rather than by legislation. However, notably, both regimes ultimately recommended opt-in rather than opt-out, thereby reducing (although not entirely eliminating) some of the substantive changes itemised in the previous section of the Report:

•    in Ireland – 'the use of Rules of Court rather than primary legislation is consistent with the principles set out in the Government of Ireland's White Paper, *Better Regulation*': *Irish Report* (2005), para 1.45 — however, no rules of court have yet been enacted;

•    in Scotland – rules of court were considered appropriate in Scotland, given the status of Acts of Sederunt made by the Court of Session itself, hence the

recommendation that 'as far as possible, any class action procedure should be regulated by Act of Sederunt rather than by Act of Parliament': *Scottish Report*, para 4.10.

Otherwise, the regimes of Australia (federal), Victoria (state), and all the presently-existing provincial opt-out regimes in Canada, have been implemented by statute.

In Victoria, the history of the present opt-out regime, contained within Pt 4A of the Supreme Court Act 1986, is instructive. Notwithstanding a comprehensive and carefully-considered law reform report recommending an opt-out collective action regime for the Victorian jurisdiction (see Victorian Attorney-General's Law Reform Advisory Council (by V Morabito and J Epstein), *Class Actions in Victoria—Time for a New Approach* (1997)), Parliament did not introduce any legislation. Thereafter, law-makers in that jurisdiction ran the gamut of implementing an opt-out regime via court rules (via Order 18A of the Supreme Court (General Civil Procedure) Rules), followed by an *ultra vires* challenge by the first defendant sued thereunder, a special request by the judge in charge of the Trial Division of the Victorian Supreme Court (Hedigan J) that the Victorian Court of Appeal consider the question, 'Is Order 18A of the General Rules of Civil Procedure valid?' (per *Schutt's* case, above), a narrow finding of 3:2 in *Schutt* that it *was* valid, a further appeal to the High Court of Australia on that question, the hasty introduction of legislation by the Victorian Parliament to remove any doubt about the legality of the regime, and the ultimate vacation of the High Court appeal on that particular issue (eventually, a challenge to the validity of the Pt 4A regime upon constitutional grounds also failed, on 26 June 2002: *Mobil Oil Australia Pty Ltd v Victoria* (2002) 211 CLR 1 (HCA)).

This is surely <u>not</u> a precedent which law-makers in this jurisdiction would wish to follow!

\*\*\*

434

[Further analysis of many of the topics discussed in this Report is contained in: R Mulheron, *The Class Action in Common Law Legal Systems: A Comparative Perspective* (Hart Publishing, Oxford, 2004) and *The Modern Cy-près Doctrine: Applications and Implications* (Routledge Cavendish, London, 2006).

\*\*\*



**APPENDIX O**

**An Act respecting the Class Action: Quebec**

R.S.Q., chapter R-2.1

TITLE I

CLASS ACTION

1.  (Amendment integrated into c. C-25, a. 34).

1978, c. 8, s. 1.

2.  (Amendment integrated into c. C-25, a. 954).

1978, c. 8, s. 2.

3.  (Amendment integrated into c. C-25, aa. 999-1051).

1978, c. 8, s. 3.

4.  (Amendment integrated into c. C-25, Book X).

1978, c. 8, s. 4.

TITLE II

ASSISTANCE TO CLASS ACTIONS

CHAPTER I

DEFINITIONS

Interpretation:

5.  In this title, unless the context indicates a different meaning,

"assistance";

 *(a)* "assistance" means the assistance granted under Chapter III of this title;

"recipient";

 *(b)* "recipient" means the person who receives assistance;

"Fonds";

 *(c)* "Fonds" means the Fonds d'aide aux recours collectifs established by section 6;

"representative";

 *(d)* "representative" means the person who is ascribed the status of representative for the bringing of a class action, in accordance with article 1003 of the Code of Civil Procedure;

"applicant".

 *(e)* "applicant" means a person who applies for assistance.

1978, c. 8, s. 5.


CHAPTER II

THE FONDS

Name.

6.  An agency is established under the name of "Fonds d'aide aux recours collectifs".

Legal person.

The Fonds is a legal person established in the public interest.

1978, c. 8, s. 6; 1999, c. 40, s. 242.

Object.

7.  The object of the Fonds is to ensure the financing of class actions in the manner provided for by this title and to disseminate information respecting the exercise of such actions.

1978, c. 8, s. 7; 1984, c. 46, s. 31.

Administration.

8.  The Fonds shall be administered by three persons including a president, appointed for not more than three years by the Government, after consultation with the Barreau du Québec and the Commission des services juridiques.

Salary, fees.

The Government shall fix, where necessary, the salary, additional salary or fees that may be paid to each of the administrators, and their allowances or indemnities.

1978, c. 8, s. 8.

Administrator to remain in office.

9.  An administrator shall remain in office on the expiry of his term until he is reappointed or replaced.

1978, c. 8, s. 9.

Absence or unable to act.

10.  If an administrator is absent or unable to act, the Government may appoint a person to replace him temporarily.

1978, c. 8, s. 10; 1999, c. 40, s. 242.

Head office.

11.  The Fonds shall have its head office at the place determined by the Government; a notice of the location or of any change of location of the head office shall be published in the Gazette officielle du Québec.

Sittings.

The Fonds may hold its sittings anywhere in Québec.

1978, c. 8, s. 11.

Quorum.

12.  Two members constitute a quorum of the Fonds. In the case of a tie-vote, the president has a casting vote.

Personal interest.

An administrator having a personal interest related to an application for assistance must declare his interest and must abstain from participating in the decision, under pain of forfeiture of office.

Participation in decision.

However, if such an interest results solely from the fact that the administrator is a member of the group on behalf of which an application for assistance is made to the Fonds, the administrator shall participate in the decision but must declare his interest.

1978, c. 8, s. 12.

Appointment.

13.  The secretary and the other officers of the Fonds are appointed in accordance with the Public Service Act ( chapter F-3.1.1).

1978, c. 8, s. 13; 1986, c. 61, s. 37; 2000, c. 8, s. 242.

Minutes, copies and extracts.

14.  Minutes of the sittings of the Fonds approved by the administrators are authentic; the same applies to copies or extracts certified by the president or the secretary.

1978, c. 8, s. 14.

Fiscal year.

15.  The fiscal year of the Fonds ends on 31 March each year.

1978, c. 8, s. 15.

Budget.

16.  Not later than 1 September each year, the Fonds shall send its budget to the Minister of Justice for the ensuing fiscal year. Such budget shall be without effect so long as it has not been approved by the Minister.

Administrator dismissed.

The Government may dismiss any administrator of the Fonds who acquiesces to an expenditure not provided for by the budget of the Fonds, except an expenditure not exceeding the revenues of the Fonds not provided for in the budget.

1978, c. 8, s. 16.

Annual report.

17.  The Fonds shall send to the Minister of Justice, not later than 30 June each year, a report of its activities for the previous fiscal year.

Tabling.

The Minister shall table such report before the National Assembly if it is in session, or, if it is not in session, within thirty days from the opening of the next session or resumption, as the case may be.

1978, c. 8, s. 17.

Information and report.

18.  The Fonds shall at any time give to the Minister of Justice any information or report he requires on its activities.

1978, c. 8, s. 18.

Audit of books and accounts.

19.  The Auditor General shall, each year and, in addition, whenever the Government so orders, audit the books and accounts of the Fonds.

1978, c. 8, s. 19.


CHAPTER III

ASSISTANCE


DIVISION I

GRANTING ASSISTANCE

Application in writing.

20.  Every representative and every person intending to be ascribed such status may apply in writing for assistance from the Fonds.

1978, c. 8, s. 20.

Content.

21.  The applicant shall set forth in his application the basis of his claim and the essential facts determining its exercise, and shall describe the group on behalf of which he intends to bring or is bringing the class action.

Content.

He shall also state his financial condition and that of the members of the group who have made themselves known; he shall indicate the purposes for which the assistance is intended to be used, the amount required, and any other revenue or service available to him.

1978, c. 8, s. 21.

Affidavit.

22.  The applicant shall certify in his application that the information supplied by him is accurate, and he shall authorize the Fonds to verify the accuracy thereof.

Vouchers and other information.

He shall furnish the vouchers and other information the Fonds requires.

1978, c. 8, s. 22.

Power of the Fonds.

23.  The Fonds shall study the applicant's application and it may, for that purpose, meet with the applicant or his attorney and allow him to present observations.

Criteria for granting assistance.

In order to determine whether to grant assistance, the Fonds shall assess whether the class action may be brought or continued without such assistance; in addition, if the status of representative has not yet been ascribed to the applicant, the Fonds shall consider the probable existence of the right he intends to assert and the probability that the class action will be brought.

Appeal.

Where the representative or a member requesting to be substituted for him intends to appeal the judgment which decides the questions of law or fact dealt with collectively, the Fonds, in order to determine whether to grant or terminate assistance, shall assess whether the action may be continued without such assistance and whether the appeal is likely to succeed if brought.

Decision.

The Fonds may defer the study of a part of the application, refuse assistance or grant it, in whole or in part; in all cases, it shall render its decision within one month following receipt of the application.

1978, c. 8, s. 23; 1991, c. 19, s. 1; 1997, c. 43, s. 555.

Written notification.

24.  If the Fonds defers the study of a part of the application or if it refuses to grant assistance, it shall notify the applicant in writing of its decision and indicate the reasons therefor.

1978, c. 8, s. 24.

Agreement between Fonds and recipient.

25.  If assistance is granted, the Fonds shall agree upon the conditions with the applicant or his attorney.

The agreement between the Fonds and the recipient shall, in particular, provide for:

 (a) the amount and use of the assistance;

 (b) the advances that may be paid to the recipient;

 (c) the terms and conditions of producing accounts and expenditures;

 (d) the reports the recipient or his attorney must supply to the Fonds;

 (e) the cases where assistance may be suspended or diminished;

 (f) the terms and conditions of reimbursing the advances received or of assistance, if such is the case;

 (g) the subrogation of the Fonds in the rights of the recipient or his attorney up to the amounts paid to them.

1978, c. 8, s. 25.

Temporary assistance.

26.  An administrator of the Fonds may grant the applicant temporary assistance, which shall not exceed the amount prescribed by regulation of the Fonds, if he considers that immediate assistance is necessary to avoid the loss or non-exercise of the applicant's right and if the Fonds cannot meet in time to decide the applicant's application. The decision of the administrator must be substantiated.

Reimbursement.

The applicant must reimburse the amounts so received if the Fonds thereafter refuses to grant assistance.

1978, c. 8, s. 26.

DIVISION II

RIGHTS AND OBLIGATIONS OF THE FONDS AND OF THE RECIPIENT

Right of recipient.

27.  The recipient is entitled to the payment by the Fonds of the expenses expedient for the preparation or bringing of the class action in the manner provided for in the agreement contemplated in section 25.

1978, c. 8, s. 27.

Obligations of recipient.

28.  The recipient must notify the Fonds of any fact changing the information supplied in accordance with sections 21 and 22.

Obligations of recipient.

He must also send to the Fonds a copy of the judgment of the court authorizing the bringing of the class action or terminating it, ordering the publication of a notice or of such a nature as to amend the agreement.

1978, c. 8, s. 28.

Obligations of the Fonds.

29.  The Fonds shall pay for the recipient in the manner provided for in the agreement contemplated in section 25, up to the amount of the assistance:

 *(a)* the fees of the recipient's attorney;

 *(b)* the fees and costs of experts and advocates-counsel acting for the recipient;

 *(c)* the costs and other court expenditures including costs of notification, if they are at the expense of the recipient;

 *(d)* the other expenses expedient to the preparation or the bringing of the class action.

1978, c. 8, s. 29.

Reimbursement.

30.  The recipient or, if such is the case, his attorney shall reimburse to the Fonds the amounts paid by it up to the amounts they receive from a third party as fees, costs or expenses.

1978, c. 8, s. 30.

Subrogation.

31.  In the cases where the representative was granted assistance, if the defendant in whose favour the final judgment has been rendered shows to the satisfaction of the Fonds that it is impossible for him to obtain the full payment of the judicial costs on the property of the representative, the Fonds, after examining the financial condition of the defendant, may pay these judicial costs in the name of the representative. The Fonds then becomes subrogated in the rights of the defendant up to the amount paid to him.

1978, c. 8, s. 31.

Filing.

32.  The Fonds shall file at the office of the Superior Court of the district in which the class action is brought, the conclusions of the decision granting assistance.

Obligation of the court.

The court must hear the Fonds before deciding the payment of costs, determining the fees of the representative's attorney, or approving a transaction on costs or fees.

1978, c. 8, s. 32.

Loss of assistance.

33.  A recipient who fails to bring the class action or who is not authorized to bring it, or who loses his status of representative or waives it, is no longer entitled to assistance.

Obligation of recipient.

He must then notify the Fonds, report to it, and reimburse to it the advances received and not yet spent.

1978, c. 8, s. 33.

Assistance to cease pleno jure.

34.  Assistance ceases pleno jure if the recipient uses it for purposes other than those agreed upon; in such case, he shall reimburse the amount of assistance received and not used for the purposes of the class action.

1978, c. 8, s. 34.

DIVISION III

PROCEEDING BEFORE THE ADMINISTRATIVE TRIBUNAL OF QUÉBEC

Contestation.

35.  Any applicant whose application for assistance is denied may, within 30 days of notification of the decision of the Fonds, contest the decision before the Administrative Tribunal of Québec.

1978, c. 8, s. 35; 1988, c. 21, s. 66; 1997, c. 43, s. 558.

36.  (Repealed).

1978, c. 8, s. 36; 1997, c. 43, s. 559.

Decision.

37.  If the Tribunal decides that the applicant is entitled to assistance, it shall order the Fonds to proceed with the granting of the assistance after agreement with the applicant or his attorney in conformity with section 25.

1978, c. 8, s. 37; 1997, c. 43, s. 560.

CHAPTER III.1

ASSISTANCE FOR PROCEEDINGS BEFORE THE FEDERAL COURT OF CANADA

Financial assistance.

37.1.  The Fonds may grant financial assistance for the institution of a proceeding of the nature of a class action before the Federal Court of Canada, provided that

 1) the applicant proves that substantial grounds exist to warrant the institution of the proceeding before the Federal Court, rather than before the Superior Court;

 2) the applicant and at least 50% of the members of the group are Québec residents ;

3) the subject-matter of the proceeding is one in respect of which the Federal Court - Trial Division and the Superior Court have concurrent jurisdiction.

Members.

The number of members of the group and the proportion of the members who are Québec residents may be established on the basis of existing statistics or available data.

1999, c. 70, s. 1.

Assistance.

37.2.  Assistance shall be granted subject to the other provisions of this Act, except the provisions of sections 32 and 42.

Assistance.

However, before granting assistance, the Fonds shall, in all cases, determine whether or not the proceeding can be instituted or continued without the assistance and consider the probable existence of the right the applicant intends to assert as well as the probability that the proceeding will be instituted.

1999, c. 70, s. 1.


CHAPTER IV

REGULATIONS

Regulations of the Government.

38.  The Government may, by regulation:

 (a) fix, for the application of section 42, the percentage withheld by the Fonds from the balance or from a liquidated claim;

 (b) determine the cases where assistance may be granted to persons who do not reside in Québec and establish criteria and standards in that regard;

 (c) determine the cases where assistance may be granted to a resident of Québec who intends to institute a proceeding of the nature of a class action outside Québec.

1978, c. 8, s. 38.

Regulations of the Fonds.

39.  The Fonds may, by regulation subject to the approval of the Government:

*(a)* determine the form and content of the applications and of the reports to be filed with the Fonds;

*(b)* determine the amount that an administrator may commit pursuant to section 26;

*(c)* determine the percentage of the assistance that may be remitted to a recipient as an advance payment;

*(d)* (paragraph repealed);

*(e)* prescribe rules necessary for its internal management and the conduct of its business.

1978, c. 8, s. 39; 1986, c. 61, s. 38.

Notice in Gazette officielle du Québec.

40.  No regulation dealing with the matters contemplated in section 38 or in paragraph a, b, c or e of section 39 shall be made except after a notice of 30 days published in the Gazette officielle du Québec, setting forth the text thereof.

1978, c. 8, s. 40.

Coming into force.

41.  Every regulation made under sections 38 and 39 comes into force on the date of its publication in the Gazette officielle du Québec or on any later date fixed therein.

1978, c. 8, s. 41.


CHAPTER V

FINANCIAL PROVISIONS

Percentage withheld by the Fonds.

42.  In the case of a collective recovery of the claims, the Fonds shall withhold a percentage fixed by regulation of the Government on the balance established under article 1033 or 1034 of the Code of Civil Procedure; in other cases, the Fonds shall withhold a percentage fixed by regulation of the Government on every liquidated claim.

1978, c. 8, s. 42.

Powers of the Fonds.

43.  The Fonds may, with respect to the assistance it grants,

*(a)* spend the sums placed at its disposal for that purpose by the Minister of Justice and those which have been withheld in accordance with section 42;

*(b)* also make, annually, financial commitments other than a loan for an amount up to the amount determined by the Minister of Justice at the time of approval of the budget of the Fonds.

1978, c. 8, s. 43; 1982, c. 37, s. 25.

Loans.

44.   In addition to its powers under section 43, the Fonds may, with the prior authorization of the Minister of Justice, contract a loan in respect of the assistance it grants or in order to carry on its operations.

1978, c. 8, s. 44; 1982, c. 37, s. 25.

Powers of the Government.

44.1.  The Government, on such conditions as it determines, may

*(a)* undertake to supply the liquidity fund required by the Fonds so as to enable it to repay the capital and interest of a loan contracted by the Fonds, when due;

*(b)* guarantee the payment, in capital and interest, of any loan or other financial commitment contracted or made by the Fonds.

Required sums.

The sums required for the purposes of this section are taken out of the consolidated revenue fund.

1982, c. 37, s. 25.

Sums required.

45.   The sums required for the application of this title shall be taken, for the years 1978/1979 and 1979/1980, out of the consolidated revenue fund and for the subsequent years out of the moneys granted each year for that purpose by Parliament.

1978, c. 8, s. 45.


TITLE III

MISCELLANEOUS PROVISIONS

46. (Omitted).

1978, c. 8, s. 46.

47. (Omitted).

1978, c. 8, s. 47.

48. (Omitted).

1978, c. 8, s. 48.

49. (Omitted).

1978, c. 8, s. 49.

50. (Omitted).

1978, c. 8, s. 50.

51. (Omitted).

1978, c. 8, s. 51.

52. (Amendment integrated into c. A-14, s. 63).

1978, c. 8, s. 52.

53. (Amendment integrated into c. A-14, s. 80).

1978, c. 8, s. 53.

54. (Amendment integrated into c. A-14, s. 87.1).

1978, c. 8, s. 54.

Minister responsible.

55. The Minister of Justice is responsible for the application of this act.

1978, c. 8, s. 55.

56. (Omitted).

1978, c. 8, s. 56.

57.  (This section ceased to have effect on 17 April 1987).

1982, c. 21, s. 1; U. K., 1982, c. 11, Sch. B, Part I, s. 33.

REPEAL SCHEDULE

In accordance with section 17 of the Act respecting the consolidation of the statutes and regulations (chapter R-3), chapter 8 of the statutes of 1978, in force on 1 June 1979, is repealed, except sections 46 to 51, effective from the coming into force of chapter R-2.1 of the Revised Statutes.

450



**APPENDIX P**

**Glossary of terms**

**Aggregate Damages:** a means of assessing damages which does not require the proof of individual loss suffered by each member of the represented class. Damages are assessed either on the basis that the represented class is a single entity i.e., a global damage award is made or via the use of statistical evidence.

**Class Action:** a synonym for representative or collective action, most commonly associated and used to describe the collective/representative action mechanism available in the United States.

**Collective Action:** a synonym for representative action, albeit without the connotation of a connection with the extent representative action under CPR 19.6. The term is in some contexts used to describe follow-on actions brought under the Competition Act 1998, especially in the context of the term 'collective consumer redress'. **In the context of the present paper** a collective action refers to an action brought by a representative party for and on behalf of itself, or simply by the representative body on behalf of, a represented class of claimants or defendants seeking the vindication of substantive law rights, where a nature of the cause of action gives rise to a commonality of interest between the members of the represented class.

**Cy-près Distribution:** a traditional means of distributing assets held in trust where the terms of the trust can no longer be fulfilled and which has been used analogously in some jurisdictions as a means to distribute unclaimed damages or unclaimed settlement awards in representative proceedings.

Follow-on Action: a form of collective/representative action brought, at present, under section 47B of the Competition Act 1998, and which is brought after an adverse finding in regulatory proceedings against a defendant who has been found to have breached the provisions of the 1998 Act.

**Group litigation order (GLO):** a sophisticated case management order which permits multiple joinder of parties whose legal actions have a common interest. Each action managed in this way remains a traditional unitary action.

**Opt-in:** the requirement in a collective action that individual litigants actively elect to take part in the litigation as members of the represented class.

**Opt-out:** the requirement that individual litigants, who fall within the definition of the represented class, actively elect not to take part in the collective action. Failure to actively elect not to be a member of the class automatically entails class membership. Opt-out thus describes presumptive class membership.

**Representative action:** an action which provides for legal persons to be represented in civil proceedings by another or other legal persons. It enables multiple individual actions to be pursued as one single individual action, albeit one which binds the represented class members. This term is generally used to refer to an action brought under CPR 19.6.

**Representative party:** the legal person or persons who is authorised to conduct representative or collective proceedings on behalf of a defined or definable class of legal persons. The representative party can act as either a representative claimant or a representative defendant.

**Represented class:** the defined or definable class of legal persons who have a cause of action against a common or common defendant(s) that give rise to the same or common issues and whose actions are pursued in a representative action by a representative claimant or claimants.

**Stand-alone action:** a representative or collective action that is neither predicated upon nor arises out of prior regulatory action against a legal person.

454



**APPENDIX Q**

European Economic and Social Committee,

*Opinion on Defining the collective actions system and its role in the context of Community Consumer Law*[308]



**European Economic and Social Committee**

**INT/348
Collective actions system
and its role in Community
consumer law**

Brussels, 14 February 2008

OPINION
of the
European Economic and Social Committee
on
Defining the collective actions system and its role in the context of Community consumer law
Own-initiative opinion

———————————

[308] Official Journal 25.06.2008 (C 162/1), reprinted with the very kind permission of the European Economic and Social Committee.

On 16 February 2007, the European Economic and Social Committee acting under Rule 29(2) of the its Rules of Procedure, decided to draw up an own-initiative opinion on:

> *Defining the collective actions system and its role in the context of Community consumer law.*

The Section for the Single Market, Production and Consumption, which was responsible for preparing the Committee's work on the subject, adopted its opinion on 31 January 2008. The rapporteur was Mr Pegado Liz.

At its 442nd plenary session, held on 13 and 14 February 2008 (meeting of 14 February), the European Economic and Social Committee adopted the following opinion by 134 votes to 94 with 6 abstentions.


*

*    *


**Conclusions and recommendations**

◎⌐    The EESC has decided to reopen the debate on the need for an in-depth appraisal – and the advisability of carrying out such an appraisal – of the role of and legal arrangements for a form of collective group action, harmonised at Community level, in particular in the area of consumer law and competition law, at least at an initial stage.

◎◎⌐    The EESC has always advocated the definition at Community level of a collective action designed to secure effective compensation in the event of the infringement of collective or diffuse rights. Such a measure would usefully complement the protection already afforded by both legal remedies and alternative remedies, a notable example of the former remedy being actions for injunction, as defined by Directive 98/27/EC of 19 May 1998.

◎◎◎⌐    The EESC has, on a number of occasions, advocated the need for the EU to take action in this field since, in its view, such action:

- may make a decisive contribution towards removing obstacles hampering the operation of the internal market which are brought about by the divergences in the various national legal systems; action by the EU would thus give consumers a renewed confidence in the benefits of the single market and also provide the requisite conditions for genuine, fair competition between enterprises (Articles 3(1) (c) and (g) of the EC Treaty);
- would make it possible to step up consumer protection, thus making it easier for consumers to more effectively invoke their rights to institute legal proceedings, whilst also ensuring that EU laws are implemented more effectively (Article 3(1)(t) of the EC Treaty);
- would comply with the basic principle of ensuring the right to an effective remedy and a fair hearing by an impartial tribunal, a right which is guaranteed under the Charter of Fundamental Rights of the European Union (Article 47).

◎❷␍ The fact that several EU Member States have, over the last few years, adopted disparate judicial systems for representing the collective interests of consumers, whereas other Member States have yet to introduce provisions in this field, leads to inequalities as regards access to justice and has a detrimental effect on the achievement of the internal market. The EESC deplores this state of affairs, all the more since public satisfaction and confidence represent one of the widely publicised objectives of the achievement of the internal market in the twenty-first century. The EESC is all too aware of the effects that any possible steps might have on the competitiveness of European companies and the knock-on effect that disproportionate costs would eventually have on workers and consumers.

❷␍ The EESC therefore intends to make its contribution to this appraisal by putting forward concrete proposals in respect of the legal arrangements for such collective actions, taking account not just of the national systems applicable in European states but also of the experience gained by other states which have developed such measures. The Committee takes particular account of the principles set out in Recommendation C(2007) 74 of the Council of Ministers of the OECD on Consumer Dispute Resolution and Redress, of 12 July 2007.

❷◎␍ In defining the proposed parameters for an EU legislative initiative, the EESC has taken account of the common legal tradition of European judicial institutions and the common principles underlying civil procedure in the EU Member States; the EESC has therefore rejected the features of US-style "class actions", which are incompatible with the abovementioned traditions and principles. The EESC considers particularly harmful any practice of giving a substantial share of sums

won as compensation or punitive damages from cases championing consumer interests to third party investors or lawyers, mirroring American class actions.

❷◌◌◌ In the light of the aims and purposes of such an instrument, the EESC has analysed the main possible options as regards: the legal arrangements to be introduced (advantages and disadvantages of an opt-in, opt-out or combined scheme); the role of the court; the question of compensation; appeals and the financing of the measures.

❷◌◌◌◌ The legal basis for such an initiative and the legal instrument to be employed are further key issues which have also been analysed and in respect of which proposals have been put forward.

◌❹◌ The EESC would also point out that this appraisal of the establishment of machinery for collective actions is in no way at variance with the existence and development of alternative dispute resolution (ADR) methods, indeed the opposite is the case. The EESC was one of the first bodies to express the need to set up effective instruments to enable consumers to invoke their rights - both individual and collective rights - without involving the courts. In this respect, the EESC would state the case for improved alignment of ombudsman and related systems in the various sectors of consumer society, particularly in places where cross-border trade is most developed or most likely to develop.

❹◌ There is a whole range of collective remedies for consumers who have suffered loss, from individual, voluntary and consensual actions to collective and legal remedies. Each of these levels of dispute settlement must work optimally, facilitating compensation for loss suffered at the level which is the most accessible for victims.

❹◌◌ The EESC welcomes the European Commission's declared intention to continue to study this issue. The EESC does, however, underline the need for this intention to be matched by a real political will, leading to the introduction of appropriate legislative measures.

❹◌◌◌ Voicing the wishes of the representatives of organised civil society, the EESC also calls upon the European Parliament, the Council and the Member States to ensure that this appraisal is carried out taking into consideration the interests of the various parties and complying with the principles of proportionality and subsidiarity and is followed by the vital political decisions which have to be taken

in order to enable an initiative along the recommended lines to be adopted as soon as possible

## Introduction

❶◎◎◎◻        The purpose of this own-initiative opinion is to promote a broad-based discussion on the role and legal arrangements for collective action[309] at Community level, in particular in the area of consumer law and competition law, at least at an initial stage[310]. Its ultimate aim is to encourage civil society and the competent institutions of the European Union to study the need for and the impact of such an initiative, to think about the definition of its legal nature and the terms and conditions of its implementation, in the framework of a European legal area.

❶◎❷◻    The methodology used is based on a prior analysis of needs in the single market and the conformity of the initiative with Community law. Its capacity to resolve cross-border disputes, particularly those involving the economic interests of consumers, effectively and rapidly, is then studied.

## The single market and the collective interests of consumers

❶❷◻    The development of "mass" commercial transactions following the development of mass production from the second half of the last century brought about major changes in methods of entering into contracts and obtaining agreements for the sale and provision of services.

The advent of the information society and the opportunities thus created for distance selling and electronic commerce have brought new benefits to consumers, but they are now potentially subject to new forms of pressure and new risks when entering into contracts.

❶❷◎◻    Where they have become established, public offers, standard contracts, more and more aggressive forms of advertising and marketing, unsuitable pre-contractual information, widespread unfair practices and anti-competitive practices may cause

---

[309]        In the sense of civil procedure, having the aim of defending collective or diffuse interests either for prevention (injunction) or for redress (claims for damages). Another meaning of the expression "collective action" can be found in British and US legal literature to denote the sociological roots of associability (see *Collective action in the European Union; interests and the new politics of associability*, Justin Greenwood and Mark Aspinwall, Routledge, London, 1998), which is particularly informative about the sociological origins and social needs leading to collective actions in the strict procedural sense.

[310]        The possibility, which already exists in several national legal systems, of enlarging the scope of collective actions to include all collective or diffuse interests in areas such as the environment, the cultural heritage, spatial planning etc should not be excluded, irrespective of whether such actions are brought against private-law or public-law bodies, including administrations or public authorities.

harm to key groups of consumers who are most often not identified and may be difficult to identify.

In the legal systems based on traditional procedural law, derived from Roman law, homogeneous individual interests, the collective interests of groups and the diffuse interests of the public are not always served by suitable forms of judicial action which may be described as easy, rapid, inexpensive and effective[311].

Almost everywhere in the world, particularly in the EU Member States, legal systems provide judicial remedies to protect collective or diffuse interests.

a)    However these systems are rather disparate and give rise to clear differences in the protection of these interests. These disparities are the cause of distortions in the operation of the internal market.

Because of a lack of harmonisation at EU level, national judicial systems have, in the recent past, developed along very different lines. These differences cannot be attributed so much to divergences in basic principles but rather to different traditions as regards procedural law. The tables appended to this document illustrate the key differences at national level[312].

---

[311]    It is rare to find such a concise form of words in the legal literature as that used by an eminent lawyer and Portuguese member of Parliament, during a parliamentary debate, to support the introduction of collective actions in Portugal.

Referring to the new second and third-generation forms of law: labour law, consumer law, environmental law, spatial planning law, law for the protection of the cultural heritage, "*universal forms of law which belong to many if not all*", Mr Almeida Santos said:

*"These forms of law belong to everyone, or at least to a large number of people. Is it therefore right that the protection of these rights should be so parsimonious, with plaintiffs forced to wait for their case to come to court, a case which might be identical to that of their colleague or neighbour, sometimes winning their case only when the result no longer has any meaning, when the compensation awarded has already been eroded by inflation, or when the restoration of their honour comes too late to prevent divorce or irreparable damage to their financial standing, or when the final arrival at their destination at the end of a long procedural calvary perfectly sums up the ineffectiveness and futility of the legal process? Should we accept this Kafkaesque judicial purgatory as the status quo?"*

*"Suddenly we realise that exclusively individual legal protection is no longer enough; that there are 'meta-individual' rights and interests, mid-way between individual rights and collective interests; that the right of those directly or indirectly harmed to go to court is insufficient; that the individualistic concept of law and justice is approaching its end, that the dawn of a new pluralism and a new law is on the horizon"* (in D.A.R. Series I, No. 46, 21/2/1990, p. 1617).

[312]    The study of the Centre for Consumer Law of the Catholic University of Leuven prepared for the Commission (DG Sanco) is an excellent summary which illustrates the consequences of the different national approaches to the settlement of cross-border disputes, particularly where consumers from several Member States are affected by the same unfair cross-border commercial practices, by defects in the same products or by contracts negotiated at a distance including the same unfair general contractual clauses.

❶❶❑    A number of parties, in particular organisations representing consumer interests but also many legal practitioners and professors of Community law, lost no time in denouncing the disadvantages to which this situation gives rise, in terms of creating inequality amongst European citizens as regards access to law and justice[313].

❶❶❍❑    Within the EU Institutions, it was only in 1985, however, following a seminar held in Ghent in 1982 under the auspices of the Commission, that the memorandum on *Consumer access to justice*[314] was published, in which the Commission for the first time looked, inter alia, at systems for the legal defence of collective interests.

❶❶❍❍❑    However, it was only in its Supplementary Communication of 7 May 1987 that the Commission, following a Resolution of the European Parliament of 13 March 1987[315], actually announced its intention of looking at the possibility of a framework directive introducing a general right for associations to defend their collective interests before the courts and calling on the Council to recognise the prominent role of consumer organisations, both as intermediaries and as direct agents in relation to consumer access to justice.

❶❶❍❍❍❑    In its Resolution of 25 June 1987, exclusively devoted to consumer access to justice, the Council stressed the important role which consumer organisations were required to play, calling on the Commission to consider whether a Community-level initiative in that area might be appropriate[316].

❶❶❍❷❑    Finally, in 1989, when preparing its *Future priorities for a relaunch of consumer protection policy,* the Commission expressed the view in its Three Year

---

[313]    When examining the literature on this subject, mention must be made of the pioneering work by Jacques van Compernolle entitled *Le droit d'action en justice des groupments*, Larcier, Brussels 1972 and the collaborative work entitled *L'aide juridique au consommateur* by T. Bourgoignie, Guy Delvax, Françoise Domont-Naert and C. Panier, CDC Bruylant, Brussels, 1981.

[314]    Sent to the Council on 4 January 1985 and supplemented on 7 May 1987 by a *Supplementary Communication on consumer access to justice*. Moreover, in the Commission Communication of 4 June 1985 entitled *A new impetus for consumer protection policy* (COM(85) 314 final), the outlines of which were approved by the Council on 23 June 1986 (OJ C 167, 5.6.1986), it was stressed that traditional legal procedures were slow and often expensive compared with the amounts at stake in consumer cases and that appropriate means of consultation and redress were needed to ensure that consumer rights were duly protected.

[315]    The rapporteur was the Dutch MEP Ms Boot. One of the aspects of the text which should be stressed, following the amendments tabled by MEPs Squarcialupi and Pegado Liz, was the appeal to the Commission to propose a directive harmonising the laws of the Member States so as to safeguard the defence of the collective interests of consumers, by giving consumer associations the opportunity to bring legal action in the interests of the category they represented and of individual consumers (A2-152/86 of 21 November 1986 (EP 104.304).

[316]    Resolution 87/C, OJ C 176, 4.7.1987.

Programme (1990-1992)[317] that the arrangements for access to justice and compensation were inadequate in a large number of Member States because of their cost, complexity and the time involved, and that there were problems linked to cross-border transactions. It announced that it would be carrying out studies on measures to be adopted, with particular attention for the possibility of collective actions for compensation for losses sustained by consumers[318].

❶❷❸▱ It was, however, only in 1993 that the Commission relaunched a public debate on this issue with the publication of the significant *Green Paper on access of consumers to justice and the settlement of consumer disputes in the single market*[319].

---

[317]    Approved by the Council on 9 March 1989 (OJ C 99, 13.4.1989).

[318]    COM(90) 98 final of 3 May 1990. This was the first reference to collective actions in an official Commission document.

[319]    COM(93) 576 final of 16 November 1993. In order to understand this document, it is important to recall that, between 1991 and 1992, there were a number of initiatives in the debate on questions connected with access to law and justice, including the Conference on consumer compensation mechanisms held by the *Office of Fair Trading* in London in January 1991, the third Conference on consumer access to justice held in Lisbon on 21-23 May 1992 under the auspices of the Commission and the *Instituto do Consumidor*, as well as the seminar on the *Protection of the cross-border Consumer* held in Luxembourg in October 1993 by the Ministry of the Economy, and that on the Family and solidarity supported by the Commission, which resulted in reports which are still of great relevance today. During the same period a number of leading academics and legal experts set down their views on the issue (see, *inter alia*, *Group Actions and Consumer Protection*, Thierry Bourgoignie (Ed.), Col. Droit et Consommation, Vol XXVIII, 1992; *Group Actions and the Defence of the Consumer Interest in the European Community*, Anne Morin, INC, France, 1990).

It was on this occasion that the question of the establishment of a uniform system for actions for injunctions was examined in detail for the first time. Many people thought at the time that this would serve as a basis for a true system of collective action in defence of consumer interests[320].

❹❹❷◎▯    In its Resolution of 22 April 1994[321], the European Parliament concluded that it would be appropriate to carry out a degree of harmonisation of the procedural rules of the Member States, making provision for the right, in cases involving amounts below a certain threshold, to launch Community proceedings which would permit the rapid resolution of cross-border disputes. The Parliament also indicated that it would be appropriate to harmonise, to a certain extent, the conditions applicable to bringing actions for injunctions against illegal commercial practices.

---

[320]    It should, however, be pointed out that the Green Paper is based on several earlier decisions and documents, which underpin it and give it the necessary basis of political support. In March 1992 the Commission had entrusted to a group of independent experts, led by Peter Sutherland, the task of drawing up a report on the operation of the internal market in order to assess the impact of the implementation of the White Paper on the Internal Market.

The report, published on 26 October 1992, looked in particular at the question of access to justice. It stated that there was no certainty as to the effectiveness of the protection of consumer rights and drew attention to concerns about the ineffectiveness of the Brussels Convention of 1968 on mutual recognition of court judgments and the resulting difficulty of obtaining the enforcement in a Member State of a judgment delivered by a court in another Member State. It recommended (Recommendation No 22) that the Community look into the question as a matter of urgency. This recommendation gave rise to the Communication from the Commission to the Council and the European Parliament: *The Operation of the Community's Internal Market after 1992: Follow up to the Sutherland Report* (SEC(92) 2277 final). The *Working Document of the Commission on a Strategic Programme on the Internal Market*, submitted by the Commission in June 1993, recognised the need for a coherent operational framework for access to justice which would need to include a number of measures regarding the dissemination, transparency and application of Community law (COM(93) 256 final). Moreover, the Commission Communication to the Council of 22 December 1993 drew attention to the fact that completion of the internal market could lead to an increase in the number of cases where residents of one Member State were asking for their rights to be respected in another Member State (COM(93) 632 final).

As the Commission argued that it was not up to the Community to seek a harmonisation which would have abolished the specific characteristics of different national legal systems, the Commission expressed its intention of focusing on the provision of information and training on Community law, transparency, effectiveness and rigour in the application of that law, and on coordination and cooperation in judicial matters between Member States and the Commission, facilitated by the entry into force of the Maastricht Treaty, and in particular of its "third pillar". These efforts resulted in the publication of the Green Paper and in the large-scale consultation which was launched in its wake. At its meeting of 27 September 1993 (686th internal market session), the Council had already concluded that it was essential to develop the debate on access to justice, in particular on the basis of a Green Paper announced by the Commission for the end of the year which would look at the question of procedural means and, if appropriate, that of increased transparency of sanctions. It was at this time that a major study was drawn up for the Commission by E. Balate, C. Nerry, J. Bigot, R. Techel, M.A. Munge, L. Dorr and P. Pawlas, with the assistance of A.M. Pettovich, on the subject of *A right to group actions for consumer associations throughout the Community* (Contract B5-1000/91/012369), which remains a standard work in this field.

[321]    PE 207.674 of 9 March; rapporteur: Mr Medina Ortega.

❹❹❷◎◎◻    Similarly, the EESC, in an opinion adopted unanimously at the plenary session of 1 June 1994[322], referred, *inter alia*, to the principle of: "*general recognition of the active legal right of consumer associations to represent collective and diffuse interests, before any judicial or out-of-court authority in any Member State, irrespective of the nationality of the interested parties and the associations themselves, or of the place where the dispute arises*". It expressly called on the Commission to establish a uniform procedure for collective actions and joint representation, not only to put a stop to illegal practices but also for actions for damages[323].

❹❹❷◎◎◎◻    For her part Commissioner Emma Bonino, from the moment she set out her priorities, focused on the establishment of a Community procedure for the rapid resolution of cross-border disputes and the harmonisation of conditions for bringing actions for injunctions against illegal commercial practices, together with the mutual recognition of the right of consumer organisations to bring legal action[324].

---

[322]    CES 742/94; rapporteur: Mr Ataíde Ferreira (OJ C 295, 22.10.1994). The ESC's interest in the subject was not new. In other documents, for example two own-initiative opinions on the completion of the internal market and consumer protection drawn up by Mr Ataíde Ferreira and adopted respectively on 26 September 1992 (CES 1115/91, OJ C 339, 31.12.1991) and 24 November 1992 (CES 878/92, OJ C 19, 25.1.1993), the Commission's attention had already been drawn to the need to identify opportunities for action in relation to the regulation of cross-border disputes and to recognise the powers of representation of consumer organisations in both national and transfrontier disputes (CES 115/91, point 5.4.2; CES 878/92, point 4.12, and section 4 of the interesting study appended to it, carried out jointly by Eric Balate, Pierre Dejemeppe and Monique Goyens and published by the ESC, pp. 103 et seq.).

[323]    This subject was subsequently taken up by the EESC in several of its opinions, the most significant of which were the own-initiative opinion on the *Single market and consumer protection: opportunities and obstacles* (rapporteur: Mr Ceballo Herrero), adopted at the session of 22 November 1995, which noted that at that date there had been no follow-up to the suggestions and proposals put forward by the ESC in its previous opinion on the Green Paper (CES 1309/95); the opinion on the *Single Market in 1994 - Report from the Commission to the European Parliament and the Council* (COM(95) 238 final) (rapporteur: Mr Vever), which pointed to delays in the effective implementation of the internal market, particularly regarding consumer legislation, and in particular for cross-border relations (CES 1310/95, OJ C 39, 12.2.1996); the opinion on the *Communication from the Commission: Priorities for Consumer Policy (1996-1998)* (rapporteur: Mr Koopman), in which the Committee, while welcoming the proposal for a directive on actions for injunctions and the action plan presented by the Commission on consumer access to justice, said that it awaited with interest developments in the area, that, in that area, the single market was far from complete and that a "conscious adherence to consumer rights" was a basic condition for gaining that confidence from the consumer (CES 889/96, OJ C 295, 7.10.1996). The same kind of concern was also expressed in the ESC's opinion on the *Communication from the Commission to the European Parliament and the Council on the impact and effectiveness of the single market* (COM(96) 520 final of 23 April 1997) (rapporteur: Mr Pasolli, CES 467/97 - OJ C 206, 7.7.1997).

[324]    In her first public statement, at a European Parliament hearing on 10 January 1995, the new Commissioner for consumer affairs recognised that consumer policy was a matter of the first importance for the construction of a Citizens' Europe and made a personal commitment to follow-up the consultations already carried out in connection with the Green Paper on Access to Justice.

In reply to specific questions about the situation with regard to access to justice, the Commissioner acknowledged that consumer access to justice was far from satisfactory and that the time taken for court

❹❹⓪❹⌐    Subsequently a Proposal for a European Parliament and Council Directive on injunctions for the protection of consumers' interests was published on 25 January 1996[325]. With this directive the Commission took up the recommendation of the Sutherland Report and responded to the suggestion, which enjoyed widespread support, contained in the Green Paper[326,327].

❹❹❹⌐    The directive undeniably a revolutionised Community law, as for the first time the Community was legislating in a general way on a matter relating to civil procedural law[328].

The suggestion that the scope of application be extended to include damages was not however followed up.

---

proceedings in certain Member States was likely to compromise seriously the effectiveness of consumer law.

[325]    COM(95) 712 final.

[326]    Taking as a basis Article 100a of the Treaty on European Union, and having regard to the principles of subsidiarity and proportionality, the Commission made provision for the harmonisation of the procedural rules of the various Member States relating to certain forms of legal redress, with the following objectives:

– the cessation or prohibition of any act infringing consumer interests protected by the various directives listed in an annex;

– measures necessary to correct the effects of the infringement, including publication of the decision; and

– the imposition of a financial penalty on the losing party to the dispute in the event of non-compliance with the decision by the deadline set.

The same proposal provided that any body representing the interests of consumers in a Member State, when the interests it represented were affected by an infringement originating in another Member State, could apply to the court or competent authority of that Member State to enforce the rights it represented.

[327]    The final text of the directive was adopted at the Consumer Council held in Luxembourg on 23 April 1998, by a qualified majority with Germany voting against, and its final version, which includes most of the suggestions and criticisms made, was published on 11 June 1998.

[328]    Directive 98/27/EC of 19 May 1998, OJ L 166, 11.6.1998. It should be remembered that the European Parliament was very critical of the scope and limitations of the proposal and made various changes to the initial text, including:

– extending the scope of a directive to cover all future directives concerning the protection of consumer interests;

– including among the recognised bodies organisations and federations representing consumers or firms acting at European and not exclusively national level.

In an opinion drawn up by Mr Ramaekers, the EESC criticised the legal basis of the proposal, considering that it should have been Article 129a rather than Article 100a of the Treaty, as well as its limited scope and the requirement for prior application to a national body in the country where the proceedings had to be brought, which would significantly and unnecessarily delay the proceedings (CES 1095/96 - OJ C 30, 30.1.1997).

❶❷❸◎◻    In parallel, the Commission drew up an *Action plan on consumer access to justice and the settlement of consumer disputes in the internal market*, presented on 14 February 1996, in which, having defined and described the problem of consumer disputes and studied the various solutions available at national level in the Member States, it listed a number of initiatives which it planned to launch. These included studying the possibility of consumers suffering loss at the hands of the same commercial operator to instruct consumer organisations to group their complaints *ex ante* in order to pool homogeneous individual cases with a view to submitting them simultaneously to the same court[329].

❶❷❸◎◎◻    In this context, the European Parliament, in its Resolution of 14 November 1996, expressed the view that access to justice was a fundamental human right and a precondition for guaranteeing legal certainty, either at national or Community level. It recognised the importance of out-of-court procedures for settling consumer disputes but drew attention to the need for the consumer, having exhausted all the out-of-court conciliation procedures, to be able to resort to ordinary court procedures in accordance with the principles of legal effectiveness and certainty. Consequently, it called on the Commission to draw up other proposals to improve the access of non-resident European citizens to national judicial procedures, and encouraged the Member States to promote the involvement of consumer associations as the authorised representatives of persons empowered to bring claims before the courts and to recognise these associations as being entitled to bring collective actions in response to certain illegal commercial practices[330].

❶❷❸◎◎◻    Since then the question would appear to have been effectively left in abeyance by the European Commission[331].

At the EESC, however, the question has been taken up on several occasions, with a view to demonstrating the need for a Community-level civil procedural instrument for the legal defence of diffuse, collective or homogeneous individual interests[332].

---

[329]    COM(96) 13 final.
[330]    A-0355/96 (PE 253.833).
[331]    Certain directives nonetheless contain references to collective actions as a suitable and effective way of guaranteeing compliance with their provisions. This is true, for example of Directive 97/7/EC of 20.5.1997 (distance contracts), Article 11 or Directive 2002/65/EC of 23.9.2002 (distance marketing of consumer financial services), Article 13.
[332]    Reference should be made here to the following EESC opinions:
   −    Own-initiative opinion CESE 141/2005 − OJ C 221, 8.9.2005 on Consumer policy post-enlargement (point 11.6).

⬤⬤⬤◎⬤⬤    Only recently the Commission reopened the question in its *Green Paper on Damages actions for breach of the EC antitrust rules*[333] in terms which are worth quoting:

> "*It will be very unlikely for practical reasons, if not impossible, that consumers and purchasers with small claims will bring an action for damages for breach of antitrust law. Consideration should therefore be given to ways in which these interests can be better protected by collective actions. Beyond the specific protection of consumer interests, collective actions can serve to consolidate a large number of smaller claims into one action, thereby saving time and money.*"

⬤⬤⬤⬤    In its opinion of 26 October 2006, the EESC expressed its support for this Commission initiative and confirmed the need for collective actions where they "*provide a perfect example of some key objectives: i) effective compensation for damages, facilitating claims for damages by organisations on behalf of the consumers affected, thus helping to provide real access to justice; ii) the prevention and deterrence of antitrust behaviour, given the greater social impact of this type of action*"[334].

⬤⬤⬤⬤◎⬤    The Commission entrusted to the Consumer Law Studies Centre of the Catholic University of Leuven the task of drawing up a major study, recently published, on alternative dispute resolution (ADR) methods. A not inconsiderable part of the study, which runs to 400 pages, is devoted to a description of 28 national systems of collective legal means for the defence of consumer interests, those of the 25 Member States plus those of the USA, Canada and Australia[335].

---

−    Opinion CESE 230/2006 – OJ C 88, 11.4.2006, on the Programme of Community action in the field of health and consumer protection 2007-2013, point 3.2.2.2.1.

−    Opinion CESE 594/2006 – OJ C 185, 8.8.2006 on a Legal framework for consumer policy.

[333]    COM(2005) 672 final of 19.12.2005.
[334]    Opinion CESE 1349/2006 – OJ C 324, 30.12.2006 (rapporteur: Mr Sánchez Miguel). This subject was also tackled in the Committee's own-initiative opinion on *Regulating competition and consumer protection* (CESE 949/2006 – OJ C 309, 16.12.2006.
[335]    The study was referred to in footnote 4. Although very comprehensive, this comparative study does not cover the situation in Bulgaria or Romania, nor does it take account of the most recent development in Finland, or of the highly advanced systems in Brazil, Israel and New Zealand, or of the proposals being debated in France and Italy. For an account of the Australian system, see the collaborative work *Consumer Protection Law*, by J. Goldring, L.W. Maher, J. McKeough and G. Pearson, The Federation of Press, Sydney, 1998; on the New Zealand system, see *Consumer Law in New Zealand*, by Kate Tokeley, Butterworth, Wellington, 2000; for an account of developments in Asia, and in particular India, the Philippines, Hong Kong, Bangladesh, Thailand and Indonesia, see *Developing Consumer Law in Asia*, record of the IACL/IOCU seminar, Kuala Lumpur, Faculty of Law, University of Malaya, 1994.
It appears that the Commission has recently launched another study on Evaluating the effectiveness and efficiency of collective redress mechanisms in the EU (2007/S 55-067230, 20.3.2007).

⚫⚫⚫⚫◐◐▭    The new European Commissioner with responsibility for consumer affairs, Meglena Kuneva, has announced in several declarations that this issue was one of the priorities of her term of office. This issue is also addressed in the recent communication on the *EU Consumer policy strategy 2007/2013*[336]. The issue was further reaffirmed by both Commissioner Neelie Kroes and Commissioner Meglena Kuneva at a recent conference in Lisbon organised at the initiative of the Portuguese presidency of the European Council[337].

⚫⚫⚫⚫◐◐◐▭    The Council of Ministers of the OECD has also recently adopted a Recommendation on Consumer Dispute Resolution and Redress [C(2007) 74 of 12 July 2007], which acknowledges that most existing frameworks for consumer dispute resolution and redress in the Member States were developed to address domestic cases and are not always adequate to provide remedies for consumers from another Member State.

**Why should collective actions be introduced at Community level?**

⚫⚫⚫⚫◐◐▭    If the interests of consumers are to be taken into account from a legal standpoint in the EU Member States and at EU level, it is essential not only that material rights be recognised but also that appropriate procedures are available for upholding these rights.

It should also be pointed out that the increase in the volume of cross-border trade has brought about an expansion of consumer litigation at EU level.

In many cases, it is recognised that the settlement of litigation on an individual basis is an inadequate measure. The cost and the slowness of such settlements are major contributory factors in rendering consumer rights ineffective, particularly in cases where a multitude of consumers (i.e. several thousand or even several million) suffer injury as a result of one and the same practice and in cases where the amounts represented by the individual damages are relatively small. The gradual development of the "European company" also gives rise to problems

---

[336]    COM(2007) 99 final of 13.3.2007, point 5.3; the EESC has just published an opinion on this document – Rapporteur: Ms Darmanin.

[337]    "Conference on Collective Redress: Towards European Collective Redress for Consumers?" (9/10 November 2007) during which Commissioner Kroes made the following observation: *"Consumers not only have rights, but should also be able to effectively enforce them, if necessary through court action. And when court action can only be taken by each consumer individually, no consumer will ever make it to the court room:* **collective redress mechanisms are therefore an absolute must!** *It is only then that (consumers) will be able to fully benefit from the Single Market."* Commissioner Kuneva, for her part, rightly stressed that: *"Consumers will not be able to enjoy the full benefits of the Single Market unless effective systems are in place to address their complaints and to give them the means for adequate redress. Collective redress could be an effective means to strengthen the redress framework that we have already set up for European consumers, through the encouragement of ADR mechanisms and the establishment of a cross-border small claims procedure".*

when it comes to determining which law is applicable; EU citizens should be able to invoke their rights in a uniform way. As things stand at present, improper practices which occur under identical circumstances and cause identical damage in several Member States may give rise to compensation only in those few Member States which have introduced a system of collective actions.

Furthermore, the constitutions of all the EU Member States and the European Convention for the Protection of Human Rights and Fundamental Freedoms affirm the right to a fair trial. This right includes, inter alia, the right to have meaningful and effective access to the courts.

Under the existing legal systems, citizens cannot always contest, in concrete, practical terms, certain practices which are injurious to them and initiate court proceedings.

Over a period of several decades, a number of Member States have introduced two types of response to address this problem.

Initially, they recognised the right to protect the collective interests of consumers by bringing actions before administrative bodies or before courts and tribunals. A further appropriate response has also taken the form of recognition of a procedure under which individual actions are lumped together. These actions mainly seek to bring about procedural savings by lumping together all of the actions and synthesising them into a single procedure.

The creation of a European collective action would make it possible to provide access to justice to all consumers, irrespective of their nationality and financial situation and the amount of individual damage which they have suffered. It would also be beneficial to commercial operators in view of the procedural savings which could be achieved. The costs of such an action would be lower than the costs liable to be incurred as a result of a multitude of individual actions. This procedure would also have the advantage of providing legal certainty by virtue of the fact that an extremely large number of similar complaints would be resolved under a single ruling[338]. Finally, such a measure would avoid contradictions in jurisprudence between courts in the different EU Member States called upon to settle similar cases.

---

[338]    Patrick von Braunmuhl rightly pointed out at the "Leuven Brainstorming Event on Collective Redress", organised by the Commission on 29 June 2007, that "*collective actions could reduce the number of individual cases resulting from a specific incident. Especially in an opt out system a company can settle a large number of consumers claims in one proceeding. It can negotiate with a group representative of all consumers concerned and it can concentrate its resources on one court case rather than on several different cases. Even if a voluntary settlement is not possible and the court has to decide there is more legal certainty if the decision covers all cases related to the same incident or breach of law*".

The introduction of a common system for all European countries would therefore make it possible to provide consumers with improved protection, whilst enhancing the confidence of the business world and, as a result, boosting trade within the EU.

The introduction of a European collective action, as defined above, would have a beneficial effect in respect of private international law in view of the difficulties in interpreting and applying the standards for resolving contractual and extra-contractual disputes (Rome I and Rome II). Such an action would also make it possible to set out precise definitions of the rules governing jurisdiction and the recognition and enforcement of judgements in civil and commercial matters (Regulation 44/2001)[339].

Consumer law would therefore be strengthened by increased initiation of legal proceedings which make it possible to provide consumers with fair compensation and to give effective protection to the "weak party", which is a fundamental principle of EU law. This would apply, in particular, to the recent Unfair Commercial Practices Directive. Such practices are often used simultaneously in several Member States, causing harm to many consumers but giving them no opportunity to seek collective redress. Group action is a complementary procedure vital to the effective implementation of this directive.

All of the currently known directives in the field of consumer protection, as transposed into national law by the Member States, would therefore be made more effective by the recognition of collective actions in the fields covered by these directives.

It would be desirable for small and medium-sized enterprises (SMEs) also to benefit from the application of the provisions in question as they, too, find themselves in a similar situation.

It goes without saying that the bringing of collective actions at EU level, as a final means of seeking to resolve disputes, in no way precludes recourse to systems of out-of-court settlement of consumer disputes. The latter measures have received the unqualified support of the EESC and their potential should be further explored in detail and further developed.

**Terminology**

---

[339]    This point was explained in detail at the seminar on Rome I and Rome II, held in Lisbon on 12 and 13 November 2007 and organised by the Portuguese presidency, in conjunction with the German and Slovenian presidencies, and the Academy of European Law (Europäische Rechtsakademie – ERA).

4.2.2.1.        In order to be able to properly identify the subject of the proposal, agreement must be reached on the type of legal action in question.

As the survey of the different systems adopted in the various Member States demonstrates, the designation and contents of the various types of action vary considerably. Distinctions must therefore be drawn between "representative actions", "public interest actions" and "collective actions".

4.2.2.2.        Representative actions can be brought only by consumer associations or administrative bodies (the Ombudsman and similar bodies), with a view to securing the cessation of acts which infringe the rights of the consumer and even, in the case of some countries, securing the abolition of unfair or unlawful terms in consumer contracts.

4.2.2.3.        "Public interest actions" provide consumer associations with the opportunity to decide whether or not to bring an action before a court in cases where the public, general interest of consumers is damaged by the infringement of either a specific provision of substantive law or a general standard of behaviour. "Public interest" does not represent the sum of the individual interests of consumers but is similar to "general interests".

4.2.2.4.        "Collective actions" are legal actions which enable a large number of persons to have their rights recognised and to obtain compensation. From a technical standpoint, "collective actions" therefore represent a collective procedural application of individual rights.

2.        Recourse to collective actions is not necessarily limited to just the fields of consumer protection and competition.

However, in the case of this opinion, the use of the term "collective action" is confined to the material field, as recognised under Community law.

2.2.        It is therefore proposed that the term "collective action" be used in this opinion[340].

Legal basis

---

[340]        A comparative analysis of the different terms used in several EU Member States and what they mean in the respective languages is set out in an article entitled *Class System* by Louis Degos and Geoffrey V. Morson, published in the Los Angeles Lawyer Magazine, edition of November 2006, pages 32 et seq. The terms used in certain countries are as follows: Ireland – *multi-party litigation* (MPL); the UK – *group litigation order* (GLO) or simply *group action*; in Germany – *Gruppenklage*; in Sweden – *grupptalan* or *collective lawsuit* ; in Portugal – *popular lawsuit*; and in Hungary- *combined lawsuit*.

③⓪⓪◻   The legal basis for the policy of defending the interests of consumers is to be found in Title XIV of the EC Treaty, which is entitled "Consumer protection".

Article 153 clearly provides important points for consideration.

③⓪⓪◻      As things stand at present, even though consumer law has mainly come into being on the basis of the benchmark Article 95 of the EC Treaty, consumer protection policy, as envisaged here, clearly represents a measure designed to promote the economic interests of consumers.

③⓪❷◻   There is no doubt that collective actions will provide a high level of protection and will enable consumer organisations to organise themselves with a view to protecting the interests of consumers, i.e. to provide them with fair compensation in the event of the infringement of rights accorded to them under all Community law, including competition law.

③❷◻   The introduction of collective actions at EU level will also help to improve the operation of the internal market for the benefit of consumers, which is one of the goals of the "internal market review". This will, in turn, give consumers greater confidence in respect of the expansion of cross-border trade[341].

---

[341]    Cf. Communication from the Commission on a Single market for 21st century Europe (COM(2007) 724 final of 20 November 2007.

③❷◎◻  It could also be argued that, as we are dealing here with a purely legal instrument, Articles 65 and 67 could possibly be selected as an appropriate legal basis. It was on the basis of these articles that, from 1996 onwards, the Commission proposed and the European Parliament adopted a whole series of legal instruments in the field of civil procedural law at EU level[342].

---

342    These legal instruments include the following:

–   Green Paper on access of consumers to justice and the settlement of consumer disputes in the Single Market (COM(93) 576 final);

–   Recommendation of the Commission of 12 May 1995 on payment periods in commercial transactions and the associated Commission Communication – OJ L 127, 10.6.1995 and OJ C 144, 10.6.1995 respectively;

–   Communication from the Commission on the Action Plan on Consumer Access to Justice and the Settlement of Consumer Disputes in the Internal Market - COM(96) 13 final, 14 February 1996;

–   Communication from the Commission to the Council and the European Parliament entitled: "Towards greater efficiency in obtaining and enforcing judgments in the European Union" - COM(97) 609 final - OJ C 33, 31.1.1998;

–   Directive 98/27/EC of 19 May 1998 on injunctions for the protection of consumers' interests - OJ L 166,11.6.1998;

–   Council Regulation (EC) 1346/2000 on insolvency proceedings - OJ L160, 30.6.2000. The rapporteur of the EESC opinion on this subject was Mr G. Ravoet (CESE 79/2001 of 26 January 2000 – OJ C 75, 15.3.2000);

–   Council Regulation (EC) No 1347/2000 of 29 May 2000 on jurisdiction and the recognition and enforcement of judgments in matrimonial matters and in matters of parental responsibility for children of both spouses - idem. The rapporteur for the EESC opinion on the matter was Mr Braghin (CES 940/1999 of 20 October 1999- OJ C 368, 20.12.1999);

–   Council Regulation (EC) No 1348/2000 of 29 May 2000 on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters - idem. The rapporteur for the EESC opinion on the matter was Mr Hernandez Bataller (CES 947/1999 of 21 October 1999 - OJ C 368, 20.12.1999);

–   Directive 2000/35/EC of 29 June 2000 on combating late payment in commercial transactions - OJ L 200, 8.8.2000;

–   Programme of measures to implement the principle of mutual recognition of decisions in civil and commercial matters – OJ C 12, 15.5.2001;

–   Council Decision of 28 May 2001 establishing a European Judicial Network in Civil and Commercial Matters – OJ L 174, 27.6.2001. The rapporteur for the EESC opinion on the subject was Mr Retureau (CESE 227/2001 of 28 February 2001 - OJ C 139, 11.5.2001;

–   Council Regulation (EC) 1206/2001 of 28 May 2001 on cooperation between the courts of the Member States in the taking of evidence in civil or commercial matters - OJ L 174, 27.6.2001. The rapporteur for the EESC opinion on this subject was Mr Hernandez Bataller (CESE 228/2001 of 28 February 2001) – OJ C139, 11.5.2001;

–   Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, (Brussels I). OJ L

This solution could be considered since collective actions could be used in the case of both cross-border disputes and national litigation and in fields other than that of consumer law.

③❷⓪⓪⌐   The collective action should, at all events, respect the principles of subsidiarity and proportionality; it should never go beyond the bounds of what is required to meet the objectives set out in the Treaty, insofar as such objectives cannot be adequately achieved by the Member States and are thus better realised by taking action at Community level.

③❷⓪⓪⌐   The collective action should also follow the principles and mechanisms highlighted in the Recommendation of the Council of Ministers of the OECD (Rec. C(2007) 74 of 12 July 2007), which are presented as common principles despite the diversity of legal cultures that exist in the Member States.

**The parameters of collective actions at Community level**

③⓪❶⌐  Collective actions must not take the following forms:

a)   Collective actions must not take the form of representative actions:

Representative actions are open only to a number of specially authorised bodies (consumer associations and the Ombudsman). Under this procedure consumers are generally not able to obtain redress for damage suffered by individuals.

---

12, 16.1.2001. The rapporteur for the EESC's opinion on this subject was Mr Malosse (CESE 233/2000 of 1 March 2000 – OJ C 117, 26.4.2000);

— Green Paper on Alternative Dispute Resolution in civil and commercial Law - COM(2002) 196 final, 19 April 2002;

— Regulation (EC) No 805/2004 of 21 April 2004 creating a European Enforcement Order for uncontested claims – OJ L 143 of 30 April 2004. The rapporteur for the EESC's opinion on this subject was Mr G. Ravoet (CESE 1348/2002 of 11 December 2002 - OJ C 85, 8.4.2003);

— Proposal for a Regulation establishing a European Small Claims Procedure (COM(2005) 87 final of 15.3.2005). The rapporteur for the EESC opinion on this subject was Mr Pegado Liz (CESE 243/2006 of 14.2.2006);

— Green Paper on improving the efficiency of the enforcement of judgments in the European Union: the attachment of bank accounts, COM(2006) 618 final. The rapporteur for the EESC opinion on the subject was Mr Pegado Liz (CESE 1237/2007 of 26 September 2007);

— Regulation 1896/2006/EC of 12 December 2006 (OJ L 399, 30.12.2006) creating a European order for payment procedure (COM(2004) 173 final of 19 March 2004). The rapporteur for the EESC opinion on the matter was Mr Pegado Liz (CESE 133/2005 of 22 February 2005).

The main aim of these procedures is to secure the cessation of acts which infringe consumer rights and even, in some countries, to secure the abolition of unfair or unlawful terms in consumer contracts in respect of which the courts are unable to make provision for any compensation.

Certain countries have made adjustments to these mechanisms in order to make it possible to compensate consumers. Such compensation is not, however, paid to individual consumers but retained by the representative bodies or paid to the State to be used for social purposes.

Representative actions are thus, in practice, not to be equated with real collective actions, in which all consumers are compensated in a single legal proceeding.

b)    **Collective actions must not take the form of the "class actions" employed in the USA**:

The introduction of a European collective action must not result in the establishment in Europe of US style class actions. The US judicial system is very different from the judicial systems of the EU Member States. The weaknesses of "class actions", which are accused of giving rise to excessive settlements, are peculiar to this judicial system and could not occur in Europe.

In the USA, court decisions are delivered by people's juries and elected judges. The special make-up of the US system, which differs from that of the majority of the EU Member States (which have professional judges), very frequently leads to certain State courts authorising fanciful actions and handing down decisions which are excessively favourable to the plaintiff; this, in turn, results in consumers submitting their claims to particular courts, rather than other courts which have the reputation of adopting a less favourable approach ("forum shopping").

European "collective actions", on the other hand, would serve as a bastion which would halt forum shopping in its tracks since a single type of legal procedure would be created and set up in each EU Member State, as a result of which, irrespective of the court or the State selected by the claimants, the legal action would proceed in the same way and the court rulings would be of a similar nature.

In the USA, the compensatory damages awarded may be accompanied by punitive damages. These damages, which are set by the juries and elected judges, frequently attain astronomical proportions. Punitive damages are not applied in most EU Member States.

Lawyers in the USA are remunerated by means of a generally applicable system of *contingency fees*. This system constitutes a sort of "champerty", under which lawyers, who may themselves be the claimants, have an interest in the outcome of the claim. This system is prohibited – either by law or under lawyers' codes of professional conduct – in the majority of EU Member States.

### ⊚●◻ The basic choice: "opt-in" or "opt-out"

In the light of an examination of the collective action procedures adopted in the Member States, these procedures may be classified into two categories, depending on the main mechanism which underpins the initiation of the action and the intervention of the consumer in the procedure. If the consumer has to make deliberate representations in order to be a party to the procedure, an "opt-in" system is adopted. If, on the other hand, the initiation of the action automatically involves the participation of the consumer in the procedure, without it being necessary for him or her to make themselves known, an "opt-out" system is adopted. In the latter case, the consumer always retains the right to choose not to be covered by the procedure. The drawing-up of a European collective action thus inevitably involves selecting the mechanism which is to underpin such an action.

### a)    "Opt-in" and test cases

Under the *opt-in* system the persons concerned have to make known their desire to be party to the procedure. The persons concerned must therefore make themselves known and expressly ask to be part of the action before the decision is delivered.

*Alongside the* opt-in *system, the mechanism known as "test cases" or which is based on an initial declaratory ruling has also come into being. These procedures are similar to collective actions based on the* opt-in *principle since, in the case of test cases too, the persons concerned must make themselves known in order to be able to be party to the procedure and to lodge individual claims. The distinctive feature of the test case mechanism does, however, lie in the fact that the judge selects one of the individual claims and gives a ruling on that claim alone. The ruling given under the test case procedure will then be applicable to all the other individual claims lodged with the court.*

### Advantages of these mechanisms

*Each member of the group in question has to make himself or herself known in order to be party to the procedure; the way in which this is done is generally by signing a register. It is therefore a question of making known an express desire to participate; this enables the procedure to be in line with the principle of freedom*

*to take legal proceedings. The plaintiff only takes action on behalf of the persons concerned once they have given their formal agreement.*

*Under the opt-in method, the foreseeable extent of the damages at stake may be determined ex ante. This is important for the defendants who are directly concerned by the claim for compensation, generally, and it enables them to take out insurance policies to cover part of the potential damages. Sufficient funds will therefore be held in reserve to meet legitimate compensation claims.*

*With regard to the* test case *procedure, a single individual case is submitted to the judge in order to enable him/her to make an assessment of the problem; this represents a saving of time and a more effective approach for the judge since he/she will be able to take a decision on the liability of the commercial operator concerned on the basis of one case only.*

**Drawbacks of these mechanisms**

*These mechanisms are difficult to administer and are expensive: the persons concerned have to make themselves known in order to be party to the procedure and to draw up an individual file. The management of the individual files becomes a complex matter once a large number of persons in involved.*

*This leads to very long procedural delays since the court has to organise and deal with each of the individual dossiers. In the case of mass litigation, from which most collective actions derive, the damages suffered by individuals are relatively homogenous and frequently do not need to be examined on an individual basis.*

*Turning to the* test case *procedure, the judge does not always lay down the amount of compensation due and sometimes transfers cases to individual procedures. This gives rise to administrative problems and extends the time limits of the procedure.*

*Furthermore, an analysis of collective actions under the* opt-in *procedure and the* test cases *instigated in those states which provide for such a mechanism shows that a large proportion of consumers do not lodge a claim before the courts because they do not have proper information on the existence of the procedures in question. A large proportion of the persons concerned also refuse to initiate legal proceedings because of the material, financial and psychological obstacles thrown up by legal proceedings (demands as regards time and money and the fact that the whole matter is extremely complex).*

*There is therefore a sizeable drop-out rate between the number of persons who really do take action and the potential number of persons concerned. The compensation for damages awarded to consumers is therefore incomplete and any profit unlawfully acquired by commercial operators as a result of the practice in question may, in large, part be retained by them. The deterrent goal of the procedure is not achieved.*

*These procedures also give rise to a problem with regard to the relative effect of the judgement delivered. The decision delivered in connection with a collective action will be applicable only to those persons who were party to the action. Consumers who had not made themselves known will therefore be fully at liberty to initiate individual actions which could give rise to decisions which are in contradiction with those secured in the case of the collective action.*

**b)      Opt-out**

Traditional collective actions are based on a system known as "*opt-out*", under which all the persons who are the victims of a particular conduct are included in the action by default; the only persons excluded are those who have expressly made known their desire to be excluded.

*A number of European States have drawn up a* sui generis *procedure in respect of collective actions based on the abovementioned system.*

**Advantages of this mechanism**

*An analysis of national systems based on the* opt-out *principle shows that this procedure is simpler to administer and more effective than the other procedures adopted by some Member States.*

*The system in question ensures that the persons concerned have real access to justice and, consequently, goes so far as to provide fair and effective compensation to all consumers who are the victims of particular practices.*

*This procedure also avoids administrative difficulties for both the plaintiff and the courts (the members of the group covered by the collective action make themselves known only at the end of the procedure and not in advance of the procedure).*

*The procedure also has a real deterrent effect on the liable party, since the latter is obliged to compensate all the persons who have been victims of a given practice and may have to refund the unlawful profit derived from the practice in question.*

*Account should also be taken of the advantages which this type of procedure offers to the commercial operator against whom the case is brought. Having recourse to collective actions makes it possible to achieve savings in human resources and financial savings with regard to the defence of the commercial operator involved and to organise the defence in a much more effective way. Rather than having to manage, simultaneously a vast number of similar cases being tried by a whole range of different courts, the party in question prepares his or her defence before a single court.*

## Drawbacks of this mechanism

*This mechanism could be regarded as being at variance with the constitutional principles of a number of states and with the European Convention on Human Rights and, in particular, with the principle of the freedom to take legal proceedings, insofar as persons are deemed to be automatically part of the group covered by a collective action without having given their express agreement to be so included. If the persons concerned do not ask to be excluded, they could be bound by the decision that is delivered.*

It is, however, perfectly possible to preserve this individual freedom. This could be achieved in one of two ways: either by forwarding to the persons concerned information addressed to them by name, which would make it possible to regard those persons who subsequently do not ask to be excluded as having given their tacit authorisation for the action. The other way in which this goal could be achieved is by giving members of the group concerned the right to ask to be excluded from the procedure at any time, even after the decision has been delivered and, if the decision taken is not favourable to them, to enable them to initiate individual actions.

*The rights of the defence, such as the principle of an adversarial process and the principle of equality of arms would also be safeguarded: the commercial operator involved must be able to invoke individual means of defence against one of the victims who is a member of the group covered by the collective action. This principle is linked to that of having a "fair trial" (Article 6 of the European Convention of Human Rights). Under the* opt-out *system it is indeed the case that all the persons concerned would perhaps not be designated by name and would not be known to the commercial operator against whom the action has been*

*brought. The latter party could therefore find it impossible to invoke individual means of defence.*

However, in the context of a collective action, the individual situations are inevitably homogeneous and the judge is the guarantor that this shall be the case. Litigation linked to consumer rights and competition mainly derives from contracts and the situation of the interested parties is therefore virtually identical. The legal issue (*causa petendi*) is one and the same. It is therefore difficult to see how the commercial operator could invoke a specific means of defence in respect of a single consumer.

Throughout the procedure the judge may have the possibility of throwing out an action in cases where he establishes that the situations of the claimants are characterised by considerable differences of law and fact.

Finally, when it comes to setting compensation, the judge has the possibility of establishing sub-groups in order to adjust, for example, the amount of compensation in the light of individual situations and therefore also in the light of possible reductions in liability.

**c)**    ***Opt-out* and *opt-in* according to the type of litigation**

The system recently selected by both Denmark and Norway makes provision for both *opt-in* and *opt-out* procedures. The judge may decide to have recourse to an *opt-out* system if the litigation in question involves small amounts, if the claims are similar and if it would be difficult to pursue an *opt-in* procedure. There are many cases of consumer litigation in which consumers are unable to obtain an effective individual remedy because of the large number of individuals concerned and the small financial sums involved. Use of the *opt-out* procedure makes it possible to take account of all the persons concerned and to secure a penalty which is on a par with the level of unlawful profit which may have been made. In the case of litigation involving high levels of individual damage, the *opt-in* system is selected, making it necessary for each consumer to make themselves known in order to be party to the procedure.

**Advantages of this procedure**

*The administration of the procedure is rendered easier in the case of mass litigation. The goal of providing redress is achieved if effective publicity is provided. The goal of serving as a deterrent is likewise achieved.*

*Any possible infringements of constitutional principles or the European Human Rights Convention are offset by the effectiveness of the process in respect of providing redress and serving as a deterrent.*

**Drawbacks of the mechanism**

*Attention should be drawn first of all to the difficulty in defining the boundary between the two procedures of* opt-in *and* opt-out. *The two states which have adopted these procedures have done so only recently and no concrete cases are yet available. The relevant laws refer only to: "*mass litigation in respect of small sums in the case of which the use of individual procedures should not be expected*".*

*This problem of the lack of a clearly-defined boundary could give rise to very long debates during the procedure and to appeals which would extend the length of the procedure.*

⊚●◑◻ **The role of the judge**

a)   In this particular type of procedure, which pits a large number of claimants against each other, the powers that are vested in the judge are of crucial importance.

b)   In the majority of the procedures involving the *opt-out* principle, an initial phase of the procedure involves an examination carried out by the judge to determine whether the action is admissible. This same aim is served by the examination of the individual file in respect of *test cases*.

The importance of the stage involving verification of whether or not a case is admissible lies in the fact that this stage makes it possible to halt, at the beginning of the procedure, any claims which are manifestly unjustified or of a fanciful nature and which could unlawfully damage the image of the opposing party; this objective is achieved by preventing abusive or inappropriate procedures from being taken further.

It is the judge who guarantees that this stage of verifying whether a procedure is admissible is properly carried out. In concrete terms, he has the task of verifying whether the conditions set out in law for undertaking collective actions are respected.

In particular, the judge has to check whether:

- there are indeed grounds for a legal dispute (the proceedings initiated by the claimant must not be barred);
- the composition of the group makes it impracticable to engage in a joint procedure or a procedure involving a mandate;
- there are matters of law or of fact which are common to the members of the group (the same *causa petendi*);
- the claim against the commercial operator is consistent from the point of view of the alleged facts (the criterion of the probability of the alleged claim – "*fumus boni iuris*");
- the plaintiff is able to adequately represent and protect the interests of the members of the group.

c)    At a later stage, it is also important that the judge is able to validate any proposed transaction or reject it if, in his estimation, it is not in the interests of the members of the group. To be in a position to do this, he must have greater powers than simply those of approving transactions, which are the powers usually vested in judges by law under the majority of judicial systems which apply in the EU Member States.

d)    Given the particular nature of this procedure, there is also a need to make provision for appropriate procedures for the production of evidence. The judge must be able to use powers of injunction with regard to the opposing party or third party in order to secure the production of documents or he must be able to order measures of inquiry with a view to establishing new evidence. The legislation establishing collective actions must expressly stipulate that the judge may not refuse to take the abovementioned action once it has been requested by the claimants.

e)    In order to enable judges to take on these powers in the most effective way possible, it would appear to be necessary to stipulate that only particular courts, designated by name, will have jurisdiction for collective actions. The judicial structures of the Member States should therefore be adapted accordingly and provision also needs to be made for judges sitting in the courts in question to receive special training.

③●①①①    **Effective compensation for damage**

a)    Collective actions must enable claims to be made for compensation for material damage (financial damage), physical damage and compensation for pain and suffering and other forms of non-pecuniary loss. Since the aim of the action is both to compensate consumers and to provide a deterrent, it seems necessary to make provision for compensation of all forms of damage if this goal is to be achieved. It should also be possible to provide courts with simple, inexpensive and transparent evaluation methods, without abandoning the principle of compensation for damages.

b)    Claimants involved in collective actions must also be able to secure several forms of damage from the court. In addition to stipulating the cessation of particular behaviour or the invalidity of an act which can still be carried out, compensation of damages must be able to take a direct or indirect form. Provision must also be made for compensation to be backed up by other forms of remedy, such as advertising the publication of the court's findings, public notices etc.

c)    Direct, individual compensation must not be the only form of compensation envisaged, as under certain hypotheses, it would be difficult - if not impossible - to bring about, either because the members of the group concerned cannot be identified under the *opt-out* mechanism or because there are too many such persons, or yet again, because the amount represented by their individual damages is too low. The key requirements are that the persons involved should always be compensated - even indirectly - and that the deterrent effect should be achieved.

Appropriate machinery should be devised to address the following cases: the judge is able to calculate the amount of compensation to be paid to identified or identifiable members of the group (under the *opt-in* scheme, test cases or even under *opt-out* arrangements, in cases where the commercial operator has provided a list of the customers concerned, for example). Appropriate machinery should likewise be devised to address cases where distribution of payments to individuals proves to be too expensive in view of the small amounts of individual damages involved.

In the same way, if the sums are not all distributed, priority should be given to a measure of indirect compensation in respect of the residue of the compensation. In his decision the judge should set out in detail the action to be funded by the residue and he should adopt the procedures for monitoring this operation; responsibility for implementing these procedures may be delegated to a third party.

Should even this measure of indirect compensation prove to be impossible, the total amount of the residue determined by the judge shall be paid into a fund for supporting collective action in order to enable it to finance new actions.

If the judge is unable to calculate the amount to be paid to each individual by way of compensation in cases in which it is not possible to identify all the members of the group (this applies solely in the case of the *opt-out* mechanism), he must be able to establish an assessment grid for the different categories of damages. Responsibility for distributing the compensation sums may be delegated to the court registry, the lawyer representing the group or a third party (insurance agent, account, etc.); such arrangements have the advantage of relieving the court of responsibility for this long and complex stage of analysing individual claims.

In the case of the second hypothesis, the judge must be able to make provision for individual compensation for members of the group who have made themselves known following the publication of information on the judgement; the residue of the compensation is to be allocated to actions providing indirect compensation for the damage suffered by the group.

If no indirect measure is possible, the residue must be paid to the support fund.

③❶❍❍❍◗  **Appeals**

a)  Collective actions must recognise the rights of either party to lodge an appeal.

b)  Bearing in mind the importance of (a) the need to ensure that victims are compensated without delay and (b) making certain that the rights of each of the parties have been properly appreciated, there is a need to reconcile each party's right to lodge an appeal against the decision with the abovementioned overriding needs.

c)  The recognition of this right of appeal should therefore oblige the Member States to establish a rapid appeal procedure in order to avoid the application of a purely stalling mechanism.

d)  Furthermore, having the certainty that proper provision has been made in the accounts of the liable party for the compensation which it has been ordered to pay also provides a guarantee for the victims in the event of an appeal.

③❶❍❍◗  **Financing the system**

a)    The collective action system must ultimately be self financing.

b)    Given that it is not desirable, or even possible, to introduce a blanket system of US-style *contingency fees,* since such a system runs counter to the European legal system, it is essential to make provision for a form of financing which would enable claimants who do not have the requisite funds to instigate a collective action to obtain an advance in respect of their legal costs (lawyer's fees, cost of expert opinion in connection with the inquiry measures undertaken by the judge, etc.).

c)    One of the ways of funding this system would be by establishing a "support fund for collective action", provisioned by the sum of the "unlawful profits" made by enterprises which have been convicted; these profits, as defined by the judge in the course of the procedure, could be so used insofar as they are not claimed by identified persons who have suffered direct injury[343].

d)    The support fund may also (a) have the role of centralising all the information relating to ongoing collective actions and (b) be instructed to pass on information relating to the steps to be taken by the persons concerned with a view to making themselves known, excluding themselves from a collective action or securing compensation.

### ③❶❷◌ Additional procedural rules

From a detailed point of view, there will be a vast range of procedural rules which will have to be laid down but they will be listed only as a "token entry".

Such procedural rules will have to be drawn up in the case of:

–  the arrangements in respect of notifying interested parties;
–  legal expenses and legal aid;
–  cooperation between judicial and administrative authorities in the Member States;
–  deadlines in respect of the instigation of legal proceedings and prescribed periods;
–  the use of the internet (eJustice).

---

[343]    A good example in this context is the "support fund for collective action" set up in Quebec; this fund is regarded as playing a vital role in the development of collective actions. It is provisioned by the reimbursement of sums advanced to claimants who win their collective actions and from the residue of compensation payments not claimed by members of groups involved in collective actions. Claimants who instigate collective actions are able to secure from the judge the reimbursement of expenditure incurred in instigating the action only on condition that they provide supporting documents.

**Legal instrument to be employed: a regulation or a directive?**

3.4.2.    Provision could be made for the introduction of collective actions at EU level by having recourse to either a directive or a regulation; it is considered that a mere recommendation would, by definition, fall short of what is required for creating the conditions for effective, uniform action which are necessary to enable such a measure to be adopted in a harmonised way in 27 Member States.

3.4.2.1.    Provided that the content envisaged is extended to cover other matters and not only consumers' rights, and provided that Articles 65 and 67 of the EC Treaty are selected as the legal basis, the adoption of a regulation could be considered, on a par with, for example, the regulations on: insolvency procedures; the European enforcement order; the European order for payment procedure; the European small claims procedure; and the attachment of bank accounts.

3.4.2.1.1.    If, however, it is decided to restrict – at least for an initial period – the field of application of this initiative to that of consumer rights, the most appropriate way of making provision for collective actions at EU level would appear to be by means of a directive; such a directive would follow up the directive on actions for injunction.

3.4.4.    Considerable differences as regards procedural rules continue to exist between the Member States. The basic principles underlying collective actions should therefore be set out in general terms since the Member States would apply the directive having due regard to their usual procedural principles.

It is indeed not certain that, for example, harmonisation will be possible since the courts given jurisdiction to hear these actions would themselves depend on the rules applicable in each Member State as regards the administration of justice.

The methods of referral must be in line with the specific provisions of the Member States. The use of a regulation would therefore not be appropriate.

3.4.4.    It would also appear to be self-evident that, in this case, the proposed directive must provide for full harmonisation in order to prevent Member States from making the system more binding to the detriment of enterprises which have their head office in the said Member States.

Brussels, 14 February 2008.

The President                                The Secretary-General

|  |  |
|---|---|
| of the | of the |
| European Economic and Social Committee | European Economic and Social Committee |

|  |  |
|---|---|
| Dimitris Dimitriadis | Patrick Venturini |

*

*        *

N.B.: Appendix overleaf.PPENDIX

to the
OPINION
of the European Economic and Social Committee

The following amendments, which were supported by at least a quarter of the votes cast, were rejected in the debate:

1.    Point 7.2.2.2.4

"The procedure also has a real deterrent effect on the liable party, since the latter is obliged to compensate all the persons who have been victims of a given practice ~~and may have to refund the unlawful profit derived from the practice in question~~."

Reason

See point 7.6.3.

Result of the vote

| Votes in favour: | 104 |
|---|---|
| Votes against: | 114 |
| Abstentions: | 13 |

2.    Point 7.6.1.

Delete:

*"The collective action system must ultimately be self financing."*

Reason

Access to justice is the responsibility of the public authorities and must not depend on the success of previous actions which are unconnected with subsequent cases (see also reason for amendment to point 7.6.3).

Result of the vote

Votes in favour:      107
Votes against:      116
Abstentions:        10

3.      Point 7.6.3

> *"One of the ways of funding this system would be by establishing a 'support fund for collective action', provisioned by the sum of the "unlawful profits" made by enterprises which have been convicted; these profits, as defined by the judge in the course of the procedure, could be so used insofar as they are not claimed by identified persons who have suffered direct injury. It is up to the public authorities to guarantee access to justice, for example by assigning revenue from fines for contraventions of consumer law to financing collective actions."*

**Reason**

The form of recourse envisaged aims to provide compensation for damage suffered by consumers, but excluding "punitive damages".  This concept borrowed from US practice inappropriately combines civil interests and criminal law.  The mere fact of fully compensating consumers for their loss constitutes an effective deterrent for the liable party.

The question of whether a profit has been made as a result of contravention of the law or fraud is a matter for sanctions imposed by the public authorities.  They may assign revenue from fines levied to facilitate access to collective actions.  Responsibility for ensuring access to justice lies with government, which is subject to democratic scrutiny, rather than with private law individuals and organisations.

As the damages due will have been paid to the consumers who suffered the loss, it would be inappropriate to create an artificial link between the surplus from one action and actions in subsequent cases, particularly where the objective was no longer to obtain fair reparation for the consumers who had suffered loss in the case in question.

Result of the vote

Votes in favour:      104
Votes against:      106
Abstentions:        18



**European Economic and Social Committee**

***Section for the Single Market, Production and Consumption***

# APPENDIX

# to the

# WORKING DOCUMENT

of the

Section for the Single Market, Production and Consumption

on

**"Defining the collective actions system and its role in the context of Community consumer law"**

(Own-initiative Opinion)

———————

# Comparative tables of collective redress in consumer law litigation, by country

(prepared by Mrs Gaëlle Patetta)

# Representative action in the EU Member States (I)

| | Austria | Belgium | Denmark | France | Finland | Luxembourg |
|---|---|---|---|---|---|---|
| **Description** | The Austrian Code of Civil Procedure (*Zivilprozessordnung/ZPO*) does not provide for a special proceeding for collective actions. However, in recent years, consumer organisations have found a way around this gap in legislation (Article 227 of the Code of civil procedure - *Austrian style collective action*). Injunction proceedings are provided for under Articles 28 to 30 of the Consumer protection law. | In Belgium, an individual or legal person must have a current, immediate and personal interest in order to take action. This has traditionally prevented a person or group from instituting proceedings in the name or on behalf of a group of persons. However, in recent years a degree of collective action has been introduced in a limited number of areas (legislation on trade practices and consumer credit and on environmental and human rights organisations). Article 95 of the Law of 14 July 1991 on trade practices, consumer information and protection provides for injunction proceedings. - A proposal for reform was tabled in 2003 but came to nothing. It did not give specific details of relations between the association and the group, and did not specify how the compensation should be divided between the members of the group. - A new reform proposal was tabled on 11 July 2006, aimed at amending | Articles 20 and 27 of the *Marketing Practices Act* (No 1389/2005) provide for injunction proceedings. | Approved consumer associations have the right to take legal action. Four types of action are possible (Article L 421-1 et seq. of the Consumer Code). Article L 462-1 of the Trade Code also allows consumer associations to bring injunction proceedings before the Competition Council against anti-competitive practices. A compensation claim cannot be lodged with the Council. Consumer associations may also bring an action before the administrative courts against the abuse of power by administrative authorities or to make the administration liable. | The Ombudsman may bring administrative proceedings against abusive trade practices or clauses (Article 9 of the Consumer Agency Act, and Article 3(3)(2) of the Consumer Protection Act, etc.). The Ombudsman, or, where the Ombudsman refuses to take the action, a legally-empowered consumer organisation, may also bring proceedings before the Market court, on the basis of a petition. Finally, a law introduced on 12 January 2007, which entered into force in March 2007, provides for proceedings fairly similar to that which pertains in Sweden, allowing the Ombudsman to bring consumer collective actions before the Finnish Consumer Complaints Board. | The law of 19 December 2003 enables organisations authorised by the Minister for Consumer Affairs to call for the cessation of activities that are in breach of certain laws (laws on consumer protection, credit, e-commerce, etc.). The law of 25 August 1983 on the legal protection of consumers and the law of 30 July 2002 regulating certain trade practices enables organisations authorised by the Minister to initiate criminal proceedings (file a civil action) where these two laws are infringed. |

| | | the judicial code, with a view to granting associations the right to institute collective actions. It proposes to allow associations with legal standing to bring an action to protect a collective interest pertaining to its statutory objective. The bill is still before the Chamber of Deputies. | | | | |
|---|---|---|---|---|---|---|
| **Scope** | **Consumer law** | **Consumer and investor protection** | **Consumer law** | **Consumer law** | **Consumer law** | **Consumer law** |
| **1 - Institution of the proceedings** | In the case of Austrian-style collective actions the district court has jurisdiction for actions up to EUR 10 000 and the regional court for actions above EUR 10 000. The regional court has jurisdiction for injunction proceedings. | The president of the Commercial court has jurisdiction. | The Maritime and Commercial Court in Copenhagen has jurisdiction. | Criminal courts (local court, police court or criminal court) or civil courts (local court, magistrates' court or county court). | Office of the Ombudsman, Market court or Finnish Consumer Complaints Board | |
| **1-1 Preconditions to taking a representative action** | | | | | | |
| ***1-1-a the representative*** | ***-Austrian-style collective action***: Actions may be taken by the Consumer protection association (VKI) and the Federal chamber of workers and salaried employees. **- Injunction proceedings:** Several professional representative bodies, such | Any person with a personal and direct interest (consumer or business); the Minister for the Economy; professional, inter-branch, or consumer organisations. | Any representative body that demonstrates a sufficient and personal interest may take an action. The Ombudsman may also institute proceedings. Since 1994, he may also, if he so | Duly-declared associations whose statutory object specifies the protection of consumer interests may, if they are approved for this purpose, exercise the rights conferred upon civil parties in | Ombudsman or representative organisations. In Finland, two organisations represent the interests of consumers at national level: - Suomen Kuluttajaliittory (The Consumer association of Finland) | Only one organisation – the ULC [Luxembourg Consumer Union] – has been recognised by the Minister and is authorised to initiate injunction proceedings. |

| | | | | |
|---|---|---|---|---|
| as the Federal economic chamber and the Chamber of agriculture, as well as the VKI, may bring injunction proceedings. | | requests, pool consumers' claims for compensation, where these are identical. | respect of events directly, or indirectly, prejudicing the collective interest of consumers. (Article L421-1 and R411-1 of the Consumer Code). Authorisation is granted to associations that: 1. can prove on the date of request that they have been in existence for one year, from the date of declaration; 2. during this period of existence, can provide evidence of effective and public activity with a view to the protection of consumer interests, evaluated, in particular, in line with the circulation of publications relating to the holding of regular information meetings; 3. bring together, on the date of the application for approval, a number of individually paid-up members: a) at least 10 000 for national associations; this condition not being required for associations dedicated to research and analysis | - Kuluttajat – Konsumenternary (local consumer associations) *The Consumer association of Finland* is a national coordination body representing 60 dulydeclared local associations. It also accepts individual members. In addition, seven national organisations including Finnish salaried employees, patients and retired people are members of the association. The *local consumer associations* (Kuluttajat-Konsumenternary) are a separate organisation with approximately 750 members and seven memberorganisations | |

| | | | | of a scientific nature;<br>b) an adequate number, in consideration of the territorial<br>framework of their activity, for<br>local, departmental or regional<br>associations.<br>Where the association has a<br>federal or confederal structure, the<br>total number of paid-up members of<br>all the component associations is<br>taken into consideration. | |
|---|---|---|---|---|---|
| **1-1-b grounds for admissibility** | - Austrian-style collective actions:<br>Consumer associations are taking<br>more and more actions on behalf<br>of hundreds of consumers. These actions involve<br>transferring to one single entity<br>(the consumer association) all the<br>individual actions against the same defendant. The appointed<br>proxy then brings one single action before the courts in his<br>own name.<br>This system greatly reduces the<br>cost of proceedings. The consumer department of the Ministry of Justice may come to<br>an agreement with the association to cover the costs | The consumer association taking the<br>action must be a member of the Consumer Council, to which 14 consumer associations are currently<br>affiliated. | The purpose of such actions is to<br>compensate associations where<br>damage has been incurred. But it<br>is also possible for a consumer to<br>join an action brought by a<br>representative organisation in<br>order to obtain compensation for<br>his own damages. | - Actions taken in the collective<br>interest of consumers:<br>a) action to stop illegal actions or to<br>remove illegal or abusive clauses:<br>consumer associations may ask the<br>civil court, ruling on civil actions, or<br>the criminal court, ruling on civil<br>actions, to order the counsel for the<br>defence or the defendant, where<br>appropriate subject to penalty, for<br>any measure intended to stop illegal<br>actions or to remove illegal clauses<br>from the contract or the standard<br>contract offered to consumers | - In the case of administrative<br>proceedings brought by the<br>Ombudsman, an initial proposal<br>must be made to the business to<br>make a written commitment to<br>cease the practices in question or<br>its use of abusive clauses. Only<br>where such an attempt to find an<br>amicable settlement fails can the<br>proceedings be initiated.<br>- In the case of proceedings<br>brought before the Market court,<br>the business is requested, during a<br>preparatory phase, to give a | |

| | of<br>the case. The VKI may also turn<br>to of a German financial company which covers all costs<br>in the event of the action failing<br>or, where it is successful, receives 30% of the compensation as a contingency fee.<br>This type of proceedings also allows matters of law and of fact<br>that are common to several actions to be settled once and for<br>all, in the context of a model case.<br>The Austrian Supreme Court has<br>deemed that such proceedings are<br>legal, provided that the grounds<br>for all of the individual actions<br>are the same.<br>- Injunction proceedings :<br>Associations may take an action<br>to have abusive clauses removed,<br>where EU legislation has been breached, or in the case of<br>conduct contrary to competition<br>law (e.g., unethical or misleading<br>advertising).<br>Before referring the matter to the<br>court, the plaintiffs must call | | | (Article L421-2 of the Consumer Code).<br>The associations mentioned in<br>Article L. 421-1 and organisations<br>able to provide proof of their<br>inclusion on the list published in the<br>Official Journal of the European Communities in application of<br>Article 4 of Directive 98/27/EC of<br>the European Parliament and of the<br>Council on injunctions for the<br>protection of consumers' interests<br>may bring an action before a civil<br>court to stop or prohibit any illegal<br>action in respect of the provisions<br>transposing the Directives mentioned in Article 1 of the<br>aforementioned Directive.<br>The judge may order, on these<br>grounds, where appropriate subject<br>to a fine, the deletion of an illegal or<br>abusive clause in any contract or<br>standard contract offered to, or<br>intended for, the consumer. (Article<br>L421-6 of the Consumer | written response to the petition;<br>only after this may the judgment<br>phase begin. | |

| | | | | |
|---|---|---|---|---|
| | on<br>the company to cease its illegal<br>activities. | | | Code).<br>Such action is possible notwithstanding the existence of any established individual or collective<br>damage.<br>Abusive clauses must be in force at<br>the time the writ is issued (preventive/deterrent aspect of<br>action)<br>b) Intervention in civil actions:<br>The associations mentioned in<br>Article L. 421-1 may institute<br>proceedings in civil courts and, in<br>particular, request the application of<br>the measures provided for in Article<br>L. 421-2, where the initial application aims to repair damage<br>suffered by one or more consumers<br>due to events not constituting a<br>criminal offence. (Article L 421-7 of<br>the Consumer Code).<br>- Representative actions: Where<br>several consumers, identified as<br>natural persons, have suffered<br>individual damages caused by the<br>same business act and which have a<br>common origin, any | | |

| | | | | approved association recognised as being representative on a national level in application of the provisions of Part I may, if it has been duly authorised by at least two of the consumers concerned, institute legal proceedings to obtain reparation before any court on behalf of these consumers. The mandate may not be solicited by a public appeal on radio or television, nor by posting of information, by tract or personalised letter. Authorisation must be given in writing by each consumer. Any consumer who has agreed, in accordance with the conditions provided for in Article L. 422-1, to the institution of proceedings before a criminal court is, in this event, deemed to be exercising the rights conferred upon a civil party in application of the French code of criminal procedure. Notifications or | | |
|---|---|---|---|---|---|---|

| | | | | notices concerning the consumer are, however, addressed to the association (Article L 422-1 et seq. of the Consumer Code). This type of action has been used on only 5 occasions since its inception as it has proved very complicated to handle and very costly for consumer associations. | | |
|---|---|---|---|---|---|---|
| *2- Judgments* | - Austrian style collective action: The court awards compensation for damages. - Injunction proceedings: The judge penalises conduct contrary to EU or Austrian legislation, but does not award compensation for damages. | The sole purpose of such actions is to secure the cessation of illegal practices; under no circumstances may they be taken for compensation purposes. Furthermore, the associations must bear the cost and the risk that the action entails. | The court compensates the damage incurred by the association (if any) and by the consumers who were allowed to join the action | - Actions taken in the collective interest of consumers: a) action to stop illegal actions or to remove illegal or abusive clauses: such actions enable the effective application of consumer law. Public announcements, which are often ordered by judges, enable the greatest number of consumers to be informed of their rights. Compensation awarded for the infringement of consumers' collective interest is paid to the association and not to individual consumers. Furthermore, decisions issued benefit only the parties to | - In the case of administrative proceedings, the ombudsman can only order the cessation of the activities or the removal of the abusive clause. - In the case of proceedings before the Consumer Complaints Board, the Board may order the defendant to implement the necessary recommendations to settle all actions by consumers that are affected by the same problem. | In the case of criminal proceedings, compensation may be sought as well as publication. The organisation must quantify the damage and prove the causal link between the damage and the fault of the defendant. |

| | | | | the proceedings (The principle of relative jurisdiction of the matter judged). b) Intervention in civil actions: the association may obtain compensation for damage caused to the collective interest of consumers but an initial request must be lodged by a consumer. - Representative actions: damages obtained in a ruling against a business by a court referred to by the mandated association are awarded to the consumers who gave the association its mandate. | | |

**Representative action in the EU Member States (II)**

|  | Greece | Italy | Netherlands | Poland | Slovakia | Czech Republic |
|---|---|---|---|---|---|---|
| **Definition** | Article 10 of law 251/1994 on consumer protection, provides for action aimed at preventing infringements of consumers' rights. It involves an injunction procedure against any infringement of consumer protection legislation. | Group action does not yet exist in Italy (see the section on reform plans). Provision is only made for representative action. The aim of such action is to stop (injunction) infringements of consumer rights or cause unfair clauses to be eliminated (Articles 37, 139 and 140 of the Italian Consumer Code). | There is provision for general group action under Article 3:305a of the Dutch civil code. Action to eliminate unfair clauses is provided for in Article 6:240 of the civil code. | Action to eliminate unfair clauses in consumer contracts is provided for in Articles 47936 – 47945 of the civil procedure code (k.p.c.) Action for cessation in the case of anti-competitive practices is also provided for in Articles 17 and 18 of the Act on combating anti-competitive practices of 16 April 1993 (Dz.U. 2003, Nos. 153 - 1503). The aim is to protect the interests of both consumers and investors. | Article 26 of Law No 634/1992 on consumer protection and the civil procedure code provide for the possibility of requesting the prohibition or cessation of an illegal act or practice. This procedure has only been available since 2004. | Consumers and consumer associations may institute a cessation procedure (injunction) on the basis of consumer protection Law No 634/1992 or the Commercial Code for protection against unfair competition. |
| **Scope** | Consumer law | Protection of consumers' interests and action against unfair terms in consumer contracts | Remedy of general application. | Protection of consumers and investors | All cases where consumer rights provided for under Law 634/1994 have been infringed. | The procedure can be introduced to bring an end to illegal practices detrimental to consumers. |
| **1. Competent jurisdiction** | The court of first instance is the competent jurisdiction. | The court with jurisdiction for actions for cessation (injunctions) is the civil court of first instance. |  | The "Sad Ochrony Konkurencji I Konsumentów", the court for consumer protection and competition, has jurisdiction for the action to eliminate unfair clauses. | The courts with jurisdiction for civil cases or trade disputes |  |

|  |  |  |  | For the cessation procedure, the ordinary rules of jurisdiction apply. |  |  |
|---|---|---|---|---|---|---|
| **1-1 Prior conditions for representative action** |  |  |  |  |  |  |
| **1-1-a the representative** | Only specific consumer associations which meet criteria determined by the law or specific trade or business chambers may bring an action. | - Action against unfair clauses: under Article 37 of the Italian Consumer Code, associations representing consumers and businesses, and chambers of commerce, industry, handicrafts and agriculture may institute proceedings against a business or association which uses or acknowledges use of unfair clauses and may ask the court to prohibit these clauses. - Action to protect consumers' interests: under Articles 139 and 149 of the Italian Consumer Code, associations may prevent acts and behaviours infringing consumers' interests. | A representative body may act to protect the interests of third parties, if the objective of the said body, as defined in its statute, is to act to defend such interests. | - Action to eliminate clauses: All consumers to whom the contract was proposed, consumers' associations, the Ombudsman and the President of the Office for Competition and Consumer Protection (UOKIK). - Action in cessation: Only the President of the UOKIK. | A consumer or consumer protection organisation may initiate the procedure. | The procedure can be initiated by a consumer whose rights have been infringed or by consumer organisations. |
| **1-1-b admissibility criteria** | The consumer association must: |  | The various interests must be |  |  |  |

|  |  |  | sufficiently similar to be included in a single action, and the application must contain common matters of law and fact. The representative body acts in its own name; the parties it is representing are not litigants. Before taking action, the body must endeavour to reach a settlement with the defendant. |  |  |
|---|---|---|---|---|---|
| **2-the judgment** | The court orders the acts to cease and compensates for nonmaterial injury to the general consumer interest. There is no compensation for individual damages. | - Action against unfair clauses: the judge may eliminate unfair terms in contracts concluded between consumers and businesses. - Action to protect consumer interests: the judge may put an end to the acts and behaviours that infringe consumer interests. | Requests for compensation are not possible in this action. The sole objective of the request is to ensure compliance with or termination of a contract or order publication of specific information concerning the defendant's products or services. | - Action to eliminate clauses : The clauses are eliminated. No damages may be claimed. - Action in cessation: The court orders interruption of the activity. The decision may be made public. The judge may also order a sum of money to be paid for social purposes or as compensation for the anticompetitive practice. | The court may only deliver a judgment on the cessation of the act or practice. | The decision links all the persons affected by the practices (res judicata). The decision may be published at the expense of the losing party. In actions against unfair competition practices, consumers may apply individually for damages. Collective reparation is not possible. |

# Representative actions in the EU Member States (III)

| | Hungary | Sweden | Cyprus | Lithuania | Slovenia | Ireland | Spain |
|---|---|---|---|---|---|---|---|
| **Definition** | Several representative actions are possible in the event of the infringement of consumer rights. Collective action is provided for under section 92 of the Competition Act and under section 39 of the Consumer Protection Act. Its objective is to protect the rights of consumers even if they are not identified. There is also an action to remove unfair terms, provided for under Article 209/B of the civil code Act IV of 1959 (hereinafter HCC). | In Sweden there is a "special joint complaint" action, which may be brought before the Swedish Consumer Complaint Board (see Finland for a similar action). | Following the transposition of EU Directive 98/27, the consumer protection laws provide for an injunction. This action has yet to be used. | The Code of Civil Procedure provides for an injunction and an action to remove unfair terms. Collective action is in theory provided for under Article 49 of the Code of Civil Procedure. This article states that a group may bring a claim with the intention of protecting the public interest. However, there are no other provisions setting out this action for damages, which means that it is not enforceable in practice. | Slovenia has two injunction actions. - Articles 75 and 76 of the Consumer Protection Act authorise consumer organisations to request the voidance of contracts. - Article 133 of the Code of Obligations also provides for the possibility of requesting the cessation of activities involving risk. | The law on the regulation of unfair terms in consumer contracts of 1995, amended in 2000, gives consumer organisations the possibility of requesting the high court to prohibit the use of unfair terms. This action is not used by associations through lack of financial resources. | An injunction is provided for under Article 11(4) of the law of 7 January 2000. |
| **Scope of application** | Consumer law | Consumer and social law. | This action can be lodged in the event of any violation of consumer protection laws (unfair terms, timeshare, distance selling, sale and | | - The action provided for under the Consumer Protection Act can be used only in disputes between consumers and professionals (actions which violate the law or | Unfair terms in consumer contracts. | This action may be lodged in the event of noncompliance with several sector-specific laws. |

|  |  |  | guarantee of consumer goods etc.). | professional usage).<br>- The Code of Obligations Procedure is used to protect against activities involving risk. |  |  |
|---|---|---|---|---|---|---|
| **1- Instituting judicial proceedings** | The civil court has jurisdiction for these two actions. |  |  |  |  |  |
| **1-1 Prerequisites for representative action** |  |  |  |  |  |  |
| **1-1-a the representative** | The representatives can be:<br>- section 92 of the Competition Act : consumer associations, the Competition Council<br>- section 39 of the Consumer Protection Act:<br>the Inspectorate General for Consumer Protection, the public prosecutor's office, the National Audit Office, consumer associations<br>- action to remove unfair terms:<br>the public prosecutor, the minister, the chamber of commerce, professional chambers or | Only the Ombudsman has the authority to refer a matter to the Swedish Consumer Complaint Board. But if it declines to lodge the action, consumer and employee organisations may do so. Individual consumers cannot lodge this action. | The action can be lodged by the Department for Competition and Consumer Protection of the Ministry for Trade, Industry and Tourism or any organisation able to demonstrate a legitimate and sufficient interest in protecting the collective interests of consumers in general (the Cypriot Consumers Association and the Union for Cypriot Consumers and Quality of Life). | The action may be lodged by consumer organisations and the National Office for the Protection of Consumer Rights. | - Only a consumer rights organisation which has been in existence for over a year or an association of consumer rights organisations may lodge an action under the Consumer Protection Act.<br>- The Code of Obligations Procedure may be instituted by any individual or group of individuals who wish to do so. | The action may be lodged by consumer rights organisations or by the Consumer Affairs Officer. | The National Consumers' Institute and its regional associations and the public prosecutor may lodge this action. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | professional associations as well as consumer organisations. | | | | | |
| **1-1-b conditions of admissibility** | - section 92 of the Competition Act : consumer associations and the Competition Council may bring before a court consumer complaints against a single defendant who has caused injury to a large number of consumers or wherever consumers cannot be identified in the event of significant injury resulting from an illegal act.<br>- section 39 of the Consumer Protection Act: a consumer association, the Inspectorate-General for Consumer Protection, the public prosecutor's office and the National Audit Office may take action against an individual whose illegal activities cause injury to a large number of | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | consumers or cause significant damage to consumer interests. It is not necessary for the consumers to be identified. | | | | | |
| **2- the ruling** | - section 92 of the Competition Act: the court may order the defendant to reduce or modify the price, to repair or replace the product. It may also order the ruling to be published in a national journal with the costs to be covered by the losing party. - section 39 of the Consumer Protection Act: the court may order the cessation of the injurious situation and may also order the ruling to be published in a national journal with the costs to be covered by the losing party. - action to remove unfair terms: The contract is declared | If it deems the action to be justified, the Consumer Complaint Board may order the defendant to implement the necessary recommendations to settle all disputes involving consumers who have been victims of the same problem even if they have not acted individually. | The action makes it possible to obtain a temporary or permanent injunction. In certain cases, the competent authority may also order the enterprise to pay an administrative penalty. | Only an injunction may be obtained from the court. Compensation in the form of damages is not possible. | Under these two actions, the court orders cessation. In the action provided for under the Consumer Protection Act, it may also make provision for information and publicity measures with the costs to be covered by the defendant. The court may also rule that a contract or part of a contract be annulled. | | The aim of the action is to prohibit or put an end to an illegal practice. In certain cases, plaintiffs may also claim compensation for damages incurred. |

| | invalid and the judge may order the ruling to be published in a national journal or on the Internet. | | | | | |
|---|---|---|---|---|---|---|

# Collective action in EU Member States (I)

| | England | Germany | Sweden | Spain |
|---|---|---|---|---|
| **Definition** | The 2000 amendment to the 1998 Civil Procedure Rules improves and develops collective actions known as multi-party actions (Part 19 III and 48). This procedure enables a certain number of claimants (natural or legal persons or other entities), with a common interest (de facto or de jure) to bring action as a group against one or more defendants. This is a test case procedure. It should be noted that Article S. 47 B of the 1998 Competition Act allows certain authorised organisations to bring a compensation suit before the Competition Appeal Tribunal on behalf of a group of two or more individual consumers subsequent to some form of abuse of dominant position. However, the action must follow on from a decision noting the antitrust practice. | Germany has adopted a procedure intended to facilitate the commencement of actions by individual investors for false information, misleading or inadequate information or public information concerning capital markets – law of 1 November 2005, the Act on Model Case Proceedings in Disputes Under Capital Markets Law. The test phase for this law continues until 2010. If successful, it will be extended to other areas. This is a test case procedure. Germany also has the Sammel ou Muster klage procedure, under 1(3) No. 8 of the RBerG (German Law Governing Legal Advice). Consumer associations or centres for consumer protection may bring cases on behalf of consumers who have transferred their disputes to them | A model for group action was established in 1973, originally limited to cases where the National Board of Consumer Claim (NBC) had already examined the matter and recommended that the consumers be awarded compensation. The consumers' ombudsman then became competent for cases which had not previously been examined by the NBC. The law of 30 May 2002 established a new procedure for group action, the grupprättegang, which entered into force on 1 January 2003. The action is brought by a plaintiff (private person, legal entity, non-profit making association or governmental authority) representing a large group of people. According to the type of plaintiff, the group action is qualified as private group action, action by an organisation or public group action. This procedure has been used six times since it was set up. | The law of 7 January 2000 established collective action to facilitate compensation for damages suffered by consumers and users. Provision is made for this under articles 11.2 and 11.3 of the law. |
| **Scope** | Group action may be used for all types of dispute, | The scope is very limited, concerning only disputes | Group action may apply to all cases brought before | Civil liability action may be criminal or |

| | | | |
|---|---|---|---|
| | but in practice is primarily used in cases of physical injury caused by a sudden accident, industrial disease or the harmful effects of pharmaceutical products; physical injury and/or financial damage caused by the use of defective products, the sale of financial products at a loss or further to the publication of misleading information; material damage caused by, inter alia, a faulty repair; against the government for financial damage caused by the failure to implement European law. | regarding financial market law, e.g. an application for compensation owing to false information, misleading information or omitted public information concerning the financial markets; or an application for the fulfilment of a contract, which is based on an offer under the Securities Acquisition and Takeover Act. | the ordinary courts of first instance, with the exception of action by an organisation, which is restricted to consumer and environmental law. Nevertheless, group action is essentially intended for environmental law, labour law, consumer law and the main laws on consumer protection: the law on marketing, the law on the contractual conditions of consumers, the law on product safety, the law on consumer sales, the law on consumer credit, the law on consumer insurance, the law on price information and the law on distance and door-to-door sales. | contractual in nature and allows compensation for damages arising from unfair clauses, unfair competition or unlawful publicity. These actions may be brought for all types of pecuniary or personal damage, including non-material damage. |
| **1 – Presentation of the body** | | | |
| | | | |
| **1-1 Prior conditions for collective action** | | | |
| | | | |
| **1-1-a the group** | This may be a group of claimants or a group of defendants. In principle, the members of the group, who must have suffered damages, must be mentioned by name in the application for a summons. Failing that, group actions may be brought without the names and addresses of the members being known in advance, provided however that they are readily identifiable. | The law on model procedures in financial law disputes allows similar disputes to be grouped together (minimum of ten). The disputes must concern the same issue in the field of stock market disputes. | The group is made up of persons on whose behalf the plaintiff is bringing the action. It must be identified in detail and must include a large number of people. The group may be extended during the action provided that this does not result in any additional excessive delays in the procedure. The members of the group must have suffered damages and must be mentioned by | The group must be made up of the majority of the injured parties, i.e. of those injured parties who have decided or may easily be persuaded to decide (the burden of proof rests on the group). Nevertheless, owing to their legitimacy, associations are not required to bring together the majority of the injured parties. |

| | | | | |
|---|---|---|---|---|
| | The court must have a reliable assessment of the number of potential plaintiffs. It may also set criteria for joining the group, often based on factual circumstances. During the action, the judge may authorise the plaintiff to extend the group provided that this does not result in any additional excessive delays in the procedure. | | name in the application for a summons. Group action may however be brought without the names and addresses of the members being known in advance, if they are readily identifiable. | |
| **1-1-b definition of the group** | **Opt-in**<br>This system requires explicit agreement to be included in the action brought. The action is based on a specific mandate and silence is interpreted as refusal.<br>The plaintiffs may join the group at any time but the court may set a deadline, after which no further complaint may be added to the register. Parties wishing to be included in the action after this date must apply to the court for authorisation, stating the reasons why they were unable to register before the deadline.<br>If a potential plaintiff does not join the action before the deadline, he may still bring an individual action, but he will not benefit from public funding or insurance.<br>A claimant may withdraw from the group at any moment, subject to payment of the | **Opt-in**<br>This is a unique system since plaintiffs who have brought similar individual procedures will be bound by the outcome of the model procedure, irrespective of whether they have taken an active part in this.<br>However, the other injured parties who have not taken legal action may not benefit from the decision. | **Opt-in**<br>This system requires explicit agreement to be included in the action brought. The action is based on a specific mandate and silence is interpreted as refusal.<br>Only those bodies or persons who, having received service of process from the judge of their intention to form part of the group, have clearly expressed the wish to do so. Once they have opted for the procedure, the group members are forbidden from acting on an individual basis and only the group may appeal against the judge's decision. The members of the group covered by the procedure are mentioned by name in the judge's decision | **Opt-in**<br>This system requires explicit agreement to be included in the action brought. The action is based on a specific mandate and silence is interpreted as refusal.<br>The consumer may take part in the class procedure. |

|  | expenses<br>incurred until withdrawal. If a test claimant wishes<br>to withdraw from the dispute, a new test claimant<br>must be appointed. |  |  |  |
|---|---|---|---|---|
| **1-1-c the test claimant** | The test claimant is appointed by the authorisation<br>order. | The Higher Court appoints a test claimant; the test claimant and the defendants are the only parties. The other plaintiffs are authorised to follow the procedure as third parties. | There are three possible types of action:<br>- private group action: brought by a physical<br>person who has suffered damages.<br>- Action by an organisation: an organisation may<br>bring group action if its aim is to protect<br>consumers or employees in connection with the<br>goods or services offered by the defendant or if it<br>establishes that there is a significant advantage to<br>the litigation being dealt with via group action.<br>This action is open to all non-profit making<br>organisations pursuing these objectives provided<br>that they have the financial means needed and that<br>the court considers that they are an appropriate<br>representative for the group.<br>- public group action: brought by an authority<br>appointed by the government, in light of the nature<br>of the litigation and the capacity of the authority to<br>represent the members of the group. | The action may be brought by an individual<br>consumer, a consumer association, a specific<br>group (afectados) or the public authorities. The<br>protected interests of the consumers may be<br>collective or generalised.<br>- The interest is collective (intereses colectivos)<br>when the injured party is readily identifiable. The<br>burden of proof rests on the group. The action may<br>therefore be brought by both a consumer<br>association and a group of consumers if the group<br>includes the majority of the injured parties.<br>- The interest is generalised (intereses difusos)<br>when the injured parties are difficult to identify.<br>Under these circumstances, certain consumer<br>associations are authorised to bring a collective<br>action. |
| **1-1-d the solicitor** | The solicitor is appointed either by one or more<br>plaintiffs, or by one or more defendants: his duties<br>are to coordinate the action on behalf |  | The presence of a lawyer is not required for public<br>group action or when one of the group members is<br>able to plead the case. Private group |  |

| | of the plaintiffs or defendants, take action on their behalf and manage the register. These duties are generally allocated by the court to the principal solicitor who is appointed by the parties. If no agreement can be reached among the parties, the court may appoint a solicitor. | | action and action by an organisation must be conducted by a lawyer who is a member of the Bar to ensure that the interests of all parties are protected. | |
|---|---|---|---|---|
| **1-2 legal costs and legal aid** | | | | |
| **1-2-a legal costs** | The legal costs are borne by the losing party. They are advanced by the test claimant but the court may decide otherwise. There are two types of costs: - individual costs: subject to the discretion of the court. A plaintiff who has lost may be required to bear the costs incurred by the defendant in answering his complaint, even if the other plaintiffs win. Should the plaintiffs win, the defendant will bear all the costs incurred. - common costs: the principal court may decide how the costs incurred with a view to resolving common questions or test claim costs should be distributed among the plaintiffs. The group members are normally responsible as a group for the costs of the common action. Conditional fee arrangements are allowed, i.e., if | In principle, the legal costs are borne by the losing party. | The legal expenses are borne by the losing party. They are advanced by the test claimant, and the judge may compel other members to bear certain expenses. The conditional fee system is preferred. Under this system, a claimant and a lawyer may conclude a risk acceptance agreement, under which the lawyer's fees will be set on the basis of the outcome of the dispute. Remuneration as a percentage of the compensation obtained is excluded. Agreements of this nature (risk agreements) may only be argued to group members if they have been approved by the court. | Contingency fees are not authorised. However, it is possible to come to an agreement concerning minimum fees to be paid to the lawyer regardless of the outcome of the trial and which may be increased according to the damages awarded. |

| | | | | |
|---|---|---|---|---|
| | the solicitor loses, he receives no fees, and if he wins, he receives the fees plus a bonus. | | | |
| **1-2-b legal aid** | The claimants may take up an insurance policy (Legal Expenses Insurance) and/or receive funding from the Legal Services Commission. | Legal protection insurance does not apply to group actions. Legal aid is possible under certain conditions and is authorised by the court. | The legal expenses are borne by the losing party. In the case of a group, they are advanced by the test claimant. The judge may compel other members to pay certain expenses. The test claimant may benefit from legal aid to cover the legal expenses and the fees of the lawyer or consultant, and to compensate for his work in connection with the group action, the time spent on the procedure and the advances. | Legal protection insurance is allowed. Legal aid also exists. People eligible to benefit from this must have a salary of less than double the minimum income set each year by the government. |
| **2 – Committal** | | | | |
| **2-1 the competent court** | The ordinary judge is competent, but when the procedure is brought, a principal court is appointed. | The Higher Regional Court is competent once ten applications concerning stock market disputes have been submitted, concerning the same subject. | Group action falls in principle within the remit, in the first instance, of the 68 district courts (Tingsratten), in particular that of the defendant or of the district in which the damages occurred. By way of an exception, actions falling under environmental law are heard before five courts specialising in environmental law. | The civil judge is competent. |
| **2-2 submission of application for collective action** | Each plaintiff must submit an individual detailed complaint (particulars of claim), which must include: a precise statement of the facts on which the plaintiffs are basing their action, | During a financial market procedure, in the first instance, the plaintiffs and defendants may enter an application to bring a model procedure before the court. | A group action is brought in accordance with the general rules of civil procedure. The statement of claim must identify: -the group, -the facts, common or similar, of the complaints | |

| | | | |
|---|---|---|---|
| | their interest in the matter, the compensation requested and the grounds for the complaint. When a person wants his complaint to be examined in the context of a group action, he must submit an application to this effect. The plaintiff must send a copy of his application to the manager of the register with a request to be added to the register. The principal court has the power to order plaintiffs to provide Group Particulars of claim as well, summarising all of the individual complaints. The court may reject a complaint if it considers that the procedure is unfair and unjust and that the cost/benefit ratio does not justify the action. Pre-action discovery is not intended for multiparty action. However, the plaintiffs must comply with pre-action protocol before submitting their complaints. Failure to comply with the rules for the commencement of proceedings may be sanctioned (fine). | The aim of the application may be: - to establish the (non-) existence of certain conditions justifying or ruling out committal, - or for the Higher Regional Court to clarify certain legal questions (Oberlandesgericht). | of the group members, the facts known to the plaintiff which may be important for the examination of certain complaints, -the other facts which are important for establishing whether the individual complaints should be treated as a group action. The plaintiff will also set out in the application the names and addresses of all the group members and the facts to be served to the group members. It may appear, during the examination of another individual procedure, that a group action is more appropriate, and the plaintiff may then, in writing, ask the court to convert his action into a group action, provided that the defendant agrees and it is clear that the advantages of group action outweigh the disadvantages to the defendant of such a procedure. | |
| **3 – Admissibility of the action and the authorisation procedure** | | | |
| **3-1 Conditions for admissibility** | A certain number of complaints must raise | If at least ten applications on identical questions have | The complaints of the group members must be | The aim of the action is the payment of |

| | | | |
|---|---|---|---|
| | common or connected de jure or de facto questions. There must be a major advantage for the court and the parties in having these cases examined collectively. | been entered within four months, the first court must defer judgment on the questions common to these applications and forward the matter to the Higher Regional Court so that it may decide on the model procedure. | identical or of a similar nature as regards the damages suffered. The number of legal bases for the complaints of the group members must not be so large as to render the procedure unmanageable. Group action must offer an advantage compared to other judicial procedures and the group must be identified appropriately. Moreover, the entity or plaintiff who brings the action on behalf of the group must be an appropriate representative for the group, must possess the necessary financial resources for the proceedings, and must not have any interests which run counter to the group's interests. | compensation or the fulfilment of a specific obligation on the part of the defendant. It may also seek to have the defendant's conduct declared unlawful. The collective action should be advertised in advance so that the injured parties may assert their rights or their individual interest. The publication expenses come under the assessed costs. |
| **3-2 The authorisation Order** | | | |
| **3-2-a Request for authorisation** | The procedure usually begins with the examination by the judge of a request for an authorisation order, called a Group Litigation Order (GLO), submitted by a solicitor, on the grounds that there are or there might be a certain number of applications concerning common or connected de facto or de jure questions. The request for a GLO may be made by a plaintiff or a defendant, or even the court, at any time, | | There is no specific rule concerning authorisation or the decision to bring the procedure. | The admissibility of the request is assessed when the judge delivers his decision. |

| | | | |
|---|---|---|---|
| | provided however that the Lord Chief Justice or the Vice-Chancellor have consented. The request for a GLO must contain: a summary of the nature of the dispute, the number and type of the complaints already submitted, the number of parties liable to be involved, the de facto or de jure questions which might be put during the dispute and whether there are questions distinguishing smaller groups from the complaints of the overall group. | | |
| **3-2-b Discovery** | The parties and the court must establish together the extent and deadlines for communicating evidence very early in proceedings and in light of the circumstances of the case. Both plaintiffs and defendants are required to provide appropriate information. So as to facilitate an amicable settlement. Unless the court decides otherwise, any communication, by a plaintiff included on the register, of evidence concerning the questions relating to the GLO must be forwarded to all the plaintiffs included or to be included on the register. Experts' opinions are limited to what is reasonably required to settle the dispute. | No discovery | The forms of proof are governed by the traditional rules: each party must provide proof and the court may sometimes ask that certain specific evidence be brought to the discussion. |

| | | | |
|---|---|---|---|
| **3-2-c Content of the order** | The GLO will specify which court will examine the complaints included on the group register. The GLO will order that a register be kept in which all the complaints will be registered, will set out a list of connected de facto and/or de jure questions for the resolution of the dispute, will confirm the choice of one or more cases (or will choose them itself) which will be examined as test cases (the decision on these will constitute case law), may appoint the solicitor of one or more parties to be principal solicitor for the group of plaintiffs or the group of defendants, may order that the complaints be transferred to a principal court, may order that judgment be deferred on all the other connected complaints until a decision is delivered on a test case, will order that future connected complaints be added to the action and may set a date after which no further plaintiffs may be added to the register. | The applications judged admissible will be announced publicly by the court which will then include them in a register of complaints drawn up by the Electronic Federal Gazette and available via internet (www.ebundesanzeiger.de). | |
| **3-2-d Publication of the order** | The GLO will set the conditions for publication. Service of process is not sent directly to all the persons potentially concerned by the GLO. When | | |

| | | | |
|---|---|---|---|
| | the court draws up an order on its own initiative, without hearing the parties or giving them the opportunity to be represented, a concerned party may request that the order be disregarded, amended or suspended. When a hearing has been held or when certain parties have had the opportunity to be represented but one party has not received service of process or has not had the opportunity to be represented, the latter has the right to contest the adoption of the order, requesting that it be disregarded, amended or suspended. He must contest this before a deadline set by the court or within seven days following the date on which he became aware of the order. | | |
| **3-2-d Procedure subsequent to the order** | Once the GLO has been drawn up and unless the principal court decides otherwise, every complaint already included on the register of the group will automatically be included in the multi-party action. Hearing dates already set, external to the group's dispute, are cancelled. Complaints already pending will be transferred to the court and included on the register. If the court decides not to draw up a GLO, each | | |

| | | | |
|---|---|---|---|
| | complaint will be examined individually. An appeal is possible, subject to authorisation by the judge. | | |
| **4 – Trial** | | | |
| **4-1 Decisions and Steps** | | | |
| **4-1-a Extension of the action** | | | The court may permit the plaintiff to extend a group action to include other complaints or new members, if this does not result in any major delay or disadvantage to the defendant. The request to extend the group must be made in writing and contain the same information as the statement of claim. |
| **4-1 b Abandoning or withdrawing the action** | Should the principal court decide that a complaint cannot easily be examined together with the other complaints included on the group's register, or if it considers that including a complaint on the register would have an adverse effect upon the examination of the others, it may order that the complaint in question not be included on the group's register, or that it be withdrawn. If the court considers that a particular complaint does not fulfil the registration criteria, it may order that | | The test claimant may abandon the group action within the deadline set for sending the agreement, and the procedure will then be abandoned. He may also abandon part of the questions connected to one member's complaint, and that complaint will be abandoned. In that case, the relevant group member may submit to the court, before a specified deadline, a written notice stating that he wishes to be a party and bring an action in defence of his rights. The test claimant's action will then be separate, and may be |

| | | | |
|---|---|---|---|
| | it be withdrawn from the provisions of the GLO. In case of withdrawal, the complaint may still be examined individually, unless a subsequent decision decrees that it be abandoned, rejected, suspended or settled. | | transferred to another competent court. | |
| **4-1- c substitution of the test claimant** | | The parties involved in the model procedure may accept an agreement, as well as the third parties who have entered applications. | If the plaintiff can no longer be considered an appropriate test claimant for the group members, or if he is involved in an appeal, the court appoints another person as test claimant, who has the right to bring a group action. If no new test claimant can be appointed, the action will be abandoned. | |
| **4-2 Amicable settlement** | The English system does not allow confirmation, in so far as the settlement is not mandatory for all the parties to the action and does not prevent the action being pursued. However it is urged by the judge. If the defendants agree to a settlement entailing a global offer, the plaintiffs must decide how this sum will be distributed. However, the court may set an amount and impose a distribution mechanism. If a test claim is settled amicably, the court may order that another complaint be | | The test claimant is authorised to negotiate an amicable settlement with the defendant on the group's behalf. In order to be valid, this settlement must be approved by decision of the judge. It must not discriminate against certain members nor be clearly unfair. It then applies to all group members without discrimination. However, it will only be binding upon group members after service of process and a court injunction. | |

| | | | |
|---|---|---|---|
| | substituted as test claim. In this case, all decisions taken prior to the substitution apply to the new test claim. | | | |
| **4-3 Decision** | | | | |
| **4-3-a The judge will usually deliver his decision first on the common questions and then on the individual questions.** | Concerns one or more test cases. The judge first sets out the principles. | At its discretion, the court will appoint the model case and the model plaintiff. The decision is delivered via model decree. | The court may deliver a decision which, for certain members, is a final decision on fundamental questions and for other members, signifies that discussion on one particular question has been adjourned. The court will then order each group member whose case has not received a final decision to request, before a set deadline, that the question pending be examined. If a group member does not submit such a request, his action will be rejected, unless the defendant has not consented to the request or there are clear grounds for the action. | There are specific rules concerning content and fulfilment in the case of actions brought by consumer associations. If the defendant is sentenced to fulfil certain obligations, the judge must identify the consumers who will benefit from this fulfilment. The judge's decision must at least set down the criteria for benefiting from this fulfilment. If the decision declares the defendant's conduct to be unlawful, it must decide whether the sentence affects injured parties who are not involved in the trial. If consumers take part in the action, the decision must give a ruling on their specific requests. |
| **4-3-b Sentence** | The judge may order collective or individual collection. Should the court order individual collection, each member must enter his individual complaint in the year following the publication of the notice. The court has the discretionary power | The model decree is mandatory. The first court will then give a ruling based on the decision of the Higher Court regarding the individual questions, in particular the amount of compensation. It is possible to appeal to the German Supreme Court (Bundesgerichtshof) against the | | A decision awarding compensation to a consumer constitutes a writ of execution. There is a specific procedure should the decision not establish individual damages, and simply identify the criteria and conditions necessary for obtaining |

| | to decide how the balance will be allocated. Either each party is attributed the amount of compensation, or the judge attributes a lump sum to be distributed by the group. A third party is appointed to assess the complaints individually or distribute an amount to each of the members, under the supervision of the court. | decision of the Higher Court. | | compensation. Third parties who are not involved in the trial may benefit from the decision on the collective action provided they fulfil the conditions identified in the decision. |
|---|---|---|---|---|
| **4-3-c Scope of the decision** | The decision or order is binding upon all the complaints which were included on the group's register at the time when the decision was delivered or the order drawn up. The court may decide that the decision or order is also binding upon complaints subsequently added to the group's register. The resolution of a collective action does not necessarily result in the resolution of each complaint. The appeal against the decision or order may be collective as well as individual. Any party to whom the judgment or order is unfavourable may request authorisation to appeal. A party whose complaint was added to the register after the decision was delivered or the order drawn up may not request that the decision or order be disregarded, amended or | | The group members are not bound by the decision unless they have previously submitted to the court in writing their agreement to take part in the group and to benefit from the procedure. In this case, the decision will have authority over all the members as if they had acted on their own account. An appeal against the decision may be lodged only by the group. | |

| | suspended,<br>nor may he appeal; he may however request that<br>the decision or order not be binding upon him. | | | |
|---|---|---|---|---|
| **4-3-d Service of the decision** | | | The court must serve the decision or final<br>decision, as well the settlement which is<br>subject to a request for confirmation, to the group<br>members. | |

**Collective actions in EU Member States (II)**

| | Netherlands | Denmark | Portugal | Finland |
|---|---|---|---|---|
| **Definition** | 27 July 2005 saw the adoption of an Act on collective settlement of mass damages (Wet collectieve afwikkeling massaschade), which facilitated the collective settlement of such damages (articles 7:907 CC and 1013 CPC). This procedure was created for accidents in which a large number of parties suffered the same injury at the same time. It can only be used where victims, represented by an association, have reached an amicable settlement. | A class action proceeding has been created by Act 181 of 28 February 2007, which will enter into force on 1 January 2008. Class action is presented as a distinct form of procedure intended to enable a – possibly large – number of similar claims to be treated in one and the same suit. The procedure is different for small-claims (opt-out) and for larger claims (opt-in). In addition, only the Ombudsman may conduct the opt-out proceeding. | Portugal has created a class action procedure whose principle has been enshrined in the Constitution since 1989 and which provides for a "right of popular action" (Acção Popular) for the prevention, cessation or pursuit in law of some infractions – Art. 13 of Act 24/96 "Estabeleço o regime legal aplicável a defesa dos consumidores". Portugal also has a suspensory proceeding – Art. 21 of Act 24/96 and Arts. 1(2) and 4 (1) of Decree 234/99 – which can be brought by the Institute of Consumers (Instituto do Consumidor) in regard of goods and services that constitute a risk to the health, safety or economic interests of consumers. Only the cessation, suspension or interruption of the sale of these goods can be sought. | Since 1995, several committees have been tasked with looking into the creation of a class action in Finland. The last report dates from March 2006. Following this report, a law establishing class action, "Ryhmäkannelaki", was passed on 13 April 2007 and will come into force on 1 October 2007. This law has been presented as reinforcing the procedure created in January 2007 which enabled the Ombudsman to initiate an action before the Finish Consumer Complaint Board. Were the recommendations of the Board not to be followed, the Ombudsman could initiate this class action (see the chart Representative action in the EU Member States (I)). |
| **Field of application** | The procedure is of general application. | | The law establishes the scope of the "popular action" as follows: public health, the environment, quality of life, protection for the consumption of goods and services, the cultural heritage and public property. | A class action can only be initiated for collective litigation in the fields of consumer protection (defective goods, contractual clauses, investment and insurance products). Cases involving stock market investments are excluded. |
| **1 –Filing the claim** | | | | |
| **1-1 Prerequisites for the class** | | | | |

| Action | | | | |
|---|---|---|---|---|
| **1-1-a The class** | A group of plaintiffs cannot itself act. They must be represented by a representative body whose articles cover consumer protection. | In the opt-in proceeding, the action can be brought by a consumer, an association, a private institution or other grouping, providing the action falls within its remit, or by the consumers' Ombudsman or other legally competent public authorities. In the case of a class action with opt-out, only a legally empowered public authority (such as the Ombudsman) may initiate the proceeding. In the opt-in procedure: the tribunal sets a deadline for written notice of participation in the class action. The tribunal determines the address to which such notification should be sent. Where justified by special circumstances, the tribunal can allow the adhesion to be made after the deadline. In the opt-out procedure, the tribunal can set a deadline for exclusion from the class action by written notification. The tribunal decides the address to which this notification must be sent. Where justified by special circumstances, the tribunal can allow the renunciation to be made after the deadline. The tribunal can decide that notification shall | Any citizen, as well as associations or foundations representing interests protected by the law within the field of application of the class action, can act if necessary, without mandate, on behalf of all the members concerned The group does not have to be already constituted when the petition is lodged and can be created in the course of the proceeding and even when the damages are being recovered. Those involved do not need to be precisely identified. | Only the Ombudsman can initiate the proceeding. The tribunal can rule that for some issues the claims of some class members be treated separately in sub-classes |

| | | be made entirely or partially by means of public announcement. It can enjoin the group's representative to perform the notification. The costs of this notification are paid provisionally by the group's representative. | | |
|---|---|---|---|---|
| **1-1-b Defining the class** | **Opt-out**<br>Any party not wishing to be bound by the settlement has three months after its approval to make this known. | **Opt-out and Opt-in**<br>- Opt-out for small claims collective actions where there is no likelihood of individual proceedings being initiated. At the request of the group's representative, the tribunal decides that the class action will cover class members who do not abstain from the proceedings. All parties are automatically party to the proceedings. Only the Ombudsman can initiate this proceeding with opt-out.<br>- Opt-in for all other disputes. | **Opt-out**<br>Once the petition has been lodged, the tribunal notifies identified parties individually and unidentified parties through newspapers or public notices. | **Opt-in:**<br>Anyone wishing to take part in the proceeding must come forward and explicitly join. Victims can adhere to the action by filling in an online form. |
| **1-1-c Representative** | The representative body. | - In the action with opt-out: the tribunal can designate the consumers' ombudsman or other legally competent public authorities as representative.<br>- In the action with opt-in: the tribunal can designate associations, private institutions or other groupings as representative if the proceeding falls within the purpose of this association (for example, the | The right to conduct a "popular action" is accorded to any citizen exercising his civil and political rights, to associations and foundations that defend interests protected by the law, and to local authorities. | Only the Ombudsman can act as representative |

|  |  | consumers' council in a case regarding consumers), or the consumers' ombudsman or other legally competent public authorities. |  |  |
|---|---|---|---|---|
| **1-2 Court costs and legal aid** |  |  |  |  |
| **1-2-a Court costs** |  | Usually, only the parties are obliged to pay the costs of the proceeding. The tribunal can, however, elect to impose some of the costs on the class members. The group's representative can be required to deposit a guarantee for the court costs and to indemnify the other party. Furthermore, the members of an opt-in class action group can be required to deposit a guarantee as a condition for joining the class action. An individual member of the group can be required to pay the court costs corresponding to this guarantee plus the amount, where appropriate, he would stand to gain by participating in the group. In the case of an opt-out class action, a guarantee cannot be required from the group members. | In the civil courts, the presence of a lawyer is obligatory if the economic value of the protected interest exceeds the maximum authorised by the judicial body dealing with the case. If the case results in – even partial – victory, no legal costs whatsoever are paid. If the case fails completely, the judge can set an amount for the action pursued of between 1/10 and 1/2 of the normal costs. Lawyers are paid by the parties according to the normal law. There are no contingency fees. | Only the parties to the proceeding are required to pay the costs. Class members are not deemed parties to the procedure. |
| **1-2-b Legal aid** |  | If the court costs imposed on a member of the group are not covered by liability insurance or other form of insurance, they will be | Those of limited means can have their lawyers' fees and sometimes the court costs paid through a legal aid mechanism |  |

| | | paid by<br>the Treasury if the class action meets the<br>conditions for a free suit. | | |
|---|---|---|---|---|
| **2 – Referral to the tribunal** | | | | |
| **2-1 Competent tribunal** | The Amsterdam Court of Appeal is competent to approve the settlement. | | There is no dedicated judicial forum. | Jurisdiction lies with the tribunals of first instance (Turku, Vaasa, Kuopio, Helsinki, Lahti and Oulu). |
| **2-2 Filing the class action application** | | The class action is initiated by the filing of a claim before the tribunal. The claim can be lodged by anyone eligible to be designated as representative of the group. The claim must include a description of the class, information about how the class members can be identified and informed of the action, and a statement by the representative of the class that he is ready to assume this role. | A class action is filed under the general rules for civil procedure. The claim must specify: the class, the common or similar facts underlying the claims of the class members, the known facts about the applicant that could be important for examining some claims, other facts important for determining whether the individual claims should be the subject of a class action. The applicant will also set out in the petition the names and addresses of all the class members and the facts to be notified to the class members. It may emerge in the course of an individual action that a class action would be more appropriate. The plaintiff can then ask the court in writing for his action to be converted into a class action if the defendant consents and if it is clear that the benefits of the | The claim must indicate:<br>- the class concerned in the action,<br>- known claims,<br>- the facts on which these claims are based,<br>- reasons why the matter can be addressed in a class action,<br>- circumstances known to the plaintiff that are particularly important for examining the claims of some of the class members,<br>- insofar as possible, the evidence the plaintiff intends to present in support of his action and the purpose served by each piece of evidence,<br>- an application for reimbursement of court costs if the applicant considers this appropriate, and<br>- the reason why the tribunal has jurisdiction. |

| | | | class action outweigh the disadvantages that such a procedure would entail for the defendant. | |
|---|---|---|---|---|
| **3 – Eligibility of the action and authorisation procedure** | | | | |
| **3-1 Eligibility conditions** | This class action is possible if the litigation involves:<br>- shared rights and obligations or the same factual and legal bases<br>- claims or obligations of the same kind based on the same factual and legal bases. | The essential conditions for initiating a class action are as follows:<br>- there must be a claim of the same nature involving several parties,<br>- a class action must be the best way of addressing these claims,<br>- it must be possible to effectively identify the class members – i.e., the parties affected – and inform them of the proceeding,<br>– it must be possible to designate a representative. | The initial plaintiff does not need to be correctly represented. It is enough that the parties are entitled to act, that the petition is not manifestly unfounded and that the interests concerned are ones protected by law. | The proceeding is possible if:<br>- several parties have the same claim based on common or similar circumstances against the same defendant,<br>- a class action proceeding is appropriate given the size of the class, the nature of the claims and the nature of the evidence adduced,<br>- the class is sufficiently well defined. |
| **3-2 Authorisation order** | | | | |
| **3-2-a Application for authorisation** | Entities entitled to act can initiate a case for damages incurred in their name and in the interests of those concerned | The tribunal must affirm that the nature of the claim makes a class action appropriate. | A preliminary ruling on eligibility is issued. | |
| **3-2-b Discovery** | | | No discovery | |
| **3-2-c Substance of the order** | | The tribunal determines the framework of the class action. If a class action is annulled or dismissed, the class members must be informed, unless this is patently unnecessary. If the class action is annulled or dismissed, each member | | |

| | | | |
|---|---|---|---|
| | | of the group affected by it can, by written notification to the tribunal within four weeks, intervene regarding his claim and pursue his case with an individual proceeding. The same holds if the tribunal decides that an action cannot not be addressed through a class action | |
| **3-2-d Publication of the order** | | The tribunal proceeds to inform interested parties either personally or by public announcement in the press (non-identified interests). The notice calls on interested parties to declare whether they with to exclude themselves from the action. The judge also proceeds to summon the defendants. | The tribunal must inform the parties promptly by post or email that a class action proceeding has been launched and name the presiding judge. The tribunal must set a deadline for participation in the class. The applicant (Ombudsman) must, by post or email, inform the class members whose identity he knows that the case is pending. If the notice cannot be sent in this way, it must be published in one or more newspapers or in some other appropriate manner. |
| **3-2-d Procedure following the order** | | | The applicant (Ombudsman) drafts a petition setting out the names of the members, their addresses, professions and, if necessary, the reasons for the action. The petition for a hearing must be lodged with the tribunal within a month of the deadline for participation in the group. The |

| | | | | tribunal may extend the deadline if special reasons so merit. Following receipt of the petition for a hearing, the tribunal issues a summons enjoining the defendant to reply in writing. |
|---|---|---|---|---|
| **4 – Legal proceedings** | | | | |
| **4-1 Decisions and measures** | | | | |
| **4-1-a Extension of the action** | | | | |
| **4-1 b Renunciation or withdrawal from the action** | | | | |
| **4-1-c Substitution of the representative** | | The tribunal can designate a new representative if this proves necessary. In collective actions with opt-in, the tribunal can designate a new group representative if this is requested by at least half of the group members who have associated themselves and if the request is accompanied by a statement by the new representative of his readiness to assume the role. | | |
| **4-2 Amicable settlement** | In the case of a class action, damages and interest can only be secured if there is an amicable settlement. The settlement must involve: -an agreement between one or several parties who undertake to pay compensation and an entity which represents the interests of a group | The compromises struck by the group representative in a class action case are only valid when approved by the tribunal. The tribunal approves the compromise unless this involves an unacceptable discrimination of some class members or is, for other reasons, | Settlement is possible at any time. It must be approved by the judge and communicated in the same way as the notification of interested parties. | |

| | | | |
|---|---|---|---|
| | (class) of parties<br>(victims) as set out in its articles<br>-a definition of the group(s) of parties in whose<br>interest the settlement is made<br>- the number of parties in the group(s)<br>- the amount of the indemnity going to the group(s)<br>- the conditions that must be met for parties to<br>receive the indemnity<br>- how the indemnity is calculated<br>- names and addresses of those who must be<br>informed of the right to opt out<br>- the indemnity must be established objectively and<br>it must be set out in the agreement<br>- if a third party is designated to arrange the<br>indemnity, this party must be a party to the<br>agreement. | manifestly unreasonable. The tribunal can<br>decide that notice must be made. | |
| **4-3 The judgement** | | | |
| **4-3-a In most cases, the judge will rule first on common and then on individual issues.** | In the case of an amicable settlement, one or several<br>parties agree to pay damages and interest to all the<br>victims. The damages and interest are assessed<br>using an indemnity scale for collective actions. The<br>settlement is between the association and the parties<br>who will pay the indemnity. | | Identified claimants are compensated in<br>proportion with their losses as determined by the<br>judge.<br>Sums awarded to non-identified claimants are<br>sent to the Ministry of Justice, which retains<br>them until the right lapses (3 years). Thereafter,<br>they will be used to finance access to law and the<br>legal system in other "popular actions".<br>There is no punitive interest or damages. | The class members are not considered as parties<br>to the proceeding and do not have a right to be<br>heard. |
| **4-3-b The judgement** | Those who have not asked to be excluded are | | General application of civil procedure rules. | An application may be made for a practice to be |

| | | | |
|---|---|---|---|
| | compensated at a time specified in the settlement (one year at the latest). Those who do not claim their compensation in time forfeit their rights. | | | halted or for an injunction to prevent it. Financial reparation may also be requested, as may compensation for physical injury. |
| **4-3-c Scope of the judgement** | All the parties named in the settlement are bound by the judgement, which is enforceable. They can only exclude themselves by making a written declaration. | Tribunal judgements made in a class action are legally binding on the class members concerned by the proceeding. If the group representative does not submit an appeal, an appeal can be submitted by anyone who may be designated representative of the group. If the group's opposing party lodges an appeal against a class action judgement, the appeal is dealt with according to the rules governing collective actions. | The judgement applies indiscriminately to all claimants, save those who have expressly excluded themselves. Under the general rules on civil proceedings an appeal against this ruling can go as far as the Supreme Court. The appeal can be collective or individual. The judge can decide that the appeal will not have suspensory effect. | Parties may exclude themselves from the proceeding before the judgement is given; thereafter, all the class members are bound by the decision. |
| **4-3-d Notification of the judgement** | | | Judgements are notified to the identified parties and if they win the case, must be published – at the cost of the unsuccessful party – in two newspapers chosen by the judge. | ` |

**Collective redress in non-EU States**

| | United States | Quebec | Brazil |
|---|---|---|---|
| **Definition** | Article 23 of US federal rules of civil procedure, amended by the Fairness Act of February 2005, created "collective actions". One or more individuals or an organisation representing a group can file a lawsuit on behalf of group members, without the latter being individually identified. | Several Canadian provinces (Quebec, Ontario, etc.…) have legislation on collective actions. Such lawsuits can also be brought to the Federal Court. The Quebec model known as "recours collectifs" entered into force in 1979 and was amended in 2002 (Articles 999-1052 of the Code of Civil Procedure); this procedure enables one member | The right to collective actions has been enshrined in the Brazilian Constitution since 1988 The Public Civil Action law adopted in 1985 and the Consumer Code (Article 81) created the "Açao coletiva". This procedure is instigated by a plaintiff representing a group with a view to its protection in judicial proceedings. The judgment which is |

| | | to file a lawsuit without authorisation on behalf of all members. Defence actions do not exist (article 900 of the Code of Civil Procedure). | passed on this occasion applies to the group as a whole. |
|---|---|---|---|
| **Scope** | Collective actions were generalised in 1966 to all fields: civil rights, consumer law, environment law, labour law, etc. | Collective actions are of general application. | There are several types of collective actions: − popular actions against acts which are damaging to public heritage − Public civil action against moral damage and damage to national heritage concerning the environment, consumers, property and rights of artistic, aesthetic, historical or touristic value, etc. − Consumer Code group action against acts which infringe diffuse, collective or homogeneous individual rights of consumers. − rights are diffuse when it is difficult to identify which consumers are victims (e.g. misleading advertising). Diffuse rights are transindividual and indivisible; they belong to a group of nonidentifiable individuals who are only united by factual circumstances (such as buying the same products or watching the same TV programme). − rights are collective when consumer victims are easily identifiable. The burden of proof rests on the group. Actions can be brought both by a consumer association and a group of consumers if the group comprises a majority of the victims. Collective rights are also transindividual and indivisible but, unlike diffuse rights, there is a legal link between them or with the defendant (e.g. a bank, a credit company or a school infringe collective rights by imposing excessive prices or illegal charges on their customers. There is a contractual link between the members of the |

| | | | |
|---|---|---|---|
| | | | group and the defendant).<br>− individual and homogenous rights: in this case a class action is to remedy individual damages. It concerns subjective rights with a common origin, and relates to common questions of law or fact.<br>− Collective injunction warrant: damage caused by the illegal act of a public authority. |
| **1 -Instigation of the Proceedings** | | | |
| **1-1 Preliminary conditions for a class action** | | | |
| **1-1-a The group** | The group can be constituted during proceedings or when financial penalties are applied. It must be constituted from a number of persons, who can be precisely identified upon allocation and who are at least easily identifiable (the group must be sufficient in number, and its members' interests must be sufficiently similar and welldefined). | The group is only defined at the authorisation stage. | Group-action to compensate individual damages (individual and homogenous rights): only after judgment has been passed on responsibility do consumers come forward and constitute a group. In other types of group action, the group is an abstract entity. |
| **1-1-b defining the group** | **The opt-out**<br>This goes back to the origins of the American system. The group automatically includes all potential victims of a particular conduct with the exception of those who have explicitly declared their wish to opt out from the group thus constituted. | **The opt-out**<br>An individual who finds out that a class action lawsuit has been filed can decide to opt out. In that case he should inform the clerk of the Superior Court by registered post of his wish to opt out before the expiry of the opt out period set by the judge and announced by a notice published in the newspapers. | The system varies depending on the type of Consumer Code classaction:<br>− Infringements of diffuse rights: protection of diffuse rights does not involve protecting the individual rights of group members. Judgement generally involves a certain degree of restitution in kind. In the rare cases where financial compensation is ordered, the money is paid into a government funds and not to group members. If they have suffered individual loss, they must apply for compensation by filing an individual lawsuit or |

| | | | |
|---|---|---|---|
| | | | a class-action lawsuit for the defence of individual homogenous rights.<br>− The same applies to infringement of collective rights. In general, a lawsuit is initiated to bring about cessation of an activity by the defendant.<br>− Infringement of individual homogenous rights: opt-in<br>The system requires explicit agreement to become a party to the instigated action. The lawsuit requires explicit authorisation, and silence amounts to opting out.<br>The outcome of the case does not benefit initiators of individual lawsuits unless they request suspension of their individual proceedings within 30 days from filing the class action lawsuit. |
| **1-1-c the representative** | The representative is a person who acts on behalf of the group members in view of the fact that his legal situation is representative of the members. However, no legal definition exists, and a mandate is not required. In addition, a member of the group can also be heard during the inquiry. | The representative is a member of the group empowered by the court to represent the other members. He leads the action as a whole. The representative can be a legal person under private law, a company or an association. No mandate is required. However the court has discretionary powers to hear a member of the group if it considers that it may be useful. | Lawsuits may be initiated:<br>− by any citizen in the case of popular action<br>− by the Public Prosecutor's Office, the federal government, federal states, municipalities, independent administrations, public companies, foundations, semi-public companies and associations in the case of public civil actions.<br>− by the Public Prosecutor's Office, the federal government, federal states, municipalities, and public administrative entities or bodies in the case of Consumer Code class action; also by associations and consumer groups in the case of class action to compensate individual damages.<br>− by political parties represented in the National Congress, trade union organisations, organisations representing groups, and associations which have been properly constituted and operating for at least a year, to defend members or associates |

| | | | |
|---|---|---|---|
| | | | in the case of the collective injunction warrant. |
| **1-1-d Legal counsel** | Legal counsel is officially designated by the certification order | | |
| **1-2 procedural costs and legal aid** | | | Collective actions are seen as helping to make the law more democratic. For this reason, legislative authorities have exempted such lawsuits from payment of procedural costs (Article 87 CDC). However, if the plaintiff has acted in bad faith, financial penalties may be applied. |
| **1-2-a procedural costs** | "Contingency fees" system whereby the plaintiffs' lawyer pays an advance on procedural costs and is remunerated on the basis of a percentage of compensation paid out to the group. | The representative of the group bears sole responsibility for costs and expenses in the case of an unsuccessful lawsuit. Lawyers' fees are fixed by the court. The law provides for judicial supervision of the agreement. The principle of "contingency fees" applies. | |
| **1-2-b Legal aid** | No legal aid | An assistance fund for class action suits which is a public law legal entity has been set up. The fund can advance the procedural costs. The assistance is refundable if the lawsuit is successful. Besides financing lawsuits, the fund also provides information on collective actions. The fund is financed partly by subsidies from the Ministry of Justice and partly self-financed by refunds on advances and a percentage levied on undistributed awards (sums awarded as compensation and not claimed by victims). The fund is managed by a body independent of the government. | |
| **2 – Submission of a case to the court** | | | |
| **2-1 the court having** | Since the Fairness Act (2005), collective | The Superior Court has sole jurisdiction in the first | The court with jurisdiction over the action is the |

| jurisdiction | actions in principle fall within the jurisdiction of federal courts, whereas state courts have special jurisdiction. Federal courts have "original jurisdiction" over collective actions for sums of over $5 million involving the residents of several federal states or residents of one state and a foreign state. The law therefore provides for "removal", i.e. transfer to a federal court by the defendant of a class action lawsuit which fulfils these conditions and which was originally brought to a state court. The aim is to remedy abusive "forum shopping" practices with plaintiffs' lawyers bringing cases to state courts which are deemed to be favourable to plaintiffs ("magnet jurisdictions"). There are two exceptions to the jurisdiction exercised in principle by federal courts over such cases: − a court can refuse to rule on a class action lawsuits if twothirds of the group members and the main defendants are residents of the state in which the lawsuit was originally initiated. The law sets out six criteria for the court to take into consideration: − the claims asserted involve matters of national or interstate interest − the claims asserted are governed by laws of the state in which the action was originally filed or by the laws of other states − the class action has been pleaded in a manner that seeks to avoid federal jurisdiction | instance. | court which has jurisdiction over the location where the damages were incurred, or the court of any municipality if the damages extend to three regions, of one of the state capitals if the damages extend to more than three municipalities, or of the federal district for damages extending to more than three states or of national importance. |

| | | | |
|---|---|---|---|
| | − the action was brought in a forum unconnected with the<br>class members, the alleged harm, or the defendants<br>− the number of citizens of the state in which the action was<br>originally filed is substantially larger than the number of<br>citizens of another state<br>− during the three-year period preceding filing, one or more<br>other collective actions asserting the same or similar<br>claims were filed on behalf of the same persons<br>− the federal court must decline to rule on a class action for<br>which:<br>− more than two-thirds of the group are residents<br>− at least one defendant whose conduct forms the main<br>basis for the claims asserted is a resident of the state<br>where the action was originally filed<br>− the principal injuries were incurred in that state, and<br>during the three-year period preceding the filing of that<br>class action, no other class action has been filed asserting<br>the same or similar allegations against any of the<br>defendants by the same or other persons; or<br>two-thirds or more of the group members and the primary defendants<br>are residents of the state in which the action was<br>originally filed. | | |
| **2-2 filing a motion<br>for class action** | the parties must file a motion with the court which has<br>jurisdiction. The motion must include the following:<br>− substantiation of territorial jurisdiction<br>− an assertion of the impracticability of a | The action is filed by a member of the group. The defendant is<br>notified and both parties are heard. | Filing of a collective procedure is subject to ordinary civil procedure<br>rules.<br>The damage in question must fall within the scope of the law governing<br>one of the types of collective action. |

| | | | |
|---|---|---|---|
| | joinder of proceedings<br>− a confirmation of the link which enables the group to be constituted<br>− an assertion that the claims and defence put forward by the representative of the group and its members are typical<br>− a presentation of the reasons for which approval is requested<br>− a summary of the claims for compensation<br>− an oath taken by the parties and their legal counsel(s) to protect the interest of absent members honestly, fairly and adequately<br>− a decision on whether or not to request the presence of a jury.<br>After the motion has been filed, the "primary discovery" or discussion phase begins. The complaint is served on the defendant, who has 30 days to respond or "dismiss" it. This period can be extended on request. At the end of this phase, the judge passes judgment. The motion is filed at the same time as the request for authorisation.<br>Defendants invariably call for dismissal of the lawsuit. If the lawsuit is admitted, the defendant may request a "summary judgment" enabling him to win the case without the need for a trial. If the defendant fails at this stage, and in the absence of an out-of-court settlement, the next stage is certification of the group as requested by the plaintiff | | The initiator of an individual lawsuit can ask for his hearing to be suspended if there is a collective procedure asserting the same legal claims and with the same purpose, until judgment has been passed on the collective procedure. |
| **3 – Admissibility of** | | | |

| | | | |
|---|---|---|---|
| **the lawsuit and the authorisation procedure** | | | |
| **3-1 Conditions for admissibility** | There are specific and general admissibility conditions.<br>The general conditions ("prerequisites to a class action" are as follows:<br>− numerosity: the class must be so numerous that individual joinder of all members is impracticable<br>− commonality: there must exist questions of law or fact common to the class<br>− typicality: the claims or defences of the representative party must be typical of the claims or defences of the persons concerned<br>− adequacy of representation: the representative party must be able to protect the interests of the class fairly and honestly<br>Specific conditions ("collective actions maintainable": the prosecution of separate actions would create a risk of inconsistent rulings; rulings with respect to individual members of the class would harm the interests of other members, or impair their ability to protect their own interests; the opposing party has acted or refused to act on grounds generally applicable to the class; questions of law or fact common to the members of the class predominate over any questions affecting only individual members ("predominance"); a class action is superior to other available methods for the fair and efficient adjudication of the controversy ("superiority"). | For the action to be admissible, the following cumulative conditions must be met:<br>− the actions of the members raise identical, similar or related questions of law or fact;<br>− the facts alleged seem to justify the conclusions sought, i.e. the cause is serious ("colour of right" of the lawsuit), without needing to prove the legal validity of conclusions concerning the alleged facts; the purpose of this condition is to prevent frivolous lawsuits;<br><br>− the composition of the group makes the application of another lawsuit difficult or impracticable<br>− the member to whom the court intends to ascribe the status of representative is in a position to represent the members adequately. | Depending on the nature of the damage, the judge will examine whether the procedural means used (the type of lawsuit) are appropriate and whether the plaintiff has a legitimate cause for action.<br>Current Brazilian law establishes legitimacy of the plaintiff on the basis of one criterion: the plaintiff must be one of the persons stipulated by the law. |

| | | |
|---|---|---|
| | Other factors are taken into consideration, for example the effective existence of a category or group, the interest of members of the class in individually controlling the prosecution or defence of separate actions, the extent and nature of any litigation already commenced and involving members of the class, and the difficulties likely to be encountered in the management of a class action. | |
| **3-2 The certification Order** | | |
| **3-2-a The request for certification** | The petitioner initiating a group action must submit a request for certification (the term used in US law to refer to authorisation). This request also designates an attorney to represent the group. If certification is refused, proceedings continue between individual parties and no longer with the group as a whole. | A preliminary request for authorisation of the lawsuit is submitted. This request ("motion") states the facts of the case and the nature of the lawsuit, and it describes the group; it must be served on the defendant. A central register of motions is kept in the office of the Superior Court. | |
| **3-2-b Discovery** | After the request for certification, the "discovery period" begins. This procedure enables the plaintiff to obtain disclosure by the defendant of any documents in the possession of the latter which the plaintiff deems necessary to support his action. In principle Federal Rule 34 does not stipulate any limit on the number of documents whose disclosure may be requested. At the end of the procedure, a hearing (order) is held, during which the parties present their evidence. At the end of this hearing, the court takes a decision on certification. If | Since 1 January 2003, the discovery procedure at the stage of admissibility has been changed. The defendants are not longer allowed to put questions to plaintiffs, nor to request the court to contest the truth of the alleged facts in writing; only oral contestation is possible. They no longer have the right to adduce evidence at the authorisation hearing, nor can they present the facts orally. However, the judge may authorise presentation of appropriate evidence. | |

|  |  |  |  |
|---|---|---|---|
|  | certification is refused,<br>only the individual plaintiffs can continue the procedure, and<br>not the group as a whole. If certification is granted, in the case<br>of a suit for damages, all the members of the group who can<br>reasonably be identified must be served notice of the<br>certification decision, and be given a chance to opt out from the<br>procedure. |  |  |
| **3-2-c Content of the order** | A certification order defines the class and the class claims,<br>issues, or defences, and must appoint class counsel. The court<br>also has the power to decertify the group. | The judgment granting the motion describes the group whose<br>members will be bound by any judgment, identifies the principal<br>questions to be dealt with collectively and the related conclusions<br>sought, orders the publication of a notice to the members, and<br>appoints the member representing the group. The judgment granting the motion may be revised at any time at the request of<br>one of the parties if the court deems that the lawsuit no longer<br>fulfils the conditions for admissibility (amendment or annulment<br>of the judgment). |  |
| **3-2-d Publication of the order** | In the case of a claim for damages, if certification is granted the<br>judge makes existence of the action public by notifying the<br>certification decision to all members of the group who can be<br>reasonably identified, or by means of the press if there are<br>unidentified victims. | The judgment orders publication of a notice to the members of the<br>group. This includes: the description of the group, the right of a<br>member to intervene in the class action, the principal questions to<br>be dealt with collectively and the related conclusions sought, the<br>right of a member to request his exclusion from the group, the<br>formalities to be followed and the time limit for requesting his<br>exclusion; the fact that a member who is not a representative or an<br>intervener cannot be called upon to pay the costs of the class | Once the original request has been received, the judge orders a writ to<br>be served on the accused and publishes an order in the Official Gazette<br>declaring initiation of the action and enabling other victims to join the<br>proceedings.<br>The law also provides for notification of the procedure by means of<br>consumer protection organisations. |

| | | |
|---|---|---|
| | | action; and any other information the court deems it useful to include in the notice. | |
| **3-2-d Procedure after the order** | If certification is refused, only individual plaintiffs can continue the procedure, and not the group as a whole. An appeal can be lodged within 10 days of the court's decision. | The representative brings his request in accordance with the ordinary rules within three months of the authorisation. Failing this, the judge may declare it perempted. If the judgment authorising a collective action is annulled, proceedings are pursued between individual parties, in accordance with the ordinary rules. Members have the option to opt out of the group at this stage. The judgment granting the motion and authorising the exercise of the recourse is without appeal. The judgment dismissing the motion is subject to appeal. | |
| **4 – The trial** | | | |
| **4-1 Decisions and Measures** | | | |
| **4-1-a Extension of the action** | | | |
| **4-1 b Voluntary dismissal of the action or withdrawal** | Any voluntary dismissal of the action must be approved by the court after a hearing to establish whether it is fair, reasonable, and adequate. With regard to withdrawal from the action, the court must make it clear from the beginning of the procedure that it will exclude any member of the group who so requests and will explain how they can do so. | A member may request his exclusion from the group by notifying the clerk of his decision, by registered mail, before the expiry of the time limit for exclusion. In this case he is not bound by any judgment on the demand of the representative. In the course of the collective action, the law provides for protection of group members by the court. Hence, any discontinuation or out-of-court settlement can only take effect if approved by the court. | |
| **4-1- c substitution of the representative** | | A member may, by motion, apply to the court to have himself or another member substituted for the representative. The court may substitute the applicant or another | |

| | | member<br>consenting thereto for the representative if it is of opinion that the<br>latter is no longer in a position to represent the members adequately.<br>The substituted representative accepts the trial at the stage it has<br>then reached; he may, with the authorisation of the court, refuse to<br>ratify the proceedings already had if they have caused an irreparable prejudice to the members. He cannot be bound to pay<br>the costs and other expenses for proceedings prior to the substitution, unless the court orders otherwise | |
|---|---|---|---|
| **4-2 Out-of-court settlement** | The action may be closed by a settlement or compromise at any stage of the procedure, even after certification. Settlements must be approved by the judge, who must issue an opinion.<br>The 2005 reform, which was intended to prevent certain abuses of the law, strengthened judicial supervision of settlements, particularly in consumer law (the Consumer Class Action Bill of Rights). A federal court may not approve:<br>− any proposed out-of-court settlement unless it is deemed to be fair, reasonable and adequate;<br>− a proposed settlement under which any class member is obligated to pay sums to class counsel that would result in a net loss to the class member unless the court finds that non-monetary benefits to the class member substantially outweigh the monetary loss<br>− a proposed settlement that provides for the payment of greater sums to some class members than to others solely on the basis of their closer geographic proximity to the court. | Settlement "transaction" is possible during proceedings, and must be approved by the court, provided that a notice has already been given to members containing certain information specified by the Code of Civil Procedure. Members disputing the settlement may present their arguments to the court. | The parties can sign an agreement or compromise known as an "an agreement to amend conduct" (TAC) Once ratified by the judge, this agreement has the same affect as a judicial decision. By means of this document, the Public Prosecutor's Office or any other public entity or body authorised to file an action signs an agreement with party accused of irregular conduct, thereby obliging them to amend their conduct. In the case of non-compliance with the agreement, the party which is at fault may execute it directly without the need for new proceedings or for prior proof of the facts. |

|  | Not later than 10 days after a proposed settlement of a class action is filed in court, the defendant must notify the appropriate federal or state authorities (the Attorney General or regulatory body if the defendant is a bank or insurance company); failing this, the settlement is ineffective against the plaintiffs. Final approval of a proposed settlement may not be issued earlier than 90 days after notification. |  |  |
|---|---|---|---|
| **4-3 The judgment** |  |  |  |
| **4-3-a Usually the judge rules firstly on questions which are common to the group and then on individual questions.** | A special feature of collective actions in the US is that juries may be asked to find on a class action if the representative so requests. | The ordinary rules of first instance hearings apply. Judgment is first passed on general questions, and then if necessary on individual responsibility or individual evaluation of the damage suffered by a member. The final judgment describes the group, determines the responsibility or otherwise of the defendant, and orders the defendant to pay damages or to reimburse a certain amount of money. There is no jury. The lawsuit as a whole is conducted by the representative | In the case of group actions to protect individual and homogeneous rights, the judge first decides in principle on finding against the defendant for the damages which he has caused. After the passing of this judgment, the second, "liquid and executory judgment" orders compensation after the victims have declared themselves. |
| **4-3-b Award of damages** | It is the jury which determines total damages and interest by combining individual claims. If any undistributed sums are left over, the court may order them to be awarded to a work of public interest. In addition, the jury may decide to condemn the defendant to punitive damages to punish him for his conduct. These damages may only be awarded if the defendant's conduct meets certain criteria. Defendants have the option of requesting the judge for a remittitur (reduction of the | The judge may order a professional to pay "exemplary" damages, equivalent to punitive damages, or to reimbursement of a sum of money. The judge may order collective or individual recovery. − The court orders collective recovery if the judgment enables the establishment with sufficient accuracy of the total amount of the claims of the members, even if the identity of each of the members or the exact amount of their claims is not established. The money is deposited in the office of the | Class action lawsuits to protect diffuse or collective rights: generally, compensation involves restitution together with a penalty. In the case of misleading advertising, the judge usually orders counter-advertising at the expense of the defendant and compensation for damage to consumers' general interests. In the rare situations where financial compensation is ordered, it is paid into a government fund supervised by the Ministry of Justice. The money in the fund must then be used to restore the rights which have been violated or to |

| | award) if the amount of punitive damages is excessive. In principle, the award is made in favour of the representative, who is then responsible for distributing the award among the victims. | court or with a financial institution. It is then distributed to the members of the group as per the arrangements decided on by the court. The court may also designate a third person to liquidate claims; this person has an similar role to that of the magistrate appointed in French collective proceedings to liquidate claims ("mandataire liquidateur"). − If it is not possible to establish the claims with sufficient accuracy, the court orders individual recovery. Each of the members must file his individual claim during the year following publication of the notice. The court has discretionary powers to dispose of the undistributed award. In general, the balance is distributed among non-profit organisations operating in fields which are directly or indirectly related to the issues of the action. With regard to distribution, either each party is awarded a sum of damages, or the judge awards a sum of money to be distributed by the group. A third party is designated to liquidate individual claims or to distribute awards among individual members, under the supervision of the court. | protect rights which are similar to those concerned by the lawsuit (financing research and education projects). Group action to protect individual homogeneous rights: the judge only rules on the responsibility of the defendant. Consumers who are victims must then lodge their individual claims with the court to establish that they are members of the group and to prove the causal link and the damage suffered by them. If only a few consumers come forward during the year following the judgment (as often happens in mass litigation with only small individual damages), the law authorises representative entities to have the decision executed. These then need to prove the total amount of damages suffered by the group. The total amount is paid into the government fund. |
| **4-3-c Scope of the judgment** | The judgment has the force of res judicata for all the persons in the group unless they are officially excluded. The Court of Appeals may permit an appeal from an order granting or denying class action certification if application is made within ten days after entry of the order. | | The effects of the judgment depend on the type of rights: − in the case of diffuse rights, the decision has erga omnes effects − in the case of collective rights, the decision is effective for all group members − in the case of individual homogeneous rights, the decision, if favourable, is effective for all victims, and if unfavourable, it has no effect on them. |
| **4-3-d Notification of the judgment** | The court may require the representative to notify victims. | When the final judgment acquires the authority of res judicata, the | |

| | Notice may be served at any time to ensure the fair conduct of the lawsuit, including notice of decisions on collective questions. | court orders the publication of a notice containing a description of the group and indicating the tenor of the judgment. | |
|---|---|---|---|

**Collective redress in non-EU States (II)**

|  | Norway | Chile | Israel | Australia |
|---|---|---|---|---|
| **Definition** | The new law on civil proceedings (Tvisteloven) adopted in 2007 includes a chapter on collective actions (chapter 32). It will enter into force on 1 January 2008. The new law provides different mechanisms for small claims litigation (opt-out) and cases involving larger claims (opt-in). A collective action can be lodged by a group or against a group. | Law of 14 July 2004 allows certain specified representatives to initiate an individual action, the outcome of which applies to all victims. | A law introduced in Israel in 1988 opened up the financial investment sector to collective action. In 1995, this procedure was extended to infringements of consumer protection law, as well as banking and insurance law. An amending law was passed on 12 March 2006 which allows individuals and organisations to take action against companies or public authorities on behalf of a group of victims. A fund has been created by the new law to support collective action, where the general interest is at stake. | The Federal Court Act was amended in 1992 in order to create a collective action. A representative party may lodge a collective action with six other members of the group against the same defendant relating to disputes involving federal law and mutual questions of fact or of law. |
| **Scope** |  | Consumer law | The scope is very broad (all infringements of consumers' interests, discrimination, social rights, protection of handicapped persons, action against the government and public authorities). | All cases come under federal law. |
| **1 – Launching judicial proceedings** |  |  |  |  |
| **1-1 Prerequisites for collective action** |  |  |  |  |
| **1-1-a Group** | The two types of action can be lodged by a consumer, a representative organisation, an association, or the Ombudsman. The court can decide to establish sub-groups if | The action can be lodged by - SERNAC (national consumer's service) - a group of consumers involving at least 50 persons - consumers' associations | An action can be lodged by an individual or an organisation. | The action may be lodged by an individual with a sufficient interest in taking legal action against another individual on his or her own behalf or on behalf of other persons. |

| | questions of law or fact concern only some<br>members of the group. | | | Seven or more persons must be the victims of the same<br>individual and have cases involving mutual questions of<br>fact and of law. |
|---|---|---|---|---|
| **1-1-b Group size** | **Opt-out and Opt-in:**<br>Opt-out for small claims cases involving a large<br>number of claimants where it is clear that no<br>individual action would be taken: All persons<br>concerned are automatically party to proceedings.<br>Opt-in for other cases. | | | **Opt-out :**<br>All victims form part of the group unless they decide to<br>opt-out from the group. If they do not opt out, they are<br>automatically bound by the decision. |
| **1-1-c Representative** | Is appointed by the court. This person could<br>well be the original claimant, if he/she agrees.<br>The court has the power to appoint a new<br>representative when proceedings are underway. | | | There are no financial circumstances or conflicts of<br>interest which preclude the possibility of being the group<br>representative. The ACCC (Australian Competition and<br>Consumer Commission ) may also represent the group. |
| **1-1-d Lawyer** | | | | |
| **1-2 Cost of proceedings and legal aid** | | | | |
| **1-2-a Cost of proceedings** | In most cases the parties involved in proceedings are themselves responsible for the<br>costs entailed. The court can, however, decide<br>to charge members of the group part of these<br>costs in the case of proceedings with an opt-in.<br>It is usually obligatory to have a lawyer.<br>He/she, as well as the representative, have a<br>right to be remunerated for the work carried out | | The court approves the amount of lawyers' fees on the<br>basis of the following criteria: the expected benefit of<br>the action for members of the group, the complexity and<br>difficulty of the case, the benefits for whoever lodged<br>the action, the way in which the lawyer assumed<br>responsibility for the action, the amounts of<br>compensation actually awarded compared to initial | Members of the group are not party to the action and are<br>therefore not responsible for the costs of the action. Only<br>the representative is required to pay the defendant's<br>expenses should the case be lost.<br>Contingency fees are banned in Australia. |

| | by them. The amount is set by the court. | | requests. | |
|---|---|---|---|---|
| **1-2-b Legal aid** | | | | |
| **2 – Submission to the court** | | | | |
| **2-1 Court Responsible** | Municipal court. | | | The competent court is the federal court. |
| **2-2 Lodging of collective action** | | Once the action has been lodged, and the general conditions set out in law have been met, the judge orders that the defendant and SERNAC, if it is not at the origin of the action, be notified.<br>The defendant has 10 days to comment on the action. | | The action must:<br>- provide details of the group or identify the members<br>without necessarily naming them all,<br>- indicate the nature of the actions being brought by<br>members of the group,<br>- indicate the questions of fact or of law common to<br>members of the group. |
| **3 – Admissibility of the action and granting of leave** | | | | There is no admissibility stage but members are<br>informed of the start of the collective action and of<br>their right to opt out from it. |
| **3-1 Requirements for admissibility** | Proceedings are only initiated if the following<br>criteria have been fulfilled:<br>- several persons must have a claim or be<br>subject to an obligation on a similar legal and<br>factual basis.<br>- collective action is the most appropriate<br>procedure for dealing with claims. | Whether leave is granted or not depends on the<br>following criteria:<br>- the action has been brought by SERNAC, or a group of at least 50 consumers, or a consumers' association.<br>- the practice which is being called into question impacts on the collective and diffuse interests of consumers<br>- the action sets out the factual points which affect the above interests<br>- the potential number of victims justifies, in terms of cost and benefits, recourse to this special procedure. | An admissibility action exists.<br>However, the judge has considerable discretion as<br>regards the admissibility of an action. For example, if<br>the collective action claim involves essential goods and<br>services for consumers and if this action will have an<br>adverse impact on the defendant far greater than the<br>benefits received by members of the group or<br>undertaking, the judge may reject the claim. | |
| **3-2 Granting of leave** | | | | |
| **3-2-a Request for the** | The collective action is initiated by | The judge must rule on the admissibility of | | |

| | | | |
|---|---|---|---|
| **granting of leave** | serving a writ of summons which demonstrates that the criteria for granting leave have been fulfilled, and which sets out what kind of action is involved. (opt-out or opt-in) | the action within five days of having received the defendant's comments. If the defendant fails to comment, the judge will rule within the same deadline. | |
| **3-2-b Discovery** | | | |
| **3-2-c Granting of leave** | The court must indicate as soon as possible after the writ has been served whether it will grant leave or not. In granting leave, the court must set out what kind of claims can be considered in the proceedings, the mechanism chosen (opt-in or opt-out), the deadline for registering members of the group (opt-in), determine what proportion of costs will be charged to the members of the group (proceedings with opt-in may include a covering of costs), appoint the representative. | | |
| **3-2-d Publication of leave granted** | The Court must ensure that persons who may wish to join proceedings (opt-in), or who are automatically part of them (opt-out) are notified of the action by means of a letter, announcement, or any other method it sees fit. The possible implications which proceedings may have, as well as the conditions for participating in them must also be detailed. | Once leave has been granted, two notifications are published in national newspapers, informing potential victims that they can join the proceedings. Following such notification, it is no longer possible for an individual action to be lodged against the same defendant on the same issue. | |

| | | | |
|---|---|---|---|
| **3-2-d Procedure following the granting of leave** | | The defendant can appeal against the decision to grant leave. Proceedings are suspended until the Court of Appeal has reached its decision. | |
| **4 – Proceedings** | | | |
| **4-1 Decisions and Measures** | | | |
| **4-1-a Extension of the action** | | | |
| **4-1 b Withdrawal of action** | | | The judge has the option of separating the claims in individual actions if there are fewer than seven persons involved. The judge may do the same if the cost of identifying group members or distributing the compensation awarded is excessive compared to the total amount of compensation, or if individual actions would be more effective. |
| **4-1- c Replacement of the representative** | | | |
| **4-2 Amicable settlements** | The settlement must be ratified by the court in the case of proceedings with an opt-out | The judge can suggest mediation or a settlement as and when he/she deems necessary. | The proposed settlement must be forwarded to members of the group, who are entitled to exclude themselves from the settlement. It must also be submitted to an expert competent in the field who must attest to the reasonable nature of the proposed settlement. The judgment endorsing the settlement must make clear reference to the expert opinion. | |
| **4-3 Ruling** | | | |
| **4-3-a Usually, the** | | | |

| **judge first issues the ruling concerning questions of common interest, followed by those of individual interest.** | | | | |
|---|---|---|---|---|
| **4-3-b Sentencing** | | The ruling must indicate:<br>- in what way the facts are relevant to the collective and diffuse interests of consumers<br>- the responsibility, if any, of the defendant, and the penalty incurred<br>- compensation procedure<br>- reimbursement of overpayments. | The judge is free to set the amount of compensation owed to members of the group. The judge may reduce the amount of compensation, or stipulate that it will be awarded over a period of time if he/she believes that the overall amount of compensation due constitutes an excessive cost for the defendant. It might also be the case that the compensation will not be awarded to members of the group but to another, more appropriate beneficiary. | The ruling determines responsibility and sets the amount of compensation for members of the group (punitive damages are possible) either on a collective or individual basis. |
| **4-3-c Scope of the ruling** | | The defendant can appeal against the ruling. This suspends execution. | | |
| **4-3-d Notification of the ruling** | | Once executed, the sentence applies erga omnes. The ruling is published at least twice in local, regional and national daily newspapers which are determined by the judge.<br>Interested parties must come forward and present themselves to the same court which issued the ruling within 90 days following the last notice to validate their rights. | | |

**Planned reforms for introducing collective actions in Europe**

|  | Austria | France | Italy |
|---|---|---|---|
| **Government and other bills** | Recently the Austrian Parliament unanimously requested the Austrian minister of justice to examine the possibility of introducing group (class) action into legislation. | A government bill "in favour of consumers" was presented to the Council of Ministers on 8 November 2006 but withdrawn from the parliamentary timetable at the conference of group presidents in January 2007. | The Italian government tabled a bill on 27 July 2006 (No1495) aimed at introducing collective action by the addition of an article to the Italian consumer code. Four other bills (Nos 1289, 1662, 679 and 1883) proposed a system similar or very close to that in the government bill. Four other bills (Nos 1330, 1443, 1834 and 1882) were also tabled which proposed a very detailed scheme open to any private person wishing to represent consumers. These bills contain a novel feature: the curatore amministrativo ("administrator/representative"), whose task it is to manage the procedure. Nearly all of these bills are currently being examined by the Justice Committee of the Italian Chamber of Deputies. |
| **Details of the procedure** | With the aid of an expert group, the minister of justice began drafting new legislation in September 2005. The procedure is still in progress. | Articles 12 to 14 of the bill "in favour of consumers" made provision for group (class) action. -Scope of collective action: only concerned consumer law. Only losses resulting from non-performance or improper performance of contractual obligations by the same supplier, involving the same type of contract relating to the sale of products or provision of services could lead to a collective action. Moreover, only material damage suffered by consumers who were natural persons was covered. Finally, a ceiling of EUR 2,000 was set on compensation claimed by a consumer and only Tribunaux de Grande Instance (Regional Courts) authorised by decree would have heard such actions. - Only approved representative consumer associations at national level could have initiated this procedure. | -Government bill (No1495) and bill No 1883: creation of a new article 140(a) in the consumer code providing for a procedure which is only open to some consumer associations, chambers of commerce, industry, crafts and agriculture, and professional associations. They will be able to ask a court to order the defendant to pay damages and interest and reimburse sums due to consumers, on grounds of illegal acts in the performance of a contract, noncontractual illicit acts and anti-competitive behaviour giving rise to multiple damages. The procedure is divided into two stages: |

| | | The bill provided for a mechanism of representation without mandate for bringing legal action. Consumer groups could have acted directly on behalf of potential victims. <br> - The proposed procedure was divided into two stages: <br> 1st stage: the court dealing with the case would only have given a ruling on the responsibility of the supplier concerned. <br> 2nd stage: this stage would only have been initiated in the event of a declaratory judgement of responsibility. The court would have ordered the judgement to be published and have fixed a period during which consumers could have claimed compensation from the supplier. <br> Each victim would have then had to make himself known and amicably request compensation from the supplier. <br> In the event of no response or disagreement over the amount proposed by the supplier, the consumer would then have had to individually refer the matter back to the court which had made the first judgement in order to fix the amount of compensation. | - 1st stage – only consumer associations, professional associations and chambers of commerce, industry, crafts and agriculture can bring an action to obtain a judgement that would give a ruling on the existence of damage and determine the minimum amount to be paid to each of the consumers who are victims of unlawful practices. . <br> - 2nd stage - consumer associations, professional associations and chambers of commerce, industry, crafts and agriculture or the supplier refer the matter to the conciliation section of a court or another conciliation body, which fixes the amount of compensation for each consumer. <br> - 3rd stage – if conciliation fails, each consumer brings an individual action in order to obtain compensation. <br> - Other bills similar to the government bill (Nos 1289, 679 and 1662): <br> The procedure is only open to the consumer associations and similar entities listed in Article 139 of decree No 206 of 6 September 2005. <br> However, the scope is more restricted than that of the government bill since it would only be possible to bring action for damages arising from illegal acts committed in the performance of the contracts provided for in Article 1342 of the Civil Code (consumer credit contracts, bank contracts, insurance contracts, etc.) One of these bills (No 1289) even excludes collective action being brought in areas where an arbitration or conciliation mechanism exists in an |

| | | | |
|---|---|---|---|
| | | | independent administrative authority. The procedure is divided into several stages: In bills Nos 1662 and 679, collective action can only be initiated after a preliminary attempt at conciliation. In bill No 1289, this conciliation stage is mandatory following the judgement establishing the existence of damage and defining the criteria for evaluation and compensation. If the preliminary attempt at conciliation fails, each consumer must bring an individual action. - Other bills (Nos 1330, 1443, 1834 and 1882): Anyone who has an interest may apply to the court of the place of residence of the person or one of the persons (public or private) causing the damage for compensation or restitution of money in respect of a harmful act. The associations representing the interests of the group are authorised to bring a collective action on condition that they do it jointly with at least one person who has a legal interest to bring an action. Moreover, any person who potentially belongs to the group but who does not wish to take part in a collective action may bring an "individual" action. The procedure may be undertaken for any "act giving rise to collective damage": unlawful act, omission, culpable breach of contract or tort which interests a plurality of people in similar circumstances. The group is a body of identifiable individuals who have suffered damage, comply with the definition of the group determined by the |

| | | | |
|---|---|---|---|
| | | | court and are included on the register maintained by the "administrator/representative" (opt-in). An "administrator/ representative" is appointed by the court. It is his task to collect registrations for the group register and to distribute any compensation awarded as a result of the collective action. The institution of a collective action is not a case of lis alibi pendens within the meaning of Article 39 of the code of civil procedure for persons who, at the time an individual action is instituted, have not expressly opted for a collective action. Provision is made for an admissibility stage: The admissibility petition in respect of the collective action must contain the particulars laid down in Article 63 of the code of civil procedure: a- details of the competent court b- the family name, first name, place of residence, date and place of birth of the "group promoter". The family name, first name and place of residence of the person causing the damage. If the representative or the person causing the damage is a legal entity, the petition must contain the name and registered office of the entity together with details of the body with the power of representation in legal proceedings. c-the fax number or e-mail address at which the lawyer states he wishes to receive communications and notifications during the proceedings. d-the proposed definition of the "group" containing the criteria for |

| | | | identifying precisely the persons belonging to the group and to whom the legal and factual submissions refer.<br>e- the claim for a specific amount of compensation for damage or for the restitution of a sum of money together with the criteria for its distribution between the participants in the action.<br>f- the legal and factual submissions.<br>g- the list of persons belonging to the group who ask to be represented by the "group promoter", with details of the family name, first name, place of residence, place and date of birth, and an estimate of the damage.<br>h- for each person, evidence must be produced providing proof of damage.<br>An extract of the writ containing a brief account of the evidence and the facts, the claims and the court dealing with the case, must be published in an official gazette within 10 days of serving notice to the person who has caused the damage.<br>The person causing the damage can lodge an objection to the collective action within two months of being served notification, inter alia by disputing the grounds for the admissibility of the action.<br>If the parties reach a compromise settlement, it will not be valid until it has been approved by a majority of the participants in the action in a vote organised by the "administrator/representative".<br>The first vote is only valid if at least 1/3 of the participants take part in the vote. Failing this, a second vote is held without the necessary quorum. |

| | | | Once the agreement has been adopted, the "administrator/representative" forwards it to the reporting judge for definitive approval. The reporting judge then forwards it to the court, which gives a decision on the agreement (judicial confirmation). The "administrator/representative" sends a notification to all the participants in the action containing details of the agreement concluded. The judgement is delivered by the full court. The "administrator/representative" must take all the necessary steps to enforce the judgement and act quickly to distribute the sums due to the participants in the order in which they were registered (based on evidence of damage for each participant). Lawyers are not permitted to organise collective actions (directly or indirectly). The fees of lawyers working for the "group promoter" can be freely determined, but they must not exceed 10% of the sums obtained. Fees are fixed according to the complexity of the case and the result obtained. |
|---|---|---|---|

Ministry of
**JUSTICE**

# The Government's Response to the Civil Justice Council's Report:

## 'Improving Access to Justice through Collective Actions'

July 2009



**Ministry of JUSTICE**

# The Government's Response to the Civil Justice Council's Report:

## 'Improving Access to Justice through Collective Actions'

**This information is also available on the Ministry of Justice website: www.justice.gov.uk**

# Contents

Executive Summary                                           3

Responses to Recommendations                               4

Summary of Responses to Recommendations                   17

Collective Actions – Glossary of Terms                    19

**The Government's Response to the Civil Justice Council's Report:**
'Improving Access to Justice through Collective Actions'

2

## Executive Summary

- The Civil Justice Council's report *Improving Access to Justice through Collective Actions* (December 2008) recommended that it should be possible for collective actions to be brought by representative bodies in respect of any type of civil law claim.

- The Government does not support the introduction of a generic right of collective action. It believes that such rights should be considered, and where appropriate introduced, in respect of specific 'sectors'.

- Rights of action should be introduced only where there is evidence of need and following an assessment of economic and other impacts and consideration of alternative approaches.

- In particular, regulatory options should be considered before introducing court based options. For example, in some sectors it might be appropriate to give regulators power to order the payment of compensation.

- The distinction between opt-in and opt-out models for collective actions is not necessarily clear cut. They are to some extent part of a continuum. There are several options depending on the stage of proceedings at which the class is closed. Some of these may combine the features and benefits of both models.

- The issue of who may bring collective actions is best determined sector by sector. Different criteria and methods of authorisation may apply (including authorisation by the court on a case by case basis).

- The existence of effective ADR mechanisms in any collective action procedure will be crucial. So too will strong case management by the court, including merits and cost-benefit criteria.

- The 'loser pays' principle for costs should be maintained to help deter unmeritorious litigation.

- The Government will develop a framework document setting out the issues to be addressed when introducing a right of collective action, with options and, where appropriate, a preferred approach. This will act as a 'toolkit' for policy makers and legislators.

- The Ministry of Justice will work with the Civil Justice Council and Civil Procedure Rule Committee to develop flexible generic procedural rules within which any collective action scheme can operate.

## Responses to Recommendations

### Introduction

1. The Civil Justice Council's report *Improving Access to Justice through Collective Actions* was published on 12 December 2008. The report was published as formal advice to the Lord Chancellor and invited him to provide a formal response.

2. This paper constitutes the Government's formal response. The Government would like to thank the Civil Justice Council (CJC) and all those who assisted in the preparation of this important report for all their hard work.

### Overview

3. A collective action is a civil action brought (or defended) by a representative body or party on behalf of a class or group of litigants, all of whom would otherwise have a right to bring a claim individually if they chose. The result binds the members of the group or class as if they were themselves parties before the court. This and related terms are defined in the glossary at the end of this paper and marked GL when they first appear below.

4. The primary recommendation made by the CJC is for the introduction of a generic collective action[GL] enabling actions to be brought by representatives in relation to any type of civil claim in which multiple parties have an interest. The report argues that this will 'introduce a more, efficient, economical and fair means of increasing access to justice for all, claimant and defendant alike, whilst benefiting, through the economies and efficiency gains it brings, the proper administration of justice'.

5. The CJC also recommends that the court should control, by way of a certification process, whether collective actions may be brought and whether they should be on an opt-in[GL] or opt-out[GL] basis. This process could consider, among other things, the availability and suitability of alternative options, legal merits and whether the likely benefits justify the cost. The report also recommends strong case management by the court and court approval of the fairness of settlements.

6. The report makes it clear that a generic right of action need not preclude other reforms of civil court procedure and alternative options, including reform of the Group Litigation Order (GLO)[GL] and development of regulatory compensatory mechanisms.

The Government's response to the Civil Justice Council's Report:
'Improving Access to Justice through Collective Actions'

7.  The report refers to a number of cases in England and Wales where it considers that better access to justice and judicial efficiency could have been achieved by a collective opt-out regime. Examples given by the CJC include bank charge claims by bank customers, claims involving unfair terms in consumer contracts; where financial penalties have punished anti-competitive behaviour but follow on actions have not been brought, and employment claims relating to equal pay, sex discrimination and working time directives.

8.  The main evidence of a need for reform in the report is extracted from a paper written by Rachael Mulheron, Professor of Law at Queen Mary, University of London.[1] It consists in the main of details of the operation of collective actions in other jurisdictions, primarily Australia, Ontario, Portugal and the USA. It points to the larger number and range of collective actions in the first two compared to the use of the GLO here. But, without consideration of the wider economic, social and legal contexts, such comparisons do not constitute direct evidence of need in England and Wales. There is also little consideration or evidence of wider economic impacts of the overseas systems and whether these have been negative, positive or neutral. For example in Portugal a consumer organisation is exempt from an adverse costs order should it lose a representative claim. Whilst this might remove a disincentive for bringing meritorious claims it could also have the undesirable effect of removing the barrier to bringing borderline or unmeritorious claims, whilst burdening business with their cost. Neither is consideration given to whether there were viable alternatives to the creation of opt-out collective actions.

9.  The Government does not support the introduction of a generic right of action across all sectors. We believe that a sector based approach to the introduction of collective action rights is likely to produce a better outcome overall and to be more achievable. This paper sets out the rationale for that view but also identifies where we agree and disagree with the CJC's recommendations that are relevant to the form and operation of any collective action rights that might be introduced. At the end of this paper the response to each specific recommendation is summarised.

10. The purpose of civil litigation should be to secure redress for individuals or groups whose private law rights have been breached. The Government accepts the CJC's conclusion that there may be circumstances where cases could be brought more efficiently on a collective basis. Where common issues of fact or law exist it should in general be more cost effective, for both the parties and their funders and the courts, if they are dealt with only once. That said, adversarial civil litigation is inherently risky and can be very costly. For this reason, both the Government and the courts view litigation as, in general, the dispute resolution system of last resort. Before proceeding to look at court based solutions it is important to consider alternatives and, in the context of problems affecting a large

---

[1]  R Mullheron, Reform of Collective Redress in England and Wales: A Perspective of Need (2008).

number of people to examine in particular whether there are viable regulatory alternatives. The scope for ADR<sup>GL</sup> (alternative dispute resolution) should also be explored before resorting to court. If court proceedings are appropriate, it will be vital to ensure that there is a strong case management and filters in place to safeguard against weak or trivial litigation and control costs.

11. The Government has concluded that representative rights of action should be introduced only where there is clear evidence of need. Policy makers for the relevant sector should be satisfied that access to justice can be achieved more cost-effectively and proportionately by collective court based litigation, rather than through individual claims or by other options, such as enhanced regulatory powers.

12. The Government considers that the only practical way forward is on a sector by sector basis. The reason for this is twofold. Firstly there are potential structural differences between the sectors which will require different consideration. For example the existence of a regulatory framework, and the nature of the regulation in place is likely to vary substantially between sectors. So will the existence and nature of a body or bodies suitable to act as representatives. The balance of the issues concerning the merits of the opt-in and opt-out approaches, and the implications of the latter for the basis and distribution of damages, could also vary between sectors. All these issues, which are discussed further below, could directly affect what needs to be included in legislation to create a representative action for a sector.

13. Secondly, it will be necessary to undertake a full assessment of the likely economic and other impacts before implementing any reform. However, a meaningful global impact assessment would be virtually impossible to achieve and if such an impact assessment could be constructed it would not necessarily be helpful. An overall positive assessment would inevitably miss or underplay considerations specific to individual sectors, some of which might be significantly adverse. For example, defendants in some economic sectors might be particularly vulnerable to the risk of disproportionate 'blackmail suits'. If the overall assessment were to prove negative that might prevent further progress altogether, even though there were potential benefits to be had in some areas.

## Primary Legislation

14. Currently the general law does not provide for a collective action to be brought by any party which does not have a right of action itself in respect of the claim. It is the Government's view that any right to bring this type of action would have to be created in primary legislation. This has already been done in one case by s.47B of the Competition Act 1998 (introduced by s.19 of the Enterprise Act 2002). Amendments to the Civil Procedure Rules could not be used to create such a right, because a right of action is a matter of substantive law, not simply an issue of practice or procedure.

15. We therefore agree with the CJC that any right of representative action must be created by primary legislation. It would be politically and constitutionally inappropriate, as well as legally uncertain, to attempt to do this solely by rules. Furthermore, as noted earlier, the Government does not consider that an identical approach across the full spectrum of the civil rights is necessary or desirable. The approach may vary between sectors according to their respective economic and regulatory circumstances and in respect of issues such as the authorisation of representative bodies and the allocation of damages. For that reason any primary legislation will be specific to the sector concerned and would be introduced by the Government Department responsible for that area.

16. Any legislation would focus on creating the primary right of action and on other substantive issues such as how representative bodies are to be authorised, limitation periods and allocation of damages. Procedural issues would be dealt with in rules of court which will, so far as practicable, adopt a generic approach.

## The Regulatory Environment

17. One of the most important factors that will vary between sectors is the regulatory environment. While some sectors, e.g. public utilities and the financial sector have a formal regulatory framework in place this is not true of every sector. In principle, regulatory solutions would appear to have a number of advantages over private civil litigation as a route to compensation in cases of widespread abuse. They may have the capacity to deal with matters in a holistic and relatively inexpensive and timely way. However, the effectiveness of this approach will depend on the resources available in the relevant regulator. Some regulators have expressed concerns that delivering compensation could distract them from their core role. There are also risks, such as the possibility of challenge by way of judicial review in respect of any new role in securing compensation.

18. The CJC makes the key assumption that regulation is 'not primarily suited to resolve the very wide range of detriment that can give rise to the need for large scale remedial action' and that private action is therefore to be preferred. The Government does not agree with this underlying assumption. While regulatory aims and objectives are usually strategic and not specifically focussed on compensatory objectives, this does not preclude their adaptation for this purpose. Where regulatory bodies exist and are in a position to act on behalf of consumers or other groups they could for example be given power to order compensation to be paid to consumers in addition to or instead of a financial penalty.

19. The decision on whether to adopt what might be termed a 'regulation plus' model would be for the Government Department responsible for the relevant sector, but it might be a more cost-effective way of dealing with cases involving a large number of small claims. A retailer could for example be ordered by a regulator to pay a full or partial refund to all affected consumers who could prove purchase. That would be far less

expensive and risky than a collective action, especially where the individual amounts at stake are very small.

20. This approach could be achieved in some cases without further legislation through the use of more flexible civil sanctions allowed under the *Regulatory Enforcement and Sanctions Act 2008.*

## Authorisation of Representative bodies

21. The CJC has recommended that collective claims should be capable of being brought by 'a wide range of representative parties: individual representative claimants or defendants, designated bodies and ad hoc bodies'. CPR Rule 19.6 already provides to some extent for the first, allowing for claims to be brought or defended by those with the 'same interest' on behalf of others in the same category. The recommendation would widen this by providing for such actions to be brought by parties that do not themselves have a direct cause of action.

22. The Government agrees that, in sectors where the case for facilitating collective actions is made, it should be possible for such actions to be brought by representative bodies which do not have a direct claim. This is more likely to deliver cost-effective access to justice than reliance on the existing representative party rule. A representative body should be in a position to manage the litigation more expertly and dispassionately than an affected individual, and be unlikely to wish to pursue weak claims or refuse realistic offers to settle. Access should be easier because a representative body is likely be better placed and more willing to bear the risks and costs of potentially complex litigation than a single party.

23. As noted above, individual litigants with a direct interest in the dispute may already act as representative parties under CPR Rule 19.6 (assuming the 'same interest' condition which the courts have construed narrowly is fulfilled). The CJC suggest that the Lord Chancellor could be given power to designate a second category of bodies in a similar way to the current system for designating bodies entitled to bring claims under the Competition Act. In addition it suggests that a third category could be authorised to bring collective actions by the court on an ad hoc basis, as part of the certification process which it proposes should apply to every claim.

24. In line with our view that collective actions should be introduced on a sector by sector basis, the Government does not believe that there should be a single approach or set of approaches to the issue of authorisation. Some sectors will have strong appropriate bodies, capable and willing to act in a representative capacity. However, in other sectors suitable representative bodies may not exist at all. The suitability criteria for such bodies may also vary between sectors.

25. The best approach in any given sector is likely to vary. It could rely on ministerial designation of one or more bodies or categories of body, or *ad hoc* court authorisation against generic or sector-specific criteria,

or a combination of both. It is the Government's view that the method of designation should be determined by the Department responsible for the relevant sector because they would be in the best position to assess the criteria relevant to that sector. This could be done in primary or secondary legislation or by giving administrative power to designate to a Minister, official or other body.

26. Representative bodies would not be under any duty to bring cases. The decision on whether or not to bring a case must ultimately be for that body, which will take a decision based on all the circumstances, including its other priorities as well as the importance and prospects of success of the particular claim. In the event that a particular representative body decides not to bring an action potential litigants will retain their right of action and will be able to decide whether or not to bring a claim in their own right. It will, however, be important to ensure that measures are put in place to avoid satellite litigation so far as possible, including claims or judicial review proceedings (where applicable) against representative bodies, by parties dissatisfied with a decision to either bring or refuse to bring a particular claim.

## Opt-In versus Opt-Out

27. The CJC recommends that collective claims should in principle be able to be brought on either an opt-out or opt-in basis, subject to consideration by the court as to which was the more suitable as part of the certification process.

28. The CJC suggests, for example, that an opt-out system might be best suited to actions seeking to vindicate civil or other general rights where there is a preponderance of common areas of law or fact.

29. On the other hand, it gives the example of a mass tort claim where the claims are factually complex and with different areas of causation. It suggests that these type of claims might be better taken forward as a number of discrete opt-in actions, where claims are grouped together on the basis of their similarities or as an opt-out action on common issues with decertification to follow and the claims then proceeding on an opt-in basis or as GLOs.

30. This is a complex and contentious issue. Advocates of the opt-out approach point to the procedural difficulties with getting an opt-in action off the ground. In particular, it can be difficult to identify and mobilise sufficient members of a class at an early stage in order to demonstrate that the cost-benefit of the action and secure funding. Evidential difficulties can also arise if only a few members of a class are contained in the group represented before the court.

31. On the other hand, opponents of the opt-out approach point to several difficulties of principle. Parties' rights are determined in their absence and,

quite possibly, ignorance of the action.[2] Secondly, damages have to be assessed without direct knowledge of the individual damage to each class member and quite possibly of the exact size of the class. Also, it is likely that the defendant will pay more in damages than is ever used to compensate class members. Thirdly, some consider it wrong, and likely to fuel a 'compensation culture' for people to obtain damages having taken no positive steps to participate in an action and quite possibly without knowing it existed.

32. Whether an action is taken forward on an opt-in or an opt-out basis, it will be equally important to ensure that the claim is properly advertised. In an opt-in claim this will be necessary in order to achieve a significant number of active participants needed to ensure a viable case. For opt-out claims it will be important because the class representative will need to ensure that as many class members as possible are aware of the claim so that they can take an active decision to remain represented in it or to opt-out. Extensive publicity will therefore be required to minimise the risk that individuals' rights are determined without their knowledge or consent in breach of natural justice and human rights. The only difference will be in the timing of that publicity. For an opt-in it will be at an early stage, probably before a claim is issued. For opt-out cases it will be possible to publicise the claim at a much later stage, quite possibly after an award of damages or settlement.

33. However, the distinction between opt-in and opt-out is not necessarily as clear cut as the above arguments suggest. In order to receive any compensation, a claimant would have to opt in sooner or later, if only to claim a share of a pot of damages that has already been determined (which is likely to be subject to a time limit). A better way of looking at the issue is to consider the stage in the process by which people have to come forward. The group or class to be compensated is effectively defined and closed and that point. The key cut-off points to be as shown in the alternative models described below.

**A.** Before the claim is issued. The representative action would be brought solely on behalf of identified group members. This would be more restrictive than under the Competition Act and GLO regimes; the latter allows new claimants to be added to the register during the litigation. This is a pure opt-in system.

**B.** Before the common issues of liability are decided. The action would be brought initially in terms of a defined class with a minimum number of identified members. Other members of the class could opt-in (confirm participation) at any time before the decision on liability and could then have a say in running the case and be included in any judgment or settlement. Claimants opting-out or unidentified (not coming forward)

---

[2]   Members of an opt-in group are not formally parties to the action either. But they have been identified and consented to being represented, and the representative party and the court can take their views and circumstances into account.

by that point would not benefit from or be bound by the outcome. They would still be able to bring separate claims after that date, although the decision in the collective action might operate as a precedent. This is a modified opt-in, or hybrid system.

**C.** After the decision on liability but before the quantification of damages. The issue of liability would be *res judicata* for any claimants who had not expressly opted-out before it was decided. But those class members who had not opted in or out could still bring separate claims for damages if the liability decision was favourable. As with example B, this is essentially a hybrid system. It involves modifications of the opt-in approach designed to avoid its perceived disadvantages in the early stages of cases, while also avoiding the issues that arise with an opt-out approach at the stage when damages are quantified.

**D.** After the quantification of damages. Damages would be assessed for all claimants who had not expressly opted out before that point, on the basis of an estimation of the total size of the class. Unidentified claimants can still come forward later to claim their share of the damages. Later claimants would lose their rights if the pot proved inadequate. More likely, there would be a surplus which, after a defined period, would either be returned to the defendant or distributed on a *cy-près* or some other prescribed basis (e.g. used to fund other collective litigation or surrendered to the Treasury). This is a fully-fledged opt-out model.

34. These models (apart from the first) involve some departures from the normal principles that govern private civil litigation. These include:

- changing rules of standing so that an action can proceed (until the defined cut-off point) against multiple defendants, even when a claimant with a direct cause of action against some of those defendants has not been identified;

- the ability to require disclosure by such defendants and in relation to any/all class members, not just those currently opted-in;

- and possibly suspension of limitation periods running against absent class members from the start of the action until the cut-off point for opting-in.

These adjustments to normal principles favour the claimants. They can be justified on the basis that they will be balanced by suitable protections for defendants, including a merits filter and robust case management generally.

35. The Government's view is that the appropriate model or models for representative actions will need to be considered on a sector by sector basis. It sees considerable weight in the concerns about a full opt-out model, and considers that the same objectives would be better met in most cases by one of the hybrid models. But it does not rule out adoption of an opt-out system in some sectors where this is the most cost-effective way of achieving a just outcome.

### Damages

36. The most significant issues of principle surrounding the opt-out approach relates to the calculation and distribution of damages. Opt-out requires damages to be calculated on the basis of estimates of the losses of the class as a whole, rather than by quantifying the losses of known individuals. This is more or less problematic depending on the degree of uncertainty about the size of the class and the uncertainty and potential variability of individual losses.[3]

37. More fundamentally, the potential for a shortfall or surplus cuts across the compensatory principle underpinning (most) civil damages. Unless a surplus was returned to the defendant, this could be criticised as inappropriate, unfair to defendants and arguably punitive.

38. These concerns would not arise in the same way if the basis for damages was restitutionary[(GL)] (profit-stripping) rather than compensatory[(GL)]. But, outside the limited circumstances where restitutionary damages already exist, this would require a change of substantive law (which would necessarily apply in all claims of the type concerned, not just class actions). Such a change would need to be assessed on its own substantive merits, not as a mechanism to facilitate a procedural solution. In contexts where the principal objective for promoting 'private enforcement' is regulatory rather than compensatory, profit-stripping may indeed be the more appropriate measure of damages. And a *cy-près*[(GL)] or other distribution of any surplus not required for compensation would have the positive advantage of avoiding the windfall that arises when restitutionary damages are awarded in an individual claim.

39. The CJC did not recommend a change to the compensatory basis of damages. It recommended that the Lord Chancellor should consult on the possibility of allowing the court to award aggregated damages[(GL)]. It also recommended that any surplus damages should be distributed on a *cy-près* basis. The Government considers that these are all issues to be considered on a sector-by-sector basis. Any change would be a matter of substantive law which could be dealt with in the legislation creating the representative action.

---

[3]  For example, individual losses in a price-fixing claim might be identical and certain, but losses in a mass disaster could be highly uncertain and variable, depending on the nature of injuries and the earnings of victims.

### Certification, Case Management and Alternative Dispute Resolution

40. As noted earlier the CJC recommends the use of a strict certification procedure as an essential element of any collective action mechanism. The Government agrees. Issues likely to form part of a court certification procedure include:

- whether the claim has legal merit;

- whether the likely benefits justify the likely cost;

- whether the claim could be achieved more cost-effectively by a non-court mechanism (such as regulatory action or via an ombudsman);

- if litigation is appropriate, whether a collective action is the most appropriate route (rather than individual claims, a GLO or a test case);

- whether the representative body or party is likely to be able to meet the defendant's costs if unsuccessful, whether from insurance, its own resources or otherwise, and whether to order the payment of security for costs; and

- depending on the statutory provisions in the particular sector, authorisation or approval as suitable of the proposed representative body or party.

41. Following certification, it will remain necessary for the court to manage collective actions carefully. A collective action may be the most efficient and straightforward way of dealing with a particular case (and as noted above this is something the court would consider as part of any certification process), but collective actions will be complex by their nature. Add to that the fact that many of the cases will be high value and will deal with issues which are themselves complex and it becomes clear that case management will pay a critical role in ensuring that issues are dealt with proportionately and costs are kept as low as possible.

42. Alternative Dispute Resolution (ADR) will form a crucial element of any collective action procedure. There should be a presumption that ADR will be used to try to settle the case, where possible before issuing proceedings and certainly before any trial. Case management will play a major role in ensuring that parties actively take steps to engage in ADR and judges should be ready to use their existing powers to stay proceedings for the purposes of ADR or settlement negotiations. Because of the likely high value and cost of many potential collective claims, it is appropriate to consider whether ADR ought to be mandatory either across the board or in certain circumstances. Because collective actions are usually by their nature complex, settlement negotiations (by which route many claims are resolved) may also be more complex and for that reason ADR, and particularly those forms which offer assisted negotiation, may be particularly helpful in achieving settlement. The Government therefore agrees with the CJC's view that ADR should form a routine part of the

13

case management of a collective action. It will consider how to achieve this, and the need for any exceptions, as part of the proposed framework of generic procedural rules for collective actions.

43. The Government agrees with the CJC that enhanced case management of collective actions on the lines of the Commercial Court scheme has much to offer. Complex commercial claims have much in common with collective actions. Issues such as compliance with pre-action protocols, disclosure, expert evidence, and control of timetables and costs will be common to both types of case.

44. Another important question is whether settlements reached through ADR (or via agreement between parties) should be required to undergo some form of court approval process (similar to that under Part 21 of the CPR in claims on behalf of children and others under a legal disability).

45. The CJC recommends that it should. The court should be satisfied that any settlement reached is just, fair and reasonable and any member of the represented class who objects to the settlement should be allowed to submit views on the settlement. In an opt-out claim, the court would also direct how absent claimants should opt-in, what reasonable steps should be taken to advertise for absent claimants to notify them of the settlement, what evidence is required to claim a share, what the limitation period should be for doing so and who should administer the judgment and at what cost.

46. Such a regime could bring potential benefits in terms of ensuring that collective actions operate fairly and in the interests of all represented parties. However, it will also impose additional costs, and increasing the costs of settlement could be a potential disincentive for parties to settle. It will be necessary to weigh the benefit of such a requirement against the costs and to determine whether this is something which should apply generally or whether it should be on a case by case basis at the court's discretion.

47. The CJC has recommended that appeals against case management decisions, other interim decisions, decisions on certification issues or final decisions should be subject to normal provisions including the current permission requirement set out in CPR Part 52, The Government accepts that this is a logical way forward. Given that members of a collective action are by definition represented, rather than before the court themselves, it is appropriate that appeals from interim decisions (including certification) should generally be the province of the representative body, and subject to the normal permission requirements that apply to these appeals.

48. However, if the representative party chooses not to appeal a final order, the question remains as to whether class members should be able to do so. The CJC suggests that class members should only be able to appeal if the representative party does not wish to do so, and should be subject to the normal time limits and permission requirements. Furthermore, the class member bringing the appeal should then be treated as the representative party for the class. In general this appears to be a reasonable way forward. There are, nevertheless, potential difficulties where a class member or members wish to appeal but others within the class do not. To what extent should the outcome of an appeal bind the whole class? Appeals relating to liability issues may not be capable of determination in any way other than to affect the whole class. The permission stage may assist in balancing some of these considerations. However, the current CPR permission stage is based on a reasonable prospect of success test rather than the types of issue which might arise in a collective action (similar to those arising at the earlier certification and fairness hearings). It will therefore probably be necessary to review the criteria for permission in the context of a collective action appeal by a class member other than the representative party.

## Costs and Costs Shifting

49. One of the main issues that will need to be addressed in the context of collective actions is that of costs. A particular issue surrounding collective actions in some jurisdictions has been the absence of costs shifting. In some USA class action cases the absence of a 'loser pays' rule has, in the views of many commentators, led to abuses of the system by lawyers. In particular it has led to cases with little merit being brought before the courts and also so-called 'blackmail litigation' whereby unmeritorious claims are made with the intention of forcing the defendant to settle on an objectively unreasonable basis. In particular the system of 'notice pleading' available in the USA (where the alleged wrong need only be described in general terms) has encouraged this tendency, though the bar has been raised by recent case law. With little or no cost shifting and high costs, it will often be financially more advantageous for a defendant to settle a claim, rather than fight and win it with almost no prospect of recovering the costs incurred by so doing.

50. Cost shifting (or the 'loser pays' principle) is for the most part a significant deterrent to such behaviour, in particular where it is combined with the ability of the court to require a claimant to pay a security for costs. The Government believes that the court should retain full discretion to shift costs onto the loser (which is the normal order of the court, although the court may sometimes award limited or no costs to the winner in exceptional circumstances). We therefore accept the recommendation made by the CJC in this respect.

### The Way Forward

51. Since the Government has concluded that rights of collective action should be considered and introduced on a sector by sector basis, the responsibility for the necessary primary legislation will fall to the Government Departments concerned, following consultation with stakeholders and assessment of economic and other impacts. However, to ensure that all the relevant issues are considered and, where appropriate, consistent conclusions are reached, the Government intends to develop a policy framework document to assist policymakers and others to address all the issues.

52. The final contents of this framework will be determined as the work proceeds, but it will certainly cover the following areas:

- regulatory and other alternative options;

- options and criteria for designating or authorising representative bodies

- funding options;

- Issues surrounding opt-in, opt-out and hybrid models, and the associated issues around damages and limitation periods;

- Enforcement and, in particular, cross border issues.

53. In addition to the framework document, the Government will also work with the Civil Justice Council to develop proposals for procedural rules to be put to the Civil Procedure Rule Committee. The rules should be sufficiently flexible to deal with different the models of collective action which primary legislation might provide, for example claims brought on both an opt-in and an opt-out basis, and either ministerial designation or court authorisation of representative bodies. Subject to any sector-specific exceptions, the rules will also include provisions for mandatory use of alternative dispute procedures, certification, security for costs, case management and fairness hearings.

54. It will be for the relevant Government Departments to decide whether to consider introducing collective actions in any given sector and the timetable for doing so. Work on the framework document and generic rules will begin in the second half of 2009, and be led by the cross-Government official working group which drafted this paper.

## Summary of Responses to Recommendations

**1. A generic collective action should be introduced. Individual and discrete collective actions could also properly be introduced in the wider civil context i.e., before the CAT or the Employment Tribunal to complement the generic civil collective action.**

Not accepted. Generic action is not appropriate. Government takes the view that the introduction of additional collective action rights on a sector specific basis is the most appropriate and productive approach (see paras 9–13).

**2. Collective claims should be capable of being brought by a wide range of representative parties: individual representative claimants or defendants, designated bodies, and ad hoc bodies.**

Accepted (see paras 21–26). This will vary between sectors, depending on the availability and suitability of different bodies.

**3. Collective claims may be brought on an opt-in or opt-out basis, subject to court certification (see Recommendation 4). Where an action is brought on an opt-out basis the limitation period for class members should be suspended pending a defined change of circumstance.**

For consideration sector by sector. But the Government considers that in most cases a hybrid opt-in model will be preferable to a full opt-out model (see paras 27–35).

**4. No collective claim should be permitted to proceed unless it is certified by the court as being suitable to proceed as such. Certification should be subject to a strict certification procedure, which is to include provision for the imposition of security for costs.**

Accepted. Exceptions to the normal criteria would be for consideration on a sector by sector basis; security for costs should be considered but may not be appropriate in every case (see paras 40–48).

**5. Appeals from either positive certification or a refusal to certify a claim should be subject to the current rules on permission to appeal from case management decisions. Equally, all other appeals brought within collective action proceedings should be subject to the normal appeal rules. Class members may seek to appeal final judgments.**

Accepted in principle. But further consideration is needed as to whether all class members should be able to appeal final judgments, and in what circumstances. (see paras 47–48).

**6. Collective claims should be subject to an enhanced form of case management by specialist judges. Such enhanced case management should be based on the recommendations of Mr Justice Aikens' Working Party which led to the Complex Case Management Pilot currently in the Commercial Court.**

Accepted (see paras 41–43).

**7. Where a case is brought on an opt-out basis, the court should have the power to aggregate damages in an appropriate case. The Civil Justice Council recommends that the Lord Chancellor conduct a wider policy consultation into such a reform given that it affects both substantive and procedural law.**

For consideration sector by sector (see paras 36–39).

**8. To protect the interests of the represented class of claimants any settlement agreed by the representative claimant and the defendant(s) must be approved by the court within a 'Fairness Hearing' before it can bind the represented class of claimants. In approving a settlement or giving judgment on a collective claim the court should take account of a number of issues in order to ensure that the represented class are given adequate opportunity claim their share of the settlement or judgment.**

Accepted in principle. Possible exceptions would be for consideration on a sector by sector basis (see paras 44–46).

**9. There should be full costs shifting.**

Accepted in principle– subject to the usual judicial discretion on costs. Any exceptions would be for consideration on a sector by sector basis (see paras 49–50).

**10. Unallocated damages from an aggregate award should be distributed by a trustee of the award according to general trust law principles. In appropriate cases such a cy-près distribution could be made to a Foundation or Trust.**

For consideration sector by sector (see paras 36–39).

**11. While most elements of a new collective action could be introduced by the Civil Procedure Rule Committee, it is desirable that any new action be introduced by primary legislation.**

Accepted – the Government agrees that any new right of action will require primary legislation, but (as noted above) not with the creation of a single generic right of action (see paras 14–16).

# Collective Actions – Glossary of Terms

## Types of action

**Class Action**: a synonym for collective or representative action commonly used to describe such actions in the US system. Most apt to describe actions brought on behalf of defined class, but without all members of the class being identified to the court. It may be possible for class members to opt out and bring separate actions or class membership may be compulsory.

**Collective Action**: a general term for any civil litigation seeking to secure collective redress. See also representative action etc.

**Collective redress**: the securing of compensation, by whatever means, for a number of persons who have suffered the same or similar wrong. Compensation might be secured through civil litigation, regulatory action or otherwise.

**Follow-on Action**: a civil action brought, after an adverse finding in administrative proceedings by a regulatory body. Under the Competition Act 1998, such actions may be brought against a defendant who has been found to have breached the provisions of the 1998 Act or article 81/82 of the EC Treaty.

**Group action**: another term for collective action, most apt to describe actions where all persons for whom the claim is brought are identified to the court.

**Group litigation order (GLO)**: a sophisticated case management order under the CPR which permits multiple joining of parties whose legal actions have a common legal or factual basis. Each action managed in this way remains a traditional unitary action.

**Representative action**: generally used as synonym for collective action, most apt and commonly used to describe the situation where a **representative body** or person (also sometimes known as an **ideological claimant**) has the right to bring an action on behalf of a class or group of which it is not itself a member. The only current example in this country is the follow-on representative action that can be brought under the Competition Act 1998.

The term can also apply to **representative party actions** where one member of a class can pursue an action on behalf of others with a common interest who are not before the court, as under CPR 19.6 in England and Wales.

## Damages

**Aggregated damages**: a means of assessing compensatory damages that does not require proof of the individual loss suffered by each member of the represented class. Damages are assessed either as a average amount for the estimated number of class members or on the basis that the represented class is a single entity i.e. a global award is made.

**Compensatory damages**: Amount of money adequate to compensate a claimant for loss suffered as a result of the wrongful actions of the defendant, designed to restore claimants to the position they would have been in but for the wrong. They can include amounts for actual financial losses incurred or anticipated in future, and amounts to compensate for non-quantifiable losses such as pain and suffering.

**Restitutionary damages**: Also known as an **account of profits** or, colloquially, **profit-stripping**. A measure of damages designed to restore wrongdoers (defendants) to the position they would have been in but for their wrongful action. This alternative measure of damages may arise where the defendant is unjustly enriched, where there has been mistake or frustration where the defendant has made a profit after breach. This form of damages is relatively unusual – unless there are exceptional circumstances, courts will award compensatory damages for breach of contract etc.

## Other Terms Used

**Alternative dispute resolution (ADR)**: a collective term describing non-court based methods of dispute resolution such as arbitration, mediation, neutral evaluation, expert determination and related methods.

**Binding Precedent**: a binding precedent (also mandatory precedent or binding authority) is a precedent which must be followed by all lower courts. It is usually created by the decision of a higher court.

**Cy-près Distribution**: a traditional means of distributing assets held in trust where the terms of the trust can no longer be fulfilled and which has been used analogously in some jurisdictions as a means to distribute unclaimed damages or unclaimed settlement awards in representative actions.

**Res Judicata**: "a matter [already] judged". A case in which there has been a final judgment and is no longer subject to appeal. The term is also used to refer to the doctrine meant to bar (or preclude) re-litigation of such cases between the same parties. In this latter usage, the term is synonymous with "preclusion."

**Opt-in**: the requirement in a collective action that individual litigants actively elect to take part in the litigation as members of the represented group. An individual who does not opt-in does not benefit from the outcome of the collective action, although that may constitute a precedent that would be relevant if the individual later brought a separate claim.

**Opt-out**: the requirement that individual litigants, who fall within the definition of the represented class, actively elect not to take part in the collective action. Failure to opt-out makes the outcome of the collective action binding on the individual. So, under the principle of *res judicata*, they cannot subsequently bring their own claim.

**Sector**: a discrete area of economic or social activity, within which particular issues, including specific types of legal claim, may arise. Different departments will be responsible for Government policy in relation to different sectors, and the relevant department would be responsible for considering and taking forward proposals to allow collective actions within that sector. Examples of sectors include consumer protection, intellectual property, employment rights and competition law.

© Crown copyright
Produced by the Ministry of Justice

Alternative format versions of this report are available on request from
Michael.Animashaun@justice.gsi.gov.uk or 020 3334 3189.


HM TREASURY

# Extension of the statutory regime for issuer liability:

## a response to consultation

**March** 2010



HM TREASURY

# Extension of the statutory regime for issuer liability

a response to consultation

March 2010

 Official versions of this document are printed on 100% recycled paper. When you have finished with it please recycle it again.

If using an electronic version of the document, please consider the environment and only print the pages which you need and recycle them when you have finished.

© Crown copyright 2010

The text in this document (excluding the Royal Coat of Arms and departmental logos) may be reproduced free of charge in any format or medium providing that it is reproduced accurately and not used in a misleading context. The material must be acknowledged as Crown copyright and the title of the document specified.

Where we have identified any third party copyright material you will need to obtain permission from the copyright holders concerned.

For any other use of this material please write to Office of Public Sector Information, Information Policy Team, Kew, Richmond, Surrey TW9 4DU or e-mail: licensing@opsi.gsi.gov.uk

ISBN 978-1-84532-716-3
PU966

# Contents

|  |  | Page |
|---|---|---|
| Chapter 1 | Introduction and summary of proposals | 3 |
| Chapter 2 | Basis of liability | 7 |
| Chapter 3 | Markets to which the regime is applicable | 9 |
| Chapter 4 | Securities and issuers to which the regime is applicable | 13 |
| Chapter 5 | Investors to which the regime is applicable | 15 |
| Chapter 6 | Disclosures subject to the regime | 17 |
| Chapter 7 | Liability for dishonest delay | 23 |
| Chapter 8 | Other issues | 25 |
| Annex A | Respondents to the consultation | 27 |



# Introduction and summary of proposals

**1.1** The efficient working of capital markets is supported by the provision of timely and accurate information for market participants to analyse and drive the price formation process. This process operates both to protect investors and, more generally, to promote the efficient allocation of financial resources. Therefore, the question of to what extent companies, as issuers of securities, should be liable for inaccurate statements upon which investors rely to their detriment is an important one. Any liability regime must balance the interests of issuers and investors – providing appropriate incentives to make timely and accurate disclosures, as well as an appropriate right to recover losses without promoting speculative and unmeritorious litigation.

**1.2** The subject of the UK policy on issuer liability for disclosure arose during the implementation of the Transparency Directive into UK law. After consultation the Government sought Parliamentary approval for a statutory liability regime that was codified in section 90A of the Financial Services and Markets Act 2000 (FSMA), as introduced by section 1270 the Companies Act 2006. It was acknowledged, however, that further adjustment to the regime might be required; therefore, in section 90B of FSMA, HM Treasury was given the power to amend, limit or extend the scope of the liability regime.

**1.3** In October 2006 the Government asked Professor Paul Davies QC, Cassel Professor of Commercial Law at the London School of Economics, to carry out an independent review in respect of damage or loss suffered as a consequence of inaccurate, false or misleading information disclosed by issuers or their management to the market, or the failure to disclose relevant information to the market promptly or at all.

**1.4** Professor Davies issued a first discussion paper in March 2007[1] and responses to that, coupled with extensive discussions with stakeholders, led him to publish his final set of proposals for changes to the law in June 2007[2]. The Government duly considered these and issued a further consultation based upon them in July 2008[3], in which it set out proposals for the extension of the statutory regime for issuer liability, including draft Regulations.

**1.5** This consultation closed in October 2008 with the Government receiving a total of 25 responses. A full list of respondents is set out in Annex A. Respondents presented a range of views and opinions on the questions raised. This paper therefore sets out the Government's response to the consultation and explains how the responses have informed the Government's view in drafting the final Regulations - The Financial Services and Markets Act 2000 (Liability of Issuers) Regulations 2010.

---

[1] *Liability for Misleading Sstatements to the Market: A Discussion Paper by Professor Paul Davies QC*, March 2007. Available at: http://www.hm-treasury.gov.uk/d/davies_discussionpaper_260307.pdf

[2] *Final Report of the Davies Review of Issuer Liability*, Professor Paul Davies QC, June 2007. Available at: http://www.hm-treasury.gov.uk/d/davies_review_finalreport_040607.pdf

[3] *Extension of the Statutory Regime for Issuer Liability*, HM Treasury, July 2008. Available at: http://www.hm-treasury.gov.uk/d/issuerliability_170708.pdf

1.6 The Government invited comments on the following list of proposals which are set out here along with the Government's decisions following the consultation process.

---

**Box 1.A: Summary of proposals**

1. To make no change to the current basis of liability (i.e., fraud).

**The Government has made no change to this proposal.**

2. That liability should attach in respect of securities admitted to trading on a UK regulated market or a UK multilateral trading facility.

**The Government has made no change to this proposal.**

3. That the statutory liability regime apply to:

- issuers of all securities admitted to trading on a UK regulated market or multilateral trading facility; and

- issuers of securities admitted to trading on an EEA regulated market or multilateral trading facility, where the UK is the home state for the issuer under the Transparency Directive or the issuer has its registered office in the UK.

**The Government has altered this proposal so that the statutory regime will be extended to cover all cases where securities are admitted to trading on a securities market where either the market concerned is situated or operating in the UK, or the UK is the issuer's home state.**

4. That the regime apply to:

- "transferable securities" as defined in section 102A(3) of FSMA;

- in the case of depositary receipts and other secondary securities giving a right to acquire or sell other transferable securities, the issuer liable to pay compensation shall be the issuer of the underlying securities, provided that the secondary securities concerned have been admitted to trading by or with its consent;

- for depositary receipts and other secondary securities admitted to trading without the consent of the issuer of the underlying securities, and for all other derivative instruments, the issuer of the depositary receipts, other secondary securities or derivative instruments shall be liable to pay compensation under the regime.

**The Government has made no change to this proposal, however it has clarified the wording in the Regulations so that they achieve the stated policy aim.**

5. That the scope of disclosure of the statutory regime should be:

- all information published by the issuer by means of a recognised information service;

- other information where the availability of that information has been announced by the issuer by means of a recognised information service; and

- a recognised information service for these purposes will include both RISs and information services used to disseminate information which is required to be published by the rules of an MTF.

---

**The Government has altered this proposal to take account of the extension of the regime to cases where securities are admitted to trading on a securities market where either the market concerned is situated or operating in the UK, or the UK is the issuer's home state.**

6. That the statutory regime should provide that the proposed immunity does not affect the rights of a holder of securities in his capacity as such.

**The Government has altered the safe harbour provision and specifically preserved the following forms of liability: civil liability under section 90 (compensation for statements in listing particulars or prospectus); civil liability under rules made under section 954 of the Companies Act 2006 (compensation); civil liability for breach of contract; civil liability under the Misrepresentation Act 1967; civil liability arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned; liability to a civil penalty; criminal liability.**

7. That the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service.

**The Government has made no change to this proposal.**

8. To extend the statutory regime to include liability where the issuer:

- acts dishonestly in delaying publication of the information;
- by the delay intends to enable a gain to be made or to cause loss to another or expose another to the risk of loss.

**The Government has made no change to this proposal.**

9. That liability should attach irrespective of whether the relevant transaction takes place on or off market.

**The Government has made no change to this proposal.**

10. To extend the regime to include sellers (but not holders) of securities.

**The Government has altered this proposal to extend the regime to include sellers and holders of securities.**

11. Not to extend the statutory liability regime to directors and advisers.

**The Government has made no change to this proposal.**

12. To make no changes to the statutory regime in respect of assessment of damages.

**The Government has made no change to this proposal.**

13. To consider further the issue of subordination of investors' claims.

**The Government has made no change to this proposal.**

# 2

# Basis of liability

2.1 One of the most fundamental questions surrounded what liability standard should be used in relation to misstatements. After considering the merits of three liability standards (fraud, negligence & gross negligence) Professor Davies recommended that fraud should be the basis of liability. The term fraud being used in the standard civil (as opposed to criminal) law sense: a statement whose maker knew it to be false or did not care whether it was true or false. Someone with a genuine belief in the truth of what was said would not be acting fraudulently, even if that belief were based on inadequate checking.

2.2 The Government agreed with this and proposed to make no change to the current basis of liability – i.e. fraud.

## Respondents' views

2.3 The vast majority of respondents were in favour of the Government making no change. They supported the arguments put forward in the consultation paper: that a negligence standard would likely lead to defensive and bland reporting; that gross negligence would likely be treated as akin to negligence and so also produce bland reporting; and, that the policing of negligence is best left to the Financial Services Authority's (FSA) rules and enforcement powers.

2.4 Respondents who supported the fraud standard agreed that it maintained the right balance between enforcement by private investors and public enforcement by the FSA as the regulator.

2.5 A small minority, however, argued that fraud was too high a standard of proof and that gross negligence should be adopted. These respondents argued that issuers have a duty to act with care and if there is reckless disregard in relation to this duty then they should be held liable.

## The Government's response

2.6 The Government agrees with the majority of respondents and will make no change to fraud as being the basis of liability, as per the consultation proposal. The Government believes this strikes an appropriate balance between public and private enforcement. Negligent reporting will remain subject to the FSA's rules and the statutory regime will continue to play an important but subordinate role to such public enforcement by the FSA.



# 3 Markets to which the regime is applicable

**3.1** There were two issues considered: first, whether the regime should extend to Multilateral Trading Facilities (MTF)[1], and secondly, what the geographical scope of the liability regime should be. These two issues will be addressed in turn with the Government's response to both thereafter.

## Extension to UK-Based multilateral trading facilities

**3.2** The statutory liability regime established in section 90A of FSMA applies to issuers of securities admitted to trading on UK regulated markets[2]; this was a necessary requirement of implementing the Transparency Directive into UK law. While there is no requirement to provide a statutory regime for issuers admitted to trading on other markets, it was felt that there was no reason why protection should not be afforded to those issuers and investors. Indeed Professor Davies' work showed that disclosures made by issuers on these markets are made in very similar circumstances, in response to the same investor needs and that issuers face similar incentives to make prompt and accurate disclosures.

**3.3** Consequently, the Government proposed that the liability regime should apply to all securities (i.e. securities issued by a UK or non-UK issuer) admitted to trading on a UK regulated market or a UK MTF.

## Respondents' views

**3.4** The majority of respondents supported this proposal. The view was that it was appropriate to apply a consistent liability regime to securities regardless of them being admitted to trading on different platforms. If was felt the focus should be on the information provided rather than the location of trading. Respondents therefore supported a uniform approach to issuer liability across markets, which it was felt would deliver certainty as to issuer responsibilities and investor rights. One respondent felt that through promoting certainty in this manner, the attraction of UK securities markets would be increased.

**3.5** Respondents concerned with the treatment of Swiss issuers argued that the statutory liability regime should not extend to Swiss issuers admitted to trading on the SWX Europe MTF. However, since the end of the consultation period the Swiss stock exchange has announced that they are seeking to repatriate trading of the Swiss stocks from London. Therefore, their specific construction of issuers' securities being listed in Switzerland but with a primary listing in the UK no longer exists. However they continued to question whether the UK should apply its rules on liability to securities, which, though admitted to trading on a UK market, are issued by an issuer established in another European Economic Area (EEA) state.

---

[1] Multilateral Trading Facilities are defined in Article 4.1(15) of the Directive on Markets in Financial Instruments and defined in FSMA for the purposes of Part VI of the Act in section 102B(6).

[2] Defined in s.103 FSMA by reference to Article 4.1(14) of the Market in Financial Instruments Directive (2004/39/EC).

3.6 Another respondent argued that under EU law it is the home state which regulates disclosures. Therefore, where the UK is not the home member state, it is the law of the EEA state which is the home member state that should be applied, even where the securities are traded on a regulated market in the UK. On this analysis it was argued that no provision should be made for application outside the UK, except to the extent that the Transparency Directive requires the UK to do so.

## Extension to non-UK markets

3.7 A further aspect considered in the consultation paper was whether the liability regime should extend to UK issuers of securities admitted to trading on non-UK markets. In doing so the consultation paper discussed two options: to extend the statutory regime to all cases where English law is found to be the applicable law, or, to restrict its extension to a narrower group of markets.

3.8 After setting out the arguments on each side the Government proposed that the statutory liability regime apply to:

- issuers of all securities admitted to trading on a UK regulated market or multilateral trading facility; and

- issuers of securities admitted to trading on an EEA market or multilateral trading facility, where the UK is the home state for the issuer under the Transparency Directive or the issuer has its registered office in the UK.

## Respondents' views

3.9 Where respondents commented they were evenly split on this issue. Those respondents who agreed with the proposed extension to EEA markets acknowledged that the arguments put forward in the consultation paper were sound practical reasons for an expansion to EEA markets, but not to all cases where English law would apply. Some of these respondents also stated that in principle they would prefer an extension to all cases where English law was found to apply, but recognised the practical problems in so doing.

3.10 An equal number of respondents felt that the proposal did not go far enough and that it should be extended to all cases where English law is found to be the applicable law. Respondents who argued for such an extension questioned the argument that to do so would create uncertainty - it was noted that the application of choice of law rules already creates a degree of unpredictability and the statutory regime would not alleviate this unpredictability.

3.11 These respondents felt that it would not be desirable for the courts, using conflict of law rules, to be able to determine that English law was the applicable law, but then the statutory liability regime would not apply as a result of a geographical limit. Some respondents gave practical examples (for example, a UK investor in a UK company that has its sole listing on the US NASDAQ exchange) arguing that such an investor should not be completely excluded from the statutory liability regime simply because the company is listed outside the EEA.

3.12 Some respondents also felt that the argument put forward in the consultation paper that the number of cases where a court would apply English law outside the UK and EEA is likely to be small was not a sufficient justification for excluding those investors. They stated that as a matter of principle a liability regime has to take into account both potentially common and uncommon cases.

3.13 One respondent argued that under EU law the UK cannot seek to apply its law on market liability, on a home country basis, to disclosures by UK companies trading on facilities elsewhere in the EEA.

## The Government's response

**3.14** The Government has, after careful consideration, decided that in order to ensure the scope of the liability regime is clear and is applied on a uniform basis, subject to conflict of laws resolution, it will be extended to cover all cases where securities are admitted to trading on a securities market where either the market concerned is situated or operating in the UK, or the UK is the issuer's home state. This means that the proposed liability regime may in some cases be capable of applying extraterritorially, where for example, a claim relates to securities of a UK issuer admitted to trading on a US market. However in practice, the liability regime proposed would only give a right of compensation in cases where English law is found to be the applicable law of the forum in which a claim was brought. It will then fall to the courts, using the relevant conflict of laws provisions (e.g. Rome II Regulation[3]) to determine which law actually applies in a specific case.

**3.15** Although the number of cases where the courts would apply English law outside the UK and EEA is likely to be small and most overseas listings occur in jurisdictions with a well-developed securities regime, such as the US, the Government acknowledges that this should not be a reason to exclude such investors from the potential scope of the liability regime.

**3.16** The Government acknowledges the views put forward by the respondents concerned with the position of Swiss issuers who, at the time of responding, had their primary listing on an MTF in London. Although this specific construct no longer exists, the Government believes that should issuers wish to trade on a UK based market, they should be within the scope of the UK statutory liability regime.

**3.17** The Government agrees with the majority of respondents that it is important to ensure, as far as possible, that a consistent liability regime applies to all securities which are admitted to trading on UK markets. It does not consider that the Transparency Directive requires member states to exempt issuers whose securities are traded on UK markets from the UK regime on issuer liability if the UK is not the home member state of that issuer.

**3.18** The Government considers that the proposed application of the liability regime is consistent with EU law. Article 7 of the Transparency Directive is silent as to which Member State is to apply its laws on liability to issuers, and the principles of liability to be applied have not been harmonised under EU law. It is therefore inevitable that conflicts of law will arise where shares issued by an issuer based in one country are admitted to trading in another. EU law provides the tools to resolve them.

---

[3] Regulation (EC) no 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II).



# 4 Securities and issuers to which the regime is applicable

**4.1** After assessing the related points of which category of securities should give rise to a right to compensation and who should be considered the issuer of the security, the Government proposed that the regime apply to:

- "transferable securities" as defined in section 102A(3) of FSMA;

- in the case of depositary receipts and other secondary securities giving a right to acquire or sell other transferable securities, the issuer liable to pay compensation shall be the issuer of the underlying securities, provided that the secondary securities concerned have been admitted to trading by or with its consent;

- for depositary receipts and other secondary securities admitted to trading without the consent of the issuer of the underlying securities, and for all other derivative instruments, the issuer of the depositary receipts, other secondary securities or derivative instruments shall be liable to pay compensation under the regime.

## Respondents' views

**4.2** There was near unanimous support for the principles that underpinned these proposals. Therefore where respondents did make substantive comments they related primarily to two areas of wording in the draft Regulations.

**4.3** Firstly, a number of respondents expressed concern that defining an "acquisition or disposal of securities" to include acquisition or disposal of "any interest in securities", would allow holders of certain derivative products (e.g. contracts for difference, options, futures) to bring a claim against the underlying issuer of the securities, whether or not the issuer had consented to the trading of those secondary securities. Respondents felt the effect of this wording would be to create uncertainty as to the pool of potential claimants that would be entitled to bring a claim against the underlying issuer. Furthermore, the potential value of such derivative holdings could be far greater than the market capitalisation of the underlying company issuing the securities.

**4.4** Secondly, whilst supporting the principle of liability attaching only where consent had been given, some respondents felt that the use of the word "consent" in the draft Regulations was too nebulous a term. It was argued that the Regulations should either use a more explicit term or the term should be defined more explicitly. Some respondents argued that the courts might discern that an issuer of securities who had knowledge of trading in secondary securities had given their implied consent to that trading and so be held liable.

**4.5** Finally, some respondents queried who would be liable to whom in cases of secondary securities.

## The Government's response

**4.6** The Government recognises that the term "consent" has created a degree of ambiguity as to its drafting aim. The Government is clear that simple knowledge of trading in secondary securities does not constitute implied consent by means of acquiescence and therefore potential liability to holders of those secondary securities.

**4.7** The Government has amended the Regulations to clarify this point. Section 2(a) of paragraph 1 of Schedule 1 now states that "an issuer of securities is not taken to have consented to the securities being admitted to trading on a securities market by reason only of having consented to their admission to trading on another market as a result of which they are admitted to trading on the first mentioned market." The Regulations do however make clear that an issuer who accepts responsibility for the preparation of documents (such as a prospectus or listing particulars) for the admission of securities to a particular market is deemed to have consented to their trading on that market.

**4.8** The Government acknowledges that including acquisition or disposal of "any interest in securities" in the definition of an acquisition or disposal of securities would have extended the potential class of claimants to derivative holders to whom the issuer of the underlying securities should not, without giving the appropriate consent, be liable. The Government recognises that a person acquiring, for example, an option or a warrant in relation to certain securities does not only acquire the derivative instrument, but at the same time could be said to have acquired an interest in the underlying securities covered by the derivative instrument, within the meaning of paragraph 7(3) in the draft Regulations.

**4.9** The Government has therefore clarified the definition of the acquisition or disposal of securities by providing that it does not include the acquisition or disposal of a "depositary receipt, derivative instrument or other financial instrument representing securities"; dealing in such instruments which give a right to acquire or sell other securities does not amount to the acquisition or disposal of the underlying securities.

**4.10** In relation to secondary securities the position is that if an issuer has not consented to the trading of secondary securities then they will not be liable to any holders of those securities. If, however, they have properly consented to the trading then they would potentially be liable to a holders of secondary securities if there had been a fraudulent misstatement and that statement had been relied upon in someone choosing to trade in those secondary securities. The issuer of secondary securities itself would only be liable to a holder if they themselves issue a fraudulent misstatement – they will not be liable for a fraudulent misstatement for which they were not responsible.



# 5 Investors to which the regime is applicable

**5.1** The statutory regime that Professor Davies reviewed applied only for the benefit of acquirers of shares. On the basis of Professor Davies' review and recommendation the Government proposed to extend the statutory regime to include sellers (but not holders) of securities.

## Respondents' views

**5.2** This issue dichotomised respondents between those who favoured the proposal to extend the regime to include sellers, but not holders, and those who favoured including both sellers and holders.

**5.3** Those who were in favour of not including holders argued that, whilst they could see there were arguments for their inclusion, a line had to be drawn and the proposal was the fairest way of achieving that. The view was that it would not be correct to allow a holder to bring a claim, which, if he were successful, would see damages being paid at the expense of other holders. They felt such holders would be better compensated through actions carried out by the company on their behalf.

**5.4** Those who favoured extending the regime to include holders argued that there was no principled justification for not doing so, and as they were also susceptible to harm, they deserved parity with buyers and sellers of securities as to the legal redress available. One respondent questioned the potential paradox whereby a holder of shares decides against selling his holding and instead buys further shares in reliance on a fraudulent statement; he would be able to bring a claim in respect of his new holding but not in respect of the shares he decided to retain.

**5.5** It was argued that to exclude holders would in fact lead to greater levels of uncertainty, as there would be different legal tests of liability for claims arising from the same information. This, it was argued, would likely lead to further efforts to extend the law of negligence through the court process.

**5.6** Regardless of whether respondents favoured extending the regime to include holders, they acknowledged there would, in practice, be very few cases where a continuing holder could successfully prove reliance and a resulting loss.

## The Government's response

**5.7** The Government, having weighed up all the points of view carefully, has decided to extend the statutory regime to include holders of securities as well as sellers. The potential to have two divergent regimes, one for sellers and purchases but another for holders would not be conducive to investor and issuer certainty. Furthermore, there is very little principled reason for seeking to bring sellers within the regime but to leave holders out.

**5.8** However, as the Regulations make clear, there must be reliance on information published by the issuer in deciding to continue holding securities. There is a clear difference between an active holder and a passive holder – the latter will not be entitled to bring an action as they would not be able to show reliance upon the statement in making their investment decision.

5.9 To be able to bring an action a claimant would, for example, have to demonstrate that as a result of reliance on a fraudulent misstatement he instructed his broker to cancel a sell order and instead retained the holding of securities. A holder of securities who continued to hold without giving the matter any thought would be considered to have held those securities passively and thus not able to demonstrate the necessary reliance on the information to bring a claim.



# 6 Disclosures subject to the regime

## Information subject to the regime

6.1 Under the Disclosure and Transparency Rules issuers admitted to UK regulated markets are required to use a Regulated Information Service (RIS). For issuers trading on an MTF, FSA rules do not specify the required channels through which disclosures must be made. Therefore, in order to provide issuers and investors with a consistent regime that covered the principal disclosures likely to affect the value of the securities the Government proposed that the disclosures subject to the statutory regime should be:

- all information published by the issuer by means of a recognised information service;

- other information where the availability of that information has been announced by the issuer by means of a recognised information service; and

- a recognised information service for these purposes will include both RISs and information services used to disseminate information which is required to be published by the rules of an MTF.

## Respondents' views

6.2 Respondents made several points in relation to this proposal.

6.3 The most common comment, which came from a number of respondents, related to the issue of "out of hours" disclosures as dealt with under the FSA's Disclosure and Transparency Rules (DTR). DTR 1.3.6 stipulates that if an issuer has to disclose information and an RIS is not open for business the company must distribute the information as soon as possible to: not less than two national newspapers in the UK, two newswire services operating in the UK, and, an RIS for release as soon as it opens. DTR 2.4.2 stipulates that if the rules of another regulated market or overseas stock exchange require a listed company to disclose inside information at a time when an RIS is not open for business it should disclose the information in accordance with DTR 1.3.6 at the same time as it is released to the public in the other jurisdiction. It was stated that the liability regime should align itself with the FSA's "out of hours" disclosure regime.

6.4 Some respondents also queried whether the drafting of paragraph 2(1)(b) of the draft Regulations was too broad and unintentionally captured information contained in, for example, company circulars or on a company website, which they felt should not be within the scope of the statutory regime.

6.5 A further point raised by respondents was that it was felt clarification was needed in respect of information, which, although it may not have been published by an RIS, its availability had been announced via an RIS.

6.6 Some respondents stated that the Regulations should stipulate that liability under FSMA section 90A is without prejudice to liability under FSMA section 90 and vice versa. It was said that not doing so would allow a company to argue that information which had already been included in a prospectus, and therefore subject to the section 90 regime, would fall outside the scope of the section 90A regime.

**6.7** Some respondents stated that as there is a specific exclusion for prospectuses and listing particulars, which are governed by their own regime, there should be a similar exclusion for documents or announcements issued in the context of a takeover and subject to a regulatory regime administered by the Panel on Takeovers and Mergers. They argued that these documents are shareholding rather than market regarding.

**6.8** In relation to the question as to whether RISs would be overloaded with issuers seeking to bring announcements within the scope of the regime, those respondents who offered a view felt that this was not a likely outcome of the statutory regime.

## The Government's response

**6.9** The Government recognises that without taking account "out of hours disclosures" there will potentially be a short period where information, which is of the type intended to be caught by the statutory regime, falls outside it simply because the RIS was closed for business at the time the information had to be published. Therefore the Regulations have been amended accordingly to refer to "other means required or authorised to be used to communicate information to the market in question, or to the public, when a recognised information service is unavailable".

**6.10** In respect of treatment of prospectuses and takeover documents, the former are already subject to the FSMA section 90 regime which is why they have been excluded from the section 90A liability regime. In contrast takeover documents are already covered by the common law and therefore they should be included in the statutory regime to make the whole liability regime clear. To exclude takeover documents from the common law and statutory regimes would amount to a reduction in investors' rights.

**6.11** The Government's intention in respect of prospectuses is that if a person is able to bring a claim under section 90 of FSMA, they should not be able to bring a claim under the section 90A statutory regime. The draft Regulations gave effect to this by excluding information in listing particulars and prospectuses from the definition of "information to which this Schedule applies". However, it is acknowledged that this was unsatisfactory as it meant that a person who relied on information which was also published in a prospectus might be found to have lost their right of action under section 90A, even if they did not in fact have a right of action under section 90. The draft Regulations have therefore been revised so that information contained in listing particulars or a prospectus is potentially within the section 90A liability regime. However, an issuer will not be liable to pay compensation in respect of such information under section 90A if it is liable to pay compensation under section 90 (see paragraph 4 of the Schedule inserted by the Regulations).

**6.12** No similar provision is made in relation to the liability of an issuer for dishonest delay in publishing information under paragraph 5. Section 90 only gives a right to an action in respect of misleading statements or omissions, and not in relation to delay. In theory it would be possible for a claim to be brought under paragraph 5 for dishonest delay in relation to a delay in publishing information where the information in question was contained in a prospectus or listing particulars, though it is difficult to see how in practice there could be a dishonest delay in publishing such information. However, if a claimant is able to demonstrate that information should have been published earlier has been dishonestly delayed until the information is included in the prospectus or listing particulars then the Government believes they should be entitled to bring an action under the principles of dishonest delay.

**6.13** Where the availability of information has been announced by the issuer by means of a recognised information service, that information will be subject to the liability regime, as set out in the consultation paper. This is designed to ensure that an RIS announcement, which refers to documents such as annual accounts being made available, will bring the whole text of the

annual accounts within the scope of the liability regime. The Government accepts that this will significantly extend the scope of information which is subject to the liability regime. It will mean that references made to other information will bring that information within the scope of the regime. However, liability will only vest on an issuer where there is a fraudulent misstatement or omission in the information to which the RIS announcement refers, and a person discharging managerial responsibilities within the issuer knew of it (or was reckless as to whether the statement was untrue or misleading) and a claimant is able to demonstrate that he or she has suffered loss as a consequence of relying on that fraudulent misstatement or omission. Where all these tests are satisfied in relation to information whose availability has been announced by the issuer, there seems no reason in principle why the information should not be subject to the liability regime.

6.14 Electing to extend the regime to cover all securities admitted to trading on a securities market where the UK is the issuer's home state, wherever the market in question is situated, raises the question of how we define information services for markets outside the EEA. As this regime potentially covers any market, anywhere in the world, the Government has clarified the meaning of recognised information service.

6.15 A recognised information service is now defined to mean: in respect of an EEA securities market, "a service used for disseminated information in accordance with Article 21 of the Transparency Directive"; in respect of a non-EEA securities market, "a service used for dissemination of information which is equivalent to that which is required to be disclosed under the Transparency Directive"; or in relation to any market, "any other service used by issuers to disseminate information required to be disclosed by the rules of the market".

## Source of information

6.16 The Government proposed that the issuer be liable, irrespective of whether the person claiming damages obtains the relevant information from a recognised information service, or other source, provided that the information was published on a recognised information service.

## Respondents' views

6.17 There was majority support for this proposal – it was seen as a non-contentious issue.

6.18 Some respondents queried how the liability regime would apply when there was not verbatim reporting of primary material through a secondary source.

## The Government's response

6.19 The Government remains of this view and therefore liability will attach to statements put out on a recognised information service, even if a claimant does not obtain the information directly from the recognised information service.

6.20 The rationale for liability arising even where an investor relies on information acquired from a secondary source was it was felt to not do so would impose too high an evidential burden on valid claims. Any statement put out through a recognised information service will be within the scope of the liability regime if that statement contains a fraudulent misstatement.

## Shareholders' rights

6.21 Professor Davies' view was that the statutory regime for investors should not reduce shareholders rights against their companies to bring a claim for negligence. The Government agreed with this and proposed that the statutory regime should provide that the proposed immunity does not affect "the rights of a holder of securities in his capacity as such".

## Respondents' views

**6.22** Respondents agreed with the proposition that any rights shareholders have to bring a claim for negligence against their company should not be removed. However, a large number of respondents felt that the wording used in the draft Regulations did not achieve that stated aim and that it created uncertainty as to how the statutory regime would interact with the common law, in particular the *Caparo*[1] case.

**6.23** Specifically concerns were raised that the drafting of the Regulations excluded: contractual representations; non-contractual representations where there had been a voluntary assumption of responsibility; and, shareholders' rights to claim in negligence in relation to the governance and stewardship of the company.

**6.24** Though there was general agreement with the proposition that the rights of a shareholder in *Caparo* should be preserved, there was no consensus among respondents as to exactly what those rights were, or how they should be defined for the purposes of the regime. It was argued that the phrase "the rights of a holder of securities in his capacity as such" in fact undermined the aim of having a clear statutory regime.

## The Government's response

**6.25** The Government recognises that this is a complex but very important part of the statutory regime. The Government has, after careful thought and consideration, altered the safe harbour provision to take account of the views of respondents. The principle is that the issuer should not be subject to any other liability other than that provided for in paragraphs 3 and 5 of Schedule to the Regulations, except for the stated exceptions set out in paragraph 7.

**6.26** The Government has however amended the list of exceptions in paragraph 7(3) to the Schedule to state clearly that the following forms of liability are preserved:

- Civil liability under section 90 (compensation for statements in listing particulars or prospectus).

- Civil liability under rules made under section 954 of the Companies Act 2006.

- Civil liability for breach of contract.

- Civil liability under the Misrepresentation Act 1967.

- Civil liability arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned.

- Liability to a civil penalty.

- Criminal liability.

**6.27** Paragraphs 7(3) and 7(4) of the Regulations still include liability to a civil penalty, criminal liability and the powers conferred under sections 382 and 384 (powers of the court to make a restitution order and of the Authority to require restitution), all of which were included in the draft Regulations and on which respondents did not make comment.

**6.28** The Government has now included an express provision in relation to civil liability under section 90 to clarify the relationship between paragraph 3(4) of the Schedule and paragraph 7(1). This ensures that a claim can be brought under section 90 for misleading information in

---

[1] *Caparo Industries plc v Dickman* [1990] 1 All ER 568, HL

listing particulars and prospectuses despite paragraph 7(2). Similarly, civil liability which may arise if rules are made giving the Takeover Panel power to order a person to pay compensation is expressly preserved.

6.29 The Government has elected to include an express provision in relation to contractual liability. This is to remove any doubt that where, for example, an issuer is in breach of any warranties given as to the accuracy of particular information, the issuer will remain liable for any compensation which may arise as a result of breach of contract. Similarly, where a person other than the issuer has warranted the accuracy of particular information to a third party, that person should not be able to avoid liability simply by relying on that provision of the Schedule which states that "a person other than the issuer is not subject to any liability, other than to the issuer, in respect of any such loss".

6.30 The Government has included an express provision in respect of civil liability under the Misrepresentation Act 1967. It was recognised that there was no reason to override the existing statutory protection offered by this Act.

6.31 Finally the Government has included an express provision for civil liability arising from a person's having assumed responsibility, to a particular person for a particular purpose, for the accuracy or completeness of the information concerned. This is intended to ensure that an issuer will remain liable for negligent misstatements where such liability would exist under the rule in *Caparo v Dickman[2],* as subsequently developed by the courts.

6.32 The objections respondents raised to the phrase "the rights of a holder of securities in his capacity as such" were that it was unclear and failed to clearly delimit shareholders' *Caparo* rights. The objections illustrate the difficulty of defining the cases in which shareholders may have a right to compensation for economic loss arising from negligent misstatement in relation to the governance of the company.

6.33 Under the test confirmed in *Caparo* and subsequent cases, liability arises in relation to negligent advice, where advice is given to a known recipient for a specific purpose of which the adviser is aware, and the recipient has relied on the advice, acting on it to his detriment. Expressed in other words, the defendant will be liable for negligent misstatements causing economic loss where the defendant has assumed responsibility to the claimant for the accuracy of the information given to the defendant, who acted on that information and suffered loss as a result. The revised provision in paragraph 7(3)(a)(iv) of the Schedule to the Regulations preserves this test.

6.34 The new test excludes the possibility of shareholders asserting that companies have a wider duty of care for misstatements in relation to governance rights that might cause economic loss (except of course where there is an assumption of responsibility falling within the scope of our provision). No such duty has been established in case law. The Government is not aware of any material circumstances in which such a duty would be appropriate, nor were any examples provided during consultation.

6.35 Respondents were unable to offer alternative wording which would leave open the possibility of shareholders asserting that such a wider duty of care exists in law, without creating ambiguity as to the meaning and intended effect. The Government does not believe it is practicable to draft an exception in relation to undefined hypothetical rights that the courts might or might not subsequently recognise. A general exception referring to rights of a shareholder in his capacity as such or similar wording is not capable of being clearly defined without creating doubt as to the scope and effect of the statutory regime. It would be likely to

---

[2] Ibid.

result in significant tangential litigation seeking to define exactly how the exception should be applied.

6.36  In respect of documents such as circulars specifically addressed to shareholders for, inter alia, governance purposes, the Government believes that any claims brought by shareholders in relation to negligent misstatement giving rise to economic loss would depend on the test set out in paragraph 6.33 (as indeed was the approach taken in two recent cases), which is preserved under the new regime.

6.37  Accordingly, the Government believes that any potential for identifying undefined rights which this change of wording might extinguish is outweighed by the need to avoid uncertainty in the scope of the regime, which would leave open the potential for unmeritorious litigation and might expose issuers to the risk of liability for negligent misstatement in circumstances where this was not intended.

# 7 Liability for dishonest delay

**7.1** The Government's view in seeking to create a liability for dishonest delay is to reinforce the incentives for prompt disclosures, provided that the scope of the liability is precisely drawn to ensure that legitimate delay is not penalised and defensive behaviour on the part of issuers is not promoted. Clearly it is recognised that there will be situations where disclosure of information is delayed for good reason (for example to check facts before publication).

**7.2** Consequently, the Government proposed to extend the statutory regime to include liability where the issuer:

- acts dishonestly in delaying publication of the information; and

- by the delay intends to enable a gain to be made or to cause loss to another or expose another to the risk of loss.

## Respondents' views

**7.3** This was a finely balanced issue and respondents presented a range of views.

**7.4** A number of respondents were not in favour of the creation of a liability for dishonest delay. Some felt that the existing FSA powers, especially the DTR rules, already covered this area sufficiently and that these represented the most effective way of punishing delay. Respondents therefore questioned whether, with the FSA's current powers, a statutory liability for dishonest disclosure would in fact provide a more effective incentive for prompt disclosure. One respondent also argued that where serious and intentional dishonestly takes place sanctions against individual directors could be brought under the Fraud Act.

**7.5** Some respondents felt that such a regime would increase the risk of speculative litigation and unnecessary settlement. However, others argued that the high evidential burden placed upon claimants would act as a disincentive to speculative litigation. Indeed one respondent who supported liability for dishonest delay felt that the dual test laid down was such a high burden on claimants that it would be practically impossible to surmount.

**7.6** Some respondents argued that although they supported the creation of a liability for dishonest delay, it should be restricted to information that is subject to a statutory requirement to publish.

**7.7** Some respondents argued that where a delay was deliberately caused by a director concealing information from the relevant company – the company as a whole not being aware of the dishonesty – liability should be excluded.

**7.8** A number of respondents questioned whether the drafting was sufficiently tight to ensure the stated aim of ensuring that that legitimate delay is not penalised and defensive behaviour on the part of issuers is not promoted. Furthermore, some respondents stated that there was a possibility that by not stipulating the test of dishonesty to be applied, the court would apply the civil test of dishonesty rather than the criminal test, as these Regulations impose a civil liability.

## The Government's response

**7.9** The Government recognises that this remains a finely balanced issue; however, is still of the opinion that such a liability is appropriate to reinforce the incentive to disclose relevant information promptly.

**7.10** As stated in the consultation document it is important that the scope of liability can be precisely drawn to ensure that legitimate delay is not penalised and defensive behaviour on the part of issuers is not promoted. Therefore the question of how the liability regime will interact with the FSA's rules is an important one. The fact that a delay is not regarded as dishonest would not mean that there was no breach of the FSA's rules. Similarly, not all breaches of the FSA's rules would entail the imposition of statutory liability. The FSA's rules are intended to have a wider reach than the statutory liability regime by covering delay arising from negligence and recklessness.

**7.11** The Government acknowledges that the argument that liability for dishonest delay should only attach to statements that are required to be made has some merit in terms of reducing the risk of opportunistic litigation. However, in order to be successful a claimant would have to demonstrate that a particular statement should have been made at a previous point in time and in fact wasn't, and the act of so doing, was as a result of dishonest behaviour intended to enable a gain to be made or to cause loss to another or expose another to the risk of loss. This is a very high evidential hurdle that claimants will have to satisfy and thus reduces the possibility of opportunistic litigation.

**7.12** The Government is not convinced by the argument that liability should be excluded for cases where a board member is concealing information from the board. To do so would create serious evidential problems. Moreover, companies should have their own internal controls and checks that prevent the possibility of this occurring.

**7.13** The Government acknowledges that there is a risk that the courts would adopt the civil, as opposed to criminal, test for dishonesty. Therefore to prevent this, the Regulations expressly define dishonesty using the criminal test so that a person will be "dishonest" in respect of a delay where that person's conduct would be regarded as dishonest by those who regularly trade in the markets in question, and, in addition, the person concerned was aware that their conduct would be regarded as dishonest.



# 8 Other issues

## Trading off-market

**8.1** The Government proposed that liability should attach irrespective of whether the relevant transaction takes place on or off market.

### Respondents' views

**8.2** A vast majority of respondents supported this proposal. One respondent, however, argued that the liability for off market transactions should be limited to situations where both the seller and purchaser are based in the UK.

### The Government's response

**8.3** The Government does not propose to change this proposal and therefore liability will attach irrespective of whether the transaction takes place on or off market.

**8.4** To limit this to situations where both the seller and purchaser are based in the UK would run contrary to the principles underpinning the rest of the liability regime and would impose an unnecessary restriction.

## Application to directors and advisers

**8.5** The common law applies to directors and advisers who make statements on behalf of the company. However the statutory regime, as established, applies only to issuers and excludes liability on the part of others. The Government therefore proposed not to extend the statutory regime to include directors and advisers.

### Respondents' views

**8.6** The vast majority of respondents supported this proposal.

**8.7** A small minority of respondents however argued that the desire to produce a cleaner legislative package should not necessarily preclude this area being considered further. One respondent argued that the statutory regime should continue to mirror the common law position whereby directors and advisors are liable for the statements they make on behalf of the company.

### The Government's response

**8.8** The Government does not feel it would be beneficial to extend the liability regime to cover directors and advisors.

**8.9** Directors remain liable to their company in negligence and liable to be sued by the company, or by a shareholder on behalf of the company through the new derivative action procedure of the Companies Act 2006. Furthermore, they continue to be exposed to the FSA's penalty regime if knowingly concerned in the contravention by the issuer (under section 91(2) of FSMA). The Government believes that these provisions are sufficient.

## Measure of damages

8.10 Professor Davies felt that it would not be desirable to tie the courts' hands by formulating rules with respect to damages. The Government agreed with this and proposed to make no changes to the statutory regime in respect of assessment of damages – it would be a matter for the courts to decide.

## Respondents' views

8.11 There was wide support for this proposal among respondents who felt that it was right that the courts should decide the quantum of any damages.

8.12 One respondent however stated that the best place to deal with the issue of damages is in the legislation itself and that this should form part of the statutory regime.

## The Government's response

8.13 The Government agrees with the majority of respondents that it would not be desirable to tie the courts' hands through laying out in legislation the assessment of damages. Therefore the Government will not make any changes to the statutory regime in respect of assessment of damages.

## Subordination of investor claims

8.14 The current position under the statutory regime is that in the event of an issuer's insolvency, investors' claims rank alongside other unsecured creditors and ahead of those of shareholders. Davies stated that this was an area which needed further consideration; however, there was no reason to delay other changes while this is resolved. Therefore the Government proposed to consider further the issue of subordination of investors' claims.

## Respondents' views

8.15 Where respondents made comment, there was agreement that this is an area which needs further consideration. Some respondents also proffered a view on whether investors' claims should be subordinated with a roughly equal split between those who felt they should be subordinated and those who felt they should rank equally with unsecured creditors.

8.16 One respondent felt that the area was fundamental to the liability regime and that it was unsatisfactory that the statutory regime would be introduced without this area being fully dealt with.

## The Government's response

8.17 The Government agrees that this is an important area and one that needs further consideration in conjunction with the Insolvency Service. However, the Government does not feel that the liability regime should be delayed until this area is fully resolved.

 # Respondents to the consultation

Ashurst

Association of British Insurers

Barclays Bank

BP

Clifford Chance

Confederation of British Industry

Deloitte

Financial Markets Law Committee

GC100 (Association of General Counsel and Company Secretaries of the FTSE 100)

HBOS

Herbert Smith

Hermes Fund Management Ltd

International Capital Markets Association Limited & Securities Industry and Financial Markets Association

Investment Management Association

London Stock Exchange

Mr Philip Bovey

Norton Rose

Preger Dreifuss

Prudential

Swiss Exchange

SwissHoldings

The Association of Investment Companies

The Institute for Chartered Accountants in England and Wales

The Law Society's Company Law Committee

The Quoted Companies Alliance

**HM Treasury contacts**

This document can be found in full on our
website at:
hm-treasury.gov.uk

If you require this information in another
language, format or have general enquiries
about HM Treasury and its work, contact:

Correspondence and Enquiry Unit
HM Treasury
1 Horse Guards Road
London

SW1A 2HQ

Tel:  020 7270 4558
Fax:  020 7270 4861

E-mail:  public.enquiries@hmtreasury.gov.uk


ISBN 978-1-84532-716-3

# The Recognition, and *Res Judicata* Effect, of a United States Class Actions Judgment in England: A Rebuttal of *Vivendi*

## Rachael Mulheron*

United States' courts have proven willing to certify multi-jurisdictional class actions which purport to adjudicate the claims of both American and foreign (i.e., non-US-domiciled) class members. This article contends, however, that a class actions judgment/settlement issued by a US court would not be recognised, and would not be given preclusive effect, in England, should absent English class members wish to re-litigate the same grievance before an English court. Specifically, it is argued that two separate preconditions for such recognition and preclusive effect would fail, *viz*, a US court would usually lack the requisite 'personal jurisdiction' over absent English class members; and the necessary 'identity of parties' would be absent. The article seeks to anticipate the appropriate answer to a conundrum which is certain to arise for future English judicial consideration, whilst acknowledging the uneasy fit which currently exists between English private international law and multi-jurisdictional class actions.

### INTRODUCTION

The interaction between multi-jurisdictional opt-out class actions, and the rules of private international law, is an increasingly challenging area of class actions jurisprudence. This article tackles the thorny question as to whether a class actions judgment issued by a United States court (whether decided on the merits, or a judicially-sanctioned settlement) would be recognised, and given preclusive *(res judicata)* effect, in England, should absent English class members[1] wish to re-litigate the same grievance before an English court.

The conundrum of whether a multi-jurisdictional class should be certified, which includes absent foreign class members who do not opt-out, is by no means limited to US class actions – the problem has arisen in Canadian class actions jurisprudence too.[2] However, US jurisprudence is of particular interest, and the

*Professor, Department of Law, Queen Mary University of London. This article is based upon a presentation to the British Institute of International and Comparative Law (BIICL) in London on 15 November 2010. The writer wishes to thank, in particular, Prof Douglas Edlin, Philip Rubens, Vincent Smith, Anne Ware, and two anonymous referees, for constructive and thought-provoking feedback about the issues considered in this article. The usual caveat applies. While the author is a member of the Civil Justice Council of England and Wales, the views expressed in this article are written in a personal academic capacity, and should not be taken to necessarily represent the views of that body.

1 Defined, for the purposes of this article, to mean: a class member domiciled in England; who is not a named representative claimant to the US class action; who falls within the defined class in the US class action, because that class includes English class members; who does not actively participate in the US class action in any respect; and who does not opt-out of the US class action. References to 'English'/'England' should be taken to include 'Welsh'/'Wales' throughout.

2 eg, *McKenna* v *Gammon Gold Inc* [2010] ONSC 1591 (*McKenna*) at [87] *per* Strathy J. The issue of recognition/preclusive effect of a Canadian class actions judgment/settlement is presently disputed in *Nutech Brands Inc* v *Air Canada Cargo* (Ont SCJ, 20 June 2007), in which the writer is an expert

Rachael Mulheron

focus of this article, for two reasons. First, given the continued unwillingness of English legislators to enact an opt-out class action, some claimants domiciled in England who have suffered a cross-border grievance have, unsurprisingly, cast their eyes across to the US federal class action regime to seek redress.[3] Attempts by English claimants – whether they be shareholders,[4] price-fixing victims,[5] or consumers[6] – to form an 'add-on' sub-class to a US class action, to be bound by (and to seek to benefit from) the outcome of the class action, have not always met with success. However, a successful example of an 'add-on' English sub-class has recently occurred in the cartel class action settlement involving British Airways plc (BA) and Virgin Atlantic Airways Ltd (Virgin) in *In re International Air Transportation Surcharge Antitrust Litigation* (the *Fuel Surcharge Cartel Settlement*), approved by the District Court of the Northern District of California in 2008 (with the settlement period concluding in December 2012).[7] These types of cases suggest that an English court will, at some point, be required to rule on the recognition and preclusive effect of US class actions judgments/settlements in England (and, moreover, that English legislators need to improve urgently the state of their own collective redress landscape[8]).

A second reason for the importance of the issue is that some American courts have had to weigh into the debate (albeit somewhat ambivalently), and in controversial terms. For example, in *In re Vivendi Universal SA Securities Litigation*[9] (*Vivendi*), Judge Holwell remarked that:

> While the issue is hardly free from doubt, based on the affidavits before it, the Court concludes that English courts, when ultimately presented with the issue, are more likely than not to find that US courts are competent to adjudicate with finality the

---

witness for one of the defendants. For an insightful and detailed consideration of Canadian courts' willingness to certify multi-jurisdictional classes, see, eg, J. Brown, 'Seeking Recognition of Canadian Class Action Judgments in Foreign Jurisdictions: Perils and Pitfalls' (2008) 2 Canadian Class Action Rev 220, 223–227; and Brown, 'Canada–US Cross-Border Class Actions: Class Certification and the Enforcement of the Resulting Class Action Judgments' (Paper for 2011 ABA Annual Meeting, Toronto, 5 August 2011).

3  ie, the damages class action contained in r 23(b)(3) of the Federal Rules of Civil Procedure (FRCP).

4  eg, *In re Parmalat Securities Litig* 497 F Supp 2d 526 (SDNY 2007).

5  eg, *Kruman* v *Christie's Intl plc* 284 F 3d 384 (2d Cir 2003).

6  eg, *Gullone* v *Bayer Corp* 408 F Supp 2d 569 (ND Ill 2006), aff'd, 484 F 3d 951 (7th Cir 2007).

7  Case No M:06-cv-01793-CRB (ND Cal 2008), with settlement website at: https://www.airpassengerrefund.co.uk/Documents.aspx (last visited 2 December 2011). See especially, under 'Important Documents', Notice to Claimants (Long Form Notice), Claim Form, Settlement Agreements, and Final Hearing Transcript.

8  An argument developed further by this writer in, eg, 'The Case for an Opt-Out Class Action for European Member States: A Legal and Empirical Analysis' (2009) 15 Columbia J of European Law 409, 441–448; *Reform of Collective Redress in England and Wales: A Perspective of Need* (Research Paper for the Civil Justice Council of England and Wales, February 2008) 107–112; and *The Class Action in Common Law Legal Systems: A Comparative Perspective* (Oxford: Hart Publishing, 2004) ch 4. Also, R. Nagareda, 'Aggregate Litigation Across the Atlantic and the Future of American Exceptionalism' (2009) 62 *Vanderbilt LR* 1, 36–37 (non-recognition of US judgments abroad may 'spur further the development in European nations of their own distinctive avenues for aggregate redress for their citizens'); and *In re Vioxx Litig* 395 NJ Super 358, 374, aff'd, 936 A 2d 968 (2007) (England's limited civil procedure landscape is not 'a ticket to relief elsewhere, but rather, as a subject for legislative or court reform, should such be warranted').

9  242 FRD 76 (SDNY 2007), involving German, Austrian, French, English and Dutch sub-classes.

*Recognition and Res Judicata Effect of US Class Actions Judgments*

claims of absent class members and, therefore, would recognize a judgment or settlement in this action.[10]

To the contrary of this '*Vivendi* view', it will be argued herein that English courts, when confronted with the prospect of a dissatisfied absent English class member (hereafter, ECM) seeking to re-litigate the same issues which were the subject of the US class actions judgment/settlement, would not recognise that judgment/settlement, unless that ECM has taken some proactive step in the US class action. Moreover, even if the US class actions judgment/settlement were to be recognised, it will be further contended that the US decision would not estop the ECM from instituting a second action in England, for some of the requirements for the operation of *res judicata* arising from the US class action, as between the ECM and the defendant, will not have been met. Therefore, ECMs will not be precluded from re-suing the defendant, either unitarily or collectively, in England.[11]

It must be reiterated that the issue the subject of consideration in this article falls away where ECMs simply cannot join a US class action at all. There have been various reasons over the years for foreign class members being 'dumped out' of US class actions[12] – eg, on the basis of *forum non conveniens*,[13] or where the US courts have disclaimed subject-matter jurisdiction over their claims[14] (as recently occurred in the so-called 'f-cubed' securities transaction[15] in *Morrison* v *National Australia Bank Ltd*,[16] whereby the US Supreme Court held that US securities law does not have the extra-territorial effect necessary for the inclusion of foreign shareholder class members – this will have an immediate effect upon English shareholders considering joining suit in the US.) Nevertheless, the prospect of a US class actions judgment/settlement purporting to bind ECMs remains very real, *if* add-on English sub-classes are permitted on the basis the US court does have subject-matter jurisdiction and is prepared to certify the class action.

---

10 *ibid*, 103 (similar conclusion re France/the Netherlands, but the opposite concluded for Germany/Austria); with the position re French class members aff'd: 2009 US Dist LEXIS 31198 (SDNY, 31 March 2009).

11 Given the writer's conclusion that a US class actions judgment/settlement will not be entitled to recognition in England, the bar on ECMs recovering additional damages, *per* the Civil Jurisdiction and Judgments Act 1982, s 34 would not apply (but for settling ECMs, see text accompanying notes 51–54 below); in any event, the criterion of 'same parties, or their privies' in s 34 will be lacking (see text accompanying notes 115–129 below).

12 Discussed, eg, in: Mulheron, 'The Case for Opt-out' n 8 above, 441–448.

13 *Gullone* n 6 above; *Vioxx* n 8 above.

14 eg: *F Hoffmann-La Roche Ltd* v *Empagran SA* 542 US 155 (2004) (re non-application of the Sherman Act).

15 ie, where a class of foreign claimant investors sues a foreign issuer in an American court for violations of Securities Exchange Act §§10(b), 29(a), 15 USC § 78a (1934), based on securities transactions which occurred on foreign stock exchanges. See, eg H. Buxbaum, 'Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict' (2007) 46 Columbia J of Transnational Law 14.

16 130S Ct 2869 (24 June 2010). Discussion of *Morrison*, and of its possible legislative reversal, lies outside this article's scope, but see: L. Wasserman, 'Transational Class Actions and Interjurisdictional Preclusion' (2011) 86 Notre Dame LR 313; and for *Morrison*'s impact on the *Vivendi* litigation: 765 F Supp 2d 512 (SDNY 2011).

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

The article commences by describing the limited US and English jurisprudence on the recognition and preclusive effect of a US class actions judgment/settlement in England to date, and outlines the conundrum by reference to key features of the aforementioned *BA/Virgin Fuel Surcharge Cartel Settlement*. Thereafter, the rules of English common law which govern the recognition and preclusive effect to be accorded to a US class actions judgment/settlement are examined. Attention then turns to the key question as to whether (and, if so, when) a US court has jurisdiction over absent ECMs. This is a crucial precursor for both recognition and preclusive effect. Four different rationales for asserting jurisdiction will be examined, critiqued, and in some cases, rejected as being irrelevant altogether, insofar as English law is concerned.

It may be that a legislative response will ultimately be required for a problem which has been described as being 'unique to class actions'.[17] For now, however, this article seeks to anticipate the likely judicial response, should an ECM who is caught up in a US class action seek to re-litigate the *same* grievance which was the subject of the US judgment/settlement, against the *same* defendant/s, before an English court.[18]

## SETTING THE CONTEXT

### No English ratio on point

As judicially[19] and academically[20] reiterated, whether a US judgment can be recognised and given preclusive effect in England is not a question to be determined by US law (as the place of the foreign court), but rather, by the English rules of private international law.

Ironically, no English court has been asked to adjudicate upon the issue because, thus far, no ECM has tested the point. However, some US courts have had to grapple with the problem – principally because of the certification analysis required under FRCP 23(b)(3). This task has required them, as one court put it, to 'analyz[e] a veritable mountain of expert affidavits on foreign law'.[21]

---

17 *McKenna* n 2 above at [85] and [105] *per* Strathy J.

18 For other interesting and thought-provoking academic consideration of the issue, see, eg J. Dixon, 'The *Res Judicata* Effect in England of a US Class Action Settlement' (1997) 46 ICLQ 134; M. Stiggelbout, 'The Recognition in England and Wales of United States Judgments in Class Actions' (2011) 52 *Harvard Intl LJ* 433; J. Harris, 'The Recognition and Enforcement of US Class Action Judgments in England' (2006) 22 *Contratto e Impresa/Europe* 617; A. Pinna, 'Recognition and *Res Judicata* of US Class Action Judgments in European Legal Systems' (2008) 1 Erasmus LR 31.

19 In England: *Adams* v *Cape Industries plc* [1990] Ch 433, 513 *per* Slade LJ (*Adams*), citing *Pemberton* v *Hughes* [1899] 1 Ch 781, 791; and see too *Desert Sun Loan Corp* v *Hill* [1996] CLC 1132, 1145 *per* Roch LJ (*Desert Sun*). In the US, *Bersch* v *Drexel Firestones Inc* 519 F 2d 974, 996–997 (2d Cir 1975) (*Bersch*).

20 Sir Lawrence Collins (ed), *Dicey, Morris and Collins on The Conflict of Laws* (London: Sweet & Maxwell, 14th ed, 2006) vol 1 (D&M) 589–590, 620; Pinna, n 18 above, 37–38; Dixon, n 18 above, 139; A. Jaffey, *Introduction to the Conflict of Laws* (London: Butterworths, 1988) 223.

21 *Vivendi* n 10 above, 20. Various expert opinions are quoted in *Vivendi* and *In re Alstom SA Securities Litig* 253 FRD 266, 281 (SDNY 2008) (*Alstom*) which, at the time of writing, were unavailable on the settlement websites (eg http://www.vivendiclassaction.com/us/court.php3 (last visited 24 November 2011)) or in other publicly-available forums; but some expert opinions are available in

Recognition and *Res Judicata* Effect of US Class Actions Judgments

The only English case of marginal interest (as has been noted elsewhere, both academically[22] and judicially[23]) is the older decision of *Campos* v *Kentucky & Indiana Terminal Railroad Co.*[24] Bondholder Sylvan Lemaire issued a 'spurious class action' in the US (under the predecessor of the current US class action[25]), on behalf of himself and other bondholders, against the defendant Railroad Co, but lost his claim, with the US District Court holding that coupon bonds *could* be discharged by payment of English currency and not in gold.[26] Another bondholder, Miss Campos, then sued in England, alleging the same grievance against the same defendant. She failed too, for the same reason.

Importantly, McNair J permitted Miss Campos to re-litigate the issue in the English High Court – overruling the Railroad Co's argument that she was bound by the US class actions judgment and ought to have been precluded from re-litigating – for two reasons. First, the spurious class action was not conducted on opt-out principles, but rather, on opt-in principles; and Miss Campos was not a bondholder when the spurious class action was commenced, and did not later opt-in or otherwise intervene. Hence, even under US law, the US judgment would not have been binding on her. Secondly, Miss Campos had not been served with process, and 'in accordance with English private international law, a foreign judgment could not give rise to a plea of *res judicata* in the English Courts unless the party alleged to be bound had been served with the process which led to the foreign judgment'.[27] Therefore, the US class action had no preclusive effect, and Miss Campos *could* re-litigate (ultimately, to no avail).

Of course, these observations by McNair J were only *dicta*; and the spurious class action (essentially a permissive joinder device[28]) did not resemble an opt-out class action. Hence, the status of Miss Campos is entirely different from the ECM the focus of this article.

**The United States courts on the issue**

A leading American commentator on civil procedure, Professor George Bermann, has described the application to certify a US class action, 'consisting heavily and possibly even preponderantly of nationals or residents of other

---

*In re Royal Ahold Securities and 'Erisa' Litig* 437 F Supp 467 (2006) and *In re Royal Dutch/Shell Transport Securities Litig* 2004 WL 3929259, 2004 WL 5728796, 2005 WL 6317464, 2005 WL 6317472 (DNJ) (*per* Westlaw (International Directory, 'ALLFEDS' library)), including, re the position of ECMs, (conflicting) expert Declarations by Prof Edwin Peel, Prof Jonathan Harris, and the Rt Hon Sir Christopher Staughton.

22 eg, Dixon, n 18 above, 139–140; Peel Declaration, *ibid* at [13]; Harris Declaration, *ibid* at [34]; Stiggelbout, n 18 above, 436.

23 eg, *Vivendi* n 9 above, 102.

24 [1962] 2 Lloyd's Rep 459.

25 The spurious class action was the 1938 version of FRCP 23. See *Bright* v *US* 603 F 3d 1273, 1279 (Ct App 2010); and A. Conte and H. Newberg, *Newberg on Class Actions* (St Paul, Minn: Thomson West, 4th ed, 2002) §2.2.

26 140 F Supp 82 (SDNY 1956).

27 n 24 above, 473, citing a 'similar' case, *Rossano* v *Manufacturers Life Ins Co* [1962] 1 Lloyd's Rep 187.

28 Conte and Newberg, n 25 above, §1.9, and cited by *Vivendi* n 9 above, fn 17.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

countries', as the 'new paradigm'.[29] Defendants have commonly challenged certification of such a class action, on the basis that if any judgement/settlement reached in the class action is not going to be accorded recognition and preclusive effect abroad – with the risk of re-litigation by foreign class members hovering – then the superiority criterion[30] cannot be met.[31] If the US class action would be 'tainted with jurisdictional infirmity',[32] then the foreign class members *should* be excluded. Recognition and *res judicata* concerns may validly be considered when evaluating the superiority criterion, where the proposed class encompasses foreign class members.[33]

US courts have varied markedly in their attitudes towards foreign class members at certification. Some courts have readily included them with nary a word of the legal implications, should those foreign class members seek to re-litigate.[34] On the other hand, other courts have acknowledged the difficulty – with the remark, in *Bersch* v *Drexel Firestone Inc*[35] that the 'dubious binding effect' of a class actions judgment/settlement on absent foreign plaintiffs, and 'the propriety of purporting to bind such plaintiffs by a settlement', was a 'serious problem'.

However, more recently, not only has *Vivendi*[36] taken a more positive view about the prospects of recognition and preclusive effect of a US class actions judgment/settlement in England, but less than a year later, District Judge Marrero agreed, in *In re Alstom SA Securities Litigation*:

> After examining the expert declarations and considering the parties' arguments concerning English law, the Court concludes that Plaintiffs have sufficiently demonstrated that English courts would more likely than not recognize and give preclusive effect to any judgment rendered by this Court involving absent English class members against [all but the Alstom defendants].[37]

---

29 'US Class Actions and the "Global Class" ' (2009) 19 Kansas J of Law and Public Policy 91, 93.
30 FRCP 23(b)(3) requires that the representative claimant demonstrate that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy'.
31 As in, eg, *Bersch* n 19 above, 986; *Alstom* n 21 above, citing *Vivendi* n 9 above, 95.
32 Phrase used in *Robertson* v *Thomson Corp* (1999), 43 OR (3d) 161 (Gen Div) at [44] *per* Sharpe J.
33 See further, eg, Mulheron, 'The Case for Opt-Out' n 8 above, 445–446; Pinna, n 18 above, 34–36; Bermann, n 29 above, 94–95; M. Murtagh, 'The Rule 23(b)(3) Superiority Requirement and Transnational Class Actions: Excluding Foreign Class Members in Favor of European Remedies' (2011) 34 Hastings Intl and Comp LR 1; M. Jasilli, 'A Rat *Res*? Questioning the Value of *Res Judicata* in Rule 23(b)(3) Superiority Issues for Foreign Cubed Class Action Securities Litigation' (2009) 48 Columbia J of Transnational Law 114; T. Monestier, 'Transnational Class Actions and the Illusory Search for *Res Judicata*' (2011) 86 Tulane LR 1, 9–13.
34 eg, *Phillips Petroleum Co* v *Shutts* 472 US 797, 799 (1985) (*Shutts*) (class members were domiciled 'in all 50 states, the District of Columbia, and several foreign countries'), with academic critique that 'the Court regarded the foreign claimants as adding nothing to the jurisdictional due process analysis, [but] such a conclusion is flawed': D. Bassett, 'US Class Actions Go Global: Transnational Class Actions and Personal Jurisdiction' (2003) 72 Fordham LR 41, 56.
35 n 19 above, 986 (class members from England, France, Germany, Italy and Switzerland), and cited in: *Tri-Star Farms Ltd* v *Marconi plc* 225 F Supp 2d 567, 577 (WD Pa 2002). Also, *CL-Alexanders Laing & Cruickshank* v *Goldfeld* 127 FRD 454, 459 (SDNY 1989).
36 n 9 above, 102–103.
37 n 21 above, 289 (French courts had exclusive jurisdiction re disputes between Alstom and its shareholders).

These cases may well have come down to 'a battle of the experts',[38] but nevertheless, their combined effect has prompted one American commentator to note that, as things stand, 'defendants will likely be unable to convince the [US certification] court that it is unclear whether a British court would recognise a class action judgment.'[39] However, this article contends, to the contrary, that an English court would not accord that judgment recognition or preclusive effect.

### The issue's significance (using the *Fuel Surcharge Cartel Settlement* as an illustration)

It may be useful to consider the conundrum against the backdrop of the recent *BA/Virgin Fuel Surcharge Cartel Settlement*. This class actions settlement, approved by the Northern District of California, concerned price-fixed fuel surcharges paid by passengers of BA and Virgin, on long-haul passenger fares between 11 August 2004 and 23 March 2006.[40] As the definition of 'long-haul' flights included most flights between the United Kingdom and non-EU destinations,[41] a substantial number of English individuals and organisations were affected. These class members fell into two of the four separate classes which were certified for the purposes of settlement: BA's UK Settlement Class, and Virgin's UK Settlement Class.[42] Separate class representatives were appointed for those settlement classes, whose 'interests [were] aligned with the interests of all other Settlement Class Members'.[43] Regarding the members of the two UK settlement classes, the US District Court boldly stated that: '[t]his Court finds that it has jurisdiction over this action, each of the parties to the Settlement Agreements, *and the members of the proposed Settlement Classes*'.[44]

The settlement has rightly been praised as a legal milestone, as being the first time that a domestic US class and an English class had been treated entirely equivalently in respect of the compensation awarded in a US class action.[45] According to the published settlement documents, members of the Settlement Classes were entitled to seek a '*partial* refund of the fuel surcharge that they paid',[46] amounting to a refund of one-third of the surcharge paid:

---

38  Buxbaum, n 15 above, 34. For critique, see, eg, Jasilli, n 33 above, 129 ('[t]he [*Vivendi*] opinion contains little more than laundry lists of assertions by experts'); Monestier, n 33 above, 21–25 (adding, eg, that 'expert witnesses are necessarily partisan'); Stiggelbout, n 18 above, 458–459.

39  Murtagh, n 33 above, 32, albeit that 'one must . . . remember that foreign governments and courts will eventually decide for themselves whether a [US] class action judgment is enforceable' (at 28).

40  *In re Intl Air Transport Surcharge Antitrust Litig* 2008 US Dist LEXIS 50415 (ND Cal, 25 April 2008, Judge Breyer), referring to settlement agreements dated 15 February 2008 approved pursuant to FRCP 23(e).

41  Long Form Notice, n 7 above, 4 (qualifying flights listed in 'Attachment A').

42  n 40 above, order 3, 3–4.

43  *ibid*, order 4, 5–6.

44  *ibid*, order 1, 3 (emphasis added).

45  eg, C. Ruckin, 'Cohen Milstein Lands $200m BA-Virgin Settlement' *Legal Week* 15 February 2008. Cf earlier differential settlements, eg *Kruman* n 5 above, and *In re Auction Houses Antitrust Litig* 2001 US Dist Lexis 1713 (SDNY 2001).

46  Claim Form, n 7 above, 1 (emphasis added).

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.

(2012) 75(2) MLR 180–211

Rachael Mulheron

BA and Virgin Atlantic will refund up to £73,531,076 to members of the UK Settlement Classes who submit valid claim forms, with any unclaimed refunds to be retained by the Defendants. They will also refund up to $59,007,273 to US Class Members who submit valid claim forms. Members of either Class who file a valid claim will be paid 33.3% of the passenger fuel surcharge they paid on qualifying coupons. Refund payments will range between £4 and £20 per passenger per round-trip ticket purchased in the UK . . . [47]

As Dixon observes, the recognition and preclusive effect of a US class actions judgment/settlement could affect any decision of ECMs as to whether to 'opt out of, or remain in, or ignore, a class action of which he or she has received notice.'[48] Likely consequences for these three potential groupings of ECMs under the *Fuel Surcharge Cartel Settlement* are:

- *the Opt–Out UK Settlement Class Members* – for any ECM who chooses to opt-out of the class action settlement, the possibility of litigating against the same defendants remains. Naturally, 'opt-outs' always pose some threat to the finality which settling defendants seek from a settlement agreement, and consistently with this, the *Fuel Surcharge Cartel Settlement*[49] expressly countenances the continuing right for an 'opt-out' claimant to sue BA or Virgin. However, the percentage of opt-outs is unlikely to be high.[50]
- *the Claiming UK Settlement Class Members* – if ECMs come forward, at the appropriate juncture, to claim their compensation under the US District Court-approved settlement, and then, say, feel dissatisfied by the amount of surcharge recovered and wish to 'top up' those damages by re-litigating their grievance in the English court, any such attempt will undoubtedly be precluded by the terms of the settlement itself. As pointed out in *In re Lloyd's American Trust Fund Litigation*,[51] it is very likely that 'the Court can fashion a proof-of-claim mechanism which would likely bind any participating class member and thereby discourage re-litigation in the hope of a more favorable settlement.' Indeed, in the *Fuel Surcharge Cartel Settlement*, for those who submit their claim form in the prescribed manner,[52] the judgment stipulates that '[t]he Court enjoins initiation, commencement, or prosecution of any action or claims by any Releasing Party against Settling Defendants that is subject to the release and dismissal contemplated by the Settlements';[53] and the terms of the release are, unsurprisingly, drafted very widely indeed.[54] Hence, this sub-group of ECMs presents no threat of re-litigation, either in an English court or anywhere else.

---

47  Long Form Notice, n 7 above, cl 7, under heading, '7. What does the Settlement provide?'
48  Dixon, n 18 above, 134.
49  Long Form Notice, n 7 above, cl 13.
50  Mulheron, 'The Case for Opt-out' n 8 above, 431–434.
51  1998 US Dist LEXIS 1199 (SDNY, 4 February 1998) at 44–45.
52  Either by submitting in writing or online (see n 7 above).
53  n 40 above, 8.
54  Long Form Notice, n 7 above, 5, cl 10, 'If I file a claim and remain in the Class, what claims am I giving up?'

Recognition and *Res Judicata* Effect of US Class Actions Judgments

- **the Uninvolved UK Settlement Class Members** – this group (probably the largest of the three groups) is the one of real interest for the purposes of this article. For an ECM who does absolutely nothing under a US class action settlement – who never comes forward to claim compensation, but does not opt-out either – what are the potential legal options? Under the *Fuel Surcharge Cartel Settlement*, an uninvolved ECM would not be precluded from suing the defendants in an English court, because even though the Long Form Notice states that 'you will not receive a refund from the Settlement and your refund will remain with BA and Virgin Atlantic', the definition of a 'UK Releasing Party' only consists of those UK Settlement Class Members who 'receive and accept a Refund Payment under the Settlement Agreement' (ie an 'opt-in settlement class') – whereas a 'US Releasing Party' is defined more broadly, under an 'opt-out settlement class', to mean any US Settlement Class Member who did not opt-out of the Settlement Agreement.[55] To reiterate, however, this article's focus scenario is upon ECMs who are caught up in either an *opt-out* (not an opt-in) settlement class, or a class actions judgment, either of which purports to bind all class members who do not opt-out – and where those ECMs neither opt in to claim, nor opt out to disassociate from the settlement/judgment.

For the uninvolved ECMs, in the aforementioned focus scenario, the prospect of allowing the US proceedings to take their course, and then 'taking a second bite at the defendant in their "home" jurisdiction if they are dissatisfied with the result in [the US] jurisdiction' (as one Ontario court put it[56]), may be attractive. Realistically, as Bermann notes, the issue of recognition and preclusive effect in that sort of case is only likely to arise if a US class action is perceived to have yielded an unsatisfactory level of damages to foreign class members.[57] From the defendant's perspective though, if some uninvolved ECMs consider that they could do better before an English court – and if the rules of English private international law *permit* them to re-litigate – then this is surely a grave disincentive to any defendant settling with them. Defendants enter class actions settlements precisely to 'purchase global peace'. As the Ontario Court of Appeal remarked in *Currie* v *McDonald's Restaurants of Canada Ltd*,[58] (*Currie*) when considering a similar point regarding parallel class actions in the US and Canada, it achieves absolutely no finality or closure for a defendant to settle a US class action and then be vexed by similar litigation before a foreign court; indeed, the risk of non-recognition is very likely to discourage a defendant from extending the fruits of settlement to foreign class members at all. Obviously, in the *Fuel Surcharge Cartel Settlement*, it would be in the interests of the settling defendants, BA and Virgin, if an English court *could* declare that the US District Court's judgment is final and binding as against all uninvolved ECMs, given that the settlement sums are very considerable (up to £73 million to the UK class

---

55 *ibid*, cl 9; Settlement Agreements, cl 1.26, 1.27, 8.5; and Final Hearing Transcript, 17.
56 *McKenna* n 2 above at [98].
57 Bermann, n 29 above, 95.
58 (2005) 74 OR (3d) 321 (Ont CA) [27].

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

members alone), and purport to 'resolve the claims of United Kingdom and United States classes.'[59]

Some US courts have remarked (by reference to expert affidavits) that there are various 'practical difficulties'[60] that fend off the risk of a defendant facing another action by an uninvolved ECM in England, and that 'the likelihood of re-litigation by absent class members in a European forum is low'.[61] Essentially, a dissatisfied ECM would need either to bring a unitary action if it was financially viable to do so; or join others in a collective attempt to seek better individual compensation, via one of the English generic[62] or sectoral[63] multi-party procedural devices. However, the bleak and 'claimant-unfriendly' landscape painted in the US judgments is not necessarily likely to continue in England, for two reasons.

First, while England does not presently have an opt-out class actions regime 'on the statute book', there have been significant reform initiatives to that effect. Sectoral opt-out legislation, in respect of financial services claims, was almost introduced in 2010, but was waylaid by the timing of the general election.[64] Draft court rules have been prepared for inclusion within the English Civil Procedure Rules, which (if any opt-out regime is implemented by means of primary legislation) will provide, if enacted, the detailed framework for the conduct of that opt-out class action.[65] Secondly, the costs-shifting landscape may not be as rigid a bar to English proceedings which US case law has often cited[66] – especially given the recent endorsement of percentage contingency fees both judicially,[67] and in a recently-promulgated Bill,[68] and given the longer-standing judicial 'green light' for third party funders to charge percentage contingency fees in any event.[69]

In the writer's opinion, all of this reflects an ongoing acknowledgment, in political, media and legal academic contexts, of the need to improve the English collective redress landscape, such that it is unlikely that re-litigation by ECMs, of

---

59 Long Form Notice, n 7 above, 1 (opening statement).
60 *In re US Financial Sec Litig* 69 FRD 24, 48 (SD Cal 1975). Also, *Cromer Finance Ltd* v *Berger* 205 FRD 113 (SDNY 2001) (*Cromer*).
61 *Vivendi* n 9 above, 107.
62 ie, the Group Litigation Order (Pt 19.III of the Civil Procedure Rules (CPR)); the representative rule (CPR 19.6); test/lead actions (CPR 19.15); consolidation (CPR 3.1(2)(g),(h)); or joinder (CPR 19.2(2)). For discussion of these various devices, see, eg R. Mulheron, 'From Representative Rule to Class Action: Steps rather than Leaps' (2005) 24 CJQ 424; and 'Some Difficulties with Group Litigation Orders – and Why a Class Action is Superior' (2005) 24 CJQ 40.
63 eg, Competition Act 1998, s 47B (a follow-on action for competition law infringements), and critiqued in: Mulheron, *Reform of Collective Redress* n 8 above, ch 8.
64 R. Mulheron, 'Recent Milestones in Class Actions Reform in England: A Critique and a Proposal' (2011) 127 LQR 288, analysing the class actions proposal in the Financial Services Bill 2010, cll 18–25.
65 *Draft Rules of Court for Collective Proceedings* (February 2010) at http://www.civiljusticecouncil. gov.uk/files/CJC_Draft_Rules_for_Collective_Actions_Feb_2010.pdf (last visited 25 November 2011). The writer was a member of the working group commissioned to prepare the relevant generic rules.
66 *Vivendi* n 9 above, 107; *Cromer* n 60 above, fn 32.
67 Sir Rupert Jackson, *Review of Civil Litigation Costs: Final Report* (January 2010) ch 12.
68 Legal Aid, Sentencing and Punishment of Offenders Bill 2010–11 (HC Bill 205), cll 41–43.
69 R. Mulheron and P. Cashman, 'Third Party Funding of Litigation: A Changing Landscape' (2008) 27 CJQ 312.

Recognition and *Res Judicata* Effect of US Class Actions Judgments

a grievance decided or settled in a US class action, will permanently remain 'more hypothetical than real'.[70] A more feasible way of resolving mass grievances is likely to occur in England in the future – which will require an English court to adjudicate directly on the point the subject of this article. While the domestic development of collective redress may reduce the motivation for ECMs to look to a US class action for compensation, it may conversely increase the prospect of parallel class action litigation in England and the US. Either way, there are serious consequences for the wider administration of justice,[71] for both US and English courts and litigants, if recognition and preclusive effect is not accorded to a US class action.

The tension is obvious:' "there are strong policy reasons favouring the fair and efficient resolution of interprovincial and international class action litigation", [but] there are equally strong policy reasons . . . why the court must not act beyond its jurisdictional competence.'[72] Determining whether a US court has so acted, in relation to uninvolved ECMs caught up in a US class action, will require an application of the rules outlined in the following section.

## THE RELEVANT COMMON LAW RULES

### Recognition and preclusive effect

A US class actions judgment, whether taking the form of a determination on the merits, or a judicially-approved settlement, will be a judgment in *personam*[73] – and as Roch LJ confirmed in *Desert Sun Island*, any such judgment which is sought to be enforced in England is governed by the common law.[74] No relevant Treaty or Convention,[75] or any statute which governs the recognition in English courts of judgments issued by recognised foreign courts,[76] applies.

According to Dicey and Morris, although '[a] foreign judgment has no direct operation in England . . . [n]evertheless, a foreign judgment may be recognised or enforced in England.'[77] It involves a two-stage process, as Barnett describes:

> Whether a judgment is recognised for the purposes of enforcement and/or preclusion, it is important to note that recognition – as a process – precedes the attribution of either effect; that is, the enforcement of, or preclusion by, a foreign judgment

---

70  *Vivendi* n 9 above, 106.
71  eg: Manitoba LRC, *Class Proceedings* (Rep 100, 1999) 30–32; Dixon, n 18 above, 135; N. Tadmore, 'Recognition of Foreign *In Personam* Money Judgments in Australia' (1995) 2 Deakin LR 129, 133.
72  *McKenna* n 2 above at [88] *per* Strathy J, citing, as internal quote: *Currie* n 58 above at [15] *per* Sharpe JA.
73  A judgment which imposes a personal liability on a party (eg, to pay damages): *Oxford Dictionary of Law* (Oxford: OUP, 2006) 296.
74  n 19 above, 1144.
75  See D&M, n 20 above, 566, fn 1, for reference to the American Law Institute's *Draft Statute on Recognition and Enforcement of Foreign Judgments* (2005); and 573.
76  Foreign Judgments (Reciprocal Enforcement) Act 1933; Administration of Justice Act 1920; Civil Jurisdiction and Judgments Act 1982 (incorporating into English law the Brussels and Lugano Convention).
77  D&M, n 20 above, 567.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

follows only once the judgment has been recognised. Recognition, therefore, is the *sine qua non* for the enforcement or preclusive effects to which a foreign judgment may be entitled before the recognising court.[78]

According to well–established judicial authority[79] (and respected academic commentary),[80] the common law rules governing the recognition by an English court of a foreign judgment require that:

(A) the foreign court is a court of competent jurisdiction, ie, that it has jurisdiction over:
  (i) the subject–matter of the litigation (which will be assumed for the purposes of this article); and
  (ii) the parties whom the judgment of the court purports to bind;
(B) the foreign judgment was:
  (i) final and conclusive;
  (ii) for a definite sum of money; and
  (iii) not for a tax, fine or other penalty;
(C) the judgment was one on the merits; and
(D) there is no defence to recognition − and of those available,[81] those which potentially apply are:
  (i) the class actions proceedings were in breach of natural justice; or
  (ii) the foreign judgment is contrary to public policy of the recognising State.

Wherever those criteria are met, then English law regards the foreign judgment as a debt or obligation, due by the defendant to the claimant, for which the claimant can bring an action to enforce that debt.[82]

The criteria for determining the *res judicata* (preclusive) status of a foreign judgment are largely co–extensive with the criteria by which foreign judgments are recognised at common law.[83] The purpose of *res judicata* (also known as 'cause of action estoppel' in the civil context[84]) is 'that there should be an end to litigation

---

78 P. Barnett, *Res Judicata, Estoppel and Foreign Judgments* (Oxford: OUP, 2001) 32. Also: A. Briggs, *The Conflict of Laws* (Oxford: OUP, 2nd ed, 2008) 199; Wasserman, n 16 above, 316; Stiggelbout, n 18 above, 461.

79 eg, *Carl Zeiss Stiftung v Rayner & Keeler Ltd* [1967] 1 AC 853, 909–910, 933 (*Carl Zeiss*); *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 104; *Good Challenger v MetalExportImport SA* [2003] EWCA Civ 1668 at [58]; *Barrett v Universal Island Records Ltd* [2006] EWHC 1009 (Ch) at [176]; *Al Qahtani & Sons Beverage Industry Co v Antliff* [2010] EWHC 1735 (QB Comm) at [53].

80 eg, D&M, n 20 above, 588–608, rules 35, 36; Barnett, n 78 above, 35–36, 62; A. Briggs and P. Rees, *Civil Jurisdiction and Judgments* (London: Informa, 5th ed, 2009) 723, and Briggs, n 78 above, 136–148; C. Clarkson and J. Hill, *The Conflict of Laws* (Oxford: OUP, 3rd ed, 2006) 134, 144; J. Collier, *Conflict of Laws* (Oxford: OUP, 3rd ed, 2001) 109–117.

81 D&M, *ibid* rules 41–45 (fraud, natural justice, public policy, specific statutes such the Protection of Trading Interests Act 1980, s 5, which provides that a judgment for multiple damages shall not be enforced by any UK court, conflicting or inconsistent judgments, a foreign judgment was in breach of arbitration or jurisdiction clauses, and that the judgment was invalid under foreign law).

82 Jaffey, n 20 above, 223–224, citing: *Schibsby v Westenholz* (1870) LR 6 QB 155 (*Schibsby*). See rationale 3 below.

83 Barnett, n 78 above, 38; and Briggs, n 78 above, 149.

84 cf the other limb of *res judicata*, issue estoppel (for the distinction, see, eg, *R v Mahalingan* [2008] SCC 63 at [16]; *Arnold* n 79 above, 104–105). Cause of action (not issue) estoppel is the focus of this article.

*Recognition and Res Judicata Effect of US Class Actions Judgments*

and that justice demands that the same party shall not be harassed twice in the same cause'.[85] The long-standing policy underpinning *res judicata* is that there is a public interest in the finality of litigation.[86] The elements (additional to (A)–(C) above), required to establish that a foreign judgment has *res judicata* effect, are that:[87]

(I)  the parties (or privies) in foreign action 1, relied on as creating an estoppel/ *res judicata*, and those in action 2, must be the same; and

(II) the subject matter being debated in action 2 must be the same issue as that decided by the judgment in the earlier foreign action 1 (again assumed for the purposes of this article).

Some of these requirements will likely be uncontentious, in the context of the US class actions judgment/settlement which purports to bind ECMs.

### Requirements which are (probably) satisfied

*Finality*

Any judgment/settlement issued in a US class action will be final and conclusive, if it is considered to be so by the US federal court which adjudicated it.[88] It would certainly satisfy Lord Reid's statement in *Carl Zeiss*, that 'the merits of the cause of action must be finally disposed of so that the matter cannot be raised again in the foreign country'[89] – because it is 'not provisional or subject to revision',[90] and has left nothing for future determination, in that all controversies between the representative claimant/s and the defendant/s are determined.[91] Moreover, the US class action rule itself permits that a judicially-approved *settlement* of a class action will be binding on those absent class members who do not opt-out.[92] The fact that it may be appealed against (if, say, the relevant fairness criteria were judicially overlooked) does not preclude its finality.[93] Notably, and while not determinative of the issue, English law is equally adamant about the conclusiveness of settlements: '[t]he whole point of a settlement is to bring finality. Where a cause of action falls within the scope of a settlement agreement negotiated by lawyers, for which valuable consideration has been given, it is only in an exceptional case that the court will decline to give effect to the settlement unless there are grounds on which the contract itself could be set aside.'[94]

---

85  *Good Challenger* n 79 above at [58].
86  *Lockyer* v *Ferryman* (1877) 2 App Cas 519, 530; *Nouvion* v *Freeman* (1889) 15 App Cas 1, 7 (*Nouvion*).
87  See notes 79, 80 above.
88  *Lewis* v *Eliades* [2003] EWHC 368 at [25]–[27], citing *Beatty* v *Beatty* [1924] 1 KB 807.
89  *Carl Zeiss* n 79 above, 909–910, 918–919, citing: *Nouvion* n 86 above, 9.
90  *Desert Sun* n 19 above, 1146, *per* Stuart-Smith LJ.
91  *Nouvion* n 86 above, 12.
92  FRCP 23(e).
93  *Colt Industries Inc* v *Sarlie (No 2)* [1966] 1 WLR 1287 (CA) 1293.
94  *Barrett* n 79 above at [166]. Also: A. Turner, *Spencer-Bower and Turner's Doctrine of Res Judicata* (London: Butterworths, 2nd ed, 1969) 37 ('[a]ny judgment or order . . . made in pursuance of the consent and agreement of the parties' can have *res judicata* effect); Wasserman, n 16 above, 341–342; Stiggelbout, n 18 above, 468–469; Dixon, n 18 above, 140–141.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.

Rachael Mulheron

To be 'final and conclusive', the US class actions judgment/settlement must also be for a definite and actually ascertained sum of money.[95] This requirement for recognition and preclusive effect is a 'direct consequence of the assumption that a foreign judgment gives rise to a debt, an obligation to pay the sum ordered.'[96] In the context of a class action, the *precise* amount of money paid by the defendant may not be ascertainable at the outset, principally because of the contingent of class members who may not come forth to claim their compensation. Any unclaimed sum could revert to the defendant (as with the compensation set aside for the ECMs under the *Fuel Surcharge Cartel Settlement*[97]), or could be sent by way of a *cy-près* damages distribution (as with the sum set aside for the US class members in that *Settlement*[98]). However, from the defendant's point of view, the total *maximum* liability is final and conclusive; and from the ECMs' point of view, individual entitlements are readily ascertainable. Hence, the potential for an unclaimed sum does not detract from the fact that the settlement is for a definite and ascertainable sum of money.

*On the Merits*

Although 'closely allied' to the previous point, English law has clarified 'on the merits' to comprise a 'separate point' for the purposes of both recognition and preclusive effect.[99]

A US class actions settlement can be a decision 'on the merits', even if it does not determine whether or not the class action claim should succeed. In *The Sennar* Lord Diplock stated that 'on the merits' meant that '[the court's] judgment on that cause of action is one which cannot be varied, re-opened or set aside by the court that delivered it or any court of co-ordinate jurisdiction though it may be subject to appeal to a court of higher jurisdiction';[100] while Lord Brandon stated it to mean 'a decision which establishes certain facts as proved or not in dispute; states what are the relevant principles of law applicable to such facts; and expresses a conclusion with regard to the effect of applying those principles to the factual situation concerned'.[101] Although a US class actions settlement would appear to comply more easily with Lord Diplock's remarks, subsequent English case law has tended to play down any significant differences between these viewpoints.[102]

In any event, the merits of the class action are certainly *not irrelevant* to any settlement judicially-sanctioned under FRCP 23(b)(3) — given that *one* factor to which a US court will have regard, when assessing, at a fairness hearing, whether a settlement is 'fair, reasonable and adequate' under FRCP 23(e)(2), is the amount offered to each class member relative to the likelihood of success (or 'likely

---

95  D&M, n 20 above, 577–579, citing *Beatty* n 88 above.
96  Tadmore, n 71 above, 149.
97  Long Form Notice, n 7 above, cl 7, under 'What does the Settlement provide?'
98  See n 7 above, especially Final Hearing Transcript, 16–17 (objection to that point of difference between the settlement classes not upheld).
99  *Tracomin SA v Sudan Oil Seeds Co Ltd* [1983] All ER 404 (QB, Comm) 413–414 *per* Staughton J.
100  *DSV Silo-und Verwaltungsgesellschaft mbH v Owners of the Sennar* [1985] 1 WLR 490, 493–494.
101  *ibid*, 499.
102  *Baker v Ian McCall Intl Ltd* [2000] CLC 189, 201; *Desert Sun* n 19 above, 1141.

Recognition and *Res Judicata* Effect of US Class Actions Judgments

rewards') in the class action.[103] The court is manifestly required to make *some* rational appraisal of the merits of the class action at that fairness hearing, even if that does fall short of the type of merits consideration undertaken in a full trial.[104] Hence, the criterion, 'on the merits', will be satisfied, for the purposes of recognition and preclusive effect.

*No Relevant Defences*

English courts will not recognise foreign judgments that are contrary to 'principles of natural justice' or that are 'contrary to English public policy'. These defences to recognition focus upon different 'wrongs'. A foreign judgment will be contrary to public policy if 'founded on a law that is not acceptable to the public policy of the [domestic] forum', whereas it will be contrary to natural justice if the procedure of the foreign court lacked the basic requirements of an opportunity to be heard and due notice of the foreign proceedings.[105] As Collier has remarked, the defences have had little success in English law in enabling a party to resist enforcement of a foreign judgment.[106]

Whatever credence may have been given to these defences in some earlier US class actions cases[107] – as Pinna notes,[108] many European experts in US class actions litigation have differed about the compatibility of the opt-out approach in FRCP 23(b)(3) with the public policy of various European Member States – the defences received short shrift in *Alstom*:

> an English court is unlikely to find a judgment rendered by this Court as inconsistent with natural justice or contrary to England's public policy. With regard to natural justice, Defendants were served with proper notice of the proceedings, were allowed to arrange their defenses through filing a motion to dismiss and opposing class certification, and have not objected to the procedures of this Court as being unacceptable. With regard to public policy, the Court does not find that the circumstances underlying the instant matter are typical of the extreme circumstances in which the public policy defense has been raised successfully in English courts.[109]

---

103  *In re General Motors Corp Pick-Up Truck Fuel Tank Prods Liab Litig* 55 F 3d 768, 784–785, 796 (3rd Cir 1995); *Cty of Suffolk* v *Long Island Lighting Co* 907 F 2d 1295, 1323–1324 (2nd Cir 1990); and discussed in, eg, Conte and Newberg n 25 above, §§11.41, 11.43–11.51; and Mulheron, *The Class Action*, n 8 above, 397–407.

104  *Carson* v *Am Brands Inc* 450 US 79, 88 fn 14 (1981); *City of Detroit* v *Grinnell Corp* 495 F 2d 448, 456 (2nd Cir 1974), and see too Dixon, n 18 above, 142; Stigglebout, n 18 above, 468–469.

105  P. Nygh and M. Davies, *Conflict of Laws in Australia* (London: Butterworths, 7th ed, 2002) 193–195 citing, eg *Jacobson* v *Frachon* (1927) 44 TLR 103 (CA). For absent class members, 'minimal procedural due process protection [means] [t]he plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel': *Shutts* n 34 above, 811–812.

106  Collier, n 80 above, 120–122. Also, see Stigglebout, n 18 above, 469–473, and Harris Declaration, n 21 above, [22]–[24], and the authorities cited therein.

107  *Bersch* n 19 above.

108  Pinna, n 18 above, 40–41. Also: BIICL, *Collective Redress and the Brussels I Regulation* (London: Research Project for the Ministry of Justice, April 2010) 52 (whether English court would consider US class action judgment contrary to public policy 'is unclear. There are different views').

109  *Alstom* n 21 above, 289.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

Similarly, in *Vivendi*, the defences were not cited by the court as a reason for an English court to reject recognition of the US class actions judgment/settlement.[110]

Indeed, to argue successfully that it would be inimical to public policy to permit ECMs to be bound by a judgment/settlement in litigation in which they took no proactive part, would be even less likely now, since the 2010 law reform proposals to enact an opt–out class actions regime within the Financial Services Bill. That reform proposal was predicated, *inter alia*, on the necessity of a class action for reasons of access to justice, and for judicial economy.[111] Furthermore, under the English representative rule,[112] class members have long been able to be bound by a judgment without expressly authorising or consenting to the action or proactively participating in its conduct, without being served with process individually, and without being precisely identified at the time that the representative action is commenced.[113]

In that respect, and as noted elsewhere too,[114] the common features which the English representative rule shares with a FRCP 23(b)(3) class action mean that it is difficult to perceive of any public policy or natural justice objection which could be raised to the recognition, and preclusive effect, of a US class actions judgment/settlement which purported to bind ECMs.

**Requirements which are (probably) not satisfied**

*Identity of Parties*

For any foreign judgment to be taken to have preclusive effect, the parties to that judgment, or their privies, must be identical to the parties to the English action, because '[t]he obligation and the corresponding right created by the foreign judgment are attached to these persons who are seen to have entered the implied contract giving rise to the obligation and the right.'[115] Absent that identity, the uninvolved ECMs will not be precluded from re-litigating the same subject matter in England, whether unitarily or collectively, because the US class actions judgment will not have *res judicata* effect.

As Barnett notes, the identity of the parties in original and subsequent proceedings is usually 'a straightforward assessment: are the same parties named on

---

110  *Vivendi* n 9 above, fn 19.
111  Mulheron, n 64 above, and more generally: CJC, *Improving Access to Justice Through Collective Actions: Final Report* (London: November 2008) especially Pts 4 and 7.
112  CPR 19.6.
113  See, eg, Mulheron, 'From Representative Rule' n 62 above, 442–43; *The Class Action* n 8 above, 34–38; and 'Opting In, Opting Out, and Closing the Class: Some Dilemmas for England's Class Actions Law-Makers' (2011) 50 Canadian Business LJ 376, and discussion of cases therein, eg, *EMI Records Ltd* v *Kudhail* [1985] FSR 36; *Howells* v *Dominion Ins* [2005] EWHC 552 (QB); *Independiente Ltd* v *Music Trading On-Line (HK) Ltd* [2003] EWHC 470 (Ch); *PNPF Trust Co Ltd* v *Taylor* [2009] EWHC 1693 (Ch).
114  Pinna, n 18 above, 43; Dixon, n 18 above, 148–151; Stiggelbout, n 18 above, 472; Harris Declaration, n 21 above, [21]–[26], [40]–[59]; Peel Declaration, n 21 above, [10.3]; BIICL Research Project, n 108 above. Cf the contrary view in Staughton Declaration, n 21 above, [35]–[40].
115  Tadmore, n 71 above, 150.

the respective records?'[116] The same applies to English opt-in group actions – a group action has preclusive effect where a second action is commenced by a party who was a named claimant in the group action.[117] However, Clarkson and Hill's comment that identity of parties 'is more complicated . . . in cases involving multi-party litigation', is entirely correct,[118] because under an opt-out US damages class action, the ECM is clearly not a party on the record in that action.

As far as US law is concerned, any absent class member occupies a 'special, non-traditional status in litigation'.[119] He is not a party for the purposes of discovery or costs, or for the purposes of being defendant to a counterclaim[120] – but he 'will be bound by any class judgment, whether favourable or adverse, assuming that they have been adequately represented with respect to issues they share in common with the class representative'.[121] For this latter reason, Dixon concludes that 'the class members [in the US class action] are all parties for *res judicata* purposes',[122] such that there *will* be an identity of parties between the US class action and the English re-litigation.

However, this view appears rather contentious, because whether the ECM is a party (indeed, whether *any* of the conditions for recognition of a foreign judgment are met) is a matter for *English law* to decide. Relevantly, how a represented person is treated under the English representative rule is significant. Not only do the terms of that rule suggest that a represented person 'is not a party to the claim',[123] but judicially[124] and academically[125] too, it has been said that represented persons are not parties to the representative action. Hence, it is difficult to perceive how an English court would consider an absent ECM in a US class action to have been a party to that action.

Moreover, it is difficult to see any basis for arguing, instead, that an ECM was a deemed party, or privy, to the US class action. Deemed parties, for the purposes of determining whether the first action has preclusive effect, requires 'the court to look to see who is standing behind the action.'[126] Of the various categories of deemed parties, the closest that may apply to the scenario of the ECM is those 'who have an interest in the dispute and a right to intervene, but who stand by and allow the litigation to be conducted by others'[127] – yet the deemed parties

---

116  Barnett, n 78 above, 65.
117  See *Barrow* v *Bankside Members Agency Ltd* [1996] 1 WLR 257 (CA) 260 (re whether the extended principle in *Henderson* (1843) 3 Hare 100, 67 ER 313 applied to group litigation, and critiqued in R. Mulheron, 'Justice Enhanced: Framing an Opt-Out Class Action for England' (2007) 70 MLR 550, 572–575).
118  Clarkson and Hill, n 80 above, 147.
119  Conte and Newberg n 25 above, §1.3, 19, and cited in *Wyly* v *Milberg Weiss Bershad & Schulman LLP* 12 NY 3d 400, 410 (Ct App NY, 2009).
120  *Shutts* n 34 above, 809–810.
121  Conte and Newberg, *ibid*, and see too *Fauvergue* v *US* 2009 US Lexis 43, 14–15 (Ct App Fed Ct, 2009), citing *Amer Pipe & Construction Co* v *Utah* 414 US 538, 550–551, 554.
122  Dixon, n 18 above, 143.
123  CPR 19.6(4)(b).
124  *Ventouris* v *Mountain (Italia Express)* [1990] 1 WLR 1370, 1372, aff'd [1991] 1 WLR 607 (CA) (represented person under the representative rule not a party for purposes of discovery).
125  A. Zuckerman, *Zuckerman on Civil Procedure* (London: Sweet & Maxwell, 2nd ed, 2006) [12.25].
126  Barnett, n 78 above, 68.
127  *ibid*, citing examples thereof.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

under that category have not resembled absent class members in any way. A privy is different: whereas a deemed party is a party in its own right, a privy acquires the right to the benefit of, or the obligation to be bound by, a judgment, via the person bound. Of the categories of privy established by English law – by blood, by title or by interest[128] – only the last-mentioned has any present relevance. Those categories of privity, however, have generally concerned parties who knew each other's identity, and where the named party acted with the privy's knowledge (say, employer and employee, trustee and beneficiary, or joint tortfeasors).[129] It is submitted that an ECM, as privy, could not acquire an obligation to be bound by a US class action via the representative claimant in that action.

Thus, in this writer's view, an ECM would not be a party to the US class action, such that there would not be identity of parties, for the purposes of preclusive effect.

*Jurisdiction Over the Absent ECMs*

Another criterion of recognition and preclusive effect which is likely to fail is that – according to English private international law, which governs the question – a US court will not have assumed jurisdiction over the ECMs which the US court, as a foreign court of competent jurisdiction, purports to bind by its judgment. If nailing a copy of a declaration to a court door in Tobago was not sufficient to assert jurisdiction over a defendant who had never been to that island, insofar as English law was concerned,[130] then clearly whatever US courts may decide about international jurisdiction over absent class members will not determine jurisdictional competence either. In the absence of any English authority on point, it is of great interest to examine four rationales which have been judicially endorsed, in North American case law, by which to establish a US court's jurisdictional competence over ECMs. These are critiqued in the following section for their cogency and likely application, were such a conundrum to arise before an English court.

## WHETHER A UNITED STATES' COURT HAS JURISDICTION OVER ABSENT ENGLISH CLASS MEMBERS

**Rationale 1: A US class actions judgment/settlement should be recognised if *the defendant* was present within the US, or voluntarily submitted to the jurisdiction of the US court**

*Support for the Rationale*

The requirement in English private international law, that a foreign court have jurisdictional competence over the parties, has been typically met by proving one

---

128  *Dadourian Group Intl* v *Simms* [2006] EWHC 2973 (Ch) at [715] citing *Carl Zeiss* n above 79, 909–910 and *Gleeson* v *Whippell* [1977] 1 WLR 510 (Ch) 515.

129  Barnett, n 78 above, 70–71, and *Gleeson ibid*, requiring 'a sufficient degree of identification between the two'. Views differ on this: some consider that the requisite 'privity of interest' would not exist, *per* the Staughton and Peel Declarations, n 21 above at [41] and [18]–[25] respectively; whereas the Harris Declaration, n 21 above at [37]–[39], and Stigglebout, n 18 above, 466–468, 475, 485–487, explore whether a wider interpretation of 'privity of interest' could cover a representative claimant and an absent class member.

130  *Buchanan* v *Rucker* (1808) 9 East 192, 194, 103 ER 546.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211
197

of two pre-requisites: either that the defendant appeared in the foreign proceedings or took some other step to agree[131] or *voluntarily submit* to the foreign court's jurisdiction over it/him; or that the defendant had some (even temporary) *physical presence* in the foreign jurisdiction, at the time that the suit was filed.[132] Proof of either limb will establish that the defendant had the requisite territorial connection with the foreign jurisdiction.

Of course, it is only natural that the rules of English private international law governing recognition have focussed upon *unwilling defendants* − because, in the usual unitary litigation, it is assumed that the claimant has voluntarily submitted to the jurisdiction of the foreign court, from the very act of filing suit;[133] and it is usually *an absent defendant* who is challenging the *res judicata* effect of a judgment rendered in its absence.[134] The 'unique'[135] problem here is that the ECMs will be represented by a representative claimant who *has* willingly agreed to the US court's jurisdiction, as a party on the record and by entering into a judicially-sanctioned settlement agreement. Nevertheless, can *the defendant's* presence in, or submission to, the US court's jurisdiction be sufficient to satisfy the requirement that the US court has exercised competent jurisdiction over ECMs?

This contention was indeed favoured in *Alstom*: 'English common law, as currently interpreted and applied, focuses the analysis *solely on the territorial connections of the defendant*.'[136] Consequently, it was easy to establish that the US court had jurisdictional competence over the ECMs, because the defendants had 'maintained extensive operations in the United States, and Defendants have pled voluntarily on the merits, which, under English common law, sufficiently renders them within the Court's jurisdiction.'[137]

Interestingly, although the *Vivendi* court considered the territorial connection of the *defendant* to the US jurisdiction as well ('[b]y this standard, of course, this Court would be competent as Vivendi's extensive US operations place it within the Court's jurisdiction'[138]), its conclusion that a US class actions judgment/settlement would probably be recognised by an English court was based upon

---

131  ie, by agreeing in advance, expressly and explicitly, to accept the foreign jurisdiction, via contractual provision. See, eg, Nygh and Davies, n 105 above, 175–176, citing, eg, *Singh v Rajah of Faridkote* [1894] AC 670 (PC) 686, and *Vogel v RA Kohnstamm Ltd* [1973] 1 QB 133; and D&M, n 20 above, 600. Cf Briggs, *The Conflict of Laws*, n 78 above, 141 (any implied agreement 'only in the clearest of cases').

132  eg, *Adams* n 19 above, 517–519; *Schibsby* n 82 above, and cited recently in: *Masri v Consolidated Contractors Intl Co SAL* [2011] EWHC 1024 (QB Comm) at [254]. See too *Lucasfilm Ltd v Ainsworth* [2009] EWCA Civ 1328 at [187]–[195]; and D&M, n 20 above, 588–608; Barnett, n 78 above, 35–36.

133  *Schibsby ibid*; and cited in D&M, n 20 above, 595.

134  Acknowledged in *Vivendi* n 9 above, 102 (English law has 'consistently discuss[ed] the competency of a foreign court in terms of whether there was jurisdiction over the defendant'); and *Alstom* n 21 above, 288.

135  *McKenna* n 2 above at [105].

136  n 31 above, 289 (emphasis added). Also Stigglebout, n 18 above, 462–466; and strong support for this rationale in, eg, the Harris Declaration, n 21 above at [9]–[16], [29]–[36]), citing with approval Barnett, n 78 above, 73.

137  *ibid*, 288.

138  n 9 above, 102.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

other factors, *viz*, reciprocity (an argument considered, and rebutted, under Rationale 3 below).

*Why Focus Upon the* Defendant's *Connection is Inappropriate*
The conclusion in *Alstom* that the rules governing a foreign court's competency of jurisdiction over unwilling defendants is simply, in and of itself, sufficient to determine the court's competency of jurisdiction over absent class members, is, arguably, flawed and unconvincing, for two key reasons (quite apart from the superficial difference, that unwilling defendants are 'on the record' in the US litigation, whereas the ECMs are not).

First, the *Alstom* view downplays the approach that English courts have adopted when it was *a claimant's* ability to bring fresh proceedings in an English court which was at issue. Suppose an insurer or an employee sues in foreign proceedings, and the insured or the employer, respectively, seek to re-litigate in an English court. English courts have considered, in such cases, whether the fresh claimant was a party to the original foreign action, a deemed party, or a privy of the party on the record, and have scrutinised who, precisely, the claimant was in the foreign proceedings, and the importance of examining 'who, in reality, is behind the [foreign] action'[139] – given the need (discussed previously) for an identity of parties or their privies for preclusive effect. Similarly, in *Campos*,[140] McNair J paid no attention to the fact that the defendant Railroad Company was present in the US; the question was whether Miss Campos herself had voluntarily submitted to the US court's jurisdiction (and she had not). Hence, whether an English court should give preclusive effect to a foreign judgment has not turned upon whether *the defendants* appeared in, or voluntarily submitted to, the foreign court's jurisdiction – and nor would it turn upon that issue, where an earlier US class action was being considered, in which the new claimant had been an uninvolved ECM in that action.

Secondly, the defendant's presence in or voluntary submission to the US jurisdiction cannot be determinative, where (as under English law) the rationale which governs recognition of a foreign judgment is that of *obligation*.[141] The whole point of proving a defendant's link to the foreign jurisdiction in that way is that the defendant 'has an obligation for the time being to abide by its laws and accept the jurisdiction of its court',[142] where such a link is established. Where, however, it is *only* the representative claimant/s and defendant/s who are present in the foreign jurisdiction but not the absent class members, then as observed in *Parsons* v *McDonald's Restaurants of Canada Ltd*, 'the application of the obligation theory to bind a defendant present in the foreign country would not be sufficient to justify an exercise of jurisdiction over such absent members.'[143]

---

139  Barnett, n 78 above, 66–67, citing, eg, *Gleeson* v *Wippell & Co Ltd* [1977] 1 WLR 510 (Ch) 516, and *Drouot Ass SA* v *Cons Metallurgical Industries* [1998] ECR I-3075.
140  [1962] 2 Lloyd's Rep 459 (QB).
141  See Rationale 3 below.
142  *Adams* n 19 above, 519.
143  (2004) 70 OR (3d) 53 (Ont SCJ) at [21] *per* Cullity J (decision affirmed on appeal, n 58 above).

*Recognition and* Res Judicata *Effect of US Class Actions Judgments*

Hence, the view in *Alstom* that *the defendant's* territorial connection with the US jurisdiction is all that matters, where the recognition of a US class actions judgment/settlement against ECMs is concerned, is unconvincing.

**Rationale 2:** *By analogy* **to the principles governing unwilling defendants, ECMs can be sufficiently 'tied' to the US jurisdiction**

*Support for the Rationale*

Absent class members are said to have provided 'a limited consent'[144] to the US court's jurisdiction, via their involvement in the US class action. Take the example of the *Fuel Surcharge Settlement Agreement* − the ECMs: (1) were represented by a claimant who voluntarily chose to initiate proceedings in the US, (2) fell within the sub-class description, (3) were adequately represented by the representative claimant (according to the certification order), (4) shared the requisite commonality with the representative claimant, and (5) may not have opted out of the US proceedings, when they had the opportunity to do so. Can it be argued, then, that a US District Court can assert competent jurisdiction over those ECMs if *they* voluntarily submit to the US court's jurisdiction (and if the court's judgment/settlement purported to bind them if they did not opt out)?

There is both US and English authority to provide some obiter support for this proposition. Respectively, in *Alstom*, the US District Court foreshadowed that, '[c]onceivably, the English common law framework for assessing the preclusive effect of foreign judgments may be modified in the future to require that the foreign court have proper territorial connections *with the absent party*',[145] while in *Campos*, it will be recalled that McNair J considered whether Miss Campos had been served with process in the US spurious class action (she was not, and that action had no preclusive effect).[146] Hence, there is some precedent − and certainly much logic − in scrutinising the connection between the US jurisdiction and the ECMs. In the absence of the ECMs' physical presence in the US when the class action was filed, or submission by prior agreement, that leaves the third option: voluntary appearance.

*Have ECMs Made a 'Voluntary Appearance' in the US Class Action?*

In *Desert Sun Loan Corp* v *Hill*, Roch LJ reiterated that, '[t]o show that there was a voluntary appearance in the proceedings in the eyes of the court of the foreign country whose judgment the English court is being asked to enforce is not sufficient, unless it amounts to a voluntary submission *according to our rules*'[147] − albeit with an earlier admission that 'the dividing line between what is and what is not a voluntary submission . . . may often be difficult to draw satisfactorily.'[148]

---

144 The phrase used, eg, in *Vivendi* n 9 above, 94, citing *Shutts* n 34 above, 806–814.
145 n 136 above (emphasis added).
146 [1962] 2 Lloyd's Rep 459 (QB).
147 *Desert Sun* n 19 above, 1145 (emphasis added). Also, *Midgulf Intl Ltd* v *Groupe Chimiche Tunisien* [2009] EWHC 963 (QB) at [46] citing: *Akai Pty Ltd* v *People's Ins Co Ltd* [1998] 1 Lloyd's Rep 90 (QB) 96.
148 *Henry* v *Geoprosco Intl Ltd* [1976] QB 726 (CA) 748.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

    In the absence of any relevant English authority, it is interesting to speculate as to what *could* amount to a voluntary submission by an ECM to a US court's jurisdiction. Having regard to the procedures outlined in the Claim Form and the Long Form Notice in the *Fuel Surcharge Cartel Settlement* merely by way of example,[149] Table 1 lists a number of actions which (if taken by the uninvolved ECM who had not opted out from a US class actions judgment/settlement which purported to bind him) would arguably satisfy the requirement of a voluntary submission:

Table 1:  What (arguably) amounts to a voluntary submission? The ECM . . .

- completes and returns the claim form to the Settlement Administrator;
- completes the claim form online on the designated/court-authorised websites set up for refunds;
- comments in writing on the Settlement agreement;
- objects in writing to the Settlement agreement in the prescribed manner;
- writes to the Settlement Administrator, or to the class or defendant airlines' lawyers, directly, indicating that the ECM intends to submit, or has submitted, a refund claim;
- instructs and/or pays a lawyer to appear on the ECM's behalf (or files a Notice of Intention to Appear) at the fairness hearing for the Settlement Agreement;
- instructs and/or pays a lawyer (whether court-appointed class lawyers or his own) to represent him in seeking a refund under the Settlement Agreement;
- registers his details on the class lawyers' website, preparatory to a claim for refund;
- enters into some funding/costs agreement with a third party funder or ATE insurer (if any individual issues require resolution);
- submits a statement of facts which seeks to prove some individual issue (eg, causation, or quantum).

On the other hand, the steps in Table 2 arguably would not constitute 'taking a step', or any voluntary submission, by the ECM:

Table 2:  What (arguably) does not constitute voluntary submission? The ECM . . .

- merely sees, receives or is aware of, the Claim Form and Long Form Notice;
- is aware (via media reports, word-of-mouth, etc) that English lawyers are acting for the class;
- visits the Settlement Administrator's website, or writes to the Settlement Administrator, to find out more about the action, but without indicating an intention to claim a refund;
- registers contact information on a court-authorised website, but nothing more.

Before leaving this rationale, it is relevant to consider some interesting views by academic commentators on the question of a US court's jurisdictional competence over foreign class members. First, Pinna contends that 'it is possible to conclude that the absence of opting out is a valid consent of the absent plaintiff to the jurisdiction of US courts', such that 'jurisdiction of the US courts cannot be challenged any longer'.[150] However, this writer disagrees; it is submitted that an ECM will need to do *something more* than merely not opt-out (ie, *per* the steps in Table 1), for an English court to consider that ECM to have 'voluntarily appeared' in a US class action.

---

149  See n 7 above, and the steps outlined in Long Form Notice, cll 12, 20.
150  Pinna, n 18 above, 58.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

*Recognition and Res Judicata Effect of US Class Actions Judgments*

Secondly, Briggs argues[151] that the common law rule in *Felthouse* v *Bindley*[152] – which establishes that failure to respond to an offer shall not be taken to constitute consent/acceptance by the offeree – means that there can be no voluntary submission by absent class members to a US court's jurisdiction merely by virtue of their silence and inactivity. However, a difficulty with that argument is that the *Felthouse* v *Bindley* rule simply has no application to the (non)actions of absent class members in class actions jurisprudence. Silence *does* mean consent to be bound by the outcome of the action, if that action is conducted on opt-out principles; and consistently with this, the collective action proposed for the Financial Services Bill 2010 clearly envisaged that silence would amount to class membership, if the action was judicially-ordered to follow an opt-out approach. Moreover, as mentioned previously, silent class members *can* be bound by an English representative action under CPR 19.6 by doing absolutely nothing – their express mandate of the representative action is not required.[153] By corollary, it is the writer's view that the *Felthouse* v *Bindley* rule should not govern the question of what amounts to a 'voluntary appearance' by an ECM in a US class action.

Finally, Bassett[154] contends that a US court's jurisdiction over foreign class members should *only* be capable of being established if those foreign claimants *affirmatively opt in to the class litigation*. By doing so, this rigorously establishes personal jurisdiction (argues Bassett), because the consent to be bound is neither implied nor fictitious, and an affirmative choice to sue 'provides superior due process protections', albeit that '[t]he potential risks of requiring foreign claimants to opt into the class lawsuit include the possibility that many will not elect to do so, and thus the class litigation will bind few foreign claimants'. However, it is the writer's opinion that, insofar as *the rules of English private international law* are concerned, an affirmative opting-in procedure (whilst optimal) is unlikely to be a mandatory pre-condition for the recognition and enforcement of a US class actions judgment/settlement in England. A voluntary submission (ie, taking a step) will be capable of being shown by any of the steps in Table 1, *viz*, something less than filing a notice to join the class action.

### Rationale 3: An English court's assumption of jurisdiction over foreign class members does (or should) give rise to a reciprocal principle that US courts may assume jurisdiction over ECMs

There is no doubt that validly commenced English representative actions *have* included non-English-resident class members in some scenarios – witnessed, for example, where English courts asserted jurisdiction over various Italian Parma

---

151  Briggs and Rees, n 80 above, 782–783, with the Peel Declaration, n 21 above, concurring, at [17], but Stiggelbout, n 18 above, disagreeing, at 483–485.
152  (1862) 142 ER 1037.
153  See text accompanying n 113 above.
154  Bassett, n 34 above, 87–89. Also, Monestier, n 33 above, 7 ('[a]n opt-in class action for foreign claimants eliminates the *res judicata* problem altogether' and 'presents a more principled approach to the inclusion of foreign claimants in US class actions') and 60–78.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

ham producers (as a claimant class)[155] and over a number of foreign insurers (within a defendant class).[156] In neither case did the English court question its jurisdiction over those foreign class members; to the contrary, in the latter, the Court of Appeal said that it '[did] not consider that a representative action is necessarily inappropriate where some of the class represented by a defendant cannot be served [in England]'.[157] Recently, in *Emerald Supplies Ltd* v *British Airways plc*,[158] the fact that the represented class included indirect purchasers *situated around the world*, who were victims of an alleged longstanding cartel, was not a reason for the decision that the representative action was procedurally incompetent.

### Support for a Principle of Reciprocity/Comity in this Context

The point was made by the US District Court in *Vivendi* (and some English academic commentators concur[159]) that English courts can hardly refuse to recognise a US court's jurisdiction over ECMs, when English courts are prepared to exercise jurisdiction, under the English representative rule, over a foreign absent class member:

> the inference that an English court would not find a US court competent where non-resident class members had not personally been served, appears inconsistent with English law governing class or 'representative' actions which, in fact, allows absent parties to be bound . . . There is no requirement, express or implied, that class members, foreign or domestic, must appear or be served in order to be bound. It is true that the scope of representative actions relating to claims for damages is considerably narrower in England than in the United States and that it is unlikely that the present action could proceed as a representative action in England. However, this appears to be more of a procedural distinction than a jurisdictional one, the point being that English law recognizes the competency of its own courts to bind absent parties in appropriate situations.[160]

This passage appears[161] to rely upon the rationale of comity and reciprocity – defined as 'neighbourly gestures or courtesies extended from one state to another, without accepting a legal obligation to behave in that manner. Comity is founded upon the concept of sovereign equality among states and is expected to be reciprocal'.[162] To similar effect, in *Hilton* v *Guyot*, the US Supreme Court

---

155 *Consorzio del Prosciutto di Parma* v *Marks & Spencer Ltd* [1991] RPC 351 (CA) 357–358, 368.
156 *Irish Shipping Ltd* v *Commercial Union Assurance Co plc (The Irish Rowan)* [1991] 2 QB 206 (CA).
157 *ibid*, 228.
158 [2010] EWCA Civ 1284 at [7]; the class was 'a very extensive group . . . geographically': at [2].
159 Dixon, n 18 above, 145–147, concluding (at 150) that a US class settlement had a 'good chance of being upheld in England'; and supported in the Harris Declaration, n 21 above at [42]–[52]. cf Stiggelbout, n 18 above, 490–493.
160 *Vivendi* n 9 above, 103 (citations and internal references to affidavit evidence omitted).
161 Reference to 'comity' occurs in the headnote catchwords, but not in the *Vivendi* judgment itself.
162 *Oxford Dictionary of Law* (Oxford: OUP, 2006) 101. For judicial discussion: *Somportex Ltd* v *Philadelphia Chewing Gum Corp* 453 F 2d 435, 440 (3rd Cir 1971); *Gordon and Breach Science Publishers Ltd* v *Am Institute of Physics and Amer Physical Socy* 905 F Supp 169, fn 8 (SDNY 1995); *Morguard Investments Ltd* v *De Savoye* [1990] 3 SCR 1077, 1096. For academic discussion: Tadmore,

described comity as 'the recognition which one nation allows within its territory to the . . . judicial acts of another nation, having due regard both to international duty and convenience'.[163] In the current context, it would follow that a US court would have jurisdictional competence over ECMs where it exercised a jurisdiction which an English court would exercise itself.

However, comity and reciprocity do not provide a sound or cogent basis for English courts to recognise a US class actions judgment/settlement and give it preclusive effect. This aspect of the *Vivendi* court's reasoning is especially unconvincing, for three reasons.


*Comity/Reciprocity are not the Governing Principles; and are not Satisfied in any Event*
First, the doctrines of comity and reciprocity are not the governing principles by which the recognition and enforcement of foreign judgments is governed in English private international law (which is the *only* law which counts for this purpose). Certainly, the doctrines have gained *some* endorsement in English case law from time to time – notably, in *Campania Naviera Vascongad* v *Steamship, 'Cristina'* (where Lord Wright described the doctrines as a 'possible explanation' for the recognition of the jurisdiction of another sovereign State[164]); in *Godard* v *Gray* (where Blackburn J tentatively supported the principle of comity[165]); and in the area of matrimonial causes.[166]

However, the rationale that truly underpins English common law rules of recognition/enforcement is the doctrine of obligation – ie, 'that where a competent [foreign] court has adjudicated a certain sum to be due, a legal duty or obligation arises to pay that sum, and an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced' in England, as Parke B explained in *Williams* v *Jones*.[167] Essentially, the doctrine of obligation views a foreign court's judgment as 'a private transaction', as a 'settlement of the rights of private parties . . . by which such parties should be bound' – a matter of private law, by contrast to the doctrine of comity which views 'the formal pronunciation of a court of a foreign sovereign as a formal public act'.[168] The doctrine of obligation has been academically described as a theory which 'better explain[s] why a foreign judgment would be given effect, which was broader in scope than the other earlier theories

---

n 71 above, 134–136; Collier, n 80 above, 387–389; D&M, n 20 above, 5–9, 569–570; F. Juenger, 'The Recognition of Money Judgments in Civil and Commercial Matters' (1988) 36 Am J of Comp Law 1, 6–10.

163  159 US 113, 163–164, 212, 228 (1895) *per* Gray J (US Supreme Court refused to recognise French judgment, because of lack of reciprocity in French law for recognising US judgments).

164  [1938] AC 485, 502–503.

165  (1870–71) LR 6 QB 139; cf *Schibsby* n 82 above, 159, which rejected that contention in 1870.

166  eg: *In re Dulles' Settlement (No 2)* [1951] 1 Ch 842 (CA); *Travers* v *Holley* [1953] P 246 (CA) 257 *per* Hodson LJ; *Perrini* v *Perrini* [1979] Fam 84; although Hodson LJ said, after *Travers*, that the comity principle did not extend *beyond* matrimonial causes: *Re Trepca Mines Ltd* [1960] 1 WLR 1273 (CA) 1282.

167  (1845) 13 M&W 628 (Exch) 633, 153 ER 262, having espoused the doctrine of obligation slightly earlier in *Russell and Wife* v *Smyth* (1842) 9 M&W 810.

168  Tadmore, n 71 above, 137, citing H. Yntema, 'Enforcement of Foreign Judgments in Anglo-American Law' (1935) 33 Michigan LR 1129. Also, Briggs and Rees, n 80 above, 784, fn 1.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.

Rachael Mulheron

[of comity and reciprocity]'.[169] The English Court of Appeal recently confirmed, in *Rubin* v *Eurofinance SA*, that although recognition and enforcement of foreign judgments was '[a]t first . . . founded on the doctrine of comity', that position changed in light of *Williams* v *Jones*, and that the doctrine of obligation reflects the 'modern position'.[170] Indeed, the doctrine has longstanding support[171] – to the extent whereby, in *Adams* v *Cape Industries plc*, Slade LJ could say that the position was 'clear', and that foreign judgments are enforced, 'if at all, not through considerations of comity but upon the basis of the principle explained . . . in *Williams* v *Jones*.'[172]

Hence, by extrapolation, the fact that an English representative action may be binding on US-domiciled class members does not, of itself, mean that an English court would regard a US class actions judgment/settlement that bound ECMs as capable of being recognised by an English court. Rather, presence in or submission to the US jurisdiction are the pre-requisites for a US court's jurisdictional competence; reciprocity is not determinative.[173]

The second problem with the *Vivendi* reciprocity view is that there is no reciprocity operative in this scenario at all. As Collier points out,[174] quite apart from the fact that English law does not support the rationale of comity, the fact is that 'precise reciprocity is difficult to achieve'. That sentiment is particularly true in the present context. The English representative rule in CPR 19.6 is not the same tool (or a 'judgment of like effect'[175]) as a FRCP 23(b)(3) opt-out damages class action. Not only is 'the scope of [English] representative actions relating to claims for damages considerably narrower' than under the US damages class action (as *Vivendi* pointed out[176]), but the procedural fabric of the two devices is entirely different. As the writer has discussed elsewhere,[177] the representative rule has been interpreted so as to convey a very limited utility for claimant class members' damages claims. With rare exceptions,[178] the representative rule has not permitted a bifurcated approach to separate common from individual issues, because that would preclude 'the same interest' among class members and representatives which the rule demands; compensation per class member is permissible usually only when ancillary to injunctive or declaratory relief;[179] and the rule theoretically permits opting-out on its

---

169 B. Caffrey, *Enforcement of Foreign Judgments* (Sydney: CCH Australia Ltd, 1985) 57.
170 [2010] EWCA Civ 895 at [34], [35] *per* Ward LJ, citing: *Adams* n 19 above, 513 *per* Slade LJ.
171 eg: *Schibsby* n 82 above; *Grant* v *Easton* (1883) LR 13 QBD 302 (CA); *Nouvion* n 86 above; *Emanuel* v *Symon* [1908] 1 KB 302.
172 [1990] Ch 433 (CA) 513; and endorsed in, eg, *Murthy* v *Sivasjothi* [1998] EWCA Civ 1646.
173 Briggs, n 78 above, 138; D&M, n 20 above, 603–605.
174 Collier, n 80 above, 116.
175 *Hilton* v *Guyot* 159 US 113, 212 (1895). And, as an *opt-in* device, nor does the Group Litigation Order resemble a FRCP 23(b)(3) action: Mulheron, 'Some Difficulties' n 62 above.
176 n 9 above, 103.
177 See, eg, Mulheron, *The Class Action* n 8 above, 77–94; 'From Representative Rule' n 62 above, 427–431; and 'Opting In, Opting Out' n 113 above, 386–391.
178 eg, *Prudential Ass Co Ltd* v *Newman Industries Ltd* [1981] Ch 229 *per* Vinelott J (proposing a 'common ingredient' test); and earlier, eg, *Wood* v *McCarthy* [1893] QB 775; *Moon* v *Atherton* [1972] 2 QB 435 (CA).
179 The representative rule recently again proved unsuitable for claims in which class members sought individual damages recovery: *Emerald Supplies* n 158 above. Critiqued in R. Mulheron: 'A Century

Case 2:23-cv-09217-MEMF-KS   Document 114-5   Filed 09/05/25   Page 1342 of 1378
Page ID #:5632
Recognition and *Res Judicata* Effect of US Class Actions Judgments

face,[180] but such orders do not appear to have been made in any relevant English case law (indeed, with one court recently stating that, 'there was no absolute bar on the Court making a representation order because the person to be represented objects'[181]). Hence, when the *Vivendi* court declared that the English courts were prepared to bind foreign absent class members under the representative rule, which ought to form the basis for reciprocity of treatment of ECMs under a US class action, it failed to sufficiently acknowledge that, in key respects, the two regimes bear little resemblance to each other.

As a third and final point about comity/reciprocity, under the (ultimately unenacted) opt-out class actions regime proposed in the Financial Services Bill 2010[182] (and under the accompanying draft rules of court[183]), any person not domiciled in England/Wales *had to opt in* to an opt-out collective action, in order to be bound by any judgment/settlement in the action. The draft provisions (applicable in the absence of any governing treaty concerning recognition/ enforcement) were justifiable for two reasons. First, and reflective of the earlier approaches of certain Canadian legislatures,[184] they were 'intended to avoid any arguments in relation to national sovereignty which might arise if the provisions purported to assert jurisdiction to decide cases for foreign domiciliaries who have taken no active part in the proceedings.'[185] As the Alberta Law Reform Institute explained of the approach: it 'indicat[es] that the non-resident accepts the juris-diction of the court such that they would be precluded by the doctrine of *res judicata* from later suing, or benefiting from a suit brought, in another jurisdiction.'[186] Secondly, as submitted under Rationale 2 above, although an ECM would likely be bound by a US judgment/settlement if he did something less than proactively opt in to the US action, doing nothing at all cannot be equated to having 'submitted' to the jurisdiction of the US court. Therefore, although comity is not the rationale underpinning the recognition of foreign judgments in England, the court rules perceptibly achieved *some* degree of reciprocity and fairness, in that neither a foreign court (in respect of an absent *English* class member) nor an English court (in respect of an absent *foreign* class member) should be taken to have assumed jurisdiction over an out-of-jurisdiction class member who did absolutely nothing in relation to the class action.

---

Later, the Ghost of *Markt* Lives On' (2009) 8 Comp LJ 159 (first instance); and: '*Markt* and Failed: Missing a Gem of an Opportunity for the Representative Rule' (2012) EBLR [forthcoming] (appeal).

180 CPR 19.6(4). See *Millharbour Management Ltd* v *Weston Homes Ltd* [2011] EWHC 661 (TCC) at [22(5)].

181 *PNPF Trust* n 113 above at [49].

182 Financial Services Bill 2010, cl 19(6)(b).

183 Draft Rules of Court, n 65 above, cll 19.16(2)(g),(h)(iii), 19.22(1)(g)(ii), 19.24(1)(b)(ii).

184 Alberta's Class Proceedings Act, SA 2003, s 17(1)(b), as amended by the Class Proceedings Amendment Act 2010; British Columbia's Class Proceedings Act, RSBC 1996, s 16(2).

185 See Explanatory Notes accompanying the court rules at http://www.judiciary.gov.uk/ NR/rdonlyres/C054527A-8F97-45AB-8471-EB891FF757B7/0/ CJCDraftRulesforCollectiveActionsFeb2010.pdf (last visited 1 December 2011) 11, heading 5, 'Non-Domiciled Class Members'.

186 *Class Actions* (Rep No 85, 2000) at [232].

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

In summary, reciprocity is not the relevant principle for recognition and preclusive effect in English private international law; the English representative rule is not a true reciprocal device to the US class action; and in any event, the opt-out collective action which was proposed for English law in 2010 was deliberately drafted so that foreign members would have to opt-in to the English action – hardly any basis for stating that, reciprocally, uninvolved ECMs should be bound a US class actions judgment/settlement.

**Rationale 4: Some 'real and substantial connection' between ECMs and the US jurisdiction, with appropriate due process and procedural fairness, should suffice**

*Support for the Rationale*
A different rationale for recognition and preclusive effect was posed by the Ontario Court of Appeal in *Currie* v *McDonald's Restaurants of Canada Ltd*.[187] The court had to consider a US class actions settlement issued by a Circuit Court in Illinois,[188] and its recognition/preclusive effect as against Canadian class members who had not opted out of the US action but who wished to bring fresh proceedings in Ontario. Sharpe JA, writing for the court, held that the Illinois court *would* have the requisite jurisdiction over Canadian absent class members, *provided that*:

> (a) there is a real and substantial connection linking the cause of action to the foreign jurisdiction, (b) the rights of the non-resident class members are adequately represented, and (c) non-resident class members are accorded procedural fairness including adequate notice . . . [then] failure [by the Canadian class members] to opt out may be regarded as a form of passive attornment sufficient to support the jurisdiction of the foreign court.[189]

Sharpe JA added the caveat, however, that asserting jurisdiction over absent class members 'may be easier to justify . . . in interprovincial cases than in international cases.'[190]

In *Currie*, the Canadian class members had engaged in prize competitions run by McDonald's in Ontario, but had not had direct contact with the US (foreign) jurisdiction – but there were other 'connecting' factors with the US jurisdiction, ie, McDonald's had its head office in Illinois, and the allegedly wrongful acts of prizes being siphoned off to relatives of McDonald's employees occurred in the US. Sharpe JA held that there *was* '[a] substantial connection between the alleged wrong and Illinois'.[191] However, the procedural fairness requirement, in limb (c) of Sharpe JA's test, was not met. Given that the trial judge (Cullity J) had already

---

187  n 58 above.
188  *Boland* v *Simon Marketing Inc and McDonald's Corp* (Cir Ct of Cook Cty, Illinois, Settlement Agreement and Certification Order approved 8 April 2003).
189  n 58 above at [30].
190  *ibid*, citing *Muscutt* v *Courcelles* (2002), 60 OR (3d) 20 at [95]–[100].
191  *ibid* at [22], [25].

*Recognition and Res Judicata Effect of US Class Actions Judgments*

found[192] that only about 30 per cent of potential Canadian class members would have received notice of the Illinois action, as opposed to 72 per cent of US class members, the Ontario Court of Appeal refused to recognise, or give preclusive effect to, the Illinois judicially-sanctioned settlement, because the notice to Canadian class members was inadequate.[193]

Any analysis of the 'real and substantial connection test', insofar as Canadian law is concerned, lies outside the scope of this article, but suffice to say that it has attracted significant judicial (including Canadian Supreme Court)[194] and academic[195] comment in that jurisdiction.

*No English Endorsement of the Test*

Insofar as English law is concerned, *Currie's* 'real and substantial connection' test for the recognition and preclusive effect of foreign judgments has never been endorsed – except in the limited context of recognising foreign divorce decrees in the UK, for which the test, articulated in 1969,[196] no longer applies (because, as the Irish High Court explained in *Flightlease (Ireland) Ltd* v *Companies Act*, that jurisprudence 'was overtaken by statutory intervention'[197]).

The reason for that disfavour, according to some leading commentators, is that Canadian law is 'more concerned to ask whether the proceedings were brought in an appropriate court', rather than to ask whether the party to be bound by the foreign class actions judgment 'has assumed that obligation [to be bound]' – and it is the *doctrine of obligation* which underpins recognition/enforcement of foreign judgments in English law.[198] Briggs describes the 'real and substantial test' as taking a 'consciously and deliberately very different approach [to English private international law]',[199] and a 'radical departure' which 'represents a fundamental reorientation of the law on foreign judgments. It is not clear that the Canadian Supreme Court fully appreciated what it was doing.'[200]

Interestingly, the 'real and substantial connection' test *does* continue to have a place in English private international law – but in the different context of disputes about *forum non conveniens*, ie, whether an English court should give

---

192 n 143 above at [55]–[58].
193 n 58 above at [31], [34]–[43].
194 eg *Morguard Investments Ltd* v *De Savoye* [1990] 3 SCR 1077; *Hunt* v *T&N plc* [1993] 4 SCR 289 at [59]; *Saldanha* v *Beals* (2003) 3 SCR 416; *McKenna* n 2 above at [89]–[90]; *Ramdath* v *George Brown College* [2010] ONSC 2019.
195 eg J. Castel, 'The Uncertainty Factor in Canadian Private International Law' (2007) 52 McGill LJ 555; J. Walker, 'Recognizing Multijurisdiction Class Action Judgments within Canada: Key Questions: Suggested Answers' (2008) 46 Canadian Business LJ 450; C. Jones and A. Baxter, 'Fumbling Toward Efficacy: Inter-jurisdictional Class Actions' (2006) 3 *Canadian Class Action Review* 405; Monestier, n 33 above, 52–59; Brown, 'Canada–US Cross Border Class Actions' n 2 above, 9 ('one of the broadest tests for determining whether jurisdiction can be assumed').
196 *Indyka* v *Indyka* [1969] 1 AC 33.
197 [2006] IEHC 193 at [5.3], referring to the Recognition of Divorces and Legal Separations Act 1971. Also, *Agbaje* v *Akinnoye-Agbaje (Rev 1)* [2010] UKSC 13 at [5].
198 Briggs and Rees, n 80 above, 784, fn 1. Also D&M, n 20 above, 605–606 ('no authority in England suggests that this is the appropriate test for the recognition/enforcement of foreign judgments *in personam*').
199 Briggs, *Agreements on Jurisdiction and Choice of Law* (Oxford: OUP, 2008) 349–350, fn 40.
200 Briggs, *Conflict of Laws* n 78 above, 138–139, citing *Morguard* n 194 above.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

permission to serve out of the jurisdiction (which requires that England be the proper place in which to bring the claim[201]), or whether a claim brought in an English court should be stayed because a forum elsewhere is more appropriate. According to *Spiliada Maritime Corp* v *Cansulex Ltd*,[202] the court must consider what is the 'natural forum', *viz*, the jurisdiction with which the action has the most 'real and substantial connection'. However, the test does not apply to the recognition and preclusive effect of foreign judgments in English law.

Indeed, the English Court of Appeal recently noted,[203] 'in passing', the *Currie*-type test for recognition/enforcement, but showed no inclination to follow the same approach. Indeed, in *Flightlease* in 2006, the Irish High Court refused to follow the Canadian test, when expressly invited to do so – noting that it had not obtained broad acceptance in the common law world; that '[f]or the time being, Canada appears to be an exception' to the longstanding English common law governing the recognition of foreign judgments; and that 'a radical change in the common law had the potential, in some cases, to create significant effects (including retrospective effects) on many parties (and not just the parties before the court) and should not, therefore, be lightly engaged in.'[204] Hence, the prospect of *Currie's* 'real and substantial connection' test being judicially adopted in English private international law, as a basis for asserting that a US court had exercised competent jurisdiction over ECMs, appears to be remote.

However, were it to be accepted by an English court as an appropriate rationale for recognition and enforcement, then as pointed out in *Currie*, both adequate representation and procedural safeguards for the ECMs in the US proceedings (particularly, adequate notice and appropriate advice regarding the ECMs' opt-out rights) would be necessary concomitants to a 'real and substantial connection' to the US jurisdiction. In that respect, the International Bar Association's (IBA's) *Guidelines for Recognizing and Enforcing Foreign Judgments for Collective Redress* published in 2008,[205] have purported to 'describe minimum internationally accepted standards for the procedural and substantive rights to be afforded by a court issuing a collective redress judgment to the persons it purports to bind',[206] so that, inter alia, the domestic court being asked to review it may 'determine when, and in what circumstances, it would be fair, just and reasonable for a foreign judgment for collective redress to have preclusive effect in the jurisdiction in which absent claimants reside'.[207] The Guidelines are very laudable, in this writer's view. They highlight the worthiness and desirability for a

---

201 *Per* CPR 6.37(3) and *Astrazeneca UK Ltd* v *Albemarle Intl Corp* [2010] EWHC 1028 (Comm) at [33].

202 [1987] AC 460, 478–482 *per* Lord Goff. Also *Cecil* v *Bayat* [2010] EWHC 641 (Comm) at [23], [144]; *Cherney* v *Deripaska* [2009] EWCA Civ 849 at [20]; *AK Investment CJSC* v *Kyrgyz Mobil Tel Ltd* [2011] UKPC 7 at [5].

203 *Rubin* n 170 above at [37] *per* Ward LJ, citing *Beals*, n 194 above.

204 [2006] IEHC 193 at [5.9], [5.15]–[5.18] *per* Clarke J.

205 The Guidelines, produced by the Taskforce on International Procedures and Protocols for Collective Redress, and adopted by the IBA's Legal Practice Division on 16 October 2008, are available at http://www.ibanet.org/Search/Default.aspx?q=guidelines%20collective%20redress (last visited 25 November 2011). The writer is a member of that Taskforce.

206 *ibid*, 7 at [7], especially arts 1.02, 4.04, and cited in: *Ramdath* n 194 above at [87], *per* Strathy J.

207 *ibid* at [9], [8].

Recognition and *Res Judicata* Effect of US Class Actions Judgments

common, rather than a fractured, judicial response towards a relatively new problem for private international law, with an appropriate focus upon *the proce-dures which applied in the foreign class action*. In similar vein, several respected academic commentators and working parties have contended that a foreign court *should* be taken to have exercised competent jurisdiction over absent class members if due process protections were afforded to those absent class members[208] – although other leading academic commentators are more cautious, favouring that the *status quo* be maintained and that English private international law should not permit the *Currie* route.[209]

**CONCLUSION**

In this article, it has been argued that a US class action judgment/settlement, which purports to bind ECMs, would not be recognised by an English court, nor would it be given preclusive *res judicata* effect, if one (or a group) of those ECMs sought to re-litigate the same grievance against the same defendant in an English court. The key reasons for this are two-fold. The US court will lack personal jurisdiction over the ECMs whom the judgment/settlement of the US court purports to bind; and the requisite identity of parties (or privies) will be absent.

It has further been argued that three rationales proposed in North American jurisprudence for asserting personal jurisdiction would not succeed in English law. Those rationales are: that a US class actions judgment/settlement should be recognised and given preclusive effect if *the defendant* was present in, or voluntarily submitted to, the US court's jurisdiction; that an English court's assumption of jurisdiction over foreign absent class members does (and should) give rise to a reciprocal principle that US courts may assume jurisdiction over ECMs; and that a 'real and substantial connection' between ECMs and the US jurisdiction, with assurances of due process and procedural fairness, should be sufficient to establish jurisdiction over those class members. None of these would appear to have any chance of judicial endorsement in England. However, it has been argued that, *by analogy* to the principles governing unwilling defendants, ECMs may be sufficiently 'tied' to the US jurisdiction, if they have 'taken a step' in the US class action. Such a step could arguably comprise something less than formally filing a claim form during the settlement period. Short of 'taking a step', however, the ECMs will retain the right to re-litigate the same subject matter in an English court.

If these arguments were accepted by an English court as being correctly-formed, then this is not a particularly desirable outcome for finality of litigation,

---

208  Dixon, n 18 above, 136, 150–151; Barnett, n 78 above, 73–74; Brown, 'Seeking Recognition' n 2 above; D. Fairgrieve and G. Howells, 'Collective Redress Procedures: European Debates' (2009) 58 ICLQ 379, 381, 407; Stiggelbout, n 18 above, 499–500; *Transnational Group Actions Report and Resolution* (73rd ILA Conference, Rio de Janeiro, 17–21 August 2008, Prof Catherine Kessedjian (France) as chair) at [120], and the accompanying 'Guidelines of Best Practices on Transnational Group Litigation', 10.1–10.3; Bassett, n 34 above, 89–90.

209  Briggs and Rees, n 80 above, 782, footnotes 1, 5; 784 (noting that any change in the law would *have* to be legislative); Briggs, *Conflict of Laws*, n 78 above, 138; J. Fawcett, 'Multi-party Litigation in Private International Law' (1995) 44 ICLQ 744, 769.

© 2012 The Author. The Modern Law Review © 2012 The Modern Law Review Limited.
(2012) 75(2) MLR 180–211

Rachael Mulheron

for judicial economy, or for juridical cross-border co-operation. Back in 1869, an English court noted that, '[a] foreign country has no jurisdiction to pronounce judgment against a person behind his back'.[210] On the other hand, the *Currie* court remarked, in 2005, that 'recognition and enforcement of foreign class proceedings would seem desirable. [It] would encourage the defendant to extend the benefits of the settlement to non-residents. Non-resident class members would receive a benefit without resorting to litigation, and the defendant would buy peace from further litigation.'[211]

Opt-out class action jurisprudence has created a 'new type of claimant'; existing rules of private international law were created in an entirely different era; cross-border trade and business has developed but the law 'has often failed to keep pace';[212] and a more uniform approach to the recognition of a multi-jurisdictional class actions judgment/settlement is highly desirable. Domestic private international law, as it stands, seems ill-equipped to handle the conundrum of an ECM 'caught up' in a US opt-out class action. How the English judiciary and/or legislature deal with the recognition and preclusive effect of a US class actions judgment/settlement — in the interests of *all* who are involved in such litigation — will not only be an important step in the development of English private international law, but will provide useful direction to US courts in their difficult task of deciding whether or not to certify a multi-jurisdictional class.

---

210 *Castrique* v *Imrie* (1869–70) LR 4 HL 414, 435 *per* Blackburn J.
211 *Currie* n 58 above at [27].
212 F. Perez-Correa, 'Enforcement and Recognition of Foreign Judgments and Arbitral Awards in Mexico' (2010) 77 Defence Counsel J 384, 384.

Copyright of Modern Law Review is the property of Wiley-Blackwell and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# CLASS ACTIONS IN ENGLAND AND WALES

### SECOND EDITION



#### GENERAL EDITORS

## DAMIAN GRAVE, MAURA McINTOSH AND GREGG ROWAN

##### CONTRIBUTING AUTHORS

GREIG ANDERSON, NEIL BLAKE, SIMON CLARKE, JULIAN COPEMAN, KIM DIETZEL, HARRY EDWARDS, DAMIAN GRAVE, RUPERT LEWIS, MAURA McINTOSH, GREGG ROWAN, ANDREW TAGGART, HOWARD WATSON, ALAN WATTS AND STEPHEN WISKING

##### ASSISTANT AUTHORS

DAVID BENNETT, SARAH IRONS, JOANNE KEILLOR, NIHAR LOVELL, KATE MACMILLAN, ALEC MILNE, JOE MOORCROFT-MORAN, CERI MORGAN, SARAH PENFOLD, NAOMI REID AND JOE WILLIAMS



**SWEET & MAXWELL**


THOMSON REUTERS

an Union

de (Dutch Act
ges 2005)

CHAPTER 1

## OVERVIEW OF CLASS ACTIONS

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTRODUCTION | 1-001 |
| 2. | OUTLINE OF EXISTING PROCEDURES | 1-008 |
| A. | Informal procedures | 1-010 |
| B. | Representative proceedings | 1-013 |
| C. | Group Litigation Orders | 1-024 |
| D. | Competition law actions | 1-029 |
| E. | Class action procedures in other jurisdictions | 1-030 |
| 3. | BACKGROUND TO THE INTRODUCTION OF GROUP LITIGATION ORDERS | 1-035 |
| A. | Multi-party cases in the 70s, 80s and 90s | 1-035 |
| B. | Group Actions Made Easier | 1-048 |
| C. | Access to Justice Final Report | 1-053 |
| D. | Introduction of GLOs | 1-057 |
| 4. | FURTHER CALLS FOR REFORM | 1-058 |
| A. | Civil Justice Council: Improving Access to Justice through Collective Actions | 1-060 |
| B. | The Government's response to the Civil Justice Council's Report | 1-065 |
| C. | Financial Services Bill | 1-069 |
| D. | Consumer Rights Act 2015 and competition law claims | 1-071 |
| 5. | UK COMPETITION LAW COLLECTIVE REDRESS | 1-072 |
| A. | Consumer representative action introduced by Enterprise Act 2002 | 1-073 |
| B. | OFT discussion paper on competition law private actions | 1-075 |
| C. | BIS consultation on private actions in competition law | 1-077 |
| 6. | EU DEVELOPMENTS | 1-082 |
| A. | Green Paper on competition law private actions | 1-083 |
| B. | Consumer Policy Strategy for 2007–2013 | 1-084 |
| C. | White Paper on competition damages actions | 1-085 |
| D. | Green Paper on consumer collective redress | 1-088 |
| E. | Towards a coherent European approach on collective redress | 1-089 |
| F. | Directive on competition law damages actions | 1-090 |
| G. | Communication and Recommendation on collective redress | 1-091 |
| H. | Representative Actions Directive | 1-093 |

[1]

- specify the court (the "management court") which will manage the claims on the group register.[82]

A feature of the GLO regime is that the individual claims included on the group register remain separate, although they are managed as one. So, for example, unless the court orders otherwise, disclosure of any document relating to the GLO issues by a party to a claim on the group register is treated as disclosure of that document to all parties to claims on the group register and which are subsequently entered on the group register.[83] Equally, where a judgment or order is made in a claim on the group register in relation to one or more of the GLO issues, that judgment or order is binding on the parties to all other claims on the group register at the time the judgment or order is made (and claims subsequently added, if the court so directs).[84]

The introduction of GLOs offered a significant improvement over the previously available methods of handling group claims, providing a procedural framework to give some structure and certainty while at the same time allowing a great deal of flexibility for the courts to manage cases in a manner appropriate to their particular circumstances. However, GLOs arguably do not provide a complete answer to the problems posed by group claims. Indeed, the likelihood of continuing debate and development in this area was recognised by Lord Woolf when he stated:

> "In this area of litigation more than any other my examination of the problems does not pretend to be the final answer but merely to try to be the next step forward in a lively debate within which parties and judges are hammering out better ways of managing the unmanageable."[85]

The use of GLOs as a means of resolving complex multi-party litigation remains relatively limited. There have, to date, been in the region of 110 GLOs since they were introduced in May 2000. It is difficult to give a definitive number, as the "list of all group litigation orders" published by HM Courts and Tribunals service on the gov.uk website[86] is not comprehensive.[87]

The limited use of the GLO regime is no doubt at least in part due to its opt-in nature. Particularly where claims taken in isolation are low value, it may not be realistic to expect individual claimants to take positive action to pursue them even

**1-026**

**1-027**

---

[82] CPR r.19.22(2) (previously r.19.11(2): see footnote to para.1-001 above).
[83] CPR r.19.23(4) (previously r.19.12(4)).
[84] CPR r.19.23(1) (previously r.19.12(1)).
[85] Lord Woolf, Access to Justice: Final Report, p.224, para.6.
[86] See *http://www.gov.uk/guidance/group-litigation-orders* [Accessed 23 May 2022].
[87] Cases in which a GLO has been made but which are not listed on the website include the *WM Morrison Payroll Information Group Litigation* (GLO made 24 November 2015) and the *Kenyan Emergency Group Litigation* (GLO made 22 October 2013). The *Lloyds/HBOS Group Litigation*, in which a GLO was made on 6 August 2014, was only added to the website on 23 January 2018, three and a half years later and during the trial of the action. A number of other cases have been managed like a GLO although no GLO has been made, and this practice appears to be becoming increasingly common. Examples include the phone hacking litigation (see e.g. *Various Claimants v News Group Newspapers Ltd* [2022] EWHC 891 (Ch)); the Iraqi Civilians litigation (see comments of Senior Master Fontaine in *Hutson v Tata Steel UK Ltd (Formerly Corus UK Ltd)* [2016] EWHC 3031 (QB) at [46] - this is separate from the Iraqi Civilian Employees Litigation in which a GLO was made on 12 July 2010); the Tesco shareholder litigation (see e.g. *SL Claimants v Tesco Plc* [2019] EWHC 109 (Ch)); and the Ingenious Media film partnerships litigation (see e.g. *Rowe v Ingenious Media Holdings Plc* [2021] EWCA Civ 29; [2021] 1 W.L.R. 3189; [2021] Costs L.R. 315.

though the value of all similar claims, when taken together, could be very considerable indeed. Even where individual claimants are motivated to join a GLO, the potential costs may act as a significant disincentive[88]: each will be liable for a share of the costs of the litigation, and any adverse costs if the claim is unsuccessful, and those costs may be extensive.

1-028    GLOs have, however, been used in a wide variety of cases including environmental claims, industrial disease claims, product liability claims, tax disputes, child abuse cases, claims relating to financial investments, claims relating to data breaches, and shareholder claims. Amounts in dispute have ranged from the very modest[89] to the very large.[90] The numbers of claimants have also varied widely, from a mere 18 claimants in the *Corby Group Litigation*,[91] to tens of thousands in, for example, the *Abidjan Group Litigation*[92] and the *Kenyan Emergency Group Litigation*,[93] and hundreds of thousands in the *VW NOx Emissions Group Litigation*[94] and the proposed GLO in the *Fundao Dam Litigation*.[95]

While the majority of GLOs have been granted in claims relating to events within England and Wales, a significant number have involved acts conducted outside England and Wales by those who are subject to the jurisdiction of the English courts (e.g. because they are emanations of the UK Government, or companies domiciled in England and Wales, or there is some other basis on which the English courts can exercise jurisdiction).[96]

The GLO regime is considered in more detail in later chapters of this text.

---

[88]    Unless there is funding available through a conditional fee or damages-based agreement, an after-the-event (ATE) insurance policy, or a third party litigation funding agreement, or some combination of these; see further Chs 7 (Costs) and 8 (Fee Agreements and Funding).

[89]    In the *Mogden Group Litigation*, for example, the damages awarded to individual test claimants in respect of a nuisance at their properties arising from odours at a nearby sewage treatment works ranged from £607.50 to £4,617.50 (including both general and special damages); see *Dobson v Thames Water Utilities Ltd* [2011] EWHC 3253 (TCC); 140 Con. L.R. 135. In the *Opiate Dependent Prisoners Group Litigation*, where prisoners who were dependant on opiates at the time of their admission to prison brought claims for personal injury against the Ministry of Justice relating to the detoxification regime to which they were subjected while in prison, it was recognised that amounts awarded to individual claimants were likely to be quite small; see *Goodale v Ministry of Justice* [2010] EWHC B40 (QB) at [10].

[90]    In the *Franked Investment Income Group Litigation*, for example, relating to the taxation treatment of dividends received by UK-resident companies from non-resident subsidiaries, the maximum amount of the claims advanced was said to be of the order of £5 billion; *The Test Claimants in the FII Group Litigation v HMRC* [2008] EWHC 2893 (Ch); [2009] S.T.C. 254; [2009] Eu. L.R. 413 at [8].

[91]    *The Claimants appearing on the Register of the Corby Group Litigation v Corby DC* [2009] EWHC 1944 (TCC); [2009] N.P.C. 100; [2010] Env. L.R. D2 at [3].

[92]    Nearly 30,000 claimants: see *Motto v Trafigura Ltd* [2011] EWCA Civ 1150; [2012] 1 W.L.R. 657; [2011] 6 Costs L.R. 1028 at [1].

[93]    Over 40,000 claimants: see *Kimathi v Foreign and Commonwealth Office* [2015] EWHC 3432 (QB) at [29]

[94]    About 117,000 claimants: see *Crossley v Volkswagen Aktiengesellschaft* [2019] EWHC 698 (QB) at [1].

[95]    The litigation involves over 200,000 claimants. The claims were struck out before a GLO application was heard (see *Municipio de Mariana v BHP Group Plc* [2020] EWHC 2930 (TCC)), but the claimants successfully appealed against that decision (see [2022] EWCA Civ 951) so that the litigation is able to proceed.

[96]    See sections 3 to 5 of Ch.10 (Environmental and Human Rights Based Group Actions).

[18]

---

**D.**

A UK-wide collective r[...]
by the Consumer Rights A[...]
1998.[97] "Collective procee[...]
brought in the CAT on be[...]

The 2015 Act enables ju[...]
out" approach (but those d[...]
basis).[98] The "opt-out" ap[...]
been the subject of signific[...]
chapter.

Collective proceedings [...]
proceedings order".[99] The [...]
are met, including that the [...]
or law and are suitable to [...]
just and reasonable for the [...]
class members.[101]

The 2015 Act also mak[...]
ments on an opt-out basis[...]
who fall within the releva[...]
domiciled outside the UK[...]

Collective proceedings [...]
more detail in Ch.14 (Co[...]

**E.    Class a[...]**

Detailed consideration [...]
England and Wales is [...]
background, it is informat[...]
class action jurisdictions [...]
jurisdictions proceed on [...]

**(1)    United States**

Perhaps the most well-[...]
for which is r.23 of the F[...]
class action, there are cer[...]

•    numerosity—the [...]
     impracticable;
•    commonality—th[...]
•    typicality—the cl[...]
     cal of the claims [...]

---

[97]    Sch.8 of the 2015 Act ame[...]
        s.47B which sets out the m[...]
[98]    Competition Act 1998 s.47[...]
[99]    Competition Act 1998 s.47[...]
[100]   Competition Act 1998 s.47[...]
[101]   Competition Act 1998 s.47[...]
[102]   Competition Act 1998 ss.4[...]
[103]   r.23(a) of the Federal Rule[...]

nation of the

and "redress
, price reduc-
the involve-
that conflicts
uding in rela-
that would be

choose either
nificant influ-
coming years.

CHAPTER 2

# JURISDICTION, CHOICE OF LAW AND THE RECOGNITION AND ENFORCEMENT OF JUDGMENTS

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTRODUCTION | 2-001 |
| 2. | JURISDICTION | 2-006 |
| A. | The applicable legal regimes | 2-010 |
| B. | The European Regime—proceedings commenced before IP completion day | 2-014 |
| C. | 2005 Hague Convention | 2-031 |
| D. | Statutory provisions relating to consumer and employment contracts | 2-035 |
| E. | The common law | 2-038 |
| F. | The common law rules: gateways for service out of the jurisdiction | 2-047 |
| G. | Procedure for challenging jurisdiction | 2-057 |
| H. | Challenging a claim brought abroad where exclusive English jurisdiction agreed: anti-suit injunctions | 2-060 |
| 3. | CHOICE OF LAW | 2-066 |
| A. | The applicable legal regimes | 2-067 |
| B. | Rome I: general rules concerning choice of law in contractual disputes | 2-072 |
| C. | Rome I: specific rules for consumer contracts | 2-077 |
| D. | Rome II: general rules concerning choice of law in non-contractual disputes | 2-079 |
| E. | Rome II: application to different types of claims | 2-083 |
| F. | "After the event" choice of law agreements or special choice of law rules for group actions? | 2-094 |
| 4. | RECOGNITION AND ENFORCEMENT OF JUDGMENTS | 2-097 |
| A. | The applicable legal regimes | 2-098 |
| B. | European Regime: general rules for recognition and enforcement | 2-101 |
| C. | European Regime: grounds for refusing recognition | 2-104 |
| D. | The 2005 Hague Convention: recognition and enforcement | 2-111 |
| E. | The common law rules: enforcement of a foreign judgment | 2-112 |
| F. | The common law rules: recognition of a foreign judgment | 2-116 |
| G. | The common law rules: defences to recognition or enforcement | 2-118 |
| H. | The common law rules: res judicata effect of an opt-out class action judgment or settlement | 2-122 |

[47]

jurisdiction to give a judgment in personam, capable of enforcement or recognition, where the person against whom the judgment was given[371]:

1. was, at the time the proceedings were instituted, present in the foreign country;[372]
2. was claimant, or counterclaimed, in the proceedings in the foreign court;[373]
3. submitted to the jurisdiction of the court by voluntarily appearing in the proceedings; or
4. had, before the commencement of the proceedings, agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of the courts of that country.

It is not sufficient that the foreign court had jurisdiction according to its own rules, for example, because the subject matter of the claim had a connection to the country of the court in question.

**2-115**　No foreign judgment will be enforced (or recognised) in England at common law unless it is "final and conclusive". The test of finality is the treatment of the judgment by the foreign tribunal as res judicata:

"In order to establish that [a final and conclusive] judgment has been pronounced, it must be shown that in the court by which it was pronounced, it conclusively, finally, and forever established the existence of the debt of which it is sought to be made conclusive evidence in this country, so as to make it res judicata between the parties."[374]

The possibility of an appeal to a higher court or where an appeal is actually pending in the foreign country where the judgment was given does not alter the finality of the judgment.[375] If the judgment is given by a court of a law district forming part of a larger federal system (for example, the court of a US state), it will be sufficient for it to be final and conclusive in the law district where it was given.[376]

### F.　The common law rules: recognition of a foreign judgment

**2-116**　In addition to questions of enforcement, the common law rules may also apply to determine whether foreign judgments will be recognised as a matter of English law. Such questions may arise where, for example, an unsuccessful claimant in proceedings overseas seeks to bring a similar claim in England, or where a party raises an issue in proceedings in England that has already been decided abroad.

The common law requirements for the recognition of a foreign judgment are

---

[371] *Dicey, Morris & Collins on the Conflict of Laws* (2012, incorporating the 2018 supplement), Vol.1, para.14R–054; see *Adams v Cape Industries Plc* [1990] Ch. 433 CA (Civ Div) at 512–550; [1990] 2 W.L.R. 657; [1990] B.C.C. 786. This is in contrast to recognition and enforcement under the European Regime, where the basis on which the EU Member State court had jurisdiction is irrelevant.

[372] However, a foreign court will not have jurisdiction on this basis where bringing proceedings in that country would be contrary to a jurisdiction agreement between the parties: s.4(3)(c) Foreign Judgments (Reciprocal Enforcement) Act 1933.

[373] See *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC).

[374] *Nouvion v Freeman* (1889) 15 App. Cas. 1 HL at 9.

[375] *Scott* (1862) 121 E.R. 978; (1862) 2 B. & S. 11 HC (QB); *Carew-Reid v Lloyds Banking Group Plc* [2013] CSOH 5; 2013 G.W.D. 4-113.

[376] *Colt Industries (No.2)* [1966] 3 All E.R. 85; [1966] 2 Lloyd's Rep. 163 CA (Civ).

similar, but not identical,[377] to those for the enforcement of a foreign judgment. To be recognised and relied upon in proceedings in England, a foreign judgment:

1. must have been given by a court which had jurisdiction under English conflict of laws rules;[378] and

2. must be final and conclusive on the merits.[379]

Where a foreign judgment is entitled to recognition (or is enforceable), a person **2-117** may not bring proceedings on a cause of action in respect of which judgment has already been given in proceedings between the same parties or their privies.[380] The foreign judgment can give rise to res judicata, or cause of action estoppel. It may also give rise to issue estoppel, which will prevent a matter of fact or law necessarily decided by a foreign court from being re-litigated in England.[381]

In the class action context, questions may arise as to whether a person may be considered to have been a party to foreign proceedings and subject to the jurisdiction of the foreign court, when recognition of any resulting judgment is sought in the English courts. For example, persons may be deemed represented in or bound by class action proceedings according to local law, even though they may have not assented to them.

Whether or not an estoppel will arise will depend on whether the foreign court is regarded as one of competent jurisdiction, as a matter of English law.[382] In circumstances where a person has involuntarily been made a party to foreign proceedings, for example, in opt-out proceedings of which they were unaware (and where adequate publicity was not provided), an estoppel would likely not arise. This is considered in more detail in Part H of this section, below.[383]

### G. The common law rules: defences to recognition or enforcement

Where the criteria for recognition or enforcement are met, the court may still **2-118** refuse to recognise or enforce a judgment in a number of limited circumstances, which are considered below. In particular, it may refuse recognition or enforcement:

1. if the judgment has been obtained by fraud (on the part of the party in whose

---

[377] In particular, a foreign judgment does not need to be in respect of a debt or definite sum of money in order to be recognised.

[378] See para.2-114 above.

[379] *Harris v Quine* (1868–69) L.R. 4 Q.B. 653 HC (QB); *The Sennar (No.2)* [1985] 1 W.L.R. 490; [1985] 2 All E.R. 104; [1985] 1 Lloyd's Rep. 521 HL. Contrast with *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847; [1996] 5 Bank. L.R. 98; [1996] C.L.C. 1132 CA (Civ Div). See also para.2-115 above.

[380] Civil Jurisdiction and Judgments Act 1982 s.34. This provision will not apply when the English claim is in respect of a different cause of action from that litigated in the foreign proceedings. However, the principle in *Henderson v Henderson* [1843-60] All E.R. Rep. 378; 67 E.R. 313; (1843) 3 Hare 100 may apply to prevent a party from raising a claim which could and should have been included in the proceedings before the foreign court. Alternatively it may be considered an abuse of process for the second action to be brought: *Desert Sun Loan Corp* [1996] 2 All E.R. 847 CA (Civ Div) at 859, 863, 864; [1996] C.L.C. 1132.

[381] See *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No.2)* [1967] 1 A.C. 853 HL at 917, 925, 967; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536.

[382] The law of the foreign court will determine the relationship between the individual and the proceedings but English law will determine whether that makes the individual a party for res judicata purposes; see *Dicey, Morris & Collins on the Conflict of Laws* (2012, incorporating the 2018 supplement), Vol.1, para.14-034.

[383] See paras 2-122 to 2-127 below.

[111]

al given by the
s. In this case,
egulator. It fol-
e vehicles was

y specific and
e litigation that

00s (primarily
imants did not
erty other than
es did not, at a
hat there was a
he value of the

omic loss will
sonal injury or
to the apparent
it said was sup-
no reduction in
defeat devices

rn approach of
erlapping legal

ions and backed
s well as more
l claimants. The
ocietal concern
imants' case did
aused by higher
able reasons, to

o have affected
e been apparent
ia reports on the
by one or more
p for software
liability claims
t they have been

CHAPTER 12

## SHAREHOLDER CLAIMS

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTRODUCTION | 12-001 |
| 2. | ACTIONS UNDER FSMA | 12-003 |
| A. | Section 90 FSMA—liability for prospectuses and listing particulars | 12-005 |
| B. | Section 90A FSMA—liability for other published information | 12-043 |
| C. | FSMA s.90 and s.90A: a summary comparison | 12-065 |
| 3. | OTHER ACTIONS BASED ON FALSE STATEMENTS | 12-066 |
| A. | General principles relating to false representations | 12-067 |
| B. | Separate requirements for the causes of action | 12-075 |
| C. | Reliance | 12-087 |
| D. | Causation | 12-091 |
| 4. | A CASE STUDY ON OTHER CAUSES OF ACTION: THE LLOYDS/HBOS GROUP LITIGATION | 12-096 |
| A. | Tortious duties | 12-097 |
| B. | Company law duties | 12-100 |
| C. | Fiduciary duties | 12-102 |
| 5. | REMEDIES | 12-104 |
| A. | Damages for deceit or negligent misstatement and under the Misrepresentation Act 1967 | 12-104 |
| B. | Damages under FSMA | 12-124 |
| C. | Damages for other common law claims | 12-131 |
| D. | Calculation of loss | 12-132 |
| E. | Rescission | 12-138 |
| 6. | ALTERNATIVE TO COMMENCING AN ACTION—COMPENSATION SCHEME | 12-140 |
| 7. | LIMITATION PERIOD FOR CLAIMS | 12-143 |
| A. | Claims in the tort of deceit | 12-143 |
| B. | Claims in the tort of negligent misstatement | 12-144 |
| C. | Claims under the Misrepresentation Act 1967 | 12-147 |
| D. | Claims under ss.90 and 90A FSMA | 12-148 |

### 1.  INTRODUCTION

Shareholder claims in relation to public companies have not historically been a **12-001**
significant feature of litigation in England and Wales. However, shareholders form
a natural constituency for group litigation and in recent years a number of significant
and high-profile cases have been brought by groups of shareholders. These include,

ACTIONS UNDER FSMA

### (2)  Omissions or delay

Section 90A also provides for liability in respect of an omission from published **12-046**
information of any matter required to be included in it,[69] or if there is a delay to the
publication of such information.[70] This has, as its focus, information which has not
been included in a publication made, or which has not been provided to the market
in any publication at all, contrary to the issuer's disclosure obligations in the
particular circumstances.

What will amount to "required" information will be a matter for the courts to
develop, but the starting point will likely be the content of the relevant disclosure
obligations pursuant to which the relevant publication is (or ought to have been)
made. This will depend on the circumstances and will require consideration of the
variety of disclosure obligations that apply to companies under s.90A.

For example, the allegation may be that the issuer has failed to disclose inside **12-047**
information (either within a publication made, in an omission case, or in a timely
way, in a delay case) pursuant to the requirements of art.17 of the UK Market Abuse
Regulation (UK MAR).[71] In such cases, the court will most likely look to test
whether the information was "required" as a result of it meeting the test for "inside
information". That is, whether it is information of a precise nature, concerning the
issuer or its financial instruments, which has not been made public and which, if it
were made public, would be likely to have a significant effect on the price of the
issuer's shares or other financial instruments.[72] Disclosure of such information can
only legitimately be delayed in certain specified circumstances in accordance with
UK MAR.

Similarly, obligations to notify the markets of: (i) significant transactions (pursu-
ant to Listing Rules r.10); (ii) related party transactions (pursuant to Listing Rules
r.11); (iii) an issuer's purchase of its own shares (pursuant to Listing Rules r.12);
and (iv) dealings in relevant securities transactions by major shareholders (pursu-
ant to Disclosure and Transparency Rules r.5.8.12R) or by persons discharging
managerial responsibilities (pursuant to UK MAR art.19(1)) might give rise to
complaint in the event that omitting to publish, or a delay in publishing, such
information is said to have caused loss.

Alternatively, information may have been published on an ad hoc basis, pursu-
ant to, for example, the Listing Rule requirement[73] for an issuer to publish a Class
1 circular. In such instances, what is "required" for the purposes of any omission
from a circular is likely to be informed by reference to the Listing Rule require-
ment that shareholders be provided with "sufficient information" to make an
informed decision on what they are being asked to approve.

---

[69]  FSMA Sch.10A para.3(1)(b)(ii).
[70]  FSMA Sch.10A para.5(1).
[71]  Regulation (EU) No 596/2014 of the European Parliament and of the Council of 16 April 2014 on
      market abuse (market abuse regulation) and repealing Directive 2003/6/EC of the European Parlia-
      ment and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC,
      as brought into effect in UK law by the European Union (Withdrawal) Act 2018 (as amended), as
      supplemented by the Market Abuse (Amendment) (EU Exit) Regulations 2019 (SI 2019/310) (2019
      Regulations).
[72]  For more detail on the meaning and application of the EU Market Abuse Regulation, see Karen
      Anderson, Jenny Stainsby, Mark Bardell and Carol Shutkever, *Practitioner's Guide to the Law and
      Regulation of Market Abuse*, 2nd edn (Sweet & Maxwell, 2016).
[73]  Listing Rule (LR) r.10.5.1R and LR r.10.8.4G.

SHAREHOLDER CLAIMS

"in relation to a depositary receipt, derivative instrument or other financial instrument representing securities where the issuer of the securities represented has consented to the admission of the instrument to trading…the issuer of the securities represented."[99]

### (7) Reliance

12-055    In respect of untrue or misleading statements and dishonest omissions, at least, s.90A expressly requires a successful claimant to establish reliance. This is liable to present substantial challenges in bringing claims of this sort in practice.

The requirement for reliance is made clear in Sch.10A para.3(4), which provides:

"A loss is not regarded as suffered as a result of the statement or omission unless the person suffering it acquired, continued to hold or disposed of the relevant securities—

(a)    in reliance on the information in question, and
(b)    at a time when, and in circumstances in which, it was reasonable for him to rely on it.""

In respect of dishonest delay, the statute is silent on whether reliance is a necessary element, although this is potentially simply a symptom of the fact that the untrue or misleading statements or omissions provision relates to published information (to which the concept of reliance more naturally bites) whereas delayed publication envisages no publication at all.

12-056    In a group action context, the need to prove reliance is potentially very challenging. A finding of reliance necessarily implies that a claimant would have behaved differently but for the defect in question. To date, there has been little court guidance as to how groups of shareholders can establish reliance in this sense. For example, will each claimant need to establish individual reliance, including by proving that they read, and made their investment decisions based on, the specific part of the published information which contains the relevant flaw? Or might it be possible for the claimants as a whole to satisfy the court that an alternative approach to establishing reliance is permissible?

If proof of individual reliance is needed, there is clear scope for divergence of approach, and likelihood of success, as between investors who fall into different groups on this issue. For example, a more sophisticated investor is more likely to be able to evidence receipt of, and potentially detailed consideration of, the published information as a result of its standard investment practices. By contrast, it may be difficult for a retail investor to prove that they even read the document in question at all, let alone based their investment decision on particular passages.

12-057    In a judgment following the first case management conference in the *Tesco* case, Hildyard J recognised the importance of reliance to the cause of action, noting the need to plead reliance with sufficient particularity:

"on a matter which is absolutely central to the statutory form of action, that is to say, the issue of reliance, the court should be properly astute to ensure that sufficient particularity is supplied. That is both in order to ensure that the defendant knows precisely what is alleged, or sufficiently precisely what is alleged, and also to focus the mind of each of the individual claimants, who have brought very serious allegations, as to precisely the basis on which individually they have proceeded."[100]

[99]    FSMA Sch.10A para.8(2)(a).
[100]    *SL Claimants/MLB Claimants v Tesco Plc* [2017] EWHC 3296 (Ch) at [29].

[580]

At a subsequent hearing in that case, the court ordered the claimants to provide disclosure of documents that addressed the question of reliance.[101] The court found that the claimants had to take additional steps to identify documents which would allow the defendants to test whether they had relied upon alleged untrue or misleading statements or omissions. The court held that "reliance will ultimately have to be established in the case of each investor"[102] and "the documents seemed to be as necessary for the purposes of establishing as they are for rebutting the reliance case".[103] This was a significant decision in circumstances where claimants often argue that there are alternatives to the requirement that each claimant must individually prove reliance.[104]

In similar vein, in *Allianz Global v RSA*,[105] Miles J imposed an unless order on claimants who had failed to comply with the court's order requiring them to submit answers to questionnaires in relation to the issue of reliance, which were a precursor to the selection of sample claimants asserting different modes of reliance on information published by RSA. The judge said:

**12-058**

"...the orders I have made are not to be treated as optional or merely directional; they were orders requiring the provision of this information by each of the claimants separately. The defendant cited Hildyard J's comment in a similar case that where a claimant becomes party to an action of this kind it is not a mere question of subscription in the sense of just signing up to the proceedings and sitting back; every claimant who becomes a party is bound to comply with the rules governing the litigation. I agree."

The court in *Autonomy* has considered the reliance requirement under s.90A and Sch.10A in more detail. It considered the question of reliance in four parts: (1) reliance by whom? (2) reliance on what? (3) what degree of reliance? and (4) when is reliance reasonable?

In relation to the first question, the court held that reliance must be by the person acquiring the securities, and not by some other person.[106]

In relation to the second question, the court held that reliance must be upon a statement or omission, rather than, in some generalised sense, on a piece of published information. In order to demonstrate reliance upon a statement or omission, a claimant will have to demonstrate that they were consciously aware of the statement or omission in question, and that it induced them to enter into the transaction.[107] The requirement for reliance upon a piece of information will not be satisfied when the claimant cannot demonstrate that they reviewed or considered the information: "it cannot have been intended to give an acquirer of shares a cause of action based on a misstatement that he never even looked at, merely because it is contained (say) in an annual report, some other part of which he relied on".[108]

Notwithstanding the above, the court also found that statements and omissions may in combination create an impression which no single one imparts and, if that

---

[101] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315 (Ch).
[102] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315 (Ch) at [83].
[103] *SL Claimants/MLB Claimants v Tesco Plc* [2019] EWHC 3315 (Ch) at [101].
[104] See further paras 12-059 to 12-063 below.
[105] *Allianz Global Investors GmbH v RSA Insurance Group Ltd* [2021] EWHC 3091 (Ch) at [7].
[106] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [481].
[107] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [503].
[108] *Autonomy v Lynch* [2022] EWHC 1178 (Ch) at [503] and [505].



# DICEY, MORRIS AND COLLINS

ON

# THE CONFLICT OF LAWS

### SIXTEENTH EDITION

UNDER THE GENERAL EDITORSHIP OF

## LORD COLLINS OF MAPESBURY

P.C., LL.D., LL.M., F.B.A.

AND

## PROFESSOR JONATHAN HARRIS

Q.C. (Hon.), M.A., B.C.L. (Oxon.), Ph.D. (Birm.)

WITH

### SPECIALIST EDITORS

### VOLUME 1



**SWEET & MAXWELL**          **THOMSON REUTERS**

CHAPTER 14

# FOREIGN JUDGMENTS[1]

|  |  | PAGE |  |  | PAGE |
|---|---|---|---|---|---|
| 1. | Introductory | 712 |  | (4) Foreign judgments in rem | 768 |
| 2. | Enforcement and recognition at common law | 724 | C. | Conclusiveness of foreign judgments: defences | 772 |
|  | A. Enforcement and recognition | 724 | 3. | Enforcement and recognition under statute | 799 |
|  | B. Jurisdiction of foreign courts at common law for recognition and enforcement purposes in England | 742 |  | (1) Administration of Justice Act 1920 | 799 |
|  | (1) Jurisdiction in personam of foreign court for recognition and enforcement purposes in England | 742 |  | (2) Foreign Judgments (Reciprocal Enforcement) Act 1933 | 804 |
|  |  |  |  | (3) Hague Convention on Choice of Court Agreements 2005 | 813 |
|  | (2) Foreign proceedings brought in breach of an agreement | 765 |  | (4) Parts II and IV of the Civil Jurisdiction and Judgments Act 1982 | 821 |
|  | (3) Foreign judgments within the scope of certain specialised international conventions | 768 | 4. | Protection of Trading Interests Act 1980 | 825 |

[1] See Patchett, *Recognition of Commercial Judgments and Awards in the Commonwealth* (1984), Pt I; Read, *Recognition and Enforcement of Foreign Judgments* (1938); Piggott, *Foreign Judgments and Jurisdiction* (1908); Briggs, *Civil Jurisdiction and Judgments* (7th ed. 2021), Chs 32–36; Barnett, *Res Judicata, Estoppel and Foreign Judgments* (2001); Schlosser (2000) 284 *Receuil des Cours* 9, pp.31–53, 200–214; Restatement, Ch.5; Von Mehren, *Adjudicatory Authority in Private International Law: A Comparative Study* (2007); Restatement Fourth, *Foreign Relations Law* (2018), ss.481–490; Hay, Borchers, Symeonides, and Whytock, Ch.24; Briggs, *Private International Law in English Courts* (2014), Ch.6; Fentiman, *International Commercial Litigation* (2nd ed. 2015), Ch.18; Cheshire, North and Fawcett, Chs 15–17; Silberman and Ferrari (eds.), *Recognition and Enforcement of Foreign Judgments* (2017); Cuniberti (2019) 394 *Recueil des cours* 93; Bonomi, in Ferrari and Arroyo, *Private International Law: Contemporary Challenges and Continuing Relevance* (2020), Ch.14. For US analysis and reform proposals see American Law Institute, *Recognition and Enforcement of Foreign Judgments: Analysis and Proposed Federal Statute* (2006); Silberman (2008) 19 King's L.J. 235; Brand, in Ferrari and Arroyo, *Private International Law: Contemporary Challenges and Continuing Relevance* (2020), Ch.13. This Chapter deals with judgments of foreign municipal courts. International tribunals set up by treaty are variously described as courts and arbitral tribunals, but their judgments or awards do not fall within the scope of this Chapter. See below, Rule 73 (International Centre for Settlement of Investment Disputes); and *cf. Dallal v Bank Mellat* [1986] Q.B. 441 (Iran-US Claims Tribunal). On the concept of a court for the purposes of recognition and enforcement, see *Teece v Kuwait Finance House (Bahrain) BSC* [2017] NZHC 1308, [2018] 2 N.Z.L.R. 257.

Rule 45                    *International Litigation*

in countries which are parties to the European Convention on State Immunity.

## 2. ENFORCEMENT AND RECOGNITION AT COMMON LAW

### A. *Enforcement and recognition*

14R–024    **Rule 46—(1) Subject to the Exceptions hereinafter mentioned and to Rule 63 (international conventions), a foreign judgment[94] *in personam* given by the court of a foreign country with jurisdiction to give that judgment in accordance with the principles set out in Rules 47 and 48, and which is not impeachable under any of Rules 52 to 55, may be enforced by a claim or counterclaim for the amount due under it if the judgment is**

> **(a)  for a debt, or definite sum of money[95] (not being a sum payable in respect of taxes or other charges of a like nature[96] or in respect of a fine or other penalty[97]); and**
>
> **(b)  final and conclusive,[98]**

**but not otherwise.**

---

[94] As to what is a judgment, see *Berliner Industriebank AG v Jost* [1971] 2 Q.B. 463 (CA) (ascertainment of a debt in German bankruptcy proceedings); *Midland International Trade Services Ltd v Sudairy, Financial Times*, May 2, 1990 (judgment of court as distinct from administrative tribunal); *Teece v Kuwait Finance House (Bahrain) BSC* [2017] NZHC 1308, [2018] 2 N.Z.L.R. 257 (Bahrain Chamber for Dispute Resolution a court for the purposes of enforcement in New Zealand).

[95] *Sadler v Robins* (1808) 1 Camp. 253. The historical explanation of this limitation is that the form of action appropriate for the enforcement of a foreign judgment was originally debt, though some authorities allow assumpsit. The rule that enforcement of foreign judgments is confined to final judgments for a fixed sum in money was repudiated by the Supreme Court of Canada in *Pro-Swing Inc v Elta Golf Inc* [2006] 2 S.C.R. 612 (on which see also *Minera Aquiline Argentina SA v IMA Exploration Inc* [2007] 10 W.W.R. 648 (BCCA); *USA v Yemec* (2010) 320 D.L.R. (4th) 96, and it was rejected in Jersey (*Brunei Investment Agency v Fidelis Nominees Ltd* [2008] Jersey L.R. 337). However, if the non-money judgment of the foreign court is entitled to recognition as *res judicata*, the fact that it cannot be enforced as a debt may be of limited practical significance, for if proceedings which have to be brought on the original cause of action can be cut short by showing the issues of substance to be *res judicata*, with only the question of remedy left for the original decision of the English court, the technical unenforceability of the foreign judgment is merely a detail. This perhaps explains the decision in *Pattni v Ali* [2006] UKPC 51, [2007] 2 A.C. 85 (Kenyan judgment held to be determinative of contractual rights of parties, giving rise to enforceable obligation).

[96] *Government of India v Taylor* [1955] A.C. 491, 514; *Rossano v Manufacturers' Life Insurance Co Ltd* [1963] 2 Q.B. 352, 376–378; *Att–Gen for Canada v Schulze* (1901) 9 S.L.T. 4; *USA v Harden* (1963) 41 D.L.R. (2d) 721 (Sup Ct Can); *Commissioner of Taxes v McFarland*, 1965 (1) S.A. 470; *Re CJ CGV Co Ltd* [2013] VSC 656, (2013) 281 F.L.R. 390. See Stoel (1967) 16 I.C.L.Q. 663.

[97] *Huntington v Attrill* [1893] A.C. 150 (PC); *US v Inkley* [1989] Q.B. 255 (CA). See Restatement, s.120.

[98] *Nouvion v Freeman* (1889) 15 App. Cas. 1; *Plummer v Woodburne* (1825) 4 B. & C. 625; *Paul v Roy* (1852) 15 Beav. 433; *Patrick v Shedden* (1853) 2 E. & B. 14; *Frayes v Worms* (1861) 10 C.B.(N.S.) 149; *Blohn v Desser* [1962] 2 Q.B. 116; *Berliner Industriebank AG v Jost* [1971] 2 Q.B. 463 (CA); *Gauthier v Routh* (1842) 6 U.C.Q.B.(O.S.) 602; *Graham v Harrison* (1889) 6 Man.L.R. 210; Read, pp.64–86; Restatement, ss.107–109.

724

**Provided that a foreign judgment may be final and conclusive, though it is subject to an appeal, and though an appeal against it is actually pending in the foreign country where it was given.**[99]

**(2) A foreign judgment given by the court of a foreign country with jurisdiction to give that judgment in accordance with the principles set out in Rules 47 and 48, which is not impeachable under any of Rules 52 to 55 and which is final and conclusive on the merits,**[100] **is entitled to recognition at common law and may be relied on in proceedings in England.**[101]

**(3) No proceedings may be brought by a person on a cause of action in respect of a judgment which has been given in his favour in proceedings between the same parties or their privies in a court in another part of the United Kingdom or in a court in an overseas country unless that judgment is not enforceable according to clause (1), or not entitled to recognition according to clause (2), of this Rule.**[102]

**This Rule must be read subject to Rule 60.**

### COMMENT

**Introduction.** Until after 1933 there was no mode of directly enforcing a    **14–025** foreign judgment in England (unless it were a Scottish or Northern Irish judgment or the judgment of a court of some country of the Commonwealth overseas[103]) by execution, but a foreign judgment for a debt or definite sum of money might be enforced by an action *in personam* on the part of the person in whose favour the judgment was given (generally[104] the claimant in the foreign proceedings) for the sum due under the judgment. Enforcement was not dependent on the reciprocal treatment of English judgments in the foreign country. Nor was it necessary that the judgment should be given as the result of investigation of the merits of the case; if the court were one which in the view of English law had jurisdiction over the defendant, and the defendant

---

[99] *Nouvion v Freeman* (1889) 15 App. Cas. 1, 13; *Nouvion v Freeman* (1887) 37 Ch.D. 244, 255 (CA); *Scott v Pilkington* (1862) 2 B. & S. 11; *Colt Industries Inc v Sarlie (No.2)* [1966] 1 W.L.R. 1287; *Carew-Reid v Lloyds Banking Group Plc* [2013] CSOH 5; *Barned's Banking Co Ltd v Reynolds* (1875) 36 U.C.Q.B. 256; *Howland v Codd* (1894) 9 Man.L.R. 435; *Wilcox v Wilcox* (1914) 16 D.L.R. 491 (Man CA); *Campbell v Morgan* [1919] 1 W.W.R. 644 (Man); *Pan American World Airways v Varghese* (1984) 7 D.L.R. (4th) 499, app. dismissed (1985) 15 D.L.R. (4th) 768 (Ont. CA); *Four Embarcadero Center Venture v Mr Greenjeans* (1988) 64 O.R. (2d) 746, app. dismissed (1988) 65 O.R. (2d) 160 (CA).

[100] *Harris v Quine* (1869) L.R. 4 Q.B. 653; *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1975] A.C. 591; *The Sennar (No.2)* [1985] 1 W.L.R. 490 (HL); *Tracomin SA v Sudan Oil Seeds Co Ltd (No.1)* [1983] 1 W.L.R. 662, affd. [1983] 1 W.L.R. 1026 (CA); contrast *Charm Maritime Inc v Kyriakou* [1987] 1 Lloyd's Rep. 433, 441, 450 (CA); *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847 (CA).

[101] See Read, pp.101–106, and Gutteridge (1932) 13 B.Y.I.L. 49, 60–64.

[102] Civil Jurisdiction and Judgments Act 1982, s.34.

[103] See Rules 56, 59, below.

[104] But not invariably: an order for payment of costs made against an unsuccessful claimant may be enforced under this Rule.

failed to defend, the court's judgment might be enforced in England as fully as if the case had been defended on the merits.[105] The foregoing remains the law in the sense that a foreign judgment is still enforceable by action, but since 1933 the more direct enforcement of certain foreign judgments has become possible under the 1933 and 1982 Acts.

**14–026**    **Clause (1) of the Rule.** For a claim to be brought to enforce a foreign judgment, the judgment must be for a definite sum of money, which expression includes a final order for costs, e.g. in a divorce suit.[106] It must order X, the defendant in the English action, to pay to A, the claimant, a definite and actually ascertained[107] sum of money; but if a mere arithmetical calculation is required for the ascertainment of the sum it will be treated as being ascertained;[108] if, however, the judgment orders X to do anything else, e.g. specifically perform a contract, it will not support an action,[109] though it may be *res judicata* as to the issues of substance, with the consequence that there may be summary judgment as to liability on a fresh claim brought on the original cause of action.[110] The judgment must further be for a sum other than a sum payable in respect of taxes or the like, or in respect of a fine or other penalty. It is well settled[111] that an English court will not entertain an action for the enforcement, either directly or indirectly, of a penal[112] or revenue,[113] or other public[114] law of a foreign country. Since "the essential nature and real foundation of a cause of action are not changed by recovering judgment upon it,"[115] it follows that the court cannot entertain an action for the enforcement, either directly or indirectly,[116] of a foreign judgment ordering the payment of taxes,[117] fines or other contributions or penalties. A penalty in this sense normally means a sum payable to the State, and not to a private claimant,[118]

---

[105] *Russell v Smyth* (1842) 9 M. & W. 810; *Boyle v Victoria Yukon Trading Co* (1902) 9 B.C.R. 213.

[106] *Russell v Smyth*, above; *cf. Ruf v Walter* [1990] 6 W.W.R. 661 (Sask).

[107] *Sadler v Robins* (1808) 1 Camp. 253. Compare *Hall v Odber* (1809) 11 East 118.

[108] *Beatty v Beatty* [1924] 1 K.B. 807 (CA).

[109] *cf. Church of Scientology of California v Miller, The Times*, October 15, 1987, affd. *The Times*, October 23, 1987 (CA); and see n.95, above.

[110] Wolff, s.243; see *Duke v Andler* [1932] 4 D.L.R. 529 (Sup Ct Can). But see White (1982) 9 Sydney L.Rev. 630.

[111] See Rule 20.

[112] See, e.g. *Huntington v Attrill* [1893] A.C. 150 (PC); *US v Inkley* [1989] Q.B. 255 (CA). See para.8–008, above.

[113] See, e.g. *Government of India v Taylor* [1955] A.C. 491.

[114] *United States Securities and Exchange Commission v Manterfield* [2009] EWCA Civ 27, [2010] 1 W.L.R. 172 (not enforcement of penal or public law).

[115] *Wisconsin v Pelican Insurance Co*, 127 U.S. 265, 292 (1888). See Hay, Borchers, Symeonides and Whytock, pp.1444–1445 and Restatement Fourth, *Foreign Relations Law* (2018), s.489 Rep. Notes, for subsequent developments in the United States. For subsequent development and analysis, see Finch (2002) 86 Minn.L.R. 497.

[116] *Rossano v Manufacturers' Life Insurance Co Ltd* [1963] 2 Q.B. 352, 376–378.

[117] *Att-Gen for Canada v Schulze*, (1901) 9 S.L.T. 4; *USA v Harden* (1963) 41 D.L.R. (2d) 721 (Sup Ct Can); *Commissioner of Taxes v McFarland*, 1965 (1) S.A. 470.

[118] See also *Robb Evans v European Bank Ltd* (2004) 61 N.S.W.L.R. 75 (applying this principle to the category of other public laws).

*Foreign Judgments*                                    RULE 46

so that an award of punitive or exemplary damages is not penal.[119] But it is possible that an award of multiple damages, e.g. in an anti-trust action, might nevertheless be regarded as penal at common law.[120] If the purpose of the damages as awarded by the foreign court is to punish the defendant, enforcement of the judgment may be found to be against English public policy, with which the rule against enforcing foreign penal laws will overlap.[121] If the foreign judgment imposes a fine on the defendant and also orders payment of compensation to the injured party (called the "*partie civile*" in French proceedings), the latter part of the judgment can be severed from the former and enforced in England.[122]

No foreign judgment will be recognised or enforced in England at common   **14–027**
law unless it is "final and conclusive." The expression is repetitive but, having been rendered familiar by many judicial statements, is reproduced in the 1933 Act.[123] The test of finality is the treatment of the judgment by the foreign tribunal as a *res judicata*. "In order to establish that [a final and conclusive] judgment has been pronounced, it must be shown that in the court by which it was pronounced, it conclusively, finally, and forever established the existence of the debt of which it is sought to be made conclusive evidence in this country, so as to make it *res judicata* between the parties":[124] it follows that the possibility of an appeal to a higher court does not alter the finality of the judgment.[125] A foreign order which is liable to be abrogated or varied by the court which pronounced it is not a final judgment.[126] But a default judgment

---

[119] *cf. S.A. Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279, 309, *per* Lord Denning M.R., *obiter* (a case on the 1933 Act); *Doe v Howard* [2015] VSC 75; *Britton v Symon Estate* (2016) 395 D.L.R. (4th) 139 (Sask.).

[120] *cf. Jones v Jones* (1889) 22 Q.B.D. 425 (a case not involving a foreign judgment); *Rio Tinto Zinc v Westinghouse Electric Corporation* [1978] A.C. 547; but see *Surgibit IP Holdings Pty Ltd v Ellis (No.2)* [2017] NSWSC 1379 (award of treble damages made because of the defendants' wilful breach of patents held not to be penal). The effect of the Protection of Trading Interests Act 1980 is that such judgments are not enforceable in the United Kingdom at common law or otherwise, including in respect of an award of compensatory damages which has been multiplied, though where there are judgments on separate causes of action, a judgment under one for compensatory damages may still be enforced notwithstanding that judgment under another is for multiple damages and so unenforceable: *Lewis v Eliades* [2003] EWCA Civ 1758, [2004] 1 W.L.R. 692; *SAS Institute Inc v World Programming Ltd* [2018] EWHC 3452 (Comm.), [2019] F.S.R. 663. See further Rule 60.

[121] In *Schnabel v Lui* [2002] NSWSC 15, the court regarded (at [177]) damages which had been awarded to punish the defendant for his wrongdoing as being penal, and enforcement as precluded by Rule 20. The precise application of Rule 20 in these circumstances is therefore unsettled. See Mills, in Bariatti, Fumagalli and Crespi Reghizzi, *Punitive Damages and Private International Law* (2019), Ch.8.

[122] *Raulin v Fischer* [1911] 2 K.B. 93; *cf. Black v Yates* [1992] Q.B. 526.

[123] s.1(2)(a), as substituted by 1982 Act, Sch.10, para.1.

[124] *Nouvion v Freeman* (1889) 15 App. Cas. 1, 9.

[125] A judgment is also still final if separate (but related) proceedings which may be brought in same court may result in a judgment which may then be set off against, or otherwise used to abate the sums due under, the original judgment: *Bussoleno Ltd v Kelly* [2011] IEHC 220, [2012] I.L.R.M. 81.

[126] *Nouvion v Freeman* (1889) 15 App. Cas. 1, 13; *Re Macartney* [1921] 1 Ch. 522, 531, 532; *Westfal-Larsen AS v Ikerigi Naviera SA* [1983] 1 All E.R. 382, 389; *LFDB v SM* [2015] FCA 725 (freezing order not final and conclusive); *cf. Charm Maritime Inc v Kyriakou* [1987] 1 Lloyd's Rep. 433, 442, 450 (CA); see also *M'Donnell v M'Donnell* [1921] 2 I.R. 148; and in the context of judgments on arbitration awards, *Svenska Petroleum Exploration AB v Government of Republic of Lithuania* [2005] EWHC 9 (Comm.), [2005] 1 Lloyd's Rep. 515.

727

may, in this sense, be final and conclusive, even though it is liable to be set aside in the very court which rendered it.[127] Otherwise, the clearer the claimant's case, the more useless the judgment would be. The test has been stated as whether the default judgment was "entirely floating as a determination, enforceable only as expressly provided and in the course of that enforcement subject to revision", in which case it will not be final, or "given the effect of finality unless subsequently altered", in which case it will be final.[128]

**14–028**     If the judgment is given by a court of a law district forming part of a larger federal system, e.g. an American State, the finality and conclusiveness of the judgment in the law district where it was given are alone relevant in England; its finality and conclusiveness in other parts of the federal system, e.g. in other American States, are irrelevant.[129]

**14–029**     The class of foreign judgments in relation to which it is most difficult to decide whether or not they are "final and conclusive" are maintenance orders, providing for periodical payments. The principle applicable to such orders is, however, the same as that applying to all other foreign judgments. If they are incapable of alteration by the court which made them, then they are actionable in England.[130] But if they are capable of variation by the court which made them, as are orders for periodical payments made by the Family Division of the High Court, no action is maintainable upon them,[131] just as no action in the Queen's Bench Division will lie upon an order of the Family Division.[132] Yet an order variable in respect of future payments may be invariable in so far as arrears are concerned in which case an action may be brought for the recovery

---

[127] *Midtown Acquisitions LP v Essar Global Fund Ltd* [2017] EWHC 519 (Comm.), [2017] 1 W.L.R. 3083 (New York judgment by confession final and conclusive, but stay of execution granted pending application to vacate judgment: see para.14–083, below); *Vanquelin v Bouard* (1863) 15 C.B.(N.S.) 341, 367–368; *Boyle v Victoria Yukon Trading Co* (1902) 9 B.C.R. 213; *Barclays Bank Ltd v Piacun* [1984] 2 Qd.R. 476; *Minkler and Kirschbaum v Sheppard* (1991) 60 B.C.L.R. (2d) 360; *Re Dooney* [1993] 2 Qd.R. 362; *cf. Four Embarcadero Center Venture v Mr Greenjeans* (1988) 64 O.R. (2d) 746, app. dismissed (1988) 65 O.R. (2d) 160 (CA). For criticism of dicta in *Nouvion v Freeman* see Read, pp.85–86.

[128] *Ainslie v Ainslie* (1927) 39 C.L.R. 318, 389–390, applied in *Schnabel v Lui* [2002] NSWSC 15, [97]; *CLE Owners Inc v Wanlass* [2005] 8 W.W.R. 559 (Man. CA); *Re Cavell Insurance Co* (2006) 269 D.L.R. (4th) 663 (Ont. CA). But if the default judgment is set aside (and there is no sustainable objection to the order by which it is set aside: *cf. Merchant International Co Ltd v Natsionalna Aktsionerna Kompaniia Naftogaz* [2012] EWCA Civ 196, [2012] 1 W.L.R. 3036; see Harder (2012/2013) 14 Yb. P.I.L. 103), it ceases to be entitled to recognition, and a local judgment will be set aside on application: *Benefit Strategies Group Ltd v Prider* (2007) 211 F.L.R. 113 (SASC).

[129] *Colt Industries Inc v Sarlie (No.2)* [1966] 1 W.L.R. 1287.

[130] *cf. McLean v McLean* [1979] 1 N.S.W.L.R. 620; *Holt v Thomas* (1987) 38 D.L.R. (4th) 117 (Alb).

[131] *Harrop v Harrop* [1920] 3 K.B. 386; *Re Macartney* [1921] 1 Ch. 522; *M'Donnell v M'Donnell* [1921] 2 I.R. 148; *Cartwright v Cartwright* [2002] EWCA Civ 931; *Maguire v Maguire* (1921) 64 D.L.R. 180 (Ont. CA); *Davis v Davis* (1922) 22 S.R.N.S.W. 185; *Estate H v Estate H*, 1952 (4) S.A. 168; *Ashley v Gladden* [1954] 4 D.L.R. 848 (Ont. CA); *Smith v Smith* [1955] 1 D.L.R. 229 (BC); *Re Paslowski and Paslowski* (1957) 11 D.L.R. (2d) 180 (Man). The rule is criticised by Grodecki (1959) 8 I.C.L.Q. 18, 32–40, and has been rejected by some American State courts: see Restatement, s.109.

[132] *Bailey v Bailey* (1884) 13 Q.B.D. 855 (CA); *Robins v Robins* [1907] 2 K.B. 13.

*Foreign Judgments*                                              RULE 46

of the arrears.[133] Statutory means exist for the enforcement in England of
maintenance orders made by Scottish or Northern Irish courts, and by the
courts of certain foreign countries outside the United Kingdom.[134]

**Proviso.** At common law, a foreign judgment may be final and conclusive    **14–030**
even though an appeal is actually pending in the foreign country where it was
given.[135] "In order to its receiving effect here, a foreign decree need not be
final in the sense that it cannot be made the subject of appeal to a higher court;
but it must be final and unalterable in the court which pronounced it; and if
appealable the English court will only enforce it, subject to conditions which
will save the interests of those who have the right of appeal."[136] So in a proper
case a stay of execution would no doubt be ordered pending a possible
appeal.[137]

It has also been held that a judgment which was final in the court which    **14–031**
pronounced it may be recognised and enforced even though it was later set
aside by an appellate court if the appellate judgment is refused recognition on
the basis of one of the defences in Rules 52 to 55.[138] When a party success-
fully appeals against the judgment of a lower court, there is no doubt that, so
far as the foreign system is concerned, the appellate judgment entirely super-
sedes the judgment of the court below. However, if it is only the appellate
judgment which is shown to have been tainted by fraud, it is only the appellate
judgment which may be refused recognition.

**Enforcement.** Where the statement of case[139] in proceedings on a foreign    **14–032**
judgment has been served on the defendant and the defendant has acknowl-
edged service or filed a defence, the claimant may apply for summary
judgment on the ground that the defendant has no real prospect of successfully
defending the claim.[140] Unless the defendant satisfies the court that there is an
issue or question in dispute which ought to be tried—for instance, on the

---

[133] *Beatty v Beatty* [1924] 1 K.B. 807 (CA); *G v G* [1984] LR. 368; *Splatt v Splatt* (1889) 10
N.S.W.L.R. 227; *Hadden v Hadden* (1898) 6 B.C.R. 340; *Robertson v Robertson* (1908) 16
O.L.R. 170; *Wood v Wood* (1916) 28 D.L.R. 367 (Ont. CA); *Patton v Reed* (1972) 30 D.L.R. (3d)
494 (BC); *Lear v Lear* (1974) 51 D.L.R. (3d) 56 (Ont. CA).
[134] See below, Rule 111.
[135] *Scott v Pilkington* (1862) 2 B. & S. 11; *Colt Industries Inc v Sarlie (No.2)* [1966] 1 W.L.R.
1287; *Enercon GmbH v Enercon (India) Ltd* [2012] EWHC 689 (Comm.), [2012] 1 Lloyd's Rep.
519, at [51]. Contrast the position under the 1920 Act, s.9(2)(e), the 1933 Act, ss.1(3), 5(1) and
the 1982 Act, Schs 6 and 7, para.3, below, paras 14–174, 14–187 and 14–215.
[136] *Nouvion v Freeman* (1889) 15 App. Cas. 1, 13.
[137] *Scott v Pilkington* (1862) 2 B. & S. 11, 41; *Colt Industries Inc v Sarlie (No.2)* [1966] 1
W.L.R. 1287; *Four Embarcadero Center Venture v Mr Greenjeans*, above, n.127; *Arrowmaster
Inc v Unique Farming Ltd* (1993) 17 O.R. (3d) 407; *Continental Casualty Co v Symons* (2015)
127 O.R. (3d) 758 (Ont. C.A.); *cf. The Varna (No.2)* [1994] 2 Lloyd's Rep. 41, 46.
[138] *Merchant International Co Ltd v Natsionalna Aktsionerna Kompaniia Naftogaz* [2012]
EWCA Civ 196, [2012] 1 W.L.R. 3036; *Joint Stock Co Aeroflot–Russian Airlines v Berezovsky*
[2014] EWCA Civ 20, [2014] 1 C.L.C. 53; see Harder (2012/2013) 14 Yb. P.I.L. 103.
[139] Under the practice prior to the CPR, the statement of claim usually contained a specific
assertion that the foreign court had jurisdiction: there is nothing in the CPR which requires any
change in the practice.
[140] CPR, r.24.2, replacing RSC Ord.14, r.1; *Grant v Easton* (1883) 13 Q.B.D. 302 (CA); *Colt
Industries Inc v Sarlie (No.2)* [1966] 1 W.L.R. 1287 (CA).

Rule 46        *International Litigation*

ground that the judgment was obtained by fraud[141]—the court may give judgment for the claimant.[142] Where the defendant does not appear the claimant may enter judgment at once.[143] The proceedings upon such an action may thus have a largely formal character. The English court must have *in personam* jurisdiction over the judgment debtor, and the process in a claim to enforce a judgment at common law must be served on the judgment debtor in England, unless permission is obtained to serve outside. But even where the judgment debtor has no connection with England process may be issued, with permission, for service outside the jurisdiction, solely on the basis that the claim is to enforce a foreign judgment.[144]

14–033      It is immaterial that the debtor dies before judgment is pronounced by the foreign court and that the judgment is pronounced against personal representatives.[145] Since *Miliangos v George Frank (Textiles) Ltd*[146] there is no reason why a claim for enforcement of a foreign judgment may not be for the amount of the judgment in the currency in which it was rendered. A foreign judgment *in personam* cannot be enforced in England by a claim *in rem*.[147]

14–034      **Clause (2) of the Rule.** A foreign judgment may be relied on in English proceedings otherwise than for the purpose of its enforcement. A claimant who has brought proceedings abroad and lost may seek to bring a similar claim in England; or in proceedings on a different claim an issue may be raised which has been decided abroad. In such cases a foreign judgment entitled to recognition may give rise to *res judicata*, i.e. to a cause of action estoppel, which prevents a party to proceedings from asserting or denying, as against the other party, the existence of a cause of action, the nonexistence or

existence of which [...]
estoppel, which w[...]
foreign court from [...]

Thus a foreign [...]
favour of the defe[...]
England for the sa[...]
a different remedy[...]
issue has been de[...]
foreign judgments [...]
have determined [...]
rule is that the on[...]
the latter.[152]

It was establish[...]
*v Rayner & Keele[...]*
issue estoppel, i.[...]
necessarily decid[...]
estoppel, three re[...]

---

[141] *Manger v Cash* (1889) 5 T.L.R. 271; *Codd v Delap* (1905) 92 L.T. 510 (HL); *Israel Discount Bank of New York v Hadjipateras* [1984] 1 W.L.R. 137 (CA); *Jet Holdings Inc v Patel* [1990] 1 Q.B. 335, 347 (CA); *House of Spring Gardens Ltd v Waite* [1991] 1 Q.B. 241, 250 (CA); *Jacobs v Beaver* (1908) 17 O.L.R. 496.

[142] CPR, r.24.2.

[143] CPR Pt 12.

[144] CPR, PD6B, para.3.1(10), which replaces CPR, r.6.20(9), which in turn replaced RSC, Ord.11 r.1(1)(m). The effect of *Perry v Zissis* [1977] 1 Lloyd's Rep. 607 (CA) is therefore reversed. There is no requirement that there be shown to be assets in England when the application is made, although the proceedings must have a "legitimate benefit": *Tasarruf Mevduati Sigorta Fonu v Demirel* [2007] EWCA Civ 799, [2007] 1 W.L.R. 2508 (which appears not to have been cited to the Court of Appeal in a decision to the contrary effect, *Linsen International Ltd v Humpuss Transportasi Kimia* [2011] EWCA Civ 1042: see *Parbulk II AS v PT Humpuss Intermoda Transportasi TBK* [2011] EWHC 3143 (Comm.), at [80]). *cf. Habib Bank Ltd v Central Bank of Sudan* [2014] EWHC 2288 (Comm.); *Deutsche Bank AG v Sebastian Holdings Inc* [2016] EWHC 3222 (Comm.), [19]; *Chevron Corp v Yaiguaje* [2015] SCC 42, (2015) 388 D.L.R. (4th) 253 (Sup. Ct. Can.). See further Kupelyants (2018) 14 J. Priv. Int. L. 455. But this jurisdictional rule will not apply unless and until a final judgment has been rendered by the foreign court: *Mercedes-Benz AG v Leiduck* [1996] 1 A.C. 284, 289–299 (PC); and proceedings to obtain freezing and delivery up orders against a respondent implicated in the concealment of assets do not fall within this jurisdictional rule unless judgment has been given against those respondents, or has been given against other persons but steps are now being taken to enforce it against these respondents: *Belletti v Morici* [2009] EWHC 2316 (Comm.), [2010] 1 All E.R. (Comm.) 412; see also *City 1 Mauritius Holdings v Unitech Ltd* [2014] EWHC 3704 (Comm.), [2014] 2 C.L.C. 784.

[145] *Re Flynn (No.2)* [1969] 2 Ch. 403.

[146] [1976] A.C. 443. See Rule 254. *cf.* the position under the 1933 Act, below, para.14–187.

[147] *The City of Mecca* (1881) 6 P.D. 106 (CA); *The Sylt* [1991] 1 Lloyd's Rep. 240, 244.

[148] In an appropriat[...]
to be recognised in E[...]
court that it has no j[...]
decision, but an abste[...]
arises from it: *Relfo L[...]*
*v Relfo Ltd* [2010] E[...]

[149] See also 1933 [...]

[150] *Ricardo v Garc[...]
Banner Universal M[...]*
[2018] E.C.C. 55, [[...]
*Investments v BNP P[...]*
against successful pa[...]
foreign court was no[...]
proceedings were co[...]
the estoppel if the E[...]
*Citibank NA* [1981] [...]
and *Morrison Rose [...]*
(1876) 1 P.D. 393; [...]

[151] *Callandar v D[...]
proceedings in rem i[...]
be asked based on a [...]
& J. 168; contrast *H[...]
Lottie* (1904) 9 Excl[...]

[152] *Showlag v Ma[...]*
[2021] SGCA 14. Bu[...]
general rule will be [...]

[153] [1967] 1 A.C[...]

[154] *The Sennar (N[...]*
145; *Tracomin SA v[...]
W.L.R. 1026 (CA); [...]
*(No.2)* [1991] 1 Llo[...]
835 (Comm.); *Easte[...]
2713 (Comm.), [20[...]
1014 (Comm.), [20[...]
W.L.R. 1123; *GFH [...]
Ikerigi Compania N[...]
[1988] 2 Lloyd's R[...]
[1996] 2 All E.R. 8[...]

*Foreign Judgments*                                    RULE 46

existence of which has been determined by the foreign court, or to an issue estoppel, which will prevent a matter of fact or law necessarily decided by a foreign court from being re-litigated in England.[148]

Thus a foreign judgment which is final and conclusive on the merits in **14–035** favour of the defendant is at common law[149] a good defence to a claim in England for the same matter.[150] There is no cause of action estoppel against a different remedy,[151] although there may be an issue estoppel if a relevant issue has been decided directly in the foreign action. Where two conflicting foreign judgments, each of which would satisfy the criteria for recognition, have determined issues which arise in the English proceedings, the general rule is that the one given first in time is to be recognised, to the exclusion of the latter.[152]

It was established by a majority of the House of Lords in *Carl Zeiss Stiftung* **14–036** *v Rayner & Keeler Ltd (No.2)*[153] that a foreign judgment could give rise to an issue estoppel, i.e. prevent a party from denying any matter of fact or law necessarily decided by the foreign court. For there to be such an issue estoppel, three requirements must be satisfied:[154] first, the judgment of the

---

[148] In an appropriate case the court may declare, in advance, that a foreign judgment is entitled to be recognised in England: *Phillips v Avena* [2005] EWHC 3333 (Ch.). A decision by a foreign court that it has no jurisdiction to entertain a claim to enforce a foreign revenue law is not a decision, but an abstention from decision, on the merits of the claim in question, and no estoppel arises from it: *Relfo Ltd v Varsani* [2009] EWHC 2297 (Ch.) (not challenged on appeal: *Varsani v Relfo Ltd* [2010] EWCA Civ 560, [2011] 1 W.L.R. 1402).

[149] See also 1933 Act, s.8 (below, para.14–189), and 1982 Act, ss.18–19.

[150] *Ricardo v Garcias* (1845) 12 Cl. & F. 368; *Jacobson v Frachon* (1927) 138 L.T. 386 (CA); *Banner Universal Motion Pictures Ltd v Endemol Shine Group Ltd* [2017] EWHC 2600 (Ch.), [2018] E.C.C. 55, [63]-[70]; *cf. Booth v Leycester* (1837) 1 Keen 579; *JSC Ingosstrakh-Investments v BNP Paribas SA* [2012] EWCA Civ 644, [2012] 1 Lloyd's Rep. 649 (no estoppel against successful party on issue it lost, although also finding that the issue determined by the foreign court was not identical to that arising in the English proceedings). It is irrelevant which proceedings were commenced first. It used to be said that the foreign judgment only gave rise to the estoppel if the English proceedings were subsequent to the foreign judgment: but see *Lee v Citibank NA* [1981] Hong Kong L.R. 470 (CA), following *Bell v Holmes* [1956] 1 W.L.R. 1359 and *Morrison Rose & Partners v Hillman* [1961] 2 Q.B. 266 (CA) and not following *The Delta* (1876) 1 P.D. 393; *Houstoun v Sligo* (1885) 29 Ch.D. 448, 454.

[151] *Callandar v Dittrich* (1842) 4 M. & G. 68. On the other hand, a mere change in form to proceedings *in rem* is immaterial: *The Griefswald* (1859) Swab. 430, 435. But the same relief may be asked based on a different case giving rise to a new equity: *Hunter v Stewart* (1861) 4 De G.F. & J. 168; contrast *Henderson v Henderson* (1843) 3 Hare 100, 115. See *Michado v The Hattie and Lottie* (1904) 9 Exch.C.R. 11.

[152] *Showlag v Mansour* [1995] 1 A.C. 431 (PC); *Merck Sharp & Dohme Corp v Merck KGaA* [2021] SGCA 14. But if the party holding the earlier judgment is estopped from relying on it, the general rule will be displaced.

[153] [1967] 1 A.C. 853, 917, 925, 967.

[154] *The Sennar (No.2)* [1985] 1 W.L.R. 490, 499 (HL) See also *Vervaeke v Smith* [1983] 1 A.C. 145; *Tracomin SA v Sudan Oil Seeds Co Ltd (No.1)* [1983] 1 W.L.R. 662, 673, affd [1983] 1 W.L.R. 1026 (CA); *The Jocelyne* [1984] 2 Lloyd's Rep. 429; *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC (No.2) [1991] 1 Lloyd's Rep. 429; *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm.); *Eastern European Engineering Ltd v Vijay Construction (Pty) Ltd* [2018] EWHC 2713 (Comm.), [2019] 1 Lloyd's Rep 1; *Mad Atelier International BV v Manes* [2020] EWHC 1014 (Comm.), [2020] QB 971; *PAO Tatneft v Ukraine* [2020] EWHC 3161 (Comm.), [2021] 1 W.L.R. 1123; *GFH Capital Ltd v Haigh* [2020] EWHC 1269 (Comm.); *cf. Westfal-Larsen A/S v Ikerigi Compania Naviera SA* [1983] 1 All E.R. 382; *EI du Pont de Nemours v Agnew (No.2)* [1988] 2 Lloyd's Rep. 240 (CA); *Black v Yates* [1992] Q.B. 526; *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847 (CA).

---

*(left margin fragments)*

court may give
not appear the
n action
rt must have *in*
ess in a claim to
lgment debtor in
even where the
y be issued, with
e basis that the

onounced by the
sonal representa-
here is no reason
be for the amount
oreign judgment
*em.*[147]

ed on in English
nent. A claimant
bring a similar
an issue may be
oreign judgment
a cause of action
ng or denying, as
e nonexistence or

.T. 510 (HL); *Israel
Holdings Inc v Patel
Q.B. 241, 250 (CA);

turn replaced RSC,
07 (CA) is therefore
n England when the
nefit": *Tasarruf Mev-
08 (which appears not
, *Linsen International
II AS v PT Humpuss
f. Habib Bank Ltd v
v Sebastian Holdings
SCC 42, (2015) 388
. Int. L. 455. But this
een rendered by the
PC); and proceedings
the concealment of
g given against those
ng taken to enforce it
.), [2010] 1 All E.R.
WHC 3704 (Comm.),

below, para.14–187.
's Rep. 240, 244.

Rule 46       *International Litigation*

foreign court must be (a) of a court of competent jurisdiction in relation to the party who is to be estopped, (b) final and conclusive and (c) on the merits; secondly, the parties to the English litigation must be the same parties (or their privies) as in the foreign litigation;[155] and, thirdly, the issues raised must be identical. A decision[156] on the issue must have been necessary for the decision of the foreign court and not merely collateral.[157] But Lord Reid emphasised that special caution is required before a foreign judgment can be held to give rise to an issue estoppel: English courts are unfamiliar with modes of procedure in many foreign countries, and it may be difficult to see whether a particular issue has been decided or that a decision was a basis of a foreign judgment and not merely collateral or obiter; and it might be unjust for a litigant to be estopped from putting forward a case in England because of a failure to do so in an earlier case of a trivial character abroad.[158]

**14–037**     Where an issue estoppel arises from a foreign decision, it may be an abuse of process to pursue English proceedings which seek to relitigate the determined issues. The question of who is estopped by the decision of a foreign court may, however, be more complex than the "same parties (or their privies)" formula suggests. Privity of interest may arise where one party acts as agent for another, or, in an appropriate case, between trustee and beneficiary,[159] although a common commercial interest is insufficient to establish such a relationship.[160] If a foreign court has decided an issue against one, but not both, of the parties to the English action, it may however be an abuse of process for the other to seek to litigate the point already decided against the co-party.[161] In *House of Spring Gardens Ltd v Waite*[162] it was held that a foreign judgment was enforceable against a judgment debtor who (unlike his co-defendants) had stood aside from proceedings in the foreign country to

---

[155] *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No.2)* [1967] 1 A.C. 853, 910–911, 928–929, 936–937, 944–946; *Standard Chartered Bank (Hong Kong) Ltd v Independent Power Tanzania Ltd* [2016] EWCA Civ 411, [2016] 1 Lloyd's Rep. 25 (no privity of interest between parent and subsidiary).

[156] But where what was decided by the foreign court cannot be determined, e.g. where judgment is entered in default of appearance, this principle will be inapplicable: *Masters v Leaver* [2000] I.L.Pr. 387 (CA); *Baker v Ian McCall International Ltd* [2000] C.L.C. 189.

[157] *Good Challenger Navegante SA v Metalexportimport SA* [2003] EWCA Civ 1668, [2004] 1 Lloyd's Rep. 67 (CA); *Air Foyle Ltd v Center Capital Ltd* [2002] EWHC 2325 (Comm.), [2003] 2 Lloyd's Rep. 753; *Sun Life Assurance Association of Canada v Lincoln National Life Insurance Co* [2004] EWCA Civ 1660, [2005] 1 Lloyd's Rep. 606; *H J Heinz Co Ltd v EFL Inc* [2010] EWHC 1203 (Comm.), [2010] 2 Lloyd's Rep. 727.

[158] [1967] 1 A.C. 853, 918, *per* Lord Reid; see also *Tugushev v Orlov* [2021] EWHC 926 (Comm.). But *cf. The Sennar (No.2)* [1985] 1 W.L.R. 490, 500 (HL).

[159] *Gleeson v Wippell & Co Ltd* [1977] 1 W.L.R. 510, 515. It will, of course, depend on the terms of the trust and the circumstances of each case whether the interests of the trustee and beneficiary are sufficiently aligned such that the doctrine should operate.

[160] *Standard Chartered Bank (Hong Kong) Ltd v Independent Power Tanzania Ltd* [2016] EWCA Civ 411, [2016] 1 Lloyd's Rep. 25.

[161] *Rayner v Bank für Gemeinwirtschaft AG* [1983] 1 Lloyd's Rep. 462 (CA). Conversely, if the foreign litigation involved additional parties this should not preclude a judgment of that court giving rise to an issue estoppel against the subset who are party to the English proceedings: see *Merck Sharp & Dohme Corp v Merck KGaA* [2021] SGCA 14.

[162] [1991] 1 Q.B. 241; *Bussoleno Ltd v Kelly* [2011] IEHC 220, [2012] I.L.R.M. 81. See also *Owens Bank Ltd v Etoile Commerciale SA* [1995] 1 W.L.R. 44 (PC), which shows that the abuse of process doctrine extends more generally to those whose contention that they are not estopped is devoid of merit.

*Foreign Judgments*                                        RULE 46

have the original judgment set aside for fraud. As he knew of the proceedings, which were brought by the co-defendants whose interest in the matter was joint, he should be seen as privy to the proceedings and the judgment, but if there were a technical objection to that reasoning, it would still be an abuse of process to allow the party to ask the English court to re-examine the point already adjudicated by the foreign court.[163]

Likewise, the question whether a person was a party and is liable on that 14–038 account to be estopped may require careful examination.[164] For example, persons may be "represented" in proceedings before a foreign court in circumstances in which the foreign court has ordered them to be joined or deems them to be bound according to local procedure (for example, in class action proceedings), even though they have not made or given any expression of assent. Even if it is correct to regard a person in such a case as party to the proceedings, on the footing that whether a person is a party to proceedings is principally[165] a matter for the procedural law of the foreign court to determine, estoppel will only arise against them if the foreign court is regarded as one of competent jurisdiction so far as the individual person is concerned. In the absence of what English law will accept as having been a submission to the adjudicatory jurisdiction of the foreign court, a person who is involuntarily made a party to foreign proceedings, or who is placed by the foreign court in an analogous position, will not be estopped by the decision of the foreign court.[166]

The requirement that the judgment must be final and conclusive[167] applies 14–039 when it is relied on by the defendant as a defence,[168] just as it does when it

---

[163] *cf. Kim v Lee* [2020] EWHC 2162 (QB) (no issue estoppel arising from unsuccessful foreign criminal process).

[164] *Swiss Life AG v Kraus* [2015] EWHC 2133 (QB).

[165] The correct analysis should be that the foreign system determines the precise relationship of the individual to the proceedings, and the incidents of that relationship, but it is ultimately for English law to determine whether that makes the individual a party for the purpose of the doctrine of estoppel by *res judicata*.

[166] *cf. Currie v McDonald's Restaurants of Canada Ltd* (2005) 250 D.L.R. (4th) 224 (Ont. CA) (on which, see Monestier (2010) 45 Tex.Int.L.J. 537), finding a non-participant person may in principle be bound and estopped by a judgment or settlement in class action proceedings on the basis of "passive submission". Neither this decision nor the analyses proposed by Dixon (1997) 46 I.C.L.Q. 134 or Stiggelbout (2011) 52 Harvard Int. L.J. 435 is consistent with English law as it has so far been developed or declared. French law comes to the same conclusion that a non-participant person is not bound (Lemontey & Michon, 2009 *Clunet* 535), though by a different route; Dutch law, by contrast, evidently does not rule out the possibility that a non-participant who did not take steps to opt out of the class may be bound by the judgment or settlement (*Re Royal Ahold NV* (June 23, 2010) (Amsterdam Dist Ct)); and for the possibility that there may yet be a distinction to be drawn between "non-parties and non-parties", in relation to whom the law is not identical, see *Global Partners Fund Ltd v Babcock & Brown Ltd* [2010] NSWCA 196, at [73]. On intra-Canada recognition of class action judgments, see *Canada Post Corp v Lépine* [2009] 1 S.C.R. 549.

[167] In particular, the judgment on the point for which an estoppel effect is sought. The requirement for finality is a matter of English law, but finality is tested according to the law of the judgment court: see *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No.2)* [1967] 1 A.C. 853, 919; *Joint Stock Co Aeroflot–Russian Airlines v Berezovsky* [2014] EWCA Civ 20, [2014] 1 C.L.C. 53, at [28]–[34].

[168] *Plummer v Woodburne* (1825) 4 B. & C. 625; *Frayes v Worms* (1861) 10 C.B. (N.S.) 149; *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No.2)* [1967] 1 A.C. 853. See also *Charm Maritime Inc v Kyriakou* [1987] 1 Lloyd's Rep. 433 (CA).

733

is relied upon by the claimant seeking enforcement. The judgment must be "on the merits." In *The Sennar (No.2)*[169] Lord Diplock seems to have thought this added nothing to the condition that the judgment must be final and conclusive, but Lord Brandon suggested that "a decision on the merits is a decision which establishes certain facts as proved or not in dispute; states what are the relevant principles of law applicable to such facts; and expresses a conclusion with regard to the effect of applying those principles to the factual situation concerned."[170] The issue determined by the foreign court in *The Sennar (No.2)*, was that a jurisdiction agreement bound the claimant to bring the claim in Sudan, and as such may have been considered as being procedural in nature. But it was the final conclusion of the foreign court on the point which it had been asked to decide, namely, whether the exclusive jurisdiction agreement applied to a claim framed in tort; and it was on this account held capable of supporting an estoppel against the claimant[171] upon the issue.[172] In *Desert Sun Loan Corp v Hill*[173] the Court of Appeal accepted in principle that issue estoppel could arise from an interlocutory judgment of a foreign court on a procedural, non-substantive issue where there was express submission of the issue in question to the foreign court, and the specific issue of fact was raised before and decided, finally and not just provisionally, by the court. It was emphasised that before according preclusive effect to any such finding by a foreign court the need for caution should be borne in mind.[174] Consequently, if the decision of the foreign court is a non-reviewable but clear decision upon an issue submitted to it for its determination,[175] it is unnecessary for the purposes of issue estoppel to characterise the issue so decided as being substantive rather than procedural.

---

[169] [1985] 1 W.L.R. 490, 494 (HL).

[170] *ibid.*, p.499. See *Saleh v Director of Serious Fraud Office* [2017] EWCA Civ 18, [2017] Lloyd's Rep. F.C. 177 (judgment resulting from the decision made by a claimant to withdraw claim not on the merits); compare *Midtown Acquisitions LP v Essar Global Fund Ltd* [2017] EWHC 519 (Comm.), [2017] 1 W.L.R. 3083, at [41]–[46] (judgment by confession considered to be on the merits).

[171] Who was necessarily taken to be bound by findings made by a court to the jurisdiction of which he had unquestionably submitted.

[172] See also *Diag Human SE v Czech Republic* [2014] EWHC 1639 (Comm.), [2014] 2 Lloyd's Rep. 283 (where a foreign court decided that an arbitral award was not binding, the decision could give rise to an issue estoppel between the parties); *First Laser Ltd v Fujian Enterprises (Holdings) Co Ltd* [2012] HKCFA 52; (2012) 15 HKCFAR 569, at [43]–[49]; compare *Chai v Peng* [2014] EWHC 3519 (Fam.), [2015] 2 F.L.R. 412 (Malaysian Court of Appeal determined that Malaysia not an inappropriate forum for divorce, but English court would be applying a different test to decide the most appropriate jurisdiction, so no identity of issue).

[173] [1996] 2 All E.R. 847 (CA).

[174] This represents the view of the majority, Evans and Stuart-Smith L.JJ.; Roch L.J. dissented. The decision is problematic, for it suggests that issue estoppel may arise against a defendant who appears before a foreign court for the sole purpose of contesting its jurisdiction over him, in circumstances in which Civil Jurisdiction and Judgments Act 1982, s.33, would appear to make it clear that the appearance does not constitute submission, with the consequence that the foreign court is not one of competent jurisdiction for the purpose of deriving issue estoppel from its decision (*cf. A/S D/S Svendborg v Wansa* [1997] 2 Lloyd's Rep. 183). This point seems to have been overlooked in *Armacel Pty Ltd v Smurfit Stone Container Corp* [2008] FCA 592, (2008) 248 A.L.R. 573. See further Garnett (2019) 15 J. Priv. Int. L. 490.

[175] For further consideration of the separate question whether it is open to the losing party to contend that it did not submit to the jurisdiction of the foreign court, so that its ruling is not to be recognised as against him, notwithstanding that it sought a determination on the point in question, see below, para.14–076.

---

Other cases can be mor[...]
judgment which recognise[...]
a judgment for the purpose[...]
has similarly been held in [...]
a foreign judgment which [...]
on the basis of public poli[...]
policy of each State may b[...]
is a matter for determinat[...]
however, arise from other [...]
of a judgment from a thir[...]
principle at least, arise fro[...]
has even been suggested t[...]
court does not meet the str[...]
on the merits, a degree of [...]
however, far from clear th[...]
explain whether, and to w[...]

It has been held that at [...]
given in favour of the def[...]
statute of limitation was n[...]
is reversed by s.3 of the [...]
foreign judgment determin[...]
to be on the merits. A jud[...]
judgment on the merits.[18...]

By the Civil Liability [...]
respect of any damage ma[...]
the same damage. It has b[...]
(which is in different term[...]
to the liability of the par[...]
Scotland, and not in a for[...]
foreign judgment gives n[...]
This question was left ope[...]
*v Lee Kui Jak*,[185] but it in[...]
apply to foreign judgmen[...]

---

[176] See para.14–118, below.

[177] [2012] EWCA Civ 855, [...]

[178] *Chantiers de l'Atlantique* [...] (Comm.); Hill (2012) 8 J. Priv[...] Harder (2013) 62 I.C.L.Q. 441.

[179] *Republic of Kazakhstan v* [...] Lloyd's Rep. 370 (affd. [2007]

[180] *Deutsche Bank AG v Hig[...]* [2010] 1 W.L.R. 1023, at [22[...] grounds).

[181] *Harris v Quine* (1869) L.[...] *Aschaffenburg AG* [1975] A.C[...]

[182] See Read, p.101; but on th[...] *Stiftung v Rayner & Keeler Ltd* [...]

[183] *Comex Houlder Diving L[...]*

[184] Clerk and Lindsell, *Torts* [...]

[185] [1987] A.C. 871.

[186] *ibid.*, p.902, *per* Lord Go[...] Keith who delivered the leadin[...]

*Foreign Judgments*                                    RULE 47

laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that country territorial jurisdiction over him under our rules of private international law."[266]

The Court of Appeal referred to the "voluntary" presence of the defendant **14–068** as being one not induced by compulsion, fraud or duress, but it is clear from the context[267] that it was not finally decided that the presence of these factors would negative jurisdiction. There is no decision in England on what the position is when the defendant is forcibly brought, or fraudulently induced to come, into the jurisdiction of the foreign court and there served with process.[268] But in the United States the view is held that in such a case jurisdiction exists but may or should be disclaimed by the court for reasons of equity if the claimant is privy to the force or fraud.[269] In this case also, it is clear, the defendant has the benefit of the laws of the State concerned and owes temporary allegiance thereto. The question whether at common law a foreign court has jurisdiction over an individual who is neither resident or present within the foreign jurisdiction but who carries on business regularly there through an agent has been raised but not decided,[270] although it is a basis of jurisdiction under the 1920 Act.[271]

**Presence—legal persons.** Where a corporation is concerned neither resi- **14–069** dence nor presence has, of course, any real meaning. But there is a long line of cases dealing with the question whether a foreign corporation does or does not carry on business in England so as to render itself amenable to the jurisdiction of the English courts at common law.[272] The principle of these cases applies also to the question whether a corporation is present in a foreign country so as to give its courts jurisdiction over it.[273] In *Adams v Cape*

---

[266] [1990] Ch. 433, 519. The Court of Appeal indicated that dicta (in cases on the jurisdiction of the *English* court) indicated that the relevant time was *service* of proceedings, rather than *issue*, but expressed no final view. The Court of Appeal (at p.518) also left open the question whether residence without presence would be a sufficient basis of jurisdiction, but *cf. State Bank of India v Murjani Marketing Group Ltd*, above, which suggests that it does suffice, para.14–064.

[267] See *ibid.*, pp.518–519.

[268] See *Stein v Valkenhuysen* (1858) E.B. & E. 65 and *Watkins v North American Lands, etc., Co* (1904) 20 T.L.R. 534 (HL), above, para.11–042, which suggest that in appropriate circumstances English process might be set aside if the defendant was fraudulently lured into the jurisdiction.

[269] Restatement, s.82, comments b, d and f.

[270] *Blohn v Desser* [1962] 2 Q.B. 116, 123, on which see below, para.14–084. The mere fact that the defendant contracted through an agent in the foreign country is not of itself sufficient: *cf. Seegner v Marks* (1895) 21 V.L.R. 491.

[271] 1920 Act, s.9(2)(b), on which see below, para.14–173. On the jurisdiction of the English court in such a case see above, para.11–043.

[272] See above, paras 11–050 *et seq.*

[273] *Littauer Glove Corp v FW Millington (1920) Ltd* (1928) 44 T.L.R. 746; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *Adams v Cape Industries Plc* [1990] Ch. 433 (CA); see also *Moore v Mercator Enterprises Ltd* (1978) 90 D.L.R. (3d) 590 (N.S.).

RULE 47                    *International Litigation*

*Industries Plc*[274] the Court of Appeal held that in the case of corporations the
test of jurisdiction is satisfied if the corporation is carrying on business at a
definite and fixed place. The basic principle is that a trading corporation will
be regarded as present within the jurisdiction of the courts of a foreign country
if (a) it has established and maintained a fixed place of business and for more
than a minimal time has carried on its own business there, *or* (b) its repre-
sentative has for more than a minimal period of time been carrying on the
corporation's business in that country at or from some fixed place of business.
In the latter case it will be necessary to consider a number of factors (already
mentioned in connection with the jurisdiction of the English court[275]) to
determine whether the business being carried on is that of the corporation or
its representative. In deciding whether a company is present in a foreign
country as a result of the acts of a subsidiary present there, the court must
consider whether the subsidiary was acting as agent, and if so, on what terms;
it may also treat the subsidiary as the *alter ego* of the parent if special
circumstances exist which indicate that there is a "mere façade concealing
the true facts".[276] If the local agent has authority to enter into contracts on behalf
of the corporation without seeking the prior approval of the corporation, this
is a powerful indicator that the corporation is present; if the agent does not
have this authority, this fact points powerfully in the opposite direction.[277]

14–070    In the case of companies which carry on or promote their business by
placing advertisements or other invitations or information on an internet
website which is accessible from, or even targeted at customers in, the foreign
country in which the judgment was given, there is no English support for the
view that this should be regarded as constituting a place of business in the
foreign country for the purpose of the rules on the recognition and enforce-
ment of judgments, and some authority against.[278] There is a distinction to be
drawn between "carrying on business in" and carrying on business from a
fixed place of business in the foreign country.[279] Though the former expres-
sion may have some jurisdictional relevance in some systems, it is the latter
which establishes presence for the purpose of the First Case of the Rule. And
this latter has not yet been held to be demonstrated or satisfied by a "presence
in cyberspace".

14–071    Under the 1920 Act the principle of the cases on the jurisdiction of the
English court applies also to the question whether a corporation carries on
business in the jurisdiction of the original court within the meaning of the

---

[274] [1990] Ch. 433, 530–544. *cf. Akande v Balfour Beatty Construction Ltd* [1998] I.L.Pr. 110
(a case on the 1920 Act).
[275] See above, para.11–058.
[276] [1990] Ch. 433, 539, citing *Woolfson v Strathclyde Regional Council*, 1978 S.L.T. 159, 161
(HL) (a case not involving the conflict of laws).
[277] *F&K Jabbour v Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146; *Adams
v Cape Industries Plc* [1990] Ch. 433, 531 (CA).
[278] *Lucasfilm Ltd v Ainsworth* [2009] EWCA Civ 1328, [2010] 3 W.L.R. 333, at [194]. The
point was not discussed on further appeal to the Supreme Court: [2011] UKSC 39, [2012] 1 A.C.
208.
[279] An Irish court has held that when a company is in liquidation and is no longer carrying on
business, it is not to be regarded as present within the jurisdiction in question: *Re Flightlease
(Ireland) Ltd* [2006] IEHC 193, [2008] 1 I.L.R.M. 53.

*Foreign Judgments*                          RULE 47

Act.[280] Thus it has been held that a New Zealand insurance company does not carry on business in Ghana merely because it maintains agents there with limited powers to settle claims.[281] The 1933 Act[282] requires that the corporation must have its principal place of business (and not merely carry on business) in the foreign country, or alternatively that the judgment debtor had an office or place of business in the foreign country and the proceedings were in respect of a transaction effected through or at that office or place.[283]

**The second case. Appearance as claimant or counter-claimant.** It is obvious that a person who applies to a tribunal as claimant is bound to submit to its judgment, should there be an adverse judgment, if for no other reason than that fairness to the defendant demands this.[284] It is no less obvious that a claimant is exposed to acceptance of jurisdiction of a foreign court as regards any set-off, counterclaim or cross-action which may be brought by the defendant.[285] By the same token, a defendant who resorts to a counterclaim or like cross-proceeding in a foreign court clearly submits to the jurisdiction thereof.[286]                          **14–072**

**The third case. Appearance.** This case rests on the simple and universally admitted principle that a litigant who has voluntarily submitted to the jurisdiction of a court by appearing before it cannot afterwards dispute its jurisdiction. Where such a litigant, though a defendant rather than a claimant, appears and pleads to the merits without contesting the jurisdiction there is clearly a voluntary submission. The same is the case where the defendant does indeed contest the jurisdiction[287] but nevertheless proceeds further to plead to the                          **14–073**

---

[280] See para.14–173, below.

[281] *Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330.

[282] s.4(2)(a)(iv).

[283] s.4(2)(a)(v). See further para.14–190, below.

[284] On this basis, a foreign judgment would not, therefore, be enforceable against absent English members of a foreign opt-out class action who had not actively assented to the proceedings: Mulheron (2012) 75 M.L.R. 180; Grave, McIntosh and Rowan, *Class Actions in England and Wales* (2018), Ch.2. It is suggested that mere knowledge of the foreign opt-out class action should not normally be enough for the judgment to be enforceable, as this would not constitute an appearance nor would it impose a burden on claimants to "opt out" of the proceedings, although this raises the concern that those claimants might benefit from the foreign proceedings without accepting the risk of their failure. *cf. Currie v McDonald's Restaurants of Canada Ltd* (2005) 74 O.R. (3d) 321 (CA).

[285] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC); Westlake, ss.324, 325. It may, however, be otherwise where the action instituted after the claimant has submitted to the foreign jurisdiction is brought by someone other than the defendant against whom the original claim was made: see *Murthy v Sivajothi* [1999] 1 W.L.R. 467, discussed further below, para.14–079. Indeed, if a cross-claim brought by the original defendant has nothing whatever to do with the subject matter of the original claim, but is permitted by the foreign court in accordance with its procedural law, it may still be arguable that the submission of the claimant should not be regarded as a matter of English law (whatever the foreign law may say, which is of no significance on this point) as automatically extending to proceedings and judgment in the cross-action.

[286] *GFH Capital Ltd v Haigh* [2020] EWHC 1269 (Comm.).

[287] But a defendant who wishes to enter an appearance but fails to succeed in doing so does not submit: *De Santis v Russo* [2002] 2 Qd.R 230 (Qd CA).

merits,[288] or agrees to a consent order dismissing the claims and cross-claims,[289] or where the defendant fails to appear in proceedings at first instance but appeals on the merits.[290] If the defendant takes no part in the proceedings and judgment is given in default of appearance, and the defendant later moves to set the default judgment aside, the application to set aside may be a voluntary appearance if it is based on non-jurisdictional grounds, even if the application is unsuccessful.[291] There is no English authority directly in point; in *Guiard v De Clermont*[292] the defendant applied successfully to have a default judgment set aside and to have judgment entered in his favour at first instance, but the original judgment was restored by an appeal court; he was held to have voluntarily submitted.

**14–074**    *Section 33 of the Civil Jurisdiction and Judgments Act 1982.* Where the defendant contests the jurisdiction of a foreign court, the position is regulated by s.33 of the Civil Jurisdiction and Judgments Act 1982. If the challenge to the jurisdiction of the foreign court is successful, no question of submission arises. If it is unsuccessful and the defendant goes on[293] to contest the case on the merits, the defendant will have submitted to the jurisdiction of the foreign court. But if the defendant takes no further part in the proceedings and judgment in default is entered, will the defendant be regarded as having voluntarily submitted? Common sense would suggest that a defendant who has been vigorously protesting that a court has no jurisdiction should not be regarded as having voluntarily submitted.[294] Under the 1933 Act an appearance for the purpose of (inter alia) contesting the jurisdiction is not to be regarded as a voluntary appearance.[295] But in *Harris v Taylor*,[296] decided at common law, a defendant who had entered a conditional appearance in the Isle of Man court in order to set aside the proceedings on jurisdictional grounds was held to have submitted to the jurisdiction of the Manx Court, even though

---

[288] *cf. Boissière v Brockner* (1889) 6 T.L.R. 85, criticised by Clarence Smith (1953) 2 I.C.L.Q. 510, 517–520; *McFadden v Colville Ranching Co* (1915) 8 W.W.R. 163 (Alta); *Richardson v Allen* (1916) 28 D.L.R. 134 (Alta CA).

[289] *Adams v Cape Industries Plc* [1990] Ch. 433, 461, *per* Scott J., affd. on other grounds *ibid.*, p.503 (CA).

[290] *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act); *Service Temps Inc v Macleod* [2013] CSOH 162, 2014 S.L.T. 375; *JSC BTA Bank v Turkiye Vakiflar Bankasi TAO* [2018] EWHC 835 (Comm.).

[291] This may be an explanation for *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847, where the application to set aside was based on the construction or validity of a power of attorney: a non-jurisdictional issue which had jurisdictional consequences.

[292] [1914] 3 K.B. 145.

[293] An exception may arguably arise where the claimant has no "practical alternative" to contesting the merits; *Navigators Insurance Co v Mohammed* [2015] EWHC 1137 (Comm.).

[294] *Re Dulles' Settlement (No.2)* [1951] Ch. 842, 850 (CA), *per* Denning L.J. See also *Daarnhouwer & Co NV v Boulos* [1968] 2 Lloyd's Rep. 259; *Navigators Insurance Co v Mohammed* [2015] EWHC 1137 (Comm.).

[295] 1933 Act, s.4(2)(a)(i).

[296] [1914] 3 K.B. 580 (CA); followed in *Kennedy v Trites* (1916) 10 W.W.R. 412 (BC); followed in *Dovenmuehle v Rocca Group Ltd* (1981) 34 N.B.R. (2d) 444, app. Dismissed (1982) 43 N.B.R. (2d) 359 (Sup Ct Can); *WSG Nimbus Pte Ltd v Board of Control for Cricket in Sri Lanka* [2002] 3 Sing. L.R. 603 (HC). See also *Re McCain Foods and Agricultural Publishing Co Ltd* (1979) 103 D.L.R. (3d) 734 (Ont. CA); *Mid-Ohio Imported Car Co v Tri-K Investments Ltd* (1995) 129 D.L.R. (4th) 181 (BCCA).



# DICEY, MORRIS AND COLLINS

### ON

# THE CONFLICT OF LAWS

*SECOND CUMULATIVE SUPPLEMENT TO THE
SIXTEENTH EDITION*

Up-to-date to September 1, 2024

UNDER THE GENERAL EDITORSHIP OF

## LORD COLLINS OF MAPESBURY

P.C., LL.D., LL.M., F.B.A.

AND

## PROFESSOR JONATHAN HARRIS

K.C. (Hon.), M.A., B.C.L. (Oxon.), Ph.D. (Birm.)

WITH

### SPECIALIST EDITORS



**SWEET & MAXWELL**   **THOMSON REUTERS**

*Foreign Judgments*

**14–038**  Note 166. On estoppel in class action proceedings, see also Karayanni (2022) 422 *Recueil des cours* 11.

**14–039**  Note 170. In *El Haddad v Al Rostamani* [2021] EWHC 1892 (Ch.), at [48], it was common ground that for an issue estoppel to arise it was necessary that the foreign judgment create an issue estoppel according to the foreign law, as well as according to English law. In *Bucher-Haefner v Lewinsohn* [2022] EWHC 2080 (Ch.), at [44], it was considered that an issue estoppel may also arise from the basis on which the parties obtained a court order by consent; commencing further proceedings inconsistent with the reasons given for the order was also considered to constitute an abuse of process.

Note 174. See also *Province of Balochistan v Tethyan Copper Co Pty Ltd* [2021] EWHC 1884 (Comm.), [2021] 2 Lloyd's Rep. 443, at [308].

**14–040**  Note 177. See also *Hulley Enterprises Ltd v Russia* [2023] EWHC 2704 (Comm.), [2024] K.B. 208.

Note 178. The potential estoppel effect overseas of a decision refusing enforcement of a foreign judgment may justify granting a declaration of non-enforceability rather than merely dismissing proceedings requesting enforcement: see *Kea Investments Ltd v Wikeley Family Trustee Ltd (in interim liquidation)* [2023] NZHC 3260, at [129] and [137].

**14–041**  See also *Huawei Technologies (UK) Ltd v DSV Solutions Ltd* [2023] EWHC 1505 (Comm.), [2023] 1 W.L.R. 4199, at [42] *et seq.*

**14–044**  Note 191. *Zavarco Plc v Nasir* [2020] EWHC 629 (Ch.), [2020] Ch. 651, was affirmed: [2021] EWCA Civ 1217, [2022] Ch. 105 (doctrine of merger is inapplicable to declaratory judgments).

**14–047**  Note 200. *Zavarco Plc v Nasir* [2020] EWHC 629 (Ch.), [2020] Ch. 651, was affirmed: [2021] EWCA Civ 1217, [2022] Ch. 105. See also *Município De Mariana v BHP Group (UK) Ltd* [2022] EWCA Civ 951, [2022] 1 W.L.R. 4691, at [173], analysing *Henderson v Henderson* estoppel as a form of abuse of process.

### B. *Jurisdiction of foreign courts at common law for recognition and enforcement purposes in England*

#### (1) JURISDICTION IN PERSONAM OF FOREIGN COURTS FOR RECOGNITION AND ENFORCEMENT PURPOSES IN ENGLAND

**14R–058**  The equivalent Rule in the 15th edition of the Main Work was cited with approval in *Barclays Bank Plc v Shetty* [2022] EWHC 19 (Comm.), at [90].

Note 290. See f[...]
1 W.L.R. 612, at [...]

Note 291. See al[...]

The equivalent pa[...]
in *Greys Avenue* [...]
Main Work refers [...]
tion of the foreign [...]
this must mean p[...]

Note 306. On the [...]
sion has occurred [...]
[2024] EWHC 32[...]

Note 308. The fa[...]
jurisdiction does [...]
dispute its jurisdi[...]
[118] *et seq.*

Note 309. *Barer* [...]
[2019] 1 S.C.R. 5[...]

Note 317. The eq[...]
with approval in [...]
W.L.R. 612, at [4[...]

Note 325. See als[...]
249, finding that [...]
jurisdiction agree[...]
merely because th[...]
in a different forei[...]
if the earlier proc[...]

Note 340. See al[...]
*The Common Law* [...]

Note 354. In *Alm*[...]
of Appeal decline[...]
the foreign court w[...]
Supreme Court w[...]
would be preferab[...]
of international ag[...]
ity of accession t[...]
para.14–021, and [...]

Note 387. See als[...]
*Common Law Ju*[...]