FEB 25 2010

No. 08-1191

IN THE
Supreme Court of the United States

ROBERT MORRISON, *et al.*,

*Petitioners,*

v.

NATIONAL AUSTRALIA BANK LTD., *et al.*,

*Respondents.*

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT

**BRIEF OF THE UNITED KINGDOM OF
GREAT BRITAIN AND NORTHERN IRELAND
AS *AMICUS CURIAE* IN SUPPORT OF
RESPONDENTS**

JOHN E. BEERBOWER
  *Counsel of Record*
GINA M. MAGEL
NICHOLAS P. LINGARD
CRAVATH, SWAINE & MOORE LLP
  Worldwide Plaza
  825 Eighth Avenue
  New York, NY 10019-7475
  E-mail: jbeerbower@cravath.com
  Telephone: (212) 474-1000

February 25, 2010

Blank Page

i

# TABLE OF CONTENTS

                                                                    **Page**

TABLE OF AUTHORITIES ........................................ v

INTEREST OF *AMICUS* ............................................ 1

SUMMARY OF ARGUMENT .................................... 2

ARGUMENT ............................................................. 5

I.    THE U.K. REGULATORY AND LEGAL
      SYSTEMS AND ESTABLISHED U.S.
      POLICIES AND PRECEDENTS PROVIDE
      IMPORTANT CONTEXT FOR THE
      RESOLUTION OF THE ISSUES HERE
      PRESENTED ....................................................... 5

      A.    The U.K. Regulatory and Legal Systems
            Provide Adequate Remedies for
            Securities Fraud, yet Differ in
            Important Respects from the U.S.
            Systems........................................................... 5

            1.    The U.K. Financial Markets Are
                  Subject to Strict Disclosure
                  Obligations ............................................. 6

            2.    U.K. Law Provides Multiple
                  Potential Causes of Action for
                  Securities Fraud .................................... 8

            3.    The U.K. Has a Sophisticated Legal
                  System Available for the Litigation
                  of Securities Claims, Including
                  Procedures for Group Litigation .......... 9

ii

**Page**

    B.   Relevant U.S. Policies and Precedents Are Well-Settled ........................................ 13

II.   THERE ARE SERIOUS AND SUBSTANTIAL POLICY CHOICES EMBODIED IN THE REGULATION OF THE ISSUANCE AND EXCHANGE OF SECURITIES ..................................................... 15

    A.   Reasonable Policy Makers Can and Do Differ as to Substantive Disclosure Standards ................................................. 16

    B.   Reasonable Policy Makers Can and Do Differ as to the Desirability of a Private Right of Action for Alleged Securities Fraud ......................................................... 18

    C.   Reasonable Policy Makers Can and Do Differ as to Other Important Procedural Choices ....................................................... 19

III.  SIGNIFICANT REGULATORY AND COMMERCIAL INTERESTS ARE AT STAKE IN THE ISSUES HERE PRESENTED .................................................... 21

    A.   Extraterritorial Extension of the Rule 10b-5 Private Right of Action Can Undermine Cross-Border Cooperation ...... 23

    B.   Extraterritorial Extension of the Rule 10b-5 Private Right of Action Can Impede Open Capital Markets .................. 25

**Page**

C.   Extraterritorial Extension of the
Rule 10b-5 Private Right of Action
Risks Multiple Litigations and
Inconsistent Determinations ...................... 28

IV.  THIS COURT SHOULD ADOPT CLEAR
RULES LIMITING THE
EXTRATERRITORIAL SCOPE OF § 10(b)
AND RULE 10b-5 ............................................. 29

A.   Foreign Purchasers of Securities on a
Foreign Exchange Who Are Injured By
Misleading Statements or Omissions
Made Outside of the United States By a
Foreign Issuer Should Have No Private
Right of Action Under § 10(b) or
Rule 10b-5 ..................................................... 29

B.   In the Alternative, if a Private Right of
Action Is Available, Fraudulent
Conduct in the United States That Does
Not Constitute Deceptive Acts in
Connection with the Sale of Securities
Should Be Insufficient to Create
Liability Under § 10(b) or Rule 10b-5 ........ 30

C.   Clear Rules Limiting the
Extraterritorial Scope of § 10(b) and
Rule 10b-5 Would Be Consistent with
International Law and Would Promote
Efficient Global Capital Markets .............. 33

iv

**Page**

V.   RESTRAINING EXTRATERRITORIAL
     APPLICATION OF U.S. SECURITIES
     LAWS WILL NOT LEAVE AN
     ENFORCEMENT VOID ..................................... 37

CONCLUSION ........................................................... 40

v

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baggett v. Electricians Local 915 Credit Union*,
  620 So. 2d 784 (Fla. Dist. Ct. App. 2d Dist.
  1993) ..................................................................... 38

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................. 17

*Bersch v. Drexel Firestone, Inc.*,
  519 F.2d 974 (2d Cir. 1975) ................................ 28

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975) ............................................. 27

*Campos v. Kentucky and Indiana Terminal
  Railroad*,
  [1962] 2 Lloyd's Rep. 459 ..................................... 28

*Central Bank of Denver, N.A. v. First
  Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ............................................. 14

*EEOC v. Arabian American Oil Co.*,
  499 U.S. 244 (1991) ....................................... 13, 22

*F. Hoffman-La Roche v. Empagran S.A.*,
  542 U.S 155 (2004) ............................... 2, 13, 21, 34

*First Interstate Dev. Corp. v. Ablanedo*,
  511 So. 2d 536 (Fla. 1987) .................................. 38

*Foley Bros. v. Filardo*,
  336 U.S. 281 (1949) ............................................. 22

**Page(s)**

*Gencor Ltd. v. Comm'n of the European
Communities,*
   Case T-102/96, 1999 E.C.R. II-753 ..................... 34

*Hartford Fire Ins. Co. v. California,*
   509 U.S. 764 (1993)............................................. 33

*IIT, International Investment Trust v. Vencap,
Ltd.,*
   519 F.2d 1001 (2d Cir. 1975) .............................. 37

*In re Royal Bank of Scotland Group plc
Securities Litigation,* No. 1:09-CV-00300
   (S.D.N.Y., filed Jan. 12, 2009) .............................. 1

*Lauritzen v. Larsen,*
   345 U.S. 571 (1953)............................................. 22

*Mansell v. Robinson,*
   [2007] EWHC 101 (Q.B.) ..................................... 11

*Microsoft Corp. v. AT&T Corp.,*
   550 U.S. 437 (2007)...................................21, 22, 35

*Morrison v. National Australia Bank Ltd.,*
   547 F.3d 167 (2d Cir. 2008) ........................passim

*NACCO Industries, Inc. v. Applica Inc.,*
   No. 2541-VCL 2009 WL 4981577 (Del. Ch.
   2009) .................................................................... 38

*Rossdeutscher v. Viacom, Inc.,*
   768 A.2d 8 (Del. 2001).......................................... 38

vii

**Page(s)**

*SEC v. Texas Gulf Sulphur Co.,*
   401 F.2d 833 (2d Cir. 1968) ................................. 16

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004)......................................... 2, 33

*Stoneridge Investment Partners, LLC v.
   Scientific–Atlanta, Inc.,*
   552 U.S. 148 (2008)......................................passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)............................................ 27

*TSC Indus. Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976)............................................ 16

*Webb v. Kirkland,*
   899 So. 2d 344 (Fla. Dist. Ct. App. 2d Dist.
   2005)...................................................................... 38

*Zoelsch v. Arthur Andersen & Co.,*
   824 F.2d 27 (D.C. Cir. 1987)............................... 32

## Statutes & Rules

15 U.S.C. § 78dd(b) (2000) ....................................... 14

15 U.S.C. § 78j(b)...............................................passim

15 U.S.C. § 78u(d)(3)(A) ........................................... 38

17 C.F.R. § 240.10b-5 (2007)............................passim

Civil Procedure Rules, RR. 19.10-19.15 .................. 10

viii

**Page(s)**

Civil Procedure Rules, RR. 43-45 ........................... 10

Courts and Legal Services Act 1990, 1990,
    c. 41, § 58 (U.K.) .................................................. 10

Courts and Legal Services Act 1990, 1990,
    c. 41, § 58A (U.K.) ............................................... 10

Courts and Legal Services Act 1990, 1990,
    c. 41, § 58B (U.K.) ............................................... 11

European Commission Regulation 809/2004,
    O.J. 2004 L 149/1 .................................................. 6

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. VIII (U.K.) ...................................... 7

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. XIV (U.K.) ...................................... 7

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. XXV, § 380 (U.K.) .......................... 8

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. XXV, § 381 (U.K.) .......................... 8

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. XXV, § 382 (U.K.) .......................... 8

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. XXV, § 384 (U.K.) .......................... 8

Financial Services and Markets Act 2000,
    2000, c. 8, Pt. XXVII, § 397 (U.K.)........................ 7

ix

**Page(s)**

Financial Services and Markets Act 2000,
  2000, c. 8, Pt. VI, § 87A (U.K.) ........................... 17

Financial Services and Markets Act 2000,
  2000, c. 8, § 90 (U.K.) .................................8, 11, 17

Financial Services and Markets Act 2000,
  2000, c. 8, Pt. VI, § 90A (U.K.) ............................ 9

Financial Services and Markets Act 2000,
  2000, c. 8, Pt. VI § 91 (U.K.) ................................. 7

Financial Services Authority Disclosure Rules
  and Transparency Rules, R. 2.2 .......................... 7

Financial Services Authority Disclosure Rules
  and Transparency Rules, RR. 4.1-4.3 ................. 7

Financial Services Bill 2009, Bill [6] (Eng.) ............ 12

Senior Courts Act 1981, 1981, c. 54, § 69
  (Eng.) .................................................................... 11

Solicitors Act 1974, 1974, c. 47, § 59 (U.K.) ............ 10

Termination of a Foreign Private Issuer's
  Registration of a Class of Securities,
  Exchange Act Release No. 34-55540, 72
  Fed. Reg. 16934-01, 16934-35 (Apr. 5, 2007) ..... 26

U.N. Charter art. 2.................................................... 33

x

**Page(s)**

**Other Authorities**

Am. Coll. of Trial Lawyers Task Force on
    Discovery & Inst. for the Advancement of
    the Am. Legal Sys., *Final Report* (Mar. 11,
    2009) .................................................................... 20

Andrews, Neil H., *The Modern Civil Process*
    (2008) .................................................................... 10

Bloomberg, Michael R. & Schumer, Charles E.,
    *Sustaining New York's and the US' Global
    Financial Services Leadership* (Jan. 2007) ........ 26

Coffee, John C., Jr., *Global Class Actions*,
    Nat'l Law J., June 11, 2007 ................................ 27

Davies, Paul, *Final Report* (June 2007) .................. 18

Davies, Paul, *Liability for Misstatements to the
    Market* (Mar. 2007) ............................................... 9

Group of 20, *Washington Declaration: G-20
    Summit on Financial Markets and the
    World Economy* (Nov. 15, 2008) ......................... 23

H.M. Treasury, *Embracing Financial
    Globalisation* (May 2008) ................................... 25

Jackson, Rt. Hon. Lord Justice, *Review of Civil
    Litigation Costs: Final Report* (Dec. 2009)... 12, 13

Lowe, Vaughan, *International Law* (2007) ............. 35

xi

**Page(s)**

Memorandum of Understanding Concerning
    Consultation, Cooperation and the
    Exchange of Information Related to Market
    Oversight and the Supervision of Financial
    Services Firms, SEC-FSA, Mar. 14, 2006.......... 24

Ministry of Justice, *The Government's*
    *Response to the Civil Justice Council's*
    *Report: "Improving Access to Justice*
    *through Collective Actions"* (July 2009) ............. 11

Nat'l Econ. Council & Office of Sci. and Tech.
    Policy, Executive Office of the President, *A*
    *Strategy for American Innovation: Driving*
    *Towards Sustainable Growth and Quality*
    *Jobs* (Sept. 2009)................................................. 25

Press Release, SEC, SEC Announces Initiative
    to Encourage Individuals and Companies
    to Cooperate and Assist in Investigations
    (Jan. 13, 2010)..................................................... 25

Press Release, SEC, SEC Office of
    International Affairs and Divisions of
    Market Regulation and Corporation
    Finance Release Fact Sheet (June 16, 2006)..... 26

Restatement (Third) of the Foreign Relations
    Law of the United States (1987) .................passim

## INTEREST OF *AMICUS*[1]

The United Kingdom is committed to the rule of law. It has a comprehensive system of securities regulation and long-established private law remedies. The United Kingdom has made numerous important policy choices regarding securities regulation and litigation practices and procedures. Many of those choices reflect a balancing of interests and policies that differs from the balances that have been struck in the United States.

The Government of the United Kingdom is responsible for formulating and implementing the financial and economic policies of the country. It has a strong interest in ensuring that companies based in the United Kingdom comply with its laws. In addition, as a result of the recent economic crisis, the Government of the United Kingdom has become a significant equity holder in various domestic financial institutions.[2]

---

[1] The parties have consented to the filing of all timely *amicus curiae* briefs. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to this brief's preparation or submission.

[2] For example, the United Kingdom is now an 84% shareholder of The Royal Bank of Scotland Group plc, which entity is a defendant in a securities class action fraud case currently pending in the Southern District of New York. *In re Royal Bank of Scotland Group plc Sec. Litig.*, No. 1:09-CV-00300 (S.D.N.Y., filed Jan. 12, 2009).

2

Although there is no U.K. party in this case, the broad assertion of extraterritorial jurisdiction by United States courts implicates the legitimate sovereign interests and policy choices of the United Kingdom. The risk of infringing upon the sovereignty of other nations is a particular concern with respect to the regulation of securities transactions, especially in cases involving foreign purchasers, a foreign issuer, and alleged harm suffered in transactions on a foreign securities exchange (so-called "foreign-cubed" securities cases).

The United Kingdom has previously voiced its concerns about an expansive extraterritorial application of United States law.[3] This Brief reiterates and articulates those concerns in the specific context of private securities litigation.

## SUMMARY OF ARGUMENT

The United Kingdom respectfully submits that the proper recognition of the sovereignty of other nations, the development of sophisticated regulation of the issuance and trading of securities within numerous nations, the globalization of capital markets, the increasing interdependence of national

---

[3] *See, e.g.,* Brief of the United Kingdom of Great Britain and Northern Ireland, Ireland and the Kingdom of the Netherlands as *Amici Curiae* in Support of Petitioners, *F. Hoffman-La Roche v. Empagran S.A.,* 542 U.S 155 (2004) (No. 03-724); Brief of the Governments of the Commonwealth of Australia, the Swiss Confederation and the United Kingdom of Great Britain and Northern Ireland as *Amici Curiae* in Support of the Petitioner, *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004) (No. 03-339).

3

economies and principles of comity and international relations all support the affirmance of the result reached below by the United States Court of Appeals for the Second Circuit.

The United Kingdom also respectfully urges this Court to use this opportunity to set forth a clear rule limiting the extraterritorial application of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[4] and Rule 10b-5[5] promulgated thereunder by the Securities and Exchange Commission ("SEC").[6]

The policy interests addressed herein would be best served by adoption of the following rule:[7]

> Foreign purchasers of securities on a foreign exchange who are injured by misleading statements or omissions made outside of the United States by a foreign issuer have no private right of action under § 10(b) or Rule 10b-5.

---

[4] 15 U.S.C. § 78j(b).

[5] 17 C.F.R. § 240.10b-5 (2007).

[6] Petitioners argue, and Respondents accept, that the formulation of the issue as one of subject matter jurisdiction is incorrect. *See* Brief for Petitioners 15-32; Brief for Respondents 22. The United Kingdom takes no position.

[7] This proposed rule is addressed to claims by foreign investors, since those are the claims considered below and now before this Court. The policy considerations set forth herein apply also to claims by U.S. investors purchasing securities of a foreign issuer on a foreign exchange.

4

In the alternative, if a private right of action is to be potentially available in these circumstances, then these same policy interests would be served by the following clarification in the test promulgated to govern "foreign-cubed" securities cases:

> Fraudulent conduct occurring in the United States that does not itself constitute deceptive acts in connection with the sale of securities is insufficient to create liability under § 10(b) and Rule 10b-5.

The considerations described herein, as well as long-established principles of U.S. law, support the adoption by this Court of either of these alternative rules of law concerning the applicability of § 10(b) of the Exchange Act and of Rule 10b-5.

5

## ARGUMENT

I. **THE U.K. REGULATORY AND LEGAL SYSTEMS AND ESTABLISHED U.S. POLICIES AND PRECEDENTS PROVIDE IMPORTANT CONTEXT FOR THE RESOLUTION OF THE ISSUES HERE PRESENTED**

### A. The U.K. Regulatory and Legal Systems Provide Adequate Remedies for Securities Fraud, yet Differ in Important Respects from the U.S. Systems

We set out below a brief overview of the U.K. regulatory and legal systems governing the issuance and trading of securities.[8] This overview underscores two points, each central to the arguments that follow: (i) the U.K., like many other nations, has a sophisticated financial regulatory system and substantive and procedural rules for remedying securities fraud; and (ii) the U.K.'s

---

[8] Although we refer in this Brief to the laws of the United Kingdom, the U.K. is in fact comprised of three jurisdictions: England and Wales; Scotland; and Northern Ireland. The principal statute regulating securities disclosure, the Financial Services and Markets Act 2000 ("FSMA"), applies throughout the U.K. Financial Services and Markets Act 2000, 2000, c. 8 (U.K.) (as amended 2006). In the other areas relevant to this Brief, the substantive law in effect in all three jurisdictions is substantially similar although each jurisdiction has its own courts and rules of civil procedure. For simplicity, this Brief uses terminology and references appropriate to England and Wales.

6

approach to securities regulation and litigation differs in important respects from that of the U.S., and those differences represent legitimate policy choices and sovereign interests that ought to be respected by the United States.

### 1.   The U.K. Financial Markets Are Subject to Strict Disclosure Obligations

The European Union ("E.U.") Prospectus Regulation[9] sets out the content requirements for prospectuses issued by U.K. and other E.U. companies. The liability regime for prospectuses is set out in the FSMA and rules made under it.[10] Similarly, the FSMA and associated rules provide for a liability regime and specify requirements for periodic disclosures, such as annual and bi-annual financial reports and interim management statements, to be issued by companies whose shares are admitted to trading on a regulated market.[11]

---

[9] Commission Regulation 809/2004, O.J. 2004 L 149/1, corrected by O.J. 2004 L 215/3. In the areas of requirements for prospectuses, periodic financial disclosures and other ad hoc disclosure requirements for issuers whose securities are admitted to trading on a E.U.-regulated market, the E.U. has adopted Regulations and Directives harmonizing laws among the E.U. member states. Regulations of the E.U. automatically become part of the laws of a E.U. member state upon their coming into force. Directives of the E.U. are transposed into the laws of a member state by domestic legislation.

[10] *See* Financial Services Authority Prospectus Rules, *available at* http://fsahandbook.info/FSA/html/handbook/PR.

[11] *See* Financial Services Authority Disclosure Rules and Transparency Rules (DTR), *available at* http://fsahandbook.info/

7

The U.K. has (along with the rest of the E.U.) adopted a stringent "continuous disclosure" regime under which, subject only to specified exceptions, an issuer whose shares are admitted to trading on a regulated market must announce without delay any precise information directly concerning it which would be likely to have a significant effect on the price of its securities.[12]

The Financial Services Authority ("FSA") is an independent statutory authority responsible for the regulation of financial services and markets in the U.K., and related enforcement activities. The enforcement powers of the FSA include the powers to: impose penalties for a breach of its listing rules, disclosure rules, prospectus rules or transparency rules;[13] impose penalties for market abuse;[14] bring criminal proceedings for specified misleading statements and practices;[15] fine or censure authorized firms;[16] apply for an injunction where there is reasonable likelihood of contravention, or continuing contravention, of the FSMA;[17] and order

---

FSA/html/handbook/DTR. Rules 4.1-4.3 address periodic financial reporting.

[12] *See* DTR 2.2.

[13] FSMA Pt. VI, § 91.

[14] FSMA Pt. VIII.

[15] FSMA Pt. XXVII, § 397.

[16] FSMA Pt. XIV.

[17] FSMA Pt. XXV, §§ 380-381.

8

restitution where any such provision has been contravened.[18]

## 2.   U.K. Law Provides Multiple Potential Causes of Action for Securities Fraud

U.K. law provides multiple potential causes of action—at common law and under statute—for persons who suffer loss in connection with alleged misstatements or omissions in prospectuses and other securities disclosures.

At common law, actions may be available for fraud or deceit, negligent misrepresentation, and innocent misrepresentation. Common law liability may arise not only from affirmative misrepresentations, but also from omissions in cases where there is a duty to disclose. Such actions may also be available where an omission has the effect of rendering a statement misleading.

The FSMA provides statutory causes of action in connection with prospectuses and other prescribed disclosures. Specifically, § 90 of the FSMA provides that a person who acquires securities to which a prospectus applies has the right to claim compensation for loss suffered as a result of any untrue or misleading statement in the prospectus or the omission of any matter required to be included. Section 90 does not specify a requirement of

---

[18] FSMA Pt. XXV, §§ 382-384.

9

"reliance"[19] nor does it require a showing of scienter, liability being presumed unless a due diligence defense can be established. The FSMA also provides the right to claim compensation for a false or misleading financial report or other prescribed statement.[20]

### 3. The U.K. Has a Sophisticated Legal System Available for the Litigation of Securities Claims, Including Procedures for Group Litigation

There is no impediment to a court in the U.K. having jurisdiction to hear a claim brought by any plaintiff, irrespective of domicile or nationality, against a company incorporated in that part of the U.K., unless a court in another part of the European Economic Area[21] is already seized of the case. However, in cases involving non-E.U. defendants, the court may decline to take jurisdiction by reason of *forum non conveniens*. There is no significant delay in bringing large civil cases to trial in the High Court

---

[19] *See generally* Paul Davies, *Liability for Misstatements to the Market* ¶ 27 (Mar. 2007), *available at* http://www.hm-treasury.gov.uk/d/davies_discussionpaper_260307.pdf [hereinafter "Davies Review"].

[20] FSMA Pt. VI, § 90A. This Brief is not intended to contain an exhaustive enumeration of all remedies that may be available at common law or under statute; for example, § 2(1) of the Misrepresentation Act 1967 also provides a cause of action for certain misrepresentations made in pre-contract negotiations by one party to another. Misrepresentation Act 1967, 1967, c. 7, § 2(1) (Eng.).

[21] Except for Liechtenstein.

10

of Justice,[22] which is the court of first instance for most securities matters.

The proceedings available to a claimant in England and Wales include multi-party litigation under the Group Litigation Order procedure, an "opt-in" procedure.[23] In line with the usual English rule, costs follow the event in group litigation. Conditional fee agreements are permitted in litigation in U.K. courts, subject to restrictions;[24] however, contingency fees are not permitted.[25] Litigation funding is not per se prohibited, but agreements may be unenforceable if they tend to corrupt public justice or threaten the integrity of the

---

[22] A significant reduction in the number of medium and large cases taken to the High Court since 1999 has ameliorated congestion in that Court. *See generally* Neil H. Andrews, *The Modern Civil Process* 10.08 (2008).

[23] *See* Civil Procedure Rules ("CPR"), 19.10-19.15, *available at* http://www.justice.gov.uk/civil/procrules_fin/contents/parts/part19.htm.

[24] *See, e.g.,* Courts and Legal Services Act 1990, 1990, c. 41, §§ 58, 58A (U.K.); CPR 43-45.

[25] *See* Solicitors Act 1974, 1974, c. 47, § 59 (U.K.); Courts and Legal Services Act 1990, § 58(1); Solicitors Code of Conduct, R. 2.04 (2007).

11

litigation process.[26]   Trial by jury is rare in U.K. private securities fraud litigation.[27]

The regime for issuer liability, the forms of collective proceeding available to claimants and civil litigation costs have all recently been the subject of specific policy reviews in the United Kingdom:

> (i)    Issuer liability: the FSMA was enacted only after extensive consultation and legislative scrutiny. A subsequent Review of Issuer Liability incorporated consultation with a wide range of interested parties.[28]

> (ii)    Collective proceedings: reforms of the law relating to collective proceedings

---

[26] *See Mansell v. Robinson*, [2007] EWHC 101, ¶¶ 5-7 (Q.B.) (Underhill, J.).   Section 58B of the Courts and Legal Services Act 1990 would provide statutory recognition to the concept of third party litigation funding, but the section has not been brought into force.

[27] Trial of civil fraud actions is, in principle, by jury. However, a claim for compensation in respect of a prospectus under § 90 of the FSMA does not require a showing of fraud. *See* Davies Review, *supra* note 19, at ¶¶ 27-28. Moreover, even in fraud cases, jury trial is not required if "the court is of the opinion that the trial requires any prolonged examination of documents or accounts".   Senior Courts Act 1981, 1981, c. 54, § 69 (Eng.) (with respect to the Queen's Bench Division); *see generally* Davies Review, *supra* note 19, at ¶ 114.

[28] *See* Davies Review, *supra* note 19; Ministry of Justice, *The Government's Response to the Civil Justice Council's Report: "Improving Access to Justice through Collective Actions"* (July 2009), *available at* http://www.justice.gov.uk/about/docs/government-response-cjc-collective-actions.pdf [hereinafter "Government Response"].

12

were considered in depth by the Civil Justice
Council, to whose report the Government
issued a reasoned response.[29] The U.K.
Government has recently introduced a
Financial Services Bill to Parliament[30] which,
if enacted, will make provision for collective
proceedings (on an "opt-in" or "opt-out" basis,
in the court's discretion) against persons
engaged in financial services or payment
services business in respect of claims arising
in connection with the services provided by
them. The U.K. Government has, however,
chosen not to create a general "opt-out" class
action regime for securities litigation against
issuers.

(iii)    Civil litigation costs: a senior
judge has just completed a Review of Civil
Litigation Costs, the Final Report of which
was published in January 2010.[31] The Review
recommends that (other than in personal
injury, defamation and judicial review cases)
the rule should continue to be that the loser
pay the winner's costs, with the court having
discretion to order otherwise to better
facilitate access to justice.[32] The Review also

---

[29] *See* Government Response, *supra* note 28.

[30] Financial Services Bill 2009, Bill [6] (Eng.).

[31] Rt. Hon. Lord Justice Jackson, *Review of Civil Litigation Costs:    Final Report* (Dec. 2009), *available at* http://www.judiciary.gov.uk/about_judiciary/cost-review/jan2010/ final-report-140110.pdf [hereinafter "Jackson Report"].

[32] *Id.* at 334, 329, 310.

13

proposes that contingency fee arrangements should be permitted subject to conditions to safeguard the interest of clients.[33] These recommendations will now be studied by the U.K. Government.

## B. Relevant U.S. Policies and Precedents Are Well-Settled

The parties and other *amici* have fully described the relevant precedents and long-established principles of U.S. law that provide the basis on which the issues raised by the Petition should be analyzed. We simply list the key points.

> (i) Absent express congressional direction to the contrary, U.S. laws are presumed to apply only within the United States. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).

> (ii) Absent express congressional direction to the contrary, principles of comity and customary international law are to guide U.S. courts in interpreting legislation, so as to "avoid unreasonable interference with the sovereign authority of other nations". *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *see* Restatement (Third) of the Foreign Relations Law of the United States §§ 403(1), 403(2) (1987) [hereinafter "Restatement"].

---

[33] *Id.* at 133.

14

(iii)    The Exchange Act contains no express congressional direction as to the extraterritorial application of § 10(b).    The only language in the U.S. Securities Acts that is relevant to the question clearly suggests a lack of intended application outside the United States.[34]

(iv)    The private right of action under Rule 10b-5 is a judicially created implied right to be expanded only with caution. *Stoneridge Investment Partners, LLC v. Scientific– Atlanta, Inc.*, 552 U.S. 148, 164-166 (2008).

(v)    In actions brought by private parties, there is no liability under § 10(b) for "aiding and abetting". *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

(vi)    In actions brought by private parties, there is no liability under § 10(b) for misleading acts or statements upon which investors did not rely. *Stoneridge*, 552 U.S. at 166-167.

---

[34] The Exchange Act and any rule or regulation made thereunder "shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate to prevent the evasion of [the Exchange Act]." 15 U.S.C. § 78dd(b) (2000). No such rules and regulations have been prescribed.

15

## II. THERE ARE SERIOUS AND SUBSTANTIAL POLICY CHOICES EMBODIED IN THE REGULATION OF THE ISSUANCE AND EXCHANGE OF SECURITIES

The Second Circuit, Petitioners and several *amici* have seriously underestimated the range and importance of legitimate differences that exist with respect to securities regulation.[35]   The conclusory observation that there can be no serious objection by a foreign sovereign to the application of a more stringent U.S. standard for fraud[36] ignores highly significant consequences of the extraterritorial application of the U.S. securities laws, especially of the Rule 10b-5 private right of action.

Similarly, the assertion by Petitioners—and in the Restatement—that there is no record of conflicts between the securities fraud provisions of the United States and those of foreign nations[37] is misleading. There are substantive differences reflecting legitimate policy choices.   Moreover, the panoply of procedural rules and remedies that accompany litigation in federal courts under U.S. securities laws

---

[35] *See, e.g., Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 175 (2d Cir. 2008); Brief for Petitioners 35-42; Brief for Alecta Pensionsförsäkring, Ömsesidigt, AmpegaGerling Investment GmbH, APG Algemene Pensioen Groep N.V., ATP - Arbejdsmarkedets, *et al.* as *Amici Curiae* 20-22.

[36] *See, e.g., Morrison*, 547 F.3d at 175 (citing *IIT, Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 921 (2d Cir. 1980)).

[37] *See* Brief for Petitioners 38; Restatement § 416, Reporters' Note 3.

16

creates a very different environment for the commencement, prosecution and settlement of lawsuits than exists in other jurisdictions. Application of U.S. securities laws brings with it the full force of the U.S. legal system and real conflicts with other legal systems.

## A. Reasonable Policy Makers Can and Do Differ as to Substantive Disclosure Standards

All securities regulatory regimes impose disclosure obligations on issuers. But, the precise contours of those obligations differ in important respects, including as to the subject matter of required disclosures and methods of establishing a contravention of the substantive standards.

As to the subject matter of required disclosures, both the United States and the United Kingdom require, in various contexts, disclosure of "material" information, yet materiality is defined in different ways. In the U.S., "material" is understood to mean that the information "may affect the desire of investors to buy, sell, or hold the company's securities", *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc), and would have been regarded by a "reasonable investor as having significantly altered the 'total mix' of information available". *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In the U.K., the statutory formulation of disclosure obligations varies with the type of corporate statement (prospectuses and other fund-raising documents, periodic corporate reports and ad hoc corporate announcements). As one example, in issuing a prospectus, a company whose

17

shares are admitted to trading on a regulated market must meet enumerated disclosure obligations and must also disclose other information "necessary to enable investors to make an informed assessment of" the issuer and the securities on offer.[38]

These differences in materiality formulations are not only matters of language or nuance; they reflect legitimate policy decisions, such that disclosure obligations differ in critical respects between jurisdictions. The same analysis is true with respect to the requirements for establishing a violation of disclosure obligations and, in particular, whether plaintiffs can rely on the "fraud on the market" theory. In U.S. securities law, the fraud on the market theory represents judicial acceptance of one strand of financial economics,[39] while in the U.K. a similar principle exists by virtue of the statutory formulation of the cause of action for a misleading prospectus under § 90 of the FSMA, which does not require proof of reliance.[40] For periodic financial reports, however, reliance is a necessary condition to a claim in the U.K., for which a higher fraud-based standard of liability is designed to reduce the risk of "unmeritorious claims for large sums" and of "encourag[ing] defensive and bland reporting".[41] The

---

[38] FSMA Pt. VI, § 87A.

[39] *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-247 (1988).

[40] *See* Davies Review, *supra* note 19, at ¶ 27.

[41] Paul Davies, *Final Report* ¶¶ 18, 9 (June 2007) *available at* http://www.hm-treasury.gov.uk/d/davies_review_finalreport_040607.pdf.

18

common law causes of action in England and Wales
continue to require proof of actual reliance.

Thus, under the major national regulatory
schemes, issuers face different substantive disclosure
requirements and plaintiffs confront different
burdens in establishing a contravention of those
requirements. Such differences arise even as
between jurisdictions that have well-developed
securities regulatory regimes, such as the U.K. and
the U.S.

### B. Reasonable Policy Makers Can and Do Differ as to the Desirability of a Private Right of Action for Alleged Securities Fraud

Reasonable policy makers can and do differ as to
the desirability and appropriateness of even having a
private right of action against an issuer for securities
fraud. Unlike a claim against an individual
wrongdoer that would be paid from personal assets, a
claim against a public company by former
shareholders, if successful, imposes the costs of
compensation for losses on current shareholders.
Often the current shareholders were not owners of
the company at the time of the wrongdoing. In such
cases, the result can be a mere transfer of wealth
from one group of innocent investors to another, with
large transaction costs in the form of legal fees and
expenses. To the extent current shareholders were
also shareholders at the time of the fraud, then the
transfers will be to oneself, with the subtraction of
large transaction costs. It is not obvious that such a
right of action is good policy; it is obvious, however,
that it is not the only reasonable policy.

19

## C.  Reasonable Policy Makers Can and Do Differ as to Other Important Procedural Choices

Jurisdiction in U.S. courts brings a host of procedural ramifications that are potentially inconsistent or in conflict with the policy choices made in other jurisdictions, including the U.K. Such matters include:[42]

    (i)    The scope of discovery;

    (ii)    The availability of class actions or other forms of multi-party litigation;

    (iii)    The availability of "opt-out" classes, whether by default or in the court's discretion;

    (iv)    The availability of contingency fee arrangements for plaintiffs' counsel;

    (v)    The availability of attorney fee awards against an unsuccessful party;

    (vi)    The legality of third-party litigation funding;

    (vii)    The availability of jury trials; and

    (viii)    The expected time to bring a case to trial.

---

[42] We have set out, *supra* Part I.A.3, the rules applicable in the U.K. on each of these matters.

20

Each of these procedural matters shapes the incentives to pursue legal redress in a particular jurisdiction[43] and may have a material impact on the outcome of a given case. Moreover, the proper policy choice as to each is neither obvious nor the subject of widespread agreement.[44] In fact, the long U.S. experience with the choices it has made with respect to many of these matters has given rise not to internal unanimity and consensus, but to increasingly serious controversy and proposals for change.[45]

Most importantly, the assertion by the Second Circuit that "anti-fraud enforcement objectives are broadly similar as governments and other regulators are generally in agreement that fraud should be discouraged", *Morrison*, 547 F.3d at 175, may be true, but is not pertinent to the analysis here. It fails to recognize and credit the diverse interests of other nations' legal and regulatory schemes. Attempts by Petitioners[46] to distinguish the present case from this Court's jurisprudence on the

---

[43] *See, e.g.*, Am. Coll. of Trial Lawyers Task Force on Discovery & Inst. for the Advancement of the Am. Legal Sys., *Final Report* 9 (Mar. 11, 2009), *available at* http://www.actl.com/ (follow "All Publications" hyperlink; then follow "ACTL-IAALS Official Final Report" hyperlink) (discussing how U.S. procedural rules may incentivize defendants to settle even unmeritorious claims) [hereinafter "Task Force Report"].

[44] *See, e.g.*, Jackson Report, *supra* note 31, at chs. 12, 33, 37. As to the availability of jury trials, *see* Andrews, *supra* note 22, at § 2.39 n. 93.

[45] *See, e.g.*, Task Force Report, *supra* note 43.

[46] *See, e.g.*, Brief for Petitioners 36-38, 40.

21

extraterritorial application of U.S. antitrust and patent law based on this assertion fail for the same reason.[47]

## III. SIGNIFICANT REGULATORY AND COMMERCIAL INTERESTS ARE AT STAKE IN THE ISSUES HERE PRESENTED

The fundamental interest at stake is the right of sovereign nations to make these policy determinations for themselves and to have their choices respected by other nations. This Court has

---

[47] In *Empagran*, the Court held that application of the Sherman Act to purely foreign economic injury risked interfering with the competition laws of other countries, which may diverge from U.S. antitrust laws. 542 U.S. at 167. In particular, the Court emphasized the relative novelty of treble damages in private U.S. antitrust actions, and the risk that incentives to participate in foreign competition authorities' leniency programs would be diminished if foreign injury could be pursued in U.S. private actions. *Id.*

In *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 441-444, 454-455 (2007), a patent case, the Court applied the "presumption that United States law governs domestically but does not rule the world" to buttress its conclusion that U.S. patent law does not apply to certain foreign activities. The presumption applies with equal force here. Petitioners argue that there is a relevant difference in giving foreign citizens redress in U.S. courts for fraudulent conduct that occurred here, but as we show in Part V below, restraining the extraterritorial application of § 10(b) and Rule 10b-5 would not deny remedies for fraud that occurs in the U.S. and would not leave an enforcement void: both securities and non-securities fraud claims could be pursued abroad, and action might be taken domestically by the SEC in appropriate cases or by private plaintiffs in state courts.

22

recognized that "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Arabian American Oil Co.*, 499 U.S. at 248 (quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949)).    Further, "United States law governs domestically but does not rule the world", *Microsoft*, 550 U.S. at 454, and "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains". *Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953).  It is especially inappropriate to apply U.S. laws to claims that "may embody different policy judgments". *Microsoft*, 550 U.S. at 455.  The regulation of securities markets involves exactly the kind of "policy judgments" where sovereignty should be respected and expansive extraterritorial application of U.S. law is inappropriate.

Nations have a strong interest in regulating their own capital markets, developing disclosure rules to govern their own issuers, deciding how and when class action shareholder litigation should occur and determining the penalties for violations of such laws.  Such decisions vary among countries with different regulatory, legislative and financial concerns.    U.S. judicial interference in those decisions risks damaging the mutual respect that comity is meant to protect and could be perceived as

23

an attempt to impose American economic, social and judicial values.[48]

In addition to general policy concerns regarding comity, extending the extraterritorial scope of Rule 10b-5 carries several specific risks.

## A. Extraterritorial Extension of the Rule 10b-5 Private Right of Action Can Undermine Cross-Border Cooperation

The international community has made a commitment to strengthening cross-border cooperation in the consistent regulation of financial markets. In late 2008, the Group of 20 (G-20) issued a declaration on the financial crisis. It reaffirmed its commitment to reinforcing international cooperation and strengthening international regulatory standards while noting that "*[r]egulation is first and foremost the responsibility of national regulators* who constitute the first line of defense against market instability" and that "[r]egulators must ensure that their actions support market discipline, *avoid potentially adverse impacts on other countries*, including regulatory arbitrage, and support competition, dynamism and innovation in the marketplace." G-20, *Washington Declaration: G-20 Summit on Financial Markets and the World Economy* ¶ 8 (Nov. 15, 2008), *available at* http://www.g20.org/Documents/g20_summit_declaration.pdf (emphasis added).

---

[48] *See* Restatement § 403, cmt. g (stating that statutes should be construed to avoid "conflict with the law of another state that has a clearly greater interest").

24

The U.K. and the U.S. have been active in promoting cross-border cooperation in the field of securities regulation and supervision, both through international organizations such as the G-20 and the International Organization of Securities Commissions and through bilateral cooperation initiatives. The close cooperation of the U.K. FSA and the U.S. SEC in securities law enforcement matters is supported by their broader strategic dialogue on matters of common interest.[49]

Expansive extraterritorial application of the Rule 10b-5 private right of action risks undermining the kind of global regulatory cooperation that the current economic situation demands and the G-20 calls for. The effectiveness of any action by a foreign regulator—such as the U.K. FSA—is threatened by the unpredictable specter of private litigation in U.S. courts.[50]

---

[49] *See* Memorandum of Understanding Concerning Consultation, Cooperation and the Exchange of Information Related to Market Oversight and the Supervision of Financial Services Firms, SEC-FSA, Mar. 14, 2006, at http://www.sec.gov/about/offices/oia_multilateral/ukfsa_mou.pdf [hereinafter "MOU"].

[50] The FSA has recently revised its enforcement guidance to include specific provisions for leniency in respect of cooperation. On January 13, 2010, the SEC also adopted new tools to "foster cooperation" and create greater incentives for individuals and companies to cooperate with its regulations. These tools include proffer agreements, cooperation agreements and deferred prosecution and non-prosecution agreements. Press Release, SEC, SEC Announces Initiative to Encourage Individuals and Companies to Cooperate and Assist in Investigations (Jan. 13, 2010), *available at* http://www.sec.gov/

25

## B.   Extraterritorial Extension of the Rule 10b-5 Private Right of Action Can Impede Open Capital Markets

The United Kingdom believes that open, effectively regulated and efficiently functioning financial markets bring economic benefits to all participants.[51]  The President of the United States has also recently reiterated his support for open capital markets.[52]

Extraterritorial extension of the Rule 10b-5 private right of action may impede open capital markets.  It substantially raises the risk of exposing foreign issuers to unforeseen class actions, thereby discouraging foreign investment in United States businesses and inhibiting cross-border capital flows. Application of U.S. securities laws to foreign issuers engaged in foreign transactions raises the cost of doing business in the U.S. and could deter

---

news/press/2010/2010-6.htm.  Incentives for foreign issuers to take advantage of these tools and cooperate with securities regulators are diminished by the unpredictable risk of private litigation in U.S. courts.

[51] *See generally* H.M. Treasury, *Embracing Financial Globalisation* (May 2008), *available at* http://www.hm-treasury.gov.uk/d/embracing_financial_globalisation300508.pdf.

[52] *See* Nat'l Econ. Council & Office of Sci. and Tech. Policy, Executive Office of the President, *A Strategy for American Innovation: Driving Towards Sustainable Growth and Quality Jobs* 15-16 (Sept. 2009).

26

corporations from operating within the U.S. or participating in U.S. financial markets.[53]

As this Court has recently reiterated, "[p]rivate securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals

---

[53] The Schumer-Bloomberg Report found that meritless securities class action lawsuits and settlements in the United States with their attendant costs and possibility of director and officer liability have made London and other European capitals more attractive venues for listing and investment for some businesses than the United States. *See* Michael R. Bloomberg & Charles E. Schumer, *Sustaining New York's and the US' Global Financial Services Leadership* 73-78 (Jan. 2007), *available at* http://www.abanet.org/buslaw/committees/CL116000pub/materials/library/NY_Schumer-Bloomberg_REPORT_FINAL.pdf [hereinafter "Schumer-Bloomberg Report"]. This Court recognized similar concerns in *Stoneridge*, 552 U.S. at 164.

Indeed, during the recent round of speculation about cross-border mergers of stock exchanges, the SEC took pains to reassure foreign stock exchanges that their association with U.S. counterparts would not result in an exportation of the entire U.S. legal and regulatory regime to public companies listed on their markets. *See* Press Release, SEC, SEC Office of International Affairs and Divisions of Market Regulation and Corporation Finance Release Fact Sheet (June 16, 2006), *available at* http://www.sec.gov/news/press/2006/2006-96.htm. The SEC has also explained that it wishes to remove "a disincentive to foreign private issuers accessing the U.S. public capital markets". *See* Termination of a Foreign Private Issuer's Registration of a Class of Securities, Exchange Act Release No. 34-55540, 72 Fed. Reg. 16934-01, 16934-35 (Apr. 5, 2007). The SEC has recognized that enabling foreign companies to avoid the application of U.S. securities law requirements in appropriate circumstances will make the U.S. a more attractive venue for listing and investment.

27

whose conduct conforms to the law". *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).[54] Such class actions "disruptively expos[e] foreign corporations to a litigation environment in which plaintiffs arguably have undue leverage", and "the United States' foreign neighbors must fear that a global class action in a U.S. court may threaten the solvency of even their largest companies and could have an adverse impact on the interests of local constituencies, including labor, creditors and local communities." John C. Coffee, Jr., *Global Class Actions*, Nat'l Law J., June 11, 2007, at 12.

At the same time, a concern that some jurisdictions may not have regulatory and legal systems that are perceived as adequate does not justify or necessitate the U.S. taking on the role of international securities policeman. Investors knowingly buy into the financial, legal and regulatory regimes of the jurisdictions in which they purchase or trade securities. Inherent in their investment decisions—and in the global flow of capital—is a choice of varying safeguards. The market will align incentives appropriately if issuers are held responsible by the jurisdiction in which they have issued their securities and if investors know they can seek redress for harms in the jurisdiction in which they purchased or traded securities. Indeed, such a restrained approach should encourage less

---

[54] *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975) ("There has been widespread recognition that litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general.").

28

developed financial regulatory regimes to adopt clear and enforceable rules to encourage investment in their financial markets.

### C. Extraterritorial Extension of the Rule 10b-5 Private Right of Action Risks Multiple Litigations and Inconsistent Determinations

Serious doubt exists as to whether a judgment or court-approved settlement in a U.S. securities class action would bind a non-U.S. plaintiff who did not opt out of the class. This issue has been addressed directly in only one English case, where the judge, *obiter*, expressed doubt as to whether a foreign "opt-out" class action could give rise to *res judicata*.[55] Thus, since the common law of England and Wales and U.K. legislation provide various causes of action for misstatements and omissions in connection with securities, it is possible that plaintiffs could have two bites of the apple and defendants could face inconsistent outcomes. There is the accompanying risk that the "precious resources of United States courts and law enforcement agencies" could be devoted to cases that may be unfairly duplicated in other jurisdictions. *Bersch v.*

---

[55] *Campos v. Kentucky and Indiana Terminal Railroad*, [1962] 2 Lloyd's Rep. 459, 473 ("[T]here is great force in [the] contention that in accordance with English private international law a foreign judgment could not give rise to a plea of *res judicata* in the English Courts unless the party alleged to be bound had been served with the process which led to the foreign judgment.") (McNair, J.).

29

*Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir. 1975).

## IV. THIS COURT SHOULD ADOPT CLEAR RULES LIMITING THE EXTRATERRITORIAL SCOPE OF § 10(b) AND RULE 10b-5

For the reasons set forth above, the United Kingdom respectfully submits that this Court should affirm the result reached below by the United States Court of Appeals for the Second Circuit and use this opportunity to set forth a clear, simple rule limiting the extraterritorial scope of § 10(b) and Rule 10b-5.

### A. Foreign Purchasers of Securities on a Foreign Exchange Who Are Injured By Misleading Statements or Omissions Made Outside of the United States By a Foreign Issuer Should Have No Private Right of Action Under § 10(b) or Rule 10b-5

The United Kingdom respectfully urges this Court now to rule that foreign purchasers of securities on a foreign exchange who are injured by misleading statements or omissions made outside of the United States by a foreign issuer have no private right of action under § 10(b) of the Exchange Act or Rule 10b-5.[56]

---

[56] This case involves claims by foreign investors, so the proposed rule is addressed to such claims. *See supra* note 7.

30

Adoption of this rule would eliminate the risks presented by the current uncertainty surrounding the extraterritorial application of § 10(b) and Rule 10b-5. Such a clear pronouncement by this Court would reassure foreign states that their individual legal and regulatory interests will be respected; it would also ensure that the adequacy of disclosure made in their jurisdiction by entities in their jurisdiction with respect to securities issued in their jurisdiction would be decided under the laws of their jurisdiction by the courts and regulatory agencies of their jurisdiction. It would allow issuers to plan their global affairs and assess their potential legal exposure with greater confidence and provide investors with a clearer understanding of where they can seek relief for alleged securities fraud. These benefits would enhance the efficiency not only of the legal system, but also of the financial markets on which issuers and investors interact.

**B.** **In the Alternative, if a Private Right of Action Is Available, Fraudulent Conduct in the United States That Does Not Constitute Deceptive Acts in Connection with the Sale of Securities Should Be Insufficient to Create Liability Under § 10(b) or Rule 10b-5**

Many of the submissions obfuscate the issues at stake here by the careless or misleading use of the phrases "fraud" and "fraudulent scheme".[57]   The

---

[57] *See, e.g.*, Brief for Petitioners 7 ("The central allegation of Petitioners' claims is that the fraudulent scheme occurred in

31

Exchange Act, like the federal interests it promotes, is concerned not with "fraud", but with "securities fraud"—deceptive acts "in connection with the purchase or sale of any security". Only such acts can give rise to liability under Rule 10b-5 under any of the three conditions described by Petitioners (use of interstate commerce, use of the mails, or use of any national securities exchange).[58]

The Second Circuit considered the question of where the allegedly fraudulent activity "in connection with the purchase or sale of securities" had occurred.[59] It concluded that the activity "in connection with the purchase or sale of securities" was the conduct in Australia of the Australian parent in making disclosures relevant to the trading of its stock.[60]

The principles addressed herein support the rule that regulation of and punishment for securities fraud should be the concern of the sovereign jurisdiction in which the securities fraud occurs— that is, the jurisdiction in which the actors who made the disclosures reside, the relevant exchanges are located and the primary adverse impact on investors is felt.

---

Florida."); *id.* at 10 ("The foregoing allegations of fraud were all committed in the United States.").

[58] *See* Brief for Petitioners 13-14.

[59] *See Morrison,* 547 F.3d at 175-177.

[60] *Id.* at 171, 176.

32

Therefore, if a private right of action is to be potentially available to foreign investors in foreign issuers who purchased on foreign exchanges, then the United Kingdom respectfully suggests that this Court should hold that conduct in the U.S. can create liability under the Exchange Act only if that U.S. conduct in fact constitutes deceptive acts in connection with the sale of securities.[61] It should not be enough that plaintiffs allege fraudulent conduct in the U.S. that has a potential effect on the price of a security or on some subsequent market disclosure. As in this case, there may be wrongdoing that could constitute fraud on an employer, a parent entity, a supplier or a customer, but such conduct is not within the province of the Exchange Act. Misconduct within a corporate structure does not become "securities fraud" simply because it could be foreseen to impact a publicly traded security.[62]

Such a limitation is consistent with this Court's holding in *Stoneridge*, 552 U.S. at 166 (stating that the alleged conduct was not sufficiently related to the allegedly fraudulent disclosures even though it directly facilitated those disclosures). A clear

---

[61] This clarification would result in a standard for foreign-cubed cases that appears to align with the test used in the D.C. Circuit, which holds that "jurisdiction is appropriate when the fraudulent statements or misrepresentations originate in the United States, are made with scienter and in connection with the purchase or sale of securities, and 'directly cause' the harm to those who claim to be defrauded, even if reliance and damages occur elsewhere". *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 (D.C. Cir. 1987).

[62] *Cf.* Brief for Petitioners 25 n. 11.

33

articulation of this limitation with respect to private actions under § 10(b) and Rule 10b-5 would eliminate the asserted differences among the Circuits and would minimize the risk of interference with the policy balances embodied in the securities laws and regulations of foreign nations.

### C. Clear Rules Limiting the Extraterritorial Scope of § 10(b) and Rule 10b-5 Would Be Consistent with International Law and Would Promote Efficient Global Capital Markets

The sovereign right of each nation to prescribe laws and adjudicate claims regarding persons within its territory is foundational to international law.[63] Where more than one sovereign state claims jurisdiction, the states exercising jurisdiction should do so in a way that is compatible with the exercise of jurisdiction by other states. The primary bases for assertion of jurisdiction are: (i) substantial conduct within a state's territory; and (ii) conduct outside the state's territory that is intended to, or does have, a substantial effect[64] inside its territory.[65]

---

[63] U.N. Charter art. 2, para. 1. The U.K. has set out in detail its position on the international law dimensions of extraterritorial application of U.S. law in previous briefs to this Court. *See, e.g.,* Brief of the Governments of the Commonwealth of Australia, the Swiss Confederation and the United Kingdom of Great Britain and Northern Ireland as *Amici Curiae* in Support of the Petitioner, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (No. 03-339).

[64] The effects doctrine is given its primary application in antitrust law. *See, e.g., Hartford Fire Ins. Co. v. California*, 509

34

The Second Circuit's conduct and effects test,[66] like the SEC's proposed test for its own enforcement jurisdiction,[67] seems to resemble these accepted international standards for the assertion of jurisdiction.[68] But, those standards include and are limited by the caveat that a state must not exercise jurisdiction where to do so would be "unreasonable", which circumstances include the likelihood of conflict with regulation by another state.[69] The United Kingdom submits that assertion of jurisdiction in private foreign-cubed securities cases is "unreasonable". As in *Empagran*,[70] case-by-case analysis is unnecessary to reach this conclusion, because the likelihood of conflict with regulation by

---

U.S. 764, 795-796 (1993); *Gencor Ltd. v. Comm'n of the European Communities*, Case T-102/96, 1999 E.C.R. II-753 ¶ 90.

[65] *See* Restatement § 402(1).

[66] *See, e.g., Morrison*, 547 F.3d at 171; Brief for Petitioners 18-22.

[67] *See* Brief for the United States as *Amicus Curiae* on the Petition for a Writ of Certiorari 13-14.

[68] *See* Restatement § 402(1).

[69] The Restatement lists various factors relevant to determining whether exercise of jurisdiction is reasonable, including "(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory" and "(h) the likelihood of conflict with regulation by another state". Restatement §§ 403(2)(a), (h).

[70] 542 U.S. at 167-168.

35

another state[71] is so strong as to be of paramount concern in any case concerning foreign investors injured from misleading statements or omissions made outside of the United States by a foreign issuer of securities.

Elsewhere in this Brief we have outlined elements of the procedural framework that make the U.S. one of the most attractive jurisdictions in the world for plaintiffs seeking to commence securities fraud actions.[72]   Allowing U.S. courts to hear foreign-cubed securities cases based on the analysis offered by Petitioners would effectively vest U.S. courts with universal jurisdiction[73] over securities violations—a step that would be at odds with international law, would encourage potential plaintiffs from all over the world to flood the U.S. justice system, and would have U.S. law "rule the world". *Microsoft*, 550 U.S. at 455.

Petitioners suggest that the application of the doctrine of *forum non conveniens* resolves these

---

[71] *See* Restatement § 403(2)(h) (stating that "the likelihood of conflict with regulation by another state" is relevant to determining whether exercise of jurisdiction is reasonable); *see id.* cmt. g.

[72] *See supra* Part II.C.

[73] At international law, universal *criminal* jurisdiction is recognized in a limited range of cases of universal concern, such as piracy and certain heinous crimes. *See* Restatement § 404; Vaughan Lowe, *International Law* 177-184 (2007). However, in no category of *civil* cases is universal jurisdiction clearly recognized at international law, unless the states concerned have consented to it by treaty or it has crystallized in customary international law. *See generally* Restatement § 404.

36

comity concerns.[74] But, *forum non conveniens* fails to
adequately address the concerns raised here. Within
the U.S. judicial structure of multiple Circuit Courts
of Appeal and nearly one hundred District Courts, an
ad hoc, case-by-case approach generates too much
unpredictability of outcome to provide the reasonable
certainty that capital markets need and to protect a
sovereign's right to decide what legal and regulatory
regime should apply to actions and consequences
within its territory.

The balancing test formulated by the Second
Circuit inquires into what is "central or at the heart
of a fraudulent scheme" and whether activities in the
United States were "more than merely preparatory"
and "directly caused losses to investors abroad".
*Morrison,* 547 F.3d at 174, 171. Petitioners, citing
the SEC and the Solicitor General, support the
"material and substantial" test, which would also
require a case-by-case analysis of whether there was
"significant conduct within the United States that is
material to the fraud's success". Brief for the United
States as *Amicus Curiae* on the Petition for Writ of
Certiorari 13; Brief for Petitioners 18-22, 40. Each of
these formulations demands highly fact-sensitive,
case-by-case assessments; each lends itself to the
molding of facts to meet the language of the test.
Different courts could reach different conclusions,
without incurring reviewable legal error, on identical
facts. The resulting unpredictability of outcomes will
inevitably lead to more lawsuits and to more
uncertainty in the marketplace.

---

[74] Brief for Petitioners 41-42.

37

Efficient capital markets depend upon transparency. Transparency is served by standards that are readily understood by local and foreign issuers and investors, without the need for costly and time-consuming case-by-case legal advice. Moreover, the attractiveness of the United States as a destination for U.K. and other foreign investment depends upon a predictable legal environment.[75] Transparency and predictability would be enhanced by the adoption of either of the rules proposed herein.

## V. RESTRAINING EXTRATERRITORIAL APPLICATION OF U.S. SECURITIES LAWS WILL NOT LEAVE AN ENFORCEMENT VOID

In *IIT, International Investment Trust v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975), Judge Friendly stated that "[w]e do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners". No one can reasonably dispute that conclusion; however, that observation neither suggests nor supports the broad applications of U.S. securities law that have subsequently been sought through its invocation. It is not the case that adoption of a rule restraining extraterritorial application of Rule 10b-5 would cause or allow the

---

[75] *See* Schumer-Bloomberg Report, *supra* note 53, at 73-78. This Court noted similar concerns in *Stoneridge*, 552 U.S. at 164.

38

United States to become a base for foreign frauds. It would not leave an enforcement void.

First, fraud continues to be actionable in the U.S. under state law.[76] For example, Florida law recognizes common law actions for fraud and deceit,[77] fraudulent misrepresentation[78] and negligent misrepresentation.[79] Thus, the alleged conduct by the U.S. subsidiary in this case may be actionable as common law fraud, even if it is not securities fraud.

Second, the SEC may choose to commence action "[w]henever it shall appear to [it] that any person has violated any provision of" the Exchange Act or Rule 10b-5. Exchange Act, § 21(d).[80] Critically, in cases involving foreign issuers, SEC enforcement action (unlike a private suit) permits the opportunity

---

[76] The Delaware Court of Chancery, for example, has recently applied the premise that "a claim for common law fraud based on false statements in federal securities filings could be litigated independently in state court" to support its decision not to dismiss a common law fraud case based on alleged securities fraud. *NACCO Industries, Inc. v. Applica Inc.*, No. 2541-VCL 2009 WL 4981577, at *17, *20-22 (Del. Ch. 2009) (citing *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8 (Del. 2001)).

[77] *See, e.g., First Interstate Dev. Corp. v. Ablanedo*, 511 So. 2d 536, 539 (Fla. 1987).

[78] *See, e.g., Webb v. Kirkland*, 899 So. 2d 344 (Fla. Dist. Ct. App. 2d Dist. 2005).

[79] *See, e.g., Baggett v. Electricians Local 915 Credit Union*, 620 So. 2d 784, 786 (Fla. Dist. Ct. App. 2d Dist. 1993).

[80] 15 U.S.C. § 78u(d)(3)(A).

39

for cooperative dialogue with foreign regulators, such as the U.K. FSA.[81]  Such dialogue and cooperation limit the risks of conflict with regulation by another state and of duplicative foreign litigation.

Finally, and perhaps most importantly, sovereign nations, such as the U.K. and Australia, should be allowed and expected to use their own well-developed legal and regulatory regimes to address alleged securities fraud.  A failure to recognize that other valid enforcement regimes exist as an alternative to the expansion of the Rule 10b-5 private right of action threatens the legitimacy of the U.S. legal system, as well as that of the legal and regulatory regimes of other sovereign nations.

---

[81] *See, e.g.*, MOU, *supra* note 49.

40

## CONCLUSION

For the foregoing reasons, the United Kingdom respectfully submits that this Court should affirm the result reached below by the United States Court of Appeals for the Second Circuit.    The United Kingdom also respectfully urges this Court to use this opportunity to set forth a clear rule restraining the extraterritorial application of the implied private right of action under § 10(b) of the Exchange Act and Rule 10b-5.

Respectfully submitted,

JOHN E. BEERBOWER
  *Counsel of Record*
GINA M. MAGEL
NICHOLAS P. LINGARD
CRAVATH, SWAINE & MOORE LLP
  Worldwide Plaza
  825 Eighth Avenue
  New York, NY 10019-7475
  E-mail: jbeerbower@cravath.com
  Telephone: (212) 474-1000

February 25, 2010