**No. 18-486**



IN THE

# Supreme Court of the United States

———

TOSHIBA CORPORATION,

*Petitioner,*

v.

AUTOMOTIVE INDUSTRIES PENSION TRUST FUND;
NEW ENGLAND TEAMSTERS &
TRUCKING INDUSTRY PENSION FUND,

*Respondents.*

———

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

———

**BRIEF OF THE GOVERNMENT OF THE
UNITED KINGDOM OF GREAT BRITAIN AND
NORTHERN IRELAND AS *AMICUS CURIAE*
IN SUPPORT OF THE PETITIONER IN ITS
PETITION FOR A WRIT OF CERTIORARI**

———

SIR IAIN MACLEOD
   *The Legal Adviser*
SAMUEL LINEHAN
   *Assistant Legal Adviser*
FOREIGN AND COMMONWEALTH
   OFFICE
UNITED KINGDOM

DONALD I. BAKER
   *Counsel of Record*
W. TODD MILLER
ISHAI MOOREVILLE
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
Suite 300
Washington, DC 20037
(202) 663-7820
dbaker@bakerandmiller.com

*Attorneys for the Government
   of the United Kingdom of
   Great Britain and Northern
   Ireland*



December 4, 2018

WILSON-EPES PRINTING CO., INC. – (202) 789-0096 – WASHINGTON, D. C. 20002



## QUESTION PRESENTED

Whether the normal presumption against extra-territoriality in the Securities Exchange Act is set aside as soon as a foreign-issued security, regulated by a foreign government, is included in an American Depository Receipt sold in the United States.

(i)

## TABLE OF CONTENTS

Page

QUESTION PRESENTED .................................. i

TABLE OF AUTHORITIES ................................ v

INTERESTS OF AMICUS CURIAE .................. 1

SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ....................................................... 4

  I.  THE NINTH CIRCUIT DECISION ENABLES A PRIVATE U.S. PLAINTIFF TO DISRUPT A FOREIGN GOVERNMENT'S SECURITIES REGULATORY SYSTEM BY BRINGING LAWSUITS BASED ON MISCONDUCT ALLEGED TO HAVE OCCURRED WITHIN THE ISSUER'S HOME JURISDICTION ......... 4

  II.  U.S. LAW SHOULD REFLECT THE REALITY THAT THE FOREIGN ISSUER HAS NO CONTROL OVER THE CREATION OF UNSPONSORED ADRs OR OTHER UNSPONSORED DERIVATES USING ITS SHARES ................................ 7

  III.  THE NINTH CIRCUIT SHOULD HAVE APPLIED THIS COURT'S *MORRISON* MESSAGE ON INTERNATIONAL LAW AND COMITY BY TELLING THE PLAINTIFFS TO PURSUE THEIR SECURITIES CLAIMS AGAINST TOSHIBA IN JAPAN ....................................................... 9

iv

TABLE OF CONTENTS—Continued

Page

IV. IF A U.S. INVESTOR WERE COM-
PLANING ABOUT ADRs BASED ON
SECURITIES ISSUED BY A BRITISH
COMPANY, IT WOULD HAVE ACCESS
TO AN EFFECTIVE MODERN SECU-
RITIES REGULATORY SYSTEM WITH
BOTH PUBLIC REMEDIES AND
PRIVATE DAMAGE RECOVERIES IN
THE UNITED KINGDOM ....................... 12

V. THIS COURT WILL CONTINUE TO
FACE APPEALS LIKE THIS ONE BY
FOREIGN DEFENDANTS AS LONG AS
THE U.S. HAS A CIVIL PROCEDURE
SYSTEM WHICH IS UNIQUELY
FAVORABLE TO PLAINTIFFS .............. 14

CONCLUSION .................................................... 20

v

# TABLE OF AUTHORITIES

CASES                                              Page(s)

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
    421 U.S. 240 (1975)...................................    15

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007)...................................    17

*Credit Suisse Sec. LLC v. Billings*,
    551 U.S. 264 (2007)...................................    8

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1999)...................................    5, 6

*F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*,
    542 U.S. 155 (2004)...................................    1

*Kiobel v. Royal Dutch Petro. Co.*,
    569 U.S. 108 (2013)...................................    2, 18

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)..................................*passim*

*Murray v. The Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804) ......................    9, 10

*OBB Personenverkehr AG v. Sachs*,
    136 S. Ct. 390 (2015)................................    18

*Parkcentral Global HUB Ltd. v.
Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) ......................    6, 7

*Rio Tinto PLC v. Sarei*,
    569 U.S. 945 (2013)...................................    2

*The Antelope*,
    23 U.S. (10 Wheat.) 66 (1825)...................    9

*Weinberger v. Rossi*,
    456 U.S. 25 (1982)....................................    10

vi

TABLE OF AUTHORITIES—Continued

CONSTITUTION                                    Page(s)

    U.S. Const. amend. VII ................................ 16

U.S. STATUTES AND RULES

    15 U.S.C. § 78j(b) .......................................... 5, 7, 8

    17 C.F.R. § 240.10b-5 ................................. 3, 5, 11

    Fed. R. Civ. P. 12(b)(6) ................................. 17

    Fed. R. Civ. P. 23 ......................................... 15

COURT FILINGS

    Brief of the Governments of Australia and the United Kingdom of Great Britain and Northern Ireland as Amici Curiae In Support of the Petitioners On Certain Questions in Their Petition for a Writ of Certiorari, *Rio Tinto PLC v. Sarei*, 569 U.S. 945 (2013) (filed Dec. 28, 2011) (No. 11-649) 2011 U.S. S. Ct. Briefs LEXIS 2904 ............................................... 2

    Brief of the Governments of the Kingdom of the Netherlands and the United Kingdom of Great Britain and Northern Ireland as Amici Curiae in Support of Neither Party, *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108 (2013) (filed June 13, 2012) (No. 10-1491) 2012 U.S. S. Ct. Briefs LEXIS 2651 ..................................... 1

vii

TABLE OF AUTHORITIES—Continued

Page(s)

Brief of the United Kingdom of Great
    Britain and Northern Ireland as Amicus
    Curiae in Support of Respondents,
    *Morrison v. National Australian Bank
    Ltd.*, 561 U.S. 247 (2010) (filed Feb. 26,
    2010) (No. 08-1191) 2010 U.S. S. Ct.
    Briefs LEXIS 174 ........................................    1

Brief of the United Kingdom of Great
    Britain and Northern Ireland, Ireland
    and the Kingdom of the Netherlands as
    Amici Curiae in Support of Petitioners, *F.
    Hoffmann-La Roche v. Empagran, S.A.*,
    542 U.S. 155 (2004) (filed Feb. 3, 2004)
    (No. 03-724) 2004 U.S. S. Ct. Briefs
    LEXIS 104 ..................................................    1

FOREIGN CASES, STATUTES AND RULES

Civ. Proc. Rules (U.K.) ........................... 15, 17, 18

Commission Recommendation 2013/396/EU,
    art. 5 (E.U.), 2013 O.J. (L 201) 60 ............    15

Conditional Fee Agreements Order 2013
    (SI 2013/689), art. 3 (U.K.) .......................    18

Council Directive 2004/109, 2004 O.J.
    L390/38, as amended (EC).........................    12

Courts and Legal Services Act 1990, c. 41
    (U.K.) ..........................................................    18

Damages-Based Agreements Regulations
    2013/609, art. 4 (U.K.) ...............................    18

viii

## TABLE OF AUTHORITIES—Continued

Page(s)

Financial Conduct Authority Disclosure
Guidance and Transparency Rules
(DTR) (U.K.) .............................................. 13

Financial Services and Markets Act, 2000,
c. 8, as amended (U.K.) ................. 12, 13, 14, 16

Foreign Proceedings (Excess of
Jurisdiction) Act, No. 3, (1984) (Austl.),
as amended by Foreign Judgments Act,
No. 112 (1991) ........................................... 10

Misrepresentation Act 1967, 1967, c. 7
(U.K.) ......................................................... 14

Protection of Trading Interests Act, 1980,
c. 11, as amended (U.K.) ........................... 10

*Rookes v. Barnard* [1964] A.C. 1129 (H.L.) .. 17

Senior Courts Act 1981 (U.K.) ...................... 16

Solicitors Act 1974, 1974, c. 47 (U.K.) .......... 18

Solicitors Code of Conduct, R. 2.04 (2007)
(U.K.) ......................................................... 18

### OTHER ARTICLES AND AUTHORITIES

John Y. Gotanda, Punitive Damages: A
Comparative Analysis, 42 Colum. J.
Transnat'l L. 391 (2004) ........................... 17

Note, *Predictability and Comity: Toward
Common Principles of Extraterritorial
Jurisdiction*, 98 Harv. L. Rev. 1310
(1985) ......................................................... 10

Restatement (Third) of the Foreign Rela-
tions Law of the United States (1987) ..... 10

ix

TABLE OF AUTHORITIES—Continued

Page(s)

Sec. & Exch. Comm'n, Office of Inv'r Educ. and Advocacy, *Investor Bulletin: American Depository Receipts* (August 2012) ........... 7

Sir Robert Jennings & Sir Arthur Watts, eds., *Oppenheim's International Law* (9th ed. 1992) .................................................... 11

Warren Pengilley, *Extraterritorial Effects of United States Commercial and Antitrust Legislation*: A View From "Down Under," 16 Vand. J. Transnat'l L. 833 (1983) ......................................................... 11

William Glaberson, *NAFTA Invoked to Challenge Court Award*, N.Y. Times, Jan. 28, 1999 ................................................... 16



## INTERESTS OF AMICUS CURIAE

The Government of the United Kingdom of Great Britain and Northern Ireland ("U.K." or "the Government") has long been concerned about the recurring willingness of some U.S. Circuit Courts of Appeals to allow private civil claims against foreign enterprises that are inconsistent with international law and comity.[1] In recent years, the U.K. has three times urged this Court to reverse judgments against foreign corporations on the grounds that they were inconsistent with international law and would interfere with other nations' legal systems.[2] In each instance, the Court reversed. *See F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004); *Morrison v. Nat'l Austl.*

---

[1] Pursuant to Supreme Court Rule 37.6, Amicus Curiae states that no counsel for a party authored this brief in whole or in part and that no person or entity other than Amicus Curiae, its members, and its counsel contributed monetarily to the preparation or submission of this brief. Counsel of record for all parties received notice at least 10 days prior to the due date of the Amicus Curiae's intention to file this brief. Both Petitioners and Respondents have consented to the filing of this brief and their indications of consent have been filed with the Clerk.

[2] Brief of the United Kingdom of Great Britain and Northern Ireland, Ireland and the Kingdom of the Netherlands as Amici Curiae in Support of Petitioners, *F. Hoffmann-La Roche Ltd. v. Empagran, S.A.*, 542 U.S. 155 (2004) (filed Feb. 3, 2004) (No. 03-724) 2004 U.S. S. Ct. Briefs LEXIS 104; Brief of the United Kingdom of Great Britain and Northern Ireland as Amicus Curiae in Support of Respondents, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) (filed Feb. 26, 2010) (No. 08-1191) 2010 U.S. S. Ct. Briefs LEXIS 174; Brief of the Governments of the Kingdom of the Netherlands and the United Kingdom of Great Britain and Northern Ireland as Amici Curiae in Support of Neither Party, *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108 (2013) (filed June 13, 2012) (No. 10-1491) 2012 U.S. S. Ct. Briefs LEXIS 2651.

2

*Bank Ltd.*, 561 U.S. 247 (2010) (*"Morrison"*); and *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108 (2013).[3]

This appeal involves a particularly alarming example of interference with a foreign nation's legal system, because the Ninth Circuit's decision would immediately allow private U.S. plaintiffs to undermine a foreign government's usual regulation of its domestic securities markets, even when a foreign-registered company's own activities have no factual nexus to the United States. Based on the Ninth Circuit's decision, many U.K. securities issuers are now newly exposed to the burdens and uncertainties of U.S. securities litigation.

The U.K. is a major global financial center, with financial services accounting for 12% of its Gross Domestic Product. Thus, the U.K. has a strong interest in maintaining international comity and protecting its ability to implement its own regulations for securities registered in the U.K. without undue interference from foreign legal systems.

## SUMMARY OF ARGUMENT

The U.K. has established its own system of securities regulation and private law remedies which reflect

---

[3] The U.K. also submitted an amicus brief jointly with the Government of Australia in support of the petition for certiorari in another such case, *Rio Tinto PLC v. Sarei*, 569 U.S. 945 (2013), where the Court vacated the Ninth Circuit decision and remanded in light of the decision in *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108 (2013). *See* Brief of the Governments of Australia and the United Kingdom of Great Britain and Northern Ireland as Amici Curiae In Support of the Petitioners On Certain Questions in Their Petition for a Writ of Certiorari, *Rio Tinto PLC v. Sarei*, 569 U.S. 945 (2013) (filed Dec. 28, 2011) (No. 11-649) 2011 U.S. S. Ct. Briefs LEXIS 2904.

3

the Government's own policy choices regarding such
regulation and the availability and method of litiga-
tion. If cases such as the instant one were allowed to
go forward, they may severely interfere with the U.K.'s
policy choices regarding oversight of securities regis-
tered within its jurisdiction. Jurisdictional restraints
are a fundamental underpinning of the international
legal order, and over-expansive exercises of jurisdic-
tion create a substantial risk of jurisdictional conflicts.

The Government is opposed to broad assertions
of extraterritorial jurisdiction over foreign companies
whose securities are registered, regulated, and traded
abroad based solely on the availability of unsponsored
American Depository Receipts ("ADRs") in the United
States. The error created by the Ninth Circuit Court
of Appeals can be avoided by a more sensitive appli-
cation of the presumption against extraterritorial
application of U.S. statutes, as emphasized by this
Court in *Morrison*.

Other sovereign nations should be allowed and
expected to use their own well-developed legal and
regulatory regimes to address alleged securities fraud
within the domestic markets which they regulate.
Judicial failure to recognize that other valid enforce-
ment regimes exist weakens the international credi-
bility of the U.S. legal system and undermines
the legal and regulatory regimes of other sovereign
nations. Allowing foreign nations to set their own
rules for possibly deceptive conduct involving foreign-
issued securities is a better alternative to the
extraterritorial expansion of private actions under
SEC Rule 10b-5.

In short, the U.K. believes the Ninth Circuit deci-
sion should be reversed, and that the Supreme Court
should clarify that the purchase of unsponsored ADRs

4

based on foreign-issued securities does not, by itself, grant jurisdiction to U.S. courts for securities-related claims.

## ARGUMENT

**I. THE NINTH CIRCUIT DECISION EN-ABLES A PRIVATE U.S. PLAINTIFF TO DISRUPT A FOREIGN GOVERNMENT'S SECURITIES REGULATORY SYSTEM BY BRINGING LAWSUITS BASED ON MISCONDUCT ALLEGED TO HAVE OCCURRED WITHIN THE ISSUER'S HOME JURISDICTION**

The basic reality in international securities markets is that they are highly interdependent. The risk of inconsistent government regulation becomes serious when the same securities are regulated by two different regulatory regimes in two different national markets. The Ninth Circuit has simply ignored this reality.

Unsponsored ADRs are negotiable certificates usually issued by a U.S. depository institution, representing a beneficial interest in, but not legal title to, a specific number of shares issued abroad by a foreign company. The underlying shares on which ADRs are premised are normally traded outside the United States and are regulated by the securities regulator in the issuer's home jurisdiction (and the regulators in any other national markets where the securities are sold).

Like other derivative securities, an ADR's current value is necessarily based on the changing value of the underlying securities which are included in it. The ADRs themselves are apparently treated as domestic securities for the purposes of U.S. law but conduct in

5

the foreign markets for the underlying securities is not regulated by the Securities & Exchange Commission.

This appeal involves a class action claim by U.S. purchasers of the ADRs based on Toshiba securities to recover damages under Section 10b of the Securities Exchange Act.[4] This claim is allegedly based on the issuer's conduct in the Japanese market, conduct which has been investigated by the Japanese securities regulator and has also been the subject of private investor litigation in Japan. However, the substantive standard for liability in the U.S. case is based on SEC Rule 10b-5, rather than Japanese law.[5]

The potential for conflict between U.S. law and the Japanese regulatory regime is obvious on its face — with Toshiba facing the threat of two sovereigns issuing conflicting commands on how it is supposed to behave in the Japanese securities market, where the price of its Japanese securities is set, and from where the prices of the ADRs available in the U.S. are derived.

This Court has long recognized this risk of regulatory conflict and tried to mitigate it by emphasizing a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1999) ("*Aramco*").

This "presumption against extraterritoriality" announced in *Aramco* was applied to the Securities Exchange Act in *Morrison*, where a unanimous Court emphasized the importance of international comity in

---

[4] *See* 15 U.S.C. § 78j(b).

[5] *See* 17 C.F.R. § 240.10b-5.

6

order to avoid regulatory conflicts between jurisdictions. In *Morrison*, the Court rejected the Rule 10b-5 claim brought on behalf of a class of Australian investors who had purchased stock in Australia which was issued by an Australian company, listed on the Australian exchange, and regulated by its government. Applying the presumption against extraterritoriality, this Court held the Securities Exchange Act did not apply unless the securities (i) were traded on a U.S. exchange or (ii) involved domestic U.S. transactions.[6]

In the instant *Toshiba* case, the Ninth Circuit simply held that, if there is a domestic transaction someplace in the causation chain from the foreign issuer to U.S. purchaser, then the *Aramco-Morrison* presumption no longer applies, and the foreign issuer's overseas market conduct can be challenged under the U.S. Securities Exchange Act.

The same essential situation had been faced much more thoughtfully by the Second Circuit in *Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014) ("*Parkcentral*"), and the U.K. urges this Court to follow the guidance of that decision in granting the petition in the present case. As in the present case, the question in *Parkcentral* was whether the *Morrison* presumption against extraterritoriality ceases to apply if there is a domestic transaction in the chain between foreign issuer and the plaintiff — or whether having a domestic transaction was necessary but not necessarily a sufficient condition for invoking U.S. jurisdiction. There, the Court found that "[t]he language the Court used [in *Morrison*] was consistent

---

[6] *Morrison,* 561 U.S. at 270, 273.

7

with the description of necessary elements rather than sufficient conditions."[7]

By contrast, making the presence of a domestic transaction determinative of whether the *Morrison* presumption applies

> would require [U.S.] courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it. Such a rule would inevitably place § 10(b) in conflict with the regulatory laws of other nations.[8]

## II. U.S. LAW SHOULD REFLECT THE REALITY THAT THE FOREIGN ISSUER HAS NO CONTROL OVER THE CREATION OF UNSPONSORED ADRs OR OTHER UNSPONSORED DERIVATES USING ITS SHARES

Unsponsored ADRs are negotiable certificates usually issued by a U.S. depository institution, in order to "allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to U.S. capital markets."[9]

The foreign securities issuer has no control over the U.S. institution's decision on whether to issue

---

[7] *ParkCentral,* 763 F.3d at 215.

[8] *Id.*

[9] Sec. & Exch. Comm'n, Office of Inv'r Educ. and Advocacy, "Investor Bulletin: American Depository Receipts" at 1 (August 2012), available at https://www.sec.gov/investor/alerts/adr-bullet in.pdf

8

unsponsored ADRs based on the issuer's securities. Thus, the question of whether Toshiba's securities are to be made part of an ADR entirely rests with the entrepreneurial judgment of a third party.

Yet third party choice has enormous legal consequences for Toshiba under the Ninth Circuit's decision. All ADRs necessarily involve some domestic transaction, and thus the Court of Appeals' decision essentially makes every issuer of a foreign security included in an ADR immediately subject to private litigation in U.S. courts under U.S. law concerning its overseas market conduct.

The U.K. sees this result as very unfair to the foreign issuer (which is essentially subjected to an *involuntary* law and forum selection agreement). It is also very unwise institutionally, because it immediately empowers U.S. private litigants to bring lawsuits which interfere with the foreign regulatory regime in which the private defendant is registered. *Cf. Credit Suisse Sec. LLC v. Billings*, 551 U.S. 264, 275–6 (2007) (analyzing whether antitrust claims were precluded by the securities laws, and considering "the existence of regulatory authority under the securities law to supervise the activities in question" and "the resulting risk...[of] conflicting guidance, requirements, duties, privileges, or standards of conduct" if both antitrust and securities laws were applied vis-à-vis the same activities).

The Ninth Circuit seemed entirely unconcerned about whether Toshiba's foreign-regulated activities would be made subject to Section 10(b), despite the absence of any affirmative Toshiba action to cause the derivative product at issue to be marketed in the United States.

9

## III. THE NINTH CIRCUIT SHOULD HAVE APPLIED THIS COURT'S *MORRISON* MESSAGE ON INTERNATIONAL LAW AND COMITY BY TELLING THE PLAINTIFFS TO PURSUE THEIR SECURITIES CLAIMS AGAINST TOSHIBA IN JAPAN

Nations have a strong interest in regulating their own capital markets. This includes developing disclosure rules to govern their own issuers, deciding how and when private shareholder litigation should occur, and determining the penalties for violations of such laws. Such decisions vary among countries with different regulatory, legislative and financial concerns. U.S. judicial interference in those decisions risks damaging the mutual respect that comity is meant to protect.

It is a bedrock principle of international law that each sovereign nation is equal and entitled to prescribe laws and to adjudicate claims regarding those persons within its sovereign territory. *The Antelope*, 23 U.S. (10 Wheat.) 66, 122 (1825) ("No principle of general law is more universally acknowledged, than the perfect equality of nations. Russia and Geneva have equal rights. It results from this equality, that no one can rightfully impose a rule on another.").

Similarly, "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("*The Charming Betsy*"). This core principle of American jurisprudence has been regularly reaffirmed by

10

this Court. *See, e.g., Weinberger v. Rossi*, 456 U.S. 25, 32 (1982).[10]

From *The Charming Betsy* onward, this Court's decisions have focused on how to construe statutes with due regard for international law and considerations of international comity. If these considerations normally control when a court is construing a statute, they must also control when a court is construing a judicially-created right of action that has been implied from a statute. When creating and applying an implied right of action under a federal statute, U.S. courts should be equally required to take account of the legitimate sovereign interests of other nations.

Comity concerns more than mere politeness. "If other nations believe that American policy unfairly disadvantages their citizens… they are apt to resist enforcement efforts and perhaps to retaliate with countermeasures of their own." Note, *Predictability and Comity: Toward Common Principles of Extraterritorial Jurisdiction,* 98 Harv. L. Rev. 1310, 1321 (1985). In the past, other nations have enacted measures to restrain efforts to enforce U.S. law extraterritorially; the clearest examples were the "blocking" statutes that the U.K. and other countries enacted in the 1980's in response to what were regarded as overly broad jurisdictional claims being made under U.S. antitrust laws.[11]

---

[10] *See also* Restatement (Third) of the Foreign Relations Law of the United States § 403, cmt. g (stating that statutes should be construed to avoid "conflict with the law of another state that has a clearly greater interest").

[11] *See, e.g.,* Protection of Trading Interests Act, 1980, c. 11, § 2, as amended (U.K.); Foreign Proceedings (Excess of Jurisdiction) Act, No. 3, §§ 7-8 (1984) (Austl.), as amended by Foreign Judgments Act, No. 112 (1991). *See also Predictability and Comity,* 98

11

Other sovereign nations should be allowed and expected to use their own well-developed legal regimes to address alleged securities frauds in their own securities markets. A failure to recognize that other valid enforcement regimes exist, as an alternative to the expansion of the Rule 10b-5 private right of action, threatens the legitimacy of the U.S. legal system, as well as that of the legal and regulatory regimes of other nations.

Furthermore, international law recognizes that the various grounds on which jurisdiction may be asserted are

> parts of a single broad principle according to which the right to exercise jurisdiction depends on there being between the subject matter and the state exercising jurisdiction a sufficiently close connection to justify that state in regulating the matter and perhaps also to override any competing rights of other states.[12]

Here, the U.K. respectfully submits that the availability of unsponsored ADRs in the U.S., standing alone, does not create a sufficient nexus with the U.S. to override the jurisdictional rights of other nations.

---

Harv. L. Rev. at 1311, n.6 (describing the "main categories" of retaliatory legislation); Warren Pengilley, *Extraterritorial Effects of United States Commercial and Antitrust Legislation: A View From "Down Under,"* 16 Vand. J. Transnat'l L. 833, 871-72 (1983).

[12] Sir Robert Jennings & Sir Arthur Watts, eds., *Oppenheim's International Law* 457-8 (9th ed. 1992).

12

## IV. IF A U.S. INVESTOR WERE COMPLANING ABOUT ADRs BASED ON SECURITIES ISSUED BY A BRITISH COMPANY, IT WOULD HAVE ACCESS TO AN EFFECTIVE MODERN SECURITIES REGULATORY SYSTEM WITH BOTH PUBLIC REMEDIES AND PRIVATE DAMAGE RECOVERIES IN THE UNITED KINGDOM

The U.K. has a sophisticated legal regime governing the financial services sector, including a comprehensive regime governing the buying, selling and trading of securities. The Financial Services and Markets Act 2000 ("FSMA")[13] established the main framework for the regulation of financial services in the U.K. The FSMA created the U.K. regulatory agencies, established their areas of jurisdiction, and governs the enforcement of substantive regulatory provisions.

Much of the legal framework for financial services in the U.K. is derived, directly or indirectly, from European Union ("E.U.") law. The E.U. has special reporting rules for issuers with securities admitted for trading on regulated markets.[14] These rules have been implemented into U.K. law and require issuers to regularly publish certain information, including yearly and half-yearly financial reports, major changes in the holding of voting rights, and certain inside

---

[13] *See* Financial Services and Markets Act, 2000, c. 8 (U.K.), as amended ("FSMA") available at http://www.legislation.gov.uk/ukpga/2000/8/contents

[14] *See* Council Directive 2004/109, 2004 O.J. L390/38 (EC), as amended, available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv:OJ.L_.2004.390.01.0038.01.ENG

13

information that could affect the price of the securities.[15]

In the U.K., regulatory responsibilities are exercised by one or both of the U.K.'s two independent statutory regulators for financial services. These are the Financial Conduct Authority ("FCA") and the Prudential Regulation Authority ("PRA"). The FSMA provides that regulated financial services firms face concurrent liability under criminal,[16] civil and administrative law. With respect to the administrative enforcement of the law, part XIV of the FSMA grants powers to the regulators to take disciplinary action against regulated entities that stop short of criminal prosecution — including imposition of financial penalties.

With respect to civil liability, sections 71, 138D, and 241 of the FSMA provide for a right to claim damages in private law where a private person can establish sufficient standing and where the putative defendant has breached a relevant provision of the FSMA.[17] Further, the FSMA provides statutory causes of action in connection with prospectuses and other prescribed disclosures.

Specifically, section 90 of the FSMA provides that a person who acquires securities to which a prospectus applies has the right to claim compensation for loss suffered as a result of any untrue or misleading

---

[15] *See* FSMA, Part VI, and the U.K. Financial Conduct Authority Disclosure Guidance and Transparency Rules (DTR), available at http://www.handbook.fca.org.uk/handbook/DTR/

[16] *See* FSMA, § 19. It is an offence for any natural or legal person to carry on, or purport to carry on, a regulated activity without either authorisation to do so or exemption from the requirement for authorisation.

[17] FSMA, §§ 71, 138D, and 241.

14

statement in the prospectus or the omission of any matter required to be included.[18] The law also provides the right to claim compensation for a false or misleading financial report or other prescribed statement.[19]

Thus, the U.K. has an effective securities regulatory system with remedies available to plaintiffs in both private and public law. Such remedies would be available to a U.S. plaintiff should they suffer a loss relating to ADRs based on securities issued by a U.K. company.

## V. THIS COURT WILL CONTINUE TO FACE APPEALS LIKE THIS ONE BY FOREIGN DEFENDANTS AS LONG AS THE U.S. HAS A CIVIL PROCEDURE SYSTEM WHICH IS UNIQUELY FAVORABLE TO PLAINTIFFS

It is a well-known fact that most countries regard the establishment of litigation rules as an important exercise of public policy and as a result, litigation rules can vary significantly from jurisdiction to jurisdiction.

What stands out is that the U.S. legal system provides a unique combination of advantages to plaintiffs that are not present in the U.K. and other nations. First, the so-called "American rule" on litigation costs requires each side to bear its own

---

[18] *See* FSMA, § 90(1).

[19] FSMA, § 90A. This Brief is not intended to contain an exhaustive enumeration of all remedies that may be available at common law or under statute; for example, § 2(1) of the Misrepresentation Act 1967 also provides a cause of action for certain misrepresentations made in pre-contract negotiations by one party to another. Misrepresentation Act 1967, 1967, c. 7, § 2(1) (U.K.).

15

litigation costs—regardless of the outcome of the litigation—rather than requiring the losing plaintiff to reimburse the successful defendant for some or all of its litigation costs.[20]  By contrast, the general rule in the U.K. and virtually every other major jurisdiction is a "loser pays" cost rule, so that the losing party must reimburse the winning party for all or most of attorneys' fees and litigation costs in almost all cases.[21]

Second, the whole subject of collective redress by groups of injured parties has been widely debated in the U.K., E.U. and elsewhere during recent decades.[22] Meanwhile, the United States. has adopted a plaintiff-favoring class action system under Rule 23 of the Federal Rules of Civil Procedure.  This is an "opt-out" procedure, while the U.K. and most other nations require parties to affirmatively "opt-in" to any class actions that they have authorized.[23]   The opt-out system allows the creation of much larger classes and

---

[20] *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255 (1975).

[21] Rule 44.2 of the Civil Procedure Rules (U.K.), available at https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part-44-general-rules-about-costs

[22] Commission Recommendation 2013/396/EU, art. 5 (E.U.), 2013 O.J. (L 201) 60, 64, available at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32013H0396. The Commission recommended, inter alia, that collective redress actions should use the 'loser pays' principle, should be 'opt-in', should not permit contingency fees which risk an incentive to litigation, and should prohibit punitive damages.

[23] *See, e.g.,* Civil Procedure Rules, Part 19 (U.K.) (discussing group litigation), available at https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part19.  These rules generally provide for only parties to a litigation to proceed as a group.

16

thereby generates much greater potential damage exposure for potential defendants.

The handful of other jurisdictions which permit opt-out class actions (e.g. Australia and some Canadian provinces) always apparently combine it with their normal "loser pays" litigation cost rules in order to reduce the risks of questionable class actions. Thus, the combination of opt-out class actions and no litigation cost recovery appears to be unique feature of the U.S. system, and it is a source of ongoing concern to the U.K. every time a significant extraterritorial class action is brought in the U.S., regardless of whether it is ultimately resolved by litigation or settlement.

Third, the right to a jury trial in a civil case, guaranteed by the Seventh Amendment to the U.S. Constitution, can generate some higher damage verdicts, and as a result of this risk, higher settlements.[24] By contrast, in the U.K. liability and damages in civil cases are normally determined by judges and explained in written opinions.[25]

---

[24] *See, e.g.*, William Glaberson, *NAFTA Invoked to Challenge Court Award,* N.Y. Times, Jan. 28, 1999, available at http://www. nytimes.com/1999/01/28/business/nafta-invoked-to-challenge-cou rt-award.html?pagewanted=all&src=pm (two leading U.S. international trade experts "noted that business leaders in other countries have for years complained that America's large jury verdicts make investment here unpredictable").

[25] *See* Senior Courts Act 1981, § 69 (U.K.), available at http:// www.legislation.gov.uk/ukpga/1981/54/section/69. A claim for compensation in respect of a false or misleading prospectus under § 90 of the FSMA is not subject to a jury trial.

17

Fourth, punitive damages are periodically available in the United States, but rarely, if ever, allowed in the U.K. or elsewhere.[26]

Fifth, the U.S. legal system allows somewhat broader discovery to be obtained by the plaintiffs, including expansive document requests and depositions which are quite expensive, invasive, and time-consuming for the defending party.[27]  Again, the U.K. legal system does not allow such broad discovery in civil proceedings,[28] and in civil law countries (such as Japan), discovery is much narrower still.

Lastly, the U.S. has a contingency fee system which is more lightly regulated and thus allows U.S. attorneys to recover attorneys' fees in far greater percentages and amounts than appears to be allowed in the U.K. and elsewhere, especially in class action cases. Conditional fee agreements are permitted in litigation

---

[26] *See Rookes v. Barnard* [1964] A.C. 1129 (H.L.) (appeal taken from Eng.) (punitive damages, also known as "exemplary damages," are generally not recoverable under U.K. law).  There is no reported case ever in which a securities dispute in the U.K. has given rise to exemplary damages. *See also* John Y. Gotanda, *Punitive Damages: A Comparative Analysis*, 42 Colum. J. Transnat'l L. 391, 396 n.24 (2004) (identifying numerous countries that only allow compensatory damages in private actions).

[27] *See, e.g., Bell Atlantic v. Twombly*, 550 U.S. 544, 548 (2007) (where this Court cited the burdens of discovery as one of the reasons to impose enhanced standards of what a plaintiff had to be able to plead in order to survive a motion to dismiss under Fed. R. Civ. P.12(b)(6)).

[28] *See generally* Civil Procedure Rules, Part 31 (U.K.), available at https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part31.

18

in U.K. courts, subject to restrictions;[29] however, contingency fees are not permitted.[30]

The U.K. respectfully suggests that the U.S. rules outlined above largely explain why this Court has continued to see a succession of cases where the conduct being challenged lacks a strong factual nexus with the U.S.[31] Forum shopping has the potential to seriously undermine the ability of nations to regulate domestic securities and set the rules governing litigation between private parties regarding such securities within their national jurisdictions. In the Government's view, plaintiffs should not be allowed to exploit differences between national legal systems and choose the litigation rules that best suit their interests in a particular case.

---

[29] *See, e.g.*, Courts and Legal Services Act 1990, c. 41, §§ 58, 58A (U.K.); Civil Procedure Rules, Parts 43-45 (U.K.). The U.K. does permit limited conditional fee agreements. The maximum that a success fee can be increased is 100% (or double the regular fees incurred by the attorneys). Conditional Fee Agreements Order 2013 (SI 2013/689), art. 3 (U.K.), available at http://www.legislation.gov.uk/uksi/2013/689/made

[30] *See* Solicitors Act 1974, 1974, c. 47, § 59 (U.K.); Courts and Legal Services Act 1990, § 58(1) (U.K.); Solicitors Code of Conduct, R. 2.04 (2007) (U.K.). The U.K. does permit certain damage-based fee agreements, but such payments must not be above 50% of the sums ultimately recovered by the client and must be net of any costs and disbursements that have been paid or are payable by another party to the proceedings. *See* Damages-Based Agreements Regulations 2013/609, art. 4 (U.K.), available at http://www.legislation.gov.uk/uksi/2013/609/made

[31] This process has continued since this Court's strong warning in *Morrison*. *See Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108 (2013) and *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015), which were cases where no credible factual nexus existed between the alleged overseas injuries and the United States.

19

If the Ninth Circuit decision were not jurisdictionally restrained by this Court, it could lead to an international "race-to-the-bottom" in which the forum offering the most favorable rules to plaintiffs for particular disputes prevails. Such forum shopping could turn out to be a sword that cuts both ways. Not only would it permit a plaintiff to obtain the benefits of U.S. litigation rules for securities registered abroad; it would also make it possible for foreign plaintiffs to obtain remedies for wrongs allegedly committed by U.S.-registered securities in any foreign court, even when the U.S. company does not sponsor any securities within the foreign jurisdiction. It is difficult to see how states could, under such circumstances, effectively exercise their sovereign right to regulate within their sovereign boundaries.

20

## CONCLUSION

The Government of the United Kingdom regards this as a very important case. Therefore, for the reasons explained above, the U.K. respectfully urges the Court to grant the Petition for a Writ of Certiorari.

Respectfully submitted,

SIR IAIN MACLEOD
   *The Legal Adviser*
SAMUEL LINEHAN
   *Assistant Legal Adviser*
FOREIGN AND COMMONWEALTH
   OFFICE
UNITED KINGDOM

DONALD I. BAKER
   *Counsel of Record*
W. TODD MILLER
ISHAI MOOREVILLE
BAKER & MILLER PLLC
2401 Pennsylvania Ave., NW
Suite 300
Washington, DC 20037
(202) 663-7820
dbaker@bakerandmiller.com

*Attorneys for the Government of the United Kingdom of Great Britain and Northern Ireland*

December 4, 2018