ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
HADIYA K. DESHMUKH (328118)
SHAO-JIA CHANG (356004)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
schang@rgrdlaw.com
    – and –
MICHAEL A. TRONCOSO (221180)
DANIELLE S. MYERS (259916)
ASHLEY M. PRICE (281797)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>BARCLAYS PLC, et al.,<br><br>                Defendants. | Case No. 2:23-cv-09217-MEMF-KS<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS' OPPOSITION TO BARCLAYS PLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT<br><br>DATE: November 13, 2025<br>TIME: 10:00 a.m.<br>JUDGE: Hon. Maame Ewusi-Mensah Frimpong<br>CTRM: 8B, 8th Floor |

4920-1219-7743.v2

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    RELEVANT FACTS ...................................................................................................2

III.   THE SAC STATES A DISHONEST DELAY CLAIM...........................................4

    A.    Dishonest Delay Within the U.K.'s Legal Framework.............................4

    B.    The SAC Satisfies Every Element of a Dishonest Delay Claim and Cures the Deficiencies Found in the Court's Order ............................................5

    C.    Barclays Delayed Disclosing the Information It had Regarding Staley's Relationship with Epstein and Its Misleading Letter ...............................6

    D.    Barclays' Delay in Disclosure of What it Knew Was Dishonest...........................8

    E.    The SAC's Dishonest Delay Claim is Proper Under Section 90A ........................10

IV.    FNC STILL DOES NOT JUSTIFY DISMISSAL OF THE FSMA CLAIMS..................11

    A.    Plaintiffs' Forum Choice Deserves Full Deference ................................11

    B.    An Adequate Forum Need Not Be the "Most Competent".....................12

    C.    Private Interest Factors Still Weigh Against Dismissal........................13

    D.    Public Interest Factors Do Not Support Dismissal ...............................16

V.     BARCLAYS' COMITY ARGUMENTS FAIL ..............................................................17

VI.    CONCLUSION...........................................................................................................18

4920-1219-7743.v2

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Activision Publ'g, Inc. v. EngineOwning UG,*
2023 WL 3272399 (C.D. Cal. Apr. 4, 2023) ........................................................................17

*Aenergy, S.A. v. Republic of Angola,*
31 F.4th 119 (2d Cir. 2022) ...............................................................................................15

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972).............................................................................................................11

*Allianz Funds Multi-Strategy Trust v. Barclays*
[2024] EWHC 2710 (Ch)..............................................................................................4, 7, 8

*Alternate Health USC, Inc. v. Edalat,*
2023 WL 8732811 (9th Cir. Dec. 19, 2023) ......................................................................12

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997).............................................................................................................17

*Barclays PLC et al v. Sklarov et al.,*
No. 1:20-cv-08437-LAK (S.D.N.Y. Oct. 9, 2020) .............................................................13

*Barclays PLC v. Plaid Inc,*
No. 1:21-cv-09667-AKH (S.D.N.Y. Nov. 22, 2021)...........................................................13

*Bos. Telecomms. Grp., Inc. v. Wood,*
588 F.3d 1201 (9th Cir. 2009) ............................................................................................14

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985).............................................................................................................16

*Carijano v. Occidental Petroleum Corp.,*
643 F.3d 1216 (9th Cir. 2011) ...........................................................................11, 12, 13, 14

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC,*
587 F. Supp. 3d 56 (S.D.N.Y. 2022)...............................................................................13, 17

*Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.,*
801 F. Supp. 2d 211 (S.D.N.Y. 2011).................................................................................11

*Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.,*
918 F.2d 1446 (9th Cir. 1990) ............................................................................................15

*Cooper v. Tokyo Elec. Power Co., Inc.,*
860 F.3d 1193 (9th Cir. 2017) ............................................................................................15

- ii -

**Page**

*Deirmenjian v. Deutsche Bank, A.G.*,
2006 WL 4749756 (C.D. Cal. Sep. 11, 2006)..............................................................13, 16

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) .................................................................................12

*Giuffre v. Andrew*,
579 F. Supp. 3d 429 (S.D.N.Y. 2022)........................................................................6

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
972 F.3d 1101 (9th Cir. 2020) .................................................................................15

*Gutierrez v. Advanced Med. Optics, Inc.*,
640 F.3d 1025 (9th Cir. 2011) .................................................................................12

*Hansen v. Grp. Health Coop.*,
902 F.3d 1051 (9th Cir. 2018) .................................................................................10

*Harden v. Amazon.com Servs. LLC*,
2024 WL 3915092 (C.D. Cal. Aug. 9, 2024)............................................................12

*Hartford Fire Ins. Co. v. Cal.*,
509 U.S. 764 (1993)..................................................................................................17

*Herbert v. VWR Int'l, LLC*,
686 F. App'x 520 (9th Cir. 2017) .............................................................................15

*Hunichen v. Atonomi LLC*,
2021 WL 5854964 (W.D. Wash. Nov. 12, 2021)......................................................15

*In re Apple Inc.*,
979 F.3d 1332 (Fed. Cir. 2020).................................................................................16

*In re Apple Inc. Device Performance Litig.*,
347 F. Supp. 3d 434 (N.D. Cal. 2018) ................................................................15, 17

*In re BP P.L.C. Sec. Litig.*,
2013 WL 6383968 (S.D. Tex. Dec. 5, 2013).............................................................16

*In re Orland Ltd.*,
2022 WL 885167 (B.A.P. 9th Cir. Mar. 25, 2022)....................................................12

*In re Vivendi Universal, S.A.*,
242 F.R.D. 76 (S.D.N.Y. 2007).................................................................................15

- iii -

4920-1219-7743.v2

**Page**

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ...............................................................................................11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2017 WL 66281 (N.D. Cal. Jan. 4, 2017)...........................................................................17

*Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020)..............................................................................14

*Jensen v. U.S. Tennis Ass'n*,
2025 WL 707447 (9th Cir. Mar. 5, 2025)..............................................................................8

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...............................................................................................16

*Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*,
337 F. Supp. 3d 274 (S.D.N.Y. 2018)..................................................................................13

*Montanore Minerals Corp. v. Bakie*,
867 F.3d 1160 (9th Cir. 2017) .............................................................................................17

*Mujica v. Airscan Inc.*,
771 F.3d 580 (9th Cir. 2014) ..........................................................................................17, 18

*Plotsker v. Envato Pty Ltd.*,
2025 WL 2481422 (C.D. Cal. Aug. 26, 2025)......................................................................14

*Sabadash v. Brevent*,
2024 WL 3841615 (C.D. Cal. July 8, 2024).........................................................................18

*Scot. Air Int'l, Inc. v. Brit. Caledonian Grp., PLC*,
81 F.3d 1224 (2d Cir. 1996)..................................................................................................12

*SEC v. Leslie*,
2009 WL 688836 (N.D. Cal. Mar. 16, 2009).........................................................................14

*Siswanto v. Airbus Americas, Inc.*,
2016 WL 7178460 (N.D. Ill. Dec. 9, 2016)..........................................................................12

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
2020 WL 12740596 (C.D. Cal. Jan. 17, 2020) .....................................................................12

*Stoyas v. Toshiba Corp.*,
424 F. Supp. 3d 821 (C.D. Cal. 2020) ...........................................................................12, 16

- iv -

4920-1219-7743.v2

**Page**

*Stoyas v. Toshiba Corp.*,
    896 F.3d 933 (9th Cir. 2018) ...............................................................................................12

*Thomas v. Bible*,
    983 F.2d 152 (9th Cir. 1993) ...............................................................................................11

*Tongfang Glob. Ltd. v. Element Television Co., LLC*,
    2020 WL 4354173 (C.D. Cal. June 22, 2020) .....................................................................12

*Tuazon v. R.J. Reynolds Tobacco Co.*,
    433 F.3d 1163 (9th Cir. 2006) ...................................................................................14, 16, 17

*Van Schijndel v. Boeing Co.*,
    434 F. Supp. 2d 766 (C.D. Cal. 2006) ..............................................................................12, 16

*Various Claimants v. Standard Chartered*
    [2025] EWHC 698 (Ch)...........................................................................................................7

**STATUTES, RULES, AND REGULATIONS**

28 U.S.C.
    §1332(d)(2) .............................................................................................................................13
    §1367......................................................................................................................................13

Federal Rules of Civil Procedue
    Rule 9(b) ..................................................................................................................................9
    Rule 26 ...................................................................................................................................14

**SECONDARY AUTHORITIES**

Paul Davies, *Davies Review of Issuer Liability: Final Report* (March 2007) .....................4, 7, 10

Paul Davies, *Davies Review of Issuer Liability: Liability for misstatements to the market: A discussion paper by Professor Paul Davies QC* (March 2007)..........................................4, 7, 8

4920-1219-7743.v2

## I.     INTRODUCTION[1]

This Court already considered and upheld the Exchange Act claims, confirmed jurisdiction, and rejected Barclays' *forum non conveniens* arguments.  ECF 93 ("Order") at 10, 19-23.  The Court found only the dishonest delay claim to be insufficiently pleaded, and granted leave to amend.  The second amended complaint ("SAC") addresses the deficiency by alleging that Barclays' October 12, 2023 press release in combination with the FCA Decision published on the same day revealed in detail what Staley and Higgins – and thus, Barclays – knew but delayed disclosing.[2]

The SAC draws directly from the October 12, 2023 FCA Decision, which lays bare years of emails between Staley and Epstein demonstrating a deeply intimate relationship.  Staley knew of these communications and the truth they contained, and by early 2020, Barclays' Board had reviewed them during its own internal investigation.  Defendants' concealment of this information until the publication of the FCA Decision constitutes precisely the sort of dishonest delay the FSMA was intended to prevent.

Rather than confront these factual allegations, Barclays mischaracterizes the law and the allegations, inventing a publication-by-the-issuer requirement that would reward issuers who bury damaging information and never admit the truth.[3]  It goes further still, accusing Plaintiffs of attempting to "recast" an omissions claim.  Those accusations are unfounded.  Plaintiffs are

---

[1]     This opposition is timely filed.  Although the Court entered an Order Granting Motion to Dismiss on October 2, 2025, ECF 116, the Court had previously partially granted a stipulation providing the filing deadline for this opposition be October 3, 2025, ECF 109 at 1.

[2]     "SAC" refers to the Second Amended Class Action Complaint for Violations of the Securities Laws of the United States and the United Kingdom (ECF 98).  Unless otherwise specified, capitalized terms shall have the meaning as defined in the SAC.  Unless otherwise noted, paragraph references ("¶__" or "¶¶__") are to the SAC.  All "Ex__" citations are to the Declaration of Ashley M. Price in Support of Plaintiffs' Opposition to Barclays PLC's Motion to Dismiss the Second Amended Complaint, filed herewith.  Emphasis is added and citations are omitted throughout unless otherwise indicated.

[3]     Because Barclays' Memorandum of Points and Authorities in Support of Its Motion to Dismiss the Second Amended Complaint (ECF 114-1) ("Motion" or "Mot.") has over 10,000 words, it fails to comply with Local Rule 11-6.1, requiring only 7,000 words.

- 1 -

4920-1219-7743.v2

entitled to plead the statutory cause of action that best fits their injury and it is misplaced for Barclays, the party that dishonestly withheld information from its investors, to suggest otherwise.

Finally, Barclays renews its *forum non conveniens* ("FNC") argument, but nothing has changed since the Court rejected it. Because Barclays will still have to litigate the Exchange Act claims brought against it before this Court, Barclays cannot show that litigating the FSMA claim in this forum is so inconvenient as to warrant dismissal. Moreover, in its enactment, FSMA was contemplated to be applied extraterritorially. Barclays' recycled motion is simply a bid for reconsideration and should be denied.

In sum, Barclays seeks to shift blame and rewrite the law, but the SAC pleads exactly what the statute requires.

## II. RELEVANT FACTS

Staley, Barclays' CEO and board member from December 2015 to November 2021, maintained a close, personal friendship with Epstein dating back to approximately 2000. ¶¶24, 46, 72, 104. Their relationship continued even after Epstein's conviction for soliciting prostitution of a minor. ¶¶52, 112. They exchanged more than 1,200 emails in which Staley described Epstein as his "most cherished" and "deepest" friend. ¶¶67, 112. While a senior executive at JPMorgan, Staley shared with Epstein confidential business information, and later did the same regarding his appointment as Barclays' CEO. ¶¶56(e), 81(a), 120. He sought Epstein's advice on both business and personal matters, like the graduate school endeavors of his daughter, who called Epstein "uncle Jeffery [sic]." ¶¶81(a), 120. Staley and Epstein spoke frequently by phone, and Staley paid multiple visits to Epstein's residences in New York City, Florida (during Epstein's work release), New Mexico, and on Epstein's island in the U.S. Virgin Islands – all sites (especially the island) later identified by survivors and investigators as central to Epstein's widespread sex abuse and sex trafficking operations. ¶¶67, 81(a), 120.

After Epstein's July 2019 arrest on federal sex trafficking charges of teenage girls in New York and Florida, regulators and the media scrutinized his ties to known business associates and friends, including Staley. ¶52. In August 2019, the FCA asked Higgins for Barclays' assurance that there was no impropriety in Staley's relationship with Epstein. ¶60. With Staley's input and

- 2 -

4920-1219-7743.v2

approval, Barclays sent an October 8, 2019 letter ("Letter") claiming that Staley "did not have a close relationship with Mr. Epstein" and that his "last contact" with Epstein occurred "well before he joined Barclays in 2015." ¶¶61-63.

Soon thereafter, the FCA received from JPMorgan a cache of over 1,200 emails contradicting Barclays' Letter. ¶64. Because the emails revealed a relationship far closer than Barclays admitted, the FCA summoned Higgins to a meeting in December 2019 and urged Barclays to conduct its own review of the emails and Staley's relationship with Epstein. ¶65.

In early 2020, Barclays retained Clifford Chance to review the emails, conduct an internal investigation, and prepare a confidential report for the Board. ¶66. The report appended the most controversial emails, which included messages where Staley told Epstein, "I deeply appreciate our friendship. I have few so profound," and another exchange where Staley wrote: "That was fun. Say hi to Snow White." Epstein responded: "[W]hat character would you like next?" to which Staley replied: "Beauty and the Beast." ¶¶66-67.

Defendants knew the email cache contradicted what Barclays had told the FCA but continued to conceal these facts. On November 28, 2021, *The Mail on Sunday* reported that Higgins privately admitted to one large investor that the FCA's forthcoming report "makes for uncomfortable reading." ¶87.

On October 12, 2023, the FCA published its final determination that Staley "recklessly misled the FCA and acted with a lack of integrity" and directed investors to a comprehensive and detailed report, the FCA Decision, which analyzed the evidence – including numerous emails between Staley and Epstein and interviews with Staley and other Barclays witnesses – on which it based its finding that the Letter was "clearly misleading." ¶¶104, 106-123. The FCA fined Staley £1.8 million and banned him from holding a senior management position in the financial services industry. ¶104. The same day, Barclays published a press release ("Press Release") regarding the FCA Decision and disclosed that as a result, the Board had stripped Staley of performance awards. ¶¶124-125.

As a result of the October 12, 2023 news, the price of Barclays ADRs and ordinary shares declined and investors were harmed. ¶127.

4920-1219-7743.v2

## III.    THE SAC STATES A DISHONEST DELAY CLAIM

### A.    Dishonest Delay Within the U.K.'s Legal Framework

Dishonest delay is part of the FSMA liability regime enacted to hold issuers accountable for misrepresentations, omissions, or the dishonest withholding of information.  Its purpose is to ensure issuers provide "timely and accurate information for market participants," thereby supporting the "efficient working of capital markets."  HM Treasury, *Extension of the statutory regime for issuer liability: a response to consultation* (March 2010) ("HM Treasury Response"), ¶1.1, ECF 114-5; *see also* Paul Davies, *Davies Review of Issuer Liability: Final Report* (March 2007) ("Davies Final Report") at 2, 4, ECF 114-5.

Although Section 90A was first introduced by the Companies Act 2006, the U.K. government anticipated "***extend[ing] the scope*** of the liability regime" under Section 90B.[4]  *See* HM Treasury Response at 4 & ¶1.2; *see also* Davies Final Report at 4.  One such extension was liability for dishonest delay.  *See Allianz Funds Multi-Strategy Trust v. Barclays* [2024] EWHC 2710 (Ch), ¶47 (quoting Paul Davies, *Davies Review of Issuer Liability: Liability for misstatements to the market: A discussion paper by Professor Paul Davies QC* (March 2007) ("Davies Review"), ¶¶83-86, ECF 114-5); Kramer Decl., ¶76.  Professor Davies explained that issuers should be liable for "withhold[ing] information . . . to mislead the market," Davies Review, ¶86, a proposal the U.K. government adopted "to reinforce the incentive to disclose relevant information promptly."  HM Treasury Response, ¶¶7.1-7.2, 7.4, 7.9.  The dishonest delay statute was enacted to provide ***greater*** protections to investors.  HM Treasury, *Extension of the statutory regime for issuer liability* (July 2008) ("HM Treasury Consultation Paper"), ¶6.4, ECF 114-5.

---

[4]    Prior to Section 90A coming into effect, the U.K. government asked Professor Paul Davies, QC, a leading company law academic, to review the regime, "which resulted in the '2007 Davies Review' and '2007 Davies Final Report.'"  ECF 69-1 ("Kramer Decl."), ¶30.  The U.K. government "largely adopted" Professor Davies' proposals, resulting in "substantial modification of the issuer liability regime with the enactment of Sch. 10A on 1 October 2010."  *Id.*; *see also id.*, ¶31 (listing key amendments).

- 4 -

**B.    The SAC Satisfies Every Element of a Dishonest Delay Claim and Cures the Deficiencies Found in the Court's Order**

Under FSMA Schedule 10A ("Sch. 10A"), an issuer is liable for dishonest delay where a person discharging managerial responsibilities ("PDMR") "acted dishonestly in delaying publication of the information" and investors acquired, held, or disposed of securities and suffered loss as a result. Sch. 10A(5)(1)-(2). Conduct is "dishonest" if "(a) it is regarded as dishonest by persons who regularly trade on the securities market in question, and (b) the person was aware (or must be taken to have been aware) that it was so regarded." Sch. 10A(6).

Staley, Barclays' CEO and board member until he left the Company, plainly qualifies as a PDMR. *See* Kramer Decl., ¶¶105-106. He had personal knowledge of his close friendship with Epstein and knew the Letter was inaccurate and misleading. Higgins, as Chair of Barclays' Board, was a PDMR throughout the Class Period. *Id*. By early 2020, Higgins had received the email cache, reviewed a report appending the most troubling exchanges, and knew those emails contradicted Barclays' assurances to the FCA. *See* §III.D, *infra*.

Against the backdrop of intense regulatory and media scrutiny, reasonable market participants would regard this concealment as dishonest. And because both Staley and Higgins persisted in withholding information, they necessarily knew – or must be taken to have known – that their conduct was dishonest. Sch. 10A(6).[5]

The Court previously held that the Press Release could not itself establish dishonest delay because it was "based on the FCA's final determination and not on what Defendants independently may have known." Order at 23.

The SAC now makes clear, the Press Release references and, in announcing Barclays' remuneration decision, relies on the FCA Decision that details the investigation into Staley's relationship with Epstein and how that relationship was characterized in the Letter. ¶¶106-124. To reach its conclusion, the FCA interviewed Staley and other Barclays executives and analyzed hundreds of emails between Staley and Epstein to find they used a "'notably warm tone,'" ¶108,

---

[5] As a result of the dishonest delay, investors, including St. Louis Firemen, purchased Barclays ordinary shares at inflated prices and suffered losses. ¶¶169-170.

- 5 -

and reprinted numerous emails Barclays had reviewed no later than early 2020.  ¶¶111-112.  For instance, Barclays and Higgins reviewed emails in which Staley told Epstein that: "we count you as one of our deepest friends," and "I can't tell you how much your friendship has meant to me. . . . To my most cherished friend."  ¶112.

The FCA Decision also underscores the years-long, personal nature of the relationship.  In addition to effusive validations of their friendship, Staley referred to Epstein as "family" and "uncle Jeffery [sic]," and relished over his visits to Epstein's properties in New Mexico and the U.S. Virgin Islands – central locations for Epstein's alleged sex trafficking.  ¶¶24, 67, 81(a)(i)-(vii), 112 (*e.g.*, "I'm in the hot tub [at the New Mexico ranch] with a glass of white wine. . . .  And I deeply appreciate our friendship"; "When I retire, I'm going to put a mooring in front of your dock for my boat"); *see also Giuffre v. Andrew*, 579 F. Supp. 3d 429, 433-35 (S.D.N.Y. 2022) (denying dismissal of Epstein survivor's claims  alleging such conduct on Epstein properties in the U.S. Virgin Islands and New Mexico).  The cache even included suggestive exchanges, such as a message in which Staley and Epstein referred to having "fun" with "Snow White" and wanting "Beauty and the Beast" next time. ¶67.  Barclays' concealment of this information – despite having independent knowledge by early 2020 – is precisely the dishonest delay prohibited by Section 90A.  Order at 23.

These reprinted emails contextualize, substantiate and confirm – with the imprimatur of a governmental authority – what Barclays had kept dishonestly undisclosed from investors, *i.e.*, an intimate, longstanding friendship that Barclays had independently known about by no later than January 2020 but concealed for years. *Id.*

C.      **Barclays Delayed Disclosing the Information It had Regarding Staley's Relationship with Epstein and Its Misleading Letter**

The Court should reject Barclays' attempt to fabricate additional requirements that the issuer must itself later publish the delayed information and admit its own misstatements.  Mot. at 11.  These have no support in the statute and the SAC adequately pleads dishonest delay.

Nothing in Paragraph 5 makes liability contingent on the issuer later publishing corrective information.  Barclays relies on a single decision already questioned by another U.K. court. *See*

- 6 -

*Various Claimants v. Standard Chartered* [6] [2025] EWHC 698 (Ch), ¶¶94, 95, 117 (expressing serious "doubts about whether Leech J was correct to conclude that dishonest delay claims are dependent on the issuer publishing corrective information"); Kramer Decl., ¶¶79-82. Neither Professor Davies nor the U.K. government suggested such a requirement when developing the dishonest delay framework. [7] *See* Davies Review, ¶¶84-87; Davies Final Report, ¶¶47-50; *see also Standard Chartered*, ¶¶106-107 (discussing the Davies and U.K. government reports).

As both *Standard Charter* and *Allianz* recognized, "'***delay***' can mean when something happens late or when **something does not happen at all**." *Standard Chartered*, ¶100 (former emphasis in original); *see also Allianz*, ¶138(1) (same). *Standard Chartered* explained it would be "odd" to condition liability for failing to make a statement on whether a later statement is made. *Standard Chartered*, ¶104. Such a rule would even "provide[] a perverse incentive" to remain silent to avoid liability, contrary to the U.K. government's intent to "reinforce incentives for prompt disclosure to markets." HM Treasury Consultation Paper, ¶6.1; *Standard Chartered*, ¶114; Kramer Decl., ¶82.3.

Barclays' reliance on *Allianz* is misplaced. Mot. at 11. There, the court determined that Paragraph 2 of Schedule 10A, defining "'information to which this Schedule applies,'" should be read into the dishonest delay provision of Paragraph 5. *Allianz*, ¶138(2)-(3). But Paragraph 2 plainly applies to **published information**, whereas dishonest delay arises where an issuer "**fail[s] to make any statement at all**." Davies Review, ¶85. As *Standard Chartered* explains, omissions claims require issuer-published information because the omission must be measured against a disclosure; dishonest delay addresses information withheld altogether. *Standard Chartered*, ¶101.

[6] Mr. Moore attempts to sidestep *Standard Chartered* by asserting it "was an example of active case management of s. 90A claims," while "*Allianz* was a decision on the merits." Moore Decl., ¶¶65-66. However, *Allianz*, too, was driven by case management reasons: to narrow claims and facilitate settlement. *Allianz*, ¶¶143, 152. That *Standard Chartered* declined to follow *Allianz* despite "judicial comity" underscores that court's misgivings about dismissing the dishonest delay claim for lack of later publication. Moreover, *Standard Chartered*'s reasoning that such claims should be decided based on "actual facts and a trial" equally applies here, where much of the same evidence supports both the Section 10(b) claims as the dishonest delay claims. *Standard Chartered*, ¶112.

[7] Courts interpret Section 90A referencing "material produced in the domestic legislative process (such as the 2007 Davies Review and 2007 Davies Final Report)." Kramer Decl., ¶33; *see also Allianz*, ¶¶107-108; *Standard Chartered*, ¶¶63-64, 104.

- 7 -

Moreover, the *Standard Chartered* court found it was "a little extraordinary" to infer such a requirement into Paragraph 5 when it could easily have been "clearly spelled out," as it is for omissions. *Id.*, ¶103.[8]  But it was not.  Thus, no publication by Barclays is required to plead that Barclays dishonestly delayed disclosure of information it possessed showing Staley's relationship with Epstein was close and personal, and the Letter was "misleading."  ¶107.

Even if a later publication were required, however, the SAC satisfies that standard.  On October 12, 2023, Barclays published the Press Release directing investors to the FCA Decision.  ¶125.  Paragraph 2 expressly includes information published "***by other means*** where the availability of the information has been ***announced by the issuer*** by recognized means."  Sch. 10A(2)(1)(b).  Indeed, the U.K. government explained that this provision ensures that when a Regulated Information Service ("RIS") announcement refers to a document, "the whole text of [the document] [is brought] within the scope of the liability regime."  HM Treasury Response, ¶6.13.

Barclays' Press Release falls squarely within this definition: it announced the FCA Decision, which revealed what Barclays long knew but concealed – that Barclays had possessed emails detailing Staley's close relationship with Epstein and its Letter was "clearly misleading."  ¶¶104-124.[9]  Nothing more is required.

**D.      Barclays' Delay in Disclosure of What it Knew Was Dishonest**

Staley, as CEO and a PDMR, had first-hand knowledge of his relationship with Epstein, reflected in numerous e-mails calling Epstein one of his "deepest," "profound," and "most cherished" friends, recounting visits to Epstein's notorious island and ranch, and seeking Epstein's

---

[8]    Barclays characterizes the dishonest delay claim as asking the court to "'endorse a "policy innovation" in' English law."  Mot. at 11 (quoting *Jensen v. U.S. Tennis Ass'n*, 2025 WL 707447, at *2 (9th Cir. Mar. 5, 2025).  But *Standard Chartered* thoroughly considered *Allianz,* Section 90A, and U.K. legislative materials and doubted that publication is required.  ¶117.

[9]    Barclays attempts to add yet another unfounded element to Paragraph 5, suggesting that the delayed information must be an admission that the issuer had made false statements.  Mot. at 11.  Neither the statute nor Professor Davies nor the U.K. government's reports require such an "admission."  Such a requirement would be illogical – the dishonest delay claim relies on the nondisclosure of information, and Barclays could not "admit" a ***lack of a statement*** was false.

4920-1219-7743.v2

advice on familial and confidential matters. ¶¶67, 108, 112, 120. Yet, when the FCA asked Barclays in August 2019 to explain how it had assured itself that there was "no impropriety" in Staley and Epstein's relationship, Staley approved the Letter mischaracterizing the relationship. ¶¶60-61, 63. Through Barclays' response, Staley misrepresented to the FCA how recently he had been in contact with Epstein and the closeness of their friendship. ¶116. The FCA later found Staley's approval of those statements was "not inadvertent, careless or negligent" but reckless and lacking integrity. ¶¶104, 118-119. These allegations are sufficient to plead that he dishonestly concealed the truth concerning the information Barclays provided to its regulator. ¶119.

Higgins, Barclays' Chairman and a PDMR, also knew the truth. By January 2020, he had reviewed Clifford Chance's report appending the most troubling emails in the cache, which included Staley telling Epstein: "I miss you"; "I need to shake your hand in freedom" (following Epstein's release from prison); "When I retire, I'm going to put a mooring in front of your dock for my boat" (after visiting Epstein's island); and "You have paid a price for what has been accused. But we know what u have done for us. And we count you as one of our deepest friends. And most honest of people." ¶112. Higgins later admitted the "emails 'ma[de] for uncomfortable reading.'" ¶87. Yet he and the Board continued to conceal the knowledge obtained from them, even amid intense public and regulatory scrutiny following Epstein's arrest for sex trafficking teenage girls. ¶21. His and the Board's decision to conceal these facts that directly contradicted the Letter to the FCA supports an inference that the delay was "regarded as dishonest by people who regularly trade on the securities market in question." ¶167; Sch. 10A(6); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Barclays' suggestion that the SAC merely pleads "recklessness" utterly ignores these detailed allegations. Also conspicuously absent from Barclays' assertion that the SAC does not plead the "requisite" "intent" is any mention of Higgins' review (and thus knowledge) of the Staley-Epstein emails during Barclays' internal investigation. Mot. at 13. The SAC alleges that Staley and Higgins both knew the true facts, knew the Letter was misleading, and nevertheless withheld disclosure for years. *Cf.* Kramer Decl., ¶¶102-103 ("no specified requirement of

- 9 -

4920-1219-7743.v2

knowledge" for dishonest delay). That conduct is far more than a "serious failure of judgment" (¶167) – it is dishonesty under Schedule 10A.

Barclays also mischaracterizes what information the SAC alleges should have been disclosed. Mot. at 13. The claim is not that Barclays had a duty to predict or disclose the FCA's regulatory conclusion reached against Staley. Rather, it is that Staley and Higgins knew the underlying facts – including the 1,200-email cache and the misleading Letter – and dishonestly withheld them from investors. Mot. at 13-14. Those facts, not the FCA's conclusions, are what the SAC pleads as the basis for dishonest delay.[10]

### E.    The SAC's Dishonest Delay Claim is Proper Under Section 90A

Barclays' accused Plaintiffs of engaging in a "sleight of hand" by purportedly recasting a misstatement claim or omission theory as dishonest delay is baseless. Mot. at 11. As shown above, the SAC properly alleged a dishonest delay claim under Paragraph 5 of Schedule 10A, and Plaintiffs are entitled to pursue that theory. *See* §III.B-D, *supra*. A plaintiff "is the master of the plaintiff's complaint" and may plead the cause of action that best fits the facts and injury alleged. *See Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1056 (9th Cir. 2018).

The most recent U.K. authority confirms this. In *Standard Chartered*, the High Court rejected the very argument Barclays advances here, holding there is "no particular vice in an overlap" between Paragraph 3 and Paragraph 5, "and it is not surprising that there is such an overlap" given that dishonest delay claims were added later to expand issuer liability. *Standard Chartered*, ¶112. The court cautioned that Paragraph 5 should not be "stretched to such an extent so as to prevent any overlap," and warned that narrowing the provision with extra-statutory requirements would create "arbitrary anomalies" and undermine the U.K. government's intent. *Id.*, ¶118. This Court should follow *Standard Chartered* and reject Barclays' attempt to irrelevant

---

[10]    Moore argues that the SAC needed to "identify (i) . . . the information which it is alleged Barclays was required to publish; [and] (ii) when that obligation is said to have arisen." Moore Decl., ¶116. However, unlike FSMA omissions liability, which "expressly" applies only to matters required to be included in "published information," dishonest delay does not have the same requirement. Kramer Decl., ¶78. Though the U.K. government considered it, that limitation rejected because the claimants already have to satisfy a "very high evidential hurdle" to prove dishonesty. HM Treasury Response, ¶7.11; *see also* Davies Final Report at 5 (recommending the regime apply "to all RIS announcements").

- 10 -

4920-1219-7743.v2

analogy. *See* Mot. at 11-12 n.8 (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1209 (9th Cir. 2021)) (quoting the Ninth Circuit's denial of the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), presumption of reliance on omissions under U.S. securities laws).

## IV.    FNC STILL DOES NOT JUSTIFY DISMISSAL OF THE FSMA CLAIMS

FNC is an "exceptional tool to be employed sparingly," requiring dismissal only if a defendant shows (1) an adequate alternative forum, and (2) private and public interest factors that outweigh the "strong presumption in favor of the plaintiff's choice of forum." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224, 1227 (9th Cir. 2011). Barclays shows neither.

Barclays is already litigating the Exchange Act claims in this District arising from the same facts. Splitting claims against a single Defendant across jurisdictions would waste resources and risk conflicting judgments. Moreover, this Court has already rejected Barclays' FNC arguments and nothing has changed. Order at 22. Barclays' Motion amounts to nothing more than an untimely motion for reconsideration. *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).

### A.    Plaintiffs' Forum Choice Deserves Full Deference

A plaintiff's choice of its home forum is entitled to substantial deference. *Carijano*, at 1228-29. Plaintiffs are U.S. residents. And, notwithstanding Barclays' improper focus on California residency, Mot. at 19-21, when U.S. plaintiffs sue foreign defendants, the United States – not one particular state – is the "home forum." *Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 218-19 (S.D.N.Y. 2011).

The facts reinforce Plaintiffs' choice: Staley is a U.S. citizen; his relationship with Epstein was centered in U.S. locations – New York City, New Mexico, Florida, and the U.S. Virgin Islands (¶¶52, 112, 120); Barclays operates in the U.S. with multiple California offices (¶35; Ex.1); and U.S. regulators have already investigated this conduct (¶¶64, 92, 93). These connections directly refute Barclays' claim that "operative facts have not occurred within the forum." Mot. at 19.

Barclays also argues that foreign class members dilute deference to Plaintiffs' choice, citing transfer-of-venue cases. Mot. at 18. But *Carijano* squarely rejected that argument: FNC is

- 11 -

4920-1219-7743.v2

dismissal, not transfer, and deference is not weakened by the presence of foreign plaintiffs. *Carijano*, 643 F.3d at 1224, 1229.[11]

### B.    An Adequate Forum Need Not Be the "Most Competent"

This Court already concluded that a U.K. court may be adequate, but it is "not necessarily . . . a ***better*** forum" because Exchange Act claims cannot be brought there.  Order at 21.  Ninth Circuit precedent requires adequacy only where the entire case and all parties can be heard abroad. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002); *Gutierrez v. Advanced Med. Optics, Inc.*, 640 F.3d 1025, 1029 (9th Cir. 2011); *see Harden v. Amazon.com Servs. LLC*, 2024 WL 3915092, at *4 (C.D. Cal. Aug. 9, 2024).  Barclays' non-binding authorities neither change that law nor support dismissal of the FSMA claims where Barclays will ***still*** have to litigate the Exchange Act claims in the U.S.  Mot. at 17 & n.12.[12]  The Ninth Circuit has cautioned courts considering whether to dismiss some claims based on FNC where the case would proceed anyway against the same defendant on other claims in the U.S..  *See Stoyas v. Toshiba Corp.*, 424 F. Supp. 3d 821, 829 (C.D. Cal. 2020) ("the clear import of the Ninth Circuit's decision . . . is for this court to reconsider its prior dismissal of the JFIEA claim") (citing *Stoyas v. Toshiba Corp.*, 896 F.3d 933, n.25 (9th Cir. 2018)).

Because FNC does not require plaintiffs to choose the "optimal" forum, *Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766, 774 (C.D. Cal. 2006), *aff'd sub. nom.*, *Schijndel v. Boeing Co.*, 263 F. App'x 555 (9th Cir. 2008), Barclays is wrong to suggest that adequacy requires the "more competent" court.  Mot. at 15.  Nor would this Court need to "change" or "fundamentally alter"

---

[11]    Barclays also relies on the U.K. government's position in an *amicus* brief addressing the extraterritorial application of the Exchange Act –not at issue here in regards to the FSMA claim.  Mot. at 18-19.

[12]    The circumstances in those cases were entirely different.  *See, e.g.*, *Siswanto v. Airbus Americas, Inc.*, 2016 WL 7178460 (N.D. Ill. Dec. 9, 2016) (dismissing claims against U.S. defendants brought by non-U.S. plaintiffs for an accident abroad); *Tongfang Glob. Ltd. v. Element Television Co., LLC*, 2020 WL 4354173 (C.D. Cal. June 22, 2020) (dismissing foreign counter-claims against foreign counter-defendants); *Alternate Health USC, Inc. v. Edalat*, 2023 WL 8732811 (9th Cir. Dec. 19, 2023) (same); *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2020 WL 12740596 (C.D. Cal. Jan. 17, 2020) (dismissing foreign defendants with no remaining U.S. law claims); *In re Orland Ltd.*, 2022 WL 885167, at *7 (B.A.P. 9th Cir. Mar. 25, 2022) (holding contract liability with foreign party belonged in the UAE and the U.S. alter-ego debtors were not necessary parties to that liability dispute and remained in bankruptcy); *Scot. Air Int'l, Inc. v. Brit. Caledonian Grp., PLC*, 81 F.3d 1224, 1234-35 (2d Cir. 1996) (foreign law claims dismissed for FNC only after U.S.-law claims already dismissed).

4920-1219-7743.v2

U.K. law to hear a dishonest delay claim.  Mot. at 13, 16; *see also supra* at §III.E.  The Court will merely interpret and apply existing English law, as federal courts routinely do and as this Court has already done.  *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 107 (S.D.N.Y. 2022); Order at 23.

Finally, Barclays' accusation of forum shopping also fails.  Mot. at 17.  Adding another U.S.-based plaintiff is efficient case management, not gamesmanship – particularly where St. Louis Firemen and Teamsters Funds share similar interests, having both suffered losses as a result of the same misconduct by the same wrongdoers.  *Carijano* at 1228-29.  This Court has original jurisdiction over the FSMA claim through diversity, under 28 U.S.C. §1332(d)(2) (Order at 20), and supplemental jurisdiction under 28 U.S.C. §1367.  Consolidating related claims in one forum is precisely what the Federal Rules contemplate.[13]

### C.  Private Interest Factors Still Weigh Against Dismissal

The Court is familiar with and has applied the private interest factors, finding that the first four private interest factors weigh against dismissal and that Defendants conceded the last three factors.  Order at 21-22.

**Residence and Convenience**.  Plaintiffs are U.S. entities representing a class that includes U.S. investors.  Barclays conducts substantial business here,[14] and litigates here[15], facts underscoring this forum's convenience.  *Carijano*, 643 F.3d at 1230.  Indeed, multinational corporations "'can expect to litigate in foreign courts.'"  *Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 297 (S.D.N.Y. 2018), *aff'd*, 785 F. App'x 18 (2d Cir. 2019); *see also*

---

[13]    Barclays' warnings of "ruinous liability" are irrelevant, Exchange Act claims against Barclays will proceed here regardless, and class actions or contingency fees have no place in the forum adequacy analysis.  *See Deirmenjian v. Deutsche Bank, A.G.*, 2006 WL 4749756, at *24 -*32 (C.D. Cal. Sep. 11, 2006).

[14]    *See*, Ex. 2 at 431 (identifying only the U.K. and the U.S. under "Income from individual countries which represent more than 5% of total income").

[15]    *See, e.g.*, Complaint, *Barclays PLC et al v. Sklarov et al.*, No. 1:20-cv-08437-LAK (S.D.N.Y. Oct. 9, 2020), ECF 1; Complaint, *Barclays PLC v. Plaid Inc*, No. 1:21-cv-09667-AKH (S.D.N.Y. Nov. 22, 2021), ECF 1; Ex. 1 https://home.barclays/contact-us/americas/usa/ (identifying investment banking offices in Los Angeles, San Francisco, and Menlo Park, 7 other offices across the U.S. as well as "a team of Corporate Banking Relationship Directors based in New York and Miami").

- 13 -

*Plotsker v. Envato Pty Ltd.*, 2025 WL 2481422, at *10 (C.D. Cal. Aug. 26, 2025) (foreign parties' reliance on U.S.-based lawyers demonstrates convenience of U.S. forum); *see also* Order at 21.

**Access to and Cost of Evidence and Testimony**. Core evidence and witnesses are or originated in the U.S., including individuals identified on Plaintiffs' initial disclosures[16] and JPMorgan, where the Staley-Epstein relationship began. ECF 115-4 at 5-8. Defendants emphasize that "many" other witnesses reside abroad, but *Carijano* instructs courts to weigh materiality, not head counts. *Carijano*, 643 F.3d at 1231. Barclays has not made any showing that securing testimony from foreign witnesses would be oppressive. *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 603 (M.D. Tenn. 2020).

Additionally, the most important evidence – the Staley-Epstein emails – has already been collected and exists in digital form, which the Court already found is "easily available and transmitted online." Order at 22. Barclays' vague invocations of data privacy laws and FCA coordination do not change the calculus as those concerns would apply equally in U.K. court and also for the Exchange Act claims. Mot. 20-21; *see Bos. Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1208 (9th Cir. 2009). Indeed, "[a]ny court, whether in the United States or [foreign] . . . , will necessarily face some difficulty in securing evidence from abroad." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1181 (9th Cir. 2006). That is why both the U.S. and U.K. are parties to the Hague Evidence Convention. *SEC v. Leslie*, 2009 WL 688836, at *3 (N.D. Cal. Mar. 16, 2009). Barclays has only shown ordinary frictions of cross-border litigation.

**Availability of Witnesses**. As the Court already correctly found, the availability of witnesses provides no basis for dismissal, especially as "the witnesses would still be called upon" for the Exchange Act claims. Order at 22. The inquiry is not whether individuals fall outside the Court's subpoena power, but whether they would be unwilling to testify. *Carijano*, 643 F.3d at 1231. Barclays has not even asserted that a single witness is unwilling to appear. Nor has it identified any witness it intends to call who is outside its control.

---

[16] Barclays' reliance on Rule 26 disclosures is also misplaced – listing individuals with potentially discoverable information does not make them "key" witnesses. Mot. at 21.

- 14 -

4920-1219-7743.v2

Barclays' authorities only highlight this failure.  In *Herbert v. VWR Int'l, LLC*, 686 F. App'x 520 (9th Cir. 2017), FNC dismissal was supported by evidentiary declarations, not speculation.  *Id.* at 522.  In *Contact Lumber Co. v. P.T. Moges Shipping Co. Ltd.*, 918 F.2d 1446 (9th Cir. 1990) dismissal turned on the fact that key witnesses were outside defendants' control – a circumstance not present here.  *Id.* at 1451.  And *Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119 (2d Cir. 2022), involved a suit against a foreign government seeking to compel government officials to testify against their own country in a U.S. court.

**Costs of Trial**.  The cost of international litigation does not tip the balance toward dismissal – a point Barclays initially conceded.  Order at 21.  Travel and expenses will occur in either forum, and, will occur regardless because the Exchange Act claims are live.  *Cooper v. Tokyo Elec. Power Co., Inc.*, 860 F.3d 1193, 1211 (9th Cir. 2017).  A witness's preference for testifying abroad is insufficient to establish oppression or vexation.  *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1111 (9th Cir. 2020).  Barclays' generalized cost complaints do not satisfy its burden.

**Enforceability of a Judgment**.  A judgment from this Court would be fully enforceable against Barclays, over which it has personal jurisdiction.  Defendants previously conceded this factor and as this Court previously recognized, "at least some of the relevant class of plaintiffs," including St. Louis Firemen, reside in the U.S. Order at 21-22.  U.S. courts also routinely hear cases brought by classes that include foreign plaintiffs, confirming that the presence of U.K. class members poses no enforceability problem.  *See, e.g.*, *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 102-03 (S.D.N.Y. 2007), *aff'd sub nom.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016); *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 449 (N.D. Cal. 2018).  The extent to which enforceability for U.K. class members poses any issue is more properly determined at class certification, as even their expert concedes.  Moore Decl., ¶163; *see Hunichen v. Atonomi LLC*, 2021 WL 5854964, at *12 (W.D. Wash. Nov. 12, 2021).

**Other Practical Problems**.  The practical realities favor keeping this case in one forum.  Dismissal would fracture the litigation, create parallel proceedings, increase costs and delay, and

- 15 -

risk inconsistent outcomes through multiple triers of fact – precisely the inefficiency courts seek to avoid.  *Van Schijndel*, 434 F. Supp. 2d at 780; *Stoyas*, 424 F. Supp. 3d at 829.

### D. Public Interest Factors Do Not Support Dismissal

The Court also considered the five public interest factors and properly concluded that none compels dismissal here.  Order at 22.

**U.S. Interests Are Strong**.  The U.S. has a compelling interest in protecting harmed U.S. investors.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985); *Tuazon*, 433 F.3d at 1182.  The relevant inquiry focuses on the "'significant connections between a particular venue and *the events that gave rise to a suit*.'"  *In re Apple Inc.*, 979 F.3d 1332, 1345 (Fed. Cir. 2020) (emphasis in original).  Staley's relationship with Epstein, Barclays' U.S. presence and Barclays' solicitation of U.S. investors tie this case to U.S. interests.  *See also*, §IV.A, *supra*.  Indeed, Epstein's crimes have been and continue to be the subject of extensive U.S. scrutiny (both by courts and the media), including Staley's association with him.  ¶¶13-17, 64, 92-97; Ex. 3.

Barclays points to the U.K.'s sovereign interests to argue it is the most "natural forum," but the Ninth Circuit directs courts to ask only whether *this* forum has a local interest.  Mot. at 16; *Tuazon*, 433 F.3d at 1182.  Even if the U.K. has some stake, the U.S.'s overriding interest outweighs it.  *Deirmenjian*, 2006 WL 4749756, at *16.  Moreover, Barclays' reliance on *Howe* and the U.K.'s amicus in *Toshiba* and *Morrison* is misplaced; those matters involved extraterritorial application of U.S. law, not a case like this one where the U.K. has recognized its own laws may apply extraterritorially.  *See* §V, *infra*.[17]

**This Court Is Fully Capable of Interpreting U.K. Law**.  As Plaintiffs set forth in their prior briefing (ECF 69 at 23), this Court is "certainly capable of applying English law."  *In re BP P.L.C. Sec. Litig.*, 2013 WL 6383968, at *55 (S.D. Tex. Dec. 5, 2013).  Barclays' assertion that Plaintiffs are attempting to alter U.K. law is unfounded – Plaintiffs are simply bringing a claim

---

[17]    Plaintiffs oppose Defendants' request for judicial notice to the extent documents are offered for the truth of the matters asserted.  *See* ECF 115; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).  Plaintiffs do not oppose the Court's consideration of the documents to the extent that they reflect what the U.K. government said about the cases before it at the time that those briefs were filed.

- 16 -

under dishonest delay, a statute that has existed since 2010.  Mot. at 16, 24; Moore Decl., at ¶21.  Indeed, the Court has already demonstrated its ability to interpret U.K. law.  Order at 23.

**Burdens on Local Courts and Juries and Court Congestion**.  These factors do not favor dismissal.  This Court is already adjudicating Exchange Act claims, and trying the FSMA claims alongside them avoids duplication and inefficiency.  *See Reckitt Benckiser Grp.*, 587 F. Supp. 3d at 107.  U.S. juries are fully capable of considering complex subjects, including foreign law.  *Tuazon*, 433 F.3d at 1181-82.  It is also unclear how the case would be "speedier" in the U.K. (Mot. at 24), when only U.S. procedural rules provide for a class mechanism capable of resolving all claims in one action.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

## V.    BARCLAYS' COMITY ARGUMENTS FAIL

This Court has a "virtually unflagging obligation" to hear cases over which it has jurisdiction.  *Montanore Minerals Corp. v. Bakie*, 867 F.3d 1160, 1165 (9th Cir. 2017).  Adjudicatory comity applies only in "exceptional circumstances."  *Activision Publ'g, Inc. v. EngineOwning UG*, 2023 WL 3272399, at *21 (C.D. Cal. Apr. 4, 2023).  The Ninth Circuit weighs: (1) the strength of the United States' interest; (2) the foreign government's interest; and (3) the adequacy of the alternative forum.[18]  *Mujica v. Airscan Inc.*, 771 F.3d 580, 603 (9th Cir. 2014).  Courts also ask whether there is an actual conflict between American and foreign law.  *Id*. at 602.  Barclays fails on all counts.

**No Conflict of Law**.  "'No conflict exists, for [comity] purposes, where a person subject to regulation by two states can comply with the laws of both.'"  *Mujica*, 771 F.3d at 600 (quoting *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 799 (1993)).  There is no such conflict here.  Barclays voluntarily subjected itself to both regimes when it sponsored ADRs in the United States.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *8-*9 (N.D. Cal. Jan. 4, 2017).

---

[18]    The adequacy of the forum is addressed *supra* at §IV.B. and Barclays' arguments fail for the same reasons under the comity analysis.  *See Apple Inc.*, 347 F. Supp. 3d at 448-50.

- 17 -

**U.S. Interests Predominate Over Foreign Interests**. Courts consider the location and character of the conduct, the nationality of the parties, and relevant policy interests. *Mujica*, 771 F.3d at 604. Those factors all point to the U.S. – Staley's relationship with Epstein and Barclays' concealment of it have extensive U.S. ties. Protecting investors from dishonest foreign corporate conduct is a core U.S. policy. *Sabadash v. Brevent*, 2024 WL 3841615, at *11 (C.D. Cal. July 8, 2024). Barclays overstates the U.K.'s stake. "'[C]ourts will not extend comity to foreign proceedings when doing so would be contrary to the policies . . . of the United States.'" *Mujica*, 771 F.3d at 607.

In fact, the U.K. government approved of Section 90A's applicability abroad where English law applies. It explained the regime "***may in some cases be capable of applying extraterritorially, where for example, a claim relates to securities of a UK issuer admitted to trading on a US market***," and emphasized that the rarity of such cases "should not be a reason to exclude such investors" from its protections. HM Treasury Response, ¶3.14. Likewise, the FCA and SEC have formally agreed to cooperate in furthering investor protection and market integrity. Ex. 4 (2019 SEC-FCA Memorandum of Understanding). Applying Section 90A alongside Exchange Act claims only accords with U.K. policy.

## VI.      CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

DATED:  October 3, 2025

s/ Ashley M. Price
ASHLEY M. PRICE

ROBBINS GELLER RUDMAN
& DOWD LLP
MICHAEL A. TRONCOSO
DANIELLE S. MYERS
ASHLEY M. PRICE
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
mtroncoso@rgrdlaw.com
dmyers@rgrdlaw.com
aprice@rgrdlaw.com

- 18 -

4920-1219-7743.v2

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
HADIYA K. DESHMUKH
SHAO-JIA CHANG
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
hdeshmukh@rgrdlaw.com
schang@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 19 -

4920-1219-7743.v2

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,861 words, which complies with the word limit of L.R. 11-6.1.


DATED:  October 3, 2025

s/ Ashley M. Price
ASHLEY M. PRICE

4920-1219-7743.v2