# EXHIBIT 3

# How JPMorgan Enabled the Crimes of Jeffrey Epstein

A Times investigation found that America's leading bank spent years supporting — and profiting from — the notorious sex offender, ignoring red flags, suspicious activity and concerned executives.

  

By David Enrich, Matthew Goldstein and Jessica Silver-Greenberg

The reporters, who started investigating Epstein more than six years ago, reviewed more than 13,000 of pages of legal and financial records for this article.

Sept. 8, 2025

One day in October 2011, Jeffrey Epstein walked into the cavernous lobby of 270 Park Avenue in Midtown Manhattan. The skyscraper was home to JPMorgan Chase, arguably the world's most prestigious bank. The sex offender — who barely a year earlier was under house arrest after serving 13 months in a Florida jail — was ushered onto an elevator and whisked to a top floor where Jamie Dimon, the bank's chief executive, and the rest of the senior leadership had their offices.

Epstein had long been a treasured customer at JPMorgan. His accounts were brimming with more than $200 million. He generated millions of dollars in revenue for the bank, landing him atop an internal list of major money makers. He helped JPMorgan orchestrate an important acquisition. He introduced executives to men who would become lucrative clients, like the Google co-founder Sergey Brin, and to global leaders, like Prime Minister Benjamin Netanyahu of Israel. He helped executives troubleshoot crises and strategize about global opportunities.

But a growing group of employees worried that JPMorgan's association with a man who had pleaded guilty to a sex crime — and was under federal investigation for human trafficking — could harm the bank's reputation. Just as troubling, anti-

money-laundering specialists within the bank noticed Epstein's pattern of withdrawing tens of thousands of dollars in cash virtually every month. These were red flags for illicit activity.

That was why Epstein was at the bank's headquarters. JPMorgan's top executive in charge of ensuring compliance with laws and regulations had already pushed to fire him as a client. Now Stephen Cutler, a former federal securities regulator and the bank's general counsel, had added his voice to the chorus.

Epstein's chief defender at the bank was Jes Staley, a top contender to one day succeed Dimon as chief executive. Staley persuaded Cutler to sit down with Epstein and "hear him out." It was a high-stakes meeting for Epstein; his close ties to JPMorgan had been invaluable in his quest for money, influence and legitimacy. The bank lent him money. Staley dished confidential information to him. At Epstein's behest, JPMorgan set up accounts — into which he routinely transferred huge sums — for young women who turned out to be victims of his sex-trafficking operations. It wired his funds overseas. It even paid him millions of dollars.

Case 2:23-cv-09217-MEMF-KS    Document 117-4    Filed 10/03/25    Page 4 of 32    Page ID #:5829



Jes Staley, once the leading contender to succeed Jamie Dimon as chief executive of JPMorgan, repeatedly went to bat for Jeffrey Epstein at the bank.  James Manning/PA Images, via Getty Images

Epstein's crimes have been exhaustively documented, and elements of JPMorgan's relationship with Epstein have become public via legal proceedings in the United States and Britain. But the full story of how America's leading lender enabled the century's most notorious sexual predator has not been told. This account has been pieced together from thousands of pages of internal bank records, sealed deposition transcripts and other court documents and financial data, as well as interviews with people with direct knowledge of the Epstein relationship. Among

the findings: Bank officials for more than a decade were anxious about Epstein's prolific wire transfers and cash withdrawals — JPMorgan ultimately processed more than $1 billion in such transactions for him — and warned senior management about his suspicious activities. But on at least four occasions over five years, the bank's leaders overrode those objections and continued to serve Epstein.

Joseph Evangelisti, a spokesman for JPMorgan, said in a statement that the bank's relationship with Epstein "was a mistake and in hindsight we regret it, but we did not help him commit his heinous crimes." He added, "We would never have continued to do business with him if we believed he was engaged in an ongoing sex trafficking operation." The bank has pinned blame for the scandal on Staley, a trusted confidant to Dimon. "We now know that trust was misplaced," Evangelisti said.

Tales of greed trumping ethics and morals are older than Wall Street itself, and the story of how and why JPMorgan spent years serving Epstein is a case study in that dynamic. But it is instructive in other ways as well. More than six years after his death in a Manhattan jail cell, where he was awaiting prosecution on federal sex-trafficking charges, mysteries continue to swirl around how Epstein amassed and deployed money and influence on a grand scale. Over time, those mysteries curdled into conspiracy theories — most of them unsubstantiated — that placed Epstein at the center of a vast global pedophilia ring or as a foreign intelligence operative compiling dirt on the rich and powerful. The Trump administration's refusal to release files gathered by federal investigators as they built a case against Epstein — aside from unsuccessfully seeking to unseal an F.B.I. agent's grand-jury testimony — has only added to the frenzied speculation.

In Epstein's lengthy alliance with JPMorgan, we found a more mundane, if no less damning, explanation for Epstein's remarkable success. He was, in the words of one friend, the former Israeli prime minister Ehud Barak, "a collector of people." He used those relationships to cultivate new connections and establish his legitimacy. He traded favors and gossip and advice. He created an aura of indispensability and of being so plugged-in that he bordered on omniscience —

traits that made him a vital asset for a worldwide cast of government and business leaders. That, in turn, gave Epstein access to more money and connections that he could use to power his criminal activities.

But in 2011, this edifice of power and influence was at risk of crumbling. His conviction and incarceration led some of his powerful friends to back away and threatened to leave him an outcast from the financial world. His relationship with JPMorgan was therefore more important than ever. The fact that he remained a client in good standing conferred on him respectability and helped him foster new ties to corporate elites. He was determined not to blow it. Sitting in Cutler's office that autumn afternoon, Epstein assured the general counsel that he had "turned over a new leaf." And he rattled off names of prominent figures who, he told Cutler, could vouch for his character. "Go talk to Bill Gates about me," Epstein said at one point.

Afterward, Cutler sat alone, trying to figure out what to do. He kept brooding for weeks. Epstein struck him as a smooth operator; it wasn't hard to imagine him charming powerful people. Yet Cutler didn't see how he would be able to explain to his female colleagues that JPMorgan was keeping Epstein as a client, he would later say. After a second conversation with Epstein, he informed Staley that he still thought the bank should cut ties.

But the recommendation came with crucial caveats. Cutler considered his primary job to be protecting JPMorgan from legal risks, and from his perspective, the Epstein relationship was a threat to the bank's reputation. He did not see evidence that Epstein was using his accounts for criminal purposes. As a result, he would not insist that the bank expel him as a client. Nor would he escalate the matter to Dimon, the chief executive.

And so Epstein was allowed to stay.

Case 2:23-cv-09217-MEMF-KS Document 117-4 Filed 10/03/25 Page 7 of 32 Page ID #:5832



Jamie Dimon has said he did not "recall knowing anything about Jeffrey Epstein" until 2019, even though his subordinates were fighting over whether to keep him as a client. Tom Williams/Associated Press

**The story of JPMorgan's** relationship with Epstein begins in the late 1990s in the canyons of Manhattan's financial district. Epstein was in his 40s, a college dropout who briefly worked on Wall Street after a time as a high school math teacher, and he had a gift for making it seem as if he belonged. He had gone on to advise and manage money for some big-name clients. In 1985, he opened a bank account at a company that is now part of JPMorgan, but it wasn't until more than a decade later, as his wealth and renown grew, that he began getting noticed at the bank.

A JPMorgan client suggested to Sandy Warner, the bank's chief executive at the time and a titan of American finance, that he meet this up-and-comer. Warner invited Epstein to a meeting in his 20th-floor office in the bank's neoclassical headquarters at 60 Wall Street. (JPMorgan would move to Midtown a couple of years later.) The pair talked about markets and policy, Warner recalled in an interview. Epstein presented himself as a heavyweight, claiming to manage money for the Rockefellers.

That meeting was followed by a well-attended gathering at Epstein's Manhattan home. Warner today insists that he was immediately creeped out by Epstein. Even so, he phoned one of his lieutenants to encourage him to meet Epstein, "who drops 50 names in an hourlong conversation." That lieutenant was Jes Staley.

Staley had joined JPMorgan in 1979 after graduating from Bowdoin College in Maine with an economics degree. He worked for the bank in Brazil, where he met his future wife, and then relocated to New York. His star rose rapidly inside the storied investment bank. In 1999, Warner promoted him to run JPMorgan's private-banking division, which catered to ultrawealthy clients. Not long after, at Warner's urging, Staley visited Epstein at his office in an old mansion across the street from St. Patrick's Cathedral in Midtown Manhattan. It was the beginning of a long, fateful friendship. (Staley, as well as some other current and former senior bank executives, did not respond to our questions or declined to comment for this article.)

Epstein was on his way to becoming one of JPMorgan's most important clients. A 2003 internal report pegged his net worth at about $300 million. The report, which hasn't previously been disclosed, noted that Epstein's occupation was advising wealthy individuals like Leslie H. Wexner, the billionaire operator of brands like Victoria's Secret and the Limited, though bank documents at the time did not list any other clients. That year, JPMorgan attributed more than $8 million in fees to Epstein, making him the biggest revenue generator among investor clients in the private-banking division.

But the report overlooked something that, had it been taken seriously, might have dimmed the bank's enthusiasm. In 2003, Epstein withdrew more than $175,000 in cash from his JPMorgan accounts — a huge haul, even for someone with millions at the bank. Outside investigators later found that Epstein paid almost that exact amount to women that year. JPMorgan recognized that those withdrawals needed to be reported to federal regulators that monitor large cash transactions. But the bank failed to treat those withdrawals as an early-warning system for itself.

Indeed, JPMorgan's anti-money-laundering specialists subsequently acknowledged that such withdrawals should have alerted the bank to the possibility that Epstein was committing crimes.



JPMorgan did financial work for Epstein's company that handled the affairs of his private island Little Saint James in the U.S. Virgin Islands. The bank later paid settlements to victims who were sexually abused there. Emily Michot/Miami Herald/Tribune News Service, via Getty Images

JPMorgan, however, was all in. Soon it opened accounts not just for Epstein but also for his companies, including one that handled the affairs of his private island, Little Saint James, off the coast of St. Thomas in the U.S. Virgin Islands. The bank also provided financial backing for Epstein to help Jean-Luc Brunel, a French modeling scout who had been the subject of media reports about drugging and raping women, start a modeling agency called MC2. JPMorgan would ultimately open at least 134 accounts for Epstein, his companies and his associates.

Wittingly or not, the bank was supporting important cogs in Epstein's sex-trafficking machinery. On the island, Epstein would compel teenage girls and young women to give him nude massages and have sex with him. Some of Epstein's underage victims said MC2 lured them to the United States with the prospect of paid modeling work. (In 2022, Brunel died by suicide in a French jail cell after being charged with raping teenage girls.)

The millions of dollars in fees that Epstein was paying the bank was only part of his allure. Arguably more important, he was identifying potential new clients and business opportunities. In 2003, for example, he introduced Staley to Brin, the co-founder of Google and one of the world's richest men. Brin hired JPMorgan to help manage his immense fortune — he would eventually park more than $4 billion in assets at the bank — a decision that Staley credited to Epstein. Staley later said in a deposition that a parade of other Epstein referrals — including to Gates, Elon Musk and Sultan Ahmed bin Sulayem, an Emirati billionaire — followed, though not all became clients.

Just as JPMorgan landed Brin, Epstein made an even more consequential contribution to the bank's growth. Hedge funds were all the rage among America's rich, and Staley thought that if he could offer clients access to these investment vehicles, it would help distinguish JPMorgan from rivals. As it happened, Epstein had a useful point of contact: Glenn Dubin, who co-founded a $7 billion hedge fund called Highbridge Capital Management, and his wife, Eva Andersson-Dubin, a former Miss Sweden whom Epstein once dated. Epstein was the godfather to the Dubins' daughter, and photographs and paintings of the girl were ubiquitous in Epstein's colossal Upper East Side townhouse. (Epstein would later name Andersson-Dubin as a beneficiary of his estate. Her lawyer said she learned she was a beneficiary only after his death and rejected the bequest.)

In 2004, with Epstein acting as middleman, JPMorgan agreed to pay $1.3 billion for a controlling stake in Highbridge. The acquisition would turn into a landmark for the bank — and for Staley, who described it as "probably the most important

transaction in my professional career." Staley, who by then was running JPMorgan's asset and wealth management business, was soon reporting to Dimon, the bank's No. 2 executive and C.E.O.-in-waiting.

Epstein, for his part in arranging the Highbridge deal, pocketed a $15 million fee from the hedge fund that JPMorgan now controlled. The payout reflected a crucial reality: Epstein was the rarest of customers, one whose moneymaking potential extended far beyond his own accounts. It was imperative to keep this superclient happy.

A few months later, in early 2005, Staley emailed an underling in the private bank about bringing on another new client. Her name was Ghislaine Maxwell. She was Epstein's ex-girlfriend and remained entwined in his life. (She would later be convicted of playing a central role in his sex-trafficking operations and is serving a 20-year sentence.) "Ghislaine is a good friend of one of our very big clients in the US," Staley wrote. "Can we please try to help her." Epstein later transferred millions of dollars into Maxwell's JPMorgan account, including $7.4 million to buy a green Sikorsky helicopter to fly people to Little Saint James.



Epstein's waterfront home in Palm Beach, Fla., was the site of the sex crime he was charged with in 2008. Even after he was a registered sex offender, JPMorgan did not end its relationship with him. Pedro Portal/Miami Herald/Tribune News Service, via Getty Images

10/2/25, 2:18 PM    Case 2:23-cv-09217-MEMF-KS    Document 117-4    Filed 10/03/35    Page 12 of 32    Page
How JPMorgan Enabled the Crimes of Jeffrey Epstein - The New York Times
ID #:5837

**By then, Epstein's abuse** of young women and girls was attracting the notice of law enforcement. In March 2005, the parents of a 14-year-old girl filed a complaint with the police in Palm Beach, Fla., alleging that Epstein had molested her. The police opened an investigation, and soon other teenage girls shared similar stories of abuse. (Women have subsequently accused Epstein of raping them as teenagers as far back as 1985.)

Even before the investigation became public, warning lights should have been flashing inside JPMorgan. Epstein's huge cash withdrawals continued — a total of more than $1.7 million in 2004 and 2005, according to records we reviewed — much of which was used to procure girls and young women. Some of the withdrawals took place at the bank branch in JPMorgan's Park Avenue headquarters, where Epstein's accountant regularly arrived to cash huge checks written from Epstein's various accounts.

At Epstein's request, the private bank also agreed to open accounts for two young women without actually speaking to either of them. Instead, one of Epstein's minions provided bare-bones information, and JPMorgan couldn't confirm one woman's Social Security number. A banker was supposed to meet with the woman to verify her details but never did, according to a report prepared for the U.S. Virgin Islands, which later sued JPMorgan. (Evangelisti, the bank spokesman, said the accounts "were properly verified and documented.")

Decades of scandals — in which banks facilitated drug smuggling, human trafficking, money laundering, terrorism and even genocide — gave rise to requirements that lenders vet their customers, closely monitor their activities and flag suspicious transactions to the government. Among its many lapses with Epstein, JPMorgan often failed to alert federal watchdogs to transactions that the bank later acknowledged were suspicious. And by opening accounts for young women without meeting them, the bank was missing a well-known hallmark of human traffickers: that they control victims' interactions with the outside world.

Case 2:23-cv-09217-MEMF-KS   Document 117-4   Filed 10/03/25   Page 13 of 32   Page ID #:5838

Not until Epstein was arrested and indicted in July 2006 on charges of soliciting prostitution from a teenage girl did JPMorgan start paying more attention. In a deposition in 2023, Staley said that he phoned Dimon to tell him an important client had just been indicted and that the two executives later met in person to discuss the situation. (Dimon has denied this under oath.) "So painful to read," Mary Erdoes, who had succeeded Staley at the helm of the private bank, emailed her boss, attaching an article about the indictment. Staley responded that he had just met with Epstein the previous night. "I've never seen him so shaken," he typed on his BlackBerry, saying that Epstein "adamantly denies" being involved with girls.



Mary Erdoes, a top JPMorgan executive, signed off on a new loan to Epstein months after his indictment in Florida on a charge of soliciting prostitution from a teenage girl. Steven Ferdman/Getty Images

In private, Staley and Erdoes seemed to make light of their client's predilections. That August, Staley attended a Hamptons fund-raiser and was struck by the crowd's composition. "The ages between husband and wives would have fit in well with Jeffrey," he told Erdoes in an email. She replied that Epstein's name had come up at an event the night before. An acquaintance noted how another prominent New York businessman liked to surround himself with beautiful assistants. "Lots of comparisons to JE," Erdoes wrote, adding that people were "laughing about Jeffrey."

JPMorgan pulled together a team to decide what to do about their indicted but lucrative client. Around this time, the Justice Department charged another bank customer, the actor Wesley Snipes, with tax fraud. JPMorgan quickly kicked Snipes out of the bank, according to sealed court records we reviewed. (Snipes was later convicted on tax-related misdemeanors but acquitted of more serious fraud charges.)

But the Florida sex-crime charge against Epstein — even when coupled with news that the Justice Department had opened its own investigation into his activities — didn't lead to a similar result. The team assigned to the Epstein matter noted his suspicious pattern of large cash withdrawals but, after discussing things with Staley and Erdoes, opted to keep him as a client. The one condition: JPMorgan "will not proactively solicit new investment business from him," an internal memo said. But that did not preclude continuing to lend him money. The following year, Erdoes signed off on a new loan to Epstein. "I am relieved to hear," a banker wrote after learning that Erdoes had approved the new credit line despite concerns raised by others within the bank.

**Much of the paper trail was in email exchanges. Below are excerpts.**

In 2008, the situation again seemed to grow untenable. A parade of victims had sued Epstein for sexually abusing them, and the ugly details in the court filings caught the attention of JPMorgan executives. Then, in June, Epstein pleaded guilty to soliciting sex from a minor and was sentenced to 18 months in the Palm Beach County jail. It was a sweetheart deal — among other things, he avoided prosecution on more serious allegations — but even so, he was now a felon and a sex offender. The bank's general counsel was supposed to sign off on doing business with felons.

The rank and file in the private-banking division pushed to expel Epstein. "No one wants him," a banker noted in an email. The decision was made to tell Staley that "we are uncomfortable with Epstein" and that they shouldn't bother going to Cutler, who had become general counsel the previous year after being the top enforcement officer at the Securities and Exchange Commission. They should just boot him out of the bank.

Staley later testified under oath that he alerted Dimon to Epstein's guilty plea and that Dimon told him to talk to Cutler. Staley made no secret about his desire to retain his star customer, and when he and Cutler met, "the decision was made to keep Mr. Epstein as a PB client," according to an internal write-up. Around that time, as two executives in the private bank emailed about whether Epstein's accounts would be closed, one of them said the decision was "pending Dimon

review." Another internal email noted that Cutler was reviewing Epstein-related documents "for Jamie." Yet in his own sworn deposition, Dimon said he did not "recall knowing anything about Jeffrey Epstein" until 2019.

Regardless of who made the decision, Epstein remained a client — "no change to relationship approach" was the final verdict — and even during his jail sentence, JPMorgan continued wiring money from his accounts to banks in Russia and Eastern Europe, where young women were being drawn into his sex-trafficking network, according to sealed court records.

All the while, Staley was regularly backchanneling with his buddy. "I hope you're hanging in there," Staley wrote at one point. "Just think of the island and my boat anchored in front." (Staley had a 90-foot yacht, Bequia, named after the Caribbean island on which he and his wife honeymooned.)



Staley sailed his 90-foot yacht, Bequia, to stay on Epstein's private island in 2011, telling Epstein it was "paradise." Bing Guan/Bloomberg, via Getty Images

When Bernie Madoff's Ponzi scheme collapsed in late 2008, Erdoes asked Staley to call Epstein "to get the scoop" about how wealthy clients in the Palm Beach area were faring. Around the same time, a rumor was circulating that Dimon might become the Treasury secretary in the Obama administration — in which case Staley would be a prime contender to succeed him as chief executive. Staley emailed Epstein about Dimon's status. Epstein responded, "We can help push Obama."

Epstein was a master manipulator who sometimes exaggerated or lied about his access and power. It is not clear whether he had sway with officials in Barack Obama's inner circle at the time, though he and a top Obama economic adviser, Lawrence Summers, were friendly. In any case, there is no question that Staley and at least some of his colleagues trusted Epstein.

Staley at times shared confidential information. As the world descended into a deep financial crisis in 2008, Staley divulged to Epstein that the bank was trying to buy one company and sell another. The next month, he revealed that JPMorgan's private bank had been inundated by $44 billion in new assets in the past two weeks. He disclosed that JPMorgan was working on a deal for the Pritzker family, and he detailed the bank's talks with the Federal Reserve about how to stabilize the financial system. Over and over, Staley passed what he later acknowledged was potentially market-moving information to a criminal.

Epstein cultivated relationships with other JPMorgan bankers and executives, and it is possible that Staley was not the only one leaking to the sex offender. In the fall of 2009 — barely two months after Epstein was released from jail and began a period of home arrest — he learned that Staley was in line for a big promotion, this time to run JPMorgan's investment-banking division. He seemed to know more about Staley's future than Staley did. "I am told you are on track," Epstein wrote more than three weeks before Staley was formally tapped for the job.

The public announcement made clear that Staley was now the front-runner to one day inherit Dimon's throne. "Jes has impeccable character and integrity," Dimon told Fortune magazine. (When Bin Sulayem emailed Epstein about Staley's

promotion, Epstein implied that he himself had masterminded it.) Staley immediately began turning to Epstein for advice. How much should he earn in the new gig? How should he handle the job transition? What should his priorities be? To that last question, Epstein urged Staley to embrace China, perhaps by moving some banking operations there. He arranged for Staley to get "a quick tutorial" about China from an Oxford-educated expert.

What did Epstein get out of this? Clearly he wanted to endear himself to bank executives. But there was more to it. In his New York townhouse, Epstein kept framed stock certificates of iconic American companies like General Motors, AT&T and JPMorgan. A felon and sex offender under house arrest, he was at risk of becoming a pariah. Yet he was also proving indispensable to top executives at one of the world's premier banks. The intimate relationship imbued him with prestige in the eyes of those he hoped to impress.

Staley would later be asked under oath why Epstein introduced him to the China expert. "Epstein relied on his network for his legitimacy," Staley answered. "And I, as running the largest investment bank in the world, was part of that network for him."



While Epstein was serving his sentence in Florida, Staley visited his Zorro Ranch in New Mexico. "I owe you much," Staley wrote to Epstein from the ranch's hot tub. Drone Base/Reuters

**One of the enduring mysteries** about Epstein is why so many rich and powerful men risked their reputations by continuing to spend time with him after he was registered as a sex offender. Did they value his advice? Consider him a friend? Like tapping into his network? Or was it about sex with the young women who always seemed to be around him?

At least with Staley, the answer might have been all of the above. While Epstein was under house arrest in November 2009, Staley visited his sprawling Zorro Ranch in New Mexico, where girls and young women later accused Epstein of raping and trafficking them. (Epstein also discussed using the desert compound as a venue for inseminating women in order to seed the human race with his DNA.) Staley emailed Epstein while sipping white wine in the hot tub. "Next time, we're here together," he wrote. "I owe you much." Other messages were littered with

apparent sexual references. "That was fun. Say hi to Snow White," Staley emailed in 2010. Epstein responded by asking which character he would like next. "Beauty and the Beast," Staley answered.

One day around then, while visiting Epstein's New York townhouse for a meeting, Staley had a conversation with a woman in her 20s. She had been with Epstein since around 2003, making her one of the longest-serving women in the retinue that surrounded Epstein. The woman would later allege in a class-action lawsuit, which was eventually settled, that Epstein sexually abused her for more than a dozen years and that he forced her and other victims to engage in commercial sex with "certain select friends."

According to Staley, the woman suggested that he come by her apartment in an Upper East Side building owned by Epstein's brother. On the appointed day, Staley arrived, and after chatting in the living room, they went to her bedroom and had sex. Afterward, Staley took a shower. He was out of the building in less than an hour and walked back to work. (Staley, who is married, has publicly acknowledged having sex with one of Epstein's assistants, but the details have not previously been reported. Staley swore in a deposition that it was his only Epstein-connected sexual encounter.)

Late in 2010, JPMorgan approved $50 million of additional credit to facilitate market trading by Epstein, whose criminal history would have rendered him untouchable at many mainstream banks. By now, he had about $212 million at the bank, nearly half of his estimated net worth. Yet fresh concerns were brewing.

Employees in JPMorgan's anti-money-laundering division learned from media reports that the Justice Department was investigating whether Brunel's MC2 modeling agency was feeding Eastern European girls and women into Epstein's suspected sex-trafficking network. Plus, there were Epstein's regular wire transfers, the credit cards and bank accounts he requested for teenagers and young women and his voluminous cash withdrawals. The anti-money-laundering employees were waking up, even if they didn't grasp the significance of what they were seeing. "Sugar Daddy!" one exclaimed after noting that Epstein had sent about $450,000 to an 18-year-old.

The bank's head of compliance, William Langford, was especially alarmed. "No patience for this," he emailed a colleague. Langford had joined JPMorgan in 2006 after years of policing financial crimes for the Treasury Department. He knew — and had warned colleagues — that companies can be criminally charged for money laundering if they willfully ignored such activities by their clients. He saw ultrawealthy customers as a particular blind spot; all the time that private bankers spent wining and dining these lucrative clients could cloud judgments about their trustworthiness. It looked like that was what was happening with Epstein. One of Langford's achievements at JPMorgan was the creation of a task force devoted to combating human trafficking. The group noted in a presentation that frequent large cash withdrawals and wire transfers — exactly what employees were seeing in Epstein's accounts — were totems of such illicit activity.

Early in the new year, Langford approached Erdoes, who was now running JPMorgan's asset-and-wealth-management group. He told her that Epstein should be "exited." Erdoes, however, said Staley was responsible for the Epstein relationship — an odd deflection, because Staley now worked in the investment-banking division, which didn't control Epstein's private-banking accounts. Yet JPMorgan's "rapid response" team — activated at Langford's urging — reached a similar conclusion: Langford should talk to Staley, because he "is friends with Epstein. He needs to understand the potential backlash to the firm given all of the work done to root out clients involved in human trafficking."

10/2/25, 2:18 AM
Case 2:23-cv-09217-MEMF-KS Document 117-4 Filed 10/03/25 Page 23 of 32 Page
ID #:5848
How JPMorgan Enabled the Crimes of Jeffrey Epstein - The New York Times



Staley, Erdoes and other JPMorgan employees were among the visitors to Epstein's palatial townhouse on Manhattan's Upper East Side. Bebeto Matthews/Associated Press

The meeting took place in January 2011. Staley by then had a reputation for running interference on Epstein's behalf, repeatedly telling colleagues that he would trust Epstein with his daughters. (He meant it literally: Staley arranged for Epstein to coach one of his daughters on her education and career.) Now he allotted all of 15 minutes for the discussion with Langford. Langford said in a deposition that he started off by quickly explaining the human-trafficking initiative. In that context, how could the bank justify working with someone who had pleaded guilty to a sex crime and was now under investigation for sex trafficking?

Staley pushed back, saying that Epstein hoped to get his plea deal overturned in court. He told Langford to speak with Epstein's attorneys. Langford was surprised — he had never spoken to a client's criminal lawyer — but a month later, he got on the phone with Ken Starr, the former special prosecutor who pursued Bill Clinton

for his sexual relationship with Monica Lewinsky and who was now representing Epstein. "Got all my points in," Starr reported to his client afterward. "I said, no crimes, period. Inappropriate, yes. criminal, no. Bragged on you."

At the request of Langford and other executives, Staley asked Epstein whether he was involved in sex trafficking. According to an internal bank memo, Epstein replied that "there was no truth to the allegations" and that he "was not expecting any problems" from law enforcement. Staley seemed to believe him.

Langford now had a choice. He could make a fuss about Epstein by talking to Dimon, appealing to the bank's board of directors, pushing Staley or going back to Erdoes. But, he said in the deposition, he did none of those things.

That week, Staley sailed his yacht to Little Saint James. Epstein was on his way to Paris, and Staley emailed to let him know that the island was "paradise." Days later, JPMorgan agreed to keep Epstein as a client.

**Staley and at least one other executive alerted** Epstein to the bank's heightened sensitivity about his constant cash withdrawals. Apparently in response, Epstein altered his tactics. Instead of taking cash out of his personal accounts, he withdrew money from a JPMorgan account for Hyperion Air, which owned Epstein's jets. In 2012, for example, nearly $300,000 was withdrawn from Hyperion's account, more than enough to cover Epstein's roughly $225,000 in payments to procure women that year, according to records we reviewed. Epstein told executives in the private bank that the withdrawals were to pay for jet fuel and other aviation expenses.

Where was all this money coming from? Epstein's nine-figure fortune derived from multiple sources. Much originated with Wexner, the Limited founder who, to the everlasting bafflement of his friends, granted Epstein power over his personal finances and would later accuse him of misappropriating huge sums. After that billionaire cut ties to Epstein around 2007, tens of millions of dollars poured in from another billionaire, Leon Black, a founder of the private-equity firm Apollo Global Management; Black, himself a JPMorgan client, said the payments were for Epstein's advice about taxes and estate planning.

And then there was JPMorgan. In addition to giving Epstein crucial access to the global financial system, the bank directly enriched him. There was $15 million from the Highbridge acquisition. And in 2011, even as senior officials like Langford wanted Epstein out, the bank paid him an additional $9 million. It was to settle a lawsuit that Epstein had brought years earlier against the Wall Street firm Bear Stearns, which JPMorgan bought in 2008. Erdoes went to Epstein's Manhattan townhouse to discuss the settlement.

To Epstein's critics, the resolution of the Bear Stearns litigation was a fresh chance for JPMorgan to cut off the sex offender. And those critics now had a powerful new ally: Cutler, the general counsel.

Back in 2008, Cutler had signed off on Epstein remaining a customer. Now things were different. "This is not an honorable person in any way," Cutler emailed Erdoes, Staley and others in July 2011. "He should not be a client." Staley, however, insisted that the relationship was safe. Surely, if billionaires and prime ministers trusted Epstein, so could JPMorgan. Plus, it was a matter of fairness. Epstein had served his time. He deserved a second chance, Staley argued.

That was when Cutler invited Epstein to the bank's headquarters for a meeting, the first of two conversations he had with the felon that fall. (Epstein also tried to arrange a meeting with Dimon, though there is no evidence that he was successful.) Around then, Cutler also learned that Epstein was classified as a Level 3 sex offender, meaning he had a high risk of committing additional crimes. Yet despite his misgivings, Cutler didn't insist upon dismissing him.

It was another blown opportunity — and it showed how, despite the bank's later attempts to pin the blame on Staley, responsibility for Epstein was shared across the institution. Executives like Cutler and Langford, while united in believing that he was a threat to the bank's reputation, didn't take a stand. Elsewhere in the bank, the combination of a thirst for profits and Epstein's knack for making himself seem indispensable proved potent and hard to kick, the financial equivalent of a powerful narcotic.

Sure enough, just as more bank employees were losing patience with Epstein in 2011, he began dangling more goodies. That March, to the pleasant surprise of JPMorgan's investment bankers in Israel, they were granted an audience with Netanyahu. The bankers informed Staley, who forwarded their email to Epstein with a one-word message: "Thanks." (The bank spokesman said JPMorgan "neither needed nor sought Epstein's help for meetings with any government leaders.") And around that same time, Epstein presented an opportunity that, like the Highbridge deal years earlier, had the potential to be transformative.

This one involved Bill Gates, who had only recently entered Epstein's orbit. In an apparent effort to ingratiate — and further entangle — himself with his bankers and the Microsoft co-founder, Epstein pitched Erdoes and Staley on creating an enormous investment and charitable fund with something like $100 billion in assets. The so-called donor-advised fund would be seeded with billions from the Bill and Melinda Gates Foundation. More would come from JPMorgan clients. The bank would collect fees for administering the fund. Naturally, Epstein hoped to get a slice, too.

The idea gained traction inside JPMorgan — it was given the code name Project Molecule — but never came to fruition, apparently too big and complex to get off the ground. Epstein was frustrated, but in a few months he faced a much greater problem at the bank: His patron was suddenly on the outs.

**Dimon had several core traits** as the leader of America's biggest bank. One was his willingness to micromanage; a 2010 profile in this magazine mentioned that "Dimon seemingly meddles in every detail." The tendency is hard to square with his insistence that he didn't know Epstein was a client even as his subordinates battled about the propriety of working with him. (As David Boies, one of the

lawyers representing Epstein's victims, told us, either Dimon knew about Epstein and lied in a sworn deposition or his subordinates kept him in the dark. "Neither is good," Boies said.)

Another defining characteristic was Dimon's habit of ruthlessly cycling through top executives. In 2009, Dimon pushed aside the two longtime executives running the investment-banking division and replaced them with Staley, who immediately became Dimon's heir apparent. But by 2012, Staley was out of favor. That summer, in the wake of an investing fiasco that cost the bank billions, he learned that Dimon planned to shake up his leadership team — including by demoting him. (Dimon and others suspected that Staley had been leaking information about the so-called London Whale scandal to the media.)

Staley broke the bad news to Epstein, who had spent years nurturing his relationship with the would-be chief executive. Epstein devised a plan to salvage his investment. The British bank Barclays was searching for a new chief. Epstein enlisted a London power broker to plant seeds about Staley with senior bank officials. Staley was interviewed for the job, but it ultimately went to a Barclays executive. Six months later, in January 2013, Staley decided to leave JPMorgan after 33 years.



Stephen Cutler (second from right), JPMorgan's general counsel, wanted the bank to cut ties with Epstein in 2011 but ultimately didn't insist on it, and the relationship continued. Daniel Rosenbaum for The New York Times

Epstein's days at the bank also were numbered. That same month, federal banking regulators issued a cease-and-desist order against JPMorgan for anti-money-laundering lapses, including not adequately monitoring its customers' transactions and failing to report suspicious activities to the government. The order was part of a wave of government actions against the bank, and it prompted the compliance department to get more aggressive — including when it came to Epstein. As part of a broader effort to reduce risk in the private-banking division, his accounts were among those marked as ripe for elimination.

Epstein's personal banker, Justin Nelson, balked; he prepared a memo trumpeting Epstein's large volume of business with JPMorgan and noting that despite his status as a sex offender, he was "still clearly well-respected and trusted by some of the richest people in the world." But when JPMorgan convened its latest meeting to determine Epstein's future, the decision was made to kick him out of the bank.

In mid-July, Erdoes returned to Epstein's townhouse. A deputy prepared talking points. Erdoes was to tell Epstein that "the repetitive nature of your cash transactions is a problem for us and our relationship with you." Banking regulators had "a very low tolerance for cash activity when combined with your personal history." These were essentially the same arguments that JPMorgan employees had made as far back as 2006. Finally, the bank was acting on them.

That fall, Epstein began moving his $176 million from JPMorgan to his new home at Deutsche Bank. (Years later, Deutsche would pay more than $100 million in settlements with victims and regulators who sued over the bank's relationship with Epstein.) But JPMorgan was not ready to fully part ways with Epstein. He remained in regular contact with Nelson, his personal banker. A big reason was Epstein's relationship with Leon Black, the private-equity billionaire. Epstein was acting as an intermediary between the bank and Black, trying to secure him loans and other financial services.

Erdoes and at least one other senior JPMorgan executive knew that Nelson was continuing to interact with Epstein, and for years after JPMorgan ostensibly washed its hands of its notorious client, the banker included Epstein in meetings with Black, showed up at Epstein's Manhattan townhouse and even visited his Zorro Ranch in New Mexico. It was a testament to Epstein's remarkable staying power — and to JPMorgan's inability, when potential profits were on the line, to just say no.

**Staley and Epstein** were both gone from JPMorgan, but they remained close. There were dinners at Epstein's townhouse, supportive messages ("The strength of a Greek army was that its core held shoulder to shoulder, and would not flee or break," Staley wrote to his friend in 2015. "That is us") and a visit that year with his family to Epstein's island. Later in 2015, Staley landed a plum job: the chief executive of Barclays. Given Epstein's role in putting Staley on the bank's radar three years earlier, he deserved at least partial credit for what would most likely be Staley's final act.

For a spell, everyone was happy. But in the summer of 2019, Epstein was arrested on his plane after it landed at Teterboro Airport in New Jersey, and federal prosecutors charged him with sex trafficking; he then died by suicide in his jail cell. Suddenly, investigators, journalists and others were racing to understand how this man had prospered for so many years. His longtime bank was an obvious place to look.

JPMorgan went into damage-control mode. It opened an internal review — code name: Project Jeep — and discussed Epstein at board meetings. Late that year, the bank did something it should have been doing all along: It filed a report with federal regulators that retroactively flagged as suspicious some 4,700 Epstein transactions — totaling more than $1.1 billion and including hundreds of millions of dollars in payments to Russian banks and young Eastern European women who were brought to the United States, according to investigators working for Senator Ron Wyden who have been digging into Epstein's financial backers. Banks are required to file such reports in real time to alert law enforcement to things like money laundering, sex trafficking and drug dealing. Doing it after the fact might have provided JPMorgan with legal cover, but it did nothing to help identify Epstein's crimes as they were happening.

The bank's current and former executives began pointing fingers. Erdoes and others blamed Staley for pushing to keep Epstein as a client. (The bank even sued him; the litigation was settled under confidential terms.) Staley — who would resign from Barclays in 2021 and be barred from being an executive in the British financial-services industry after an investigation into his relationship with Epstein — faulted Erdoes and others. Dimon said under oath that the decision to keep Epstein ultimately rested with Cutler.

The fallout for JPMorgan has been limited. In 2023, it paid $290 million to settle a lawsuit brought by roughly 200 of Epstein's victims and an additional $75 million to resolve related litigation brought by the U.S. Virgin Islands, where many of Epstein's crimes took place. The payments were a rounding error for a company that raked in more than $50 billion in profits that year. (The bank didn't admit

10/2/25, 2:12 PM
Case 2:23-cv-09217-MEMF-KS    Document 117-4    Filed 10/03/25    Page 32 of 32    Page
How JPMorgan Enabled the Crimes of Jeffrey Epstein - The New York Times
ID #:5857

wrongdoing and is trying to force its insurers to cover some of the litigation costs.) No regulator took action against JPMorgan. No executives lost their jobs. Dimon remains one of the most powerful bankers in the world.

The apparent impunity alarmed Bridgette Carr, a law professor and human-trafficking expert whom the U.S. Virgin Islands hired after Epstein's death to analyze JPMorgan's role. Carr concluded that the bank enabled his crimes. "I am deeply worried here that the ultimate message to other financial institutions is that they can keep serving traffickers," she told us. "It's still profitable to do that, given the lack of substantial consequences."

**Read by Malcolm Hillgartner   Narration produced by Krish Seenivasan   Engineered by Anj Vancura**

Susan C. Beachy and Julie Tate contributed research.

Source photograph for photo illustration: Palm Beach Sheriff's Office/Associated Press

Prop stylist: Heather Greene

*A correction was made on Sept. 8, 2025: An earlier version of this article misstated the chronology of Jeffrey Epstein's early career. He was a high school math teacher before working on Wall Street, not after.*

---

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.  Learn more

**David Enrich** is a deputy investigations editor for The Times. He writes about law and business.

**Matthew Goldstein** is a Times reporter who covers Wall Street and white-collar crime and housing issues.

**Jessica Silver-Greenberg** is a Times investigative reporter writing about big business with a focus on health care. She has been a reporter for more than a decade.

A version of this article appears in print on , Page 26 of the Sunday Magazine with the headline: The Epstein Accounts