CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jennifer Kennedy Park (344888)
jkpark@cgsh.com
1841 Page Mill Rd, Suite 250
Palo Alto, CA 94304
Telephone: 650-815-4100
Facsimile: 650-815-4199

Roger A. Cooper (*pro hac vice*)
racooper@cgsh.com
Isabella M. Riishojgaard (*pro hac vice*)
iriishojgaard@cgsh.com
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

Thomas A. Bednar (*pro hac vice*)
tbednar@cgsh.com
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-3229
Telephone: 202-974-1500
Facsimile: 202-974-1999

*Counsel for Amicus Curiae the Institute of International Bankers*
*Local counsel for service of filings: Ryan Hatch*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>    v.<br><br>BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS,<br>              Defendant. | Case No. 2:23-cv-09217-MEMF-KS<br><br>**BRIEF OF AMICUS CURIAE THE INSTITUTE OF INTERNATIONAL BANKERS IN SUPPORT OF BARCLAYS PLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Maame Ewusi-Mensah Frimpong |

i

# TABLE OF CONTENTS

I.    STATEMENT OF INTERESTS OF AMICUS CURIAE ....................................1

II.   INTRODUCTION ............................................................................2

III.  CASE BACKGROUND AND LEGAL STANDARD ..................................3

IV.   THE U.K. IS BETTER POSITIONED TO ADJUDICATE A NOVEL AND COMPLEX ISSUE OF U.K. SECURITIES LAW .................................................4

    A.    Plaintiffs' Dishonest Delay Claim Presents An Issue Of First Impression Under U.K. Law .................................................................4

    B.    U.K. Courts Possess Unique Expertise In U.K. Law That Better Positions Them To Adjudicate Section 90A Delayed Disclosure Claims ........................6

    C.    Section 90A Claims Present Consequential Issues Of Law, And Adjudicating Them Outside The U.K. Threatens To Upset The U.K. Securities Law Framework ............................................................7

    D.    U.S. And U.K. Courts Disfavor Settling Other Countries' Novel Or Complex Questions Of Law ...............................................................8

        1.    *U.S. And U.K. Precedent Reflect The Principle That Novel Issues Of Foreign Law Are Best Resolved By The Court Of The Relevant Foreign Jurisdiction* ...............................................................9

        2.    *U.S. Policy Against Forum Shopping Supports Dismissing Plaintiffs' U.K. Claim* .............................................................11

    E.    The U.K. Parliament Intended Section 90A Claims To Be Adjudicated In U.K. Courts .................................................................12

V.    PERMITTING SECTION 90A CLAIMS FOR DISHONEST DELAY TO GO FORWARD IN U.S. COURTS EXPOSES DUAL-LISTED COMPANIES TO UNFAIR CONSEQUENCES 13

    A.    Allowing Section 90A Dishonest Delay Claims To Proceed In The U.S. Is An End Run Around *Morrison* .................................................14

    B.    Permitting Litigation Of Section 90A Claims In The U.S. Strips Away Protections That Are Fundamental To U.K. Law .........................................15

        1.    *Class Action Availability* .........................................................15

        2.    *Cost-Shifting Rules* .................................................................17

3.   *Reliance Requirement* ...................................................................... 17

C.   Allowing The Section 90A Claim To Go Forward Would  Unfairly Harm Defendants And Undermine U.S. And Foreign Legal Regimes ...................... 18

1.   *Undermining Expectations Of Dual-Listed Companies* ............................ 18

2.   *Creating Barriers To Settlement* .............................................................. 20

VI.   CONCLUSION .................................................................................................. 21

VII.   CERTIFICATION OF COMPLIANCE ............................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abad v. Bayer Corp.*,
563 F.3d 663 (7th Cir. 2009) ..................................................................... 9, 10

*Aenergy, S.A. v. Republic of Angola*,
31 F.4th 119 (2d Cir. 2022) ....................................................................... 9, 12

*In re Air Crash Over S. Indian Ocean*,
352 F. Supp. 3d 19 (D.D.C. 2018) ............................................................. 9, 11

*Allianz Funds Multi-Strategy Trust (on behalf of Allianz Best Styles
Global Equity Fund) and Others v. Barclays Plc*
[2024] EWHC 2710 (Ch) ........................................................................... *passim*

*Allianz Glob. Invs. GmbH v. G4S Ltd.*
[2022] EWHC 1081 (Ch) ........................................................................... 19

*Alternate Health USA, Inc. v. Edalat*,
No. 22-55353, 2023 WL 8732811 (9th Cir. 2023) ...................................... 9, 10

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974) .................................................................................. 22

*Autonomy and others v. Lynch and Hussain*
[2022] EWHC 1178 (Ch) ........................................................................... 19

*Ayco Farms, Inc. v. Ochoa*,
862 F.3d 945 (9th Cir. 2017) ..................................................................... 4, 12

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975) ...................................................................... 21

*In re BP S'holder Derivative Litig.*,
MDL No. 10-md-2185, Civ. Action No. 4:10-cv-3447, 2011 WL
4345209 (S.D. Tex. Sept. 15, 2011) ........................................................... 10

*City of New Orleans Employees' Ret. Sys. ex rel. BP P.L.C. v.
Hayward*,
508 F. App'x 293, 299-300 (5th Cir. 2013) ................................................ 10

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173, 181 (2d Cir. 2014) ............................................................... 16

*In re Citizens Bank, N.A.*,
15 F.4th 607 (3d Circ. 2021) ...................................................................... 22

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) ................................................................... 4

*Faraday Reinsurance Co. Ltd v. Howden N. Am. Inc and Another*
[2011] EWHC 2837 (Comm) ...................................................................... 11

iv

*Judith Vidal-Hall v. Google Inc*
  [2014] EWHC 13 (QB) ................................................................................9, 11

*Lenovo Group Ltd. v. Telefonaktiebolaget LM Ericsson (PUBL)*
  [2025] EWCA Civ 182 ......................................................................................11

*Lloyd v. Google LLC*
  [2021] UKSC 50 ................................................................................................17

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ...................................................................................*passim*

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ............................................................................15

*Persons Identified in Schedule 1 v. Standard Chartered Plc*
  [2025] EWHC 698 (Ch) ..........................................................................6, 8, 19

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) ..........................................................................................11

*Prismall v. Google UK Ltd*
  [2024] EWCA Civ 1516 .....................................................................................17

*Ranza v. Nike, Inc.*,
  793 F.3d 1059 (9th Cir. 2015) .........................................................................12

*The RBS Rights Issue Litig.*,
  [2017] EWHC 463 (Ch) .....................................................................................19

*In Re Shanda Games Ltd. Sec. Litig.*,
  128 F.4th 26 (2d Cir. 2025) .............................................................................16

*Shanda Games Ltd. v. Monk*,
  No. 25-351, 2025 WL 3131847 at 42 (U.S. Nov. 10, 2025) .............................16

*Sharp v. Blank and Others*
  [2019] EWHC 3096 (Ch) ...................................................................................19

*Stoyas v. Toshiba Corp.*,
  191 F. Supp. 3d 1080 (C.D. Cal. 2016) ............................................................9

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*,
  421 F. Supp. 2d 741 (S.D.N.Y. 2006) ...............................................................9

*Strauss v. Credit Lyonnais, S.A.*,
  842 Fed. Appx. 701 (2d. Cir. 2021) ...................................................................1

*The Persons Identified in Schedule 1 of the Claim Form (the "SL Claimants") v. Tesco Plc*
  [2019] EWHC 2858 (Ch) ..............................................................................8, 19

*Vivendi SA v. T-Mobile USA Inc.*,
  586 F.3d 689 (9th Cir. 2009) ...........................................................................12

v

*VTB Capital Plc v. Nutritek Int'l Corp.*
    [2013] UKSC 5 ................................................................................................. 11

*Wirral Council (as Administering Auth. of Merseyside Pension Fund)*
    *v. Indivior Plc*
    [2025] EWCA Civ 40 ..................................................................................... 8, 17

**Statutes**

Civil Procedures Rules 1998, r. 44.2 (U.K.) ........................................................ 18

Companies Act 2006, c.46, Explanatory Notes (U.K.) ......................................... 13

Financial Services and Markets Act 2000, c. 8, § 90A (U.K.) ................................ 2

**Other Authorities**

Brief for United Kingdom as *Amicus Curiae, Toshiba Corp. v. Auto.*
    *Indus. Pension Trust Fund*, No. 18-486 (U.S. Dec. 4, 2018) ....................... 17, 20

*In re Reckitt Benckiser Grp.* PLC, Sec. Litig., No. 1:25-cv-04708-JPC-
    SDA (S.D.N.Y. Oct. 20, 2025) ......................................................................... 6

**I.     STATEMENT OF INTERESTS OF AMICUS CURIAE**

The Institute of International Bankers ("IIB") is the only national association devoted exclusively to representing and advancing the interests of internationally headquartered banking organizations that operate in the United States.  The IIB's membership consists of internationally headquartered banking and financial institutions from over 35 countries around the world.  Many of its members are listed on multiple exchanges, with several listed on the London Stock Exchange (LSE).[1] Barclays, like many international banks, is a member.  Collectively, the U.S. branches and other operations of IIB member institutions enhance the depth and liquidity of the U.S. financial markets, including for domestic borrowers, and play a key role in the U.S. economy and those of the many other countries where they operate.

The IIB regularly appears before federal courts as *amicus curiae* in cases that raise issues of concern to the national and international banking community.  The IIB has particular expertise in matters concerning the application of the U.S. securities regime to its members.  For example, the IIB appeared as *amicus curiae* in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), a seminal case in which the Supreme Court held that the U.S. securities laws do not apply extraterritorially to non-domestic securities transactions.  The IIB also often appears in cases involving other federal statutes important to its members that concern issues of international comity and foreign law.  For example, the IIB filed an *amicus* brief in *Strauss v. Credit Lyonnais, S.A.*, 842 Fed. Appx. 701 (2d. Cir. 2021), highlighting concerns that an expansive application of the Anti-Terrorism Act could harm legitimate foreign banking activity.

The IIB and its members have a substantial interest in the matter now before this Court.  This action presents the critical question of whether U.S. courts should

---

[1] *See* INSTITUTE OF INT'L BANKERS, *IIB Member Banks by Country of Origin*, https://www.iib.org/general/custom.asp?page=IIB_MEMBER_BANKS_BY_COUNTRY_OF_ORIGIN (last visited Jan. 15, 2026).

adjudicate unsettled claims brought under foreign securities laws in a U.S. class action, and the IIB submits this brief to highlight the far-reaching implications of that question for dual-listed companies and international financial institutions.

## II.   INTRODUCTION[2]

Plaintiffs' claim for dishonest delay under Section 90A of the U.K.'s Financial Services and Markets Act ("FSMA") improperly seeks to have American courts decide an unsettled issue of U.K. law and would unfairly expose dual U.K.-U.S. listed companies to significantly increased and uncertain litigation risk in U.S. courts, under class action procedures unique to the U.S., for foreign-law claims concerning foreign securities and entirely foreign conduct.  If this Court permits the Section 90A dishonest delay claim to proceed, the Court will need to interpret a provision of U.K. law that U.K. courts themselves have not yet developed.  That path creates the risk of inconsistent interpretations of U.K. securities laws, and engenders greater uncertainty for affected companies.  Allowing this claim to proceed also sets the dangerous precedent of permitting a U.S.-style opt-out class action to be used as a vehicle for a foreign securities law claim in the U.S. that has no analogue in the U.K. This would run afoul of the underlying concerns that animated the Supreme Court's *Morrison* decision more than 15 years ago by expanding the scope of U.S. securities fraud litigation over foreign transactions.  It would also create unfair and unpredictable outcomes for litigants, including the potential for increased litigation on both sides of the Atlantic without an effective mechanism for resolution.  The U.S. and the U.K. have structured their securities litigation regimes quite differently, and companies have structured their operations and made securities listing decisions in reliance on those distinctions, entailing significant financial investments.  Plaintiffs

---

[2] In addition to counsel of record, Cleary Gottlieb Steen & Hamilton attorneys who contributed to this brief include James Norris-Jones and James Brady-Banzet, U.K.-based attorneys who are admitted to practice in England and Wales, and Matthew Yelovich, who is admitted to the bars of California and New York.

seek to treat these distinct legal regimes like a menu, ordering a la carte the causes of action from one jurisdiction and the procedural rules of another.  Neither the U.S. nor the U.K. governments intended securities litigation to proceed in this manner.

Allowing Plaintiffs to litigate the FSMA claim in a U.S. court therefore does not serve the public interest of the United States, nor of California, and runs contrary to the interests of the U.K. and businesses with securities registered there.  As such, Plaintiffs' Section 90A claim presents a textbook case for dismissal under the doctrine of *forum non conveniens*.  The Court should dismiss the Section 90A claim and allow it to proceed, if at all, in the U.K.  Were the Court to rule on the sufficiency of the claim, it should be dismissed for failure to state a claim, as this expansive claim would defeat the statutory purpose of Section 90A.

## III.    CASE BACKGROUND AND LEGAL STANDARD

Lead Plaintiff Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees ("Teamsters") and Plaintiff the Firemen's Retirement System of St. Louis ("St. Louis" and together "Plaintiffs") brought this action for securities fraud under Sections 10(b) and 20(a) of the Exchange Act and Section 90A of the FSMA against Defendants Barclays PLC ("Barclays"), Nigel Higgins, and James E. Staley.  Because the public float of Barclays' U.S.-traded American Depository Receipts ("ADR") is significantly lower than that of Barclays' common shares traded on the LSE, when Teamsters invited St. Louis, which had purchased shares on the LSE, to join this lawsuit, the effect was to substantially increase the potential damages.

This Court previously denied Barclays' motion to dismiss the Section 90A claims on *forum non conveniens* grounds.  Those claims have been recast in the Second Amended Complaint ("SAC") now before the Court.  The IIB takes no position on the merits of the case or the claims brought under the Exchange Act, but respectfully encourages the Court to dismiss the Section 90A claim due to the far-

reaching consequences of permitting an investor to pursue in a U.S. court unsettled foreign securities law claims for securities traded on a foreign exchange.

In analyzing the application of the *forum non conveniens* doctrine, courts consider whether: (1) an adequate alternative forum exists, and (2) the balance of private and public interest factors favor dismissal.[3]  While Barclays' briefing in support of its motion to dismiss addresses both prongs, the concerns outlined in this brief bear on the public interest factors.[4]  These factors strongly favor dismissal, as it is the U.K.—not California or the United States—that has a substantial interest in adjudicating this unsettled Section 90A claim and whose courts have the requisite expertise to do so.

## IV. THE U.K. IS BETTER POSITIONED TO ADJUDICATE A NOVEL AND COMPLEX ISSUE OF U.K. SECURITIES LAW

### A. Plaintiffs' Dishonest Delay Claim Presents An Issue Of First Impression Under U.K. Law

The proper categorization of St. Louis's claim under U.K. law is a critical threshold issue, and it raises novel issues that have not been settled by U.K. courts. As pleaded, St. Louis's claim for dishonest delay under Section 90A more closely resembles a claim for a misleading statement or omission.  Specifically, St. Louis alleges that Barclays should have "publicly correct[ed]" its alleged prior "public misstatements," but "dishonestly delayed" doing so by never correcting them.  ECF No. 98 ¶ 114, 117.  A dishonest delay claim, by contrast, applies where a company makes statements that are accurate but untimely, and the delay is dishonest.[5]  Proper classification of the claim is important because of significant differences between the

---

[3] *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002).

[4] *Ayco Farms, Inc. v. Ochoa*, 862 F.3d 945, 950 (9th Cir. 2017).

[5] *See* Paul Davies QC, *Davies Review of Issuer Liability: Liability for misstatements to the market*, ¶¶ 85–86 (Mar. 2007), https://www.treasurers.org/ACTmedia/daviesdiscussion260307.pdf; *Allianz Funds Multi-Strategy Trust (on behalf of Allianz Best Styles Global Equity Fund) and Others v. Barclays Plc* [2024] EWHC 2710 (Ch) [138].

reliance requirements for each claim. Dishonest delay claims have no reliance element, whereas a claim alleging a misstatement or omission requires plaintiffs to show that defendants knew of the alleged misstatement and that plaintiffs relied upon it to their detriment.[6] And reliance must be established on an individual basis, for U.K. law does not recognize a presumption of reliance (in a class or individual action).[7] In addition, the FSMA prescribes distinct mental state requirements for issuer liability pursuant to Section 90A depending on whether a claim concerns a misstatement, an omission, or a dishonest delay.[8] "[T]he U.K.'s approach to securities regulation and litigation differs in important respects from that of the U.S., and those differences represent legitimate policy choices and sovereign interests that ought to be respected by the United States."[9]

As discussed below, although English courts have examined the boundary between misleading omission and delayed disclosure claims, they have not settled on the circumstances, if any, in which a misleading omission claim can also be cast as a dishonest delay claim. This is not expressly permitted by the text of Section 90A, and it does not appear to be consistent with the statutory purpose to create distinct claims. U.K. law regarding the dishonest delay cause of action is in its most nascent stages of development, with only two English courts even having considered its application, and no appellate court having done so.[10] This claim is even more novel in the U.S., where this Court is the first to issue an opinion addressing a Section 90A dishonest delay claim. In late 2025, another Section 90A dishonest delay claim was

---

[6] *See* FSMA Schedule 10A, para 3, https://www.legislation.gov.uk/ukpga/2000/8/schedule/10A (describing requisite mental states).

[7] *Id.*

[8] *Id.*

[9] *Brief of the United Kingdom as Amicus Curiae Supporting Respondents* at 5–6, *Morrison*, 561 U.S. 247, available at 2010 WL 723009 (Feb. 5, 2010).

[10] *Persons Identified in Schedule 1 v. Standard Chartered Plc* [2025] EWHC 698 (Ch); *Allianz Funds Multi-Strategy Trust v Barclays Plc* [2024] EWHC 2710.

filed in the S.D.N.Y. (by the same law firm), raising the troubling prospect that, if these claims are permitted to go forward, U.S. courts will develop this area of U.K. law before U.K. courts have had a chance to do so.[11]

**B.** **U.K. Courts Possess Unique Expertise In U.K. Law That Better Positions Them To Adjudicate Section 90A Delayed Disclosure Claims**

U.K. courts are better positioned than U.S. courts to adjudicate the novel issue raised here. They possess institutional experience in applying the U.K. securities law regime and engaging in interpretation of U.K. statutes, which is especially necessary given the paucity of U.K. caselaw. A U.S. court, in contrast, would need to both evaluate an untested claim and determine how that claim fits into an unfamiliar legal framework that differs fundamentally from the U.S. securities law framework. The U.K., for instance, does not follow the quarterly reporting cycle of the U.S., but issuers have continuous disclosure obligations, with differences in how key concepts such as materiality are defined.[12]

The U.K. has crafted different private enforcement rights and procedures for investors. Most critically, the U.K. imposes significant limitations on private enforcement that do not exist in the U.S.: issuer-only liability, cost shifting rules, and the absence of class actions.[13] Critically, there is no analogue to a dishonest delay claim in U.S. securities law; there is thus no U.S. legal precedent to guide this Court

---

[11]*See In re Reckitt Benckiser Grp.* PLC, Sec. Litig., No. 1:25-cv-04708-JPC-SDA (S.D.N.Y. Oct. 20, 2025).

[12] *See* Suresh Nallareddy, Robert Pozen, Shivaram Rajgopal, *Consequences of Mandatory Quarterly Reporting: The U.K. Experience*, OXFORD BUS. L. BLOG (Mar. 29 2017), https://blogs.law.ox.ac.uk/business-law-blog/blog/2017/03/consequences-mandatory-quarterly-reporting-uk-experience; *see also* Kristina Wyatt, *US and European Climate Reporting: Is the Distinction Between Single and Double Materiality Overblown?*, PERSEFONI (Mar. 31 2024), https://www.persefoni.com/blog/us-european-climate-reporting.

[13] *See* Eilís Ferran, *Are US-Style Investor Suits Coming to the U.K.?*, 1, 18–20 (July 20, 2009), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1436333.

in construing St. Louis's claim.  In contrast, U.K. courts' familiarity with the U.K. securities law regime and methods of statutory construction make them far better equipped to resolve novel questions under Section 90A.

### C.    Section 90A Claims Present Consequential Issues Of Law, And Adjudicating Them Outside The U.K. Threatens To Upset The U.K. Securities Law Framework

The Section 90A dishonest delay issue presented to this Court is not only novel, it is highly consequential to U.K. issuers, for if claims alleging false or misleading statements can be recast as dishonest delay claims, plaintiffs can avoid having to establish reliance, lowering the bar for stating a claim under U.K. securities law and likely leading to significant increases in claims.  The effects on U.K. issuers cannot be overstated, as London is the second most important global financial center, only after New York,[14] and the U.K. has developed a carefully calibrated regulatory framework designed to balance multiple interests, including investor protection, while remaining a global financial center.[15]  U.K. courts, not U.S. courts, should be the ones to resolve claims affecting this careful balance.

By imposing a reliance requirement on misleading statement and omission claims, Parliament made a deliberate policy choice to maintain a clear separation between different types of claims.[16]  The reliance requirement is a "significant controlling mechanism" in U.K. securities law, intended to grant U.K. courts the

---

[14] Valentina Romei, *Economic strengths and weaknesses facing next UK government — in charts*, FIN. TIMES (June 27 2024), https://www.ft.com/content/3f5e04e0-beac-4807-8f6f-9b302493fca9.

[15] *See* FIN. CONDUCT AUTH., *Our secondary objective* (Dec. 10, 2023), https://www.fca.org.uk/about/what-we-do/secondary-objective.

[16] *Allianz Funds Multi-Strategy Trust* [2024] EWHC 2710 (Ch) [104] (" . . . Parliament must have intended to give the term 'reliance' some content and to limit the recovery of compensation to those investors who are able to prove something more than that they suffered loss as a consequence of a misleading statement or omission being made to the market. Otherwise, the framers of Schedule 10A would have adopted very similar language to S.90.").

ability to police unmeritorious claims.[17]  Further, English courts have also rejected the U.S. "fraud on the market" presumption of reliance for such claims.[18]

Allowing Plaintiffs to recast misstatement and omission claims as claims for dishonest delay will expand the scope of liability for dishonest delay claims beyond that which was intended by the U.K. Parliament, with wide-ranging consequences. Crucially, the reliance requirement for misstatement and omission claims prevents passive investors from bringing these claims, because passive investors are generally unable to prove that they were aware of a defendant's misleading statement and relied on it to their detriment.[19]  However, if a group of passive investors (like Plaintiffs here) are permitted to recast a misstatement or omission claim as a dishonest delay claim, this circumvents the critical gatekeeping reliance requirement.  In these circumstances, any investor allegedly damaged by a company's misrepresentations— including countless passive investors holding securities in index funds—could bring suit without needing to show they even *knew* of the defendant's alleged wrongdoing, let alone relied on it in purchasing their securities.  Given these significant consequences, U.K. courts—not U.S. courts—should be the ones to determine whether such claims may proceed.

**D.  U.S. And U.K. Courts Disfavor Settling Other Countries' Novel Or Complex Questions Of Law**

---

[17] *Wirral Council (as Administering Auth. of Merseyside Pension Fund) v. Indivior Plc* [2025] EWCA Civ 40 [142].  *See also Persons Identified in Schedule 1 v. Standard Chartered Plc* [2025] EWHC 698 (Ch) [44], [90]; *Allianz Funds Multi-Strategy Trust* [2024] EWHC 2710 (Ch) [98]; *The Persons Identified in Schedule 1 of the Claim Form (the "SL Claimants") v. Tesco Plc* [2019] EWHC 2858 (Ch) [91].

[18] *See Allianz Funds Multi-Strategy Trust* [2024] EWHC 2710 (Ch) [121].

[19] *See* Arlie Goodman and Hormis Kallarackel, *English High Court Clarifies Scope Of FSMA Securities Litigation*, MAYER BROWN (Nov. 5, 2024), https://www.mayerbrown.com/en/insights/publications/2024/11/english-high-court-clarifies-scope-of-fsma-securities-litigation; *Allianz Funds Multi-Strategy Trust* [2024] EWHC 2710 (Ch) [57].

        1.     *U.S. And U.K. Precedent Reflect The Principle That Novel Issues Of Foreign Law Are Best Resolved By The Court Of The Relevant Foreign Jurisdiction*

Both U.S. and U.K. courts adhere to the well-established principle that novel or complex issues of foreign law are ordinarily best resolved by the courts of the relevant foreign jurisdiction.[20] This principle serves critical objectives of the legal systems, including consistent implementation of laws, comity between nations, and the need to deter forum shopping.[21] These concerns are particularly acute in the context of developing statutory regimes such as Section 90A, where it would be inappropriate for a U.S. court to effectively make new U.K. law.[22]

U.S. courts have long deferred on novel or complex issues of foreign law to the courts of the relevant foreign jurisdiction. In *Alternate Health USA, Inc. v. Edalat*, for example, the Ninth Circuit affirmed the district court's *forum non conveniens* dismissal of Canadian securities law counterclaims.[23] The Ninth Circuit held that with "novel issues about how" the Canadian law "would be interpreted by a Canadian court," the district court "reasonably concluded that its lack of familiarity with Canadian law weighed heavily in favor of dismissal." *Id.* Similarly, the Fifth

---

[20] *See Alternate Health USA, Inc. v. Edalat,* No. 22-55353 , 2023 WL 8732811, at *1 (9th Cir. 2023); *see also Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.,* 421 F. Supp. 2d 741, 758–60, 774–75 (S.D.N.Y. 2006); *Abad v. Bayer Corp.,* 563 F.3d 663, 671 (7th Cir. 2009); *In re Air Crash Over S. Indian Ocean,* 352 F. Supp. 3d 19, 41 (D.D.C. 2018); *Judith Vidal-Hall v. Google Inc* [2014] EWHC 13 (QB) [133].

[21] *See Bayer Corp.*, 563 F.3d at 671; *Stoyas v. Toshiba Corp.*, 191 F. Supp. 3d 1080, 1097–98 (C.D. Cal. 2016), *rev'd on other grounds*, 896 F.3d 933 (9th Cir. 2018); *Aenergy, S.A. v. Republic of Angola,* 31 F.4th 119, 129 (2d Cir. 2022).

[22] *See In re BP S'holder Derivative Litig.*, MDL No. 10-md-2185, Civ. Action No. 4:10-cv-3447, 2011 WL 4345209, at *14 (S.D. Tex. Sept. 15, 2011), *aff'd sub nom. City of New Orleans Employees' Ret. Sys. ex rel. BP P.L.C. v. Hayward*, 508 F. App'x 293 (5th Cir. 2013) (dismissing U.K. Companies Act claims involving complex interpretation of "a recently enacted statutory corporate governance scheme" that offers "little guidance from the English courts").

[23] *See Alternate Health USA, Inc.*, 2023 WL 8732811, at *1.

Circuit affirmed dismissal of a claim that would have required interpreting a recently enacted U.K. act; the Circuit pointed out that the doctrine of *forum non conveniens* "is designed in part to help courts avoid conducting complex exercises in comparative law," and reviewing the recent act would have left the "U.S. court with little jurisprudence that would direct it in how to apply the statute properly." *City of New Orleans Employees' Ret. Sys.*, 508 F. App'x at 299-300. Courts similarly dismissed product liability cases where an Argentine law would likely govern and which remained unsettled on key points. *Bayer Corp.,* 563 F.3d at 669, 671 (Posner, J.) ("[T]he uncertainty of Argentine law is a compelling reason why this case should be litigated in Argentina. . . . . When the decision of a case is uncertain because the orthodox sources of law do not provide adequate guidance . . . , the court asked to decide must make law, in this case Argentine law; and an Argentine court is the more competent maker of Argentine law."); *In re Air Crash Over S. Indian Ocean,* 352 F. Supp. 3d at 41 ("[T]he possibility that this Court might have to address such complex, novel legal issues is another public interest factor that weighs heavily in favor of dismissing [the foreign law claim].") (internal citation omitted). After all, the "doctrine of *forum non conveniens* . . . is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 251 (1981).

U.K. courts also recognize the importance of developing new issues of U.K. law within the U.K. judicial system. The English High Court has observed that although a foreign court could, in theory, decide questions of English law, doing so would be costly, inefficient, and inferior to resolution by the English courts, because the English Court of Appeal and U.K. Supreme Court cannot review a foreign court's decisions on English law.[24] "The general principle that a court applies its own law

---

[24] *Judith Vidal-Hall v. Google Inc.* [2014] EWHC 13 (QB) [133]; *VTB Capital Plc v. Nutritek Int'l Corp.* [2013] UKSC 5 [46] ("A case should be tried in a country whose law applies," and this factor "is of particular force if issues of law are likely

more reliably than does a foreign court assists in identifying the appropriate forum." *Faraday Reinsurance Co. Ltd v. Howden N. Am. Inc and Another* [2011] EWHC 2837 (Comm) [66].  And indeed, an English court in the equivalent position would be unlikely to agree to hear a novel U.S. law claim.  *Lenovo Group Ltd. v. Telefonaktiebolaget LM Ericsson (PUBL)* [2025] EWCA Civ 182 [28] (noting that English courts should not provide opinions on issues of foreign law where they do not have the most experience in that area).

> 2. *U.S. Policy Against Forum Shopping Supports Dismissing Plaintiffs' U.K. Claim*

U.S. courts are skeptical of entertaining novel foreign law claims where plaintiffs appear to seek "tactical advantage" through "forum shopping," and weigh this factor in favor of *forum non conveniens* dismissal.  *Aenergy, S.A.*, 31 F.4th at 129.  That is the clearly the situation here.

"[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice of forum commands." *See Ayco Farms, Inc.*, 862 F.3d at 950–51 (citation omitted) (affirming dismissal on *forum non conveniens* grounds in part because plaintiffs forum shopped in a case that "overwhelmingly concerns events in other states and countries"); *see also Aenergy*, 31 F.4th at 129 (finding district court correct to assume Angolan plaintiff's forum selection "smacks of forum shopping," as it "sought a tactical advantage" in the U.S. court).  The Ninth Circuit has repeatedly affirmed district courts' dismissals under *forum non conveniens* in cases where plaintiffs forum shopped.  *Ayco Farms*, 862 F.3d at 951; *Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689 (9th Cir. 2009); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1078 (9th Cir. 2015).

Forum shopping is apparently afoot here, where Plaintiffs seek to combine the

---

to be important and if there is evidence of relevant differences in the legal principles or rules applicable to such issues in the two countries in contention as the appropriate forum.").

benefits of a U.K. substantive law provision with the procedural benefits of a U.S. forum.  A ruling allowing such U.K. claims to be heard in the U.S., as well as a ruling that plaintiffs can state a dishonest delay claim based solely on a failure to correct an earlier alleged misstatement or omission, will encourage more forum shopping of such claims in the future.  It will incentivize plaintiffs' firms to manufacture suits that mix and match the substantive laws of multiple countries with the procedural advantages of a U.S. forum until they find the most favorable combination.  That should not be permitted.

### E. The U.K. Parliament Intended Section 90A Claims To Be Adjudicated In U.K. Courts

Section 90A's legislative history shows that the U.K. Parliament also intended such claims to be adjudicated in the U.K.

During parliamentary debates at the time Section 90A was introduced, Lord Sainsbury of Turville explained that the new provision would establish a civil liability regime for disclosures made pursuant to the EU 2004 Transparency Directive.[25]  Speaking in his capacity as the Parliamentary Under-Secretary for Science and Innovation, Lord Sainsbury also stated the U.K. Government's concern that issuers might be sued outside their chosen regulatory home, and its resulting preference "that issuers should be sued primarily in the jurisdiction for which they have opted as their home member state for the purposes of the prospectus directive and transparency directive" due to the "risk of issuers in U.K.-regulated markets being sued in other EU jurisdictions."[26]

The Explanatory Notes to the legislation emphasize that Parliament intended for Section 90A to address an uncertain area of law as required under the EU's 2004

---

[25]  Lord Sainsbury, HL Deb, 23 May 2006, col. 741–743 https://publications.parliament.uk/pa/ld200506/ldhansrd/vo060523/text/60523-16.htm.

[26]  *Id.*

Transparency Directive.[27]  The Government sought "to ensure that the potential scope of liability is reasonable," and "was anxious not to extend unnecessarily the scope of any duties which might be owed to investors or wider classes of third parties."[28]  Taken together, these sources demonstrate that the U.K. Parliament designed a carefully circumscribed domestic regime, not one that should be exported or expanded.

## V.    PERMITTING SECTION 90A CLAIMS FOR DISHONEST DELAY TO GO FORWARD IN U.S. COURTS EXPOSES DUAL-LISTED COMPANIES TO UNFAIR CONSEQUENCES

Allowing Section 90A claims against dual-listed companies to proceed in U.S. courts would circumvent limitations that both U.S. and U.K. authorities have imposed on securities fraud litigation, exposing those companies to significant, unforeseen, and unfair increases in litigation costs and liability.  This harm occurs not merely if Plaintiffs prevail, but the moment their U.K. claim is allowed to proceed.  In bringing the lawsuit before this Court, for instance, Plaintiffs and their lawyers attempt to secure for themselves the best of both worlds:  a U.S. jurisdictional hook (via low-volume ADR trades on the New York Stock Exchange), class action procedures and presumptions and other U.S. procedural advantages, and a U.K. cause of action that does not exist in the U.S.

This strategy allows Plaintiffs to claim a much larger sum of damages by incorporating the significantly larger number of LSE-share investors and higher trading volumes on the LSE.  In contrast, class members with any U.S. nexus— including ADR holders—made up only 4.89% of the total outstanding shares as of 2023.  Feinstein Rep. ¶ 38, ECF No. 127-3.  Plaintiffs' attorneys thus obtain something they could not get by proceeding separately under the laws of each country:  a much larger putative class with significantly greater exposure for issuers,

---

[27] Companies Act 2006, c.46, Explanatory Notes ¶ 1643 (U.K.).
[28] *Id.*

and therefore a likely higher settlement value, with substantially higher attorneys' fees.  Cases that may not be economical if based solely on thinner trading in U.S.-listed securities will suddenly become lucrative.  For dual-listed issuers, this means losing the expected benefits of the jurisdictions in which they chose to locate, list their securities, and build their operations.  Meanwhile, U.S. courts should expect an increase in cases that are predominantly concerned with foreign transactions and foreign causes of action, burdening the courts and their dockets with claims in which the U.S. has no interest.

### A.   Allowing Section 90A Dishonest Delay Claims To Proceed In The U.S. Is An End Run Around *Morrison*

Allowing Plaintiffs' Section 90A claim is also inconsistent with the Supreme Court's landmark ruling in *Morrison*, 561 U.S. 247, which held that the U.S. securities laws do not apply extraterritorially for private actions, thus limiting access to U.S. courts for claims against foreign issuers involving foreign transactions.[29]

*Morrison* was decided against the backdrop of an ever-expansive use by plaintiffs of U.S. securities laws to litigate fraud claims against foreign issuers involving foreign transactions for alleged foreign misconduct.  The Court recognized the "fear that [the U.S.] has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets." [30] According to the Court, that is not what Congress intended, and in the absence of express Congressional intent, the presumption against extraterritorial application of

---

[29] Roger Cooper, Jared Gerber, & Anna Connolly, *Sidestepping 'Morrison' through foreign law claims and litigation*, FINANCIER WORLDWIDE MAGAZINE (Dec. 2020); *see also Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014) (*Morrison* "plainly did not contemplate," nor permit securities laws to reach conduct that "occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges, in the absence of any congressional provision addressing the incompatibility of U.S. and foreign law nearly certain to arise.").

[30] *Morrison*, 561 U.S. at 270.

federal laws would bar such claims.[31]  Here, Plaintiffs' use of the Section 90A claim seeks the same result as that rejected in *Morrison*.  They attempt to do so not by extending the U.S. securities law to foreign transactions—*Morrison* plainly prohibits that—but by in effect dispensing with the U.S. securities law altogether and using foreign law to reach foreign transactions, wrapped in a broad U.S. opt-out class action.[32]  The spirit of *Morrison* surely disfavors this kind of extension.

**B.      Permitting Litigation Of Section 90A Claims In The U.S. Strips Away Protections That Are Fundamental To U.K. Law**

The U.K. has embodied its policy preferences in the substantive and procedural protections that limit the volume, scope, and speculative nature of securities litigation.  But here Plaintiffs seek to bring their Section 90A claim under U.S. procedural law, without any of the U.K. procedural protections that were intended to apply to adjudication of that claim.  Several examples illustrate how this would undermine U.K. law protections for issuers and materially incentivize plaintiffs to bring even more of this kind of litigation.

1.      *Class Action Availability*

Opt-out class actions in the U.K. are available only for competition law claims heard before a specialized tribunal.[33]  The U.K. Government considered and rejected

_____

[31] *Id.* at 256, 264–66.

[32] Plaintiff classes have tried other tactics to extend the reach of U.S. securities law class actions, but courts have rejected such attempts.  *See e.g., In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26 (2d Cir. 2025), *cert. denied sub nom. Shanda Games Ltd. v. Monk,* No. 25-351, 2025 WL 3131847 at 42 (U.S. Nov. 10, 2025) ("the purchase of foreign-issued stock on a foreign exchange did not constitute a transaction in a security 'listed on a domestic exchange' for *Morrison* purposes merely because the security was dual-listed on a domestic exchange") (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014)).

[33] Consumer Rights Act of 2015, c. 81 (UK), https://www.legislation.gov.uk/ukpga/2015/15/section/81/notes; Troy Yoshino and Suzanne Labi, *Class Actions 101: An Introduction to UK Collective Actions and How*

the introduction of a general opt-out class action in 2009.[34]  Since then, courts in the U.K. have rejected the handful of attempts by plaintiffs to bring opt-out class actions outside of the antitrust context, including with respect to FSMA Section 90A.[35]

The official position of the U.K. Government is that the ease of class certification in the U.S. compared to the U.K. "is a source of ongoing concern to the U.K. every time a significant extraterritorial class action is brought in the U.S."[36]  In the U.S., securities fraud classes are allowed under expansive terms, with an opt-out class typically including any investor who "bought shares after the misleading statement was made and still held the shares at the point the truth emerged" without needing knowledge of and reliance on the misstatement in question.[37]  Under those parameters, classes become both easier to certify and also much larger.[38]  Plaintiffs here seek that benefit of the U.S. process, something they would not be entitled to in

---

*They Differ from US Class Actions*, WINSTON & STRAWN LLP (Nov. 27, 2023), https://www.winston.com/en/blogs-and-podcasts/class-action-insider/class-actions-101-an-introduction-to-uk-collective-actions-and-how-they-differ-from-us-class-actions; ORRICK, *United States (U.S.) Class Actions and United Kingdom (UK) Collective Actions* (last visited Oct. 29, 2025), https://www.orrick.com/en/Articles/UK-and-US-Class-Actions.

[34] *Lloyd v. Google LLC* [2021] UKSC 50 [3]-[4].

[35] *See Wirral Council,* [2025] EWCA Civ 40 (upholding the English High Court's decision to block a representative action brought under the securities law FSMA 90A, decided on the grounds that a class action would deny English courts the opportunity to adjudicate claims individually); *Lloyd v. Google LLC* [2021] UKSC 50 (dismissing a representative action due to the individualized nature of plaintiffs' damages); *Prismall v. Google UK Ltd* [2024] EWCA Civ 1516 (finding no justification for a representative claim since it is unclear whether plaintiffs have the requisite "same interest" in data privacy expectations).

[36] Brief for United Kingdom as *Amicus Curiae* at 16, *Toshiba Corp. v. Auto. Indus. Pension Trust Fund*, No. 18-486 (U.S. Dec. 4, 2018).

[37] *Allianz Funds Multi-Strategy Trust* [2024] EWHC 2710 (Ch) [48], [60] (Such a class can exist under a "fraud on the market theory," positing that "in an informationally efficient capital market the price of securities reflects all publicly available information.")

[38] *Id.*

the U.K., where their statutory cause of action originates.

### 2.   *Cost-Shifting Rules*

The default rule in England and Wales is "that the unsuccessful party will be ordered to pay the costs of the successful party."[39]  In contrast, there is no "loser pays" rule in the U.S.; each party bears its own legal fees regardless of outcome.[40]  Thus, unlike in the U.K., here is no financial risk to bringing U.K. law claims in the U.S., even unmeritorious ones.  This incentivizes potential plaintiffs who engage in foreign transactions in foreign securities of dual-listed companies to bring their claims in the U.S., no matter how weak, and to avoid the risk of having to pay their opponents' legal fees if they lose.[41]  This is transparent arbitrage and a tactic for artificially inflating class size in these proceedings.

### 3.   *Reliance Requirement*

As discussed above, *see supra* Section III.B, St. Louis's attempt to recharacterize a misstatement or omission claim as one for dishonest delay removes the reliance requirement, which would significantly expand the scope of liability

---

[39]   Rule 44.2 of the Civil Procedure Rules (U.K.), available at https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part-44-general-rules-about-costs.

[40] *See* Jaime Leigh Loos, *The Effect of a Loser-Pays Rule on the Decisions of an American Litigant*, 7 MAJOR THEMES ECON., 31, 31-32 (2005) (citing James Hughes and Edward Snyder, *Litigation and Settlement Under the* English *and American Rules: Theory and Evidence*, 38 J.L. & ECON. 225 (1995)).

[41] *See* John Beisner, Karl Thompson & Allison Orr Larsen, *Canadian Class Action Law: A Flawed Model for European Class Actions*, 9 ENGAGE 123, 128 (2008) (arguing that lawyers have multiple incentives to bring class action suits in the U.S. as opposed to in other countries "almost regardless of their merits," due to American litigation rules that make it "relatively easy and inexpensive for U.S. plaintiffs to institute class actions"); *see also* Stephen Dnes, *Class Act: The case for reforming Britian's class action regime* 1, 16 (INST. ECON. AFFS., Discussion Paper No. 141, Sept. 2025) (noting that America's system is more beneficial to plaintiffs than Canada's "loser pays" cost-shifting system).

beyond what was envisioned by the U.K. legislature.[42]

### C.  Allowing The Section 90A Claim To Go Forward Would  Unfairly Harm Defendants And Undermine U.S. And Foreign Legal Regimes

Permitting Plaintiffs to bring foreign claims using U.S.-style class action mechanisms will negatively impact courts and litigants, both in the U.S. and abroad.

#### 1.  *Undermining Expectations Of Dual-Listed Companies*

If Section 90A claims are allowed to proceed in U.S. courts, there may be serious financial consequences for U.K.-U.S. dual-listed companies and the LSE. Historically, the U.K. has boasted a comparatively lower risk of securities litigation relative to the U.S.[43]  For instance, while the U.K. has hosted only a handful of notable securities cases over the past decade (and none as class actions), at least 225 new securities class action lawsuits were filed in U.S. courts in 2024 alone.[44]  This

---

[42] *See supra* note 17.

[43] Alperen A. Gözlügöl, *The decline of stock markets in the UK: is regulation to blame and deregulation a fix?,* 25 J. of Corp. L. Stud. 79, 101-102 , (June 19, 2025) https://dx.doi.org/10.1080/14735970.2025.2495412; Chris Mayo, *Why North American Firms Should Be Looking At A London IPO*, London Stock Exchange (August 20, 2020) https://www.londonstockexchange.com/discover/news-and-insights/why-north-american-firms-should-be-looking-london-ipo; Fiona McFarlane, *London Calling: Opportunities for US Companies on the London Stock Exchange*, Bird & Bird (September 30, 2025) https://www.twobirds.com/en/insights/2025/uk/london-calling-opportunities-for-us-companies-on-the-london-stock-exchange.

[44] Pinsent Masons, *Why companies should consider the London Stock Exchange* (November 24, 2023) https://www.pinsentmasons.com/out-law/analysis/companies-consider-london-stock-exchange; *Persons Identified in Schedule 1* [2025] EWHC 698 (Ch); *Allianz Funds Multi-Strategy Trust* [2024] EWHC 2710 (Ch); *The Persons Identified in Schedule 1 of the Claim Form (the "SL Claimants")* [2019] EWHC 2858 (Ch); *Allianz Glob. Invs. GmbH v. G4S Ltd.* [2022] EWHC 1081 (Ch); *Sharp v. Blank and Others* [2019] EWHC 3096 (Ch); *The RBS Rights Issue Litig.* [2017] EWHC 463 (Ch); *Autonomy and others v. Lynch and Hussain* [2022] EWHC 1178 (Ch); *c.f.* Cornerstone Research and Stanford Law School Securities Class Action Clearinghouse, *Securities Class Action Filings – 2024 Year in Review* (January 25, 2025) https://www.cornerstone.com/wp-

lower litigation risk reflects the U.K. Government's policy choices, and it provides a critical comparative advantage for the LSE and the entire U.K. financial industry.[45] Moreover, corporations choose London stock market listings in reliance on the U.K. regulatory regime because it provides a robust rule of law while maintaining a balanced approach to liability that limits litigation risk and, above all, provides *certainty*.

Permitting Section 90A claims to be litigated in U.S. courts would upset that balance and certainty by exposing dual-listed companies to U.S. litigation risk and compliance costs that they neither anticipated nor consented to when listing in London. A pro-plaintiff ruling here would disrupt settled expectations, and would provide a windfall to plaintiff investors who would receive something they did not bargain for when buying foreign shares on a foreign exchange: the ability to bring a foreign cause of action in a U.S. class action vehicle. Public companies that operate in multiple jurisdictions plan around the substantive law and procedural backdrop of those jurisdictions, enabling them to understand their litigation risk with the expectation that it will remain stable and not be subject to change by the courts of other countries. Permitting St. Louis's claim threatens to allow other plaintiffs to similarly drag foreign defendants into the U.S. over foreign transactions, subjecting them to a hybrid legal structure that is difficult to plan for and navigate.

Additionally, such an outcome would have a negative impact on the U.K.'s

---

content/uploads/2025/01/Securities-Class-Action-Filings-2024-Year-in-Review.pdf, page 1.

[45] Rama Kanungo, *Why is the London Stock Exchange losing out to the US- and can it stem the flow?*, THE CONVERSATION (Apr. 23, 2024), https://theconversation.com/why-is-the-london-stock-exchange-losing-out-to-the-us-and-can-it-stem-the-flow-228160; Chris Mayo, *supra* note 38; *How does the London Stock Exchange Match Against the New York Stock Exchange in 2023?*, BUSINESS MONDAYS (Feb. 27, 2023), https://businessmondays.co.uk/how-does-the-london-stock-exchange-match-against-the-new-york-stock-exchange-in-2023/.

"sovereign right to regulate within their sovereign boundaries."[46]   The U.K. Government has warned that such forum shopping would "lead to an international 'race-to-the bottom' in which the forum offering the most favorable rules to plaintiffs for particular disputes prevails."[47]   These concerns are not hypothetical.   As noted above, another stock drop suit with the same profile as this case has already been filed.   *See* supra Section III.A.   If this Court chooses to entertain the claim at all, it signals to plaintiffs' attorneys that U.S. courts are open for business for Section 90A claims, opening the floodgates to similar claims and establishing U.S. courts as the preferred forum for claims that should be resolved in the U.K.

### 2. *Creating Barriers To Settlement*

Allowing Section 90A claims to proceed in U.S. courts would also make it significantly harder for classes to achieve settlement, harming both defendants and plaintiffs.   The risk of protracted litigation is not theoretical—the U.K. has indicated on multiple occasions that "[s]erious doubt exists" as to whether the English courts would find a U.S. class action settlement binding on foreign plaintiffs that did not opt out of the action.[48]   This would mean that a settlement in the U.S. may not bring an end to proceedings over the same English law claim.   This creates uncertainty for defendants, with the risk of duplicative or further related litigation.[49]   Without the

---

[46] Brief for United Kingdom as *Amicus Curiae* at 19, *Toshiba Corp. v. Auto. Indus. Pension Trust Fund*, No. 18-486 (U.S. Dec. 4, 2018).

[47] Brief for United Kingdom as *Amicus Curiae* at 19, *Morrison*, 561 U.S. 247.

[48] *Brief of the United Kingdom as Amicus Curiae Supporting Respondents* at 28, *Morrison*, 561 U.S. 247; *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996-97, n.48 at 997 (2d Cir. 1975), abrogated by *Morrison*, 561 U.S. 247 (acknowledging receipt of affidavit that England, among other foreign countries, would not recognize a U.S. judgment in favor of a defendant as a bar to an action by their own citizens without a formal opt-out, even assuming the citizens had received notice that they would be bound).

[49] *See* Rhonda Wasserman, *Transnational Class Actions and Interjurisdictional Preclusion*, 86 NOTRE DAME L. REV. 313, 316 (2011) ("[E]ven if a foreign court were to recognize an American class action judgment, the defendant

20

assurance of global peace, defendants would be disincentivized from settling at all, leaving plaintiffs without the certainty, speed, and reliable recovery that settlements offer, and defendants continuing to pay significant legal costs.

Nonbinding class actions also infringe upon the efforts of the U.S. judiciary to maintain a balance between the interests of plaintiffs and defendants in class actions.[50]  Typically, plaintiffs have the opportunity to secure a single, potentially large judgment against defendants on behalf of all injured parties; in exchange, defendants face the costs of only one suit and obtain finality through full releases of all claims and preclusion.  That careful balance would be upended if claims like the Section 90A claim here are permitted to proceed to the detriment of all parties.

## VI.    CONCLUSION

For these reasons, this Court should dismiss St. Louis's Section 90A claim.

## VII.    CERTIFICATION OF COMPLIANCE

The undersigned counsel of record for the Amicus certifies that this brief contains 6915 words, which complies with the world limit of L.R. 11-6.1.

Dated: February 23, 2026    CLEARY GOTTLIEB STEEN & HAMILTON LLP


                            /s/Jennifer Kennedy Park
                            Jennifer Kennedy Park

---

could face a risk of relitigation if the judgment were not accorded robust preclusive effect.")

[50] *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974) (federal rules were amended because "it was unfair to allow members of a class to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one"); *see also In re Citizens Bank, N.A.*, 15 F.4th 607, 620-21 (3d Cir. 2021) (failing to bind potential litigants would "arbitrarily deprive [defendant] of the benefits of the class action device to which it is entitled under Rule 23—namely, the full preclusive effect of the class action judgment") (internal citation omitted).

*Attorneys for Amicus*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jennifer Kennedy Park (Cal Bar No. 344888)
Jkpark@cgsh.com
1841 Page Mill Rd, Suite 250
Palo Alto, CA 94304
T: 650-815-4100
F: 650-815-4199

Roger A. Cooper (*pro hac vice*)
Racooper@cgsh.com
Isabella Riishojgaard (*pro hac vice*)
Iriishojgaard@cgsh.com
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

Thomas A. Bednar (*pro hac vice*)
Tbednar@cgsh.com
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-3229
T: 202-974-1500
F: 202-974-1999

*Local counsel for service of filings: Ryan Hatch*
Ryan Hatch (Cal Bar No. 235577)
Ryan@hatchlaw.com
13323 W. Washington Blvd, Suite 302
Los Angeles, CA 90066
T: 310-279-5076
F: 310-693-5328