Robert V. Prongay (SBN 270796)
Jonathan M. Rotter (SBN 234137)
**GLANCY PRONGAY WOLKE & ROTTER LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: jrotter@glancylaw.com

*Counsel for Amicus Curiae*
*Financial Recovery Technologies, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS, <br><br> Defendants. | Case No. 2:23-cv-09217-MEMF-KS <br><br> **BRIEF OF AMICUS CURIAE FINANCIAL RECOVERY TECHNOLOGIES, LLC IN RESPONSE TO AMICUS BRIEF OF THE INSTITUTE OF INTERNATIONAL BANKERS** <br><br> Judge:    Hon. Maame Ewusi-Mensah Frimpong <br> Date:    March 19, 2026 <br> Time:    10:00 am <br> Courtroom:  8B |

# TABLE OF CONTENTS

I.    STATEMENT OF INTEREST OF AMICUS CURIAE ..................................1

      A.    About FRT .......................................................................................1

      B.    Reasons and Authority for Submission.........................................2

II.   HOW UK SHAREHOLDER RECOVERY EFFORTS GET
      ORGANIZED AND FILED........................................................................2

III.  UK COURTS WILL BE INACCESSIBLE TO ALL BUT A FEW
      LARGE CLAIMANTS ...............................................................................5

IV.   PUBLIC FACTORS FAVOR KEEPING ALL CLAIMS HERE ...................7

      A.    Factor #1: Local Interest of Lawsuit........................................7

      B.    Factor #2: Court Familiarity with Governing Law ...............................8

            i.    This court can apply UK securities laws. ....................................8

            ii.   This Court should apply U.S. procedural law. ...........................10

      C.    Factors #3-#5: Court Congestion, Burden on Local Courts/Juries,
            and Costs of Resolving Disputes Unrelated to Forum.........................12

V.    PRIVATE FACTORS FAVOR KEEPING ALL CLAIMS TOGETHER.....13

      A.    Factor #7: Other Practical Problems ....................................................14

            i.    Disparate impacts on similarly harmed investors.......................14

            ii.   UK litigants will likely rely on U.S. discovery. .........................15

            iii.  U.S. class action settlement releases can prejudice
                  those with claims in both Classes. ...............................................16

VI.   CONCLUSION ........................................................................................17

VII.  CERTIFICATION OF COMPLIANCE .........................................................18

i

# TABLE OF AUTHORITIES

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*,
    585 U.S. 33 (2018)...................................................................................................10

*Behrens v. Arconic, Inc.*,
    2020 WL 1250956 (E.D. Pa. Mar. 13, 2020) ...........................................................9

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*,
    960 F.3d 549 (9th Cir. 2020) ..................................................................................11

*Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*,
    17 F. Supp. 3d 743 (N.D. Ill. 2014).........................................................................8

*Giner v. Est. of Higgins*,
    2012 WL 123973 (W.D. Tex. Jan. 13, 2012) ..........................................................11

*Morris v. Lincare, Inc.*,
    2024 WL 2702101 (M.D. Fla. May 24, 2024) ........................................................11

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................................11

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981)..................................................................................................8

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)................................................................................................11

**Domestic Statutes**

28 U.S.C. §1783.................................................................................................................15

**Foreign Statutes**

Financial Servies and Markets Act 2000, c. 8, § 90A (U.K.).....................................3

## I.   STATEMENT OF INTEREST OF AMICUS CURIAE

### A.   About FRT

Founded in 2008, Financial Recovery Technologies LLC ("FRT"), www.frtservices.com, is primarily focused on helping institutional investors monitor opportunities, file claims, and recover proceeds from global shareholder litigation. With its headquarters in Medford, Massachusetts, FRT also has offices in London and Sydney.   It supports more than 2,500 clients with $45+ trillion in assets under management ("AUM") including:

- Three of the five largest global custody banks;
- Five of the ten largest European public pension funds;
- Four of the ten largest sovereign wealth funds;
- Six of the ten largest U.S. based hedge funds;
- Nine of the ten largest U.S. public pension funds; and
- Three of the five largest global asset managers.

During the past five years, FRT has submitted millions of claims, processed 1M+ payments, and recovered $4B+ for clients.

In the United States alone, each year FRT clients receive, on average, approximately 25% of all money distributed in securities class action settlements. These funds compensate victims of investment fraud including (but not limited to) public and private company employees, retirees and pensioners, police, fire and municipal pension systems.

FRT offers its clients monitoring and participation support in all countries where there are legal mechanisms for shareholder recovery through claimant registration or proof of claim form submission.   Relevant to this amicus submission, FRT services include:

- Settled Recovery covering U.S. and Canada securities and antitrust (competition) class actions and U.S. Securities & Exchange Commission ("SEC") Fair Funds.

1

- <u>Passive Group Litigation Recovery</u> covering Australia/New Zealand class actions, Dutch Collective Settlements, United Kingdom ("UK") (regulatory) Compensation Schemes, and efforts in other countries that, like the U.S., use class actions or other representative processes with no active or opt-in risks or burdens for claimants.
- <u>International Opt-In Group Recovery</u> covering shareholder recovery efforts in countries like the UK that use direct or group opt-in suits and require investors to actively participate in litigation to some degree.

**B.    Reasons and Authority for Submission**

In accordance with the Court's Order Granting the Institute of International Bankers' ("IIB") Motion for Leave to File ("Motion") Amicus Brief in Support of Barclays PLC's ("Barclays") Motion to Dismiss ("Brief"), and requiring responses to be filed by February 24, 2026 (ECF 153), FRT offers this amicus curiae submission to inform the Court about:

- how UK shareholder recovery efforts get organized and filed;
- UK procedural barriers that will prevent most members of the Ordinary Share Class from having their claims heard in UK courts;
- how these barriers make the UK an inferior forum for Ordinary Share claims; and
- how they inform the public and private factors this Court is using to evaluate *forum non conveniens.*

Most importantly, we offer the Court the perspectives of investors, which IIB wholly ignores.

**II.    HOW UK SHAREHOLDER RECOVERY EFFORTS GET ORGANIZED AND FILED**

The UK is not a "developing" regime with "unsettled" or "novel" securities laws, despite IIB saying this at least 16 times in its Motion and Brief. England is among the most mature venues for shareholder recovery. It has an active plaintiff bar

2

with at least a half dozen law firms regularly filing securities suits.  London law firms defending them are among the world's most formidable.  UK litigation funding sources and after-the-event ("ATE") insurance markets are among the largest in the world.

The primary method for shareholder recovery is group opt-in suits.  These include individual actions or multiple writs by competing investor groups.  UK courts coordinate suits with group litigation orders ("GLOs").  During the past 14 years, FRT has supported clients in more than 100 UK recovery efforts.  All of them have alleged UK securities law violations including claims under Section 90A of the Financial Services and Markets Act 2000, belying IIB's contention that these claims are "seldom-used and legally untested."  Motion, ECF 140 at 3.

Independent of the substance of its securities laws, the UK legal system has significant *procedural* barriers to shareholder recoveries.  The top three include:

- Adverse cost awards: Under UK law, the losing side will be ordered to pay the prevailing side's legal fees and expenses.  Plaintiffs or litigation funders must post security or provide evidence of ATE insurance sufficient to cover potential awards, which average around 60% of the prevailing side's fees and costs.

- Participation burdens: UK courts use case management orders to streamline group suits including test cases and phased trials.  However, claimants must still actively participate in proceedings and must frequently provide documents and information before trials on issuer liability concerning their investment strategies and other matters related to standing or reliance.

- Anonymity: Like the U.S., UK court dockets and legal pleadings are publicly available, so claimant involvement is fully visible.  This deters investors such as sovereign wealth and government funds that may not want to publicly appear litigious, and/or investors that fear chilling relationships with management by taking openly adversarial positions.

3

UK securities suits get organized differently from U.S. securities class actions. Given rules governing attorney compensation, many efforts require third-party litigation funding. Funders pay counsel fees and advance case costs during proceedings, and if successful, they receive expense reimbursement and success fees from the recoveries.

Funders condition their financing on participation by claimants with total losses exceeding preset minimum amounts to ensure potential recoveries are large enough to reward their investment. This requires plaintiff counsel and/or funders to engage in time-consuming and expensive book-building processes whereby they notify and encourage registration by claimants until total losses exceed the funder's threshold. If book-building efforts don't produce sufficient investor interest, the recovery efforts fail to launch.

The result: UK shareholder recovery efforts are by no means certain, and litigation funders are gatekeepers for investor inclusion. Efforts take years to organize and, in the end, may or may not proceed. If they do, suits get filed long after the underlying scandals and long after any parallel U.S. securities class actions have commenced.

Claimant groups rarely include more than a fraction of all harmed investors. Participation is typically limited to institutional investors with large losses. Most funders exclude retail investors. Many exclude passive investors. Some prefer not to include institutions with smaller losses given the time, effort, and cost required to prosecute their claims.

These challenges are not likely to change. Recent UK court decisions have rejected attempts to use Civil Procedure Rule 19.8 for representative shareholder proceedings.[1] In December 2025, the UK Supreme Court sustained a rejection by the

---

[1] *See* Stewarts, "Representative proceedings not permitted in Indivior and Reckitt securities claims" (Dec. 15, 2023), available at

4

Competition Appeal Tribunal of opt-out proceedings for investor claims involving foreign exchange transactions, despite acknowledging that opt-in proceedings were not viable.[2]

In short, for now, the UK has rejected representative proceedings in favor of direct suits limited to claimants with large losses.  These procedural barriers have nothing to do with the substance of UK securities laws.  They prevent most investors from ever getting into court, giving them no chance to have their claims tested under UK securities laws.  Together, these barriers greatly reduce investor access to justice, and the efficient resolution of shareholder claims in the UK.

## III.    UK COURTS WILL BE INACCESSIBLE TO ALL BUT A FEW LARGE CLAIMANTS

In its Amended Order Denying Staley's Motion to Dismiss (ECF 56) and Granting in Part Barclays Bank's Motion to Dismiss (ECF 58), ECF 93 ("Order"), this Court said that to be adequate, "[t]he foreign forum must provide the plaintiff with some remedy for his wrong in order for the alternative forum to be adequate." ECF 93 at 21.  It concluded the UK was adequate because "a remedy is provided under UK law." *Id.*

The UK is less adequate as a forum for shareholder disputes than suggested by the existence of its securities laws.  In practice, the procedural barriers summarized above will effectively close the courthouse doors to most members of the Ordinary Share Class including (but not limited to) retail investors, shareholders using passive investment strategies, and institutional investors with small losses.  There will be no

---

https://www.stewartslaw.com/news/representative-proceedings-not-permitted-in-indivior-and-reckitt-securities-claims/ (last visited Feb. 24, 2026).

[2]  *See* Slaughter & May, "FX collective proceedings: The Supreme Court judgment" (Dec. 18, 2025), available at https://www.slaughterandmay.com/insights/new-insights/fx-collective-proceedings-the-supreme-court-judgment/ (last visited Feb. 24, 2026).

effective remedy available except to a small number of the largest claimants. Even those large enough to potentially get their claims into court will not have an opportunity to do so unless litigation funder(s) are willing to finance prosecutions against Barclays and their bookbuilding efforts are successful.

At the same time, these procedural barriers impose risks and burdens on claimants which further chill participation by those not otherwise precluded by funders from recovery efforts. FRT clients consider the UK the riskiest and most burdensome venue for recoveries. Accordingly, they set minimum estimated loss thresholds—typically $10M or $15M—that must be exceeded before they consider joining a UK opt-in suit. Thresholds help ensure any future recovery will be worth enduring the associated risks and burdens of direct suit. As a result, for any given UK recovery effort, FRT typically has only one to three institutional clients join. In some cases, no clients join.

By contrast, in U.S. securities class action settlements, FRT clients submit proof of claim forms whenever they have eligibility, meaning their participation rates are essentially 100%. They can do so anonymously, without cost or risk of adverse cost awards, and without any participation burdens beyond completing proof of claim forms and providing trade substantiation records. In short, their participation threshold is zero.

This is not a choice between two good forums. If the Court dismisses the Ordinary Share Class for *forum non conveniens*, as a practical matter, the UK court system will be closed to most Class members. Even for those with losses large enough to get into court, there is no assurance their suits will proceed given funder hurdles.

By contrast, if the Court keeps all claims together here, all members of the Ordinary Share Class will have the ability for their claims to be tested under the UK securities laws and most, if not all, can be expected to file proof of claim forms in any future resolution of this class action.

6

## IV.   PUBLIC FACTORS FAVOR KEEPING ALL CLAIMS HERE

### A.   Factor #1: Local Interest of Lawsuit

In its earlier decision, this Court did not compare the economic losses suffered by the U.S. ADR and Ordinary Share Classes. Rather, it focused on the parties' burdens in each forum, the overall fairness to both if it kept all claims, and the interests of each country in resolving the issues. That focus is correct.

IIB suggests the Court should measure each country's interest as a venue using relative trading volumes and potential losses suffered by each Class on their respective exchanges. *See* Brief, ECF 140-1 at 3, 13-14. Because trading volumes for Barclays Ordinary Shares on the London Stock Exchange ("LSE") significantly exceed volumes for ADRs traded on the New York Stock Exchange ("NYSE"), IIB argues the losses suffered by Ordinary Share Class must be bigger and, therefore, the UK has a greater interest in resolving claims there. IIB does not say what total shares, trading volumes, or potential losses *would* be sufficient to keep all claims together, only that "ADR holders - made up of only 4.89% of the total outstanding shares as of 2023," giving this Court "no interest." *Id.* at 13-14.

IIB's arguments miss the mark. Even if ADR trading volumes are smaller by comparison, at the end of the Class Period they were more than 40 million shares per week. So, in absolute dollars, losses suffered by the ADR Class are very substantial. Moreover, as the Court previously noted, some if not the majority of Ordinary Share Class members reside outside the UK, including (like the representative plaintiff) in the U.S. *See* Order, ECF 93 at 21-22.

Even if this comparative approach made sense, and we submit it does not, IIB makes an 'apples to oranges' comparison. It compares the estimated losses of a U.S. class action that includes all harmed ADR investors with the losses of a hypothetical UK representative proceeding that includes all harmed Ordinary Share investors. For the reasons above, such representative proceedings do not exist under UK law. If a UK recovery effort gets organized and filed, which is by no means certain, it will only

7

involve a limited number of the largest institutional claimants from the Ordinary Share Class. Under IIB's approach, the more appropriate comparison is between the ADR Class and the small group of Ordinary Share investors who file suit in the UK, which cannot be determined now as there is no pending UK recovery effort related to this scandal.

More generally, given historically low investor participation in UK recovery efforts, the losses suffered by most U.S. ADR classes will exceed those of any limited investor group suing in the UK. So, in the end, IIB's suggested 'percentage' approach to measuring country interests actually favors the plaintiffs' arguments for keeping everything together in this U.S. class action.

**B.      Factor #2: Court Familiarity with Governing Law**

*i.        This court can apply UK securities laws.*

Federal district courts routinely apply foreign law. *See Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, 17 F. Supp. 3d 743, 746 (N.D. Ill. 2014), *aff'd sub nom. Baumeister v. Lufthansa, AG*, 811 F. 3d 963 (7th Cir. 2016) (citing numerous cases). As the Supreme Court has noted, the need to apply foreign law "alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n. 29 (1981).

Arguing the Court should not do so here, between its Motion and Brief, IIB describes UK securities law claims as "novel," "complex," or "unsettled" more than twenty (20) times. Saying so doesn't make it true. The UK securities laws do not differ fundamentally from those in the U.S. While their statutory expressions differ, the concepts and enforcement goals underlying both regimes are similar. Both premise issuer liability on misrepresentations and/or material omissions. Both involve concepts of materiality, loss causation, reliance, and damage. U.S. courts regularly consider these issues, as they do scienter or other "distinct mental state requirements." Brief, ECF 140-1 at 5.

8

Similarly, IIB overstates the complexity of dishonest delay claims. This concept is not unique to UK law. It's part of the securities laws in many other jurisdictions including Australia and European countries. Dishonest delay—and delayed disclosure claims generally—resemble U.S. securities law concepts including material omissions and/or misrepresentations by the failure to disclose known material adverse facts.

IIB notes that UK courts have not accepted the 'fraud on the market' theory of presumptive reliance. Brief, ECF 140-1 at 8. This is a red herring as plaintiffs here allege dishonest delay claims which, IIB concedes, do not have a reliance element. Regardless, given legal uncertainty, many UK funders *will not underwrite* certain securities claims by investors using passive investment strategies. This makes the UK a less adequate forum for passive investors, who will be excluded from recovery efforts by the funder's investment decision and not by disqualification under UK securities laws.

Even if the UK securities laws were novel or complex, which we dispute, there are other ways this Court can proceed short of the "harsh result" of dismissal. Order, ECF 93 at 20. Under Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

This Court can consider briefing by the parties, treatises and other secondary sources, or engage special masters or outside experts to give opinions on the application of UK law to the facts of this case. *See Behrens v. Arconic, Inc.*, 2020 WL 1250956, at *1 (E.D. Pa. Mar. 13, 2020) (court appointed partner at major Paris law firm as expert and master to determine applicability of French statute). IIB's U.S.

9

counsel essentially does this by including on its team firm lawyers licensed in England and Wales, who presumably helped summarize UK law. Brief, ECF 140-1 at 2 n.2.[3]

Other courts have done the same. For example, in the Foundation recovery effort against Petrobras, the Brazilian oil company, the Dutch court found the company engaged in wrongdoing. It then asked outside experts to opine whether the laws of the claimants' home countries allowed for damages after concluding the parties' briefing did not objectively present these issues.

Here, the Court will have an even easier time determining foreign law because in both the U.S. and UK laws are written in English, whereas in Petrobras, different languages were involved including Dutch and Portuguese. That court faced challenges related to language barriers and translations that do not exist here.

This Court can and should form its own opinions on UK law. As the Supreme Court has noted, federal courts are not required to accept *even a foreign government's interpretation of its own laws*, or to ignore other relevant material. *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 585 U.S. 33, 34 (2018). This Court should not decline to do so here based solely on the self-serving legal summaries of IIB, which advocates for Barclays' interests.

### ii.    This Court should apply U.S. procedural law.

IIB's real objection is not to this Court's application of UK law, which it is well equipped to do, but to the application of U.S. federal civil procedure rules if all claims are kept together.

---

[3] With so much on UK law available to this Court, there is no basis for IIB's claim that the Court is in a worse position or less equipped than a UK court to apply UK securities laws to claims of the Ordinary Share Class. Brief, ECF 140-1 at 2, 9. Barclays and IIB are really worried the Court will reach the "wrong" conclusion, *i.e.,* one different from what they want. They prefer to see these claims dismissed as they know few, if any, will get into the UK courts for resolution.

Federal procedural law applies even in cases involving foreign substantive law. *See, e.g.*, *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 557 (9th Cir. 2020); *Giner v. Est. of Higgins*, 2012 WL 123973, at *12–13 (W.D. Tex. Jan. 13, 2012).

Rule 23 is a procedural rule and not substantive law. *See Morris v. Lincare, Inc.*, 2024 WL 2702101, at *4 (M.D. Fla. May 24, 2024) (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (holding that a class action, like traditional joinder, "merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged.")).

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court precluded extra-territorial application of U.S. securities laws. Here the Court is applying UK securities laws to claims of the Ordinary Share Class, making that decision inapplicable.

Conceding this, IIB argues that using U.S. civil procedure violates the "spirit" of *Morrison*. Brief, ECF 140-1 at 15. The SEC would appear to disagree. In the ongoing $200M Barclays Fair Fund that resolved agency enforcement proceedings against Barclays for violating U.S. securities laws, the agency extended eligibility for compensation to claims by investors who bought Barclays Ordinary Shares on the LSE. *See* www.barclaysfairfund.com (Barclays Fair Fund website).

IIB argues that application of U.S. civil procedure rules will disrupt Barclays' "settled expectations" because the company has "structured [its] operations and made securities listing decisions in reliance" on a UK securities regime that protects it from suit. Motion, ECF 140 at 4; Brief, ECF 140-1 at 2, 19.

The Court should reject this hyperbole. The UK adopted Section 90A on November 8, 2006. For *more than 100 years* before then, Barclays had its headquarters and main operations in London, and its shares listed on the LSE. None

11

of this will change if this Court applies Section 90A to the claims of the Ordinary Share Class, and doing so will not "undermine London as a premier financial center."[4]

In the end, IIB seeks to further Barclays' goal of sending Class member claims to the UK where it knows most of them will have no opportunity for redress due to procedural barriers preventing their claims from being heard. Barclays and IIB have failed to show that the UK is a viable forum for these claimants. Quite the opposite, in its "settled expectations" argument, IIB emphasizes some of the same procedural barriers including risk of adverse cost orders and absence of representative proceedings under UK civil procedure rules.

Preference is not persuasion. IIB's desire for UK procedural rules does not *strongly* favor dismissal when the Ordinary Share Class has at least equal compelling arguments in opposition. Barclays bears the burden on *forum non conveniens*. Neither it nor IIB advocating its interests has succeeded, and plaintiffs' choice of venue should not be disturbed.[5]

### C. Factors #3-#5: Court Congestion, Burden on Local Courts/Juries, and Costs of Resolving Disputes Unrelated to Forum

Earlier, this Court noted that separating claims was less efficient for the parties because Barclays would still need to litigate in the U.S. even if foreign law claims were dismissed. Order, ECF 93 at 22.

---

[4] With similar hyperbole, IIB argues that if the Court does not dismiss claims of the Ordinary Share Class, its members will get a "windfall" and "something they did not bargain for" (Motion, ECF 140 at 5). In FRT's experience, when making investments, institutional investors do not expect to be defrauded, do not compare potential recovery avenues under U.S. versus U.K. securities laws, and do not "bargain" with anyone on forum protections. They make decisions based on expected returns and other unrelated considerations.

[5] To pejorate plaintiffs, IIB accuses them of "forum shopping" (Brief, ECF 140-1 at 11-12). This is not a 'file here or file there' choice. The ADR claims had to be filed here. The question is whether it is most fair and efficient for the parties and the court systems in the US and the UK to keep together all claims arising from the same underlying scandal.

During its 14 years servicing clients for non-US shareholder recovery efforts, FRT has seen little indication that foreign courts are territorial about resolving these disputes, or that they believe they alone should handle them. Quite the opposite. Massive numbers of claimants and suits have overwhelmed judicial systems in several countries.

Generally, U.S. securities class actions are faster, more efficient, and less expensive to prosecute than non-U.S. recovery efforts. Here, advancing claims of the Ordinary Share Class with those of the ADR Class will add only marginally to overall cost and time for proceedings as the underlying facts and evidence concerning Barclays' alleged misconduct will be the same regardless of the substantive securities laws applied to claims.

By contrast, UK proceedings against Barclays may or may not launch. If they do, they will be slower and more costly. In addition to the redundancy of developing in two separate court systems the same factual records concerning underlying events, any UK prosecution will necessarily cost millions more than this U.S. class action due to the need for plaintiffs there to post security and/or provide ATE insurance coverage for potential adverse cost awards, and to compensate a litigation funder for financing the efforts.

## V.    PRIVATE FACTORS FAVOR KEEPING ALL CLAIMS TOGETHER

As this Court noted, "[a]t its core, the doctrine is concerned with fairness to the parties." Order, ECF 93 at 20. In its submission, IIB advocates only for the interests of Barclays. It makes no serious attempt to argue that investors in the Ordinary Share Class have no interest in their claims remaining in the U.S. courts with the ADR Class. In truth, Ordinary Share class members have significant interest in their claims being here as nearly all of them will be prevented from bringing claims in the UK courts because of the procedural barriers summarized above.

In the post-*Morrison* world, overseas investors are increasingly global in their recovery efforts, joining actions in many different countries. They are particularly

comfortable with U.S. litigation, including securities class actions, and regularly file proof of claim forms in settlements.  For years, the U.S. plaintiff bar has been encouraging overseas investors to join U.S. securities suits in both federal and state courts like Delaware.  Foreign investors have served as lead plaintiffs in U.S. securities class actions and/or have opted out of classes to pursue direct actions here in the U.S.

FRT clients span the globe.  Many are not based in the U.S. or the UK and for them, neither of the two countries is more convenient by virtue of its location.  However, given the procedural barriers for recovery efforts in the UK, we know (based on more than 14 years of conversations) that they much prefer to be included in U.S. securities class actions.

### A.    Factor #7: Other Practical Problems

During the years since *Morrison*, we have seen other inefficiencies and unfairness to investors caused by the separation of claims for prosecution in different countries.

### i.    *Disparate impacts on similarly harmed investors*

When companies get sued in multiple countries after a scandal, we often see disparate impacts on investors harmed by the same wrongdoing due to local procedural barriers.  As here, those procedural barriers have nothing to do with the merits of their claims under local securities laws.

Consider the plight of Fiat Chrysler investors after the 2015 emissions scandal.  That year, the company was sued for securities fraud in a U.S. class action limited to investors who purchased the company's common stock on the U.S. exchange or U.S. alternative trading systems.  Claims for shares purchased on Italy's national stock exchange in Milan were excluded from the class and the $110M U.S. settlement that followed.

In 2021, Stellantis NV (a Dutch entity) was formed through a merger between the French PSA Group and Fiat Chrysler.  In 2024, a Dutch Foundation was launched

14

for investors who bought Fiat shares on the Milan exchange seeking compensation for claims arising from the same underlying emissions scandal.  On July 23, 2025, the Dutch court declared the Foundation inadmissible, essentially ending the case on procedural grounds before it started.

Here, the equities more heavily favor the Ordinary Share Class.  In Stellantis, the Dutch Foundation pursued representative proceedings, like a U.S. class action.  Claimants did not need to sue individually.  Here, a UK effort would require Class members to sue Barclays directly, and the procedural barriers discussed above would limit participation to only a small subset of its members.  For most, the courthouse doors will be closed.

### ii.  UK litigants will likely rely on U.S. discovery.

Earlier, this Court noted that even if the claims are split, Barclays will still need to defend in the U.S.  In other words, even if the parties, witnesses, and sources of proof are based in the UK, the information will still need to be produced here.  Order, ECF 93 at 22.

In securities fraud cases, most information necessary to prove claims is within the defendant company.  Outside the U.S., including the UK, parties cannot compel the production of relevant information.  They must negotiate production or ask the court to order it over objections.  As a result, plaintiffs in any parallel UK group suit will likely try to use the U.S. court system to obtain information they cannot get directly there.

Under 28 U.S.C. §1783, U.S. federal courts can order the testimony of witnesses and/or the production of documents in the U.S. to assist foreign proceedings.  In non-U.S. recovery efforts, plaintiffs frequently use §1783 to obtain discovery in the U.S., including records in parallel securities class actions.  Getting information this way can be quicker and easier than trying to do so directly in home courts where discovery powers are limited.

AMICUS BRIEF OF FINANCIAL RECOVERY TECHNOLOGIES, CASE NO. 2:23-CV-09217-MEMF-KS

In other words, if the Court dismisses claims of the Ordinary Share Class, the few members who could file suit in the UK would likely end up back here asking for relevant documents and information produced in the ADR class action. This would not be efficient.

### iii. U.S. class action settlement releases can prejudice those with claims in both Classes.

In its submission, IIB argues at cross purposes. It claims that keeping all claims together will *coerce* Barclays into settlement. At the same time, it argues that keeping claims together will *discourage* Barclays from settling given the prospect of more suits in the UK, which it says deprives Barclays the "certainty, speed, and reliable recovery" from settlement. Brief, ECF 140-1 at 20-21.

Neither is true. Resolution of a U.S. class action that includes both Classes will not hamper Barclays' ability to resolve claims in the UK because any claims there will be limited to those few investors suing the bank directly. Plaintiffs in the group opt-in suit will be named in the writ, and their losses can be readily calculated. The situation is comparable to opt-out suits in the U.S., which defendant companies resolve with or separately from the underlying class actions.

Barclays should have advance notice of any potential UK suit against it. Bookbuilding requires broad outreach to investors, so these efforts are open secrets at best. Also, most recovery efforts include a pre-filing stage during which group counsel reaches out to the company defendant early to discuss tolling agreements, settlement attempts, and logistics around filing and service of writs.

However, claim splitting *will* adversely impact those investors with claims in *both* Classes who join a UK opt-in suit. After public revelations of corporate wrongdoing, U.S. securities class actions always precede non-U.S. recovery efforts based on the same underlying events. Given the faster pace of proceedings, U.S. class actions may even be resolved, by dismissal or settlement, before non-U.S. recovery efforts get significantly underway.

16

Overly broad release language in a future settlement can force investors with both ADR claims and Ordinary Share claims being litigated in the UK to make a Sophie's Choice: to forego compensation in the U.S. for their ADR claims to preserve their Ordinary Share claims in the UK, or to accept the U.S settlement for their ADR claims and abandon UK suits for Ordinary Share claims.

This has happened in other cases. For example, the U.S. securities class action against Nissan Motor Co., Ltd. settled in 2022 for $36 million. The broad release language there forced eligible claimants who had ADR claims here and ordinary share claims in the Japanese courts to choose between taking U.S. settlement money for the ADR claims or continuing suits for the common shares in Japan. These claimants had to estimate their potential recoveries in each forum and then choose one or the other; either way, they were prevented from fully recovering their losses.

Each year, around 15% to 20% of securities class actions are filed against non-U.S. issuers. To protect clients, FRT has had to implement internal procedures to review U.S. class action settlement release language and its potential impact on any ongoing non-U.S. recovery efforts. That's how the Nissan issue got flagged. Claimants here will not face any such risk if the Court keeps all claims together.

## VI.    CONCLUSION

As this Court noted earlier, dismissal for *forum non conveniens* is a "drastic exercise" of its powers and an "exceptional tool" to be used only when there are an adequate alternative forum and the public and private factors "strongly favor dismissal." Order, ECF 93 at 20. Neither of these conditions exist here.

Considering the respective court burdens, congestion, and cost of resolving claims, and weighing fairness to all parties, including claimants in the Ordinary Share Class, whose interests IIB wholly ignores, the claims of *all* shareholders harmed by the same underlying Barclays scandal are best kept together in one class action.

Separating claims will preclude any potential recovery for most members of the Ordinary Share Class given the UK procedural barriers that will prevent them

from getting into court; and the public and private factors do not weigh so strongly in favor of Barclays that this Court should take the extraordinary step of disturbing the plaintiffs' choice of forum.

## VII.    CERTIFICATION OF COMPLIANCE

The undersigned counsel of record for the Amicus certifies that this brief contains 5,343 words, which complies with the world limit of L.R. 11-6.1.


DATED:  February 24, 2026          **GLANCY PRONGAY WOLKE
                                   & ROTTER LLP**

                                   By:  */s/ Jonathan M. Rotter*
                                   Robert V. Prongay (SBN 270796)
                                   Jonathan M. Rotter (SBN 234137)
                                   1925 Century Park East, Suite 2100
                                   Los Angeles, California 90067
                                   Telephone: (310) 201-9150
                                   Facsimile: (310) 201-9160
                                   Email: rprongay@glancylaw.com
                                   Email: jrotter@glancylaw.com

                                   *Counsel for Amicus Curiae*
                                   *Financial Recovery Technologies, LLC*

18

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On February 24, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on February 24, 2026 in Los Angeles, California.

*/s/ Jonathan M. Rotter*
Jonathan M. Rotter

1

PROOF OF SERVICE