Adam S. Paris (SBN # 190693)
(parisa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

Jeffrey T. Scott (*pro hac vice*)
(scottj@sullcrom.com)
Matthew J. Porpora (*pro hac vice*)
(porporam@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3558

[ADDITIONAL COUNSEL ON SIGNATURE BLOCK]

*Attorneys for Defendant Barclays PLC and Nigel Higgins*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

STEPHEN MERRITT, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BARCLAYS PLC, JAMES E. STALEY, and NIGEL HIGGINS,

Defendants.

Case No. 2:23-cv-09217-MEMF-KS

**BARCLAYS PLC AND NIGEL HIGGINS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY THE CLASSES**

[Declaration of Adam S. Paris]

Hearing Date: December 3, 2026
Hearing Time: 10:00 A.M.
Courtroom: 8B
Judge: Hon. Maame Ewusi-Mensah Frimpong

# TABLE OF CONTENTS

*Page*


INTRODUCTION ........ 1

BACKGROUND ........ 3

ARGUMENT ........ 5

I. Common Issues Do Not Predominate Because the Challenged Statements Had No Price Impact, Rebutting the *Basic* Presumption of Reliance ........ 6

A. Statements About the Staley-Epstein Relationship Had No Price Impact ........ 7

B. Barclays' Cooperation Statement Had No Price Impact ........ 13

II. The *Affiliated Ute* Presumption of Reliance for Omissions Claims Does Not Apply ........ 15

III. Plaintiff Has Not Proffered the Required Methodology for Measuring Classwide Damages ........ 16

A. Plaintiff Does Not Offer Any Evidentiary Proof of a Case-Specific Damages Methodology ........ 16

B. Plaintiff's Approach to Measuring Damages Is Inconsistent with Its Liability Case and Deeply Flawed ........ 17

CONCLUSION ........ 19

## TABLE OF AUTHORITIES


Page(s)

**Cases**

*Alaska Elec. Pension Fund* v. *Pharmacia Corp.*, 2007 WL 276150 (D.N.J. Jan. 25, 2007) .......... 10

*In re Apache Corp. Sec. Litig.*, 2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .......... 6, 11, 13

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) .......... *passim*

*Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) .......... 1

*Black Lives Matter L.A.* v. *City of L.A.*, 113 F.4th 1249 (9th Cir. 2024) .......... 5, 10, 15, 18

*Bricklayers* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014) .......... 12

*Buhrke Fam. Revocable Tr.* v. *U.S. Bancorp*, 726 F. Supp. 3d 315 (S.D.N.Y. 2024) .......... 14

*Coburn* v. *Evercore Tr. Co.*, 844 F.3d 965 (D.C. Cir. 2016) .......... 12

*Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013) .......... *passim*

*ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) .......... 14

*In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569 (N.D. Cal. Apr. 21, 2026) .......... *passim*

*Espy* v. *J2 Glob., Inc.*, 99 F.4th 527 (9th Cir. 2024) .......... 12

*In re FibroGen Sec. Litig.*, 2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) .......... 13

*In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587 (6th Cir. 2025) .......... 15

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113 (2021) .......... *passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) .......... 1, 2, 6

*IBEW* v. *Deutsche Bank AG*, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) .......... 11

*Jaeger* v. *Zillow Grp., Inc.*,
2025 WL 2741642 (9th Cir. Sept. 26, 2025) ....................6, 8

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ....................10, 11, 14, 15

*Lytle* v. *Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) ....................17

*Macomb Cnty.* v. *Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) ....................14

*Meyer* v. *Greene*,
710 F.3d 1189 (11th Cir. 2013) ....................10, 13

*Monroe Cnty. Emps. Ret. Sys.* v. *S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ....................6, 10

*Nuveen* v. *City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ....................17

*Office of General Treasurer* v. *Boeing Co.*,
182 F.4th 422 (4th Cir. 2026) .................... *passim*

*OPERS* v. *Fed. Home Loan Mortg. Corp.*,
___ F.4th ___, 2026 WL 2454184 (6th Cir. Aug. 21, 2026) ....................3, 17

*Plevy* v. *Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998) ....................10

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ....................7, 9, 10, 15

*Shupe* v. *Rocket Cos.*,
752 F. Supp. 3d 735 (E.D. Mich. 2024) ....................12

*Speerly* v. *Gen. Motors, LLC*,
143 F.4th 306 (6th Cir. 2025) (en banc) ....................19

*In re Vale S.A. Sec. Litig.*,
2026 WL 1002335 (E.D.N.Y. April 13, 2026) ....................18

*In re Volkswagen "Clean Diesel" Litig.*,
2 F.4th 1199 (9th Cir. 2021) ....................2, 15

*Ward* v. *Apple Inc.*,
784 F. App'x 539 (9th Cir. 2019) ....................3, 16, 19

**Rule**

Fed. R. Civ. P. 23 ....................1, 5, 10

## INTRODUCTION

Plaintiff apparently hopes this Court will just rubber-stamp its proposed class of purchasers of Barclays American Depositary Receipts ("ADRs") for its Section 10(b) claim.[1] But Plaintiff ignores its burden to "prove—not simply plead—that the proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiff cannot rely on the Complaint's allegations; instead, it must show by a preponderance of the evidence that it is entitled to class certification. Plaintiff fails to do so. For at least three reasons, Plaintiff's claim here cannot be certified because Plaintiff fails to show that common questions of fact and law predominate under Rule 23(b)(3).

*First*, the class cannot be certified because Barclays has rebutted the presumption of reliance established in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), by showing it is "more likely than not that the alleged misrepresentations had [no] price impact." *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021). As is well understood, the requirement to prove investor reliance "ordinarily would defeat predominance and 'preclude certification' of a securities-fraud class action." *Id.* at 119. In *Basic*, the Supreme Court permitted plaintiffs in securities class actions to invoke a rebuttable "fraud-on-the-market" presumption of classwide reliance if they prove, among other things, that the market is efficient. The *Basic* presumption rests on the theory that "the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Halliburton*, 573 U.S. at 263. But the Supreme Court held in *Halliburton*, and reaffirmed in *Goldman*, that "defendants may rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock." *Goldman*, 594 U.S. at 119. Any showing that a "misrepresentation (or its correction) did not affect the [stock's] market price" rebuts the *Basic* presumption. *Halliburton*, 573 U.S. at 279-80.

Here, Barclays' stock price did not increase when the challenged statements about the Staley-Epstein relationship were made, and also did not decline when the market "learned for the

[1] The Court dismissed the English law claim brought by a different plaintiff who purchased Barclays ordinary shares. (ECF 160.)

first time" about Staley's close relationship with Epstein. (Mot. 3 (ECF 126).) Nor can Plaintiff establish price impact from its alleged corrective disclosure on October 12, 2023—two years after Staley left Barclays—when the U.K. Financial Conduct Authority ("FCA") disclosed its final determination that Staley misled FCA about his relationship with Epstein. Economic analysis by Barclays' expert, Dr. René Stulz—a world-renowned economist—shows that Barclays' stock price declined that day for reasons unrelated to any information about the Staley-Epstein relationship. Indeed, before FCA issued its decision, Barclays' stock price had already declined in response to Barclays' CEO's remarks on a podcast "about the outlook for banking sector earnings," which the market interpreted as "prepar[ing] the market for less-than-sparkling investment banking results" at Barclays. (Ex. 7 (Reuters article); Ex. 1 ¶¶ 39-62 (Stulz).) The market "attribut[ed] the [stock-price] fall" to those comments. (Ex. 7.) This evidence "severs the link between the alleged misrepresentation[s] and … the [stock] price." *Halliburton*, 573 U.S. at 281.

*Second*, the narrow *Affiliated Ute* presumption for reliance on omissions does not apply because the Complaint alleges "numerous materially false and misleading statements." *In re Volkswagen "Clean Diesel" Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021). In *Volkswagen*, the Ninth Circuit rejected the same argument employed by Plaintiff here to transform misstatements into purported omissions, which also is the same argument this Court rejected when the now-dismissed plaintiff here tried to transform its misstatement claim into a dishonest-delay claim under English law. (ECF 160 at 16-18.) As the court in *Volkswagen* explained, "[a]ll misrepresentations are also nondisclosures, at least to the extent that there is a failure to disclose which facts in the representation are not true," but courts "cannot allow such concealment to transform affirmative misstatements into implied omissions." 2 F.4th at 1208-09.

*Third*, under the Supreme Court's decision in *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-35 (2013), Plaintiff must establish through "evidentiary proof" that "damages are capable of measurement on a classwide basis" using a methodology "consistent with its liability case." Plaintiff and its expert make no effort to do so. Instead of presenting a damages methodology specific to Plaintiff's liability theory, Plaintiff's expert, Dr. Feinstein, "merely assert[s] that he

[will] be able to develop a model at some point in the future," which does not satisfy *Comcast*. *Ward* v. *Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019). Indeed, in *Office of General Treasurer* v. *Boeing Co.*, 182 F.4th 422 (4th Cir. 2026), the Fourth Circuit recently held that a cookie-cutter damages approach virtually identical to Dr. Feinstein's approach here did not satisfy *Comcast*. In *Boeing*, the plaintiffs' expert's damages analysis was only "a few pages" saying he "might start with 'an event study'" and then rely on "a non-exhaustive list of potential valuation approaches," but "didn't choose one for this case or explain how any would work." 182 F.4th at 435-36, 442-43. Dr. Feinstein does the same here. But a "menu of options that the party will decide on later is not a damages methodology" that satisfies *Comcast*. *Id.* at 440. The Sixth Circuit also recently rejected Dr. Feinstein's playbook for exactly this reason. *See OPERS* v. *Fed. Home Loan Mortg. Corp.*, ___ F.4th ___, 2026 WL 2454184, at *8 (6th Cir. Aug. 21, 2026). Accordingly, Plaintiff fails to carry its burden under *Comcast*.

## BACKGROUND

On December 1, 2015, Barclays hired Staley as CEO. (TAC ¶ 11 (ECF 162).) Following Epstein's arrest for sex trafficking in July 2019, "media attention turned to the business associates and friends of Epstein," including Staley. (*Id.* ¶¶ 13-14.)

***Challenged Statements.*** Plaintiff alleges Defendants made nine misrepresentations purportedly downplaying the closeness of Staley's relationship with Epstein before Staley joined Barclays:

1. July 22, 2019: The *New York Times* quoted a Barclays spokesperson that "Mr. Staley has never engaged or paid fees to Mr. Epstein to advise him, or to provide professional services." (*Id.* ¶ 48.)

2-5. February 13, 2020: Barclays stated that "Mr. Staley developed a professional relationship with Mr. Epstein." (*Id.* ¶ 64.) Staley reiterated his "professional" relationship with Epstein during Barclays' earnings call and in two media interviews. (*Id.* ¶¶ 66-67, 69.)

6. April 3, 2020: Barclays stated "[t]he Board's governance processes were rigorously followed" and Staley "retains the [Board's] full confidence." (*Id.* ¶ 72.)

7. February 18, 2021: Barclays stated its "conclusions [regarding Staley] remain unchanged, in relation to the investigations by the … FCA." (*Id.* ¶ 73.)

8. November 1, 2021: Barclays issued a press release announcing FCA's "preliminary conclusions" of its "investigation into Mr Staley's characterization to Barclays of his relationship with the late Mr Jeffrey Epstein and the subsequent description of that relationship in Barclays' response to the FCA." (*Id.* ¶ 78.) Barclays stated, "[i]n view of those conclusions, and Mr Staley's intention to contest them, the Board and Mr Staley have agreed that he will step down." (Ex. 3.) Plaintiff alleges the letter falsely stated, "the investigation makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes, which was the central question underpinning Barclays' support for Mr Staley following" Epstein's arrest in 2019. (TAC ¶ 78.)

9. November 12, 2021: Barclays reiterated "the investigation makes no findings that Mr Staley saw, or was aware of, any of Mr Epstein's alleged crimes." (*Id.* ¶ 81.)

Plaintiff also challenges a generic statement about cooperation in Barclays' 2019-2022 annual reports, which disclosed Barclays is "subject to enquiries and examinations" by various "regulators" and "is cooperating with the relevant authorities." (*Id.* ¶¶ 65, 74, 84, 89.)

Plaintiff alleges these statements caused Barclays' stock to "trade[] at artificially inflated prices" (*id.* ¶ 75), but it submitted no evidence supporting that allegation.

***Press Reports About Staley's Personal Relationship with Epstein.*** On November 12, 2021, the *Financial Times* published an article titled "Jes Staley exchanged 1,200 emails with Epstein that included unexplained phrases," such as "snow white." (TAC ¶ 80.) The article added that the emails were sent between 2008 and 2012 and "showed a close relationship"; so close that "Staley visited Epstein while he was serving a prison sentence in Florida." (Ex. 4.) On February 16, 2023, the press reported further on the 1,200 emails described in the *Financial Times* article after excerpts of them were publicly released in a lawsuit. (Stulz ¶ 71.) Plaintiff admits those emails "express[ed] pronouncements of 'profound' friendship" by Staley to Epstein and included the emails with "references to Snow White and Beauty and the Beast." (TAC ¶ 28.)

Plaintiff's expert's own analysis shows these media reports did not have a statistically significant impact on Barclays' stock price. (Feinstein Ex. 10a (ECF 127-3).)

***Alleged Corrective Disclosure.*** Notwithstanding the earlier press reports about Staley's relationship with Epstein, Plaintiff alleges the market learned for the first time that Staley had a close, personal relationship with Epstein on October 12, 2023, when FCA reaffirmed its November 2021 preliminary determination that Staley had mischaracterized his relationship with Epstein to FCA and to Barclays. (TAC ¶ 99.) As FCA stated, "Mr Staley recklessly approved a letter sent by Barclays to the FCA, which contained two misleading statements, about the nature of his relationship with Jeffrey Epstein and the point of their last contact." (*Id.*)

FCA never determined that Barclays failed to cooperate during the investigation. On the contrary, FCA concluded that Barclays had no knowledge of Staley's misconduct, finding that Staley "misled both the FCA and the Barclays Board about the nature of his relationship with Mr Epstein." (*Id.*) FCA determined that Barclays had "relied on information supplied by Mr Staley," and that Staley "was the only person at Barclays who knew the full extent of his personal relationship with Mr Epstein and the specific timings of his contact with him." (*Id.*) Not one analyst covering Barclays concluded that Barclays failed to cooperate with FCA, or that Barclays' cooperation efforts were disingenuous because FCA had determined that Staley had misled Barclays. (Ex. 2 ¶¶ 23, 39-49 (Starks).)

Although Barclays' stock price declined on October 12, 2023, that decline occurred in response to unrelated "comments by [Barclays'] chief executive about the outlook for banking" before FCA even issued its decision. (Ex. 7.)

## ARGUMENT

Class certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met. *Comcast*, 569 U.S. at 33-34. Because "[c]lass actions are the 'exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,' … [c]lass certification is [] not to be granted lightly." *Black Lives Matter L.A.* v. *City of L.A.*, 113 F.4th 1249, 1257-58 (9th Cir. 2024). "[P]laintiffs must 'affirmatively demonstrate' by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites." *Id.*

**I. Common Issues Do Not Predominate Because the Challenged Statements Had No Price Impact, Rebutting the *Basic* Presumption of Reliance.**

In *Halliburton*, the Supreme Court held that a defendant can rebut the *Basic* presumption by showing that the "misrepresentation (or its correction) did not affect the stock's market price." 573 U.S. at 279. After *Halliburton*, however, lower courts almost never found that a defendant successfully rebutted the *Basic* presumption. Thus, in *Goldman*, the Supreme Court clarified that a defendant's rebuttal right was not an empty promise and does not impose on defendants a nearly impossible burden to disprove all possibility of price impact, as some courts had required. *See Monroe Cnty. Emps. Ret. Sys.* v. *S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) (defendants failed to "rule out" all possibility of "price impact whatsoever"). The Supreme Court held that the "court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 594 U.S. at 126-27.

The Supreme Court also clarified that courts cannot refuse to consider price-impact evidence that "overlaps with materiality or any other merits issue," but instead "must take into account *all* record evidence relevant to price impact … —qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122, 124. The Supreme Court thus rejected Plaintiff's argument here—based on pre-*Goldman* authority—that courts cannot consider evidence that overlaps with "loss causation," such as the "reasons for stock price declines." (Mot. 17.) That is "not the law." *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *10 (S.D. Tex. Feb. 9, 2024). As the Ninth Circuit explained, the Supreme Court in *Goldman* held that courts must "'consider[] all evidence relevant to price impact,'" including whether the alleged corrective disclosure "reveal[ed] 'true facts concealed' by [alleged] misrepresentation[s]," notwithstanding any overlap with "loss causation." *Jaeger* v. *Zillow Grp., Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sept. 26, 2025); *see Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) ("*Goldman II*") (same); *In re Enovix Corp. Sec. Litig.*, 2026 WL 1078569, at *11 (N.D. Cal. Apr. 21, 2026) (defendant rebutted *Basic* by showing that alleged corrective disclosures were not "corrective").

Plaintiff challenges two categories of statements: (i) statements allegedly downplaying the Staley-Epstein relationship (TAC ¶¶ 48, 64, 66-67, 69, 72-73, 78, 81), and (ii) the generic statement that Barclays cooperates when regulators make inquiries (*id.* ¶¶ 65, 74, 84, 89). Barclays has proved "it is more likely than not" that those statements had no price impact. *Goldman*, 594 U.S. at 127.[2]

**A. Statements About the Staley-Epstein Relationship Had No Price Impact.**

Dr. Feinstein's analysis shows no statistically significant price increase when the challenged statements were made. (Feinstein Ex. 10a.) Dr. Feinstein posits, however, that the statements "maintain[ed]" inflation by preventing the stock price "from falling," and asserts any "inflat[ion]" introduced by the challenged statements can be measured indirectly by looking to whether the stock price "f[e]ll" when "the allegedly withheld truth" was disclosed to the market. (Feinstein ¶¶ 168, 226, 231(i).) This is known as the inflation-maintenance theory. Plaintiff alleges that statements characterizing Staley's relationship with Epstein as "professional" (TAC ¶ 3) maintained an inflated stock price by hiding that Staley's relationship with Epstein was "close" and "personal" (*id.* ¶ 24). Plaintiff thus hypothesizes that the inflation dissipated when the market was informed the relationship was "close" and "personal" (*id.*), but it makes no effort to prove it.

In *Goldman*, the Supreme Court established important guardrails for assessing price impact under the inflation-maintenance theory. When an alleged misstatement does not cause the stock price to increase, that could mean either: (i) the statement had no price impact because it was immaterial, or (ii) the statement was material and impacted the stock price by maintaining inflation already embedded in the price. To show the latter, "[p]laintiffs typically try to prove" price impact "indirectly" by focusing on the back-end stock-price decline following negative company news. *Goldman*, 594 U.S. at 123. "They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier

---

[2] Courts must assess price impact statement-by-statement. *See Goldman II*, 77 F.4th at 94 ("clearly erroneous" to lump together "separately disseminated [statements]"); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *17 (S.D. Cal. Mar. 20, 2023) (statement-by-statement analysis).

misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* "But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* Thus, the "mismatch" test answers the question: when is it reasonable to use a stock-price decline as an indirect proxy for inflation introduced when alleged misstatements were made?

Although the price-impact inquiry resembles loss causation, the Supreme Court's decision in *Goldman* "demand[s] a closer fit" between the statement and correction for price impact than required for loss causation. *Jaeger*, 2025 WL 2741642, at *1; *see Goldman II*, 77 F.4th at 99 n.11 (same). Without the required "tight fit," *Enovix*, 2026 WL 1078569, at *12, the inference that the "back-end price drop equals front-end inflation," *Goldman*, 594 U.S. at 123, becomes almost irrefutable, because allegations of wrongdoing nearly always conflict, at some level of generality, with a company's prior statements. Accordingly, there must be a "[]match" in both content and specificity between the "misrepresentation and the corrective disclosure." *Goldman*, 594 U.S. at 123.

Applying *Goldman* and its progeny, the questions for price impact here are: (i) when did the market first learn that Staley's relationship with Epstein was "close" and "personal" (TAC ¶ 24), rather than "professional," as Barclays allegedly misstated (*id.* ¶ 3); and (ii) did Barclays' stock price decline in response to that allegedly truthful information? Notably, the evidence shows Barclays' stock price did not decline when the market "learned for the first time" about the closeness of Staley's relationship with Epstein. (Mot. 3.) Although that alone rebuts *Basic* by a preponderance of the evidence, there is more. The evidence also shows that unrelated news about Barclays caused the stock-price decline on Plaintiff's alleged corrective disclosure date—thus conclusively severing the link between the alleged misrepresentations and the relevant back-end price decline.

***1. No price impact after disclosure of truthful substitute.*** Dr. Feinstein's own event study shows Barclays' stock price did not decline when the media reported extensively about Staley's personal relationship with Epstein before the alleged corrective disclosure. The media

reported every fact that, according to Plaintiff, corrected the statements by revealing the "true depth of the relationship" (Mot. 3), without any stock-price decline (Feinstein Ex. 10a). For example:

| Alleged Corrective Fact | Press Report |
|---|---|
| The "longstanding" relationship was reflected in "1,200 emails in which Staley expressed profound personal closeness with Epstein." (Mot. 3.) | On November 12, 2021, the *Financial Times* reported "Staley exchanged 1,200 emails with Jeffrey Epstein" that "showed a close relationship between the two men." (Ex. 4.)<br><br>On February 16, 2023, the *Wall Street Journal* reported further details about the "more than a thousand emails," including (i) Staley's email to Epstein that "I deeply appreciate our friendship. I have few so profound," (ii) the emails referencing "Snow White" and "Beauty and the Beast" spotlighted in the Complaint, and (iii) emails "discussing trips to the island where Epstein had allegedly trafficked young women." (Ex. 6.) |
| Staley made "multiple visits to Epstein's residences, including locations that were reportedly central to Epstein's alleged sex-trafficking activities." (Mot. 3.) | On January 18, 2023, the *Guardian* reported "Staley often visited Epstein at his homes, including at 'the massage room' of his New York townhouse, his private island in the US Virgin Islands, and a 'victim stash house' property on Manhattan's Upper East Side." (Ex. 5.) |
| Staley "sought advice on confidential business and personal matters, like the graduate school endeavors of his daughter." (Mot. 3.) | On November 12, 2021, the *Financial Times* reported Staley "allowed Epstein to mentor one of his daughters during her college application." (Ex. 4.) |
| Staley visited "Epstein in Florida during his prison sentence." (Mot. 3.) | On November 12, 2021, the *Financial Times* reported "Staley visited Epstein while he was serving a prison sentence in Florida in 2009 for procuring a child for prostitution and soliciting a prostitute." (*Id.*) |

This evidence that truthful information "was public prior to the corrective disclosures" without any statistically significant stock-price decline "demonstrate[s] a lack of price impact by a preponderance of the evidence." *Qualcomm*, 2023 WL 2583306, at *13; *see Enovix*, 2026 WL

1078569, at *12 (same); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *10 (S.D.N.Y. Mar. 29, 2024) (same).[3]

Nor can Plaintiff rely on this Court's pleading-stage determination that it was required to accept Plaintiff's allegation that the market might have given more "weight" to Staley's "deni[al]" of a personal relationship with Epstein than public reporting of his contemporaneous text messages evidencing the true nature of their relationship. (ECF 93 at 16.) At class certification, there are no plaintiff-friendly inferences and Plaintiff must rely on evidence, not allegations. *See Black Lives Matter*, 113 F.4th at 1258 ("Rule 23 does not impose a mere pleading standard; plaintiffs cannot plead their way to class certification through just allegations and assertions."). Plaintiff has no evidence to support its counterintuitive argument that markets blindly credit subjective characterizations (that a relationship is "not personal") and ignore concrete evidence. On the contrary, reasonable investors rely on "hard data" from which they "draw their own conclusions." *Plevy* v. *Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998); *see Alaska Elec. Pension Fund* v. *Pharmacia Corp.*, 2007 WL 276150, at *4 n.7 (D.N.J. Jan. 25, 2007) (company's "defensive comments … did not affect the curative disclosure … in a 'barrage of news reports'"). Regardless, the question for price impact is not whether one source is more persuasive than another, but whether a disclosure reveals "'new' information." *Enovix*, 2026 WL 1078569, at *11; *see Meyer* v. *Greene*, 710 F.3d 1189, 1199-1200 (11th Cir. 2013) ("repackaging of already-public information" by "investor who wielded great clout in the industry" does not change that the information "had already been public"). Here, the market repeatedly learned the very fact Plaintiff alleges was concealed from it—that Staley had a close, personal relationship with Epstein—without any price impact. That rebuts the *Basic* presumption.

[3] Before *Goldman*, some courts held that the absence of a statistically significant price decline did not "necessarily" "rule out" all theoretical possibility of price impact as a "statistical" matter, *Monroe*, 332 F.R.D. at 394-96, thereby imposing on defendants a burden more onerous than the beyond-a-reasonable-doubt standard in criminal cases. But *Goldman* clarified that under the "preponderance" standard, defendants need only establish that it is "more likely than not that the alleged misrepresentations had [no] price impact." *Goldman*, 594 U.S. at 126-27. Under that standard, the lack of a statistically significant stock-price decline in response to a truthful disclosure "demonstrate[s], by a preponderance of the evidence," that the challenged statements lacked price impact. *Kirkland*, 2024 WL 1342800, at *10; *see Qualcomm*, 2023 WL 2583306, at *13 (same).

*2. No price impact on Plaintiff's alleged corrective disclosure date.* Barclays' experts further show by a preponderance of the evidence that the stock-price decline on Plaintiff's alleged corrective disclosure date was not from the market "learn[ing] for the first time" that Staley had an "intimate and longstanding relationship" with Epstein. (Mot. 3.) This is so for three reasons.

*First*, Dr. Stulz conducted a minute-by-minute analysis of Barclays' stock price movements on the alleged corrective disclosure date (October 12, 2023) to determine which of the two Barclays-related disclosures that day caused the stock-price decline: (i) comments Barclays' CEO made on the London-based "In the City" podcast, posted after trading closed on October 11 at 8:49 PM London-time; or (ii) FCA's final decision, released two hours after trading opened on October 12 on the London Stock Exchange at 10:09 AM London-time. In that podcast, Barclays' CEO discussed many topics "relevant to Barclays," including that "overall, there is a challenge in the banking environment." (Stulz ¶ 28.) Dr. Stulz's analysis shows there was a statistically significant stock-price decline "following the release of th[e] podcast interview … and before the release of the alleged corrective disclosures." (*Id.* ¶ 20.) In other words, the statistically significant stock-price decline occurred *before* FCA released its decision. Moreover, Barclays stock price did *not* decline in a statistically significant manner following Plaintiff's alleged corrective disclosure. (*Id.* ¶ 77.) This economic analysis proves that the stock-price decline on October 12, 2023 occurred before FCA issued its decision and thus could not have been a response to that decision or a corrective disclosure of the alleged misrepresentations.[4] This "alternative explanation[] for the stock decline" on Plaintiff's alleged corrective disclosure date reinforces the absence of price impact. *Kirkland*, 2024 WL 1342800, at *9; *see Apache*, 2024 WL 532315, at *11 (same).

[4] Dr. Stulz could not perform his intraday analysis on the U.S.-traded ADRs because both the podcast and the FCA decision were released before trading opened in New York on October 12. Nonetheless, his analysis of Barclays' ordinary shares traded on the London Stock Exchange applies to the ADRs. That is because, among other reasons, Plaintiff's expert concluded that Barclays' ordinary shares and ADRs trade in an efficient market, as confirmed through his additional statistical testing showing that their stock prices move in tandem. (Feinstein ¶¶ 208-13; *see* Stulz ¶¶ 35-37.) Indeed, without such proof that Barclays' ADR price mirrors the price of Barclays ordinary shares on the London Stock Exchange—the primary market where the vast majority of Barclays shares trade (Feinstein ¶¶ 32-40, 119, 127-32)—Plaintiff could not meet its burden to prove that the market for Barclays ADRs is efficient. *See IBEW* v. *Deutsche Bank AG*, 2013 WL 5815472, at *7-8, 21-22 (S.D.N.Y. Oct. 29, 2013).

*Second*, no analysts attributed the stock-price decline on October 12, 2023 to the market finally absorbing—after dozens of prior disclosures over several years—that Staley had a close, personal relationship with Epstein. (*See* Starks ¶¶ 46-49.) By contrast, a *Reuters* article published at 8:57 AM London-time on October 12, 2023—more than one hour before FCA released its decision—noted "several sources attribut[ed] the fall [in Barclays' ordinary share price that morning] to broad comments by the bank's chief executive about the outlook for banking." (Ex. 7.) Similarly, a *Bloomberg* article published at 9:15 AM London-time—also before FCA released its decision—reported that "[s]hares in Barclays fell as much as 3.8% in early trading Thursday," citing "[s]tagnant deal activity, easing volatility and peaking interest rates [that] are set to compound pressure on bank earnings, according to Barclays Plc's chief executive officer." (Stulz ¶ 42.) This evidence further proves the absence of price impact. *See Goldman II*, 77 F.4th at 103-05 (that "none" of the "analyst reports" referenced the challenged statements after the alleged corrective disclosure supported absence of price impact); *Enovix*, 2026 WL 1078569, at *13 (same); *Shupe* v. *Rocket Cos.*, 752 F. Supp. 3d 735, 779 (E.D. Mich. 2024) (same).

*Third*, the operation of the efficient market for Barclays stock further supports Dr. Stulz's empirical analysis and Dr. Starks's analysis of analyst reports. Plaintiff's expert concludes that the market for Barclays stock is "efficient," meaning that all "public information" is "promptly" "incorporated and reflected" in the stock price. (Feinstein ¶¶ 19, 45.) When markets are efficient, "a security's price fluctuates only on the 'arrival of new information.'" *Coburn* v. *Evercore Tr. Co.*, 844 F.3d 965, 969 (D.C. Cir. 2016).

Because "previously disclosed" facts detailing the closeness of Staley's relationship with Epstein "would have already been incorporated into [Barclays'] share price," republication of that information in FCA's decision "would not have moved [Barclays'] share price in an efficient market." *Bricklayers* v. *Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 94-95 (1st Cir. 2014). Thus, any stock-price decline on October 12, 2023 could not have been caused by the market learning about previously reported details of the Staley-Epstein relationship. *See Espy* v. *J2 Glob., Inc.*, 99 F.4th 527, 542 (9th Cir. 2024) (Plaintiff failed to "explain[] why this information—already publicly available, requiring no 'expertise or specialized skills … ' to uncover and disseminate—

was not yet reflected in [the] stock price.") (citation omitted); *Enovix*, 2026 WL 1078569, at *13 (denying class certification where corrective disclosure revealed no "new" information not "already [] revealed" earlier); *Apache*, 2024 WL 532315, at *10 (same); *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12-13 (N.D. Cal. Mar. 11, 2024) (shortening class period at class certification because "Plaintiffs do not contend that [the later disclosure] is the first time the market learned about the manipulations themselves," only that "this is when the market learned about the FDA's reaction, a fact which cannot properly be characterized as a corrective disclosure").

In sum, the only new information revealed on October 12, 2023 and not already impounded into the stock price was Barclays' CEO's comments about banking, and the intraday trading data shows the stock price had declined in response to that unrelated news *before* FCA's decision repeated old news about Staley's relationship with Epstein. "Having based [its] claim of reliance on the efficient market theory, [Plaintiff] must now abide by its consequences." *Meyer*, 710 F.3d at 1198.[5]

**B. Barclays' Cooperation Statement Had No Price Impact.**

In *Goldman*, the Supreme Court held that "[t]he generic nature of a misrepresentation" is "important evidence of a lack of price impact," because "a more-general statement will affect a security's price less than a more-specific statement on the same question." 594 U.S. at 122-23. Barclays' statement that it repeated in its 2019-2022 annual reports that it is "subject to enquiries and examinations" and "is cooperating with the relevant authorities" (TAC ¶¶ 65, 74, 84, 89) sits at the most generic end of the spectrum. That statement did not discuss FCA's investigation of Staley, or identify any other investigation, but simply stated Barclays' opinion that it cooperates whenever regulators make inquiries. (*Id.*)

That generic statement had no price impact. "[P]rofessional investors, and most amateur investors as well, know how to devalue" generic "'express[ions] [of] opinion' that [are] not

---

[5] At a minimum, no class can be certified as to the July 2019 statement denying that Staley had a "professional" relationship with Epstein. As the Court stated, "Plaintiffs did not dispute" that statement was corrected on February 13, 2020, when Barclays "confirm[ed] Staley's 'professional relationship' with Epstein" (ECF 161 at 8 n.4), without any stock-price decline (*see* Feinstein Ex. 10a).

'capable of objective verification.'" *Macomb Cnty.* v. *Align Tech., Inc.*, 39 F.4th 1092, 1098-99 (9th Cir. 2022). A statement that a "company is 'cooperating' is a matter of perspective" and therefore not the kind of statement investors rely on. *Buhrke Fam. Revocable Tr.* v. *U.S. Bancorp*, 726 F. Supp. 3d 315, 348 (S.D.N.Y. 2024). And because "almost every [] [company] makes these statements" that it cooperates with its regulators, such generalized statements provide no basis for investors to distinguish Barclays from any other company, and thus cannot affect a reasonable investor's investment calculus. *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). Because Barclays' cooperation statement is not the "kind of precise information on which investors rely '[w]hen valuing corporations,'" *Align*, 39 F.4th at 1099, the statement "*as written*" is too generic to "prop[] up the [stock] price," *Goldman II*, 77 F.4th at 100. The "generic" nature of the statement is "important evidence of a lack of price impact." *Goldman*, 594 U.S. at 122-23.

Moreover, the stock-price decline on the day FCA announced its final decision cannot establish that Barclays' cooperation statement had price impact for all the reasons discussed above (at 11-12)—namely, the stock price declined before FCA's decision in response to Barclays' CEO's comments about banking, and no analysts commented on FCA's decision.

There is more. The FCA decision did not reveal any information suggesting Barclays did not cooperate during its investigation. Rather, FCA determined the opposite: that Staley "did not accurately set out the nature and extent of his relationship with Mr Epstein to Barclays." (Ex. 8 ¶ 2.16.) There is a clear "mismatch in content between the statement and the corrective disclosure." *Kirkland*, 2024 WL 1342800, at *11.[6]

To be sure, in its motion-to-dismiss and reconsideration decisions, the Court determined that loss causation was adequately pleaded because Staley's conduct is imputable to Barclays as a legal matter under agency law, and thus the market may have inferred that Barclays itself had "not cooperated" by virtue of "sending [Staley's] misleading letter" to FCA. (ECF 161 at 9 n.5; ECF 93 at 19.) Those rulings are irrelevant here for two reasons. *First*, loss causation and price

[6] Moreover, cooperation in this context entails being responsive to regulators' requests and that is what Barclays did. Cooperation does not ensure that the information a company provides from its employees will always be accurate—particularly because here FCA found that Staley had misled Barclays.

impact are different, and thus it would be "error" to "conflate loss causation at the pleading stage and reliance at the class certification stage." *Enovix*, 2026 WL 1078569, at *9. Price impact requires more than a match in subject matter, but a "tight fit" in content and specificity between the statement and alleged corrective disclosure, which is absent here. *Id.* at 12. *Second*, only evidence, not allegations and speculation, can tip the scales at class certification. *See Black Lives Matter*, 113 F.4th at 1258. Here, there is no evidence that *investors* would have understood FCA's findings as impugning Barclays itself based on technical notions of agency law. On the contrary, "no analysts … drew the inference" that FCA's decision revealed that Barclays had lied about cooperating with regulators and then drew a connection to Barclays' earlier generic statement about generally cooperating with regulators. *Kirkland*, 2024 WL 1342800, at *9; *see Qualcomm*, 2023 WL 2583306, at *12 (rejecting plaintiff's speculation about how the "market interpreted these generic statements"); Starks ¶¶ 46-49.

## II. The *Affiliated Ute* Presumption of Reliance for Omissions Claims Does Not Apply.

In a perfunctory footnote, Plaintiff argues alternatively that the *Affiliated Ute* presumption for omissions claims applies because Barclays "fail[ed] to disclose" that the 13 challenged statements were untrue. (Mot. 16 n.6.) But the Ninth Circuit and every other Circuit has rejected attempts to turn every misstatement into an "omission[] … [that] fail[s] to disclose which facts are not true," because it would allow plaintiffs to sidestep the more demanding *Basic* standard and obtain automatic class certification. *Volkswagen*, 2 F.4th at 1208-09; *see In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 607-12 (6th Cir. 2025) (collecting cases; "[b]ecause every misrepresentation includes some sort of 'concealment,' the right way to think about *Affiliated Ute* is as a narrow case premised on the conceptual difficulty of proving reliance on a representation that was never made"). Here, Plaintiff faces no conceptual difficulty of "prov[ing] a speculative negative" that it "relied on what was not said." *Volkswagen*, 2 F.4th at 1206. The 13 challenged "statements very much happened." *FirstEnergy*, 149 F.4th at 619. Indeed, this Court already recognized that this case is about "misleading statements." (ECF 160 at 16-17.) Consequently, the *Affiliated Ute* presumption does not apply.

## III. Plaintiff Has Not Proffered the Required Methodology for Measuring Classwide Damages.

In *Comcast*, 569 U.S. at 33-35, the Supreme Court held that a plaintiff seeking class certification must submit "evidentiary proof" that its "damages are capable of measurement on a classwide basis" in a manner "consistent with its liability case." Because Plaintiff alleges that 13 misstatements inflated Barclays' stock price over a four-year class period, Plaintiff needs a way to determine how much inflation was present at any particular time—and thus how much each investor would stand to recover in this suit. If Plaintiff does not have a classwide damages methodology, it cannot proceed as a class. Here, Plaintiff's expert did not even try to satisfy *Comcast*.

### A. Plaintiff Does Not Offer Any Evidentiary Proof of a Case-Specific Damages Methodology.

In a cursory damages discussion with no analysis specific to this case, Dr. Feinstein recites the legal standard for measuring damages in securities cases—"out-of-pocket" damages—and promises that he will figure out how to apply that legal standard to the facts of this case later. (Feinstein ¶¶ 222-31.) If that satisfies *Comcast*, then the requirement of "evidentiary proof" of a classwide damages methodology is meaningless. Saying that investors should receive out-of-pocket damages is true in *every* securities case. "[T]hat's effectively saying that they are seeking compensatory damage." *Boeing*, 182 F.4th at 442. It tells a court nothing about whether this Plaintiff has an actual damages methodology to quantify the amount of inflation in Barclays' stock price on each of the 1,068 trading days over the class period—even though that information is necessary to calculate out-of-pocket damages. (Feinstein ¶¶ 199, 224-26, 231.)

Dr. Feinstein's promise to develop an actual methodology to measure inflation in the stock price does not satisfy *Comcast*. A plaintiff's expert cannot "merely assert[] that he [will] be able to develop a model at some point in the future." *Ward*, 784 F. App'x at 540. That is why—based on *Ward* and other Ninth Circuit authority—the Fourth Circuit recently rejected this same shell game: "The out-of-pocket description broadly tells us what securities-fraud damages are—the difference between the price paid or received and the price that would have existed absent the

fraud. But it doesn't tell us how to determine the artificial inflation embedded in [the company's] stock price on any day of the class period. *Comcast* demands that missing step." *Boeing*, 182 F.4th at 440 n.16, 442. The Sixth Circuit rejected Dr. Feinstein's approach for the same reason and this Court should too. *See OPERS*, 2026 WL 2454184, at *8 (Dr. Feinstein's "general reference to an event study and 'other empirical analyses' is insufficient").

Dr. Feinstein defends his refusal to identify a methodology to measure the amount of inflation attributable to Defendants' statements by claiming that it relates to the merits element of "loss causation," which is not required at class certification. (Feinstein ¶ 220.) That argument conflates two different things. Loss causation is a binary inquiry, and looks to *whether* the stock price was or was not inflated by an alleged misstatement. *See Nuveen* v. *City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013). But *how much* the price was inflated during the class period goes to the separate element of damages. Plaintiff must have a reliable way to measure that inflation over the class period to calculate damages. If it does not, then Plaintiff may not proceed as a class. And even assuming that the amount of inflation *also* matters to the merits issue of loss causation, that does not make it any less relevant for damages at the class-certification stage. *See Goldman*, 594 U.S. at 122 n.2.

### B. Plaintiff's Approach to Measuring Damages Is Inconsistent with Its Liability Case and Deeply Flawed.

Beyond reciting the legal standard for out-of-pocket damages (*i.e.*, inflation-at-purchase minus inflation-at-sale), Dr. Feinstein mentions the possibility of starting with an "event study" to measure the decline in Barclays' stock price after FCA issued its decision, and using that as a proxy for the inflation supposedly created by the first alleged misstatement at the "start of the Class Period." (Feinstein ¶ 231(i)-(iv).) Those are only the seeds of a potential damages methodology. Dr. Feinstein nowhere commits to a particular methodology for measuring inflation on each day of the class period—his so-called "inflation ribbon"—which is the critical input for out-of-pocket damages. (*Id.* ¶ 231(ii).) The most he says is that he will use unspecified "valuation tools" to measure inflation. (*Id.* ¶ 231(iii)-(iv).) But that does not satisfy *Comcast*. "Merely gesturing at a model or describing a general method will not suffice." *Lytle* v. *Nutramax*

*Labs., Inc.*, 114 F.4th 1011, 1032 (9th Cir. 2024); *see Boeing*, 182 F.4th at 444 ("describ[ing] examples of what he might or could use [to measure inflation]—a discussion that would largely apply to every securities-fraud action[—] … isn't a methodology").

Moreover, although Dr. Feinstein often uses a "constant inflation" approach, whereby he assumes that inflation in the stock price remained constant from the first alleged misstatement at the beginning of the class period through the end of the class period, *In re Vale S.A. Sec. Litig.*, 2026 WL 1002335, at *7 (E.D.N.Y. April 13, 2026), that approach is unworkable here. Inflation cannot be constant because, as Dr. Stulz explains, the mix of available information about the Staley-Epstein relationship changed significantly between 2019 and 2023 (Stulz ¶¶ 93-97), and the state of affairs at Barclays altered dramatically once Staley resigned in November 2021 following FCA's preliminary determination (*id.* ¶¶ 98-103). Because these reports about the close, personal nature of Staley's relationship with Epstein would have affected the market's perceptions of the alleged misstatements downplaying that relationship, any alleged inflation in Barclays' stock price could not have remained constant throughout the entire class period (particularly after Staley left Barclays). (*Id.* ¶¶ 93-103.) But Dr. Feinstein never explained how he intends to factor the evolving information in the market about the Staley-Epstein relationship over the class period (as alleged in the Complaint) into his calculation of inflation. That is fatal to class certification. *See Boeing*, 182 F.4th at 448 (expert's proposed "constant inflation" approach "isn't consistent with the[] allegations" of statements made "at different points in time, with different industry and macroeconomic conditions and with evolving investors' perceptions of the riskiness of a Boeing investment").

Indeed, in *Vale*, when Dr. Feinstein finally disclosed his constant-inflation approach, the court rejected it because he "conducted no analysis to determine whether" inflation "remained constant throughout the class period." 2026 WL 1002335, at *7. Dr. Feinstein cannot avoid that result here by refusing to commit to any methodology until after certification of a damages class. Courts must conduct the "rigorous" analysis "before certifying" a class, *Black Lives Matter*, 113 F.4th at 1262, and not permit a plaintiff to "bob and weave pre-certification and not commit to a

firm methodology until [it] has the leverage of class certification to use as a sword in litigation." *Boeing*, 182 F.4th at 447.

Nor can Plaintiff evade evidentiary complexities—involving 13 statements and a changing mix of information over the four-year class period—by simply pointing to Dr. Feinstein's assertion that whatever methodology he ultimately decides to use to measure inflation will "enable" him to address those "complexities." (Feinstein ¶ 231(iv).) "[I]f the predominance inquiry is to serve its critical function, it cannot be answered by 'maybe,' 'perhaps,' and other 'what ifs' that leave the hard questions for later." *Speerly* v. *Gen. Motors, LLC*, 143 F.4th 306, 324 (6th Cir. 2025) (en banc); *see Boeing*, 182 F.4th at 443 (same); *Ward*, 784 F. App'x at 540.

**CONCLUSION**

The Court should deny Plaintiff's motion for class certification.

Dated: September 14, 2026

/s/ Adam S. Paris
Adam S. Paris (SBN # 190693)
(parisa@sullcrom.com)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

Jeffrey T. Scott (*pro hac vice*)
(scottj@sullcrom.com)
Matthew J. Porpora (*pro hac vice*)
(porporam@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3558

Peter B. Morrison (SBN # 230148)
(peter.morrison@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

Scott D. Musoff (*pro hac vice*)
(scott.musoff@skadden.com)
Boris Bershteyn (*pro hac vice*)
(boris.bershteyn@skadden.com)
Lara A. Flath (*pro hac vice*)
(lara.flath@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

*Attorneys for Defendant Barclays PLC and Nigel Higgins*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Barclays PLC, certifies that this brief contains 6,993 words, which complies with the word limit set in Section VIII.C of the Court's Civil Standing Order, dated July 1, 2026, and Local Civil Rule 11-6.

Dated: September 14, 2026

SULLIVAN & CROMWELL LLP

/s/ Adam S. Paris
Adam S. Paris

*Attorney for Defendant Barclays PLC and Nigel Higgins*